## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FRITZ EMMANUEL LESLY MIOT;
RUDOLPH CIVIL; MARLENE GAIL
NOBLE; MARICA MERLINE
LAGUERRE; and VILBRUN
DORSAINVIL,

        *Plaintiffs,*

   v.

DONALD J. TRUMP, President of the
United States of America; UNITED
STATES OF AMERICA; THE
DEPARTMENT OF HOMELAND
SECURITY; and KRISTI NOEM, Secretary
of Homeland Security.

        *Defendants.*

Case No. 1:25-cv-02471

**ORAL ARGUMENT REQUESTED**

## PLAINTIFFS' MOTION
## AND
## MEMORANDUM OF LAW IN SUPPORT OF MOTION
## FOR A STAY UNDER 5 U.S.C. § 705

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ iii

INTRODUCTION ......................................................................................... 1

BACKGROUND ........................................................................................... 4

    A.    The TPS statute restricts the Secretary of Homeland Security's authority to terminate a country's TPS designation. ..................................... 4

    B.    Haiti has been designated for TPS since 2010. ................................. 7

    C.    The Trump administration has terminated Haiti's TPS designation. ........... 8

        1.    Secretary Noem "partially vacated" Secretary Mayorkas's July 2024 extension of Haiti's TPS designation. ................................. 9

        2.    Secretary Noem terminated Haiti's TPS designation. ...................... 11

    D.    Termination of Haiti's TPS designation will cause irreparable harm to Plaintiffs. ........................................................................... 13

ARGUMENT ............................................................................................ 22

I.    Plaintiffs are likely to succeed on the merits. ............................................ 22

    A.    The termination is in excess of statutory authority insofar as it depends on the "partial vacatur." ............................................ 23

    B.    The termination was effected without observance of procedure required by law. ................................................................. 24

    C.    The termination is arbitrary and capricious. .................................. 25

        1.    The termination was predetermined. ..................................... 26

        2.    The termination relies on an unexplained departure from past practice. ................................................................ 28

        3.    The explanation for the termination is implausible and contrary to the evidence. ........................................................... 29

    D.    The termination is contrary to constitutional right and power. ................. 31

        1.    The termination is contrary to constitutional right. ......................... 31

        2.    The termination is contrary to constitutional power. ....................... 37

II.    Plaintiffs will suffer irreparable harm absent a stay. ................................... 41

III.    Postponing the termination is in the public interest. .................................. 43

i

CONCLUSION..................................................................................................45

PROOF OF SERVICE .......................................................................................47

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABM Onsite Servs.-W., Inc. v. Nat'l Lab. Rels. Bd.*,
  849 F.3d 1137 (D.C. Cir. 2017) ...................................................................29

*A.L.A. Schechter Poultry Corp. v. United States*,
  295 U.S. 495 (1935) ...........................................................................39, 41

*Adarand Constructors, Inc. v. Pena*,
  515 U.S. 200 (1995) ..............................................................................31

*Aracely R. v. Nielsen*,
  319 F. Supp. 3d 110 (D.D.C. 2018) ..............................................................42

*Bowen v. Georgetown Univ. Hosp.*,
  488 U.S. 204 (1988) ..............................................................................41

*CASA de Maryland, Inc. v. Trump*,
  355 F. Supp. 3d 307 (D. Md. 2018) ..............................................................23

*Cath. Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Rev.*,
  513 F. Supp. 3d 154 (D.D.C. 2021) ..............................................................22

*Centro Presente v. U.S. Dep't of Homeland Sec.*,
  332 F. Supp. 3d 393 (D. Mass. 2018) ...............................................9, 23, 32, 34

*City of Kansas City v. Dep't of Hous. & Urban Dev.*,
  923 F.2d 188 (D.C. Cir. 1991) ...................................................................31

*Comcast Corp. v. FCC*,
  526 F.3d 763 (D.C. Cir. 2008) ...................................................................29

*Cuomo v. U.S. Nuclear Regul. Comm'n*,
  772 F.2d 972 (D.C. Cir. 1985) ...................................................................22

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016) ..............................................................................29

*FCC v. Consumers' Rsch.*,
  145 S. Ct. 2482 (2025) ...........................................................................40

iii

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ................................................................................................29

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
  561 U.S. 477 (2010) ................................................................................................37

*Gundy v. United States*,
  588 U.S. 128 (2019) ................................................................................................37

*Haitian Evangelical Clergy Ass'n v. Trump*,
  --- F. Supp. 3d ---, 2025 WL 1808743 (E.D.N.Y. 2025)..........................................*passim*

*Harris v. Bessent*,
  775 F. Supp. 3d 86 (D.D.C. 2025) ...........................................................................45

*Horizon Lines, LLC v. United States*,
  414 F. Supp. 2d 46 (D.D.C. 2006) ...........................................................................31

*J. W. Hampton, Jr. & Co. v. United States*,
  276 U.S. 394 (1928) ................................................................................................37

*League of Women Voters v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ...............................................................................42, 43

*Leggett & Platt, Inc. v. Nat'l Lab. Rels. Bd.*,
  988 F.3d 487 (D.C. Cir. 2021) .................................................................................26

*McNary v. Haitian Refugee Ctr., Inc.*,
  498 U.S. 479 (1991) ................................................................................................23

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) .............................................................................................26, 29

*N.S. v. Hughes*,
  335 F.R.D. 337 (D.D.C. 2020),
  *modified on clarification sub nom. N.S. v. Dixon*, 2020 WL 6701076 .............................43, 45

*N.Y. Cent. Sec. Corp. v. United States*,
  287 U.S. 12 (1932) ..................................................................................................38

*NAACP v. U.S. Dep't of Homeland Sec.*,
  364 F. Supp. 3d 568 (D. Md. 2019) .........................................................................35

*Nakka v. U.S. Citizenship & Immigr. Servs.*,
  111 F.4th 995 (9th Cir. 2024) ..................................................................................23

*Nat'l Broad. Co. v. United States,*
  319 U.S. 190 (1943) ..................................................................................38

*Nat'l TPS All. v. Noem,*
  773 F. Supp. 3d 807 (N.D. Cal. 2025) .................................................43, 44, 45

*Nat'l Treasury Emps. Union v. Fed. Lab. Rels. Auth.,*
  404 F.3d 454 (D.C. Cir. 2005) ..................................................................26

*Okpa v. INS,*
  266 F.3d 313 (4th Cir. 2001)....................................................................27

*Panama Refin. Co. v. Ryan,*
  293 U.S. 388 (1935) ..........................................................................37, 39, 41

*Perkins Coie LLP v. U.S. Dep't of Just.,*
  --- F. Supp. 3d ---, 2025 WL 1276857 (D.D.C. 2025) ...............................38, 43

*Poursina v. U.S. Citizenship & Immigr. Servs.,*
  936 F.3d 868 (9th Cir. 2019).................................................................39, 40

*Ramos v. Nielson,*
  321 F. Supp. 3d 1083 (N.D. Cal. 2018) ..............................................23, 32, 35

*Ramos v. Nielsen,*
  336 F. Supp. 3d 1075 (N.D. Cal. 2018) ........................................................8, 34

*Saget v. Trump,*
  375 F. Supp. 3d 280 (E.D.N.Y. 2019) ....................................................*passim*

*Sanchez v. Mayorkas,*
  593 U.S. 409 (2021) ..................................................................................27

*Seila L. LLC v. Consumer Fin. Prot. Bureau,*
  591 U.S. 197 (2020) ..................................................................................41

*Stern v. Marshall,*
  564 U.S. 462 (2011) ..................................................................................37

*Texas v. United States,*
  50 F.4th 498 (5th Cir. 2022) ....................................................................23

*Touby v. United States,*
  500 U.S. 160 (1991) ..................................................................................38

*Trump v. Hawaii,*
  585 U.S. 667 (2018) ............................................................................................32, 39

*U.S. Inst. of Peace v. Jackson,*
  --- F. Supp. 3d ---, 2025 WL 1428641 (D.D.C. 2025) ...........................................43

*United States v. Vaello Madero,*
  596 U.S. 159 (2022) ..................................................................................................40

*United States v. Virginia,*
  518 U.S. 515 (1996) ..................................................................................................31

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.,*
  429 U.S. 252 (1977) ............................................................................................32, 36

*Washington v. Davis,*
  426 U.S. 229 (1976) ..................................................................................................31

*Whitman v. Am. Trucking Ass'ns, Inc.,*
  531 U.S. 457 (2001) ......................................................................................37, 39, 41

*Zadvydas v. Davis,*
  533 U.S. 678 (2001) ..................................................................................................32

*Zhu v. Gonzales,*
  411 F.3d 292 (D.C. Cir. 2005) ............................................................................39, 40

**Statutes**

5 U.S.C. § 559 ...............................................................................................................23

5 U.S.C. § 705 ....................................................................................................2, 22, 45

5 U.S.C. § 706(2) ....................................................................................................23, 24

5 U.S.C. § 706(2)(A) ...............................................................................................3, 25, 43

5 U.S.C. § 706(2)(B) ................................................................3, 31, 36, 37, 41, 43

5 U.S.C. § 706(2)(C) .................................................................................................3, 43

5 U.S.C. § 706(2)(D) ...........................................................................................3, 24, 43

8 U.S.C. § 1160(e)(3) ...................................................................................................23

8 U.S.C. § 1252(a)(2)(B)(i) .........................................................................................23

vi

8 U.S.C. § 1252(f)(1) ........................................................................................23

8 U.S.C. § 1254a ..............................................................................................23

8 U.S.C. § 1254a(a)(1)(A) ..................................................................................5

8 U.S.C. § 1254a(b)(1) ...............................................................................5, 23

8 U.S.C. § 1254a(b)(1)(A) ..................................................................................5

8 U.S.C. § 1254a(b)(1)(B) ..................................................................................5

8 U.S.C. § 1254a(b)(1)(B)(iii) ..........................................................................25

8 U.S.C. § 1254a(b)(1)(C) ....................................................1, 5, 12, 38, 41

8 U.S.C. § 1254a(b)(2) ........................................................................................5

8 U.S.C. § 1254a(b)(3)(A) ........................................................................ *passim*

8 U.S.C. § 1254a(b)(3)(B) ...................................................3, 6, 9, 10, 24

8 U.S.C. § 1254a(b)(3)(C) ..................................................................................6

8 U.S.C. § 1254a(b)(5)(A) ................................................................................23

8 U.S.C. § 1254a(c)(1)(A) ...........................................................................5, 29

8 U.S.C. § 1254a(c)(1)(A)(i) ............................................................................12

8 U.S.C. § 1254a(c)(2)(B) ...........................................................................5, 30

8 U.S.C. § 1254a(c)(2)(B)(i) ........................................................................5, 13

8 U.S.C. § 1254a(c)(3)(A) ................................................................................30

8 U.S.C. § 1254a(f)(2) ......................................................................................43

Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135 (Nov. 25, 2002) ...............5

Homeland Security Act Amendments of 2003, Pub. L. 108-7, 117 Stat. 11
    (Feb. 20, 2003) ...............................................................................................5

**Regulations**

8 C.F.R. § 244.2 ........................................................................................................5

75 Fed. Reg. 3476 (Jan. 21, 2010) ............................................................................7

76 Fed. Reg. 29000 (May 19, 2011) ..........................................................................7

77 Fed. Reg. 59943 (Oct. 1, 2012) ............................................................................7

79 Fed. Reg. 11808 (Mar. 3, 2014) ...........................................................................7

80 Fed. Reg. 51582 (Aug. 25, 2015) .........................................................................7

86 Fed. Reg. 41863 (Aug. 3, 2021) ..................................................................7, 8, 30

88 Fed. Reg. 5022 (Jan. 26, 2023) ...................................................................7, 8, 30

89 Fed. Reg. 54484 (July 1, 2024) ...............................................7, 8, 9, 24, 25, 30

90 Fed. Reg. 8443 (Jan. 20, 2025) ...................................................................10, 27

90 Fed. Reg. 9040 (Feb. 5, 2025) ............................................................................28

90 Fed. Reg. 10511 (Feb. 24, 2025) ..............................................9, 10, 11, 24

90 Fed. Reg. 23697 (June 4, 2025) ..........................................................................28

90 Fed. Reg. 28760 (July 1, 2025) .....................................................................*passim*

**Court Documents**

Reply in Support of App. for Stay, *Trump v. Wilcox*, No. 24A966 (U.S. Apr. 2025),
     2025 WL 1372312.................................................................................................35

Stay Application, *Noem v. Nat'l TPS All.*, No. 24A1059 (U.S. May 1, 2025).......................23

**Internet Sources**

Maggie Astor, *Trump Says He Would Try Again to Revoke Haitian Immigrants' Protections*,
     N.Y. TIMES (Oct. 3, 2024),
     https://www.nytimes.com/2024/10/03/us/politics/trump-haitian-
     immigrants-legal-status.html..........................................................................8, 27

Ayendy Bonifacio, *Tracing the Anti-Haitianism Behind the Springfield Scapegoating*, NACLA (Sept. 16, 2024), https://nacla.org/anti-haitianism-springfield-scapegoating ........................................33

Ali Bradley, Damita Menezes, *Trump on Springfield Haitian migrants: 'They have to be removed'*, NEWSNATION (Oct. 2, 2024), https://www.newsnationnow.com/politics/2024-election/trump-springfield-haitian-migrants-removed/ .................................................................................27

Sara Dorn, *Trump Doubles Down on False Pet-Eating Claims; Suggests Haitian migrants Eat 'Other Things Too*, Forbes (Oct. 16, 2024), https://www.forbes.com/sites/saradorn/2024/10/16/trump-doubles-down-on-false-pet-eating-claims-suggests-haitian-migrants-eat-other-things-too/ .............34

Ariana Figueroa, *Trump promises mass deportations of undocumented people. How would that work?*, MISSOURI INDEPENDENT (Aug. 23, 2024), https://missouriindependent.com/2024/08/23/trump-promises-mass-deportations-of-undocumented-people-how-would-that-work/ ..................................33

Hannah Fingerhut and Ali Swenson, *Trump defends controversial comments about immigrants poisoning the nation's blood at Iowa Rally*, ASSOCIATED PRESS (December 19, 2023), https://apnews.com/article/donald-trump-immigration-iowa-dff7f632948fa6511fb7d1955a28610c.................................................................33

Joey Garrison, *Who are Afrikaners? Trump welcomes white South Africans as other refugees are halted*, USA TODAY (May 10, 2025), https://www.usatoday.com/story/news/politics/2025/05/10/afrikaner-refugees-trump-welcoming-white-south-africans/83557827007/ ..................................36

Michael Gold, Maggie Haberman, *Trump, at Fund-Raiser, Says He Wants Immigrants from 'Nice' Countries*, N.Y. TIMES (Apr. 7, 2024), https://www.nytimes.com/2024/04/07/us/politics/trump-immigrants-nice-countries.html ...............................................................................33, 36

Riley Hoffman, *READ: Harris-Trump presidential debate transcript*, ABC NEWS (Sept. 10, 2024), https://abcnews.go.com/Politics/harris-trump-presidential-debate-transcript/story?id=113560542................................................................34

Miriam Jordan, Why Thousands of Haitians Have Settled in Springfield, Ohio, N.Y. TIMES (Sept. 14, 2024), https://www.nytimes.com/2024/09/14/us/haitian-migrants-springfield-ohio.html........................................................................44

Fredlyn Pierre Louis, *Haitian immigrants grapple with uncertainty as TPS end date looms*, NBC NEWS (March 8, 2025), https://www.nbcnews.com/news/nbcblk/haitian-immigrants-grapple-uncertainty-tps-end-date-looms-rcna193868 ........................................................................2

Kristi Noem (@Sec_Noem), X (Jan. 29, 2025), https://x.com/sec_noem/status/1884752724194963594?s=46&t=DFMGD qrcqeJ4X9klKmN2s (last visited Feb. 23, 2025) ....................................27

Kristi Noem (@Sec_Noem), X (Feb. 27, 2025 8:59 PM), https://x.com/Sec_Noem/status/1895307762349023270 ................................35

Alex Nowrasteh, Haitian Immigrants Have a Low Incarceration Rate, Cato at Liberty (July 7, 2025), https://www.cato.org/blog/haitian-immigrants-have-low-incarceration-rate..........30

Edith Olmsted, *Trump Escalates Racist Attacks With Dangerous Lie*, THE NEW REPUBLIC (Oct. 9, 2024), https://newrepublic.com/post/186961/donald-trump-racist-attacks-springfield-ohio-lie ..............................................................................33

Ed Pilkington, *Mass deportations, detention camps, troops on the street: Trump spells out migrant plan*, THE GUARDIAN (May 3, 2024), https://www.theguardian.com/us-news/article/2024/may/03/trump-mass-deportations-detention-camps-military-migrants ............................................26

U.S. Immigration and Customs Enforcement, "ICE ERO Boston arrests Haitian gang member with numerous convictions," (Jan. 24, 2025), https://www.ice.gov/news/releases/ice-ero-boston-arrests-haitian-gang-member-numerous-convictions...............................................................13

Ali Vitali, Kasie Hunt & Frank Thorp V, *Trump Referred to Haiti and African Nations as 'Shithole' Countries*, NBC NEWS (Jan. 11, 2018), https://www.nbcnews.com/politics/white-house/trump-referred-haiti-african-countries-shithole-nations-n836946 ..........................................33

*Trump Slams Haitians Attempting to Enter U.S., Says They 'Probably Have AIDS'*, ABC (Oct. 10, 2021), https://abc7.com/haitian-migrants-donald-trump-former-president-immigration/11108741/ ...........................................................................34

*Donald Trump on Illegal Immigrants "Poisoning the Blood of Our Country,"*
C-Span (Dec. 16 2023),
https://www.c-span.org/clip/campaign-2024/donald-trump-on-illegal-
immigrants-poisoning-the-blood-of-our-country/5098439 ...............................................33

*Homeland Security Secretary Nominee Governor Kristi Noem Testifies at Confirmation
Hearing*, C-SPAN (Jan. 17, 2025)
https://www.c-span.org/program/senate-committee/homeland-security-
secretary-nominee-gov-kristi-noem-testifies-at-confirmation-hearing/654484......27, 35

Travel Advisory: Haiti, U.S. Dep't of State (Sept. 18, 2024),
https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/
haiti-travel-advisory.html ..................................................................................................2

U.S. Embassy in Haiti, Information for Travelers,
https://ht.usembassy.gov/u-s-citizen-services/local-resources-of-u-s-
citizens/information-for-travelers/#:~:text=Political%20violence%20and%20
violent%20crimes,%2Dau%2DPrince%20international%20airport...................................2

## Other Authorities

126 Cong. Rec. H8687 (Oct. 2, 1990) .........................................................................................4

American Immigration Counsel, The Contributions of Temporary Protected Status
Holders to the U.S. Economy (Sept. 2023)...........................................................................45

Executive Order 14204—Addressing Egregious Actions of the
Republic of South Africa,
2025 WL 824236 (Feb. 7, 2025).............................................................................................36

S.K.S. Shannon et al., The Growth, Scope, and Spatial Distribution of People with
Felony Records in the United States, 1948–2010, 54 Demography 1795 (2017) .............13

## INTRODUCTION

This suit, brought under the Administrative Procedure Act, challenges the Trump administration's unlawful termination of Temporary Protected Status for Haitian immigrants. Approximately 350,000 lives are at stake—literally, not figuratively. If the termination stands, people will almost certainly die. Some will likely be killed, others will likely die from disease, and yet others will likely starve to death.

Temporary Protected Status (TPS) is a statutorily created immigration status conferred on foreign nationals who—because of war, natural disaster, or other extraordinary conditions—cannot safely return to their home country. TPS allows recipients to live and work in the United States as long as their home country is designated for TPS.

Plaintiffs are Haitian immigrants with TPS. If Haiti's TPS designation is terminated, Plaintiffs—and other Haitian TPS holders—will be subject to immediate deportation to Haiti.

Haiti has been designated for TPS since 2010, when a massive earthquake tipped the already struggling country into a full-blown crisis. As recognized at the time, Haiti warranted TPS designation because, in the words of the statute, conditions in Haiti prevented Haitians "from returning to [Haiti] in safety." 8 U.S.C. § 1254a(b)(1)(C). Since 2010, Haiti's TPS designation has been repeatedly extended because that crisis has only intensified. Without a functioning government, Haiti is a nation in chaos. Rape, kidnapping, and murder are rampant while food, housing, and medical care are scarce.

1

Since the assassination of President Jovenel Moïse in 2021, armed gangs have gained control over much of [Haiti's capital] Port-au-Prince, creating a power vacuum that has made governing a challenge and fueled further violence, homelessness and starvation. More than 5,600 people were killed and 1,400 were kidnapped amid gang conflicts last year, according to the United Nations. The violence has rendered 1 million people homeless in Haiti, forcing many into makeshift shelters and exacerbating the country's economic challenges.[1]

Recognizing the ongoing "humanitarian, security, and political crises" that grip Haiti, the State Department advises people to "not travel to Haiti due to kidnapping, crime, civil unrest, and limited health care."[2]

Despite this, the administration has announced that it is terminating Haiti's TPS designation "effective September 2." 90 Fed. Reg. 28760 (July 1, 2025). Given the imminent threat to their lives and other important interests, Plaintiffs ask, pursuant to 5 U.S.C. § 705, that the Court stay the termination pending a final resolution on the merits.[3]

---

[1]    Fredlyn Pierre Louis, *Haitian immigrants grapple with uncertainty as TPS end date looms*, NBC News (March 8, 2025), https://www.nbcnews.com/news/nbcblk/haitian-immigrants-grapple-uncertainty-tps-end-date-looms-rcna193868.

[2]    Travel Advisory: Haiti, U.S. Dep't of State (Sept. 18, 2024), https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/haiti-travel-advisory.html; U.S. Embassy in Haiti, Information for Travelers, https://ht.usembassy.gov/u-s-citizen-services/local-resources-of-u-s-citizens/information-for-travelers/#:~:text=Political%20violence%20and%20violent%20crimes,%2Dau%2D Prince%20international%20airport.

[3]    Although it has not published an updated Federal Register notice, the government has conceded that, under *Haitian Evangelical Clergy Ass'n v. Trump*, --- F. Supp. 3d ---, 2025 WL 1808743, at *9 (E.D.N.Y. 2025) ("*HECA*"), which is discussed below (*see infra* at 9–11), "the Federal Register notice purporting to terminate Haiti's TPS designation effective September 2, 2025 is ineffective" and "that Haiti's TPS designation does not expire until February 3, 2026." Order at 4, *Haitian Evangelical Clergy Ass'n v. Trump*, No. 1:25-cv-01464 (July 28, 2025) (ECF 70). But whether scheduled to take effect September 2 or February 3,

The prerequisites are satisfied: Plaintiffs are likely to succeed on the merits; they are likely to suffer irreparable harm absent a stay; and the public interest favors a stay.

Plaintiffs are likely to succeed on the merits because the termination is unlawful in multiple respects. First, it is "in excess of statutory … authority" (5 U.S.C. § 706(2)(C)) because it purports to terminate Haiti's TPS designation before its previously determined expiration date in contravention of the TPS statute, 8 U.S.C. § 1254a(b)(3)(B). Second, it was effected "without observance of procedure required by law" (5 U.S.C. § 706(2)(D)) because the termination notice does not contain the elements required by 8 U.S.C. § 1254a(b)(3)(A). Third, the termination is "arbitrary [and] capricious" (5 U.S.C. § 706(2)(A)) because—as shown by the pretextual bases offered as justification and the administration's unexplained departure from past practice—it was a predetermined outcome driven by impermissible factors and without consideration of relevant facts. Finally, the termination is "contrary to constitutional right [and] power" (*id.* § 706(2)(B)) because it is motivated, at least in part, by discriminatory animus and because it rests on the Secretary's exercise of unfettered discretion in violation of the nondelegation doctrine.

If allowed to take effect, the termination of Haiti's TPS designation will cause Plaintiffs and other Haitian TPS holders irreparable harm. Loss of TPS will expose them to immediate deportation to a lawless country where they will be at constant risk of rape, kidnapping, and murder while lacking access to sufficient food, housing, and medical care. And because many TPS holders, having lived in the United States for decades, have

---

the termination threatens Plaintiffs with imminent irreparable harm and, for the reasons explained below, must be set aside as unlawful.

U.S.-citizen spouses and children, deportation would rip them from their families. Moreover, even if not instantly deported, TPS holders would be subject to indefinite detention and even if not detained, would in any event lose their right to work, which would prevent them from supporting themselves and their families.

A stay is in the public interest. There is a strong public interest in having the administration abide by the laws that govern its conduct. There also is a strong public interest in keeping families together. And there is a strong public interest in TPS holders' continued participation in the U.S. labor force: Haitian TPS holders, who pay taxes and staff essential jobs across a variety of industries, are critical to many local economies.

The termination should be stayed pending a final resolution on the merits.

## BACKGROUND

### A.    The TPS statute restricts the Secretary of Homeland Security's authority to terminate a country's TPS designation.

Congress created TPS to advance a core American principle: That the United States is a "beacon of freedom" to those displaced from their homelands by havoc beyond their control. 126 Cong. Rec. H8687 (Oct. 2, 1990) (statement of Rep. Moakley).

TPS permits immigrants from designated countries to live and work in the United States if certain statutory conditions are met. The Secretary of Homeland Security may designate a country for TPS if the Secretary finds that (1) there has been an "earthquake, flood, drought, epidemic, or other environmental disaster"; (2) the county has suffered "an earthquake, flood, drought, epidemic, or other environmental disaster" that renders it "unable, temporarily, to handle adequately the return" of nationals to the country; or

4

(3) "there exist extraordinary and temporary conditions in the" country "that prevent" its nationals "from returning … in safety." 8 U.S.C. §§ 1254a(b)(1)(A)–(C). When considering whether to designate a country because it is unsafe for its national to return home, Secretary is allowed but not required to consider whether "permitting the [country's nationals] to remain temporarily in the United States is contrary to the national interest of the United States." *Id.* § 1254a(b)(1)(C).[4] Although the designation decision itself falls to the DHS Secretary, the decision may not be made arbitrarily or capriciously. It must be made in "consultation with the appropriate agencies of the Government" and based on the statutorily specified criteria. *Id.* § 1254a(b)(1).

Once a country is designated for TPS, that country's nationals who (1) are physically present in the United States and (2) have not been convicted of more than one misdemeanor may register as TPS holders. 8 U.S.C. §§ 1254a(c)(1)(A), (2)(B); 8 C.F.R. § 244.2. Those outside the U.S. and those who have committed more than one misdemeanor are not eligible for TPS. 8 U.S.C. §§ 1254a(c)(1)(A), (2)(B)(i). TPS holders may not be deported and are authorized to work in the United States so long as their home country's designation remains in place. *Id.* § 1254a(a)(1)(A).

A country's initial designation is for a "period … of not less than 6 months and not more than 18 months." 8 U.S.C. § 1254a(b)(2).

---

[4]  Originally, Congress charged the Attorney General with administering the TPS statute, and the statute still refers to "the Attorney General." But in 2002 Congress transferred responsibility to the Secretary of Homeland Security. *See* Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135, 2142–45, 2177–2212 (Nov. 25, 2002); Homeland Security Act Amendments of 2003, Pub. L. 108-7, 117 Stat. 11, 526–32 (Feb. 20, 2003).

A TPS designation is subject to periodic review. At least 60 days before the TPS designation is set to expire, the DHS Secretary, "after consultation with appropriate agencies of the Government, shall review the conditions in the foreign state … and shall determine whether the conditions for such designation … continue to be met." 8 U.S.C. § 1254a(b)(3)(A). If the Secretary determines that the conditions for designation continue to exist, the designation must be extended. *Id.* § 1254a(b)(3)(A). Conversely, if the Secretary determines that the conditions for designation are no longer met, the designation must be terminated. *Id.* § 1254a(b)(3)(B). Regardless which, "notice of … such determination (including the basis for the determination …)" must be timely published "in the Federal Register. "8 U.S.C. § 1254a(b)(3)(A). If the Secretary fails to make the mandated determination within the statutorily prescribed period, the designation is automatically extended by at least six months. *Id.* § 1254a(b)(3)(C).

Thus, the only circumstance under which a TPS designation may be lawfully terminated is if, as a result of the statutorily mandated periodic review, the Secretary affirmatively determines that a foreign state "no longer continues to meet the conditions for designation under [8 U.S.C. § 1254a(b)((3)(B)]" and then gives timely notice of "the basis for the determination." 8 U.S.C. § 1254a(b)(3)(B).

If a TPS designation is terminated, the termination "shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension." 8 U.S.C. § 1254a(b)(3)(B).

**B.      Haiti has been designated for TPS since 2010.**

Haiti was first designated for TPS in January 2010, following a devastating earthquake. 75 Fed. Reg. 3476 (Jan. 21, 2010). Since then, Haiti's TPS designation has been extended—and the country has been redesignated—multiple times.[5] These successive actions were prompted by the enduring consequences of the 2010 earthquake, which both caused widespread damage to Haiti's infrastructure and public health systems and worsened pre-existing conditions, such as food insecurity and the lack of sufficient housing. Subsequent natural disasters, including Hurricane Matthew in 2016 and Hurricane Irma in 2017, compounded these problems, which directly and indirectly affect millions of Haitians. *See* 76 Fed. Reg. 29000 (May 19, 2011); 77 Fed. Reg. 59943 (Oct. 1, 2012); 79 Fed. Reg. 11808 (Mar. 3, 2014); 80 Fed. Reg. 51582 (Aug. 25, 2015); 86 Fed. Reg. 41863 (Aug. 3, 2021); 88 Fed. Reg. 5022 (Jan. 26, 2023); 89 Fed. Reg. 54484 (July 1, 2024).

During the prior administration, Haiti's TPS designation was extended three times by then-Secretary Mayorkas who, upon completing the statutorily mandated review process, concluded each time that the statutory conditions for Haiti's TPS designation continued to be met. *See* 86 Fed. Reg. 41863 (Aug. 3, 2021); 88 Fed. Reg. 5022 (Jan. 26, 2023); 89 Fed. Reg. 54484 (July 1, 2024). In 2021, Secretary Mayorkas concluded that "Haiti is grappling with," among other things, "a deteriorating political crisis, violence, and a staggering increase in human rights abuses" in addition to "rising food insecurity" and

---

[5]   The extension of a TPS designation extends TPS protection only for those who already hold TPS. The redesignation of country for TPS enables those who were not present in the U.S. at the time of the prior designation to register for TPS.

"a severe lack of healthcare services." 86 Fed. Reg. at 41864–67. In 2023, Secretary Mayorkas, reciting extensive evidence of Haiti's deteriorating situation, determined once again that "Haiti is experiencing economic, security, political, and health crises simultaneously." 88 Fed. Reg. at 5025. Finally, in July 2024, Secretary Mayorkas—citing political corruption, human-rights abuses, escalating gang violence, limited health care, food insecurity, and the continuing impact of a destructive 2021 earthquake that was quickly followed by a severe tropical storm—"determined" again "that an 18-month TPS extension is warranted because the extraordinary and temporary conditions supporting Haiti's TPS designation remain." 89 Fed. Reg. at 54487. He further determined that "it is not contrary to the national interest of the United States to permit Haitian TPS holders to remain in the United States temporarily." *Id*. at 54491. The extension extended Haiti's TPS designation through February 3, 2026. *Id.*

That is where things stood before President Trump returned to office in January.

### C.    The Trump administration has terminated Haiti's TPS designation.

Before taking office, President Trump, who has long slandered Haitian immigrants, vowed to "revoke" Haiti's TPS designation and send Haitian TPS holders "back to their country."[6] He has now made good on that threat.[7]

---

[6]   Maggie Astor, *Trump Says He Would Try Again to Revoke Haitian Immigrants' Protections*, N.Y. Times (Oct. 3, 2024), https://www.nytimes.com/2024/10/03/us/politics/trump-haitian-immigrants-legal-status.html.

[7]   President Trump had tried to terminate Haiti's TPS designation during his first term but multiple courts prevented him from doing so, holding that his attempted termination was an unlawful "preordained" action motivated at least in part by the "discriminatory purpose of removing non-white immigrants from the United States." *Saget v. Trump*, 375 F. Supp. 3d 280, 346, 374 (E.D.N.Y. 2019); *accord Ramos v. Nielsen*, 336 F. Supp. 3d 1075,

1.    **Secretary Noem "partially vacated" Secretary Mayorkas's July
2024 extension of Haiti's TPS designation.**

The administration's termination of Haiti's TPS designation has been a two-step

process. The first step was Secretary of Homeland Security Kristi Noem's "partial vacatur"

of then-Secretary Mayorkas's July 2024 extension of Haiti's TPS designation through

February 3, 2026. The "partial vacatur" purported to change the expiration date of Haiti's

TPS designation to "August 3, 2025, instead of February 3, 2026." 90 Fed. Reg. 10511,

10511 (Feb. 24, 2025). Although subsequently "set aside as unlawful under the APA"

*HECA*, 2025 WL 1808743, at *9, the "partial vacatur" is an essential element of the

administration's purported termination of Haiti's TPS designation effective September 2,

2025—the action that Plaintiffs challenge here.

As noted, the TPS statute forbids termination of a country's TPS designation

earlier than the previously scheduled "expiration of the most recent previous extension."

8 U.S.C. § 1254a(b)(3)(B). Thus, by statute, the administration could not terminate Haiti's

TPS designation sooner than February 3, 2026, when it was set to expire under the July

2024 extension. 89 Fed. Reg. at 54491.

To get around this statutory impediment to President Trump's agenda, Secretary

Noem purported to shorten the extension by six months, to August 3, 2025, by "partially

vacating" the July 2024 extension. 90 Fed. Reg. at 10513. If the extension were shortened,

the administration could then terminate Haiti's TPS designation earlier than otherwise

1100 (N.D. Cal. 2018), *vacated and remanded sub nom. Ramos v. Wolf*, 975 F.3d 872 (9th Cir.
2020), *reh'g en banc granted, opinion vacated*, 59 F.4th 1010 (9th Cir. 2023); *see also Centro
Presente v. U.S. Dep't of Homeland Sec.*, 332 F. Supp. 3d 393, 415 (D. Mass. 2018).

9

allowed while claiming to have nominally complied with 8 U.S.C. § 1254a(b)(3)(B)'s prohibition on premature terminations. And that is precisely what the administration did: after "partially vacating" the July 2024 extension, it issued a termination notice—the administrative action at issue here—purporting to terminate Haiti's TPS designation "effective September 2, 2025." 90 Fed. Reg. at 28760.[8] Had the administration not "partially vacate[d]" the July 2024 extension first, it could not claim to have even nominally complied with § 1254a(b)(3)(B).

Secretary Noem issued the "partial vacatur" in express "furtherance of" Executive Order 14159, which President Trump issued within hours of regaining office. 90 Fed. Reg. at 10513. That order decries what it characterizes as an "unprecedented flood of illegal immigration into the United States." 90 Fed. Reg. 8443 (Jan. 20, 2025). The order instructs the Secretary of State, Attorney General, and DHS Secretary to "rescind the policy decisions of the previous administration," which it says "led to the increased or continued presence of illegal aliens in the United States," and to "align any and all departmental activities with the policies set out by this order." *Id.* at 8446. The order expressly targets TPS designations, which it instructs should be "limited in scope and made for only so long as may be necessary to fulfill the textual requirements of the statute." *Id.*

Secretary Noem did not claim to have statutory authority to "partially vacate" the July 2024 extension of Haiti's TPS designation. Rather, she invoked what she asserted was

---

[8]    Because notice of the termination was not published until July 1, it could not take effect earlier than September 2 under § 1254a(b)(3)(B), which, recognizing the important reliance interests involved, requires at least 60-days' notice of a termination.

her "inherent authority … to reconsider any TPS-related determination, and upon reconsideration, to vacate or amend the determination." 90 Fed. Reg. at 10514. But because 8 U.S.C. § 1254a(b)(3)(A) prescribes "a specific procedure for reconsideration of a TPS designation," it "precludes Secretary Noem from reconsidering a TPS designation pursuant to other procedures (or no procedures at all), including by partial vacatur." *HECA*, 2025 WL 1808743, at *8.

Because the "partial vacatur," the necessary antecedent to the final termination at issue here, was "unlawful under the APA," it was "set aside" by *HECA* (2025 WL 1808743, at *9), which was issued the same day as the termination notice. As *HECA* holds, "Secretary Noem cannot reconsider Haiti's TPS designation in a way that takes effect before February 3, 2026, the expiration of the most recent previous extension." *Id.* at *8.

### 2.    Secretary Noem terminated Haiti's TPS designation.

Although set aside as unlawful, the "partial vacatur" laid the groundwork for the termination notice challenged here. Also issued "[i]n furtherance of" President Trump's January 20 executive order, the termination notice purports to terminate Haiti's TPS designation "effective September 2, 2025." 90 Fed. Reg. at 28760, 28762.

The termination notice says that the Secretary "reviewed country conditions in Haiti." 90 Fed. Reg. at 28762. Indeed, the notice accurately observes that "Haiti is in the grip of severe humanitarian and human rights crisis"; "[a]rmed gangs are striking the Port-au-Prince metropolitan area and its surroundings with terror and violence, including rape and other forms of sexual violence"; and "[w]idespread gang violence in

Haiti is sustained by the country's lack of functional government authority." 90 Fed. Reg. at 28763. Still, the notice reports no determination by the Secretary whether Haitians can return to Haiti "in safety" (8 U.S.C. § 1254a(b)(1)(C)) and does not recite "the basis" for such a determination. *Id.* § 1254a(b)(3)(A). That is not surprising. Because even a cursory examination of conditions in Haiti would reveal that Haitians cannot return there in safety, those conditions could not justify termination of Haiti's TPS designation, which is President Trump's stated goal.[9]

Deeming the "[n]ational interest … an expansive standard that may encompass an array of broad considerations, including foreign policy, public safety (*e.g.*, potential nexus to criminal gang membership), national security, migration factors (*e.g.*, pull factors), immigration policy (e.g., enforcement prerogatives), and economic considerations (*e.g.*, adverse effects on U.S. workers, impact on U.S. communities)," the termination notice asserts that, "[b]ased on her review, the Secretary has determined that termination of TPS for Haiti is required because it is contrary to the national interest to permit Haitian nationals … to remain temporarily in the United States." 90 Fed. Reg. at 28762.

Although TPS is available only to individuals already physically present in the United States (8 U.S.C. § 1254a(c)(1)(A)(i)), the termination notice cites President Trump's "determin[ation] to fully restrict and limit ***the entry*** of nationals from Haiti" as a reason to terminate Haiti's TPS designation. 90 Fed. Reg. at 28762 (emphasis added). Asserting that Haiti's TPS designation operates as a "pull factor[]" that induces Haitian migration

---

[9]    It is beyond any reasonable dispute that the dire conditions in Haiti prevent Haitians from returning in safety. *See* Happel Decl. ¶¶ 4–87 (Ex. 1).

to the United States, the termination notice declares the designation to be "inconsistent with President Trump's outlined policy priorities." *Id.* at 28763.

And although those convicted of a felony or more than one misdemeanor are ineligible for TPS (8 U.S.C. § 1254a(c)(2)(B)(i)), the termination notice also asserts that the designation "conflict[s] with the national interest of the United States" because "there are Haitian nationals who are TPS recipients who have been the subject of administrative investigations for fraud, public safety, and national security." 90 Fed. Reg. at 28763. There are 350,000 Haitian TPS holders but, with one possible exception, the termination notice identifies no Haitian TPS holder who has been arrested for, let alone convicted of, a crime.[10] The lone possible exception is Wisteguens Jean Quely Charles. Citing an earlier DHS press release, the termination notice states that Charles was "arrested, charged and convicted for 17 crimes between August 2022 and August 2024." *Id.* Notably, the termination notice does not say that Charles was a TPS holder and the press release cited in the notice suggests that he likely was not, describing him instead as someone who "entered the U.S. lawfully" but "violated the terms of his lawful admission."[11]

### D. Termination of Haiti's TPS designation will cause irreparable harm to Plaintiffs.

As the termination notice and State Department advisories make clear, Haiti is a

---

[10] By comparison, 8.11% of the U.S. adult male population is estimated to have a felony conviction. S.K.S. Shannon et al., The Growth, Scope, and Spatial Distribution of People with Felony Records in the United States, 1948–2010, 54 Demography 1795, 1808 (2017).

[11] U.S. Immigration and Customs Enforcement, "ICE ERO Boston arrests Haitian gang member with numerous convictions," https://www.ice.gov/news/releases/ice-ero-boston-arrests-haitian-gang-member-numerous-convictions (Jan. 24, 2025).

dangerous country without a functioning government where gangs terrorize the populace, large swaths of which lack adequate food, housing, and medical care. *See supra* at 1–2, 11–12. Deporting TPS holders to Haiti upon termination of Haiti's TPS designation would therefore place them at imminent risk of serious bodily harm. It would also wrench many from U.S.-citizen family members, including not only spouses and children but also parents in some instances. And even if not immediately deported, Haitian TPS holders would suffer other irreparable harms upon termination of Haiti's TPS designation. They would be subject to immediate, indefinite detention and, detained or not, would in any event immediately lose their right to work in the United States—and thus the ability to support themselves, their families, and dependent relatives living in Haiti. Plaintiffs' stories illustrate these perils.

Plaintiff Fritz Emmanuel Lesly Miot, a Ph.D. candidate in neuroscience at Loma Linda University, has lived in the United States since 2001, when he lawfully entered the country on a J-2 visa. Miot Decl. ¶ 2 (Ex. 2). Afflicted with Type 1 diabetes, he must "inject [himself] with artificial insulin multiple times a day." *Id.* ¶ 7. Given "Haiti's dysfunctional health care system" and the violence that has caused many doctors to flee the country, having to return to Haiti—where it is uncertain that he will be able to access either insulin or the specialized doctors he needs—would likely be a death sentence for Miot. *Id.* ¶¶ 7–8. Even if the requisite specialists were theoretically available, the mass exodus of medical professionals has significantly reduced the supply of doctors and caused a correspondingly significant increases in doctors' fees, likely rendering the remaining

doctors' services "prohibitively expensive." *Id.* ¶ 8. And even if they were theoretically available and affordable, "physically getting to a specialist … would be difficult given the roadblocks and conditions of lawlessness and violence in the streets." *Id.* Miot also justifiably fears "catching diseases like cholera, malaria, and dengue fever which are endemic to Haiti and … regularly claim lives there but … are rare and treatable in the United States." *Id.* ¶ 9. Were he to contract "any one of these or other serious diseases," his "Type 1 diabetes would make them more dangerous and potentially life-threatening to [him] than they would be for someone without [his] condition." *Id.*

Diabetes aside, Miot would be at constant risk of kidnapping if forced to return to Haiti. As someone who has "lived most of [his] life in the United States" and rarely speaks Creole, he "would stick out in Haiti as someone who had for years been living abroad in the United States." Ex. 2 ¶ 10. That would make him "a prime target" for kidnapping by the gangs that rule Haiti "because they would think that [he], as someone who has been in the United States for most of his life, would have money and/or would know people who have money to pay them a ransom for my release." *Id.* ¶ 11.

Like Miot, Plaintiff Rudolph Civil, "a software engineer for one of the nation's largest banks," has lived in the United States since childhood. Civil Decl. ¶ 2 (Ex. 3). Having left Haiti when he was seven-years old, Civil speaks Creole "infrequently" and "with an American accent." *Id.* ¶ 7. Consequently, he too "would stick out to everyone as someone who has lived for most of his life in the United States" and thus be "a prime target for the gangs to kidnap and hold for a money ransom." *Id.* The risk that Civil would

be targeted by gangs were he deported to Haiti is heightened by the fact that his father "was a government official … at the Bureau of Customs, a department associated with money and goods." *Id.* ¶ 8. In 2023, a gang member broke into his father's house, tried twice to shoot him, and ultimately, after the gun jammed, hit Civil's father on the head before robbing him and abducting Civil's cousin, who was there at the time. *Id.* Civil reasonably fears that gangs would target him if they learned that he is his father's son.

Although not afflicted with diabetes, Civil too fears contracting "cholera, malaria, and dengue fever." Ex. 3 ¶ 11. He fears that if he falls ill "it would be difficult to find and get to a doctor, since many doctors have left the country, some hospitals are no longer functioning, what doctors remain are expensive, and just getting from one area to another involves risking being stopped and accosted by gang member." *Id.*

Civil is understandably concerned that he would be unable "to get a job in Haiti due to the tremendous unemployment and horrible conditions" as "[t]here are little if any software engineering opportunities or other jobs there for someone with my career skills and bachelor's degree in computer engineering." Ex. 3 ¶ 10. And even if he did find a job of some kind, he does not know how he would secure food or housing because he "would have no idea how to navigate to get things done in Haiti," which is effectively "a foreign country" to him because he left when still a child. *Id.* ¶¶ 12–13.

If Haiti's TPS designation is terminated, Civil would immediately lose his right to work in the United States. The consequences would be profound. Civil not only supports himself but also "contribute[s] to the support of family members in Haiti who need" what

16

he sends them. Ex. 3 ¶ 5. He sends money to his grandmother and to his maternal aunt, "for [her] basic necessities and those (including schooling) of her three children, one of whom has Down syndrome and special needs." *Id.* Were he to lose his right to work in the United States, Civil would lose the income with which he supports himself and "would not be able to contribute to the support of any of these people." *Id.*

Plaintiff Marlene Gail Noble, who was "abandoned as an infant" in Port-au-Prince, contracted tuberculosis before she was two. Noble Decl. ¶¶ 3–5 (Ex. 4). The disease "caused [her] spinal cord to collapse," which made her "unable to sit, move well, or function without additional medical care." *Id.* ¶ 4. In 1993, when she was two, "a faith-based organization based in Florida" brought her "to the United States for medical treatment." *Id.* ¶ 5. She has lived here ever since. *Id.* ¶ 17. In 1999, she was adopted by a couple in Pennsylvania. *Id.* ¶ 7. From the time she arrived in the United States her "humanitarian parole status was renewed each time before it expired, until approximately the year 2000, when [she] was nine years old." *Id.* ¶ 8. It "was not renewed at that time because [she] had been adopted by" American parents, who—relying on they were told by the adoption attorney—believed, albeit erroneously, that "the adoption had made [her] a US citizen" who "no longer needed humanitarian parole." *Id.* ¶¶ 8, 17. It was not until 2021 that Noble, having retained an immigration attorney, determined that her adoptive parents had failed to timely adjust her status and that she was "very likely not a US citizen" and likely had no "easy path to secure citizenship or even secure lawful status." *Id.* ¶ 12. After learning this, Noble sought and received TPS. *Id.* ¶ 13.

Having been brought to the U.S. as a toddler, Noble knows no one in Haiti. Ex. 4 ¶ 18. She does "not speak, nor can [she] understand, French or Haitian Creole, the official languages of Haiti." *Id.* Deportation to Haiti would jeopardize Noble's physical wellbeing in at least two ways. First, Haiti "has no functional health care system to treat" her spinal "kyphosis," for she has already undergone two surgeries. *Id.* ¶¶ 15, 19. Second, lacking any connections or resources in Haiti, she "would immediately be homeless and subject to the country's current lawlessness and violence, particularly if," as would likely be the case, she is "seen as an American." *Id.* ¶¶ 19–20. Simply put, Noble "would have no home, no resources or food, and … would suffer immense harm, if not death," if she is forced to return to Haiti, a country that she has not seen in more than three decades.

Like Noble, Plaintiff Marcia Merline Laguerre was brought to the United States as a young child. She "entered the U.S. Virgin Islands with [her] parents in 2005 when [she] was one year and a few months old" and lived there "until 2007 or 2008," when her family "moved to Florida, where [they] lived for about two years before moving to New York." Laguerre Decl. ¶ 2 (Ex. 5). A junior majoring in economics at CUNY's Hunter College who works as a receptionist and administrative assistant at a fiduciary firm specializing in retirement planning, Laguerre is pursuing a career in finance. *Id.* ¶¶ 9–10. But for the threat that she will lose TPS, which she has had since 2010 (*id.* ¶ 2), Laguerre is well on her way to achieving her goal. Earlier this month, she passed the Securities Industry Essentials exam, "an entry level exam … administered by the Financial Industry Regulatory Authority (FINRA)," after having received a highly competitive scholarship

that covered both the cost of a preparatory course and the cost of the exam itself. *Id.* ¶¶ 15–16, 18. And just one day before passing the exam, she was "offered a New York 2026 Wealth Management Summer Analyst Program — Private Bank internship for the Summer of 2026 at a Long Island branch of one of the nation's largest banks." *Id.* ¶ 17. It is, obviously, a "wonderful opportunity," but one that she will be unable to take advantage of "[w]ithout work authorization, which" she has "through TPS." *Id.*

Using the income that she earns at the fiduciary firm, Laguerre purchases the household groceries and contributes to the rent. Ex. 5 ¶ 24. She also "regularly send[s] money" to her 19-year old sister, who attends the University of Albany and relies on those funds. *Id.* Laguerre "won't be able to support [herself] or contribute in any of these ways" if she loses her TPS status. *Id.*

Laguerre is married to a U.S. citizen; she and her husband live in Queens. Ex. 5 ¶ 3, 21. Her sisters, also U.S. citizens, live in Brooklyn. *Id.* ¶¶ 3, 22. If deported, she will be separated from her spouse and sisters. *Id.* ¶ 20.

Like the other Plaintiffs who came to the United States as young children, Haiti is "a foreign country" to Laguerre, who does not "know anyone there." Ex. 5 ¶ 24. She does not speak Creole well and "can't read or write it or French." *Id.* She is "terrif[ied]" by the prospect of deportation to Haiti, fearing that "gang members would rape [her] and/or traffic [her] for sex" and that she would be targeted for kidnapping as "someone who has spent virtually her entire life in the United States." *Id.* ¶ 26.

As someone who suffers frequent bouts of illness, which cause her to have "intense

pain all over [her] body, extreme tiredness, headaches, itchiness, low appetite, difficulty holding down food, and sometimes a high temperature," Laguerre is deeply worried by Haiti's "tremendous lack of sanitation … and medical services" and fearful that "the lack of adequate food and of sanitation would" cause her to "get seriously ill more frequently than" she does "now, and likely with more serious consequences." Ex. 5 ¶¶ 29–31.

Plaintiff Vilbrun Dorsainvil, who "worked as a medical doctor in Haiti, currently work[s] as a registered nurse … at Springfield Regional Medical Center in Springfield, Ohio." Dorsainvil Decl. ¶ 2 (Ex. 6). Dorsainvil owns a house in Springfield but would be "unable to pay" the mortgage if the termination of Haiti's TPS designation stands and he loses his work authorization. *Id.* Through the money that he earns as a nurse, Dorsainvil supports not only himself but also his cousin Ulrick and many people in Haiti, including his ex-fiancée and their mutual daughter, his mother, his godson, a brother, a nephew, and others. *Id.* ¶ 8. In some instances, the money that he provides is "[t]heir sole support." *Id.* ¶¶ 8, 15. If he loses TPS and his right to work in the U.S., he "wouldn't be able to support any of these people" and "do[es]n't know what would become of them." *Id.* ¶ 9.

"[B]orn into a family with a social conscience and democratic political views," Dorsainvil fears that he would be a victim of political violence if sent to Haiti, both because of his association with his brother Jean Claude Dorsainvil, who co-founded and led the Haitian Green Party, and because he shares—and acts on—his family's democratic beliefs. Ex. 6 ¶¶ 10, 20. Vilbrun's fears are neither abstract nor speculative. Jean Claude, who "made many enemies in Haiti because he fearlessly and regularly denounced the

corruption of Haitian politicians on radio stations and in other public forums," was forced to flee Haiti, and now resides in Mexico, after he was "arrested and imprisoned for his political opinions in 2019." *Id.* ¶¶ 10, 14. Vilbrun's "other siblings suffered because of" their and Jean Claude's "political views and associations." *Id.* ¶ 13. His brother Rony Dorsainvil likewise fled to Mexico after he "was arrested and imprisoned without cause, we think because of his association with Jean Claude." *Id.* Another brother, Bernito Dorsainvil, "fled to the countryside" after crashing his car badly while "try[ing] to elude" unknown men who had started to follow him and his wife on their way to church. *Id.* Yet another brother, Rocheny Dorsainvil, "fled Haiti in fear because of his association with Jean Claude" and "is now living in Romania." *Id.* ¶ 13. Still "[o]ther siblings also fled or are in hiding because of their association with Jean Claude." *Id.* Indeed, Vilbrun himself was "forc[ed] … to leave Haiti" after being attacked on multiple occasions "because of [his] family associations and/or outspoken views." *Id.* ¶ 12.

Because "Haiti lacks the rule of law," it "wouldn't be safe for" Dorsainvil "to return to Haiti now, even if [his] family hadn't experienced" the political violence that they have. Ex. 6 ¶ 16. Dorsainvil reasonably believes that he "would be a prime target for [gangs] to kidnap because," as "a professional, they could easily surmise or learn that I had been living abroad, and they would think that I would have money to pay them a ransom and/or know people who do." *Id.* ¶ 17. "Haiti's police are weak and wouldn't be able to protect [him] from the gangs, which are more powerful than they are." *Id.*

Like the other Plaintiffs, Dorsainvil fears "that conditions in Haiti would make it

21

impossible … to safely and consistently access basic necessities like food, work, and health care." Ex. 6 ¶ 18. "Gang roadblocks and violence in the streets would make it dangerous for [him] simply to try to access whatever food might be available or other things I might need, for example a doctor or hospital if I were to get sick or injured." *Id.*

In sum, Plaintiffs—and 350,000 other Haitian TPS holders—would suffer irreparable harm if Haiti's TPS designation is terminated.

## ARGUMENT

"[T]o the extent necessary to prevent irreparable injury," a court considering an APA challenge "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. "The factors to be considered in determining whether a stay is warranted are: (1) the likelihood that the party seeking the stay will prevail on the merits …; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay." *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985). When, as here, the government is the defendant, the last two factors collapse into one. *Cath. Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Rev.*, 513 F. Supp. 3d 154, 176 (D.D.C. 2021). Each factor favors a stay here.

## I. Plaintiffs are likely to succeed on the merits.

The APA declares unlawful, and directs a reviewing court to set aside, any agency action that is "in excess of statutory … authority"; "without observance of procedure required by law"; "arbitrary [and] capricious"; or "contrary to constitutional right [or]

power." 5 U.S.C. § 706(2). Because the termination Haiti's TPS designation is all of these, Plaintiffs are likely to succeed on their claim that the termination violates the APA.[12]

### A. The termination is in excess of statutory authority insofar as it depends on the "partial vacatur."

As noted above (*see supra* at 9–10) and as the government conceded in connection with its largely analogous termination of Venezuela's TPS designation, Secretary Noem's "partial vacatur" of the July 2024 extension of Haiti's TPS designation is "an essential prerequisite" for her subsequent termination of the designation effective September 2, 2025—the administrative action challenged here. Stay Appl. at 18 n.12, *Noem v. Nat'l TPS*

---

[12] Based on its assertions in other cases, the government will likely argue that this Court lacks jurisdiction to grant relief because, under 8 U.S.C. § 1252(f)(1), a court may not "enjoin or restrain operation of" 8 U.S.C. § 1254a, and because under 8 U.S.C. § 1254a(b)(5)(A), "[t]here is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a [TPS] designation." There is no merit to either contention even if the two provisions—neither of which mentions the APA—were applicable despite 5 U.S.C. § 559, under which a "[s]ubsequent statute," such as the TPS statute, "may not be held to supersede or modify" the APA "except to the extent that it does so expressly." Given the fundamental differences between injunctions and set-asides, courts have consistently held that "orders pursuant to 5 U.S.C. § 706(2) are not prohibited by 8 U.S.C. § 1252(f)(1)." *HECA*, 2025 WL 1808743, at *7; *accord, e.g.*, *Texas v. United States*, 50 F.4th 498, 528 (5th Cir. 2022). Nor is a set-aside foreclosed by § 1254a(b)(5)(A). Even if it barred review of the Secretary's substantive determinations with respect to country conditions and the national interest (*cf.* 8 U.S.C. §§ 1254a(b)(1), (b)(3)(A)), it does not prevent the Court from setting aside agency action that is "procedurally deficient." *Saget*, 375 F. Supp. 3d at 332; *accord, e.g.*, *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 321 (D. Md. 2018); *Centro Presente*, 332 F. Supp. 3d at 409; *Ramos*, 321 F. Supp. 3d at 1101–08; *see also McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 492 (1991) (8 U.S.C. § 1160(e)(3) does not preclude "collateral challenges to unconstitutional practices and policies"); *Nakka v. U.S. Citizenship & Immigr. Servs.*, 111 F.4th 995, 1009 (9th Cir. 2024) (8 U.S.C. § 1252(a)(2)(B)(i) does not bar "collateral actions challenging general policies and procedures"). Thus, § 1254a(b)(5)(A) "is best read as barring judicial review of the merits of the determination itself, but not whether the determination" was the result of unlawful "'practices and policies.'" *CASA*, 355 F. Supp. 3d at 320.

*All.*, No. 24A1059 (U.S. May 1, 2025).

By statute, a TPS designation cannot be terminated before "the expiration of the most recent previous extension." 8 U.S.C. § 1254a(b)(3)(B). The July 2024 extension extended Haiti's TPS designation through February 3, 2026. 89 Fed. Reg. at 54487. Thus, absent the "partial vacatur," Secretary Noem could not terminate Haiti's TPS designation before that date. It is only because the "partial vacatur" purported to "reduc[e]" the extension period so that it would "expire on August 3, 2025, instead of February 3, 2026" (90 Fed. Reg. at 10511) that she can now claim, albeit falsely, that the September 2, 2025, termination date complies with § 1254a(b)(3)(B).

But the "partial vacatur" has been "set aside as unlawful under the APA" because "Secretary Noem does not have statutory or inherent authority to partially vacate a country's TPS designation." *HECA*, 2025 WL 1808743, at *9. Inasmuch as the termination challenged here necessarily depends on the "partial vacatur" (*cf.* 90 Fed. Reg. at 28761), it too is an *ultra vires* act that must be held "unlawful and set aside." 5 U.S.C. § 706(2).

## B.    The termination was effected without observance of procedure required by law.

Secretary Noem made the decision to terminate Haiti's TPS designation "without observance of procedure required by law" in violation of 5 U.S.C. § 706(2)(D). Congress has prescribed a process for the periodic review of a designation. Specifically, "after consultation with appropriate agencies of the Government," the Secretary must "review the conditions in the foreign state" and then "determine whether the conditions for [the foreign state's] designation … continue to be met." 8 U.S.C. § 1254a(b)(3)(A). Having

24

made that determination, the Secretary must then give notice of the determination and "the basis for the determination" in the Federal Register. *Id.* Secretary Noem did not comply with these procedural requirements before terminating Haiti's TPS designation.

Haiti is designated for TPS because the country is gripped by "simultaneous economic, security, political, and health crises" (89 Fed. Reg. at 54487) that individually and in conjunction create conditions that prevent Haitians "from returning to Haiti in safety." *Id.* at 54491 (citing 8 U.S.C. § 1254a(b)(1)(B)(iii)). Therefore, when "review[ing] the conditions in [Haiti]," Secretary Noem must determine whether these "conditions for [Haiti's] designation" continue to exist, and then, having done so, must publish notice in the Federal Register of her determination and the basis for it. 8 U.S.C. § 1254a(b)(3)(A).

The termination notice does not contain the requisite elements. Although it says that Secretary Noem's "review included examining … whether extraordinary and temporary conditions in Haiti that prevent aliens who are Haitian nationals from returning to Haiti in safety continue to exist" (90 Fed. Reg. at 28762), it gives no notice of any determination by her as to whether those conditions continue to exist. Nor does it provide the basis for any such determination. Thus, the termination notice does not satisfy the procedure set forth in 8 U.S.C. § 1254a(b)(3)(A).

### C. The termination is arbitrary and capricious.

Agency action is arbitrary and capricious, and therefore unlawful under 5 U.S.C. § 706(2)(A), if the agency

> has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its

decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Agency action also is arbitrary and capricious when the agency "fail[s] to follow its own well-established precedent without explanation." *Leggett & Platt, Inc. v. Nat'l Lab. Rels. Bd.*, 988 F.3d 487, 494 (D.C. Cir. 2021) (quoting *Nat'l Treasury Emps. Union v. Fed. Lab. Rels. Auth.*, 404 F.3d 454, 457 (D.C. Cir. 2005)). Secretary Noem's termination of Haiti's TPS designation is arbitrary and capricious by each of these measures.

### 1.    The termination was predetermined.

Rather than a good-faith, evidence-based product of the congressionally mandated review of "the conditions in [Haiti]" (8 U.S.C. § 1254a(b)(3)(A)), the termination is a predetermined result driven by political considerations. The decision to terminate Haiti's TPS designation was made long before the President assumed office and, thus, long before Secretary Noem could "consult[] with appropriate agencies of the Government" to determine whether the conditions for designation continue to exist. *Id.*

During the most recent campaign, the President repeatedly promised to "begin the largest domestic deportation operation in American history."[13] When asked whether he would end Haiti's TPS designation if elected, he responded unequivocally, declaring that

---

[13]  Ed Pilkington, *Mass deportations, detention camps, troops on the street: Trump spells out migrant plan*, THE GUARDIAN (May 3, 2024), https://www.theguardian.com/us-news/article/2024/may/03/trump-mass-deportations-detention-camps-military-migrants.

he "absolutely … would revoke it" and send Haitians "back to their country."[14]

Secretary Noem echoed the President's political plan for TPS following her nomination. At her confirmation hearing, she testified that "[TPS] has been abused and manipulated by the Biden Administration," that it "will no longer be allowed," and that TPS extensions will not "go[] forward the way that they are."[15] Secretary Noem later pledged to do whatever President Trump wants, stating that "[w]hen the President gives a directive, the Department of Homeland Security will follow it."[16]

Secretary Noem has made good on her promise to prioritize the President's political agenda over her statutory obligations. When she issued the termination notice and antecedent "partial vacatur," she did so in express "furtherance of" the President's directive "to rescind policies that led to increased or continued presence of illegal aliens in the United States" (90 Fed. Reg. at 28762 (citing 90 Fed. Reg. 8446))—which TPS holders, as a matter of law, are not. *See Sanchez v. Mayorkas*, 593 U.S. 409, 416 (2021) ("The TPS statute permits [a TPS recipient] to remain in the country[.]"); *Okpa v. INS*, 266 F.3d 313,

---

[14] Maggie Astor, *Trump Says He Would Try Again to Revoke Haitian Immigrants' Protections*, N.Y. TIMES (Oct. 3, 2024), https://www.nytimes.com/2024/10/03/us/politics/trump-haitian-immigrants-legal-status.html.; Ali Bradley, Damita Menezes, *Trump on Springfield Haitian migrants: 'They have to be removed'*, NEWSNATION (Oct. 2, 2024), https://www.newsnationnow.com/politics/2024-election/trump-springfield-haitian-migrants-removed/.

[15] *Homeland Security Secretary Nominee Governor Kristi Noem Testifies at Confirmation Hearing*, C-SPAN (Jan. 17, 2025) https://www.c-span.org/program/senate-committee/homeland-security-secretary-nominee-gov-kristi-noem-testifies-at-confirmation-hearing/654484.

[16] Kristi Noem (@Sec_Noem), X (Jan. 29, 2025), https://x.com/sec_noem/status/1884752724194963594?s=46&t=DFMGDqrcqeJ4X9klKmN2s (last visited Feb. 23, 2025).

315 (4th Cir. 2001) ("TPS allows an alien to remain in the United States legally[.]"); *Saget*, 375 F. Supp. 3d at 367 (Haitian TPS holders "are lawfully present in the United States along with their U.S.-born dependents"). As further justification for the termination, she cited President Trump's "America First" agenda and his "determin[ation] to fully restrict and limit the entry of nationals from Haiti." 90 Fed. Reg. at 28762.

In short, "preordained and pretextual," the termination of Haiti's TPS designation is—like the termination attempted during President Trump's first term in office—based on political whim rather than the "purely evidence-based" review that "the statute requires." *Saget*, 375 F. Supp. 3d at 346.

### 2. The termination relies on an unexplained departure from past practice.

The exclusive ground that Secretary Noem gives for the termination of Haiti's TPS designation is her "determin[ation] that … it is contrary to the national interest to permit Haitian nationals … to remain temporarily in the United States." 90 Fed. Reg. at 28762. The TPS statute has existed for 35 years but, until this year, no termination of a TPS designation had been justified—much less exclusively justified—on national interest grounds. To the contrary, prior terminations were based on changed conditions in the designated country and a finding that it was safe for TPS holders to be repatriated. That has suddenly changed. Within six months of President Trump regaining office, the current administration has terminated at least three TPS designations based exclusively or primarily on the administration's interpretation of the "national interest." 90 Fed. Reg. 9040 (Venezuela); 90 Fed. Reg. 23697 (Cameroon); 90 Fed. Reg. 28760 (Haiti). The

administration has offered no explanation for its abrupt departure from past practice.

Although "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change" *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016), "an agency's unexplained departure from precedent is arbitrary and capricious" and must be set aside as such. *ABM Onsite Servs.-W., Inc. v. Nat'l Lab. Rels. Bd.*, 849 F.3d 1137, 1142 (D.C. Cir. 2017) (citing *Comcast Corp. v. FCC*, 526 F.3d 763, 769 (D.C. Cir. 2008)). Thus, before departing from past practice, "the agency must at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'" *Encino Motorcars*, 579 U.S. at 221 (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). Here, the administration has done neither.

### 3. The explanation for the termination is implausible and contrary to the evidence.

Secretary Noem's explanation for the termination of Haiti's TPS designation "runs counter to the evidence before the agency" and "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

First, the Secretary asserts that TPS is a "pull factor[]," *i.e.*, inducement, for "large-scale irregular migration" of Haitians to the United States. 90 Fed. Reg. at 28762–63. But that is wrong as a matter of both law and fact. By statute, a person must be physically present in the United States at the time of the designation to qualify for TPS; no one who later enters the country is eligible for TPS. 8 U.S.C. § 1254a(c)(1)(A). The contention that Haiti's TPS designation draws illegal migrants to the U.S. is belied by DHS's own data,

which show that the number of Haitian nationals caught trying to enter the U.S. illegally plummeted between 2021 and 2024, steadily falling from slightly more than 46,160 in 2021 to just 2,790 in 2024, even though Haiti was designated and redesignated for TPS three times during that period. Reichlin-Melnick Decl. ¶ 11 (Ex. 7); *cf.* 86 Fed. Reg. 41863; 88 Fed. Reg. 5022; 89 Fed. Reg. 54484. The termination notice's assertion to the contrary rests on a conflation of "U.S. Border Patrol data with U.S. Customs and Border Protection … data." Reichlin-Melnick Decl. ¶ ¶ 4–7.

The termination notice next asserts that Haitian TPS holders threaten public safety. The notice cites "multiple large-scale prison breaks in Haiti" and "serious and violent crimes" being committed by "Haitian gang members." 90 Fed. Reg. at 28763. But it is silent when it comes to the criminality rate of Haitian TPS holders who, as a matter of law, cannot have the kinds of criminal histories described in the termination notice if they wish to be and remain eligible for TPS benefits. *See* 8 U.S.C. § 1254a(c)(2)(B), (3)(A). In fact, the President's first administration cited this statutory bar to TPS eligibility in explaining its decision to "not consider crime rates among TPS recipients." *Saget*, 375 F. Supp. 3d at 300. Meanwhile, government data show that immigrants in general and Haitian immigrants in particular commit far fewer crimes than those born in the United States. According to Census Bureau data, "[n]ative-born Americans have an incarceration rate 48 percent higher than that of all Haitian immigrants."[17]

---

[17]    Alex Nowrasteh, Haitian Immigrants Have a Low Incarceration Rate, Cato at Liberty (July 7, 2025), https://www.cato.org/blog/haitian-immigrants-have-low-incarceration-rate.

The termination's demonstrably mistaken analysis of the available data "casts serious doubt on the reliability of its legal conclusions." *Horizon Lines, LLC v. United States*, 414 F. Supp. 2d 46, 56 (D.D.C. 2006). Indeed, because it is "based on a factual premise that is flatly contradicted by the agency's own record," the termination notice does not reflect "reasoned administrative decisionmaking" and, for that reason, "cannot survive review under the arbitrary and capricious standard." *Id.* (internal quotation marks omitted) (quoting *City of Kansas City v. Dep't of Hous. & Urban Dev.*, 923 F.2d 188, 194 (D.C. Cir. 1991)).

### D. The termination is contrary to constitutional right and power.

Agency action that is "contrary to constitutional right [or] power" must be set aside as unlawful. 5 U.S.C. § 706(2)(B). The termination of Haiti's TPS designation is contrary to constitutional right and contrary to constitutional power.

### 1. The termination is contrary to constitutional right.

The termination is "contrary to constitutional right" because it is motivated, at least in part, by discriminatory animus.

The Fifth Amendment's "equal protection component" forbids the federal government from discriminating based on race, ethnicity, or national origin. *Washington v. Davis*, 426 U.S. 229, 239 (1976).[18] Although proof of "discriminatory intent" is required, a plaintiff need not prove that "the challenged action rested solely on racially

---

[18]  The doctrinal and factual analysis is the same for these immutable traits. *See, e.g.*, *United States v. Virginia*, 518 U.S. 515, 532 n.6 (1996) (strict scrutiny applies to classifications based on national origin); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 223–24 (1995) (strict scrutiny applies to classifications by ethnicity).

discriminatory purposes." *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–65 (1977). It is enough to show discriminatory intent or purpose was "a motivating factor." *Id.* at 265–66. At that point, "judicial deference is no longer justified," and the government action is subject to strict scrutiny. *Id.* at 266.[19]

Discriminatory animus may be proven by circumstantial evidence, such as the sequence of events leading to a decision, departures from normal procedures or substantive conclusions, the background of a decision, disparate impact, and statements made by the relevant decisionmakers. *Id.* at 266–67. Evidence that the discriminatory beliefs of others guided the decisionmaker is enough. *See Saget*, 375 F. Supp. 3d at 371 (finding "sufficient evidence of interactions and communications between White House officials and DHS regarding [the Secretary]'s decision" to terminate Haiti's TPS designation to raise "serious questions on the merits of Plaintiffs' equal protection claim").

Here, the anti-Haitian animus culminating in the termination of Haiti's TPS designation is anything but subtle.

---

[19]   The more deferential standard applied in *Trump v. Hawaii*, 585 U.S. 667 (2018), has no application here. None of the "pivotal factors" that informed the Court's analysis there are present here. *Saget*, 375 F. Supp. 3d at 367. First, as TPS holders, Plaintiffs "are lawfully present in the United States along with their U.S.-born dependents" (*id.*), not "aliens abroad" seeking entry into the United States. *Hawaii*, 585 U.S. at 702. This makes "all the difference" because Plaintiffs' lawful presence "within the United States" entitles them to greater constitutional protection than those who remain abroad. *Zadvydas v. Davis*, 533 U.S. 678, 693–94 (2001). Second, the termination is not an executive order, "facially neutral," or pertinent to national security. *Hawaii*, 585 U.S. at 702. The termination targets a specific group of overwhelmingly non-white immigrants, namely, Haitians. Thus, *Hawaii*'s more deferential standard does not apply, and the *Arlington Heights* standard applies. *See Saget*, 375 F. Supp. 3d at 367 (refusing to apply *Hawaii* to TPS termination); *Ramos*, 321 F. Supp. 3d at 1127–31 (same); *Centro Presente*, 332 F. Supp. 3d at 410–12 (same).

The most damning evidence of animus — President Trump's own words — requires no interpretation. Echoing the racist trope of national purity, he has said that "illegal immigrants" — the category to which he assigns Haitian TPS holders[20] — are "poisoning the blood" of America.[21] President Trump has not only articulated animus against non-white immigrants generally[22] but long expressed discriminatory animus toward Haitians in particular.[23] During his first administration, for example, the President referred to Haiti as a "shithole country," [24] suggested Haitians "probably have AIDS," and

---

[20]  Edith Olmsted, *Trump Escalates Racist Attacks With Dangerous Lie*, THE NEW REPUBLIC (Oct. 9, 2024), https://newrepublic.com/post/186961/donald-trump-racist-attacks-springfield-ohio-lie.

[21]  C-Span, *Donald Trump on Illegal Immigrants "Poisoning the Blood of Our Country,"* https://www.c-span.org/clip/campaign-2024/donald-trump-on-illegal-immigrants-poisoning-the-blood-of-our-country/5098439; Hannah Fingerhut and Ali Swenson, *Trump defends controversial comments about immigrants poisoning the nation's blood at Iowa Rally*, ASSOCIATED PRESS (December 19, 2023), https://apnews.com/article/donald-trump-immigration-iowa-dff7f632948fa6511fb7d1955a28610c.

[22]  *See, e.g.*, Ariana Figueroa, *Trump promises mass deportations of undocumented people. How would that work?*, MISSOURI INDEPENDENT (Aug. 23, 2024), https://missouriindependent.com/2024/08/23/trump-promises-mass-deportations-of-undocumented-people-how-would-that-work/ ("I don't know if you call [immigrants] people. In some cases they're not people, in my opinion."); Michael Gold, Maggie Haberman, *Trump, at Fund-Raiser, Says He Wants Immigrants from 'Nice' Countries*, N.Y. TIMES (Apr. 7, 2024), https://www.nytimes.com/2024/04/07/us/politics/trump-immigrants-nice-countries.html ("Why can't we allow people to come in from nice countries, . . . you know like Denmark, Switzerland? Do we have any people coming in from Denmark? How about Switzerland? How about Norway?").

[23]  Ayendy Bonifacio, *Tracing the Anti-Haitianism Behind the Springfield Scapegoating*, NACLA (Sept. 16, 2024), https://nacla.org/anti-haitianism-springfield-scapegoating.

[24]  Ali Vitali, Kasie Hunt & Frank Thorp V, *Trump Referred to Haiti and African Nations as 'Shithole' Countries*, NBC NEWS (Jan. 11, 2018), https://www.nbcnews.com/politics/white-house/trump-referred-haiti-african-countries-shithole-nations-n836946.

complained that Haitian immigration is "like a death wish for our country."[25] During his most recent campaign, he endorsed the conspiracy theory that Haitian immigrants were "eating the pets of the people" in Springfield, Ohio.[26] Even after that lie was quickly and thoroughly debunked, the President, implying that Haitian immigrants are cannibals, claimed they were eating "other things too that they're not supposed to be."[27]

President Trump has translated his anti-Haitian rhetoric into policy. During his first term in office, he tried to terminate Haiti's TPS designation but was prevented from doing so when multiple courts held the attempted termination was an unlawful "preordained" action motivated at least in part by the "discriminatory purpose of removing non-white immigrants from the United States." *Saget*, 375 F. Supp. 3d at 346–47, 374; *accord Ramos*, 336 F. Supp. 3d at 1100; *see also Centro Presente*, 332 F. Supp. 3d at 415. And now, still motivated by his enduring animus against Haitian immigrants, he is attempting to do so again.

President Trump's animus can be imputed to Secretary Noem. The President claims that "Article II of the Constitution vests the 'executive Power'—'all of it'—in the

---

[25] *Trump Slams Haitians Attempting to Enter U.S., Says They 'Probably Have AIDS'*, ABC (Oct. 10, 2021), https://abc7.com/haitian-migrants-donald-trump-former-president-immigration/11108741/.

[26] Riley Hoffman, *READ: Harris-Trump presidential debate transcript*, ABC NEWS (Sept. 10, 2024), https://abcnews.go.com/Politics/harris-trump-presidential-debate-transcript/story?id=113560542.

[27] Sara Dorn, *Trump Doubles Down on False Pet-Eating Claims; Suggests Haitian migrants Eat 'Other Things Too*, Forbes (Oct. 16, 2024), https://www.forbes.com/sites/saradorn/2024/10/16/trump-doubles-down-on-false-pet-eating-claims-suggests-haitian-migrants-eat-other-things-too/.

President alone." Reply in Support of App. for Stay, *Trump v. Wilcox*, No. 24A966 (U.S.), 2025 WL 1372312, at *1. Accepting this principle, Secretary Noem has declared that she will do anything that President Trump wants, stating that "[w]hen the President gives a directive, the Department of Homeland Security will follow it."[28] And indeed she has, terminating Haiti's TPS designation in avowed "furtherance of" President Trump's agenda. 90 Fed. Reg. at 28762. Because President Trump's animus against Haitian immigrants has "influenced or manipulated the decision-making process," the termination of Haiti's TPS designation "may violate the equal protection" clause "[e]ven if it cannot be proven that" Secretary Noem or other subordinates "personally harbor animus towards TPS-beneficiaries from Haiti." *NAACP v. U.S. Dep't of Homeland Sec.*, 364 F. Supp. 3d 568, 577 (D. Md. 2019); *accord Saget*, 375 F. Supp. 3d at 369 (same); *Ramos*, 321 F. Supp. 3d at 1123 (same).[29]

Additional evidence confirms that the termination of Haiti's TPS designation is motivated, at least in part, by discriminatory animus against Haitians.

Although Plaintiffs "need not plead or show the disparate treatment of other similarly situated individuals," the termination of Haiti's TPS designation undeniably

---

[28]    Noem, *supra* at 27 n.15.

[29]    That said, Secretary Noem too has expressed a distaste for non-white immigrants, calling them "dirtbags" (@Sec_Noem, X (Feb. 27, 2025 8:59 PM), https://x.com/Sec_Noem/status/1895307762349023270); "murderers" (*Homeland Security Secretary Nominee Governor Kristi Noem Testifies at Confirmation Hearing*, C-SPAN (Jan. 17, 2025), https://www.c-span.org/program/senate-committee/homeland-security-secretary-nominee-gov-kristi-noem-testifies-at-confirmation-hearing/654484); and "rapists" (*id.*).

"impacts one race, namely non-white Haitians, more than another." *Saget*, 375 F. Supp. 3d at 366 n.25 & 367. The termination stands in sharp contrast to the preferential treatment that President Trump has afforded white—but not black—South Africans, granting Afrikaners special refugee status based on exaggerated claims of "racial discrimination." Executive Order 14204—Addressing Egregious Actions of the Republic of South Africa, 2025 WL 824236 (Feb. 7, 2025).[30]

Discriminatory animus also can be inferred from the administration's failure to observe statutorily mandated procedures as well as its unexplained departure from past practice. *See supra* at 24–25, 28–29. Both are strong indications that "improper purposes are playing a role" in the termination of Haiti's TPS designation, especially in light of the fact that "the factors usually considered important by" the Secretary of Homeland Security "strongly favor a decision contrary to the one reached." *Arlington Heights*, 429 U.S. at 267.

A direct extension of President Trump's discriminatory preference for immigrants from "nice," predominantly white countries "like Denmark, Switzerland, [and] Norway,"[31] the termination of Haiti's TPS designation is "contrary to constitutional right" and thus must be set aside as unlawful. 5 U.S.C. § 706(2)(B).

---

[30] *See also* Joey Garrison, *Who are Afrikaners? Trump welcomes white South Africans as other refugees are halted*, USA TODAY (May 10, 2025), https://www.usatoday.com/story/news/politics/2025/05/10/afrikaner-refugees-trump-welcoming-white-south-africans/83557827007/

[31] Gold & Haberman, *supra* at 33 n.22.

### 2.    The termination is contrary to constitutional power.

Based exclusively on Secretary Noem's determination of what is in the "national interest," the termination of Haiti's TPS designation is also unlawful because it is "contrary to constitutional … power." 5 U.S.C. § 706(2)(B).

The Constitution vests the federal government with three distinct powers—legislative, executive, and judicial—each of which is to be exercised exclusively by its associated branch. *See Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 472 (2001) (legislative power); *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 496–97 (2010) (executive power); *Stern v. Marshall*, 564 U.S. 462, 484 (2011) (judicial power). It necessarily violates this separation of powers when Congress delegates to another branch its exclusive authority to exercise "legislative power." *Whitman*, 531 U.S. at 472.

A delegation of legislative power must satisfy the "intelligible principle" test, which requires Congress to "lay down by legislative act an intelligible principle to which the person or body authorized to" exercise discretion "is directed to conform." *J. W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 409 (1928). "Congress must set forth standards 'sufficiently definite and precise to enable Congress, the courts, and the public to ascertain' whether Congress's guidance has been followed." *Gundy v. United States*, 588 U.S. 128, 158 (2019). Only *after* "Congress ha[s] made all the relevant policy decisions" (*id.* at 163*),* may an executive agency "determine specific facts" and "fill up the details under the general provisions made by the Legislature." *Panama Refin. Co. v. Ryan*, 293 U.S. 388, 426 (1935) (internal quotation marks omitted).

Legislation reaches the limit of what the Constitution permits where it directs the President or an agency to determine what course of action is in the interest of "public safety" (*Touby v. United States*, 500 U.S. 160, 163-65 (1991)), or—most especially—the "public interest." *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 225–26 (1943) (FCC's power to regulate airwaves); *N.Y. Cent. Sec. Corp. v. United States*, 287 U.S. 12, 24–25 (1932) (ICC's power to approve railroad consolidations). But in each case where broad delegations at the outer limit are permitted, the context provided by the statute, its declared aims, and a body of case law define the contours of what is meant by those terms. And these broad delegations are deemed acceptable because they come attended by more particular factors that the executive is instructed to consider. *See, e.g., Touby*, 500 U.S. at 166 (pursuit of "public safety" based on determination of a drug's "history and current pattern of abuse" and the "'scope, duration, and significance of [that] abuse.'").

The Secretary's delegated authority to terminate a TPS designation based on her own personal assessment of what is in "the national interest of the United States" lacks any guiding intelligible principle. 8 U.S.C. § 1254a(b)(1)(C). The Secretary admits that "'[n]ational interest' is an expansive standard that may encompass an array of broad considerations." 90 Fed. Reg. at 28762. Indeed, it is so broad and admittedly undefined that "the scope appears to be essentially unlimited." *Perkins Coie LLP v. U.S. Dep't of Just.*, --- F. Supp. 3d ---, 2025 WL 1276857, at *21 (D.D.C. 2025), *appeal docketed*, No. 25-5241 (D.C. Cir. July 2, 2025). "National interest" in the immigration context could be manipulated to capture anything the DHS Secretary personally thinks important and good for the

38

country, even if legally or constitutionally dubious. The DHS Secretary cannot remedy this unlawful delegation "by adopting … a limiting construction of the statute." *Whitman*, 531 U.S. at 472. Rather, it is the exclusive role of Congress both to define "national interest" and to specify what acts, standards, and conditions are relevant to its assessment. *See id.*; *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529–30 (1935); *Panama Refin. Co.*, 293 U.S. at 421. Otherwise, it is handing the executive a blank check.

Cases previously relied upon by Secretary Noem to defend her actions do not show otherwise. The Supreme Court in *Trump v. Hawaii* declined to squarely decide whether § 1182(f) of the Immigration and Nationality Act presented a justiciability problem where it held that the President had, in any event, satisfied any standard that could be applied by extensive factfinding and national security assessments. 585 U.S. at 684–86. And the Court of Appeals cases she has cited—*Zhu v. Gonzales*, 411 F.3d 292 (D.C. Cir. 2005), and *Poursina v. U.S. Citizenship & Immigr. Servs.*, 936 F.3d 868 (9th Cir. 2019)— actually confirm the standardless nature of "national interest." *Zhu* "assum[ed] for the sake of the argument that the 'national interest' is a manageable legal standard" but acknowledged that it left the Attorney General "unfettered by any statutory standard whatsoever" before disposing of the case on a separate and here inapposite basis. 411 F.3d at 295. *Poursina* recognized that "invocation of the 'national interest' … lacks a judicially manageable standard of review" but, following *Zhu*, decided that a statute's provision that the Attorney General "may" waive certain requirements in the "national interest" completely immunized his decision from judicial review. 936 F.3d at 871–72.

39

Neither case presented the constitutional question of excessive delegation.

And to the extent that delegation was implicated, those decisions' language equating the breadth of agency discretion in issuing legally binding decisions to the freedom of Congressional debate under the Speech and Debate Clause (c*f. Zhu*, 411 F.3d at 295; *Poursina*, 936 F.3d at 872) cannot be reconciled with our separations-of-powers doctrine. *See generally FCC v. Consumers' Rsch.*, 145 S. Ct. 2482, 2496–97, 2511 (2025) (linking nondelegation and separation of powers). It cannot be that the DHS Secretary is as unconstrained in making a decision implicating the rights of individuals as a Representative is in making a speech on the floor of the House. Neither *Zhu* nor *Poursina* directly addresses nondelegation concerns in a secretary's unilateral proclamation of the "national interest," but each errs in thinking that Congress may bestow unbounded discretion on an executive officer by use of the term "national interest." That does not comport with the nondelegation doctrine.

To delegate discretionary authority for an officer to act in the "national interest" is, furthermore, a tautology. Congress and the Executive, creations of the Constitution, derive their powers from the sovereignty of the people for the purpose of acting in their interest. *United States v. Vaello Madero*, 596 U.S. 159, 185 (2022) (Gorsuch, J. concurring) ("In this country, the federal government derives its powers directly from the sovereign people, *McCulloch v. Maryland*, 4 Wheat. 316, 404–05 (1819), and is empowered to act only in accord with the terms of the written Constitution the people have approved, *Marbury v. Madison*, 1 Cranch 137, 176–77 (1803)." (citation modified)). And subordinate executive

officers derive their authority solely from the two political branches—from the statutes of Congress and the authority of the President to enforce them. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("It is axiomatic that an administrative agency's power . . . is limited to the authority granted by Congress."); *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 203 (2020) ("Under our Constitution, the 'executive Power'—all of it—is 'vested in a President[.]'"). Therefore, everything that Government officials do is, presumptively and by design, in the "national interest."

But it is Congress's responsibility to define more particularly, in the context of any legislation, what acts, standards, and conditions for action further that national interest. *See Whitman*, 531 U.S. at 472; *Schechter Poultry*, 295 U.S. at 529–30; *Panama Refin. Co.*, 293 U.S. at 421. Where it does not, it fails to provide any more guidance than what an official's oath requires, thereby handing the executive a blank check.

Insofar as it gives the Secretary of Homeland Security unfettered discretion to determine what is in the "national interest" (8 U.S.C. § 1254a(b)(1)(C)), the TPS statute violates the nondelegation doctrine. Inasmuch as Secretary Noem's termination of Haiti's TPS designation in particular rests entirely on her uncabined determination of what is in the "national interest" (90 Fed. Reg. at 28762), the termination is "contrary to constitutional … power" and must therefore be set aside as unlawful. 5 U.S.C. § 706(2)(B).

## II.    Plaintiffs will suffer irreparable harm absent a stay.

Denial of a stay would inflict irreparable harm, even on the assumption that the termination does not take effect until February 3, 2026. *See supra* at 2 n.3. If the Court does not postpone the effective date of the termination pending a final decision on the merits,

Plaintiffs will suffer injuries that are "certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief to prevent irreparable harm." *League of Women Voters v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (citation modified). In fact, the injuries would be "beyond remediation." *Id.* at 8.

Unless the termination is stayed, Plaintiffs will soon face deportation to a country where violence and human-rights abuse are pervasive while food, housing, and medical care are scarce. *See supra* 13–22; Ex. 1 ¶¶ 4–87. If deported, Plaintiffs' lives will be at risk because Haiti is a place ruled by violent gangs likely to target Plaintiffs; because Plaintiffs would be unable to secure the medical treatment that they need; and because Plaintiffs may be unable to secure employment and thus unable to purchase food regardless whether there is food to be bought. *See* Ex. 2 ¶¶ 7–11; Ex. 3 ¶¶ 5, 7–13; Ex. 4 ¶¶ 3–20; Ex. 5 ¶¶ 2–31; Ex. 6 ¶¶ 8–20. And even if Plaintiffs do not die upon their return, they will be torn from their families. *See* Ex. 5 ¶¶ 3, 20–22. Indeed, Plaintiffs might be separated from their families even if not deported because they will be subject to immediate, indefinite detention, which is itself "the sort of actual and imminent injur[y] that constitute[s] irreparable harm." *Aracely R. v. Nielsen*, 319 F. Supp. 3d 110, 155 (D.D.C. 2018) (collecting cases). And even if not detained, Plaintiffs will lose their right to work in the United States and thus their ability to support themselves, their families, and others. *See* Ex. 3 ¶ 5; Ex. Ex. 5 ¶ 24; Ex. 6 ¶¶ 8, 9, 15.

Simply put, Plaintiffs—who have an important "reliance interest in Haiti maintaining its TPS designation until" lawfully terminated (*HECA*, 2025 WL 1808743, at

*4 (citing *Nat'l TPS All. v. Noem*, 773 F. Supp. 3d 807, 850 (N.D. Cal. 2025) ("*NTPSA*"),

*appeal docketed*, No. 25-2120 (9th Cir. Apr. 2, 2025))—will suffer irreparable injury absent

a stay. In fact, this factor "weighs heavily in favor" of a stay. *Saget*, 375 F. Supp. 3d at 374.

## III.     Postponing the termination is in the public interest.

The public interest favors the preservation of Plaintiffs' constitutional rights, the

violation of which "is always contrary to the public interest." *Perkins Coie LLP*, 2025 WL

1276857, at *49 (internal quotation marks and citation omitted). The same is true of

enforcing the procedural obligations of administrative agencies. "There is a substantial

public interest in having governmental agencies abide by the federal laws that govern

their existence and operations." *U.S. Inst. of Peace v. Jackson*, --- F. Supp. 3d ---, 2025 WL

1428641, at *43 (D.D.C. 2025) (citation modified) (quoting *League of Women Voters*, 838 F.3d

at 12), *appeal docketed*, No. 25-5185 (D.C. Cir. May 22, 2025); *accord N.S. v. Hughes*, 335 F.R.D.

337, 355 (D.D.C. 2020) ("The public has a clear interest in seeing that government officials

do not exceed their statutory authority."), *modified on clarification sub nom. N.S. v. Dixon*,

2020 WL 6701076. A stay in this case would advance each of these public interests because

the termination of Haiti's TPS designation is an "arbitrary [and] capricious" action "in

excess of statutory … authority" that was effected "without observance of procedure

required by law" and is "contrary to constitutional right [and] power." 5 U.S.C. §

706(2)(A)–(D).

A stay would advance the public interest in other ways too.

Ineligible for public assistance (*see* 8 U.S.C. § 1254a(f)(2)), TPS holders are

employed at high rates. "TPS holders work in frontline jobs, hospitality, delivery,

customer service, retail, restaurants, transportation, construction, factories, and manufacturing, among many other professional fields." *NTPSA*, 773 F. Supp. 3d at 840. Their labor is critical to many local economies. For example, Haitian TPS holders have helped power Springfield, Ohio's economic recovery, enabling employers to fill jobs and meet demand that they otherwise could not.[32] Termination of Haiti's TPS designation, and the corresponding end to Haitian TPS holders' work authorization, will disrupt and depress the economy in Springfield and the many other communities around the country where Haitian TPS holders have settled. *Cf.* 773 F. Supp. 3d at 841–42 ("The cost to companies to replace laid-off TPS employees could be as high as $1.3 billion.").

Once Haitian TPS holders lose work authorization, they will be unable to support themselves or their families. *See* Ex. 3 ¶ 5; Ex. Ex. 5 ¶ 24; Ex. 6 ¶¶ 8, 9, 15. Consequently, as the Northern District of California recognized when postponing the Secretary's premature termination of Venezuela's TPS designation, "if TPS holders no longer have jobs, they or their families may need to seek public assistance." *NTPSA*, 773 F. Supp. 3d at 840. And "[w]ithout jobs, TPS holders and their families would also lose employer-sponsored health insurance, which would likely increase health care expenditures for local governments." *Id.* The financial burden on states and localities would be compounded by a simultaneous loss of tax revenues. "In New York," for example,

> TPS households earned $2.3 billion in income, paid $348.9 million in federal taxes, $305.5 million in state and local taxes, and also contributed $1.6 billion in spending

---

[32] Miriam Jordan, Why Thousands of Haitians Have Settled in Springfield, Ohio, N.Y. TIMES (Sept. 14, 2024), https://www.nytimes.com/2024/09/14/us/haitian-migrants-springfield-ohio.html.

power. Moreover, at least 41 percent of TPS households are homeowners and pay taxes on property having a total value of approximately $19 billion.

*Id.* at 841 (internal quotation marks omitted). [33] In short, unless postponed, the termination of Haiti's TPS designation will have an adverse "economic impact[] on the United States and the communities where the TPS holders currently live." *Id.*

But premature termination of Haiti's TPS designation would also inflict non-economic harm on the communities where TPS holders live. Premature termination of Haiti's TPS designation would also adversely affect public safety. "Fears of detention and deportation cause undocumented immigrants to forego medical care, such as diagnostic testing and vaccinations, which increases health risks to the broader community." *NTPSA*, 773 F. Supp. 3d at 842. Moreover, "immigrants without legal status are less likely to report crimes or testify in court, reducing public safety and making effective law enforcement more difficult." *Id.*

Thus, the public interest, strongly favors postponement of the termination.

The government, by contrast, cannot identify any harm that a stay would inflict. Indeed, "the government 'cannot suffer harm from [a stay] that merely ends an unlawful practice or reads a statute as required.'" *Harris v. Bessent*, 775 F. Supp. 3d 86, 100 (D.D.C. 2025) (citation omitted); *accord N.S.*, 335 F.R.D. at 355.

## CONCLUSION

The Court should stay the termination pursuant to 5 U.S.C. § 705.

---

[33]  *See also* American Immigration Counsel, The Contributions of Temporary Protected Status Holders to the U.S. Economy (Sept. 2023).

Dated: August 20, 2025

Respectfully submitted,

/s/ Geoffrey M. Pipoly

Geoffrey M. Pipoly

Ira J. Kurzban
Kevin Gregg
KURZBAN, KURZBAN, TETZELI & PRATT, P.A.
131 Madeira Ave.
Coral Gables, FL 33134
Phone: (305) 444-0060
ira@kktplaw.com
kgregg@kktplaw.com

Sejal Zota
JUST FUTURES LAW
1629 K Street N.W., Suite 300
Washington, DC 20006
Phone: (617) 812-2822
sejal@justfutureslaw.org

Raymond Audain*
GISKAN SOLOTAROFF & ANDERSON LLP
1 Rockefeller Plaza, 8th Floor
New York, NY 10020
Phone: (646) 290-6249

*  Application for *pro hac vice*
   admission forthcoming

Andrew Tauber (D.C. Bar No. 495980)
Sarah Levine Hartley*
   (D.C. Bar No. 90002370)
BRYAN CAVE LEIGHTON PAISNER, LLP
1155 F. Street NW, Ste. 700
Washington, D.C. 20004
Phone: (202)-508-6200
andrew.tauber@bclplaw.com
sarah.hartley@bclplaw.com

Geoffrey M. Pipoly
Steven G. Trubac*
Alexa Thein
Madisen Hursey
BRYAN CAVE LEIGHTON PAISNER, LLP
161 N. Clark Street, Ste. 4300
Chicago, IL 60601
Phone: (312) 602-5000
geoff.pipoly@bclplaw.com
alexa.thein@bclplaw.com
madisen.hursey@bclplaw.com

Matthew Stanford
BRYAN CAVE LEIGHTON PAISNER, LLP
2 N. Central Ave., Ste. 2100
Phoenix, AZ 85004
Phone: (602) 364-7000
matt.stanford@bclplaw.com

*Attorneys for Plaintiffs*

46

## CERTIFICATE OF SERVICE

I hereby certify that on this day the foregoing document was filed with the Court's electronic filing system. I hereby further certify that, no later than August 21, 2025, the foregoing document also will be sent via certified mail to the Defendants at the following addresses:

Donald J. Trump
President of the United States
1600 Pennsylvania Avenue, NW
Washington, DC 20500

U.S. Department of Homeland Security
c/o Office of the General Counsel
245 Murray Lane, SW Mail Stop 0485
Washington, DC 20525-0485

Kristi Lynn Arnold Noem,
Secretary of Homeland Security
c/o Office of the General Counsel
U.S. Department of Homeland Security
245 Murray Lane, SW Mail Stop 0485
Washington, DC 20525-0485

United States of America
c/o Pamela Jo Bondi U.S. Attorney
General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

United States of America
c/o U.S. Attorney for the District
of Columbia
601 D. Street NW
Washington, DC 20579

I hereby further certify that on August 20, 2025, true and correct copies of the foregoing document were emailed to the following attorneys at the Office of Immigration Litigation, U.S. Department of Justice, each of whom has previously appeared behalf of defendants in *HECA v. Trump*, No. 1:25-cv-1464 (E.D.N.Y.), which also addressed termination of Haiti's TPS designation:

Amanda Saylor                    amanda.b.saylor@usdoj.gov

Anna Dichter                     anna.l.dichter@usdoj.gov

47

Catherine Ross                          catherine.ross@usdoj.gov

Eric Michael Snyderman                  eric.m.snyderman@usdoj.gov

Lauren E. Bryant                        lauren.e.bryant@usdoj.gov

/s/ Geoffrey M. Pipoly
Geoffrey M. Pipoly

*Counsel for Plaintiffs*

48