## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

No. 1: 25-cv-2471

**FRITZ EMMANUEL LESLY MIOT; RUDOLPH CIVIL; MARLENE GAIL NOBLE; MARICA MERLINE LAGUERRE; and VILBRUN DORSAINVIL,**

        *Plaintiffs*,

v.

**DONALD J. TRUMP, President of the United States of America; UNITED STATES OF AMERICA; THE DEPARTMENT OF HOMELAND SECURITY; and KRISTI NOEM, Secretary of Homeland Security,**

        *Defendants*.

**BRIEF OF *AMICI CURIAE* AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS, SERVICE EMPLOYEES INTERNATIONAL UNION, AMERICAN FEDERATION OF TEACHERS, UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, UNITE HERE, NATIONAL NURSES UNITED, INTERNATIONAL UNION OF ELECTRICAL WORKERS-COMMUNICATIONS WORKERS OF AMERICA, AND INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS IN SUPPORT OF PLAINTIFFS' MOTION FOR A STAY UNDER 5 U.S.C. § 705**

## TABLE OF CONTENTS

Page(s)

INTEREST OF AMICI CURIAE ............................................................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT .............................................................. 3

ARGUMENT ......................................................................................................................... 6

I.     The INA Does Not Authorize DHS to Terminate s TPS Designation By Relying Solely on "National Interest" Considerations Divorced from Country Conditions in Haiti .......... 6

II.    DHS's Decision to Terminate Haiti's TPS Designation Will Harm, Not Help, U.S. Workers ...................................................................................................................... 11

CONCLUSION .................................................................................................................... 21

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Chaplaincy of Full Gospel Churches v. England*,

    454 F.3d 290 (D.C. Cir. 2006) ........................................................................ 12

*Cuomo v. U.S. Nuclear Regul. Comm'n*,

    772 F.2d 972 (D.C. Cir. 1985) ........................................................................ 12

*FCC v. Fox Television Stations, Inc.*,

    556 U.S. 502 (2009) ....................................................................................... 10

*Haitian Evangelical Clergy Ass'n v. Trump*,

    No. 25-cv-1464, 2025 WL 1808743 (E.D.N.Y. July 1, 2025) ....................... 16

*Kingdomware Techs., Inc. v. United States*,

    579 U.S. 162  (2016) ................................................................................... 7, 8

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,

    463 U.S. 29 (1983) ...................................................................................... 5, 6

**Statutes**

5 U.S.C. § 705 ...................................................................................................... 12, 21

8 U.S.C. § 1254a(b)(1) ......................................................................................... 8, 9

8 U.S.C. § 1254a(b)(1)(A) ...................................................................................... 9

8 U.S.C. § 1254a(b)(1)(B) ...................................................................................... 9

8 U.S.C. § 1254a(b)(1)(C) ........................................................................... 4, 5, 9, 10

8 U.S.C. § 1254a(b)(3)(A) ..................................................................................... 7, 8

8 U.S.C. § 1254a(b)(3)(B) ..................................................................................... 5, 7

8 U.S.C. § 1254a(b)(3)(C) ....................................................................................... 7

**Administrative Materials**

DHS, "Extension and Redesignation of Haiti for Temporary Protected Status,"
89 Fed. Reg. 54484 (July 1, 2024) ................................................................................ 4, 10

DHS, "Partial Vacatur of 2024 Temporary Protected Status Decision for Haiti,"
90 Fed. Reg. 10511 (Feb. 24, 2025) ........................................................................... 16

DHS, "Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans,"
90 Fed. Reg. 13611 (Mar. 25, 2025) ........................................................................... 13

DHS, "Termination of the Designation of Haiti for Temporary Protected Status,"
90 Fed. Reg. 28760  (July 1, 2025) ................................................................ 4, 5, 6, 8, 9, 12

**Miscellaneous**

"Condition," Merriam-Webster.com Dictionary, https://www.merriam-
webster.com/dictionary/condition .................................................................................. 8

DHS, Press Release, "DHS Terminates Haiti TPS, Encourages Haitians to Obtain Lawful
Status," (June 27, 2025), https://www.dhs.gov/news/2025/06/27/dhs-terminates-haiti-tps-
encourages-haitians-obtain-lawful-status ...................................................................... 11

Beatrice Dain & Jeanne Batalova, "Haitian Immigrants in the United States," Migration Policy
Institute (Nov. 8, 2023), https://www.migrationpolicy.org/article/haitian-immigrants-united-
states-2022 .................................................................................................................... 14

Cassandra Zimmer, "The U.S. Cut Off a Million TPS Holders. Here's Why That's Everyone
Else's Opportunity," Niskanen Center (July 30, 2025), https://www.niskanencenter.org/the-u-
s-cut-off-a-million-tps-holders-heres-why-thats-everyone-elses-opportunity ...................... 13

Dee Gill, "Codifying the Nursing Home Industry's Elusive, Alarming Turnover Rates," UCLA
Anderson Rev. (2021), https://anderson-review.ucla.edu/codifying-the-nursing-home-
industryselusive-alarming-turnover-rates/ ......................................................................... 15

Donnelle Eller, "Beyond Ottumwa: Thousands of Iowa, U.S. Meatpacking Jobs at Risk in
Migrant Crackdown," Des Moines Register (Aug. 11, 2025),
https://www.desmoinesregister.com/story/money/agriculture/2025/08/11/trump-crackdown-
on-immigrants-could-cost-meatpackers-20-of-workers-ice/85441314007 ........................... 19

Letter from Katie Smith Sloan, President & CEO of LeadingAge, to DHS Secretary Kristi Noem
(Apr. 30, 2025), *available at* https://leadingage.org/wp-
content/uploads/2025/04/LeadingAge-to-DHS-re-TPS-and-Parole-4.30.25.pdf .................. 16

Simon Rios, "As Legal Status is Set to End for Many Haitians, Mass. Health Care Sector Braces
for Staffing Shortages," WBUR (Aug. 7, 2025),
https://www.wbur.org/news/2025/08/07/haitians-tps-massachusetts-trump-health-care ....... 17

Steve Eder, Danielle Ivory & Marcela Valdes, *The Hidden Truth Linking the Broken Border to
Your Online Shopping Cart*, N.Y. Times (Nov. 17, 2024),
https://www.nytimes.com/2024/11/17/us/immigration-undocumented-migrants-jobs.html .. 18

## INTEREST OF AMICI CURIAE[1]

The **American Federation of Labor & Congress of Industrial Organizations ("AFL-CIO")** is a federation of 63 national and international labor organizations with a total membership of over 15 million working men and women who are employed in every sector of this country.  All seven other *amici* are labor organizations affiliated with the AFL-CIO.

The **Service Employees International Union ("SEIU")** is a labor organization of approximately two million members who work in the healthcare industry, state and local government, and in property service industries, such as janitors, security officers, airport workers, retail, distribution, laundry, and fast food workers, and adjunct professors, throughout the United States, Canada, and Puerto Rico.  SEIU is the largest health care union in the United States with 1 million members nationwide, with its members working in hospitals, ambulatory care centers, off-site provider-based clinics, nursing homes and home care settings.  Insofar as thousands of Haitians with Temporary Protected Status ("TPS") are employed in the healthcare industry, the decision taken by the U.S. Department of Homeland Security ("DHS") to terminate the TPS designation for Haiti would harm SEIU by causing it to lose members and by deteriorating working conditions for other members.

The **American Federation of Teachers ("AFT")** is a labor union that represents approximately 1.8 million members across the United States who provide essential services in education, healthcare, and the public sector.  Many AFT members are foreign-born, including those authorized to work in the U.S. through the TPS program for Haitian nationals.  These

---

[1] *Amici* certify that no counsel for a party authored this brief in whole or in part; and that no person other than these *amici* made a monetary contribution to its preparation or submission.

workers are public servants. They teach in our classrooms, care for patients, and serve our communities. The AFT is greatly concerned about the harmful impact that ending Haitian TPS will have on its members with Haitian TPS, their families, colleagues, and the communities they serve.

The **United Food and Commercial Workers International Union ("UFCW")** is a labor union that represents over 1.2 million people across the United States, Canada and Puerto Rico. In the United States and Puerto Rico, UFCW represents over 900,000 workers. Many UFCW members work in the meatpacking and food processing industries in the United States, and a significant number of Haitian TPS holders are among their ranks.

**UNITE HERE** is an international labor union that primarily represents workers in the hotels, casino gaming and food service industries, and has approximately 270,000 members in the United States. Service jobs in the hospitality industry attract new immigrants as they arrive and seek work opportunities in United States. As a result, UNITE HERE's membership includes many immigrants who are temporarily authorized to work in the United States, including through the TPS program. Haitian TPS holders make up a significant number of members in locals representing workers in Florida, New Orleans, Atlantic City, and New York City. Those members and the employees who work with them will be impacted by the termination of Haiti's TPS program.

**National Nurses United ("NNU")** is a labor union that represents 250,000 registered nurses ("RNs") in the United States. NNU's members work in acute-care hospitals and other health care facilities across the nation. NNU's RN members work side-by-side with a wide variety of ancillary health care workers including certified nursing assistants, licensed vocational nurses, technicians, and other support staff, among whom Haitian TPS holders are well

represented.  NNU will be harmed by DHS's termination decision because the abrupt departure of these valued coworkers will exacerbate the workload faced by already understaffed and overworked RNs, particularly in geographies such as Florida and New York.

The **International Union of Electrical Workers-Communications Workers of America ("IUE-CWA")** is the Industrial Division of the Communications Workers of America ("CWA").  The Union represents 40,000 workers across the country in a wide range of manufacturing industries.  IUE-CWA represents employees in at least one factory in the Mid-Atlantic where a significant number of members are Haitian TPS holders.  IUE-CWA's bargaining units across the nation have already been harmed by DHS's decision to abruptly terminate parole programs earlier this year, leading to sizable discharges in a field already facing a workforce shortage.  This situation will be exacerbated if Haitian TPS holders are also compelled to exit the workforce.

The **International Union of Bricklayers and Allied Craftworkers ("BAC")** represents 70,000 workers in the masonry trades across the United States and Canada. These skilled craftworkers include bricklayers, stone and marble masons, cement masons, plasterers, tilesetters, terrazzo and mosaic workers, and pointers/cleaners/caulkers. BAC's industry and membership include Haitian TPS holders.

## INTRODUCTION AND SUMMARY OF ARGUMENT

*Amici* are the AFL-CIO, America's largest federation of labor unions, together with seven of the AFL-CIO's affiliated unions, collectively representing millions of workers across a wide spectrum of industries, including healthcare, education, manufacturing, meatpacking, hospitality, and construction.  In each of these sectors, our hardworking membership is comprised of

American citizens and non-citizens alike, who work together to make this country run.

Prominent among our non-citizen members are thousands of TPS holders from Haiti.

Some of these Haitian TPS holders have been employment-authorized incident to their

status for 15 years, following Haiti's initial designation in the aftermath of the destructive 2010

earthquake that took over a hundred thousand lives.  Others have arrived more recently as a

result of what DHS in 2024 called "simultaneous economic, security, political, and health crises"

following the July 2021 assassination of President Jovenel Moise—crises that have left the

country virtually ungovernable over the last four years.  DHS, "Extension and Redesignation of

Haiti for Temporary Protected Status," 89 Fed. Reg. 54484, 54487 (July 1, 2024).  All are valued

members of our unions who have offered their considerable skills to professions that provide

essential services to the public.  And—given the "extraordinary and temporary" conditions

prevailing in Haiti today, where gangs have taken the place of the government, over half of the

country suffers from food insecurity, and outbreaks of preventable diseases such as cholera have

become commonplace—none can "return[] to [their home country] in safety." 8 U.S.C.

§ 1254a(b)(1)(C).

Although DHS has endeavored to terminate Haiti's TPS designation, it does not appear to

disagree with this basic premise.  Indeed, the Department finds that "gang violence in Haiti

persists as armed groups operate with impunity, enabled by a weak or effectively absent central

government," cites reports that confirm that "Haiti is in the grip of severe humanitarian and

human rights crisis," and concludes—with marked understatement—that "the current situation in

Haiti is concerning."  DHS, "Termination of the Designation of Haiti for Temporary Protected

Status," 90 Fed. Reg. 28760, 28763 (July 1, 2025) ("Termination Notice").  Accordingly, DHS

did not—and could not—find that Haiti "no longer continues to meet the conditions for

designation" under the TPS statute, a threshold requirement for any termination decision.  8 U.S.C. § 1254a(b)(3)(B).

Instead, DHS hung its hat on statutory language stating that a country may not be *designated* on the grounds of "extraordinary and temporary conditions" if the Secretary of Homeland Security "finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States." 8 U.S.C. § 1254a(b)(1)(C).  DHS then concluded that Haiti's TPS designation should be terminated on these "national interest" grounds alone, relying on anecdotal, cherry-picked evidence about Haitian nationals committing crimes in the United States (with no indication that they were ever TPS holders) and a smattering of unsupported commentary about TPS being a "pull factor" for additional migration.  90 Fed. Reg. at 28763–64.

Plaintiffs have met their burden to demonstrate that this manner of proceeding is contrary to law and arbitrary and capricious.  The best reading of the TPS statute requires DHS to base any decisions concerning the termination or extension of TPS designations on a review of in-country conditions concerning the humanitarian situation in the designated foreign state, not solely on a malleable consideration of the "national interest."  That was not done here.  And, though the factors that could potentially be incorporated into a "national interest" analysis are indeed broad, DHS must nevertheless engage in reasoned decisionmaking under the Administrative Procedure Act ("APA").  It thus cannot "entirely fail[] to consider an important aspect of the problem, offer[] an explanation for the decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463

U.S. 29, 43 (1983). As Plaintiffs demonstrate in their Motion, ECF No. 26 at 41–43, the Termination Notice flunks this test.

*Amici* write primarily to highlight one particular aspect of the Termination Notice that underscores its arbitrariness—its deficient treatment of the workforce impact of DHS's actions— and to emphasize that a stay of DHS's decision is in the public interest. Though Secretary Noem purported to consider—among other issues—"economic considerations" including "adverse effects on U.S. workers" in making her "national interest" determination, 90 Fed. Reg. at 28762, the Termination Notice lacks *any* real-world information on the workforce impact that removing hundreds of thousands of work-authorized Haitian TPS holders will have on industries that are core to our Nation's economic health.

Had the Secretary deigned to engage in any fact-finding to support her unreasoned conclusion, she would have discovered that, rather than protecting U.S. workers, mass layoffs of Haitian TPS holders will exacerbate labor shortages, undermine U.S. workers' terms and conditions of employment by requiring them to work more hours, and deteriorate the quality of services for patients and consumers. Thus, her apparent conclusion that terminating Haiti's TPS designation would serve the "national interest" because of its impact on the U.S. workforce bears all the hallmarks of arbitrariness set forth in *State Farm*. Instead, the public interest, including that of America's workers, weighs heavily in favor of a stay of agency action.

## ARGUMENT

I. **The INA Does Not Authorize DHS to Terminate s TPS Designation By Relying Solely on "National Interest" Considerations Divorced from Country Conditions in Haiti**

In Part II, *infra*, *amici* will discuss the baleful impact that the termination of Haiti's TPS designation has on U.S. workers—especially when viewed in the context of other DHS actions

leading to mass terminations of other categories of employment-authorized non-citizens—and demonstrate that permitting this action to go into effect is contrary to the public interest. Before doing so, however, *amici* wish to clarify a key point. As American labor unions representing millions of workers across the country, *amici* wholeheartedly agree that the effect of immigration policies on American workers is a valid—indeed, a crucial—factor that must be considered in an assessment of the "national interest." But *amici* do not mean to imply that the decision to terminate or extend a TPS designation should be made on "national interest" grounds *alone*. Instead, the TPS statute required Secretary Noem to make findings as to whether the "conditions for designation"—a statutory phrase best read to refer to country conditions in Haiti—continued to prevent Haitian TPS holders from returning safely to their homeland. She did not meaningfully do so here.

The TPS statute's provisions on review, termination, and extension of designations imposes on the Secretary a duty to evaluate each county's "conditions for designation." First, "[a]t least 60 days before end of [any] period of designation," the Secretary "after consultation with appropriate agencies of the Government, *shall* review the conditions in the foreign state . . . and *shall* determine whether the conditions for such designation under this subsection continue to be met." 8 U.S.C. § 1254a(b)(3)(A) (emphasis added). If the Secretary determines that the foreign state "no longer continues to meet the conditions for designation," she "*shall* terminate the designation by publishing notice in the Federal Register." *Id.* § 1254a(b)(3)(B). If the Secretary does not determine that the foreign state "no longer meets the conditions for designation," then the period of designation is extended for a minimum of an additional 6 months. *Id.* § 1254a(b)(3)(C). Because, "[u]nlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement," *Kingdomware Techs., Inc. v. United States*, 579

7

U.S. 162, 171 (2016), it is clear that these requirements are mandatory, not optional.[2]  Thus, the Secretary cannot terminate (or extend) a TPS designation without: (1) reviewing "conditions in the foreign state"; and (2) determining whether "the conditions for designation" continue to exist.

But what, exactly, must the Secretary determine?  Standing alone, "conditions" is reasonably susceptible to two meanings.  On the one hand, a "condition" could mean "something essential to the appearance or occurrence of something else."  "Condition," Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/condition.  Under this reading, implicitly adopted by DHS at 90 Fed. Reg. 28762, both the question of whether "extraordinary and temporary" conditions persist in Haiti and whether permitting Haitian nationals to remain is contrary to the national interest *might* be independently reviewable.

Read in the context of the statute as a whole, however, a more compelling reading emerges.  When used in the plural as it appears every time in statutory text, "conditions" is best read to mean "attendant circumstances," as in "living conditions" or "working conditions." *Id.* For the purposes of the TPS statute, "conditions for designation" would therefore refer to *country conditions* in Haiti.  The periodic review required by 8 U.S.C. § 1254a(b)(3)(A) thus requires the Secretary to, at a minimum, make a determination as to whether the in-country factual predicate for an extension of the TPS designation continues to exist.

This reading flows naturally from the statutory text.  First, the review process expressly requires that the Secretary review "conditions *in* the foreign state."  8 U.S.C. § 1254a(b)(3)(A)

---

[2] The mandatory nature of the review provisions is underscored by the permissive provisions governing new designations, which state that the Secretary "*may* designate any foreign state" for TPS if certain statutory requirements are met, but is not required to do so. 8 U.S.C. § 1254a(b)(1).  "When a statute distinguishes between 'may' and 'shall,' it is generally clear that 'shall' imposes a mandatory duty."  *Kingdomware Techs.*, 579 U.S. at 172.

(emphasis added).  On its face, whether the Secretary "finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest," is not a "condition in the foreign state," nor does it bear any reasonable relationship to any such conditions.[3]  It would be irrational for Congress to require the Secretary to conduct an interagency review of in-country conditions, only to authorize her to terminate a TPS designation based solely on factors that are wholly extraneous to that review.

Moreover, it is clear that all three bases for TPS designation set forth in 8 U.S.C. § 1254a(b)(1) refer expressly to in-country conditions, the continued existence of which is ascertainable following the required periodic review.  *See, e.g., id.* § 1254a(b)(1)(A) (foreign state may be designated if "there is an ongoing armed conflict within the state" that would "pose a serious threat to [the] personal safety" to returning nationals); *id.* § 1254a(b)(1)(B) (foreign state may be designated where "there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a substantial, but temporary, disruption of living conditions," and the country is "unable . . . to handle adequately the return" of its nationals; *id.* § 1254a(b)(1)(C) (referring to "extraordinary and temporary conditions" that prevent that country's nationals "from returning to the state in safety").

Viewed in this light, the Secretary's determination as to the national interest, relying on factors that are far afield from the humanitarian considerations underlying the TPS statute, is arguably not part and parcel of the "conditions for designation" subject to periodic review at all.

---

[3] Indeed, as DHS notes, "'national interest' is an expansive standard that may encompass an array of broad considerations" that have nothing to do with "conditions in the foreign state," including "public safety," "national security," "migration factors (e.g. pull factors)," "immigration policy (e.g. enforcement prerogatives)," and "economic considerations (e.g. adverse effects on U.S. workers, impact on U.S. communities)." 90 Fed. Reg. at 28762.

Rather than a "condition for designation," the "national interest" finding would be an *exception to* initial designation—a safety valve that allows the Secretary to refrain from designating a foreign state for TPS even when "extraordinary and temporary" conditions for designation are present.

Even, however, assuming *arguendo* that "national interest" considerations can play *some* role in the Secretary's decision whether to terminate or extend a TPS designation, relying *solely* on such considerations to the exclusion of whether Haitians can, in fact "return to [Haiti] in safety," 8 U.S.C. § 1254a(b)(1)(C), is at minimum an unexplained departure from established agency practice. Even if the Secretary were correct that she retained discretion to terminate a TPS designation on national interest grounds alone, she failed to "display [any] awareness that [she] is changing position," or articulate "good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). As Plaintiffs note, "the TPS statute has existed for 35 years, but, until this year, no termination of a TPS designation has been justified— much less exclusively justified—on national interest grounds."[4] ECF No. 26 at 40. The Termination Notice departs from this longstanding methodological consensus *sub silentio*, and is thus arbitrary and capricious.

To reiterate—the working conditions and livelihoods of America's workers are paramount to the vitality of our nation, and may properly be considered in any assessment of the

---

[4] While prior extension notices have included boilerplate findings that it is "not contrary to the national interest of the United States to permit Haitian TPS beneficiaries to remain in the United States temporarily," *see e.g.*, 89 Fed. Reg. 54484, 54491 (July 1, 2024), this recitation of the statutory language followed findings that "extraordinary and temporary conditions" continued to justify the extension and redesignation of Haiti. *Amici* are unaware of any Notice before this year that sought to justify termination of a TPS designation on "national interest" grounds alone without making a finding that the "conditions for designation" had ceased to exist.

"national interest." But Plaintiffs are correct that the TPS statute requires that determinations concerning the extension or termination of existing TPS designations be based on in-country conditions in Haiti and findings regarding whether TPS holders can "return[] . . . in safety" to Haiti—finding that were not made by Secretary Noem in the Termination Notice.[5] Thus, they are likely to succeed on the merits of their claims.

## II.    DHS's Decision to Terminate Haiti's TPS Designation Will Harm, Not Help, U.S. Workers

If allowed to take effect, DHS's decision to terminate Haiti's TPS designation will push hundreds of thousands of workers out of the formal labor market. In many sectors crucial to our economy and our society, this will be disastrous for U.S. workers. Many employers will predictably seek to fill this artificial and self-inflicted labor shortage by requiring remaining workers to work mandatory overtime to meet their staffing needs, diminishing U.S. workers' quality of life, and leading to increased occupational injuries. Other employers will simply be unable to maintain a necessary level of production or services. They will thus be compelled to lay off U.S. workers—or even to close down.

---

[5] Several days before the publication of the Termination Notice in the Federal Register, DHS issued a press release declaring that Secretary Noem had "determined that, overall, country conditions have improved to the point where Haitians can return home in safety." The press release quoted an agency spokesman as stating: "The environmental situation in Haiti has improved enough that it is safe for Haitian citizens to return home." DHS, Press Release, "DHS Terminates Haiti TPS, Encourages Haitians to Obtain Lawful Status," (June 27, 2025), https://www.dhs.gov/news/2025/06/27/dhs-terminates-haiti-tps-encourages-haitians-obtain-lawful-status.

The Court will search the Termination Notice in vain for any such determinations. The inexplicable chasm between DHS's public characterization of its decision and the actual basis for that decision further underscores the arbitrariness of the agency's actions.

The Termination Notice does not consider any of these real-world consequences of expelling hundreds of thousands of people from their jobs overnight. Instead, it references purported "adverse effects on U.S. workers" that would occur if Haiti's TPS designation were *extended*, and asserts that the decision to terminate the designation was justified, in part, by "economic considerations." 90 Fed. Reg. at 28762–3. The Termination Notice, however, does not make any factual findings in support of any such determination. Instead, it appears to imply that the mere presence of lawfully-authorized Haitian immigrant workers in the workforce *per se* harms their non-immigrant colleagues. That assumption is baseless and contradicted by a bevy of economic data relating to Haitian immigrants generally, and TPS holders specifically, as well as by *amici*'s experience across a wide variety of sectors of the economy.

This has two implications for this case. First, if Plaintiffs demonstrate a likelihood of success on the merits on any of their statutory and constitutional claims as well as irreparable harm, this Court must weigh whether granting a stay would be in the public interest. *See Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985) (standard for section 705 stay are the same as those that govern the grant of a preliminary injunction); *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (movant must demonstrate that stay "would not substantially injure other interested parties" and "that the public interest would be furthered" by the stay). Preventing harm to other U.S. workers—as well as to the consumers and patients who benefit from Haitian TPS holders' labor—is clearly within the public interest for the purpose of the stay analysis under 5 U.S.C § 705.

And, second, to the extent that any portion of Secretary Noem's "national interest" determination relies on unsubstantiated assertions about harms that would befall U.S. workers as a result of an *extension* of Haiti's TPS designation, such a determination is arbitrary and

capricious in the most literal sense of the term.  It is based on no evidence at all and contradicted by both abundant evidence in the public record and by *amici*'s experiences as the leading representatives of U.S. workers in a whole host of sectors where Haitian TPS holders are employed.

Indeed, what *does* harm U.S. workers are the Administration's unprecedented decisions to remove large numbers of their immigrant colleagues from the workforce, particularly in strategic economic sectors that are experiencing labor shortages.  Just this year, in addition to terminating TPS designations for other countries, including Venezuela, Afghanistan, Cameroon, Nepal, Nicaragua, and Honduras, DHS also rescinded and revoked the parole status and work authorization of hundreds of thousands of individuals who lawfully entered under the Cuba, Haiti, Nicaragua, and Venezuela ("CHNV") parole program.  *See* DHS, "Termination of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans," 90 Fed. Reg. 13611 (Mar. 25, 2025).  All in all, absent judicial intervention, several hundred thousand parolees and over one million TPS holders may lose work authorization in 2025—"a single-year mass expiration unprecedented in the [programs'] history that will reverberate throughout the U.S. labor market."[6]

This mass expiration will touch almost all aspects of our economy and all strata of our workforce.  *Amici* provide the Court with insight regarding four particular sectors—healthcare, hospitality, meatpacking/food processing, and manufacturing.

---

[6] Cassandra Zimmer, "The U.S. Cut Off a Million TPS Holders. Here's Why That's Everyone Else's Opportunity," Niskanen Center (July 30, 2025), https://www.niskanencenter.org/the-u-s-cut-off-a-million-tps-holders-heres-why-thats-everyone-elses-opportunity.

Haitian immigrants work across our nation in a variety of occupations, but have made particular contributions in the healthcare sector.  As of 2021, the 103,000 Haitian healthcare workers comprised the sixth-largest immigrant group in this field,[7] where the demand for labor is high and understaffing and overwork is already the norm.  And, because Haitian immigrants are highly concentrated, with almost 66% residing in just three metropolitan areas—Miami, New York City, and Boston[8]—suddenly removing Haitian TPS holders would have a drastic impact on co-workers' workload and patient care quality.

In the hospital setting, registered nurses who are members of **NNU** work alongside other hospital workers who are vital to the safe delivery of patient care.  If thousands of hospital workers were suddenly unavailable to work because their work authorization was terminated, RNs, their patients, and their communities would be severely impacted.

When the number of ancillary staff such as certified nursing assistants, licensed vocational nurses, technicians, environmental service workers, and food service workers is reduced, then RNs are left to pick up the slack, putting an increased burden on an already understaffed and overworked RN workforce throughout Florida and New York.  Instead of caring for patients, RNs will be forced out of necessity to distribute meal trays, answer phones, perform housekeeping duties, transport patients, and spend additional time assisting patients with daily living activities like bathing, dressing, grooming and toileting that would otherwise be

---

[7] Beatrice Dain & Jeanne Batalova, "Haitian Immigrants in the United States," Migration Policy Institute (Nov. 8, 2023), https://www.migrationpolicy.org/article/haitian-immigrants-united-states-2022.

[8] *Id.*

performed by nursing assistants.  This in turn will lead to extended wait times for emergency room admissions, delayed blood draws, delays in administering medications and in responding to call lights when patients need immediate assistance.

**SEIU** represents a large hospital in Florida and confirms the loss of an estimated 400–500 Haitian TPS holders will exacerbate the number of job vacancies, currently 50 vacancies, created during the pandemic from which the hospital has yet to recover.  The loss of Haitian TPS workers intensifies burdens other workers experience as they cope with these job vacancies and three to-six-month training periods needed to orient new nurses, physician assistants, physician assistants and other health professionals.

The nursing home industry that serves our nation's seniors will be affected even more directly.  Even with Haitian TPS holders present in the workforce, the nursing home industry continues to experience significant challenges, including short-staffing, high turnover, and staff burnout.[9]  In addition to contributing to exacting working conditions for healthcare workers, this leads to negative outcomes for patient care.  Evidently, removing tens of thousands of qualified workers with Haitian TPS from this crucial sector will exacerbate the situation, further overburdening the workers that remain, compromising care for existing patients, and reducing capacity to admit additional patients.

Groups representing the industry—who are often adverse to *amici* on a host of issues—whole-heartedly agree on this point.  For instance, LeadingAge, which represents over 5,400

---

[9] *See* Dee Gill, "Codifying the Nursing Home Industry's Elusive, Alarming Turnover Rates," UCLA Anderson Rev. (2021), https://anderson-review.ucla.edu/codifying-the-nursing-home-industryselusive-alarming-turnover-rates/ ("Averages . . . for turnover at nursing homes are . . . 140.7% for RNs, 114.1% for LPNs, 129.1% for CNAs—because some nursing homes have annual turnover exceeding 300%.").

non-profit senior care providers nationwide, wrote a letter to Secretary Noem in April 2025 emphasizing the effects that the termination of Haiti's TPS designation (together with the termination of the CHNV parole program) would have on their sector.[10]  Canvassing its members, LeadingAge reported that many providers expected to suffer significant job loss.  One senior living community noted a likely loss of 35 employees, including "skilled and difficult to replace staff members such as certified nursing assistants and dietary aides."[11]  In Pennsylvania, another provider reported the likely loss of 30 Haitian employees; for another Virginia provider, that number climbed to 60.[12]  Noting that "some of the affected employees have been in their roles for a decade or more," LeadingAge concluded that "[t]he sudden loss of these individuals risks unsettling care routines, diminishing quality of care, and causing distress among residents who depend on familiar, stable support in their daily lives."[13]

---

[10] Letter from Katie Smith Sloan, President & CEO of LeadingAge, to DHS Secretary Kristi Noem (Apr. 30, 2025), *available at* https://leadingage.org/wp-content/uploads/2025/04/LeadingAge-to-DHS-re-TPS-and-Parole-4.30.25.pdf ("LeadingAge Letter"). At that time, Secretary Noem had issued a "partial vacatur" of DHS 2024 designation of TPS, purporting to shorten the length of that designation from February 2026 to August 2025, DHS, "Partial Vacatur of 2024 Temporary Protected Status Decision for Haiti," 90 Fed. Reg. 10511 (Feb. 24, 2025), but has not yet terminated the designation. As Plaintiffs explain, the "partial vacatur" has now been permanently enjoined. *Haitian Evangelical Clergy Ass'n v. Trump*, No. 25-cv-1464 (BMC), 2025 WL 1808743 (E.D.N.Y. July 1, 2025). All of the points in LeadingAge's letter are equally applicable whether Haiti's TPS designation is terminated in September 2025, as the Termination Notice purported to do in reliance on her now-enjoined "partial vacatur" order, or in February 2026, as would be the case now absent this Court's intervention.

[11] LeadingAge Letter, *supra* n.10.

[12] *Id.*

[13] *Id.*

According to a recent report covering the health sector in Massachusetts, nursing home industry groups estimate that nearly 2,000 caregivers across the state would be discharged due to the termination of Haiti's TPS designation, with some facilities bracing to lose up to 20% of their staff.[14] The loss of these valuable union workers would not only affect patient care. They also affect the terms and conditions of employment of U.S. workers in the bargaining unit, who would be asked to "do more with less" in grueling work environments characterized by unsustainable patient-to-caregiver ratios.

Many Haitian TPS holders are employed in the hospitality sector—a field that has experienced chronic labor shortages. For instance, **UNITE HERE**'s South Florida local reports that Haitian TPS holders are present in all of its bargaining units, with over 100 alone working for concessionaires at the Fort Lauderdale Airport. Following the termination of CHNV parole, a concessionaire reported that it had lost over 20 cooks, over 10 utility workers, and an unspecified number of cashiers, food preparers, and porters due to the mass revocation of CHNV parole. This led to a serious effect on the local union's members, both in the amount of work distributed among them, as well as the chilling effect on members' willingness to organize and assert their rights at work.

The same is true of UNITE HERE's membership in New Orleans, approximately 100 of whom are Haitian TPS holders, largely at one of two major hotels. UNITE HERE estimates that one of these hotels would stand to lose 75% of its housekeeping staff. As a result, remaining workers will be forced to work overtime as well as increase the number of rooms they are

---

[14] Simon Rios, "As Legal Status is Set to End for Many Haitians, Mass. Health Care Sector Braces for Staffing Shortages," WBUR (Aug. 7, 2025), https://www.wbur.org/news/2025/08/07/haitians-tps-massachusetts-trump-health-care.

expected to clean.  Even with overtime, it is unlikely that the remaining workers will be able to handle the excess workload.  If the hotel is unable to meet demand for housekeeping services, it will likely be forced to pause room reservations or severely reduce offering housekeeping services altogether, thus putting it at a major competitive disadvantage in the market.

While CHNV parolees were relatively recent arrivals who were union members for at most 2-3 years, many Haitian TPS holders have been union members for over a decade.  They are among the most senior and experienced workers on the job.  Some are longtime shop stewards or are otherwise regarded as natural leaders among their coworkers.  For instance, Haitian housekeepers have played a strong role in UNITE HERE's ongoing campaigns in New Orleans.  They have led the fight to raise wages at union properties, have led delegations and cafeteria rallies to demand respect from management and better pay, and are currently organizing in a campaign for a new union contract.  The loss of these workers will mean more than just the loss of someone capable of doing the work—it will be the loss of years of experience, acumen, and leadership.

In UNITE HERE's experience, workforce shocks of this magnitude often lead employers to turn to temporary staffing agencies to supply workers.  Such labor agencies, in addition to undermining the wages and working conditions for U.S. workers employed by the hotels by paying substandard wages and benefits, often violate immigration law by hiring undocumented workers.[15]  All in all, UNITE HERE predicts that it will be harmed by a loss of members, subcontracting of work outside the bargaining unit, and harsher working conditions for existing

---

[15] Steve Eder, Danielle Ivory & Marcela Valdes, *The Hidden Truth Linking the Broken Border to Your Online Shopping Cart*, N.Y. Times (Nov. 17, 2024), https://www.nytimes.com/2024/11/17/us/immigration-undocumented-migrants-jobs.html.

members—a scenario that has begun with the termination of CHNV parolees and will exacerbate if there is a wave of terminations of Haitian TPS holders.

In meatpacking, where **UFCW** represents several hundred thousand workers, the effects of DHS's labor market actions also portends to be dire. According to the Meat Institute—the lobby group for meat industry employers—approximately 20% of the country's meat processing workforce stand to lose their jobs as a result of the rescission of CHNV parole and several TPS designations, including that of Haiti.[16]  As a result, meat production is likely to decrease, with the remaining workers expected to shoulder increased workloads to allow companies to keep up with demand.

UFCW can reasonably predict the effect that the loss of Haitian members with TPS will have on its remaining members based on the effects suffered by its bargaining units following the rescission of CHNV parole. UFCW locals surveyed in the Midwest reported over 500 terminations across ten bargaining units in three states with 175 of these occurring in one facility alone. As a result, UFCW-represented plants have implemented enhanced mandatory overtime requirements as companies struggled to keep up with production demands while operating with a reduced workforce. For instance, in one facility, where approximately 130 CHNV parolees were discharged, the company added an entire day to workers' regular work schedules for the entire month of June 2025, compelling them to work six days a week. Short-staffing on the meat line

---

[16] Donnelle Eller, "Beyond Ottumwa: Thousands of Iowa, U.S. Meatpacking Jobs at Risk in Migrant Crackdown," Des Moines Register (Aug. 11, 2025), https://www.desmoinesregister.com/story/money/agriculture/2025/08/11/trump-crackdown-on-immigrants-could-cost-meatpackers-20-of-workers-ice/85441314007. Notably, many of these same workers had been designated as essential during the COVID-19 pandemic, when President Trump invoked the emergency powers of the Defense Production Act to force meatpacking plants to remain open. *Id.*

also means greater safety concerns for workers in an already dangerous industry.  Finally, U.S. workers at other UFCW-represented plants (such as hide producers) that rely on goods processed by CHNV parolees faced reduced hours and layoffs due to the downstream effects of the decrease in production.  The loss of Haitian TPS holders from the meatpacking workforce will only exacerbate these conditions.

Lastly, **IUE-CWA** presents a window into the effect that DHS's termination is likely to have in the manufacturing sector.  IUE-CWA represents approximately 6,000 employees at a home appliance manufacturer in the Midwest.  Even before DHS's decisions to abruptly terminate CHNV parole and the Haiti TPS designation at issue in this case, IUE-CWA reports that this facility had approximately 150 unfilled positions, and had eliminated a shift due to lack of labor.  As a result, the employer announced that it was imposing mandatory overtime on all remaining workers, requiring them to work 9 hours per day, until further notice, in order to meet its production needs.  Following the rescission of CHNV parole, the employer discharged almost 150 employees, causing the Union's other workers to see their working conditions further degraded by the need to meet the company's production needs with an ever-decreasing pool of workers.

As a result of the Termination Notice, IUE-CWA fears that a similar story will unfold at a manufacturing plant in the Mid-Atlantic with over 1,000 employees that produces products for the residential energy market.  Haitian TPS holders are a large part of the workforce at this plant, which is also experiencing a labor shortage and high turnover rates.  Every other week, current bargaining unit employees are compelled to work mandatory overtime.  Bargaining unit employees who are authorized to work through temporary protected status for Haitians are scattered throughout the facility.  If those workers suddenly lose employment authorization, the

20

employer will likely need to reduce production, which could lead to product shortages, price increases, and supply chain disruption for the residential energy market.

In synthesis, DHS's termination of Haiti's TPS designation is but one more action that threatens to generate a mass exodus of qualified, lawful, employment-authorized immigrant workers from the workforce. *Amici*'s experience across a variety of economic sectors demonstrates that this is *not* a boon for U.S. workers or for the unions who represent their interests. First, unions shall lose dedicated worker-leaders whose engagement and solidarity has led to the improvement of working conditions for all. And the secondary effects shall be stark. As a direct result of DHS's actions, nurses will feel pressure to work longer hours to attend to more patients, exacerbating the turnover and burnout that is endemic to the industry. Manufacturing and meatpacking workers will face forced overtime that degrades their quality of life and renders them more susceptible to injury as employers struggle to keep production afloat. Hospitality employers will be incentivized to turn to staffing agencies known to pay substandard wages and benefits to meet their workforce needs.

The public interest thus weighs strongly in favor of a stay of agency action. And, to the extent that workforce considerations played any role in Secretary Noem's determination of where the "national interest" lies, her failure to consider the real-world impact of terminating Haiti's TPS designation on U.S. workers renders it arbitrary and capricious.

## CONCLUSION

The Court should grant Plaintiffs' motion for a stay under Section 705 of the APA, 5 U.S.C. § 705.

Dated: August 27, 2025

Respectfully submitted,

/s/ Matthew Ginsburg
Matthew Ginsburg (DC Bar No. 1001159)
Andrew Lyubarsky* (DC Bar No. 888304116)
AFL-CIO
815 Sixteenth Street, N.W.
Washington, DC 20006
mginsburg@aflcio.org
(202) 637-5397

 *Application to appear pro hac vice
 pending

*Attorneys for Labor Amici*