UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

FRITZ EMMANUEL LESLY MIOT, et al.,

        *Plaintiffs*,

        v.                  No. 1:25-cv-02471-ACR

DONALD J. TRUMP, President of the United States of America, et al.,

        *Defendants*.

**BRIEF OF THE COMMONWEALTH OF MASSACHUSETTS, THE STATES OF CALIFORNIA, NEW YORK, CONNECTICUT, DELAWARE, HAWAI'I, ILLINOIS, MAINE, MARYLAND, MICHIGAN, MINNESOTA, NEW JERSEY, NEVADA, OREGON, RHODE ISLAND, VERMONT, WASHINGTON, AND THE DISTRICT OF COLUMBIA AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS**

ANDREA JOY CAMPBELL
  *Attorney General*
  *Commonwealth of Massachusetts*
Tasha J. Bahal
  *Deputy State Solicitor*
David Rangaviz
  *Assistant Attorney General*
  *Civil Rights Division*
1 Ashburton Pl.
Boston, MA 02108

ROB BONTA
  *Attorney General*
  *State of California*
Michael L. Newman
  *Senior Assistant Attorney General*
Vilma Palma-Solana
  *Supervising Deputy Attorney General*
Annabelle Wilmott
  *Deputy Attorney General*
1515 Clay Street, 21st Floor
Oakland, CA 94612-1499

LETITIA JAMES
  *Attorney General*
  *State of New York*
BARBARA D. UNDERWOOD
  *Solicitor General*
JUDITH N. VALE
  *Deputy Solicitor General*
ZOE LEVINE
    *Special Counsel for Immigrant Justice*
CLELAND B. WELTON II
  *Assistant Solicitor General of Counsel*
28 Liberty Street
New York, NY 10005
(212) 416-6197

*Additional counsel listed on signature page*

# TABLE OF CONTENTS

<div align="right">**Page**</div>

TABLE OF AUTHORITIES ................................................................................... ii

INTRODUCTION ............................................................................................... 1

BACKGROUND AND INTEREST OF AMICI STATES ............................................ 2

ARGUMENT ..................................................................................................... 6

THE PUBLIC INTEREST FAVORS PLAINTIFFS IN THIS IMPORTANT CASE
BECAUSE DEFENDANTS' ACTIONS WOULD INFLICT IRREPARABLE HARM
ON FAMILIES AND ON THE AMICI STATES ...................................................... 6

    A.    Terminating Haiti's TPS Designation Would Separate Families, Devastate
        Children, and Fracture the Amici States' Communities and Schools. ........................ 7

    B.    Terminating Haiti's TPS Designation Would Damage the Amici States'
        Economies and Workforces. ............................................................... 12

    C.    Terminating Haiti's TPS Designation Would Compromise Public Health
        and Increase Health Care Costs. ......................................................... 15

    D.    Terminating Haiti's TPS Designation Would Harm Public Safety. .................... 18

CONCLUSION .................................................................................................. 20

## **TABLE OF AUTHORITIES**

**Cases**                                                                              **Page(s)**

*Baillargeon v. CSX Transp. Corp.*,
    463 F. Supp. 3d 76 (D. Mass. 2020) ........................................................................7

*City & Cnty. of San Francisco v. Trump*,
    897 F.3d 1225 (9th Cir. 2018) ...............................................................................7

*City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*,
    981 F.3d 742 (9th Cir. 2020) .................................................................................7

*City of Philadelphia v. Sessions*,
    280 F. Supp. 3d 579 (E.D. Pa. 2017) .....................................................................16

*Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*,
    512 F.3d 1112 (9th Cir. 2008) ...............................................................................7

*Haitian-Ams. United Inc. v. Trump*,
    No. 1:25-cv-10498 (D. Mass. 2025) .......................................................................5

*Haitian Evangelical Clergy Ass'n v. Trump*,
    No. 25-cv-01464-BMC, 2025 WL 1808743 (E.D.N.Y. July 1, 2025) ................1, 5

*Hernandez v. Sessions*,
    872 F.3d 976 (9th Cir. 2017) .................................................................................6

*Jones v. D.C.*,
    177 F. Supp. 3d 542 (D.D.C. 2016) .......................................................................6

*National Ass'n of Mfrs. v. U.S. Dep't of Homeland Sec.*,
    491 F. Supp. 3d 549(N.D. Cal. 2020) ....................................................................6

*National TPS All. v. Noem*,
    No. 25-cv-1766, 2025 WL 957677 (N.D. Cal. 2025) .............................................6

*National TPS All. v. Noem*,
    No. 25-2120, 2025 WL 2487771 (9th Cir. 2025) ...................................................6

*New York v. Trump*,
    No. 1:17-cv-5228 (E.D.N.Y. 2017) ........................................................................15

*Ramos v. Mayorkas*,
    No. 18-16981, 2023 WL 4363667 (9th Cir. 2023) .................................................3

*Ramos v. Nielsen*,
     336 F. Supp. 3d 1075 (N.D. Cal. 2018) ............................................................... 3, 5

*Ramos v. Wolf*,
     59 F.4th 1010 (9th Cir. 2023) ............................................................................. 3, 5

*Ramos v. Wolf*,
     975 F.3d 872 (9th Cir. 2020) .............................................................................. 3, 5

*Regents of Univ. of Cal. et al. v. United States Dep't of Homeland Sec.*,
     No. 3:17-cv-05211 (N.D. Cal. 2017) ........................................................................16

*Winter v. Natural Res. Def. Council*,
     555 U.S. 7 (2008) ..............................................................................................................6

*World Gym, Inc. v. Baker*,
     474 F. Supp. 3d 426 (D. Mass. 2020) .....................................................................7

**Regulations**                                                                                              **Page(s)**

8 C.F.R.
     § 244.4......................................................................................................................19
     § 244.14....................................................................................................................19

Extension and Redesignation of Haiti for Temporary Protected Status,
     89 Fed. Reg. 54484 (July 1, 2024).....................................................................3, 11

Partial Vacatur of 2024 Temporary Protected Status Decision for Haiti,
     90 Fed. Reg. 10511 (Feb. 24, 2025) ............................................................ 1, 3-4, 8

Termination of the Designation of Haiti for Temporary Protected Status,
     83 Fed. Reg. 2648 (Jan. 18, 2018) ..........................................................................3

Termination of the Designation of Haiti for Temporary Protected Status,
     90 Fed. Reg. 28760 (July 1, 2025)...................................................................1, 4, 8

**Miscellaneous Authorities**                                                                   **Page(s)**

Alejandra Reyes-Velarde, *'Double Disadvantage': These California Workers' Pay Gap
     Is Widest by Far*, CalMatters (July 27, 2023), https://calmatters.org/california-
     divide/2023/07/california-workers-2/ .....................................................................14

Alejandro Portes et al., *The U.S. Health System and Immigration: An Institutional Interpretation* 24 Socio. F. 487 (Sept. 2009) ................................................................. 16-17

Am. Coll. of Obstetricians & Gynecologists, Comm. Op. no. 627, *Health Care for Unauthorized Immigrants*, 125 Obstetrics & Gynecology 755 (Mar. 2015) ................................................................................................................17

Am. Coll. of Obstetricians & Gynecologists, Comm. Statement no. 4, *Health Care for Immigrants*, 141 Obstetrics & Gynecology 427 (2023)........................................................17

Am. Immigr. Council, *The Contributions of Temporary Protected Status Holders to the U.S. Economy* (Sept. 2023), https://www.americanimmigrationcouncil.org/sites/default/files/research/contributionstemporaryprotectedstatus_0923.pdf .......................................................................................13

Am. Immigr. Council, Fact Sheet, *U.S. Citizen Children Impacted by Immigration Enforcement* (June 24, 2021), https://www.americanimmigrationcouncil.org/research/us-citizen-children-impacted-immigration-enforcement ............................................................................................................9

Am. Immigr. Council, *Immigrants in California* (data year 2023), https://map.americanimmigrationcouncil.org/locations/california/ .........................................14

Am. Immigr. Council, *Immigrants in Massachusetts* (data year 2023), https://map.americanimmigrationcouncil.org/locations/massachusetts/................................14

Am. Immigr. Council, *Immigrants in New York* (data year 2023), https://map.americanimmigrationcouncil.org/locations/new-york/.........................................14

Am. Immigr. Council, *Immigrants in the United States* (data year 2023), https://map.americanimmigrationcouncil.org/locations/national/ ..........................................14

Ana Martinez-Donate et al., *Between the Lines: A Mixed-Methods Study on the Impacts of Parental Deportation on the Health and Well-Being of U.S. Citizen Children*, 9 J. Migration & Health 1 (2024) ...............................................................................................11

Beatrice Dain & Jeanne Batalova, *Haitian Immigrants in the United States*, Migration Pol'y Inst. (Nov. 8, 2023), https://www.migrationpolicy.org/article/haitian-immigrants-united-states................................................................................................13, 15

Br. for States of N.Y. et al., *Haitian Evangelical Clergy Ass'n v. Trump*, No. 25-cv-01464-BMC (E.D.N.Y. April 28, 2025), ECF No. 43 .............................................................5

Br. of the Commonwealth of Mass. et al., *Haitian-Ams. United Inc. v. Trump*, No. 1:25-cv-10498 (D. Mass. Mar. 26, 2025), ECF No. 33......................................................................5

Br. for the States of Cal. et al., *National TPS All. v. Noem*, No. 25-cv-1766 (N.D. Cal. Mar. 7, 2025), ECF No. 62 ...................................................................................................5

Br. for States of N.Y. et al., *Ramos v. Wolf*, 59 F.4th 1010 (9th Cir. 2023) (No. 18-16981), ECF No. 168 .............................................................................................................5

Br. for States of Cal. et al., *Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020) (No. 18-16981), ECF No. 35 .................................................................................................................5

Br. of Amici States of Cal. et al., *Ramos v. Nielsen,* 336 F. Supp. 3d 1075 (N.D. Cal. 2018) (No. 18-cv-1554), ECF No. 103 ...........................................................................5

Cal. Legis. Analyst's Off., *The 2024-2025 Budget: Department of Social Services Immigration and Equity Programs* (Mar. 15, 2024), https://lao.ca.gov/Publications/Report/4885# ...........................................................4

Carolyn Jones, *'Afraid to Go to School': Immigrant Families in Salinas Are Gripped by Fear*, San Gabriel Valley Trib. (Feb. 20, 2025), https://www.sgvtribune.com/2025/02/20/immigrant-families-in-the-salinas-valley-gripped-by-fear/ ....................................................................................................................10

Cassandra D. Kelly-Cirino et al., *Importance of Diagnostics in Epidemic and Pandemic Preparedness*, 4 BMJ Glob. Health 1 (2019) ..........................................................16

Commonwealth of Mass., *Department of Developmental Services* (n.d.), https://www.mass.gov/orgs/department-of-developmental-services...12Edith Olmsted, *Trump Is Now Threatening All Immigrants "Illegal" or Not*, New Republic (Oct. 9, 2024), https://newrepublic.com/post/186961/donald-trump-racist-attacks-springfield-ohio-lie ..........1

Elizabeth M. McCormick, *Federal Anti-Sanctuary Law: A Failed Approach to Immigration Enforcement and a Poor Substitute for Real Reform*, 20 Lewis & Clark L. Rev. 165 (2016) ...........................................................................................................18

Fed. Aviation Admin., *FAA Background Information Regarding U.S. Civil Aviation – Haiti* (n.d.), https://www.faa.gov/air_traffic/publications/us_restrictions/doc/Haiti_Background_Information_12_FEB_2025.pdf .....................................................................................8

Fed. Aviation Admin., KICZ A0003/25 NOTAM, United States of America Prohibition Against Certain Flights in the Territory and Airspace of Haiti (Mar. 11, 2025), https://www.faa.gov/air_traffic/publications/us_restrictions/KICZ_NOTAM_A0003-25_Haiti_Prohibition.pdf ...................................................................................................8

FWD.us, *Temporary Protected Status Protects Families While Also Boosting the U.S. Economy* (Feb. 2024), https://www.fwd.us/news/temporary-protected-status-report-2025/ ........................................................................................................................ 7, 12-13

George J. Borjas & Hugh Cassidy, *The Wage Penalty to Undocumented Immigration*, 61 Lab. Econ., no. 101757 (2019) ..................................................................................14

Giulia McDonnell Nieto del Rio et al, *'They're Going to Deport Us': Trump's Immigration Policies Prompt Some Children to Skip School*, Boston Globe (Feb. 25, 2025), https://www.bostonglobe.com/2025/02/25/metro/trump-immigration-school-attendance/ ..................................................................................................................10

Int'l Inst. of New England, *IINE Statement on Suspension of TPS for Nearly 500,000 Haitian Immigrants* (Feb. 21, 2025), https://iine.org/2025/02/iine-statement-on-tps-suspension-haiti/ ...........................................................................................................4

Jacob S. Rugh & Matthew Hall, *Deporting the American Dream: Immigrant Enforcement and Latino Foreclosures*, Socio. Sci. 1053 (Dec. 2016)..........................................15

James Queally, *Fearing Deportation, Many Domestic Violence Victims Are Steering Clear of Police and Courts*, L.A. Times (Oct. 9, 2017), https://www.latimes.com/local/lanow/la-me-ln-undocumented-crime-reporting-20171009-story.html ...............................................................................................19

Jennifer Bisram, *NYC Officials Call on Trump Administration to Stop TPS Rollback for Haitians*, CBS News (Feb. 27, 2025), https://www.cbsnews.com/newyork/news/nyc-tps-rollback-canceled-haiti/............................................................................................4

Jill H. Wilson, Cong. Rsch. Serv., RS20844, *Temporary Protected Status and Deferred Enforced Departure* (2024), https://sgp.fas.org/crs/homesec/RS20844.pdf............................3

Julia Reinstein & Hannah Demissie, *Trump Pushes False Claim That Haitian Migrants Are Stealing and Eating Pets*, ABC News (Sept. 10, 2024), https://abcnews.go.com/Politics/trump-pushes-false-claim-haitian-migrants-stealing-eating/story?id=113570407 ...........................................................................................1

Karen Aho, *Spotlight on the Economic Contributions of TPS Holders*, Immigr. Impact (Oct. 23, 2023), https://immigrationimpact.com/2023/10/23/economic-contributions-tps-holders/................................................................................................................ 13-14

Katherine Yun et al., *Parental Immigration Status Is Associated with Children's Health Care Utilization: Findings from the 2003 New Immigrant Survey of U.S. Legal Permanent Residents*, 17 Maternal & Child Health J. 1913 (2013).........................................17

Katie Johnston, *'Our Future Workforce': How 41 Haitian Migrants Solved a Marlborough Nonprofit's Staffing Shortage*, Boston Globe (Oct. 1, 2024), https://www.bostonglobe.com/2024/10/01/business/migrants-jobs-labor-shortage-massachusetts/................................................................................................................12

Lila Flavin et al., *Medical Expenditures on and by Immigrant Populations in the United States: A Systematic Review* 48 Int'l J. Health Servs. 601 (2018).............. 17Mallika Seshadri, *Research: Immigration Enforcement Hinders Schoolwork; Schools Offer Support*, EdSource (Feb. 16, 2024), https://edsource.org/2024/immigration-enforcement-hinders-performance-in-school-heres-how-communities-are-helping/705983 ......................11

Maria Cramer et al., *'Migrant Crime Wave' Not Supported by Data, Despite High-Profile Cases*, N.Y. Times (Feb. 15, 2024), https://www.nytimes.com/2024/02/15/nyregion/migrants-crime-nyc.html............................19

Mark D. Perkins et al., *Diagnostic Preparedness for Infectious Disease Outbreaks*, 390 Lancet 2211 (2017) ...................................................................................................16

Mass. Immigrant & Refugee Advoc. Coal., *MIRA Partnering with State to Offer TPS Clinics for Emergency Assistance Shelter Residents* (Sept. 5, 2024), https://miracoalition.org/news/mira-partnering-with-state-to-offer-tps-clinics-for-emergency-assistance-shelter-residents/ ......................................................................5

Meredith L. King, *Immigrants in the U.S. Health Care System: Five Myths That Misinform the American Public*, Ctr. for Am. Progress (June 7, 2007), https://cdn.americanprogress.org/wp-content/uploads/issues/2007/06/pdf/immigrant_health_report.pdf ............................ 16-17, 20

Migration Pol'y Inst., *U.S. Immigrant Population by State and County (2019-2023)* (n.d.), https://www.migrationpolicy.org/programs/data-hub/charts/us-immigrant-population-state-and-county?width=850&height=850&iframe=true .......................................4

Miguel Pinedo & Christian Escobar, *Childhood Parental Deportations, Immigration Enforcement Experiences, and Posttraumatic Stress Disorder Among US-Born Latino Adults*, *2021,* 114 Am. J. Pub. Health S495 (2024) .................................................... 10, 11-12

Miriam Jordan, *Fear Shadows Many Children in Immigrant Families*, N.Y. Times (Apr. 12, 2025), https://www.nytimes.com/2025/04/12/us/fear-shadows-many-children-in-immigrant-families.html ..............................................................................................9

New York State, Press Release, *Governor Hochul, Mayor Adams Announce $38 Million for Asylum Seeker Legal Services and Case Management* (Oct. 3, 2023), https://www.governor.ny.gov/news/governor-hochul-mayor-adams-announce-38-million-asylum-seeker-legal-services-and-case 5Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement*, Dep't of Urb. Plan. & Pol'y, Univ. of Ill. at Chi. (May 2013), https://www.policylink.org/sites/default/files/INSECURE_COMMUNITIES_REPORT_FINAL.PDF ....................................................................................................18

Omar Martinez et al., *Evaluating the Impact of Immigration Policies on Health Status Among Undocumented Immigrants: A Systematic Review*, 17 J. Immigr. & Minority Health 947 (2015) ...............................................................................................16

Randy Capps et al., *Immigration Enforcement and the Mental Health of Latino High School Students*, Migration Pol'y Inst. (Sept. 2020), https://www.migrationpolicy.org/sites/default/files/publications/immigration-enforcement-mental-health-latino-students_final.pdf...............................................9

Richard Pallardy, *2010 Haiti Earthquake*, Brittanica (last updated Apr. 21, 2025), https://www.britannica.com/event/2010-Haiti-earthquake.......................................2

Ronald B. Cox Jr. et al., *Validation of the Family Fear of Deportation Scale for Youth*, 72 Fam. Rels. 734 (2023)..................................................................................................9

Scott D. Rhodes et al., *The Impact of Local Immigration Enforcement Policies on the Health of Immigrant Hispanics/Latinos in the United States*, 105 Am. J. Pub. Health 329 (Feb. 2015)......................................................................................................16

Sezer Kisa & Adnan Kisa, *"No Papers, No Treatment": A Scoping Review of Challenges Faced by Undocumented Immigrants in Accessing Emergency Healthcare*, 23 Int'l J. for Equity in Health, no. 184 (2024)...................................................................16

Ted Hesson & Mica Rosenberg, *Trump Says Migrants Are Fueling Violent Crime. Here Is What the Research Shows*, Reuters (July 16, 2024), https://www.reuters.com/world/us/trump-focuses-migrants-crime-here-is-what-research-shows-2024-04-11/...................................................................................19

Thomas S. Dee, '*Recent Immigration Raids Increased Student Absences*,' Annenberg Institute Brown University (June 2025), https://edworkingpapers.com/sites/default/files/ai25-1202.pdf...............................10

Tom K. Wong, *The Effects of Sanctuary Policies on Crime and the Economy*, Ctr. for Am. Progress (Jan. 26, 2017), https://www.americanprogress.org/article/the-effects-of-sanctuary-policies-on-crime-and-the-economy/.................................................19

U.S. Cong. Budget Off., *The Impact of Unauthorized Immigrants on the Budgets of State and Local Governments* (Dec. 2007), https://www.cbo.gov/sites/default/files/110th-congress-2007-2008/reports/12-6-immigration.pdf.................................................15

U.S. Dep't of Homeland Sec., *Temporary Protected Status: Calendar Year 2023 Annual Report* (May 15, 2024), https://www.uscis.gov/sites/default/files/document/reports/TPS_CY23_Congressional_Report.pdf ...............................................................................................................2

U.S. Dep't of State, *Haiti Travel Advisory* (last updated July 15, 2025),
    https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/haiti-travel-
    advisory.html ...................................................................................................................8

U.S. Embassy in Haiti, *Security Alert: Strikes and Demonstrations in Port-au-Prince*
    (Feb. 24, 2025), https://ht.usembassy.gov/security-alert-strikes-and-demonstrations-
    in-port-au-prince/ ............................................................................................................8

Verónica Egui Brito & Syra Ortiz Blanes, *In a Few Weeks, Hundreds of Thousands of
    Venezuelans Will Lose TPS. What You Need to Know*, Miami Herald (Feb. 13, 2025),
    https://www.miamiherald.com/news/local/immigration/article300049004.html ...................19

Victoria D. Ojeda et al., *Deported Men's and Father's Perspective: The Impacts of
    Family Separation on Children and Families in the U.S.*, 11 Frontiers in Psychiatry 1
    (2020)................................................................................................................... 10-11

## INTRODUCTION

During his 2024 campaign, President Trump and his campaign falsely alleged that Haitian immigrants in Springfield, Ohio had come to the United States without authorization and were eating their neighbors' pets.[1] Although officials in Springfield swiftly denied this baseless claim and made clear that the members of their Haitian population were lawfully present, in many cases on the basis of Temporary Protected Status (TPS), Trump later disputed that those TPS holders had legal status—asserting that "they may have done it through a certain little trick, but they are illegal immigrants as far as I am concerned."[2]

Shortly after taking office, the Trump Administration (via Secretary of Homeland Security Kristi Noem) purported to partially vacate Haiti's TPS designation without regard to the perilous conditions in Haiti and without any evidence that those conditions had improved.[3] On July 1, 2025, a federal court set aside the "partial vacatur" as unlawful under the Administrative Procedure Act.[4] That same day, the Administration issued a notice terminating Haiti's TPS status, effective September 2, 2025,[5] relying on the invalidated vacatur to sidestep the statute's prohibition on early

---

[1] Julia Reinstein & Hannah Demissie, *Trump Pushes False Claim That Haitian Migrants Are Stealing and Eating Pets*, ABC News (Sept. 10, 2024). (For authorities available online, URLs appear in the Table of Authorities. All websites were last visited August 25, 2025.)

[2] Edith Olmsted, *Trump Is Now Threatening All Immigrants "Illegal" or Not*, New Republic (Oct. 9, 2024); *see* Reinstein & Demissie, *supra*.

[3] *See* Partial Vacatur of 2024 Temporary Protected Status Decision for Haiti, 90 Fed. Reg. 10511 (Feb. 24, 2025) ("Partial Vacatur").

[4] *Haitian Evangelical Clergy Ass'n v. Trump*, No. 25-cv-01464-BMC, 2025 WL 1808743, at *9 (E.D.N.Y. July 1, 2025).

[5] *See* Termination of the Designation of Haiti for Temporary Protected Status, 90 Fed. Reg. 28760 (July 1, 2025) ("July 2025 Termination Notice").

termination. In doing so, Defendants seek to unlawfully strip legal protections from hundreds of thousands of Haitians with TPS—nearly one quarter of all TPS holders nationwide.[6]

The Amici States—which submit this brief in support of Plaintiffs and to underscore that Defendants' actions here were baseless, arbitrary, and contrary to the public interest—have strong interests in postponing Defendants' unlawful termination of Haiti's TPS status pending judicial review, and ultimately in preventing that action from taking effect.[7] The Amici States are home to thriving Haitian communities—including many individuals who are able to live and work in the United States because of TPS. Far from being a burden on or threat to our States, Haitian TPS holders provide resounding benefits to their communities and to the Amici States. They are valued employees and residents of the Amici States, and many provide important public services to the Amici States' residents. They are homeowners and neighbors, coworkers, teachers and students, entrepreneurs and job-creators, caregivers, construction workers and union members, and parents. Stripping these individuals of legal status would harm our residents, our economies, and our public health and safety. The public interest weighs heavily in favor of granting Plaintiffs' requested relief and postponing the termination pending adjudication of Plaintiffs' claims.

## BACKGROUND AND INTEREST OF AMICI STATES

In 2010, a catastrophic earthquake in Haiti killed and displaced hundreds of thousands of people, throwing the country into crisis.[8] In response, the Department of Homeland Security

---

[6] *See* U.S. Dep't of Homeland Sec., *Temporary Protected Status: Calendar Year 2023 Annual Report* 4 (May 15, 2024).

[7] The Amici States include: the Commonwealth of Massachusetts, the states of California, New York, Connecticut, Delaware, Hawai'i, Illinois, Maine, Maryland, Michigan, Minnesota, New Jersey, Nevada, Oregon, Rhode Island, Vermont, Washington, and the District of Columbia.

[8] *See* Richard Pallardy, *2010 Haiti Earthquake*, Brittanica (last updated Apr. 21, 2025).

(DHS) designated Haiti for TPS protection in 2010, extended the TPS protection in 2011, and repeatedly issued extensions thereafter.[9] In 2018, during the first Trump Administration, DHS attempted to terminate Haiti's TPS designation,[10] but that decision was enjoined by a federal court and did not take effect.[11] DHS again designated Haiti for TPS in 2021, and then redesignated and extended TPS for Haiti in 2023 and 2024.[12] As extended, Haiti's TPS designation is not set to expire until at least February 3, 2026. As of September 2024, 260,790 Haitians were living in the United States with TPS.[13]

In renewing and extending Haiti's TPS designation in 2024, DHS recognized that Haiti is currently experiencing severe political, security, environmental, humanitarian, and economic crises "that prevent Haitian nationals . . . from returning to Haiti in safety."[14] Among other things, the country lacks a functioning democratically-elected government to control the gang violence that has killed or injured more than 2,500 people in 2024 alone and led to an attack on the country's primary international airport by gangs.[15] Yet DHS purported to partially vacate Haiti's TPS

---

[9] Partial Vacatur, 90 Fed. Reg. at 10512 (describing redesignations and extensions).

[10] Termination of the Designation of Haiti for Temporary Protected Status, 83 Fed. Reg. 2648 (Jan. 18, 2018).

[11] *See Ramos v. Nielsen,* 336 F. Supp. 3d 1075, 1108-09 (N.D. Cal. 2018). A panel of the Ninth Circuit issued an opinion vacating the district court's injunction, *see Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020)—but the mandate never issued and the opinion never took effect, because the Ninth Circuit granted rehearing en banc and vacated the panel opinion, *see Ramos v. Wolf*, 59 F.4th 1010 (9th Cir. 2023). DHS voluntarily dismissed the appeal after redesignating Haiti for TPS. *See Ramos v. Mayorkas*, No. 18-16981, 2023 WL 4363667, at *1 (9th Cir. June 29, 2023).

[12] Partial Vacatur, 90 Fed. Reg. at 10512 (describing redesignations and extensions).

[13] *See* Jill H. Wilson, Cong. Rsch. Serv., RS20844, *Temporary Protected Status and Deferred Enforced Departure* 7 (2024).

[14] *See* Extension and Redesignation of Haiti for Temporary Protected Status, 89 Fed. Reg. 54484, 54491 (July 1, 2024).

[15] *See id*. at 54488.

designation without evidence that the country conditions in Haiti had improved,[16] and then, in its July 2025 Termination Notice, still failed to determine whether Haitians can return in safety, but expressly acknowledged Haiti's ongoing humanitarian and human rights crisis.[17]

The Amici States are home to at least 283,500 Haitian immigrants.[18] New York and Massachusetts are home to the second-largest and third-largest populations of Haitian immigrants in the country respectively, including an estimated 15,000 Haitian TPS holders in Massachusetts.[19] At least 5,400 Haitian TPS holders live in New York City alone.[20] These immigrants and their families have made meaningful contributions to our States, and our States have worked hard to welcome them. For example, California has allocated $10 million annually to provide legal services to TPS holders since 2018, and will continue to dedicate resources to this important community through its funding for the immigrant community as a whole—including $45 million annually to support legal services, education, and technical assistance to community organizations.[21] Recognizing that obtaining a work authorization through the TPS program is a valuable avenue to self-sufficiency, Massachusetts arranged for clinics to assist Haitians in

---

[16] Partial Vacatur, 90 Fed. Reg. at 10513 (stating only that developments "might result in an improvement in conditions").

[17] July 2025 Termination Notice, 90 Fed. Reg. at 28763.

[18] Migration Pol'y Inst., *U.S. Immigrant Population by State and County (2019-2023)* (n.d.).

[19] *Id*.; Int'l Inst. of New England, *IINE Statement on Suspension of TPS for Nearly 500,000 Haitian Immigrants* (Feb. 21, 2025).

[20] Jennifer Bisram, *NYC Officials Call on Trump Administration to Stop TPS Rollback for Haitians*, CBS News (Feb. 27, 2025).

[21] Cal. Legis. Analyst's Off., *The 2024-2025 Budget: Department of Social Services Immigration and Equity Programs* (Mar. 15, 2024).

Massachusetts's emergency assistance shelters to complete TPS applications.[22] New York has also dedicated substantial resources and support to TPS holders, including by assisting with work authorization applications and connecting these TPS holders to employers.[23]

In short, the Amici States are proud to invest in TPS holders, including specifically individuals from Haiti, and have a critical interest in ensuring that their legal status is not unlawfully revoked. Moreover, the Amici States have a strong interest in ensuring that federal agencies refrain from actions that—like those at issue in this matter—are arbitrary and capricious, discriminatory, and unconstitutional. And, in service of these interests, the Amici States have previously filed amicus briefs in other cases in support of plaintiffs challenging unlawful attempts to terminate or vacate already issued TPS designations.[24] For example, the federal court in *National TPS Alliance v. Noem* repeatedly relied on the Amici States' brief in support of its decision to postpone the effective date of DHS's purported termination of Venezuela's TPS designation.[25]  The Ninth Circuit recently affirmed that District Court order.[26]

---

[22] *See* Mass. Immigrant & Refugee Advoc. Coal., *MIRA Partnering with State to Offer TPS Clinics for Emergency Assistance Shelter Residents* (Sept. 5, 2024).

[23] *See, e.g.,* New York State, Press Release, *Governor Hochul, Mayor Adams Announce $38 Million for Asylum Seeker Legal Services and Case Management* (Oct. 3, 2023).

[24] *See* Br. for States of N.Y. et al., *Haitian Evangelical Clergy Ass'n v. Trump*, No. 25-cv-01464-BMC (E.D.N.Y. April 28, 2025), ECF No. 43; Br. of the Commonwealth of Mass. et al., *Haitian-Ams. United Inc. v. Trump*, No. 1:25-cv-10498 (D. Mass. Mar. 26, 2025), ECF No. 33; Br. for the States of Cal. et al., *National TPS All. v. Noem*, No. 25-cv-1766 (N.D. Cal. Mar. 7, 2025), ECF No. 62; Br. for States of N.Y. et al., *Ramos v. Wolf*, 59 F.4th 1010 (9th Cir. 2023) (No. 18-16981), ECF No. 168; Amicus Curiae Br. of the States of Cal. et al., *Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020) (No. 18-16981), ECF No. 35; Br. of Amici States of Cal. et al., *Ramos v. Nielsen,* 336 F. Supp. 3d 1075 (N.D. Cal. 2018) (No. 18-cv-1554), ECF No. 103.

[25] No. 25-cv-01766, 2025 WL 957677, at *21, 24-26, 45 (N.D. Cal. Mar. 31, 2025).

[26] *See National TPS Alliance v. Noem*, No. 25-2120, 2025 WL 2487771 (9th Cir. Aug. 29, 2025).

## ARGUMENT

### THE PUBLIC INTEREST FAVORS PLAINTIFFS IN THIS IMPORTANT CASE BECAUSE DEFENDANTS' ACTIONS WOULD INFLICT IRREPARABLE HARM ON FAMILIES AND ON THE AMICI STATES

The Amici States support plaintiffs' position on the pending motion to postpone the effective date of the agency action terminating Haiti's TPS. We write to highlight some of the significant public interests at stake. *See Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008) (courts must consider the public interest when determining whether to grant injunctive relief); *National TPS All.*, 2025 WL 957677, at *20 (court should weigh preliminary injunction factors in deciding a § 705 motion).

In cases like this one, which affect many nonparties (including the Amici States), hardship to third parties is integral to the public interest analysis. *See Jones v. D.C.*, 177 F. Supp. 3d 542, 546 n.3 (D.D.C. 2016). In general, third-party harms that are relevant to the public interest analysis include harms to family members;[27] economic and employment-based harms;[28] increased public

---

[27] *Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017) (citing "indirect hardship to [plaintiffs'] friends and family members," including harm to children who "had to receive counseling because of the trauma of their government-compelled separation from their father" (quotation marks omitted)).

[28] *National Ass'n of Mfrs. v. U.S. Dep't of Homeland Sec.*, 491 F. Supp. 3d 549, 571 (N.D. Cal. 2020) (enjoining limitation on certain nonimmigrant work visas and noting harms to "hundreds of thousands of American businesses of all sizes and economic sectors").

health care expenses;[29] public health harms;[30] public safety harms;[31] and impacts to public services.[32] All of these cognizable harms would come to pass and affect Amici States and their residents if Defendants' action is allowed to take effect.

## A.    Terminating Haiti's TPS Designation Would Separate Families, Devastate Children, and Fracture the Amici States' Communities and Schools.

The families of Haitian TPS holders, many of whom live in the Amici States, will be profoundly harmed if Defendants' action takes effect. In 2022, approximately 87,000 U.S. citizen children and 116,000 U.S. citizen adults lived with a Haitian TPS holder.[33] Thus, more than 200,000 U.S. citizens lived in "mixed status" households with individuals whom DHS seeks to unlawfully strip of their legal status—and this figure does not account for the hundreds of thousands of Haitians who were newly eligible under the 2023 and 2024 designations. Terminating TPS would create extreme hardship for these households, withdrawing their members' work authorizations and exposing them to the threat of deportation.

---

[29] *Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 512 F.3d 1112, 1126 (9th Cir. 2008) (citing municipality's "overall health care expenses").

[30] *World Gym, Inc. v. Baker*, 474 F. Supp. 3d 426, 434 (D. Mass. 2020) (recognizing public interest in preserving public health); *see also City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*, 981 F.3d 742, 762 (9th Cir. 2020) (affirming injunction against DHS's redefinition of "public charge," acknowledging that the rule would have "adverse effects on the health and welfare of the immigrant as well as general population").

[31] *Baillargeon v. CSX Transp. Corp.*, 463 F. Supp. 3d 76, 86 (D. Mass. 2020) (examining public interest in access to emergency services).

[32] *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018) ("[T]he public interest cannot be disserved by an injunction that brings clarity to all parties and to citizens dependent on public services.").

[33] FWD.us, *Temporary Protected Status Protects Families While Also Boosting the U.S. Economy* 2 (Feb. 2024).

Compelling TPS holders to return en masse to Haiti would pose substantial dangers to many members of the Amici States' communities. In purporting to vacate and then terminate Haiti's TPS designation, Secretary Noem did not even attempt to argue that Haiti's conditions had improved, but instead speculated that recent developments "might result in an improvement in conditions."[34] Yet no such "improvement" has materialized to date: the July 2025 termination notice itself acknowledged Haiti's ongoing humanitarian crisis, rampant gang violence, and the absence of a functioning government,[35] and the U.S. State Department continues to classify Haiti as a "Level 4: Do Not Travel" country—its highest risk designation—warning of "kidnapping, crime, civil unrest, and limited health care."[36] The Federal Aviation Administration recently extended its prohibition on commercial aircraft operations in Haiti because "[a]rmed gangs continue to control large portions of the capital, Port-au-Prince, and have used small arms to fire on civilian aircraft, helicopters, airports, and related infrastructure on several occasions."[37]

Against that backdrop, revoking Haiti's TPS designation would present current TPS holders—particularly those with U.S. citizen children, many of whom live in the Amici States—with an agonizing choice. TPS-holder parents would be forced to choose between (1) returning to Haiti alone, leaving their children behind; (2) taking their U.S. citizen children with them to a dangerous country that the children do not know; or (3) staying in the United States without

---

[34] Partial Vacatur, 90 Fed. Reg. at 10513.

[35] July 2025 Termination Notice, 90 Fed. Reg. at 28763.

[36] U.S. Dep't of State, *Haiti Travel Advisory* (last updated July 15, 2025); *see* U.S. Embassy in Haiti, *Security Alert: Strikes and Demonstrations in Port-au-Prince* (Feb. 24, 2025).

[37] Fed. Aviation Admin., *FAA Background Information Regarding U.S. Civil Aviation – Haiti* (n.d.); *see* Fed. Aviation Admin., KICZ A0003/25 NOTAM, United States of America Prohibition Against Certain Flights in the Territory and Airspace of Haiti (Mar. 11, 2025).

authorization and living with significant fear and uncertainty, knowing they cannot work legally, and could be forcibly removed to Haiti at any time.

This harrowing dynamic would severely harm the mental health and well-being of countless U.S.-citizen children who reside in the Amici States.[38] Children of undocumented parents living in the United States frequently experience persistent anxiety, driven by the constant fear that a family member may be deported.[39] This fear can profoundly shape their daily lives. For example, the *New York Times* recently reported on a seventeen-year-old TPS-protected Haitian girl in Columbus, Ohio, whose family is so fearful of deportation and family separation that she and her nine-year-old sister "just go to school and back, school and home"—with her sister often refusing to go to school at all.[40] One study found that thirty percent of Latino student participants— including students born in the United States—altered their routines due to deportation fears.[41] This included refraining from driving, seeking medical care, attending religious services, or participating in afterschool activities; taking a different route to school; and staying at home more often.[42]

These harms would have ripple effects throughout the Amici States and their schools, with far-reaching and long-term consequences. Indeed, a recent profile of a California school district

---

[38] *See* Am. Immigr. Council, Fact Sheet, *U.S. Citizen Children Impacted by Immigration Enforcement* (June 24, 2021).

[39] Ronald B. Cox Jr. et al., *Validation of the Family Fear of Deportation Scale for Youth*, 72 Fam. Rels. 734, 736 (2023).

[40] *See* Miriam Jordan, *Fear Shadows Many Children in Immigrant Families*, N.Y. Times (Apr. 12, 2025).

[41] Randy Capps et al., *Immigration Enforcement and the Mental Health of Latino High School Students*, Migration Pol'y Inst. 2-3 (Sept. 2020).

[42] *Id*.

noted that "fear is everywhere" and "rumors about ICE sweeps abound."[43] As a result, families are "afraid to go to school."[44] A recent Stanford-led study about chronic absenteeism in Central Valley schools following immigration raids similarly found that the raids coincided with a 22% increase in daily student absences, with particularly large increases among the youngest students.[45] In Massachusetts alone, school administrators have reported thousands of absences due to fear of immigration enforcement.[46]

When these fears materialize and families are forcibly separated, the consequences are even more severe. Parental deportation is deeply traumatic and disruptive for children: it is linked to extreme psychological distress, anxiety, depression, post-traumatic stress disorder (PTSD), externalizing behaviors (such as aggression), and difficulties sleeping.[47] Beyond emotional and psychological harm, these children often face additional hardships, including financial instability, housing and food insecurity, and disruptions in their education, such as increased school absences

---

[43] Carolyn Jones, *'Afraid to Go to School': Immigrant Families in Salinas Are Gripped by Fear*, San Gabriel Valley Trib. (Feb. 20, 2025).

[44] *Id*.

[45] Thomas S. Dee, '*Recent Immigration Raids Increased Student Absences*,' Annenberg Institute Brown University (June 2025), https://edworkingpapers.com/sites/default/files/ai25-1202.pdf.

[46] Giulia McDonnell Nieto del Rio et al, *'They're Going to Deport Us': Trump's Immigration Policies Prompt Some Children to Skip School*, Boston Globe (Feb. 25, 2025).

[47] Miguel Pinedo & Christian Escobar, *Childhood Parental Deportations, Immigration Enforcement Experiences, and Posttraumatic Stress Disorder Among US-Born Latino Adults*, *2021*, 114 Am. J. Pub. Health S495, S496 (2024); *see also* Victoria D. Ojeda et al., *Deported Men's and Father's Perspective: The Impacts of Family Separation on Children and Families in the U.S.*, 11 Frontiers in Psychiatry 1, 10 (2020).

and lower academic engagement.[48] Bullying related to immigration status is also common.[49] And the long-term effects extend into adulthood. Adults who experienced parental deportation during childhood are more than twice as likely to suffer from PTSD as those who did not endure such separation.[50]

The harms associated with the proposed TPS termination are particularly acute given the whiplash nature of the Administration's abrupt policy change. Just last year, approximately 523,000 Haitians qualified for TPS protection under the most recent redesignation, which gave these individuals assurance that they would be protected through February 3, 2026.[51] No such extension had ever before been vacated prior to the current Administration. Yet just months after DHS extended Haiti's designation, the new Administration shattered the plans and prospects of countless Haitian families in the Amici States when it reversed course, purported to partially vacate the TPS Haiti extension, and now, seeks to terminate Haiti's TPS status in September 2025.

The fracturing of Haitian families would have far-reaching impacts on children, their families, and on the Amici States in which they live. The public interest strongly favors preserving the unity of these families.

---

[48] Ojeda et al., *supra*, at 7, 9-10; Ana Martinez-Donate et al., *Between the Lines: A Mixed-Methods Study on the Impacts of Parental Deportation on the Health and Well-Being of U.S. Citizen Children*, 9 J. Migration & Health 1, 5 (2024).

[49] Mallika Seshadri, *Research: Immigration Enforcement Hinders Schoolwork; Schools Offer Support*, EdSource (Feb. 16, 2024).

[50] Pinedo & Escobar, *supra*, at S501.

[51] *See* Extension and Redesignation of Haiti for TPS, 89 Fed. Reg. at 54492.

**B.      Terminating Haiti's TPS Designation Would Damage the Amici States' Economies and Workforces.**

The termination of Haiti's TPS designation would also substantially harm the Amici States' economies by depleting their workforces and depriving them of considerable tax revenue.

The Amici States employ TPS holders to perform crucial public services. For example, Massachusetts's Department of Developmental Services[52] alone currently employs about forty Haitian TPS holders, who primarily provide direct care in group home settings to some of Massachusetts's most vulnerable populations. Haitian TPS holders also serve as personal care attendants, childcare workers, and other crucial roles in and adjacent to the Amici States' governments. Vacating Haiti's TPS designation—and thus stripping such individuals of their legal status and work authorization—would therefore pose serious operational challenges to the Amici States' abilities to care for vulnerable populations such as children, elders, and developmentally disabled individuals. At minimum, the Amici States face significant costs to rehire or recruit care workers to fill such positions, because caregiving positions are challenging to fill in both the private and public sector.[53]

TPS holders are also crucial contributors to the Amici States' broader economies. TPS-eligible Haitians contribute $4.4 billion annually to the U.S. economy.[54] Sixty-nine percent of Haitian immigrants aged sixteen and older were members of the civilian labor force in 2022, with high

---

[52] *See* Commonwealth of Mass., *Department of Developmental Services* (n.d.).

[53] *See, e.g.,* Katie Johnston, *'Our Future Workforce': How 41 Haitian Migrants Solved a Marlborough Nonprofit's Staffing Shortage*, Boston Globe (Oct. 1, 2024).

[54] FWD.us, *supra,* at 2; *see id.* at 5 ("TPS-eligible" includes those who hold TPS as well as those who qualify for TPS but may not have applied).

rates of participation in healthcare support and service industries.[55] Moreover, a recent estimate found that 75,000 TPS-eligible Haitians work in labor-short industries, defined as those with openings for at least four percent of their workforce.[56] In Delaware, the Haitian community provides a significant contribution to the poultry industry, which is one of the State's most important sectors. Two of Delaware's leading poultry plants, Mountaire Farms and Perdue Farms, have indicated they anticipate losing almost twenty percent of their workforce due to the TPS termination. The removal of thousands of people from Delaware's poultry industry would almost certainly impact the national economy as well as food security, increasing prices and causing food shortages at grocery stores and restaurants.

As a group, TPS holders from all countries have also shown high rates of entrepreneurship—14.5 percent of TPS holders are entrepreneurs, as compared with 9.3 percent of the U.S.-born workforce.[57] The 2021 TPS population included more than 38,100 entrepreneurs, or self-employed workers, who generated $1.5 billion in business income.[58] In California alone, 7,800 self-employed TPS holders generated $224.8 million in business income.[59] These workforce contributions generate substantial state and federal tax revenue. In 2023, TPS holders from all countries paid $3.1 billion in federal taxes, contributing to programs like Social Security and

---

[55] Beatrice Dain & Jeanne Batalova, *Haitian Immigrants in the United States*, Migration Pol'y Inst. (Nov. 8, 2023).

[56] FWD.us, *supra*, at 2 & note.

[57] Karen Aho, *Spotlight on the Economic Contributions of TPS Holders*, Immigr. Impact (Oct. 23, 2023).

[58] Am. Immigr. Council, *The Contributions of Temporary Protected Status Holders to the U.S. Economy* 4 (Sept. 2023).

[59] *Id.*

Medicare, and paid $2.1 billion in state and local taxes.[60] In Massachusetts, New York, and California alone, TPS households earned $4.9 billion in income, paid $717.7 million in federal taxes and $588.6 million in state and local taxes, and contributed $3.66 billion in spending power.[61]

Revoking Haiti's TPS designation would endanger all these economic contributions. Many current TPS holders would have no choice but to return to Haiti, taking their economic contributions with them. And those who remain in the country would be stripped of their work authorization, causing them to lose their current employment and forcing them to accept lower paying "off the books" jobs. The result would be lower wages and less productivity in the Amici States' economies. The average wage gap between undocumented and legal immigrants exceeds thirty-five percent,[62] with particularly acute impacts for undocumented women. In California, for example, undocumented women make fifty-eight cents for every dollar paid to all men, forty-four cents compared to white men, and sixty-seven cents for every dollar paid to all women.[63] Such lower-wage, unauthorized employment would also inevitably lead to a decline in tax revenues for the Amici States. Finally, at least forty-one percent of TPS households are homeowners and pay taxes on property having a total value of approximately $19 billion.[64] The Amici States would likely face a wave of mortgage foreclosures if current TPS holders are forced suddenly to leave

---

[60] *See* Am. Immigr. Council, *Immigrants in the United States* (data year 2023).

[61] *See* Am. Immigr. Council, *Immigrants in Massachusetts* (data year 2023); Am. Immigr. Council, *Immigrants in California* (data year 2023); Am. Immigr. Council, *Immigrants in New York* (data year 2023).

[62] *See* George J. Borjas & Hugh Cassidy, *The Wage Penalty to Undocumented Immigration*, 61 Lab. Econ., no. 101757, at 2 (2019).

[63] Alejandra Reyes-Velarde, *'Double Disadvantage': These California Workers' Pay Gap Is Widest by Far*, CalMatters (July 27, 2023).

[64] Aho, *supra*.

the country or else accept lower-paid employment, thus harming property values and reducing property tax receipts.[65]

The TPS-holder community, including Haitian TPS holders, comprises countless dynamic contributors to the Amici States' economies. Terminating their legal status would cause substantial harms to Amici States' economies, workforces, and tax revenue.

## C. Terminating Haiti's TPS Designation Would Compromise Public Health and Increase Health Care Costs.

Terminating Haiti's TPS designations would also have significant negative effects on public health in the Amici States and around the country. For example, fifty-five percent of Haitian immigrants are covered by private health insurance (often through employer-sponsored insurance programs).[66] Ending work authorization for hundreds of thousands of Haitian TPS holders would deprive many of those individuals and their families of their employer-sponsored health insurance. The result would be to increase the Amici States' heath care expenditures—both by increasing the proportion of Haitian immigrants who are on public health insurance and by increasing public expenditures on emergency care provided to uninsured patients (e.g., through emergency health insurance, payments to hospitals and community health centers, and funding for public health programs).[67] Avoiding such costs is an important public interest weighing in favor of postponement.

---

[65] *See* Jacob S. Rugh & Matthew Hall, *Deporting the American Dream: Immigrant Enforcement and Latino Foreclosures*, 3 Socio. Sci. 1053, 1055, 1067-68 (Dec. 2016).

[66] *See* Dain & Batalova, *supra*.

[67] *See, e.g.*, U.S. Cong. Budget Off., *The Impact of Unauthorized Immigrants on the Budgets of State and Local Governments* 8 (Dec. 2007); Am. Compl., Ex. 83, Decl. of Jesse M. Caplan at 1-2, *New York v. Trump*, No. 1:17-cv-5228 (E.D.N.Y. Oct. 4, 2017), ECF No. 55-83 ("Caplan Decl.").

Moreover, stripping legal status from hundreds of thousands of Haitian immigrants would risk serious negative consequences for public health and the public interest.[68] As courts have noted in other contexts, the "[p]ublic health is served when individuals freely seek preventive care and do not stave off care until they need emergency room treatment in the midst of a health crisis." *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 609 (E.D. Pa. 2017), *subsequent judgment aff'd in relevant part*, 916 F.3d 276 (3d Cir. 2019). For example, the public greatly benefits when residents seek out diagnostic testing for and treatment of (or vaccination against) infectious diseases such as COVID-19, tuberculosis, and HIV.[69] But as studies have consistently found for decades, undocumented immigrants are often reluctant to seek medical treatment due to fear of detention and deportation.[70] This phenomenon is so well documented that health-care providers often take

---

[68] *See, e.g.*, App. in Supp. of Pls.' Mot. for Provisional Relief at 789-90, *Regents of Univ. of Cal. et al. v. United States Dep't of Homeland Sec.*, No. 3:17-cv-05211 (N.D. Cal. Nov. 1, 2017), ECF No. 118-1; Caplan Decl. at 1-2; Meredith L. King, *Immigrants in the U.S. Health Care System: Five Myths That Misinform the American Public*, Ctr. for Am. Progress 7 (June 7, 2007).

[69] *See, e.g.*, Cassandra D. Kelly-Cirino et al., *Importance of Diagnostics in Epidemic and Pandemic Preparedness*, 4 BMJ Glob. Health 1, 1, 6-7 (2019); Mark D. Perkins et al., *Diagnostic Preparedness for Infectious Disease Outbreaks*, 390 Lancet 2211, 2211 (2017); Alejandro Portes et al., *The U.S. Health System and Immigration: An Institutional Interpretation*, 24 Socio. F. 487, 501-02, 506 (Sept. 2009).

[70] *See, e.g.*, Sezer Kisa & Adnan Kisa, *"No Papers, No Treatment": A Scoping Review of Challenges Faced by Undocumented Immigrants in Accessing Emergency Healthcare*, 23 Int'l J. for Equity in Health, no. 184, at 2, 6, 8 (2024); Omar Martinez et al., *Evaluating the Impact of Immigration Policies on Health Status Among Undocumented Immigrants: A Systematic Review*, 17 J. Immigr. & Minority Health 947, 966 (2015) (immigrants often "refrain from seeking vital services, including medical services, from any local government or private agency—even agencies unrelated to law enforcement—for fear of exposing themselves or their family members to legal sanctions or harassment"); Scott D. Rhodes et al., *The Impact of Local Immigration Enforcement Policies on the Health of Immigrant Hispanics/Latinos in the United States*, 105 Am. J. Pub. Health 329, 332 (Feb. 2015) (immigrants reported that they "did not access or utilize health services for which they were eligible, including preventive services," because "[t]hey worried that . . . their lack of documentation . . . would put them at risk for detention and deportation.").

significant steps to combat it—as where one clinic "placed itself right next to a Baptist church in order to prevent raids by [ICE] agents that would scare away its mostly undocumented users."[71]

Against this well-understood backdrop, stripping Haitian immigrants of lawful status (by terminating their TPS protection) would risk significant public health consequences. Many immigrants would not only lose employer-sponsored health care but would also be discouraged from seeking medical treatment of any kind due to fear of deportation. This would increase the broader community risk and would have many adverse results for individual immigrants and their families. For example, undocumented women are less likely to receive needed health care and preventive screenings than the general U.S. population—leading to significantly higher rates of conditions like cervical cancer, birth complications, neonatal morbidity, respiratory distress syndrome, and seizures for newborns.[72]

And newly undocumented former TPS holders may also elect not to seek treatment for their children or other family members—who may themselves be natural-born U.S. citizens.[73] For example, studies show that children of undocumented immigrants are often sicker when seeking emergency room care and frequently miss preventive annual exams.[74] The results can be fatal, as

---

[71] Portes et al., *supra,* at 506.

[72] Am. Coll. of Obstetricians & Gynecologists, Comm. Op. no. 627, *Health Care for Unauthorized Immigrants*, 125 Obstetrics & Gynecology 755, 756 (Mar. 2015); *see also* Am. Coll. of Obstetricians & Gynecologists, Comm. Statement no. 4, *Health Care for Immigrants*, 141 Obstetrics & Gynecology 427, 428-29 (2023).

[73] *See* Lila Flavin et al., *Medical Expenditures on and by Immigrant Populations in the United States: A Systematic Review* 48 Int'l J. Health Servs. 601, 617-18 (2018).

[74] *See* King, *supra*, at 5; Katherine Yun et al., *Parental Immigration Status Is Associated with Children's Health Care Utilization: Findings from the 2003 New Immigrant Survey of U.S. Legal Permanent Residents*, 17 Maternal & Child Health J. 1913, 1916-19 (2013).

where a child in Oklahoma died "when his parents delayed seeking medical treatment because they feared that hospital officials would report them to ICE."[75]

Because terminating Haiti's TPS designation would strip status from a significant population of immigrants in the Amici States, and because such a shift would both raise healthcare costs and pose grave risks to public health, the public interest weighs in favor of postponement.

## D.    Terminating Haiti's TPS Designation Would Harm Public Safety.

The Amici States have strong interests in effective law enforcement and protection of public safety, at both the state and local levels. Terminating Haiti's TPS designation would make effective law enforcement and protection of public safety more difficult.

Because TPS holders and their families have built lives in the United States, some may try to stay in this country even if their TPS status is terminated. But individuals who lack legal status are less likely to report crime—even crimes in which they themselves are victims—if they "fear that [officials] will ask . . . about their immigration status" and increase their perceived risk of being removed.[76] Fear of removal, or of having a family or community member removed, makes victims and witnesses reluctant to come forward, to testify in court, and even to seek safety in a

---

[75] Elizabeth M. McCormick, *Federal Anti-Sanctuary Law: A Failed Approach to Immigration Enforcement and a Poor Substitute for Real Reform*, 20 Lewis & Clark L. Rev. 165, 199 (2016).

[76] Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement*, Dep't of Urb. Plan. & Pol'y, Univ. of Ill. at Chi. 14 (May 2013).

domestic violence shelter.[77] When law enforcement is unable to obtain evidence of crimes and maintain witness cooperation at trial, public safety suffers.[78]

Contrary to unsubstantiated contentions, recent arrivals of immigrants (including Haitians) have not led to any "crime wave."[79] Moreover, TPS applicants must meet specified criteria to be granted that status, including screenings for criminal history and background checks.[80] And conviction for certain criminal offenses can also trigger withdrawal of TPS status. *See* 8 C.F.R. §§ 244.14(a)(1), 244.4(a).

Terminating Haiti's TPS designation would pose challenges to jurisdictions around the country in enforcing their criminal codes and protecting public safety. The Amici States' interests in maintaining public order weigh heavily in favor of granting a postponement.

---

[77] *See, e.g.,* James Queally, *Fearing Deportation, Many Domestic Violence Victims Are Steering Clear of Police and Courts*, L.A. Times (Oct. 9, 2017).

[78] *See, e.g.*, Tom K. Wong, *The Effects of Sanctuary Policies on Crime and the Economy,* Ctr. for Am. Progress (Jan. 26, 2017) (sanctuary counties have lower crime rates than comparable nonsanctuary counties); *see also* Queally, *supra* (quoting former San Francisco District Attorney George Gascón's concern that "severe injury or homicide" can result when domestic violence is unreported).

[79] *See, e.g.*, Ted Hesson & Mica Rosenberg, *Trump Says Migrants Are Fueling Violent Crime. Here Is What the Research Shows*, Reuters (July 16, 2024); Maria Cramer et al., *'Migrant Crime Wave' Not Supported by Data, Despite High-Profile Cases*, N.Y. Times (Feb. 15, 2024).

[80] *See* Verónica Egui Brito & Syra Ortiz Blanes, *In a Few Weeks, Hundreds of Thousands of Venezuelans Will Lose TPS. What You Need to Know*, Miami Herald (Feb. 13, 2025).

## **CONCLUSION**

Plaintiffs' motion to postpone should be granted.

Dated: September 3, 2025

Respectfully submitted,

ANDREA JOY CAMPBELL
  *Attorney General*
  *Commonwealth of Massachusetts*

By:  /s/ *Tasha Bahal*
    TASHA BAHAL
    Deputy State Solicitor

Tasha J. Bahal
  *Deputy State Solicitor*
David Rangaviz
  *Assistant Attorney General*
  *Civil Rights Division*
1 Ashburton Place
Boston, MA 02108
617-963-2066
tasha.bahal@mass.gov

LETITIA JAMES
  *Attorney General*
  *State of New York*

BARBARA D. UNDERWOOD
  *Solicitor General*
JUDITH N. VALE
  *Deputy Solicitor General*
ZOE LEVINE
  *Special Counsel for Immigrant Justice*
CLELAND B. WELTON II
  *Assistant Solicitor General of Counsel*
28 Liberty Street
New York, NY 10005

ROB BONTA
  *Attorney General*
  *State of California*
Michael L. Newman
  *Senior Assistant Attorney General*
Vilma Palma-Solana
  *Supervising Deputy Attorney General*
Annabelle Wilmott
  *Deputy Attorney General*
1515 Clay Street, 21st Floor
Oakland, CA 94612-1499

<div style="display: flex;">
<div>

WILLIAM TONG
  *Attorney General*
  *State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

BRIAN L. SCHWALB
  *Attorney General*
  *District of Columbia*
400 6th Street, NW, Suite 8100
Washington, DC 20001

KATHLEEN JENNINGS
  *Attorney General*
  *State of Delaware*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801

ANNE E. LOPEZ
  *Attorney General*
  *State of Hawai'i*
425 Queen Street
Honolulu, HI 96813

KWAME RAOUL
  *Attorney General*
  *State of Illinois*
115 South LaSalle Street
Chicago, IL 60601

AARON M. FREY
  *Attorney General*
  *State of Maine*
6 State House Station
Augusta, ME 04333

ANTHONY G. BROWN
  *Attorney General*
  *State of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

</div>
<div>

DANA NESSEL
  *Attorney General*
  *State of Michigan*
P.O. Box 30212
Lansing, MI 48909

KEITH ELLISON
  *Attorney General*
  *State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Boulevard
St. Paul, MN 55155

MATTHEW J. PLATKIN
  *Attorney General*
  *State of New Jersey*
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625

AARON D. FORD
  *Attorney General*
  *State of Nevada*
100 North Carson Street
Carson City, NV 89701

PETER F. NERONHA
  *Attorney General*
  *State of Rhode Island*
150 South Main Street
Providence, RI 02903

DAN RAYFIELD
  *Attorney General*
  *State of Oregon*
1162 Court Street NE
Salem, OR 97301

CHARITY R. CLARK
  *Attorney General*
  *State of Vermont*
109 State Street
Montpelier, VT 05609

</div>
</div>

NICHOLAS W. BROWN
*Attorney General*
*State of Washington*
P.O. Box 40100
Olympia, WA 98504