correcting records on the SAVE website at *www.uscis.gov/save.*

[FR Doc. 2021–16481 Filed 7–30–21; 8:45 am]

**BILLING CODE 9111–97–P**

---

# DEPARTMENT OF THE INTERIOR

## Fish and Wildlife Service

[FWS–R1–ES–2021–N005; FXES11130100000–212–FF01E00000]

### Endangered and Threatened Wildlife and Plants; Draft Recovery Plan for White Bluffs Bladderpod

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Notice of availability; request for review and public comment.

---

**SUMMARY:** We, the U.S. Fish and Wildlife Service, announce the availability of the Draft Recovery Plan for White Bluffs Bladderpod (*Physaria douglasii* subsp. *tuplashensis*), listed as threatened under the Endangered Species Act, and endemic to Franklin County, Washington. We request review and comment on this draft recovery plan from Federal, State, and local agencies; Native American Tribes; and the public.

**DATES:** To ensure consideration, comments on the draft recovery plan must be received on or before October 4, 2021. However, we will accept information about any species at any time.

**ADDRESSES:**

*Document availability:* Obtain the recovery plan by the following method.

• *Internet: http://www.fws.gov/ endangered/species/recovery-plans.html* or *http://www.fws.gov/pacific/ ecoservices/endangered/recovery/ plans.html.*

*Comment submission:* You may submit written comments and materials by one of the following methods:

• *U.S. mail:* Jeff Krupka, Central Washington Field Office, at the above U.S. mail address.

• *Fax:* 360–753–9405.

• *Email: WFWO_LR@fws.gov.*

**FOR FURTHER INFORMATION CONTACT:** Brad Thompson, State Supervisor, U.S. Fish and Wildlife Service, Washington Fish and Wildlife Office, at the above U.S. mail address; telephone 360–753–4652. If you use a telecommunications device for the deaf, call the Federal Relay Service at 1–800–877–8339.

**SUPPLEMENTARY INFORMATION:** We, the U.S. Fish and Wildlife Service (Service), announce the availability of the Draft Recovery Plan for White Bluffs Bladderpod (*Physaria douglasii* subsp. *tuplashensis*). The subspecies, listed as threatened under the Endangered Species Act of 1973, as amended (Act; 16 U.S.C. 1531 *et seq.*), is a plant endemic to the White Bluffs of Franklin County, Washington. The draft recovery plan includes specific goals, objectives, and criteria that should be met prior to our consideration of removing the species from the Federal List of Endangered and Threatened Plants. We request review and comment on this draft recovery plan from Federal, State, and local agencies; Native American Tribes; and the public.

### Background

The White Bluffs bladderpod is a short-lived, herbaceous perennial that occurs intermittently in a narrow, linear strip about 15 kilometers (9.3 miles) long, along sparsely vegetated upper and top exposures of the White Bluffs in eastern Washington State. This plant is closely associated with highly alkaline, cemented calcium carbonate soil along the Columbia River in the State of Washington. In April 2013, and as reaffirmed in December 2013, the White Bluffs bladderpod was listed as a threatened species pursuant to the Act (78 FR 23983; April 23, 2013; 78 FR 76995; December 20, 2013).

### Recovery Planning Process

Recovery of endangered and threatened animals and plants is a primary goal of our endangered species program. To help guide the recovery effort, we prepare recovery plans for most listed species. Recovery plans describe actions considered necessary for conservation of the species, establish criteria for downlisting or delisting, and estimate time and cost for implementing recovery measures.

### Recovery Planning and Implementation

The Service recently revised its approach to recovery planning, and is now using a process termed recovery planning and implementation (RPI) (see *https://www.fws.gov/endangered/esa-library/pdf/RPI.pdf*). The RPI approach is intended to reduce the time needed to develop and implement recovery plans, increase recovery plan relevancy over a longer timeframe, and add flexibility to recovery plans so they can be adjusted to new information or circumstances. Under RPI, a recovery plan includes the statutorily required elements under section 4(f) of the Act (objective and measurable recovery criteria, site-specific management actions, and estimates of time and costs), a concise introduction, and our strategy for how we plan to achieve species recovery. The RPI recovery plan is supported by two supplementary documents: A species status assessment or biological report, which describes the best available scientific information related to the biological needs of the species and assessment of threats; and the recovery implementation strategy, which details the particular near-term activities needed to implement the recovery actions identified in the recovery plan. Under this approach, we can more nimbly incorporate new information on species biology or details of recovery implementation by updating these supplementary documents without concurrent revision of the entire recovery plan, unless changes to statutorily required elements are necessary.

### Recovery Plan Components

The primary recovery strategy for the White Bluffs bladderpod is to increase the capability of populations to withstand stochastic events; to establish new populations as possible and appropriate; to provide a safety margin against catastrophic events; and to increase the ecological and/or genetic diversity of the subspecies. Recovery will hinge on two types of strategies, direct and indirect, to improve habitat, reduce threats, and preserve or enhance the ability of individuals to survive and reproduce in the range of conditions they are likely to experience.

We may initiate an assessment of whether recovery has been achieved and delisting is warranted when the recovery criteria have been met, including once a second population has been discovered or established on conserved lands and is managed in a way that is compatible with White Bluffs bladderpod conservation. All populations must be self-sustaining.

### Request for Public Comments

Section 4(f) of the Act requires us to provide public notice and an opportunity for public review and comment during recovery plan development. It is also our policy to request peer review of recovery plans (59 FR 34270; July 1, 1994). In an appendix to the approved final recovery plan, we will summarize and respond to the issues raised during public comment and peer review. Substantive comments may or may not result in changes to the recovery plan. Comments regarding recovery plan implementation will be forwarded as appropriate to Federal and other entities so that they can be taken into account during the course of implementing recovery actions.

We will consider all comments we receive by the date specified in **DATES** prior to final approval of the plan.

HaitiTPSAR000013

 

**Federal Register** / Vol. 90, No. 18 / Wednesday, January 29, 2025 / Presidential Documents  **8337**

# Presidential Documents

Executive Order 14150 of January 20, 2025

## America First Policy Directive to the Secretary of State

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

**Section 1**. *Purpose.* From this day forward, the foreign policy of the United States shall champion core American interests and always put America and American citizens first.

**Sec. 2**. *Policy.* As soon as practicable, the Secretary of State shall issue guidance bringing the Department of State's policies, programs, personnel, and operations in line with an America First foreign policy, which puts America and its interests first.

**Sec. 3**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–01952

Filed 1–28–25; 8:45 am]

Billing code 3395–F4–P

HaitiTPSAR000014



# Presidential Documents

Executive Order 14159 of January 20, 2025

## Protecting the American People Against Invasion

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA) (8 U.S.C. 1101 *et seq.*) and section 301 of title 3, United States Code, it is hereby ordered:

**Section 1**. *Purpose.* Over the last 4 years, the prior administration invited, administered, and oversaw an unprecedented flood of illegal immigration into the United States. Millions of illegal aliens crossed our borders or were permitted to fly directly into the United States on commercial flights and allowed to settle in American communities, in violation of longstanding Federal laws.

Many of these aliens unlawfully within the United States present significant threats to national security and public safety, committing vile and heinous acts against innocent Americans. Others are engaged in hostile activities, including espionage, economic espionage, and preparations for terror-related activities. Many have abused the generosity of the American people, and their presence in the United States has cost taxpayers billions of dollars at the Federal, State, and local levels.

Enforcing our Nation's immigration laws is critically important to the national security and public safety of the United States. The American people deserve a Federal Government that puts their interests first and a Government that understands its sacred obligation to prioritize the safety, security, and financial and economic well-being of Americans.

This order ensures that the Federal Government protects the American people by faithfully executing the immigration laws of the United States.

**Sec. 2**. *Policy.* It is the policy of the United States to faithfully execute the immigration laws against all inadmissible and removable aliens, particularly those aliens who threaten the safety or security of the American people. Further, it is the policy of the United States to achieve the total and efficient enforcement of those laws, including through lawful incentives and detention capabilities.

**Sec. 3**. *Faithful Execution of the Immigration Laws.* In furtherance of the policies described in section 2 of this order:

(a) Executive Order 13993 of January 20, 2021 (Revision of Civil Immigration Enforcement Policies and Priorities), Executive Order 14010 of February 2, 2021 (Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border), Executive Order 14011 of February 2, 2021 (Establishment of Interagency Task Force on the Reunification of Families), and Executive Order 14012 of February 2, 2021 (Restoring Faith in Our Legal Immigration Systems and Strengthening Integration and Inclusion Efforts for New Americans) are hereby revoked; and

(b) Executive departments and agencies (agencies) shall take all appropriate action to promptly revoke all memoranda, guidance, or other policies based on the Executive Orders revoked in section 3(a) of this order and shall employ all lawful means to ensure the faithful execution of the immigration laws of the United States against all inadmissible and removable aliens.

**Sec. 4**. *Civil Enforcement Priorities.* The Secretary of Homeland Security shall take all appropriate action to enable the Director of U.S. Immigration and Customs Enforcement, the Commissioner of U.S. Customs and Border Protection, and the Director of U.S. Citizenship and Immigration Services to set priorities for their agencies that protect the public safety and national security interests of the American people, including by ensuring the successful enforcement of final orders of removal. Further, the Secretary of Homeland Security shall ensure that the primary mission of U.S. Immigration and Customs Enforcement's Homeland Security Investigations division is the enforcement of the provisions of the INA and other Federal laws related to the illegal entry and unlawful presence of aliens in the United States and the enforcement of the purposes of this order.

**Sec. 5**. *Criminal Enforcement Priorities.* The Attorney General, in coordination with the Secretary of State and the Secretary of Homeland Security, shall take all appropriate action to prioritize the prosecution of criminal offenses related to the unauthorized entry or continued unauthorized presence of aliens in the United States.

**Sec. 6**. *Federal Homeland Security Task Forces.* (a) The Attorney General and the Secretary of Homeland Security shall take all appropriate action to jointly establish Homeland Security Task Forces (HSTFs) in all States nationwide.

(b) The composition of each HSTF shall be subject to the direction of the Attorney General and the Secretary of Homeland Security, but shall include representation from any other Federal agencies with law enforcement officers, or agencies with the ability to provide logistics, intelligence, and operational support to the HSTFs, and shall also include representation from relevant State and local law enforcement agencies. The heads of all Federal agencies shall take all appropriate action to provide support to the Attorney General and the Secretary of Homeland Security to ensure that the HSTFs fulfill the objectives in subsection (c) of this section, and any other lawful purpose that fulfills the policy objectives of this order.

(c) The objective of each HSTF is to end the presence of criminal cartels, foreign gangs, and transnational criminal organizations throughout the United States, dismantle cross-border human smuggling and trafficking networks, end the scourge of human smuggling and trafficking, with a particular focus on such offenses involving children, and ensure the use of all available law enforcement tools to faithfully execute the immigration laws of the United States.

(d) The Attorney General and the Secretary of Homeland Security shall take all appropriate action to provide an operational command center to coordinate the activities of the HSTFs and provide such support as they may require, and shall also take all appropriate action to provide supervisory direction to their activities as may be required.

**Sec. 7**. *Identification of Unregistered Illegal Aliens.* The Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, shall take all appropriate action to:

(a) Immediately announce and publicize information about the legal obligation of all previously unregistered aliens in the United States to comply with the requirements of part VII of subchapter II of chapter 12 of title 8, United States Code;

(b) Ensure that all previously unregistered aliens in the United States comply with the requirements of part VII of subchapter II of chapter 12 of title 8, United States Code; and

(c) Ensure that failure to comply with the legal obligations of part VII of subchapter II of chapter 12 of title 8, United States Code, is treated as a civil and criminal enforcement priority.

**Sec. 8**. *Civil Fines and Penalties.* (a) The Secretary of Homeland Security, in coordination with the Secretary of Treasury, shall take all appropriate action to ensure the assessment and collection of all fines and penalties

HaitiTPSAR000016

that the Secretary of Homeland Security is authorized by law to assess and collect from aliens unlawfully present in the United States, including aliens who unlawfully entered or unlawfully attempted to enter the United States, and from those who facilitate such aliens' presence in the United States.

(b) Within 90 days of the date of this order, the Secretary of the Treasury and the Secretary of Homeland Security shall submit a report to the President regarding their progress implementing the requirements of this section and recommending any additional actions that may need to be taken to achieve its objectives.

**Sec. 9**. *Efficient Removals of Recent Entrants and Other Aliens.* The Secretary of Homeland Security shall take all appropriate action, pursuant to section 235(b)(1)(A)(iii)(I) of the INA (8 U.S.C. 1225(b)(1)(A)(iii)(I)), to apply, in her sole and unreviewable discretion, the provisions of section 235(b)(1)(A)(i) and (ii) of the INA to the aliens designated under section 235(b)(1)(A)(iii)(II). Further, the Secretary of Homeland Security shall promptly take appropriate action to use all other provisions of the immigration laws or any other Federal law, including, but not limited to sections 238 and 240(d) of the INA (8 U.S.C. 1228 and 1229a(d)), to ensure the efficient and expedited removal of aliens from the United States.

**Sec. 10**. *Detention Facilities.* The Secretary of Homeland Security shall promptly take all appropriate action and allocate all legally available resources or establish contracts to construct, operate, control, or use facilities to detain removable aliens. The Secretary of Homeland Security, further, shall take all appropriate actions to ensure the detention of aliens apprehended for violations of immigration law pending the outcome of their removal proceedings or their removal from the country, to the extent permitted by law.

**Sec. 11**. *Federal-State Agreements.* To ensure State and local law enforcement agencies across the United States can assist with the protection of the American people, the Secretary of Homeland Security shall, to the maximum extent permitted by law, and with the consent of State or local officials as appropriate, take appropriate action, through agreements under section 287(g) of the INA (8 U.S.C. 1357(g)) or otherwise, to authorize State and local law enforcement officials, as the Secretary of Homeland Security determines are qualified and appropriate, to perform the functions of immigration officers in relation to the investigation, apprehension, or detention of aliens in the United States under the direction and the supervision of the Secretary of Homeland Security. Such authorization shall be in addition to, rather than in place of, Federal performance of these duties. To the extent permitted by law, the Secretary of Homeland Security may structure each agreement under section 287(g) of the INA (8 U.S.C. 1357(g)) in the manner that provides the most effective model for enforcing Federal immigration laws in that jurisdiction.

**Sec. 12**. *Encouraging Voluntary Compliance with the Law.* The Secretary of Homeland Security shall take all appropriate action, in coordination with the Secretary of State and the Attorney General, and subject to adequate safeguards, assurances, bonds, and any other lawful measure, to adopt policies and procedures to encourage aliens unlawfully in the United States to voluntarily depart as soon as possible, including through enhanced usage of the provisions of section 240B of the INA (8 U.S.C. 1229c), international agreements or assistance, or any other measures that encourage aliens unlawfully in the United States to depart as promptly as possible, including through removals of aliens as provided by section 250 of the INA (8 U.S.C. 1260).

**Sec. 13**. *Recalcitrant Countries.* The Secretary of State and the Secretary of Homeland Security shall take all appropriate action to:

(a) Cooperate and effectively implement, as appropriate, the sanctions provided by section 243(d) of the INA (8 U.S.C. 1253(d)), with the Secretary of State, to the maximum extent permitted by law, ensuring that diplomatic

efforts and negotiations with foreign states include the foreign states' acceptance of their nationals who are subject to removal from the United States; and

(b) Eliminate all documentary barriers, dilatory tactics, or other restrictions that prevent the prompt repatriation of aliens to any foreign state. Any failure or delay by a foreign state to verify the identity of a national of that state shall be considered in carrying out subsection (a) this section, and shall also be considered regarding the issuance of any other sanctions that may be available to the United States.

Sec. 14. *Visa Bonds.* The Secretary of Treasury shall take all appropriate action, in coordination with the Secretary of State and the Secretary of Homeland Security, to establish a system to facilitate the administration of all bonds that the Secretary of State or the Secretary of Homeland Security may lawfully require to administer the provisions of the INA.

Sec. 15. *Reestablishment of the VOICE Office and Addressing Victims of Crimes Committed by Removable Aliens.* The Secretary of Homeland Security shall direct the Director of U.S. Immigration and Customs Enforcement (ICE) to take all appropriate and lawful action to reestablish within ICE an office to provide proactive, timely, adequate, and professional services to victims of crimes committed by removable aliens, and those victims' family members. The Attorney General shall also ensure that the provisions of 18 U.S.C. 3771 are followed in all Federal prosecutions involving crimes committed by removable aliens.

Sec. 16. *Addressing Actions by the Previous Administration.* The Secretary of State, the Attorney General, and the Secretary of Homeland Security shall promptly take all appropriate action, consistent with law, to rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States, and align any and all departmental activities with the policies set out by this order and the immigration laws. Such action should include, but is not limited to:

(a) ensuring that the parole authority under section 212(d)(5) of the INA (8 U.S.C. 1182(d)(5)) is exercised on only a case-by-case basis in accordance with the plain language of the statute, and in all circumstances only when an individual alien demonstrates urgent humanitarian reasons or a significant public benefit derived from their particular continued presence in the United States arising from such parole;

(b) ensuring that designations of Temporary Protected Status are consistent with the provisions of section 244 of the INA (8 U.S.C. 1254a), and that such designations are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute; and

(c) ensuring that employment authorization is provided in a manner consistent with section 274A of the INA (8 U.S.C. 1324a), and that employment authorization is not provided to any unauthorized alien in the United States.

Sec. 17. *Sanctuary Jurisdictions.* The Attorney General and the Secretary of Homeland Security shall, to the maximum extent possible under law, evaluate and undertake any lawful actions to ensure that so-called ''sanctuary'' jurisdictions, which seek to interfere with the lawful exercise of Federal law enforcement operations, do not receive access to Federal funds. Further, the Attorney General and the Secretary of Homeland Security shall evaluate and undertake any other lawful actions, criminal or civil, that they deem warranted based on any such jurisdiction's practices that interfere with the enforcement of Federal law.

Sec. 18. *Information Sharing.* (a) The Secretary of Homeland Security shall promptly issue guidance to ensure maximum compliance by Department of Homeland Security personnel with the provisions of 8 U.S.C. 1373 and 8 U.S.C. 1644 and ensure that State and local governments are provided with the information necessary to fulfill law enforcement, citizenship, or immigration status verification requirements authorized by law; and

HaitiTPSAR000018

(b) The Attorney General, the Secretary of Health and Human Services, and the Secretary of Homeland Security shall take all appropriate action to stop the trafficking and smuggling of alien children into the United States, including through the sharing of any information necessary to assist in the achievement of that objective.

**Sec. 19**. *Funding Review.* The Attorney General and the Secretary of Homeland Security shall:

(a) Immediately review and, if appropriate, audit all contracts, grants, or other agreements providing Federal funding to non-governmental organizations supporting or providing services, either directly or indirectly, to removable or illegal aliens, to ensure that such agreements conform to applicable law and are free of waste, fraud, and abuse, and that they do not promote or facilitate violations of our immigration laws;

(b) Pause distribution of all further funds pursuant to such agreements pending the results of the review in subsection (a) of this section;

(c) Terminate all such agreements determined to be in violation of law or to be sources of waste, fraud, or abuse and prohibit any such future agreements;

(d) Coordinate with the Director of the Office of Management and Budget to ensure that no funding for agreements described in subsection (c) of this section is included in any appropriations request for the Department of Justice or the Department of Homeland Security; and

(e) Initiate clawback or recoupment procedures, if appropriate, for any agreements described in subsection (c) of this section.

**Sec. 20**. *Denial of Public Benefits to Illegal Aliens.* The Director of the Office of Management and Budget shall take all appropriate action to ensure that all agencies identify and stop the provision of any public benefits to any illegal alien not authorized to receive them under the provisions of the INA or other relevant statutory provisions.

**Sec. 21**. *Hiring More Agents and Officers.* Subject to available appropriations, the Secretary of Homeland Security, through the Commissioner of U.S. Customs and Border Protection and the Director of U.S. Immigration and Customs Enforcement, shall take all appropriate action to significantly increase the number of agents and officers available to perform the duties of immigration officers.

**Sec. 22**. *Severability.* It is the policy of the United States to enforce this order to the maximum extent possible to advance the interests of the United States. Accordingly:

(a) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its other provisions to any other persons or circumstances shall not be affected thereby; and

(b) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid because of the failure to follow certain procedures, the relevant executive branch officials shall implement those procedural requirements to conform with existing law and with any applicable court orders.

**Sec. 23**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party

HaitiTPSAR000019

**8448**    **Federal Register** / Vol. 90, No. 18 / Wednesday, January 29, 2025 / Presidential Documents

against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–02006
Filed 1–28–25; 11:15 am]
Billing code 3395–F4–P

HaitiTPSAR000020

8451

| **Federal Register** | **Presidential Documents** |
| --- | --- |

Vol. 90, No. 19

Thursday, January 30, 2025

Title 3—

**The President**

Executive Order 14161 of January 20, 2025

## Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.,* and section 301 of title 3, United States Code, it is hereby ordered:

**Section 1**. *Policy and Purpose.* (a) It is the policy of the United States to protect its citizens from aliens who intend to commit terrorist attacks, threaten our national security, espouse hateful ideology, or otherwise exploit the immigration laws for malevolent purposes.

(b) To protect Americans, the United States must be vigilant during the visa-issuance process to ensure that those aliens approved for admission into the United States do not intend to harm Americans or our national interests. More importantly, the United States must identify them before their admission or entry into the United States. And the United States must ensure that admitted aliens and aliens otherwise already present in the United States do not bear hostile attitudes toward its citizens, culture, government, institutions, or founding principles, and do not advocate for, aid, or support designated foreign terrorists and other threats to our national security.

**Sec. 2**. *Enhanced Vetting and Screening Across Agencies.*

(a) The Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall promptly:

(i) identify all resources that may be used to ensure that all aliens seeking admission to the United States, or who are already in the United States, are vetted and screened to the maximum degree possible;

(ii) determine the information needed from any country to adjudicate any visa, admission, or other benefit under the INA for one of its nationals, and to ascertain whether the individual seeking the benefit is who the individual claims to be and that the individual is not a security or public-safety threat;

(iii) re-establish a uniform baseline for screening and vetting standards and procedures, consistent with the uniform baseline that existed on January 19, 2021, that will be used for any alien seeking a visa or immigration benefit of any kind; and

(iv) vet and screen to the maximum degree possible all aliens who intend to be admitted, enter, or are already inside the United States, particularly those aliens coming from regions or nations with identified security risks.

(b) Within 60 days of the date of this order, the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence shall jointly submit to the President, through the Assistant to the President for Homeland Security, a report:

(i) identifying countries throughout the world for which vetting and screening information is so deficient as to warrant a partial or full suspension on the admission of nationals from those countries pursuant to section 212(f) of the INA (8 U.S.C. 1182(f)); and

(ii) identifying how many nationals from those countries have entered or have been admitted into the United States on or since January 20,

HaitiTPSAR000021

**8452**    **Federal Register** / Vol. 90, No. 19 / Thursday, January 30, 2025 / Presidential Documents

2021, and any other information the Secretaries and Attorney General deem relevant to the actions or activities of such nationals since their admission or entry to the United States.

(c) Whenever information is identified that would support the exclusion or removal of any alien described in subsection 2(b), the Secretary of Homeland Security shall take immediate steps to exclude or remove that alien unless she determines that doing so would inhibit a significant pending investigation or prosecution of the alien for a serious criminal offense or would be contrary to the national security interests of the United States.

**Sec. 3**. *Additional Measures to Protect the Nation.* As soon as possible, but no later than 30 days from the date of this order, the Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall also:

(a) Evaluate and adjust all existing regulations, policies, procedures, and provisions of the Foreign Service Manual, or guidance of any kind pertaining to each of the grounds of inadmissibility listed in sections 212(a)(2)–(3) of the INA (8 U.S.C. 1182(a)(2)–(3)), to ensure the continued safety and security of the American people and our constitutional republic;

(b) Ensure that sufficient safeguards are in place to prevent any refugee or stateless individual from being admitted to the United States without undergoing stringent identification verification beyond that required of any other alien seeking admission or entry to the United States;

(c) Evaluate all visa programs to ensure that they are not used by foreign nation-states or other hostile actors to harm the security, economic, political, cultural, or other national interests of the United States;

(d) Recommend any actions necessary to protect the American people from the actions of foreign nationals who have undermined or seek to undermine the fundamental constitutional rights of the American people, including, but not limited to, our Citizens' rights to freedom of speech and the free exercise of religion protected by the First Amendment, who preach or call for sectarian violence, the overthrow or replacement of the culture on which our constitutional Republic stands, or who provide aid, advocacy, or support for foreign terrorists;

(e) Ensure the devotion of adequate resources to identify and take appropriate action for offenses described in 8 U.S.C. 1451;

(f) Evaluate the adequacy of programs designed to ensure the proper assimilation of lawful immigrants into the United States, and recommend any additional measures to be taken that promote a unified American identity and attachment to the Constitution, laws, and founding principles of the United States; and

(g) Recommend any additional actions to protect the American people and our constitutional republic from foreign threats.

**Sec. 4**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

HaitiTPSAR000022

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20 2025.*

[FR Doc. 2025–02009
Filed 1–29–25; 8:45 am]
Billing code 3395–F4–P

HaitiTPSAR000023

nonimmigrant will be able to maintain compliance requirements for F–1 nonimmigrant student status while having TPS.

### When a student applies simultaneously for TPS and benefits under this notice, what is the minimum course load requirement while an application for employment authorization is pending?

The F–1 nonimmigrant student must maintain normal course load requirements for a "full course of study" [43] unless or until the nonimmigrant student receives employment authorization under this notice. TPS-related employment authorization, by itself, does not authorize a nonimmigrant student to drop below twelve credit hours, or otherwise applicable minimum requirements (*e.g.,* clock hours for non-traditional academic programs). Once approved for Special Student Relief employment authorization, the F–1 nonimmigrant student may drop below twelve credit hours, or otherwise applicable minimum requirements (with a minimum of six semester or quarter hours of instruction per academic term if at the undergraduate level, or for a minimum of three semester or quarter hours of instruction per academic term if at the graduate level). *See* 8 CFR 214.2(f)(5)(v), (f)(6), and (f)(9)(i) and (ii).

### How does a student who has received a TPS-related EAD then apply for authorization to take a reduced course load under this notice?

There is no further application process with USCIS if a student has been approved for a TPS-related EAD. The F–1 nonimmigrant student must demonstrate and provide documentation to the DSO of the direct economic hardship resulting from the current crisis in Haiti. The DSO will then verify and update the student's record in SEVIS to enable the F–1 nonimmigrant student with TPS to reduce the course load without any further action or application. No other EAD needs to be issued for the F–1 nonimmigrant student to have employment authorization.

### Can a noncitizen who has been granted TPS apply for reinstatement of F–1 nonimmigrant student status after the noncitizen's F–1 nonimmigrant student status has lapsed?

Yes. Regulations permit certain students who fall out of F–1 nonimmigrant student status to apply for reinstatement. *See* 8 CFR 214.2(f)(16). This provision might apply

[43] *See* 8 CFR 214.2(f)(6).

to students who worked on a TPS-related EAD or dropped their course load before the date of publication of this notice, and therefore fell out of student status. These students must satisfy the criteria set forth in the F–1 nonimmigrant student status reinstatement regulations.

### How long will this notice remain in effect?

This notice grants temporary relief until August 3, 2024,[44] to eligible F–1 nonimmigrant students. DHS will continue to monitor the situation in Haiti. Should the special provisions authorized by this notice need modification or extension, DHS will announce such changes in the **Federal Register**.

### Paperwork Reduction Act (PRA)

An F–1 nonimmigrant student seeking off-campus employment authorization due to severe economic hardship resulting from the current crisis in Haiti must demonstrate to the DSO that this employment is necessary to avoid severe economic hardship. A DSO who agrees that a nonimmigrant student should receive such employment authorization must recommend an application approval to USCIS by entering information in the remarks field of the student's SEVIS record. The authority to collect this information is in the SEVIS collection of information currently approved by the Office of Management and Budget (OMB) under OMB Control Number 1653–0038.

This notice also allows an eligible F–1 nonimmigrant student to request employment authorization, work an increased number of hours while the academic institution is in session, and reduce their course load while continuing to maintain F–1 nonimmigrant student status.

To apply for employment authorization, certain F–1 nonimmigrant students must complete

[44] Because the suspension of requirements under this notice applies throughout an academic term during which the suspension is in effect, DHS considers an F–1 nonimmigrant student who engages in a reduced course load or employment (or both) after this notice is effective to be engaging in a "full course of study," *see* 8 CFR 214.2(f)(6), and eligible for employment authorization, through the end of any academic term for which such student is matriculated as of August 3, 2024, provided the student satisfies the minimum course load requirement in this notice. DHS also considers students who engage in online coursework pursuant to ICE coronavirus disease 2019 (COVID–19) guidance for nonimmigrant students to be in compliance with regulations while such guidance remains in effect. *See* ICE Guidance and Frequently Asked Questions on COVID–19, Nonimmigrant Students & SEVP-Certified Schools: Frequently Asked Questions, *https://www.ice.gov/coronavirus* (last visited Nov. 30, 2022).

and submit a currently approved Form I–765 according to the instructions on the form. OMB has previously approved the collection of information contained on the current Form I–765, consistent with the PRA (OMB Control No. 1615–0040). Although there will be a slight increase in the number of Form I–765 filings because of this notice, the number of filings currently contained in the OMB annual inventory for Form I–765 is sufficient to cover the additional filings. Accordingly, there is no further action required under the PRA.

**Alejandro Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*
[FR Doc. 2023–01593 Filed 1–25–23; 8:45 am]
**BILLING CODE 9111–28–P**

---

### DEPARTMENT OF HOMELAND SECURITY

#### U.S. Citizenship and Immigration Services

[CIS No. 2737–22; DHS Docket No. USCIS–2014–0001]

RIN 1615–ZB70

#### Extension and Redesignation of Haiti for Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS).

**ACTION:** Notice of Temporary Protected Status (TPS) extension and redesignation.

---

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is extending the designation of Haiti for Temporary Protected Status (TPS) for 18 months, beginning on February 4, 2023, and ending on August 3, 2024. This extension allows existing TPS beneficiaries to retain TPS through August 3, 2024, so long as they continue to meet the eligibility requirements for TPS. Existing TPS beneficiaries who wish to extend their status through August 3, 2024, must re-register during the 60-day re-registration period described in this notice. The Secretary is also redesignating Haiti for TPS. The redesignation of Haiti allows additional Haitian nationals (and individuals having no nationality who last habitually resided in Haiti) who have been continuously residing in the United States since November 6, 2022, to apply for TPS for the first time during the initial registration period described under the redesignation information in

this notice. In addition to demonstrating continuous residence in the United States since November 6, 2022, and meeting other eligibility criteria, applicants for TPS under this designation must demonstrate that they have been continuously physically present in the United States since February 4, 2023, the effective date of this redesignation of Haiti for TPS.

**DATES:**

*Extension of Designation of Haiti for TPS:* The 18-month extension of Haiti's designation for TPS begins on February 4, 2023, and will remain in effect for 18 months, ending on August 3, 2024. The extension impacts existing beneficiaries of TPS.

*Re-registration:* The 60-day re-registration period for existing beneficiaries runs from January 26, 2023 through March 27, 2023. (*Note:* It is important for re-registrants to timely re-register during the registration period and not to wait until their Employment Authorization Documents (EADs) expire, as delaying re-registration could result in gaps in their employment authorization documentation.)[1]

*Redesignation of Haiti for TPS:* The 18-month redesignation of Haiti for TPS begins on February 4, 2023, and will remain in effect for 18 months, ending on August 3, 2024. The redesignation impacts potential first-time applicants and others who do not currently have TPS.

*First-time Registration:* The initial registration period for new applicants under the Haiti TPS redesignation begins on January 26, 2023 and will remain in effect through August 3, 2024.

**FOR FURTHER INFORMATION CONTACT:** You may contact René Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 800–375–5283.

---

[1] Individuals with TPS who were granted under the 2011 designation of Haiti and who are covered under the preliminary injunction that requires DHS to continue their TPS and TPS-related documents, unless their TPS has been withdrawn for individual ineligibility, retain their TPS and their documents remain valid through June 30, 2024 in accordance with the **Federal Register** notice published at 87 FR 68717 (Nov. 16, 2022) or any superseding such litigation-related notice that DHS may issue. *See Ramos, et al.* v. *Nielsen, et al.,* 321 F.Supp.3d 1083 (N.D. Cal. Oct. 3, 2018) ("*Ramos*"), *vacated Ramos* v. *Wolf,* 975 F.3d 872 (9th Cir. 2020), *petition for en banc rehearing* filed Nov. 30, 2020 (No. 18–16981). However, such individuals may re-register under this notice, which will help ensure that their TPS continues (if they remain eligible) as long as Haiti's designation exists even if the *Ramos* injunction ceases.

For further information on TPS, including guidance on the registration process and additional information on eligibility, please visit the USCIS TPS web page at *https://www.uscis.gov/tps.* You can find specific information about Haiti's TPS designation by selecting "Haiti" from the menu on the left side of the TPS web page.

If you have additional questions about TPS, please visit *https://www.uscis.gov/tools.* Our online virtual assistant, Emma, can answer many of your questions and point you to additional information on our website. If you are unable to find your answers there, you may also call our USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

Applicants seeking information about the status of their individual cases may check Case Status Online, available on the USCIS website at *https://www.uscis.gov,* or visit the USCIS Contact Center at *https://www.uscis.gov/contactcenter.*

Further information will also be available at local USCIS offices upon publication of this notice.

**SUPPLEMENTARY INFORMATION:**

## Table of Abbreviations

BIA—Board of Immigration Appeals
CFR—Code of Federal Regulations
DHS—U.S. Department of Homeland Security
DOS—U.S. Department of State
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
Form I–765—Application for Employment Authorization
Form I–797—Notice of Action (Approval Notice)
Form I–821—Application for Temporary Protected Status
Form I–9—Employment Eligibility Verification
Form I–912—Request for Fee Waiver
Form I–94—Arrival/Departure Record
FR—Federal Register
Government—U.S. Government
IER—U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section
IJ—Immigration Judge
INA—Immigration and Nationality Act
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services
U.S.C.—United States Code

## Purpose of This Action (TPS)

Through this notice, DHS sets forth procedures necessary for nationals of Haiti (or individuals having no nationality who last habitually resided in Haiti) to (1) re-register for TPS and apply for renewal of their EADs with USCIS or (2) submit an initial

registration application under the redesignation and apply for an EAD.

Individuals who previously registered for TPS under the August 3, 2021 prior designation of Haiti and whose applications have been granted must re-register properly within the 60-day re-registration period in order to maintain TPS and avoid withdrawal of their TPS following appropriate procedures. *See* 8 CFR 244.14. If your TPS is currently continuing under the court order in *Ramos,* re-registering for TPS under this Notice does not affect the continuation of your TPS while the order remains in effect. However, if the court order is no longer in effect, re-registering for TPS under this **Federal Register** Notice will help ensure that you have TPS until the end of the designation as long as you remain eligible.

For individuals who have already been granted TPS under Haiti's August 3, 2021 designation or the July 23, 2011 designation and who continue to have TPS, the 60-day re-registration period runs from January 26, 2023 through March 27, 2023.

USCIS will issue new EADs with an August 3, 2024 expiration date to eligible Haitian TPS beneficiaries who timely re-register and apply for EADs.

Given the time frames involved with processing TPS re-registration applications, DHS recognizes that not all re-registrants may receive new EADs before their current EADs expire. Accordingly, through this **Federal Register** notice, DHS automatically extends the validity of EADs previously issued under the August 3, 2021 TPS designation of Haiti through February 3, 2024. Therefore, as proof of continued employment authorization through February 3, 2024, TPS beneficiaries can show their EADs that have the notation A–12 or C–19 under Category and a "Card Expires" date of February 3, 2023. This notice explains how TPS beneficiaries and their employers may determine which EADs are automatically extended and how this affects the Form I–9, Employment Eligibility Verification, E-Verify, and USCIS Systematic Alien Verification for Entitlements (SAVE) processes.[2]

Individuals who have a Haiti TPS application (Form I–821) and/or Application for Employment Authorization (Form I–765) that was still pending as of January 26, 2023 do

---

[2] Certain EADs and other TPS documents issued to individuals covered by the *Ramos* injunction remain valid in accordance with that court order. For details, please *see* 86 FR 50725 (Sept. 10, 2021). If a superseding litigation-related notice is published that affects individuals under *Ramos,* DHS will also notify the public on the USCIS website.

HaitiTPSAR000025

**5024**    **Federal Register** / Vol. 88, No. 17 / Thursday, January 26, 2023 / Notices

not need to file either application again. If USCIS approves an individual's Form I–821, USCIS will grant the individual TPS through August 3, 2024. Similarly, if USCIS approves a pending TPS-related Form I–765 filed in connection with a Form I–821, USCIS will issue the individual a new EAD that will be valid through the same date.

Under the redesignation, individuals who currently do not have TPS may submit an initial application during the initial registration period that runs from January 26, 2023 through the full length of the redesignation period ending August 3, 2024.[3] In addition to demonstrating continuous residence in the United States since November 6, 2022, and meeting other eligibility criteria, applicants for TPS under this redesignation must demonstrate that they have been continuously physically present in the United States since February 4, 2023,[4] the effective date of this redesignation of Haiti, before USCIS may grant them TPS. DHS estimates that approximately 105,000 individuals may become newly eligible for TPS under the redesignation of Haiti.

### What is Temporary Protected Status (TPS)?

• TPS is a temporary immigration status granted to eligible nationals of a foreign state designated for TPS under the Immigration and Nationality Act (INA), or to eligible individuals without nationality who last habitually resided in the designated foreign state, regardless of their country of birth.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to work so long as they continue to meet the requirements of TPS. They may apply for and receive EADs as evidence of employment authorization.

• TPS beneficiaries may also apply for and be granted travel authorization as a matter of DHS discretion.

• To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(1)–(2), 8 U.S.C. 1254a(c)(1)–(2).

• When the Secretary terminates a foreign state's TPS designation, beneficiaries return to one of the following:

○ The same immigration status or category that they maintained before TPS, if any (unless that status or category has since expired or terminated); or

○ Any other lawfully obtained immigration status or category they received while registered for TPS, as long as it is still valid beyond the date TPS terminates.

### When was Haiti designated for TPS?

Haiti was initially designated on the basis of extraordinary and temporary conditions that prevented nationals of Haiti from returning in safety. *See Designation of Haiti for Temporary Protected Status,* 75 FR 3476 (Jan. 21, 2010). Following the initial designation, TPS for Haiti was extended and redesignated once from July 23, 2011, through January 22, 2013, based on extraordinary and temporary conditions.[5] Thereafter, TPS for Haiti was extended four times based on extraordinary and temporary conditions: (1) from January 23, 2013, through July 22, 2014;[6] (2) from July 23, 2014, through January 22, 2016;[7] (3) from January 23, 2016, through July 22, 2017;[8] and (4) from July 23, 2017, through January 22, 2018.[9] Subsequently, the Secretary announced the termination of the TPS designation of Haiti effective July 22, 2019.[10]

The termination of Haiti's 2011 TPS designation is being challenged in several lawsuits, and court injunctions require DHS to continue TPS for Haiti temporarily pending further court

order.[11] Secretary Mayorkas newly designated Haiti on the basis of extraordinary and temporary conditions effective August 3, 2021, through February 3, 2023.[12]

### What authority does the Secretary have to extend the designation of Haiti for TPS?

Section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1), authorizes the Secretary, after consultation with appropriate agencies of the U.S. Government, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist.[13] The decision to designate any foreign state (or part thereof) is a discretionary decision, and there is no judicial review of any determination with respect to the designation, termination, or extension of a designation. *See* INA section 244(b)(5)(A); 8 U.S.C. 1254a(b)(5)(A).[14] The Secretary, in his or her discretion, may then grant TPS to eligible nationals of that foreign state (or individuals having no nationality who last habitually resided in the designated foreign state). *See* INA section 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a foreign state's TPS designation or extension, the Secretary, after consultation with appropriate U.S. Government agencies, must review the

---

[3] In general, individuals must be given an initial registration period of no less than 180 days to register for TPS, but the Secretary has discretion to provide for a longer registration period. *See* 8 U.S.C. 1254a(c)(1)(A)(iv). In keeping with the humanitarian purpose of TPS and advancing the goal of ensuring "the Federal Government eliminates . . . barriers that prevent immigrants from accessing government services available to them" under Executive Order 14012, *Restoring Faith in Our Legal Immigration Systems and Strengthening Integration and Inclusion Efforts for New Americans,* 86 FR 8277 (Feb. 5, 2021), the Secretary has exercised his discretion to provide for a TPS initial registration period that coincides with the full period of a Haiti's redesignation.

[4] The "continuous physical presence date" (CPP) is the effective date of the most recent TPS designation of the country, which is either the publication date of the designation announcement in the **Federal Register** or such later date as the Secretary may establish. The "continuous residence date" (CR) is any date established by the Secretary when a country is designated (or sometimes redesignated) for TPS. *See* INA section 244(b)(2)(A) (effective date of designation); 244(c)(1)(A)(i–ii) (discussing CR and CPP date requirements).

[5] *See Extension and Redesignation of Haiti for Temporary Protected Status,* 76 FR 29000 (May 19, 2011).

[6] *See Extension of the Designation of Haiti for Temporary Protected Status,* 77 FR 59943 (Oct. 1, 2012).

[7] *See Extension of the Designation of Haiti for Temporary Protected Status,* 79 FR 11808 (Mar. 3, 2014).

[8] *See Extension of the Designation of Haiti for Temporary Protected Status,* 80 FR 51582 (Aug. 25, 2015).

[9] *See Extension of the Designation of Haiti for Temporary Protected Status,* 82 FR 23830 (May 24, 2017).

[10] *See Termination of the Designation of Haiti for Temporary Protected Status,* 83 FR 2648 (Jan. 18, 2018).

[11] *See Ramos* v. *Wolf,* 975 F.3d 872 (9th Cir. 2020), *petition for en banc rehearing* filed Nov. 30, 2020 (No. 18–16981) (district court's preliminary injunction against termination of six countries' TPS, including TPS for Haiti, remains in effect pending 9th Circuit consideration of plaintiffs' request for *en banc* rehearing of appellate panel decision to vacate the district court injunction); *Saget* v. *Trump,* No. 1:18–cv–1599 (E.D.N.Y. 2019) (injunction issued, but dismissed as moot, Oct. 15, 2021)); *NAACP* v. *DHS,* No. 18–cv–00239 (D. Md.); and *Centro Presente* v. *Trump,* No. 18–cv–10340 (D. Mass.).

[12] *See Designation of Haiti for Temporary Protected Status,* 86 FR 41863 (Aug. 3, 2021).

[13] INA section 244(b)(1) ascribes this power to the Attorney General. Congress transferred this authority from the Attorney General to the Secretary of Homeland Security. *See* Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135. The Secretary may designate a country (or part of a country) for TPS on the basis of ongoing armed conflict such that returning would pose a serious threat to the personal safety of the country's nationals and habitual residents, environmental disaster (including an epidemic), or extraordinary and temporary conditions in the country that prevent the safe return of the country's nationals. For environmental disaster-based designations, certain other statutory requirements must be met, including that the foreign government must request TPS. A designation based on extraordinary and temporary conditions cannot be made if the Secretary finds that allowing the country's nationals to remain temporarily in the United States is contrary to the U.S. national interest. *Id.,* at section 244(b)(1).

[14] This issue of judicial review is the subject of litigation. *See, e.g., Ramos* v. *Wolf,* 975 F.3d 872 (9th Cir. 2020), *petition for en banc rehearing* filed Nov. 30, 2020 (No. 18–16981); *Saget* v. *Trump,* 375 F. Supp. 3d 280 (E.D.N.Y. 2019).

HaitiTPSAR000026

**Federal Register** / Vol. 88, No. 17 / Thursday, January 26, 2023 / Notices **5025**

conditions in the foreign state designated for TPS to determine whether they continue to meet the conditions for the TPS designation. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that the foreign state continues to meet the conditions for TPS designation, the designation will be extended for an additional period of 6 months or, in the Secretary's discretion, 12 or 18 months. *See* INA section 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

### What is the Secretary's authority to redesignate Haiti for TPS?

In addition to extending an existing TPS designation, the Secretary, after consultation with appropriate Government agencies, may redesignate a country (or part thereof) for TPS. *See* INA section 244(b)(1), 8 U.S.C. 1254a(b)(1); *see also* INA section 244(c)(1)(A)(i), 8 U.S.C. 1254a(c)(1)(A)(i) (requiring that ''the alien has been continuously physically present since the effective date of *the most recent designation of the state*'') (emphasis added).[15]

When the Secretary designates or redesignates a country for TPS, the Secretary also has the discretion to establish the date from which TPS applicants must demonstrate that they have been ''continuously resid[ing]'' in the United States. *See* INA section 244(c)(1)(A)(ii), 8 U.S.C. 1254a(c)(1)(A)(ii). The Secretary has determined that the ''continuous residence'' date for applicants for TPS under the redesignation of Haiti will be November 6, 2022. Initial applicants for TPS under this redesignation must also show they have been ''continuously physically present'' in the United States since February 4, 2023, which is the effective date of the Secretary's redesignation of Haiti. *See* INA section 244(c)(1)(A)(i), 8 U.S.C. 1254a(c)(1)(A)(i). For each initial TPS application filed under the redesignation, the final determination of whether the applicant has met the

''continuous physical presence'' requirement cannot be made until February 4, 2023, the effective date of this redesignation for Haiti. USCIS, however, will issue employment authorization documentation, as appropriate, during the registration period in accordance with 8 CFR 244.5(b).

### Why is the Secretary extending the TPS designation for Haiti and simultaneously redesignating Haiti for TPS through August 3, 2024?

DHS has reviewed country conditions in Haiti. Based on the review, including consultation with DOS and other U.S. Government agencies, the Secretary has determined that an 18-month TPS extension is warranted because the extraordinary and temporary conditions supporting Haiti's TPS designation remain and that such extension is not contrary to the national interest of the United States. The Secretary has further determined that redesignating Haiti for TPS based on extraordinary and temporary conditions under INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(1)(C) is warranted, including a determination that redesignation is not contrary to the national interest of the United States, and is changing the ''continuous residence'' and ''continuous physical presence'' dates that applicants must meet to be eligible for TPS.

*Overview*

DHS has conducted a thorough review of country conditions in Haiti. Haiti is experiencing economic, security, political, and health crises simultaneously. Haitian gangs are the primary source of violence and instability in Haiti and pose an increasing threat as they expand their influence and geographic presence over portions of metropolitan Port-au-Prince.[16] Haitian political and business elites have long cultivated relationships with gang leaders to further their agendas and destabilize Haiti.[17] While elites often operationalize gangs, the gangs typically function as mercenaries responsive to the highest bidder.[18] Moreover, some gangs earn sufficient funds from kidnapping for ransom operations to function as independent

criminal organizations.[19] At the same time, Haiti is confronting a humanitarian crisis, with many citizens having limited access to safety, healthcare, food, water, and economic opportunity. These circumstances continue to make return to Haiti dangerous for Haitian nationals living in the United States.

*Political Situation*

The Haitian parliament was dissolved in January 2020 as the mandates of two thirds of Senate members and all Chamber of Deputies members expired, and no new elections were held.[20] On July 7, 2021, President Jovenel Moïse was assassinated in his private residence in Port-au-Prince. Subsequently, Ariel Henry, whom Moïse had appointed prime minister days before the assassination, was installed as head of a new government.[21]

Since then, PM Henry and opposition groups have engaged in intermittent negotiations about a political path towards elections. On December 21, 2022, representatives of civil society, the private sector, and political groups began signing a revised political agreement known as the ''December Accord,'' which was supported by PM Henry.[22] Some opposition members, including many members of the Citizen Conference for a Haitian Solution to the Crisis, also known as Montana Group members, had not yet agreed to the accord as of January 4, 2023.[23]

The Haitian government has long been accused of corruption and ineptitude. Politicians and the business elite in Haiti have historically relied on gangs to obtain and exert power, but the gangs have grown more autonomous in recent years.[24] An April 2021 report by

---

[15] The extension and redesignation of TPS for Haiti is one of several instances in which the Secretary and, prior to the establishment of DHS, the Attorney General, have simultaneously extended a country's TPS designation and redesignated the country for TPS. *See, e.g.,* 76 FR 29000 (May 19, 2011) (extension and redesignation for Haiti); 69 FR 60168 (Oct. 7, 2004) (extension and redesignation for Sudan); 62 FR 16608 (Apr. 7, 1997) (extension and redesignation for Liberia).

[16] Diego Da Rin, *New Gang Battle Lines Scar Haiti as Political Deadlock Persists,* International Crisis Group (July 27, 2022), *https://www.crisisgroup.org/ latin-america-caribbean/haiti/new-gang-battle-lines-scar-haiti-political-deadlock-persists.*

[17] *Id.*

[18] D.C. Beer, *Chapter 3 Haiti: The Gangs of Cité Soleil,* PRISM: National Defense University, May 24, 2016, *https://cco.ndu.edu/News/Article/780129/ chapter-3-haiti-the-gangs-of-cit-soleil/.*

[19] Jennifer Jelly and Tatiana Vasquez, *The Rise of Kidnappings for Ransom in Haiti,* The Counterterrorism Group, Dec. 13, 2021, *https:// www.counterterrorismgroup.com/post/the-rise-of-kidnappings-for-ransom-in-haiti.*

[20] Freedom House, *Freedom in the World 2022— Haiti* (Feb. 28, 2022), *https://freedomhouse.org/ country/haiti/freedom-world/2022.*

[21] Human Rights Watch, *World Report 2022— Haiti* (Jan. 13, 2022), *https://www.hrw.org/world-report/2022/country-chapters/haiti.*

[22] Haiti Libre, *Haiti—FLASH: The PM signed a historic consensus for an inclusive transition,* Dec. 22, 2022, *https://www.haitilibre.com/en/news-38427-haiti-flash-the-pm-signed-a-historic-consensus-for-an-inclusive-transition.html.*

[23] Juno7, *Accord du 21 décembre 2022: les violons ne s'accordant pas au sein de l'accord de Montana,* Dec. 29, 2022, *https://www.juno7.ht/ accord-du-21-decembre-2022-violons-laccord-de-montana/.*

[24] Diego Da Rin, *New Gang Battle Lines Scar Haiti as Political Deadlock Persists,* International Crisis Group (July 27, 2022), *https://www.crisisgroup.org/ latin-america-caribbean/haiti/new-gang-battle-lines-scar-haiti-political-deadlock-persists.*

HaitiTPSAR000027

Harvard Law School's International Human Rights Clinic alleged that the Moïse government funneled money, weapons, uniforms, and vehicles to gangs like the G9, in exchange for them repressing political opponents, often brutally, and maintaining the peace in poorer neighborhoods.[25] A July 2022 International Crisis Group report stated "collusion between state security forces and illegal armed groups has flourished in the absence of political will to hold corrupt officers accountable and because of efforts of those in power to deploy the police (as well as gangs) to serve their personal interests." [26]

*Security Situation*

Since President Moïse's assassination, Haiti has experienced a sharp deterioration in an already fragile security situation. Gang violence and kidnappings have spiked throughout the country, particularly in the capital, Port-au-Prince. The United Nations documented 934 killings, 684 injuries, and 680 kidnappings in Port-au-Prince from January to June 2022.[27] In one 10-day period in July 2022, more than 200 people were killed in gang violence in Port-au-Prince; nearly half of the decedents had no gang ties.[28] Human rights organizations have said there were more than 1,200 kidnappings in 2021, almost twice the number reported in 2020 and five times more than in 2019.[29]

There are around 200 gangs across Haiti, 95 of which operate in metropolitan Port-au-Prince. Many of Haiti's gangs have coalesced around two main alliances: the G9 and the GPèp. A struggle for dominance by various gangs has superseded the old local rivalries. Gangs have decapitated opponents in public, burnt corpses in the street, set fire to houses, and used sexual violence to intimidate residents out of collaborating with their rivals.[30] Clashes between rival gangs led to particularly high levels of gang violence in April and May 2022, leading to the temporary closure of dozens of schools, medical centers, businesses, and markets, making it difficult for people to find basic products including food, water, and medicines.[31] In May 2022, UN High Commissioner for Human Rights Michelle Bachelet described armed violence in Haiti as "unimaginable and intolerable" and stated that "violence has had a severe impact on the most basic human rights of people." [32] Also in May, Doctors Without Borders warned that kidnappings for ransom that target many residents of Port-au-Prince, including medical personnel, were making it increasingly difficult for the population to access healthcare.[33] Gangs in Port-au-Prince targeted homeless and at-risk teens as participants in gang violence.[34] In July 2022, the UN Office for the Coordination of Humanitarian Affairs (UNOCHA) estimated that more than a third of Port-au-Prince was under the control of gangs.[35]

Haitian gangs have also attacked religious and government infrastructure. On June 10, 2022, a gang known as 5 Seconds took temporary control of the Court of First Instance, the main courthouse in Port au Prince. While the courthouse had not been used for criminal trials for several years due to persistent insecurity, the gang nevertheless forced judicial officials out and stole computers, desks, and other assets. The gang appears to have stolen or destroyed case files and evidence that the president of the Association of Haitian Magistrates said would be impossible to recover as Haitian courts do not have digital copies of files.[36] On July 27, 2022, gang members set Port-au-Prince's transitional cathedral on fire and deployed tear gas during a clash in Bel Air neighborhood, in which several people were killed and others injured by stray bullets. Local sources denounced the use of state-owned machinery by the G9 as well as a lack of action by state forces. In Ouest department, the region in which Port-au-Prince is located, members of the 400 Mawozo gang set a public prosecutor's office on fire in Croix-de-Bouquets district near the capital on the night of July 25, 2022.[37]

In mid-September, gangs blocked access to the Varreux Terminal in Port-au-Prince, the main entry point for fuel in Haiti, cutting off millions of gallons of diesel and gasoline and causing a severe fuel shortage.[38] The fuel blockage paralyzed Haiti's economy.[39] Health centers and hospitals had to close, and the distribution of water was interrupted.[40] The lack of access to clean water contributed to the outbreak of cholera in early October, and complicated efforts to respond to and contain the outbreak.[41] On October 7, the government of Haiti requested assistance from the international community to confront gangs and address the humanitarian crisis.[42] In an October 12, 2022 Press Statement, U.S. Secretary of State Antony Blinken emphasized the critical nature of the humanitarian situation in Haiti, noting that the United States is committed to continuing to help Haiti address the crisis through multiple avenues.[43] On

[25] Harvard Law School International Human Rights Clinic, *Killing with Impunity: State-Sanctioned Massacres in Haiti* (April 2021), *http://hrp.law.harvard.edu/wp-content/uploads/2021/04/Killing_With_Impunity-1.pdf.*

[26] Diego Da Rin, *New Gang Battle Lines Scar Haiti as Political Deadlock Persists,* International Crisis Group (July 27, 2022), *https://www.crisisgroup.org/latin-america-caribbean/haiti/new-gang-battle-lines-scar-haiti-political-deadlock-persists.*

[27] Haiti: UN sounds alarm over worsening gang violence across Port-au-Prince, UN News, July 16, 2022, *https://news.un.org/en/story/2022/07/1122662#:~:text=%E2%80%9CWe%20have%20so%20far%20documented,Soleil%20area%20of%20the%20city.%E2%80%9D.*

[28] BBC News, *Haiti Gang Violence: 209 killed in Cité Soleil in 10 days,* July 26, 2022, *https://www.bbc.com/news/world-latin-america-62292007.*

[29] Diego Da Rin, *New Gang Battle Lines Scar Haiti as Political Deadlock Persists,* International Crisis Group (July 27, 2022), *https://www.crisisgroup.org/latin-america-caribbean/haiti/new-gang-battle-lines-scar-haiti-political-deadlock-persists.*

[30] *Id.*

[31] Office of the High Commissioner for Human Rights, *Press Release: Haiti: Bachelet deeply disturbed by human rights impact of deteriorating security situation in Port-au-Prince* (May 17, 2022), *https://www.ohchr.org/en/press-releases/2022/05/haiti-bachelet-deeply-disturbed-human-rights-impact-deteriorating-security.*

[32] *Id.*

[33] Doctors Without Borders, *Haiti: Attacks on medical staff leave many people without health care* (May 22, 2022), *https://www.doctorswithoutborders.org/latest/haiti-attacks-medical-staff-leave-many-people-without-health-care.*

[34] InSight Crime, *Haiti Gangs Recruiting, Arming More Children* (June 3, 2022), *https://insightcrime.org/news/haiti-gangs-recruiting-arming-more-children/.*

[35] UNOCHA, *Haiti: Impact of the deteriorating security situation on humanitarian access: Background note—8 July 2022* (July 9, 2022), *https://reliefweb.int/report/haiti/haiti-impact-deteriorating-security-situation-humanitarian-access-background-note-8-july-2022.*

[36] HRW, *Haiti: Wave of Violence Deepens Crisis* (July 22, 2022), *https://reliefweb.int/report/haiti/haiti-wave-violence-deepens-crisis.*

[37] ACLED, *ACLED Regional Overview—Mexico, Central America, and the Caribbean (23–29 July 2022)* (July 29, 2022), *https://reliefweb.int/report/haiti/acled-regional-overview-mexico-central-america-and-caribbean-23-29-july-2022.*

[38] PBS NewsHour, *Haiti reaches a breaking point as the economy tanks and violence soars* (Oct. 4, 2022), *https://www.pbs.org/newshour/world/haiti-reaches-a-breaking-point-as-the-economy-tanks-and-violence-soars.*

[39] Brian Ellsworth and Harold Isaac, *UN calls for 'humanitarian corridor' in Haiti as gang blockade drags on,* Reuters, Oct. 6, 2022, *https://www.reuters.com/world/americas/un-calls-humanitarian-corridor-haiti-gang-blockade-drags-2022-10-06/.*

[40] UN News, *Haiti: Fuel crisis prompts appeal for humanitarian corridor amid cholera outbreak,* Oct. 6, 2022, *https://news.un.org/en/story/2022/10/1129317.*

[41] *Id.*

[42] Reuters, *Haiti's situation is dire and cannot persist,* State Department says, Oct. 11, 2022, *https://www.reuters.com/world/americas/haitis-situation-is-dire-cannot-persist-state-department-says-2022-10-11/.*

[43] U.S. Department of State, Press Statement, Steps to Address the Humanitarian and Security Situation in Haiti, Oct. 12, 2022, *https://www.state.gov/steps-to-address-the-humanitarian-and-security-situation-in-haiti/.*

October 15, the U.S. and Canada delivered Haitian National Police-purchased armored vehicles and other law enforcement equipment to assist in re-taking the terminal.[44] A Haitian National Police operation in early November successfully re-gained control of the fuel terminal.[45] The relatively small size of the Haitian National Police remains concerning. Out of 14,161 officers, approximately 13,000 officers are assigned to law enforcement activities.[46] Haiti has just over one police officer assigned to law enforcement activities per 1,000 inhabitants, well below the 2.2 officers per 1,000 recommended by the United Nations.[47]

*Environmental Situation*

Several recent environmental disasters have contributed to the extraordinary and temporary conditions in Haiti. On August 14, 2021, a 7.2 magnitude earthquake hit the southern region of Haiti, killing more than 2,200 people, injuring 12,700, destroying 130,000 homes, and leaving thousands of people in urgent need of assistance.[48] Two days later, Tropical Storm Grace's torrential rains caused floods and landslides in the same departments affected by the earthquake, as well as in Sud-Est.[49] According to the 2021 Global Climate Risk Index, Haiti was third among the countries most affected by extreme weather events between 2000 and 2019 and continues to remain vulnerable.[50] Widespread deforestation has left the country especially prone to flooding and mudslides, which strike

Haiti at twice the rate as the Dominican Republic.[51]

*Humanitarian Situation*

Haiti has one of the highest levels of chronic food insecurity in the world with more than half of its total population chronically food insecure and 22% of children chronically malnourished, according to a September 2022 report.[52] As of October 2022, the total number of people in acute food insecurity stood at 4.7 million people, including 1.8 million people in the ''emergency'' phase on the World Food Program's (WFP) Integrated Food Security Classification Index.[53] For the first time ever, 19,000 Haitians are considered to be in the ''catastrophe'' phase (the most severe classification).[54]

Armed clashes between gangs destroyed water networks and disrupted water truck deliveries in several Port-au-Prince neighborhoods during 2022. A Doctors Without Borders project coordinator noted that in addition to an epidemic of scabies directly connected to the lack of water since the beginning of 2022, people could only ''afford small quantities of drinking water, but they [couldn't] access clean water in quantities needed for hygiene.'' [55] Adding to the struggle Haitians face to meet their basic needs, two WFP warehouses were looted and pillaged in September 2022, resulting in the loss of approximately $6 million of relief assistance, including 2,000 tons of food.[56]

Haiti continues to face many health challenges. USAID's most recent Strategic Framework report stated: ''health challenges for preventable diseases worsened after the 2010 cholera epidemic and there has been limited progress in improving health outcomes.'' [57] As of August 1, 2022,

1.4% of the country's population was fully vaccinated against COVID–19.[58] Haiti ranks among the world's bottom 10 countries in terms of COVID–19 vaccination coverage.[59]

The United Nations and the Haitian government have reported a new cholera outbreak, with the first cases detected between October 1–2, 2022.[60] As of November 15, 2022, there were 8,146 hospitalized suspected cases and 821 confirmed cases of cholera, resulting in 188 deaths.[61] The end of the two-month fuel terminal seizure allowed hospitals, water treatment plants, commercial water suppliers, and transportation networks to resume functioning, allowing for better access to cholera prevention and treatment. However, paradoxically, the availability of fuel also allowed for resumed mobility among the general population, potentially leading to increased cholera transmission.[62] In November 2022, the UN launched a ''Flash Appeal'' requesting $145.6 million to contain the outbreak and respond to other humanitarian needs throughout Haiti.[63]

*Economic Situation*

Amidst the political, security, and environmental crises, Haiti's economy has floundered. Haiti is among the countries with the greatest inequality in the region. The richest 20% of its population holds more than 64% of its total wealth, while the poorest 20% has less than 1%.[64] Latest estimates put the

[44] Reuters, *U.S., Canada deliver armored vehicles to Haitian police to fight gangs,* Oct. 15, 2022, *https://www.reuters.com/world/americas/us-canada-deliver-armored-vehicles-haitian-police-2022-10-15/.*

[45] Reuters, *Haitians hope for fuel supplies after police break up gang blockade at terminal,* Nov. 5, 2022, *https://www.reuters.com/world/americas/haitians-hope-fuel-supplies-after-police-break-up-gang-blockade-terminal-2022-11-05/.*

[46] United National Security Council, Letter dated 8 October 2022 from the Secretary-General addresses to the President of the Security Council, Oct. 10, 2022, *https://digitallibrary.un.org/record/3990649?ln=en.*

[47] *Id.*

[48] UNICEF, *Massive earthquake leaves devastation in Haiti* (last updated Oct. 4, 2021), *https://www.unicef.org/emergencies/massive-earthquake-devastation-haiti.*

[49] FAO, *Haiti: Urgent call for funding (September 2021–May 2022)—Emergency response to households affected by the earthquake and Tropical Storm Grace* (Sept. 10, 2021), *https://reliefweb.int/report/haiti/haiti-urgent-call-funding-september-2021-may-2022-emergency-response-households.*

[50] Germanwatch, *Global Climate Risk Index 2021* (Jan. 25, 2021), *https://reliefweb.int/report/world/global-climate-risk-index-2021.*

[51] Council on Foreign Relations, *Haiti's Troubled Path to Development* (Sept. 17, 2021), *https://www.cfr.org/backgrounder/haitis-troubled-path-development.*

[52] WFP, *WFP Haiti Country Brief, September 2022* (Sept. 30, 2022), *https://reliefweb.int/report/haiti/wfp-haiti-country-brief-september-2022.*

[53] UN News, *'Catastrophic' hunger recorded in Haiti for first time, UN warns,* Oct. 14, 2022, *https://news.un.org/en/story/2022/10/1129537#:~:text=According%20to%20the%20latest%20IPC,in%20Catastrophe%20phase%2C%20phase%205.*

[54] *Id.*

[55] Doctors Without Borders, *Returning to Haiti means death* (Aug. 12, 2022), *https://www.doctorswithoutborders.org/latest/returning-haiti-means-death.*

[56] Reuters, *Haiti looting caused loss of some $6 million in relief supplies, WFP says,* Sept. 26, 2022, *https://www.reuters.com/world/haiti-looting-caused-loss-some-6-mln-relief-supplies-wfp-says-2022-09-26/.*

[57] USAID, *Haiti Strategic Framework December 23, 2020–December 23, 2022* (July 29, 2021), *https://www.usaid.gov/sites/default/files/documents/*

*Strategic_Framework_-_Haiti_-_December_2020-2022.pdf.*

[58] Congressional Research Service, *Haiti: Political Conflict and U.S. Policy Overview* (Aug. 2, 2022), *https://crsreports.congress.gov/product/pdf/IF/IF12182.*

[59] World Bank, *The World Bank approved $35 million to improve Haiti's COVID–19 response* (June 11, 2022), *https://reliefweb.int/report/haiti/world-bank-approved-35-million-improve-haitis-covid-19-response.*

[60] Widlore Mérancourt, Kelly Kasulis Cho, and Amanda Coletta, The Washington Post, Cholera Resurfaces in Haiti as gangs hinder access to water, hospitals, Oct. 3, 2022, *https://www.washingtonpost.com/world/2022/10/03/haiti-cholera-gang-violence-water/.*

[61] Pan American Health Organization, *Cholera Outbreak in Hispaniola, Situation Report #6,* Nov. 17, 2022, *https://www.paho.org/en/documents/cholera-outbreak-hispaniola-2022-situation-report-6.*

[62] PBS NewsHour, *Cholera overwhelms Haiti, experts warn outbreak could worsen as fuel blockade lifts,* Nov. 16, 2022, *https://www.pbs.org/newshour/world/cholera-overwhelms-haiti-experts-warn-outbreak-could-worsen-as-fuel-blockade-lifts.*

[63] UN Office for the Coordination of Humanitarian Affairs, *Haiti 2022 Cholera Flash Appeal (Mid Oct 2022–Mid Apr 2023),* Nov. 15, 2022, *https://reliefweb.int/report/haiti/haiti-2022-cholera-flash-appeal-mid-oct-2022-mid-apr-2023.*

[64] World Bank, *The World Bank in Haiti Overview* (last updated June 14, 2022), *https://www.worldbank.org/en/country/haiti/overview.*

2021 poverty rate at 52.3%, up from 51% in 2020.[65] In 2021, Haiti had a GDP per capita of $1,815, the lowest in the Latin America and the Caribbean (LAC) region and less than a fifth of the LAC average of $15,092.[66] On the UN's Human Development Index,[67] Haiti ranked 170 out of 189 in 2020.[68]

In summary, Haiti is experiencing extraordinary and temporary conditions resulting from grave insecurity and gang crime, as well as socio-economic and humanitarian conditions, including those resulting from environmental disasters aggravating food insecurity.

Based upon this review and after consultation with appropriate U.S. Government agencies, the Secretary has determined that:

• The conditions supporting Haiti's designation for TPS continue to be met. *See* INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(1)(C).

• There continue to be extraordinary and temporary conditions in Haiti that prevent Haitian nationals (or individuals having no nationality who last habitually resided in Haiti) from returning to Haiti in safety, and it is not contrary to the national interest of the United States to permit Haitian TPS beneficiaries to remain in the United States temporarily. *See* INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).

• The designation of Haiti for TPS should be extended for an 18-month period, from February 4, 2023, through August 3, 2024. *See* INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C).

• Due to the conditions described above, Haiti should be simultaneously redesignated for TPS effective February 4, 2023, through August 3, 2024. *See* INA section 244(b)(1)(C) and (b)(2), 8 U.S.C. 1254a(b)(1)(C) and (b)(2).

• The Secretary has determined that TPS applicants under the redesignation must demonstrate that they have continuously resided in the United States since November 6, 2022.

• TPS applicants under the redesignation must demonstrate that they have been continuously physically present in the United States since February 4, 2023, the effective date of the redesignation of Haiti for TPS.

---

[65] *Id.*

[66] *Id.*

[67] The Human Development Index (HDI) is a summary measure of average achievement in key dimensions of human development: a long and healthy life, being knowledgeable and have a decent standard of living. *See* UNDP, *Human Development Index (HDI)* (last visited Aug. 15, 2022), *https://hdr.undp.org/data-center/human-development-index#/indicies/HDI.*

[68] World Bank, *The World Bank in Haiti Overview* (last updated June 14, 2022), *https://www.worldbank.org/en/country/haiti/overview.*

• It is estimated that approximately 105,000 additional individuals may be eligible for TPS under the redesignation of Haiti. This population includes Haitian nationals in the United States in nonimmigrant status or without immigration status.

**Notice of the Designation of Haiti for TPS**

By the authority vested in me as Secretary under INA section 244, 8 U.S.C. 1254a, I have determined, after consultation with the appropriate U.S. Government agencies, the statutory conditions supporting Haiti's designation for TPS on the basis of extraordinary and temporary conditions are met. *See* INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C). On the basis of this determination, I am simultaneously extending the existing designation of TPS for Haiti for 18 months, from February 4, 2023, through August 3, 2024, and redesignating Haiti for TPS for the same 18-month period. *See* INA section 244(b)(1)(C) and (b)(2); 8 U.S.C. 1254a(b)(1)(C), and (b)(2).

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

**Eligibility and Employment Authorization for TPS**

*Required Application Forms and Application Fees To Register or Re-Register for TPS*

To register initially for TPS based on the designation of Haiti, you must submit a Form I–821, Application for Temporary Protected Status, and pay the filing fee (or request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver). You may be required to pay the biometric services fee. If you can demonstrate an inability to pay the biometric services fee, you may request to have the fee waived. Please see additional information under the ''Biometric Services Fee'' section of this notice.

Individuals with existing TPS granted under the 2021 designation of Haiti must file Form-821 for re-registration as discussed above. Individuals who currently retain their TPS under the *Ramos* injunction noted in footnote 1 above, may file Form I–821 for re-registration if they wish to help ensure that their TPS continues should the *Ramos* court order end and they remain eligible. Re-registrants do not pay the $50 filing fee for the Form I–821 but must pay the biometric services fee if age 14 or older (or request a fee waiver).

TPS beneficiaries are authorized to work in the United States. You are not required to submit Form I–765 or have

an EAD, but see below for more information if you want to work in the United States.

Individuals who have a Haiti TPS application (Form I–821) that was still pending as of January 26, 2023 do not need to file the application again. If USCIS approves an individual's Form I–821, USCIS will grant the individual TPS through August 3, 2024.

For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *https://www.uscis.gov/tps.* Fees for the Form I–821, the Form I–765, and biometric services are also described in 8 CFR 103.7(b)(1) (Oct. 1, 2020). In addition, the form instructions for the Form I–821 and Form I–765 provide further information on requirements and fees for both initial TPS applicants and existing TPS beneficiaries who are re-registering.

How can TPS beneficiaries obtain an Employment Authorization Document (EAD)?

Every employee must provide their employer with documentation showing that they have the legal right to work in the United States. TPS beneficiaries are eligible for an EAD, which proves their legal right to work. Those who want to obtain an EAD must file a Form I–765, Application for Employment Authorization, and pay the Form I–765 fee (or request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver). TPS applicants may file this form along with their TPS application, or at a later date, provided their TPS application is still pending or has been approved. Beneficiaries with a Haiti TPS-related Form I–765 application in connection with a Form I–821 that was still pending as of January 26, 2023 do not need to file the application again. If USCIS approves a pending TPS-related Form I–765, USCIS will issue the individual a new EAD that will be valid through August 3, 2024.

**Refiling an Initial TPS Registration Application After Denial of a Fee Waiver Request**

If your fee waiver request is denied, you must refile your Form I–821 for TPS along with the required fees during the registration period, which extends until August 3, 2024. You may also file your Form I–765 with payment of the fee along with your TPS application or at any later date you decide you want to request an EAD during the registration period.

**Refiling a TPS Re-Registration Application After Denial of a Fee Waiver Request**

You should refile your Form I–821 for TPS and Form I–765 as soon as possible so USCIS can process your application and issue any EAD promptly, if you requested one. Properly filing early will also give you time to refile your application before the deadline, if USCIS does not grant your fee waiver request. If you receive a notice that USCIS did not grant your fee waiver request, and you are unable to refile by the re-registration deadline, you may still refile your Form I–821 with the biometric services fee. USCIS will review this situation to determine whether you established good cause for late TPS re-registration. However, if possible, we urge you to refile within 45 days of the date on any USCIS notice that we did not grant you a fee waiver. *See* INA section 244(c)(3)(C); 8 U.S.C. 1254a(c)(3)(C); 8 CFR 244.17(b). For more information on good cause for late re-registration, visit the USCIS TPS web page at *https://www.uscis.gov/tps.* If USCIS does not grant your fee waiver request, you may also refile your Form I–765 with the fee either with your Form I–821 or at a later time, if you choose.

**Note:** A re-registering TPS beneficiary age 14 and older must pay the biometric services fee (but not the Form I–821 filing fee), or request a fee waiver, when filing a TPS re-registration application. However, if you decide to wait to request an EAD, you do not have to file the Form I–765 or pay the associated Form I–765 fee (or request a fee waiver) at the time of re-registration. You may wait to seek an EAD until after USCIS has approved your TPS re-registration application or at any later date you decide you want to request an EAD. To re-register for TPS, you only need to file the Form I–821 with the biometric services fee, if applicable (or request a fee waiver).

**Filing Information**

USCIS offers the option to applicants for TPS under Haiti's designation to file Form I–821 and related requests for EADs online or by mail. When filing a TPS application, applicants can also request an EAD by submitting a completed Form I–765, Request for Employment Authorization, with their Form I–821.

*Online filing:* Forms I–821 and I–765 are available for concurrent filing online.[69] To file these forms online, you must first create a USCIS online account.[70]

*Mail filing:* Mail your application for TPS to the proper address in Table 1.

*Table 1—Mailing Addresses*

Mail your completed Form I–821, Application for Temporary Protected Status; Form I–765, Application for Employment Authorization, if applicable; Form I–912, Request for Fee Waiver (if applicable); and supporting documentation to the proper address in Table 1.

TABLE 1—MAILING ADDRESSES

| If . . . | Mail to . . . |
|---|---|
| You live in the following states: Florida or New York, and you are using the U.S. Postal Service (USPS). | USCIS, Attn: TPS Haiti, P.O. Box 660167, Dallas, TX 75266–0167. |
| You live in the following states: Florida or New York, and you are using FedEx, UPS, or DHL. | USCIS, Attn: TPS Haiti (Box 660167), 2501 S State Highway, 121 Business, Suite 400, Lewisville, TX 75067–8003. |
| You live in any other state, and you are using the U.S. Postal Service (USPS). | USCIS, Attn: TPS Haiti, P.O. Box 24047, Phoenix, AZ 85074–4047. |
| You live in any other state, and you are using FedEx, UPS, or DHL ..... | USCIS Attn: TPS Haiti (Box 24047), 1820 E Skyharbor Circle S, Suite 100, Phoenix, AZ 85034–4850. |

If you were granted TPS by an immigration judge (IJ) or the Board of Immigration Appeals (BIA) and you wish to request an EAD, please mail your Form I–765 application to the appropriate mailing address in Table 1. When you are requesting an EAD based on an IJ/BIA grant of TPS, please include a copy of the IJ or BIA order granting you TPS with your application. This will help us verify your grant of TPS and process your application.

**Supporting Documents**

The filing instructions on the Form I–821 list all the documents needed to establish eligibility for TPS. You may also find information on the acceptable documentation and other requirements for applying (that is, registering) for TPS on the USCIS website at *https://www.uscis.gov/tps* under ''Haiti.''

**Travel**

TPS beneficiaries may also apply for and be granted travel authorization as a matter of discretion. You must file for travel authorization if you wish to travel outside of the United States. If granted, travel authorization gives you permission to leave the United States and return during a specific period. To request travel authorization, you must file Form I–131, Application for Travel Document, available at *https://www.uscis.gov/i-131.* You may file Form I–131 together with your Form I–821 or separately. When filing the Form I–131, you must:

• Select Item Number 1.d. in Part 2 on the Form I–131; and

• Submit the fee for the Form I–131, or request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver.

If you are filing Form I–131 together with Form I–821, send your forms to the address listed in Table 1. If you are filing Form I–131 separately based on a pending or approved Form I–821, send your form to the address listed in Table 2 and include a copy of Form I–797 for the approved or pending Form I–821.

TABLE 2—MAILING ADDRESSES

| If you are . . . | Mail to . . . |
|---|---|
| Filing Form I–131 together with a Form I–821, Application for Temporary Protected Status. | The address listed for on the TPS page for your country. |

---

[69] Find information about online filing at ''Forms Available to File Online,'' *https://www.uscis.gov/file-online/forms-available-to-file-online.*

[70] *https://myaccount.uscis.gov/users/sign_up.*

HaitiTPSAR000031

**5030**    **Federal Register** / Vol. 88, No. 17 / Thursday, January 26, 2023 / Notices

TABLE 2—MAILING ADDRESSES—Continued

| If you are . . . | Mail to . . . |
|---|---|
| Filing Form I–131 based on a pending or approved Form I–821, and you are using the U.S. Postal Service (USPS): You must include a copy of the receipt notice (Form I–797C) showing we accepted or approved your Form I–821. | USCIS, Attn: I–131 TPS, P.O. Box 660167, Dallas, TX 75266–0867. |
| Filing Form I–131 based on a pending or approved Form I–821, and you are using FedEx, UPS, or DHL: You must include a copy of the receipt notice (Form I–797C) showing we accepted or approved your Form I–821. | USCIS, Attn: I–131 TPS, 2501 S State Hwy., 121 Business, Ste. 400, Lewisville, TX 75067. |

*Biometric Services Fee for TPS*

Biometrics (such as fingerprints) are required for all applicants 14 years of age and older. Those applicants must submit a biometric services fee. As previously stated, if you are unable to pay the biometric services fee, you may request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver. For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *https://www.uscis.gov/tps.* If necessary, you may be required to visit an Application Support Center to have your biometrics captured. For additional information on the USCIS biometric screening process, please see the USCIS Customer Profile Management Service Privacy Impact Assessment, available at *https://www.dhs.gov/publication/dhsuscispia-060-customer-profile-management-service-cpms.*

*General Employment-Related Information for TPS Applicants and Their Employers*

How can I obtain information on the status of my TPS application and EAD request?

To get case status information about your TPS application, as well as the status of your TPS-based EAD request, you can check Case Status Online at *https://www.uscis.gov,* or visit the USCIS Contact Center at *https://www.uscis.gov/contactcenter.* If your Form I–765 has been pending for more than 90 days, and you still need assistance, you may ask a question about your case online at *https://egov.uscis.gov/e-request/Intro.do* or call the USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

Am I eligible to receive an automatic extension of my current EAD through February 3, 2024, using this **Federal Register** notice?

Yes. Regardless of your country of birth, provided that you currently have a Haiti TPS-based EAD that has the notation A–12 or C–19 under Category and a "Card Expires" date of February 3, 2023, this **Federal Register** notice automatically extends your EAD through February 3, 2024. Although this **Federal Register** notice automatically extends your EAD through February 3, 2024, you must re-register timely for TPS in accordance with the procedures described in this **Federal Register** notice to maintain your TPS and employment authorization.

**Note:** The validity dates of certain EADs with facial expiration dates before February 3, 2023 for TPS beneficiaries who are covered by the *Ramos* injunction continue in accordance with 86 FR 50725 (Sept. 10, 2021) and may be continued by a superseding litigation-related notice.

When I am hired, what documentation may I show to my employer as evidence of identity and employment authorization when completing Form I–9?

You can find the Lists of Acceptable Documents on Form I–9, Employment Eligibility Verification, as well as the Acceptable Documents web page at *https://www.uscis.gov/i-9-central/acceptable-documents.* Employers must complete Form I–9 to verify the identity and employment authorization of all new employees. Within three days of hire, employees must present acceptable documents to their employers as evidence of identity and employment authorization to satisfy Form I–9 requirements.

You may present any document from List A (which provides evidence of both identity and employment authorization) or one document from List B (which provides evidence of your identity) together with one document from List C (which provides evidence of employment authorization), or you may present an acceptable receipt as described in the Form I–9 Instructions. Employers may not reject a document based on a future expiration date. You can find additional information about Form I–9 on the I–9 Central web page at *https://www.uscis.gov/I-9Central.* An EAD is an acceptable document under List A. See the section "How do my employer and I complete Form I–9 using my automatically extended EAD for a new job?" of this **Federal Register** notice for further information. If your EAD states A–12 or C–19 under

Category and has a "Card Expires" date of February 3, 2023, it has been extended automatically by virtue of this **Federal Register** notice and you may choose to present your EAD to your employer as proof of identity and employment eligibility for Form I–9 through February 3, 2024, unless your TPS has been withdrawn or your request for TPS has been denied. Your country of birth notated on the EAD does not have to reflect the TPS designated country of Haiti for you to be eligible for this extension.

What documentation may I present to my employer for Form I–9 if I am already employed but my current TPS-related EAD is set to expire?

Even though we have automatically extended your EAD, your employer is required by law to ask you about your continued employment authorization. Your employer may need to re-inspect your automatically extended EAD to check the "Card Expires" date and Category code if your employer did not keep a copy of your EAD when you initially presented it. Once your employer has reviewed the "Card Expires" date and Category code, your employer should update the EAD expiration date in Section 2 of Form I–9. See the section "What updates should my current employer make to Form I–9 if my EAD has been automatically extended?" of this **Federal Register** notice for further information. You may show this **Federal Register** notice to your employer to explain what to do for Form I–9 and to show that USCIS has automatically extended your EAD through February 3, 2024, but you are not required to do so. The last day of the automatic EAD extension is February 3, 2024. Before you start work on February 4, 2024, your employer is required by law to reverify your employment authorization on Form I–9. By that time, you must present any document from List A or any document from List C on Form I–9 Lists of Acceptable Documents, or an acceptable List A or List C receipt described in the Form I–9 instructions to reverify employment authorization.

HaitiTPSAR000032

Your employer may not specify which List A or List C document you must present and cannot reject an acceptable receipt.

If I have an EAD based on another immigration status, can I obtain a new TPS-based EAD?

Yes, if you are eligible for TPS, you can obtain a new TPS-based EAD, regardless of whether you have an EAD or work authorization based on another immigration status. If you want to obtain a new TPS-based EAD valid through August 3, 2024, then you must file Form I–765, Application for Employment Authorization, and pay the associated fee (unless USCIS grants your fee waiver request).

Can my employer require that I provide any other documentation such as evidence of my status or proof of my Haitian citizenship or a Form I–797C showing that I registered for TPS for Form I–9 completion?

No. When completing Form I–9, employers must accept any documentation you choose to present from the Form I–9 Lists of Acceptable Documents that reasonably appears to be genuine and that relates to you, or an acceptable List A, List B, or List C receipt. Employers may not request proof of Haitian citizenship or proof of registration for TPS when completing Form I–9 for new hires or reverifying the employment authorization of current employees. If you present an EAD that USCIS has automatically extended, employers should accept it as a valid List A document so long as the EAD reasonably appears to be genuine and to relate to you. Refer to the ''Note to Employees'' section of this **Federal Register** notice for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or immigration status, or your national origin.

How do my employer and I complete Form I–9 using my automatically extended EAD for a new job?

When using an automatically extended EAD to complete Form I–9 for a new job before February 3, 2024:
1. For Section 1, you should:
a. Check ''An alien authorized to work until'' and enter February 3, 2024, as the ''expiration date''; and
b. Enter your USCIS number or A-Number where indicated. (Your EAD or other document from DHS will have your USCIS number or A-Number printed on it; the USCIS number is the same as your A-Number without the A prefix.)
2. For Section 2, employers should:
a. Determine if the EAD is auto-extended by ensuring it is in category A–12 or C–19 and has a ''Card Expires'' date of February 3, 2023;
b. Write in the document title;
c. Enter the issuing authority;
d. Provide the document number; and
e. Write February 3, 2024, as the expiration date.
Before the start of work on February 4, 2024, employers must reverify the employee's employment authorization on Form I–9.

What updates should my current employer make to Form I–9 if my EAD has been automatically extended?

If you presented a TPS-related EAD that was valid when you first started your job and USCIS has now automatically extended your EAD, your employer may need to re-inspect your current EAD if they do not have a copy of the EAD on file. Your employer should determine if your EAD is automatically extended by ensuring that it contains Category A–12 or C–19 on the front of the card and has a ''Card Expires'' date of February 3, 2023. Your employer may not rely on the country of birth listed on the card to determine whether you are eligible for this extension.

If your employer determines that USCIS has automatically extended your EAD, your employer should update Section 2 of your previously completed Form I–9 as follows:
1. Write EAD EXT and February 3, 2024, as the last day of the automatic extension in the Additional Information field; and
2. Initial and date the correction.

**Note:** This is not considered a reverification. Employers do not reverify the employee until either the one-year automatic extension has ended, or the employee presents a new document to show continued employment authorization, whichever is sooner. By February 4, 2024, when the employee's automatically extended EAD has expired, employers are required by law to reverify the employee's employment authorization on Form I–9.

If I am an employer enrolled in E-Verify, how do I verify a new employee whose EAD has been automatically extended?

Employers may create a case in E-Verify for a new employee by entering the number from the Document Number field on Form I–9 into the document number field in E-Verify. Employers should enter February 3, 2024, as the expiration date for an EAD that has been extended under this **Federal Register** notice.

If I am an employer enrolled in E-Verify, what do I do when I receive a ''Work Authorization Documents Expiring'' alert for an automatically extended EAD?

E-Verify automated the verification process for TPS-related EADs that are automatically extended. If you have employees who provided a TPS-related EAD when they first started working for you, you will receive a ''Work Authorization Documents Expiring'' case alert when the auto-extension period for this EAD is about to expire. Before this employee starts work on February 4, 2024, you must reverify their employment authorization on Form I–9. Employers may not use E-Verify for reverification.

**Note to All Employers**

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This **Federal Register** notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY 877–875–6028) or email USCIS at *I-9Central@ uscis.dhs.gov.* USCIS accepts calls and emails in English and many other languages. For questions about avoiding discrimination during the employment eligibility verification process (Form I–9 and E-Verify), employers may call the U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section (IER) Employer Hotline at 800–255–8155 (TTY 800–237–2515). IER offers language interpretation in numerous languages. Employers may also email IER at *IER@usdoj.gov.*

**Note to Employees**

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY 877–875–6028) or email USCIS at *I-9Central@ uscis.dhs.gov.* USCIS accepts calls in English, Spanish and many other languages. Employees or job applicants may also call the IER Worker Hotline at 800–255–7688 (TTY 800–237–2515) for information regarding employment discrimination based on citizenship, immigration status, or national origin, including discrimination related to Form I–9 and E-Verify. The IER Worker Hotline provides language interpretation in numerous languages.

HaitiTPSAR000033

To comply with the law, employers must accept any document or combination of documents from the Lists of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee, or an acceptable List A, List B, or List C receipt as described in the Form I–9 Instructions. Employers may not require extra or additional documentation beyond what is required for Form I–9 completion. Further, employers participating in E-Verify who receive an E-Verify case result of ''Tentative Nonconfirmation'' (mismatch) must promptly inform employees of the mismatch and give such employees an opportunity to contest the mismatch. A mismatch means that the information entered into E-Verify from Form I–9 differs from records available to DHS.

Employers may not terminate, suspend, delay training, withhold or lower pay, or take any adverse action against an employee because of a mismatch while the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result is received when E-Verify cannot confirm an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY 877–875–6028). For more information about E-Verify-related discrimination or to report an employer for discrimination in the E-Verify process based on citizenship, immigration status, or national origin, contact IER's Worker Hotline at 800–255–7688 (TTY 800–237–2515). Additional information about proper nondiscriminatory Form I–9 and E-Verify procedures is available on the IER website at *https://www.justice.gov/ier* and the USCIS and E-Verify websites at *https://www.uscis.gov/i-9-central* and *https://www.e-verify.gov.*

### Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)

For Federal purposes, if you present an automatically extended EAD referenced in this **Federal Register** notice, you do not need to show any other document, such as a Form I–797C, Notice of Action, or this **Federal Register** notice, to prove that you qualify for this extension. While Federal Government agencies must follow the guidelines laid out by the Federal Government, State and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, State, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary, show you are authorized to work based on TPS or other status, or may be used by DHS to determine if you have TPS or another immigration status. Examples of such documents are:

• Your current EAD with a TPS category code of A–12 or C–19, even if your country of birth noted on the EAD does not reflect the TPS designated country of Haiti;
• Your Form I–94, Arrival/Departure Record;
• Your Form I–797C, Notice of Action, reflecting approval of your Form I–765; or
• Form I–797 or Form I–797C, Notice of Action, reflecting approval or receipt of a past or current Form I–821.

Check with the government agency requesting documentation regarding which document(s) the agency will accept. Some state and local government agencies use the SAVE program to confirm the current immigration status of applicants for public benefits.

While SAVE can verify that an individual has TPS, each state and local government agency's procedures govern whether they will accept an unexpired EAD, Form I–797, Form I–797C, or Form I–94, Arrival/Departure Record. If an agency accepts the type of TPS-related document you present, such as an EAD, the agency should accept your automatically extended EAD, regardless of the country of birth listed on the EAD. It may assist the agency if you:

a. Give the agency a copy of the relevant **Federal Register** notice listing the TPS-related document, including any applicable auto-extension of the document, in addition to presenting your recent TPS-related document with your A-Number, or USCIS number;
b. Explain that SAVE will be able to verify the continuation of your TPS using this information; and
c. Ask the agency to initiate a SAVE query with your information and follow through with additional verification steps, if necessary, to get a final SAVE response verifying your TPS.

You can also ask the agency to look for SAVE notices or contact SAVE if they have any questions about your immigration status or automatic extension of TPS-related documentation. In most cases, SAVE provides an automated electronic response to benefit-granting agencies within seconds, but occasionally verification can be delayed. You can check the status of your SAVE verification by using CaseCheck at *https://save.uscis.gov/casecheck.* CaseCheck is a free service that lets you follow the progress of your SAVE verification case using your date of birth and one immigration identifier number (A-Number, USCIS number, or Form I–94 number) or Verification Case Number. If an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted on or will act on a SAVE verification and you do not believe the SAVE response is correct, the SAVE website, *www.uscis.gov/save,* has detailed information on how to make corrections or update your immigration record, make an appointment, or submit a written request to correct records.

[FR Doc. 2023–01586 Filed 1–25–23; 8:45 am]
**BILLING CODE 9111–97–P**

---

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**[Docket No. FR–6374–N–01]**

### Appointments to the Housing Counseling Federal Advisory Committee; Solicitation of Nominations

**AGENCY:** Office of the Assistant Secretary for Housing—Federal Housing Commissioner, Department of Housing and Urban Development (HUD).

**ACTION:** Notice.

---

**SUMMARY:** The Department of Housing and Urban Development (HUD) established the HCFAC on April 14, 2015. The HCFAC will consist of 12 members, equally representing the mortgage industry and real estate industry, including consumers, and HUD-approved housing counseling agencies. This notice invites nominations for an appointment to fill one vacancy on the HCFAC to represent the mortgage industry.

**DATES:** All nominations must be received no later than February 27, 2023.

**ADDRESSES:** Nominations must be in writing using a completed HUD–90005 (Application for Membership on the HCFAC, OMB Approval Number: 2502–0606) and submitted via email to *HCFAC.application@hud.gov.* Individuals who do not have internet access may submit nominations to the Office of the Deputy Assistant Secretary for Housing Counseling, U.S. Department of Housing and Urban

HaitiTPSAR000034

study''[60] unless or until the nonimmigrant student receives employment authorization under this notice. TPS-related employment authorization, by itself, does not authorize a nonimmigrant student to drop below twelve credit hours, or otherwise applicable minimum requirements (*e.g.,* clock hours for non-traditional academic programs). Once approved for a TPS-related EAD and Special Student Relief employment authorization, as indicated by the DSO's required entry in SEVIS and issuance of an updated Form I–20, the F–1 nonimmigrant student may drop below twelve credit hours, or otherwise applicable minimum requirements (with a minimum of six semester or quarter hours of instruction per academic term if at the undergraduate level, or for a minimum of three semester or quarter hours of instruction per academic term if at the graduate level). *See* 8 CFR 214.2(f)(5)(v), (f)(6), and (f)(9)(i) and (ii).

### How does a student who has received a TPS-related EAD then apply for authorization to take a reduced course load under this notice?

There is no further application process with USCIS if a student has been approved for a TPS-related EAD. The F–1 nonimmigrant student must demonstrate and provide documentation to the DSO of the direct economic hardship resulting from the current crisis in Haiti. The DSO will then verify and update the student's record in SEVIS to enable the F–1 nonimmigrant student with TPS to reduce the course load without any further action or application. No other EAD needs to be issued for the F–1 nonimmigrant student to have employment authorization.

### Can a noncitizen who has been granted TPS apply for reinstatement of F–1 nonimmigrant student status after the noncitizen's F–1 nonimmigrant student status has lapsed?

Yes. Regulations permit certain students who fall out of F–1 nonimmigrant student status to apply for reinstatement. *See* 8 CFR 214.2(f)(16). This provision may apply to students who worked on a TPS-related EAD or dropped their course load before publication of this notice, and therefore fell out of student status. These students must satisfy the criteria set forth in the F–1 nonimmigrant student status reinstatement regulations.

[60] *See* 8 CFR 214.2(f)(6).

### How long will this notice remain in effect?

This notice grants temporary relief until February 3, 2026,[61] to eligible F–1 nonimmigrant students. DHS will continue to monitor the situation in Haiti. Should the special provisions authorized by this notice need modification or extension, DHS will announce such changes in the **Federal Register**.

### Paperwork Reduction Act (PRA)

An F–1 nonimmigrant student seeking off-campus employment authorization due to severe economic hardship resulting from the current crisis in Haiti must demonstrate to the DSO that this employment is necessary to avoid severe economic hardship. A DSO who agrees that a nonimmigrant student should receive such employment authorization must recommend an application approval to USCIS by entering information in the remarks field of the student's SEVIS record. The authority to collect this information is in the SEVIS collection of information currently approved by the Office of Management and Budget (OMB) under OMB Control Number 1653–0038.

This notice also allows an eligible F–1 nonimmigrant student to request employment authorization, work an increased number of hours while the academic institution is in session, and reduce their course load while continuing to maintain F–1 nonimmigrant student status.

To apply for employment authorization, certain F–1 nonimmigrant students must complete and submit a currently approved Form I–765 according to the instructions on the form. OMB has previously approved the collection of information contained on the current Form I–765, consistent with the PRA (OMB Control Number 1615–0040). Although there will be a slight increase in the number of Form I–765 filings because of this notice, the number of filings currently contained in the OMB annual inventory for Form I–765 is sufficient to cover the additional

[61] Because the suspension of requirements under this notice applies throughout an academic term during which the suspension is in effect, DHS considers an F–1 nonimmigrant student who engages in a reduced course load or employment (or both) after this notice is effective to be engaging in a ''full course of study,'' *see* 8 CFR 214.2(f)(6), and eligible for employment authorization, through the end of any academic term for which such student is matriculated as of February 3, 2026, provided the student satisfies the minimum course load requirements in this notice.

filings. Accordingly, there is no further action required under the PRA.

**Alejandro Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*
[FR Doc. 2024–14232 Filed 6–28–24; 8:45 am]
**BILLING CODE 9111–CB–P**

---

### DEPARTMENT OF HOMELAND SECURITY

### U.S. Citizenship and Immigration Services

[CIS No. 2772–24; DHS Docket No. USCIS–2014–0001]

RIN 1615–ZB70

### Extension and Redesignation of Haiti for Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS).

**ACTION:** Notice of Temporary Protected Status (TPS) extension and redesignation.

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is extending the designation of Haiti for Temporary Protected Status (TPS) and redesignating Haiti for TPS for 18 months, beginning on August 4, 2024, and ending on February 3, 2026. This extension and redesignation allows Haitian nationals (and individuals having no nationality who last habitually resided in Haiti) who have been continuously residing in the United States since June 3, 2024, and who have been continuously physically present in the United States since August 4, 2024, to apply or re-register for TPS.

**DATES:** *Extension and Redesignation of Designation of Haiti for TPS* begins on August 4, 2024, and will remain in effect for 18 months. For registration instructions, see the Registration Information section below.

**FOR FURTHER INFORMATION CONTACT:**
• You may contact René Cutlip-Mason, Chief, Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by mail at 5900 Capital Gateway Drive, Camp Springs, MD 20746, or by phone at 240–721–3000.
• For more information on TPS, including guidance on the registration process and additional information on eligibility, please visit the USCIS TPS web page at *https://www.uscis.gov/tps.*

HaitiTPSAR000035

You can find specific information about Haiti's TPS designation by selecting ''Haiti'' from the menu on the left side of the TPS web page.

• If you have additional questions about TPS, please visit *https://uscis.gov/tools.* Our online virtual assistant, Emma, can answer many of your questions and point you to additional information on our website. If you cannot find your answers there, you may also call our USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

• Applicants seeking information about the status of their individual cases may check Case Status Online, available on the USCIS website at *Agenda:* or visit the USCIS Contact Center at *https://www.uscis.gov/contactcenter.*

• You can also find more information at local USCIS offices after this notice is published.

**SUPPLEMENTARY INFORMATION:**

## Table of Abbreviations

BIA—Board of Immigration Appeals
CFR—Code of Federal Regulations
DHS—U.S. Department of Homeland Security
DoS—U.S. Department of State
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
Form I–131—Application for Travel Document
Form I–765—Application for Employment Authorization
Form I–797—Notice of Action
Form I–821—Application for Temporary Protected Status
Form I–9—Employment Eligibility Verification
Form I–912—Request for Fee Waiver
Form I–94—Arrival/Departure Record
FR—**Federal Register**
Government—U.S. Government
IER—U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section
IJ—Immigration Judge
INA—Immigration and Nationality Act
PM—Prime Minister
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services
U.S.C.—United States Code

## Registration Information

*Extension of Designation of Haiti for TPS:* The 18-month designation of Haiti for TPS begins on August 4, 2024, and will remain in effect for 18 months, ending on February 3, 2026. The extension allows existing TPS beneficiaries to retain TPS through February 3, 2026, if they otherwise continue to meet the eligibility requirements for TPS. Existing TPS beneficiaries who wish to extend their status through February 3, 2026, must re-register during the 60-day re-registration period described in this notice.

*Re-registration:* The 60-day re-registration period for existing beneficiaries runs from July 1, 2024, through August 30, 2024. (*Note:* It is important for re-registrants to timely re-register during the re-registration period and not to wait until their Employment Authorization Documents (EADs) expire, as delaying re-registration could result in gaps in their employment authorization documentation.)

*Redesignation of Haiti for TPS:* The 18-month redesignation of Haiti for TPS begins on August 4, 2024, and will remain in effect for 18 months, ending on February 3, 2026. The redesignation allows individuals who do not currently have TPS to apply for TPS during the initial registration period described under the first-time registration information in this notice. In addition to demonstrating continuous residence in the United States since June 3, 2024, and meeting other eligibility criteria, initial applicants for TPS under this designation must demonstrate that they have been continuously physically present in the United States since August 4, 2024, the effective date of this redesignation of Haiti for TPS.

*First-time Registration:* The initial registration period for new applicants under the Haiti TPS redesignation begins on July 1, 2024 and will remain in effect through February 3, 2026.

## Purpose of This Action (TPS)

Through this notice, DHS sets forth procedures necessary for nationals of Haiti (or individuals having no nationality who last habitually resided in Haiti) to (1) re-register for TPS and apply to renew their EAD with USCIS or (2) submit an initial registration application under the redesignation and apply for an EAD.

Re-registration is limited to individuals who have previously registered for TPS under the prior designation of Haiti and whose applications have been granted. If you do not re-register properly within the 60-day re-registration period, USCIS may withdraw your TPS following appropriate procedures. *See* 8 CFR 244.14.

For individuals who have already been granted TPS under Haiti's designation, the 60-day re-registration period runs from July 1, 2024, through August 30, 2024. USCIS will issue new EADs with a February 3, 2026 expiration date to eligible beneficiaries granted TPS under Haiti's designation who timely re-register and apply for

EADs. Given the time frames involved with processing TPS re-registration applications, DHS recognizes that not all re-registrants may receive a new EAD before their current EAD expires. Accordingly, through this **Federal Register** notice, DHS automatically extends through August 3, 2025, the validity of certain EADs previously issued under the TPS designation of Haiti. As proof of continued employment authorization through August 3, 2025, TPS beneficiaries can show their EAD with the notation A–12 or C–19 under Category and a ''Card Expires'' date of August 3, 2024, June 30, 2024, February 3, 2023, December 31, 2022, October 4, 2021, January 4, 2021, January 2, 2020, July 22, 2019, January 22, 2018, or July 22, 2017. This notice explains how TPS beneficiaries and their employers may determine if an EAD is automatically extended and how this affects the Form I–9, Employment Eligibility Verification, E-Verify, and USCIS Systematic Alien Verification for Entitlements (SAVE) processes.

Individuals who have an Application for Temporary Protected Status (Form I–821) for Haiti or Application for Employment Authorization (Form I–765) that was still pending as of July 1, 2024, do not need to file either application again. If USCIS approves an individual's pending Form I–821, USCIS will grant the individual TPS through February 3, 2026. Similarly, if USCIS approves a pending TPS-related Form I–765, USCIS will issue the individual a new EAD that will be valid through the same date.

Under the redesignation, individuals who currently do not have TPS may submit an initial application during the initial registration period that runs from July 1, 2024, through the full length of the redesignation period ending February 3, 2026. In addition to demonstrating continuous residence in the United States since June 3, 2024, and meeting other eligibility criteria, initial applicants for TPS under this redesignation must demonstrate that they have been continuously physically present in the United States since August 4, 2024,[1] the effective date of

---

[1] The ''continuous physical presence'' date is the effective date of the most recent TPS designation of the country, which is either the publication date of the designation announcement in the **Federal Register** or a later date established by the Secretary. The ''continuous residence'' date is any date established by the Secretary when a country is designated (or sometimes redesignated) for TPS. *See* INA sec. 244(b)(2)(A) (effective date of designation); 244(c)(1)(A)(i–ii) (continuous residence and continuous physical presence date requirements); 8 U.S.C. 1254a(b)(2)(A); 1254a(c)(1)(A)(i–ii).

HaitiTPSAR000036

**54486** **Federal Register** / Vol. 89, No. 126 / Monday, July 1, 2024 / Notices

this redesignation of Haiti, before USCIS may grant them TPS. DHS estimates that approximately 309,000 individuals may become newly eligible for TPS under the redesignation of Haiti.

## What is Temporary Protected Status (TPS)?

• TPS is a temporary immigration status granted to eligible nationals of a foreign state designated for TPS under the INA, or to eligible individuals without nationality who last habitually resided in the designated foreign state, regardless of their country of birth.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to obtain EADs if they continue to meet the requirements of TPS.

• TPS beneficiaries may also apply for and be granted travel authorization as a matter of DHS discretion.

• To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(1)–(2), 8 U.S.C. 1254a(c)(1)–(2).

• When the Secretary terminates a foreign state's TPS designation, beneficiaries return to one of the following:

○ The same immigration status or category that they maintained before TPS, if any (unless that status or category has since expired or terminated); or

○ Any other lawfully obtained immigration status or category they received while registered for TPS, if it is still valid beyond the date TPS terminates.

## When was Haiti designated for TPS?

Haiti was initially designated on the basis of extraordinary and temporary conditions in Haiti that prevented nationals of Haiti from returning in safety.[2] Following the initial designation, TPS for Haiti was extended and redesignated once from July 23, 2011, through January 22, 2013, based on extraordinary and temporary conditions.[3] Thereafter, TPS for Haiti was extended four times based on extraordinary and temporary conditions: (1) from January 23, 2013, through July 22, 2014;[4] (2) from July 23, 2014, through January 22, 2016;[5] (3) from

January 23, 2016, through July 22, 2017;[6] and (4) from July 23, 2017, through January 22, 2018.[7] Subsequently, the Secretary announced the termination of the TPS designation of Haiti effective July 22, 2019.[8]

The termination of Haiti's 2011 TPS designation was challenged in several lawsuits, and court injunctions required DHS to temporarily continue TPS for Haiti pending a final court order.[9] Secretary Mayorkas newly designated Haiti on the basis of extraordinary and temporary conditions effective August 3, 2021, through February 3, 2023.[10] Thereafter, TPS for Haiti was extended and redesignated effective February 4, 2023, and ending on August 3, 2024.[11]

## What authority does the Secretary have to extend the designation of Haiti for TPS?

Section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1), authorizes the Secretary, after consultation with appropriate agencies of the U.S. Government, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist.[12] The decision to designate any foreign state (or part thereof) is a discretionary decision, and there is no judicial review of any determination with respect to the

designation, termination, or extension of a designation. *See* INA sec. 244(b)(5)(A), 8 U.S.C. 1254a(b)(5)(A). The Secretary, in their discretion, may then grant TPS to eligible nationals of that foreign state (or individuals having no nationality who last habitually resided in the designated foreign state). *See* INA sec. 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a foreign state's TPS designation or extension, the Secretary, after consultation with appropriate U.S. Government agencies, must review the conditions in the foreign state designated for TPS to determine whether they continue to meet the conditions for the TPS designation. *See* INA sec. 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that the foreign state continues to meet the conditions for TPS designation, the designation will be extended for an additional period of 6 months or, in the Secretary's discretion, 12 or 18 months. *See* INA sec. 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA sec. 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

## What is the Secretary's authority to redesignate Haiti for TPS?

In addition to extending an existing TPS designation, the Secretary, after consultation with appropriate Government agencies, may redesignate a country (or part thereof) for TPS. *See* INA sec. 244(b)(1), 8 U.S.C. 1254a(b)(1); *see also* INA sec. 244(c)(1)(A)(i), 8 U.S.C. 1254a(c)(1)(A)(i) (requiring that ''the alien has been continuously physically present since the effective date of *the most recent designation of the state*'') (emphasis added).[13]

When the Secretary designates or redesignates a country for TPS, the Secretary also has the discretion to establish the date from which TPS applicants must demonstrate that they have been ''continuously resid[ing]'' in the United States. *See* INA sec. 244(c)(1)(A)(ii), 8 U.S.C. 1254a(c)(1)(A)(ii). The Secretary has

[2] *See Designation of Haiti for Temporary Protected Status,* 75 FR 3476 (Jan. 21, 2010).

[3] *See Extension and Redesignation of Haiti for Temporary Protected Status,* 76 FR 29000 (May 19, 2011).

[4] *See Extension of the Designation of Haiti for Temporary Protected Status,* 77 FR 59943 (Oct. 1, 2012).

[5] *See Extension of the Designation of Haiti for Temporary Protected Status,* 79 FR 11808 (Mar. 3, 2014).

[6] *See Extension of the Designation of Haiti for Temporary Protected Status,* 80 FR 51582 (Aug. 25, 2015).

[7] *See Extension of the Designation of Haiti for Temporary Protected Status,* 82 FR 23830 (May 24, 2017).

[8] *See Termination of the Designation of Haiti for Temporary Protected Status,* 83 FR 2648 (Jan. 18, 2018).

[9] On Dec. 28, 2023, the U.S. District Court for the Northern District of California dismissed Ramos v. Nielsen, 18–cv–01554 (N.D. Cal. Dec. 28, 2023). *Bhattarai* v. *Nielsen,* 19–cv–731 (N.D. Cal. Mar. 12, 2019) was consolidated with Ramos in August 2023. The court agreed with the government position that subsequent TPS designations rendered the pending litigation moot.

[10] *See Designation of Haiti for Temporary Protected Status,* 86 FR 41863 (Aug. 3, 2021).

[11] *See Extension and Redesignation of Haiti for Temporary Protected Status,* 88 FR 5022 (Jan. 26, 2023).

[12] INA section 244(b)(1) ascribes this power to the Attorney General. Congress transferred this authority from the Attorney General to the Secretary of Homeland Security. *See* Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135 (2002). The Secretary may designate a country (or part of a country) for TPS on the basis of ongoing armed conflict such that returning would pose a serious threat to the personal safety of the country's nationals and habitual residents, environmental disaster (including an epidemic), or extraordinary and temporary conditions in the country that prevent the safe return of the country's nationals. For environmental disaster-based designations, certain other statutory requirements must be met, including that the foreign government must request TPS. A designation based on extraordinary and temporary conditions cannot be made if the Secretary finds that allowing the country's nationals to remain temporarily in the United States is contrary to the U.S. national interest. INA sec. 244(b)(1); 8 U.S.C. 1254a(b)(1).

[13] The extension and redesignation of TPS for Haiti is one of several instances in which the Secretary and, before the establishment of DHS, the Attorney General, have simultaneously extended a country's TPS designation and redesignated the country for TPS. *See, e.g., Extension and Redesignation of Haiti for Temporary Protected Status,* 76 FR 29000 (May 19, 2011); *Extension and Re-designation of Temporary Protected Status for Sudan,* 69 FR 60168 (Oct. 7, 2004); *Extension of Designation and Redesignation of Liberia Under Temporary Protected Status Program,* 62 FR 16608 (Apr. 7, 1997).

HaitiTPSAR000037

**Federal Register** / Vol. 89, No. 126 / Monday, July 1, 2024 / Notices    **54487**

determined that the "continuous residence" date for applicants for TPS under the redesignation of Haiti will be June 3, 2024. Initial applicants for TPS under this redesignation must also show they have been "continuously physically present" in the United States since August 4, 2024, which is the effective date of the Secretary's redesignation of Haiti. *See* INA sec. 244(c)(1)(A)(i), 8 U.S.C. 1254a(c)(1)(A)(i). For each initial TPS application filed under the redesignation, USCIS cannot make the final determination of whether the applicant has met the "continuous physical presence" requirement until August 4, 2024, the effective date of this redesignation for Haiti.

USCIS, however, will issue employment authorization documentation, as appropriate, during the registration period in accordance with 8 CFR 244.5(b).

### Why is the Secretary extending the TPS designation for Haiti and simultaneously redesignating Haiti for TPS through February 3, 2026?

DHS has reviewed country conditions in Haiti. Based on the review, including input received from Department of State (DoS) and other U.S. Government agencies, the Secretary has determined that an 18-month TPS extension is warranted because the extraordinary and temporary conditions supporting Haiti's TPS designation remain. The Secretary has further determined that redesignating Haiti for TPS under INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C) is warranted and is changing the continuous residence and continuous physical presence dates that applicants must meet to be eligible for TPS.

### Overview

DHS has conducted a thorough review of country conditions in Haiti. Haiti continues to experience simultaneous economic, security, political, and health crises. Haitian gangs are the primary source of violence and instability in Haiti and pose an increasing threat as they continue to escalate and expand their influence and geographic presence over large portions of metropolitan Port-au-Prince, Haiti's capital, as well as to several of Haiti's ten departments (regional administrative divisions).[14]

Since early March 2024, the gangs have also attacked the capital's primary airport and major port terminals, and blocked roads to access the city.[15] An ongoing political impasse has left Haiti without a functioning democratically elected national government and hindered Haiti's ability to respond to the gang-driven violence. The political situation has continued to worsen since the July 2021 assassination of President Jovenel Moise.[16] At the same time, Haiti struggles through a humanitarian crisis, with many citizens having limited access to safety, healthcare, food, water, and economic opportunity. These circumstances continue to make return to Haiti dangerous for Haitian nationals living in the United States.

### Political Situation

On July 7, 2021, President Jovenel Moïse was assassinated in his private residence in Port-au-Prince. Subsequently, Ariel Henry, whom Moïse had appointed prime minister (PM) days before the assassination, assumed power as head of a new government.[17] In the wake of the assassination, there were ongoing efforts to create a transitional government and eventually hold free and fair elections, but talks repeatedly failed, with some opposition groups demanding the resignation of PM Henry as a precondition for dialogue.[18] On December 21, 2022, representatives of civil society organizations, the private sector, and political groups created a political accord called the "National consensus for an inclusive transition and transparent elections," which was supported by PM Henry.[19] While dialogue to define a strategic direction

for holding elections continued, frustration has grown at the failure to hold elections over the last three years.[20] The last national elections in Haiti were held in November 2016. Since then, the terms of 30 senators and 119 members of Haiti's lower legislative chamber have expired, leaving Haiti without an active national legislative body since January 2023.[21]

Beginning in mid-January 2024, significant protests erupted throughout Haiti, paralyzing numerous cities.[22] The protests were driven by supporters of Guy Philippe, the leader of a 2004 rebellion against former President Jean-Bertrand Aristide in which he masterminded multiple attacks on police stations.[23] Since returning to Haiti from the United States, Philippe has spent his time "shoring up support for his so-called revolution."[24] Philippe is believed by some to be a destabilizing force in Haiti and the protests have led to the closing of schools, government agencies, and private businesses in cities throughout Haiti.[25]

PM Henry traveled abroad at the beginning of 2024 for international engagements. During his travel, a series of coordinated gang attacks began against targets in Haiti's capital and beyond, freeing thousands of inmates and closing the main international airport.[26] PM Henry has been unable to

[14] Edith M. Lederer, Gang violence in Haiti is escalating and spreading with a significant increase in killings, UN says, The Associated Press, Sept. 27, 2023, available at: *https://apnews.com/article/haiti-gang-violence-un-report-killings-5d3f7ff272b7303852869dfc67692a23* (last visited Apr. 29, 2024); Haiti: Humanitarian impact of gang violence, ACAPS, June 2, 2023, available at: *https://reliefweb.int/report/haiti/acaps-briefing-note-haiti-humanitarian-impact-gang-violence-02-june-2023* (last visited Apr. 29, 2024).

[15] Widlore Mérancourt and Samantha Schmidt, As gangs attack a critical port, 'Haiti will go hungry soon', The Washington Post, Mar. 7, 2024, available at: *https://www.washingtonpost.com/world/2024/03/07/haiti-gangs-port/* (last visited Apr. 29, 2024).

[16] Clare Ribando Seelke and Karla I. Rios, Haiti: Recent Developments and U.S. Policy, Congressional Research Service (CRS), Sept. 18, 2023, available at: *https://sgp.fas.org/crs/row/R47394.pdf* (last visited Apr. 29, 2024).

[17] Human Rights Watch, *World Report 2022—Haiti* (Jan. 13, 2022), *https://www.hrw.org/world-report/2022/country-chapters/haiti* (last visited Apr. 29, 2024).

[18] United Nations Integrated Office in Haiti (BINUH)—Report of the Secretary-General, UN Security Council, p. 2, Jan. 15, 2024, available at: *https://reliefweb.int/report/haiti/united-nations-integrated-office-haiti-report-secretary-general-s202462-enarruzh* (last visited Feb. 26, 2024).

[19] Haiti Libre, *Haiti—FLASH: The PM signed a historic consensus for an inclusive transition,* Dec. 22, 2022, *https://www.haitilibre.com/en/news-38427-haiti-flash-the-pm-signed-a-historic-consensus-for-an-inclusive-transition.html* (last visited Apr. 29, 2024).

[20] Final report of the Panel of Experts on Haiti, UN Security Council, p. 8, Sept. 15, 2023, available at: *https://www.securitycouncilreport.org/un-documents/document/s-2023-674.php* (last visited Apr. 29, 2024).

[21] Becky Sullivan, As its only remaining elected officials depart, Haiti reaches a breaking point, National Public Radio (NPR), Jan. 18, 2023, available at: *https://www.npr.org/2023/01/18/1149556481/haiti-last-elected-official-political-crisis* (last visited Apr. 29, 2024); *see also* Camila Domonoske, 14 Months After Elections Began, Haiti Finally Has a President-Elect, National Public Radio (NPR), Jan. 4, 2017, available at: *https://www.npr.org/sections/thetwo-way/2017/01/04/508171191/14-months-after-elections-began-haiti-finally-has-a-president-elect* (last visited Apr. 29, 2024).

[22] Supporters of former Haitian rebel leader Guy Philippe launch widespread protests, The Associated Press, Jan. 16, 2024, available at: *https://apnews.com/article/haiti-protests-guy-philippe-supporters-d0e749d75b96aee0f01395a580a6dec0* (last visited Apr. 29, 2024).

[23] *Id.*

[24] Frances Robles, An Unlikely New Threat to Haiti's Stability: An Armed Environmental Group, The New York Times, Jan. 25, 2024, available at: *https://web.archive.org/web/20240126040146/https://www.nytimes.com/2024/01/25/world/americas/haiti-political-instability-bsap.html* (last visited Apr. 29, 2024).

[25] Supporters of former Haitian rebel leader Guy Philippe launch widespread protests, The Associated Press, Jan. 16, 2024, available at: *https://apnews.com/article/haiti-protests-guy-philippe-supporters-d0e749d75b96aee0f01395a580a6dec0* (last visited Apr. 29, 2024).

[26] Dánica Coto, Haiti's prime minister is locked out of his country and faces pressure to resign, The

Continued

return to Haiti. On March 6, 2024, Jimmy ''Barbecue'' Cherizier, the leader of one of Haiti's most powerful gang alliances, the G9, warned that unless PM Henry stepped down, there would be civil war in Haiti.[27] In March 2024, Caribbean Community (CARICOM) leaders, with agreement from key Haitian stakeholders, announced that PM Henry would resign once a transitional presidential council was established and an interim leader was selected.[28] PM Henry resigned in late April 2024, the day before the swearing in of a 9-member transitional presidential council.[29] The council is tasked with, among other duties, selecting an interim prime minister, setting the agenda of a new Cabinet, appointing a provisional electoral commission, and establishing a national security council.[30]

The Haitian government has long been accused of corruption and ineptitude. ''Politicians and the business elite in Haiti have historically relied on gangs to obtain and exert power, but the [gangs] have grown more autonomous in recent years.''[31] An April 2021 report by Harvard Law School's International Human Rights

Clinic alleged that the Moïse government funneled money, weapons, uniforms, and vehicles to gangs like the G9 in exchange for them repressing political opponents, often brutally, and maintaining the peace in poorer neighborhoods.[32] A July 2022 International Crisis Group report stated, ''[C]ollusion between state security forces and illegal armed groups has flourished in the absence of political will to hold corrupt officers accountable and because of the efforts of those in power to deploy the police (as well as gangs) to serve their personal interests.''[33]

Allegations of corruption against members of Haiti's government are prevalent and its ''justice system is plagued by insecurity, corruption, strikes, and political interference.''[34] A judge has accused more than 30 high-ranking officials, including former presidents and prime ministers, of government corruption and warrants have been issued for their arrest.[35] As of January 2024, none of the accused had been arrested.[36] Haitian government officials accused of criminal misconduct commonly ignore arrest warrants and requests for questioning.[37]

## Security Situation

Since President Moïse's assassination, Haiti has experienced a sharp deterioration in an already fragile security situation. Gang violence and kidnappings have spiked throughout the country, particularly in Port-au-Prince. In the first three months of 2024, gang violence killed or injured more than 2,500 people.[38] The violence heavily

affects three of Haiti's ten departments, with gangs having an established presence in at least six departments.[39] Gang violence continues to escalate and expand outside the capital and other major cities including Gonaïves and Cap-Haïtien. The Ouest Department, where Port-au-Prince is located, suffers from extreme insecurity from armed gang violence against civilians, police, and infrastructure alike.[40] Neighborhoods in Port-au-Prince that were previously relatively safe from the gangs have recently seen an alarming expansion of gang influence, including in Carrefour-Feuilles, Solino, Bon Repos, Mariani, and Léogâne.[41] A September 2023 final report from a panel of experts from the United Nations found that gangs controlled or influenced over 80 percent of the Port-au-Prince metropolitan area, while they committed incursions in the remaining 20 percent in which they carried out murders, kidnappings, robberies, and various other crimes.[42] In early March 2024, gangs attacked police stations and stormed two prisons in and around Port-au-Prince, allowing more than 4,700 inmates to escape.[43] Haiti's government declared a 72-hour state of emergency.[44] Following the initial attacks, the gangs blocked the roads leading to Port-au-Prince and attacked the city's main airport.[45] On March 6, the gangs attacked the primary port terminal, forcing the terminal to close indefinitely, threatening Haiti's food supply and cutting off deliveries of

Associated Press, Mar. 8, 2024, available at: *https://apnews.com/article/haiti-prime-minister-gangs-resign-e583a191a2f800bc63752220a47dec0d* (last visited Apr. 29, 2024).

[27] Haiti's top gang leader warns of ''civil war that will lead to genocide'' unless prime minister steps down, CBS News, Mar. 6, 2024, available at: *https://www.cbsnews.com/news/haiti-gang-leader-jimmy-cherizier-warns-civil-war-genocide/* (last visited Apr. 29, 2024).

[28] Widlore Mérancourt, Samantha Schmidt, and Amanda Coletta, Haitian prime minister says he'll resign, clearing way for new government, The Washington Post, Mar. 12, 2024, available at: *https://www.washingtonpost.com/world/2024/03/12/haitian-prime-minister-resign-clearing-way-new-government/* (last visited Apr. 29, 2024).

[29] Dánica Coto, Ariel Henry resigns as prime minister of Haiti, wracked by gang violence, paving the way for new government to take power, PBS News Hour, Apr. 25, 2024, available at: *https://www.pbs.org/newshour/world/ariel-henry-resigns-as-prime-minister-of-haiti-wracked-by-gang-violence-paving-the-way-for-new-government-to-take-power* (last visited May 13, 2024); Dánica Coto, Haiti's new transitional council faces urgent demands for solutions amid gang violence, PBS News Hour, Apr. 26, 2024, available at: *https://www.pbs.org/newshour/world/haitis-new-transitional-council-faces-urgent-demands-for-solutions-amid-gang-violence* (last visited May 13, 2024).

[30] Dánica Coto, Haiti's new transitional council faces urgent demands for solutions amid gang violence, PBS News Hour, Apr. 26, 2024, available at: *https://www.pbs.org/newshour/world/haitis-new-transitional-council-faces-urgent-demands-for-solutions-amid-gang-violence* (last visited May 13, 2024).

[31] Diego Da Rin, *New Gang Battle Lines Scar Haiti as Political Deadlock Persists,* International Crisis Group (July 27, 2022), *https://www.crisisgroup.org/latin-america-caribbean/haiti/new-gang-battle-lines-scar-haiti-political-deadlock-persists* (last visited Apr. 29, 2024).

[32] Harvard Law School International Human Rights Clinic, *Killing with Impunity: State-Sanctioned Massacres in Haiti* (April 2021), *http://hrp.law.harvard.edu/wp-content/uploads/2021/04/Killing_With_Impunity-1.pdf* (last visited Apr. 29, 2024).

[33] Diego Da Rin, *New Gang Battle Lines Scar Haiti as Political Deadlock Persists,* International Crisis Group (July 27, 2022), *https://www.crisisgroup.org/latin-america-caribbean/haiti/new-gang-battle-lines-scar-haiti-political-deadlock-persists* (last visited Apr. 29, 2024).

[34] World Report 2024—Haiti, Human Rights Watch, Jan. 11, 2024, available at: *https://www.ecoi.net/en/document/2103219.html* (last visited Apr. 29, 2024).

[35] Judge in Haiti issues arrest warrants accusing former presidents and prime ministers of corruption, The Associated Press, Jan. 8, 2024, available at: *https://apnews.com/article/haiti-corruption-arrest-warrant-presidents-prime-ministers-1e2c1d0530cbca235e33ada3009acabf* (last visited Apr. 29, 2024).

[36] *Id.*

[37] *Id.*

[38] Sarah Morland, Haiti's death toll rises as international support lags, UN report says, Reuters, Apr. 19, 2024, available at: *https://www.reuters.com/world/americas/haitis-death-toll-rises-international-support-lags-un-report-says-2024-04-19/* (last visited May 13, 2024).

[39] Haiti: Humanitarian impact of gang violence, ACAPS, June 2, 2023, available at: *https://reliefweb.int/report/haiti/acaps-briefing-note-haiti-humanitarian-impact-gang-violence-02-june-2023* (last visited Apr. 29, 2024).

[40] United Nations Integrated Office in Haiti (BINUH)—Report of the Secretary-General, UN Security Council, p.3, Jan. 15, 2024, available at: *https://reliefweb.int/report/haiti/united-nations-integrated-office-haiti-report-secretary-general-s202462-enarruzh* (last visited Apr. 29, 2024).

[41] *Id.*

[42] Final report of the Panel of Experts on Haiti, UN Security Council, p.14, Sept. 15, 2023, available at: *https://www.securitycouncilreport.org/un-documents/document/s-2023-674.php* (last visited Apr. 29, 2024).

[43] Gangs in Haiti try to seize control of main airport as thousands escape prisons: ''Massacring people indiscriminately,'' CBS News, Mar. 5, 2024, available at: *https://www.cbsnews.com/news/haiti-gangs-try-to-seize-airport-thousands-inmates-escape-prisons-state-of-emergency/* (last visited Apr. 29, 2024).

[44] Henri Astier and Gianluca Avagnina, Haiti violence: Haiti gangs demand PM resign after mass jailbreak, BBC, March 4, 2024, available at: *bbc.com/news/world-latin-america-68462851* (last visited Apr. 29, 2024).

[45] Widlore Mérancourt and Samantha Schmidt, As gangs attack a critical port, 'Haiti will go hungry soon', The Washington Post, Mar. 7, 2024, available at: *https://www.washingtonpost.com/world/2024/03/07/haiti-gangs-port/* (last visited Apr. 29, 2024).

medical supplies.[46] In response, the Haitian government extended the state of emergency until April 3 in Port-au-Prince and Haiti's Ouest Department.[47] Due to the escalating violence in neighborhoods surrounding the U.S. Embassy in Haiti and the attack on the airport, the U.S. military evacuated all non-essential Embassy personnel by airlift on Saturday, March 9, and Sunday, March 10.[48] The coordinated gang attacks that began on February 29 have displaced over 15,000 people from their homes in Port-au-Prince.[49]

There are approximately 200 groups associated with seven major gang coalitions across Haiti, and the majority of armed groups operate in metropolitan Port-au-Prince.[50] ''Many of Haiti's gangs have coalesced around two main alliances:'' the G9 and the GPèp.[51] ''Gangs have decapitated opponents in public, burnt corpses on the street, set fire to houses and used sexual violence to intimidate residents out of collaborating with their rivals.'' [52] Many of these groups employ heavy armaments in their activities, and they frequently use handguns and assault weapons.[53]

Reported homicides increased significantly in 2023, by 119.4 percent from 2022, while reported kidnappings also increased significantly in 2023, by

83 percent from 2022.[54] Since the start of 2024, gangs have launched assaults against entire neighborhoods in Port-au-Prince. Automatic gunfire and burning barricades trapped residents of the Solino neighborhood in their homes in mid-January 2024.[55] The Solino neighborhood, home to many police officers, is regarded as a gateway to access other neighborhoods such as Canapé Vert that have remained relatively safe to this point.[56] Similar attacks began in the Gabelliste neighborhood in early January 2024.[57] Armed attacks in the neighborhoods of Carrefour, Cité Soleil, and Tabarre that began on February 5 have displaced almost 10,000 people from those areas.[58]

In response to the gang violence and escalating insecurity plaguing much of Haiti, as well as the lack of prosecutions and convictions relating to the violence leading to a sense of impunity, a movement known as *Bwa Kale* began in April 2023.[59] This movement is driven by anti-gang vigilantes who have armed themselves with improvised weapons and hunted down and killed suspected gang members, often burning their bodies in the aftermath.[60]

Vigilante groups had been active in Haiti prior to April 2023, but a rumored large-scale attack to be carried out by gang members in Port-au-Prince led to a major incident involving vigilantes. Police intercepted a mini-bus of

suspected gang members carrying weapons in the Canapé Vert neighborhood of Port-au-Prince.[61] A large crowd surrounded the mini-bus, pelting the suspected gang members with stones and setting several of them on fire while they were still alive.[62] Thirteen people were killed.[63] Footage of the attack spread widely on social media and inspired additional attacks.[64] Lynchings were reported in Port-au-Prince in the following days.[65] Increasing numbers of people joined vigilante groups to defend themselves and their neighborhoods from gang attacks.[66] In April 2023 alone, 164 cases of mob killings and lynchings of suspected gang members were reported.[67]

Reports suggest collaboration between some vigilante groups and Haitian security forces, and that current or former Haitian police officers have participated in the vigilante violence.[68] At times, they may have also shared their weapons with the vigilante groups.[69] In response, the gangs have mounted their own movement to retaliate against the vigilante groups, called *Zam Pale.*[70] The offensive by the various vigilante groups lasted only a few months before gangs resumed their push into new territory. However, some vigilante groups remain active.[71]

Haitian law enforcement has been unable to cope with the level of gang violence due to a failure to expand the size of the Haitian National Police or sufficiently improve its operational capabilities.[72] The gangs, meanwhile, have expanded their arsenals and upgraded their firepower, hindering the

[46] Id.

[47] Harold Isaac and Sarah Morland, Haiti healthcare near collapse, says UN, as state of emergency extended, Reuters, Mar. 8, 2024, available at: *https://www.reuters.com/world/americas/haiti-extends-state-emergency-pm-absent-2024-03-07/* (last visited Apr. 29, 2024).

[48] Emily Mae Czachor, U.S. military airlifts embassy staff from Port-au-Prince amid Haiti's escalating gang violence, CBS News, Mar. 11, 2024, available at: *https://www.cbsnews.com/news/us-military-airlifts-evacuation-staff-embassy-port-au-prince-haiti-gang-violence/* (last visited Apr. 29, 2024).

[49] Evans Sanon and Dánica Coto, Violence is battering Haiti's fragile economy and causing food and water shortages, The Associated Press, Mar. 9, 2024, available at: *https://apnews.com/article/haiti-violence-gangs-food-economy-092a20f037b48a8e1837a4e6424cf571* (last visited Apr. 29, 2024).

[50] United Nations Integrated Office in Haiti (BINUH)—Report of the Secretary-General, UN Security Council, p.6, Apr. 14, 2023, available at: *https://binuh.unmissions.org/sites/default/files/sg_report_on_binuh_14_april_2023.pdf* (last visited Apr. 29, 2024).

[51] Diego Da Rin, *New Gang Battle Lines Scar Haiti as Political Deadlock Persists,* International Crisis Group (July 27, 2022), *https://www.crisisgroup.org/latin-america-caribbean/haiti/new-gang-battle-lines-scar-haiti-political-deadlock-persists* (last visited Apr. 29, 2024).

[52] Id.

[53] United Nations Integrated Office in Haiti (BINUH)—Report of the Secretary-General, UN Security Council, p.6, Apr. 14, 2023, available at: *https://binuh.unmissions.org/sites/default/files/sg_report_on_binuh_14_april_2023.pdf* (last visited Apr. 29, 2024).

[54] Id. at p.3.

[55] Haiti: residents trapped as armed gangs target key pocket of Port-au-Prince, The Guardian, Jan. 18, 2024, available at: *https://www.theguardian.com/world/2024/jan/18/haiti-residents-trapped-port-au-prince-gangs* (last visited Apr. 29, 2024).

[56] 'It's very scary now:' Fear grips Haiti's Port-au-Prince amid gang violence, Al Jazeera, Jan. 19, 2024, available at: *https://www.aljazeera.com/gallery/2024/1/19/fear-grips-haitis-port-au-prince-amid-gang-violence* (last visited Apr. 29, 2024).

[57] United Nations—International Organization for Migration, Haiti—Emergency Tracking Tool—Dashboard #34, Displacement following attacks in Solino and Gabelliste—Municipality of Port-au-Prince, (Jan. 18, 2024), *https://dtm.iom.int/reports/haiti-emergency-tracking-tool-34-displacement-following-attacks-solino-and-gabelliste* (last visited Apr. 29, 2024).

[58] United Nations—International Organization for Migration, Haiti—Emergency Tracking Tool—Dashboard #37.1, Updates on displacement following attacks in Carrefour, Cité Soleil and Tabarre (Feb. 13, 2024), *https://dtm.iom.int/reports/haiti-emergency-tracking-tool-371-updates-displacement-following-attacks-carrefour-cite?close=true* (last visited Apr. 29, 2024).

[59] Final report of the Panel of Experts on Haiti, UN Security Council, p. 3, Sept. 15, 2023, available at: *https://www.securitycouncilreport.org/un-documents/document/s-2023-674.php* (last visited Apr. 29, 2024).

[60] Id.; Henry Shuldiner, Haiti's Anti-Gang Vigilantes May Pose Future Criminal Threat, InSight Crime, May 9, 2023, available at: *https://insightcrime.org/news/bwa-kale-vigilante-movement-challenging-haitis-gangs/* (last visited Apr. 29, 2024).

[61] Diego Da Rin, Haitians Turn to Mob Justice as the Gang Threat Festers, International Crisis Group, Jul. 3, 2023, available at: *https://www.crisisgroup.org/latin-america-caribbean/haiti/haitians-turn-mob-justice-gang-threat-festers* (last visited Apr. 29, 2024).

[62] Id.

[63] Id.

[64] Id.

[65] Id.

[66] Id.

[67] Id.

[68] Id.

[69] Id.

[70] Final report of the Panel of Experts on Haiti, UN Security Council, p. 17, Sept. 15, 2023, available at: *https://www.securitycouncilreport.org/un-documents/document/s-2023-674.php* (last visited Apr. 29, 2024).

[71] Haiti's Gangs: Can a Foreign Mission Break Their Stranglehold?, International Crisis Group, Jan. 5, 2024, available at: *https://www.crisisgroup.org/latin-america-caribbean/haiti/b49-haitis-gangs-can-foreign-mission-break-their-stranglehold* (last visited Apr. 29, 2024).

[72] Diego Da Rin, Haitians Turn to Mob Justice as the Gang Threat Festers, International Crisis Group, Jul. 3, 2023, available at: *https://www.crisisgroup.org/latin-america-caribbean/haiti/haitians-turn-mob-justice-gang-threat-festers* (last visited Apr. 29, 2024).

HaitiTPSAR000040

**54490**    **Federal Register** / Vol. 89, No. 126 / Monday, July 1, 2024 / Notices

Haitian National Police's ability to effectively fight them.[73] According to remarks delivered in April 2023 by the UN Special Representative of the Secretary-General for Haiti, María Isabel Salvador, the Haitian National Police are down from 14,772 personnel to about 13,200 personnel of whom only approximately 9,000 are police officers. However, only 3,500 police officers are on active duty throughout the entire country at any one time.[74] In just the first half of 2023, gang members attacked multiple police stations, murdered 29 police officers, and posted grisly pictures of the deceased on social media.[75]

Haiti's government requested international help in late 2022 to aid the Haitian National Police in combatting gang violence.[76] A Multinational Security Support (MSS) mission was authorized by the United Nations Security Council in United Nations Security Council Resolution 2699.[77] The mandate for the MSS mission is to provide operational support to the Haitian National Police, including through capacity building, and to support the Haitian National Police in providing security for critical infrastructure.[78] However, to date, the multinational armed force has not deployed to Haiti.[79]

**Environmental Situation**

Several recent environmental disasters have contributed to the extraordinary and temporary conditions in Haiti. On August 14, 2021, a 7.2 magnitude earthquake hit the southern region of Haiti, killing more than 2,200 people, injuring 12,700 people, destroying 130,000 homes, and leaving thousands of people in immediate need of aid.[80] Only a few days later, Tropical Storm Grace resulted in floods and landslides in the same departments affected by the earthquake, in addition to Sud-Est.[81] Some healthcare facilities have still not been rebuilt since the August 2021 earthquake.[82] Worldwide, ''Haiti remains one of the most vulnerable countries'' to natural disasters, predominately including hurricanes, floods, and earthquakes.[83] Over 96 percent of Haitians are vulnerable to these disasters.[84] Widespread deforestation has left the country especially prone to flooding and mudslides, and Haiti being situated on a geographical fault line makes it more susceptible to natural disasters in general as compared to the majority of other Caribbean countries.[85] In 2023, smaller but still significant storms and flooding destroyed over 13,000 homes and cut off roads between communities.[86] In June 2023, a 4.4 magnitude earthquake and 5.5

magnitude earthquake hit Haiti's west coast only two days apart causing the deaths of at least four people while destroying homes, blocking roads, and overwhelming healthcare facilities.[87]

**Humanitarian Situation**

Haiti has one of the highest levels of chronic food insecurity in the world with more than half of its total population chronically food insecure and 22 percent of children chronically malnourished, according to the World Food Programme.[88] As of September 2023, the total number of people in acute food insecurity stood at 4.35 million people, including 1.4 million people in the ''emergency'' phase on the World Food Program's (WFP) Integrated Food Security Classification Index.[89]

A 2024 BINUH report found that the security crisis has led to disruptions in the market supply chain, contributing to the high level of food insecurity.[90] Gangs that control the main roads between cities and departments charge increasingly high fees to allow vehicles transporting food, as well as other goods, to pass unharmed.[91] The global rise in food prices, depreciation of the Haitian currency, and other restrictions on internal movement of goods in Haiti have, along with the security crisis, contributed to the high food prices and general shortage of food.[92]

The Pan-American Health Organization and the Haitian government reported a new cholera

[73] Final report of the Panel of Experts on Haiti, UN Security Council, p. 3, Sept. 15, 2023, available at: *https://www.securitycouncilreport.org/un-documents/document/s-2023-674.php* (last visited Apr. 29, 2024).

[74] María Isabel Salvador (BINUH) on the question concerning Haiti—Security Council, 9311th meeting (Apr. 26, 2023), available at: *https://webtv.un.org/en/asset/k1d/k1dtg6n2jc* (last visited Apr. 29, 2024).

[75] Diego Da Rin, Haitians Turn to Mob Justice as the Gang Threat Festers, International Crisis Group, Jul. 3, 2023, available at: *https://www.crisisgroup.org/latin-america-caribbean/haiti/haitians-turn-mob-justice-gang-threat-festers* (last visited Apr. 29, 2024).

[76] Reuters, Explainer: Why did the UN vote to send an international force to Haiti? (Oct. 2, 2023), available at: *https://www.reuters.com/world/americas/why-did-un-vote-send-an-international-force-haiti-2023-10-02/* (last visited Apr. 29, 2024).

[77] United Nations Security Council, Resolution 2699, Oct. 2, 2023, available at: *https://digitallibrary.un.org/record/4022890?ln=en&v=pdf* (last visited Apr. 29, 2024).

[78] Ambassador Robert Wood, Remarks at a UN Security Council Briefing on Haiti, United States Mission to the United Nations, Apr. 22, 2024, available at: *https://usun.usmission.gov/remarks-at-a-un-security-council-briefing-on-haiti-11/#:~:text=This%20mission%20seeks%20to%20build, and%20communities%20to%20build%20trust.* (last visited Apr. 29, 2024).

[79] What's going on with the planned international mission to Haiti?, Reuters, Apr. 26, 2024, available at: *https://www.reuters.com/world/americas/haitis-prime-minister-called-international-security-support-who-answered-2024-03-05/* (last visited Apr. 29, 2024).

[80] UNICEF, *Massive earthquake leaves devastation in Haiti* (last updated Oct. 4, 2021), *https://www.unicef.org/emergencies/massivEdite-earthquake-devastation-haiti* (last visited Apr. 29, 2024).

[81] FAO, *Haiti: Urgent call for funding (September 2021–May 2022)—Emergency response to households affected by the earthquake and Tropical Storm Grace* (Sept. 10, 2021), *https://reliefweb.int/report/haiti/haiti-urgent-call-funding-september-2021-may-2022-emergency-response-households* (last visited Apr. 29, 2024).

[82] Luke Taylor, 'We have no time to heal': floods followed by earthquake heap more trauma on Haiti, The Guardian, available at: *https://www.theguardian.com/global-development/2023/jul/11/we-have-no-time-to-heal-floods-followed-by-earthquake-heap-more-trauma-on-haiti* (last visited Apr. 29, 2024).

[83] The World Bank in Haiti, The World Bank, Oct. 26, 2023, available at: *https://www.worldbank.org/en/country/haiti/overview* (last visited Apr. 29, 2024).

[84] The World Bank in Haiti, The World Bank, Oct. 26, 2023, available at: *https://www.worldbank.org/en/country/haiti/overview* (last visited Apr. 29, 2024).

[85] Council on Foreign Relations, *Haiti's Troubled Path to Development* (Sept. 17, 2021), *https://www.cfr.org/backgrounder/haitis-troubled-path-development* (last visited Apr. 29, 2024).

[86] Haiti—Severe weather, floods and landslides, European Commission's Directorate-General for European Civil Protection and Humanitarian Aid Operations, Jun. 6, 2023, available at: *https://reliefweb.int/report/haiti/haiti-severe-weather-floods-and-landslides-haiti-civil-protection-noaa-cpc-echo-daily-flash-06-june-2023* (last visited Apr. 29, 2024).

[87] Luke Taylor, 'We have no time to heal': floods followed by earthquake heap more trauma on Haiti, The Guardian, available at: *https://www.theguardian.com/global-development/2023/jul/11/we-have-no-time-to-heal-floods-followed-by-earthquake-heap-more-trauma-on-haiti* (last visited Apr. 29, 2024). UN, Haiti: UN deeply saddened as latest earthquake kills three, in wake of floods, available at *https://news.un.org/en/story/2023/06/1137407* (last visited Apr. 29, 2024).

[88] Haiti Country Brief, World Food Programme (WFP), Nov. 2023, available at: *https://docs.wfp.org/api/documents/WFP-0000155417/download/?_ga=2.249432451.544473126.1706236500-581114880.1706236500* (last visited Apr. 29, 2024).

[89] Haiti Country Brief, World Food Programme (WFP), Nov. 2023, available at: *https://docs.wfp.org/api/documents/WFP-0000155417/download/?_ga=2.249432451.544473126.1706236500-581114880.1706236500* (last visited Apr. 29, 2024).

[90] United Nations Integrated Office in Haiti—Report of the Secretary-General, UN Security Council, p.12, Jan. 15, 2024, available at: *https://reliefweb.int/report/haiti/united-nations-integrated-office-haiti-report-secretary-general-s202462-enarruzh* (last visited Apr. 29, 2024).

[91] *Id.*

[92] Tanvi Nagpal, No Easy Solutions: Understanding the Scale of the Humanitarian Crisis in Haiti, Center for Strategic & International Studies (CSIS), Dec. 12, 2023, *https://www.csis.org/analysis/no-easy-solutions-understanding-scale-humanitarian-crisis-haiti* (last visited Apr. 29, 2024).

HaitiTPSAR000041

outbreak in October 2022.[93] As of November 15, 2022 there had been 8,146 hospitalized suspected cases and 821 confirmed cases of cholera, resulting in 188 deaths.[94] As of September 2023, the World Health Organization found that a continued lack of access to clean water sources contributed to the spread of the disease.[95] As of January 2024, an estimated 73,000 Haitians were confirmed or suspected to have cholera across all 10 departments of Haiti.[96] Human Rights Watch also estimated that as of January 2024, only 55 percent of Haitian households could access safe drinking water while two-thirds of Haitians had limited or no access to sanitation services.[97] The recent closure of some hospitals and reduced availability of ambulance services, in addition to the generally poor health condition of the entire population (due, at least in part, to significant malnutrition), has led to more significant likelihood of severe disease and death for those Haitians who contract cholera.[98]

Haiti lacks the healthcare resources to effectively respond to the cholera outbreak. Gangs control or have influence over almost half of all hospitals in the Port-au-Prince metropolitan area, with attacks on patients, staff, and facilities forcing some to close.[99] Shootings, robberies, and kidnappings of doctors and nurses have been reported.[100] For example, in a June 2023 attack on a hospital in Ouest department, six hospital security personnel were kidnapped and "vehicles, a generator, solar panels, and various medical supplies and equipment" were stolen.[101] After an attack on a convoy of ambulances for Medecins Sans Frontieres (MSF) in December 2023 that killed a patient, MSF suspended their work at the Turgeau emergency center.[102] Human Rights Watch stated that it is estimated that three-quarters of Haiti's healthcare facilities lack adequate medical supplies and sufficient trained personnel as the security crisis has led to a mass exodus of health workers in recent years.[103]

### Economic Situation

Amidst the political, security, and environmental crises, Haiti's economy has been decimated and threatens the future of the country. Many children are not able to attend school.[104] Haiti is one of the poorest countries in the world, and it remains the poorest in Latin America and the Caribbean.[105] The economy has contracted for five straight years, from 2019 through 2023.[106] With prices increasing 53 percent year-on-year as of early 2023, inflation in Haiti is among the ten highest in the world.[107] Previous gains in the reduction of poverty have been undone with two-thirds of households reporting a reduction in their income in March 2023.[108] On the UN's Human Development Index,[109] Haiti ranked 158 out of 191 countries in 2022.[110]

In summary, Haiti is experiencing extraordinary and temporary conditions resulting from grave insecurity and gang crime, as well as socio-economic and humanitarian conditions, including those resulting from environmental disasters aggravating food insecurity.

Based on this review and after consultation with appropriate U.S. Government agencies, the Secretary has determined that:

• The conditions supporting Haiti's designation for TPS continue to be met. *See* INA sec. 244(b)(3)(A) and (C), 8 U.S.C. 1254a(b)(3)(A) and (C).

• There continue to be extraordinary and temporary conditions in Haiti that prevent Haitian nationals (or individuals having no nationality who last habitually resided in Haiti) from returning to Haiti in safety, and it is not contrary to the national interest of the United States to permit Haitian TPS beneficiaries to remain in the United States temporarily. *See* INA sec. 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).

• The designation of Haiti for TPS should be extended for an 18-month period, beginning on August 4, 2024, and ending on February 3, 2026. *See* INA sec. 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C).

• Due to the conditions described above, Haiti should be simultaneously extended and redesignated for TPS beginning on August 4, 2024, and ending on February 3, 2026. *See* INA sec. 244(b)(1)(C) and (b)(2), 8 U.S.C. 1254a(b)(1)(C) and (b)(2).

• For the redesignation, the Secretary has determined that TPS applicants must demonstrate that they have continuously resided in the United States since June 3, 2024.

• Initial TPS applicants under the redesignation must demonstrate that they have been continuously physically present in the United States since

[93] Widlore Mérancourt, Kelly Kasulis Cho, and Amanda Coletta, The Washington Post, Cholera Resurfaces in Haiti as gangs hinder access to water, hospitals, Oct. 3, 2022, *https://www.washingtonpost.com/world/2022/10/03/haiti-cholera-gang-violence-water/* (last visited Apr. 29, 2024).

[94] Pan American Health Organization, *Cholera Outbreak in Hispaniola, Situation Report #6,* Nov. 17, 2022, *https://www.paho.org/en/documents/cholera-outbreak-hispaniola-2022-situation-report-6* (last visited Apr. 29, 2024).

[95] Haïti Health Cluster: Navigating a Multifaceted Humanitarian Crisis, World Health Organization (WHO), Sept. 5, 2023, available at: *https://healthcluster.who.int/newsroom/news/item/05-09-2023-haiti-health-cluster-navigating-a-multifaceted-humanitarian-crisis* (last visited Apr. 29, 2024).

[96] United Nations Integrated Office in Haiti—Report of the Secretary-General, UN Security Council, p.13, Jan. 15, 2024, available at: *https://reliefweb.int/report/haiti/united-nations-integrated-office-haiti-report-secretary-general-s202462-enarruzh* (last visited Apr. 29, 2024).

[97] World Report 2024—Haiti, Human Rights Watch, Jan. 11, 2024, available at: *https://www.ecoi.net/en/document/2103219.html* (last visited Apr. 29, 2024).

[98] Haiti | Earthquake and Cholera Outbreak—Emergency Appeal No. MDRHT018—Operation update #6, International Federation of Red Cross and Red Crescent Societies (IFRC), Nov. 3, 2023, available at: *https://reliefweb.int/report/haiti/haiti-earthquake-and-cholera-outbreak-emergency-appeal-no-mdrht018-operation-update-6* (last visited Apr. 29, 2024).

[99] Final report of the Panel of Experts on Haiti, UN Security Council, p. 145, Sept. 15, 2023, available at: *https://www.securitycouncilreport.org/un-documents/document/s-2023-674.php* (last visited Apr. 29, 2024).

[100] *Id.*

[101] *Id.*

[102] MSF suspends work in Haiti emergency centre after armed group kills patient, Al Jazeera, Dec. 15, 2023, available at: *https://www.aljazeera.com/news/2023/12/15/msf-suspends-work-at-hatian-hospital-after-armed-group-kill-patient* (last visited Apr. 29, 2024).

[103] World Report 2024—Haiti, Human Rights Watch, Jan. 11, 2024, available at: *https://www.ecoi.net/en/document/2103219.html* (last visited Apr. 29, 2024).

[104] Final report of the Panel of Experts on Haiti, UN Security Council, pp. 2–3, Sept. 15, 2023, available at: *https://www.securitycouncilreport.org/un-documents/document/s-2023-674.php* (last visited Apr. 29, 2024).

[105] World Bank, *The World Bank in Haiti Overview* (last updated Oct. 26, 2023), *https://www.worldbank.org/en/country/haiti/overview* (last visited Apr. 29, 2024).

[106] Haiti—Recession: Haiti's economy in free fall, −10.5% of GDP in total over 5 years, Haiti Libre, Jan. 3, 2024, available at: *https://www.haitilibre.com/en/news-41354-haiti-recession-haiti-s-economy-in-free-fall105-of-gdp-in-total-over-5-years.html* (last visited Apr. 29, 2024).

[107] Johnny Wood, These countries have been the hardest hit by food price inflation, World Economic Forum, Feb. 21, 2023, available at: *https://www.weforum.org/agenda/2023/02/countries-hit-by-food-prices-inflation-cost-of-living-crisis/* (last visited Apr. 29, 2024).

[108] World Bank, The World Bank in Haiti Overview (last updated Oct. 26, 2023), *https://www.worldbank.org/en/country/haiti/overview* (last visited Apr. 29, 2024).

[109] The Human Development Index (HDI) is a summary measure of average achievement in key dimensions of human development: a long and healthy life, being knowledgeable and have a decent standard of living. The latest 2024 HDI report contains data for 2022. See UN Development Programme (UNDP), Human Development Index (HDI) (last visited Apr. 29, 2024), *https://hdr.undp.org/data-center/human-development-index#/indicies/HDI.*

[110] World Bank, The World Bank in Haiti Overview (last updated Oct. 26, 2023), *https://www.worldbank.org/en/country/haiti/overview* (last visited Apr. 29, 2024); UNDP, Human Development Index (HDI) (last visited Apr. 29, 2024), *https://hdr.undp.org/data-center/human-development-index#/indicies/HDI.*

August 4, 2024, the effective date of the redesignation of Haiti for TPS.

• There are approximately 214,000 current Haiti TPS beneficiaries who are eligible to re-register for TPS under the extension.

It is estimated that approximately 309,000 additional individuals may be eligible for TPS under the redesignation of Haiti. This population includes Haitian nationals in the United States in nonimmigrant status or without immigration status.

### Notice of the Designation of Haiti for TPS

By the authority vested in me as Secretary under INA section 244, 8 U.S.C. 1254a, I have determined, after consultation with the appropriate U.S. Government agencies, the statutory conditions supporting Haiti's designation for TPS on the basis of extraordinary and temporary conditions are met, and it is not contrary to the national interest of the United States to allow Haitian TPS beneficiaries to remain in the United States temporarily. *See* INA sec. 244(b)(1)(C) and (b)(2), 8 U.S.C. 1254a(b)(1)(C) and (b)(2). On the basis of this determination, I am simultaneously extending the existing designation of Haiti for TPS for 18 months, beginning on August 4, 2024, and ending on February 3, 2026, and redesignating Haiti for TPS for the same 18-month period. *See* INA sec. 244(b)(1) and (b)(2); 8 U.S.C. 1254a(b)(1), and (b)(2).

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

### Eligibility and Employment Authorization for TPS

### Required Application Forms and Application Fees To Register or Re-Register for TPS

To register or re-register for TPS based on the designation of Haiti, you must submit a Form I–821. If you are submitting an initial TPS application, you must pay the application fee for Form I–821 (or request a fee waiver, which you may submit on Form I–912, Request for Fee Waiver). If you are filing an application to re-register for TPS, you do not need to pay the application fee. Whether you are registering as an initial applicant or re-registering, you are required to pay the biometric services fee. If you cannot pay the biometric services fee, you may ask USCIS to waive the fee. Please see additional information under the "Biometric Services Fee" section of this notice.

TPS beneficiaries are eligible for an Employment Authorization Document (EAD), which proves their authorization to work in the United States. You are not required to submit Form I–765 or have an EAD to be granted TPS, but see below for more information if you want an EAD to use as proof that you can work in the United States.

Individuals who have a Haiti TPS application (Form I–821) that was still pending as of July 1, 2024 do not need to file the application again. If USCIS approves an individual's Form I–821, USCIS will grant the individual TPS through February 3, 2026.

For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *https://www.uscis.gov/tps.* Fees for the Form I–821, the Form I–765, and biometric services are also described in 8 CFR 106.2 and the fee waiver-related regulations in 8 CFR 106.3. In addition, USCIS Form G–1055, Fee Schedule, provides the current fees required for the Form I–821 and Form I–765 for both initial TPS applicants and existing TPS beneficiaries who are re-registering.

### How can TPS beneficiaries obtain an Employment Authorization Document (EAD)?

Everyone must provide their employer with documentation showing that they have the legal right to work in the United States. TPS beneficiaries are eligible to obtain an EAD, which proves their legal right to work. If you want to obtain an EAD, you must file Form I–765 and pay the Form I–765 fee (or request a fee waiver, which you may submit on Form I–912). TPS applicants may file this form with their TPS application, or separately later, if their TPS application is still pending or has been approved.

Beneficiaries with a Haiti TPS-related Form I–765 that was still pending as of July 1, 2024 do not need to file the application again. If USCIS approves a pending TPS-related Form I–765, USCIS will issue the individual a new EAD that will be valid through February 3, 2026.

### Refiling an Initial TPS Registration Application After Receiving a Denial of a Fee Waiver Request

If USCIS denies your fee waiver request, you can resubmit your TPS application. The fee waiver denial notice will contain specific instructions about resubmitting your application.

### Filing Information

USCIS offers the option to applicants for TPS to file Form I–821 and related requests for EADs online or by mail. However, if you request a fee waiver, you must submit your application by mail. When filing a TPS application, you can also request an EAD by submitting a completed Form I–765 with your Form I–821.

*Online filing:* Form I–821 and Form I–765 are available for concurrent filing online.[111] To file these forms online, you must first create a USCIS online account.[112]

*Mail filing:* Mail your completed Form I–821; Form I–765, if applicable; Form I–912, if applicable; and supporting documentation to the proper address in Table 1—Mailing Addresses.

TABLE 1—MAILING ADDRESSES

| If . . . | Mail to . . . |
| --- | --- |
| You live in Florida, and you are using the U.S. Postal Service (USPS) | USCIS Attn: TPS Haiti, P.O. Box 660167, Dallas, TX 75266–0167. |
| You live in Florida, and you are using FedEx, UPS, or DHL .................. | USCIS Attn: TPS Haiti (Box 660167),2501 S State Highway, 121, Business Suite 400, Lewisville, TX 75067–8003. |
| You live in Massachusetts or New York, and you are using the U.S. Postal Service (USPS). | USCIS Attn: TPS Haiti, P.O. Box 4091, Carol Stream, IL 60197–4091. |
| You live in Massachusetts or New York, and you are using FedEx, UPS, or DHL. | USCIS Attn: TPS Haiti (Box 4091), 2500 Westfield Drive, Elgin, IL 60124–7836. |
| You live in any other state or territory, and you are using the U.S. Postal Service (USPS). | USCIS Attn: TPS Haiti, P.O. Box 24047, Phoenix, AZ 85074–4047. |

---

[111] Find information about online filing at "Forms Available to File Online," *https://www.uscis.gov/file-online/forms-available-to-file-online.*

[112] *https://myaccount.uscis.gov/users/sign_up.*

TABLE 1—MAILING ADDRESSES—Continued

| If . . . | Mail to . . . |
|----------|---------------|
| You live in any other state or territory, and you are using FedEx, UPS, or DHL. | USCIS Attn: TPS Haiti (Box 24047), 2108 East Elliot Road, Tempe, AZ 85284–1806. |

If you were granted TPS by an immigration judge (IJ) or the Board of Immigration Appeals (BIA) and you wish to request an EAD, please file online or mail your Form I–765 to the appropriate address in Table 1. If you file online, please include the fee. If you file by mail, please include the fee or fee waiver request. When you request an EAD based on an IJ or BIA grant of TPS, please include with your application a copy of the order from the IJ or BIA granting you TPS. This will help us verify your grant of TPS and process your application.

**Supporting Documents**

The filing instructions for Form I–821 list all the documents you need to establish eligibility for TPS. You may also find information on the acceptable documentation and other requirements for applying (also called registering) for TPS on the USCIS website at *https://www.uscis.gov/tps* under ''Haiti.''

**Travel**

TPS beneficiaries may also apply for and be granted travel authorization as a matter of discretion. You must file for travel authorization if you wish to travel outside of the United States. If USCIS grants travel authorization, it gives you permission to leave the United States and return during a specific period. To request travel authorization, you must file Form I–131, available at *https://www.uscis.gov/i-131*. You may file Form I–131 together with your Form I–821 or separately. When you file Form I–131, you must:

• Select Item Number 1.d. in Part 2 on the Form I–131; and

• Submit the fee for Form I–131, or request a fee waiver, which you may submit on Form I–912.

If you are filing Form I–131 together with Form I–821, send your forms to the address listed in Table 1. If you are filing Form I–131 separately based on a pending or approved Form I–821, send your form to the address listed in Table 2 and include a copy of Form I–797 for your approved or pending Form I–821.

TABLE 2—MAILING ADDRESSES

| If you are . . . | Mail to . . . |
|------------------|---------------|
| Filing Form I–131 together with Form I–821 ................................................................................ | The address provided in Table 1. |
| Filing Form I–131 based on a pending or approved Form I–821, and you are using the U.S. Postal Service (USPS):<br>You must include a copy of the Notice of Action (Form I–797C or I–797) showing USCIS accepted or approved your Form I–821. | USCIS, Attn: I–131 TPS, P.O. Box 660167, Dallas, TX 75266–0867. |
| Filing Form I–131 based on a pending or approved Form I–821, and you are using FedEx, UPS, or DHL:<br>You must include a copy of the Notice of Action (Form I–797C or I–797) showing USCIS accepted or approved your Form I–821. | USCIS, Attn: I–131 TPS, 2501 S. State Hwy. 121 Business, Ste. 400, Lewisville, TX 75067. |

**Biometric Services Fee for TPS**

Biometrics (such as fingerprints) are required for all applicants, in addition to a biometric services fee. As previously stated, if you cannot pay the biometric services fee, you may request a fee waiver, which you may submit on Form I–912. For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *https://www.uscis.gov/tps.* USCIS may require you to visit an Application Support Center to have your biometrics collected. For additional information on the USCIS biometric screening process, please see the USCIS Customer Profile Management Service Privacy Impact Assessment, available at *https://www.dhs.gov/publication/dhsuscispia-060-customer-profile-management-service-cpms.*

**General Employment-Related Information for TPS Applicants and Their Employers**

**How can I obtain information on the status of my TPS application and EAD request?**

To get case status information about your TPS application, as well as the status of your TPS-based EAD request, you can check Case Status Online at *https://uscis.gov* or visit the USCIS Contact Center at *https://www.uscis.gov/contactcenter.* If you still need assistance, you may ask a question about your case online at *https://egov.uscis.gov/e-request/Intro.do* or call the USCIS Contact Center at 800–375–5283 (TTY 800–767–1833).

**Am I eligible to receive an automatic extension of my current EAD through August 3, 2025, through this Federal Register notice?**

Yes. Regardless of your country of birth, if you currently have a Haiti TPS-based EAD with the notation A–12 or C– 19 under Category and a ''Card Expires'' date of August 3, 2024, June 30, 2024, February 3, 2023, December 31, 2022, October 4, 2021, January 4, 2021, January 2, 2020, July 22, 2019, January 22, 2018, or July 22, 2017, this **Federal Register** notice automatically extends your EAD through August 3, 2025. Although this **Federal Register** notice automatically extends your EAD through August 3, 2025, you must timely re-register for TPS in accordance with the procedures described in this **Federal Register** notice to maintain your TPS and avoid possible gaps in your employment authorization documentation.

**When hired, what documentation may I show to my employer as evidence of identity and employment authorization when completing Form I–9?**

You can find the Lists of Acceptable Documents on Form I–9, Employment Eligibility Verification, as well as the Acceptable Documents web page at *https://www.uscis.gov/i-9-central/*

*acceptable-documents.* Employers must complete Form I–9 to verify the identity and employment authorization of all new employees. Within three business days of hire, employees must present acceptable documents to their employers as evidence of identity and employment authorization to satisfy Form I–9 requirements.

You may present any document from List A (which provides evidence of both identity and employment authorization) or one document from List B (which provides evidence of your identity) together with one document from List C (which provides evidence of employment authorization), or you may present an acceptable receipt as described in these lists. Employers may not reject a document based on a future expiration date. You can find additional information about Form I–9 on the I–9 Central web page at *https:// www.uscis.gov/I-9Central.* An EAD is an acceptable document under List A. See the section ''How do my employer and I complete Form I–9 using my automatically extended EAD for a new job?'' of this **Federal Register** notice for more information. If your EAD states A– 12 or C–19 under Category and has a ''Card Expires'' date of August 3, 2024, June 30, 2024, February 3, 2023, December 31, 2022, October 4, 2021, January 4, 2021, January 2, 2020, July 22, 2019, January 22, 2018, or July 22, 2017, this **Federal Register** notice extends it automatically, and you may choose to present your EAD to your employer as proof of identity and employment eligibility for Form I–9 through August 3, 2025, unless your TPS has been withdrawn or your request for TPS has been denied. Your country of birth noted on the EAD does not have to reflect the TPS-designated country of Haiti for you to be eligible for this extension.

**What documentation may I present to my employer for Form I–9 if I am already employed but my current TPS-related EAD is set to expire?**

Even though we have automatically extended your EAD, your employer is required by law to ask you about your continued employment authorization. Your employer may need to reexamine your automatically extended EAD to check the ''Card Expires'' date and Category code if your employer did not keep a copy of your EAD when you initially presented it. Once your employer has reviewed the ''Card Expires'' date and Category code, they should update the EAD expiration date in Section 2 of Form I–9. See the section ''What updates should my current employer make to Form I–9 if my EAD

has been automatically extended?'' of this **Federal Register** notice for more information. You may show this **Federal Register** notice to your employer to explain what to do for Form I–9 and to show that USCIS has automatically extended your EAD through August 3, 2025, but you are not required to do so. The last day of the automatic EAD extension is August 3, 2025. Before you start work on August 4, 2025, your employer is required by law to reverify your employment authorization on Form I–9. By that time, you must present any document from List A or any document from List C on Form I– 9 Lists of Acceptable Documents, or an acceptable List A or List C receipt described in these lists to reverify employment authorization.

Your employer may not specify which List A or List C document you must present and cannot reject an acceptable receipt.

**If I have an EAD based on another immigration status, can I obtain a new TPS-based EAD?**

Yes, if you are eligible for TPS, you can obtain a new TPS-based EAD, even if you already have an EAD or work authorization based on another immigration status. If you want to obtain a new TPS-based EAD valid through February 3, 2026, you must file Form I–765 and pay the associated fee (unless USCIS grants your fee waiver request).

**Can my employer require that I provide any other documentation to complete Form I–9, such as evidence of my status, proof of my Haitian citizenship, or a Form I–797C showing that I registered for TPS?**

No. When completing Form I–9, employers must accept any documentation you choose to present from the Form I–9 Lists of Acceptable Documents that reasonably appears to be genuine and that relates to you, or an acceptable List A, List B, or List C receipt. Employers may not request other documentation, such as proof of Haitian citizenship or proof of registration for TPS, when completing Form I–9 for new hires or reverifying the employment authorization of current employees. If you present an EAD that USCIS has automatically extended, employers should accept it as a valid List A document if the EAD reasonably appears to be genuine and to relate to you. Refer to the ''Note to Employees'' section of this **Federal Register** notice for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or

otherwise discriminates against you based on your citizenship or immigration status or your national origin.

**How do my employer and I complete Form I–9 using my automatically extended EAD for a new job?**

When using an automatically extended EAD to complete Form I–9 for a new job before August 4, 2025:

1. For Section 1, you should:

a. Check ''A noncitizen authorized to work until'' and enter August 3, 2025, as the ''expiration date''; and

b. Enter your USCIS number or A-Number where indicated. (Your EAD or other document from DHS will have your USCIS number or A-Number printed on it; the USCIS number is the same as your A-Number without the A prefix.)

2. For Section 2, employers should:

a. Determine whether the EAD is auto-extended by ensuring it is in category A–12 or C–19 and has a ''Card Expires'' date of August 3, 2024, June 30, 2024, February 3, 2023, December 31, 2022, October 4, 2021, January 4, 2021, January 2, 2020, July 22, 2019, January 22, 2018, or July 22, 2017;

b. Write in the document title;

c. Enter the issuing authority;

d. Provide the document number; and

e. Write August 3, 2025, as the expiration date.

Before the start of work on August 4, 2025, employers must reverify the employee's employment authorization on Form I–9.

**What updates should my current employer make to Form I–9 if my EAD has been automatically extended?**

If you presented a TPS-related EAD that was valid when you first started your job and USCIS has now automatically extended your EAD, your employer may need to re-examine your current EAD if they do not have a copy of the EAD on file. Your employer should determine whether your EAD is automatically extended by ensuring that it contains Category A–12 or C–19 and has a ''Card Expires'' date of August 3, 2024, June 30, 2024, February 3, 2023, December 31, 2022, October 4, 2021, January 4, 2021, January 2, 2020, July 22, 2019, January 22, 2018, or July 22, 2017. Your employer may not rely on the country of birth listed on the card to determine whether you are eligible for this extension.

If your employer determines that USCIS has automatically extended your EAD, they should update Section 2 of your previously completed Form I–9 as follows:

1. Write EAD EXT and August 3, 2025, as the last day of the automatic

HaitiTPSAR000045

extension in the Additional Information field; and

2. Initial and date the correction.

**Note:** This is not considered a reverification. Employers do not reverify the employee until either the automatic extension has ended, or the employee presents a new document to show continued employment authorization, whichever is sooner. By August 4, 2025, when the employee's automatically extended EAD has expired, employers are required by law to reverify the employee's employment authorization on Form I–9.

### If I am an employer enrolled in E-Verify, how do I verify a new employee whose EAD has been automatically extended?

Employers may create a case in E-Verify for a new employee by entering the number from the Document Number field on Form I–9 into the document number field in E-Verify. Employers should enter August 3, 2025, as the expiration date for an EAD that has been extended under this **Federal Register** notice.

### If I am an employer enrolled in E-Verify, what do I do when I receive a ''Work Authorization Documents Expiring'' alert for an automatically extended EAD?

E-Verify automated the verification process for TPS-related EADs that are automatically extended. If you have an employee who provided a TPS-related EAD when they first started working for you, you will receive a ''Work Authorization Documents Expiring'' case alert when the auto-extension period for this EAD is about to expire. Before this employee starts work on August 4, 2025, you must reverify their employment authorization on Form I–9. Employers may not use E-Verify for reverification.

### Note to All Employers

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This **Federal Register** notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY 877–875–6028) or email USCIS at *I-9Central@ uscis.dhs.gov.* USCIS accepts calls and emails in English, Spanish, and many other languages. For questions about avoiding discrimination during the employment eligibility verification process (Form I–9 and E-Verify), employers may call the U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section (IER) Employer Hotline at 800–255–8155 (TTY 800–237–2515). IER offers language interpretation in many languages. Employers may also email IER at *IER@usdoj.gov* or get more information online at *https:// www.justice.gov/ier.*

### Note to Employees

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY 877–875–6028) or email USCIS at *I-9Central@ uscis.dhs.gov.* USCIS accepts calls and emails in English, Spanish and many other languages. Employees or job applicants may also call the U.S. Department of Justice, Civil Rights Division, Immigrant and Employee Rights Section (IER) Worker Hotline at 800–255–7688 (TTY 800–237–2515) for information regarding employment discrimination based on citizenship, immigration status, or national origin, including discrimination related to Form I–9 and E-Verify. The IER Worker Hotline provides language interpretation in many languages.

To comply with the law, employers must accept any document or combination of documents from the Lists of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee, or an acceptable List A, List B, or List C receipt as described in these lists. Employers may not require extra or additional documentation other than what is required to complete Form I–9. Further, employers participating in E-Verify who receive an E-Verify case result of ''Tentative Nonconfirmation'' (mismatch) must promptly inform employees of the mismatch and give these employees an opportunity to resolve the mismatch. A mismatch means that the information entered into E-Verify from Form I–9 differs from records available to DHS.

Employers may not terminate, suspend, delay training, withhold or lower pay, or take any adverse action against an employee because of a mismatch while the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result occurs if E-Verify cannot confirm an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY 877–875–6028). For more information about E-Verify-related discrimination or to report an employer for discrimination in the E-Verify process based on citizenship, immigration status, or national origin, contact IER's Worker Hotline at 800–255–7688 (TTY 800–237–2515). Additional information about proper nondiscriminatory Form I–9 and E-Verify procedures is available on the IER website at *https://www.justice.gov/ ier* and the USCIS and E-Verify websites at *https://www.uscis.gov/i-9-central* and *https://www.e-verify.gov.*

### Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)

For Federal purposes, if you present an automatically extended EAD referenced in this **Federal Register** notice, you do not need to show any other document, such as a Form I–797C, Notice of Action, reflecting receipt of a Form I–765 EAD renewal application or this **Federal Register** notice, to prove that you qualify for this extension. While Federal Government agencies must follow the guidelines laid out by the Federal Government, State and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, State, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary or applicant, show you are authorized to work based on TPS or other status, or that may be used by DHS to determine if you have TPS or another immigration status. Examples of such documents are:

• Your current EAD with a TPS category code of A–12 or C–19, even if your country of birth noted on the EAD does not reflect the TPS-designated country of Haiti;

• Your Form I–94, Arrival/Departure Record;

• Your Form I–797, Notice of Action, reflecting approval of your Form I–765; or

• Form I–797 or Form I–797C, Notice of Action, reflecting approval or receipt of a past or current Form I–821, if you received one from USCIS.

Check with the government agency requesting documentation about which document(s) the agency will accept.

Some state and local government agencies use SAVE to confirm the current immigration status of applicants for public benefits. While SAVE can verify that an individual has TPS or a

HaitiTPSAR000046

pending TPS application, each agency's procedures govern whether they will accept an unexpired EAD, Form I–797, Form I–797C, or Form I–94. If an agency accepts the type of TPS-related document you present, such as an EAD, the agency should accept your automatically extended EAD, regardless of the country of birth listed on the EAD. It may assist the agency if you:

a. Give the agency a copy of the relevant **Federal Register** notice showing the extension of TPS-related documentation in addition to your recent TPS-related document with your A-Number, USCIS number, or Form I–94 number;

b. Explain that SAVE will be able to verify the continuation of your TPS using this information; and

c. Ask the agency to initiate a SAVE query with your information and follow through with additional verification steps, if necessary, to get a final SAVE response verifying your TPS.

You can also ask the agency to look for SAVE notices or contact SAVE if they have any questions about your immigration status or automatic extension of TPS-related documentation. In most cases, SAVE provides an automated electronic response to benefit-granting agencies within seconds, but occasionally verification can be delayed.

You can check the status of your SAVE verification by using CaseCheck at *https://www.uscis.gov/save/save-casecheck.* CaseCheck is a free service that lets you follow the progress of your SAVE verification case using your date of birth and one immigration identifier number (such as your A-Number, USCIS number, or Form I–94 number) or Verification Case Number. If an agency has denied your application based solely or in part on a SAVE response, the agency must allow you to appeal the decision in accordance with the agency's procedures. If the agency has received and acted on or will act on a SAVE verification and you do not believe the SAVE response is correct, the SAVE website, *https://www.uscis.gov/save,* has detailed information on how to correct or update your immigration record, make an appointment, or submit a written request to correct records.

[FR Doc. 2024–14247 Filed 6–28–24; 8:45 am]

**BILLING CODE 9111–97–P**

---

# DEPARTMENT OF THE INTERIOR

## Bureau of Indian Affairs

[245A2100DD/AAKC001030/A0A501010.999900]

### Indian Gaming; Extension of Tribal-State Class III Gaming Compact in California

**AGENCY:** Bureau of Indian Affairs, Interior.

**ACTION:** Notice.

---

**SUMMARY:** This notice announces the extension of the Class III gaming compact between the Table Mountain Rancheria and the State of California.

**DATES:** The extension takes effect on July 1, 2024.

**FOR FURTHER INFORMATION CONTACT:** Ms. Paula L. Hart, Director, Office of Indian Gaming, Office of the Assistant Secretary—Indian Affairs, Washington, DC 20240, *IndianGaming@bia.gov;* (202) 219–4066.

**SUPPLEMENTARY INFORMATION:** An extension to an existing Tribal-State Class III gaming compact does not require approval by the Secretary if the extension does not modify any other terms of the compact. 25 CFR 293.5. The Table Mountain Rancheria and the State of California have reached an agreement to extend the expiration date of their existing Tribal-State Class III gaming compact to December 31, 2024. This publication provides notice of the new expiration date of the compact.

**Bryan Newland,**

*Assistant Secretary—Indian Affairs.*

[FR Doc. 2024–14350 Filed 6–28–24; 8:45 am]

**BILLING CODE 4337–15–P**

---

# DEPARTMENT OF THE INTERIOR

## Bureau of Land Management

[BLM_ID_FRN_MO4500171580]

### Notice of Realty Action: Direct Sale of Public Lands in Custer County, ID

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Notice of realty action.

---

**SUMMARY:** The Bureau of Land Management (BLM) proposes a non-competitive (direct) sale of a parcel of BLM-managed public lands in Idaho to permanently resolve the inadvertent and unauthorized use of the land. The parcel, located in Custer County, contains 2.07 acres and, if approved, would be sold to Mr. Raymond M. Simon. The sale would be subject to the applicable provisions of the Federal Land Policy and Management Act of 1976 (FLPMA), as amended, and BLM land sale regulations. The surface and mineral estate would be sold for no less than the appraised fair market value of $30,000.

**DATES:** Interested parties must submit written comments, postmarked, or delivered no later than August 15, 2024.

The land would not be offered for sale until after August 30, 2024.

**ADDRESSES:** Mail written comments to Martha Price, Acting Field Manager, BLM Challis Field Office, P.O. Box 817, Challis, ID 83226. Comments may also be emailed to *mprice@blm.gov.*

**FOR FURTHER INFORMATION CONTACT:** David Hilliard, Assistant Field Manager, BLM Challis Field Office, phone: 208–879–6217, or email: *dhilliard@blm.gov.* Individuals in the United States who are deaf, deafblind, hard of hearing, or have a speech disability may dial 711 (TTY, TDD, or TeleBraille) to access telecommunications relay services. Individuals outside the United States should use the relay services offered within their country to make international calls to the point-of-contact in the United States.

**SUPPLEMENTARY INFORMATION:** The BLM will consider a direct sale in accordance with applicable provisions of Sections 203 and 209 of FLPMA and BLM land sale regulations. The parcel would be sold for no less than the appraised fair market value of $30,000.

**Boise Meridian, Idaho**

T. 13 N., R. 19 E.
  Sec. 9, lot 4.
  The area described contains 2.07 acres.

There is no known mineral value in the parcel; therefore, the mineral estate would also be conveyed in accordance with Section 209 of FLPMA. Mr. Raymond M. Simon would be required to pay a $50 non-refundable filing fee for conveyance of the available mineral interests and any associated administrative costs with the sale. The proposed sale is in conformance with the BLM Challis Resource Management Plan approved in July 1999, and the plan maintenance action approved on May 10, 2022. The BLM prepared a parcel-specific Environmental Assessment (EA), document number DOI–BLM–ID–I030–2023–0012–EA, in connection with this realty action. It can be viewed online at *https://eplanning.blm.gov/eplanning-ui/project/2024447/510.*

Regulations at 43 CFR 2710.0–3(a) and 2711.3–3(a) authorize the BLM to utilize a direct sale of public land when a competitive sale is not appropriate and the public interest would best be

HaitiTPSAR000047

May 13, 2011.

**W. Craig Fugate,**
*Administrator, Federal Emergency Management Agency.*
[FR Doc. 2011–12353 Filed 5–18–11; 8:45 am]
**BILLING CODE 9111–23–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Citizenship and Immigration Services

**[CIS No. 2500–10; DHS Docket No. USCIS 2010–0016]**

**RIN 1615–ZB01**

### Extension and Redesignation of Haiti for Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Notice.

**SUMMARY:** This notice announces that the Secretary of Homeland Security (Secretary) is both extending the existing designation of Haiti for temporary protected status (TPS) for 18 months from July 23, 2011 through January 22, 2013, and redesignating Haiti for TPS for 18 months, effective July 23, 2011 through January 22, 2013. The extension allows current eligible TPS beneficiaries to retain their TPS through January 22, 2013. The redesignation of Haiti allows additional individuals who have been continuously residing in the United States since January 12, 2011, to obtain TPS, if eligible, including certain Haitians who arrived in the United States following the January 12, 2010 earthquake in Haiti.

Under the redesignation, individuals who currently do not have TPS, or a TPS application pending, may apply for TPS from May 19, 2011 through November 15, 2011. In addition to demonstrating continuous residence in the United States since January 12, 2011, initial applicants for TPS under this redesignation must demonstrate that they have been continuously physically present in the United States since July 23, 2011, the effective date of the redesignation of Haiti.

For individuals who have already been granted Haiti TPS, the 90-day re-registration period will run from May 23, 2011 through August 22, 2011. The Department will publish a **Federal Register** notice in May with complete information on the re-registration procedures, including the automatic 6-month extension of currently valid employment authorization documents (EADs) that expire July 22, 2011.

However, current Haiti TPS beneficiaries may not apply for re-registration until May 23, 2011. Applications and fees submitted before that date will be rejected and will have to be resubmitted once the re-registration period starts.

TPS applications that were filed during the first Haiti designation that opened on January 21, 2010, and remain pending on May 19, 2011 will be treated as initial applications under the redesignation. Therefore, individuals who have a pending TPS application will not need to file a new Application for Temporary Protected Status, Form I–821. Additional instructions are provided in this notice for individuals whose TPS applications remain pending and who would like to obtain an EAD valid through January 22, 2013.

**DATES:** *Extension of TPS:* The 18-month extension of the existing designation for Haiti is effective July 23, 2011, and will remain in effect through January 22, 2013. The 90-day re-registration period for current Haiti TPS beneficiaries will run from May 23, 2011 through August 22, 2011. Re-registration procedures will be announced prior to the start of the re-registration period.

*Redesignation of TPS:* The redesignation of Haiti for TPS is effective July 23, 2011, and will remain in effect through January 22, 2013, a period of 18 months. The initial registration period for new applicants under the Haiti TPS re-designation will run from May 19, 2011 through November 15, 2011.

**FOR FURTHER INFORMATION CONTACT:**

• For further information on TPS, including guidance on the application process and additional information on eligibility, please visit the USCIS TPS Web page at *http://www.uscis.gov/tps.* You can find specific information about this TPS extension and re-designation of TPS for Haiti by selecting "TPS Designated Country—Haiti" from the menu on the left of the TPS Web page. From the Haiti page, you can select the Haiti TPS Questions & Answers Section from the menu on the right for further information.

• You can also contact the TPS Operations Program Manager at Status and Family Branch, Service Center Operations Directorate, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue, NW., Washington, DC 20529–2060 or by phone at (202) 272–1533 (this is not a toll-free number). **Note:** The phone number provided here is solely for questions regarding this TPS notice. It is not for individual case status inquiries. Applicants seeking

information about the status of their individual cases can check Case Status Online available at the USCIS Web site at *http://www.uscis.gov,* or call the USCIS National Customer Service Center at 1–800–375–5283 (TTY 1–800–767–1833).

• Further information will also be available at local USCIS offices upon publication of this notice.

**SUPPLEMENTARY INFORMATION:**

### Abbreviations and Terms Used in This Document

DHS—Department of Homeland Security
DOJ—Department of Justice
DOS—Department of State
EAD—Employment Authorization Document
GoH—Government of Haiti
IDP—Internally Displaced Person
INA—Immigration and Nationality Act
NGO—Nongovernmental Organizations
OSC—U.S. Department of Justice, Office of Special Counsel for Immigration Related Unfair Employment Practices
Secretary—Secretary of Homeland Security
TPS—Temporary Protected Status
UN—United Nations
UNICEF—United Nations Children's Fund
USAID—U.S. Agency for International Development
USCIS—U.S. Citizenship and Immigration Services

### What is TPS?

• Temporary Protected Status (TPS) is an immigration status granted under the Immigration and Nationality Act (INA) to eligible nationals of a country designated for TPS (or to persons without nationality who last habitually resided in the designated country).

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States and to obtain work authorization documentation, so long as they continue to meet the terms and conditions of their TPS status.

• TPS beneficiaries may also be granted travel authorization as a matter of discretion.

• A grant of TPS does not lead to permanent resident status.

• When the Secretary terminates a country's TPS designation, beneficiaries return to the same immigration status they maintained before obtaining TPS (unless that status has since expired or been terminated) or to any other status they may have obtained while registered for TPS.

### When was Haiti first designated for TPS?

On January 21, 2010, the Secretary designated Haiti for TPS based on extraordinary and temporary conditions within Haiti which prevented aliens who are nationals of Haiti (or persons without nationality who last habitually resided in Haiti) from returning to Haiti

HaitiTPSAR000048

**Federal Register** / Vol. 76, No. 97 / Thursday, May 19, 2011 / Notices    **29001**

safely, specifically the effects of the 7.0-magnitude earthquake that occurred January 12, 2010. *See* 75 FR 3476; *see also* INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).[1]

**What authority does the Secretary have to extend the designation of Haiti for TPS?**

At least 60 days before the expiration of a country's TPS designation or extension, the Secretary, after consultation with appropriate agencies of the government, must review the conditions in a foreign State designated for TPS to determine whether the conditions for the TPS designation continue to be met. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that a foreign state continues to meet the conditions for TPS designation, the designation is extended for an additional 6 months (or in the Secretary's discretion for 12 or 18 months). *See* INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

**What is the Secretary's authority to redesignate Haiti for TPS?**

In addition to extending an existing TPS designation so that current beneficiaries may renew their TPS, the Secretary, after consultation with appropriate agencies of the government, may redesignate a country (or part thereof) for TPS. *See* INA section 244(b)(1), 8 U.S.C. 1254a(b)(1); *see also* INA section 244(c)(1)(A)(i), 8 U.S.C. 1254a(c)(1)(A)(i) (requiring that "the alien has been continuously physically present since the effective date of *the most recent designation of the state*") (emphasis added). This is one of several instances in which the Secretary and, prior to the establishment of DHS, the Attorney General have simultaneously extended a country's TPS designation and redesignated the country for TPS. *See, e.g.,* 69 FR 60168 (Oct. 7, 2004) (extension and redesignation for Sudan); 62 FR 16608 (Apr. 7, 1997) (extension and redesignation for Liberia).

When the Secretary designates or redesignates a country for TPS, she also has the discretion to establish the date

from which TPS applicants must demonstrate that they have been "continuously resid[ing]" in the United States. *See* INA section 244(c)(1)(A)(ii). This discretion permits her to tailor the "continuous residence" date to offer TPS protection to the group of individuals that she deems most appropriate.

The Secretary has determined that the "continuous residence" date for applicants for Haiti TPS shall be changed from its original date of January 12, 2010, to January 12, 2011. *See* 75 FR 3476. Initial applicants for TPS under this redesignation must also show they have been "continuously physically present" in the United States since July 23, 2011, which is the effective date of the Secretary's most recent designation, or redesignation, of Haiti. *See* INA section 244(c)(1)(A)(i). For each initial TPS application filed under the redesignation, the final determination whether the applicant has met the "continuous physical presence" requirement cannot be made until July 23, 2011. USCIS, however, will issue employment authorization documentation, as appropriate, during the registration period in accordance with 8 CFR 244.5(b).

**Why is the Secretary extending the TPS designation for Haiti and simultaneously re-designating Haiti for TPS?**

Over the past year, DHS and the Department of State (DOS) have continued to review conditions in Haiti. Based on this review, and after consulting with DOS, the Secretary has determined that an 18-month extension of Haiti's TPS designation from July 23, 2011 through January 22, 2013, is warranted because the conditions prompting the original designation continue to be met. The Secretary has further determined that these same conditions in Haiti support redesignating Haiti for TPS under INA section 244(b)(1)(C) and changing the "continuous residence" and "continuous physical presence" dates so as to continue affording TPS protection to eligible Haitians who arrived in the United States before January 12, 2010 and to extend TPS protection to eligible Haitians who arrived between January 12, 2010 and January 12, 2011.

The January 12, 2010 earthquake has exacerbated Haiti's position as the least-developed country in the Western Hemisphere and one of the poorest in the world. According to the Central Intelligence Agency World Factbook (last updated on September 22, 2010), 80 percent of Haiti's population is living below the poverty line. Per capita gross domestic product is now under $2 per

day, and comparative social and economic indicators continue to decline. Low revenue collection rates by the Government of Haiti (GoH)—barely over 10 percent of gross domestic product—remain insufficient for Haiti to provide adequate social services and to invest in physical and human capital.

According to the GoH, an estimated 230,000 people died and approximately three million were affected by the earthquake. In total, more than one million Haitians have been left homeless and are currently living in temporary camps. As of October 14, 2010, teams from international nongovernmental organizations (NGOs) and the GoH had conducted assessments of structures to determine habitability on 297,569 buildings out of an estimated 350,000 to 400,000 buildings destroyed by the earthquake. Roughly half of those buildings assessed were deemed safe for habitation with another 26 percent deemed possibly safe with repairs conducted. Approximately 21 percent of assessed homes thus far have been deemed unsafe, requiring major repairs or demolition.

Despite these assessments, DOS estimates that there are approximately 1,300 internally displaced persons (IDPs) camps in Haiti. Although statistical reports vary, the United Nations Children's Fund (UNICEF) reports that there are approximately 1.6 million IDPs, of which approximately 800,000 are children. The IDP camps are extremely crowded and are vulnerable to flooding, crime (including gender-based violence), and disease.

International NGOs report that primary healthcare services are available at 160 fixed and mobile sites. Thirty-one percent of these sites are supported by USAID and the Office of U.S. Foreign Disaster Assistance. The current cholera outbreak in Haiti is evidence of the vulnerability of the public health sector of Haiti. Although statistical reports have varied, the GoH Ministry of Public Health and Population reported 199,497 cholera cases, including 112,656 hospitalizations and 3,927 deaths. Health officials and aid organizations believe the outbreak may spread nationwide. In efforts to contain the outbreak, a network of cholera treatment centers has been created.

Based on this review and after consultation with the appropriate Government agencies, the Secretary has determined that:

• The conditions that prompted the January 21, 2010 designation of Haiti for TPS continue to be met. *See* INA sections 244(b)(3)(A) and (C), 8 U.S.C. 1254a(b)(3)(A) and (C).

---

[1] As of March 1, 2003, in accordance with section 1517 of title XV of the Homeland Security Act of 2002 (HSA), Public Law 107–296, 116 Stat. 2135, any reference to the Attorney General in a provision of the INA describing functions transferred under the HSA from the DOJ to the DHS "shall be deemed to refer to the Secretary" of Homeland Security. *See* 6 U.S.C. 557 (2003) (codifying HSA, tit. XV, sec. 1517).

• Nationals of Haiti (and persons without nationality who last habitually resided in Haiti) still cannot safely return to Haiti due to continued extraordinary and temporary conditions. *See* INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).

• It is not contrary to the national interest of the United States to permit aliens who meet the eligibility requirements for TPS to remain in the United States temporarily. *See* INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).

• The TPS designation of Haiti should be extended for an additional 18-month period from July 23, 2011 through January 22, 2013. *See* INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C).

• Haiti should be simultaneously redesignated for TPS effective July 23, 2011 through January 22, 2013. *See* INA sections 244(b)(1)(C) and (b)(2), 8 U.S.C. 1254a(b)(1)(C) and (b)(2).

• It is appropriate to change the date by which TPS applicants must demonstrate that they have continuously resided in the United States from January 12, 2010 to January 12, 2011.

• The date by which TPS applicants must demonstrate that they have been continuously physically present in the United States is July 23, 2011, the effective date of the redesignation of Haiti for TPS.

• There are approximately 47,000 current Haiti TPS beneficiaries who are expected to be eligible to re-register for TPS under the extension.

• It is estimated that approximately 10,000 additional individuals may be eligible for TPS under the redesignation of Haiti.

**Why is the Secretary changing the "continuous residence" date from January 12, 2010 to January 12, 2011?**

In the aftermath of the earthquake in Haiti, additional Haitian nationals were lawfully admitted to the United States as nonimmigrants or were granted humanitarian parole for emergency reasons. As described in this notice, the devastating impact of the January 12, 2010 earthquake continues to create extraordinary and temporary conditions that prevent aliens who are nationals of Haiti from safely returning to Haiti. Therefore, the Secretary has determined, in her discretion, that it is appropriate for DHS to extend TPS to eligible Haitians who arrived in the United States between January 12, 2010, and January 12, 2011, so that they will not be subject to removal while in TPS and can obtain work authorization to support themselves until they are able to return safely to Haiti.

**Notice of Extension of TPS for Haiti and Re-designation of Haiti for TPS through January 22, 2013**

By the authority vested in me as Secretary of Homeland Security under section 244 of the INA, 8 U.S.C. 1254a, I have determined, after consultation with the appropriate government agencies, that the conditions that prompted the original designation of Haiti for temporary protected status on January 21, 2010, continue to be met. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). On the basis of this determination, I am simultaneously extending the existing TPS designation of Haiti for 18 months from July 23, 2011 through January 22, 2013, and redesignating Haiti for TPS for 18 months effective July 23, 2011 through January 22, 2013. *See* INA sections 244(b)(1)(C) and (b)(2), 8 U.S.C. 1254a(b)(1)(C) and (b)(2). I am also changing the "continuous residence" date from January 12, 2010 to January 12, 2011. *See* INA section 244(c)(1)(A)(ii), 8 U.S.C. 1254a(c)(1)(A)(ii).

**Janet Napolitano,**
*Secretary.*

**How do I know whether I should wait until May 23, 2011, to apply for re-registration under the extension of TPS or whether I should file an initial TPS application now under the re-designation of Haiti?**

Table 1 below will help you decide if you should file for re-registration under the extension of TPS for Haiti or if you should file an initial application under the re-designation of Haiti for TPS.

TABLE 1—RE-REGISTRATION FILING VERSUS INITIAL FILING

| If . . . | And . . . | Then . . . |
|----------|-----------|------------|
| You filed a TPS application under the initial designation of Haiti during the registration period January 21, 2010 through January 18, 2011, or filed after January 18 under the fee waiver cure.. | Your application was approved by May 19, 2011. | You need to re-register under the extension by filing a Form I–821 application and Form I–765 during the re-registration period May 23, 2011 through August 22, 2011. |
| You filed a TPS application under the initial designation of Haiti during the registration period January 21, 2010 through January 18, 2011, or filed after January 18 under the fee waiver cure.. | Your application is still pending as of May 19, 2011. | You do not yet have TPS and your pending Form I–821 will be treated as an initial application under the re-designation. You do not need to file a new Form I–821. Please see Table 2 to determine if you need to file a new Form I–765. |
| You filed a TPS application under the initial designation of Haiti during the registration period January 21, 2010 through January 18, 2011, or filed after January 18 under the fee waiver cure.. | Your application was denied before May 19, 2011, and you believe you may be eligible for TPS under the redesignation. | You may be covered under the re-designation and you need to file an initial application during the registration period May 19, 2011 through November 15, 2011. |
| You never filed a TPS application under the initial designation of Haiti. | You believe you may be eligible for TPS under the redesignation. | You may be covered under the re-designation and you need to file an initial application during the registration period May 19, 2011 through November 15, 2011. |

HaitiTPSAR000050

**I have been granted TPS. If the re-registration period does not begin until May 2011, does my current TPS continue through January 22, 2013?**

Although an individual's TPS continues until it is withdrawn or terminated, your TPS will be withdrawn if you fail to re-register during the May 23, 2011 through August 22, 2011 period, or if USCIS does not approve your re-registration application. The forthcoming **Federal Register** notice, to be published in May 2011, regarding re-registration will explain the requirements, fees, and fee waiver procedures. Please do not submit your re-registration application before May 23rd or it will be rejected, and you will need to re-file when the re-registration period opens. Given the timeframes involved with processing TPS re-registration applications, and because the re-registration period will not open until May 23, 2011, DHS recognizes the possibility that re-registrants may not receive new EADs until after their current EADs expire on July 22, 2011. Accordingly, the May 2011 **Federal Register** notice explaining the re-registration procedures will also extend the validity of EADs issued under the original TPS designation of Haiti for an additional 6 months, through January 22, 2012. That notice will provide further details for re-registration and explanations of the 6-month automatic extension of EADs that expire on July 22, 2011.

**I have a pending TPS application filed during the original Haiti TPS registration period that ran from January 21, 2010 through January 18, 2011. What should I do?**

If your TPS application is still pending on May 19, 2011, then you will not need to file a new Application for Temporary Protected Status, Form I–821. Pending TPS applications will be treated as initial applications under the re-designation. Therefore, if your TPS application is approved, you will be granted TPS through January 22, 2013. If you have a pending TPS application *and* you wish to have an EAD valid through January 22, 2013, please look at Table 2 below to determine whether you should file a new Application for Employment Authorization, Form I–765. If you do need to file a new Form I–765, wait until the re-registration period opens May 23, 2011, before filing your application.

TABLE 2—EAD INFORMATION FOR STILL PENDING TPS APPLICATIONS

| If . . . | And . . . | Then . . . | But if . . . |
|---|---|---|---|
| You requested an EAD during the original registration period for Haiti TPS. | You received an EAD with Category C19 or A12. | You must file a new Form I–765 with fee (or fee waiver request) during the re-registration period that opens May 23, 2011 if you wish to have a new EAD valid through January 22, 2013. | Your Form I–821 is denied before the re-registration period opens May 23, 2011, then DO NOT file a new Form I–765. If you file a new Form I–765, it will be denied due to the denial of your Form I–821. |
| You requested an EAD during the original registration period for Haiti TPS. | You did not receive an EAD with Category C19 or A12. | You do not need to file a new Form I–765. If your TPS application is approved, your Form I–765 will be approved through January 22, 2013. | |
| You did not request an EAD during the original registration period for Haiti TPS. | You wish to have an EAD valid through January 22, 2013. | You must file a new Form I–765 with fee (or fee waiver request) during the re-registration period that opens May 23, 2011. | Your Form I–821 is denied before the re-registration period opens on May 23, 2011, then DO NOT file a new Form I–765. If you file a new Form I–765, it will be denied due to the denial of your Form I–821. |
| You did not request an EAD during the original registration period. | You do not wish to have an EAD valid through January 22, 2013. | You do not need to file a new Form I–765. | |

**I am not a TPS beneficiary and I do not have a TPS application pending. What are the procedures for Initial Registration for TPS under the Redesignation?**

Individuals who do not yet have Haiti TPS or a pending application for TPS may submit their TPS applications during the 180-day initial registration period that will run from May 19, 2011 through November 15, 2011.

The remainder of this **Federal Register** notice provides the procedures for initial registration under the redesignation. The following procedures *do not* apply to individuals who have already been granted TPS under the original designation of Haiti. Re-registration procedures for current TPS beneficiaries will be announced in a subsequent **Federal Register** notice that will be published in May.

**Required Application Forms and Application Fees To Register Initially for TPS**

To register for TPS for the first time, an applicant must submit:

1. Application for Temporary Protected Status, Form I–821 and pay the Form I–821 application fee, which is $50, and

2. Application for Employment Authorization, Form I–765.

• If you want an EAD, you must pay the Form I–765 fee only if you are age 14 through 65. No EAD fee is required if you are under the age of 14 or over the age of 65 and filing for initial TPS registration.

• You do not pay the Form I–765 fee if you are not requesting an EAD. Individuals who are in removal proceedings will be provided an opportunity to apply for TPS in accordance with 8 CFR 244.7(d) and 1244.7(d).

You must submit both completed application forms together. If you are unable to pay, you may apply for application and/or biometrics fee waivers by completing Request for Fee Waiver, Form I–912, or submitting your own request for a fee waiver, and providing satisfactory supporting documentation. For more information on the application forms and

HaitiTPSAR000051

application fees for TPS, please visit the USCIS TPS Web page at *http://www.uscis.gov/tps* and click on Temporary Protected Status for Haiti. Fees for the Form I–821, Form I–765, and biometrics fee are also described in 8 CFR 103.7(b).

**Biometric Services Fee**

Biometrics (such as fingerprints) are required for all applicants 14 years of age or older. Those applicants must submit a biometric services fee. As previously stated, if you are unable to pay, you may apply for a biometrics fee waiver by completing Form I–912 or your own request for a fee waiver, and

providing satisfactory supporting documentation. For more information on the biometric services fee, please visit the USCIS Web site at *http://www.uscis.gov.*

**Mailing Information**

Mail your application for TPS to the proper address in Table 3:

### TABLE 3—MAILING ADDRESSES

| If you live in . . . | For regular mail, send to . . . | For express mail and courier deliveries, send to . . . |
|---|---|---|
| The state of Florida .............. | USCIS, P.O. Box 4464, Chicago, IL 60680–4464 ......... | USCIS, *Attn: Haiti TPS, 131 South Dearborn, 3rd Floor, Chicago, IL 60603–5520.* |
| The state of New York ......... | USCIS, P.O. Box 660167, Dallas, TX 75266–0167 ....... | USCIS, *Attn: Haiti TPS, 2501 S. State Hwy. 121, Business, Suite 400, Lewisville, TX 75067.* |
| All other states ..................... | USCIS, P.O. Box 24047, Phoenix, AZ 85074–4047 ...... | USCIS, *Attn: Haiti TPS, 1820 E. Skyharbor Circle S, Suite 100, Phoenix, AZ 85034.* |

**E-Filing**

You cannot e-file your application when applying for initial registration for TPS. Please mail your application to the mailing address listed in Table 2 above.

**Employment Authorization Document (EAD)**

*May I request an interim EAD at my local USCIS office?*

No. USCIS will not issue interim EADs to TPS applicants at local offices.

*What documents may I show to my employer as proof of employment authorization and identity for Form I–9 (Employment Eligibility Verification form)?*

To complete Form I–9 for new hires, an employee must present his or her employer with proof of identity and employment authorization. For reverification, an employee needs to provide proof of continued employment authorization. Document choices are listed on the Lists of Acceptable Documents on page 5 of Form I–9. An EAD is listed as an acceptable document under "List A." Therefore, TPS beneficiaries under this redesignation of Haiti who have timely registered with USCIS as directed under this notice and obtained an EAD may present their valid EAD to their employers as proof of employment authorization and identity. In the alternative, employees may present any other legally acceptable document or combination of documents listed on the Form I–9 as proof of identity and employment authorization.

Employers may not request proof of Haitian citizenship when completing Form I–9. Employers should accept a valid EAD so long as the EAD reasonably appears on its face to be genuine and to relate to the employee.

**Note to Employers:** Employers are reminded that the laws requiring employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For questions, employers may call the USCIS Customer Assistance Office at 1–800–357–2099. Employers may also call DOJ's Office of Special Counsel for Immigration Related Unfair Employment Practices (OSC) Employer Hotline at 1–800–255–8155.

**Note to Employees:** Employees or applicants may call the OSC Employee Hotline at 1–800–255–7688 for information regarding employment problems. Additional information is available on the OSC Web site at *http://www.justice.gov/crt/osc/.*

**Note Regarding State and Local Government Agencies (Such as Departments of Motor Vehicles):** State and Local government agencies are permitted to create their own guidelines when granting certain benefits, such as a driver's license or an identification card. Each state may have different laws and requirements pertaining to the documents that may be used to prove eligibility for certain benefits. If you are applying for a state or local government benefit, you should take all documents that show that you are a TPS beneficiary to the state or local government agency. Examples are:

(1) A copy of your Form I–821 Approval Notice (I–797), and

(2) Your EAD that has a valid expiration date (if you have a TPS-based EAD).

[FR Doc. 2011–12440 Filed 5–18–11; 8:45 am]

**BILLING CODE 9111–97–P**

---

**DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**

**[Docket No. FR–5487–N–16]**

**Notice of Submission of Proposed Information Collection to OMB; Emergency Comment Request Choice Neighborhoods**

**AGENCY:** Office of the Assistant Secretary for Public and Indian Housing, HUD.

**ACTION:** Notice of proposed information collection.

---

**SUMMARY:** The proposed information collection requirement described below has been submitted to the Office of Management and Budget (OMB) for review and approval, as required by the Paperwork Reduction Act of 1995 (44 U.S.C. Chapter 35, as amended). The Department is soliciting public comments on the subject proposal, to assure better understanding of the reporting requirements and consistency in the submission of data.

**DATES:** *Comments Due Date:* May 26, 2011.

**ADDRESSES:** Interested persons are invited to submit comments regarding this proposal. Comments must be received within seven (14) days from the date of this Notice. Comments should refer to the proposal by name/or OMB approval number) and should be sent to: HUD Desk Officer, Office of Management and Budget, New Executive Office Building, Washington, DC 20503; *e-mail: Ross_A._Rutledge@omb.eop.gov; fax:* 202–395–3086.

**FOR FURTHER INFORMATION CONTACT:** Reports Management Officer, QDAM, Department of Housing and Urban Development, 451 7th Street, SW.,

HaitiTPSAR000052

 

money from relatives in Haiti who are themselves continuing to recover from the earthquake.

The United States is committed to continuing to assist the people of Haiti. DHS is therefore extending this employment authorization for F–1 nonimmigrant students whose country of citizenship is Haiti and who are continuing to experience severe economic hardship as a result of the earthquake.

### How do I apply for an employment authorization under the circumstances of this notice?

F–1 nonimmigrant students whose country of citizenship is Haiti who were lawfully present in the United States on January 12, 2010 and are experiencing severe economic hardship as a result of the earthquake may apply for employment authorization under the guidelines described in 75 FR 56120. This notice extends the time period during which such F–1 students may seek employment authorization due to the earthquake. It does not impose any new or additional policies or procedures beyond those listed in the original notice. All interested F–1 students should follow the instructions listed in the original notice.

**Janet Napolitano,**
*Secretary.*

[FR Doc. 2012–23825 Filed 9–28–12; 8:45 am]

**BILLING CODE 9111–28–P**

---

## DEPARTMENT OF HOMELAND SECURITY

[CIS No. 2524–12; DHS Docket No. USCIS–2012–0009]

RIN 1615–ZB14

### Extension of the Designation of Haiti for Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.
**ACTION:** Notice.

**SUMMARY:** This notice announces that the Secretary of Homeland Security (Secretary) is extending the designation of Haiti for Temporary Protected Status (TPS) for 18 months from January 23, 2013 through July 22, 2014. The extension allows currently eligible TPS beneficiaries to retain TPS through July 22, 2014. The Secretary has determined that an extension is warranted because the conditions in Haiti that prompted the initial 2010 TPS designation and the 2011 redesignation continue to be met. There continue to be extraordinary and temporary conditions in Haiti resulting from the devastating effects of the

January 2010 earthquake that prevent Haitians from returning to their country in safety. Permitting eligible Haitians to remain temporarily in the United States is not contrary to the national interest of the United States.

This notice also sets forth procedures necessary for nationals of Haiti (or aliens having no nationality who last habitually resided in Haiti) to re-register for TPS and to apply for renewal of their Employment Authorization Documents (EADs) with U.S. Citizenship and Immigration Services (USCIS). Re-registration is limited to persons who have previously registered for TPS under the designation of Haiti and whose applications have been granted. Certain nationals of Haiti (or aliens having no nationality who last habitually resided in Haiti) who have not previously applied for TPS may be eligible to apply under the late initial registration provisions, if they meet: (1) At least one of the late initial filing criteria and (2) all TPS eligibility criteria (including continuous residence in the United States since January 12, 2011, and continuous physical presence in the United States since July 23, 2011).

USCIS will issue new EADs with a July 22, 2014 expiration date to eligible Haitian TPS beneficiaries who timely re-register and apply for EADs under this extension. Given the timeframes involved with processing TPS re-registration applications, the Department of Homeland Security (DHS) recognizes that all re-registrants may not receive new EADs until after their current EADs expire on January 22, 2013. Accordingly, this Notice automatically extends the validity of EADs issued under the TPS designation of Haiti for 6 months, from January 22, 2013 through July 22, 2013, and explains how TPS beneficiaries and their employers may determine which EADs are automatically extended and their impact on the Employment Eligibility Verification (Form I–9) and E-Verify processes.

**DATES:** The 18-month extension of the TPS designation of Haiti is effective January 23, 2013, and will remain in effect through July 22, 2014. The 60-day re-registration period begins October 1, 2012 and will remain in effect until November 30, 2012.

**FOR FURTHER INFORMATION CONTACT:**

• For further information on TPS, including guidance on the application process and additional information on eligibility (including eligibility for late initial registration), please visit the USCIS TPS Web page at *http://www.uscis.gov/tps.* The general TPS Web page has detailed information on

filing and eligibility requirements. You can find specific information about this extension of Haiti for TPS by selecting "TPS Designated Country: Haiti" from the menu on the left of the TPS Web page. You can obtain information in French or Creole by selecting the language from the menu on the right from the TPS Haiti-specific Web page.

• You can also contact the TPS Operations Program Manager at the Status and Family Branch, Service Center Operations Directorate, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Washington, DC 20529–2060; or by phone at (202) 272–1533 (this is not a toll-free number). **Note:** The phone number provided here is solely for questions regarding this TPS notice. It is not for individual case status inquiries.

• Applicants seeking information about the status of their individual cases can check Case Status Online, available at the USCIS Web site at *http://www.uscis.gov*, or call the USCIS National Customer Service Center at 1–800–375–5283 (TTY 1–800–767–1833). Service is available in English and Spanish only.

• Further information will also be available at local USCIS offices upon publication of this notice.

**SUPPLEMENTARY INFORMATION:**

### Abbreviations and Terms Used in This Document

BIA—Board of Immigration Appeals
DHS—Department of Homeland Security
DOS—Department of State
EAD—Employment Authorization Document
Government—U.S. Government
HNP—Haitian National Police
IDP—Internally Displaced Persons
IJ—Immigration Judge
INA—Immigration and Nationality Act
OSC—U.S. Department of Justice, Office of Special Counsel for Immigration-Related Unfair Employment Practices
PAHO—Pan American Health Organization
Secretary—Secretary of Homeland Security
SAVE—USCIS Systematic Alien Verification for Entitlements Program
TPS—Temporary Protected Status
UN—United Nations
USCIS—U.S. Citizenship and Immigration Services

### What is Temporary Protected Status (TPS)?

• TPS is an immigration status granted to eligible nationals of a country designated for TPS under the Immigration and Nationality Act (INA), or to persons without nationality who last habitually resided in the designated country.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States and may obtain

HaitiTPSAR000053

**59944**    **Federal Register** / Vol. 77, No. 190 / Monday, October 1, 2012 / Notices

work authorization, so long as they continue to meet the requirements of TPS status.

• TPS beneficiaries may also be granted travel authorization as a matter of discretion.

• The granting of TPS does not lead to permanent resident status.

• When the Secretary terminates a country's TPS designation, beneficiaries return to the same immigration status they maintained before TPS (unless that status has since expired or been terminated) or to any other lawfully obtained immigration status they received while registered for TPS.

### When was Haiti designated for TPS?

On January 22, 2010, the Secretary designated Haiti for TPS based on extraordinary and temporary conditions within the country, specifically the effects of the 7.0-magnitude earthquake that occurred January 12, 2010. *See* 75 FR 3476. In 2011, the Secretary extended Haiti's designation and redesignated Haiti for TPS for 18 months through January 22, 2013. *See* 76 FR 29000 (May 19, 2011). This announcement is the second extension of TPS for Haiti since the original designation in January 2010.

### What authority does the Secretary have to extend the designation of Haiti for TPS?

Section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1), authorizes the Secretary, after consultation with appropriate Government agencies, to designate a foreign state (or part thereof) for TPS.[1] The Secretary may then grant TPS to eligible nationals of that foreign state (or aliens having no nationality who last habitually resided in that state). *See* section 244(a)(1)(A) of the INA, 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a country's TPS designation or extension, the Secretary, after consultation with appropriate Government agencies, must review the conditions in a foreign state designated for TPS to determine whether the conditions for the TPS designation continue to be met. *See* section 244(b)(3)(A) of the INA, 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that a foreign state continues to meet the conditions for TPS designation, the designation is extended

for an additional 6 months (or in the Secretary's discretion for 12 or 18 months). *See* section 244(b)(3)(C) of the INA, 8 U.S.C. 1254a(b)(3)(C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* section 244(b)(3)(B) of the INA, 8 U.S.C. 1254a(b)(3)(B).

### Why is the Secretary extending the TPS designation for Haiti for TPS through July 22, 2014?

Over the past year, the Department of Homeland Security (DHS) and the Department of State (DOS) have continued to review conditions in Haiti. Based on this review and after consulting with DOS, the Secretary has determined that an 18-month extension is warranted because the extraordinary and temporary conditions that prompted the original January 2010 TPS designation and the July 2011 extension and redesignation persist.

The January 12, 2010 earthquake that struck Haiti caused extensive damage to infrastructure, public health, agriculture, transportation, and educational facilities. A coordinated international effort and strong partnership with the Haitian people resulted in emergency response activities that saved lives and laid a foundation for Haiti to rebuild. However, many of the conditions prompting the original January 2010 TPS designation and the July 2011 extension and redesignation persist.

Haitian government estimates of the death toll caused by the earthquake have ranged from 230,000 to over 300,000 people. The Government of Haiti further estimated that more than 1,000,000 people were displaced within the Port-au-Prince metropolitan area. Destruction from the earthquake rose to catastrophic levels due to Haiti's already weak infrastructure, as the government struggled to provide minimum basic services even prior to the earthquake.

Security in Haiti remains a concern as progress toward a return to country conditions before the January 2010 earthquake has been slow. The earthquake killed 77 officers of the Haitian National Police (HNP), injured 253 officers, and destroyed or severely damaged 45 HNP stations and substations. The earthquake destroyed 13 of the 15 ministry buildings and 180 other government buildings, including the National Palace. In addition to devastating the center of government, damage from the earthquake paralyzed the economic center as well. Some 30,000 commercial buildings suffered severe damage, collapsed, or were

expected to be demolished. Political instability, including the resignation of Prime Minister Conille, had also hampered the reconstruction process. Without the Government of Haiti's authority to fully engage in development decisions, the reconstruction process was at a standstill. However, a new Prime Minister and cabinet are now in place.

Following the January 2010 earthquake, more than 1,000,000 Haitians were left homeless and living in temporary camps. In early 2012, approximately 500,000 people continued to live in internally displaced persons (IDP) camps, which are vulnerable to flooding, disease, crime, and gender-based violence. Alternative housing options are lacking. Severely damaged infrastructure remains unrepaired, disrupting the informal businesses on which the economy is based. Rubble continues to impede recovery efforts. By some estimates, the amount of debris in Port-au-Prince alone after the earthquake was about 33,000,000 cubic yards. The scale of the damage, level of displacement, low funding, and the lack of a government housing reconstruction policy have all impeded reconstruction efforts.

Poor camp conditions were exacerbated by steady rains in October 2010, which led to flooding and contributed to a deadly cholera outbreak. According to the Haitian Ministry of Health, as of May 1, 2012, there have been an estimated 532,192 cholera cases and 7,060 associated deaths since October 2010. The Pan American Health Organization (PAHO) warns that 200,000 to 250,000 people could contract the disease during the April to November 2012 rainy season.

Food security continues to be a problem 2 years after the earthquake, although much progress has been made. The quality of drinking water in the camps has remained stable since January 2012 according to the National Directorate for Potable Water and Sanitation of the Republic of Haiti. A survey conducted at 433 sites showed that roughly 63 percent of the camp population is drinking chlorinated water. Despite this promising number, camp sanitation remains a concern.

Children are a particularly vulnerable population in Haiti. Of the 661,000 displaced persons outside of Port-au-Prince six months after the quake, roughly half were estimated to be children. The Ministry of Education in Haiti estimated that 80 percent of the schools west of the capital were destroyed or severely damaged in the earthquake. The Ministry further estimated that some 35 to 40 percent of

---

[1] As of March 1, 2003, in accordance with section 1517 of title XV of the Homeland Security Act of 2002 (HSA), Public Law 107–296, 116 Stat. 2135, any reference to the Attorney General in a provision of the INA describing functions transferred from the Department of Justice to the Department of Homeland Security "shall be deemed to refer to the Secretary" of Homeland Security. *See* 6 U.S.C. 557 (codifying HSA, tit. XV, sec. 1517).

HaitiTPSAR000054

schools in the southeast were destroyed, rendering the total number of schools destroyed or severely damaged as high as 5,000.

The 2010 earthquake exacerbated Haiti's position as the poorest nation in the Western Hemisphere and one of the poorest nations in the world. Given the risk of contracting cholera, unsafe living conditions in IDP camps, damaged infrastructure, and a shortage of permanent shelter, it is unsafe for Haitians currently in the United States with TPS to return home. While the situation has improved, the effects of the earthquake continue to reverberate in Haiti.

Based upon this review and after consultation with appropriate Government agencies, the Secretary finds that:

• The conditions that prompted the July 23, 2011 extension and redesignation of Haiti for TPS continue to be met. *See* section 244(b)(3)(A) and (C) of the INA, 8 U.S.C. 1254a(b)(3)(A) and (C).

• There continue to be extraordinary and temporary conditions in Haiti that prevent Haitian nationals from returning to Haiti in safety. *See* section 244(b)(1)(C) of the INA, 8 U.S.C. 1254a(b)(1)(C).

• It is not contrary to the national interest of the United States to permit Haitians (and persons who have no nationality who last habitually resided in Haiti) who meet the eligibility requirements of TPS to remain in the United States temporarily. *See* section 244(b)(1)(C) of the INA, 8 U.S.C. 1254a(b)(1)(C).

• The designation of Haiti for TPS should be extended for an additional 18-month period from January 23, 2013 through July 22, 2014. *See* section 244(b)(3)(C) of the INA, 8 U.S.C. 1254a(b)(3)(C).

• There are approximately 60,000 current Haiti TPS beneficiaries who are expected to be eligible to re-register for TPS under the extension.

## Notice of Extension of the TPS Designation of Haiti

By the authority vested in me as Secretary under section 244 of the INA, 8 U.S.C. 1254a, I have determined, after consultation with the appropriate Government agencies, that the conditions that prompted the redesignation of Haiti for TPS on July 23, 2011 continue to be met. *See* section 244(b)(3)(A) of the INA, 8 U.S.C. 1254a(b)(3)(A). On the basis of this determination, I am extending the existing TPS designation of Haiti for 18

months from January 23, 2013 through July 22, 2014.

**Janet Napolitano,**
*Secretary.*

## Required Application Forms and Application Fees To Register or Re-register for TPS

To register or re-register for TPS for Haiti, an applicant must submit each of the following two applications:

1. Application for Temporary Protected Status (Form I–821).

• You only need to pay the Application for Temporary Protected Status (Form I–821) application fee if you are filing an application for late initial registration. *See* 8 CFR 244.2(f)(2) and information on late initial filing on the USCIS TPS Web page at *www.uscis.gov/tps.*

• You do not need to pay the Application for Temporary Protected Status (Form I–821) fee for a re-registration; and

2. Application for Employment Authorization (Form I–765).

• If you are applying for re-registration, you must pay the Application for Employment Authorization (Form I–765) fee only if you want an EAD.

• If you are applying for late initial registration and want an EAD, you must pay the Application for Employment Authorization (Form I–765) fee only if you are age 14 through 65. No Application for Employment Authorization (Form I–765) fee is required if you are under the age of 14 or over the age of 65 and applying for late initial registration.

• You do not pay the Application for Employment Authorization (Form I–765) fee if you are not requesting an EAD, regardless of whether you are applying for re-registration or are filing a late initial registration.

You must submit both completed application forms together. If you are unable to pay for the application and/or biometrics fee, you may apply for a fee waiver by completing a Request for Fee Waiver (Form I–912) or submitting a personal letter requesting a fee waiver, and by providing satisfactory supporting documentation. For more information on the application forms and fees for TPS, please visit the USCIS TPS Web page at *http://www.uscis.gov/tps.* Fees for Application for Temporary Protected Status (Form I–821), Application for Employment Authorization (Form I–765), and biometric services are also described in 8 CFR 103.7(b)(1)(i).

## Biometric Services Fee

Biometrics (such as fingerprints) are required for all applicants 14 years of age or older. Those applicants must submit a biometric services fee. As previously stated, if you are unable to pay for the biometric services fee, you may apply for a fee waiver by completing a Request for Fee Waiver (Form I–912) or by submitting a personal letter requesting a fee waiver, and providing satisfactory supporting documentation. For more information on the biometric services fee, please visit the USCIS Web site at *http://www.uscis.gov.* If necessary, you may be required to visit an Application Support Center to have your biometrics captured.

## Re-Filing a Re-Registration TPS Application After Receiving a Denial of a Fee Waiver Request

USCIS urges all re-registering applicants to file as soon as possible within the 60-day re-registration period so that USCIS can promptly process the applications and issue EADs. Filing early will also allow those applicants who may receive denials of their fee waiver requests to have time to re-file their applications before the re-registration deadline. If, however, an applicant receives a denial of his or her fee waiver request and is unable to re-file by the re-registration deadline, the applicant may still re-file his or her application. This situation will be reviewed under good cause for late re-registration. However, applicants are urged to re-file within 45 days of the date on their USCIS fee waiver denial notice, if at all possible. *See* section 244(c)(3)(C) of the INA; 8 U.S.C. 1254a(c)(3)(C); 8 CFR 244.17(c). For more information on good cause for late re-registration, visit the USCIS TPS Web page at *http://www.uscis.gov/tps.* Note: As previously stated, although a re-registering TPS beneficiary age 14 and older must pay the biometric services fee (but not the initial TPS application fee) when filing a TPS re-registration application, the applicant may decide to wait to request an EAD and pay the Application for Employment Authorization (Form I–765) fee after USCIS has approved the individual's TPS re-registration, if he or she is eligible.

## Mailing Information

Mail your application for TPS to the proper address in Table 1:

HaitiTPSAR000055

TABLE 1—MAILING ADDRESS

| If you live in . . . | For regular mail using the U.S. Postal Service, send to . . . | For delivery services other than the U.S. Postal Service, send to . . . |
| --- | --- | --- |
| The State of Florida ..................... | USCIS, P.O. Box 4464, Chicago, IL 60680–4464 ...... | USCIS, Attn: TPS Haiti, 131 S. Dearborn 3rd Floor, Chicago, IL 60603–5517. |
| The State of New York ............... | USCIS, P.O. Box 660167, Dallas, TX 75266–0167 .... | USCIS, Attn: TPS Haiti, 2501 S. State Hwy. 121, Business, Suite 400, Lewisville, TX 75067. |
| Any other state ........................... | USCIS, P.O. Box 24047, Phoenix, AZ 85074–4047 ... | USCIS, Attn: TPS Haiti, 1820 E. Skyharbor Circle S, Suite 100, Phoenix, AZ 85034. |

If you were granted TPS by an Immigration Judge (IJ) or the Board of Immigration Appeals (BIA), and you wish to request an EAD or are re-registering for the first time following a grant of TPS by the IJ or BIA, please mail your application to the appropriate address in Table 1 above. Upon receiving a Receipt Notice from USCIS, please send an email to the appropriate USCIS Service Center handling your application providing the receipt number and stating that you submitted a re-registration and/or request for an EAD based on an IJ/BIA grant of TPS. If your USCIS receipt number begins with the letters "LIN", please email the Nebraska Service Center at *TPSijgrant.nsc@uscis.dhs.gov*. If your USCIS receipt number begins with the letters "WAC", please email the California Service Center at *TPSijgrant.csc@uscis.dhs.gov*. You can find detailed information on what further information you need to email and the email addresses on the USCIS TPS Web page at *http://www.uscis.gov/tps.*

**E-Filing**

You cannot electronically file your application when registering or re-registering for Haiti TPS. Please mail your application to the mailing address listed in Table 1 above.

**Employment Authorization Document (EAD)**

*May I request an interim EAD at my local USCIS office?*

No. USCIS will not issue interim EADs to TPS applicants and re-registrants at local offices.

*Am I eligible to receive an automatic 6-month extension of my current EAD from January 22, 2013 through July 22, 2013?*

Provided that you currently have TPS under the Haiti designation, this notice automatically extends your EAD by 6 months if you:
• Are a national of Haiti (or an alien having no nationality who last habitually resided in Haiti);

• Received an EAD under the last extension or re-designation of TPS for Haiti; and
• Have an EAD with a marked expiration date of January 22, 2013, bearing the notation "A–12" or "C–19" on the face of the card under "Category."

Although your EAD is automatically extended through July 22, 2013 by this notice, you must re-register timely for TPS in accordance with the procedures described in this notice if you would like to maintain your TPS.

*When hired, what documentation may I show to my employer as proof of employment authorization and identity when completing Employment Eligibility Verification (Form I–9)?*

You can find a list of acceptable document choices on the "Lists of Acceptable Documents" for Employment Eligibility Verification (Form I–9). You can find additional detailed information on the USCIS I–9 Central Web page at *http://www.uscis.gov/I–9Central*. Employers are required to verify the identity and employment authorization of all new employees by using Employment Eligibility Verification (Form I–9). Within 3 days of hire, an employee must present proof of identity and employment authorization to his or her employer.

You may present any document from List A (reflecting both your identity and employment authorization), or one document from List B (reflecting identity) together with one document from List C (reflecting employment authorization) on the Employment Eligibility Verification (Form I–9). An EAD is an acceptable document under "List A." Employers may not reject a document based upon a future expiration date.

If your EAD has an expiration date of January 22, 2013, and states "A–12" or "C–19" under "Category", it has been extended automatically for 6 months by virtue of this **Federal Register** notice, and you may choose to present your EAD to your employer as proof of identity and employment authorization

for Employment Eligibility Verification (Form I–9) through July 22, 2013 (see the subsection below titled "*How do I and my employer complete the Employment Eligibility Verification (Form I–9) (i.e., verification) using an automatically extended EAD for a new job?*" for further information). To minimize confusion over this extension at the time of hire, you may also show your employer a copy of this **Federal Register** notice confirming the automatic extension of employment authorization through July 22, 2013. As an alternative to presenting your automatically extended EAD, you may choose to present any other acceptable document from List A, or List B plus List C.

*What documentation may I show my employer if I am already employed but my current TPS-related EAD is set to expire?*

Even though EADs with an expiration date of January 22, 2013, that state "A–12" or "C–19" under "Category" have been automatically extended for 6 months by virtue of this **Federal Register** notice, your employer will need to ask you about your continued employment authorization once January 22, 2013 is reached in order to meet its responsibilities for Employment Eligibility Verification (Form I–9). However, your employer does not need a new document in order to reverify your employment authorization until after July 22, 2013. Instead, you and your employer must make corrections to the employment authorization expiration dates in section 1 and section 2 of the Employment Eligibility Verification (Form I–9) (see the subsection below titled "*What corrections should I and my employer at my current job make to the Employment Eligibility Verification (Form I–9) if my EAD has been automatically extended?*" for further information). In addition, you may also show this **Federal Register** notice to your employer to avoid confusion about what to do for the Form I–9.

After July 22, 2013, when the automatic extension expires, your

HaitiTPSAR000056

employer must reverify your employment authorization. You may show any document from List A or List C on the Employment Eligibility Verification (Form I–9) to satisfy this reverification requirement. Your employer is required to reverify on the Employment Eligibility Verification (Form I–9) your continued employment authorization upon the July 22, 2013 expiration of your TPS-related EAD but may not specify which List A or List C document you must present. Employers reverify either in Section 3 of the Form I–9 originally completed or, if this section has already been completed or if the version of Form I–9 is no longer valid, in Section 3 of a new Form I–9 using the most current version.

*What happens after July 22, 2013 for purposes of employment authorization?*

After July 22, 2013, employers may no longer accept the EADs that this **Federal Register** notice automatically extended. However, before that time, USCIS will issue new EADs to TPS re-registrants. These new EADs will have an expiration date of July 22, 2014 and can be presented to your employer for completion of Employment Eligibility Verification (Form I–9). Alternatively, you may choose to present any other legally acceptable document or combination of documents listed on the Employment Eligibility Verification (Form I–9).

*How do I and my employer complete the Employment Eligibility Verification (Form I–9) (i.e., verification) using an automatically extended EAD for a new job?*

When using an automatically extended EAD to fill out the Employment Eligibility Verification (Form I–9) for a new job prior to July 22, 2013, you and your employer should do the following:
(1) For Section 1, you should:
a. Check "An alien authorized to work";
b. Write your alien number (USCIS number or A-number) in the first space (your EAD or other document from DHS will have your USCIS number or A-number printed on it; the USCIS Number is the same as your A-number without the A prefix); and
c. Write the automatic extension date (July 22, 2013) in the second space.
(2) For Section 2, employers should record the:
a. Document title;
b. Document number; and
c. Automatically extended EAD expiration date (July 22, 2013).
After July 22, 2013, employers must reverify the employee's employment

authorization in Section 3 of the Employment Eligibility Verification (Form I–9).

*What corrections should my current employer and I make to the Employment Eligibility Verification (Form I–9) if my EAD has been automatically extended?*

If you are an existing employee who presented a TPS-related EAD that was valid when you first started your job, but that EAD has now been automatically extended, you and your employer should correct your previously completed Employment Eligibility Verification (Form I–9) as follows:
(1) For Section 1, you should:
a. Draw a line through the expiration date in the second space;
b. Write "July 22, 2013" above the previous date;
c. Write "TPS Ext." in the margin of Section 1; and
d. Initial and date the correction in the margin of Section 1.
(2) For Section 2, employers should:
a. Draw a line through the expiration date written in Section 2;
b. Write "July 22, 2013" above the previous date;
c. Write "TPS Ext." in the margin of Section 2; and
d. Initial and date the correction in the margin of Section 2.
After July 22, 2013, when the automatic extension of EADs expires, employers must reverify the employee's employment authorization in Section 3.

*If I am an employer enrolled in E-Verify, what do I do when I receive a "Work Authorization Documents Expiration" alert for an automatically extended EAD?*

If you are an employer who participates in E-Verify, you will receive a "Work Authorization Documents Expiring" case alert when a TPS beneficiary's EAD is about to expire. Usually, this message is an alert to complete Section 3 of the Employment Eligibility Verification (Form I–9) to reverify an employee's employment authorization. For existing employees with TPS-related EADs that have been automatically extended, employers should dismiss this alert by clicking the red "X" in the "dismiss alert" column and follow the instructions above explaining how to correct the Employment Eligibility Verification (Form I–9). After July 22, 2013, employment authorization must be reverified in Section 3. Employers should never use E-Verify for reverification.

*Can my employer require that I produce any other documentation to prove my status, such as proof of my Haitian citizenship?*

No. When completing the Employment Eligibility Verification (Form I–9), including reverifying employment authorization, employers must accept any documentation that appears on the Employment Eligibility Verification (Form I–9) lists of acceptable documentation, and that reasonably appears to be genuine and that relates to you. Employers may not request documentation that does not appear on the Lists of the Acceptable Document for Form I–9. Therefore, employers may not request proof of Haitian citizenship when completing the Employment Eligibility Verification (Form I–9) for new hires or reverifying the employment authorization of current employees. If presented with EADs that have been automatically extended pursuant to this **Federal Register** notice or EADs that are unexpired on their face, employers should accept such EADs as valid "List A" documents so long as the EADs reasonably appear to be genuine and to relate to the employee. See below for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or immigration status, or your national origin.

**Note to All Employers**

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call the USCIS Form I–9 Customer Support at 1–888–464–4218 (TDD 877–875–6028 for hearing impaired). For questions about avoiding discrimination during the employment eligibility verification process, employers may also call the Department of Justice, Office of Special Counsel for Immigration-Related Unfair Employment Practices (OSC) Employer Hotline at 1–800–255–8155 (TDD for the hearing impaired is at 1–800–237–2515), which offers language interpretation in numerous languages.

HaitiTPSAR000057

## Note to Employees

For general questions about the employment eligibility verification process, employees may call the USCIS National Customer Service Center at 1–800–375–5283; calls are accepted in English and Spanish. Employees or applicants may also call the OSC Worker Information Hotline at 1–800–255–7688 (TDD for the hearing impaired is at 1–800–237–2515) for information regarding employment discrimination based upon citizenship or immigration status, or based on national origin, or for information regarding discrimination related to the Employment Eligibility Verification (Form I–9) and E-Verify. The OSC Worker Information Hotline provides language interpretation in numerous languages. In order to comply with the law, employers must accept any document or combination of documents acceptable for Employment Eligibility Verification (Form I–9) completion if the documentation reasonably appears to be genuine and to relate to the employee. Employers may not require extra or additional documentation beyond what is required for Employment Eligibility Verification (Form I–9) completion. Further, employers participating in E-verify who receive an E-verify initial mismatch (''tentative nonconfirmation'' or ''TNC'') on employees must inform employees of the mismatch and give such employees an opportunity to challenge the mismatch. Employers are prohibited from taking adverse action against such employees based on the initial mismatch unless and until E-Verify returns a final nonconfirmation. For example, employers must allow employees challenging their mismatches to continue to work without any delay in start date or training, and without any change in hours or pay, while the final E-Verify determination remains pending. Additional information is available on the OSC Web site at *http://www.justice.gov/crt/about/osc* and the USCIS Web site at *http://www.dhs.gov/E-verify.*

## Note Regarding Federal, State and Local Government Agencies (Such as Departments of Motor Vehicles)

While federal government agencies must follow the guidelines laid out by the federal government, state and local government agencies are permitted to create their own guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a federal, state, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary and/or show you are authorized to work based on TPS. Examples are:

(1) Your expired EAD that has been automatically extended, or your EAD that has a valid expiration date;

(2) A copy of this **Federal Register** notice if your EAD is automatically extended under this notice;

(3) A copy of your Application for Temporary Protected Status Receipt Notice (Form I–797) for this re-registration;

(4) A copy of your past or current Application for Temporary Protected Status Approval Notice (Form I–797), if you receive one from USCIS; and/or

(5) If there is an automatic extension of work authorization, a copy of the fact sheet from the USCIS TPS Web site that provides information on the automatic extension.

Check with the government agency regarding which document(s) the agency will accept. You may also provide the agency with a copy of this notice.

Some benefit-granting agencies use the USCIS Systematic Alien Verification for Entitlements Program (SAVE) to verify the current immigration status of applicants for public benefits. If such an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted upon or will act upon a SAVE verification and you do not believe the response is correct, you may make an InfoPass appointment for an in-person interview at a local USCIS office. Detailed information on how to make corrections, make an appointment, or submit a written request can be found at the SAVE Web site at *www.uscis.gov/save,* then by choosing ''How to Correct Your Records'' from the menu on the right.

[FR Doc. 2012–23826 Filed 9–28–12; 8:45 am]

**BILLING CODE 9111–97–P**

## DEPARTMENT OF HOMELAND SECURITY

### Federal Emergency Management Agency

**[Docket ID FEMA–2012–0024; OMB No. 1660–0108]**

### Agency Information Collection Activities: Submission for OMB Review; Comment Request

**AGENCY:** Federal Emergency Management Agency, DHS.

**ACTION:** Notice.

**SUMMARY:** The Federal Emergency Management Agency (FEMA) will submit the information collection abstracted below to the Office of Management and Budget for review and clearance in accordance with the requirements of the Paperwork Reduction Act of 1995. The submission will describe the nature of the information collection, the categories of respondents, the estimated burden (i.e., the time, effort and resources used by respondents to respond) and cost, and the actual data collection instruments FEMA will use.

**DATES:** Comments must be submitted on or before October 31, 2012.

**ADDRESSES:** Submit written comments on the proposed information collection to the Office of Information and Regulatory Affairs, Office of Management and Budget. Comments should be addressed to the Desk Officer for the Department of Homeland Security, Federal Emergency Management Agency, and sent via electronic mail to *oira.submission@omb.eop.gov* or faxed to (202) 395–5806.

**FOR FURTHER INFORMATION CONTACT:** Requests for additional information or copies of the information collection should be made to Director, Records Management Division, 1800 South Bell Street, Arlington, VA 20598–3005, facsimile number (202) 646–3347, or email address *FEMA-Information-Collections-Management@dhs.gov.*

**SUPPLEMENTARY INFORMATION:**

#### Collection of Information

*Title:* National Emergency Family Registry and Locator System.

*Type of information collection:* Revision of a currently approved information collection.

*Form Titles and Numbers:* None.

*Abstract:* NEFRLS is a Web-based database enabling FEMA to provide a nationally available and recognized database allowing adults (including medical patients) that have been

HaitiTPSAR000058

recommendations presented in the subcommittees' reports, and formulate recommendations for the Department's consideration.

The Committee is scheduled to receive the following briefs:

(1) National Plan for Safety and Security of Especially Hazardous Cargo.

(2) U.S. Army Corps of Engineers Galveston District Set-back Standard Operating Procedures.

(3) Carriage of Shale Gas Extraction Wastewater in Bulk.

A copy of each draft report, presentation and the final agenda will be available at *https://homeport.uscg.mil/tsac.*

An opportunity for oral comments by the public will be provided during the meeting on March 20, 2014. Speakers are requested to limit their comments to 3 minutes. Please note that the public oral comment period may end before the end of the stated meeting times if the Committee has finished its business. Please contact Lieutenant Commander William A. Nabach, listed in the **FOR FURTHER INFFORMATION CONTACT** section to register as a speaker.

**Minutes**

Minutes from the meeting will be available for public review and copying within 90 days following the close of the meeting and can be accessed from the Coast Guard Homeport Web site *http://homeport.uscg.mil/tsac.*

**Notice of Future 2014 TSAC Meetings**

To receive automatic email notices of future TSAC meetings in 2014, go to the online docket, USCG–2013–1065 (*http://www.regulations.gov/#!docketDetail;D=USCG-2013-1065*), and select the sign-up-for-email-alerts option. We plan to use the same docket number for all TSAC meeting notices in 2014, so when the next meeting notice is published you will receive an email alert from www.regulations.gov when the notice appears in this docket.

Dated: February 25, 2014.

**J.G. Lantz,**

*Director of Commercial Regulations and Standards.*

[FR Doc. 2014–04561 Filed 2–28–14; 8:45 am]

**BILLING CODE 9110–04–P**

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Citizenship and Immigration Services

[CIS No. 2539–13; DHS Docket No. USCIS–2014–0001]

RIN 1615–ZB25

### Extension of the Designation of Haiti for Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** Through this Notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is extending the designation of Haiti for Temporary Protected Status (TPS) for 18 months from July 23, 2014 through January 22, 2016.

The extension allows currently eligible TPS beneficiaries to retain TPS through January 22, 2016, so long as they otherwise continue to meet the eligibility requirements for TPS. The Secretary has determined that an extension is warranted because the conditions in Haiti that prompted the TPS designation continue to be met. There continues to be a substantial, but temporary, disruption of living conditions in Haiti based upon extraordinary and temporary conditions in that country that prevent Haitians who have TPS from safely returning.

Through this Notice, DHS also sets forth procedures necessary for nationals of Haiti (or aliens having no nationality who last habitually resided in Haiti) to re-register for TPS and to apply for renewal of their Employment Authorization Documents (EADs) with U.S. Citizenship and Immigration Services (USCIS). Re-registration is limited to persons who have previously registered for TPS under the designation of Haiti and whose applications have been granted. Certain nationals of Haiti (or aliens having no nationality who last habitually resided in Haiti) who have not previously applied for TPS may be eligible to apply under the late initial registration provisions, if they meet: (1) At least one of the late initial filing criteria; and, (2) all TPS eligibility criteria (including continuous residence in the United States since January 12, 2011, and continuous physical presence in the United States since July 23, 2011).

For individuals who have already been granted TPS under the Haiti designation, the 60-day re-registration period runs from March 3, 2014 through

May 2, 2014. USCIS will issue new EADs with a January 22, 2016 expiration date to eligible Haiti TPS beneficiaries who timely re-register and apply for EADs under this extension. Given the timeframes involved with processing TPS re-registration applications, DHS recognizes that not all re-registrants will receive new EADs before their current EADs expire on July 22, 2014. Accordingly, through this Notice, DHS automatically extends the validity of EADs issued under the TPS designation of Haiti for 6 months, from July 22, 2014 through January 22, 2015, and explains how TPS beneficiaries and their employers may determine which EADs are automatically extended and their impact on Employment Eligibility Verification (Form I–9) and the E-Verify processes.

**DATES:** The 18-month extension of the TPS designation of Haiti is effective July 23, 2014, and will remain in effect through January 22, 2016. The 60-day re-registration period runs from March 3, 2014 through May 2, 2014.

**FOR FURTHER INFORMATION CONTACT:**

• For further information on TPS, including guidance on the application process and additional information on eligibility, please visit the USCIS TPS Web page at *http://www.uscis.gov/tps.*

You can find specific information about this extension of Haiti for TPS by selecting "TPS Designated Country: Haiti" from the menu on the left of the TPS Web page.

• You can also contact the TPS Operations Program Manager at the Family and Status Branch, Service Center Operations Directorate, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue, NW., Washington, DC 20529–2060; or by phone at (202) 272–1533 (this is not a toll-free number). **Note:** The phone number provided here is solely for questions regarding this TPS Notice. It is not for individual case status inquires.

• Applicants seeking information about the status of their individual cases can check Case Status Online, available at the USCIS Web site at *http://www.uscis.gov,* or call the USCIS National Customer Service Center at 800–375–5283 (TTY 800–767–1833). Service is available in English and Spanish.

• Further information will also be available at local USCIS offices upon publication of this Notice.

**SUPPLEMENTARY INFORMATION:**

**Table of Abbreviations**

BIA—Board of Immigration Appeals

HaitiTPSAR000059

DHS—Department of Homeland Security
DOS—Department of State
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
Government—U.S. Government
IJ—Immigration Judge
INA—Immigration and Nationality Act
OSC—U.S. Department of Justice, Office of Special Counsel for Immigration-Related Unfair Employment Practices
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TNC—Tentative Nonconfirmation
TPS—Temporary Protected Status
TTY—Text Telephone
UN—United Nations
USCIS—U.S. Citizenship and Immigration Services

## What is Temporary Protected Status (TPS)?

• TPS is a temporary immigration status granted to eligible nationals of a country designated for TPS under the Immigration and Nationality Act (INA), or to persons without nationality who last habitually resided in the designated country.
• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and may obtain work authorization, so long as they continue to meet the requirements of TPS.
• TPS beneficiaries may also be granted travel authorization as a matter of discretion.
• The granting of TPS does not result in or lead to permanent resident status.
• When the Secretary terminates a country's TPS designation, beneficiaries return to the same immigration status they maintained before TPS, if any (unless that status has since expired or been terminated), or to any other lawfully obtained immigration status they received while registered for TPS.

## When was Haiti designated for TPS?

On January 21, 2010, the Secretary designated Haiti for TPS based on extraordinary and temporary conditions within the country, specifically the effects of the 7.0-magnitude earthquake that occurred on January 12, 2010. *See Designation of Haiti for Temporary Protected Status,* 75 FR 3476 (Jan. 21, 2010). In 2011, the Secretary both extended Haiti's designation and redesignated Haiti for TPS for 18 months through January 22, 2013. *See Extension and Redesignation of Haiti for Temporary Protected Status,* 76 FR 29000 (May 19, 2011). The Secretary last extended Haiti's TPS designation in 2012. Through a notice published in the **Federal Register** on October 1, 2012, the Secretary extended Haiti's designation for TPS for 18 months, through July 22, 2014, because the conditions warranting the 2011 redesignation continued to be met. *See Extension of the Designation of Haiti for Temporary Protected Status,* 77 FR 59943 (Oct. 1, 2012). This announcement is the third extension of TPS for Haiti since the original designation in January 2010 and the second extension of TPS for Haiti since the 2011 redesignation.

## What authority does the Secretary of Homeland Security have to extend the designation of Haiti for TPS?

Section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1), authorizes the Secretary, after consultation with appropriate Government agencies, to designate a foreign state (or part thereof) for TPS.[1] The Secretary may then grant TPS to eligible nationals of that foreign state (or aliens having no nationality who last habitually resided in that state). *See* INA section 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a country's TPS designation or extension, the Secretary, after consultation with appropriate Government agencies, must review the conditions in a foreign state designated for TPS to determine whether the conditions for the TPS designation continue to be met. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that a foreign state continues to meet the conditions for TPS designation, the designation is extended for an additional 6 months (or in the Secretary's discretion for 12 or 18 months). *See* INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

## Why is the Secretary extending the TPS designation for Haiti through January 22, 2016?

Over the past year, DHS and the Department of State (DOS) have continued to review conditions in Haiti. Based on this review and after consulting with DOS, the Secretary has determined that an 18-month extension is warranted because the extraordinary and temporary conditions that prompted the July 2011 extension and redesignation continue to exist.

[1] As of March 1, 2003, in accordance with section 1517 of title XV of the Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135, any reference to the Attorney General in a provision of the INA describing functions transferred from the Department of Justice to DHS "shall be deemed to refer to the Secretary" of Homeland Security. *See* 6 U.S.C. 557 (codifying the Homeland Security Act of 2002, tit. XV, section 1517).

While the Government of Haiti has made considerable progress in improving security and quality of life of its citizens following the January 2010 earthquake, Haiti continues to lack the adequate infrastructure, employment and educational opportunities, and basic services to absorb the approximately 58,000 Haitian nationals living in the United States under TPS. The January 12, 2010 earthquake that struck Haiti caused extensive damage to infrastructure, public health, agriculture, transportation, and educational facilities. A coordinated international effort and strong partnership with the Haitian people resulted in emergency response activities that saved lives and laid a foundation for Haiti to rebuild. However, many of the conditions prompting the 2011 extension and redesignation, continue to persist.

Haitian government estimates of the death toll caused by the earthquake have ranged from 230,000 to 316,000 people, though the accuracy of differing estimates is in dispute. The U.S. Agency for International Development reported that approximately 1.5 million people were initially displaced to temporary camps. Destruction from the earthquake rose to catastrophic levels due to Haiti's already weak infrastructure, as the government struggled to provide minimum basic services prior to the earthquake. Rubble severely impeded recovery efforts, yet most of the 11 million cubic meters of debris has been removed, making Port-au-Prince's roads passable.

The January 2010 earthquake had an immediate impact on governance and the rule of law, killing more than 16,000 of Haiti's civil service members and destroying key infrastructure, including the National Palace, the Parliament, 28 of 29 government ministry buildings, the headquarters of the Haitian National Police, many courts, and several correctional facilities. The most serious impediments to human rights in Haiti are weak governance; inadequate respect for the rule of law, a deficient judicial system; and a high prevalence of corruption in various branches of government. Establishing a timetable for long-delayed partial senatorial, municipal, and local elections has generated considerable ongoing political friction since 2011. While finally resolved, Haiti faces another round of elections in 2014.

Since the January 2010 earthquake, Haiti's population has faced increased risks to its security and fundamental human rights. Those displaced to camps, as well as those living in marginalized communities, have been

subjected to a high risk of crime, gender-based violence, and exploitation. The earthquake also exacerbated pre-existing vulnerabilities, including gender-based violence, trafficking, sexual exploitation, child labor, domestic violence, and recruitment into crime or violence. The Pan American Health Organization indicated that kidnappings, death threats, murders, armed robberies, home break-ins, and carjacking continue to occur in large urban centers of Haiti, though it notes that statistics are not readily available. The humanitarian community estimates that over 16,000 households have been affected by forced evictions, including violent evictions by police officers. On October 10, 2013, the UN Security Council voted unanimously to extend the UN peacekeeping mission in Haiti until mid-October 2014 so that it can further contribute to the country's stability and development.

The earthquake devastated much of Haiti's health infrastructure and exacerbated the already poor state of health care in the country where 40 percent of the Haitian population had no access to basic health services. Steady rains in October 2010 led to flooding, which contributed to poor camp conditions and a deadly cholera outbreak. According to the Haitian Ministry of Health and Population, there have been 693,875 cumulative cholera cases and 8,482 deaths as of November 30, 2013. Since the onset of the 2013 rainy season in April, Haiti experienced a rise in new cholera infections. Available resources for the cholera response, including funding and staff, have been in steady decline since 2012.

The January 2010 earthquake was a major setback to the economy and aggravated an already precarious social situation. The earthquake inflicted $7.8 billion in damage and caused the country's GDP to contract 5.4 percent in 2010. In 2011, the Haitian economy began to slowly recover from the effects of the earthquake, however, Tropical Storm Isaac and Hurricane Sandy adversely affected the economic recovery in 2012. Haiti's ability to attract investment is impeded, partly because of weak infrastructure such as access to electricity. Estimates indicate that unemployment in Haiti was as high as 80 percent before the earthquake, and though it has decreased, it remained at approximately 40 percent as of July 2013. More than 78 percent live on less than $2 per day and over 50 percent live on less than $1 per day. In rural areas, 88 percent of individuals live below the poverty line and basic services are practically nonexistent.

Following the January 2010 earthquake, approximately 1.5 million Haitians were left homeless and living in temporary camps. According to the International Organization for Migration as of September 2013, approximately 172,000 individuals still remained in temporary camps. It is estimated that there will be approximately 100,000 persons in these camps by the end of 2013/early 2014.

According to the World Bank, 964 schools were greatly damaged by the earthquake, affecting more than 200,000 children. Since then, many schools have been reconstructed, with the government and donors agreeing to pay school fees for a total of 1,130,000 children for the 2012/2013 school year.

Based upon this review and after consultation with appropriate Government agencies, the Secretary finds that:
• The conditions that prompted the 2011 redesignation of Haiti for TPS continue to be met. *See* INA section 244(b)(3)(A) and (C), 8 U.S.C. 1254a(b)(3)(A) and (C).
• There continue to be extraordinary and temporary conditions in Haiti that prevent Haitian nationals from returning to Haiti in safety. *See* INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).
• It is not contrary to the national interest of the United States to permit Haitians (and persons who have no nationality who last habitually resided in Haiti) who meet the eligibility requirements of TPS to remain in the United States temporarily. See INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).
• The designation of Haiti for TPS should be extended for an additional 18-month period from July 23, 2014 through January 22, 2016. *See* INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C).
• There are approximately 51,000 current Haiti TPS beneficiaries who are expected to file for re-registration and may be eligible to retain their TPS under the extension.

**Notice of Extension of the TPS Designation of Haiti**

By the authority vested in me as Secretary under INA section 244, 8 U.S.C. 1254a, I have determined, after consultation with the appropriate Government agencies, that the conditions that prompted the redesignation of Haiti for TPS in 2011 continue to be met. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). On the basis of this determination, I am extending the existing TPS designation of Haiti for 18 months from July 23, 2014 through January 22, 2016. *See* INA

section 244(b)(1)(C) and (b)(2), 8 U.S.C. 1254a(b)(1)(C) and (b)(2).

**Jeh Charles Johnson,**
*Secretary.*

**Required Application Forms and Application Fees to Register or Re-register for TPS**

To register or re-register for TPS for Haiti, an applicant must submit each of the following two applications:

1. Application for Temporary Protected Status (Form I–821).
• If you are filing an application for late initial registration, you must pay the fee for the Application for Temporary Protected Status (Form I–821). *See* 8 CFR 244.2(f)(2) and 244.6 and information on late initial filing on the USCIS TPS Web page at *http://www.uscis.gov/tps.*
• If you are filing an application for re-registration, you do not need to pay the fee for the Application for Temporary Protected Status (Form I–821). *See* 8 CFR 244.17. and

2. Application for Employment Authorization (Form I–765).
• If you are applying for late initial registration and want an EAD, you must pay the fee for the Application for Employment Authorization (Form I–765) only if you are age 14 through 65. No fee for the Application for Employment Authorization (Form I–765) is required if you are under the age of 14 or are 66 and older and applying for late initial registration.
• If you are applying for re-registration, you must pay the fee for the Application for Employment Authorization (Form I–765) only if you want an EAD, regardless of age.
• You do not pay the fee for the Application for Employment Authorization (Form I–765) if you are not requesting an EAD, regardless of whether you are applying for late initial registration or re-registration.

You must submit both completed application forms together. If you are unable to pay for the Application for Employment Authorization (Form I–765) and/or biometrics fee, you may apply for a fee waiver by completing a Request for Fee Waiver (Form I–912) or submitting a personal letter requesting a fee waiver, and by providing satisfactory supporting documentation. For more information on the application forms and fees for TPS, please visit the USCIS TPS Web page at *http://www.uscis.gov/ tps.* Fees for the Application for Temporary Protected Status (Form I–821), the Application for Employment

HaitiTPSAR000061

Authorization (Form I–765), and biometric services are also described in 8 CFR 103.7(b)(1)(i).

**Biometric Services Fee**

Biometrics (such as fingerprints) are required for all applicants 14 years of age or older. Those applicants must submit a biometric services fee. As previously stated, if you are unable to pay for the biometric services fee, you may apply for a fee waiver by completing a Request for Fee Waiver (Form I–912) or by submitting a personal letter requesting a fee waiver, and providing satisfactory supporting documentation. For more information on the biometric services fee, please visit the USCIS Web site at *http://www.uscis.gov.* If necessary, you may be required to visit an Application Support Center to have your biometrics captured.

**Re-filing a Re-registration TPS Application After Receiving a Denial of a Fee Waiver Request**

USCIS urges all re-registering applicants to file as soon as possible within the 60-day re-registration period so that USCIS can process the applications and issue EADs promptly. Filing early will also allow those applicants who may receive denials of their fee waiver requests to have time to re-file their applications *before* the re-registration deadline. If, however, an applicant receives a denial of his or her fee waiver request and is unable to re-file by the re-registration deadline, the applicant may still re-file his or her application. This situation will be reviewed to determine whether the applicant has established good cause for late re-registration. However, applicants are urged to re-file within 45 days of the

date on their USCIS fee waiver denial notice, if at all possible. *See* INA section 244(c)(3)(C); 8 U.S.C. 1254a(c)(3)(C); 8 CFR 244.17(c). For more information on good cause for late re-registration, visit the USCIS TPS Web page at *http://www.uscis.gov/tps.* Note: As previously stated, although a re-registering TPS beneficiary age 14 and older must pay the biometric services fee (but not the initial TPS application fee) when filing a TPS re-registration application, the applicant may decide to wait to request an EAD, and therefore not pay the Application for Employment Authorization (Form I–765) fee, until after USCIS has approved the individual's TPS re-registration, if he or she is eligible.

**Mailing Information**

Mail your application for TPS to the proper address in Table 1.

TABLE 1—MAILING ADDRESSES

| If . . . | Mail to . . . |
|---|---|
| You live in the State of Florida ................................................................ | *U.S. Postal Service:*<br>U.S. Citizenship and Immigration Services<br>Attn: Haiti TPS<br>P.O. Box 4464<br>Chicago, IL 60680–4464<br>*Non-US Postal Delivery Service:*<br>U.S. Citizenship and Immigration Services<br>Attn: Haiti TPS<br>131 S. Dearborn—3rd Floor<br>Chicago, IL 60603–5517 |
| You live in the State of New York ........................................................ | *U.S. Postal Service:*<br>U.S. Citizenship and Immigration Services<br>Attn: Haiti TPS<br>P.O. Box 660167<br>Dallas, TX 75266–0167<br>*Non-U.S. Postal Delivery Service:*<br>U.S. Citizenship and Immigration Services<br>Attn: Haiti TPS<br>2501 S. State Highway, 121 Business Suite 400<br>Lewisville, TX 75067 |
| You live in any other state ................................................................... | *U.S. Postal Service:*<br>U.S. Citizenship and Immigration Services<br>Attn: Haiti TPS<br>P.O. Box 24047<br>Phoenix, AZ 85074–4047<br>*Non-U.S. Postal Delivery Service:*<br>U.S. Citizenship and Immigration Services<br>Attn: Haiti TPS<br>1820 E. Skyharbor Circle S, Suite 100<br>Phoenix, AZ 85034 |

If you were granted TPS by an Immigration Judge (IJ) or the Board of Immigration Appeals (BIA), and you wish to request an EAD, or are re-registering for the first time following a grant of TPS by an IJ or the BIA, please mail your application to the appropriate address in Table 1. Upon receiving a Notice of Action (Form I–797) from USCIS, please send an email to the

appropriate USCIS Service Center handling your application providing the receipt number and stating that you submitted a re-registration and/or request for an EAD based on an IJ/BIA grant of TPS. If your USCIS receipt number begins with the letters ''LIN,'' please email the Nebraska Service Center at TPSijgrant.nsc@uscis.dhs.gov. If your USCIS receipt number begins

with the letters ''WAC,'' please email the California Service Center at TPSijgrant.csc@uscis.dhs.gov. You can find detailed information on what further information you need to email and the email addresses on the USCIS TPS Web page at *http://www.uscis.gov/tps.*

HaitiTPSAR000062

**E-Filing**

You cannot electronically file your application when re-registering or submitting a late initial registration for Haiti TPS. Please mail your application to the mailing address listed in Table 1.

**Employment Authorization Document (EAD)**

*May I request an interim EAD at my local USCIS office?*

No. USCIS will not issue interim EADs to TPS applicants and re-registrants at local offices.

*Am I eligible to receive an automatic 6-month extension of my current EAD from July 22, 2014 through January 22, 2015?*

Provided that you currently have TPS under the Haiti designation, this notice automatically extends your EAD by 6 months if you:

- Are a national of Haiti (or an alien having no nationality who last habitually resided in Haiti);
- Received an EAD under the last extension or redesignation of TPS for Haiti; and
- Have an EAD with a marked expiration date of July 22, 2014, bearing the notation "A–12" or "C–19" on the face of the card under "Category."

Although this Notice automatically extends your EAD through January 22, 2015, you must re-register timely for TPS in accordance with the procedures described in this Notice if you would like to maintain your TPS.

*When hired, what documentation may I show to my employer as proof of employment authorization and identity when completing Employment Eligibility Verification (Form I–9)?*

You can find a list of acceptable document choices on the "Lists of Acceptable Documents" for Employment Eligibility Verification (Form I–9). You can find additional detailed information on the USCIS I–9 Central Web page at *http://www.uscis.gov/I–9Central.* Employers are required to verify the identity and employment authorization of all new employees by using Employment Eligibility Verification (Form I–9). Within 3 days of hire, an employee must present proof of identity and employment authorization to his or her employer.

You may present any document from List A (reflecting both your identity and employment authorization), or one document from List B (reflecting identity) together with one document from List C (reflecting employment authorization). You may present an acceptable receipt for List A, List B, or List C documents as described in the Form I–9 Instructions. An EAD is an acceptable document under "List A." Employers may not reject a document based on a future expiration date.

If your EAD has an expiration date of July 22, 2014, and states "A–12" or "C–19" under "Category", it has been extended automatically for 6 months by virtue of this **Federal Register** Notice, and you may choose to present your EAD to your employer as proof of identity and employment authorization for Employment Eligibility Verification (Form I–9) through January 22, 2015 (see the subsection titled *"How do I and my employer complete the Employment Eligibility Verification (Form I–9) (i.e., verification) using an automatically extended EAD for a new job?"* for further information). To minimize confusion over this extension at the time of hire, you may also show your employer a copy of this **Federal Register** Notice confirming the automatic extension of employment authorization through January 22, 2015. As an alternative to presenting your automatically extended EAD, you may choose to present any other acceptable document from List A, or a combination of one selection from List B and one selection from List C.

*What documentation may I show my employer if I am already employed but my current TPS-related EAD is set to expire?*

Even though EADs with an expiration date of July 22, 2014, that state "A–12" or "C–19" under "Category" have been automatically extended for 6 months by this **Federal Register** Notice, your employer will need to ask you about your continued employment authorization once July 22, 2014 is reached to meet its responsibilities for Employment Eligibility Verification (Form I–9). However, your employer does not need a new document to reverify your employment authorization until January 22, 2015, the expiration date of the automatic extension. Instead, you and your employer must make corrections to the employment authorization expiration dates in Section 1 and Section 2 of Employment Eligibility Verification (Form I–9) (see the subsection titled *"What corrections should I and my current employer make to Employment Eligibility Verification (Form I–9) if my EAD has been automatically extended?"* for further information). In addition, you may also show this **Federal Register** Notice to your employer to explain what to do for *Employment Eligibility Verification* (Form I–9).

By January 22, 2015, the expiration date of the automatic extension, your employer must reverify your employment authorization. At that time, you must present any document from List A or any document from List C on Employment Eligibility Verification (Form I–9) to reverify employment authorization, or an acceptable List A or List C receipt described in the Form I–9 Instructions. Your employer should complete either Section 3 of the Employment Eligibility Verification (Form I–9) originally completed for the employee or, if this Section has already been completed or if the version of Employment Eligibility Verification (Form I–9) is no longer valid, complete Section 3 of a new Employment Eligibility Verification (Form I–9) using the most current version. Your employer should use either Section 3 of the Employment Eligibility Verification (Form I–9) originally completed for the employee or, if this Section has already been completed or if the version of Employment Eligibility Verification (Form I–9) is no longer valid, complete Section 3 of a new Employment Eligibility Verification (Form I–9) using the most current version. Note that your employer may not specify which List A or List C document employees must present, and cannot reject an acceptable receipt.

*Can my employer require that I produce any other documentation to prove my status, such as proof of my Haitian citizenship?*

No. When completing Employment Eligibility Verification (Form I–9), including re-verifying employment authorization, employers must accept any documentation that appears on the "Lists of Acceptable Documents" for Employment Eligibility Verification (Form I–9) and that reasonably appears to be genuine and that relates to you or an acceptable List A, List B, or List C receipt. Employers may not request documentation that does not appear on the "Lists of Acceptable Documents." Therefore, employers may not request proof of Haitian citizenship when completing Employment Eligibility Verification (Form I–9) for new hires or reverifying the employment authorization of current employees. If presented with EADs that have been automatically extended, employers should accept such EADs as valid List A documents so long as the EADs reasonably appear to be genuine and to relate to the employee. Refer to the Note to Employees section of this Notice for important information about your rights