if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or immigration status, or your national origin.

*What happens after January 22, 2015 for purposes of employment authorization?*

After January 22, 2015, employers may no longer accept the EADs that this **Federal Register** Notice automatically extended. Before that time, however, USCIS will issue new EADs to eligible TPS re-registrants who request them. These new EADs will have an expiration date of January 22, 2016 and can be presented to your employer for completion of Employment Eligibility Verification (Form I–9). Alternatively, you may choose to present any other legally acceptable document or combination of documents listed on the Employment Eligibility Verification (Form I–9).

*How do my employer and I complete Employment Eligibility Verification (Form I–9) (i.e., verification) using an automatically extended EAD for a new job?*

When using an automatically extended EAD to complete Employment Eligibility Verification (Form I–9) for a new job prior to January 22, 2015, you and your employer should do the following:

1. For Section 1, you should:
   a. Check "An alien authorized to work";
   b. Write your alien number (USCIS number or A-number) in the first space (your EAD or other document from DHS will have your USCIS number or A-number printed on it; the USCIS number is the same as your A-number without the A prefix); and
   c. Write the automatically extended EAD expiration date (January 22, 2015) in the second space.
2. For Section 2, employers should record the:
   a. Document title;
   b. Document number; and
   c. Automatically extended EAD expiration date (January 22, 2015).

No later than January 22, 2015, employers must reverify the employee's employment authorization in Section 3 of the Employment Eligibility Verification (Form I–9).

*What corrections should my current employer and I make to Employment Eligibility Verification (Form I–9) if my EAD has been automatically extended?*

If you are an existing employee who presented a TPS-related EAD that was

valid when you first started your job, but that EAD has now been automatically extended, you and your employer should correct your previously completed Employment Eligibility Verification (Form I–9) as follows:

1. For Section 1, you should:
   a. Draw a line through the expiration date in the second space;
   b. Write "January 22, 2015" above the previous date;
   c. Write "TPS Ext." in the margin of Section 1; and
   d. Initial and date the correction in the margin of Section 1.
2. For Section 2, employers should:
   a. Draw a line through the expiration date written in Section 2;
   b. Write "January 22, 2015" above the previous date;
   c. Write "TPS Ext." in the margin of Section 2; and
   d. Initial and date the correction in the margin of Section 2.

By January 22, 2015, when the automatic extension of EADs expires, employers must reverify the employee's employment authorization in Section 3.

*If I am an employer enrolled in E-Verify, what do I do when I receive a "Work Authorization Documents Expiration" alert for an automatically extended EAD?*

If you are an employer who participates in E-Verify, you will receive a "Work Authorization Documents Expiring" case alert when a TPS beneficiary's EAD is about to expire. Usually, this message is an alert to complete Section 3 of the Employment Eligibility Verification (Form I–9) to reverify an employee's employment authorization. For existing employees with TPS-related EADs that have been automatically extended, employers should dismiss this alert by clicking the red "X" in the "dismiss alert" column and follow the instructions above explaining how to correct the Employment Eligibility Verification (Form I–9). By January 22, 2015, employment authorization must be reverified in Section 3. Employers should never use E-Verify for reverification.

**Note to All Employers**

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This Notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth re-

verification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY 877–875–6028) or email USCIS at I–9Central@dhs.gov. Calls and emails are accepted in English and many other languages. For questions about avoiding discrimination during the employment eligibility verification process, employers may also call the U.S. Department of Justice, Office of Special Counsel for Immigration-Related Unfair Employment Practices (OSC) Employer Hotline at 800–255–8155 (TTY for the hearing impaired is at 800–237–2515), which offers language interpretation in numerous languages, or email OSC at osccrt@usdoj.gov.

**Note to Employees**

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY 877–875–6028) or email at *I–9Central@dhs.gov.* Calls are accepted in English, Spanish and many other languages. Employees or applicants may also call the U.S. Department of Justice, Office of Special Counsel for Immigration-Related Unfair Employment Practices (OSC) Worker Information Hotline at 800–255–7688 (TTY for the hearing impaired is at 800–237–2515) for information regarding employment discrimination based upon citizenship, immigration status, or national origin, or for information regarding discrimination related to Employment Eligibility Verification (Form I–9) and E-Verify. The OSC Worker Information Hotline provides language interpretation in numerous languages.

To comply with the law, employers must accept any document or combination of documents from the List of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee, or an acceptable List A, List B, or List C receipt described in the *Employment Eligibility Verification* (Form I–9) Instructions. Employers may not require extra or additional documentation beyond what is required for Employment Eligibility Verification (Form I–9) completion. Further, employers participating in E-Verify who receive an E-Verify case result of "Tentative Nonconfirmation" (TNC) must promptly inform employees of the TNC and give such employees an opportunity to contest the TNC. A TNC case result means that the information entered into E-Verify from Employment Eligibility Verification (Form I–9) differs from the Social Security Administration, DHS, or DOS records.

HaitiTPSAR000064

Employers may not terminate, suspend, delay training, withhold pay, lower pay or take any adverse action against an employee based on the employee's decision to contest a TNC or because the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result is received when E-Verify cannot verify an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY 877–875–6028). An employer that discriminates against an employee in the E-Verify process based on citizenship or immigration status, or based on national origin, may contact OSC's Worker Information Hotline at 800–255–7688 (TTY for the hearing impaired is at 800–237–2515). Additional information about proper nondiscriminatory Employment Eligibility Verification (Form I–9) and E-Verify procedures is available on the OSC Web site at *http://www.justice.gov/crt/about/osc/* and the USCIS Web site at *http://www.dhs.gov/E-verify.*

### Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)

While Federal government agencies must follow the guidelines laid out by the Federal government, state and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, state, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary and/or show you are authorized to work based on TPS. Examples are:

(1) Your unexpired EAD that has been automatically extended, or your EAD that has not expired;
(2) A copy of this **Federal Register** Notice if your EAD is automatically extended under this Notice;
(3) A copy of your Application for Temporary Protected Status Notice of Action (Form I–797) for this re-registration;
(4) A copy of your past or current Application for Temporary Protected Status Notice of Action (Form I–797), if you received one from USCIS; and/or
(5) If there is an automatic extension of work authorization, a copy of the fact sheet from the USCIS TPS Web site that provides information on the automatic extension.

Check with the government agency regarding which document(s) the agency will accept. You may also provide the agency with a copy of this **Federal Register** Notice.

Some benefit-granting agencies use the USCIS Systematic Alien Verification for Entitlements Program (SAVE) to verify the current immigration status of applicants for public benefits. If such an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted upon or will act upon a SAVE verification and you do not believe the response is correct, you may make an InfoPass appointment for an in-person interview at a local USCIS office. Detailed information on how to make corrections, make an appointment, or submit a written request can be found at the SAVE Web site at *http://www.uscis.gov/save,* then by choosing ''How to Correct Your Records'' from the menu on the right.

[FR Doc. 2014–04593 Filed 2–28–14; 8:45 am]

**BILLING CODE 9111–97–P**

---

# DEPARTMENT OF HOMELAND SECURITY

## U.S. Customs and Border Protection

### Agency Information Collection Activities: Haitian Hemispheric Opportunity Through Partnership Encouragement Act of 2006

**AGENCY:** U.S. Customs and Border Protection, Department of Homeland Security.

**ACTION:** 30-Day Notice and request for comments; Extension of an existing collection of information: 1651–0129.

---

**SUMMARY:** U.S. Customs and Border Protection (CBP) of the Department of Homeland Security will be submitting the following information collection request to the Office of Management and Budget (OMB) for review and approval in accordance with the Paperwork Reduction Act: Haitian Hemispheric Opportunity through Partnership Encouragement Act of 2006 (''Haiti HOPE Act''). This is a proposed extension of an information collection that was previously approved. CBP is proposing that this information collection be extended with no change to the burden hours. This document is published to obtain comments from the public and affected agencies. This proposed information collection was previously published in the **Federal Register** (78 FR 76851) on December 19, 2013, allowing for a 60-day comment period. This notice allows for an additional 30 days for public comments. This process is conducted in accordance with 5 CFR 1320.10.

**DATES:** Written comments should be received on or before April 2, 2014 be assured of consideration.

**ADDRESSES:** Interested persons are invited to submit written comments on this proposed information collection to the Office of Information and Regulatory Affairs, Office of Management and Budget. Comments should be addressed to the OMB Desk Officer for Customs and Border Protection, Department of Homeland Security, and sent via electronic mail to *oira_submission@omb.eop.gov* or faxed to (202) 395–5806.

**FOR FURTHER INFORMATION CONTACT:** Requests for additional information should be directed to Tracey Denning, U.S. Customs and Border Protection, Regulations and Rulings, Office of International Trade, 90 K Street NE., 10th Floor, Washington, DC 20229–1177, at 202–325–0265.

**SUPPLEMENTARY INFORMATION:** CBP invites the general public and other Federal agencies to comment on proposed and/or continuing information collections pursuant to the Paperwork Reduction Act of 1995 (Pub. L. 104–13; 44 U.S.C. 3507). The comments should address: (a) Whether the collection of information is necessary for the proper performance of the functions of the agency, including whether the information shall have practical utility; (b) the accuracy of the agency's estimates of the burden of the collection of information; (c) ways to enhance the quality, utility, and clarity of the information to be collected; (d) ways to minimize the burden including the use of automated collection techniques or the use of other forms of information technology; and (e) the annual costs burden to respondents or record keepers from the collection of information (a total capital/startup costs and operations and maintenance costs). The comments that are submitted will be summarized and included in the CBP request for Office of Management and Budget (OMB) approval. All comments will become a matter of public record. In this document CBP is soliciting comments concerning the following information collection:

*Title:* Haitian Hemispheric Opportunity through Partnership Encouragement Act of 2006 (''Haiti Hope Act'').

*OMB Number:* 1651–0129.

HaitiTPSAR000065

# DEPARTMENT OF HOMELAND SECURITY

## U.S. Citizenship and Immigration Services

[CIS No. 2567–15; DHS Docket No. USCIS–2014–0001]

RIN 1615–ZB40

## Extension of the Designation of Haiti for Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** Through this Notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is extending the designation of Haiti for Temporary Protected Status (TPS) for 18 months, from January 23, 2016 through July 22, 2017.

The extension allows currently eligible TPS beneficiaries to retain TPS through July 22, 2017, so long as they otherwise continue to meet the eligibility requirements for TPS. The Secretary has determined that an extension is warranted because the conditions in Haiti that prompted the TPS designation continue to be met. There continue to be extraordinary and temporary conditions in that country that prevent Haitian nationals (or aliens having no nationality who last habitually resided in Haiti) from returning to Haiti in safety.

Through this Notice, DHS also sets forth procedures necessary for nationals of Haiti (or aliens having no nationality who last habitually resided in Haiti) to re-register for TPS and to apply for renewal of their Employment Authorization Documents (EAD) with U.S. Citizenship and Immigration Services (USCIS). Re-registration is limited to persons who have previously registered for TPS under the designation of Haiti and whose applications have been granted. Certain nationals of Haiti (or aliens having no nationality who last habitually resided in Haiti) who have not previously applied for TPS may be eligible to apply under the late initial registration provisions if they meet (1) at least one of the late initial filing criteria, and (2) all TPS eligibility criteria (including continuous residence in the United States since January 12, 2011, and continuous physical presence in the United States since July 23, 2011).

For individuals who have already been granted TPS under Haiti's designation, the 60-day re-registration period runs from August 25, 2015

through October 26, 2015. USCIS will issue new EADs with a July 22, 2017 expiration date to eligible Haiti TPS beneficiaries who timely re-register and apply for EADs under this extension. Given the timeframes involved with processing TPS re-registration applications, DHS recognizes that not all re-registrants will receive new EADs before their current EADs expire on January 22, 2016. Accordingly, through this Notice, DHS automatically extends the validity of EADs issued under the TPS designation of Haiti for 6 months, through July 22, 2016, and explains how TPS beneficiaries and their employers may determine which EADs are automatically extended and their impact on Employment Eligibility Verification (Form I–9) and the E-Verify processes.

**DATES:** The 18-month extension of the TPS designation of Haiti is effective January 23, 2016, and will remain in effect through July 22, 2017. The 60-day re-registration period runs from August 25, 2015 through October 26, 2015. (**Note:** It is important for re-registrants to timely re-register during this 60-day re-registration period and not to wait until their EADs expire.)

## Further Information

• For further information on TPS, including guidance on the application process and additional information on eligibility, please visit the USCIS TPS Web page at *http://www.uscis.gov/tps.* You can find specific information about Haiti's TPS extension by selecting ''TPS Designated Country: Haiti'' from the menu on the left side of the TPS Web page.

• You can also contact the TPS Operations Program Manager at the Waivers and Temporary Services Branch, Service Center Operations Directorate, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Washington, DC 20529–2060; or by phone at (202) 272–1533 (this is not a toll-free number). **Note:** The phone number provided here is solely for questions regarding this TPS Notice. It is not for individual case status inquires.

• Applicants seeking information about the status of their individual cases can check Case Status Online, available at the USCIS Web site at *http://www.uscis.gov,* or call the USCIS National Customer Service Center at 800–375–5283 (TTY 800–767–1833).

• Further information will also be available at local USCIS offices upon publication of this Notice.

**SUPPLEMENTARY INFORMATION:**

## Table of Abbreviations

BIA—Board of Immigration Appeals
DHS—Department of Homeland Security
DOS—Department of State
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
Government—U.S. Government
IDP—Internally Displaced Person
IJ—Immigration Judge
INA—Immigration and Nationality Act
OSC—U.S. Department of Justice, Office of Special Counsel for Immigration-Related Unfair Employment Practices
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TNC—Tentative Nonconfirmation
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services

## What is Temporary Protected Status (TPS)?

• TPS is a temporary immigration status granted to eligible nationals of a country designated for TPS under the Immigration and Nationality Act (INA), or to eligible persons without nationality who last habitually resided in the designated country.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to work and obtain EADs so long as they continue to meet the requirements of TPS.

• TPS beneficiaries may also be granted travel authorization as a matter of discretion.

• The granting of TPS does not result in or lead to permanent resident status.

• To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(2) and 8 CFR 244.2–.4.

• When the Secretary terminates a country's TPS designation, beneficiaries return to the same immigration status they maintained before TPS, if any (unless that status has since expired or been terminated), or to any other lawfully obtained immigration status they received while registered for TPS.

## When was Haiti designated for TPS?

On January 21, 2010, the Secretary designated Haiti for TPS based on extraordinary and temporary conditions within the country, specifically the effects of the 7.0-magnitude earthquake that occurred on January 12, 2010. *See Designation of Haiti for Temporary Protected Status,* 75 FR 3476 (Jan. 21, 2010). In 2011, the Secretary both extended Haiti's designation and redesignated Haiti for TPS for 18 months through January 22, 2013. *See Extension and Redesignation of Haiti for*

HaitiTPSAR000066

*Temporary Protected Status,* 76 FR 29000 (May 19, 2011). Haiti's designation was then extended for an additional 18 months on October 1, 2012. *See Extension of the Designation of Haiti for Temporary Protected Status,* 77 FR 59943 (October 1, 2012). The Secretary last extended Haiti's TPS designation in 2014. Through a notice published in the **Federal Register** on March 3, 2014, the Secretary extended Haiti's designation for TPS for 18 months, through January 22, 2016, because the conditions warranting the 2011 redesignation continued to be met. *See Extension of the Designation of Haiti for Temporary Protected Status,* 79 FR 11808 (March 3, 2014). This announcement is the third extension of TPS for Haiti since the 2011 redesignation.

### What authority does the Secretary of Homeland Security have to extend the designation of Haiti for TPS?

Section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1), authorizes the Secretary, after consultation with appropriate agencies of the U.S. Government (Government), to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist.[1] The Secretary may then grant TPS to eligible nationals of that foreign state (or eligible aliens having no nationality who last habitually resided in the designated country). *See* INA section 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a country's TPS designation or extension, the Secretary, after consultation with appropriate Government agencies, must review the conditions in a foreign state designated for TPS to determine whether the conditions for the TPS designation continue to be met. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that a foreign state continues to meet the conditions for TPS designation, the designation may be extended for an additional period of 6, 12, or 18 months. *See* INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA

section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

### Why is the Secretary extending the TPS designation for Haiti through July 22, 2017?

Over the past year, DHS and the Department of State (DOS) have continued to review conditions in Haiti. Based on this review and after consulting with DOS, the Secretary has determined that an 18-month extension is warranted because the extraordinary and temporary conditions that led to Haiti's designation continue to exist and prevent Haitian nationals (or aliens having no nationality who last habitually resided in Haiti) from returning to Haiti in safety.

Many of the conditions prompting the original January 2010 TPS designation and the May 2011 redesignation persist, including a housing shortage, a cholera epidemic, limited access to medical care, damage to the economy, political instability, security risks, limited access to food and water, a heightened vulnerability of women and children, and environmental risks. More than 5 years after the earthquake, Haiti continues to recover.

The January 12, 2010 earthquake caused extensive damage to the country's physical infrastructure and public health, agricultural, housing, transportation, and educational facilities. The Haitian government estimates that 105,000 houses were destroyed and 188,383 houses collapsed or suffered considerable damage. At the peak of the displacement, estimates of people internally displaced range from approximately 1.5 million to 2.3 million. While most of the earthquake related rubble has been cleared, and there have been improvements to road conditions, the effort to rebuild damaged buildings has been slow. Virtually all government offices and ministries were destroyed in downtown Port-au-Prince and, 5 years later, remain housed in temporary facilities.

While the country continues to make progress in relocating people made homeless by the 2010 earthquake, estimates by the International Organization for Migration in December 2014 put the number of Haitians still living in internally displaced person (IDP) camps at approximately 80,000 scattered across 105 sites. Basic services available to camp residents have deteriorated as IDP camps close and funding dries up, with most camps lacking waste management services and adequate sanitation facilities—leading to a high risk of cholera transmission—and possessing malnutrition rates higher than emergency thresholds. Gender-

based violence that exists within these informal settlement areas continues to be a serious concern and personal security is a serious and pervasive issue. While IDP camps are closing, Haiti's housing shortage remains far from resolved. Haiti lacks sufficient housing units to address its pre-earthquake shortage, replace damaged or destroyed units, and satisfy projected urban growth. Some Haitians have returned to unsafe homes or built houses in informal settlements located in hazardous areas without access to basic services.

Lingering infrastructure damage since the earthquake has also impacted food security. Even prior to the 2010 earthquake, Haiti had one of the highest rates of hunger and malnutrition in the Western Hemisphere, with 45 percent of the population undernourished and 30 percent of children under 5 suffering from chronic malnutrition. Damage from the 2010 earthquake exacerbated Haiti's historic food security challenges. An estimated 2.5 million people are unable to cover their basic food needs and a January 2015 United Nations report estimated that over 600,000 people were facing severe food insecurity.

Haiti's longstanding public health challenges were exacerbated by the January 2010 earthquake and an ongoing cholera epidemic that started in October 2010. The introduction of cholera in Haiti shortly after the earthquake, and its persistence since then, is mainly due to the lack of access to clean water and appropriate sanitation facilities. Concerted efforts by Haiti and its partners have reduced the number of reported cholera cases in the country, but Haiti continues to host the largest cholera epidemic in the Western Hemisphere. As of December 2014, the cholera epidemic has affected approximately 725,000 people and claimed over 8,800 lives in Haiti since October 2010. In January 2015, the U.S. Centers for Disease Control and Prevention stated that outbreaks of epidemic diseases still occur and that progress has been slow and limited in restoring Haiti's physical health infrastructure.

Haiti's ability to recover has been further constrained by political instability. The January 2010 earthquake had an immediate impact on governance and the rule of law in Haiti, killing an estimated 18 percent of the country's civil service and destroying key government infrastructure, including the National Palace, 28 of 29 government ministry buildings, the National Police headquarters, and various judicial facilities. Following the expiration of local and parliamentary

---

[1] As of March 1, 2003, in accordance with section 1517 of title XV of the Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135, any reference to the Attorney General in a provision of the INA describing functions transferred from the Department of Justice to DHS ''shall be deemed to refer to the Secretary'' of Homeland Security. *See* 6 U.S.C. 557 (codifying the Homeland Security Act of 2002, tit. XV, section 1517).

**51584**        **Federal Register** / Vol. 80, No. 164 / Tuesday, August 25, 2015 / Notices

mandates on January 12, 2015, Haiti was left without a functioning legislative branch or duly elected local authorities. Increasingly, politically and economically motivated protests and demonstrations have turned violent.

Although the Government of Haiti has taken significant steps to improve stability and the quality of life for Haitian citizens, Haiti continues to lack the adequate infrastructure, health and sanitation services, and emergency response capacity necessary to ensure the personal safety of Haitian nationals.

Based upon this review and after consultation with appropriate Government agencies, the Secretary has determined that:

• The conditions that prompted the July 23, 2011 redesignation of Haiti for TPS continue to be met. *See* INA section 244(b)(3)(A) and (C), 8 U.S.C. 1254a(b)(3)(A) and (C).

• There continue to be extraordinary and temporary conditions in Haiti that prevent Haitian nationals (or aliens having no nationality who last habitually resided in Haiti) from returning to Haiti in safety. *See* INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).

• It is not contrary to the national interest of the United States to permit Haitians (or aliens having no nationality who last habitually resided in Haiti) who meet the eligibility requirements of TPS to remain in the United States temporarily. *See* INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).

• The designation of Haiti for TPS should be extended for an 18-month period from January 23, 2016 through July 22, 2017. *See* INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C).

• There are approximately 50,000 current Haiti TPS beneficiaries who are expected to file for re-registration under the extension.

## Notice of Extension of the TPS Designation of Haiti

By the authority vested in me as Secretary under INA section 244, 8 U.S.C. 1254a, I have determined, after consultation with the appropriate Government agencies, that the conditions that prompted the redesignation of Haiti for TPS on July 23, 2011, continue to be met. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). On the basis of this determination, I am extending the existing designation of Haiti for TPS for 18 months, from January 23, 2016 through July 22, 2017. *See* INA section

244(b)(1)(C) and (b)(2), 8 U.S.C. 1254a(b)(1)(C) and (b)(2).

**Jeh Charles Johnson,**
*Secretary.*

## Required Application Forms and Application Fees To Register or Re-Register for TPS

To register or re-register for TPS based on the designation of Haiti, an applicant must submit each of the following two applications:

### 1. Application for Temporary Protected Status (Form I–821)

• If you are filing an application for late initial registration, you must pay the fee for the Application for Temporary Protected Status (Form I–821). *See* 8 CFR 244.2(f)(2) and 244.6 and information on late initial filing on the USCIS TPS Web page at *http://www.uscis.gov/tps.*

• If you are filing an application for re-registration, you do not need to pay the fee for the Application for Temporary Protected Status (Form I–821). *See* 8 CFR 244.17.

### 2. Application for Employment Authorization (Form I–765)

• If you are applying for late initial registration and want an EAD, you must pay the fee for the Application for Employment Authorization (Form I–765) only if you are age 14 through 65. No fee for the Application for Employment Authorization (Form I–765) is required if you are requesting an initial EAD and are under the age of 14 or over the age of 65 and applying for late initial registration.

• If you are applying for re-registration, you must pay the fee for the Application for Employment Authorization (Form I–765) only if you want an EAD, regardless of age.

• You do not pay the fee for the Application for Employment Authorization (Form I–765) if you are not requesting an EAD, regardless of whether you are applying for late initial registration or re-registration. You must submit both completed application forms together. If you are unable to pay for the Application for Employment Authorization (Form I–765) and/or biometrics fee, you may apply for a fee waiver by completing a Request for Fee Waiver (Form I–912) or submitting a personal letter requesting a fee waiver, and by providing satisfactory supporting documentation. For more information on the application forms and fees for TPS, please visit the USCIS TPS Web page at *http://www.uscis.gov/tps.* Fees for the Application for Temporary Protected Status (Form I–821), the

Application for Employment Authorization (Form I–765), and biometric services are also described in 8 CFR 103.7(b)(1)(i).

## Biometric Services Fee

Biometrics (such as fingerprints) are required for all applicants 14 years of age or older. Those applicants must submit a biometric services fee. As previously stated, if you are unable to pay for the biometric services fee, you may apply for a fee waiver by completing a Request for Fee Waiver (Form I–912) or by submitting a personal letter requesting a fee waiver, and providing satisfactory supporting documentation. For more information on the biometric services fee, please visit the USCIS Web site at *http://www.uscis.gov.* If necessary, you may be required to visit an Application Support Center to have your biometrics captured.

## Re-Filing a Re-Registration TPS Application After Receiving a Denial of a Fee Waiver Request

USCIS urges all re-registering applicants to file as soon as possible within the 60-day re-registration period so that USCIS can process the applications and issue EADs promptly. Filing early will also allow those applicants who may receive denials of their fee waiver requests to have time to re-file their applications before the re-registration deadline. If, however, an applicant receives a denial of his or her fee waiver request and is unable to re-file by the re-registration deadline, the applicant may still re-file his or her application. This situation will be reviewed to determine whether the applicant has established good cause for late re-registration. However, applicants are urged to re-file within 45 days of the date on their USCIS fee waiver denial notice, if at all possible. *See* INA section 244(c)(3)(C); 8 U.S.C. 1254a(c)(3)(C); 8 CFR 244.17(c). For more information on good cause for late re-registration, visit the USCIS TPS Web page at *http://www.uscis.gov/tps.* **Note:** As previously stated, although a re-registering TPS beneficiary age 14 and older must pay the biometric services fee (but not the initial TPS application fee) when filing a TPS re-registration application, the applicant may decide to wait to request an EAD, and therefore not pay the Application for Employment Authorization (Form I–765) fee until after USCIS has approved the individual's TPS re-registration, if he or she is eligible. If you choose to do this, you would file the Application for Temporary Protected Status (Form I–821) with the fee and the Application

HaitiTPSAR000068

for Employment Authorization (Form I–765) without the fee and without requesting an EAD.

**Mailing Information**

Mail your application for TPS to the proper address in Table 1.

TABLE 1—MAILING ADDRESSES

| If . . . | Mail to . . . |
|---|---|
| You live in Florida ...................................................................... | *U.S. Postal Service:* U.S. Citizenship and Immigration Services, Attn: Haiti TPS, P.O. Box 4464, Chicago, IL 60680. *Non-U.S. Postal Delivery Service:* U.S. Citizenship and Immigration Services, Attn: Haiti TPS, 131 S. Dearborn—3rd Floor, Chicago, IL 60603. |
| You live in the State of New York ........................................... | *U.S. Postal Service:* U.S. Citizenship and Immigration Services, Attn: Haiti TPS, P.O. Box 660167, Dallas, TX 75266. *Non-U.S. Postal Delivery Service:* U.S. Citizenship and Immigration Services, Attn: Haiti TPS, 2501 S. State Highway, 121 Business Suite 400, Lewisville, TX 75067. |
| You live in any other state ..................................................... | *U.S. Postal Service:* U.S. Citizenship and Immigration Services, Attn: Haiti TPS, P.O. Box 24047, Phoenix, AZ 85074. *Non-U.S. Postal Delivery Service:* U.S. Citizenship and Immigration Services, Attn: Haiti TPS, 1820 E. Skyharbor Circle S, Suite 100, Phoenix, AZ 85034. |

If you were granted TPS by an Immigration Judge (IJ) or the Board of Immigration Appeals (BIA) and you wish to request an EAD or are re-registering for the first time following a grant of TPS by an IJ or the BIA, please mail your application to the appropriate mailing address in Table 1. Upon receiving a Notice of Action (Form I–797) from USCIS, please send an email to the appropriate USCIS Service Center handling your application providing the receipt number and stating that you submitted a re-registration and/or request for an EAD based on an IJ/BIA grant of TPS. If your USCIS receipt number begins with the letters ''LIN,'' please email the Nebraska Service Center at *TPSijgrant.nsc@uscis.dhs.gov*. If your USCIS receipt number begins with the letters ''WAC,'' please email the California Service Center at *TPSijgrant.csc@uscis.dhs.gov*. You can find detailed information on what further information you need to email and the email addresses on the USCIS TPS Web page at *http://www.uscis.gov/tps*.

**E-Filing**

You cannot electronically file your application when re-registering or submitting an initial registration for Haiti TPS. Please mail your application to the mailing address listed in Table 1.

**Employment Authorization Document (EAD)**

*How can I obtain information on the status of my EAD request?*

To obtain case status information about your TPS application, including the status of a request for an EAD, you can check Case Status Online, available at the USCIS Web site at *http://www.uscis.gov,* or call the USCIS National Customer Service Center at 800–375–5283 (TTY 800–767–1833). If your Form I–765 Application for Employment Authorization has been pending for more than 90 days, and you still need assistance, you may request an EAD inquiry appointment with USCIS by using the InfoPass system at *https://infopass.uscis.gov*. However, we strongly encourage you first to check Case Status Online or call the USCIS National Customer Service Center for

assistance before making an InfoPass appointment.

*Am I eligible to receive an automatic 6-month extension of my current EAD through July 22, 2016?*

Provided that you currently have TPS under the designation of Haiti, this Notice automatically extends your EAD by 6 months if you:

• Are a national of Haiti (or an alien having no nationality who last habitually resided in Haiti);

• Received an EAD under the last extension of TPS for Haiti; and

• Have an EAD with a marked expiration date of January 22, 2016, bearing the notation ''A–12'' or ''C–19'' on the face of the card under ''Category.''

Although this Notice automatically extends your EAD through July 22, 2016, you must re-register timely for TPS in accordance with the procedures described in this Notice if you would like to maintain your TPS.

*When hired, what documentation may I show to my employer as proof of employment authorization and identity when completing Employment Eligibility Verification (Form I–9)?*

You can find a list of acceptable document choices on the ''Lists of Acceptable Documents'' for Employment Eligibility Verification (Form I–9). You can find additional detailed information on the USCIS I–9 Central Web page at *http://www.uscis.gov/I-9Central*. Employers are required to verify the identity and employment authorization of all new employees by using Employment Eligibility Verification (Form I–9). Within 3 days of hire, an employee must present proof of identity and employment authorization to his or her employer.

You may present any document from List A (reflecting both your identity and employment authorization) or one document from List B (reflecting identity) together with one document from List C (reflecting employment authorization). You may present an acceptable receipt for List A, List B, or List C documents as described in the Form I–9 Instructions. An acceptable receipt is one that shows an employee has applied to replace a document that was lost, stolen or damaged. If you present this receipt, you must present your employer with the actual document within 90 days. An EAD is an acceptable document under ''List A.'' Employers may not reject a document based on a future expiration date.

If your EAD has an expiration date of January 22, 2016, and states ''A–12'' or ''C–19'' under ''Category,'' it has been extended automatically for 6 months by virtue of this **Federal Register** Notice, and you may choose to present your EAD to your employer as proof of identity and employment authorization for Employment Eligibility Verification (Form I–9) through July 22, 2016 (see the subsection titled ''*How do my employer and I complete the Employment Eligibility Verification (Form I–9) using an automatically extended EAD for a new job?*'' for further information). To minimize confusion over this extension at the time of hire, you should explain to your employer that USCIS has automatically extended your EAD through July 22, 2016, based on your Temporary Protected Status. You are also strongly encouraged, although not required, to show your employer a copy of this **Federal Register** Notice confirming the automatic extension of employment authorization through July 22, 2016. As an alternative to presenting your

automatically extended EAD, you may choose to present any other acceptable document from List A, or a combination of one selection from List B and one selection from List C.

*What documentation may I show my employer if I am already employed but my current TPS-related EAD is set to expire?*

Even though EADs with an expiration date of January 22, 2016, that state ''A–12'' or ''C–19'' under ''Category'' have been automatically extended for 6 months by this **Federal Register** Notice, your employer will need to ask you about your continued employment authorization once January 22, 2016, is reached to meet its responsibilities for Employment Eligibility Verification (Form I–9). Your employer does not need a new Form I–9 to reverify your employment authorization until July 22, 2016, the expiration date of the automatic extension, but may need to reinspect your automatically extended EAD to check the expiration date and code in order to record the updated expiration date on your Form I–9 if your employer did not keep a copy of this EAD at the time you initially presented it. You and your employer must make corrections to the employment authorization expiration dates in Section 1 and Section 2 of Employment Eligibility Verification (Form I–9) (see the subsection titled ''*What corrections should my current employer and I make to Employment Eligibility Verification (Form I–9) if my EAD has been automatically extended?*'' for further information). You are also strongly encouraged, although not required, to show this **Federal Register** Notice to your employer to explain what to do for Employment Eligibility Verification (Form I–9).

By July 22, 2016, the expiration date of the automatic extension, your employer must reverify your employment authorization. At that time, you must present any unexpired document from List A or any unexpired document from List C on Employment Eligibility Verification (Form I–9) to reverify employment authorization, or an acceptable List A or List C receipt described in the Form I–9 instructions. Your employer is required to reverify on Employment Eligibility Verification (Form I–9) the employment authorization of current employees upon the automatically extended expiration date of a TPS-related EAD, which is July 22, 2016, in this case. Your employer should use either Section 3 of the Employment Eligibility Verification (Form I–9) originally completed for the employee or, if this

section has already been completed or if the version of Employment Eligibility Verification (Form I–9) is no longer valid, complete Section 3 of a new Employment Eligibility Verification (Form I–9) using the most current version. Note that your employer may not specify which List A or List C document employees must present, and cannot reject an acceptable receipt. An acceptable receipt is one that shows an employee has applied to replace a document that was lost, stolen or damaged.

*Can my employer require that I produce any other documentation to prove my current TPS status, such as proof of my Haitian citizenship or proof that I have re-registered for TPS?*

No. When completing Employment Eligibility Verification (Form I–9), including reverifying employment authorization, employers must accept any documentation that appears on the ''Lists of Acceptable Documents'' for Employment Eligibility Verification (Form I–9) that reasonably appears to be genuine and that relates to you or an acceptable List A, List B, or List C receipt. Employers may not request documentation that does not appear on the ''Lists of Acceptable Documents.'' Therefore, employers may not request proof of Haitian citizenship or proof of re-registration for TPS when completing Employment Eligibility Verification (Form I–9) for new hires or reverifying the employment authorization of current employees. Refer to the Note to Employees section of this Notice for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or immigration status, or your national origin. Note that although you are not required to provide your employer with a copy of this **Federal Register** notice, you are strongly encouraged to do so to help avoid confusion.

*What happens after July 22, 2016, for purposes of employment authorization?*

After July 22, 2016, employers may no longer accept the EADs that this **Federal Register** Notice automatically extended. Before that time, however, USCIS will endeavor to issue new EADs to eligible TPS re-registrants who request them. These new EADs will have an expiration date of July 22, 2017, and can be presented to your employer for completion of Employment Eligibility Verification (Form I–9). Alternatively, you may choose to present any other legally acceptable document or

HaitiTPSAR000070

combination of documents listed on the Employment Eligibility Verification (Form I–9).

*How do my employer and I complete Employment Eligibility Verification (Form I–9) using an automatically extended EAD for a new job?*

When using an automatically extended EAD to complete Employment Eligibility Verification (Form I–9) for a new job prior to July 22, 2016, you and your employer should do the following:

1. For Section 1, you should:
a. Check ''An alien authorized to work;''
b. Write the automatically extended EAD expiration date (July 22, 2016) in the first space; and
c. Write your alien number (USCIS number or A-number) in the second space (your EAD or other document from DHS will have your USCIS number or A-number printed on it; the USCIS number is the same as your A-number without the A prefix).

2. For Section 2, employers should record the:
a. Document title;
b. Issuing authority;
c. Document number; and
d. Automatically extended EAD expiration date (July 22, 2016).

By July 22, 2016, employers must reverify the employee's employment authorization in Section 3 of the Employment Eligibility Verification (Form I–9).

*What corrections should my current employer and I make to Employment Eligibility Verification (Form I–9) if my EAD has been automatically extended?*

If you are an existing employee who presented a TPS-related EAD that was valid when you first started your job but that EAD has now been automatically extended, your employer may reinspect your automatically extended EAD if the employer does not have a photocopy of the EAD on file, and you and your employer should correct your previously completed Employment Eligibility Verification (Form I–9) as follows:

1. For Section 1, you should:
a. Draw a line through the expiration date in the first space;
b. Write ''July 22, 2016'' above the previous date;
c. Write ''TPS Ext.'' in the margin of Section 1; and
d. Initial and date the correction in the margin of Section 1.

2. For Section 2, employers should:
a. Draw a line through the expiration date written in Section 2;
b. Write ''July 22, 2016'' above the previous date;

c. Write ''EAD Ext.'' in the margin of Section 2; and
d. Initial and date the correction in the margin of Section 2.

By July 22, 2016, when the automatic extension of EADs expires, employers must reverify the employee's employment authorization in Section 3.

*If I am an employer enrolled in E-Verify, what do I do when I receive a ''Work Authorization Documents Expiration'' alert for an automatically extended EAD?*

If you are an employer who participates in E-Verify and you have an employee who is a TPS beneficiary who provided a TPS-related EAD when he or she first started working for you, you will receive a ''Work Authorization Documents Expiring'' case alert when this EAD is about to expire. Usually, this message is an alert to complete Section 3 of the Employment Eligibility Verification (Form I–9) to reverify an employee's employment authorization. For existing employees with TPS-related EADs that have been automatically extended, employers should dismiss this alert by clicking the red ''X'' in the ''dismiss alert'' column and follow the instructions above explaining how to correct the Employment Eligibility Verification (Form I–9). By July 22, 2016, employment authorization must be reverified in Section 3. Employers should never use E-Verify for reverification.

**Note to All Employers**

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This Notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY 877–875–6028) or email USCIS at *I-9Central@dhs.gov*. Calls and emails are accepted in English and many other languages. For questions about avoiding discrimination during the employment eligibility verification process, employers may also call the U.S. Department of Justice, Office of Special Counsel for Immigration-Related Unfair Employment Practices (OSC) Employer Hotline, at 800–255–8155 (TTY 800–237–2515), which offers language interpretation in numerous languages, or email OSC at *osccrt@ usdoj.gov*.

**Note to Employees**

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY 877–875–6028) or email at *I-9Central@dhs.gov*. Calls are accepted in English and many other languages. Employees or applicants may also call the U.S. Department of Justice, Office of Special Counsel for Immigration-Related Unfair Employment Practices (OSC) Worker Information Hotline at 800–255–7688 (TTY 800–237–2515) for information regarding employment discrimination based upon citizenship status, immigration status, or national origin, or for information regarding discrimination related to Employment Eligibility Verification (Form I–9) and E-Verify. The OSC Worker Information Hotline provides language interpretation in numerous languages.

To comply with the law, employers must accept any document or combination of documents from the Lists of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee, or an acceptable List A, List B, or List C receipt described in the Employment Eligibility Verification (Form I–9) Instructions. Employers may not require extra or additional documentation beyond what is required for Employment Eligibility Verification (Form I–9) completion. Further, employers participating in E-Verify who receive an E-Verify case result of ''Tentative Nonconfirmation'' (TNC) must promptly inform employees of the TNC and give such employees an opportunity to contest the TNC. A TNC case result means that the information entered into E-Verify from Employment Eligibility Verification (Form I–9) differs from records available to DHS or the Social Security Administration.

Employers may not terminate, suspend, delay training, withhold pay, lower pay, or take any adverse action against an employee based on the employee's decision to contest a TNC or because the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result is received when E-Verify cannot verify an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY 877–875–6028). An employee that believes he or she was discriminated against by an employer in the E-Verify process based on citizenship or immigration status or based on national origin, may contact OSC's Worker

HaitiTPSAR000071

Information Hotline at 800–255–7688 (TTY 800–237–2515). Additional information about proper nondiscriminatory Employment Eligibility Verification (Form I–9) and E-Verify procedures is available on the OSC Web site at *http://www.justice.gov/crt/about/osc/* and the USCIS Web site at *http://www.dhs.gov/E-verify*.

### Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)

While Federal Government agencies must follow the guidelines laid out by the Federal Government, State and local government agencies establish their own rules and guidelines when granting certain benefits. Each State may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, State, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary and/or show you are authorized to work based on TPS. Examples are:

(1) Your unexpired EAD;

(2) A copy of this **Federal Register** Notice if your EAD is automatically extended under this Notice;

(3) A copy of your Application for Temporary Protected Status Notice of Action (Form I–797) for this re-registration;

(4) A copy of your past or current Application for Temporary Protected Status Approval Notice (Form I–797), if you received one from USCIS; and/or

(5) If there is an automatic extension of work authorization, a copy of the fact sheet from the USCIS TPS Web site that provides information on the automatic extension.

Check with the government agency regarding which document(s) the agency will accept. You may also provide the agency with a copy of this **Federal Register** Notice.

Some benefit-granting agencies use the USCIS Systematic Alien Verification for Entitlements Program (SAVE) to verify the current immigration status of applicants for public benefits. If such an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted upon or will act upon a SAVE verification and you do not believe the response is correct, you may make an InfoPass appointment for an in-person interview at a local USCIS office. Detailed information on how to make

corrections, make an appointment, or submit a written request to correct records under the Freedom of Information Act can be found at the SAVE Web site at *http://www.uscis.gov/save,* then by choosing ''How to Correct Your Records'' from the menu on the right.

[FR Doc. 2015–21006 Filed 8–24–15; 8:45 am]

**BILLING CODE 9111–97–P**

---

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**[Docket No. FR–5835–N–10]**

### Notice of Proposed Information Collection: Comment Request; FHA Insured Title I Property Improvement and Manufactured Home Loan Programs

**AGENCY:** Office of the Assistant Secretary for Housing—Federal Housing Commissioner, HUD.

**ACTION:** Notice.

---

**SUMMARY:** The proposed information collection requirement described below will be submitted to the Office of Management and Budget (OMB) for review, as required by the Paperwork Reduction Act. The Department is soliciting public comments on the subject proposal.

**DATES:** *Comments Due Date: October 26, 2015.*

**ADDRESSES:** Interested persons are invited to submit comments regarding this proposal. Comments should refer to the proposal by name and/or OMB Control Number and should be sent to: Reports Liaison Officer, Department of Housing and Urban Development, 451 7th Street SW., Washington, DC 20410, Room 9120 or the number for the Federal Information Relay Service (1–800–877–8339).

**FOR FURTHER INFORMATION CONTACT:** Kevin Stevens, Director, Home Mortgage Insurance Division, Office of Single Family Program Development, Department of Housing and Urban Development, 451 7th Street SW., Washington, DC 20410, telephone (202) 708–2121 (this is not a toll free number) for copies of the proposed forms and other available information.

**SUPPLEMENTARY INFORMATION:** This notice informs the public that HUD is seeking approval from OMB for the information collection described in Section A.

### A. Overview of Information Collection

*Title of Information Collection:* Title I Property Improvement and Manufactured Home Loan Programs.

*OMB Control Number, if applicable:* 2502–0328.

*Type of Request:* Extension of currently approved collection.

*Description of the need for the information and proposed use:* Title I loans are made by private sector lenders and insured by HUD against loss from defaults. HUD uses this information to evaluate individual lenders on their overall program performance. The information collected is used to determine insurance eligibility and claim eligibility.

*Agency form numbers, if applicable:* HUD–637, 646, 27030, 55013, 55014, 56001, 56001–MH, 56002, 56002–MH, & SF 3881.

*Respondents:*

• Lenders approved to make insured Title I loans

• Dealers/Contractors

• Manufacturers of manufactured homes

• Applicants for property improvement loans

• Applicants for manufactured home loans

*Estimation of the total numbers of hours needed to prepare the information collection:*

*Estimated Number of Respondents:* 10,733.

*Estimated Number of Responses:* 59,790.

*Frequency of Response:* 1.

*Average Hours per Response:* 17.03.

*Total Estimated Burdens:* 43,049.

### B. Solicitation of Public Comment

This notice is soliciting comments from members of the public and affected parties concerning the collection of information described in Section A on the following:

(1) Whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility; (2) The accuracy of the agency's estimate of the burden of the proposed collection of information; (3) Ways to enhance the quality, utility, and clarity of the information to be collected; and (4) Ways to minimize the burden of the collection of information on those who are to respond; including through the use of appropriate automated collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

HUD encourages interested parties to submit comment in response to these questions.

### C. Authority

Section 3507 of the Paperwork Reduction Act of 1995, 44 U.S.C. Chapter 35.

HaitiTPSAR000072

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary:* Individuals or Households. Form I–854 A—Law enforcement agencies (LEAs) use Form I–854A to request an alien witness and/ or informant receive classification as an S nonimmigrant. Form I–854B—LEAs use Form I–854B to request an alien in S nonimmigrant status be permitted to apply for adjustment of status to adjust to lawful permanent resident (LPR) status under section 245(j) of the Immigration and Nationality Act (INA).

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* Form I–854A—150 responses at 3 hours per response, and Form I–854B—150 responses at 1 hour per response.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 600 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $0.

Dated: May 19, 2017.

**Jerry Rigdon,**

*Deputy Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security.*

[FR Doc. 2017–10649 Filed 5–23–17; 8:45 am]

**BILLING CODE 9111–97–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

**[CIS No. 2596–16; DHS Docket No. USCIS–2014–0001]**

**RIN 1615–ZB63**

**Extension of the Designation of Haiti for Temporary Protected Status**

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** Through this Notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is extending the designation of Haiti for Temporary Protected Status (TPS) for 6 months, from July 23, 2017, through January 22, 2018. The Secretary has determined that a limited, 6-month extension is warranted because,

although Haiti has made significant progress in recovering from the January 2010 earthquake that prompted its initial designation, conditions in Haiti supporting its designation for TPS continue to be met at this time. The Secretary is committed to making TPS determinations that fully comply with the Immigration and Nationality Act and the intent of the program to provide a temporary form of immigration relief and protection to eligible individuals who cannot return to their home country due to ongoing armed conflict, environmental disasters, or other extraordinary and temporary conditions. This Notice also sets forth procedures necessary for nationals of Haiti (or aliens having no nationality who last habitually resided in Haiti) to re-register for TPS and to apply for renewal of their Employment Authorization Documents (EAD) with U.S. Citizenship and Immigration Services (USCIS). USCIS will issue EADs with a January 22, 2018 expiration date to eligible Haiti TPS beneficiaries who timely re-register and apply for EADs under this extension. Provided a Haiti TPS beneficiary timely re-registers and properly files an application for an EAD during the 60-day re-registration period, his or her employment authorization will be automatically extended for an additional period not to exceed 180 days from the date the current EAD expires, *i.e.,* January 18, 2018. *See* 8 CFR 274a.13(d)(1). TPS beneficiaries are reminded that, prior to January 22, 2018, the Secretary will re-evaluate the designation for Haiti and decide anew whether extension, redesignation, or termination is warranted. During this period, beneficiaries are encouraged to prepare for their return to Haiti in the event Haiti's designation is not extended again, including requesting updated travel documents from the Government of Haiti.

**DATES:** *Extension of Designation of Haiti for TPS:* The 6-month extension of the TPS designation of Haiti is effective July 23, 2017, and will remain in effect through January 22, 2018. The 60-day re-registration period runs from May 24, 2017 through July 24, 2017.

**FOR FURTHER INFORMATION CONTACT:**

• For further information on TPS, including guidance on the application process and additional information on eligibility, please visit the USCIS TPS Web page at *http://www.uscis.gov/tps.* You can find specific information about Haiti's TPS extension by selecting ''Haiti'' from the menu on the left side of the TPS Web page.

• You can also contact Guillermo Roman-Riefkohl, TPS Operations

Program Manager, at the Waivers and Temporary Services Branch, Service Center Operations Directorate, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Washington, DC 20529–2060; or by phone at 202–272–1533 (this is not a toll-free number).

**Note:** The phone number provided here is solely for questions regarding this TPS Notice. It is not for individual case status inquiries.

• Applicants seeking information about the status of their individual cases can check Case Status Online, available at the USCIS Web site at *http:// www.uscis.gov,* or call the USCIS National Customer Service Center at 800–375–5283 (TTY 800–767–1833). Service is available in English and Spanish.

• Further information will also be available at local USCIS offices upon publication of this Notice.

**SUPPLEMENTARY INFORMATION:**

**Table of Abbreviations**

BIA—Board of Immigration Appeals
DHS—Department of Homeland Security
DOS—Department of State
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
IJ—Immigration Judge
INA—Immigration and Nationality Act
IER—U.S. Department of Justice Civil Rights Division, Immigrant and Employee Rights Section
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TNC—Tentative Nonconfirmation
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services

The extension allows TPS beneficiaries to maintain TPS through January 22, 2018, so long as they continue to meet the eligibility requirements for TPS. The Secretary has determined that an extension is warranted because the conditions in Haiti that prompted the TPS designation, while significantly improved, continue to be met. There continue to be extraordinary and temporary conditions in Haiti that prevent Haitian nationals (or aliens having no nationality who last habitually resided in Haiti) from returning to Haiti in safety. The Secretary also has determined that permitting such Haitian nationals to continue to remain in the United States, at this time, is not contrary to the national interest of the United States.

TPS beneficiaries are reminded that, prior to the conclusion of this six-month

HaitiTPSAR000073

extension period, the Secretary will re-evaluate Haiti's TPS designation and decide anew whether extension, redesignation, or termination is warranted. Because the designation of TPS was intended by Congress to be temporary in nature, and because the Government of Haiti has expressed a desire for its nationals to return to Haiti, the Secretary will fully re-evaluate the country conditions and any other factors he deems necessary to determine whether Haiti's TPS designation should continue. Among those factors, the Secretary will consider whether permitting Haitian nationals to remain in the United States is contrary to the national interest of the United States.

Thus, during this limited six-month period, beneficiaries are encouraged to prepare for their return to Haiti, including requesting updated travel documents from the Government of Haiti. The Secretary is committed to working with the Government of Haiti to ensure an orderly transition should Haiti's TPS designation be terminated at the conclusion of this limited six-month extension.

Re-registration is limited to persons who have previously registered for TPS under the designation of Haiti and whose applications have been granted. Certain nationals of Haiti (or aliens having no nationality who last habitually resided in Haiti) who have not previously applied for TPS may be eligible to apply under the late initial registration provisions if they meet (1) at least one of the late initial filing criteria in 8 CFR 244.2(f)(2), which are also described on the TPS Web page at *https://www.uscis.gov/humanitarian/temporary-protected-status,* and (2) all TPS eligibility criteria (including continuous residence in the United States since January 12, 2011, and continuous physical presence in the United States since July 23, 2011).

For individuals who have already been granted TPS under Haiti's designation, the 60-day re-registration period runs from May 24, 2017 through July 24, 2017. USCIS will issue EADs with a January 22, 2018 expiration date to eligible Haiti TPS beneficiaries who timely re-register and apply for EADs under this extension. Given the timeframes involved with processing TPS re-registration applications, DHS recognizes that not all re-registrants will receive new EADs before their current EADs expire on July 22, 2017. But provided a Haiti TPS beneficiary timely re-registers and properly files an application for an EAD during the 60-day re-registration period, his or her employment authorization will be automatically extended for an additional period not to exceed 180 days from the date the current EAD expires, *i.e.,* January 18, 2018. This notice explains how TPS beneficiaries and their employers may determine whether a beneficiary's employment authorization has been automatically extended and the impact on the Employment Eligibility Verification (Form I–9) and E-Verify processes. There are approximately 46,000 current Haiti TPS beneficiaries who are expected to file for re-registration under the extension.

## What is Temporary Protected Status (TPS)?

• TPS is a temporary immigration status granted to eligible nationals of a country designated for TPS under the Immigration and Nationality Act (INA), or to eligible persons without nationality who last habitually resided in the designated country.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to work and obtain EADs so long as they continue to meet the requirements of TPS.

• TPS beneficiaries may also be granted travel authorization as a matter of discretion.

• The granting of TPS does not result in or lead to lawful permanent resident status.

• When the Secretary terminates a country's TPS designation, beneficiaries return to the same immigration status they maintained before TPS, if any (unless that status has since expired or been terminated), or to any other lawfully obtained immigration status they received while registered for TPS.

## When was Haiti designated for TPS?

On January 21, 2010, the Secretary designated Haiti for TPS based on extraordinary and temporary conditions within the country, specifically the effects of the 7.0-magnitude earthquake that occurred on January 12, 2010. *See Designation of Haiti for Temporary Protected Status,* 75 FR 3476 (Jan. 21, 2010). In 2011, the Secretary both extended Haiti's designation and redesignated Haiti for TPS for 18 months through January 22, 2013. *See Extension and Redesignation of Haiti for Temporary Protected Status,* 76 FR 29000 (May 19, 2011). This announcement is the fourth extension of TPS for Haiti since the 2011 redesignation. The Secretary last extended Haiti's designation on August 25, 2015. *See Extension of the Designation of Haiti for Temporary* *Protected Status,* 80 FR 51582 (Aug. 25, 2015).

## What authority does the Secretary of Homeland Security have to extend the designation of Haiti for TPS?

Section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1), authorizes the Secretary, after consultation with appropriate agencies of the U.S. Government, to designate a foreign state (or part thereof) for TPS if the Secretary finds that certain country conditions exist.[1] The Secretary may then grant TPS to eligible nationals of that foreign state (or eligible aliens having no nationality who last habitually resided in the designated country). *See* INA section 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a country's TPS designation or extension, the Secretary, after consultation with appropriate U.S. Government agencies, must review the conditions in a foreign state designated for TPS to determine whether the conditions for the TPS designation continue to be met. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If following this review the Secretary determines that a foreign state continues to meet the conditions for TPS designation (or makes no determination at all), the designation must be extended for an additional period of 6 months or, in the Secretary's discretion, for an additional 12 or 18 months. *See* INA section 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

## Why is the Secretary extending the TPS designation for Haiti through January 22, 2018?

Since the last extension was announced, DHS has reviewed conditions in Haiti. Based on this review and after consulting with DOS, the Secretary has determined that a limited, 6-month extension is warranted because, although Haiti has made significant progress in recovering from the January 2010 earthquake that prompted its initial designation, conditions in Haiti supporting its designation for TPS persist.

---

[1] As of March 1, 2003, in accordance with section 1517 of title XV of the Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135, any reference to the Attorney General in a provision of the INA describing functions transferred from the Department of Justice to DHS ''shall be deemed to refer to the Secretary'' of Homeland Security. *See* 6 U.S.C. 557 (codifying the Homeland Security Act of 2002, title XV, section 1517).

Although lingering effects of the 2010 earthquake remain, Haiti has made significant progress in addressing issues specific to the earthquake, as its economy continues to recover and grow. For example, 96% of people displaced by the earthquake and living in internally displaced person (IDP) camps have left those camps. Over 98% of the IDP camps have closed. However, over 55,000 Haitians who lost their homes in the earthquake are still living in 31 camps for internally displaced persons without viable options to leave. Gender-based violence in these camps continues to be a serious concern, and personal security is a serious and pervasive issue. Some people who were displaced by the earthquake, although no longer in camps, have moved back to unsafe homes or relocated to informal settlements located in hazardous areas. However, demonstrating improvement in Haiti's security situation, in March 2017, the United Nations announced that the mandate of the United Nations peacekeeping mission in Haiti will end in October 2017, to be replaced by a new police-only mission focused on rule of law.

Hurricane Matthew made landfall in Haiti on October 4, 2016, causing extensive damage to crops, housing, livestock, and infrastructure across Haiti's southwest peninsula. The Government of Haiti confirmed 546 fatalities from the storm, and over 175,000 people were left without housing. The most significant impact from the storm was concentrated in 3 of Haiti's 10 departments—Nippes, Grand'Anse, and Sud. Minimal damage was inflicted on the rest of the country, including the capital, Port-au-Prince, and the second largest city, Cap-Haïtien. Still, significant losses of crops and livestock in the regions damaged by Hurricane Matthew impacted the entire country.

Heavy rains in late April 2017 caused flooding and landslides in South, South East, Grand'Anse, and Nippes departments, with South department most impacted. At least four people were killed, nearly 10,000 homes may have been damaged, and at least 350,000 people may have been affected. According to a Haitian government official, an estimated 80% of the spring harvest in South department may have been destroyed. The damage from Hurricane Matthew and the recent heavy rains are compounding the existing food insecurity experienced by an estimated 3.2 million people (approximately 30 percent of the population) in September 2016.

Haiti's weak public health system is further strained due to an ongoing cholera epidemic, whose inception was traced to U.N. peacekeepers assisting with earthquake recovery. Since October 2010, close to 800,000 Haitians have contracted cholera, and nearly 10,000 people have died from the disease. However, progress has been made in combatting cholera, and Haiti has made some progress in the health sector in recent years. Nevertheless, Haiti faces longstanding public health challenges, where 40% of the population lacked access to basic health services before the 2010 earthquake. As of 2016, this figure remains the same—40% of the population lacks access to fundamental health and nutrition services. While the lack of access to safe drinking water and Haiti's weak sanitation infrastructure remain significant concerns, these are not new problems. Extreme poverty, corruption, and low levels of education in Haiti challenge its resilience and have contributed to the government's longstanding inability to adequately provide for the security, health, and safety of its citizenry.

Based upon this review and after consultation with appropriate U.S. Government agencies, the Secretary has determined that:

• The conditions that prompted the July 23, 2011 redesignation of Haiti for TPS continue to be met. *See* INA section 244(b)(3)(A) and (C), 8 U.S.C. 1254a(b)(3)(A) and (C).

• There continue to be extraordinary and temporary conditions in Haiti that prevent Haitian nationals (or aliens having no nationality who last habitually resided in Haiti) from returning to Haiti in safety. *See* INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).

• It is not contrary to the national interest of the United States to permit Haitians (or aliens having no nationality who last habitually resided in Haiti) who meet the eligibility requirements of TPS to remain in the United States temporarily. *See* INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).

• The designation of Haiti for TPS should be extended for a 6-month period from July 23, 2017, through January 22, 2018. *See* INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C).

• It is in the best interest of TPS beneficiaries to prepare for their return to Haiti in the event that Haiti's TPS designation is not extended again, including requesting updated travel documents from the Government of Haiti.

**Notice of Extension of the TPS Designation of Haiti**

By the authority vested in me as Secretary under INA section 244, 8 U.S.C. 1254a, I have determined, after consultation with the appropriate U.S. Government agencies, that the conditions that prompted the redesignation of Haiti for TPS on July 23, 2011, continue to be met. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). On the basis of this determination, I am extending the existing designation of Haiti for TPS for 6 months, from July 23, 2017, through January 22, 2018. *See* INA section 244(b)(1)(C) and (b)(2), 8 U.S.C. 1254a(b)(1)(C) and (b)(2).

**John F. Kelly,**
*Secretary.*

**Required Application Forms and Application Fees To Register or Re-Register for TPS**

To register or re-register for TPS based on the designation of Haiti, an applicant must submit each of the following two applications:

1. Application for Temporary Protected Status (Form I–821).

• If you are filing an application for late initial registration, you must pay the fee for the Application for Temporary Protected Status (Form I–821). *See* 8 CFR 244.2(f)(2) and 244.6 and information on late initial filing on the USCIS TPS Web page at *http://www.uscis.gov/tps.*

• If you are filing an application for re-registration, you do not need to pay the fee for the Application for Temporary Protected Status (Form I–821). *See* 8 CFR 244.17.

2. Application for Employment Authorization (Form I–765).

• If you are applying for late initial registration and want an EAD, you must pay the fee (or request a fee waiver) for the Application for Employment Authorization (Form I–765) only if you are age 14 through 65. No fee for the Application for Employment Authorization (Form I–765) is required if you are under the age of 14 or are age 66 or older and applying for late initial registration.

• If you are applying for re-registration, you must pay the fee (or request a fee waiver) for the Application for Employment Authorization (Form I–765) only if you want an EAD, regardless of age.

• You do not pay the fee for the Application for Employment Authorization (Form I–765) if you are not requesting an EAD, regardless of whether you are applying for late initial registration or re-registration.

• If you do not want to request an EAD now, you may also file Form I–765 later to request an EAD, and pay the fee (or request a fee waiver), provided that

HaitiTPSAR000075

you still have TPS or a pending TPS application. Your EAD application will be considered timely filed even if the date on your current TPS-related EAD has expired. But until you timely re-register and properly file an EAD application, your current employment authorization will end on July 22, 2017. Accordingly, you must also properly file your EAD application during the 60-day re-registration period in order for your current employment authorization to be automatically extended for 180 days (*i.e.,* Janaury 18, 2018). You are strongly encouraged to file your EAD application as early as possible during the 60-day re-registration period to avoid lapses in your employment authorization.

You must submit both completed application forms together, even if you are not currently requesting an EAD. If you are unable to pay for the Application for Employment Authorization (Form I–765) and/or biometric services fee, you may apply for a fee waiver by completing a Request for Fee Waiver (Form I–912) or submitting a personal letter requesting a fee waiver, and by providing satisfactory supporting documentation. For more information on the application forms and fees for TPS, please visit the USCIS TPS Web page at *http://www.uscis.gov/tps.* Fees for the Application for Temporary Protected Status (Form I–821), the Application for Employment Authorization (Form I–765), and

biometric services are also described in 8 CFR 103.7(b)(1)(i).

**Biometric Services Fee**

Biometrics (such as fingerprints) are required for all applicants 14 years of age or older. Those applicants must submit a biometric services fee. As previously stated, if you are unable to pay for the biometric services fee, you may apply for a fee waiver by completing a Request for Fee Waiver (Form I–912) or by submitting a personal letter requesting a fee waiver, and providing satisfactory supporting documentation. For more information on the biometric services fee, please see the Instructions to Form I–821 or visit the USCIS Web site at *http://www.uscis.gov.* If necessary, you may be required to visit an Application Support Center (ASC) to have your biometrics captured. In such case, USCIS will send you an ASC scheduling notice.

**Re-Filing a Re-Registration TPS Application After Receiving a Denial of a Fee Waiver Request**

USCIS urges all re-registering applicants to file as soon as possible within the 60-day re-registration period so that USCIS can process the applications and issue EADs promptly. Filing early will also allow those applicants who may receive denials of their fee waiver requests to have time to re-file their applications before the re-

registration deadline. If, however, an applicant receives a denial of his or her fee waiver request and is unable to re-file by the re-registration deadline, the applicant may still re-file his or her application. This situation will be reviewed to determine whether the applicant has established good cause for late re-registration. However, applicants are urged to re-file within 45 days of the date on their USCIS fee waiver denial notice, if at all possible. *See* INA section 244(c)(3)(C); 8 U.S.C. 1254a(c)(3)(C); 8 CFR 244.17(c). For more information on good cause for late re-registration, visit the USCIS TPS Web page at *http://www.uscis.gov/tps.*

**Note:** As previously stated, although a re-registering TPS beneficiary age 14 or older must pay the biometric services fee (but not the initial TPS application fee) when filing a TPS re-registration application, the applicant may decide to wait to request an EAD, and therefore not pay the Application for Employment Authorization (Form I–765) fee until after USCIS has approved the individual's TPS re-registration, if he or she is eligible. If you choose to do this, you would file the Application for Temporary Protected Status (Form I–821) with the fee and the Application for Employment Authorization (Form I–765) without the fee and without requesting an EAD.

**Mailing Information**

Mail your application for TPS to the proper address in Table 1.

TABLE 1—MAILING ADDRESSES

| If . . . | Mail to . . . |
|---|---|
| You live in Florida ........................... | *For U.S. Postal Service:*<br>U.S. Citizenship and Immigration Services, P.O. Box 4464, Chicago, IL 60680.<br>*For FedEx, UPS, and DHL deliveries:*<br>U.S. Citizenship and Immigration Services, Attn: Haiti TPS, 131 S. Dearborn—3rd Floor, Chicago, IL 60603. |
| You live in the State of New York .. | *For U.S. Postal Service:*<br>U.S. Citizenship and Immigration Services, P.O. Box 660167, Dallas, TX 75266.<br>*For FedEx, UPS, and DHL deliveries:*<br>U.S. Citizenship and Immigration Services, Attn: Haiti TPS, 2501 S. State Highway, 121 Business Suite 400, Lewisville, TX 75067. |
| You live in any other state .............. | *For U.S. Postal Service:*<br>U.S. Citizenship and Immigration Services, P.O. Box 24047, Phoenix, AZ 85074.<br>*For FedEx, UPS, and DHL deliveries:*<br>U.S. Citizenship and Immigration Services, Attn: Haiti TPS, 1820 E. Skyharbor Circle S, Suite 100, Phoenix, AZ 85034. |

If you were granted TPS by an Immigration Judge (IJ) or the Board of Immigration Appeals (BIA) and you wish to request an EAD or are re-registering for the first time following a grant of TPS by an IJ or the BIA, please mail your application to the appropriate address in Table 1. When submitting a re-registration application and/or requesting an EAD based on an IJ/BIA grant of TPS, please include a copy of

the IJ or BIA order granting you TPS with your application. This will aid in the verification of your grant of TPS and processing of your application, as USCIS may not have received records of your grant of TPS by either the IJ or the BIA.

**Supporting Documents**

*What type of basic supporting documentation must I submit?*

To meet the basic eligibility requirements for TPS, you must submit evidence that you:

• Are a national of Haiti or an alien having no nationality who last habitually resided in Haiti. Such documents may include a copy of your

passport if available, other documentation issued by the Government of Haiti showing your nationality (*e.g.,* national identity card, official travel documentation issued by the Government of Haiti), and/or your birth certificate with English translation accompanied by photo identification. USCIS will also consider certain forms of secondary evidence supporting your Haitian nationality. If the evidence presented is insufficient for USCIS to make a determination as to your nationality, USCIS may request additional evidence. If you cannot provide a passport, birth certificate with photo identification, or a national identity document with your photo or fingerprint, you must submit an affidavit showing proof of your unsuccessful efforts to obtain such documents and affirming that you are a national of Haiti. However, please be aware that an interview with an immigration officer will be required if you do not present any documentary proof of identity or nationality or if USCIS otherwise requests a personal appearance. *See* 8 CFR 103.2(b)(9), 244.9(a)(1);

• Have continuously resided in the United States since January 12, 2011. *See* INA section 244(c)(1)(A)(ii); 8 U.S.C. 1254a(c)(1)(A)(ii); 8 CFR 244.9(a)(2); and

• Have been continuously physically present in the United States since June 23, 2011. *See* INA sections 244(b)(2)(A), (c)(1)(A)(i); 8 U.S.C. 1254a(b)(2)(A), (c)(1)(A)(i).

The filing instructions on the Application for Temporary Protected Status (Form I–821) list all the documents needed to establish basic eligibility for TPS. You may also find information on the acceptable documentation and other requirements for applying for TPS on the USCIS Web site at *www.uscis.gov/tps* under "Haiti."

*Do I need to submit additional supporting documentation?*

If one or more of the questions listed in Part 4, Question 2 of the Application for Temporary Protected Status (Form I–821) applies to you, then you must submit an explanation on a separate sheet(s) of paper and/or additional documentation. Depending on the nature of the question(s) you are addressing, additional documentation alone may suffice, but usually a written explanation will also be needed.

**EAD**

*How can I obtain information on the status of my EAD request?*

To get case status information about your TPS application, including the status of a request for an EAD, you can check Case Status Online at *http:// www.uscis.gov,* or call the USCIS National Customer Service Center at 800–375–5283 (TTY 800–767–1833). If your Application for Employment Authorization (Form I–765) has been pending for more than 90 days and you still need assistance, you may request an EAD inquiry appointment with USCIS by using the InfoPass system at *https:// infopass.uscis.gov.* However, we strongly encourage you first to check Case Status Online or call the USCIS National Customer Service Center for assistance before making an InfoPass appointment.

*Am I eligible to receive an automatic extension of my current EAD through January 18, 2018?*

Provided that you currently have a Haiti TPS-based EAD, you may be eligible to have your employment authorization automatically extended to January 18, 2018 if you:
• Are a national of Haiti (or an alien having no nationality who last habitually resided in Haiti);
• Received an EAD under the designation of Haiti for TPS;
• Have an EAD with a marked expiration date of July 22, 2017, bearing the notation "A–12" or "C–19" on the face of the card under "Category";
• Timely re-registered for TPS during the 60-day re-registration period; and
• Properly filed an application for an EAD during the 60-day re-registration period.

Although you may be eligible to automatically extend your employment authorization through January 18, 2018, you must timely re-register for TPS in accordance with the procedures described in this Notice if you would like to maintain your TPS. You are strongly encouraged to file your EAD renewal application as early as possible during the 60-day re-registration period to avoid lapses in your employment authorization.

*When hired, what documentation may I show to my employer as proof of employment authorization and identity when completing Employment Eligibility Verification (Form I–9)?*

You can find a list of acceptable document choices on the "Lists of Acceptable Documents" for Form I–9. You can find additional detailed information about Form I–9 on the

USCIS I–9 Central Web page at *http:// www.uscis.gov/I–9Central.* Employers are required to verify the identity and employment authorization of all new employees by using Form I–9. Within 3 days of hire, an employee must present proof of identity and employment authorization to his or her employer.

You may present any document from List A (which reflect both identity and employment authorization), or one document from List B (which reflects your identity) together with one document from List C (which reflects employment authorization), or you may present an acceptable receipt for List A, List B, or List C documents as described in the Form I–9 Instructions. An EAD is an acceptable document under List A. Employers may not reject a document based on a future expiration date.

If your EAD has an expiration date of July 22, 2017, and states "A–12" or "C–19" under "Category," and you timely filed an EAD renewal application during the 60-day re-registration period, you may choose to present your EAD to your employer together with the Form I–797C Notice of Action (showing the qualifying eligibility category of either A12 or C19) as proof of identity and employment authorization for Form I–9 through January 18, 2018 (see the subsection titled "*How do my employer and I complete the Employment Eligibility Verification (Form I–9) on the basis of automatically extended employment authorization for a new job?*" for further information). To minimize confusion over this extension at the time of hire, you should explain to your employer that your employment authorization has been automatically extended through January 18, 2018. As an alternative to presenting evidence of your automatically extended employment authorization, you may choose to present any other acceptable document from List A, a combination of one selection from List B and one selection from List C, or a valid receipt.

*What documentation may I show my employer to complete Employment Verification (Form I–9) if I am already employed but my current TPS-related EAD is set to expire?*

Even though you may be eligible to have your employment authorization automatically extended, your employer will need to ask you about your continued employment authorization once July 22, 2017, is reached to meet its responsibilities for Form I–9. Your employer will need a new document to re-verify your employment authorization. Once presented, you and your employer must make corrections to the employment authorization

HaitiTPSAR000077

expiration dates in Section 1 and Section 2 of Form I–9 (see the subsection titled ''What corrections should my current employer and I make to Employment Eligibility Verification (Form I–9) if my employment authorization has been automatically extended?'' for further information). In addition, you may also show this **Federal Register** Notice to your employer to explain what to do for Form I–9.

If you file your Form I–765 to renew your current EAD, *and* you receive a USCIS receipt notice (Form I–797C) stating that your current ''A–12'' or ''C–19'' coded EAD is automatically extended for 180 days, you may show that receipt notice to your employer along with your EAD to confirm automatic extension of employment authorization through January 18, 2018, unless your TPS has been finally withdrawn or your request for TPS has been finally denied. To avoid delays in receiving the Form I–797C and a lapse in your employment authorization, you should file your EAD renewal application as early as possible during the re-registration period.

By January 18, 2018, the expiration date of the automatic extension, your employer must re-verify your employment authorization. At that time, you must present any document from List A or any document from List C on Form I–9 to re-verify employment authorization, or an acceptable List A or List C receipt described in the Form I–9 Instructions. Your employer should complete either Section 3 of the Form I–9 originally completed for you or, if this section has already been completed or if the version of Form I–9 has expired (check the date in the bottom left-hand corner of the form), complete Section 3 of a new Form I–9 using the most current version. Note that your employer may not specify which List A or List C document employees must present and cannot reject an acceptable receipt.

*Can my employer require that I provide any other documentation to prove my status, such as proof of my Haitian citizenship?*

No. When completing Form I–9, including re-verifying employment authorization, employers must accept any documentation that appears on the ''Lists of Acceptable Documents'' for Form I–9 that reasonably appears to be genuine and that relates to you, or an acceptable List A, List B, or List C receipt. Employers may not request documentation that does not appear on the ''Lists of Acceptable Documents.'' Therefore, employers may not request

proof of Haitian citizenship or proof of re-registration for TPS when completing Form I–9 for new hires or re-verifying the employment authorization of current employees. If the expired EAD with category A12 or C19 is presented with the Form I–797C Notice of Action as described herein, an employer should accept this document combination as a valid List A document so long as the EAD reasonably appears to be genuine and to relate to the employee. Refer to the Note to Employees section of this Notice for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or immigration status, or your national origin.

*How do my employer and I complete Employment Eligibility Verification (Form I–9) on the basis of automatically extended employment authorization for a new job?*

To evidence the automatic extension of your employment authorization, you may present your expired EAD with category A12 or C19 in combination with the Form I–797C Notice of Action showing that the EAD renewal application was timely filed and that the qualifying eligibility category is either A12 or C19. This document combination is considered an unexpired Employment Authorization Document (Form I–766) under List A. When completing Form I–9 for a new job before January 18, 2018, you and your employer should do the following:

1. For Section 1, you should:

a. Check ''An alien authorized to work until'' and enter the date that is 180 days from the date your current EAD expires (January 18, 2018) as the ''employment authorized until mm/dd/yyyy'' date; and

b. Enter your Alien Number/USCIS number or A-Number where indicated (your EAD or other document from DHS will have your USCIS Number or A-Number printed on it; the USCIS number is the same as your A-Number without the A prefix).

2. When completing Section 2, employers should:

a. Determine if the EAD is auto-extended for 180 days by ensuring:

• It is in category A12 or C19;

• the ''received date'' on Form I–797 is on or before the end of the 60-day re-registration period stated in this Notice; and

• the category code on the EAD is the same category code on Form I–797C, noting that employers should consider category codes A12 and C19 to be the same category code;

b. Write in the document title;

c. Enter the issuing authority;

d. Provide the document number; and

e. Insert the date that is 180 days from the date the current EAD expires (January 18, 2018).

By January 18, 2018, employers must re-verify the employee's employment authorization in Section 3 of the Form I–9.

*What corrections should my current employer and I make to Employment Eligibility Verification (Form I–9) if my employment authorization has been automatically extended?*

If you are an existing employee who presented a TPS-related EAD that was valid when you first started your job and your employment authorization has now been automatically extended when you timely filed a new application for employment authorization during the 60-day re-registration period, you may present your expired EAD with category A12 or C19 in combination with the Form I–797C Notice of Action. The Form I–797C should show that the EAD renewal application was timely filed and that the qualifying eligibility category is either A12 or C19. Your employer may need to re-inspect your current EAD if your employer does not have a copy of the EAD on file. You and your employer should correct your previously completed Form I–9 as follows:

1. For Section 1, you should:

a. Draw a line through the expiration date in Section 1;

b. Write the date that is 180 days from the date your current EAD expires (January 18, 2018) above the previous date (July 22, 2017); and

c. Initial and date the correction in the margin of Section 1.

2. For Section 2, employers should:

a. Determine if the EAD is auto-extended for 180 days by ensuring:

• It is in category A12 or C19;

• the ''received date'' on Form I–797 is on or before the end of the 60-day re-registration period stated in this Notice; and

• the category code on the EAD is the same category code on Form I–797C, noting that employers should consider category codes A12 and C19 to be the same category code;

b. Draw a line through the expiration date written in Section 2;

c. Write the date that is 180 days from the date the employee's current EAD expires (January 18, 2018) above the previous date (July 22, 2017); and

d. Initial and date the correction in the margin of Section 2.

**Note:** This is not considered a reverification; do not complete Section 3

**23836**    **Federal Register** / Vol. 82, No. 99 / Wednesday, May 24, 2017 / Notices

until either the 180-day extension has ended or the employee presents a new document to show continued employment authorization, whichever is sooner. By January 18, 2018, when the employee's automatically extended employment authorization ends, employers must re-verify the employee's employment authorization in Section 3.

*If I am an employer enrolled in E-Verify, what do I do when I receive a ''Work Authorization Documents Expiration'' alert for an automatically extended EAD?*

E-Verify automated the verification process for employees whose TPS-related EAD was automatically extended in a **Federal Register** Notice. If you have an employee who is a TPS beneficiary who provided a TPS-related EAD when he or she first started working for you, you will receive a ''Work Authorization Documents Expiring'' case alert when the auto-extension period for this EAD is about to expire. After completing the Form I–9 in accordance with the instructions above, the employer may create a case in E-Verify for a new employee using the information provided on Form I–9 and Form I–797C. The receipt number entered as the document number on Form I–9 should be entered into the document number field in E-Verify. By January 18, 2018, employment authorization must be re-verified in Section 3. Employers should not use E-Verify for reverification.

**Note to All Employers**

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This Notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY 877–875–6028) or email USCIS at *I-9Central@dhs.gov.* Calls and emails are accepted in English and many other languages. For questions about avoiding discrimination during the employment eligibility verification process (Form I–9 and E-Verify), employers may also call the U.S. Department of Justice's Civil Rights Division, Immigrant and Employee Rights Section (IER), formerly the Office of Special Counsel for Immigration-Related Unfair Employment Practices, Employer Hotline at 800–255–8155 (TTY 800–237–2515), which offers language interpretation in numerous languages, or email IER at *IER@usdoj.gov.*

**Note to Employees**

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY 877–875–6028) or email at *I-9Central@dhs.gov.* Calls are accepted in English, Spanish, and many other languages. Employees or applicants may also call the IER Worker Hotline at 800–255–7688 (TTY 800–237–2515) for information regarding employment discrimination based upon citizenship, immigration status, or national origin, including discrimination related to Employment Eligibility Verification (Form I–9) and E-Verify. The IER Worker Hotline provides language interpretation in numerous languages.

To comply with the law, employers must accept any document or combination of documents from the Lists of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee, or an acceptable List A, List B, or List C receipt as described in the Employment Eligibility Verification (Form I–9) Instructions. Employers may not require extra or additional documentation beyond what is required for Employment Eligibility Verification (Form I–9) completion. Further, employers participating in E-Verify who receive an E-Verify case result of ''Tentative Nonconfirmation'' (TNC) must promptly inform employees of the TNC and give such employees an opportunity to contest the TNC. A TNC case result means that the information entered into E-Verify from Employment Eligibility Verification (Form I–9) differs from Federal or state government records.

Employers may not terminate, suspend, delay training, withhold pay, lower pay, or take any adverse action against an employee based on the employee's decision to contest a TNC or because the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result is received when E-Verify cannot verify an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY 877–875–6028). For more information about E-Verify related discrimination or to report an employer for discrimination in the E-Verify process based on citizenship or immigration status, or based on national origin, contact IER's Worker Hotline at 800–255–7688 (TTY 800–237–2515).

Additional information about proper nondiscriminatory Employment Eligibility Verification (Form I–9) and E-Verify procedures is available on the IER Web site at *https://www.justice.gov/ier* and the USCIS Web site at *http://www.dhs.gov/E-verify.*

**Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)**

While Federal Government agencies must follow the guidelines laid out by the Federal Government, state and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, state, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary and/or show you are authorized to work based on TPS. Examples of such documents are:

(1) Your current EAD;

(2) A copy of this **Federal Register** Notice;

(3) A copy of your receipt notice (Form I–797C) for your application to renew your current EAD providing an automatic extension of your current expired or expiring EAD;

(4) A copy of your Application for Temporary Protected Status Notice of Action (Form I–797) for this re-registration; and

(5) A copy of your past or current Application for Temporary Protected Status Notice of Action (Form I–797), if you received one from USCIS.

Check with the government agency regarding which document(s) the agency will accept.

Some benefit-granting agencies use the USCIS Systematic Alien Verification for Entitlements (SAVE) program to confirm the current immigration status of applicants for public benefits. In most cases, SAVE provides an automated electronic response to benefit-granting agencies within seconds, but, occasionally, verification can be delayed. You can check the status of your SAVE verification by using CaseCheck at the following link: *https://save.uscis.gov/casecheck/,* then by clicking the ''Check Your Case'' button. CaseCheck is a free service that lets you follow the progress of your SAVE verification using your date of birth and one immigration identifier number. If an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in

HaitiTPSAR000079

accordance with the agency's procedures. If the agency has received and acted upon or will act upon a SAVE verification and you do not believe the response is correct, you may make an InfoPass appointment for an in-person interview at a local USCIS office. Detailed information on how to make corrections, make an appointment, or submit a written request to correct records under the Freedom of Information Act can be found on the SAVE Web site at *http://www.uscis.gov/save,* then by choosing ''For Benefits Applicants'' from the menu on the left, selecting ''Save Resources,'' followed by ''SAVE Fact Sheet for Benefit Applicants.''

[FR Doc. 2017–10749 Filed 5–23–17; 8:45 am]

**BILLING CODE 9111–97–P**

---

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**[Docket No. FR–6011–N–01]**

### Annual Indexing of Basic Statutory Mortgage; Limits for Multifamily Housing Programs

**AGENCY:** Office of the Assistant Secretary for Housing—Federal Housing Commissioner, HUD.

**ACTION:** Notice.

**SUMMARY:** In accordance with Section 206A of the National Housing Act, HUD has adjusted the Basic Statutory Mortgage Limits for Multifamily Housing Programs for Calendar Year 2016.

**DATES:** Effective January 1, 2016.

**FOR FURTHER INFORMATION CONTACT:** Daniel J. Sullivan, Acting Director, Office of Multifamily Development, Department of Housing and Urban Development, 451 Seventh Street SW., Washington, DC 20410–8000, telephone (202) 402–6130 (this is not a toll-free number). Hearing or speech-impaired individuals may access this number through TTY by calling the toll-free Federal Information Relay Service at (800) 877–8339.

**SUPPLEMENTARY INFORMATION:** The FHA Down Payment Simplification Act of 2002 (Pub. L. 107–326, approved December 4, 2002) amended the National Housing Act by adding a new Section 206A (12 U.S.C. 1712a). Under Section 206A, the following are affected:

I. Section 207(c)(3)(A) (12 U.S.C. 1713(c)(3)(A));
II. Section 213(b)(2)(A) (12 U.S.C. 1715e (b)(2)(A));
III. Section 220(d)(3)(B)(iii)(I) (12 U.S.C. 1715k (d)(3)(B)(iii)(I));
IV. Section 221(d)(4)(ii)(I) (12 U.S.C.

17151(d)(4)(ii)(I));
V. Section 231(c)(2)(A) (12 U.S.C. 1715v(c)(2)(A)); and
VI. Section 234(e)(3)(A) (12 U.S.C. 1715y(e)(3)(A)).

The Dollar Amounts in these sections are the base per unit statutory limits for FHA's multifamily mortgage programs collectively referred to as the 'Dollar Amounts,' they are adjusted annually (commencing in 2004) on the effective date of the Consumer Financial Protection Bureau's adjustment of the $400 figure in the Home Ownership and Equity Protection Act of 1994 (HOEPA) (Pub. L. 103–325, approved September 23, 1994). The adjustment of the Dollar Amounts shall be calculated using the percentage change in the Consumer Price Index for All Urban Consumers (CPI–U) as applied by the Bureau of Consumer Financial Protection for purposes of the above-described HOEPA adjustment.

HUD has been notified of the percentage change in the CPI–U used for the HOEPA adjustment and the effective date of the HOEPA adjustment. The percentage change in the CPI–U is 0.7% and the effective date of the HOEPA adjustment is January 1, 2016. The Dollar Amounts have been adjusted correspondingly and have an effective date of January 1, 2016.

The adjusted Dollar Amounts for Calendar Year 2016 are shown below:

### Basic Statutory Mortgage Limits for Calendar Year 2016

*Multifamily Loan Programs*

Section 207—Multifamily Housing

Section 207 Pursuant to Section 223(f)—Purchase or Refinance Housing

Section 220—Housing in Urban Renewal Areas

| Bedrooms | Non-elevator | Elevator |
|---|---|---|
| 0 ................ | $50,515 | $58,921 |
| 1 ................ | 55,958 | 65,286 |
| 2 ................ | 66,841 | 80,053 |
| 3 ................ | 82,386 | 100,263 |
| 4+ .............. | 93,270 | 113,369 |

Section 213—Cooperatives

| Bedrooms | Non-elevator | Elevator |
|---|---|---|
| 0 ................ | $54,745 | $58,291 |
| 1 ................ | 63,122 | 66,042 |
| 2 ................ | 76,127 | 80,307 |
| 3 ................ | 97,443 | 103,892 |
| 4+ .............. | 108,558 | 114,044 |

Section 234—Condominium Housing

| Bedrooms | Non-elevator | Elevator |
|---|---|---|
| 0 ................ | $55,862 | $58,787 |

| Bedrooms | Non-elevator | Elevator |
|---|---|---|
| 1 ................ | 64,410 | 67,391 |
| 2 ................ | 77,680 | 81,947 |
| 3 ................ | 99,433 | 106,013 |
| 4+ .............. | 110,772 | 116,369 |

Section 221(d)(4)—Moderate Income Housing

| Bedrooms | Non-elevator | Elevator |
|---|---|---|
| 0 ................ | $50,273 | $54,305 |
| 1 ................ | 57,068 | 62,255 |
| 2 ................ | 68,981 | 75,702 |
| 3 ................ | 86,582 | 97,932 |
| 4+ .............. | 97,836 | 107,501 |

Section 231—Housing for the Elderly

| Bedrooms | Non-elevator | Elevator |
|---|---|---|
| 0 ................ | $47,797 | $54,305 |
| 1 ................ | 53,433 | 62,255 |
| 2 ................ | 63,808 | 75,702 |
| 3 ................ | 76,789 | 97,932 |
| 4+ .............. | 90,278 | 107,501 |

Section 207—Manufactured Home Parks Per Space—$23,191

Dated: May 17, 2017.

**Genger Charles,**

*General Deputy, Assistant Secretary for Housing.*

[FR Doc. 2017–10558 Filed 5–23–17; 8:45 am]

**BILLING CODE 4210–67–P**

---

## DEPARTMENT OF JUSTICE

### Bureau of Alcohol, Tobacco, Firearms and Explosives

**[OMB Number 1140–0013]**

### Agency Information Collection Activities; Proposed eCollection eComments Requested; Application for Tax-Exempt Transfer of Firearm and Registration to Special Occupational Taxpayer, ATF Form 3 (5320.3)

**AGENCY:** Bureau of Alcohol, Tobacco, Firearms and Explosives, Department of Justice.

**ACTION:** 30-Day notice.

**SUMMARY:** The Department of Justice (DOJ), Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), will submit the following information collection request to the Office of Management and Budget (OMB) for review and approval in accordance with the Paperwork Reduction Act of 1995. The proposed information collection was previously published in the **Federal Register** on March 14, 2017, allowing for a 60-day comment period.

HaitiTPSAR000080

rating of A–60 should generally be considered sufficient for the surface facing the source of the radiant heat flux. For radiant heat flux levels 100 KW/m² and above, H–60 rated protection should be considered as a minimum. In either case, the protection should continue on the adjacent sides of such structures for a minimum distance of 10 feet (3 meters) from the surface facing the source of the radiant heat flux (SOLAS II–2/9.2.4.2.5). This overlapping of protection on adjacent areas is necessary to prevent the radiant heat from ''wrapping around'' to expose an inadequately protected area.

The Coast Guard recommends use of the following references for calculating the radiant heat flux at a target from a fire source (i.e., pool or jet fire).

(i) The SFPE Handbook of Fire Protection Engineering, Fourth Edition (Section 3, Chapter 10);

(iii) API Recommended Practice 2FB.

We do note that there are alternative baseline radiant heat flux levels and calculations that have been recognized by the oil and gas industry meeting the intent of this recommendation.

(4) Heat Exposure

The maximum radiant heat exposure to personnel should be evaluated at the assembly/muster stations and survival craft launching stations as well as along the normal escape routes from the accommodation and service areas to those areas.

The maximum allowable radiant heat flux exposure for personnel at the muster stations and survival craft launching stations should be low enough to prevent injury when exposed for the period of time needed to embark and launch the survival craft (normally around 2.5 KW/m² for approximately thirty minutes on bare skin).

The Coast Guard recommends use of the following references for calculating the radiant heat flux exposure to a target and the limits on personnel exposure:

(i) The SFPE Handbook of Fire Protection Engineering, Fourth Edition (Section 2, Chapter 6; Section 3, Chapter 10);

(ii) Fire Protection Handbook, Twentieth Edition (Section 6, Chapter 2);

(iii) API Recommended Practice 2FB.

We do note that there are alternative methods for calculating radiant heat flux exposure to personnel and exposure limits which meet the intent of this recommendation.

(5) Mitigation

Where the explosion design load, radiant heat flux and radiant heat exposure values calculated for the facility exceed the recommended performance standard of the equipment in place, mitigation measures, such as venting, increased structural strength of blast-walls, bulkheads and decks, passive fire protection, re-arrangement and shifting of structures, or other viable and analyzed mitigation measures should be incorporated.

**Authority; Disclaimer**

This document is issued under the authority of 5 U.S.C. 552(a), 43 U.S.C. 1331, *et seq.,* and 33 CFR 1.05–1. The guidance contained in this notice is not a substitute for applicable legal requirements or current Coast Guard and Bureau of Safety and Environmental Enforcement regulations, nor is it itself a regulation. It is not intended to nor does it impose legally binding requirements on any party. It represents the Coast Guard's current thinking on this topic and may assist industry, mariners, the general public, and the Coast Guard, as well as other Federal and State regulators, in instituting lessons learned from the Report.

Dated: April 28, 2014.

**J.G. Lantz,**
*Director of Commercial Regulations and Standards, U.S. Coast Guard.*

[FR Doc. 2014–10010 Filed 5–1–14; 8:45 am]

**BILLING CODE 9110–04–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

**[CIS No. 2542–14; DHS Docket No. USCIS–2014–0001]**

**RIN 1615–ZB25**

**Extension of the Re-registration Period for Haiti Temporary Protected Status**

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Notice; Extension of re-registration period.

---

**SUMMARY:** On March 3, 2014, the Secretary of Homeland Security (Secretary) extended the designation of Haiti for Temporary Protected Status (TPS) for a period of 18 months by notice in the **Federal Register**. The Department of Homeland Security (DHS) established a 60-day re-registration period from March 3, 2014 through May 2, 2014. DHS is extending the re-registration period through July 22, 2014 through this Notice, to maximize re-registration opportunities for those eligible to re-register.

**DATES:** DHS extended Haiti TPS on March 3, 2014. The re-registration period that was to expire on May 2, 2014, will be extended with a new re-registration filing deadline of July 22, 2014.

**FOR FURTHER INFORMATION CONTACT:**

• For further information on TPS, including guidance on the application process and additional information on eligibility, please visit the USCIS TPS Web page at *http://www.uscis.gov/tps*. You can find specific information about the extension of the TPS designation for Haiti and the extension of the re-registration period by selecting ''TPS Designated Country: Haiti'' from the menu on the left of the TPS Web page. On the Haiti TPS Web page, there is a link to the Federal Register notice at 79 FR 11808 (March 3, 2014) that provides detailed information and procedures to re-register for Haiti TPS.

• You can also contact the TPS Operations Program Manager at the Family and Status Branch, Service Center Operations Directorate, U.S. Citizenship and Immigration Services, Department of Homeland Security, Mail Stop 2060, Washington, DC 20529–2060; or by phone at (202) 272–1533 (this is not a toll-free number). **Note:** The phone number provided here is solely for questions regarding this TPS notice. It is not for individual case status updates.

• Applicants seeking information about the status of their individual cases can check Case Status Online, available at the USCIS Web site at *http://www.uscis.gov,* or call the USCIS National Customer Service Center at 800–375–5283 (TTY for the hearing impaired is at 800–767–1833). Service is available in English and Spanish only.

• Further information will also be available at local USCIS offices upon publication of this Notice.

**SUPPLEMENTARY INFORMATION:**

**When did the Secretary extend the TPS designation for Haiti?**

On March 3, 2014, the Secretary extended the TPS designation for Haiti for a period of 18 months by notice in the **Federal Register**. *See* 79 FR 11808. The extension is effective from July 23, 2014 through January 22, 2016.

**Why is the Secretary extending the re-registration period for Haitian TPS beneficiaries?**

DHS is extending the re-registration period through July 22, 2014 in order to maximize re-registration opportunities for those eligible to do so. As of April 20, 2014, USCIS had received a low proportion of the expected number of

HaitiTPSAR000081

**25142**    **Federal Register**/Vol. 79, No. 85/Friday, May 2, 2014/Notices

re-registrants. Advocates working with the Haitian community report that the low number of re-registration applications may be due to confusion about the re-registration deadline as many beneficiaries did not realize that they were required to re-register by May 2, 2014 since their Employment Authorization Documents (EADs) have a printed expiration date of July 22, 2014. DHS notes that in a March **Federal Register** notice, it had auto-extended these EADs for a period of six months. *See* 79 FR 11808. Providing until July 22, 2014 to file for TPS re-registration will help Haiti TPS beneficiaries who may not have clearly understood DHS' prior public notices that informed them of the initial re-registration deadline. Although DHS is extending the re-registration deadline, Haiti TPS beneficiaries are strongly encouraged to re-register as soon as possible. This is particularly important for those beneficiaries who currently hold an EAD and are requesting a new EAD as part of their re-registration. Although DHS auto-extended existing Haiti TPS EADs for six months, TPS beneficiaries who desire new EADs should file as soon as possible to ensure they receive their updated EADs, with a new validity date, promptly. *See* 79 FR 11808.

**Jeh Charles Johnson,**
*Secretary.*
[FR Doc. 2014–10177 Filed 5–1–14; 8:45 am]
**BILLING CODE 9111–97–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Customs and Border Protection**

**Modification of National Customs Automation Program (NCAP) Test Concerning Automated Commercial Environment (ACE) Cargo Release for Truck Carriers**

**AGENCY:** U.S. Customs and Border Protection, Department of Homeland Security.
**ACTION:** General notice.

---

**SUMMARY:** This document announces U.S. Customs and Border Protection's (CBP's) plan to modify the National Customs Automation Program (NCAP) test concerning Cargo Release functionality in the Automated Commercial Environment (ACE). Originally, the test was known as the Simplified Entry Test because the test simplified the entry process by reducing the number of data elements required to obtain release for cargo transported by air. The test was subsequently modified to provide more capabilities to test

participants allowing CBP to deliver enhanced functionality and to include expansion to the ocean and rail modes of transportation. This notice now expands this functionality to the truck mode of transportation and invites more participants to join the test.

**DATES:** The ACE Cargo Release test modifications set forth in this document are effective no earlier than April 6, 2014. The test will run until approximately November 1, 2015.

**ADDRESSES:** Comments or questions concerning this notice and indication of interest in participation in ACE Cargo Release should be submitted, via email, to Susan Maskell at *susan.c.maskell@cbp.dhs.gov*. In the subject line of your email, please use, ''*Comment on ACE Cargo Release*''. The body of the email should include information regarding the identity of the ports where filings are likely to occur.

**FOR FURTHER INFORMATION CONTACT:** For policy related questions, contact Stephen Hilsen, Director, Business Transformation, ACE Business Office, Office of International Trade, at *stephen.r.hilsen@cbp.dhs.gov*. For technical questions, contact Susan Maskell, Client Representative Branch, ACE Business Office, Office of International Trade, at *susan.c.maskell@cbp.dhs.gov*.

**SUPPLEMENTARY INFORMATION:**

**Background**

**I. The National Customs Automation Program**

The National Customs Automation Program (NCAP) was established in Subtitle B of Title VI—Customs Modernization in the North American Free Trade Agreement Implementation Act (Pub. L. 103–182, 107 Stat. 2057, 2170, December 8, 1993) (Customs Modernization Act). *See* 19 U.S.C. 1411. Through NCAP, the initial thrust of customs modernization was on trade compliance and the development of the Automated Commercial Environment (ACE), the planned successor to the Automated Commercial System (ACS). ACE is an automated and electronic system for commercial trade processing which is intended to streamline business processes, facilitate growth in trade, ensure cargo security, and foster participation in global commerce, while ensuring compliance with U.S. laws and regulations and reducing costs for U.S. Customs and Border Protection (CBP) and all of its communities of interest. The ability to meet these objectives depends on successfully modernizing CBP's business functions and the

information technology that supports those functions.

CBP's modernization efforts are accomplished through phased releases of ACE component functionality designed to replace a specific legacy ACS function. Each release will begin with a test and, if the test is successful, will end with implementation of the functionality through the promulgation of regulations governing the new ACE feature and the retirement of the legacy ACS function.

The ACE Cargo Release test was previously known as the Simplified Entry Test because the test simplified the entry process by reducing the number of data elements required to obtain release for cargo transported by air. The original test notice required participants to be a member of the Customs-Trade Partnership Against Terrorism (C–TPAT) program. Through phased releases of ACE component functionality this test has been expanded to allow all eligible participants to join the test for an indefinite period regardless of the C–TPAT status of an importer self-filer or a customs broker.

For the convenience of the public, a chronological listing of **Federal Register** publications detailing ACE test developments is set forth below in *Section VII,* entitled, ''*Development of ACE Prototypes*''. The procedures and criteria applicable to participation in the prior ACE tests remain in effect unless otherwise explicitly changed by this or subsequent notices published in the **Federal Register**.

**II. Authorization for the Test**

The Customs Modernization Act provides the Commissioner of CBP with authority to conduct limited test programs or procedures designed to evaluate planned components of the NCAP. The test described in this notice is authorized pursuant to § 101.9(b) of title 19 of the Code of Federal Regulations (19 CFR 101.9(b)), which provides for the testing of NCAP programs or procedures. *See* Treasury Decision (T.D.) 95–21.

**III. Expansion of ACE Cargo Release Test to Truck Mode of Transportation**

This document is announcing CBP's plan to expand the ACE Cargo Release test which allows for the filing capabilities by importers and customs brokers for cargo transported by air, ocean or rail to include filing capabilities by importers and customs brokers for cargo transported by truck.

HaitiTPSAR000082

foreign persons who have committed or have attempted to commit, pose a significant risk of committing, or have participated in training to commit acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States.

Consistent with the determination in section 10 of E.O. 13224 that prior notice to persons determined to be subject to the Order who might have a constitutional presence in the United States would render ineffectual the blocking and other measures authorized in the Order because of the ability to transfer funds instantaneously, I determine that no prior notice needs to be provided to any person subject to this determination who might have a constitutional presence in the United States, because to do so would render ineffectual the measures authorized in the Order.

This determination shall be published in the **Federal Register**.

Dated: April 22, 2025.

**Marco Rubio,**
*Secretary of State.*
[FR Doc. 2025–07468 Filed 5–2–25; 8:45 am]
**BILLING CODE 4710–AD–P**

## DEPARTMENT OF STATE

[Public Notice: 12720]

### Plenary Meeting of the Binational Bridges and Border Crossings Group in Mexico City

**SUMMARY:** Delegates from the U.S. and Mexican governments, the states of California, Arizona, New Mexico, and Texas, and the Mexican states of Baja California, Sonora, Chihuahua, Coahuila, Nuevo Laredo, and Tamaulipas will participate in an in-person plenary meeting of the U.S.-Mexico Binational Bridges and Border Crossings Group.

**DATES:** Tuesday, June 10, 2025, and Wednesday, June 11, 2025, in Mexico City.

**FOR FURTHER INFORMATION CONTACT:** For further information on the meeting and/or to attend the public session, please contact Beney Lee, Border Affairs Officer, via email at *WHA-BorderAffairs@state.gov,* by phone at 771–204–0192, or by mail at the Office of Mexican Affairs, Room 3924, Department of State, 2201 C Street NW, Washington, DC 20520.

**SUPPLEMENTARY INFORMATION:** The purpose of this meeting is to discuss operational matters involving existing and proposed international bridges and border crossings and their related infrastructure and to exchange technical information as well as views on policy. This meeting will include a public session on Tuesday, June 10, 2025, from 9 a.m. until 12 p.m. This session will allow interested parties with views on proposed bridges and border crossings and related projects to make presentations to the delegations and members of the public.

**Beney J. Lee,**
*Border Affairs Officer, Office of Mexican Affairs, Department of State.*
[FR Doc. 2025–07758 Filed 5–2–25; 8:45 am]
**BILLING CODE 4710–29–P**

## DEPARTMENT OF STATE

[Public Notice: 12717]

### Notice of Determinations; Culturally Significant Object Being Imported for Exhibition—Determinations: "Noah Davis" Exhibition

**SUMMARY:** Notice is hereby given of the following determinations: I hereby determine that a certain object being imported from abroad pursuant to an agreement with its foreign owner or custodian for temporary display in the exhibition "Noah Davis" at the Armand Hammer Museum of Art and Cultural Center, Los Angeles, California; the Philadelphia Museum of Art, Philadelphia, Pennsylvania; and at possible additional exhibitions or venues yet to be determined, are of cultural significance, and, further, that its temporary exhibition or display within the United States as aforementioned is in the national interest. I have ordered that Public Notice of these determinations be published in the **Federal Register**.

**FOR FURTHER INFORMATION CONTACT:** Reed Liriano, Program Coordinator, Office of the Legal Adviser, U.S. Department of State (telephone: 202–632–6471; email: *section2459@state.gov*). The mailing address is U.S. Department of State, L/PD, 2200 C Street NW (SA–5), Suite 5H03, Washington, DC 20522–0505.

**SUPPLEMENTARY INFORMATION:** The foregoing determinations were made pursuant to the authority vested in me by the Act of October 19, 1965 (79 Stat. 985; 22 U.S.C. 2459), Executive Order 12047 of March 27, 1978, the Foreign Affairs Reform and Restructuring Act of 1998 (112 Stat. 2681, *et seq.;* 22 U.S.C. 6501 note, *et seq.*), Delegation of Authority No. 234 of October 1, 1999, Delegation of Authority No. 236–3 of August 28, 2000, and Delegation of Authority No. 574 of March 4, 2025.

**Mary C. Miner,**
*Managing Director for Professional and Cultural Exchanges, Bureau of Educational and Cultural Affairs, Department of State.*
[FR Doc. 2025–07735 Filed 5–2–25; 8:45 am]
**BILLING CODE 4710–05–P**

## DEPARTMENT OF STATE

[Public Notice: 12710]

### Foreign Terrorist Organization Designations of Viv Ansanm and Gran Grif

Based upon a review of the Administrative Records assembled in this matter, and in consultation with the Attorney General and the Secretary of the Treasury, I have concluded that there is a sufficient factual basis to find that the relevant circumstances described in section 219 of the Immigration and Nationality Act, as amended (hereinafter "INA") (8 U.S.C. 1189), exist with respect to: Viv Ansanm (also known as Living Together, G–9, G9 Family and Allies, G9 Fanmi e Alye, The Revolutionary Forces of the G9 Family and Allies, Fòs Revolisyoné G9 an Fanmi e Alye, G-Pèp, G-People); and Gran Grif (also known as Gran Grif gang, Gran Grif de Savien, Savien gang, Baz Gran Grif).

Therefore, I hereby designate the aforementioned organizations and their respective aliases as Foreign Terrorist Organizations pursuant to section 219 of the INA.

This determination shall be published in the **Federal Register**. The designations go into effect upon publication.

Dated: April 22, 2025.

**Marco Rubio,**
*Secretary of State.*
[FR Doc. 2025–07464 Filed 5–2–25; 8:45 am]
**BILLING CODE P**

## SURFACE TRANSPORTATION BOARD

[Docket No. FD 36831]

### Marquette Rail, LLC—Lease and Operation Exemption Including Interchange Commitment—CSX Transportation, Inc.

Marquette Rail, LLC (MQT), a Class III railroad, has filed a verified notice of exemption pursuant to 49 CFR 1150.41 to continue to lease from CSX Transportation, Inc. (CSXT), and operate the following several segments of rail line in Michigan totaling approximately

HaitiTPSAR000083

# Presidential Documents

Proclamation 10888 of January 20, 2025

## Guaranteeing the States Protection Against Invasion

**By the President of the United States of America**

**A Proclamation**

By the authority vested in me as President by the Constitution and the laws of the United States of America, I hereby proclaim:

An essential feature of any sovereign nation is the existence of territorial boundaries and the inherent authority to decide who and what may cross those boundaries. The Supreme Court of the United States has described this power as a "fundamental act of sovereignty," which "stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation." *U.S. ex rel. Knauff* v. *Shaughnessy,* 338 U.S. 537, 542 (1950). The Supreme Court has recognized the inherent right and duty of the Executive Branch to defend our national sovereignty, stating that "[w]hen Congress prescribes a procedure concerning the admissibility of aliens, it is not dealing alone with a legislative power. It is implementing an inherent executive power." *Id.*

The Congress has, in establishing "an uniform Rule of Naturalization," created a complex and comprehensive Federal scheme in the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.,* to control the entry and exit of people and goods across the borders of the United States. In routine circumstances, this complex and comprehensive scheme can protect the national sovereignty of the United States by facilitating the admission of individuals whose presence serves the national interest and preventing the admission of those who do not, such as those aliens who pose threats to public health, section 212(a)(1) of the INA, 8 U.S.C. 1182(a)(1); safety, section 212(a)(2) (8 U.S.C. 1182(a)(2)); and national security, section 212(a)(3) (8 U.S.C. 1182(a)(3)). Prospective immigrants who use the visa system are screened for such health, safety, and security concerns while outside of the United States, and are not permitted to enter the United States until they establish that they are eligible to be admitted as a matter of law and should be admitted as a matter of discretion.

But screening under those provisions of the INA can be wholly ineffective in the border environment, where access to necessary information is limited for aliens who have traveled from countries around the world to enter the United States illegally, or when the system is overwhelmed, leading to the unauthorized entry of innumerable illegal aliens into the United States.

Due to significant information gaps—particularly in the border environment—and processing times, Federal officials do not have the ability to verify with certainty the criminal record or national-security risks associated with the illegal entry of every alien at the southern border, as required by section 212(a)(2)–(3) of the INA, 8 U.S.C. 1182(a)(2)–(3). Nor do aliens who illegally cross the southern border readily provide comprehensive background information from their home countries to Federal law enforcement officials.

The public safety and national security risks in such an environment are heightened by the presence of, and control of territory by, international cartels and other transnational criminal organizations on the other side of the southern border, as well as terrorists and other malign actors who intend to harm the United States and the American people. And the risks

HaitiTPSAR000084

associated with these issues are greatly exacerbated when the number of aliens illegally crossing the southern border increases to levels that prevent actual operational control of the border.

The same is true for public health, where the Federal Government currently lacks an effective operational capability to screen all illegal aliens crossing the southern border for communicable diseases of public-health concern, as required by section 212(a)(1) of the INA, 8 U.S.C. 1182(a)(1). Effectively no aliens who illegally enter the United States provide Federal officials at the southern border with their comprehensive health information, as a lawful immigrant would. As a result, innumerable aliens potentially carrying communicable diseases of public health significance illegally cross the southern border and enter communities across the United States.

Over the last 4 years, at least 8 million illegal aliens were encountered along the southern border of the United States, and countless millions more evaded detection and illegally entered the United States. The sheer number of aliens entering the United States has overwhelmed the system and rendered many of the INA's provisions ineffective, including those previously described that are intended to prevent aliens posing threats to public health, safety, and national security from entering the United States. As a result, millions of aliens who potentially pose significant threats to health, safety, and national security have moved into communities nationwide.

This ongoing influx of illegal aliens across the southern border of the United States has placed significant costs and constraints upon the States, which have collectively spent billions of dollars in providing medical care and related human services, and have spent considerable amounts on increased law enforcement costs associated with the presence of these illegal aliens within their boundaries.

In joining the Union, the States agreed to surrender much of their sovereignty and join the Union in exchange for the Federal Government's promise in Article IV, Section 4 of the U.S. Constitution, to ''protect each of [the States] against Invasion.'' I have determined that the current state of the southern border reveals that the Federal Government has failed in fulfilling this obligation to the States and hereby declare that an invasion is ongoing at the southern border, which requires the Federal Government to take measures to fulfill its obligation to the States.

The INA provides the President with certain emergency tools. For example, it states that ''[w]henever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.'' 8 U.S.C. 1182(f). This statute ''exudes deference to the President in every clause.'' *Trump* v. *Hawaii,* 585 U.S. 667, 684 (2018). Further, the INA renders it unlawful for ''any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe.'' 8 U.S.C. 1185(a)(1).

Historically, Presidents have used these statutory authorities to deny entry of designated classes and categories of aliens into the United States through ports of entry. But if the President has the power to deny entry of any alien into the United States, and to impose any restrictions as he may deem appropriate, this authority necessarily includes the right to deny the physical entry of aliens into the United States and impose restrictions on access to portions of the immigration system, particularly when the number of aliens illegally crossing the southern border prevents the Federal Government from obtaining operational control of the border.

The INA does not, however, occupy the Federal Government's field of authority to protect the sovereignty of the United States, particularly in times

of emergency when entire provisions of the INA are rendered ineffective by operational constraints, such as when there is an ongoing invasion into the States. The President's inherent powers to control the borders of the United States, including those deriving from his authority to control the foreign affairs of the United States, necessarily include the ability to prevent the physical entry of aliens involved in an invasion into the United States, and to rapidly repatriate them to an alternative location. Only through such measures can the President guarantee the right of each State to be protected against invasion.

By the power vested in me by the Constitution and the laws of the United States, I have determined that the current situation at the southern border qualifies as an invasion under Article IV, Section 4 of the Constitution of the United States. Accordingly, I am issuing this Proclamation based on my express and inherent powers in Article II of the Constitution of the United States, and in faithful execution of the immigration laws passed by the Congress, and suspending the physical entry of aliens involved in an invasion into the United States across the southern border until I determine that the invasion has concluded.

NOW, THEREFORE, I, Donald J. Trump, President of the United States of America, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), and section 301 of title 3, United States Code, hereby direct as follows:

**Section 1**. *Suspension of Entry.* I hereby proclaim, pursuant to sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), that the entry into the United States on or after the date of this order of aliens engaged in the invasion across the southern border is detrimental to the interests of the United States. I therefore direct that entry into the United States of such aliens be suspended until I issue a finding that the invasion at the southern border has ceased.

**Sec. 2**. *Imposition of Restrictions on Entry for Aliens Invading the United States.* I hereby proclaim, pursuant to sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), that aliens engaged in the invasion across the southern border of the United States on or after the date of this proclamation are restricted from invoking provisions of the INA that would permit their continued presence in the United States, including, but not limited to, section 208 of the INA, 8 U.S.C. 1158, until I issue a finding that the invasion at the southern border has ceased.

**Sec. 3**. *Suspension of and Restriction on Entry for Aliens Posing Public Health, Safety, or National Security Risks.* I hereby proclaim, pursuant to sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), that the entry into the United States, on or after the date of this order, of any alien who fails, before entering the United States, to provide Federal officials with sufficient medical information and reliable criminal history and background information as to enable fulfillment of the requirements of sections 212(a)(1)–(3) of the INA, 8 U.S.C. 1182(a)(1)–(3), is detrimental to the interests of the United States. I therefore direct that entry into the United States of such aliens be suspended and restrict their access to provisions of the INA that would permit their continued presence in the United States, including, but not limited to, section 208 of the INA, 8 U.S.C. 1158.

**Sec. 4**. *Constitutional Suspension of Physical Entry.* Under the authorities provided to me under Article II of the Constitution of the United States, including my control over foreign affairs, and to effectuate the guarantee of protection against invasion required by Article IV, Section 4, I hereby suspend the physical entry of any alien engaged in the invasion across the southern border of the United States, and direct the Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, to take appropriate actions as may be necessary to achieve the

HaitiTPSAR000086

**8336**    **Federal Register** / Vol. 90, No. 18 / Wednesday, January 29, 2025 / Presidential Documents

objectives of this proclamation, until I issue a finding that the invasion at the southern border has ceased.

**Sec. 5**. *Operational Actions to Repel the Invasion.* The Secretary of Homeland Security, in coordination with the Secretary of State and the Attorney General, shall take all appropriate action to repel, repatriate, or remove any alien engaged in the invasion across the southern border of the United States on or after the date of this order, whether as an exercise of the suspension power in section 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), or as an exercise of my delegated authority under the Constitution of the United States, until I issue a finding that the invasion at the southern border has ceased.

**Sec. 6**. *General Provisions.* (a) Nothing in this proclamation shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this twentieth day of January, in the year of our Lord two thousand twenty-five, and of the Independence of the United States of America the two hundred and forty-ninth.

[FR Doc. 2025–01951
Filed 1–28–25; 8:45 am]
Billing code 3395–F4–P

HaitiTPSAR000087

| Community | Community map repository address |
|---|---|
| City of Buchanan | Buchanan City Hall, 302 North Redbud Trail, Buchanan, MI 49107. |
| City of Coloma | Coloma City Hall, 119 North Paw Paw Street, Coloma, MI 49038. |
| City of Niles | Niles City Hall, 333 North Second Street, Suite 301, Niles, MI 49120. |
| City of St. Joseph | St. Joseph City Hall, 700 Broad Street, St. Joseph, MI 49085. |
| City of Watervliet | Watervliet City Hall, 158 West Pleasant Street, Watervliet, MI 49098. |
| Township of Berrien | Berrien Township Office, 8916 M–140, Berrien Center, MI 49102. |
| Township of Bertrand | Bertrand Community Hall, 3835 Buffalo Road, Buchanan, MI 49107. |
| Township of Buchanan | Buchanan Township Hall, 15235 Main Street, Buchanan, MI 49107. |
| Township of Hagar | Hagar Township Hall, 3900 Riverside Road, Riverside, MI 49084. |
| Township of Royalton | Royalton Township Hall, 980 Miners Road, St. Joseph, MI 49085. |
| Township of Sodus | Sodus Township Office, 4056 King Drive, Sodus, MI 49126. |
| Village of Shoreham | Village of Shoreham Village Hall, 2120 Brown School Road, St. Joseph, MI 49085. |

| Cass County, Michigan (All Jurisdictions) Project: 23–05–0013S   Preliminary Date: March 27, 2024 | |
|---|---|
| City of Dowagiac | City Hall, 241 South Front Street, Dowagiac, MI 49047. |
| Township of Calvin | Calvin Township Hall, 18693 Mount Zion Street, Cassopolis, MI 49031. |
| Township of Jefferson | Jefferson Township Hall, 24725 Jefferson Center Street, Cassopolis, MI 49031. |
| Township of Lagrange | Lagrange Township Hall, 58253 M–62, Cassopolis, MI 49031. |
| Township of Marcellus | Township Hall, 463 W Main Street, Marcellus, MI 49067. |
| Township of Mason | Mason Township Hall, 17049 US Highway 12, Edwardsburg, MI 49112. |
| Township of Newberg | Newberg Township Hall, 13020 Born Street, Jones, MI 49061. |
| Township of Ontwa | Ontwa Township Hall, 26225 US Highway 12, Edwardsburg, MI 49112. |
| Township of Penn | Penn Township Hall, 60717 South Main Street, Vandalia, MI 49095. |
| Township of Pokagon | Pokagon Township Hall, 30683 Peavine Street, Dowagiac, MI 49047. |
| Township of Porter | Porter Township Hall, 69373 Baldwin Prairie Road, Union, MI 49130. |
| Township of Silver Creek | Silver Creek Township Hall, 32764 Dixon Street, Dowagiac, MI 49047. |
| Township of Volinia | Volinia City Hall, 53254 Goodenough Road, Marcellus, MI 49067. |
| Township of Wayne | Wayne Township Hall, 53950 Glenwood Road, Dowagiac, MI 49047. |
| Village of Cassopolis | Village Hall, 121 North Disbrow Street, Cassopolis, MI 49031. |
| Village of Edwardsburg | Village Hall, 26296 US Highway 12, Edwardsburg, MI 49112. |
| Village of Vandalia | Village Hall, 18035 State Street, Vandalia, MI 49095. |

[FR Doc. 2025–02982 Filed 2–21–25; 8:45 am]

**BILLING CODE 9110–12–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

**[CIS No. 2809–25; DHS Docket No. USCIS–2014–0001]**

**RIN 1615–ZB70**

**Partial Vacatur of 2024 Temporary Protected Status Decision for Haiti**

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS).

**ACTION:** Notice of Temporary Protected Status (TPS) partial vacatur.

---

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) has decided to partially vacate the June 4, 2024, decision of former Secretary Alejandro Mayorkas regarding the extension of the designation of Haiti for Temporary Protected Status (TPS) and the new designation of Haiti for TPS. In

the 2024 action, former Secretary Mayorkas again extended the designation of Haiti for TPS for the statutory maximum of 18 months (until February 3, 2026), which covered approximately 199,445 Haitian nationals; and again newly designated Haiti for TPS, which had the effect of allowing approximately 321,349 additional Haitian nationals to qualify for the same 18-month period. For the reasons described in this notice, the Secretary has determined to partially vacate the June 4, 2024, decision by reducing the designation period from 18 months to 12 months. The Secretary is also making a corresponding change to the registration deadline for new applicants under the new designation. Accordingly, by operation of this notice, the Haiti TPS extension and new designation will expire on August 3, 2025, instead of February 3, 2026, and the first-time registration will remain in effect until August 3, 2025, instead of February 3, 2026.

**DATES:** The partial vacatur of the June 4, 2024, decision is effective immediately. Notice of the June 4, 2024, decision was published at 89 FR 54484 (July 1, 2024).

**FOR FURTHER INFORMATION CONTACT:** Samantha Deshommes, Chief,

Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, 800–375–5283.

**SUPPLEMENTARY INFORMATION:**

**I. Temporary Protected Status (TPS) Generally**

The Immigration and Nationality Act (INA) authorizes the Secretary, after consultation with appropriate U.S. Government agencies, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist.[1] In the case of Haiti, the designation was based on former Secretary Mayorkas' determination that ''there exist extraordinary and temporary conditions in [Haiti] that prevent aliens who are nationals of [Haiti] from returning to [Haiti] in safety.'' Former Secretary Mayorkas, however, failed to evaluate whether ''permitting the aliens to remain temporarily in the United

---

[1] INA 244(b)(1), 8 U.S.C. 1254a(b)(1). Although section 244(b)(1) of the INA continues to refer to the Attorney General, this authority now resides with the Secretary of Homeland Security by operation of the Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135, as amended. *See, e.g.,* 6 U.S.C. 557; 8 U.S.C. 1103(a)(1).

HaitiTPSAR000088

States'' is not ''contrary to the national interest of the United States.''[2]

The determination whether to designate any foreign state (or part thereof) for TPS is discretionary, and with respect to an exercise of this discretion, Congress expressly withheld jurisdiction from Federal courts such that there is no judicial review of ''any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state'' for TPS.[3] If a country is designated, the Secretary, in the Secretary's discretion, may then grant TPS to eligible nationals of that foreign state (or individual aliens having no nationality who last habitually resided in the designated foreign state). *See* INA 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A). The INA provides that such aliens shall be granted employment authorization, and that such work authorization must be effective throughout the TPS designation period.[4]

At least 60 days before the expiration of a foreign state's TPS designation or extension, the Secretary, after consultation with appropriate U.S. Government agencies, must review the conditions in the foreign state designated for TPS to determine whether they continue to meet the conditions for the TPS designation. *See* INA 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines conditions in the foreign state continue to meet the conditions for TPS designation, the designation will be extended for 6 months or, in the Secretary's discretion, 12 or 18 months. *See* INA 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

## II. Background

Designations of Haiti for TPS based on ''extraordinary and temporary conditions'' in that country extend back *15 years.* Haiti was initially designated

in January 2010 on the basis of extraordinary and temporary conditions stemming from an earthquake.[5] DHS estimated at the time that there were 100,000 to 200,000 Haitians in the United States who would be eligible.[6] Following the initial designation, DHS extended the TPS designation for Haiti and newly designated Haiti based on ''extraordinary and temporary conditions'' numerous times between 2011 and 2018.[7]

In January 2018, DHS announced the termination of the TPS designation of Haiti effective July 22, 2019.[8] The termination of Haiti's TPS designation was challenged in several lawsuits, and preliminary injunctions prevented DHS from implementing the termination of TPS for Haiti pending a final court order.[9]

Meanwhile, in August 2021, former Secretary Mayorkas announced that he was newly designating Haiti for 18

[5] *See Designation of Haiti for Temporary Protected Status,* 75 FR 3476 (Jan. 21, 2010).
[6] 75 FR 3477.
[7] *See Extension and Redesignation of Haiti for Temporary Protected Status,* 76 FR 29000 (May 19, 2011); *Extension of the Designation of Haiti for Temporary Protected Status,* 77 FR 59943 (Oct. 1, 2012); *Extension of the Designation of Haiti for Temporary Protected Status,* 79 FR 11808 (Mar. 3, 2014); *Extension of the Designation of Haiti for Temporary Protected Status,* 80 FR 51582 (Aug. 25, 2015); *Extension of the Designation of Haiti for Temporary Protected Status,* 82 FR 23830 (May 24, 2017).
[8] *See Termination of the Designation of Haiti for Temporary Protected Status,* 83 FR 2648 (Jan. 18, 2018).
[9] *See, e.g.,* Order Granting Motion for Preliminary Injunction dated Oct. 3, 2018, ECF 128, in *Ramos* v. *Nielsen,* No. 18–cv–01554 (N.D. Cal.); Decision and Order dated Apr. 11, 2019, ECF 155 in *Saget* v. *Trump,* No. 1:18–cv–1599 (E.D.N.Y.). Both preliminary injunctions were appealed, *see Ramos* v. *Nielsen,* No. 18–16981 (9th Cir.) and *Saget* v. *Trump,* No. 19–1685 (2d Cir,), but the appellate proceedings were dismissed after Haiti was newly designated for TPS. *See* Order dated June 29, 2023, ECF 191, *Ramos* v. *Nielsen,* No. 18–16981 (9th Cir,); Order on parties' stipulated dismissal of appeal, dated Oct. 5, 2021, ECF 281, *Saget* v. *Trump,* No. 19–1685 (2d Cir.). On Dec. 28, 2023, the U.S. District Court for the Northern District of California dismissed *Ramos* v. *Nielsen,* No. 18–cv–01554 (N.D. Cal. Dec. 28, 2023), holding that the subsequent TPS designations rendered the litigation moot. *See* Order Granting Defendants' Motion to Dismiss dated Dec. 28, 2023, ECF 222, *Ramos* v. *Nielsen,* No. 18–cv–01554, (N.D. Cal.). On October 15, 2021, the U.S. District Court for the Eastern District of New York similarly dismissed the *Saget* case. *See* Stipulation of Dismissal and Order Dismissing Case dated Oct. 15, 2021, ECF 166, *Saget* v. *Trump,* No. 1:18–cv–1599 (E.D.N.Y.). The termination of TPS for Haiti was also challenged in *Centro Presente, et al.,* v. *Biden,* No. 1:18–cv–1–340 (D. Mass.) and *Nat'l Ass'n for the Advancement of Colored People* v. *Dep't of Homeland Security,* No.1:18–cv–239 (D. Md.). Claims in those cases were also dismissed following the new designation of TPS for Haiti. *See* Stipulation of Dismissal dated June 29, 20203, ECF 178, *Centro Presente, et al.* v. *Biden,* No. 1:18–cv–1–340 (D. Mass.); Order Approving Stipulation of Dismissal dated Nov. 4, 2021, ECF 116, *NAACP* v. *DHS,* No.1:18–cv–239 (D. Md.).

months on the basis of ''extraordinary and temporary conditions.''[10] Another 18-month extension and new designation was published in February 2023.[11] DHS then extended the re-registration period from 60 days to 18 months.[12]

Most recently, in July 2024, DHS issued a notice stating that Secretary Mayorkas once again had determined to extend and newly designate Haiti for TPS for an 18-month period, set to expire on February 3, 2026.[13] DHS concluded, in summary, that ''Haiti is experiencing extraordinary and temporary conditions resulting from grave insecurity and gang crime, as well as socio-economic and humanitarian conditions, including those resulting from environmental disasters aggravating food insecurity.''[14] However, DHS concluded, without any support in the record, that allowing Haitian nationals who would qualify for TPS to remain in the country was not contrary to the national interest, as required by the statute.

Each new designation allowed additional Haitian nationals who entered the United States, including illegally, to qualify even though these populations were not impacted by the preceding findings of ''extraordinary and temporary conditions.'' In May 2011, DHS estimated that 57,000 Haitians were eligible to register for TPS.[15] In August 2021, DHS estimated that 155,000 Haitians were eligible under that new designation.[16] And by July 2024, the estimate had ballooned to 520,694 (199,445 under the extension, and 321,249 additional aliens under the new designation).[17]

Further, former Secretary Mayorkas in 2023 reconsidered and rescinded the first Trump Administration's decisions to terminate TPS designations for Honduras, El Salvador, Nicaragua, and Nepal.[18] In the case of El Salvador,

[2] INA 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C); *see Extension and Redesignation of Haiti for Temporary Protected Status,* 89 FR 54484 (July 1, 2024). The Secretary also may designate a country (or part of a country) for TPS on the basis of (1) an ongoing armed conflict such that returning would pose a serious threat to the personal safety of the country's nationals, or (2) an environmental disaster (including an epidemic) that results in a substantial, but temporary, disruption of living conditions in the affected area and certain other conditions are met. *See* INA 244(b)(1)(A)–(B), 8 U.S.C. 1254a(b)(1)(A)–(B).
[3] INA 244(b)(5)(A), 8 U.S.C. 1254a(b)(5)(A).
[4] *See* INA 244(a)(1)(B), (a)(2), 8 U.S.C. 1254a(a)(1)(B), (a)(2).

[10] *See Designation of Haiti for Temporary Protected Status,* 86 FR 41863 (Aug. 3, 2021).
[11] *See Extension and Redesignation of Haiti for Temporary Protected Status,* 88 FR 5022 (Jan. 26, 2023).
[12] *See Extension of Re-Registration Periods for Extensions of the Temporary Protected Status Designations of El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan,* 88 FR 86665 (Dec. 14, 2023).
[13] *See Extension and Redesignation of Haiti for Temporary Protected Status,* 89 FR 54484 (July 1, 2024).
[14] 89 FR 54491.
[15] 76 FR 29002.
[16] 86 FR 41868.
[17] 89 FR 54492.
[18] *See Reconsideration and Rescission of Termination of the Designation of El Salvador for Temporary Protected Status; Extension of the Temporary Protected Status Designation for El Salvador,* 88 FR 40282 (June 21, 2023);

Secretary Mayorkas determined—five years after the 2018 termination decision was announced—that "at the time of the decision to terminate TPS, El Salvador continued to experience" certain conditions "that were either insufficiently considered or not considered in the termination decision" and therefore that "[t]he termination decision failed to adequately assess conditions in El Salvador in 2018." [19] That notice stated that "[a]n agency has inherent (that is, statutorily implicit) authority to revisit its prior decisions unless Congress has expressly limited that authority" and that "[t]he TPS statute does not limit the Secretary's inherent authority to reconsider any TPS-related determination, and upon reconsideration, to change the determination." [20] DHS did not similarly reconsider and rescind the 2018 decision to terminate the Haiti TPS designation because, as noted, Secretary Mayorkas instead decided to newly designate Haiti.[21]

### III. Reconsideration and Partial Vacatur of the 2024 Decision

President Trump underscored in Executive Order 14159, *Protecting the American People Against Invasion,* that enforcing the immigration laws "is critically important to the national security and public safety of the United States." [22] In furtherance of that objective, the President directed the Secretary, along with the Attorney General and Secretary of State, to promptly take all appropriate action, consistent with law, to rescind policies that led to increased or continued presence of illegal aliens in the United States.[23] Among the directed actions are to ensure that the TPS designations are consistent with the TPS statute and "are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute." [24]

The Secretary of Homeland Security accordingly is reconsidering and partially vacating the June 4, 2024, decision of Secretary Mayorkas to extend the Haiti TPS designation and newly designate Haiti for TPS for an additional 18 months (from Aug. 4, 2024, to Feb. 3, 2026). Specifically, the Secretary has determined that the extension and designation period for Haiti should be reduced from the statutory maximum of 18 months to 12 months. Accordingly, by operation of this notice, the Haiti TPS extension and new designation will expire on August 3, 2025, instead of February 3, 2026.

The Secretary is taking this action for several reasons. First, there is no discussion in the July 1, 2024, **Federal Register** notice of why the 18-month period was selected in lieu of a 6- or 12-month period. Nor does the administrative record underlying the June 3, 2024, decision and July 1, 2024, notice bear any discussion of why the 18-month period was chosen. Allowing aliens from a given country, including aliens who entered the United States illegally or overstayed their authorized period of admission, to remain in the United States temporarily with employment authorization is an extraordinary act. Congress recognized the gravity of such action under the TPS statute by setting the default extension period at 6 months,[25] underscoring the uniqueness of this authority,[26] and limiting its own authority to enact legislation allowing TPS recipients to adjust to lawful permanent resident status.[27] Accordingly, determinations of how long a new designation should remain in effect and whether to depart from the default six-month period for an extension of an existing designation should take into account important considerations relating to the purpose of the statute and specific country and country conditions at issue and should not rest alone on administrative convenience. Here, there was no explanation whatsoever of why the 18-month period was selected.

Second, and similarly, the July 1, 2024, notice is bereft of any justification of why permitting the ever-increasing population of Haitian TPS recipients, particularly those who entered the country unlawfully, to remain

temporarily in the United States is not contrary to the U.S. national interest. The notice simply states that "it is not contrary to the national interest of the United States." The administrative record underlying Secretary Mayorkas' June 4, 2024, decision likewise lacks any discussion of the critical national interest criterion. Such conclusory determinations do not accord with the gravity of TPS decisions under the INA. "National interest" is an expansive standard that may encompass an array of broad considerations, including foreign policy, public safety (*e.g.,* potential nexus to criminal gang membership), national security, migration factors (*e.g.,* pull factors), immigration policy (*e.g.,* enforcement prerogatives), and economic considerations (*e.g.,* adverse effects on U.S. workers, impact on U.S. communities).[28] Determining whether permitting a class of aliens to remain temporarily in the United States is contrary to the U.S. national interest therefore calls upon the Secretary's expertise and discretionary judgment, informed by her consultations with appropriate U.S. Government agencies.

Third, although the July 1, 2024, notice cites some country conditions reports that are relatively proximate to the June 4, 2024, decision, several others date back to early 2023, 2022, or even earlier.[29] And certain sources upon which DHS relied indicated that significant developments were taking place in 2024 that might result in an improvement in conditions. For example, as stated in the July 1, 2024, **Federal Register** notice, the United Nations had recently authorized a Multinational Security Support (MSS) mission to deploy in Haiti in 2024 and support the Haitian National Police in capacity building, combatting gang violence, and provide security for

---

*Reconsideration and Rescission of Termination of the Designation of Honduras for Temporary Protected Status; Extension of the Temporary Protected Status Designation for Honduras,* 88 FR 40304 (June 21, 2023); *Reconsideration and Rescission of Termination of the Designation of Nicaragua for Temporary Protected Status; Extension of the Temporary Protected Status Designation for Nicaragua,* 88 FR 40294 (June 21, 2023); *Reconsideration and Rescission of Termination of the Designation of Nepal for Temporary Protected Status; Extension of the Temporary Protected Status Designation for Nepal,* 88 FR 40317 (June 21, 2023).

[19] 88 FR 40287.

[20] 88 FR 40285.

[21] *See Designation of Haiti for Temporary Protected Status,* 86 FR 41863 (Aug. 3, 2021).

[22] 90 FR 8443, 8443 (Jan. 20, 2025).

[23] 90 FR 8446.

[24] *Id.*

[25] *See* INA 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C).

[26] *See* INA 244(g), 8 U.S.C. 1254a(g) ("Except as otherwise specifically provided, this section shall constitute the exclusive authority of the [Secretary of Homeland Security] under law to permit aliens who are or may become otherwise deportable or have been paroled into the United States to remain in the United States temporarily because of their particular nationality or region of foreign state of nationality.").

[27] *See* INA 244(h), 8 U.S.C. 1254a(h).

[28] *See, e.g., Poursina* v. *USCIS,* 936 F.3d 868, 874 (9th Cir. 2019) (observing, in an analogous INA context, "that the 'national interest' standard invokes broader economic an national-security considerations, and such determinations are firmly committed to the discretion of the Executive Branch—not to federal courts" (citing *Trump* v. *Hawaii,* 585 U.S. 667, 684–86 (2018)); *Flores* v. *Garland,* 72 F.4th 85, 89–90 (5th Cir. 2023) (same); *Brasil* v. *Sec'y, Dep't of Homeland Sec.,* 28 F.4th 1189, 1193 (11th Cir. 2022) (same); *cf. Matter of D–J–,* 23 I&N Dec. 572, 579–81 (A.G. 2003) (recognizing that taking measures to stem and eliminate possible incentives for potential large-scale migration from a given country—in that case, Haiti—is "sound immigration policy" and an "important national security interest"); *Matter of Dhanasar,* 26 I&N Dec. 884, 890–91 (AAO 2016) (taking into account impact on U.S. workers in "national interest" assessments).

[29] *See, e.g.,* 89 FR 54888, 54490 (relying on Apr. 2021 report by Harvard Law School, July 2022 report by the International Crisis Group, and Sept. 2021 report by the Council on Foreign Relations).

critical infrastructure.[30] The Department of State likewise underscored that significant development. Thus, both DHS and the Department of State contemplated the real possibility of an improvement in conditions with the deployment of the United Nations MSS mission, yet that important development was not expressly factored into the determination of the length of the extension and designation period.

Eighteen months is the maximum period of designation or extension authorized under the TPS statute. Neither the 2021 new designation, the 2023 extension and new designation, nor the 2024 extension and new designation contained any discussion of national interest considerations or why the 18-month (vs. 6 or 12-month) periods were granted. Given the protracted duration of the ''extraordinary and temporary conditions''-based designation for Haiti, the absence of any meaningful appraisal of national interest factors or justification for the 18-month extension, and the fact that eligible Haitians were able to register for TPS under the July 1, 2024, notice for over seven months, the Secretary has determined that a 12-month period is warranted. Abbreviating the period from 18 to 12 months will allow for a fresh review of country conditions in Haiti and of whether such conditions remain both ''extraordinary'' and ''temporary,'' whether Haitian may return in safety, and whether it is contrary to the U.S. national interest to continue to permit the Haitian nationals to remain temporarily in the United States.

Although the statute allows the Secretary to reassess country conditions—including whether allowing the aliens to remain temporarily in the United States is contrary to the U.S. national interest—at any time at least 60 days before the end of the extension or designation period, the statute does not preclude this more modest action in the interim.[31] The Secretary intends to conduct a review of current conditions in Haiti and make a new determination in due course.

As the prior Administration concluded, the TPS statute does not limit the Secretary's inherent authority under the INA to reconsider any TPS-related determination, and upon reconsideration, to vacate or amend the determination.[32] The Secretary is taking the modest action here of partially vacating the June 4, 2024, decision to reduce the designation and extension period from 18 months to 12 months and to make a corresponding change to the initial registration period for new applicants under the 2024 new designation.

In taking this action, the Secretary has considered putative reliance interests in Secretary Mayorkas' unreasoned granting of the statutory maximum 18-month period.[33] In particular, as noted, in determining that a 12-month period (vs. 6 months) is warranted, the Secretary considered that Haitians have already been able to register under the July 1, 2024, notice for over seven months. The Secretary also considered potential reliance interests in deciding only to partially vacate the 2024 decision instead of—as Secretary Mayorkas did in 2023—entirely rescinding or vacating the prior Administration's decision. This action does not alter the 60-day re-registration period permitted for existing beneficiaries under the 2024 extension, which expired on August 30, 2024. And eligible new applicants will still be able to register under the 2024 new designation, but they must now do so by August 3, 2025, instead of February 3, 2026. Moreover, any putative reliance interests arguably engendered by the 18-month, vs. 12-month, designation and extension period are outweighed by the overriding interests and concerns articulated in this notice.

*B. Effect of the Vacatur*

As a result of the partial vacatur, the 2024 Haiti TPS extension and new designation remains in effect until August 3, 2025, and the initial registration period for new applicants under the 2024 Haiti TPS designation will remain in effect until August 3, 2025. The Secretary, consistent with the statute, intends to review the Haiti TPS designation by June 4, 2025. If she fails to do so, the statute triggers an automatic six-month extension of the current TPS designation.

Pursuant to this partial vacatur, TPS re-registration applications, initial applications, and associated applications for employment authorization filed pursuant to the July 1, 2024, notice that remain pending with USCIS will, if approved, receive an expiration date of August 3, 2025. TPS beneficiaries under the Haiti TPS designation who have already received Employment Authorization Documents (EADs); Forms 1–797, Notice of Action (Approval Notice); and Forms 1–94, Arrival/Departure Record (collectively known as TPS-related documentation) with a February 3, 2026, expiration date do not need to refile applications with USCIS for new TPS-related documentation showing an August 3, 2025, expiration date. USCIS will not recall TPS-related documentation previously issued with February 3, 2026, expiration dates and those documents remain valid through the new TPS Haiti designation period expiring on August 3, 2025. Additionally, USCIS will not issue new TPS-related documentation with the August 3, 2025, expiration date to aliens who have previously received documentation with the February 3, 2026, expiration date.

Employers and Federal, State, and local government agencies (such as Departments of Motor Vehicles) that previously accepted or are presented with an EAD with the TPS category code of A–12 or C–19 that expires on February 3, 2026, must update their records to note that the validity date of the document is through August 3, 2025.

Aliens who have filed TPS applications pursuant to the July 1, 2024, notice that remain pending with USCIS may also choose to withdraw their TPS applications and request a refund of any filing fees by submitting

---

[30] 89 FR 54490 & nn. 77–79 (citing United Nations Security Council, Resolution 2699 (Oct. 2, 2023)).

[31] *See* INA 244(b)(3)(A)–(B), 1254a(b)(3)(A)–(B) (providing that the Secretary shall review conditions at least 60 days before the end of the initial period of designation and any extended period of designation).

[32] *See* INA 103(a), 244(b)(3), (b)(5)(A); 8 U.S.C. 1103(a), 1254a(b)(3), (b)(5)(A); *Reconsideration and Rescission of Termination of the Designation of El Salvador for Temporary Protected Status; Extension of the Temporary Protected Status Designation for El Salvador,* 88 FR 40282, 40285 (June 21, 2023) (''An agency has inherent (that is, statutorily implicit) authority to revisit its prior decisions unless Congress has expressly limited that authority. The TPS statute does not limit the Secretary's inherent authority to reconsider any TPS-related determination, and upon reconsideration, to change the determination.''); *see also, e.g., Ivy Sports Medicine, LLC* v. *Burwell,* 767 F.3d 81, 86 (D.C. Cir. 2014) (Kavanaugh, J.) (''[A]dministrative agencies are assumed to possess at least some inherent authority to revisit their prior decisions, at least if done in a timely fashion. . . . ''[I]nherent authority for timely administrative reconsideration is premised on the notion that the power to reconsider is inherent in the power to decide.'' (quotation marks and citations omitted)); *Macktal* v. *Chao,* 286 F.3d 822, 825–26 (5th Cir. 2002) (''It is generally accepted that in the absence of a specific statutory limitation, an administrative agency has the inherent authority to reconsider its decisions.'') (collecting cases); *Mazaleski* v. *Treusdell,* 562 F.2d 701, 720 (D.C. Cir. 1977) (''We have many times held that an agency has the inherent power to reconsider and change a decision if it does so within a reasonable period of time.''); *cf. Last Best Beef, LLC* v. *Dudas,* 506 F.3d 333, 340 (4th Cir. 2007) (agencies possess especially ''broad authority to correct their prior errors'').

[33] Because temporary protected status, as the name itself makes clear, is an inherently temporary status and TPS designations are time-limited and subject to agency review, any putative reliance interests of registrants in the Haiti under the Haiti designation merit only diminished weight.

a signed written withdrawal request to USCIS.

## IV. Notice of Partial Vacatur of Secretary Mayorkas' 2024 Decision Regarding the Haiti TPS Extension and New Designation

By the authority vested in me as Secretary under sections 103(a) and 244 of the Immigration and Nationality Act, 8 U.S.C. 1103(a), 1254a, I am vacating in part the decision announced in the July 1, 2024, notice titled *Extension and Redesignation of Haiti for Temporary Protected Status,* 89 FR 54484. In doing so, I am (1) amending the period of the extension and designation of Haiti for TPS from 18 months to 12 months, with a new end date of August 3, 2025; and (2) making a corresponding change to the initial registration period for new applicants under the new designation, which now will remain in effect through August 3, 2025. This notice supersedes the July 1, 2024, notice at 89 FR 54484 to the extent modified by this partial vacatur.

Information concerning the TPS designation for Haiti will be available at local USCIS offices upon publication of this notice and through the USCIS National Customer Service Center at 1–800–375–5283. This information will be published on the USCIS website at *www.USCIS.gov.*

**Kristi Noem,**

*Secretary, U.S. Department of Homeland Security.*

[FR Doc. 2025–02970 Filed 2–20–25; 4:15 pm]

**BILLING CODE 9111–97–P**

---

## INTERNATIONAL TRADE COMMISSION

**[Investigation Nos. 731–TA–1662–1663 (Final)]**

## Glass Wine Bottles From China and Mexico

### Determinations

On the basis of the record [1] developed in the subject investigations, the United States International Trade Commission ("Commission") determines, pursuant to the Tariff Act of 1930 ("the Act"), that an industry in the United States is not materially injured or threatened with material injury by reason of imports of glass wine bottles from China and Mexico, provided for in subheading 7010.90.50 of the Harmonized Tariff Schedule of the United States, that have been found by the U.S. Department of

Commerce ("Commerce") to be sold in the United States at less than fair value ("LTFV").[2]

### Background

The Commission instituted these investigations effective December 29, 2023, following receipt of petitions filed with the Commission and Commerce by the U.S. Glass Producers Coalition, which is comprised of Ardagh Glass Inc. (Indianapolis, Indiana) and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (Pittsburgh, Pennsylvania). The Commission scheduled the final phase of the investigations following notification of a preliminary determination by Commerce that imports of glass wine bottles from China were being subsidized by the government of China (89 FR 47533, June 3, 2024). Notice of the scheduling of the final phase of the Commission's investigations and of a public hearing to be held in connection therewith was given by posting copies of the notice in the Office of the Secretary, U.S. International Trade Commission, Washington, DC, and by publishing the notice in the **Federal Register** (89 FR 49901, June 12, 2024, and as revised in 89 FR 63445, August 5, 2024). The Commission conducted its hearing on August 14, 2024. All persons who requested the opportunity were permitted to participate.

Although antidumping duty petitions for Chile, China, and Mexico and a countervailing duty petition for China were filed on the same day, December 29, 2023, the investigation schedules became staggered when Commerce did not align its countervailing duty investigation concerning China with its antidumping duty investigations concerning Chile, China, and Mexico and reached an earlier final countervailing duty determination. On October 9, 2024, the Commission issued a final negative determination in its countervailing duty investigation of glass wine bottles from China (89 FR 83515, October 16, 2024).

On December 10, 2024, counsel for the petitioner filed with Commerce a request to withdraw its petition regarding imports of glass wine bottles from Chile. On December 30, 2024, Commerce published notice in the **Federal Register** of the termination of its subject investigation concerning glass wine bottles from Chile (89 FR 106425) and the Commission subsequently terminated its antidumping duty investigation

concerning glass wine bottles from Chile (90 FR 1543, January 8, 2025).

Following notification of final determinations by Commerce that imports of glass wine bottles from China and Mexico were being sold at LTFV within the meaning of section 735(a) of the Act (19 U.S.C. 1673d(a)), notice of the supplemental scheduling of the final phase of the Commission's antidumping duty investigations concerning China and Mexico was given by posting copies of the notice in the Office of the Secretary, U.S. International Trade Commission, Washington, DC, and by publishing the notice in the **Federal Register** (90 FR 3251, January 14, 2025).

The Commission made these determinations pursuant to § 735(b) of the Act (19 U.S.C. 1673d(b)). It completed and filed its determinations in these investigations on February 18, 2025. The views of the Commission are contained in USITC Publication 5588 (February 2025), entitled *Glass Wine Bottles from China and Mexico: Investigation Nos. 731–TA–1662–1663 (Final).*

By order of the Commission.

Issued: February 18, 2025.

**Lisa Barton,**

*Secretary to the Commission.*

[FR Doc. 2025–02959 Filed 2–21–25; 8:45 am]

**BILLING CODE 7020–02–P**

---

## INTERNATIONAL TRADE COMMISSION

## Notice of Receipt of Complaint; Solicitation of Comments Relating to the Public Interest

**AGENCY:** U.S. International Trade Commission.

**ACTION:** Notice.

**SUMMARY:** Notice is hereby given that the U.S. International Trade Commission has received a complaint entitled *Certain Foreign-Fabricated Semiconductor Devices, Products Containing the Same, and Components Thereof, DN3809;* the Commission is soliciting comments on any public interest issues raised by the complaint or complainant's filing pursuant to the Commission's Rules of Practice and Procedure.

**FOR FURTHER INFORMATION CONTACT:** Lisa R. Barton, Secretary to the Commission, U.S. International Trade Commission, 500 E Street SW, Washington, DC 20436, telephone (202) 205–2000. The public version of the complaint can be accessed on the Commission's Electronic Document Information System (EDIS) at *https://edis.usitc.gov.*

---

[1] The record is defined in § 207.2(f) of the Commission's Rules of Practice and Procedure (19 CFR 207.2(f)).

[2] 90 FR 76 and 79 (January 2, 2025).

HaitiTPSAR000092

# Presidential Documents

Proclamation 10949 of June 4, 2025

## Restricting the Entry of Foreign Nationals To Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats

**By the President of the United States of America**

**A Proclamation**

During my first Administration, I restricted the entry of foreign nationals into the United States, which successfully prevented national security threats from reaching our borders and which the Supreme Court upheld. In Executive Order 14161 of January 20, 2025 (Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats), I stated that it is the policy of the United States to protect its citizens from aliens who intend to commit terrorist attacks, threaten our national security, espouse hateful ideology, or otherwise exploit the immigration laws for malevolent purposes.

I also stated that the United States must be vigilant during the visa-issuance process to ensure that those aliens approved for admission into the United States do not intend to harm Americans or our national interests. More importantly, the United States must identify such aliens before their admission or entry into the United States. The United States must ensure that admitted aliens and aliens otherwise already present in the United States do not bear hostile attitudes toward its citizens, culture, government, institutions, or founding principles, and do not advocate for, aid, or support designated foreign terrorists or other threats to our national security.

I directed the Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, to identify countries throughout the world for which vetting and screening information is so deficient as to warrant a full or partial suspension on the admission of nationals from those countries pursuant to section 212(f) of the Immigration and Nationality Act (INA), 8 U.S.C. 1182(f). After completing that process, the Secretary of State determined that a number of countries remain deficient with regards to screening and vetting. Many of these countries have also taken advantage of the United States in their exploitation of our visa system and their historic failure to accept back their removable nationals.

As President, I must act to protect the national security and national interest of the United States and its people. I remain committed to engaging with those countries willing to cooperate to improve information-sharing and identity-management procedures, and to address both terrorism-related and public-safety risks. Nationals of some countries also pose significant risks of overstaying their visas in the United States, which increases burdens on immigration and law enforcement components of the United States, and often exacerbates other risks related to national security and public safety.

Some of the countries with inadequacies face significant challenges to reform efforts. Others have made important improvements to their protocols and procedures, and I commend them for these efforts. But until countries with identified inadequacies address them, members of my Cabinet have recommended certain conditional restrictions and limitations. I have considered and largely accepted those recommendations and impose the limitations

HaitiTPSAR000093

set forth below on the entry into the United States by the classes of foreign nationals identified in sections 2 and 3 of this proclamation.

NOW, THEREFORE, I, DONALD J. TRUMP, President of the United States of America, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), and section 301 of title 3, United States Code, hereby find that, absent the measures set forth in this proclamation, the immigrant and nonimmigrant entry into the United States of persons described in sections 2 and 3 of this proclamation would be detrimental to the interests of the United States, and that their entry should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:

**Section 1**. *Policy and Purpose.* (a) It is the policy of the United States to protect its citizens from terrorist attacks and other national security or public-safety threats. Screening and vetting protocols and procedures associated with visa adjudications and other immigration processes play a critical role in implementing that policy. These protocols enhance our ability to detect foreign nationals who may commit, aid, or support acts of terrorism, or otherwise pose a safety threat, and they aid our efforts to prevent such individuals from entering the United States.

(b) Information-sharing and identity-management protocols and practices of foreign governments are important for the effectiveness of the screening and vetting protocols and procedures of the United States. Governments manage the identity and travel documents of their nationals and residents. They also control the circumstances under which they provide information about their nationals to other governments, including information about known or suspected terrorists and criminal-history information. It is, therefore, the policy of the United States to take all necessary and appropriate steps to encourage foreign governments to improve their information-sharing and identity-management protocols and practices and to regularly share their identity and threat information with the immigration screening and vetting systems of the United States.

(c) Section 2(b) of Executive Order 14161 directed the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, within 60 days of the date of that order, to jointly submit to the President, through the Assistant to the President for Homeland Security, a report identifying countries throughout the world for which vetting and screening information is so deficient as to warrant a full or partial suspension on the entry or admission of nationals from those countries pursuant to section 212(f) of the INA (8 U.S.C. 1182(f)).

(d) On April 9, 2025, the Secretary of State, with the Assistant to the President for Homeland Security, presented the report described in subsection (c) of this section, recommending that entry restrictions and limitations be placed on foreign nationals of several countries. The report identified countries for which vetting and screening information is so deficient as to warrant a full suspension of admissions and countries that warrant a partial suspension of admission.

(e) In evaluating the recommendations from the Secretary of State and in determining what restrictions to impose for each country, I consulted with the Secretary of State, the Secretary of Defense, the Attorney General, the Secretary of Homeland Security, appropriate Assistants to the President, the Director of National Intelligence, and the Director of the Central Intelligence Agency. I considered foreign policy, national security, and counterterrorism goals. And I further considered various factors, including each country's screening and vetting capabilities, information sharing policies, and country-specific risk factors—including whether each country has a significant terrorist presence within its territory, its visa-overstay rate, and its cooperation with accepting back its removable nationals.

HaitiTPSAR000094

I also considered the different risks posed by aliens admitted on immigrant visas and those admitted on nonimmigrant visas. Persons admitted on immigrant visas become lawful permanent residents of the United States. Such persons may present national security or public-safety concerns that may be distinct from those admitted as nonimmigrants. The United States affords lawful permanent residents more enduring rights than it does to nonimmigrants. Lawful permanent residents are more difficult to remove than nonimmigrants, even after national security concerns arise, which increases the costs and aggravates the dangers of errors associated with admitting such individuals. And although immigrants are generally subject to more extensive vetting than nonimmigrants, such vetting is far less reliable when the country from which someone seeks to emigrate maintains inadequate identity-management or information-sharing policies or otherwise poses risks to the national security of the United States.

I reviewed these factors and assessed these goals, with a particular focus on crafting country-specific restrictions. This approach was designed to encourage cooperation with the subject countries in recognition of each country's unique circumstances. The restrictions and limitations imposed by this proclamation are, in my judgment, necessary to prevent the entry or admission of foreign nationals about whom the United States Government lacks sufficient information to assess the risks they pose to the United States. The restrictions and limitations imposed by this proclamation are necessary to garner cooperation from foreign governments, enforce our immigration laws, and advance other important foreign policy, national security, and counterterrorism objectives.

(f) After reviewing the report described in subsection (d) of this section, and after accounting for the foreign policy, national security, and counterterrorism objectives of the United States, I have determined to fully restrict and limit the entry of nationals of the following 12 countries: Afghanistan, Burma, Chad, Republic of the Congo, Equatorial Guinea, Eritrea, Haiti, Iran, Libya, Somalia, Sudan, and Yemen. These restrictions distinguish between, but apply to both, the entry of immigrants and nonimmigrants.

(g) I have determined to partially restrict and limit the entry of nationals of the following 7 countries: Burundi, Cuba, Laos, Sierra Leone, Togo, Turkmenistan, and Venezuela. These restrictions distinguish between, but apply to both, the entry of immigrants and nonimmigrants.

(h) Sections 2 and 3 of this proclamation describe some of the identity-management or information-sharing inadequacies that led me to impose restrictions. These inadequacies are sufficient to justify my finding that unrestricted entry of nationals from the named countries would be detrimental to the interests of the United States. Publicly disclosing additional details on which I relied in making these determinations, however, would cause serious damage to the national security of the United States, and many such details are classified.

**Sec. 2**. *Full Suspension of Entry for Nationals of Countries of Identified Concern.* The entry into the United States of nationals of the following countries is hereby suspended and limited, as follows, subject to the categorical exceptions and case-by-case waivers described in section 5 of this proclamation:

(a) *Afghanistan*

(i) The Taliban, a Specially Designated Global Terrorist (SDGT) group, controls Afghanistan. Afghanistan lacks a competent or cooperative central authority for issuing passports or civil documents and it does not have appropriate screening and vetting measures. According to the Fiscal Year 2023 Department of Homeland Security (DHS) Entry/Exit Overstay Report ("Overstay Report"), Afghanistan had a business/tourist (B–1/B–2) visa overstay rate of 9.70 percent and a student (F), vocational (M), and exchange visitor (J) visa overstay rate of 29.30 percent.

(ii) The entry into the United States of nationals of Afghanistan as immigrants and nonimmigrants is hereby fully suspended.

HaitiTPSAR000095

(b) *Burma*

(i) According to the Overstay Report, Burma had a B–1/B–2 visa overstay rate of 27.07 percent and an F, M, and J visa overstay rate of 42.17 percent. Additionally, Burma has historically not cooperated with the United States to accept back their removable nationals.

(ii) The entry into the United States of nationals of Burma as immigrants and nonimmigrants is hereby fully suspended.

(c) *Chad*

(i) According to the Overstay Report, Chad had a B–1/B–2 visa overstay rate of 49.54 percent and an F, M, and J visa overstay rate of 55.64 percent. According to the Fiscal Year 2022 Overstay Report, Chad had a B–1/B–2 visa overstay rate of 37.12 percent. The high visa overstay rate for 2022 and 2023 is unacceptable and indicates a blatant disregard for United States immigration laws.

(ii) The entry into the United States of nationals of Chad as immigrants and nonimmigrants is hereby fully suspended.

(d) *Republic of the Congo*

(i) According to the Overstay Report, the Republic of the Congo had a B–1/B–2 visa overstay rate of 29.63 percent and an F, M, and J visa overstay rate of 35.14 percent.

(ii) The entry into the United States of nationals of the Republic of the Congo as immigrants and nonimmigrants is hereby fully suspended.

(e) *Equatorial Guinea*

(i) According to the Overstay Report, Equatorial Guinea had a B–1/B–2 visa overstay rate of 21.98 percent and an F, M, and J visa overstay rate of 70.18 percent.

(ii) The entry into the United States of nationals of Equatorial Guinea as immigrants and nonimmigrants is hereby fully suspended.

(f) *Eritrea*

(i) The United States questions the competence of the central authority for issuance of passports or civil documents in Eritrea. Criminal records are not available to the United States for Eritrean nationals. Eritrea has historically refused to accept back its removable nationals. According to the Overstay Report, Eritrea had a B–1/B–2 visa overstay rate of 20.09 percent and an F, M, and J visa overstay rate of 55.43 percent.

(ii) The entry into the United States of nationals of Eritrea as immigrants and nonimmigrants is hereby fully suspended.

(g) *Haiti*

(i) According to the Overstay Report, Haiti had a B–1/B–2 visa overstay rate of 31.38 percent and an F, M, and J visa overstay rate of 25.05 percent. Additionally, hundreds of thousands of illegal Haitian aliens flooded into the United States during the Biden Administration. This influx harms American communities by creating acute risks of increased overstay rates, establishment of criminal networks, and other national security threats. As is widely known, Haiti lacks a central authority with sufficient availability and dissemination of law enforcement information necessary to ensure its nationals do not undermine the national security of the United States.

(ii) The entry into the United States of nationals of Haiti as immigrants and nonimmigrants is hereby fully suspended.

(h) *Iran*

(i) Iran is a state sponsor of terrorism. Iran regularly fails to cooperate with the United States Government in identifying security risks, is the source of significant terrorism around the world, and has historically failed to accept back its removable nationals.

(ii) The entry into the United States of nationals of Iran as immigrants and nonimmigrants is hereby suspended.

HaitiTPSAR000096

(i) *Libya*

(i) There is no competent or cooperative central authority for issuing passports or civil documents in Libya. The historical terrorist presence within Libya's territory amplifies the risks posed by the entry into the United States of its nationals.

(ii) The entry into the United States of nationals of Libya as immigrants and nonimmigrants is hereby fully suspended.

(j) *Somalia*

(i) Somalia lacks a competent or cooperative central authority for issuing passports or civil documents and it does not have appropriate screening and vetting measures. Somalia stands apart from other countries in the degree to which its government lacks command and control of its territory, which greatly limits the effectiveness of its national capabilities in a variety of respects. A persistent terrorist threat also emanates from Somalia's territory. The United States Government has identified Somalia as a terrorist safe haven. Terrorists use regions of Somalia as safe havens from which they plan, facilitate, and conduct their operations. Somalia also remains a destination for individuals attempting to join terrorist groups that threaten the national security of the United States. The Government of Somalia struggles to provide governance needed to limit terrorists' freedom of movement. Additionally, Somalia has historically refused to accept back its removable nationals.

(ii) The entry into the United States of nationals of Somalia as immigrants and nonimmigrants is hereby fully suspended.

(k) *Sudan*

(i) Sudan lacks a competent or cooperative central authority for issuing passports or civil documents and it does not have appropriate screening and vetting measures. According to the Overstay Report, Sudan had a B–1/B–2 visa overstay rate of 26.30 percent and an F, M, and J visa overstay rate of 28.40 percent.

(ii) The entry into the United States of nationals of Sudan as immigrants and nonimmigrants is hereby fully suspended.

(l) *Yemen*

(i) Yemen lacks a competent or cooperative central authority for issuing passports or civil documents and it does not have appropriate screening and vetting measures. The government does not have physical control over its own territory. Since January 20, 2025, Yemen has been the site of active United States military operations.

(ii) The entry into the United States of nationals of Yemen as immigrants and nonimmigrants is hereby fully suspended.

**Sec. 3.** *Partial Suspension of Entry for Nationals of Countries of Identified Concern.*

(a) *Burundi*

(i) According to the Overstay Report, Burundi had a B–1/B–2 visa overstay rate of 15.35 percent and an F, M, and J visa overstay rate of 17.52 percent.

(ii) The entry into the United States of nationals of Burundi as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Burundi to the extent permitted by law.

(b) *Cuba*

(i) Cuba is a state sponsor of terrorism. The Government of Cuba does not cooperate or share sufficient law enforcement information with the United States. Cuba has historically refused to accept back its removable nationals. According to the Overstay Report, Cuba had a B–1/B–2 visa overstay rate of 7.69 percent and an F, M, and J visa overstay rate of 18.75 percent.

HaitiTPSAR000097

**24502**    **Federal Register** / Vol. 90, No. 110 / Tuesday, June 10, 2025 / Presidential Documents

(ii) The entry into the United States of nationals of Cuba as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Cuba to the extent permitted by law.

(c) *Laos*

(i) According to the Overstay Report, Laos had a B–1/B–2 visa overstay rate of 34.77 percent and an F, M, and J visa overstay rate of 6.49 percent. Laos has historically failed to accept back its removable nationals.

(ii) The entry into the United States of nationals of Laos as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas, is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Laos to the extent permitted by law.

(d) *Sierra Leone*

(i) According to the Overstay Report, Sierra Leone had a B–1/B–2 visa overstay rate of 15.43 percent and an F, M, and J visa overstay rate of 35.83 percent. Sierra Leone has historically failed to accept back its removable nationals.

(ii) The entry into the United States of nationals of Sierra Leone as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Sierra Leone to the extent permitted by law.

(e) *Togo*

(i) According to the Overstay Report, Togo had a B–1/B–2 visa overstay rate of 19.03 percent and an F, M, and J visa overstay rate of 35.05 percent.

(ii) The entry into the United States of nationals of Togo as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Togo to the extent permitted by law.

(f) *Turkmenistan*

(i) According to the Overstay Report, Turkmenistan had a B–1/B–2 visa overstay rate of 15.35 percent and an F, M, and J visa overstay rate of 21.74 percent.

(ii) The entry into the United States of nationals of Turkmenistan as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Turkmenistan to the extent permitted by law.

(g) *Venezuela*

(i) Venezuela lacks a competent or cooperative central authority for issuing passports or civil documents and it does not have appropriate screening and vetting measures. Venezuela has historically refused to accept back its removable nationals. According to the Overstay Report, Venezuela had a B–1/B–2 visa overstay rate of 9.83 percent.

(ii) The entry into the United States of nationals of Venezuela as immigrants, and as nonimmigrants on B–1, B–2, B–1/B–2, F, M, and J visas is hereby suspended.

(iii) Consular officers shall reduce the validity for any other nonimmigrant visa issued to nationals of Venezuela to the extent permitted by law.

**Sec. 4**. *Scope and Implementation of Suspensions and Limitations.* (a) *Scope.* Subject to the exceptions set forth in subsection (b) of this section and

HaitiTPSAR000098

any exceptions made pursuant to subsections (c) and (d) of this section, the suspensions of and limitations on entry pursuant to sections 2 and 3 of this proclamation shall apply only to foreign nationals of the designated countries who:

(i) are outside the United States on the applicable effective date of this proclamation; and

(ii) do not have a valid visa on the applicable effective date of this proclamation.

(b) *Exceptions.* The suspension of and limitation on entry pursuant to sections 2 and 3 of this proclamation shall not apply to:

(i) any lawful permanent resident of the United States;

(ii) any dual national of a country designated under sections 2 and 3 of this proclamation when the individual is traveling on a passport issued by a country not so designated;

(iii) any foreign national traveling with a valid nonimmigrant visa in the following classifications: A–1, A–2, C–2, C–3, G–1, G–2, G–3, G–4, NATO–1, NATO–2, NATO–3, NATO–4, NATO–5, or NATO–6;

(iv) any athlete or member of an athletic team, including coaches, persons performing a necessary support role, and immediate relatives, traveling for the World Cup, Olympics, or other major sporting event as determined by the Secretary of State;

(v) immediate family immigrant visas (IR–1/CR–1, IR–2/CR–2, IR–5) with clear and convincing evidence of identity and family relationship (*e.g.,* DNA);

(vi) adoptions (IR–3, IR–4, IH–3, IH–4);

(vii) Afghan Special Immigrant Visas;

(viii) Special Immigrant Visas for United States Government employees; and

(ix) immigrant visas for ethnic and religious minorities facing persecution in Iran.

(c) Exceptions to the suspension of and limitation on entry pursuant to sections 2 and 3 of this proclamation may be made for certain individuals for whom the Attorney General finds, in her discretion, that the travel by the individual would advance a critical United States national interest involving the Department of Justice, including when individuals must be present to participate in criminal proceedings as witnesses. These exceptions shall be made only by the Attorney General, or her designee, in coordination with the Secretary of State and the Secretary of Homeland Security.

(d) Exceptions to the suspension of and limitation on entry pursuant to sections 2 and 3 of this proclamation may be made case-by-case for individuals for whom the Secretary of State finds, in his discretion, that the travel by the individual would serve a United States national interest. These exceptions shall be made by only the Secretary of State or his designee, in coordination with the Secretary of Homeland Security or her designee.

**Sec. 5**. *Adjustments to and Removal of Suspensions and Limitations.* (a) The Secretary of State shall, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director for National Intelligence, devise a process to assess whether any suspensions and limitations imposed by sections 2 and 3 of this proclamation should be continued, terminated, modified, or supplemented. Within 90 days of the date of this proclamation, and every 180 days thereafter, the Secretary of State, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall submit a report to the President, through the Assistant to the President for Homeland Security, describing his assessment and recommending whether any suspensions and limitations imposed by sections 2 and 3 of this proclamation should be continued, terminated, modified, or supplemented.

(b) The Secretary of State, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall immediately engage each of the countries identified in sections 2 and 3 of this proclamation on measures that must be taken to comply with United States screening, vetting, immigration, and security requirements.

(c) Additionally, and in light of recent events, the Secretary of State, in consultation with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, shall provide me an update to the review of the practices and procedures of Egypt to confirm the adequacy of its current screening and vetting capabilities.

**Sec. 6**. *Enforcement.* (a) The Secretary of State and the Secretary of Homeland Security shall consult with appropriate domestic and international partners, including countries and organizations, to ensure efficient, effective, and appropriate implementation of this proclamation.

(b) In implementing this proclamation, the Secretary of State and the Secretary of Homeland Security shall comply with all applicable laws and regulations.

(c) No immigrant or nonimmigrant visa issued before the applicable effective date of this proclamation shall be revoked pursuant to this proclamation.

(d) This proclamation shall not apply to an individual who has been granted asylum by the United States, to a refugee who has already been admitted to the United States, or to an individual granted withholding of removal or protection under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment of Punishment (CAT). Nothing in this proclamation shall be construed to limit the ability of an individual to seek asylum, refugee status, withholding of removal, or protection under the CAT, consistent with the laws of the United States.

**Sec. 7**. *Severability.* It is the policy of the United States to enforce this proclamation to the maximum extent possible to advance the national security, foreign policy, and counterterrorism interests of the United States. Accordingly:

(a) if any provision of this proclamation, or the application of any provision of this proclamation to any person or circumstance, is held to be invalid, the remainder of this proclamation and the application of its other provisions to any other persons or circumstances shall not be affected thereby; and

(b) if any provision of this proclamation, or the application of any provision of this proclamation to any person or circumstance, is held to be invalid because of the lack of certain procedural requirements, the relevant executive branch officials shall implement those procedural requirements to conform with existing law and with any applicable court orders.

**Sec. 8**. *Effective Date.* This proclamation is effective at 12:01 a.m. eastern daylight time on June 9, 2025.

**Sec. 9**. *General Provisions.* (a) Nothing in this proclamation shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable by law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

HaitiTPSAR000100

IN WITNESS WHEREOF, I have hereunto set my hand this fourth day of June, in the year of our Lord two thousand twenty-five, and of the Independence of the United States of America the two hundred and forty-ninth.

[FR Doc. 2025–10669
Filed 6–9–25; 11:15 am]
Billing code 3395–F4–P

agency with a copy of this **Federal Register** Notice.

Some benefit-granting agencies use the USCIS Systematic Alien Verification for Entitlements Program (SAVE) to confirm the current immigration status of applicants for public benefits. In most cases, SAVE provides an automated electronic response to benefit granting agencies within seconds but occasionally verification can be delayed. You can check the status of your SAVE verification by using CaseCheck at the following link: *https://save.uscis.gov/casecheck/,* then by clicking the ''Check Your Case'' button. CaseCheck is a free service that lets you follow the progress of your SAVE verification using your date of birth and one immigration identifier number. If such an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted upon or will act upon a SAVE verification and you do not believe the response is correct, you may make an InfoPass appointment for an in-person interview at a local USCIS office. Detailed information on how to make corrections, make an appointment, or submit a written request to correct records under the Freedom of Information Act can be found at the SAVE Web site at *http://www.uscis.gov/save,* then by choosing ''For Benefits Applicants'' from the menu on the left and selecting ''Questions about your Records?''.

[FR Doc. 2016–23249 Filed 9–22–16; 4:15 pm]

**BILLING CODE 9111–97–P**

---

# DEPARTMENT OF HOMELAND SECURITY

## U.S. Citizenship and Immigration Services

[CIS No. 2588–16; DHS Docket No. USCIS–2014–0011]

RIN 1615–ZB56

### Six-Month Extension of Temporary Protected Status Benefits for Orderly Transition Before Termination of Liberia's Designation for Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** The designation of Liberia for Temporary Protected Status (TPS) is set to expire on November 21, 2016. After reviewing relevant country conditions and consulting with the appropriate U.S. Government (Government) agencies, the Secretary of Homeland Security (Secretary) has determined that conditions in Liberia no longer support its designation for TPS and is therefore extending TPS benefits for 6 months for the purpose of orderly transition before the TPS designation of Liberia terminates. This termination will be effective May 21, 2017, 6 months following the end of the current designation.

To provide for an orderly transition, nationals of Liberia (and aliens having no nationality who last habitually resided in Liberia) who have been granted TPS under the Liberia designation will automatically retain their TPS and have their current TPS-based Employment Authorization Documents (EAD) extended through May 20, 2017. However, an individual's TPS may still be withdrawn because of ineligibility for TPS. On May 21, 2017, nationals of Liberia (and aliens having no nationality who last habitually resided in Liberia) who have been granted TPS under the Liberia designation will no longer have TPS.

**DATES:** The designation of Liberia for TPS is terminated effective at 12:01 a.m., local time, on May 21, 2017.

**FOR FURTHER INFORMATION CONTACT:**

• For further information on TPS, please visit the U.S. Citizenship and Immigration Services (USCIS) TPS Web page at *http://www.uscis.gov/tps.* You can find specific information about the termination of Liberia's TPS designation by selecting ''Liberia'' from the menu on the left side of the TPS Web page.

• You can also contact Jerry Rigdon, Chief of the Waivers and Temporary Services Branch, Service Center Operations Directorate, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Washington, DC 20529–2060; or by phone at 202–272–1533 (this is not a toll-free number). Note: The phone number provided here is solely for questions regarding this TPS Notice. It is not for individual case status inquires.

• Applicants seeking information about the status of their individual cases can check Case Status Online, available at the USCIS Web site at *http://www.uscis.gov,* or call the USCIS National Customer Service Center at 800–375–5283 (TTY 800–767–1833).

• Further information will also be available at local USCIS offices upon publication of this Notice.

**SUPPLEMENTARY INFORMATION:**

**Table of Abbreviations**

DHS—Department of Homeland Security
DOS—Department of State
EAD—Employment Authorization Document
EVD—Ebola Virus Disease
FNC—Final Nonconfirmation
Government—U.S. Government
INA—Immigration and Nationality Act
OSC—Department of Justice, Office of Special Counsel for Immigration-Related Unfair Employment Practices
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TNC—Tentative Nonconfirmation
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services
WHO—World Health Organization

**What is Temporary Protected Status (TPS)?**

• TPS is a temporary immigration status granted to eligible nationals of a country designated for TPS under the Immigration and Nationality Act (INA), or to eligible persons without nationality who last habitually resided in the designated country.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to work and obtain EADs so long as they continue to meet the requirements of TPS.

• TPS beneficiaries may also be granted travel authorization as a matter of discretion.

• The granting of TPS does not result in or lead to permanent resident status.

• To qualify for TPS, beneficiaries must meet the eligibility criteria described in INA section 244(c), 8 U.S.C. 1254a(c) and 8 CFR part 244.

• When the Secretary terminates a country's TPS designation, beneficiaries return to the same immigration status they maintained before TPS, if any (unless that status has since expired or been terminated), or to any other immigration status they lawfully obtained while registered for TPS.

**When was Liberia designated for TPS?**

On November 21, 2014, the Secretary designated Liberia for TPS for a period of 18 months due to the extraordinary and temporary conditions caused by an epidemic of Ebola Virus Disease (EVD) in West Africa that prevented nationals of Liberia from returning to Liberia in safety. The conditions included high EVD transmission rates in wide-spread geographic areas, overwhelmed health care systems unable to handle the large number of EVD patients or to provide treatment for normally preventable or treatable conditions, and containment

HaitiTPSAR000102

measures that were causing significant disruptions to Liberia's economy and individuals' ability to access food and earn a livelihood. *See Designation of Liberia for Temporary Protected Status,* 79 FR 69502 (Nov. 21, 2014). The Secretary last announced a 6-month extension of TPS for Liberia on March 22, 2016, based on his determination that although there were significant improvements, conditions supporting the designation persisted. *See Extension of the Designation of Liberia for Temporary Protected Status,* 81 FR 15328 (Mar. 22, 2016).

**What authority does the Secretary have to terminate the designation of Liberia for TPS?**

Section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1), authorizes the Secretary, after consultation with appropriate Government agencies, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist.[1] The Secretary may then grant TPS to eligible nationals of that foreign state (or eligible aliens having no nationality who last habitually resided in the designated country). *See* INA section 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a country's TPS designation or extension, the Secretary, after consultation with appropriate Government agencies, must review the conditions in a foreign state designated for TPS to determine whether the conditions for the TPS designation continue to be met. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that a foreign state continues to meet the conditions for TPS designation, the designation may be extended for an additional period of 6, 12, or 18 months. *See* INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation, but such termination may not take effect earlier than 60 days after the date the **Federal Register** notice of termination is published, or if later, the expiration of the most recent previous extension of the country designation. *See* INA section 244(b)(3)(B), 8 U.S.C.

1254a(b)(3)(B). The Secretary may determine the appropriate effective date of the termination and the expiration of any TPS-related documentation, such as EADs, for the purpose of providing an orderly transition. *See id.;* INA section 244(d)(3), 8 U.S.C. 1254a(d)(3).

**Why is the Secretary terminating the designation of Liberia for TPS as of May 21, 2017, after a 6-month extension of TPS benefits for the purpose of orderly transition?**

DHS and the Department of State (DOS) have reviewed conditions in Liberia. Based on the reviews and after consulting with DOS, the Secretary has determined that the termination of the TPS designation of Liberia, after a 6-month extension of TPS benefits for orderly transition, is required because the extraordinary and temporary conditions that prompted Liberia's designation for TPS have substantially resolved and no longer prevent nationals of Liberia from returning in safety.

Guinea, Liberia, and Sierra Leone were designated for TPS in the midst of the largest EVD outbreak in history. From March 2014 through November 2015, these three countries suffered over 11,000 deaths among their more than 28,500 cases of EVD. At the height of the outbreak in late 2014, Ebola was spreading rapidly, with hundreds of new cases being reported each week, the health care systems overwhelmed, and containment measures causing significant disruptions to individuals' ability to access food and earn a livelihood. While the impacts of the epidemic pose a lasting challenge to Liberia's economy and the capacity of its health system to provide treatment for preventable or treatable conditions, at this time, the EVD epidemic has subsided, and conditions have improved since the Secretary initially designated Liberia for TPS.

A robust response by the international community and the governments of Guinea, Liberia, and Sierra Leone has brought the EVD epidemic in West Africa under control and begun the long-term work of rebuilding regional economies and health systems. As of June 2016, Guinea, Liberia, and Sierra Leone are all free of EVD. A country is considered free of EVD transmission after 42 days have passed since the last known person in the country with Ebola receives a second consecutive negative blood test for the virus. While the risk of flare-ups of EVD remains, efforts are underway to promote, over time, robust prevention, surveillance, and response capacity across all three countries.

In Liberia, the government and citizens partnered in a successful effort to control the epidemic and rapidly respond to any new cases. Commerce and imports have begun to rebound, and basic services have returned to pre-EVD outbreak levels. The U.S. Department of Health and Human Services, Centers for Disease Control and Prevention has no Ebola-related Travel Health Notice in place for Liberia as of the date of this Notice.

While health systems and facilities remain fragile, medical centers are no longer overwhelmed by patients with EVD. High rates of child mortality both before and since the EVD epidemic are indicative of the overall fragility of the health system. Although this is comparable to other countries in the region, systems in Liberia must also be able to address ongoing issues of trust between healthcare facilities and communities, as well as continue to care for Ebola survivors who have a series of ongoing and previously unforeseen health conditions, both of which will continue to exacerbate and underscore the fragility of these systems. Normal business activity and national life have largely resumed, although work is ongoing to rebuild Liberia's economy and health care system. On March 29, 2016, the WHO Director-General declared the end of the Public Health Emergency of International Concern regarding the EVD outbreak in West Africa. In conjunction with ending the public health emergency, the WHO emphasized that there should be no restrictions on travel and trade with Guinea, Liberia, and Sierra Leone.

Based upon this review and after consultation with appropriate Government agencies, the Secretary has determined that Liberia no longer continues to meet the statutorily required conditions for a TPS designation on the basis of extraordinary and temporary conditions, because the extraordinary and temporary conditions that prompted Liberia's TPS designation have substantially resolved and no longer prevent nationals of Liberia from returning to Liberia in safety. Therefore, after a 6-month extension of TPS benefits for orderly transition, the Secretary is terminating the TPS designation of Liberia effective at 12:01 a.m., local time, on May 21, 2017, 6 months following the end of the current designation. *See* INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

To provide for an orderly transition, individuals who have been granted TPS under Liberia's designation will automatically retain TPS and have their current EADs extended until the

---

[1] As of March 1, 2003, in accordance with section 1517 of title XV of the Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135, any reference to the Attorney General in a provision of the INA describing functions transferred from the Department of Justice to the Department of Homeland Security (DHS) ''shall be deemed to refer to the Secretary'' of Homeland Security. *See* 6 U.S.C. 557 (codifying the Homeland Security Act of 2002, tit. XV, section 1517).

HaitiTPSAR000103

termination date. *See* INA section 244(d)(3), 8 U.S.C. 1254a(d)(3). DHS may, however, withdraw TPS from any beneficiary who fails to continue meeting the requirements for TPS. *See* INA section 244(c)(3), 8 U.S.C. 1254a(c)(3). There are approximately 2,160 current Liberia TPS beneficiaries. These persons are urged to use the time before termination of their TPS to prepare for and arrange their departure from the United States or, in the alternative, to apply for other immigration benefits for which they are eligible.

## Notice of Six-Month Extension of TPS Benefits for Orderly Transition Before Termination of the TPS Designation of Liberia

By the authority vested in me as Secretary under INA section 244, 8 U.S.C. 1254a, I have determined, after consultation with the appropriate Government agencies, that Liberia no longer meets the conditions for designation of TPS under INA section 244(b)(1). 8 U.S.C. 1254a(b)(1).

Accordingly, I order as follows:

(1) Pursuant to INA section 244(b)(3)(B), the designation of Liberia for TPS is terminated effective at 12:01 a.m., local time, on May 21, 2017, 6 months following the end of the current designation.

(2) DHS estimates that there are approximately 2,160 nationals of Liberia (and aliens having no nationality who last habitually resided in Liberia) who currently receive TPS benefits.

(3) To provide for an orderly transition, nationals of Liberia (and aliens having no nationality who last habitually resided in Liberia) who have been granted TPS under the Liberia designation will automatically retain TPS until the May 21, 2017, termination date. However, an individual's TPS may be withdrawn before this date under INA section 244(c)(3) and 8 CFR 244.14 because of ineligibility for TPS.

(4) TPS-based EADs that expire on November 21, 2016, are extended automatically through May 20, 2017, for qualified nationals of Liberia (and aliens having no nationality who last habitually resided in Liberia).

(5) Information concerning the termination of TPS for nationals of Liberia (and aliens having no nationality who last habitually resided in Liberia) will be available at local USCIS offices upon publication of this notice and through the USCIS National Customer Service Center at 1–800–375–5283. This information will be published on the USCIS Web site at *www.USCIS.gov.*

**Jeh Charles Johnson,**
*Secretary.*

### If I currently have TPS under Liberia's designation, do I need to re-register to keep my TPS until May 21, 2017, the termination date?

No. If you already have been granted TPS benefits through the Liberia TPS program, you do not have to re-register to keep your TPS benefits. You will automatically retain TPS until the termination date. However, your TPS may still be withdrawn under INA section 244(c)(3) and 8 CFR part 244 because of ineligibility for TPS. 8 U.S.C. 1254a(c)(3), 8 CFR 244.14. When termination becomes effective on May 21, 2017, you will no longer have TPS.

### Why is the Secretary automatically extending the validity of EADs from November 21, 2016, through May 20, 2017?

The Secretary has decided to extend automatically the validity of EADs to provide for an orderly transition leading up to the effective date for the termination of the Liberia TPS designation. Therefore, the validity of the applicable EADs is extended for a period of 6 months, through May 20, 2017. 8 U.S.C. 1254a(a)(2) and (d)(3).

### Must qualified individuals apply for the automatic extension of their TPS-related EADs through May 20, 2017?

No. Qualified individuals do not have to apply for this extension of their TPS-related EADs through May 20, 2017.

### What may I do if I believe that returning to Liberia is not possible or preferable for me?

This Notice terminates the designation of Liberia for TPS. Nationals of Liberia (and aliens having no nationality who last habitually resided in Liberia) in the United States who believe returning to Liberia is not possible or preferable for them may be eligible to apply for another immigration status, such as lawful permanent residence, asylum, or a nonimmigrant status. Eligibility for these and other immigration benefits is determined individually on a case-by-case basis. For information about eligibility and how to apply, visit the USCIS Web site at *www.uscis.gov* or call the USCIS National Customer Service Center at 1–800–375–5283.

### How does the termination of TPS affect my immigration status and what can I do?

After the termination of the TPS designation of Liberia becomes effective May 21, 2017, former TPS beneficiaries will maintain the same immigration status they held before TPS (unless the status has since expired or been terminated) or any other status they may have acquired while registered for TPS. Liberians who are included in the President's grant of Deferred Enforced Departure for Liberians, if extended past the current expiration date of September 30, 2016, will remain covered by Deferred Enforced Departure. Accordingly, if a TPS beneficiary held no lawful immigration status before being granted TPS and did not obtain any other status during the TPS period, he or she may be subject to removal upon the termination of the TPS designation. TPS-related EADs will expire on May 20, 2017, and will not be renewed.

Termination of the TPS designation for Liberia does not necessarily affect pending applications for other forms of immigration relief or protection. However, former TPS beneficiaries will begin to accrue unlawful presence as of May 21, 2017, if they have not been granted any other immigration status or protection or if they have no pending application to obtain benefits.

### Employment Authorization Document (EAD)

*How can I obtain information on the status of my EAD request?*

To get case status information about your request for an EAD, you can check Case Status Online at *http://www.uscis.gov,* or call the USCIS National Customer Service Center at 800–375–5283 (TTY 800–767–1833). If your Application for Employment Authorization (Form I–765) has been pending for more than 90 days, and you still need assistance, you may request an EAD inquiry appointment with USCIS by using the InfoPass system at *https://infopass.uscis.gov.* However, we strongly encourage you first to check Case Status Online or call the USCIS National Customer Service Center for assistance before making an InfoPass appointment.

*Am I eligible to receive an automatic 6-month extension of my current EAD through May 20, 2017?*

Provided that you currently have TPS under the designation of Liberia, this Notice automatically extends your EAD by 6 months if you:

• Are a national of Liberia (or an alien having no nationality who last habitually resided in Liberia);

• Received an EAD under the last designation of TPS for Liberia; and

• Have an EAD with a marked expiration date of November 21, 2016, bearing the notation "A–12" or "C–19" on the face of the card under "Category."

*When hired, what documentation may I show to my employer as proof of employment authorization and identity when completing Employment Eligibility Verification (Form I–9)?*

You can find a list of acceptable document choices on the "Lists of Acceptable Documents" for Form I–9. You can find additional detailed information on the USCIS I–9 Central Web page at *http://www.uscis.gov/I-9Central.* Employers are required to verify the identity and employment authorization of all new employees by using *Employment Eligibility Verification* (Form I–9). Within 3 days of being hired, you must present proof of identity and employment authorization to your employer.

You may present any document from List A (reflecting both your identity and employment authorization) or one document from List B (reflecting identity) together with one document from List C (reflecting employment authorization). An EAD is an acceptable document under "List A." Or you may present an acceptable receipt for a List A, List B, or List C document as described in the Form I–9 Instructions. An acceptable receipt includes a document that shows an employee has applied to replace a required document that was lost, stolen, or damaged. If you present an acceptable receipt for the application of a replacement document, you must present your employer with the actual document within 90 days. Employers may not reject a document based on a future expiration date.

If your EAD has an expiration date of November 21, 2016, and states "A–12" or "C–19" under "Category," it has been extended automatically for 6 months by virtue of this **Federal Register** Notice and you may choose to present your EAD to your employer as proof of identity and employment authorization for Form I–9 through May 20, 2017 (see the subsection titled "*How do my employer and I complete the Employment Eligibility Verification (Form I–9) using an automatically extended EAD for a new job?*" for further information). To minimize confusion over this extension at the time of hire, you should explain to your employer that USCIS has automatically

extended your EAD through May 20, 2017. You may also show your employer a copy of this **Federal Register** Notice confirming the automatic extension of employment authorization through May 20, 2017. As an alternative to presenting your automatically extended EAD, you may choose to present any other acceptable document from List A, a combination of one selection from List B and one selection from List C, or a valid receipt.

*What documentation may I show my employer if I am already employed but my current TPS-related EAD is set to expire?*

Even though EADs with an expiration date of November 21, 2016, that state "A–12" or "C–19" under "Category" have been automatically extended for 6 months by this **Federal Register** Notice, your employer will need to ask you about your continued employment authorization once November 21, 2016, is reached to meet its responsibilities for *Employment Eligibility Verification* (Form I–9). Your employer may need to re-inspect your automatically extended EAD to check the expiration date and code to record the updated expiration date on your *Employment Eligibility Verification* (Form I–9) if he or she did not keep a copy of this EAD at the time you initially presented it. You and your employer must make corrections to the employment authorization expiration dates in Section 1 and Section 2 of *Employment Eligibility Verification* (Form I–9) (see the subsection titled "*What corrections should my current employer and I make to Employment Eligibility Verification (Form I–9) if my EAD has been automatically extended?*" for further information). You are also strongly encouraged, although not required, to show this **Federal Register** Notice to your employer to explain what to do for *Employment Eligibility Verification* (Form I–9).

By May 20, 2017, the expiration date of the automatic extension, your employer must reverify your employment authorization. If you are employment authorized beyond the expiration date of the automatic extension, you must present any unexpired document from List A or any unexpired document from List C on *Employment Eligibility Verification* (Form I–9) to reverify employment authorization, or an acceptable List A or List C receipt described in the *Employment Eligibility Verification* (Form I–9) instructions. Your employer is required to reverify on *Employment Eligibility Verification* (Form I–9) the employment authorization of current employees no later than the

automatically extended expiration date of a TPS-related EAD, which is May 20, 2017, in this case. Your employer should use either Section 3 of the *Employment Eligibility Verification* (Form I–9) originally completed for you or, if this section has already been completed or if the version of *Employment Eligibility Verification* (Form I–9) is no longer valid (check the date in the upper right-hand corner of the form), complete Section 3 of a new *Employment Eligibility Verification* (Form I–9) using the most current version. Note that your employer may not specify which List A or List C document employees must present, and cannot reject an acceptable receipt. An acceptable receipt is described in the *Employment Eligibility Verification* (Form I–9) Instructions and includes one that shows an employee has applied to replace a required document that was lost, stolen or damaged.

*Can my employer require that I produce any other documentation to prove my current TPS status, such as proof of my Liberian citizenship?*

No. When completing *Employment Eligibility Verification* (Form I–9), including reverifying employment authorization, employers must accept any documentation that appears on the "Lists of Acceptable Documents" for *Employment Eligibility Verification* (Form I–9) that reasonably appears to be genuine and that relates to you or an acceptable List A, List B, or List C receipt. Employers may not request documentation that does not appear on the "Lists of Acceptable Documents." Therefore, employers may not request proof of Liberian citizenship or proof of re-registration for TPS when completing *Employment Eligibility Verification* (Form I–9) for new hires or reverifying the employment authorization of current employees. Refer to the *Note to Employees* section of this Notice for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or immigration status, or your national origin.

*What happens after May 20, 2017, for purposes of employment authorization?*

After May 20, 2017, employers may no longer accept the EADs that this **Federal Register** Notice automatically extended.

HaitiTPSAR000105

*How do my employer and I complete Employment Eligibility Verification (Form I–9) using an automatically extended EAD for a new job?*

When using an automatically extended EAD to complete Employment Eligibility Verification (Form I–9) for a new job before May 20, 2017, you and your employer should do the following:

1. For Section 1, you should:

a. Check ''An alien authorized to work;''

b. Write the automatically extended EAD expiration date (May 20, 2017) in the first space; and

c. Write your alien number (USCIS number or A-number) in the second space (your EAD or other document from DHS will have your USCIS number or A-number printed on it; the USCIS number is the same as your A-number without the A prefix).

2. For Section 2, employers should record the:

a. Document title;

b. Issuing authority;

c. Document number; and

d. Automatically extended EAD expiration date (May 20, 2017).

No later than May 20, 2017, employers must reverify your employment authorization in Section 3 of Form I–9.

*What corrections should my current employer and I make to Employment Eligibility Verification (Form I–9) if my EAD has been automatically extended?*

If you are an existing employee who presented a TPS-related EAD that was valid when you first started your job, but that EAD has now been automatically extended, your employer may need to reinspect your automatically extended EAD if your employer does not have a photocopy of the EAD on file, and you and your employer should correct your previously completed Form I–9 as follows:

1. For Section 1, you should:

a. Draw a line through the expiration date in the first space;

b. Write ''May 20, 2017,'' above the previous date;

c. Write ''TPS Ext.'' in the margin of Section 1; and

d. Initial and date the correction in the margin of Section 1.

2. For Section 2, employers should:

a. Draw a line through the expiration date written in Section 2;

b. Write ''May 20, 2017'' above the previous date;

c. Write ''EAD Ext.'' in the margin of Section 2; and

d. Initial and date the correction in the margin of Section 2.

No later than May 20, 2017, when the automatic extension of EADs expires, employers must reverify your employment authorization in Section 3.

*As an employer, what are my Employment Eligibility Verification (Form I–9) obligations after May 20, 2017?*

Employers are required to reverify an employee's employment authorization in Section 3 of Employment Eligibility Verification (Form I–9) by the expiration date of an automatically extended EAD. Your employee must present unexpired documentation from either List A or List C (or an acceptable Form I–9 receipt) showing he or she is still authorized to work. Employers may not ask for specific documents; employees choose which List A or List C documents to present from the Lists of Acceptable Documents.

*If I am an employer enrolled in E-Verify, what do I do when I receive a ''Work Authorization Documents Expiration'' alert for an automatically extended EAD?*

If you have an employee who is a TPS beneficiary who provided a TPS-related EAD when he or she first started working for you, you will receive a ''Work Authorization Documents Expiring'' case alert when the auto-extension period for this EAD is about to expire. E-Verify will not send an alert for the original November 21, 2016 expiration date. By May 20, 2017, employment authorization must be reverified in Section 3. Employers should not use E-Verify for reverification.

**Note to All Employers**

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This **Federal Register** Notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY 877–875–6028) or email *I-9Central@dhs.gov.* Calls and emails are accepted in English and many other languages. For questions about avoiding discrimination during the employment eligibility verification process, employers may also call the U.S. Department of Justice, Office of Special Counsel for Immigration-Related Unfair Employment Practices (OSC) Employer Hotline, at 800–255–8155

(TTY 800–237–2515), which offers language interpretation in numerous languages, or email OSC at *osccrt@ usdoj.gov.*

**Note to Employees**

For general questions about the employment eligibility verification process, you may call USCIS at 888–897–7781 (TTY 877–875–6028) or email *I-9Central@dhs.gov.* Calls are accepted in English and many other languages. You may also call the OSC Worker Information Hotline at 800–255–7688 (TTY 800–237–2515) for information regarding employment discrimination based upon citizenship status, immigration status, or national origin, including discrimination related to *Employment Eligibility Verification* (Form I–9) and E-Verify. The OSC Worker Information Hotline provides language interpretation in numerous languages.

To comply with the law, employers must accept any document or combination of documents from the Lists of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee, or an acceptable receipt described in the *Employment Eligibility Verification* (Form I–9) Instructions. Employers may not require extra or additional documentation beyond what is required for *Employment Eligibility Verification* (Form I–9) completion. Further, employers participating in E-Verify who receive an E-Verify case result of ''Tentative Nonconfirmation'' (TNC) must promptly inform employees of the TNC and give such employees an opportunity to contest the TNC. A TNC case result means that the information entered into E-Verify from *Employment Eligibility Verification* (Form I–9) differs from Federal or State government records.

Employers may not terminate, suspend, delay training, withhold pay, lower pay, or take any adverse action against you based on your decision to contest a TNC or because the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result is received when E-Verify cannot verify your employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY 877–875–6028). If you believe you were discriminated against by an employer in the E-Verify process based on citizenship, immigration status, or national origin, you may contact OSC's Worker Information Hotline at 800–255–7688 (TTY 800–237–2515). Additional

HaitiTPSAR000106

information about proper nondiscriminatory *Employment Eligibility Verification* (Form I–9) and E-Verify procedures is available on the OSC Web site at *http://www.justice.gov/ crt/about/osc/* and the USCIS Web site at *http://www.dhs.gov/E-verify.*

## Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)

While Federal Government agencies must follow the guidelines laid out by the Federal Government, State and local government agencies establish their own rules and guidelines when granting certain benefits. Each State may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, State, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary and/or show you are authorized to work based on TPS. Examples are:

(1) Your unexpired EAD;

(2) A copy of this **Federal Register** Notice if your EAD is automatically extended under this Notice;

(3) A copy of your Application for Temporary Protected Status Notice of Action (Form I–797);

(4) A copy of your past or current Application for Temporary Protected Status Approval Notice (Form I–797), if you received one from USCIS; and/or

(5) If there is an automatic extension of work authorization, a copy of the fact sheet from the USCIS TPS Web site that provides information on the automatic extension.

Check with the government agency regarding which document(s) the agency will accept. You may also provide the agency with a copy of this **Federal Register** Notice.

Some benefit-granting agencies use the USCIS Systematic Alien Verification for Entitlements Program (SAVE) to confirm the current immigration status of applicants for public benefits. In most cases, SAVE provides an automated electronic response to benefit granting agencies within seconds but occasionally verification can be delayed. You can check the status of your SAVE verification by using CaseCheck at the following link: *https://save.uscis.gov/ casecheck/,* then by clicking the "Check Your Case" button. CaseCheck is a free service that lets you follow the progress of your SAVE verification using your date of birth and one immigration identifier number. If such an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted upon or will act upon a SAVE verification and you do not believe the response is correct, you may make an InfoPass appointment for an in-person interview at a local USCIS office. Detailed information on how to make corrections, make an appointment, or submit a written request to correct records under the Freedom of Information Act can be found at the SAVE Web site at *http://www.uscis.gov/ save,* then by choosing "For Benefit Applicants" from the menu on the left and selecting "Questions about your Records?".

[FR Doc. 2016–23250 Filed 9–22–16; 4:15 pm]

**BILLING CODE 9111–97–P**

---

# DEPARTMENT OF HOMELAND SECURITY

## U.S. Citizenship and Immigration Services

**[CIS No. 2587–16; DHS Docket No. USCIS–2014–0010]**

**RIN 1615–ZB55**

## Six-Month Extension of Temporary Protected Status Benefits for Orderly Transition Before Termination of Guinea's Designation for Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** The designation of Guinea for Temporary Protected Status (TPS) is set to expire on November 21, 2016. After reviewing country conditions and consulting with the appropriate U.S. Government (Government) agencies, the Secretary of the Department of Homeland Security (Secretary) has determined that conditions in Guinea no longer support its designation for TPS and is therefore extending TPS benefits for 6 months for the purpose of orderly transition before the TPS designation of Guinea terminates. This termination will be effective May 21, 2017, 6 months following the end of the current designation.

To provide for an orderly transition, nationals of Guinea (and aliens having no nationality who last habitually resided in Guinea) who have been granted TPS under the Guinea designation will automatically retain their TPS and have their current tps-based Employment Authorization Documents (EAD) extended through May 20, 2017. However, an individual's TPS may still be withdrawn because of ineligibility for TPS. On May 21, 2017, nationals of Guinea (and aliens having no nationality who last habitually resided in Guinea) who have been granted TPS under the Guinea designation will no longer have TPS.

**DATES:** The designation of Guinea for TPS is terminated effective at 12:01 a.m., local time, on May 21, 2017.

**FOR FURTHER INFORMATION CONTACT:**

• For further information on TPS, please visit the U.S. Citizenship and Immigration Services (USCIS) TPS Web page at *http://www.uscis.gov/tps.* You can find specific information about the termination of Guinea's TPS designation by selecting "Guinea" from the menu on the left side of the TPS Web page.

• You can also contact Jerry Rigdon, Chief of the Waivers and Temporary Services Branch, Service Center Operations Directorate, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Washington, DC 20529–2060; or by phone at 202–272–1533 (this is not a toll-free number). Note: The phone number provided here is solely for questions regarding this TPS Notice. It is not for individual case status inquires.

• Applicants seeking information about the status of their individual cases can check Case Status Online, available at the USCIS Web site at *http:// www.uscis.gov,* or call the USCIS National Customer Service Center at 800–375–5283 (TTY 800–767–1833).

• Further information will also be available at local USCIS offices upon publication of this Notice.

**SUPPLEMENTARY INFORMATION:**

## Table of Abbreviations

DHS—Department of Homeland Security
DOS—Department of State
EAD—Employment Authorization Document
EVD—Ebola Virus Disease
FNC—Final Nonconfirmation
Government—U.S. Government
INA—Immigration and Nationality Act
OSC—Department of Justice, Office of Special Counsel for Immigration-Related Unfair Employment Practices
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TNC—Tentative Nonconfirmation
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services
WHO—World Health Organization

## What is Temporary Protected Status (TPS)?

• TPS is a temporary immigration status granted to eligible nationals of a

HaitiTPSAR000107

information may be exempt from contesting record procedures as described in the section entitled ''Systems Exempted from Certain Provisions of the Act.'' An individual who is the subject of a record in this system may amend those records that are not exempt. A determination whether a record may be amended will be made at the time a request is received.

**RECORD SOURCE CATEGORIES:**

(1) DEA intelligence and investigative records; (2) reports, investigative and intelligence reports from other participating and associated federal and state member agencies; and (3) records and reports of foreign law enforcement and regulatory agencies.

**SYSTEM EXEMPTED FROM CERTAIN PROVISIONS OF THE ACT:**

The Attorney General has exempted this system from subsections (c)(3) and (4); (d)(1), (2), (3) and (4); (e)(1), (2) and (3), (e)(5) and (e)(8); and (g), of the Privacy Act pursuant to 5 U.S.C. 552a (j) and (k). The exemptions will be applied only to the extent that information in a record is subject to exemption pursuant to 5 U.S.C. 552a(j) and (k). A determination as to exemption shall be made at the time a request for access or amendment is received. Rules have been promulgated in accordance with the requirements of 5 U.S.C. 553(b), (c) and (e) and have been published in the **Federal Register**.

[FR Doc. 03–1671 Filed 1–24–03; 8:45 am]

**BILLING CODE 4410–09–P**

---

**DEPARTMENT OF JUSTICE**

**Immigration and Naturalization Service**

[INS No. 2229–02; AG Order No. 2651–2003]

**RIN 1115—AE26**

**Termination of Designation of Angola Under the Temporary Protected Status Program**

**AGENCY:** Immigration and Naturalization Service, Justice.
**ACTION:** Notice.

---

**SUMMARY:** The Attorney General's most recent designation of Angola under the Temporary Protected Status program (TPS) expires on March 29, 2003. After reviewing country conditions and consulting with the appropriate Government agencies, the Attorney General has determined that conditions in Angola no longer support a TPS designation. Accordingly, the designation of Angola for TPS is terminated effective March 29, 2003.

After that date, aliens who are nationals of Angola (and aliens having no nationality who last habitually resided in Angola) who have had TPS under the Angola program will no longer have such status. This notice contains information regarding the termination of the TPS designation for Angola.

**DATES:** The termination of the TPS designation for Angola is effective March 29, 2003.

**FOR FURTHER INFORMATION CONTACT:** Naheed A. Qureshi, Office of Adjudications, Residence and Status Branch, Immigration and Naturalization Service, Room 3040, 425 I Street, NW., Washington, DC 20536, telephone (202) 514–4754.

**SUPPLEMENTARY INFORMATION:**

**What Is the Statutory Authority for the Designation and Termination of TPS?**

Under section 244 of the Immigration and Nationality Act (INA or ''the Act''), 8 U.S.C. 1254a, the Attorney General is authorized to designate a foreign state (or part of a state) for TPS. The Attorney General may then grant TPS to eligible nationals of that foreign state (or aliens having no nationality who last habitually resided in that state). Section 244(b)(3)(A) of the Act requires the Attorney General to review, at least 60 days before the end of the TPS designation, the conditions in a foreign state designated under section 244(b)(1) of the Act. 8 U.S.C. 1254a(b)(3)(A).

Section 244(b)(3) of the Act further requires the Attorney General to determine whether the conditions for such a designation continue to be met, and to terminate the state's designation when the Attorney General determines conditions are no longer met. 8 U.S.C. 1254a(b)(3)(B). The Attorney General must then publish a notice of termination in the **Federal Register**.

**Why Did the Attorney General Decide To Terminate TPS for Angola?**

On March 29, 2000, the Attorney General published a notice in the **Federal Register** at 65 FR 16634 designating Angola for TPS for a period of one year, based upon conditions in Angola at that time. That TPS designation was extended twice and is scheduled to expire on March 29, 2003. *See* 66 FR 18111 (April 5, 2001 (extension and redesignation); 67 FR 4997 (Feb. 1, 2002) (extension). Based upon a recent review of conditions within Angola by the Departments of Justice and State, the Attorney General finds that conditions in Angola no longer support a TPS designation.

A recent Department of State report indicates that the National Union for the Total Independence of Angola (UNITA) and the Government of Angola were able to recommit to the Lusaka Peace Process following the February 2002 death of rebel leader Jonas Savimbi. Department of State Report (Nov. 13, 2002). The Resource Information Center (RIC) of the Immigration and Naturalization Service (INS/Service) observed that ''[t]he peace accords ended the 27-year battle between the UNITA forces and the Angolan ruling party.'' RIC Report (Nov. 29, 2002). The peace agreement committed the parties to continued discussions regarding future elections and a power sharing approach to governance. Since the peace accord was signed, fighting has ceased and 84,000 UNITA combatants have been disarmed and decommissioned, effectively dismantling UNITA's military capability. Department of State Report. The United Nations estimates that approximately 5,000 of the demobilized soldiers have joined the Angolan government forces, while approximately 80,000 have reunited with their families in reception centers. RIC Report.

A separate insurgency led by the separatist guerrilla forces of the Front for the Liberation of the Enclave of Cabinda/Armed Forces of Cabinda (FLEC/FAC) continues in the northern province of Cabinda, and the Angolan Armed Forces has increased its military campaign against rebels in this area. Given the geographic isolation of Cabinda from the rest of Angola, however, the Department of State concludes that conditions in that province do not impact Angolans elsewhere. Department of State Report.

The Department of State report notes that in addition to the humanitarian needs of 380,000 UNITA members and their families, the Government of Angola faces the challenge of assisting an estimated 4 million displaced Angolan nationals. The RIC Report expresses concern that Angola lacks housing, medical services, water systems, and other basic services destroyed by a 27-year-long war.

There are as many as 8 million landmines planted in Angolan soil. Department of State Report. At least 10 provinces, accounting for 40 percent of Angola's countryside, are heavily mined, rendering large areas of arable land and pasture unfit for use. RIC Report. Nevertheless, the Department of State concludes that the risks associated with existing landmines are not sufficient to potential returnees to warrant an extension of TPS.

Despite these challenging circumstances, the United Nations High Commissioner for Refugees (UNHCR)

HaitiTPSAR000108

estimates that 70,000 refugees and 860,000 internally displaced persons have spontaneously returned to their home areas since February 2002. Department of State Report. In the spring of 2003, UNHCR intends to begin the organized repatriation of 470,000 refugees from Zambia, the Democratic Republic of Congo and Namibia. *Id.* The Government of Angola continues to work with the international community to return 4 million internally displaced persons to their homes in Angola.

Based on these findings, the Attorney General has determined that conditions warranting TPS designation no longer exist, and that the TPS designation for Angola must be terminated. Section 244(b)(3)(B) of the Act provides that the Attorney General ''shall'' terminate a designation if he determines that Angola ''no longer continues to meet the conditions for designation * * *'' A statutory condition common to designations under paragraphs (A) and (C) of section 244(b)(1) of the Act is a threat to the personal safety of potential returnees. Whether the precipitating condition is an ''ongoing armed conflict,'' INA § 244(b)(1)(A), or other ''extraordinary and temporary conditions,'' INA § 244(b)(1)(C), this shared condition—threat to returnees' safety—must ''continue to be met'' or the Attorney General ''shall'' terminate the designation. INA §§ 244(b)(3)(A), (B). The disarmament, demobilization, and ongoing reintegration of ex-combatants, the formal end to war, and the discussions regarding planned elections are all positive developments and an indication that internal armed conflict no longer threatens returning Angolans. Furthermore, efforts by the United Nations and non-governmental organizations to resettle Angolan citizens signify the improvement of humanitarian and socioeconomic conditions in Angola. For the foregoing reasons, the Attorney General determines that Angolan TPS beneficiaries may return safely to Angola at this time and, therefore, terminates the TPS designation for Angola.

**What May I Do if I Believe That My Return to Angola Is Unsafe?**

This notice terminates the designation of Angola for TPS. There may be avenues of immigration relief and protection available to aliens who are nationals of Angola (and aliens having no nationality who last habitually resided in Angola) in the United States who believe that their particular circumstances make return to Angola unsafe. Such avenues may include, but are not limited to, asylum, withholding of removal, or protection under Article 3 of the Torture Convention.

**How Does the Termination of TPS Affect Former TPS Beneficiaries?**

After the designation of Angola for TPS is terminated on March 29, 2003, former TPS beneficiaries will maintain the same immigration status they held prior to TPS (unless that status has since expired or been terminated) or any other status they may have acquired while registered for TPS. Accordingly, if an alien held no lawful immigration status prior to receiving TPS benefits and did not obtain any other status during the TPS period, he or she will maintain that unlawful status upon the termination of the TPS designation.

Former TPS beneficiaries will no longer be eligible for a stay of removal or a work authorization document pursuant to the TPS program. TPS-related work authorization documents expire on March 29, 2003, and will not be renewed.

Termination of the TPS designation for Angola does not necessarily affect pending applications for other forms of immigration relief or protection, though former TPS beneficiaries will begin to accrue unlawful presence as of March 29, 2003, if they have not been granted any other immigration status or protection or if they have no pending application for certain benefits.

**Notice of Termination of Designation of Angola Under the TPS Program**

By the authority vested in me as Attorney General under section 244(b)(3) of the Act, I have consulted with the appropriate agencies of government concerning conditions in Angola. 8 U.S.C. 1254a(b)(3). Based on these consultations, I have determined that Angola no longer meets the conditions for designation of TPS under section 244(b)(1) of the Act. *See* 8 U.S.C. 1254a(b)(1).

Accordingly, I order as follows:

(1) The designation of Angola for TPS under section 244(b) of the Act is terminated effective March 29, 2003.

(2) I estimate that there are approximately 316 nationals of Angola (and aliens having no nationality who last habitually resided in Angola) who currently receive TPS benefits.

(3) Information concerning the termination of the TPS program for nationals of Angola (and aliens having no nationality who last habitually resided in Angola) will be available at local Service offices upon publication of this notice and through the INS National Customer Service Center at 1–800–375–5283. This information will also be published on the INS web site at *http://www.ins.usdoj.gov.*

Dated: January 23, 2003.

**John Ashcroft,**
*Attorney General.*
[FR Doc. 03–1994 Filed 1–24–03; 8:45 am]
**BILLING CODE 4410–10–P**

---

**DEPARTMENT OF LABOR**

**Mine Safety and Health Administration**

**Petitions for Modification**

The following parties have filed petitions to modify the application of existing safety standards under section 101(c) of the Federal Mine Safety and Health Act of 1977.

**1. Double M Mining, Inc.**

[Docket No. M–2002–123–C]

Double M Mining, Inc., P.O. Box 14, Rt. 624, Amonate, Virginia 24610 has filed a petition to modify the application of 30 CFR 77.214(a) (Refuse piles; general) at its Auger #2 Mine (MSHA I.D. No. 46–08915) located in McDowell County, West Virginia. This standard requires refuse piles constructed on or after July 1, 1971, to be located in areas that are a safe distance from all underground mine airshafts, preparation plants, tipples or other surface installations and such piles shall not be located over abandoned openings or streamlines. The petitioner proposes to cover the coal seam with inert material, backfill and eliminate the highwall with refuse on a 2 to 1 slope and cover with soil in order to reclaim the site. The petitioner states that: (i) The face up and the adjacent areas of the mine have been augered and the areas now needs to be reclaimed; (ii) that there will be no mine drainage from the mine openings in the area because the original mine entries were developed down dip and seals have been built that isolate the active mining from the area to be reclaimed from the active mining of the Vica Coal Company who is mining from a different set of portals. The petitioner further states that the Auger #2 Mine was faced up in the area of an old refuse pile by removing the refuse and then taking a small cut to create the highwall. The petitioner asserts that the proposed alternative method would provide at least the same measure of protection as the existing standard.

**2. Freeman United Coal Company**

[Docket No. M–2002–124–C]

Freeman United Coal Company, P.O. Box 4630, Springfield, Illinois 62708

HaitiTPSAR000109

DC; Eastman Kodak Company, Rochester, NY; Electronic Data Systems, Warren, MI; Emerson Electric, St. Louis, MO; Ernst & Young, Cleveland, OH; General Dynamics-Ft. Worth Div., Ft. Worth, TX; General Electric, Schenectady, NY; Goldstar, Changwon City, KOREA; Grumman Aerospace, Bethpage, NY; Harris Corporation, Melbourne, FL; Honeywell, Inc., Minneapolis, MN; Hughes Aircraft Co., El Segundo, CA; IBM Corporation, Boca Raton, FL; KPMG Peat Marwick, Palo Alto, CA; LTV Aerospace & Defense Co., Dallas, TX; Martin Marietta Energy Sys., Oak Ridge, TN; McDonnell Douglas Corp., St. Louis, MO; National SemiConductor, Santa Clara, CA; NIES, Canberra City, AUSTRALIA; Northrop Corp., Hawthorne, CA; Price Waterhouse, Cleveland, OH; Procter & Gamble Co., Cincinnati, OH; Texas Instruments, Plano, TX; U.S. Air Force, Dayton, OH; U.S. Navy, Alexandria, VA; and Westinghouse Electric Corporation, Columbia, MD. The current industrial member companies in Europe are: Aerospatiale, Paris, FRANCE; Groupe Bull, Paris, FRANCE; CTE/ITM, Genoa, ITALY; Coopers & Lybrand, Deloitte, London, ENGLAND: Eurosept, Boulogne, FRANCE; Finmeccanica, Rome, ITALY; IBM Eurocoordination, Parris, FRANCE; IPL–TNO, Apeldoorn, THE NETHERLANDS; IVF Swedish Institute, Goteborg, SWEDEN; Lucas Engineering, Solihull, West Midlands, ENGLAND; Messerschmitt-Bolkow-Blohm, Munich, GERMANY; Nuove Pignone, Florence, ITALY; Phillips International, Eindhoven, THE NETHERLANDS; Telos Management, Milan, ITALY; and Valmet Corporation, Helsinki, FINLAND. Current industrial member companies in the Pacific region are: Fuji Electric, Tokyo, JAPAN; Fujitsu, Ltd., Kawasaki, JAPAN; Hitachi, Ltd., Yokohama, JAPAN; and Honda Engineering, Sayama City, JAPAN. Current educational members in the United States are; Arizona State Univ., Tempe, AZ; Brigham Young Univ., Provo, UT; California Polytechnic, San Luis Obispo, CA; Carnegie Mellon Univ., Pittsburgh, PA; Illinois Institute of Technology, Chicago, IL; Massachusetts Inst. of Tech., Cambridge, MA; Merrick School of Business, Baltimore, MD; North Carolina State, Raleigh, NC; North Texas State, Denton, TX; Oklahoma State Univ., Stillwater, OK; Portland State Univ., Portland, OR; Purdue Univ., Ft. Wayne, IN; Rensselaer Polytechnic, Troy, NY; Stanford Univ., Stanford, CA; Univ. California (UCLA), Los Angeles, CA; Univ. of Maryland, Baltimore, MD; Univ. of Massachusetts, Amherst, MA; Univ. of Minnesota,

Minneapolis, MN; Univ. of Missouri-Rolla, Rolla, MO; Univ. of New Hampshire, Durham, NH; Univ. of San Francisco, San Francisco, CA; Univ. of Southern California, Los Angeles, CA; Univ. of Texas, Arlington, Arlington, TX; Univ. of Texas, Austin, Austin, TX; Univ. of Texas, El Paso, El Paso, TX; and Univ. of Waterloo, Waterloo, CANADA. Current educational members in Europe are: Cranfield Institute of Tech., Poole, ENGLAND; Groupe H.E.C., Jouy-en-Josas, FRANCE; Helsinki Univ. of Technology, Espoo, FINLAND; Katholieke Universiteit Leuven, Heverlee, BELGIUM; Loughborough Univ. of Tech., Leicestershire, ENGLAND; Politechnico di Milano, Milan, ITALY; Royal Institute of Stockholm, Stockholm, SWEDEN; Tech. Institute of Aachen, Aachen, GERMANY; Univ. Frederciana Karlsruhe, Karlsruhe, GERMANY; Univ. of Trondheim, Norway, Trondheim, NORWAY; and Univ. of Twente, Twente, THE NETHERLANDS. The current educational members in the Pacific region are Kyoto Univ., Kyoto, JAPAN; and Kobe Univ., Kobe, JAPAN.

The Intelligent Manufacturing Management Program has been discontinued, and the Quality Customer/Quality Supplier Program (QCQS) has been added.

No other changes have been made in either the membership or planned activity of the group research project. Membership in this group research project remains open and the Consortium for Advanced Manufacturing-International, Inc. intends to file additional written notification disclosing all changes in membership.

On December 28, 1984, Computer Aided Manufacturing-International, Inc. (CAM–I), now known as Consortium for Advanced Manufacturing-International, Inc., filed its original notification pursuant to section 6(a) of the Act. The Department of Justice published a notice in the Federal Register pursuant to section 6(b) of the Act on January 24, 1985 (50 FR 3425–3426).

The last notification was filed with the Department on January 2, 1992. A notice was published in the Federal Register pursuant to section 6(b) of the Act on April 2, 1992 (57 FR 11337).

Joseph H. Widmar,

*Director of Operations, Antitrust Division.*

[FR Doc. 93–2856 Filed 2–5–93; 8:45 am]

BILLING CODE 4410-01-M

## Notice Pursuant to the National Cooperative Research Act of 1984— Smart House Project

Notice is hereby given that, on January 5, 1993, pursuant to section 6(a) of the National Cooperative Research Act of 1984, 15 U.S.C. 4301 et seq. ("the Act"), Smart House, L.P., has filed written notifications simultaneously with the Attorney General and the Federal Trade Commission disclosing changes in membership of the Smart House Project ("the Project"). The notifications were filed for the purpose of extending the Act's provisions limiting the recovery of antitrust plaintiffs to actual damages under specified circumstances.

The following party is now participating in the Project: Xantech Corporation, Sylmar, CA. The following parties are no longer involved in the Project: Arkla, Inc.; BellSouth Services; Columbia Gas Distribution Companies; Consolidated Natural Gas Company; Consumers Power Company; Delmarva Power & Light Company; Florida Power & Light Company; Halstead Industries; Houston Lighting & Power Company; National Rural Electric Cooperative Association; Northern Illinois Gas Company; Oglethorpe Power Corporation; Oklahoma Natural Gas Company; Pacific Gas & Electric Company; Pittway Corporation; Portland General Electric Company; Public Service Company of Colorado; Sears, Roebuck & Co.; Southern California Edison Company; Universal Electronics Inc.; Virginia Power Company; WaterFurnace International Inc.; Wisconsin Electric Power Company. No other changes have been made in either the membership or planned activity of the Project.

Participants of the Project are developing a coordinated home control and energy distribution system containing integral telecommunications and advanced safety features.

On June 14, 1985, the predecessor in interest to Smart House, L.P., filed its original notification pursuant to section 6(a) of the Act. The Department of Justice published a notice in the Federal Register pursuant to section 6(b) of the Act on October 10, 1985 (50 FR 41428).

The last notification was filed with the Department on October 5, 1992. A notice was published in the Federal Register pursuant to section 6(b) of the Act on December 17, 1992 (57 FR 60005).

Joseph H. Widmar,

*Director of Operations, Antitrust Division.*

[FR Doc. 93–2857 Filed 2–5–93; 8:45 am]

BILLING CODE 4410-01-M

HaitiTPSAR000110

## Notice Pursuant to the National Cooperative Research Act of 1984—Spray Drift Task Force

Notice is hereby given that, on January 13, 1993, pursuant to section 6(a) of the National Cooperative Research Act of 1984, 15 U.S.C. 4301 et seq. ("the Act"), the Spray Drift Task Force has filed written notifications simultaneously with the Attorney General and the Federal Trade Commission disclosing a change in the membership of the Spray Drift Task Force Joint Data Development Agreement. The notice was filed for the purpose of invoking the Act's provisions limiting the recovery of antitrust plaintiffs to actual damages under specified circumstances. Specifically, the change consists of the addition of Agro-Gor Corporation, a division of Agrico Chemical Company, New Orleans, LA.

No other changes have been made in either the membership, corporate name or planned activities of the venture.

On May 15, 1990, the Spray Drift Task Force filed its original notification pursuant to section 6(a) of the Act. The Department of Justice published a notice in the Federal Register pursuant to section 6(b) of the Act of July 5, 1990 (55 FR 27701). The last notification was filed with the Department on April 27, 1992. A notice was published in the Federal Register on May 22, 1992 (57 FR 21824).

Joseph H. Widmar,

*Director of Operations, Antitrust Division.*

[FR Doc. 93–2858 Filed 2–5–93; 8:45 am]

BILLING CODE 4410-01-M

## Immigration And Naturalization Service

[AG Order No. 1680–93]

## Termination of Designation of Lebanon Under Temporary Protected Status Program

AGENCY: Immigration and Naturalization Service, Justice.

ACTION: Notice.

SUMMARY: This notice terminates the Attorney General's designation of Lebanon under the Temporary Protected Status program provided for in section 244A of the Immigration and Nationality Act (Act). Accordingly, eligible aliens who are nationals of Lebanon, or who have no nationality and who last habitually resided in Lebanon, will lose their eligibility for Temporary Protected Status.

EFFECTIVE DATE: The termination of the Temporary Protected Status designation for Lebanon is effective April 9, 1993.

FOR FURTHER INFORMATION CONTACT: Kathryn A. Kazalonis, Senior Immigration Examiner, Immigration and Naturalization Service, room 7223, 425 I Street, NW, Washington, DC 20536, telephone (202) 514–5014.

SUPPLEMENTARY INFORMATION: Under section 244A of the Act, as amended by section 302(a) of Public Law 101–649 and section 304(b) of Public Law 102–232, (8 U.S.C. 1254a), the Attorney General is authorized to grant Temporary Protected Status in the United States to eligible aliens who are nationals of a foreign state designated by the Attorney General, or who have no nationality and last habitually resided in that state. The Attorney General so designates a state, or a part thereof, upon finding that the state is experiencing ongoing armed civil strife, environmental disaster, or certain other extraordinary and temporary conditions.

On March 21, 1991, the Attorney General designated Lebanon for Temporary Protected Status for a period of 12 months. 56 FR 12746. On January 20, 1992, the Attorney General extended the designation of Lebanon under the Temporary Protected Status program for an additional 12 months until March 28, 1993. 57 FR 2931.

Section 244A(b)(3) of the Act requires the Attorney General to review, at least 60 days before the end of the initial period of designation or any extended period of designation, the conditions in a state designated under section 244A(b)(3). The section also requires the Attorney General to determine whether the requirements for such designation continue to be met, and to terminate a state's designation when the Attorney General determines that those requirements are not met. In this notice, the Attorney General terminates the designation of Lebanon, pursuant to section 244A(b)(3) of the Act.

## Notice of Termination of Designation of Lebanon Under Temporary Protected Status Program

By the authority vested in me as Attorney General under section 244A of the Immigration and Nationality Act, and pursuant to sections 244A(b)(3) (A) and (C) of the Act, I find, after consultation with the appropriate agencies of the United States Government, that the extraordinary and temporary conditions found to exist in Lebanon on March 21, 1991, and on January 20, 1992, are not presently in existence. The United States embassy in Beirut reports that the security situation for Lebanese citizens is steadily improving. The Lebanese government's amnesty law specifically protects Lebanese citizens from prosecution for virtually all actions taken during the war years, and the majority of Lebanese go about their daily activity without hindrance. While the few persons who might still encounter difficulties in Lebanon due to their affiliations could apply for asylum, we believe that Temporary Protected Status is no longer appropriate for Lebanese citizens in general.

Accordingly, it is ordered that the designation of Lebanon for Temporary Protected Status is terminated effective 60 days after publication of this notice in the Federal Register.

Dated: January 27, 1993.

Stuart M. Gerson,

*Acting Attorney General.*

[FR Doc. 93–2861 Filed 2–5–93; 8:45 am]

BILLING CODE 4410-01-M

## Office of Justice Programs

## Office for Victims of Crime

## Discretionary Grant Program and Application Information for Fiscal Year 1993; Correction

AGENCY: Office for Victims of Crime, Office of Justice Programs, Justice.

ACTION: Correction.

SUMMARY: In the public announcement of availability of the funds and application information under the Discretionary Grant Program beginning on page 5416 in the issue of Thursday, January 21, 1993, make the following correction:

On page 5417 in the third column in the first paragraph, the fourth sentence should read: "At least 70 percent of the grant funds is to be allotted for the purchase of workshop presentations from the list; or in special cases, other workshop presentations may be purchased with OVC approval."

Dated: January 29, 1993.

Carolyn Hightower,

*Acting Director, Office for Victims of Crime.*

[FR Doc. 93–2906 Filed 2–5–93; 8:45 am]

BILLING CODE 4410-18-P

## Office for Victims of Crime

## FY 1993 Assistance to Victims of Federal Crime in Indian Country Discretionary Grant Program Application Kit; Correction

AGENCY: Office for Victims of Crime Office of Justice Programs, Justice.

HaitiTPSAR000111

**ACTION:** Correction.

**SUMMARY:** In the public announcement of the availability of FY 1993 Assistance to Victims of Federal Crime in Indian Country Discretionary Grant Program Application Kit beginning on page 584 in the issue of Wednesday, January 6, 1993, make the following correction:

On page 584, in the second column, the Summary paragraph should include Florida and Oklahoma. The Summary paragraph should read, "The Office for Victims of Crime (OVC) is publishing this Notice of availability of the FY 1993 Discretionary Grant Application Kit for the State agencies appointed by the Governors in Alabama, Colorado, Florida, Iowa, Louisiana, Mississippi, Nebraska, North Carolina, Oklahoma, and Texas."

Dated: January 29, 1993.

**Carolyn A. Hightower,**
*Acting Director, Office for Victims of Crime.*
[FR Doc. 93–2907 Filed 2–5–93; 8:45 am]
**BILLING CODE 4410–18–P**

## NATIONAL FOUNDATION ON THE ARTS AND THE HUMANITIES

### Arts in Education Advisory Panel: Notice of Renewal

In accordance with the provisions of the Federal Advisory Committee Act (Pub. L. 92–463) and General Services Administration regulations issued pursuant thereto (41 CFR part 101–6), and under the authority of section 10(a)(4) of the National Foundation on the Arts and the Humanities Act of 1965, as amended (20 U.S.C. 959 (a)(4)), notice is hereby given that renewal of the Arts in Education Advisory Panel has been approved by the Chairman of the National Endowment for the Arts for a period of 2 years until February 2, 1995. The Committee's objectives and scope of activities include the formulation of expert advice and recommendations to the Chairman, National Endowment for the Arts and the National Council on the Arts with respect to: (a) Applications submitted to the National Endowment for the Arts for Federal grant assistance under the National Foundation on the Arts and the Humanities Act of 1965, as amended, and (b) policies and programs of the National Endowment for the Arts. This Committee shall report to the National Endowment for the Arts, National Foundation on the Arts and the Humanities.

This charter will be filed with the standing Committees of the Senate and the House of Representatives having legislative jurisdiction over the Endowment and with the Library of Congress.

Dated: February 2, 1993.

**Yvonne M. Sabine,**
*Director, Office of Panel Operations, National Endowment for the Arts.*
[FR Doc. 93–2897 Filed 2–5–93; 8:45 am]
**BILLING CODE 7537–01–M**

### Challenge/Advancement Advisory Panel: Notice of Renewal

In accordance with the provisions of the Federal Advisory Committee Act (Pub. L. 92–463) and General Services Administration regulations issued pursuant thereto (41 CFR part 101–6), and under the authority of section 10(a)(4) of the National Foundation on the Arts and the Humanities Act of 1965, as amended (20 U.S.C. 959(a)(4)), notice is hereby given that renewal of the Challenge/Advancement Advisory Panel has been approved by the Chairman of the National Endowment for the Arts for a period of 2 years until February 2, 1995. The Committee's objectives and scope of activities include the formulation of expert advice and recommendations to the Chairman, National Endowment for the Arts and the National Council on the Arts with respect to: (a) Applications submitted to the National Endowment for the Arts for Federal grant assistance with the National Foundation on the Arts and the Humanities Act of 1965, as amended, and (b) policies and programs of the National Endowment for the Arts. This Committee shall report to the National Endowment for the Arts, National Foundation on the Arts and the Humanities.

This charter will be filed with the standing Committees of the Senate and the House of Representatives having legislative jurisdiction over the Endowment and with the Library of Congress.

Dated: February 2, 1993.

**Yvonne M. Sabine,**
*Director, Office of Panel Operations, National Endowment for the Arts.*
[FR Doc. 93–2898 Filed 2–5–93; 8:45 am]
**BILLING CODE 7537–01–M**

### Dance Advisory Panel; Notice of Renewal

In accordance with the provisions of the Federal Advisory Committee Act (Pub. L. 92–463) and General Services Administration regulations issued pursuant thereto (41 CFR Part 101–6), and under the authority of section 10(a)(4) of the National Foundation on the Arts and the Humanities Act of 1965, as amended (20 U.S.C. 959 (a)(4)), notice is hereby given that renewal of the Dance Advisory Panel has been approved by the Chairman of the National Endowment for the Arts for a period of 2 years until February 2, 1995. The Committee's objectives and scope of activities include the formulation of expert advice and recommendations to the Chairman, National Endowment for the Arts and the National Council on the Arts with respect to: (a) Applications submitted to the National Endowment for the Arts for Federal grant assistance under the National Foundation on the Arts and the Humanities Act of 1965, as amended, and (b) policies and programs of the National Endowment for the Arts. This Committee shall report to the National Endowment for the Arts, National Foundation on the Arts and the Humanities.

This charter will be filed with the standing Committees of the Senate and the House of Representatives having legislative jurisdiction over the Endowment and with the Library of Congress.

Dated: February 2, 1993.

**Yvonne M. Sabine,**
*Director, Office of Panel Operations, National Endowment for the Arts.*
[FR Doc. 93–2899 Filed 2–5–93; 8:45 am]
**BILLING CODE 7537–01–M**

### Design Arts Advisory Panel; Notice of Renewal

In accordance with the provisions of the Federal Advisory Committee Act (Pub. L. 92–463) and General Services Administration regulations issued pursuant thereto (41 CFR paragraph 101–6), and under the authority of section 10(a)(4) of the National Foundation on the Arts and the Humanities Act of 1965, as amended [20 U.S.C. 959(a)(4)], notice is hereby given that renewal of the Design Arts Advisory Panel has been approved by the Chairman of the National Endowment for the Arts for a period of 2 years until February 2, 1995. The Committee's objectives and scope of activities include the formulation of expert advice and recommendations to the Chairman, National Endowment for the Arts and the National Council on the Arts with respect to: (a) Applications submitted to the National Endowment for the Arts for Federal grant assistance under the National Foundation on the Arts and the Humanities Act of 1965, as amended, and (b) policies and programs of the National Endowment for the Arts. This Committee shall report to the National Endowment for the Arts,

HaitiTPSAR000112

57. Peru
58. The Philippines
59. Poland
60. Portugal
61. Romania
62. San Marino
63. Serbia
64. Singapore
65. Slovakia
66. Slovenia
67. Solomon Islands
68. South Africa
69. South Korea
70. Spain
71. St. Vincent and the Grenadines
72. Sweden
73. Switzerland
74. Taiwan
75. Thailand
76. Timor-Leste
77. Tonga
78. Turkey
79. Tuvalu
80. Ukraine
81. United Kingdom
82. Uruguay
83. Vanuatu

Pursuant to the authority provided to the Secretary of Homeland Security under sections 214(a)(1), 215(a)(1), and 241 of the Immigration and Nationality Act (8 U.S.C. 1184(a)(1), 1185(a)(1), and 1231), I am designating, with the concurrence of the Secretary of State, nationals from the following countries to be eligible to participate in the H–2B nonimmigrant worker program:

1. Andorra
2. Argentina
3. Australia
4. Austria
5. Barbados
6. Belgium
7. Brazil
8. Brunei
9. Bulgaria
10. Canada
11. Chile
12. Colombia
13. Costa Rica
14. Croatia
15. Czech Republic
16. Denmark
17. Dominican Republic
18. Ecuador
19. El Salvador
20. Estonia
21. Ethiopia
22. Fiji
23. Finland
24. France
25. Germany
26. Greece
27. Grenada
28. Guatemala
29. Honduras
30. Hungary
31. Iceland
32. Ireland
33. Israel
34. Italy
35. Jamaica
36. Japan
37. Kiribati

38. Latvia
39. Lichtenstein
40. Lithuania
41. Luxembourg
42. Macedonia
43. Madagascar
44. Malta
45. Mexico
46. Monaco
47. Mongolia
48. Montenegro
49. Nauru
50. The Netherlands
51. Nicaragua
52. New Zealand
53. Norway
54. Panama
55. Papua New Guinea
56. Peru
57. The Philippines
58. Poland
59. Portugal
60. Romania
61. San Marino
62. Serbia
63. Singapore
64. Slovakia
65. Slovenia
66. Solomon Islands
67. South Africa
68. South Korea
69. Spain
70. St. Vincent and the Grenadines
71. Sweden
72. Switzerland
73. Taiwan
74. Thailand
75. Timor-Leste
76. Tonga
77. Turkey
78. Tuvalu
79. Ukraine
80. United Kingdom
81. Uruguay
82. Vanuatu

This notice does not affect the status of aliens who currently hold valid H–2A or H–2B nonimmigrant status. Persons currently holding such status, however, will be affected by this notice should they seek an extension of stay in H–2 classification, or a change of status from one H–2 status to another. Similarly, persons holding nonimmigrant status other than H–2 status are not affected by this notice unless they seek a change of status to H–2 status.

Nothing in this notice limits the authority of the Secretary of Homeland Security or her designee or any other federal agency to invoke against any foreign country or its nationals any other remedy, penalty, or enforcement action available by law.

**Elaine C. Duke,**

*Deputy Secretary.*

[FR Doc. 2018–00812 Filed 1–17–18; 8:45 am]

**BILLING CODE 9110–9M–P**

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Citizenship and Immigration Services

**[CIS No. 2615–17; DHS Docket No. USCIS–2014–0001]**

**RIN 1615–ZB70**

### Termination of the Designation of Haiti for Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** The designation of Haiti for Temporary Protected Status (TPS) is set to expire on January 22, 2018. After reviewing country conditions and consulting with the appropriate U.S. Government agencies, the Acting Secretary of Homeland Security determined on November 20, 2017 that conditions in Haiti no longer support its designation for TPS and is therefore terminating the TPS designation of Haiti. To provide time for an orderly transition, this termination is effective on July 22, 2019, 18 months following the end of the current designation.

Nationals of Haiti (and aliens having no nationality who last habitually resided in Haiti) who have been granted TPS and wish to maintain their TPS and receive TPS-based Employment Authorization Documents (EAD) valid through July 22, 2019, must re-register for TPS in accordance with the procedures set forth in this Notice. After July 22, 2019, nationals of Haiti (and aliens having no nationality who last habitually resided in Haiti) who have been granted TPS under the Haiti designation will no longer have TPS.

**DATES:** The designation of Haiti for TPS is terminated effective at 11:59 p.m., local time, on July 22, 2019.

The 60-day re-registration period runs from January 18, 2018 through March 19, 2018.

(**Note:** It is important for re-registrants to timely re-register during this 60-day period.)

**FOR FURTHER INFORMATION CONTACT:**

• You may contact Alex King, Branch Chief, Waivers and Temporary Services Branch, Service Center Operations Directorate, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, 20 Massachusetts Avenue NW, Washington, DC 20529–2060; or by phone at (202) 272–8377 (this is not a toll-free number). **Note:** The phone number provided here is solely for questions regarding this TPS Notice. It is not for individual case status inquiries.

HaitiTPSAR000113

• For further information on TPS, including guidance on the re-registration process and additional information on eligibility, please visit the USCIS TPS web page at *http://www.uscis.gov/tps.* You can find specific information about this termination of Haiti's TPS by selecting ''Haiti'' from the menu on the left side of the TPS web page.

• Applicants seeking information about the status of their individual cases may check Case Status Online, available on the USCIS website at *http://www.uscis.gov,* or call the USCIS National Customer Service Center at 800–375–5283 (TTY 800–767–1833). Service is available in English and Spanish.

• Further information will also be available at local USCIS offices upon publication of this Notice.

**SUPPLEMENTARY INFORMATION:**

## Table of Abbreviations

BIA—Board of Immigration Appeals
CFR—Code of Federal Regulations
DHS—U.S. Department of Homeland Security
DOS—Department of State
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
FR—Federal Register
Government—U.S. Government
IJ—Immigration Judge
INA—Immigration and Nationality Act
IER—U.S. Department of Justice Civil Rights Division, Immigrant and Employee Rights Section
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TNC—Tentative Nonconfirmation
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services
U.S.C.—United States Code

Through this Notice, DHS sets forth procedures necessary for eligible nationals of Haiti (or aliens having no nationality who last habitually resided in Haiti) to re-register for TPS and to apply for renewal of their EADs with USCIS. Re-registration is limited to persons who have previously registered for TPS under the designation of Haiti and whose applications have been granted.

For individuals who have already been granted TPS under Haiti's designation, the 60-day re-registration period runs from January 18, 2018 through March 19, 2018. USCIS will issue new EADs with a July 22, 2019 expiration date to eligible Haitian TPS beneficiaries who timely re-register and apply for EADs. Given the timeframes involved with processing TPS re-registration applications, DHS

recognizes that not all re-registrants will receive new EADs before their current EADs expire on January 22, 2018. Accordingly, through this **Federal Register** notice, DHS automatically extends the validity of EADs issued under the TPS designation of Haiti for 180 days, through July 21, 2018. This Notice explains how TPS beneficiaries and their employers may determine which EADs are automatically extended and how this affects the Form I–9, Employment Eligibility Verification, and E-Verify processes.

## What is Temporary Protected Status (TPS)?

• TPS is a temporary immigration status granted to eligible nationals of a country designated for TPS under the INA, or to eligible persons without nationality who last habitually resided in the designated country.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to work and obtain EADs so long as they continue to meet the requirements of TPS.

• TPS beneficiaries may also apply for and be granted travel authorization as a matter of discretion.

• The granting of TPS does not result in or lead to lawful permanent resident status.

• To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(2), 8 U.S.C. 1254a(c)(2).

• When the Secretary terminates a country's TPS designation, beneficiaries return to one of the following:

○ The same immigration status or category that they maintained before TPS, if any (unless that status or category has since expired or been terminated); or

○ Any other lawfully obtained immigration status or category they received while registered for TPS, as long as it is still valid on the date TPS terminates.

## When was Haiti designated for TPS?

On January 21, 2010, the Secretary of Homeland Security (Secretary) designated Haiti for TPS under INA section 244(b)(1)(C) based on ''extraordinary and temporary conditions'' within the country, specifically the effects of the 7.0-magnitude earthquake that occurred on January 12, 2010, that prevented Haitians from returning in safety. *See* Designation of Haiti for Temporary Protected Status, 75 FR 3476 (Jan. 21, 2010). In 2011, the Secretary both extended Haiti's designation and

redesignated Haiti for TPS for 18 months through January 22, 2013. *See* Extension and Redesignation of Haiti for Temporary Protected Status, 76 FR 29000 (May 19, 2011). The last extension of Haiti's TPS designation, for 6 months, was announced on May 24, 2017. *See* Extension of the Designation of Haiti for Temporary Protected Status, 82 FR 23830 (May 24, 2017). DHS estimates that there are approximately 58,550 nationals of Haiti (and aliens having no nationality who last habitually resided in Haiti) who currently hold TPS under Haiti's designation.

## What authority does the Secretary have to terminate the designation of Haiti for TPS?

Section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1), authorizes the Secretary, after consultation with appropriate U.S. Government agencies, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist.[1] The Secretary may then grant TPS to eligible nationals of that foreign state (or eligible aliens having no nationality who last habitually resided in the designated country). *See* INA section 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a country's TPS designation or extension, the Secretary, after consultation with appropriate Government agencies, must review the conditions in a foreign state designated for TPS to determine whether the conditions for the TPS designation continue to be met. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that a foreign state continues to meet the conditions for TPS designation, the designation must be extended for an additional period of 6 months and, in the Secretary's discretion, may be extended for 12 or 18 months. *See* INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation, but such termination may not take effect earlier than 60 days after the date the **Federal Register** notice of termination is published, or if later, the expiration of the most recent previous extension of

---

[1] As of March 1, 2003, in accordance with section 1517 of title XV of the Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135, any reference to the Attorney General in a provision of the INA describing functions transferred from the Department of Justice to the U.S. Department of Homeland Security (DHS) ''shall be deemed to refer to the Secretary'' of Homeland Security. *See* 6 U.S.C. 557 (codifying the Homeland Security Act of 2002, tit. XV, section 1517).

HaitiTPSAR000114

the country designation. *See* INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B). The Secretary may determine the appropriate effective date of the termination and the expiration of any TPS-related documentation, such as EADs, for the purpose of providing for an orderly transition. *See id.;* INA section 244(d)(3), 8 U.S.C. 1254a(d)(3).

### Why is the Secretary terminating the TPS designation for Haiti as of July 22, 2019?

DHS has reviewed conditions in Haiti. Based on the review, including input received from other appropriate U.S. Government agencies, the Acting Secretary of Homeland Security determined on November 20, 2017 that the conditions for Haiti's designation for TPS—on the basis of ''extraordinary and temporary conditions'' relating to the 2010 earthquake that prevented Haitian nationals from returning in safety—are no longer met.

Haiti has made progress recovering from the 2010 earthquake and subsequent effects that formed the basis for its designation. For example, the number of internally displaced persons (IDP) from the earthquake has continued to decline—98 precent of IDP sites have closed, and only approximately 38,000 of the estimated 2 million Haitians who lost their homes in the earthquake were still living in camps as of June 2017. In October 2017, the United Nations withdrew its peacekeeping mission, noting the mission had achieved its goals. The peacekeeping mission has been replaced by a successor operation that is a police-only force focused on strengthening rule of law, promoting human rights and supporting the Haitian National Police.

Haiti successfully completed its presidential election in February 2017. The 2010 earthquake destroyed key government infrastructure, including dozens of primary federal buildings, which the Haitian government is working to rebuild. The Supreme Court is already reconstructed and operational, and, in April 2017, President Moïse announced a project to rebuild Haiti's National Palace. A Palace spokesperson announced on January 8 that a project to reconstruct the Palace would commence on January 12, 2018.

Haiti's economy continues to recover from the 2010 earthquake. Annual GDP growth has been generally positive since 2010, averaging 1.7 percent over the period (2010–2016). Although Haiti has grappled with a cholera epidemic that began in 2010 in the aftermath of the earthquake, cholera is currently at its lowest level since the outbreak began.

### Notice of Termination of the TPS Designation of Haiti

By the authority vested in the Secretary of Homeland Security under INA section 244(b)(3), 8 U.S.C. 1254a(b)(3), the Acting Secretary of Homeland Security determined on November 20, 2017, after consultation with appropriate U.S. Government agencies, that the conditions for the designation of Haiti for TPS under 244(b)(1)(C) of the INA. 8 U.S.C. 1254a(b)(1)(C), are no longer met. Accordingly, I order as follows:

(1) Pursuant to INA section 244(b)(3)(B) and in accordance with INA section 244(d)(3), in order to provide for an orderly transition, the designation of Haiti for TPS is terminated effective at 11:59 p.m., local time, on July 22, 2019, 18 months following the end of the current designation.

(2) Information concerning the termination of TPS for nationals of Haiti (and aliens having no nationality who last habitually resided in Haiti) will be available at local USCIS offices upon publication of this Notice and through the USCIS National Customer Service Center at 1–800–375–5283. This information will be published on the USCIS website at *www.USCIS.gov.*

**Elaine C. Duke,**
*Deputy Secretary.*

### Required Application Forms and Application Fees To Re-Register for TPS

To re-register for TPS based on the designation of Haiti, you *must* submit an Application for Temporary Protected Status (Form I–821). You do not need to pay the filing fee for the Form I–821. *See* 8 CFR 244.17. You may be required to pay the biometric services fee. Please see additional information under the ''Biometric Services Fee'' section of this Notice.

Through operation of this **Federal Register** notice, your existing EAD issued under the TPS designation of Haiti with the expiration date of January 22, 2018, is automatically extended for 180 days, through July 21, 2018. You do not need to apply for a new EAD in order to benefit from this 180-day automatic extension. However, if you want to obtain a new EAD valid through July 22, 2019, you must file an Application for Employment Authorization (Form I–765) and pay the Form I–765 fee. Note, if you do not want a new EAD, you do not have to file Form I–765 or pay the Form I–765 fee. If you do not want to request a new EAD now, you may also file Form I–765 at a later date and pay the fee (or request a fee waiver), provided that you still have

TPS or a pending TPS application. But unless you timely re-register and properly file an EAD application in accordance with this Notice, the validity of your current EAD will end on July 21, 2018. You may file the application for a new EAD either prior to or after your current EAD has expired. However, you are strongly encouraged to file your application for a new EAD as early as possible to avoid gaps in the validity of your employment authorization documentation and to ensure that you receive your new EAD by July 22, 2018.

If you are seeking an EAD with your re-registration for TPS, please submit both the Form I–821 and Form I–765 together. If you are unable to pay the application fee and/or biometric services fee, you may complete a Request for Fee Waiver (Form I–912) or submit a personal letter requesting a fee waiver with satisfactory supporting documentation. For more information on the application forms and fees for TPS, please visit the USCIS TPS web page at *http://www.uscis.gov/tps.* Fees for the Form I–821, the Form I–765, and biometric services are also described in 8 CFR 103.7(b)(1)(i).

**Note:** If you have a Form I–821 and/or Form I–765 that was still pending as of January 18, 2018, then you do *not* need to file a new application or applications. If your TPS application is approved, you will be granted TPS through July 22, 2019. Similarly, if you have a pending TPS-related application for an EAD that is approved, it will be valid through the same date.

### Biometric Services Fee

Biometrics (such as fingerprints) are required for all applicants 14 years and older. Those applicants must submit a biometric services fee. As previously stated, if you are unable to pay for the biometric services fee, you may complete a Form I–912 or submit a personal letter requesting a fee waiver with satisfactory supporting documentation. For more information on the biometric services fee, please visit the USCIS website at *http://www.uscis.gov.* If necessary, you may be required to visit an Application Support Center to have your biometrics captured. For additional information on the USCIS biometrics screening process please see the USCIS Customer Profile Management Service Privacy Impact Assessment, available at *www.dhs.gov/privacy.*

### Re-Filing a Re-Registration TPS Application After Receiving a Denial of a Fee Waiver Request

You should file as soon as possible within the 60-day re-registration period so USCIS can process your application

HaitiTPSAR000115

and issue an EAD promptly. Properly filing early will also allow you to have time to re-file your application before the deadline, should USCIS deny your fee waiver request. If, however, you receive a denial of your fee waiver request and are unable to re-file by the re-registration deadline, you may still re-file your Form I–821 with the biometrics fee. This situation will be reviewed to determine whether you established good cause for late TPS re-registration. However, you are urged to re-file within 45 days of the date on any USCIS fee waiver denial notice, if possible. *See* INA section 244(c)(3)(C); 8 U.S.C. 1254a(c)(3)(C); 8 CFR 244.17(b). For more information on good cause for late re-registration, visit the USCIS TPS web page at *http://www.uscis.gov/tps.* Following denial of your fee waiver request, you may also re-file your Form I–765 with fee either with your Form I–821 or at a later time, if you choose.

**Note:** Although a re-registering TPS beneficiary age 14 and older must pay the biometric services fee (but not the Form I–821 fee) when filing a TPS re-registration application, you may decide to wait to request an EAD. Therefore, you do not have to file the Form I–765 or pay the associated Form I–765 fee (or request a fee waiver) at the time of re-registration, and could wait to seek an EAD until after USCIS has approved your TPS re-registration. If you choose to do this, to re-register for TPS you would only need to file the Form I–821 with the biometrics services fee, if applicable, (or request a fee waiver).

**Mailing Information**

Mail your application for TPS to the proper address in Table 1.

TABLE 1—MAILING ADDRESSES

| If . . . | Mail to . . . |
| --- | --- |
| You live in the State of Florida .......................... | *For U.S. Postal Service:* U.S. Citizenship and Immigration Services, P.O. Box 4464, Chicago, IL 60680. |
| | *For FedEx, UPS and DHL deliveries:* U.S. Citizenship and Immigration Services, Attn: TPS Haiti, 131 S. Dearborn—3rd Floor, Chicago, IL 60603–5517. |
| You live in the State of New York ...................... | *For U.S. Postal Service:* U.S. Citizenship and Immigration Services, P.O. Box 660167, Dallas, TX 75266. |
| | *For FedEx, UPS and DHL deliveries:* U.S. Citizenship and Immigration Services, Attn: TPS Haiti, 2501 S. State Highway, 121 Business Suite 400, Lewisville, TX 75067. |
| You live in any other state ................................. | *For U.S. Postal Service:* U.S. Citizenship and Immigration Services, P.O. Box 24047, Phoenix, AZ 85074. |
| | *For FedEx, UPS and DHL deliveries:* U.S. Citizenship and Immigration Services, Attn: TPS Haiti, 1820 E. Skyharbor Circle S, Suite 100, Phoenix, AZ 85034. |

If you were granted TPS by an Immigration Judge (IJ) or the Board of Immigration Appeals (BIA) and you wish to request an EAD or are re-registering for the first time following a grant of TPS by an IJ or the BIA, please mail your application to the appropriate mailing address in Table 1. When re-registering and requesting an EAD based on an IJ/BIA grant of TPS, please include a copy of the IJ or BIA order granting you TPS with your application. This will help us to verify your grant of TPS and process your application, as USCIS may not have received records of your grant of TPS by either the IJ or the BIA.

**Supporting Documents**

The filing instructions on the Form I–821 list all the documents needed to establish eligibility for TPS. You may also find information on the acceptable documentation and other requirements for applying or registering for TPS on the USCIS website at *www.uscis.gov/tps* under ''Haiti.''

**Employment Authorization Document (EAD)**

*How can I obtain information on the status of my EAD request?*

To get case status information about your TPS application, including the status of an EAD request, you can check Case Status Online at *http://*
*www.uscis.gov,* or call the USCIS National Customer Service Center at 800–375–5283 (TTY 800–767–1833). If your Form I–765 has been pending for more than 90 days, and you still need assistance, you may request an EAD inquiry appointment with USCIS by using the InfoPass system at *https://infopass.uscis.gov.* However, we strongly encourage you first to check Case Status Online or call the USCIS National Customer Service Center for assistance before making an InfoPass appointment.

*Am I eligible to receive an automatic 180-day extension of my current EAD through July 21, 2018, using this* **Federal Register** *notice?*

Yes. Provided that you currently have a Haiti TPS-based EAD, this **Federal Register** notice automatically extends your EAD by 180 days (through July 21, 2018) if you:

• Are a national of Haiti (or an alien having no nationality who last habitually resided in Haiti);

• Have an EAD with a marked expiration date of January 22, 2018, bearing the notation A–12 or C–19 on the face of the card under Category.

Although this **Federal Register** notice automatically extends your EAD through July 22, 2018, you must re-register timely for TPS in accordance with the procedures described in this **Federal Register** notice if you would like to maintain your TPS.

*When hired, what documentation may I show to my employer as evidence of employment authorization and identity when completing Employment Eligibility Verification (Form I–9)?*

You can find a list of acceptable document choices on the ''Lists of Acceptable Documents'' for Form I–9. Employers must complete Form I–9 to verify the identity and employment authorization of all new employees. Within three days of hire, employees must present acceptable documents to their employers as evidence of identity and employment authorization to satisfy Form I–9 requirements.

You may present any document from List A (which provides evidence of both identity and employment authorization), or one document from List B (which provides evidence of your identity) together with one document from List C (which is evidence of employment authorization), or you may present an acceptable receipt for List A, List B, or List C documents as described in the Form I–9 Instructions. Employers may not reject a document based on a future expiration date. You can find additional detailed information about Form I–9 on USCIS' I–9 Central web page at *http://www.uscis.gov/I-9Central.*

An EAD is an acceptable document under List A. If your EAD has an

expiration date of January 22, 2018, and states A–12 or C–19 under Category, it has been extended automatically for 180 days by virtue of this **Federal Register** notice and you may choose to present your EAD to your employer as proof of identity and employment eligibility for Form I–9 through July 21, 2018, unless your TPS has been withdrawn or your request for TPS has been denied. If you properly filed for a new EAD in accordance with this notice, you will receive Form I–797C, Notice of Action that will state your current A–12 or C–19 coded EAD is automatically extended for 180 days. You may choose to present your EAD to your employer together with this Form I–797C as a List A document that provides evidence of your identity and employment authorization for Form I–9 through July 21, 2018, unless your TPS has been finally withdrawn or your request for TPS has been finally denied. See the subsection titled, ''*How do my employer and I complete the Employment Eligibility Verification (Form I–9) using an automatically extended EAD for a new job?*'' for further information.

To reduce confusion over this extension at the time of hire, you should explain to your employer that your EAD has been automatically extended through July 21, 2018. You may also provide your employer with a copy of this **Federal Register** notice, which explains that your EAD has been automatically extended. As an alternative to presenting evidence of your automatically extended EAD, you may choose to present any other acceptable document from List A, a combination of one selection from List B and one selection from List C, or a valid receipt.

*What documentation may I present to my employer for Employment Eligibility Verification (Form I–9) if I am already employed but my current TPS-related EAD is set to expire?*

Even though your EAD has been automatically extended, your employer will need to ask you about your continued employment authorization no later than before you start work on January 23, 2018. You will need to present your employer with evidence that you are still authorized to work. Once presented, you may correct your employment authorization expiration date in Section 1 and your employer should correct the EAD expiration date in Section 2 of Form I–9. See the subsection titled, ''*What corrections should my current employer and I make to Employment Eligibility Verification (Form I–9) if my employment authorization has been automatically*

*extended?*'' for further information. You may also show this **Federal Register** notice to your employer to explain what to do for Form I–9.Your employer may need to reinspect your automatically extended EAD to check the expiration date and Category code to record the updated expiration date on your Form I–9 if your employer did not keep a copy of this EAD when you initially presented it. In addition, if you properly filed your Form I–765 to obtain a new EAD, you will receive a Form I–797C, Notice of Action. Form I–797C will state that your current A–12 or C–19 coded EAD is automatically extended for 180 days. You may present Form I–797C to your employer along with your EAD to confirm that the validity of your EAD has been automatically extended through July 21, 2018, unless your TPS has been finally withdrawn or your request for TPS has been finally denied. You may also present this **Federal Register** notice to your employer to show that your EAD has been automatically extended through July 21, 2018. To reduce the possibility of gaps in your employment authorization documentation, you should file your Form I–765 to request a new EAD as early as possible during the re-registration period.

The last day of the automatic EAD extension is July 21, 2018. Before you start work on July 22, 2018, your employer must reverify your employment authorization. At that time, you must present any document from List A or any document from List C on Form I–9 Lists of Acceptable Documents, or an acceptable List A or List C receipt described in the Form I–9 Instructions to reverify employment authorization.

By July 22, 2018, your employer must complete Section 3 of the current version of the form, Form I–9 07/17/17 N, and attach it to the previously completed Form I–9, if your original Form I–9 was a previous version. Your employer can check the USCIS' I–9 Central web page at *http://www.uscis.gov/I-9Central* for the most current version of Form I–9.

Note that your employer may not specify which List A or List C document you must present and cannot reject an acceptable receipt.

*Can my employer require that I provide any other documentation to prove my status, such as proof of my Haitian citizenship?*

No. When completing Form I–9, including reverifying employment authorization, employers must accept any documentation that appears on the Form I–9 ''Lists of Acceptable

Documents'' that reasonably appears to be genuine and that relates to you, or an acceptable List A, List B, or List C receipt. Employers need not reverify List B identity documents. Employers may not request documentation that does not appear on the ''Lists of Acceptable Documents.'' Therefore, employers may not request proof of Haitian citizenship or proof of re-registration for TPS when completing Form I–9 for new hires or reverifying the employment authorization of current employees. If presented with EADs that have been automatically extended, employers should accept such documents as a valid List A document so long as the EAD reasonably appears to be genuine and relates to the employee. Refer to the Note to Employees section of this **Federal Register** notice for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or immigration status, or your national origin.

*How do my employer and I complete Employment Eligibility Verification (Form I–9) using my automatically extended employment authorization for a new job?*

When using an automatically extended EAD to complete Form I–9 for a new job before July 22, 2018, you and your employer should do the following:

1. For Section 1, you should:
a. Check ''An alien authorized to work until'' and enter July 21, 2018, the automatically extended EAD expiration date as the ''expiration date, if applicable, mm/dd/yyyy''; and
b. Enter your Alien Number/USCIS number or A-Number where indicated (your EAD or other document from DHS will have your USCIS number or A-Number printed on it; the USCIS number is the same as your A-Number without the A prefix).
2. For Section 2, employers should:
a. Determine if the EAD is auto-extended for 180 days by ensuring it is in category A–12 or C–19 and has a January 22, 2018 expiration date;
b. Write in the document title;
c. Enter the issuing authority;
d. Provide the document number; and
e. Insert July 21, 2018, the date that is 180 days from the date the current EAD expires.

If you also filed for a new EAD, as proof of the automatic extension of your employment authorization, you may present your expired or expiring EAD with category A–12 or C–19 in combination with the Form I–797C

HaitiTPSAR000117

Notice of Action showing that the EAD renewal application was filed and that the qualifying eligibility category is either A–12 or C–19. Unless your TPS has been finally withdrawn or your request for TPS has been finally denied, this document combination is considered an unexpired EAD (Form I–766) under List A. In these situations, to complete Section 2, employers should:

a. Determine if the EAD is auto-extended for 180 days by ensuring:
• It is in category A–12 or C–19; and
• The category code on the EAD is the same category code on Form I–797C, noting that employers should consider category codes A–12 and C–19 to be the same category code.

b. Write in the document title;
c. Enter the issuing authority;
d. Provide the document number; and
e. Insert July 21, 2018, the date that is 180 days from the date the current EAD expires. Before the start of work on July 22, 2018, employers must reverify the employee's employment authorization in Section 3 of Form I–9.

*What corrections should my current employer and I make to Employment Eligibility Verification (Form I–9) if my employment authorization has been automatically extended?*

If you presented a TPS-related EAD that was valid when you first started your job and your EAD has now been automatically extended, your employer may need to re-inspect your current EAD if they do not have a copy of the EAD on file. You and your employer should correct your previously completed Form I–9 as follows:

1. For Section 1, you may:
a. Draw a line through the expiration date in Section 1;
b. Write July 21, 2018, the date that is 180 days from the date your current EAD expires above the previous date (January 22, 2018); and
c. Initial and date the correction in the margin of Section 1.

2. For Section 2, employers should:
a. Determine if the EAD is auto-extended for 180 days by ensuring:
• It is in category A–12 or C–19; and
• Has an expiration date of January 22, 2018.
b. Draw a line through the expiration date written in Section 2;
c. Write July 21, 2018, the date that is 180 days from the date the employee's current EAD expires above the previous date (January 22, 2018); and
d. Initial and date the correction in the margin of Section 2.

In the alternative, if you properly applied for a new EAD, you may present your expired EAD with category A–12 or C–19 in combination with the Form

I–797C Notice of Action. The Form I–797C should show that the EAD renewal application was filed and that the qualifying eligibility category is either A–12 or C–19. To avoid confusion, you may also provide your employer a copy of this Notice. Your employer should correct your previously completed Form I–9 as follows:

For Section 2, employers should:
a. Determine if the EAD is auto-extended for 180 days by ensuring:
• It is in category A–12 or C–19; and
• The category code on the EAD is the same category code on Form I–797C, noting that employers should consider category codes A–12 and C–19 to be the same category code.

b. Draw a line through the expiration date written in Section 2;
c. Write July 21, 2018, the date that is 180 days from the date the employee's current EAD expires above the previous date (January 22, 2018); and
d. Initial and date the correction in the Additional Information field in Section 2.

**Note:** This is not considered a reverification. Employers do not need to complete Section 3 until either the 180-day extension has ended or the employee presents a new document to show continued employment authorization, whichever is sooner. By July 22, 2018, when the employee's automatically extended EAD has expired, employers must reverify the employee's employment authorization in Section 3.

*If I am an employer enrolled in E-Verify, how do I verify a new employee whose EAD has been automatically extended?*

Employers may create a case in E-Verify for a new employee using the EAD with expiration date January 22, 2018, or the Form I–797C receipt information provided on Form I–9. In either case, the receipt number entered as the document number on Form I–9 should be entered into the document number field in E-Verify.

*If I am an employer enrolled in E-Verify, what do I do when I receive a "Work Authorization Documents Expiration" alert for an automatically extended EAD?*

E-Verify automated the verification process for employees whose TPS-related EAD was automatically extended. If you have employees who are TPS beneficiaries who provided a TPS-related EAD when they first started working for you, you will receive a "Work Authorization Documents Expiring" case alert when the auto-extension period for this EAD is about to expire. This indicates that you should update Form I–9 in accordance with the

instructions above. Before such an employee starts to work on July 22, 2018, employment authorization must be reverified in Section 3. Employers should not use E-Verify for reverification.

**Note to All Employers**

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This **Federal Register** notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY 877–875–6028) or email USCIS at *I9Central@dhs.gov.* Calls and emails are accepted in English and many other languages. For questions about avoiding discrimination during the employment eligibility verification process (Form I–9 and E-Verify), employers may call the U.S. Department of Justice's Civil Rights Division, Immigrant and Employee Rights Section (IER) (formerly the Office of Special Counsel for Immigration-Related Unfair Employment Practices) Employer Hotline at 800–255–8155 (TTY 800–237–2515). The IER offers language interpretation in numerous languages. Employers may also email IER at *IER@usdoj.gov.*

**Note to Employees**

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY 877–875–6028) or email USCIS at *I-9Central@dhs.gov.* Calls are accepted in English, Spanish, and many other languages. Employees or applicants may also call the IER Worker Hotline at 800–255–7688 (TTY 800–237–2515) for information regarding employment discrimination based upon citizenship, immigration status, or national origin, including discrimination related to Employment Eligibility Verification (Form I–9) and E-Verify. The IER Worker Hotline provides language interpretation in numerous languages.

To comply with the law, employers must accept any document or combination of documents from the Lists of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee, or an acceptable List A, List B, or List C receipt as described in the Employment Eligibility Verification (Form I–9) Instructions. Employers may

HaitiTPSAR000118

not require extra or additional documentation beyond what is required for Form I–9 completion. Further, employers participating in E-Verify who receive an E-Verify case result of ''Tentative Nonconfirmation'' (TNC) must promptly inform employees of the TNC and give such employees an opportunity to contest the TNC. A TNC case result means that the information entered into E-Verify from an employee's Form I–9 differs from Federal or state government records.

Employers may not terminate, suspend, delay training, withhold pay, lower pay, or take any adverse action against an employee based on the employee's decision to contest a TNC or because the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result is received when E-Verify cannot verify an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY 877–875–6028). For more information about E-Verify-related discrimination or to report an employer for discrimination in the E-Verify process based on citizenship, immigration status, or national origin, contact IER's Worker Hotline at 800–255–7688 (TTY 800–237–2515). Additional information about proper nondiscriminatory Form I–9 and E-Verify procedures is available on the IER website at *https://www.justice.gov/ier* and the USCIS website at *http://www.dhs.gov/E-verify.*

### Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)

While Federal Government agencies must follow the guidelines laid out by the Federal Government, state and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, state, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary and/or show you are authorized to work based on TPS. Examples of such documents are:

(1) Your current EAD;

(2) A copy of your Notice of Action (Form I–797C) for your application to renew your current EAD providing an automatic extension of your currently expired or expiring EAD;

(3) A copy of your Application for Temporary Protected Status Notice of Action (Form I–797) for this re-registration; and

(4) A copy of your past or current Application for Temporary Protected Status Notice of Action (Form I–797), if you received one from USCIS.

Check with the government agency regarding which document(s) the agency will accept. Some benefit-granting agencies use the USCIS Systematic Alien Verification for Entitlements (SAVE) program to confirm the current immigration status of applicants for public benefits. In most cases, SAVE provides an automated electronic response to benefit-granting agencies within seconds, but, occasionally, verification can be delayed. You can check the status of your SAVE verification by using CaseCheck at the following link: *https://save.uscis.gov/casecheck/,* then by clicking the ''Check Your Case'' button. CaseCheck is a free service that lets you follow the progress of your SAVE verification using your date of birth and one immigration identifier number. If an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted upon or will act upon a SAVE verification and you do not believe the response is correct, you may make an InfoPass appointment for an in-person interview at a local USCIS office. Detailed information on how to make corrections, make an appointment, or submit a written request to correct records under the Freedom of Information Act can be found on the SAVE website at *http://www.uscis.gov/save.*

[FR Doc. 2018–00886 Filed 1–17–18; 8:45 am]

**BILLING CODE 9111–97–P**

---

### DEPARTMENT OF HOMELAND SECURITY

#### U.S. Citizenship and Immigration Services

[CIS No. 2616–18; DHS Docket No. USCIS–2008–0034]

RIN 1615–ZB71

### Termination of the Designation of El Salvador for Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** The designation of El Salvador for Temporary Protected Status (TPS) is set to expire on March 9, 2018. After reviewing country conditions and consulting with appropriate U.S. Government agencies, the Secretary of Homeland Security has determined that conditions in El Salvador no longer support its designation for TPS and that termination of the TPS designation of El Salvador is required pursuant to statute. To provide time for an orderly transition, the Secretary is terminating the designation effective on September 9, 2019, which is 18 months following the end of the current designation.

Nationals of El Salvador (and aliens having no nationality who last habitually resided in El Salvador) who have been granted TPS and wish to maintain their TPS and receive TPS-based Employment Authorization Documents (EAD) valid through September 9, 2019, must re-register for TPS in accordance with the procedures set forth in this Notice. After September 9, 2019, nationals of El Salvador (and aliens having no nationality who last habitually resided in El Salvador) who have been granted TPS under the El Salvador designation will no longer have TPS.

**DATES:** The designation of El Salvador for TPS is terminated effective at 11:59 p.m., local time, on September 9, 2019.

The 60-day re-registration period runs from January 18, 2018 through March 19, 2018. (**Note:** It is important for re-registrants to timely re-register during this 60-day period.)

**FOR FURTHER INFORMATION CONTACT:**

• You may contact Alex King, Branch Chief, Waivers and Temporary Services Branch, Service Center Operations Directorate, U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, 20 Massachusetts Avenue NW, Washington, DC 20529–2060; or by phone at (202) 272–8377 (this is not a toll-free number). **Note:** The phone number provided here is solely for questions regarding this TPS Notice. It is not for individual case status inquiries.

• For further information on TPS, including guidance on the re-registration process and additional information on eligibility, please visit the USCIS TPS web page at *http://www.uscis.gov/tps.* You can find specific information about this termination of El Salvador's TPS by selecting ''El Salvador'' from the menu on the left side of the TPS web page.

• Applicants seeking information about the status of their individual cases may check Case Status Online, available on the USCIS website at *http://*

HaitiTPSAR000119

| Beginning date | Ending date | Under-payments (percent) | Over-payments (percent) | Corporate overpayments (eff. 1–1–99) (percent) |
|---|---|---|---|---|
| 100192 | 063094 | 7 | 6 | |
| 070194 | 093094 | 8 | 7 | |
| 100194 | 033195 | 9 | 8 | |
| 040195 | 063095 | 10 | 9 | |
| 070195 | 033196 | 9 | 8 | |
| 040196 | 063096 | 8 | 7 | |
| 070196 | 033198 | 9 | 8 | |
| 040198 | 123198 | 8 | 7 | |
| 010199 | 033199 | 7 | 7 | 6 |
| 040199 | 033100 | 8 | 8 | 7 |
| 040100 | 033101 | 9 | 9 | 8 |
| 040101 | 063001 | 8 | 8 | 7 |
| 070101 | 123101 | 7 | 7 | 6 |
| 010102 | 123102 | 6 | 6 | 5 |
| 010103 | 093003 | 5 | 5 | 4 |
| 100103 | 033104 | 4 | 4 | 3 |
| 040104 | 063004 | 5 | 5 | 4 |
| 070104 | 093004 | 4 | 4 | 3 |
| 100104 | 033105 | 5 | 5 | 4 |
| 040105 | 093005 | 6 | 6 | 5 |
| 100105 | 063006 | 7 | 7 | 6 |
| 070106 | 123107 | 8 | 8 | 7 |
| 010108 | 033108 | 7 | 7 | 6 |
| 040108 | 063008 | 6 | 6 | 5 |
| 070108 | 093008 | 5 | 5 | 4 |
| 100108 | 123108 | 6 | 6 | 5 |
| 010109 | 033109 | 5 | 5 | 4 |
| 040109 | 123110 | 4 | 4 | 3 |
| 011111 | 033111 | 3 | 3 | 2 |
| 040111 | 093011 | 4 | 4 | 3 |
| 100111 | 033116 | 3 | 3 | 2 |
| 040116 | 033118 | 4 | 4 | 3 |
| 040118 | 123118 | 5 | 5 | 4 |
| 010119 | 063019 | 6 | 6 | 5 |
| 070119 | 063020 | 5 | 5 | 4 |
| 070120 | 033122 | 3 | 3 | 2 |
| 040122 | 063022 | 4 | 4 | 3 |
| 070122 | 093022 | 5 | 5 | 4 |
| 100122 | 123122 | 6 | 6 | 5 |
| 010123 | 093023 | 7 | 7 | 6 |
| 100123 | 123124 | 8 | 8 | 7 |
| 010125 | 093025 | 7 | 7 | 6 |

**Jeffrey Caine,**
*Chief Financial Officer, U.S. Customs and Border Protection.*
[FR Doc. 2025–12241 Filed 6–30–25; 8:45 am]
**BILLING CODE 9111–14–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

**U.S. Citizenship and Immigration Services**

[CIS No. 2825–25; DHS Docket No. USCIS–2014–0001]

**RIN 1615–ZB70**

**Termination of the Designation of Haiti for Temporary Protected Status**

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS).

**ACTION:** Notice.

**SUMMARY:** Through this notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) is terminating the designation of Haiti for Temporary Protected Status (TPS). The designation of Haiti is set to expire on August 3, 2025. After reviewing country conditions and consulting with appropriate U.S. Government agencies, the Secretary determined that Haiti no longer continues to meet the conditions for designation for TPS. The Secretary, therefore, is terminating the TPS designation of Haiti as required by statute. This termination is effective September 2, 2025. After September 2, 2025, nationals of Haiti (and aliens having no nationality who last habitually resided in Haiti) who have been granted TPS under Haiti's designation will no longer have TPS.

**DATES:** The designation of Haiti for TPS is terminated, effective at 11:59 p.m., local time, on September 2, 2025.

**FOR FURTHER INFORMATION CONTACT:** Humanitarian Affairs Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, (240) 721–3000.

**SUPPLEMENTARY INFORMATION:**

**List of Abbreviations**

CFR—Code of Federal Regulations
DHS—U.S. Department of Homeland Security
EAD—Employment Authorization Document
FR—Federal Register
FRN—Federal Register Notice
Government—U.S. Government
INA—Immigration and Nationality Act
Secretary—Secretary of Homeland Security
TPS—Temporary Protected Status
USCIS—U.S. Citizenship and Immigration Services
U.S.C.—United States Code

HaitiTPSAR000120

## What is Temporary Protected Status (TPS)?

The Immigration and Nationality Act (INA) authorizes the Secretary of Homeland Security, after consultation with appropriate agencies of the U.S. Government, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist. *See* INA sec. 244(b)(1), 8 U.S.C. 1254(b)(1). The Secretary, in her discretion, may grant TPS to eligible nationals of that foreign state (or aliens having no nationality who last habitually resided in the designated foreign state). *See* INA sec. 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a foreign state's TPS designation or extension, the Secretary—after consultation with appropriate U.S. Government agencies—must review the conditions in the foreign state designated for TPS to determine whether they continue to meet the conditions for the TPS designation. *See* INA sec. 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that the conditions in the foreign state continue to meet the specific statutory criteria for TPS designation, TPS will be extended for an additional period of 6 months or, in the Secretary's discretion, 12 or 18 months. *See* INA sec. 244(b)(3)(A), (C), 8 U.S.C. 1254a(b)(3)(A), (C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation. *See* INA sec. 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B). There is no judicial review of ''any determination of the [Secretary] with respect to the designation, or termination or extension of a designation of a foreign state'' for TPS. INA sec. 244(b)(5)(A), 8 U.S.C. 1254a(b)(5)(A).

TPS is a temporary immigration benefit granted to eligible nationals of a country designated for TPS under the INA, or to eligible aliens without nationality who last habitually resided in the designated country. During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to work and obtain an Employment Authorization Document (EAD) so long as they continue to meet the requirements of TPS. TPS beneficiaries may also apply for and be granted travel authorization as a matter of discretion. The granting of TPS does not result in or lead to lawful permanent resident status or any other immigration status. To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(2), 8 U.S.C. 1254a(c)(2) in accordance with the implementing regulations at 8 CFR parts 244 and 1244. When the Secretary terminates a country's TPS designation, beneficiaries return to the same immigration status or category that they maintained before TPS, if any (unless that status or category has since expired or been terminated), or any other lawfully obtained immigration status or category they received while registered for TPS, as long as it is still valid on the date TPS terminates.

## Designation of Haiti for TPS

Haiti was initially designated for TPS on January 21, 2010, for a period of 18 months, on the basis of extraordinary and temporary conditions in Haiti that prevented nationals of Haiti from returning in safety. *See Designation of Haiti for Temporary Protected Status,* 75 FR 3476 (Jan. 21, 2010). Following the initial designation, TPS for Haiti was extended and newly designated once from July 23, 2011, through January 22, 2013, based on extraordinary and temporary conditions.[1] Thereafter, TPS for Haiti was extended three times based on extraordinary and temporary conditions: (1) from January 23, 2013, through July 22, 2014;[2] (2) from July 23, 2014, through January 22, 2016;[3] (3) from January 23, 2016, through July 22, 2017.[4] The Secretary then granted a six month extension of TPS from July 23, 2017, through January 22, 2018, but made clear that TPS Haiti beneficiaries should prepare for their return to Haiti in the event Haiti's designation was not extended again.[5] Subsequently, the Secretary announced the termination of the TPS designation of Haiti effective July 22, 2019.[6]

The termination of Haiti's 2011 TPS designation was challenged in several lawsuits, and court injunctions required DHS to temporarily continue TPS for Haiti pending a final court order.[7]

Former Secretary Mayorkas newly designated Haiti on the basis of extraordinary and temporary conditions effective August 3, 2021, through February 3, 2023.[8] Thereafter, TPS for Haiti was extended and newly designated effective February 4, 2023, and ending on August 3, 2024.[9] In July 2024, DHS issued a notice stating that Secretary Mayorkas had once again determined to extend and newly designate Haiti for TPS for an 18-month period, set to expire on February 3, 2026.[10] DHS announced in February 2025 that Secretary Noem had decided to partially vacate the June 2024 decision of Secretary Mayorkas regarding the extension and new designation of Haiti for TPS. Secretary Noem reduced the designation period from the statutory maximum of 18 months to 12 months, providing that the Haiti TPS extension and new designation will now expire on August 3, 2025.[11] Secretary Noem's vacatur has been challenged in at least two lawsuits.[12]

## Secretary's Authority To Terminate the Designation of Haiti for TPS

At least 60 days before the expiration of a foreign state's TPS designation or extension, the Secretary—after consultation with appropriate U.S. Government agencies—must review the conditions in the foreign state designated for TPS to determine whether the country continues to meet the conditions for the TPS designation. *See* INA sec. 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary determines that foreign state no longer meets the conditions for the TPS designation, the Secretary must terminate the designation. *See* INA sec. 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B). The termination may not take effect earlier than 60 days after the date the FRN of termination is published, or if later, the expiration of the most recent previous extension of the country

---

[1] *See Extension and Redesignation of Haiti for Temporary Protected Status,* 76 FR 29000 (May 19, 2011).

[2] *See Extension of the Designation of Haiti for Temporary Protected Status,* 77 FR 59943 (Oct. 1, 2012).

[3] *See Extension of the Designation of Haiti for Temporary Protected Status,* 79 FR 11808 (Mar. 3, 2014).

[4] *See Extension of the Designation of Haiti for Temporary Protected Status,* 80 FR 51582 (Aug. 25, 2015).

[5] *See Extension of the Designation of Haiti for Temporary Protected Status,* 82 FR 23830 (May 24, 2017).

[6] *See Termination of the Designation of Haiti for Temporary Protected Status,* 83 FR 2648 (Jan. 18, 2018).

[7] On December 28, 2023, the U.S. District Court for the Northern District of California dismissed

*Ramos* v. *Nielsen,* 18–cv–01554 (N.D. Cal. Dec. 28, 2023). *Bhattarai* v. *Nielsen,* 19–cv–731 (N.D. Cal. Mar. 12, 2019) was consolidated with *Ramos* in August 2023. The court agreed with the government position that subsequent TPS designations rendered the pending litigation moot.

[8] *See Designation of Haiti for Temporary Protected Status,* 86 FR 41863 (Aug. 3, 2021).

[9] *See Extension and Redesignation of Haiti for Temporary Protected Status,* 88 FR 5022 (Jan. 26, 2023).

[10] *See Extension and Redesignation of Haiti for Temporary Protected Status,* 89 FR 54484 (July 1, 2024).

[11] *See Partial Vacatur of 2024 Temporary Protected Status Decision for Haiti,* 90 FR 10511 (Feb. 24, 2025).

[12] *Haitian American United, Inc.* v. *Trump,* No. 1:25–cv–10498 (D. Mass); *Haitian Evangelical Clergy* v. *Trump,* No. 1:25–cv–01464 (D. Md.).

HaitiTPSAR000121

designation. *See id.* The Secretary may determine the appropriate effective date of the termination and expiration of any TPS-related documentation, such as EADs, issued or renewed after the effective date of termination. *See id.; see also* INA sec. 244(d)(3), 8 U.S.C. 1254a(d)(3) (providing the Secretary the discretionary "option" to allow for a certain "orderly transition" period if she determines it to be appropriate).

### Reasons for the Secretary's Termination of the TPS Designation for Haiti

Consistent with INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A), after consulting with appropriate U.S. Government agencies, the Secretary reviewed country conditions in Haiti and considered whether Haiti continues to meet the conditions for the designation under INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C). This review included examining (a) whether extraordinary and temporary conditions in Haiti that prevent aliens who are Haitian nationals from returning to Haiti in safety continue to exist, and (b) if permitting Haitian nationals to remain temporarily in the United States is contrary to the national interest of the United States.

"National interest" is an expansive standard that may encompass an array of broad considerations, including foreign policy, public safety (*e.g.,* potential nexus to criminal gang membership), national security, migration factors (*e.g.,* pull factors), immigration policy (*e.g.,* enforcement prerogatives), and economic considerations (*e.g.,* adverse effects on U.S. workers, impact on U.S. communities).[13] Determining whether permitting a class of aliens to remain temporarily in the United States is contrary to the U.S. national interest therefore calls upon the Secretary's expertise and discretionary judgment,

informed by her consultations with appropriate U.S. Government agencies.

Based on her review, the Secretary has determined that termination of TPS for Haiti is required because it is contrary to the national interest to permit Haitian nationals (or aliens having no nationality who last habitually resided in Haiti) to remain temporarily in the United States.

President Trump clearly articulated policy imperatives bearing upon the national interest in his immigration and border-related executive orders and proclamations. In Proclamation 10888 "Guaranteeing the States Protection Against Invasion," President Trump emphasized that Congress has established a complex and comprehensive framework under the INA to regulate the entry and exit of aliens and goods across U.S. borders. Under normal conditions, this framework supports national sovereignty by enabling the admission of aliens whose presence serves the national interest and excluding those who may pose risks to public health, safety, or national security. However, in a high-volume border environment—particularly when the system is overwhelmed—this screening process can become ineffective. Limited access to critical information and significant processing delays hinder the ability of federal officials to reliably assess the criminal histories or national security threats posed by aliens attempting to enter the U.S. illegally. As a result, public safety and national security risks are significantly heightened in such conditions.[14]

In Executive Order (E.O.) 14161 "Protecting the United States From Foreign Terrorists and Other National Security and Public Safety Threats," President Trump instructed the Secretary of State, Attorney General, Secretary of Homeland Security, and Director of National Intelligence to jointly submit to the President a report that identified countries throughout the world "for which vetting and screening information is so deficient as to warrant a partial or full suspension on the admission of nationals from those countries."[15] In Proclamation "Restricting the Entry of Foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats," President Trump determined to fully restrict and limit the entry of nationals from Haiti following his review of the requested report. In support of this decision, President

Trump outlined that "according to the overstay report, Haiti had a B–1/B–2 visa overstay rate of 31.38 percent and an F, M, and J visa overstay rate of 25.05 percent . . . as is widely known, Haiti lacks a central authority with sufficient availability and dissemination of law enforcement information necessary to ensure its nationals do not undermine the national security of the United States."[16]

In E.O. "Protecting the American People Against Invasion," President Trump underscored that enforcing the immigration laws "is critically important to the national security and public safety of the United States."[17] In furtherance of that objective, the President directed the Secretary, along with the Attorney General and Secretary of State, to promptly take all appropriate action, consistent with law, to rescind policies that led to increased or continued presence of illegal aliens in the United States.[18] Among the directed actions are to ensure that the TPS designations are consistent with the TPS statute and "are appropriately limited in scope and made for only so long as may be necessary to fulfill the textual requirements of that statute."[19]

Prior to FY2025, U.S. Border Patrol recorded a consistent year-over-year increase in encounters with Haitian nationals: 56,596 in FY2022, 163,781 in FY2023, and 220,798 in FY2024.[20] For several years, there has been a significant increase in the number of Haitians arriving in the United States irregularly, particularly via land. According to one report, "from 2019 through 2021, Haitians were the top nationality for migrants crossing the dangerous Darien Gap between Colombia and Panama, and they have remained among the three largest groups in 2022 and 2023."[21] Another report states: "the continuation of a devastating political, environmental, social, and economic situation . . . in Haiti guarantees an unbroken chain migration, particularly to the United States and Canada; and when combined with already heavy backlogs in

---

[13] *See, e.g., Poursina* v. *USCIS,* 936 F.3d 868, 874 (9th Cir. 2019) (observing, in an analogous INA context, "that the 'national interest' standard invokes broader economic and national-security considerations, and such determinations are firmly committed to the discretion of the Executive Branch—not to federal courts" (citing *Trump* v. *Hawaii,* 585 U.S. 667, 684–86 (2018)); *Flores* v. *Garland,* 72 F.4th 85, 89–90 (5th Cir. 2023) (same); *Brasil* v. *Sec'y, Dep't of Homeland Sec.,* 28 F.4th 1189, 1193 (11th Cir. 2022) (same); *cf. Matter of D–J–,* 23 I&N Dec. 572, 579–81 (A.G. 2003) (recognizing that taking measures to stem and eliminate possible incentives for potential large-scale migration from a given country is "sound immigration policy" and an "important national security interest"); *Matter of Dhanasar,* 26 I&N Dec. 884, 890–91 (AAO 2016) (taking into account impact on U.S. workers in "national interest" assessments).

[14] 90 FR 8333.

[15] 90 FR 8451.

[16] 90 FR 24497.

[17] E.O. 14159, *Protecting the American People Against Invasion,* sec. 1, 90 FR 8443, 8443 (Jan. 20, 2025).

[18] *Id.,* sec. 16, 90 FR 8446.

[19] *Id.,* sec. 16(b), 90 FR 8446.

[20] U.S. Customs and Border Protection, "U.S. Border Patrol and Office of Field Operations Encounters by Area of Responsibility and Component" (last updated: May 5, 2025), available at: *https://www.cbp.gov/newsroom/stats/ nationwide-encounters.*

[21] Migration Policy Institute, "Haitian Immigrants in the United States" (Nov. 8, 2023), available at: *https://www.migrationpolicy.org/article/haitian- immigrants-united-states-2022.*

processing resident status changes, a large and growing flow of Haitians will persist.'' [22] This pattern of large-scale irregular migration as a result of ''pull factors'' has continued for years. Yet another report states ''misinformation about TPS eligibility and about the general availability of legal status in the United States may have been one factor for migrants trying to reach the U.S. border . . .'' [23] These realities are unsustainable and inconsistent with President Trump's outlined policy priorities as well as U.S. national interests.

Beyond migration factors and immigration policy, public safety and national security are important considerations when assessing if a TPS designation is in line with U.S. national interests. DHS records indicate that there are Haitian nationals who are TPS recipients who have been the subject of administrative investigations for fraud, public safety, and national security. These issues underscore a conflict with the national interest of the United States.

Gang violence in Haiti persists as armed groups operate with impunity, enabled by a weak or effectively absent central government. The Congressional Research Service described the situation in Haiti in a recent report: ''The gangs— some of which are aligned with political elites—amassed control over territory and illicit markets amid political instability following the 2021 assassination of then-President Jovenel Moise. Since April 2024, Haiti has been governed by a Transitional Presidential Council (TPC). The TPC, tasked with governing until elections can be convened, has been plagued by allegations of corruption and infighting.'' [24] According to Amnesty International, ''Haiti is in the grip of severe humanitarian and human rights crisis. Armed gangs are striking the Port-au-Prince metropolitan area and its surroundings with terror and violence, including rape and other forms of sexual violence.'' [25] On May 2, 2025, the

Secretary of State announced the State Department's designation of Viv Ansanm and Gran Grif as Foreign Terrorist Organizations and Specially Designated Global Terrorists. In his announcement, the Secretary noted ''Haitian gangs, including the Viv Ansanm coalition and Gran Grif, are the primary source of instability and violence in Haiti. They are a direct threat to U.S. national security interests in our region . . . their ultimate goal is creating a gang-controlled state where illicit trafficking and other criminal activities operate freely and terrorize Haitian citizens.'' [26]

Widespread gang violence in Haiti is sustained by the country's lack of functional government authority. This breakdown in governance directly impacts U.S. national security interests, particularly in the context of uncontrolled migration. As previously outlined, when immigration flows exceed our capacity to properly vet aliens at the border, the risks are compounded by the inability to access reliable law enforcement or security information from the alien's country of origin. The joint assessment by the Secretary of State, Secretary of Homeland Security, and Director of National Intelligence has found that Haiti lacks a functioning central authority capable of maintaining or sharing such critical information. Coupled with the serious threat posed by Haitian gangs—such as those designated by the State Department as Foreign Terrorist Organizations— continuing TPS for Haiti is not in the national interest.

This lack of government control has not only destabilized Haiti internally but has also had direct consequences for U.S. public safety. Haitian gang members have already been identified among those who have entered the United States and, in some cases, have been apprehended by law enforcement for committing serious and violent crimes. For example, in January 2025, U.S. Immigration and Customs Enforcement (ICE) apprehended Wisteguens Jean Quely Charles, a member of a violent Haitian street gang, who had been arrested, charged and convicted for 17 crimes between August 2022 and August 2024 including both ''possession of and possession to distribute controlled substances, distribution of controlled substances, trespassing, carrying dangerous weapon to wit brass knuckles, possession of a

firearm without a permit, possession of ammunition without a permit, assault and battery with a dangerous weapon, assault and battery, and resisting arrest.'' [27] This case underscores the broader risk posed by rising Haitian migration, particularly in light of multiple large-scale prison breaks in Haiti [28] and the increasing numbers of encounters reported by U.S. Customs and Border Protection. The inability of the previous administration to reliably screen aliens from a country with limited law enforcement infrastructure and widespread gang activity presents a clear and growing threat to U.S. public safety.

In E.O. ''America First Policy Directive to the Secretary of State,'' President Trump declared ''from this day forward, the foreign policy of the United States shall champion core American interests and always put America and American citizens first.'' Moreover, it instructed ''as soon as practicable, the Secretary of State shall issue guidance bringing the Department of State's policies, programs, personnel, and operations in line with an America First foreign policy, which puts America and its interests first.'' [29] The current situation in Haiti is concerning. However, the United States must prioritize its national interests, which includes assessing foreign policy, public safety, national security, migration factors, immigration policy, and economic considerations. In considering

---

[22] IOM, ''Engaging the Haitian Diaspora'' (Sept 10, 2013), available at: *https://environmentalmigration.iom.int/resources/engaging-haitian-diaspora.*

[23] Migration Policy Institute, ''Haitian Migration through the Americas: A Decade in the Making'' (Sept. 30, 2021), *https://www.migrationpolicy.org/article/haitian-migration-through-americas.*

[24] Library of Congress, Congressional Research Service, ''Haiti in Crisis: Developments Related to the Multinational Security Support Mission'' (June 3, 2025), available at: *https://www.congress.gov/crs-product/IN12331#:~:text=Between%20January%20and%20March%202025,attributed%20to%20gang%2Drelated%20violence.*

[25] Amnesty International, ''Gang Violence and Unrest in Haiti,'' available at: *https://www.amnesty.org/en/projects/gang-violence-in-haiti/.*

[26] U.S. Department of State, ''Terrorist Designations of Viv Ansanm and Gran Grif'' (May 2, 2025), available at: *https://www.state.gov/releases/office-of-the-spokesperson/2025/05/terrorist-designations-of-viv-ansanm-and-gran-grif/.*

[27] U.S. Immigration and Customs Enforcement, ''ICE ERO Boston arrests Haitian gang member with numerous convictions'' (Jan. 24, 2025), available at: *https://www.ice.gov/news/releases/ice-ero-boston-arrests-haitian-gang-member-numerous-convictions.*

[28] *See* The Guardian ''Haiti declares state of emergency after thousands of dangerous inmates escape'' (Mar. 4, 2024) (''Haiti has declared a three-day state of emergency and a night-time curfew after armed gangs stormed the country's two biggest jails, allowing more than 3,000 dangerous criminals, including murderers and kidnappers, to escape back on to the streets of the poor and violence-racked Caribbean nation.''), available at: *https://www.theguardian.com/world/2024/mar/04/haiti-mass-jailbreak-violence-port-au-prince-gangs;* Al Jazeera, ''Haiti declares curfew after 4,000 inmates escape jail amid rising violence'' (Mar. 4, 2024) (''Haiti's government has declared a state of emergency and imposed a curfew after an explosion of gang-led violence over the weekend saw thousands of prisoners escape after assaults on the country's two biggest prisons.''), available at: *https://www.aljazeera.com/news/2024/3/4/thousands-of-inmates-escape-prison-amid-deepening-haiti-violence; see also* Reuters, ''Haiti prison break leaves 12 dead as inmates go hungry'' (Aug. 16, 2024) (''A prison break in the Haitian city of Saint-Marc left 12 inmates dead on Friday, Mayor Myriam Fievre said, the third such incident in Haiti in recent months amid a protracted humanitarian crisis fueled by gang violence.''), available at: *https://www.reuters.com/world/americas/haitian-inmates-escape-prison-third-recent-jailbreak-miami-herald-says-2024-08-16/.*

[29] 90 FR 8337.

HaitiTPSAR000123

these factors individually and cumulatively, the Secretary has determined that permitting Haitian nationals to remain temporarily in the United States is contrary to the U.S. national interest.

DHS estimates there are approximately 348,187 nationals of Haiti (and aliens having no nationality who last habitually resided in Haiti) who hold TPS under Haiti's designation.[30]

## Effective Date of Termination of the Designation

The TPS statute provides that the termination of a country's TPS designation may not be effective earlier than 60 days after the FRN is published or, if later, the expiration of the most-recent previous extension. *See* INA sec. 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B).

The TPS statue authorizes the Secretary, at her discretion, to allow for an extended "orderly transition" period with respect to the termination and the expiration of any TPS-related documentation, such as EADs. The Secretary, however, has determined in her discretion that a 60-day transition period is sufficient and warranted here given the Secretary's finding that continuing to permit the Haitian nationals to remain temporarily in the United States is contrary to the U.S. national interest. Moreover, adhering to the default statutory 60-day period for orderly transition is consistent with the precedent of previous TPS country terminations over the past few months and makes clear that the United States is committed to clarity and consistency. *See* INA sec. 244(d)(3), 8 U.S.C. 1254a(d)(3). Accordingly, the termination of the Haiti TPS designation will be effective 60 days from this notice's publication date.[31]

DHS recognizes that Haiti TPS beneficiaries continue to be employment authorized during the 60-day transition period.[32] Accordingly, through this FRN, DHS automatically

---

[30] As of May 1, 2025, approximately 15,578 of these Haitian nationals (and aliens having no nationality who last habitually resided in Haiti) are also approved as Lawful Permanent Residents. Data queried by Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality [May 2025].

[31] *See* 8 CFR 244.19 ("Upon the termination of designation of a foreign state, those nationals afforded temporary Protected Status shall, upon the sixtieth (60th) day after the date notice of termination is published in the **Federal Register**, or on the last day of the most recent extension of designation by the [Secretary of Homeland Security], automatically and without further notice or right of appeal, lose Temporary Protected Status in the United States. Such termination of a foreign state's designation is not subject to appeal.").

[32] *See* INA 244(a)(1)(B), 8 U.S.C. 1254a(a)(1)(B); *see also* 8 CFR 244.13(b).

extends the validity of certain EADs previously issued under the TPS designation of Haiti through September 2, 2025. Therefore, as proof of continued employment authorization through September 2, 2025, TPS beneficiaries can show their EADs that have the notation A–12 or C–19 under Category and a "Card Expires" date of February, 3, 2026, August 3, 2025, August 3, 2024, June 30, 2024, February 3, 2023, December 31, 2022, October 4, 2021, January 4, 2021, January 2, 2020, July 22, 2019, January 22, 2018, or July 22, 2017.

The Secretary has considered putative reliance interests in the Haiti TPS designation, especially when considering whether to allow for an additional transition period akin to that allowed under certain previous TPS terminations. Temporary Protected Status, as the name itself makes clear, is an inherently temporary status. TPS designations are time-limited and must be periodically reviewed, and TPS notices clearly notify aliens of the designations' expiration dates, and whether to allow for an orderly transition period is left to the Secretary's unfettered discretion. *See* INA sec. 244(b)(3), (d)(3); 8 U.S.C. 1254a(b)(3), (d)(3). The statute inherently contemplates advance notice of a termination by requiring timely publication of the Secretary's determination and delaying the effective date of the termination by at least 60 days after publication of a **Federal Register** notice of the termination or, if later, the existing expiration date. *See* INA sec. 244(b)(3)(A)–(B), (d)(3); 8 U.S.C. 1254a(b)(3)(A)–(B), (d)(3).

## Notice of the Termination of the TPS Designation of Haiti

By the authority vested in me as Secretary under INA section 244(b)(3), 8 U.S.C. 1254a(b)(3), I have reviewed, in consultation with the appropriate U.S. Government agencies, (a) conditions in Haiti; and (b) whether permitting the nationals of Haiti (and aliens having no nationality who last habitually resided in Haiti) to remain temporarily in the United States is contrary to the national interest of the United States. Based on my review, I have determined that Haiti no longer continues to meet the conditions for Temporary Protected Status (TPS) under INA section 244(b)(1)(C), 8 U.S.C. 1254a(b)(1)(C).

Accordingly, I order as follows:

(1) Pursuant to INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(1)(B), and considering INA section 244(d)(3), 8 U.S.C. 1254a(d)(3), the designation of Haiti for TPS is terminated effective at

11:59 p.m., local time, on September 2, 2025.

(2) Information concerning the termination of TPS for nationals of Haiti (and aliens having no nationality who last habitually resided in Haiti) will be available at local USCIS office upon publication of this notice and through the USCIS Contact Center at 1–800–375–5283. This information will be published on the USCIS website at *www.uscis.gov*.

**Kristi Noem,**
*Secretary of Homeland Security.*
[FR Doc. 2025–12224 Filed 6–27–25; 4:15 pm]
**BILLING CODE 9111–97–P**

---

## INTERNATIONAL TRADE COMMISSION

[Investigation Nos. 701–TA–627 and 629 and 731–TA–1458–1461 (Review)]

## Utility Scale Wind Towers From Canada, Indonesia, South Korea, and Vietnam; Institution of Five-Year Reviews

**AGENCY:** United States International Trade Commission.

**ACTION:** Notice.

---

**SUMMARY:** The Commission hereby gives notice that it has instituted reviews pursuant to the Tariff Act of 1930 ("the Act"), as amended, to determine whether revocation of the countervailing duty orders on utility scale wind towers from Canada and Vietnam and the antidumping duty orders on utility scale wind towers from Canada, Indonesia, South Korea, and Vietnam would be likely to lead to continuation or recurrence of material injury. Pursuant to the Act, interested parties are requested to respond to this notice by submitting the information specified below to the Commission.

**DATES:** Instituted July 1, 2025. To be assured of consideration, the deadline for responses is July 31, 2025. Comments on the adequacy of responses may be filed with the Commission by September 10, 2025.

**FOR FURTHER INFORMATION CONTACT:** Laurel Schwartz (202–205–2398), Office of Investigations, U.S. International Trade Commission, 500 E Street SW, Washington, DC 20436. Hearing-impaired persons can obtain information on this matter by contacting the Commission's TDD terminal on 202–205–1810. Persons with mobility impairments who will need special assistance in gaining access to the Commission should contact the Office of the Secretary at 202–205–2000.

HaitiTPSAR000124

(4) Be both admissible as an immigrant, except as provided under section 244(c)(2)(A) of the Act, and not ineligible under section 244(c)(2)(B) of the Act.

Additionally, the applicant must be able to demonstrate that during the registration period for the initial designation (from November 4, 1997 to November 3, 1998), or during the registration period for the redesignation (from November 9, 1999 to November 2, 2000), he or she:

(1) Was a nonimmigrant or had been granted voluntary departure status or any relief from removal;

(2) Had an application for change of status, adjustment of status, asylum, voluntary departure, or any relief from removal or change of status pending or subject to further review or appeal;

(3) Was a parolee or had a pending request for reparole; or

(4) Was the spouse or child of an alien currently eligible to be a TPS registrant.

An applicant for late initial registration must file an application for late registration no later than 60 days after the expiration or termination of the conditions described above. 8 CFR 244.2(g).

### What Happens When This Extension of TPS Expires on November 2, 2004?

At least 60 days before this extension of TPS expires on November 2, 2004, the Secretary of DHS will review conditions in Burundi and determine whether the conditions for designation under the TPS program continue to be met at that time, or whether the TPS designation should be terminated. Notice of that determination, including the basis for the determination, will be published in the **Federal Register**.

If the TPS designation is extended at that time, an alien who has received TPS benefits must re-register under the extension in order to maintain TPS benefits. If, however, the Secretary of DHS terminates the TPS designation, TPS beneficiaries will maintain the immigration status they had before TPS (unless that status had since expired or been terminated) or any other status they may have acquired while registered for TPS. Accordingly, if an alien had no lawful immigration status prior to receiving TPS and did not obtain any status during the TPS period, he or she will revert to that unlawful status upon termination of the TPS designation.

### Notice of Extension of Designation of Burundi Under the TPS Program

By the authority vested in me as Secretary of DHS under sections 244(b)(1)(A), (b)(3)(A), and (b)(3)(C) of the Act, I have consulted with the appropriate government agencies and determine that the conditions that prompted designation of Burundi for TPS continue to be met. 8 U.S.C. 1254a(b)(3)(A). Accordingly, I order as follows:

(1) The designation of Burundi under section 244(b)(1)(A) of the Act is extended for an additional 12-month period from November 2, 2003, to November 2, 2004. 8 U.S.C. 1254a(b)(3)(C).

(2) There are approximately 30 nationals of Burundi (or aliens having no nationality who last habitually resided in Burundi) who have been granted TPS and who are eligible for re-registration.

(3) To maintain TPS, a national of Burundi (or an alien having no nationality who last habitually resided in Burundi) who was granted TPS during the initial designation period or redesignation period must re-register for TPS during the 60-day re-registration period from September 3, 2003 until November 3, 2003.

(4) To re-register, the applicant must file the following: (1) Form I–821, Application for Temporary Protected Status; (2) Form I–765, Application for Employment Authorization; and (3) two identification photographs (1½ inches by 1½ inches). Applications submitted without the required fee and/or photos will be returned to the applicant. There is no fee for filing a Form I–821 for re-registration application. If the applicant requests employment authorization, he or she must submit one hundred and twenty dollars ($120) or a properly documented fee waiver request, pursuant to 8 CFR 244.20, with the Form I–765. An applicant who does not request employment authorization must nonetheless file Form I–765 along with Form I–821, but is not required to submit the fee. The fifty-dollar ($50) fingerprint fee is required only for children beneficiaries of TPS who have reached the age of 14 but were not previously fingerprinted. Failure to re-register without good cause will result in the withdrawal of TPS. 8 CFR 244.17(c). Some persons who had not previously applied for TPS may be eligible for late initial registration under 8 CFR 244.2.

(5) At least 60 days before this extension terminates on November 2, 2004, the Secretary will review the designation of Burundi under the TPS program and determine whether the conditions for designation continue to be met. 8 U.S.C. 1254a(b)(3)(A). Notice of that determination, including the basis for the determination, will be published in the **Federal Register**. 8 U.S.C. 1254a(b)(3)(A).

(6) Information concerning the extension of designation of Burundi under the TPS program will be available at local BCIS offices upon publication of this notice and on the BCIS Web site at *http://www.bcis.gov.*

Dated: August 28, 2003.

**Tom Ridge,**
*Secretary of Homeland Security.*
[FR Doc. 03–22508 Filed 8–29–03; 12:00 pm]
**BILLING CODE 4410–10–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### Bureau of Citizenship and Immigration Services

[CIS No. 2294–03]

RIN 1650–AB06

### Termination of the Designation of Sierra Leone Under the Temporary Protected Status Program; Extension of Employment Authorization Documentation

**AGENCY:** Bureau of Citizenship and Immigration Services, Homeland Security.

**ACTION:** Notice.

---

**SUMMARY:** The designation of Sierra Leone under the Temporary Protected Status (TPS) Program will expire on November 2, 2003. After reviewing country conditions and consulting with the appropriate Government agencies, the Secretary of Homeland Security has determined that conditions in Sierra Leone no longer support TPS designation and is therefore terminating the TPS designation of Sierra Leone. This termination is effective May 3, 2004, six months from the end of the current extension. To provide for an orderly transition, nationals of Sierra Leone (and aliens having no nationality who last habitually resided in Sierra Leone) who have been granted TPS under the Sierra Leone designation or redesignation will automatically retain their temporary protected status and have their current Employment Authorization Documents (EADs) extended until the termination date. However, an individual's TPS may still be withdrawn because of ineligibility for TPS, prior failure to timely re-register if there was not good cause for such failure, or failure to maintain continuous physical presence in the United States. On May 3, 2004, nationals of Sierra Leone (and aliens having no nationality who last habitually resided in Sierra Leone) who have been granted TPS under the Sierra

HaitiTPSAR000125

**52408**    **Federal Register** / Vol. 68, No. 170 / Wednesday, September 3, 2003 / Notices

Leone designation or redesignation will no longer have TPS status.

**EFFECTIVE DATE:** The TPS designation of Sierra Leone is terminated effective May 3, 2004.

**FOR FURTHER INFORMATION CONTACT:** Jonathan Mills, Residence and Status Services, Office of Programs and Regulations, Bureau of Citizenship and Immigration Services, Department of Homeland Security, 425 ''I'' Street, NW., Room 3040, Washington, DC 20536, telephone (202) 514–4754.

**SUPPLEMENTARY INFORMATION:**

**What Authority Does the Secretary of the Department of Homeland Security Have To Terminate the Designation of Sierra Leone Under the TPS Program?**

On March 1, 2003, the functions of the Immigration and Naturalization Service (Service) transferred from the Department of Justice to the Department of Homeland Security (DHS) pursuant to the Homeland Security Act of 2002, Public Law 107–296. The responsibilities for administering the TPS program held by the Service were transferred to the Bureau of Citizenship and Immigration Services (BCIS).

Under section 244 of the Immigration and Nationality Act (Act), 8 U.S.C. 1254a, the Secretary of DHS, after consultation with appropriate agencies of the Government, is authorized to designate a foreign state or (part thereof) for TPS. The Secretary of DHS may then grant TPS to eligible nationals of that foreign state (or aliens having no nationality who last habitually resided in that state).

Section 244(b)(3)(A) of the Act requires the Secretary of DHS to review, at least 60 days before the end of the TPS designation or any extension thereof, the conditions in a foreign state designated under the TPS program to determine whether the conditions for a TPS designation continue to be met and, if so, the length of an extension of TPS. 8 U.S.C. 1254a(b)(3)(A). If the Secretary of DHS determines that the foreign state no longer meets the conditions for TPS designation, he shall terminate the designation, but such termination may not take effect earlier than 60 days after the date the **Federal Register** notice of termination is published. 8 U.S.C. 1254a(b)(3)(B). The Secretary of DHS may determine the appropriate effective date of the termination in order to provide an orderly transition. 8 U.S.C. 1254a(d)(3).

**Why Did the Secretary of DHS Decide To Terminate the TPS Designation for Sierra Leone as of May 3, 2004?**

On November 4, 1997, the Attorney General published a notice in the **Federal Register** designating Sierra Leone under the TPS program based upon ongoing armed conflict occurring within the country. 62 FR 59736. The Attorney General extended this TPS designation annually and re-designated Sierra Leone by publishing a notice on November 9, 1999, determining in each instance that the conditions warranting such designation continued to be met. 64 FR 61125.

Since the date of the last extension, the Departments of Homeland Security and State have continued to review conditions in Sierra Leone. It is determined that termination of the TPS designation of Sierra Leone is warranted because there is no longer an ongoing armed conflict within Sierra Leone that would pose a serious threat to the personal safety of returning nationals of Sierra Leone (or aliens having no nationality who last habitually resided in Sierra Leone). 8 U.S.C. 1254a(b)(1)(A) and (B).

The Department of State (DOS) notes that the armed conflict that provided the basis for the Sierra Leone TPS designation is over. DOS Recommendation (June 19, 2003). Most of Sierra Leone has been at peace for nearly three years. *Id.* More than 66,000 ex-combatants have entered into a program of disarmament, demobilization, and reintegration into society. *Id.* Disarmament was largely complete by January 2002, and there has been no fighting since that time. *Id.* Peaceful multiparty presidential and parliamentary elections took place in May 2002. *Id.*

A year ago, the overall political situation was fragile. *Id.* Since then, however, human rights abuses have decreased dramatically nationwide. *Id.* The United Nations High Commissioner for Refugees (UNHCR) considers no area of the country unsafe to return. *Id.* More than 400,000 refugees have returned home to participate in the reconstruction of their country. *Id.* Of the approximately 45,000 refugees remaining in neighboring countries, two-thirds are expected to return home by December 2003. *Id.* In addition, reintegration of the 300,000 internally displaced persons (IDPs) is nearly complete. *Id.*

While there are approximately 60,000 Liberian refugees in Sierra Leone, they are concentrated along the eastern border with Liberia and have not caused any instability in Sierra Leone. *Id.*

Furthermore, there have been no recent cross-border attacks from Liberia into Sierra Leone. *Id.*

The BCIS Resource Information Center (RIC) notes additional indications of stability. RIC Report (July 10, 2003). A special court has been created to bring to justice those most responsible for war crimes and other major human rights violations. *Id.* A Truth and Reconciliation Commission has been established to establish a record of the conflict and promote reconciliation. *Id.* Humanitarian and economic conditions have improved markedly. *Id.*

The newly elected government enjoys significant international support and has extended police control across the country. DOS Recommendation. A British-trained police force is in place. RIC Report. The British government continues to assist and train Sierra Leone's 10,000-member armed forces and has committed to providing significant support for at least six years. DOS Recommendation. The United Nations (U.N.) Security Council has determined that security conditions have improved so much that the international U.N. peacekeeping force, which once numbered 17,500 troops, can be phased out. *Id.* The peacekeeping force currently numbers 14,000, and will further decrease to about 9,000 by year's end. *Id.*

Based upon this review, the Secretary of DHS, after consultation with appropriate government agencies, finds that the conditions that prompted designation of Sierra Leone under the TPS program no longer exist. 8 U.S.C. 1254a(b)(3). There is not an ongoing armed conflict within Sierra Leone that would pose a serious threat to the personal safety of returning aliens who are nationals of Sierra Leone (or aliens having no nationality who last habitually resided in Sierra Leone). 8 U.S.C. 1254a(b)(1)(A). Based upon these findings, the Secretary of DHS is terminating the TPS designation for Sierra Leone as of May 3, 2004. 8 U.S.C. 1254a(b)(3)(B).

To provide for an orderly transition, nationals of Sierra Leone (and aliens having no nationality who last habitually resided in Sierra Leone) who have been granted TPS under the Sierra Leone designation or redesignation will automatically retain TPS status and have their current employment authorization documents (EADs) extended until the termination date. 8 U.S.C. 1254a(a)(2) and (d)(3). These persons are urged to use the time before termination of their TPS to apply for any other immigration benefits they are eligible for or, in the alternative, prepare

HaitiTPSAR000126

for and arrange their return to Sierra Leone.

**If I Currently Have TPS Through the Sierra Leone TPS Program, Do I Need to Re-Register To Keep My TPS Until May 3, 2004, the Termination Date?**

No. If you already have been granted TPS benefits through the Sierra Leone TPS program, you do not have to re-register to keep your TPS benefits. You will automatically retain TPS until the termination date. However, your TPS status may still be withdrawn pursuant to section 244(c)(3) of the Act because of ineligibility for TPS, prior failure to timely re-register if there was not good cause for such failure, or failure to maintain continuous physical presence in the United States. 8 U.S.C. 1254a(c)(3), 8 CFR 244.14. When termination occurs on May 3, 2004, you will no longer have TPS.

**Why Is the Secretary of DHS Automatically Extending the Validity of EADs From November 2, 2003, to May 3, 2004?**

The Secretary of DHS has decided to extend automatically the validity of EADs to provide for an orderly transition leading up to the effective date for the termination of the Sierra Leone TPS designation. Therefore, the validity of the applicable EADs is extended for a period of 6 months, to May 3, 2004. 8 U.S.C. 1254a(a)(2) and (d)(3).

**Who Is eligible To Receive an Automatic Extension of His or Her EAD?**

To receive an automatic extension of his or her EAD, an individual must be a national of Sierra Leone (or an alien having no nationality who last habitually resided in Sierra Leone) who has applied for and received an EAD under the TPS designation or redesignation of Sierra Leone. This automatic extension is limited to EADs issued on either Form I–766, Employment Authorization Document, or Form I–688B, Employment Authorization Card, bearing an expiration date of November 2, 2003. The EAD must also be either (1) a Form I–766 bearing the notation "A–12" or "C–19" on the face of the card under "Category"; or (2) a Form I–688B bearing the notation "274A.12(A)(12)" or "274A.12(C)(19)" on the face of the card under "Provision of Law".

**Must Qualified Individuals Apply for the Automatic Extension of Their TPS–Related EADs Until May 3, 2004?**

No. Qualified individuals do not have to apply for this extension of their TPS-related EADs to May 3, 2004.

**What Documents May a Qualified Individual Show to His or Her Employer as Proof of Employment Authorization and Identity When Completing the Employment Eligibility Verification Form (Form I–9)?**

For completion of the Form I–9 at the time of hire or re-verification, qualified individuals who have received an extension of their EADs by virtue of this **Federal Register** notice may present to their employer a TPS-related EAD as proof of identity and employment authorization until May 3, 2004. To minimize confusion over this extension at the time of hire or re-verification, qualified individuals may also present to their employer a copy of this **Federal Register** notice regarding the automatic extension of employment authorization documentation to May 3, 2004. In the alternative, any legally acceptable document or combination of documents listed in List A, List B, or List C of the Form I–9 may be presented as proof of identity and employment eligibility; it is the choice of the employee.

**How May Employers Determine Whether an EAD Has Been Automatically Extended Through May 3, 2004 and Is Therefore Acceptable for Completion of the Form I–9?**

For purposes of verifying identity and employment eligibility or re-verifying employment eligibility on the Form I–9 until May 3, 2004, employers of Sierra Leone TPS class members whose EADs have been automatically extended by this notice must accept such EAD if presented. An EAD that has been automatically extended by this notice will contain an expiration date of November 2, 2003, and must be either (1) a Form I–766 bearing the notation "A–12" or "C–19" on the face of the card under "Category", or (2) a Form I–688B bearing the notation "274A.12(A)(12)" or "274A.12(C)(19)" on the face of the card under "Provision of Law". New EADs or extension stickers showing the May 3, 2004 expiration date will not be issued.

Employers should not request proof of Sierra Leone citizenship. Employers presented with an EAD that this **Federal Register** notice has extended automatically, that appears to be genuine and appears to relate to the employee should accept the document as a valid "List A" document and

should not ask for additional Form I–9 documentation. This action by the Secretary of the DHS through this **Federal Register** notice does not affect the right of an employee to present any legally acceptable document as proof of identity and eligibility for employment.

Employers are reminded that the laws prohibiting unfair immigration-related employment practices remain in full force. For questions, employers may call the BCIS Office of Business Liaison Employer Hotline at 1–800–357–2099 to speak to a BCIS representative. Also, employers may call the U.S. Department of Justice Office of Special Counsel for Immigration Related Unfair Employment Practices (OSC) Employer Hotline at 1–800–255–8155 or 1–800–362–2735 (TDD). Employees or applicants may call the OSC Employee Hotline at 1–800–255–7688 or 1–800–237–2515 (TDD) for information regarding the automatic extension. Additional information is available on the OSC Web site at *http://www.usdoj.gov/crt/osc/index.html*.

**What May I Do if I Believe That Returning to Sierra Leone Would Be Unsafe?**

This notice terminates the designation of Sierra Leone for TPS. For nationals of Sierra Leone (and aliens having no nationality who last habitually resided in Sierra Leone) in the United States who believe that their particular circumstances make return to Sierra Leone unsafe, there may be avenues of immigration relief and protection available. Such avenues may include, but are not limited to, asylum, withholding of removal, or protection under Article 3 of the Torture Convention.

Eligibility for these and other immigration benefits is determined individually on a case-by-case basis. For information on eligibility and how to apply, visit the BCIS web site at *http://www.bcis.gov* or call the BCIS National Customer Service Center at 1–800–375–5283.

**How Does the Termination of TPS Affect Former TPS Beneficiaries?**

After the designation of Sierra Leone for TPS is terminated on May 3, 2004, former TPS beneficiaries will maintain the same immigration status they held prior to TPS (unless that status has since expired or been terminated) or any other status they may have acquired while registered for TPS. Accordingly, if an alien held no lawful immigration status prior to receiving TPS benefits and did not obtain any other status during the TPS period, he or she will maintain that

HaitiTPSAR000127

unlawful status upon the termination of the TPS designation.

Former TPS beneficiaries will no longer be eligible for a stay of removal or an EAD pursuant to the TPS program. TPS-related EADs will expire on May 3, 2004, and will not be renewed.

Termination of the TPS designation for Sierra Leone does not necessarily affect pending applications for other forms of immigration relief or protection, though former TPS beneficiaries will begin to accrue unlawful presence as of May 3, 2004, if they have not been granted any other immigration status or protection or if they have no pending application for certain benefits.

### Notice of Termination of Designation of Sierra Leone Under the TPS Program

By the authority vested in me as Secretary of the Department of Homeland Security under section 244(b)(3) of the Act, I have consulted with the appropriate agencies of government concerning conditions in Sierra Leone. 8 U.S.C. 1254a(b)(3). Based on these consultations, I have determined that Sierra Leone no longer meets the conditions for designation of TPS under section 244(b)(1) of the Act. 8 U.S.C. 1254a(b)(1).

Accordingly, I order as follows:

(1) Pursuant to sections 244(b) of the Act, the TPS designation of Sierra Leone for TPS terminated effective May 3, 2004, six months from the end of the current extension.

(2) I estimate that there are approximately 2,700 nationals of Sierra Leone (and aliens having no nationality who last habitually resided in Sierra Leone) who currently receive TPS benefits.

(3) To provide for an orderly transition, nationals of Sierra Leone (and aliens having no nationality who last habitually resided in Sierra Leone) who have been granted TPS under the Sierra Leone designation or redesignation will automatically retain temporary protected status until the termination date. However, an individual's TPS may still be withdrawn pursuant to section 244(c)(3) of the Immigration and Nationality Act and 8 CFR 244.14 because of ineligibility for TPS, prior failure to timely re-register if there was not good cause for such failure, or failure to maintain continuous physical presence in the United States.

(4) TPS-related Employment Authorization Documents that expire on November 2, 2003, are extended automatically until May 3, 2004, for qualified nationals of Sierra Leone (and aliens having no nationality who last habitually resided in Sierra Leone).

(5) Information concerning the termination of the TPS program for nationals of Sierra Leone (and aliens having no nationality who last habitually resided in Sierra Leone) will be available at local BCIS offices upon publication of this notice and through the BCIS National Customer Service Center at 1–800–375–5283. This information will also be published on the BCIS Web site at *http://www.bcis.gov*.

Dated: August 28, 2003.

**Tom Ridge,**
*Secretary of Homeland Security.*
[FR Doc. 03–22488 Filed 8–29–03; 11:16 am]
**BILLING CODE 4410–10–P**

---

## DEPARTMENT OF HOMELAND SECURITY

### Bureau of Citizenship and Immigration Services

[CIS No. 2293–03]

RIN 1650–AB06

### Extension of the Designation of Sudan Under Temporary Protected Status Program

**AGENCY:** Bureau of Citizenship and Immigration Services, Homeland Security.

**ACTION:** Notice.

---

**SUMMARY:** The designation of Sudan under the Temporary Protected Status (TPS) Program will expire on November 2, 2003. This notice extends the Secretary of Homeland Security's designation of Sudan for 12 months until November 2, 2004, and sets forth procedures necessary for nationals of Sudan (or aliens having no nationality who last habitually resided in Sudan) with TPS to re-register and to apply for an extension of their employment authorization documentation for the additional 12-month period. Re-registration is limited to persons who registered no later than November 3, 1998, under the initial designation and also timely re-registered under each subsequent extension of the designation, or who registered under the re-designation no later than November 2, 2000, and also timely re-registered under the extension of the re-designation. Certain nationals of Sudan (or aliens having no nationality who last habitually resided in Sudan) who previously have not applied for TPS may be eligible to apply under the late initial registration provisions.

**EFFECTIVE DATES:** The extension of Sudan's TPS designation is effective November 2, 2003, and will remain in effect until November 2, 2004. The 60-day re-registration period begins September 3, 2003, and will remain in effect until November 3, 2003.

**FOR FURTHER INFORMATION CONTACT:** Jonathan Mills, Residence and Status Services, Office of Programs and Regulations, Bureau of Citizenship and Immigration Services, Department of Homeland Security, 425 "I" Street, NW., Room 3040, Washington, DC 20536, telephone (202) 514–4754.

**SUPPLEMENTARY INFORMATION:**

### What Authority Does the Secretary of the Department of Homeland Security Have To Extend The Designation of Sudan Under the TPS Program?

On March 1, 2003, the functions of the Immigration and Naturalization Service (Service) transferred from the Department of Justice to the Department of Homeland Security (DHS) pursuant to the Homeland Security Act of 2002, Pub. L. 107–296. The responsibilities for administering the TPS program held by the Service were transferred to the Bureau of Citizenship and Immigration Services (BCIS).

Under section 244 of the Immigration and Nationality Act (Act), 8 U.S.C. 1254a, the Secretary of DHS, after consultation with appropriate agencies of the Government, is authorized to designate a foreign state or (part thereof) for TPS. The Secretary of DHS may then grant TPS to eligible nationals of that foreign state (or aliens having no nationality who last habitually resided in that state).

Section 244(b)(3)(A) of the Act requires the Secretary of DHS to review, at least 60 days before the end of the TPS designation or any extension thereof, the conditions in a foreign state designated under the TPS program to determine whether the conditions for a TPS designation continue to be met and, if so, the length of an extension of TPS. 8 U.S.C. 1254a(b)(3)(A). If the Secretary of DHS determines that the foreign state no longer meets the conditions for TPS designation, he shall terminate the designation, as provided in section 244(b)(3)(B) of the Act. 8 U.S.C. 1254a(b)(3)(B). Finally, if the Secretary of DHS does not determine that a foreign state (or part thereof) no longer meets the conditions for designation at least 60 days before the designation or extension is due to expire, section 244(b)(3)(C) of the Act provides for an automatic extension of TPS for an additional period of 6 months (or, in the discretion of the Secretary of DHS, a

HaitiTPSAR000128

# DEPARTMENT OF HOMELAND SECURITY

## U.S. Citizenship and Immigration Services

[OMB Control Number 1615–0038]

### Agency Information Collection Activities; Extension, Without Change, of a Currently Approved Collection: Petition To Remove Conditions on Residence

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** 30-Day notice.

**SUMMARY:** The Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (USCIS) will be submitting the following information collection request to the Office of Management and Budget (OMB) for review and clearance in accordance with the Paperwork Reduction Act of 1995. The purpose of this notice is to allow an additional 30 days for public comments.

**DATES:** The purpose of this notice is to allow an additional 30 days for public comments. Comments are encouraged and will be accepted until November 13, 2017. This process is conducted in accordance with 5 CFR 1320.10.

**ADDRESSES:** Written comments and/or suggestions regarding the item(s) contained in this notice, especially regarding the estimated public burden and associated response time, must be directed to the OMB USCIS Desk Officer via email at *dhsdeskofficer@ omb.eop.gov.* All submissions received must include the agency name and the OMB Control Number [1615–0038] in the subject line.

You may wish to consider limiting the amount of personal information that you provide in any voluntary submission you make. For additional information please read the Privacy Act notice that is available via the link in the footer of *http://www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** USCIS, Office of Policy and Strategy, Regulatory Coordination Division, Samantha Deshommes, Chief, 20 Massachusetts Avenue NW., Washington, DC 20529–2140, Telephone number (202) 272–8377 (This is not a toll-free number; comments are not accepted via telephone message.). Please note contact information provided here is solely for questions regarding this notice. It is not for individual case status inquiries. Applicants seeking information about the status of their individual cases can check Case Status Online, available at the USCIS Web site at *http:// www.uscis.gov,* or call the USCIS National Customer Service Center at (800) 375–5283; TTY (800) 767–1833.

**SUPPLEMENTARY INFORMATION:**

**Comments**

The information collection notice was previously published in the **Federal Register** on June 30, 2017, at 82 FR 29912, allowing for a 60-day public comment period. USCIS did receive two comments in connection with the 60-day notice.

You may access the information collection instrument with instructions, or additional information by visiting the Federal eRulemaking Portal site at: *http://www.regulations.gov* and enter USCIS–2009–0008 in the search box. Written comments and suggestions from the public and affected agencies should address one or more of the following four points:

(1) Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

**Overview of This Information Collection**

(1) *Type of Information Collection Request:* Extension, Without Change, of a Currently Approved Collection.

(2) *Title of the Form/Collection:* Petition to Remove the Conditions on Residence.

(3) *Agency form number, if any, and the applicable component of the DHS sponsoring the collection:* Form I–751; USCIS.

(4) *Affected public who will be asked or required to respond, as well as a brief abstract: Primary: Individuals or households.* This form is used by USCIS to verify the petitioner's status and determine whether they are eligible to have the conditions on their permanent resident status removed.

(5) *An estimate of the total number of respondents and the amount of time estimated for an average respondent to respond:* The estimated total number of respondents for the information collection I–751 is 159,119 and the estimated hour burden per response is 3.75 hours. The estimated total number of respondents for biometric processing is 318,238 and the estimated hour burden per response is 1.17 hours.

(6) *An estimate of the total public burden (in hours) associated with the collection:* The total estimated annual hour burden associated with this collection is 969,035 hours.

(7) *An estimate of the total public burden (in cost) associated with the collection:* The estimated total annual cost burden associated with this collection of information is $19,492,200.

Dated: October 5, 2017.

**Samantha Deshommes,**
*Chief, Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security.*

[FR Doc. 2017–21884 Filed 10–10–17; 8:45 am]

**BILLING CODE 9111–97–P**

# DEPARTMENT OF HOMELAND SECURITY

## U.S. Citizenship and Immigration Services

[CIS No. 2610–17; DHS Docket No. USCIS–2014–0003]

**RIN 1615–ZB66**

### Termination of the Designation of Sudan for Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** The designation of Sudan for Temporary Protected Status (TPS) is set to expire on November 2, 2017. After reviewing country conditions and consulting with the appropriate U.S. Government agencies, the Secretary of Homeland Security (Secretary) has determined that conditions in Sudan have sufficiently improved for TPS purposes and no longer support a designation for TPS. Therefore, the Secretary is terminating the TPS designation of Sudan. To provide for an orderly transition, this termination is effective November 2, 2018, twelve months following the end of the current designation.

Nationals of Sudan (and aliens having no nationality who last habitually resided in Sudan) who have been

granted TPS and wish to maintain their TPS and have their current TPS-based Employment Authorization Documents (EAD) extended through November 2, 2018, should re-register for TPS in accordance with the procedures set forth in this Notice. On November 3, 2018, nationals of Sudan (and aliens having no nationality who last habitually resided in Sudan) who have been granted TPS under the Sudan designation will no longer have TPS.

**DATES:** The designation of Sudan for TPS is terminated, effective at 11:59 p.m., local time, on November 2, 2018. The 60-day re-registration period runs from October 11, 2017 through December 11, 2017. (**Note:** It is important for re-registrants to timely re-register during this 60-day period and not to wait until their EADs expire.)

**FOR FURTHER INFORMATION CONTACT:**

• You can contact Alexander King, Branch Chief, Waivers and Temporary Services Branch, Service Center Operations Directorate, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Washington DC 20529–2060; or by phone at (202) 272–8377 (this is not a toll-free number). Note: The phone number provided here is solely for questions regarding this TPS Notice. It is not for individual case status inquiries.

• For further information on TPS, including guidance on the application process and additional information on eligibility, please visit the USCIS TPS Web page at *http://www.uscis.gov/tps.* You can find specific information about this termination of Sudan for TPS by selecting ''Sudan'' from the menu on the left side of the TPS Web page.

• Applicants seeking information about the status of their individual cases can check Case Status Online, available at the USCIS Web site at *http://www.uscis.gov,* or call the USCIS National Customer Service Center at 800–375–5283 (TTY 800–767–1833). Service is available in English and Spanish.

• Further information will also be available at local USCIS offices upon publication of this Notice.

**SUPPLEMENTARY INFORMATION:**

**Table of Abbreviations**

BIA—Board of Immigration Appeals
DHS—Department of Homeland Security
DOS—Department of State
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
Government—U.S. Government
IJ—Immigration Judge
INA—Immigration and Nationality Act

IER—U.S. Department of Justice Civil Rights Division, Immigrant and Employee Rights Section (IER)
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TNC—Tentative Nonconfirmation
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services

Through this Notice, DHS sets forth procedures necessary for eligible nationals of Sudan (or aliens having no nationality who last habitually resided in Sudan) to re-register for TPS and to apply for renewal of their EADs with USCIS. Re-registration is limited to persons who have previously registered for TPS under the designation of Sudan and whose applications have been granted.

• For individuals who have already been granted TPS under Sudan's designation, the 60-day re-registration period runs from October 11, 2017 through December 11, 2017. USCIS will issue new EADs with a November 2, 2018 expiration date to eligible Sudan TPS beneficiaries who timely re-register and apply for EADs. Given the timeframes involved with processing TPS re-registration applications, DHS recognizes that not all re-registrants will receive new EADs before their current EADs expire on November 2, 2017. However, provided a Sudan TPS beneficiary timely re-registers and properly files an application for an EAD during the 60-day re-registration period, his or her EAD will be automatically extended for an additional period not to exceed 180 days from the date the current EAD expires, *i.e.,* through May 1, 2018. This notice explains how TPS beneficiaries and their employers may determine which EADs are automatically extended and their impact on Employment Eligibility Verification (Form I–9) and the E-Verify processes.

**What is Temporary Protected Status (TPS)?**

• TPS is a temporary immigration status granted to eligible nationals of a country designated for TPS under the Immigration and Nationality Act (INA), or to eligible persons without nationality who last habitually resided in the designated country.

• During the TPS designation period and so long as a TPS beneficiary continues to meet the requirements of TPS, he or she is eligible to remain in the United States, may not be removed, and is authorized to work and obtain an EAD.

• TPS beneficiaries may also apply for and be granted travel authorization as a matter of discretion.

• The granting of TPS does not result in or lead to lawful permanent resident status.

• To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(2), 8 U.S.C. 1254a(c)(2).

• When the Secretary terminates a country's TPS designation, beneficiaries return to the same immigration status they maintained before TPS, if any (unless that status has since expired or been terminated), or to any other lawfully obtained immigration status they received while registered for TPS that is still valid on the date TPS terminates.

**When was Sudan designated for TPS?**

On November 4, 1997, the Attorney General designated Sudan for TPS due to: (1) An ongoing armed conflict, and that because of such conflict, requiring the return of nationals to Sudan would pose a serious threat to their personal safety; and, (2) extraordinary and temporary conditions within Sudan that prevented nationals from returning to Sudan in safety. *See Designation of Sudan Under Temporary Protected Status,* 62 FR 59737 (Nov. 4, 1997). Since the initial designation, the Attorney General and, later, the Secretary, have extended TPS and/or redesignated Sudan for TPS. Sudan's most recent redesignation for TPS was in 2013, when the Secretary both extended Sudan's designation and redesignated Sudan for TPS for 18 months. *See Extension and Redesignation of Sudan for Temporary Protected Status,* 78 FR 1872 (Jan. 9, 2013). Sudan's TPS designation was most recently extended in 2016, when the Secretary extended Sudan's designation for TPS for 18 months through November 2, 2017. *See Extension and Redesignation of Sudan for Temporary Protected Status,* 81 FRN 4045 (Jan. 25, 2016).

**What authority does the Secretary have to terminate the designation of Sudan for TPS?**

Section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1), authorizes the Secretary, after consultation with appropriate U.S. Government agencies, to designate a foreign state (or part thereof) for TPS if the Secretary determines that certain country conditions exist.[1] The Secretary

---

[1] As of March 1, 2003, in accordance with section 1517 of title XV of the Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135, any reference to the Attorney General in a provision of the INA describing functions transferred from the Department of Justice to the Department of Homeland Security (DHS) ''shall be deemed to refer
Continued

HaitiTPSAR000130

may then grant TPS to eligible nationals of that foreign state (or eligible aliens having no nationality who last habitually resided in the designated country). *See* INA section 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A).

At least 60 days before the expiration of a country's TPS designation or extension, the Secretary, after consultation with appropriate Government agencies, must review the conditions in a foreign state designated for TPS to determine whether the conditions for the TPS designation continue to be met. *See* INA section 244(b)(3)(A), 8 U.S.C. 1254a(b)(3)(A). If the Secretary does not determine that a foreign state no longer meets the conditions for TPS designation, the designation will be extended for an additional period of 6 months, or in the Secretary's discretion, 12, or 18 months. *See* INA section 244(b)(3)(C), 8 U.S.C. 1254a(b)(3)(C). If the Secretary determines that the foreign state no longer meets the conditions for TPS designation, the Secretary must terminate the designation, but such termination may not take effect earlier than 60 days after the date the **Federal Register** notice of termination is published, or if later, the expiration of the most recent previous extension of the country designation. *See* INA section 244(b)(3)(B), 8 U.S.C. 1254a(b)(3)(B). The Secretary may determine the appropriate effective date of the termination and the expiration of any TPS-related documentation, such as EADs, for the purpose of providing an orderly transition. *See* id.; INA section 244(d)(3), 8 U.S.C. 1254a(d)(3).

**Why is the Secretary terminating the TPS designation for Sudan as of November 2, 2018?**

DHS and the Department of State (DOS) have reviewed the conditions in Sudan. Based on this review and consultation, the Secretary has determined that conditions in Sudan have sufficiently improved for TPS purposes. Termination of the TPS designation of Sudan is required because it no longer meets the statutory conditions for designation. The ongoing armed conflict no longer prevents the return of nationals of Sudan to all regions of Sudan without posing a serious threat to their personal safety. Further, extraordinary and temporary conditions within Sudan no longer prevent nationals from returning in safety to all regions of Sudan. To provide for an orderly transition, this

to the Secretary'' of Homeland Security. *See* 6 U.S.C. 557 (codifying the Homeland Security Act of 2002, tit. XV, section 1517).

termination is effective November 2, 2018, twelve months following the end of the current designation.

Conflict in Sudan is limited to Darfur and the Two Areas (South Kordofan and Blue Nile states). As a result of the continuing armed conflict in these regions, hundreds of thousands of Sudanese have fled to neighboring countries. However, in Darfur, toward the end of 2016 and through the first half of 2017, parties to the conflict renewed a series of time-limited unilateral cessation of hostilities declarations, resulting in a reduction in violence and violent rhetoric from the parties to the conflict. The remaining conflict is limited and does not prevent the return of nationals of Sudan to all regions of Sudan without posing a serious threat to their personal safety.

Above-average harvests have moderately improved food security across much of Sudan. While populations in conflict-affected areas continue to experience acute levels of food insecurity, there has also been some improvement in access for humanitarian actors to provide much-needed humanitarian aid.

Although Sudan's human rights record remains extremely poor in general, conditions on the ground no longer prevent all Sudanese nationals from returning in safety.

Taking into account the geographically limited scope of the conflict, the renewed series of unilateral cessation of hostilities declarations and concomitant reduction in violence and violent rhetoric from the parties to the conflict, and improvements in access for humanitarian actors to provide aid, the Secretary has determined that the ongoing armed conflict and extraordinary and temporary conditions that served as the basis for Sudan's most recent designation have sufficiently improved such that they no longer prevent nationals of Sudan from returning in safety to all regions of Sudan. Based on this determination, the Secretary has concluded that termination of the TPS designation of Sudan is required because Sudan no longer meets the statutory conditions for designation. To provide for an orderly transition, this termination is effective November 2, 2018, twelve months following the end of the current designation. DHS estimates that there are approximately 1,040 nationals of Sudan (and aliens having no nationality who last habitually resided in Sudan) who currently receive TPS benefits.

**Notice of Termination of the TPS Designation of Sudan**

By the authority vested in me as Secretary under INA section 244, 8 U.S.C. 1254a, I have determined, after consultation with the appropriate U.S. Government agencies, that Sudan no longer meets the conditions for designation of TPS under 244(b)(1) of the Act. 8 U.S.C. 1254a(b)(1). Accordingly, I order as follows:

(1) Pursuant to INA section 244(b)(3)(B), to provide for an orderly transition, the designation of Sudan for TPS is terminated effective at 11:59 p.m., local time, on November 2, 2018, 12 months following the end of the current designation.

(2) Information concerning the termination of TPS for nationals of Sudan (and aliens having no nationality who last habitually resided in Sudan) will be available at local USCIS offices upon publication of this Notice and through the USCIS National Customer Service Center at 1–800–375–5283. This information will be published on the USCIS Web site at *www.USCIS.gov.*

**Elaine C. Duke,**
*Acting Secretary.*

**Required Application Forms and Application Fees To Re-Register for TPS**

To re-register for TPS based on the designation of Sudan, you must submit each of the following applications:

1. Application for Temporary Protected Status (Form I–821):

• You do not need to pay the fee for the Form I–821. *See* 8 CFR 244.17.

2. Application for Employment Authorization (Form I–765):

• If you want an EAD, you must pay the fee (or request a fee waiver) for the Application for Employment Authorization (Form I–765), regardless of your age.

• If you do not want an EAD, you do not have to pay the Form I–765 fee.

If you do not want to request an EAD now, you may also file Form I–765 later to request an EAD and pay the fee (or request a fee waiver), provided that you still have TPS or a pending TPS application. Your EAD application will be considered timely filed even if the date on your current TPS-related EAD has expired. However, if you do not timely re-register and properly file an EAD application, the validity of your current EAD will end on November 2, 2017. Accordingly, you must also properly file your EAD application during the 60-day re-registration period for your current EAD to be automatically extended for 180 days (*i.e.,* through May 1, 2018). You are

strongly encouraged to properly file your EAD application as early as possible during the 60-day re-registration period to avoid lapses in your employment authorization and to ensure that you receive your Form I–797C, Notice of Action, prior to November 2, 2017.

You must submit both completed forms together. If you are unable to pay the application form fee for the I–765 and/or biometrics fee, you may complete a Request for Fee Waiver (Form I–912) or submit a personal letter requesting a fee waiver with satisfactory supporting documentation. For more information on the application forms and fees for TPS, please visit the USCIS TPS Web page at *http://www.uscis.gov/ tps.* Fees for the Form I–765, and biometric services are also described in 8 CFR 103.7(b)(1)(i).

**Biometric Services Fee**

Biometrics (such as fingerprints) are required for all applicants 14 years and older. Those applicants must submit a biometric services fee. As previously stated, if you are unable to pay for the biometric services fee, you may complete a Form I–912 or submit a personal letter requesting a fee waiver with satisfactory supporting documentation. For more information on the biometric services fee, please visit the USCIS Web site at *http:// www.uscis.gov.* If necessary, you may be required to visit an Application Support Center to have your biometrics captured.

**Re-Filing a Re-Registration TPS Application After Receiving a Denial of a Fee Waiver Request**

You should file as soon as possible within the 60-day re-registration period so USCIS can process your application and issue any EAD promptly. Properly filing early will also allow you to have time to re-file your application before the deadline and receive a Form I–797C demonstrating your EAD's automatic extension, should USCIS deny your fee waiver request. If, however, you receive a denial of your fee waiver request and are unable to re-file by the re-registration deadline, you may still re-file your I–765 application. This situation will be reviewed to determine whether you established good cause for late re-registration. However, you are urged to re-file within 45 days of the date on any USCIS fee waiver denial notice, if possible. *See* INA section 244(c)(3)(C); 8 U.S.C. 1254a(c)(3)(C); 8 CFR 244.17(b). For more information on good cause for late re-registration, visit the USCIS TPS Web page at *http:// www.uscis.gov/tps.*

**Note:** Although a re-registering TPS beneficiary age 14 and older must pay the biometric services fee (but not the initial Form I–821 fee) when filing a TPS re-registration application, you may decide to wait to request an EAD, and therefore not pay the Form I–765 fee (or request a fee waiver) until after USCIS has approved your TPS re-registration, if you are eligible. If you choose to do this, you would file the Form I–821 with the biometrics services fee, if applicable, (or request a fee waiver) and the Form I–765 without the fee and without requesting an EAD.

**Mailing Information**

Mail your application for TPS to the proper address in Table 1.

TABLE 1—MAILING ADDRESSES

| If . . . | Mail to . . . |
|---|---|
| You are applying through the U.S. Postal Service. | USCIS, Attn: TPS Sudan, P.O. Box 6943, Chicago, IL 60680–6943. |
| For FedEx, UPS, and DHL deliveries: | USCIS, Attn: TPS Sudan, 131 S. Dearborn Street, 3rd Floor, Chicago, IL 60603–5517. |

If you were granted TPS by an Immigration Judge (IJ) or the Board of Immigration Appeals (BIA) and you wish to request an EAD or are re-registering for the first time following a grant of TPS by an IJ or the BIA, please mail your application to the appropriate mailing address in Table 1. When re-registering and/or requesting an EAD based on an IJ/BIA grant of TPS, please include a copy of the IJ or BIA order granting you TPS with your application. This will aid in the verification of your grant of TPS and processing of your application, as USCIS may not have received records of your grant of TPS by either the IJ or the BIA.

**Supporting Documents**

The filing instructions on the Application for Temporary Protected Status (Form I–821) list all the documents needed to establish eligibility for TPS. You may also find information on the acceptable documentation and other requirements for applying or registering for TPS on the USCIS Web site at *www.uscis.gov/ tps* under "Sudan."

*Do I need to submit additional supporting documentation?*

If one or more of the questions listed in Part 4, Question 2 of the Form I–821 applies to you, then you must submit an explanation on a separate sheet(s) of paper and/or additional documentation.

**Employment Authorization Document (EAD)**

*How can I obtain information on the status of my EAD request?*

To get case status information about your TPS application, including the status of a request for an EAD, you can check Case Status Online at *http:// www.uscis.gov,* or call the USCIS National Customer Service Center at 800–375–5283 (TTY 800–767–1833). If your Form I–765 has been pending for more than 90 days, and you still need assistance, you may request an EAD inquiry appointment with USCIS by using the InfoPass system at *https:// infopass.uscis.gov.* However, we strongly encourage you first to check Case Status Online or call the USCIS National Customer Service Center for assistance before making an InfoPass appointment.

*Am I eligible to receive an extension of my current EAD while I wait for my new one to arrive?*

Provided that you currently have a Sudan TPS-based EAD, you may be eligible to have the validity of your current EAD extended for 180 days (through May 1, 2018) if you:

• Are a national of Sudan (or an alien having no nationality who last habitually resided in Sudan);

• Received an EAD under the designation of Sudan for TPS;

• Have an EAD with a marked expiration date of November 2, 2017, bearing the notation "A–12" or "C–19" on the face of the card under "Category;"

• Timely re-registered for TPS during the 60-day re-registration period; and

• Properly filed an application for an EAD during the 60-day re-registration period.

You must timely re-register for TPS in accordance with the procedures described in this Notice if you would like to maintain your TPS and in order to have the validity of your current EAD extended by 180 days. You are strongly encouraged to file your EAD renewal application as early as possible during the 60-day re-registration period to avoid lapses in your employment authorization.

*When hired, what documentation may I show to my employer as evidence of employment authorization and identity when completing Employment Eligibility Verification (Form I–9)?*

You can find a list of acceptable document choices on the "Lists of Acceptable Documents" for Form I–9. You can find additional detailed information about Form I–9 on the

HaitiTPSAR000132

USCIS I–9 Central Web page at *http://www.uscis.gov/I-9Central.* Employers are required to verify the identity and employment authorization of all new employees by using Form I–9. Within three days of hire, an employee must present evidence of identity and employment authorization to his or her employer by presenting documentation sufficient to satisfy Form I–9 requirements.

You may present any document from List A (which provides evidence of both identity and employment authorization), or one document from List B (which provides evidence of your identity) together with one document from List C (which is evidence of employment authorization), or you may present an acceptable receipt for List A, List B, or List C documents as described in the Form I–9 Instructions. An EAD is an acceptable document under List A. Employers may not reject a document based on a future expiration date.

If your EAD has an expiration date of November 2, 2017, and states "A–12" or "C–19" under "Category," and you timely and properly filed an EAD renewal application during the 60-day re-registration period, you may choose to present your EAD to your employer together with the Form I–797C Notice of Action (showing the qualifying eligibility category of either A–12 or C–19) as a List A document that provides evidence of your identity and employment authorization for Form I–9 through May 1, 2018, unless your TPS has been finally withdrawn or your request for TPS has been finally denied. See the subsection titled, "*How do my employer and I complete the Employment Eligibility Verification (Form I–9) using an automatically extended EAD for a new job?*" for further information.

To minimize confusion over this extension at the time of hire, you should explain to your employer that your EAD has been automatically extended through May 1, 2018. You may also provide your employer with a copy of this **Federal Register** Notice which explains how your EAD could be automatically extended; however, this **Federal Register** Notice is not acceptable evidence that your EAD has been automatically extended. As an alternative to presenting evidence of your automatically extended EAD, you may choose to present any other acceptable document from List A, a combination of one selection from List B and one selection from List C, or a valid receipt.

*What documentation may I show my employer for my Employment Eligibility Verification (Form I–9) if I am already employed but my current TPS-related EAD is set to expire?*

Even though you may be eligible to have your EAD automatically extended, your employer will need to ask you about your continued employment authorization no later than before you start work on November 3, 2017. You will need to present your employer with evidence that you are still authorized to work. Once presented, you may correct your employment authorization expiration date in Section 1 and your employer should correct the employment authorization document expiration date in Section 2 of Form I–9. See the subsection titled, "*What corrections should my current employer and I make to Employment Eligibility Verification (Form I–9) if my employment authorization has been automatically extended?*" for further information. In addition, you may also show this Notice to your employer to explain what to do for Form I–9.

When you properly file your Form I–765 to renew your current EAD, you will receive a USCIS receipt notice (Form I–797C). The receipt notice will state that your current "A–12" or "C–19" coded EAD is automatically extended for 180 days. You may show this receipt notice to your employer along with your EAD to confirm your EAD has been automatically extended through May 1, 2018, unless your TPS has been finally withdrawn or your request for TPS has been finally denied. You may also show this **Federal Register** Notice to your employer to minimize confusion; however, this **Federal Register** Notice is not acceptable evidence that your EAD has been automatically extended. To avoid delays in receiving the Form I–797C and a lapse in your employment authorization, you should file your EAD renewal application as early as possible during the re-registration period.

The last day of the automatic EAD extension is May 1, 2018. Before you start work on May 2, 2018, your employer must reverify your employment authorization. At that time, you must present any document from List A or any document from List C on Form I–9 Lists of Acceptable Documents, or an acceptable List A or List C receipt described in the Form I–9 Instructions to reverify employment authorization. Your employer should either complete Section 3 of the Form I–9 originally completed for you; or if this section has already been completed or if the version of Form I–9 has expired

(check the date in the bottom left-hand corner of the form), complete Section 3 of a new Form I–9 ensuring it is the most current version. Note that your employer may not specify which List A or List C document you must present and cannot reject an acceptable receipt.

*Can my employer require that I provide any other documentation to prove my status, such as proof of my Sudanese citizenship?*

No. When completing Form I–9, including reverifying employment authorization, employers must accept any documentation that appears on the appropriate "Lists of Acceptable Documents" for Form I–9 that reasonably appears to be genuine and that relates to you, or an acceptable List A, List B (for new hires only), or List C receipt. Employers may not request documentation that does not appear on the "Lists of Acceptable Documents." Therefore, employers may not request proof of Sudanese citizenship or proof of re-registration for TPS when completing Form I–9 for new hires or reverifying the employment authorization of current employees. If the expired EAD with category A–12 or C–19 is presented with the Form I–797C Notice of Action as described herein, an employer should accept this document combination as a valid List A document so long as the EAD reasonably appears to be genuine and to relate to the employee. Refer to the Note to Employees section of this Notice for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you based on your citizenship or immigration status, or your national origin.

*How do my employer and I complete Employment Eligibility Verification (Form I–9) on the basis of automatically extended employment authorization for a new job?*

As proof of the automatic extension of your employment authorization, you may present your expired EAD with category A–12 or C–19 in combination with the Form I–797C Notice of Action showing that the EAD renewal application was timely filed and that the qualifying eligibility category is either A–12 or C–19. Unless your TPS has been finally withdrawn or your request for TPS has been finally denied, this document combination is considered an unexpired Employment Authorization Document (Form I–766) under List A. When completing Form I–9 for a new job you are starting before May 2, 2018,

HaitiTPSAR000133

you and your employer should do the following:

1. For Section 1, you should:

a. Check ''An alien authorized to work until'' and enter the date that is 180 days from the date your current EAD expires (May 1, 2018) as the ''expiration date, if applicable, mm/dd/yyyy''; and

b. Enter your Alien Number/USCIS number or A-Number where indicated (your EAD or other document from DHS will have your USCIS Number or A-Number printed on it; the USCIS number is the same as your A-Number without the A prefix).

2. When completing Section 2, employers should:

a. Determine if the EAD is auto-extended for 180 days by ensuring:

• It is in category A–12 or C–19;

• The ''received date'' on Form I–797 is on or before the end of the 60-day re-registration period stated in this Notice; and

• The category code on the EAD is the same category code on Form I–797C, noting that employers should consider category codes A–12 and C–19 to be the same category code.

b. Write in the document title;

c. Enter the issuing authority;

d. Provide the document number; and

e. Insert May 1, 2018, the date that is 180 days from the date the current EAD expires. By the start of work on May 2, 2018, employers must reverify the employee's employment authorization in Section 3 of the Form I–9.

*What corrections should my current employer and I make to Employment Eligibility Verification (Form I–9) if my employment authorization has been automatically extended?*

If you are an existing employee who presented a TPS-related EAD that was valid when you first started your job and your employment authorization has now been automatically extended because you timely and properly filed a new application for employment authorization during the 60-day re-registration period, you may present your expired EAD with category A–12 or C–19 in combination with the Form I–797C Notice of Action. The Form I–797C should show that the EAD renewal application was timely filed and that the qualifying eligibility category is either A–12 or C–19. To avoid confusion, you may also provide your employer a copy of this **Federal Register** Notice; however, this **Federal Register** Notice is not acceptable evidence that your EAD has been automatically extended. Your employer may need to re-inspect your current EAD if your employer does not have a copy of the EAD on file. You and your employer should correct your

previously completed Form I–9 as follows:

1. For Section 1, you may:

a. Draw a line through the expiration date in Section 1;

b. Write the date that is 180 days from the date your current EAD expires (May 1, 2018) above the previous date (November 2, 2017); and

c. Initial and date the correction in the margin of Section 1.

2. For Section 2, employers should:

a. Determine if the EAD is auto-extended for 180 days by ensuring:

• It is in category A–12 or C–19;

• The ''received date'' on Form I–797 is on or before the end of the 60-day re-registration period stated in this Notice; and

• The category code on the EAD is the same category code on Form I–797C, noting that employers should consider category codes A–12 and C–19 to be the same category code;

b. Draw a line through the expiration date written in Section 2;

c. Write the date that is 180 days from the date the employee's current EAD expires (May 1, 2018) above the previous date (November 2, 2017); and

d. Initial and date the correction in the margin of Section 2.

**Note:** This is not considered a reverification. Employers do not need to complete Section 3 until either the 180-day extension has ended or the employee presents a new document to show continued employment authorization, whichever is sooner. By May 2, 2018, when the employee's automatically extended employment authorization has ended, employers must reverify the employee's employment authorization in Section 3.

*If I am an employer enrolled in E-Verify, how do I verify a new employee whose EAD has been automatically extended?*

Employers may create a case in E-Verify for a new employee using the Form I–797C receipt information provided on Form I–9. The receipt number entered as the document number on Form I–9 should be entered into the document number field in E-Verify.

*If I am an employer enrolled in E-Verify, what do I do when I receive a ''Work Authorization Documents Expiration'' alert for an automatically extended EAD ?*

E-Verify automated the verification process for employees whose TPS-related EAD was automatically extended. If you have an employee who is a TPS beneficiary who provided a TPS-related EAD when he or she first started working for you, you will receive a ''Work Authorization Documents

Expiring'' case alert when the auto-extension period for this EAD is about to expire. This indicates that you should update Form I–9 in accordance with the instructions above. By the employee's start of work on May 2, 2018, employment authorization must be reverified in Section 3. Employers should not use E-Verify for reverification.

**Note to All Employers**

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This Notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY 877–875–6028) or email USCIS at *I9Central@dhs.gov.* Calls and emails are accepted in English and many other languages. For questions about avoiding discrimination during the employment eligibility verification process (Form I–9 and E-Verify), employers may call the U.S. Department of Justice's Civil Rights Division, Immigrant and Employee Rights Section (IER) (formerly the Office of Special Counsel for Immigration-Related Unfair Employment Practices) Employer Hotline at 800–255–8155 (TTY 800–237–2515). IER offers language interpretation in numerous languages. Employers may also email IER at *IER@usdoj.gov.*

**Note to Employees**

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY 877–875–6028) or email USCIS at *I-9Central@dhs.gov.* Calls are accepted in English, Spanish, and many other languages. Employees or applicants may also call the IER Worker Hotline at 800–255–7688 (TTY 800–237–2515) for information regarding employment discrimination based upon citizenship, immigration status, or national origin, including discrimination related to Employment Eligibility Verification (Form I–9) and E-Verify. The IER Worker Hotline provides language interpretation in numerous languages.

To comply with the law, employers must accept any document or combination of documents from the Lists of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee,

HaitiTPSAR000134

or an acceptable List A, List B, or List C receipt as described in the Employment Eligibility Verification (Form I–9) Instructions. Employers may not require extra or additional documentation beyond what is required for Employment Eligibility Verification (Form I–9) completion. Further, employers participating in E-Verify who receive an E-Verify case result of "Tentative Nonconfirmation" (TNC) must promptly inform employees of the TNC and give such employees an opportunity to contest the TNC. A TNC case result means that the information entered into E-Verify from Employment Eligibility Verification (Form I–9) differs from Federal or state government records.

Employers may not terminate, suspend, delay training, withhold pay, lower pay, or take any adverse action against an employee based on the employee's decision to contest a TNC or because the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result is received when E-Verify cannot verify an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an FNC may call USCIS for assistance at 888–897–7781 (TTY 877–875–6028). For more information about E-Verify-related discrimination or to report an employer for discrimination in the E-Verify process based on citizenship, immigration status, or national origin, contact IER's Worker Hotline at 800–255–7688 (TTY 800–237–2515). Additional information about proper nondiscriminatory Employment Eligibility Verification (Form I–9) and E-Verify procedures is available on the IER Web site at *https://www.justice.gov/ier* and the USCIS Web site at *http://www.dhs.gov/E-verify.*

### Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)

While Federal Government agencies must follow the guidelines laid out by the Federal Government, state and local government agencies establish their own rules and guidelines when granting certain benefits. Each state may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, state, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary and/or show you are authorized to work based on TPS. Examples of such documents are:

(1) Your current EAD;

(2) A copy of your receipt notice (Form I–797C) for your application to renew your current EAD providing an automatic extension of your currently expired or expiring EAD;

(3) A copy of your Application for Temporary Protected Status Notice of Action (Form I–797) for this re-registration; and

(4) A copy of your past or current Application for Temporary Protected Status Notice of Action (Form I–797), if you received one from USCIS.

Check with the government agency regarding which document(s) the agency will accept. Some benefit-granting agencies use the USCIS Systematic Alien Verification for Entitlements (SAVE) program to confirm the current immigration status of applicants for public benefits. In most cases, SAVE provides an automated electronic response to benefit-granting agencies within seconds, but, occasionally, verification can be delayed. You can check the status of your SAVE verification by using CaseCheck at the following link: *https://save.uscis.gov/casecheck/,* then by clicking the "Check Your Case" button. CaseCheck is a free service that lets you follow the progress of your SAVE verification using your date of birth and one immigration identifier number. If an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted upon or will act upon a SAVE verification and you do not believe the response is correct, you may make an InfoPass appointment for an in-person interview at a local USCIS office. Detailed information on how to make corrections, make an appointment, or submit a written request to correct records under the Freedom of Information Act can be found on the SAVE Web site at *http://www.uscis.gov/save.*

[FR Doc. 2017–22074 Filed 10–10–17; 8:45 am]

**BILLING CODE 9111–97–P**

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Citizenship and Immigration Services

[OMB Control Number 1615–0116]

**Agency Information Collection Activities: Extension, Without Change, of a Currently Approved Collection; Request for Fee Waiver; Request for Fee Exemption**

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** 60-Day notice.

**SUMMARY:** The Department of Homeland Security (DHS), U.S. Citizenship and Immigration (USCIS) invites the general public and other Federal agencies to comment upon this proposed extension of a currently approved collection of information. In accordance with the Paperwork Reduction Act (PRA) of 1995, the information collection notice is published in the **Federal Register** to obtain comments regarding the nature of the information collection, the categories of respondents, the estimated burden (*i.e.,* the time, effort, and resources used by the respondents to respond), the estimated cost to the respondent, and the actual information collection instruments.

**DATES:** Comments are encouraged and will be accepted for 60 days until December 11, 2017.

**ADDRESSES:** All submissions received must include the OMB Control Number 1615–0116 in the body of the letter, the agency name and Docket ID USCIS–2010–0008. To avoid duplicate submissions, please use only *one* of the following methods to submit comments:

(1) *Online.* Submit comments via the Federal eRulemaking Portal Web site at *http://www.regulations.gov* under e-Docket ID number USCIS–2010–0008;

(2) *Mail.* Submit written comments to DHS, USCIS, Office of Policy and Strategy, Chief, Regulatory Coordination Division, 20 Massachusetts Avenue NW., Washington, DC 20529–2140.

**FOR FURTHER INFORMATION CONTACT:** USCIS, Office of Policy and Strategy, Regulatory Coordination Division, Samantha Deshommes, Chief, 20 Massachusetts Avenue NW., Washington, DC 20529–2140, telephone number 202–272–8377 (This is not a toll-free number. Comments are not accepted via telephone message). Please note contact information provided here is solely for questions regarding this notice. It is not for individual case status inquiries. Applicants seeking

HaitiTPSAR000135



# Nationwide Encounters

Encounter data includes U.S. Border Patrol (USBP) Title 8 Apprehensions, Office of Field Operations (OFO) Title 8 Inadmissibles, and Title 42 Expulsions. Data is available for the Northern Land Border, Southwest Land Border, and Nationwide (i.e., air, land, and sea modes of transportation) encounters.

Title 8 Enforcement Actions refers to apprehensions or inadmissibles processed under CBP's immigration authority. Inadmissibles refers to individuals encountered at ports of entry (POEs) by OFO who are seeking lawful admission into the United States (U.S.) but are determined to be inadmissible, individuals presenting themselves to seek humanitarian protection under our laws, and individuals who withdraw an application for admission and return to their countries of origin within a short timeframe. Apprehensions refers to the physical control or temporary detainment of a person by USBP between POEs who is not lawfully in the U.S. which may or may not result in an arrest.

Title 42 Expulsions refers to individuals encountered by USBP and OFO and expelled to the country of last transit or home country in the interest of public health under Title 42 U.S.C. 265 from March 21, 2020 to May 11, 2023.

Demographics for USBP and OFO include:

- Accompanied Minors (AM)

- Individuals in a Family Unit (FMUA)

- Single Adults

- Unaccompanied Alien Children (UAC) / Single Minors

To access the data used to build these dashboards, please visit the [CBP Data Portal](CBP Data Portal).

HaitiTPSAR000136

Case 1:25-cv-02471-ACR    Document 78-5    Filed 12/10/25    Page 74 of 312

Data is extracted from live CBP systems and data sources. Statistical information is subject to change due to corrections, systems changes, change in data definition, additional information, or encounters pending final review. Final statistics are available at the conclusion of each fiscal year.

# U.S. Border Patrol At Large and U.S. Border Patrol At Entry Apprehensions

## Monthly Totals    +

| Monthly Totals | Oct-23 | Nov-23 | Dec-23 | Jan-24 | Feb-24 | Mar-24 | Apr-24 | May-24 |
|---|---|---|---|---|---|---|---|---|
| **Nationwide Total Apprehensions** | 190,454 | 192,357 | 251,178 | 125,440 | 142,104 | 139,124 | 131,078 | 121,646 |
| *At Large* | 2,977 | 2,668 | 4,676 | 2,057 | 2,670 | 2,700 | 2,813 | 2,429 |
| *At Entry* | 187,477 | 189,689 | 246,502 | 123,383 | 139,434 | 136,424 | 128,265 | 119,217 |
| **Southwest Border Total Apprehensions** | 188,749 | 191,106 | 249,740 | 124,215 | 140,641 | 137,473 | 128,895 | 117,905 |
| *At Large* | 2,687 | 2,439 | 4,465 | 1,869 | 2,405 | 2,429 | 2,534 | 2,039 |
| *At Entry* | 186,062 | 188,667 | 245,275 | 122,346 | 138,236 | 135,044 | 126,361 | 115,866 |

HaitiTPSAR000137

| Monthly Totals | Oct-23 | Nov-23 | Dec-23 | Jan-24 | Feb-24 | Mar-24 | Apr-24 | May-24 |
|---|---|---|---|---|---|---|---|---|
| **Northern Border Total Apprehensions** | 1,522 | 1,148 | 1,178 | 926 | 1,267 | 1,480 | 1,940 | 3,399 |
| *At Large* | 240 | 189 | 143 | 121 | 182 | 165 | 166 | 221 |
| *At Entry* | 1,282 | 959 | 1,035 | 805 | 1,085 | 1,315 | 1,774 | 3,178 |

At Entry: Refers to an alien who has entered the United States without admission and has not yet reached his/her destination, regardless of the amount of time since entry.

At Large: Refers to an alien who has illegally entered the United States, has already reached their destination, and is encountered or who was legally admitted

# U.S. Border Patrol and Office of Field Operations Encounters by Area of Responsibility and Component

**Note:** *Internet Explorer has problems displaying the following charts. Please use another browser (Chrome, Safari, Firefox, Edge) to view. When using a mobile device, the charts are best displayed in landscape mode.*

HaitiTPSAR000138

Nationwide Encounters | U.S. Customs and Border Protection
and Northern Land Border Encounters by Fiscal Year (FY)

**Choose Region**
Nationwide ▼

**Fiscal Year**
(All) ▼

**Component**
(All) ▼

**Area of Responsibility**
(All) ▼

**Demographic**
(All) ▼

**Citizenship**
(All) ▼

**Title of Authority**
(All) ▼

**Reset Filters**

FY   ☐ 2022   ■ 2023   ■ 2024   ■ 2025 (FYTD)

## FY Nationwide Encounters by Month

| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2025 (FYTD) | 142,752 | 124,980 | 124,496 | 81,497 | 28,624 | 29,031 | 29,238 | | | | | | 560,618 |
| 2024 | 309,024 | 308,605 | 370,883 | 242,530 | 256,071 | 246,505 | 247,929 | 240,924 | 204,932 | 170,180 | 158,893 | 144,666 | 2,901,142 |
| 2023 | 278,317 | 284,624 | 302,392 | 209,151 | 213,911 | 259,471 | 276,036 | 275,166 | 211,457 | 245,154 | 304,073 | 341,392 | 3,201,144 |
| 2022 | 187,136 | 198,553 | 205,691 | 186,808 | 190,578 | 250,404 | 262,109 | 274,992 | 247,523 | 238,929 | 251,521 | 272,338 | 2,766,582 |

## FY Comparison by Demographic

| | Single Adults | | FMUA | | UAC | | Accompanied Minors |
|---|---|---|---|---|---|---|---|
| | 694 | 723 | 0 | | | | |

HaitiTPSAR000139



**Source:** USBP and OFO official year end reporting for FY22-FY24; USBP and OFO month end reporting for FY25 to date. Data is current as of 5/5/2025.

# U.S. Border Patrol and Office of Field Operations Encounters by State

*Note: Nationwide encounters are the sum of CBP encounters across all areas of responsibility including Northern Land Border, Southwest Land Border, OFO non-land border ports of entry (e.g., airports, seaports), and USBP sectors that do not share a land border with Canada or Mexico (e.g., Miami Sector). This data is available for further review and download on the Nationwide Encounters Public Data Portal page.*

HaitiTPSAR000140

and Northern Land Border Encounters by Fiscal Year (FY)



| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2025 (FYTD) | 142,752 | 124,980 | 124,496 | 81,497 | 28,624 | 29,031 | 29,238 | | | | | | 560,618 |
| 2024 | 309,024 | 308,605 | 370,883 | 242,530 | 256,071 | 246,505 | 247,929 | 240,924 | 204,932 | 170,180 | 158,893 | 144,666 | 2,901,142 |
| 2023 | 278,317 | 284,624 | 302,392 | 209,151 | 213,911 | 259,471 | 276,036 | 275,166 | 211,457 | 245,154 | 304,073 | 341,392 | 3,201,144 |
| 2022 | 187,136 | 198,553 | 205,691 | 186,808 | 190,578 | 250,404 | 262,109 | 274,992 | 247,523 | 238,929 | 251,521 | 272,338 | 2,766,582 |

### FY Comparison by Demographic

| | Single Adults | | | FMUA | | | UAC | | | Accompanied Minors | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 694 | 723 | 0 | | | | | | | | | |

HaitiTPSAR000141

Case 1:25-cv-02471-ACR    Document 78-5    Filed 12/10/25    Page 79 of 312



**Source:** USBP and OFO official year end reporting for FY22-FY24; USBP and OFO month end reporting for FY25 to date. Data is current as of 5/5/2025.

# U.S. Border Patrol and Office of Field Operations Encounters

HaitiTPSAR000142



## U.S. Customs and Border Protection (CBP) Encounters
### Nationwide Encounters for Fiscal Year (FY) 2025 to Date

Choose Region
**Nationwide** ▼

Demographic
**(All)** ▼

Citizenship
**(All)** ▼

**Reset Filters**

| | OFO | USBP | All CBP |
|---|---|---|---|
| **MAR FY2025** | 20,835 | 8,196 | 29,031 |
| **APR FY2025** | 19,224 | 10,014 | 29,238 |
| **Percent Change** | ▼-7.7% | ▲22.2% | ▲.7% |

### FYTD Nationwide Demographic by Month

| | Office of Field Operations | | | | | U.S. Border Patrol | | | | FYTD Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | Single Adults | FMUA | Accompanied Minors | UAC | Total | Single Adults | FMUA | UAC | Total | |
| OCT | 56,547 | 27,096 | 245 | 744 | 84,632 | 36,752 | 15,470 | 5,898 | 58,120 | 142,752 |
| NOV | 52,186 | 24,382 | 162 | 710 | 77,440 | 29,337 | 12,427 | 5,776 | 47,540 | 124,980 |
| DEC | 50,784 | 24,621 | 220 | 731 | 76,356 | 27,634 | 14,375 | 6,131 | 48,140 | 124,496 |
| JAN | 35,130 | 15,570 | 168 | 502 | 51,370 | 20,192 | 7,176 | 2,759 | 30,127 | 81,497 |
| FEB | 18,039 | 1,185 | 73 | 91 | 19,388 | 7,654 | 837 | 745 | 9,236 | 28,624 |
| MAR | 19,600 | 1,063 | 115 | 57 | 20,835 | 7,073 | 477 | 646 | 8,196 | 29,031 |
| APR | 17,784 | 1,255 | 118 | 67 | 19,224 | 8,627 | 585 | 802 | 10,014 | 29,238 |
| **Total** | **250,070** | **95,172** | **1,101** | **2,902** | **349,245** | **137,269** | **51,347** | **22,757** | **211,373** | **560,618** |

HaitiTPSAR000143

**Source:** USBP and OFO official year end reporting for FY24; USBP and OFO month end reporting for FY25 to date. Data is current as of 5/5/2025.

To ensure that law enforcement sensitive statistics are not publicly released, modifications to data filters have been made that may alter the format of data previously obtained from this dashboard.

For additional years of Southwest Land Border encounter data, visit the Southwest Land Border Encounters webpage.

**Last Modified: May 12, 2025**

HaitiTPSAR000144

**Attachment A - Temporary Protected Status (TPS) Legal Authority**

Pursuant to section 244(b)(1) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1254a(b)(1), the Secretary of Homeland Security, after consultation with appropriate agencies of the Government, may designate a foreign state (or part thereof) for TPS. The Secretary may then grant TPS to eligible nationals of that foreign state (or in the case of an alien having no nationality who last habitually resided in that state). INA § 244(b)(1) sets forth three possible bases on which the Secretary may designate a foreign state for TPS:

- Ongoing armed conflict in the foreign state and, due to such conflict, requiring the return of aliens who are nationals of that state would pose a serious threat to their personal safety;
- An earthquake, flood, drought, epidemic, or other environmental disaster in a foreign state has resulted in a substantial, but temporary, disruption of living conditions in the area affected, the foreign state is unable to handle adequately the return of aliens who are nationals of the state, *and* the foreign state has officially requested TPS designation; or
- Extraordinary and temporary conditions exist in the foreign state that prevent nationals of the state from returning in safety, unless the Secretary finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.

An initial TPS designation is at the discretion of the Secretary but may not be less than 6 months or exceed 18 months. INA § 244(b)(2).

At least 60 days before the expiration of a TPS designation, the Secretary, after consultation with appropriate agencies of the Government, shall review the conditions in a foreign state designated for TPS to determine whether the conditions for the TPS designation continue to be met and, if so, the length of an extension of the TPS designation (6-, 12-, or 18- months). *See* INA § 244(b)(3)(A). If the Secretary determines that the foreign state no longer meets the conditions for the TPS designation, she or he must terminate the designation. *See* INA § 244(b)(3)(B). Although the Secretary must make her or his determination on extension or termination at least 60 days before the expiration of the TPS designation, publication of the required *Federal Register* notice announcing the decision must be "on a timely basis." INA § 244(b)(3)(A). If the Secretary does not make a decision under INA § 244(b)(3)(A) that the foreign state no longer meets the conditions for designation, there is an automatic, minimum six-month extension of a country's TPS designation.
*See* INA § 244(b)(3)(C).

After the Secretary designates a country for TPS, nationals of the country (and persons without nationality who last habitually resided in the country) may apply for TPS, but they must individually demonstrate their eligibility pursuant to the criteria established in INA § 244(c) and the TPS regulations at 8 CFR § 244.1 *et seq*. These criteria include, but are not limited to, requirements that the applicant show continuous physical presence in the United States since the effective date of the country designation and continuous residence since such date as the Secretary determines; admissibility as an immigrant (with limited exceptions); that the applicant

Attachment A: TPS Legal Authority
Page 2

is not ineligible under certain mandatory criminal history, terrorism, and national security bars as specified in INA § 244(c)(2)(A)-(B); and that the applicant is registering for TPS in accordance with regulatory procedures in 8 CFR §§ 244.2–244.9.

If granted TPS, the alien receives employment authorization and an Employment Authorization Document, if requested, that is valid for one year from the date of adjudication or the duration of the TPS designation, whichever is less. TPS is a temporary benefit that does not, by itself, provide aliens with a basis for seeking lawful permanent resident (LPR) status or any other immigration status. However, receipt of TPS benefits will not bar an otherwise eligible alien from adjusting to LPR status or acquiring another lawful immigration status. When a TPS country's designation ends, TPS beneficiaries return to the same immigration status, if any, that they held prior to TPS (unless that status has expired or been terminated) or any other status they may have acquired while registered for TPS.

HaitiTPSAR000146

 **Homeland Security**    Environmental Planning and Historic Preservation Decision Support System

# Implementation of a Family Reunification Parole Process for [Country Nationals] - Project Approved

## Status

- In Preparation (06/09/2023)
- Environmental Review (06/09/2023)
- Legal Review (06/09/2023)
- Senior Environmental Review (06/09/2023)
- Proponent Review (06/12/2023)
- Project Approved (06/12/2023)

## Project Information

### General

**Name:** Implementation of a Family Reunification Parole Process for [Country Nationals]
**DSS ID:** DSS-USCIS-2023-17206
**Security:** Unclassified
**Description:** DHS announces administrative procedures for family reunification parole (FRP) processes for Colombia, Cuba, El Salvador, Guatemala, Haiti, and Honduras.

The administrative process will invite beneficiaries from the six identified countries (and add-on derivatives) of an approved Form I-130, Petition For Alien Relative, who reside outside the United States and are waiting for their immigrant visa to become available, to be paroled into the United States on a case-by-case basis.

While this process is related to DHS's overall lawful pathways strategy, it is a separate process designed to promote family reunification for certain approved foreign family members of United States Citizens (USC) and Lawful Permanent Residents (LPR)  The process of paroling beneficiaries of an approved Form I-130 from the six identified countries and reuniting them with their USC or LPR family member has been determined to have independent value and utility to DHS and the affected public.

DHS is not aware of any significant impact on the environment, or any change in environmental effect that will result from the announced administrative procedures for the FRP processes. Actions taken by parolees following entry into the United States are not federal actions and are outside the scope of this analysis. DHS finds these procedures clearly fits within categorical exclusion A3 established in the Department's NEPA implementing procedures.
**Funded through IRA?:** No

Implementation of a Family Reunification Parole Process for [Country Nationals] (Unclassified)

**Funded through the IIJA?:** No
**Critical Infrastructure?:** No
**Adopting Another Agency Catex Determination?:** No
**Project Types:**
· Administrative & Regulatory Activities - Promulgation of rules, issuance of rulings or interpretations, and the development and publication of policies, orders, directives, notices, procedures, manuals, advisory circulars, and other guidance documents. (CATEX A3)
· Administrative & Regulatory Activities - Other, Use "other" to trigger full review
**Existing EA/EIS?:** No
**Requires EA/EIS?:** No
**Project Priority:** Normal
**Federal Assistance:** No
**Estimated Project Cost:**  (not entered)

## Component

**Component:** USCIS - U.S. Citizenship and Immigration Services

## Dates

**FY Funding:** 2023
**Proposed Project Start:** 06/22/2023
**Proposed Project End:** On-going
**Review Start:** 06/09/2023

## Project Location

• Nationwide

## Team

• Document Preparer, Bryan Williamson, bryan.j.williamson@uscis.dhs.gov
• Collaborator-Document Preparation, Christopher Schulenburg, christopher.d.schulenburg@uscis.dhs.gov
• Collaborator-Document Preparation, Joshua A (Josh) Rigney, joshua.a.rigney@uscis.dhs.gov
• Environmental Reviewer, Jennifer Hass, jennifer.hass@hq.dhs.gov
• Legal Reviewer, Elizabeth Gaffin, elizabeth.s.gaffin@uscis.dhs.gov
• Senior Environmental Reviewer, Teresa Pohlman, teresa.pohlman@hq.dhs.gov
• Proponent, Mark Boivin, mark.r.boivin@uscis.dhs.gov

## Categorical Exclusions

• A3 - Promulgation of rules, issuance of rulings or interpretations, and the development and publication of policies, orders, directives, notices, procedures, manuals, advisory circulars, and other guidance documents of the following nature:
(a) Those of a strictly administrative or procedural nature;

(b) Those that implement, without substantive change, statutory or regulatory requirements;

(c) Those that implement, without substantive change, procedures, manuals, and other guidance documents;

(d) Those that interpret or amend an existing regulation without changing its environmental effect;

(e) Technical guidance on safety and security matters; or,

(f) Guidance for the preparation of security plans.

## Required Conditions

1. Any change to the Proposed Action that may cause a physical interaction with the human environment will require re-evaluation for compliance with NEPA and other EP&HP requirements before the action can proceed.
2. This review addresses NEPA and other EP&HP requirements as described in DHS Directive 023-01. This review may identify the need for additional federal, state, and/or local permits, approvals, etc. required for the Proposed Action. However, this review may not satisfy those requirements and the Proponent is responsible for ensuring that all other appropriate federal, state, and/or local permits, approvals, etc. have been obtained.

## Decision Documents

- Memorandum For Record (MFR), 5.58kB

## Attachments

- Additional Project Description, 31.48kB

## Comments

- Bryan Williamson, The Proposed Action will not limit access to, and ceremonial use of, Indian sacred sites on federal lands, by Indian religious practitioners, and/or adversely affect the physical integrity of such sites. (06/09/2023 01:19:43)
- Bryan Williamson, The Proposed Action is not anticipated to have a potentially significant effect on a district, highway, structure, or object that is listed, or eligible for listing, on the National Register of Historic Places, a historic or cultural resource, traditional or sacred site, or result in the destruction of a significant scientific, cultural, or historic resource.

  Additionally, actions taken by parolees following entry into the United States are not federal actions and are outside the scope of this analysis.
  (06/09/2023 01:19:35)

- Bryan Williamson, There are no anticipated direct or indirect effects on the resources covered by the Magnuson-Stevens Fishery Conservation and Management Act (essential fish habitat) is anticipated as a result of the proposed action. (06/09/2023 01:18:38)
- Bryan Williamson, The Proposed Action is not anticipated to result in a disproportionately high and adverse health or environmental effects on minority and low-income populations.

Actions taken by parolees following entry into the United States are not federal actions and are outside the scope of this analysis. (06/09/2023 01:18:23)

## EPHP Review

### Environmental Resources

- Is the Proposed Action a piece of a larger action or connected to another action? -- No
  Please explain how you came to this determination. : The Proposed Action is a stand-alone administrative action to invite beneficiaries from the six identified countries (and add-on derivatives) of an approved Form I-130, Petition For Alien Relative, who are outside the United States and are waiting for their immigrant visa to become available, to be paroled into the United States on a case-by-case basis.

  While the Proposed Action is related to DHS's overall lawful pathways strategy, it is a separate process designed to promote family reunification for certain approved foreign family members of United States Citizens (USC) and Lawful Permanent Residents (LPR).  The process of paroling beneficiaries of an approved Form I-130 from the six identified countries and reuniting them with their USC or LPR family member has been determined to have independent value and utility to DHS and the affected public.

  This Proposed Action complements other DHS policy efforts, however, it is not dependent on any other action, nor does it trigger any subsequent action.
- Will the Proposed Action have a potentially significant effect on public health or safety? Areas to consider include, but are not limited to: environmental justice considerations; air quality; noise impacts; hazardous wastes and/or contamination; wastewater; potable water; and changes in modes or safety of transportation. -- No
  Explain how the proposed action would not have a potentially significant effect on public health or safety. : As the Proposed Action does not include any construction or ground disturbing activities, there are no anticipated direct or indirect effects to public health or safety associated with the Proposed Action. Individuals who are paroled into the United States under this Proposed Action must comply with medical screening requirements of the U.S. Centers for Disease Control and Prevention for admission into the United States.

Implementation of a Family Reunification Parole Process for [Country Nationals] (Unclassified)

The Proposed Action is not anticipated to have any significant effects on environmental justice considerations, air quality, noise levels, hazardous wastes and/or contamination, wastewater, potable water, or changes in modes or safety of transportation.

- Would the proposed action place a disproportionately high and adverse human health or environmental effect on minority populations and low-income populations? -- No
  Comments:
  Bryan Williamson, The Proposed Action is not anticipated to result in a disproportionately high and adverse health or environmental effects on minority and low-income populations.

  Actions taken by parolees following entry into the United States are not federal actions and are outside the scope of this analysis. (06/09/2023 13:18:23)

- Will the Proposed Action have a potentially significant effect on species or habitats protected by the Endangered Species Act, Marine Mammal Protection Act, Migratory Bird Treaty Act, Bald and Golden Eagle Protection Act, or Magnuson-Stevens Fishery Conservation and Management Act? -- No
  Provide a conclusion under which statute the determination was made (e.g., no effect, NLAA, LAA, for ESA, etc.), how the determination was made, why it is considered significant, and copies of any consultation (informal and/or formal). : The Proposed Action is an administrative action and is not anticipated to have a potentially significant effect on species or habitats protected under ESA, MMPA, MBTA, BGEPA, or MSFCMA.

  The Proposed Action has no anticipated direct effects to protected species or their habitat. DHS has no reason to believe that any persons present in the United States as a result of the Proposed Action would violate the ESA, MMPA, MBTA, BGEPA, or MSFCMA.

  Actions taken by parolees following entry into the United States are not federal actions and are outside the scope of this analysis.

  Attachments:  FWS, NMFS, or Wildlife Agency Consultation:  (No files uploaded yet.)

- What is your Endangered Species Act (ESA) finding and determination? -- No effect
  Explain how the determination was made (e.g., are species present in the area but your proposed action will have no effect? why?). Although not required, recommend attaching any consultation or correspondence conducted.: The Proposed Action is an administrative action and is not anticipated to have potential impacts on species or habitats protected under the Endangered Species Act (ESA).

  There are no anticipated direct or indirect effects to species protected under the ESA or their habitat as a result of the Proposed Action.

Implementation of a Family Reunification Parole Process for [Country Nationals] (Unclassified)

DHS has no reason to believe that any persons present in the United States as a result of the Proposed Action would violate the ESA. Actions taken by parolees following entry into the United States are not federal actions and outside the scope of this analysis.

As the Proposed Action is administrative and procedural in nature and is not anticipated to have impacts on ESA listed species or habitat, DHS has determined a "no effect" finding is appropriate for this action.
Attachments:  ESA consultation:  (No files uploaded yet.)

- What is your Marine Mammal Protection Act (MMPA) finding and determination? -- No effect or negligible effect
Explain how the determination was made (e.g., are species present in the area but your proposed action will have no effect or negligible effects? why?). Although not required, recommend attaching any consultation or correspondence conducted.: The Proposed Action is an administrative action and is not anticipated to have potential impacts on species or habitats protected under the Marine Mammal Protection Act (MMPA).

  There are no anticipated direct or indirect effects to species protected under the MMPA or their habitat as a result of the Proposed Action.

  DHS has no reason to believe that any persons present in the United States as a result of the Proposed Action would violate the MMPA. Actions taken by parolees following entry into the United States are not federal actions and are outside the scope of this analysis.

  As the Proposed Action is administrative and procedural in nature and is not anticipated to have impacts on MMPA protected species or habitat, DHS has determined a "no effect or negligible effect" finding is appropriate for this action.
  Attachments:  MMPA consultation:  (No files uploaded yet.)

- Would the proposed action adversely affect a species protected under the Bald and Golden Eagle Protection Act or Migratory Bird Treaty Act or habitat for such species?  -- No
Explain how the determination was made (e.g., are species present in the area but your proposed action will have no adverse effect or no significant effect? why?). Although not required, recommend attaching any consultation or correspondence conducted.: The Proposed Action is an administrative action and is not anticipated to have potential impacts on species or habitats protected under the Bald and Golden Eagle Protection Act (BGEPA) or Migratory Bird Treaty Act (MBTA).

  There are no anticipated direct or indirect effects to species protected under the BGEPA or MBTA or their habitat as a result of the Proposed Action.

DHS has no reason to believe that any persons present in the United States as a result of the Proposed Action would violate the BGEPA or MBBTA. Actions taken by parolees following entry into the United States are not federal actions and outside the scope of this analysis.

Attachments:  BGEPA MBTA consultation:  (No files uploaded yet.)

- What is your Magnuson-Stevens Fishery Conservation and Management Act (essential fish habitat) finding and determination? -- No effect

Attachments:  EFH consultation:  (No files uploaded yet.)

Comments:

Bryan Williamson, There are no anticipated direct or indirect effects on the resources covered by the Magnuson-Stevens Fishery Conservation and Management Act (essential fish habitat) is anticipated as a result of the proposed action. (06/09/2023 13:18:38)

- Will the Proposed Action have a potentially significant effect on an environmentally sensitive area? Examples include, but are not limited to: areas having special designation or recognition such as prime or unique agricultural lands, coastal zones, designated wilderness study areas, wild and scenic rivers, 100-year floodplains, wetlands, sole source aquifers, Marine Sanctuaries, National Wildlife Refuges, National Parks, National Monuments, etc.  -- No resources present

Please explain how you came to this determination. : The Proposed Action is a stand-alone administrative action with no construction or ground disturbing activities.

The Proposed Action is not anticipated to have potential impacts on environmentally sensitive areas such as prime or unique agricultural lands, coastal zones, designated wilderness study areas, wild and scenic rivers, 100-year floodplains, wetlands, sole source aquifers, Marine Sanctuaries, National Wildlife Refuges, National Parks, National Monuments, or other protected lands. No significant direct or indirect impacts to environmentally sensitive areas are anticipated as a result of the Proposed Action.

DHS has no reason to believe that any persons present in the United States as a result of the Proposed Action would impact an environmentally sensitive area. Actions taken by parolees following entry into the United States are not federal actions and outside the scope of this analysis.

- Will the Proposed Action result in the potential violation of a Federal, State, or local law or requirement imposed to protect the environment? -- No

Please summarize determination. : The Proposed Action will not result in a violation of Federal, state, or local law or requirement imposed to protect the environment. The Proposed Action is an administrative action with no construction or ground disturbing activities.

DHS has no reason to believe that any persons present in the United States as a result of the Proposed Action would violate any Federal, State, or local law or requirement imposed to protect the

environment. Actions taken by parolees following entry into the United States are not federal actions and outside the scope of this analysis.

- Will the Proposed Action have an effect on the quality of the human environment that is likely to be highly controversial in terms of scientific validity, likely to be highly uncertain, or likely to involve unique or unknown environmental risks?  -- No

  Required: Please explain. : The Proposed Action is not anticipated to affect the quality of the human environment in any way that is likely to be highly controversial in terms of scientific validity, be highly uncertain, or involve unknown environmental risks.

- Will the Proposed Action employ new or unproven technology that is likely to involve unique or unknown environmental risks, where the effect on the human environment is likely to be highly uncertain, or where the effect on the human environment is likely to be highly controversial in terms of scientific validity?  -- No

  Required: Please explain.: The Proposed Action is administrative in nature and does not involve any new or unproven technology.

- Will the Proposed Action establish a precedent for future actions that have significant effects? -- No

  Please explain how you came to this determination. : The Proposed Action is an independent action that will not establish precedent for future action with significant effects. Additionally, future DHS major federal actions will be evaluated in accordance with Directive 023-01 rev 01 and Instruction 023-01-001-01 rev 01 for compliance with the National Environmental Policy Act.

- Is the Proposed Action significantly greater in scope or size than normally experienced for its particular category of action? -- No

  Required: Please summarize determination.: The Proposed Action is not significantly greater in scope or size than normally experienced for this category of action.

DHS has considered the potential environmental impacts of these procedural changes and has determined that the Proposed Action has independent value and utility to DHS and the affected public.

- Will the Proposed Action have the potential to result in the significant degradation of existing poor environmental conditions? Will the Proposed Action initiate a potentially significant environmentally degrading influence, activity, or effect in areas not already significantly modified from their natural condition? -- No

  Please explain how you came to this determination. : The Proposed Action is not anticipated to have any direct or indirect impacts that would result in the significant degradation of existing poor environmental conditions.

The Proposed Action will not initiate a potentially significant environmentally degrading influence, activity, or effect in areas not already significantly modified from their natural condition.

Implementation of a Family Reunification Parole Process for [Country Nationals] (Unclassified)

- Is the Proposed Action related to other actions with individually insignificant but cumulatively significant impacts?  -- No

  Please explain how you came to this determination. : While the action falls within the agency's statutory authority to administer the nation's lawful immigration system, the Proposed Action is independent in nature and is not related to or triggered by any other action with individually insignificant but cumulatively significant impacts.

- Are there any other requirements for the protection of the environment that need to be considered for this proposed action?  -- No

## Historic Preservation & Cultural Resources

- Is the Proposed Action a piece of a larger action or connected to another action? -- No

  Please explain how you came to this determination. : The Proposed Action is a stand-alone administrative action to invite beneficiaries from the six identified countries (and add-on derivatives) of an approved Form I-130, Petition For Alien Relative, who are outside the United States and are waiting for their immigrant visa to become available, to be paroled into the United States on a case-by-case basis.

  While the Proposed Action is related to DHS's overall lawful pathways strategy, it is a separate process designed to promote family reunification for certain approved foreign family members of United States Citizens (USC) and Lawful Permanent Residents (LPR).  The process of paroling beneficiaries of an approved Form I-130 from the six identified countries and reuniting them with their USC or LPR family member has been determined to have independent value and utility to DHS and the affected public.

  This Proposed Action complements other DHS policy efforts, however, it is not dependent on any other action, nor does it trigger any subsequent action.

- Will the Proposed Action have a potentially significant effect on public health or safety? Areas to consider include, but are not limited to: environmental justice considerations; air quality; noise impacts; hazardous wastes and/or contamination; wastewater; potable water; and changes in modes or safety of transportation. -- No

  Explain how the proposed action would not have a potentially significant effect on public health or safety. : As the Proposed Action does not include any construction or ground disturbing activities, there are no anticipated direct or indirect effects to public health or safety associated with the Proposed Action. Individuals who are paroled into the United States under this Proposed Action must comply with medical screening requirements of the U.S. Centers for Disease Control and Prevention for admission into the United States.

  The Proposed Action is not anticipated to have any significant effects on environmental justice considerations, air quality, noise levels, hazardous wastes and/or contamination, wastewater, potable

HanfTPSAR000155

water, or changes in modes or safety of transportation.
- Would the proposed action place a disproportionately high and adverse human health or environmental effect on minority populations and low-income populations? -- No
  Comments:
  Bryan Williamson, The Proposed Action is not anticipated to result in a disproportionately high and adverse health or environmental effects on minority and low-income populations.

  Actions taken by parolees following entry into the United States are not federal actions and are outside the scope of this analysis. (06/09/2023 13:18:23)
- Will the Proposed Action have a potentially significant effect on species or habitats protected by the Endangered Species Act, Marine Mammal Protection Act, Migratory Bird Treaty Act, Bald and Golden Eagle Protection Act, or Magnuson-Stevens Fishery Conservation and Management Act?  -- No
  Provide a conclusion under which statute the determination was made (e.g., no effect, NLAA, LAA, for ESA, etc.), how the determination was made, why it is considered significant, and copies of any consultation (informal and/or formal). : The Proposed Action is an administrative action and is not anticipated to have a potentially significant effect on species or habitats protected under ESA, MMPA, MBTA, BGEPA, or MSFCMA.

  The Proposed Action has no anticipated direct effects to protected species or their habitat. DHS has no reason to believe that any persons present in the United States as a result of the Proposed Action would violate the ESA, MMPA, MBTA, BGEPA, or MSFCMA.

  Actions taken by parolees following entry into the United States are not federal actions and are outside the scope of this analysis.

  Attachments:  FWS, NMFS, or Wildlife Agency Consultation:  (No files uploaded yet.)
- What is your Endangered Species Act (ESA) finding and determination? -- No effect
  Explain how the determination was made (e.g., are species present in the area but your proposed action will have no effect? why?). Although not required, recommend attaching any consultation or correspondence conducted.: The Proposed Action is an administrative action and is not anticipated to have potential impacts on species or habitats protected under the Endangered Species Act (ESA).

  There are no anticipated direct or indirect effects to species protected under the ESA or their habitat as a result of the Proposed Action.

  DHS has no reason to believe that any persons present in the United States as a result of the Proposed Action would violate the ESA. Actions taken by parolees following entry into the United

Implementation of a Family Reunification Parole Process for [Country Nationals] (Unclassified)

States are not federal actions and outside the scope of this analysis.

As the Proposed Action is administrative and procedural in nature and is not anticipated to have impacts on ESA listed species or habitat, DHS has determined a "no effect" finding is appropriate for this action.
Attachments:  ESA consultation:  (No files uploaded yet.)

- What is your Marine Mammal Protection Act (MMPA) finding and determination? -- No effect or negligible effect
Explain how the determination was made (e.g., are species present in the area but your proposed action will have no effect or negligible effects? why?). Although not required, recommend attaching any consultation or correspondence conducted.: The Proposed Action is an administrative action and is not anticipated to have potential impacts on species or habitats protected under the Marine Mammal Protection Act (MMPA).

  There are no anticipated direct or indirect effects to species protected under the MMPA or their habitat as a result of the Proposed Action.

  DHS has no reason to believe that any persons present in the United States as a result of the Proposed Action would violate the MMPA. Actions taken by parolees following entry into the United States are not federal actions and are outside the scope of this analysis.

  As the Proposed Action is administrative and procedural in nature and is not anticipated to have impacts on MMPA protected species or habitat, DHS has determined a "no effect or negligible effect" finding is appropriate for this action.
Attachments:  MMPA consultation:  (No files uploaded yet.)

- Would the proposed action adversely affect a species protected under the Bald and Golden Eagle Protection Act or Migratory Bird Treaty Act or habitat for such species?  -- No
Explain how the determination was made (e.g., are species present in the area but your proposed action will have no adverse effect or no significant effect? why?). Although not required, recommend attaching any consultation or correspondence conducted.: The Proposed Action is an administrative action and is not anticipated to have potential impacts on species or habitats protected under the Bald and Golden Eagle Protection Act (BGEPA) or Migratory Bird Treaty Act (MBTA).

  There are no anticipated direct or indirect effects to species protected under the BGEPA or MBTA or their habitat as a result of the Proposed Action.

  DHS has no reason to believe that any persons present in the United States as a result of the Proposed Action would violate the BGEPA or MBBTA. Actions taken by parolees following entry

Implementation of a Family Reunification Parole Process for [Country Nationals] (Unclassified)

into the United States are not federal actions and outside the scope of this analysis.

Attachments:  BGEPA MBTA consultation:  (No files uploaded yet.)

- What is your Magnuson-Stevens Fishery Conservation and Management Act (essential fish habitat) finding and determination? -- No effect

   Attachments:  EFH consultation:  (No files uploaded yet.)

   Comments:

   Bryan Williamson, There are no anticipated direct or indirect effects on the resources covered by the Magnuson-Stevens Fishery Conservation and Management Act (essential fish habitat) is anticipated as a result of the proposed action. (06/09/2023 13:18:38)

- Will the Proposed Action have a potentially significant effect on an environmentally sensitive area? Examples include, but are not limited to: areas having special designation or recognition such as prime or unique agricultural lands, coastal zones, designated wilderness study areas, wild and scenic rivers, 100-year floodplains, wetlands, sole source aquifers, Marine Sanctuaries, National Wildlife Refuges, National Parks, National Monuments, etc.  -- No resources present

   Please explain how you came to this determination. : The Proposed Action is a stand-alone administrative action with no construction or ground disturbing activities.

   The Proposed Action is not anticipated to have potential impacts on environmentally sensitive areas such as prime or unique agricultural lands, coastal zones, designated wilderness study areas, wild and scenic rivers, 100-year floodplains, wetlands, sole source aquifers, Marine Sanctuaries, National Wildlife Refuges, National Parks, National Monuments, or other protected lands. No significant direct or indirect impacts to environmentally sensitive areas are anticipated as a result of the Proposed Action.

   DHS has no reason to believe that any persons present in the United States as a result of the Proposed Action would impact an environmentally sensitive area. Actions taken by parolees following entry into the United States are not federal actions and outside the scope of this analysis.

- Will the Proposed Action result in the potential violation of a Federal, State, or local law or requirement imposed to protect the environment? -- No

   Please summarize determination. : The Proposed Action will not result in a violation of Federal, state, or local law or requirement imposed to protect the environment. The Proposed Action is an administrative action with no construction or ground disturbing activities.

   DHS has no reason to believe that any persons present in the United States as a result of the Proposed Action would violate any Federal, State, or local law or requirement imposed to protect the environment. Actions taken by parolees following entry into the United States are not federal actions and outside the scope of this analysis.

Implementation of a Family Reunification Parole Process for [Country Nationals] (Unclassified)

- Will the Proposed Action have an effect on the quality of the human environment that is likely to be highly controversial in terms of scientific validity, likely to be highly uncertain, or likely to involve unique or unknown environmental risks?  -- No
  Required: Please explain. : The Proposed Action is not anticipated to affect the quality of the human environment in any way that is likely to be highly controversial in terms of scientific validity, be highly uncertain, or involve unknown environmental risks.
- Will the Proposed Action employ new or unproven technology that is likely to involve unique or unknown environmental risks, where the effect on the human environment is likely to be highly uncertain, or where the effect on the human environment is likely to be highly controversial in terms of scientific validity?  -- No
  Required: Please explain.: The Proposed Action is administrative in nature and does not involve any new or unproven technology.
- Will the Proposed Action establish a precedent for future actions that have significant effects? -- No
  Please explain how you came to this determination. : The Proposed Action is an independent action that will not establish precedent for future action with significant effects. Additionally, future DHS major federal actions will be evaluated in accordance with Directive 023-01 rev 01 and Instruction 023-01-001-01 rev 01 for compliance with the National Environmental Policy Act.
- Is the Proposed Action significantly greater in scope or size than normally experienced for its particular category of action? -- No
  Required: Please summarize determination.: The Proposed Action is not significantly greater in scope or size than normally experienced for this category of action.

  DHS has considered the potential environmental impacts of these procedural changes and has determined that the Proposed Action has independent value and utility to DHS and the affected public.
- Will the Proposed Action have the potential to result in the significant degradation of existing poor environmental conditions? Will the Proposed Action initiate a potentially significant environmentally degrading influence, activity, or effect in areas not already significantly modified from their natural condition? -- No
  Please explain how you came to this determination. : The Proposed Action is not anticipated to have any direct or indirect impacts that would result in the significant degradation of existing poor environmental conditions.

  The Proposed Action will not initiate a potentially significant environmentally degrading influence, activity, or effect in areas not already significantly modified from their natural condition.
- Is the Proposed Action related to other actions with individually insignificant but cumulatively significant impacts?  -- No
  Please explain how you came to this determination. : While the action falls within the agency's

HahtTPSAR000159

statutory authority to administer the nation's lawful immigration system, the Proposed Action is independent in nature and is not related to or triggered by any other action with individually insignificant but cumulatively significant impacts.

- Are there any other requirements for the protection of the environment that need to be considered for this proposed action?  -- No
- Will the proposed action have a potentially significant effect on a district, highway, structure, or object that is listed, or eligible for listing, on the National Register of Historic Places, a historic or cultural resource, traditional or sacred site, or result in the destruction of a significant scientific, cultural, or historic resource? -- No

  Attachments:  HR - Consultation:  (No files uploaded yet.)

  Comments:

  Bryan Williamson, The Proposed Action is not anticipated to have a potentially significant effect on a district, highway, structure, or object that is listed, or eligible for listing, on the National Register of Historic Places, a historic or cultural resource, traditional or sacred site, or result in the destruction of a significant scientific, cultural, or historic resource.

  Additionally, actions taken by parolees following entry into the United States are not federal actions and are outside the scope of this analysis.

  (06/09/2023 13:19:35)
- What is the National Historic Preservation Act Section 106 effect determination? -- No potential to effect

  This determination is not used often. Please explain. : The Proposed Action does not have any associated construction or ground disturbing activities. This action has no potential to affect historic properties listed or eligible for listing under the National Historic Preservation Act.

  ** This question should be carefully checked by the Environmental Reviewer.
- Does the proposed action limit access to, and ceremonial use of, Indian sacred sites on federal lands, by Indian religious practitioners, and/or adversely affect the physical integrity of such sites. -- No

  Comments:

  Bryan Williamson, The Proposed Action will not limit access to, and ceremonial use of, Indian sacred sites on federal lands, by Indian religious practitioners, and/or adversely affect the physical integrity of such sites. (06/09/2023 13:19:43)

# DHS National Environmental Policy Act
# Memorandum For Record
# for Categorically Excluded Actions that do not require a REC

| **INTRODUCTION** |
|---|
| The purpose of this Memorandum for Record is to provide a record that the potential for impacts to the quality of the human environment has been considered in the decision to implement the Proposed Action described below, in compliance with the National Environmental Policy Act of 1969 (NEPA) and DHS Directive 023-01 and Instruction 023-01-001-01, Implementation of NEPA. DHS has previously analyzed actions of this type and concluded that there is no potential for significant impact on the human environment, that a DHS Categorical Exclusion applies, and that a more detailed review and documentation in a Record of Environmental Consideration is not necessary. |
| **SECTION I - Description of Proposed Action** |
| 1.  **Title of Proposed Action:**  Implementation of a Family Reunification Parole Process for [Country Nationals] |
| 2.  **Identifying Number of Proposed Action (if available):**  DSS-USCIS-2023-17206 |
| 3.  **Project Security Type:**  Unclassified |
| 4.  **Estimated Start Date:** 06/22/2023 |
| 5.  **Location of Proposed Action (e.g., Nationwide, Regional, Site-Specific.  If site-specific, provide street address, city, county and state):**<br>    Nationwide |
| 6.  **Project Type:**<br>· Administrative & Regulatory Activities - Promulgation of rules, issuance of rulings or interpretations, and the development and publication of policies, orders, directives, notices, procedures, manuals, advisory circulars, and other guidance documents. (CATEX A3)<br>· Administrative & Regulatory Activities - Other, Use "other" to trigger full review |

7.  **Description of Proposed Action.**
DHS announces administrative procedures for family reunification parole (FRP) processes for Colombia, Cuba, El Salvador, Guatemala, Haiti, and Honduras.

The administrative process will invite beneficiaries from the six identified countries (and add-on derivatives) of an approved Form I-130, Petition For Alien Relative, who reside outside the United States and are waiting for their immigrant visa to become available, to be paroled into the United States on a case-by-case basis.

While this process is related to DHS's overall lawful pathways strategy, it is a separate process designed to promote family reunification for certain approved foreign family members of United States Citizens (USC) and Lawful Permanent Residents (LPR)  The process of paroling beneficiaries of an approved Form I-130 from the six identified countries and reuniting them with their USC or LPR family member has been determined to have independent value and utility to DHS and the affected public.

DHS is not aware of any significant impact on the environment, or any change in environmental effect that will result from the announced administrative procedures for the FRP processes. Actions taken by parolees following entry into the United States are not federal actions and are outside the scope of this analysis. DHS finds these procedures clearly fits within categorical exclusion A3 established in the Department's NEPA implementing procedures.

| 8.  **Document Preparer:**  Bryan Williamson |
|---|
| 9.  **Senior Environmental Reviewer:**  Teresa Pohlman |
| 10.  **Project Proponent:**  Mark Boivin |

Implementation of a Family Reunification Parole Process for [Country Nationals] (Unclassified)

## SECTION II - Finding

This action is not expected to result in any significant adverse environmental impacts as described in the National Environmental Policy Act of 1969 (NEPA). The proposed action has been thoroughly reviewed by the U.S. Citizenship and Immigration Services and it has been determined, by the undersigned, that this action is categorically excluded under current DHS by the undersigned, that this action is categorically excluded under current DHS CATEX(A3) from further environmental documentation, in accordance with DHS Directive 023-01 and Instruction 023-01-001-01, Implementation of NEPA, since implementation of this action:

1. Clearly fits within one or more of the categories of excludable actions listed in Appendix A of DHS Instruction 023-01-001-01;
2. Has not been segmented into smaller parts in order to avoid a more extensive evaluation of the potential for significant environmental impacts; and
3. Does not involve any extraordinary circumstances, as defined in DHS Instruction 023-01-001-01, Section V(B)(2), that would create the potential for a normally excluded action to have a significant environmental effect.

| 06/09/2023 | Bryan Williamson |
|---|---|
| Date | Document Preparer |

| 06/09/2023 | Teresa Pohlman |
|---|---|
| Date | Senior Environmental Reviewer |

In reaching my decision/recommendation on the U.S. Citizenship and Immigration Services component's proposed action, I have considered the information contained in this MFR on the potential for environmental impacts.

| 06/09/2023 | Mark Boivin |
|---|---|
| Date | Proponent |

## Preview of Attachments

The following pages will display this project's attachments that are of these file types:

- .jpg / .jpeg
- .png
- .gif
- .txt
- .pdf

The attachments of compatible file types from this project are:

### Note:

All project attachments can be downloaded at the 'File Upload/Manage Attachments' page.

Haiti TPS AR000163

| From: | Ward, Alicia |
|---|---|
| To: | Block, Andrew J; MILLER, SARAH; Baker, Bryan |
| Cc: | |
| Subject: | Re: TPS Data Follow-up |
| Date: | Tuesday, April 15, 2025 1:26:47 PM |
| Attachments: | Outlook-w2cscj2f.png |

Hi Andrew,

Please find below the TPS estimates for newly eligible Haiti.

Newly potentially eligible given a new designation with continuous residence date of 04/14/2025   70,000
Breakout:

| | |
|---|---|
| Nonimmigrants in valid status who arrived since 06/03/2024 | 3,000 |
| Nonimmigrants who overstayed and arrived since 06/03/2024 | 700 |
| Post-06/03/2024 entrants (border/port encounters) w/o repatriation or relief | 66,000 |
| Post-06/03/2024 border crossers not apprehended | 300 |

Kindly,

**Alicia Ward**
**Statistician**
Office of Homeland Security Statistics
U.S. Department of Homeland Security

https://www.dhs.gov/ohss



---

From: Block, Andrew J
Sent: Wednesday, March 19, 2025 4:13 PM
To: MILLER, SARAH                    ; Ward, Alicia                    ; Baker, Bryan

Cc:
Subject: TPS Data Follow-up

Hello OHSS Colleagues,

Thanks for a great chat today.

And our review of Haiti is coming up soon.

████████████████████████████████████████

Here are the data points we discussed, plus some additional specificity:

- Number of aliens removed/returned (by any pathway) to a particular TPS country, regardless of nationality.  (Pathways may include administrative returns, enforcement returns, Title 42 expulsions, etc.)
- NIV overstays by nationals from a TPS country
- NIV admissions by country of residence
- NIV admissions:  number of distinct aliens who entered

I'm thinking COB Wednesday, April 2 as a deadline, but we have flexibility.

All the best,
Andrew

**Andrew Block**
Program Analyst
Office of Policy & Strategy
U.S. Citizenship and Immigration Services
Department of Homeland Security
████████████



**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of Policy and Strategy*
5900 Capital Gateway Drive
Camp Springs, MD 20588-0009

**U.S. Citizenship and Immigration Services**

## Summary of Nonimmigrant Visa Issued to Haitian Nationals FY2018-2025 (YTD)

Between Fiscal Year 2018 and 2025[1], the number of Nonimmigrant Visas (NIV)[2] issued by the Department of State to Haitian nationals decreased from on average 2,370 NIV issuances a month to 1,224 a month. The table below summarizes the NIV issuance data.

**Non-Immigrant Visas Issuance for Haiti, 2018-2025**

| FY | NIV Issuance Annual | NIV Issuance Monthly Average |
|---|---|---|
| **2018** | **28,445** | 2,370 |
| **2019** | 22,375 | 1,865 |
| **2020** | 11,957 | 996 |
| **2021** | 8,582 | 715 |
| **2022** | 14,280 | 1,190 |
| **2023** | 10,557 | 880 |
| **2024** | 7,938 | 662 |
| **2025** | 6,118 | 1,224 |

---

[1] The latest month in which the NIV data is reported by the Department of State is May 2025.
[2] https://travel.state.gov/content/travel/en/legal/visa-law0/visa-statistics/nonimmigrant-visa-statistics/monthly-nonimmigrant-visa-issuances.html

**www.uscis.gov**

HaitiTPSAR000166



| Public Safety Records | Total |
|---|---|
| Egregious Public Safety (EPS) | 369 |
| Non-EPS | 496 |
| No Public Safety Record Information Found | 567,680 |
| Total | 568,545 |

| Fraud + Public Safety (PS)* | Total |
|---|---|
| Fraud AND Public Safety Record Found | 80 |

| Fraud Record Determinations | Total |
|---|---|
| Fraud Found | 2,327 |
| Fraud Not Found | 512 |
| Inconclusive | 273 |
| No SOF Information Found | 565,433 |
| Total | 568,545 |

| ALL | Total |
|---|---|
| A Number (A#) had a HIT for Fraud, PS, and NS | 1 |

**FRAUD DETECTION AND NATIONAL SECURITY DIRECTORATE (FDNS), Systems Integration Division (SID)**

**Disclaimer for all Special Protected Classes**

Information contained within this report may be subject to immigration specific confidentiality provisions, such as IIRIRA § 404(h), IRCA Section 121(c); 8 C.F.R. § 208.6 (Disclosure of Asylum Information to Third Parties, which is applied to refugee information by policy); 8 U.S.C. § 1367, pertaining to certain victims of domestic abuse, and certain victims of qualifying criminal activities and severe forms of human trafficking; Legalization, 8 U.S.C. §1255a(c)(4)-(5); Special Agriculture Worker (SAW), 8 U.S.C. §§ 1160(b)(5) and (6); LIFE Act, Pub. L. 106-553; Temporary Protected Status, 8 U.S.C. § 1254a(c)(6); other immigration specific limitations; and the terms and conditions as set forth in USCIS's System of Records Notices. This information may only be accessed by authorized personnel with a need to know the information and must be safeguarded.

A violation of the confidentiality provisions in SAW (8 USC 1160(b)(6)(D)), Legalization (8 U.S.C. § 1255A (c)(5)(E)), or LIFE Legalization (Pub. L. 106-553 §1104(c)(5) (December 21 2000)) cases can result in a fine up to $10,000. Violations of the confidentiality provisions of Section 1367(a)(2) are punishable by disciplinary action and a fine of up to $5,000 per violation and may be assessed against anyone who shares any information relating to a protected individual in violation of the confidentiality provisions of Section 1367 (see 8 U.S.C. § 1367(c)).

**Onward disclosure request process**

Requests for authorization to disclose information are to be made through the DHS Single Point of Service/Request for Information (SPS/RFI) process for referral to USCIS. To make a request for onward disclosure through the SPS/RFI process, an RFI form specifying the request for onward disclosure must be completed and submitted. The RFI form should include the information that would be shared, the entity with which it would be shared, and the purpose of the proposed disclosure, as well as the contact information of the requester.

The RFI form can be obtained from the RFI Desk/Office at uscis.rfi@uscis.dhs.gov.

WARNING: this file is designated FOR OFFICIAL USE ONLY (FOUO) and contains DEPARTMENT OF HOMELAND SECURITY (DHS) U.S. CITIZENSHIP AND IMMIGRATION SERVICES (USCIS) information.  This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need to know."

| | |
|---|---|
| Date Data Request Received: | 9/11/2025 Updated Request 10/29/2025 |
| Data Requested by Directorate/Office and Division/Branch and Employee Name: | OP&S for DHS Under Secretary of Strategy, Policy, and Plans, Rob Law. |
| Data Retrieval Date: | 9/11/2025 Same Data previously submitted to USCIS OP&S and added a Summary grouping by requested categories (FD+PS, FD+NS, PS+NS, ALL) on 10/29/2025. |
| Data Retrieval By SID: | Dan M. Summary added by Katie G. |
| Data System(s) Searched: | NexGen, USCIS National Production Dataset (NPD) |
| Data Quality Control Review By SID: | Gary P. |
| Notes: | Unique alien numbers were passed through FDNS-DS NexGen to identify if the alien number provided had an associated KST/Non-KST National Security Record or EPS/Non-EPS Public Safety Record indicating derogatory information. Only the primary entity on the FDNS Record was queried for each alien number.  Please note the KST/Non-KST designation is based on FDNS-DS NexGen at the time the record was closed or the time when the data was queried. If one individual is the subject of multiple National Security investigations with both KST and Non-KST designations listed, KST will be reported. If one individual is the subject of multiple Public Safety investigations with both EPS and Non-EPS designations listed, EPS will be reported. Unique receipts were passed through FDNS-DS NexGen to identify associated Statement of Findings (SOF) where the receipt number was directly associated to the SOF. Summary tables for Record and SOF results are provided in the workbook. <br><br> Added a Summary grouping by requested categories (FD+PS, FD+NS, PS+NS, ALL) <br><br> Definitions worksheet also included. |
| Summary Analysis: | See summary tables for requested totals for Haiti report. |

HaitiTPSAR000168

Note: Data provided above is based on previous metrics on worksheet entitled "Haiti".

\* Public Safety data represents both Egregious Public Safety as well as non-Egregious Public Safety Categories.

HaitiTPSAR000169

**Statement of Findings Determination on TPS Receipts Provided by TPS Country**

| Fraud Record Determinations | Total |
|---|---|
| Fraud Found | 2,327 |
| Fraud Not Found | 512 |
| Inconclusive | 273 |
| No SOF Information Found | 565,433 |
| **Total** | **568,545** |

**Notes:** Receipt data provided were passed through FDNS-DS NexGen to identify if any receipt had an associated Statement of Findings.

Source: FDNS-NexGen as of 9-9-2025

**TPS Alien Numbers Provided where the Alien Number is Associated with a Public Safety Record and TPS Country**

| Public Safety Records | Total |
|---|---|
| Egregious Public Safety (EPS) | 369 |
| Non-EPS | 496 |
| No Public Safety Record Information Found | 567,680 |
| **Total** | **568,545** |

**Notes:** Unique alien numbers were passed through FDNS-DS NexGen to identify if the alien number provided had an associated KST/Non-KST National Security Record or EPS/Non-EPS Public Safety Record indicating derogatory information. Only the primary entity on the FDNS Record was queried for each alien number. Please note the KST/Non-KST designation is based on FDNS-DS NexGen at the time the record was closed or the time when the data was queried. If one individual is the subject of multiple national security investigations with both KST and Non-KST designations listed, KST will be reported. If one individual is the subject of multiple Public Safety investigations with both EPS and Non-EPS designations listed, EPS will be reported. Unique receipts were passed through FDNS-DS NexGen to identify associated Statement of Findings (SOF) where the receipt number was directly associated to the SOF.

Source: FDNS-NexGen as of 8-7-2025

**Notes:** Unique alien numbers were passed through FDNS-DS NexGen to identify if the alien number provided had an associated KST/Non-KST National Security Record or EPS/Non-EPS Public Safety Record indicating derogatory information. Only the primary entity on the FDNS Record was queried for each alien number. Please note the KST/Non-KST designation is based on FDNS-DS NexGen at the time the record was closed or the time when the data was queried. If one individual is the subject of multiple national security investigations with both KST and Non-KST designations listed, KST will be reported. If one individual is the subject of multiple Public Safety investigations with both EPS and Non-EPS designations listed, EPS will be reported. Unique receipts were passed through FDNS-DS NexGen to identify associated Statement of Findings (SOF) where the receipt number was directly associated to the SOF.

Source: FDNS-NexGen as of 8-7-2025

HaitiTPSAR000170

| Definitions | |
|---|---|
| Egregious Public Safety (EPS) | Any case where information indicates the alien is under investigation for, has been arrested for (without disposition), or has been convicted of any of a list of criminal concerns, including but not limited to murder, rape, sexual abuse of a minor, trafficking in firearms or explosives, or other crimes listed in the MOA with ICE, Policy Memorandum 110. |
| Known or Suspected Terrorist (KST | Known or Suspected Terrorist is a category of individuals who have been nominated and accepted for placement in the Terrorist Screening Data Set (TSDS), are on the Terrorist Watch List, and have a specially- coded lookout posted in TECS, and/or CLASS, as used by DOS. A KST in TECS has a record number beginning with a "P" for person and ending in a "B10," and should indicate that the individual is a "Known Terrorist" or "Suspected Terrorist." |
| Non-EPS | Public Safety concerns that do not meet the threshold of Egregious Public Safety as defined above. |
| Non-KST | A Non-KST NS concern includes all other NS concerns, regardless of source, including but not limited to: associates of KST(s), unindicted co-conspirators, terrorist organization members, persons involved with providing material support to terrorists or terrorist organizations, and agents of foreign governments. |

HaitiTPSAR000171

Haiti

| | |
|---|---|
| Newly potentially eligible given a new designation with continuous residence date of 09/29/2025 | 67,000 |
| Breakout: | |
| Nonimmigrants in valid status who arrived since 06/03/2024 | 3,000 |
| Nonimmigrants out of status who arrived since 06/03/2024 | 1,000 |
| Post-06/03/2024 entrants (border/port encounters) w/o repatriation or relief | 63,000 |
| Post-06/03/2024 border crossers not apprehended | 400 |

Note: Details may not sum to total due to rounding. Estimate does not include LPRs.

Estimate of Overstays from Haiti: Fiscal Years 2020- 2025 to Date

| Fiscal Year of Admit Until Date | NI Visa Overstays |
|---|---|
| 2020 | 11,850 |
| 2021 | 1,250 |
| 2022 | 8,850 |
| 2023 | 28,040 |
| 2024 | 16,600 |
| 2025 YTD | 5,190 |

Notes: To protect privacy, table cells are rounded to the nearest ten. Table presents counts of events; individuals who overstayed multiple times will appear multiple times. Table contains system identified overstay leads. TPS status may not keep an individual in legal status. Includes overstayers who entered through Air or Sea Ports of Entry with the following nonimmigrant COAs: A3, B1, B2, CW1, CW2, E1, E2, E2C, E3, E3D, F1, F2, G5, H1B, H1C, H2A, H2B, H2R, H3, H4, J1, J2, K1, K2, K3, K4, L1, L1A, L1B, L2, M1, M2, N8, N9, O1, O2, O3, P1, P2, P3, P4, Q1, R1, R2, TD, TN, V1, V2, V3, WB, WT.
Source: OHSS query of ADIS-R data. Fiscal year 2020-2024 data are as of the conclusion of each fiscal year. FY2025 data is as of September 30, 2025.

HaitiTPSAR000172

Haiti

| | |
|---|---|
| Newly potentially eligible given a new designation with continuous residence date of 09/29/202[...] | 67,000 |
| Breakout: | |
|   Nonimmigrants in valid status who arrived since 06/03/2024 | 3,000 |
|   Nonimmigrants out of status who arrived since 06/03/2024 | 1,000 |
|   Post-06/03/2024 entrants (border/port encounters) w/o repatriation or relief | 63,000 |
|   Post-06/03/2024 border crossers not apprehended | 400 |

Note: Details may not sum to total due to rounding. Estimate does not include LPRs.

HaitiTPSAR000173

Estimate of Overstays from Haiti: Fiscal Years 2020- 2025 to Date

| Fiscal Year of Admit Until Date | NI Visa Overstays |
|---|---|
| 2020 | 11,850 |
| 2021 | 1,250 |
| 2022 | 8,850 |
| 2023 | 28,040 |
| 2024 | 16,600 |
| 2025 YTD | 5,190 |

Notes: To protect privacy, table cells are rounded to the nearest ten. Table presents counts of events; individuals who overstayed multiple times will appear multiple times. Table contains system identified overstay leads. TPS status may not keep an individual in legal status. Includes overstayers who entered through Air or Sea Ports of Entry with the following nonimmigrant COAs:
A3, B1, B2, CW1, CW2, E1, E2, E2C, E3, E3D, F1, F2, G5, H1B, H1C, H2A, H2B, H2R, H3, H4, J1, J2, K1, K2, K3, K4, L1, L1A, L1B, L2, M1, M2, N8, N9, O1, O2, O3, P1, P2, P3, P4, Q1, R1, R2, TD, TN, V1, V2, V3, WB, WT.

Source: OHSS query of ADIS-R data. Fiscal year 2020-2024 data are as of the conclusion of each fiscal year. FY2025 data is as of September 30, 2025.

HaitiTPSAR000174

Form I-821, Application for Temporary Protected Status
Current Beneficiaries by Country of Designation
As of May 1, 2025

**U.S. Citizenship and Immigration Services**

| Country of Designation | Current TPS Beneficiaries | | |
|---|---|---|---|
| | Approved Individuals that are not LPRs | Approved Individuals that are also LPRs | Total Approved Individuals |
| **TOTAL** | **1,303,200** | **130,712** | **1,433,912** |
| Afghanistan | 8,006 | 3,730 | 11,736 |
| Burma | 3,738 | 170 | 3,908 |
| Cameroon | 5,027 | 224 | 5,251 |
| El Salvador | 169,755 | 60,941 | 230,696 |
| Ethiopia | 4,649 | 189 | 4,838 |
| Haiti | 332,609 | 15,578 | 348,187 |
| Honduras | 51,094 | 20,999 | 72,093 |
| Lebanon | 238 | - | 238 |
| Nepal | 7,130 | 5,330 | 12,460 |
| Nicaragua | 2,901 | 1,096 | 3,997 |
| Somalia | 726 | 74 | 800 |
| South Sudan | 211 | 15 | 226 |
| Sudan | 1,799 | 242 | 2,041 |
| Syria | 3,965 | 2,130 | 6,095 |
| Ukraine | 101,154 | 2,725 | 103,879 |
| Venezuela | 607,904 | 16,722 | 624,626 |
| Yemen | 2,294 | 547 | 2,841 |

Form I-821, Application for Temporary Protected Status
Current Pending by Country of Designation
As of May 1, 2025

**U.S. Citizenship and Immigration Services**

| Country of Designation | Current Pending TPS Applications | | | | |
|---|---|---|---|---|---|
| | I-821 Initial Pending Applications from Current Beneficiaries | I-821 Re-registration Pending Applications from Current Beneficiaries | I-821 Initial Pending Applications from non-Current Beneficiaries | I-821 Re-registration Pending Applications from non-Current Beneficiaries | Total Pending Applications |
| **TOTAL** | **3,038** | **527,619** | **345,051** | **107,139** | **982,847** |
| Afghanistan | 48 | 220 | 8,895 | 17 | 9,180 |
| Burma | 2 | 31 | 174 | 4 | 211 |
| Cameroon | 5 | 88 | 893 | 13 | 999 |
| El Salvador | 519 | 115,712 | 984 | 1,608 | 118,823 |
| Ethiopia | 2 | 22 | 270 | - | 294 |
| Haiti | 827 | 138,938 | 201,477 | 3,901 | 345,143 |
| Honduras | 144 | 1,532 | 925 | 138 | 2,739 |
| Lebanon | 11 | - | 993 | - | 1,004 |
| Nepal | 1 | 90 | 55 | 5 | 151 |
| Nicaragua | 13 | 103 | 354 | 18 | 488 |
| Somalia | 7 | 122 | 1,509 | 9 | 1,647 |
| South Sudan | 1 | 13 | 35 | 9 | 58 |
| Sudan | 5 | 734 | 166 | 109 | 1,014 |
| Syria | 57 | 274 | 688 | 33 | 1,052 |
| Ukraine | 239 | 52,428 | 48,547 | 41,241 | 142,455 |
| Venezuela | 1,140 | 217,220 | 78,813 | 60,007 | 357,180 |
| Yemen | 17 | 92 | 273 | 27 | 409 |

**Table Key:**
- Represents zero or rounds to 0.0.

**Note(s):**
1) The report reflects the most up-to-date estimate available at the time the database is queried.
2) Counts may differ from those reported in previous periods due to system updates and post-adjudicative outcomes.
3) Counts may differ from other reports due to updated logic that utilizes more accurate SSN information.
4) Duplicates were removed based on receipt number, A-Number, SSN, and Name-DOB combination.
5) Country of Designation is based on Country of Citizenship or Country of Birth as of application.
6) Counts may include individuals that may have also been approved for lawful permanent resident (LPR) status.
7) Current holders reflect beneficiaries approved without a subsequent denial or TPS withdrawal. USC are not included.
8) An "Unknown" "Country of Designation" indicates current TPS holders where their Country of Citizenship and Country of Birth is not one of the current TPS countries and not a former TPS designated country. These counts may include "stateless" individuals.

**Source(s):**
Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality
CLAIM3, ELIS, CIS2, NPD, queried 5/2025, PAER0017802.

HaitiTPSAR000175



| Country | Count |
|---|---|
| I-131, Application for Travel Documents, Parole Documents, and Arrival/Departure Records<br>Haitian Advanced Parole for those Traveling to Haiti<br>Receipts from ELIS2<br>October 1, 2022 to April 24, 2025 (Current) | |
| Haiti | 2,506 |

**Note(s):**

1) Some petitions/applications/requests approved or denied may have been received in previous reporting periods.

2) This report reflects the most up to date data available at the time the database is queried.

3) Counts may differ from those reported in previous periods due to system updates and post-adjudicative outcomes.

4) For a complete list of USCIS forms and descriptions, visit: **https://www.uscis.gov/forms**

5) Nicaraguan citizenship or nationality is based off of country of citizenship.

6) Counts are reflective of Haitians traveling to Haiti.

7) Counts are limited to bnft_typ_cd = 24, 144, and 145.

**Source:**

Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality

ELIS, queried 4/2025, PAER0017765.

HaitiTPSAR000176



I-131, Application for Travel Documents, Parole Documents, and Arrival/Departure Records
Receipts from CLAIMS3
For Haitian Citizens and/or Nationals
October 1, 2022 to April 24, 2025 (Current)

| Country | Count |
|---|---|
| Haiti | 3,877 |

**Note(s):**

1) Some petitions/applications/requests approved or denied may have been received in previous reporting periods.

2) This report reflects the most up to date data available at the time the database is queried.

3) Counts may differ from those reported in previous periods due to system updates and post-adjudicative outcomes.

4) For a complete list of USCIS forms and descriptions, visit: **https://www.uscis.gov/forms**

5) Country of travel is not available in CLAIMS3, so this table provides the count of all I-131 receipts for Haitian citizens and/or nationals from CLAIMS3.

7) Counts are limited to part_2_1 = D and to citizens or nationals of Haiti who filed a I-131.

**Source:**

Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality

CLAIMS3, queried 4/2025, PAER0017765.

HaitiTPSAR000177

Form I-821, Application for Temporary Protected Status
Current Beneficiaries by Country of Designation
As of October 6, 2025



U.S. Citizenship and Immigration Services

| | | Current TPS Beneficiaries | | |
|---|---|---|---|---|
| Country of Designation | Designation Detail | Approved Individuals that are not LPRs | Approved Individuals that are also LPRs | Total Approved Individuals |
| TOTAL | | 1,228,535 | 118,571 | 1,347,106 |
| Burma | | 3,717 | 253 | 3,970 |
| El Salvador | | 159,756 | 66,220 | 225,976 |
| Ethiopia | | 4,643 | 295 | 4,938 |
| Haiti | | 335,460 | 17,618 | 353,078 |
| Lebanon | | 376 | 1 | 377 |
| Nepal | | 6,778 | 5,237 | 12,015 |
| Somalia | | 982 | 85 | 1,067 |
| South Sudan | | 214 | 18 | 232 |
| Sudan | | 1,740 | 285 | 2,025 |
| Syria | | 4,007 | 2,097 | 6,104 |
| Ukraine | | 102,641 | 4,098 | 106,739 |
| Venezuela | Venezuela-2021-INIT | 248,266 | 19,833 | 268,099 |
| Venezuela | Venezuela-2023-REDSGNTN | 357,700 | 1,968 | 359,668 |
| Yemen | | 2,255 | 563 | 2,818 |

**Table Key:**

– Represents zero or rounds to 0.0.

**Note(s):**

1) The report reflects the most up-to-date estimate available at the time the database is queried.

2) Counts may differ from those reported in previous periods due to system updates and post-adjudicative outcomes.

3) Counts may differ from other reports due to updated logic that utilizes more accurate SSN information.

4) Duplicates were removed based on receipt number, A-Number, SSN, and Name-DOB combination.

5) Country of Designation is based on Country of Citizenship or Country of Birth as of application.

6) Counts may include individuals that may have also been approved for lawful permanent resident (LPR) status.

7) Current holders reflect beneficiaries approved without a subsequent denial or TPS withdrawal. USC are not included.

8) An "Unknown" "Country of Designation" indicates current TPS holders where their Country of Citizenship and Country of Birth is not one of the current TPS countries and not a former TPS designated country. These counts may include "stateless" individuals.

**Source(s):**

Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality

CLAIM3, ELIS, CIS2, NPD, queried 10/2025, PAER0019005.

---

Form I-821, Application for Temporary Protected Status
Current Pending by Country of Designation
As of October 6, 2025



U.S. Citizenship and Immigration Services

| | | Current Pending TPS Applications | | | | |
|---|---|---|---|---|---|---|
| Country of Designation | Designation Detail | I-821 Initial Pending Applications from Current Beneficiaries | I-821 Re-registration Pending Applications from Current Beneficiaries | I-821 Initial Pending Applications from non-Current Beneficiaries | I-821 Re-registration Pending Applications from non-Current Beneficiaries | Total Pending Applications |
| TOTAL | | 3,355 | 838,806 | 321,230 | 9,476 | 1,172,867 |
| Burma | | 4 | 79 | 123 | 2 | 208 |
| El Salvador | | 484 | 110,363 | 888 | 1,182 | 112,917 |
| Ethiopia | | 1 | 35 | 273 | 1 | 310 |
| Haiti | | 1,181 | 131,829 | 195,058 | 3,830 | 331,898 |
| Honduras | | - | - | 665 | 66 | 731 |
| Lebanon | | 24 | 5 | 975 | - | 1,004 |
| Nepal | | - | 1 | 1 | 1 | 3 |
| Nicaragua | | - | - | 29 | 4 | 33 |
| Somalia | | 13 | 68 | 1,307 | 4 | 1,392 |
| South Sudan | | 2 | 29 | 39 | 3 | 73 |
| Sudan | | 4 | 215 | 115 | 9 | 343 |
| Syria | | 60 | 282 | 437 | 29 | 808 |
| Ukraine | | 263 | 92,860 | 46,808 | 821 | 140,752 |
| Venezuela | Venezuela-2021-INIT | 395 | 209,711 | 3,307 | 1,448 | 214,861 |
| Venezuela | Venezuela-2023-REDSGNTN | 906 | 293,166 | 70,926 | 2,048 | 367,046 |
| Yemen | | 18 | 163 | 279 | 28 | 488 |

HaitiTPSAR000178

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of Policy and Strategy*
5900 Capital Gateway Drive
Camp Springs, MD 20588-0009



**U.S. Citizenship
and Immigration
Services**

October 1, 2025

Using publicly available data on Nonimmigrant Visa (NIV) Issuances[1] and Nonimmigrant Admissions (I-94),[2] PR&E compared the number of aliens from Haiti who applied to enter the United States of America to the number of entrances into the U.S. from Haitian aliens. Although I-94 admissions were reported by Country of Residence and NIV issuances were reported by nationality, a reasonable comparison can be made across the six years (2018-2023) of available complete data.

Between 2018 and 2025, NIV issuances for Haitian nationals decreased significantly, from 26,389 in 2018 to 5,515 in 2025. The decline in NIV issuances could be attributed to measures aimed at mitigating elevated overstay rates and addressing potential risks to U.S. national security. The Presidential Proclamation on Restricting the Entry of Foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats imposes restrictions on NIV access for Haitian nationals and limits their entry into the United States.[3]

Under the provisions of the Presidential Proclamation, the United States suspends or restricts visa issuance and entry for nationals of certain countries, including Haiti, based on specific criteria.[4] Haiti's lack of a centralized authority capable of providing adequate law enforcement information and ensuring effective dissemination of such data has been identified as a key factor in these restrictions.[5] This deficiency raises concerns about the ability to verify that Haitian nationals do not pose risks to U.S. national security, further contributing to the reduction in NIV issuances.[6]

---

[1] https://travel.state.gov/content/travel/en/legal/visa-law0/visa-statistics/nonimmigrant-visa-statistics/monthly-nonimmigrant-visa-issuances.html
[2] https://ohss.dhs.gov/topics/immigration/yearbook/2023/table27
[3] https://www.whitehouse.gov/presidential-actions/2025/06/restricting-the-entry-of-foreign-nationals-to-protect-the-united-states-from-foreign-terrorists-and-other-national-security-and-public-safety-threats/
[4] https://ht.usembassy.gov/immigrant-visas/
[5] https://www.whitehouse.gov/presidential-actions/2025/06/restricting-the-entry-of-foreign-nationals-to-protect-the-united-states-from-foreign-terrorists-and-other-national-security-and-public-safety-threats/
[6] https://www.whitehouse.gov/presidential-actions/2025/06/restricting-the-entry-of-foreign-nationals-to-protect-the-united-states-from-foreign-terrorists-and-other-national-security-and-public-safety-threats/

**www.uscis.gov**

HaitiTPSAR000179

The number of I-94 Admissions follows a similar trend to the NIV issuances. I-94 admissions have overall decreased between 2018 and 2023, from 95,160 in 2018 to 47,660 in 2023. Like NIV issuances, this pattern is likely reflective of measures aimed to restrict visa eligibility criteria resulting in limited access to NIVs for Haitian nationals.

*Table 1. I-94 admissions vs. Non-Immigrant Visas in for Haiti, 2018-2023*

| FY | I-94 | NIV | % of NIV issuances which result in I-94 admission |
|---|---|---|---|
| 2018 | 95,160 | 26,389 | 3.61% |
| 2019 | 132,440 | 22,375 | 5.92% |
| 2020 | 59,890 | 11,957 | 5.01% |
| 2021 | 65,460 | 8,582 | 7.63% |
| 2022 | 55,530 | 14,280 | 3.89% |
| 2023 | 47,660 | 10,557 | 4.51% |

The ratio of I-94 admissions to NIV issuances fluctuated between 2018 and 2023, reflecting varying patterns of travel and visa utilization. In 2018, the ratio was 3.61%, indicating that for every NIV issued, approximately 3.6 I-94 admissions occurred. The ratio peaked in 2021 at 7.63%, suggesting an increase in the number of admissions relative to visas issues. This could indicate repeat entries by individuals holding valid multiple-entry visas or travelers using previously issued visas. By 2023, the ratio stabilized at 4.51, closer to pre-pandemic levels. Haiti was designated for Temporary Protected Status (TPS) on January 21, 2010. The proportion of entries per visa issuance highlights fluctuating travel patterns and indicates a consistent decline likely influenced by external factors, including the COVID-19 pandemic and restrictive immigration policies.

*Figure 1. I-94 admissions vs. Non-Immigrant Visas in for Haiti, 2018-2025*



Using publicly available data on ICE removals and Repatriations,[7] PR&E compared the number of aliens from Haiti who were removed or otherwise repatriated back to Haiti by ICE since 2018. The total number of removals and repatriation of Haitian aliens by ICE fluctuated, peaking in FY 2022 at 14,090 and declining sharply to 260 in 2025. The sharp decline in 2025 may indicate a significant shift in enforcement priorities or broader migration trends.

*Table 2. Removals and Repatriations for Haiti Since 2018*

| FY | ICE removals | Other Repatriation Types | Total Removals & Repatriations |
|---|---|---|---|
| FY 2018 | 990 | 260 | 1,250 |
| FY 2019 | 730 | 180 | 910 |
| FY 2020 | 910 | 910 | 1,820 |
| FY 2021 | 400 | 10,300 | 10,700 |
| FY 2022 | 1,540 | 12,550 | 14,090 |
| FY 2023 | 740 | 910 | 1,650 |
| FY 2024 | 820 | 740 | 1,560 |
| FY 2025 | 160 | 100 | 260 |

Using publicly available data on NIV overstays,[8] PR&E compared the number of Haitian aliens who were expected to depart but did not. Overstay rates were higher than removal rates in FY 2023, with an average of 28,043 Haitian aliens overstaying their non-immigrant visas compared to FY 2022.[9] The sharp increase in overstays in FY 2023 suggests a significant shift in travel behavior among Haitian nationals or changes in enforcement. Elevated overstay rates can pose risks to U.S. national security and public safety, as individuals who overstay their visas may be harder to track and monitor.

*Table 3. NIV overstays for Haiti, 2021-2023*

| FY 2021 | FY 2022 | FY 2023 |
|---|---|---|
| N/A[10] | 8,854 | 28,043 |

---

[7] https://ohss.dhs.gov/khsm/dhs-repatriations
[4] https://www.dhs.gov/publication/entryexit-overstay-report
[9] Data for NIV overstays is only available for FY2021 through FY2023.
[10] No report for NIV overstays was produced for FY2021.

HaitiTPSAR000181

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of Policy and Strategy*
5900 Capital Gateway Drive
Camp Springs, MD 20588-0009



**U.S. Citizenship
and Immigration
Services**

October 1, 2025

<div align="center">

**TEMPORARY PROTECTED STATUS (TPS)
POLICY CONSIDERATIONS: Haiti
(October 2025)[1]**

</div>

**Overview of Current Country Conditions**

Haiti was first designated for Temporary Protected Status more than fifteen years ago on January 21, 2010 upon DHS finding extraordinary and temporary conditions existed that prevented Haitian nationals from returning in safety.[2] In July 2025, DHS determined that Haiti no longer meets TPS criteria and announced the termination of its designation, initially set for September 2, 2025.[3] In spite of Section 244 of the Immigration and Nationality Act making Temporary Protected Status decisions not subject to judicial review, a July 2025 final ruling delayed the effective date of the termination to no earlier than February 3, 2026.[4]

While country conditions in Haiti may still be challenging, as described in the reports supporting the Secretary's June 4, 2025, decision to terminate TPS for Haiti, there have been improvements.

Haiti continues to experience gang violence. Gangs, some linked to political elites, have amassed control over 90% of Port-au-Prince and key regions in Haiti, weakening state authority and blocking access routes to the capital.[5,6] However, there are some areas of improvement in the transportation and governance that offer signs of optimism.[7] Domestic flights have resumed at Haiti's main international airport, though international flights are still suspended and the Federal

---

[1] The reporting period for this report is January 1, 2025, to September 30, 2025.
[2] *See Designation of Haiti for Temporary Protected Status*, 75 FR 3476 (Jan. 12, 2010).
[3] *See Termination of the Designation of Haiti for Temporary Protected Status*, 90 FR 28760 (Jul. 1, 2025).
[4] *Haitian Evangelical Clergy Ass'n v. Trump*, No. 25-cv-1464 (E.D.N.Y.) (July 15, 2025)
[5] UN News, Top United Nations Officials urge Swift Global Action as Haiti Nears Collapse (Jul. 2, 2025), available at https://press.un.org/en/2025/sc16111.doc.htm
[6] UN Security Council, Report of the Secretary-General on Haiti (Jun. 27, 2025,) available at https://digitallibrary.un.org/record/4084794/files/S_2025_418-EN.pdf
[7] Juhakenson Blaise, Haiti registers a whopping 6M voters amid mass displacements, officials say, The Haitian Times (Sep. 12, 2025), available at https://haitiantimes.com/2025/09/12/haiti-oni-registers-millions-voters/

HaitiTPSAR000182

Aviation Administration extended its ban on U.S. commercial flights to Port-au-Prince until March 2026.[8,9] Despite security-related challenges, the National Identification Office reported that 6.3 million Haitians of voting age are registered to vote in the upcoming 2026 elections, which will be the first the country has held since 2016. [10,11,12]

Beyond country conditions, also of critical importance is the consideration of visa overstays, fraud, and public safety threats in determining whether it is in the national interest for Haiti's Temporary Protected Status designation to be extended.

**Temporary Protected Status Designation Time Frames**:

- Initial Temporary Protected Status designation period: January 21, 2010, through July 22, 2011[13]
- Temporary Protected Status extension and new designation periods:
    - July 23, 2011, through January 22, 2013[14]
    - January 23, 2013, through July 22, 2014[15]
    - July 23, 2014, through January 22, 2016[16]
    - January 23, 2016, through July 22, 2017[17]
    - July 23, 2017, through January 22, 2018[18]
- TPS Recission (litigated after a separate district court judge ignored the clear language of INA 244): January 18, 2018[19]
- New designation of Haiti for Temporary Protected Status: August 3, 2021, through February 3, 2023[20]
- Temporary Protected Status extension and new designation periods:
    - February 4, 2023, through August 3, 2024[21]
    - August 4, 2024, through February 3, 2026[22]

---

[8] UN Security Council, Report of the Secretary-General on Haiti (Jun. 27, 2025,) available at https://digitallibrary.un.org/record/4084794/files/S_2025_418-EN.pdf

[9] AP News, FAA extends ban on US commercial flights to Haiti's capital because of risk from gangs (Sep. 8, 2025,) available at https://apnews.com/article/faa-ban-haiti-capital-commercial-flights-march-356bee7f9653220194b6fc65978f7de5

[10] Juhakenson Blaise, Haiti registers a whopping 6M voters amid mass displacements, officials say, The Haitian Times (Sep. 12, 2025), available at https://haitiantimes.com/2025/09/12/haiti-oni-registers-millions-voters/

[11] *Id.*

[12] *Id.*

[13] *See Designation of Haiti for Temporary Protected Status*, 75 FR 3476 (Jan. 12, 2010).

[14] *See Extension and Redesignation of Hait for Temporary Protected Status*, 76 FR 29000 (May 19, 2011).

[15] *See Extension of the Designation of Haiti for Temporary Protected Status,* 77 FR 59943 (Oct. 01,2012)

[16] *See Extension of the Designation of Haiti for Temporary Protected Status,* 79 FR 11808 (Mar. 3, 2014)

[17] *See Extension of the Designation of Haiti for Temporary Protected Status,* 80 FR 51582 (Aug. 25,2025)

[18] *See Extension of the Designation of Haiti for Temporary Protected Status,* 82 FR 23830 (May 24, 2017)

[19] Haiti is one of the countries with TPS litigation. As such, the rescission of the TPS designation in 2019 had not gone into effect prior to the redesignation in 2021. *See Termination of the Designation of Haiti for Temporary Protected Status*, 83 FR 2648 (Jan. 18, 2018).

[20] *See Designation of Haiti for Temporary Protected Status,* 86 FR 41863 (Aug. 3, 2021)

[21] *See Extension and Redesignation of Haiti for Temporary Protected Status,* 88 FR 5022 (Jan. 26, 2023)

[22] *See Extension and Redesignation of Haiti for Temporary Protected Status,* 89 FR 54484 (Jul. 1, 2024)

- Partial Vacatur of 2024 Temporary Protected Status Decision for Haiti to expire on August 3, 2025, instead of February 3, 2026[23]
- Termination of the Designation of Haiti for Temporary Protected Status effective September 2, 2025[24]

**Reason(s) for Initial Temporary Protected Status Designation for Haiti**:

Haiti was initially designated for Temporary Protected Status upon finding extraordinary and temporary conditions that prevented Haitian nationals (and aliens having no nationality who last habitually resided in Haiti) from returning safely.[25] Haiti's TPS designation was based on a variety of factors such as a natural disaster, destruction of critical infrastructure, and humanitarian challenges.[26]

**Historical Reason(s) for Extension and New Designation of Temporary Protected Status for Haiti**:

DHS extended and newly designated Haiti for Temporary Protected Status in 2011, 2013, 2014, 2016, and 2017.[27,28,29,30,31] According to the published notices, DHS determined there continued to be extraordinary and temporary conditions resulting from the effects of the January 2010 earthquake.

In 2018, DHS determined that the conditions for Haiti's designation on the basis of extraordinary and temporary conditions relating to the 2010 earthquake were no longer supported, which statutorily compelled the Secretary to terminate the designation.[32] While the termination of Haiti's Temporary Protected Status was challenged in the courts even though the statute prohibits judicial review, the Temporary Protected Status designation and related benefits remained.

In 2021, DHS newly designated Haiti for Temporary Protected Status based on extraordinary and temporary conditions, citing a deteriorating political crisis, violence, and human rights abuses.[33] DHS extended and newly designated Haiti for Temporary Protected Status again in 2023 and 2024 based on extraordinary and temporary conditions, citing similar reasoning and conditions to what was included in the 2021 designation.[34,35]

On July 1, 2025, DHS published the Secretary's determination that termination of Temporary

[23]*See Partial Vacatur of 2024 Temporary Protected Status Decision for Haiti,* 90 FR 10511 (Feb. 24, 2025)
[24] *See Termination of the Designation of Haiti for Temporary Protected Status,* 90 FR 28760, (Jul. 1, 2025)
[25] *See Designation of Haiti for Temporary Protected Status*, 75 FR 3476 (Jan. 12, 2010).
[26] *See Designation of Haiti for Temporary Protected Status*, 75 FR 3476 (Jan. 12, 2010).
[27] *See Extension and Redesignation of Haiti for Temporary Protected Status*, 76 FR 29000 (May 19, 2011).
[28] *See Designation of Haiti for Temporary Protected Status*, 77 FR 59943 (Oct. 1, 2012).
[29] *See Extension of the Re-Designation Period for Haiti Temporary Protected Status*, 79 FR 25141 (May 2, 2014).
[30] *See Extension* of the *Designation of Haiti for Temporary Protected Status*, 80 FR 51582 (Aug. 25, 2015).
[31] *See Extension of the Designation of Haiti for Temporary Protected Status*, 82 FR 23830 (May 24, 2017).
[32] *See Termination of the Designation of Haiti for Temporary Protected Status*, 83 FR 2648 (Jan. 18, 2018).
[33] *See Designation of Haiti for Temporary Protected Status*, 86 FR 41863 (Aug. 3, 2021).
[34] *See Extension and Redesignation of Haiti for Temporary Protected Status*, 88 FR 5022 (Jan. 26, 2023).
[35] *See Extension and Redesignation of Haiti for Temporary Protected Status*, 89 FR 54484 (Jul. 1, 2024).

HaitiTPSAR000184

Protected Status for Haiti is required because it is contrary to the national interest for Haitian nationals (or aliens having no nationality who last habitually resided in Haiti) to remain temporarily in the United States, effective September 2, 2025.[36] In July 2025, a final ruling established that the termination of Temporary Protected Status for Haiti would take effect no earlier than February 3, 2026.[37]

## I.   Extraordinary and Temporary Conditions

### 1.   *Has the foreign state continued to experience extraordinary and temporary conditions that prevent nationals of the state from returning to the state in safety?*

As discussed in Attachment B, Country of Origin Information Considerations, Haiti continues to experience challenges related to gang violence. Despite these concerns, Haiti has made important development gains in healthcare access through international humanitarian efforts to include safe drinking water and cholera treatment centers.[38,39] The United States has provided significant security assistance to Haiti, including $40 million for the Multinational Security Support mission and Haitian National Police, while the Haitian government has committed substantial investments to strengthen security, governance, and the judicial system.[40,41] In response to escalating gang violence, the U.N. Security Council authorized the transition of the Kenya-led Multinational Security Support mission into a Gang Suppression Force with expanded authority to counter criminal gangs, working alongside Haitian security forces.[42,43] Additionally, Haiti is preparing for its first general elections since 2016, scheduled for November 2025, and has proposed a new draft constitution aimed at restructuring governance and consolidating executive power.[44,45]

### 2.   *What are relevant national interest considerations for the TPS for Haiti designation?*

---

[36] *See Designation of Haiti for Temporary Protected Status*, 90 FR 28760 (Jul. 1, 2025).

[37] *Haitian Evangelical Clergy Ass'n v. Trump*, No. 25-cv-1464 (E.D.N.Y.) (July 15, 2025)

[38] Jacqueline Charles, UN directs $9 million in emergency funds to Haiti amid worsening humanitarian crisis, Miami Herald (Sep. 10, 2025), available at https://www.miamiherald.com/news/nation-world/world/americas/haiti/article312042903.html

[39] *See Designation of Haiti for Temporary Protected Status*, 90 FR 28760 (Jul. 1, 2025).

[40] Karla Rios,  Haiti in Crisis: Developments Related to the Multinational Security Support Mission, US Congressional Research Service: Foreign Affairs Division (Jun. 3, 2025), available at https://www.congress.gov/crs-product/IN12331

[41] Security Council, Haiti 'Running Out of Time', Delegate Warns Security Council, Noting Possible Fall of Capital to Gangs Cannot Be Allowed, United Nations (Apr. 21, 2025), available at https://press.un.org/en/2025/sc16047.doc.htm

[42] United Nations, Security Council Authorizes Transition of Multinational Security Support Mission in Haiti to 'Gang Suppression Force' (Sep. 30, 2025), available at https://press.un.org/en/2025/sc16185.doc.htm

[43] U.S. Department of State, On the Next Steps to Restoring Security in Haiti (Oct. 1, 2025), available at https://www.state.gov/releases/office-of-the-spokesperson/2025/10/on-the-next-steps-to-restoring-security-in-haiti/

[44] Sarah Morland, Haiti leader says long-awaited general elections penned for November, Jan. 25, 2025, Reuters, available at https://www.reuters.com/world/americas/haiti-leader-says-general-elections-planned-november-2025-01-29/

[45] Juhakenson Blaise, Haitians reject draft constitution over concerns of fragmentation and weakened democracy (Jun. 9, 2025), available at https://haitiantimes.com/2025/06/09/new-constitution-draft-rejection/

HaitiTPSAR000185

DHS records indicate some members of the Haiti Temporary Protected Status population have been under administrative investigation for risk to national security or public safety, or for attempting to obtain immigration benefits through fraud or misrepresentation.



As of September 9, 2025, Fraud Detection and National Security-Data System NexGen data also shows approximately 2,327 of the Haiti Temporary Protected Status population (including current beneficiaries and applicants with pending applications) has a record where fraud was found, 512 had a record which was investigated but fraud was not found, and 273 had a record which was inconclusive regarding fraud.[48] NextGen data also shows 865 aliens of the Haiti Temporary Protected Status population (including current beneficiaries and applicants with pending applications) had Public Safety records, of which 369 had Egregious Public Safety (EPS)[49] records, and 51 had National Security Related Information (NSRI) records.[50] This information should be taken into consideration when evaluating whether a Temporary Protected Status decision for Haiti aligns with the national interest of the United States.

**TPS as a Likely "Pull Factor" Driving Haiti's Irregular Migration to the U.S.**

Challenges such as poverty, chronic political instability, and devastating natural disasters have historically driven Haitian migration.[51] There is empirical evidence to suggest that Temporary Protected Status designations—particularly repeated new designations— contribute as a pull factor for illegal immigration, especially when combined with other factors, such as broader immigration policies or perceptions of leniency in enforcement.[52] As of 2022, approximately 731,000 Haitian immigrants resided in the United States, comprising the country's 15th largest

---

[48] USCIS Internal Data, Fraud Detection and National Security Directorate, FDNS-DS NexGen data, TPS Haiti, as of Sept. 9, 2025.

[49] The *Memorandum of Agreement Between USCIS and ICE Regarding the Referral of Immigration Benefit Fraud and Public Safety Cases,* Dec.2020 (USCIS-ICE MOA) defines an EPS case as one where an unlawful immigrant is under investigation or arrest or was convicted of certain criminal acts. These criminal acts include those defined in INA 101(a)(43) such as murder, rape, or sexual abuse of a minor, illicit trafficking of controlled substances, illicit trafficking in firearms or destructive devices, or crimes of violence with a penalty of at least 1 year.

[50] USCIS Internal Data, Fraud Detection and National Security Directorate, FDNS-DS NexGen data, TPS Haiti, as of Sept. 9, 2025.

[51] Diana Roy and Rocio Cara Labrador, Haiti's Troubled Path to Development, Council on Foreign Relations (Jun. 25, 2024), available at https://www.cfr.org/backgrounder/haitis-troubled-path-development

[52] Migration Policy Institute, Haitian Migration through the Americas: A Decade in the Making, (Sept. 30, 2021), https://www.migrationpolicy.org/article/haitian-migration-through-americas

5

foreign-born population.[53] This is particularly noteworthy since Haiti's population is 11.8 million, ranking 83rd in the world.[54,55] For several years, there has been a significant increase in the number of Haitians arriving in the United States unlawfully, particularly via land. U.S. authorities encountered Haitians at the U.S.-Mexico border approximately 53,900 times in Fiscal Year 2022 and more than 76,100 times in Fiscal Year 2023.[56] From 2019 through 2021, Haitians were the top nationality for migrants crossing the dangerous Darien Gap between Colombia and Panama, and they remained among the three largest groups in 2022 and 2023.[57] Additionally, the U.S. Coast Guard interdicted nearly 7,200 Haitians at sea in Fiscal Year 2022 and 5,100 in the first 11 months of Fiscal Year 2023, marking dramatic increases over previous years.[58] Since the beginning of Fiscal Year 2025, U.S. Coast Guard crews repatriated 603 aliens to Haiti, compared to 857 aliens to Haiti in Fiscal Year 2024.[59]

Unchecked surges of aliens into the United States counter the national interests of the United States, as they can perpetuate unsafe migration practices and challenge the integrity of the U.S. immigration system by overwhelming immigration officers and enforcement mechanisms.

**Recent Travel Trends**

As noted in the Presidential Proclamation titled *Restricting the Entry of Foreign Nationals to Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats*, (2025 Presidential Proclamation)[60] the United States suspends or restricts visa issuance and entry for nationals of certain countries, including Haiti, based on specific criteria.[61] Haiti's lack of a centralized authority capable of providing adequate law enforcement information and ensuring effective dissemination of such data has been identified as a key factor in these restrictions.[62] This deficiency raises concerns about the ability to verify if Haitian nationals pose risks to U.S. national security.

---

[53] Beatrice Dain & Jeanne Batalova, Haitian Immigrants in the United States, (Nov. 8, 2023), Migration Policy Institute, available at https://www.migrationpolicy.org/article/haitian-immigrants-united-states-2022
[54] CIA World Factbook, Haiti, Sept. 12, 2025, available at https://www.cia.gov/the-world-factbook/countries/haiti/#people-and-society
[55] Beatrice Dain & Jeanne Batalova, Haitian Immigrants in the United States, (Nov. 8, 2023), Migration Policy Institute, available at https://www.migrationpolicy.org/article/haitian-immigrants-united-states-2022
[56] Beatrice Dain & Jeanne Batalova, Haitian Immigrants in the United States, (Nov. 8, 2023), Migration Policy Institute, available at https://www.migrationpolicy.org/article/haitian-immigrants-united-states-2022
[57] Beatrice Dain & Jeanne Batalova, Haitian Immigrants in the United States, (Nov. 8, 2023), Migration Policy Institute, available at https://www.migrationpolicy.org/article/haitian-immigrants-united-states-2022
[58] Beatrice Dain & Jeanne Batalova, Haitian Immigrants in the United States, (Nov. 8, 2023), Migration Policy Institute, https://www.migrationpolicy.org/article/haitian-immigrants-united-states-2022
[59] U.S. Coast Guard News, Coast Guard repatriates 191 aliens to Haiti (Sept. 2, 2025), available at https://www.news.uscg.mil/Press-Releases/Article/4291448/coast-guard-repatriates-191-aliens-to-haiti/
[60] 90 Fed. Reg. 24497 (June 10, 2025).
[61] U.S. Embassy in Haiti, Immigrant Visas, available at https://ht.usembassy.gov/immigrant-visas/ (last visited Sep. 22, 2025)
[62] See Restricting the Entry of Foreign Nationals to Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats, 90 FR 24497 (June 10, 2025).

HaitiTPSAR000187

The number of Nonimmigrant Visas (NIVs) issued by the Department of State to Haitian nationals has decreased since Fiscal Year 2018.[63] In Fiscal Year 2018, the average monthly number of Nonimmigrant Visas issued to Haitian nationals was 2,370.[64] The number decreased to 1,865 in 2019, to 996 in 2020, and finally to 715 in 2021 before increasing to 1,190 in 2022.[65] From Fiscal Year 2022 to 2023, the average monthly NIV issuances again decreased to 880 and subsequently to 662 in 2024 before increasing again to 1,224 by May 2025.[66] Although there are significant fluctuations in the average number of NIV issuances across the past eight years, ultimately the average number of monthly NIV issuances has declined by more than 50%. This downward trend in NIV issuance could be attributed to several factors, for example, shifts in U.S. immigration policies including stricter visa eligibility requirements; operational disruptions such as staffing shortages, backlogs, or changes in consular operations; the COVID-19 pandemic could have played a significant role in the sharp decline particularly in 2020 and 2021 due to travel restrictions, embassy closures, and reduced demand for travel; economic and political instability may have influenced the demand for visas as well as the ability of certain Haitians to meet visa requirements; enhanced scrutiny or vetting measures to prevent visa fraud and misuse, etc. Without more definitive or conclusive evidence, it is difficult to assess the exact reason(s) for this decline.

DHS records indicate that among all Advance Parole Document requests made by Haitian nationals in the United States, the percentage applying for travel authorization to Haiti varies, with an average of 7% between 2019 and 2025.[67] While the overall percentage of the Haitian nonimmigrant population applying for Advanced Parole remains relatively small, there were notable spikes to 18.6% in 2022 and to 14.8% in 2025.[68] The 2025 increase may reflect improved conditions in Haiti, conditions otherwise necessitating travel, or other factors, such as individuals seeking lawful entry to facilitate other immigration benefits.

Furthermore, the 2025 Proclamation highlighted the need to address terrorism-related and public-safety risks, as well as concerns about nationals from certain countries overstaying their visas,

---

[63] US Department of State, Monthly Nonimmigrant Visa Issuance Statistics, https://travel.state.gov/content/travel/en/legal/visa-law0/visa-statistics/nonimmigrant-visa-statistics/monthly-nonimmigrant-visa-issuances.html (last updated May 2025), synthesized by USCIS Office of Policy and Strategy, as of Sept. 16, 2025
[64] US Department of State, Monthly Nonimmigrant Visa Issuance Statistics, https://travel.state.gov/content/travel/en/legal/visa-law0/visa-statistics/nonimmigrant-visa-statistics/monthly-nonimmigrant-visa-issuances.html (last updated May 2025), synthesized by USCIS Office of Policy and Strategy, as of Sept. 16, 2025
[65] US Department of State Monthly Nonimmigrant Visa Issuance Statistics, https://travel.state.gov/content/travel/en/legal/visa-law0/visa-statistics/nonimmigrant-visa-statistics/monthly-nonimmigrant-visa-issuances.html (last updated May 2025), synthesized by USCIS Office of Policy and Strategy, as of Sept. 16, 2025
[66] US Department of State Monthly Nonimmigrant Visa Issuance Statistics, https://travel.state.gov/content/travel/en/legal/visa-law0/visa-statistics/nonimmigrant-visa-statistics/monthly-nonimmigrant-visa-issuances.html (last updated May 2025), synthesized by USCIS Office of Policy and Strategy, as of Sept. 16, 2025
[67] USCIS Internal Data, Office of Performance and Quality, U.S. Citizenship and Immigration Services
[68] USCIS Internal Data, Office of Performance and Quality, U.S. Citizenship and Immigration Services

which could strain immigration and law enforcement resources.[69] Overstaying the terms of the nonimmigrant visa is a violation of U.S. immigration laws and presents challenges for immigration enforcement and resource allocation. Visa overstaying diverts resources from other critical enforcement priorities, such as addressing illegal border crossings. President Trump imposed conditional restrictions and limitations on the entry of certain foreign nationals from 19 countries, including Haiti.[70] According to the Fiscal Year 2024 Department of Homeland Security Entry/Exit Overstay Report, Haiti had a Non-Visa Waiver Program Countries Business or Pleasure Visitors (B-1/B-2) visa overstay rate of 24.84% and a Student and Exchange Visitors (F, M, J) visa overstay rate of 22.35%.[71] These figures significantly exceed the global average overstay rates of 2.33% for B-1/B-2 visas and 3.23% for F, M, J visas – over ten times higher for business or pleasure visitors and over six times higher for student and exchange visitors.[72] Haiti's visa overstay rates consistently remain very high compared to other nations, reflecting ongoing challenges in compliance with U.S. visa regulations. Elevated overstay rates present potential risks to U.S. national security and public safety, as individuals who overstay their visas may be harder to locate and monitor, increasing vulnerabilities within immigration enforcement systems.

## II. Additional Considerations

This section highlights certain incremental improvements in Haiti's governance and current conditions.

### Safety and Security

On February 6, 2025, Secretary of State Rubio stated that the United States "will continue to support [a Multinational Security Support mission in Haiti]" and that he had issued a waiver to allow approximately $40 million of security assistance to flow to that mission and the Haitian National Police amid the Trump Administration's foreign assistance "pause."[73] In March 2025, the Haitian Government announced a historic investment to strengthen security and governance, including 236 million USD for the national police, 5.35 million USD for strategic equipment, and 33.6 million USD for the modernizing the armed forces.[74] The initiatives seek to restore authority, protect citizens, ensure justice, counter impunity, revitalize the judicial system, and

---

[69] See Restricting the Entry of Foreign Nationals to Protect the United States From Foreign Terrorists and Other National Security and Public Safety Threats, 90 FR 24497 (June 10, 2025).

[70] Id.

[71] U.S. Customs and Border Protection, Entry/Exit Overstay Report, Department of Homeland Security (Jul. 16, 2025), available at https://www.dhs.gov/sites/default/files/2025-08/25_0826_cbp_entry-exit-overstay-report-fiscal-year-2024.pdf.

[72] U.S. Customs and Border Protection, Entry/Exit Overstay Report, Department of Homeland Security (Jul. 16, 2025), available at https://www.dhs.gov/sites/default/files/2025-08/25_0826_cbp_entry-exit-overstay-report-fiscal-year-2024.pdf.

[73] Karla Rios, Haiti in Crisis: Developments Related to the Multinational Security Support Mission, US Congressional Research Service: Foreign Affairs Division (Jun. 3, 2025), available at https://www.congress.gov/crs-product/IN12331

[74] Meetings Coverage Security Council, Haiti 'Running Out of Time', Delegate Warns Security Council, Noting Possible Fall of Capital to Gangs Cannot Be Allowed, United Nations (Apr. 21, 2025), available at https://press.un.org/en/2025/sc16047.doc.htm

restore trust in public institutions.[75]

In November 2024, gang violence forced the temporary closure of Haiti's main international airport for a second time that year.[76,77] While the airport reopened to commercial flights in December, domestic flights did not resume until June 2025.[78] The resumption of domestic flights marks a rare success in Haiti's fight against gangs that control at least 85% of Port-au-Prince.[79] International flights have still not resumed and the Federal Aviation Administration is extending its ban on U.S. commercial flights to Port-au-Prince until March 2026.[80,81]

In May 2025, the Trump Administration designated the Viv Ansanm gang coalition and Gran Grif gang as Foreign Terrorist Organizations and Specially Designated Global Terrorists.[82] During Senate testimony, Secretary Rubio proposed that the Organization of American States take a larger role in Haiti, potentially coordinating a security mission, while emphasizing that the Multinational Security Support alone is insufficient.[83] The Administration expressed readiness to support the Organization of American States but stressed the importance of regional partner cooperation.[84]

In August 2025, the United States proposed a significant shift in the ongoing effort to help Haiti wrestle back territory from criminal armed gangs by rebranding the current Kenya-led Multinational Security Support mission into a more aggressive Gang Suppression Force with a new mandate, more police and expanded autonomy from the Haitian police.[85] The United States

---

[75] Meetings Coverage Security Council, Haiti 'Running Out of Time', Delegate Warns Security Council, Noting Possible Fall of Capital to Gangs Cannot Be Allowed, United Nations (Apr. 21, 2025), available at https://press.un.org/en/2025/sc16047.doc.htm

[76] Danica Coto, Haiti's main airport reopens nearly 3 months after gang violence forced it closed, (May 20, 2024), AP News, https://apnews.com/article/haiti-airport-reopening-portauprince-gangs-violence

[77] Evens Sanon & Megan Jenetsky, Haiti's main airport shuts down as gang violence surges and a new prime minister is sworn in, (Nov. 11, 2024), AP News, available at https://apnews.com/article/haiti-airport-gang-violence

[78] Evens Sanon, Haiti's first domestic flight takes off since gangs halted commercial air travel last year, AP News (Jun. 12, 2025), available at https://apnews.com/article/haiti-airport-flight-reopens-first-gangs

[79] Evens Sanon, Haiti's first domestic flight takes off since gangs halted commercial air travel last year, AP News (Jun. 12, 2025), available at https://apnews.com/article/haiti-airport-flight-reopens-first-gangs

[80] UN Security Council, Report of the Secretary-General on Haiti (Jun. 27, 2025,) available at https://digitallibrary.un.org/record/4084794/files/S_2025_418-EN.pdf

[81] AP News, FAA extends ban on US commercial flights to Haiti's capital because of risk from gangs (Sep. 8, 2025,) available at https://apnews.com/article/faa-ban-haiti-capital-commercial-flights-march-356bee7f9653220194b6fc65978f7de5

[82] Karla Rios, Haiti in Crisis: Developments Related to the Multinational Security Support Mission, US Congressional Research Service: Foreign Affairs Division (Jun. 3, 2025), available at https://www.congress.gov/crs-product/IN12331

[83] Karla Rios, Haiti in Crisis: Developments Related to the Multinational Security Support Mission, US Congressional Research Service: Foreign Affairs Division (Jun. 3, 2025), available at https://www.congress.gov/crs-product/IN12331

[84] Karla Rios, Haiti in Crisis: Developments Related to the Multinational Security Support Mission, US Congressional Research Service: Foreign Affairs Division (Jun. 3, 2025), available at https://www.congress.gov/crs-product/IN12331

[85] Jacqueline Charles, 'Gang Suppression Force' to replace Haiti's Kenya-led mission under U.S. proposal, Miami Herald, (Aug. 31, 2025), available at https://www.miamiherald.com/news/nation-world/world/americas/haiti/article311889116.html

HaitiTPSAR000190

and Panama are proposing a United Nations Security Council resolution to expand the Kenya-led multinational force in Haiti into a 5,550-member force with authority to detain gang members, aiming to address escalating violence.[86] The draft resolution expresses appreciation towards Kenya but emphasizes the need for a larger force due to the rapid growth of gang activity.[87] In September 2025, the United Nations Security Council authorized the transition of the Multinational Security Support mission to a Gang Suppression Force for an initial period of 12 months.[88,89] The Gang Suppression Force is expected to work together with the Haitian National Police and Armed Forces to counter gangs that threaten the civilian population and undermine Haitian institutions.[90]

**National Governance**

Elections for roles in the federal government are expected to unfold in three stages, starting in November 2025 and culminating in a presidential race in February 2026.[91] General elections are due to be held in Haiti on November 15, 2025, the first elections held in the country since 2016.[92,93] The National Identification Office reported that 6.3 million Haitians of voting age are registered to vote in the upcoming 2026 elections.[94]

Haiti's latest draft constitution was submitted on May 21, 2025 to the Transitional Presidential Council (CPT) by the Steering Committee of the National Conference.[95] Key changes proposed in the draft include: the elimination of local managerial structures— Communal Section Administrative Council (CASEC) and the Assembly of the Communal Section (ASEC)— in favor of elected departmental governors who serve for five-year terms (with the possibility of

---

[86] Edith M. Lederer, US and Panama propose new force of 5,550 in Haiti with the power to detain gang suspect, Associated Press (Sep. 4, 2025), available at https://apnews.com/article/un-haiti-kenya-panama-1255acdacddbf8dff502c19e9695aac4

[87] Edith M. Lederer, US and Panama propose new force of 5,550 in Haiti with the power to detain gang suspect, Associated Press (Sep. 4, 2025), available at https://apnews.com/article/un-haiti-kenya-panama-1255acdacddbf8dff502c19e9695aac4

[88] United Nations, Security Council Authorizes Transition of Multinational Security Support Mission in Haiti to 'Gang Suppression Force' (Sep. 30, 2025), available at https://press.un.org/en/2025/sc16185.doc.htm

[89] U.S. Department of State, On the Next Steps to Restoring Security in Haiti (Oct. 1, 2025), available at https://www.state.gov/releases/office-of-the-spokesperson/2025/10/on-the-next-steps-to-restoring-security-in-haiti/

[90] United Nations, Security Council Authorizes Transition of Multinational Security Support Mission in Haiti to 'Gang Suppression Force' (Sep. 30, 2025), available at https://press.un.org/en/2025/sc16185.doc.htm

[91] Al Jazeera, Haiti names new head of transitional council ahead of scheduled elections (Aug. 7, 2025), available at https://www.aljazeera.com/news/2025/8/7/haiti-names-new-head-of-transitional-council-ahead-of-scheduled-elections

[92] Sarah Morland, Haiti leader says long-awaited general elections penned for November, (Jan. 25, 2025), Reuters, available at https://www.reuters.com/world/americas/haiti-leader-says-general-elections-planned-november-2025-01-29/

[93] Juhakenson Blaise, Haiti registers a whopping 6M voters amid mass displacements, officials say, The Haitian Times (Sep. 12, 2025), available at https://haitiantimes.com/2025/09/12/haiti-oni-registers-millions-voters/

[94] Juhakenson Blaise, Haiti registers a whopping 6M voters amid mass displacements, officials say, The Haitian Times (Sep. 12, 2025), available at https://haitiantimes.com/2025/09/12/haiti-oni-registers-millions-voters/

[95] Juhakenson Blaise, Haitians reject draft constitution over concerns of fragmentation and weakened democracy The Haitian Times, (Jun. 9, 2025), available at https://haitiantimes.com/2025/06/09/new-constitution-draft-rejection/

HaitiTPSAR000191

reelection), the consolidation of executive power under the president,  and the prioritization of Haitian citizenship for individuals holding public office.[96]

The transitional presidential council is considered to be widely unpopular, and its nine members have been rotating into the leadership position.[97] In August 2025, Laurent Saint-Cyr was named as the head of the transitional council ahead of the elections.[98] He is meant to be the final head of the council before it completes its task of holding a presidential election in February 2026.[99] At that point, Saint-Cyr and the council are expected to hand off power to the election's victor.[100]

**Access to Healthcare**

While it is arguable that access to healthcare is not directly pertinent to the statutory consideration of whether extraordinary and temporary conditions are present that prevent nationals from returning in safety, because access to healthcare was considered by the prior Administration as a basis for establishing a new TPS designation, USCIS OP&S has reviewed conditions surrounding access to healthcare. There have been noticeable incremental improvements in international humanitarian efforts to increase access to healthcare in Haiti. The United Nations (UN) announced $9 million in emergency funds to Haiti to help the UN and its partners step up life-saving support to the most vulnerable, including those who have fled their homes and host communities in the Center and Artibonite regions.[101] L'Hôpital Universitaire La Paix in Port-au-Prince is the only public hospital functioning in a capital largely controlled armed gangs.[102,103]

In April 2025, UNICEF has reached more than 8,500 displaced individuals and members of the host community through multisectoral interventions, including safe drinking water distribution via water-trucking and provision of household water treatment products; free primary health care, deworming, and vaccination through mobile clinics; sensitization and behavior change

---

[96] Juhakenson Blaise, Haitians reject draft constitution over concerns of fragmentation and weakened democracy The Haitian Times, (Jun. 9, 2025), available at https://haitiantimes.com/2025/06/09/new-constitution-draft-rejection/
[97] Al Jazeera, Haiti names new head of transitional council ahead of scheduled elections (Aug. 7, 2025), available at https://www.aljazeera.com/news/2025/8/7/haiti-names-new-head-of-transitional-council-ahead-of-scheduled-elections
[98] Al Jazeera, Haiti names new head of transitional council ahead of scheduled elections (Aug. 7, 2025), available at https://www.aljazeera.com/news/2025/8/7/haiti-names-new-head-of-transitional-council-ahead-of-scheduled-elections
[99] Al Jazeera, Haiti names new head of transitional council ahead of scheduled elections (Aug. 7, 2025), available at https://www.aljazeera.com/news/2025/8/7/haiti-names-new-head-of-transitional-council-ahead-of-scheduled-elections
[100] Al Jazeera, Haiti names new head of transitional council ahead of scheduled elections (Aug. 7, 2025), available at https://www.aljazeera.com/news/2025/8/7/haiti-names-new-head-of-transitional-council-ahead-of-scheduled-elections
[101] Jacqueline Charles, UN directs $9 million in emergency funds to Haiti amid worsening humanitarian crisis, Miami Herald (Sep. 10, 2025), available at https://www.miamiherald.com/news/nation-world/world/americas/haiti/article312042903.html
[102] Jacqueline Charles, UN directs $9 million in emergency funds to Haiti amid worsening humanitarian crisis, Miami Herald (Sep. 10, 2025), https://www.miamiherald.com/news/nation-world/world/americas/haiti/article312042903.html
[103] Jacqueline Charles, UN directs $9 million in emergency funds to Haiti amid worsening humanitarian crisis, Miami Herald (Sep. 10, 2025),  https://www.miamiherald.com/news/nation-world/world/americas/haiti/article312042903.html

activities to prevent malnutrition; as well as educational plans, recreational activities, and psychosocial support for children.[104]

Although the number of suspected cholera cases in Haiti have declined nationwide, cholera continues to affect displaced and host communities in Haiti.[105,106] Out of the 3,077 suspected cases of cholera reported from December 29, 2024 to September 13, 2025, 92 cases were confirmed through culture testing.[107] As part of a strategy of early detection and rapid response, nearly 87 surveillance officers and 13 data managers from the Pan-American Health Organization[108] have been trained to deploy and identify suspected cholera cases since the beginning of 2025.[109] The Pan-American Health Organization has helped to establish a new cholera treatment center and provided training on cholera case management and infection control for six existing cholera treatment centers.[110] Beyond treatment, community awareness sessions on disease prevention have reached 7,000 people and were accompanied by the distribution of mosquito nets, water purification tablets, and oral rehydration solution packets.[111]

**International Intervention and Resilience Building**

Relatedly, in March 2025, the World Bank released a plan to make approximately US$320 million in grant financing available with the aim of building resilience among Haiti's most vulnerable.[112] It will do so by strengthening economic governance and creating employment opportunities, maintaining essential institutional capacity for the provision of basic service delivery, and preserving human capital to increase resilience to natural disasters and shocks.[113]

---

[104] UNICEF, Haiti Humanitarian Flash Update No. 2 (May 2025), available at https://www.unicef.org/documents/haiti-humanitarian-situation-report-no-5-may-2025 (last visited Oct. 12, 2025)

[105] UN WHO Pan American Health Organization, Hope amid hardship: Battling cholera in Haiti's displacement camps (Aug. 2025), available at https://www.paho.org/en/stories/hope-amid-hardship-battling-cholera-haitis-displacement-camps

[106] IciHaiti, Cholera present in IDP camps (Sep. 26, 2025), available at https://www.icihaiti.com/en/news-45859-icihaiti-health-cholera-present-in-idp-camps.html

[107] Pan American Health Organization, PAHO – Health Cluster Situation Report No. 26. Humanitarian Situation in Haiti. 13 September 2025, WHO (Sep. 23, 2025), available at https://www.paho.org/en/documents/paho-health-cluster-situation-report-no26-humanitarian-situation-haiti-13-september-2025

[108] The Pan American Health Organization (PAHO) is the specialized international health agency for the Americas and also serves as Regional Office for the Americas of the World Health Organization (WHO), the specialized health agency of the United Nations. *See* PAHO, "Who We Are" https://www.paho.org/en/who-we-are.

[109] UN WHO Pan American Health Organization, Hope amid hardship: Battling cholera in Haiti's displacement camps (Aug. 2025), available at https://www.paho.org/en/stories/hope-amid-hardship-battling-cholera-haitis-displacement-camps

[110] UN WHO Pan American Health Organization, Hope amid hardship: Battling cholera in Haiti's displacement camps (Aug. 2025), available at https://www.paho.org/en/stories/hope-amid-hardship-battling-cholera-haitis-displacement-camps

[111] UN WHO Pan American Health Organization, Hope amid hardship: Battling cholera in Haiti's displacement camps (Aug. 2025), available at https://www.paho.org/en/stories/hope-amid-hardship-battling-cholera-haitis-displacement-camps

[112] Joanne Clark, World Bank to invest US$320 million to support Haiti, Caribbean National Weekly (Mar. 7, 2025), available at https://www.caribbeannationalweekly.com/news/world-bank-to-invest-us320-million-to-support-haiti/

[113] Joanne Clark, World Bank to invest US$320 million to support Haiti, Caribbean National Weekly (Mar. 7, 2025), available at https://www.caribbeannationalweekly.com/news/world-bank-to-invest-us320-million-to-support-haiti/

HaitiTPSAR000193

**Justice System**

Between March and May 2025, the UN Integrated Office in Haiti and the Office of the UN High Commissioner for Human Rights provided support to the jurisdictions of Croix-des-Bouquets and Les Cayes for holding criminal hearings without jury assistance to address prolonged pretrial detention.[114] As a result, 132 defendants were prosecuted for serious criminal offences, including rape, murder, criminal conspiracy and the unlawful possession and trafficking of firearms.[115]

From April to June 2025, the UN Integrated Office in Haiti and UN Office on Drugs and Crime conducted a series of capacity-building activities to enhance the skills of over 300 law enforcement officials, magistrates, lawyers and civil servants.[116] In cooperation with UN Integrated Office in Haiti, the UN Office on Drugs and Crime also facilitated digital skills training for 90 officials.[117]

In April 2025, national authorities published a decree establishing specialized judicial units to investigate, prosecute, and adjudicate complex financial crimes and mass crimes, including cases of sexual violence.[118] In June 2025, the UN Integrated Office in Haiti supported training by the bar of Port-au-Prince for 150 lawyers to engage effectively with the specialized units.[119]

In May 2025, the Minister of Justice and Public Security announced the government's plan to build three new prisons in the Centre, North, and South departments, in line with international standards.[120] These infrastructures aim to reduce prison overcrowding and improve detention conditions, while strengthening prison security in the light of the attacks perpetrated by gangs on several prisons in the country.[121]

---

[114] UN Security Council, Report of the Secretary-General on Haiti. (Jun. 27, 2025), available at https://digitallibrary.un.org/record/4084794/files/S_2025_418-EN.pdf

[115] UN Security Council, Report of the Secretary-General on Haiti. (Jun. 27, 2025), available at https://digitallibrary.un.org/record/4084794/files/S_2025_418-EN.pdf

[116] UN Security Council, Report of the Secretary-General on Haiti (Jun. 27, 2025), available at https://digitallibrary.un.org/record/4084794/files/S_2025_418-EN.pdf

[117] UN Security Council, Report of the Secretary-General on Haiti (Jun. 27, 2025), available at https://digitallibrary.un.org/record/4084794/files/S_2025_418-EN.pdf

[118] UN Security Council, Report of the Secretary-General on Haiti (Jun. 27, 2025), available at https://digitallibrary.un.org/record/4084794/files/S_2025_418-EN.pdf

[119] UN Security Council, Report of the Secretary-General on Haiti (Jun. 27, 2025), available at https://digitallibrary.un.org/record/4084794/files/S_2025_418-EN.pdf

[120] UN, Quarterly Report on the Human Rights Situation in Haiti (Aug. 1, 2025), available at http://binuh.unmissions.org/en/quarterly-report-human-rights-situation-haiti-april-%E2%80%93-june-2025

[121] UN, Quarterly Report on the Human Rights Situation in Haiti (Aug. 1, 2025), available at http://binuh.unmissions.org/en/quarterly-report-human-rights-situation-haiti-april-%E2%80%93-june-2025

HaitiTPSAR000194

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director*
Camp Springs, MD 20588-0009



U.S. Citizenship
and Immigration
Services

**October 29, 2025**

**DECISION**

MEMORANDUM FOR THE SECRETARY

FROM:          Joseph B. Edlow
               Director

SUBJECT:       **Decision Memorandum on the Termination of Temporary Protected
               Status Designation for Haiti**

HaitiTPSAR000195



HaitiTPSAR000196



HaitiTPSAR000197



HaitiTPSAR000198



HaitiTPSAR000199



[redacted]

HaitiTPSAR000201

HaitiTPSAR000202



HaitiTPSAR000203

HaitiTPSAR000204



HaitiTPSAR000205



**Secretary's Decision:**

1. _Terminate_: *Terminate Haiti's designation*

   Specify the Effective Date of the Termination (if other than recommended): _____

   Approve/date _____ 11-19-25

HaitiTPSAR000206



**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
Refugee, Asylum and International Operations Directorate
5900 Capital Gateway Drive
Camp Springs, MD 20529

# Haiti: Temporary Protected Status (TPS) Country of Origin Information (COI) Considerations Addendum[1]

- **Foreign Terrorist Organization Designation**: On May 2, 2025, the United States Department of State announced the designation of Viv Ansanm and Gran Grif as Foreign Terrorist Organizations (FTOs), effective May 5, 2025.[2] According to the Department of State, "[t]he groups provide a unified platform for criminal groups to use violence to destabilize Haiti and quash actions aimed at restoring state control."[3]

- **State of Emergency**: On August 9, 2025, Haiti's transitional government declared a three-month state of emergency for the "West, Artibonite and Center departments," in response to insecurity and food shortages.[4]

- **Gangs exert "near-total control" of Port-au-Prince**: In a briefing to the United Nations Security Council on July 2, 2025, Ghada Waly, the executive director of the United Nations Office on Drugs and Crime, reported that "organized criminal groups have gained near-total control of the capital, with an estimated 90 per cent of Port-au-Prince under their grip, while they continue expanding across strategic routes and border

---

[1] The addendum covers the period from March 20, 2025 to September 3, 2025.
[2] Department of State, Foreign Terrorist Organization Designations of Viv Ansanm and Gran Grif, 90 Fed. Reg. 19065, May 5, 2025, available at: https://www.federalregister.gov/documents/2025/05/05/2025-07464/foreign-terrorist-organization-designations-of-viv-ansanm-and-gran-grif.
[3] Designation of Viv Ansanm and Gran Grif, Department of State Office of the Spokesperson, May 2, 2025, available at: https://www.state.gov/designation-of-viv-ansanm-and-gran-grif/.
[4] Haiti declares a 3-month state of emergency as gangs ravage country's central region, The Associated Press, Aug. 9, 2025, available at: https://apnews.com/article/haiti-state-of-emergency-gangs-west-artibonite-5afeb9b859928436eaf4c362fbb91489.

regions."[5] Between April and June 2025, gangs "ransacked, burned, or destroyed" schools, health centers, and private homes, among other buildings.[6]

➢ **Gangs expanded territorial control outside of Port-au-Prince**: According to the United Nations Integrated Office in Haiti, as of July 2025, "the gangs appear to be pursuing a strategic objective of establishing a presence in localities along key roadways crossing the Centre and Artibonite departments, particularly with the aim of controlling routes that connect the capital to the northern regions and to the border with the Dominican Republic, in the east of the country."[7]

➢ **Drone Strikes**: Haiti's transitional government hired foreign contractors to conduct drone strikes against alleged gang strongholds.[8] The strikes began in March 2025.[9] There are concerns about the harm that these strikes may have already caused to civilians.[10] The United Nations Integrated Office in Haiti reported that, between April and June 2025, "814 people were killed, and 449 others were injured during security forces operations, 36% of them by explosive drones. 15% of victims during these operations were not associated with gangs."[11]

---

[5] UN Security Council Briefing on the Situation in Haiti, United Nations Office on Drugs and Crime, Jul. 2, 2025, available at: https://www.unodc.org/unodc/en/speeches/2025/020725-unsc-briefing-haiti.html.

[6] Quarterly Report on the Human Rights Situation in Haiti April – June 2025, United Nations Integrated Office in Haiti, Aug. 1, 2025, p.15, available at: https://binuh.unmissions.org/sites/default/files/quarterly_report_on_the_human_rights_situation_in_haiti_april_-_june_2025.pdf.

[7] Intensification of Criminal Violence in Lower Artibonite, The Center Department, and Regions Located East of the Metropolitan Area of Port-au-Prince, United Nations Integrated Office in Haiti, July 2025, p.4, available at: https://www.ohchr.org/sites/default/files/2025-07/2025-july-artibonite-and-mirebalais-EN.pdf.

[8] Henry Shuldiner, Drone Strikes Shake Haiti's Gangs but Leave Legal and Strategic Questions, InSight Crime, Jun. 24, 2025, available at: https://insightcrime.org/news/drone-strikes-shake-haiti-gangs-leave-legal-strategic-questions/.

[9] Henry Shuldiner, Drone Strikes Shake Haiti's Gangs but Leave Legal and Strategic Questions, InSight Crime, Jun. 24, 2025, available at: https://insightcrime.org/news/drone-strikes-shake-haiti-gangs-leave-legal-strategic-questions/.

[10] Henry Shuldiner, Drone Strikes Shake Haiti's Gangs but Leave Legal and Strategic Questions, InSight Crime, Jun. 24, 2025, available at: https://insightcrime.org/news/drone-strikes-shake-haiti-gangs-leave-legal-strategic-questions/.

[11] Quarterly Report on the Human Rights Situation in Haiti April – June 2025, United Nations Integrated Office in Haiti, Aug. 1, 2025, p.3, available at: https://binuh.unmissions.org/sites/default/files/quarterly_report_on_the_human_rights_situation_in_haiti_april_-_june_2025.pdf.

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
Refugee, Asylum and International Operations Directorate
5900 Capital Gateway Drive
Camp Springs, MD 20588



**U.S. Citizenship and Immigration Services**

# Haiti: Temporary Protected Status (TPS) Country of Origin Information (COI) Considerations[1]

## Overview

According to InSight Crime, the security situation in Haiti has deteriorated since the 2021 assassination of President Jovenel Moïse, with Haitian security forces "plagued by corruption, ineffectiveness, ties to gangs, chronic understaffing, poor training, and underfunding."[2] The International Crisis Group reported in February 2025 that "a violent siege of Haiti's capital in early 2024 triggered the creation of a transitional government and the eventual arrival of a Kenyan-led mission to help counter the gang threat. But infighting has paralysed the government, empowered the gangs and made it unlikely that planned elections can come off safely."[3]

## Political Considerations

Haiti has not had a "functioning legislature since January 2020, and there are no remaining elected officials."[4] In March 2024, de facto Prime Minister Ariel Henry "agreed to resign after a transitional council was formed."[5] The Transitional Presidential Council (TPC), a nine-person council tasked with naming a new prime minister and cabinet, was "announced in a decree" on April 12, 2024.[6] Members were sworn in on April 25, 2024.[7] The transitional council is set to

---

[1] This report covers the reporting period of February 1, 2024 to March 20, 2025, and also includes information from April-May 2025 related to the designation of Viv Ansanm and Gran Grif as foreign terrorist organizations.

[2] Haiti, InSight Crime, Feb. 6, 2025, available at: https://insightcrime.org/haiti-organized-crime-news/haiti/.

[3] Locked in Transition: Politics and Violence in Haiti, International Crisis Group, Feb. 19, 2025, available at: https://www.crisisgroup.org/latin-america-caribbean/caribbean/haiti/107-locked-transition-politics-and-violence-haiti.

[4] Carla Y. Davis-Castro, Latin America and the Caribbean: Fact Sheet on Leaders and Elections, Congressional Research Service Product, Feb. 21. 2025, available at: https://www.congress.gov/crs-product/98-684?q=%7B%22search%22%3A%22Haiti%22%7D&s=2&r=2.

[5] Carla Y. Davis-Castro, Latin America and the Caribbean: Fact Sheet on Leaders and Elections, Congressional Research Service, February 21. 2025, available at: https://www.congress.gov/crs-product/98-684?q=%7B%22search%22%3A%22Haiti%22%7D&s=2&r=2.

[6] Evens Sanon and Dánica Coto, Transitional council in Haiti to choose new leaders is formally established amid gang violence, The Associated Press, Apr. 12, 2024, available at: https://apnews.com/article/haiti-transitional-council-gang-violence-86ae6d010d0fba2a5742ec82ec05ac25.

[7] Carla Y. Davis-Castro, Latin America and the Caribbean: Fact Sheet on Leaders and Elections, Congressional Research Service, February 21. 2025, available at: https://www.congress.gov/crs-product/98-684?q=%7B%22search%22%3A%22Haiti%22%7D&s=2&r=2.

expire on February 7, 2026.[8] The Transitional Presidential Council's responsibilities reportedly included "clearing the way for Henry's replacement, welcoming the Kenya-led Multinational Security Support mission and steering the country toward elections and constitutional reform this year so a new president can take office by Feb. 7, 2026."[9]

Haiti's government has been "plagued with political infighting."[10] The country had three different prime ministers in 2024.[11] Ariel Henry, the prime minister who had held the position since the death of Jovenel Moïse, stepped down in April 2024 after being prevented from returning to Haiti by armed groups following a visit to Kenya to discuss the deployment of an international peace keeping force.[12] Garry Conille, the first prime minister chosen by the Transitional Presidential Council, was sworn in on June 3, 2024.[13] The Transitional Presidential Council appointed Alix Didier Fils-Aime as Prime Minister on October 11, 2024,[14] "amid worsening violence and alleged power struggles between Conille and the TPC [Transitional Presidential Council]."[15]

The legitimacy of the Transitional Presidential Council has been challenged by "corruption allegations,"[16] leaving the council "teetering on the brink of collapse."[17] The *Miami Herald* stated in January 2025 that the Transitional Presidential Council "has been engulfed in a bribery scandal involving three of its seven voting members. The allegations, which came to light in July [2024], have raised doubts about whether the embattled transitional government can survive and prepare the ground for credible elections."[18]

---

[8] Carla Y. Davis-Castro, Latin America and the Caribbean: Fact Sheet on Leaders and Elections, Congressional Research Service, February 21. 2025, available at: https://www.congress.gov/crs-product/98-684?q=%7B%22search%22%3A%22Haiti%22%7D&s=2&r=2.

[9] Jacqueline Charles, Some Haiti leaders seek to reconfigure political transition panel amid bribery scandal, The Miami Herald, Jan. 8, 2025, available at: https://www.miamiherald.com/news/nation-world/world/americas/haiti/article298196483.html.

[10] Frances Robles, Haiti's Many Problems and Very Few Solutions, Explained, The New York Times, Nov. 17, 2024, available at: https://www.nytimes.com/2024/11/17/world/americas/haiti-problems-gangs-crimes.html.

[11] Frances Robles, Haiti's Many Problems and Very Few Solutions, Explained, The New York Times, Nov. 17, 2024, available at: https://www.nytimes.com/2024/11/17/world/americas/haiti-problems-gangs-crimes.html.

[12] Dánica Coto, With fear and hope, Haiti warily welcomes new governing council as gang-ravaged country seeks peace, The Associated Press, Apr. 25, 2024, available at: https://apnews.com/article/haiti-ariel-lhenry-resigns-violence-gangs-government-22868c51b5f4c9ca5a8d69fcb5df376b .

[13] Carla Y. Davis-Castro, Latin America and the Caribbean: Fact Sheet on Leaders and Elections, Congressional Research Service, Feb. 21, 2025, available at: https://www.congress.gov/crs-product/98-684?q=%7B%22search%22%3A%22Haiti%22%7D&s=2&r=2.

[14] Carla Y. Davis-Castro, Latin America and the Caribbean: Fact Sheet on Leaders and Elections, Congressional Research Service, Feb. 21. 2025, available at: https://www.congress.gov/crs-product/98-684?q=%7B%22search%22%3A%22Haiti%22%7D&s=2&r=2.

[15] Karla I. Rios, Haiti in Crisis: What Role for a Multinational Security Support Mission? Congressional Research Service, Updated Dec. 27, 2024, pg. 2, available at: https://www.congress.gov/crs-product/IN12331.

[16] Karla I. Rios, Haiti in Crisis: What Role for a Multinational Security Support Mission? Congressional Research Service, Updated Dec. 27, 2024, pg. 2, available at: https://www.congress.gov/crs-product/IN12331.

[17] Jose Flécher, Haiti's costly presidential council on brink of collapse amid deepening corruption scandal, The Haitian Times, Oct. 15, 2024, available at: https://haitiantimes.com/2024/10/15/haiti-presidency-the-presidential-council-verge-implosion/.

[18] Jacqueline Charles, Some Haiti leaders seek to reconfigure political transition panel amid bribery scandal, The Miami Herald, Jan. 8, 2025, available at: https://www.miamiherald.com/news/nation-world/world/americas/haiti/article298196483.html.

**Security Considerations**

As of March 6, 2025, "the security situation remains extremely volatile in Haiti."[19] The International Crisis Group reported in February 2025 that gang violence in Haiti has "continued unabated."[20] In its 2024 Homicide Round-Up, InSight Crime reported that homicides in Haiti had increased 51.6% in 2024, from a rate of 40.9 homicides per 100,000 people in 2023 to 62 homicides per 100,000 people in 2024.[21]

Armed groups "have tightened their grip on much of Port-au-Prince, with the multinational security mission making little headway and transitional authorities mired in internal disputes."[22] The United Nations reported in April 2024 that there were "150 to 200 armed groups" active in Haiti.[23] Congressional Research Service stated that "some local sources suggest the number of criminal groups is closer to 750, including self-defense groups."[24] Some of these criminal groups have organized into two larger gang alliances, known as the G9 and Family[25] and the G-Pèp.[26] Those two groups "have been rivals for years, battling for control of neighbourhoods in Port-au-Prince. Both groups have been accused of mass killings and sexual violence in areas under their authority, as well as in districts they want to take over."[27]

In September 2023, the G9 and the G-Pèp[28] joined with other gangs to create "a new alliance called Viv Ansanm" (Living Together).[29] In October 2024, Armed Conflict Location and Event Data reported on the Viv Ansanm coalition:

> This coalition, which brought together the main gang factions operating in Port-au-Prince — G-9 and G-Pèp — pledged to protect civilians and called on the population living in gang-controlled neighborhoods to resume their daily activities, which are often disrupted by gang conflicts. […] However, the coordinated Viv

[19] Haiti travel advice, Government of Canada, last updated Mar. 6, 2025, available at: https://travel.gc.ca/destinations/haiti.

[20] Crisis Watch February 2025, International Crisis Group, Feb. 2025, available at: https://www.crisisgroup.org/crisiswatch/february-trends-and-march-alerts-2025#haiti.

[21] Marina Cavalari, et al, InSight Crime's 2024 Homicide Round-Up, InSight Crime, Feb. 26, 2025, available at: https://insightcrime.org/news/insight-crime-2024-homicide-round-up/.

[22] Locked in Transition: Politics and Violence in Haiti, International Crisis Group, Feb. 19, 2025, available at: https://www.crisisgroup.org/latin-america-caribbean/caribbean/haiti/107-locked-transition-politics-and-violence-haiti.

[23] Haiti: Gangs have 'more firepower than the police', UN News, Apr. 4, 2024, available at: https://news.un.org/en/story/2024/04/1148231.

[24] Clare Ribando Seelke and Karla I. Rios, Haiti: Recent Developments and U.S. Policy, Congressional Research Service, Feb. 1, 2024, available at: https://crsreports.congress.gov/product/pdf/R/R47394.

[25] G9 and Family is at times also referred to as "G9 Family and Allies", or simply "G9."

[26] Haiti, InSight Crime, Feb. 6, 2025, available at: https://insightcrime.org/haiti-organized-crime-news/haiti/.

[27] Jillian Kestler-D'Amours, Who are Haiti's gangs and what do they want? All you need to know, Al Jazeera, Mar. 13, 2024, available at: https://www.aljazeera.com/news/2024/3/13/who-are-haitis-gangs-and-what-do-they-want-all-you-need-to-know.

[28] Some sources refer to the criminal group as "G-PEP," while others refer to it as G-Pèp.

[29] Sandra Pellegrini, Viv Ansanm: Living together, fighting united – the alliance reshaping Haiti's gangland, Armed Conflict Location and Event Data, Oct. 16, 2024, available at: https://acleddata.com/2024/10/16/viv-ansanm-living-together-fighting-united-the-alliance-reshaping-haitis-gangland/.

Ansanm incursions launched on state institutions on 29 February, which aimed to force Prime Minister Ariel Henry to resign, marked a turning point and demonstrated the coalition's ability to adapt, negotiate, and work cohesively toward shared goals. This series of attacks led to Henry announcing on 11 March that he would resign. […] Furthermore, the attacks came amid advanced negotiations on the deployment of the Kenya-led Multinational Security Support (MSS) mission, created to stabilize the country's security. Gangs have perceived the MSS mission as an emerging threat, prompting them to join forces and adapt their operations in the lead-up to the troops' deployment.

A year after going public, the Viv Ansanm alliance has altered Haiti's conflict landscape. The truce among previously warring gangs has led to a notable decrease in fighting, especially after the alliance consolidated with the February incursions. This allowed them to concentrate on revenue-generating activities, widen their reach to a larger number of areas, and counter security operations.[30]

Throughout 2024, "criminal groups united under the 'Viv Ansanm' coalition intensified large-scale and coordinated attacks that brought the country to a standstill from February to May, and from October to the present [January 2025]."[31] Criminal groups controlled around 85% of Port-au-Prince, Haiti's capital and largest city, as of November 2024.[32] Furthermore, criminal groups "have rapidly expanded into previously secure areas of Port-au-Prince, as well as key regions such as the Ouest and Artibonite departments, Haiti's agricultural hub. Many of these groups have alleged ties to police officers and political and economic elites."[33] In May 2025, the U.S. Department of State issued a statement that Viv Ansanm, as well as Gran Grif – the largest gang in Artibonite department – "provide a unified platform for criminal groups to use violence to destabilize Haiti and quash actions aimed at restoring state control."[34] As a result, the Department of State designated Viv Ansanm and Gran Grif as foreign terrorist organizations under section 219 of the Immigration and Nationality Act, effective May 5, 2025.[35]

*The Haitian National Police & the Multinational Security Support Mission*

As of March 2024, the Haitian National Police (HNP) was viewed as "underequipped, understaffed and low on morale after years of institutional degradation despite international

---

[30] Sandra Pellegrini, Viv Ansanm: Living together, fighting united – the alliance reshaping Haiti's gangland, Armed Conflict Location and Event Data, Oct. 16, 2024, available at: https://acleddata.com/2024/10/16/viv-ansanm-living-together-fighting-united-the-alliance-reshaping-haitis-gangland/.

[31] World Report 2025 – Haiti, Human Rights Watch, Jan. 16, 2025, available at: https://www.ecoi.net/en/document/2120084.html.

[32] Conor Lennon, As violent gangs extend control in Haiti, UN commits to staying the course, United Nations News, Nov. 21, 2024, available at: https://news.un.org/en/story/2024/11/1157246 .

[33] World Report 2025 – Haiti, Human Rights Watch, Jan. 16, 2025, available at: https://www.ecoi.net/en/document/2120084.html.

[34] Department of State, Fact Sheet, Designation of Viv Ansanm and Gran Grif, May 2, 2025, available at: https://www.state.gov/designation-of-viv-ansanm-and-gran-grif/.

[35] Department of State, Foreign Terrorist Organization Designations of Viv Ansanm and Gran Grif, 90 Fed. Reg. 19065, May 5, 2025, available at: https://www.federalregister.gov/documents/2025/05/05/2025-07464/foreign-terrorist-organization-designations-of-viv-ansanm-and-gran-grif.

support."[36] The Congressional Research Service has noted that the Haitian National Police is not only weak but "at times allegedly complicit with criminal groups."[37] A February 2024 report by the Global Initiative Against Transnational Organized Crime stated that "several sources close to the [ Haitian National Police] also reported deep internal conflicts within the force, notably due to established or presumed complicities between some officers and armed groups or vigilante groups."[38]

The Multinational Security Support mission, an international force led by Kenya, was deployed to Haiti in June 2024 "to provide security for critical infrastructure and operational support to the HNP [Haitian National Police]."[39] As of February 7, 2025, *The Haitian Times* reported that "the total number of MSS [Multinational Security Support] members has reached 1,003. The multinational force includes police and military officers from Kenya, Jamaica, Belize, the Bahamas, Guatemala, and El Salvador."[40]

The Multinational Security Support "has done little to oppose the gangs amid shortages in staff and funding, and uncertain political backing," according to InSight Crime.[41] In a January 2025 article, *The Haitian Times* stated that "a lack of funding prevents the MSS [Multinational Security Support] from completing its deployment target of 2,500 forces and obtaining the logistical and operational materials, particularly maritime and aerial equipment"[42] Furthermore, "many continue to question whether the mission has any kind of oversight or accountability structure."[43] Despite these setbacks, the United Nations Security Council renewed the mission's mandate through October 2, 2025.[44]

### Return to Haiti

In March 2025, the International Organization for Migration released its assessment of circumstances surrounding people who have been returned to Haiti in 2024, stating:

---

[36] Nicolás Devia-Valbuena, et al, How to Avert a Gang Takeover of Haiti, United States Institute of Peace, Mar. 7, 2024, available at: https://www.usip.org/publications/2024/03/how-avert-gang-takeover-haiti.

[37] Karla I. Rios, Haiti in Crisis: What Role for a Multinational Security Support Mission? Congressional Research Service, Updated Dec. 27, 2024, pg. 2, available at: https://www.congress.gov/crs-product/IN12331.

[38] Romain Le Cour Grandmaison, et al, A Critical Moment: Haiti's Gang Crisis and International Responses, Global Initiative Against Transnational Organized Crime, Feb. 2024, pg. 21, available at: https://globalinitiative.net/wp-content/uploads/2024/02/Romain-Le-Cour-Grandmaison-Ana-Paula-Oliveira-and-Matt-Herbert-A-critical-moment-Haitis-gang-crisis-and-international-responses-GI-TOC-February-2024.pdf.

[39] Karla I. Rios, Haiti in Crisis: What Role for a Multinational Security Support Mission? Congressional Research Service, Updated Dec. 27, 2024, pg. 2, available at: https://www.congress.gov/crs-product/IN12331.

[40] Juhakenson Blaise, 144 Kenyan officers, Salvadoran helicopters, and U.S. support bolster Haiti security efforts, The Haitian Times, Feb. 7, 2025, available at: https://haitiantimes.com/2025/02/07/144-kenyan-police-officers-join-haiti-mss/.

[41] Haiti, InSight Crime, Feb. 6, 2025, available at: https://insightcrime.org/haiti-organized-crime-news/haiti/.

[42] Juhakenson Blaise, Key takeaways from Haiti's multinational mission: progress, setbacks, and future challenges, The Haitian Times, Jan. 8, 2025, available at: https://haitiantimes.com/2025/01/08/key-takeaways-from-haiti-multinational-mission/.

[43] Juhakenson Blaise, Key takeaways from Haiti's multinational mission: progress, setbacks, and future challenges, The Haitian Times, Jan. 8, 2025, available at: https://haitiantimes.com/2025/01/08/key-takeaways-from-haiti-multinational-mission/.

[44] Resolution 2751 (2024), United Nations Security Council, Sep. 30, 2024, pg. 1, available at: https://docs.un.org/en/S/Res/2751(2024).

Deportations of Haitians to Haiti remain one of the country's main migration dynamics. Many Haitians attempt to leave the country through regular or irregular pathways for various reasons. Those who take irregular routes not only risk their lives but are often deported back to Haiti by destination or transit countries. In 2024, nearly 200,000 people were deported to Haiti from various countries. Many had spent months or even years abroad and face significant challenges reintegrating into their communities. The security and socio-economic situation in Haiti further complicates this process. As a result, even after being deported, many attempt to leave again - sometimes multiple times - through irregular migration routes. […]

The vast majority (93%) of deported individuals planned to return to their home or stay with relatives after deportation. Only 1% were unsure of where they would go upon arrival in Haiti. Transportation to areas of origin was the most frequently immediate need mentioned by deported [Haitians] (84%), followed by food (71%) and a place to stay overnight before continuing their journey (38%). […]

In most cases, individuals who had experienced deportation in the past were deported by the same country that deported them at the time of the interviews, indicating repeated attempts to migrate to the same destination.[45]

### Freedom of Movement

In its 2023 annual report on human rights, released in April 2024, the U.S. Department of State discussed freedom of movement in Haiti:

The law provided for freedom of internal movement, foreign travel, emigration, and repatriation, and the government generally respected these rights. The government's capacity to ensure the freedom of internal movement and repatriations was weakened by gang violence in the capital.[46]

Gang violence had "expanded into previously unaffected regions" and "kidnappings for ransom by armed gangs increased and affected all parts of society."[47] In addition, the United States Department of State reported that:

armed gangs were also responsible for conflicts resulting in killings, brutal attacks on citizens, targeted instances of sexual violence, mutilation of human remains, widespread displacement, and the destruction of homes and property. […]

---

[45] Haitians deported to Haiti: Profiles, migration experience and intentions of Haitians deported in 2024, International Organization for Migration, Mar. 17, 2025, pg. 4-22, available at: https://reliefweb.int/report/haiti/haitians-deported-haiti-profiles-migration-experience-and-intentions-haitians-deported-2024.

[46] 2023 Country Reports on Human Rights Practices: Haiti, U.S. Department. of State, Apr. 23, 2024, available at: https://www.ecoi.net/en/document/2107721.html.

[47] 2023 Country Reports on Human Rights Practices: Haiti, U.S. Departmentt. of State, Apr. 23, 2024, available at: https://www.ecoi.net/en/document/2107721.html.

> Intergang clashes and generalized gang violence caused widespread displacement throughout the metropolitan area of Port-au-Prince. […] In gang-controlled neighborhoods and areas where gangs were active, gang members destroyed homes, property, and vehicles; killed and injured neighborhood residents; and limited economic opportunities. As a result, residents of these neighborhoods left their homes to shelter with family and friends in surrounding areas or in informal reception centers.
>
> The government had extremely limited capacity to address the needs of IDPs [internally displaced persons] […] External partners and donors, in partnership with the Haitian General Directorate for Civil Protection, provided most of the humanitarian assistance to survivors and IDPs [internally displaced persons].[48]

On March 18, 2025, the International Organization for Migration noted that more than 60,000 people were displaced in Port-au-Prince in the preceding month, and that more than one million people were displaced in Haiti overall.[49] Human Rights Watch reported in its 2025 World Report (covering events of 2024) that the total number of displaced people "is more than double the 2022 figure, making Haiti the country with the highest global displacements per capita, due to crime-related violence."[50]

A March 2025 report by the United States Institute of Peace noted that "as armed groups extend their control into new territories […] major roads are impassable."[51] United Nations News quoted independent security expert Robbert Muggah regarding control of roadways around Port-au-Prince by gangs in an April 2024 article:

> [T]wo rival factions joined forces "in coordinated attacks" targeting the airport, the National Palace, the National Theatre, hospitals, schools, police stations, customs offices and ports, "effectively forcing their will and expanding their territory", he explained.
>
> "Gangs are in fact controlling very strategic areas of the capital and the main roads connecting Port-au-Prince to the ports and to the land borders as well as coastal towns and areas, where we see a lot of the trafficking happening," Mr. Muggah said.[52]

---

[48] 2023 Country Reports on Human Rights Practices: Haiti, U.S. Department. of State, Apr. 23, 2024, available at: https://www.ecoi.net/en/document/2107721.html.

[49] Violence Triggers Record Displacements in Port-au-Prince: Over 60,000 People in a Month, International Organization for Migration, Mar. 18, 2025, available at: https://www.iom.int/news/violence-triggers-record-displacements-port-au-prince-over-60000-people-month.

[50] World Report 2025 – Haiti, Human Rights Watch, Jan. 16, 2025, available at: https://www.ecoi.net/en/document/2120084.html.

[51] Kirk Randolph, et al, How to Break Gangs' Grip on Haiti, United States Institute of Peace, Mar. 13, 2025, available at: https://www.usip.org/publications/2025/03/how-break-gangs-grip-haiti.

[52] Haiti: Gangs have 'more firepower than the police', United Nations News, Apr. 4, 2024, available at: https://news.un.org/en/story/2024/04/1148231.

## Economy

As of November 2024, the World Bank reported that "Haiti remains the poorest country in Latin America and the Caribbean and among the poorest countries in the world."[53] According to the World Bank, Haiti's "economy contracted for five consecutive years by 1.7% in 2019, 3.3% in 2020, 1.8% in 2021, 1.7% in 2022, and 1.9 percent in 2023. Gross Domestic Product is estimated to have contracted for a sixth year by 4.2% in 2024 behind the backdrop of gang violence."[54]

## Infrastructure

International Organization for Migration stated in its 2025 Haiti Crisis Response plan that "since September 2022, the situation [in Haiti] has worsened, with gangs expanding their control and carrying out brutal attacks on critical infrastructure in Port-au-Prince, including schools, hospitals, and police stations."[55] According to InSight Crime, the Viv Ansanm alliance "has given the gangs a platform to sow political chaos by launching coordinated attacks against critical infrastructure, including airports, seaports, government buildings, and prisons. Repeated attacks on key infrastructure have paralyzed the capital city, derailing efforts to restore order."[56]

Haiti's infrastructure has endured damage from natural disasters as well, as Haiti is "one of the most vulnerable countries worldwide to natural hazards, mainly hurricanes, floods, and earthquakes," according to the World Bank Group.[57] Congressional Research Services reported in February 2024 that "inadequate recovery efforts" following the 2010 earthquake, "combined with subsequent natural disasters (e.g., Hurricane Matthew, a 2021 earthquake) and disease outbreaks (e.g., cholera, Coronavirus Disease 2019 [COVID-19]), have further weakened the state's ability to protect and provide for its citizens."[58] According to REACH: Informing More Effective Humanitarian Action, a humanitarian initiative supported in part by the United Nations, "a significant escalation of violence and political turmoil in 2024 further eroded critical services and institutions, including the country's health system and water infrastructure."[59]

In February 2025, the International Federation of Red Cross and Red Crescent Societies provided more details on the status of health infrastructure in Haiti:

---

[53] The World Bank in Haiti, World Bank Group, Nov. 6, 2024, available at: https://www.worldbank.org/en/country/haiti/overview.
[54] The World Bank in Haiti, World Bank Group, Nov. 6, 2024, available at: https://www.worldbank.org/en/country/haiti/overview.
[55] Haiti Crisis Response Plan 2025, UN International Organization for Migration (IOM), Dec. 17, 2024, available at: https://crisisresponse.iom.int/response/haiti-crisis-response-plan-2025.
[56] Haiti, InSight Crime, Feb. 6, 2025, available at: https://insightcrime.org/haiti-organized-crime-news/haiti/.
[57] The World Bank in Haiti, World Bank Group, Nov. 6, 2024, available at: https://www.worldbank.org/en/country/haiti/overview.
[58] Clare Ribando Seelke and Karla I. Rios, Haiti: Recent Developments and U.S. Policy, Congressional Research Service, Feb. 1, 2024, available at: https://crsreports.congress.gov/product/pdf/R/R47394.
[59] Haiti: A Deepening Public Health Crisis – January 2025, REACH, Feb. 6, 2025, available at: https://repository.impact-initiatives.org/document/impact/effec060/REACH_GLO_-Public-Health-Brief-Haiti_February-2025.pdf.

Hospitals, often caught in the crossfire of clashes between armed coalitions, are operating at best in slow motion. Staff are unable to get to their workplaces, and sick people are reluctant to seek treatment for fear of being hit by stray bullets or kidnapped. The elderly and disabled remain vulnerable to serious illness and abuse. And in general, the crisis is having an impact on the mental health of the affected populations. Several health facilities, such as the Médecins Sans Frontières hospital in Cité Soleil and Tabarre, the Albert Schweitzer hospital (Artibonite) and the Mirebalais University hospital (Centre), were targeted by gangs, forcing them to close temporarily. In the department of Artibonite, a quarter of health establishments report problems of physical access to health infrastructures, for both patients and staff, due to insecurity. Between January and August 2023, at least 40 doctors were kidnapped in Haiti. Even when health infrastructures do exist and function, they remain insufficient to provide the basic care required by those who desperately need it. When it comes to health needs, people living in remote areas don't often seek medical care, and only go to hospital as a last resort, when it's often too late. As a result, pregnant women, nursing mothers and young girls living in areas affected by insecurity must struggle daily to access services essential to their health, well-being, and survival.[60]

In January 2025, Médecins Sans Frontières (Doctors Without Borders) also described limited access to health infrastructure, like hospitals, in Haiti's capital:

Health care services in Port-au-Prince are under severe pressure. The main hospital, L'Hôpital de l'Université d'État d'Haïti, is currently inoperable and situated within one of the conflict zones. Other hospitals are facing similar challenges or are overwhelmed with casualties, limiting their ability to accept new patients. Even MSF's [Médecins Sans Frontières'] Tabarre Hospital, which specializes in trauma and burn care, is often at capacity, forcing it to focus only on the most severely wounded patients. Last year, in May alone, more than 30 medical centers and hospitals shut their doors—including L'Hôpital de l'Université d'État d'Haïti—due to vandalism, looting, or being located in insecure areas.

In addition to those wounded in the violence, people with chronic illnesses, such as tuberculosis and the human immunodeficiency virus , are at high risk due to the lack of access to medical services and lifesaving medications. Unsanitary conditions in displacement sites have spread across Port-au-Prince, heightening the risk of waterborne diseases like cholera.[61]

---

[60] Haiti Earthquake and Cholera Emergency Appeal (MDRHT018)-Final Report, International Federation of Red Cross and Red Crescent Societies, Feb. 13, 2025, available at: https://reliefweb.int/report/haiti/haiti-earthquake-and-cholera-emergency-appeal-mdrht018-final-report.
[61] Crisis in Haiti: What to know, Médecins Sans Frontières, Jan. 23, 2025, available at: https://www.doctorswithoutborders.org/latest/crisis-haiti-what-know.

**Tourism**

The Department of State's most recent travel advisory for Haiti, issued in September 2024, classified Haiti as Level 4: Do Not Travel on its travel advisory scale, "due to kidnapping, crime, civil unrest, and limited health care."[62] Furthermore, the advisory stated:

> Since March 2024, Haiti has been under a State of Emergency. Crimes involving firearms are common in Haiti. They include robbery, carjackings, sexual assault, and kidnappings for ransom. Kidnapping is widespread, and U.S. [United States] citizens have been victims and have been hurt or killed. Kidnappers may plan carefully or target victims at random, unplanned times. Kidnappers will even target and attack convoys. Kidnapping cases often involve ransom requests. Victims' families have paid thousands of dollars to rescue their family members.
>
> Protests, demonstrations, and roadblocks are common and unpredictable. They often damage or destroy infrastructure and can become violent. Mob killings and assaults by the public have increased, including targeting those suspected of committing crimes.
>
> The airport in Port-au-Prince can be a focal point for armed activity. Armed robberies are common. Carjackers attack private vehicles stuck in traffic. They often target lone drivers, especially women. As a result, the U.S. embassy requires its staff to use official transportation to and from the airport.
>
> Do not cross the border by land between Haiti and the Dominican Republic due to the threat of kidnapping and violence. These dangers are present on roads from major Haitian cities to the border. The UnitedStates embassy cannot help you enter the Dominican Republic by air, land, or sea. U.S. citizens who cross into the Dominican Republic at an unofficial crossing may face high immigration fines if they try to leave. The U.S. Coast Guard has concerns about security in the ports of Haiti. Until those are addressed, the Coast Guard advises mariners and passengers traveling through the ports of Haiti to exercise caution.
>
> The U.S. government is very limited in its ability to help United States citizens in Haiti. Local police and other first responders often lack the resources to respond to emergencies or serious crime. Shortages of gasoline, electricity, medicine, and medical supplies are common throughout the country. Public and private medical clinics and hospitals often lack trained staff and basic resources. In addition, they require prepayment for services in cash.[63]

The Canadian government's Haiti travel advice website, current as of March 6, 2025, warned travelers to "avoid all travel to Haiti due to the threat posed by kidnappings, gang violence and

[62] Haiti Travel Advisory, U.S. Department of State, Sep. 18, 2024, available at: https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/haiti-travel-advisory.html.
[63] Haiti Travel Advisory, U.S. Department of State, Sep. 18, 2024, available at: https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/haiti-travel-advisory.html.

the potential for civil unrest throughout the country."[64] Regarding air travel, the same advisory noted that the "Toussaint-Louverture airport in Port-au-Prince has reopened although with limited operations. Most airlines have suspended their flights to and from Port-au-Prince until further notice."[65] The Dominican Republic had closed its air, land, and sea borders with Haiti as of March 5, 2025.[66]

Dominican Today, an online English-language news outlet based in the Dominican Republic, reported on the tourism industry in Haiti in December 2024:

> Haiti's ongoing crisis has severely impacted essential sectors such as health, education, and the economy, with tourism among the hardest hit. Insecurity and government inaction have paralyzed the industry, leaving the Ministry of Tourism unable to present a 2024 activity report. Violence and limited access to key destinations have hindered data collection and planning, further exacerbating the decline in visitor arrivals and the government's ability to devise recovery strategies.[67]

On March 11, 2025, the U.S. Federal Aviation Administration extended "prohibitions barring United States flights to the Haitian capital, Port-au-Prince, through September 8, citing risks from armed gangs to civil aviation."[68] In 2024, the main airport in Port-au-Prince closed for nearly three months[69] beginning in March,[70] and again for one month beginning in November, due to violence.[71]

### Food and Health Considerations

According to Human Rights Watch, "coordinated attacks" by the Viv Ansanm coalition have "severely impacted public services, including electricity, water supply, sanitation, health care, education, and transportation, significantly restricting access to essential goods."[72] Human Rights Watch further reported:

> Half of Haiti's population struggled daily to afford food, giving the country one of the highest rates of acute food insecurity in the world. Killings and kidnappings by criminal groups increased, with a weak state response and an ineffectual justice

---

[64] Haiti travel advice, Government of Canada, Mar. 6, 2025, available at: https://travel.gc.ca/destinations/haiti.

[65] Haiti travel advice, Government of Canada, Mar. 6, 2025, available at: https://travel.gc.ca/destinations/haiti.

[66] Haiti travel advice, Government of Canada, Mar. 6, 2025, available at: https://travel.gc.ca/destinations/haiti.

[67] Insecurity stalls Haiti's tourism growth in 2024, Dominican Today, Dec. 31, 2024, available at: https://dominicantoday.com/dr/tourism/2024/12/31/insecurity-stalls-haitis-tourism-growth-in-2024/.

[68] FAA extends ban on U.S. flights to Port-au-Prince through Sept. 8, Reuters, Mar. 11, 2025, available at: https://www.nbcnews.com/news/world/faa-extends-bar-us-flights-port-au-prince-september-8-rcna195888.

[69] Haiti airport reopens after weeks of gang violence, British Broadcasting Company News, May 20, 2024, available at: https://www.bbc.com/news/articles/cndd394p7n2o.

[70] Security Alert: U.S. Embassy Port-au-Prince, Haiti (March 18, 2024), U.S. Embassy in Haiti, Mar. 18, 2024, available at: https://ht.usembassy.gov/security-alert-u-s-embassy-port-au-prince-haiti-march-18-2024/.

[71] Caitlin Stephen Hu, et al, FAA grounds all US flights to Haiti after three planes were struck by gunfire, Central News Network, Nov. 12, 2024, available at: https://www.cnn.com/2024/11/11/americas/haiti-spirit-airlines-jetblue-intl-latam/index.html .

[72] World Report 2025 – Haiti, Human Rights Watch, Jan. 16, 2025, available at: https://www.ecoi.net/en/document/2120084.html.

system. Sexual violence became widespread, with survivors having minimal access to health services and a near-absence of justice. Rising hunger and extreme poverty have forced children to join criminal groups, where they face abuse, including sexual exploitation.[73]

Only 40 percent of Haitians had access to electricity, but intermittently and at high prices. Forty-five percent of the population lacks access to clean drinking water, and 7 out of 10 people do not have access to an improved sanitation system, aggravating the spread of cholera.[74]

*Food Insecurity*

The World Food Programme reported in January 2025 that Haiti "has one of the world's highest levels of chronic food insecurity, with over half its total population chronically food insecure and 22 percent chronically malnourished children."[75] In addition, the World Food Programme stated that:

> The latest Integrated Food Security Phase Classification (IPC) of August 2024 shows that half of the population, or 5.4 million people, are food insecure (IPC3+). In addition, 2 million people are in IPC 4 (Emergency), and 6,000 in IPC 5 (Catastrophe), for the second time in Haiti and in the region since the beginning of these analyses. Compared to the September 2023 analysis, there has been an increase of 600,000 people in IPC4. The key drivers remained increased violence, limited access to food, rising prices, and climatic shocks.[76]

*Cholera*

On March 11, 2025, Médecins Sans Frontières reported that "150 Haitians were treated for cholera between Feb. 15 and March 6 [2025]," and that cholera "was on the rise in Haiti."[77]

In February 2025, the International Federation of Red Cross and Red Crescent Societies provided statistics on the previous major cholera outbreak that began in 2022, and noted difficulties with underreporting:

[73] World Report 2025 – Haiti, Human Rights Watch, Jan. 16, 2025, available at: https://www.ecoi.net/en/document/2120084.html.
[74] World Report 2025 – Haiti, Human Rights Watch, Jan. 16, 2025, available at: https://www.ecoi.net/en/document/2120084.html.
[75] WFP Haiti Country Brief January 2025, World Food Programme, Jan. 30, 2025, pg. 1, available at: https://docs.wfp.org/api/documents/WFP-0000164786/download/?_ga=2.187891944.1783373056.1741817299-675931106.1741817299.
[76] WFP Haiti Country Brief January 2025, World Food Programme, Jan. 30, 2025, pg. 1, available at: https://docs.wfp.org/api/documents/WFP-0000164786/download/?_ga=2.187891944.1783373056.1741817299-675931106.1741817299 .
[77] Wilner Bossou, VOA Creole: MSF reports 150 new cholera cases in Haiti, Voice of America, Mar. 11, 2025, available at: https://www.voanews.com/a/voa-creole-msf-reports-150-new-cholera-cases-in-haiti-/8007305.html .

One year since the declaration of the Cholera outbreak, according to the epidemiological report published by the Ministry of Public Health on 31 January 2024, a total of 79,411 suspect cases had been reported with 4,608 confirmed cases, a total of 75,160 cases were hospitalized, and 1,172 deaths. Suspected cholera cases that were initially concentrated in certain areas of the capital are recorded in all 10 departments of the country, the majority still in the West (52 percent) although the growth rate is higher in the other nine departments. […] The number of cholera cases is underreported and underestimated as the capacity of the epidemiological surveillance system to detect suspected cases is still considered weak and confirmation of cases minimal, due to the lack of resources and the difficulty in transporting the samples to the laboratories due to lack of fuel and the presence of roadblocks by armed gangs which hamper access.[78]

---

[78] Haiti Earthquake and Cholera Emergency Appeal (MDRHT018)-Final Report, International Federation of Red Cross and Red Crescent Societies, Feb. 13, 2025, available at: https://reliefweb.int/report/haiti/haiti-earthquake-and-cholera-emergency-appeal-mdrht018-final-report .

PRE-DECISIONAL/DELIBERATIVE

**Attachment A - Temporary Protected Status (TPS) Legal Authority**

Pursuant to section 244(b)(1) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1254a(b)(1), the Secretary of Homeland Security, after consultation with appropriate agencies of the Government, may designate a foreign state (or part thereof) for TPS. The Secretary may then grant TPS to eligible nationals of that foreign state (or in the case of an alien having no nationality who last habitually resided in that state). INA § 244(b)(1) sets forth three possible bases on which the Secretary may designate a foreign state for TPS:

- Ongoing armed conflict in the foreign state and, due to such conflict, requiring the return of aliens who are nationals of that state would pose a serious threat to their personal safety;
- An earthquake, flood, drought, epidemic, or other environmental disaster in a foreign state has resulted in a substantial, but temporary, disruption of living conditions in the area affected, the foreign state is unable to handle adequately the return of aliens who are nationals of the state, *and* the foreign state has officially requested TPS designation; or
- Extraordinary and temporary conditions exist in the foreign state that prevent nationals of the state from returning in safety, unless the Secretary finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.

An initial TPS designation is at the discretion of the Secretary but may not be less than 6 months or exceed 18 months. INA § 244(b)(2).

At least 60 days before the expiration of a TPS designation, the Secretary, after consultation with appropriate agencies of the Government, shall review the conditions in a foreign state designated for TPS to determine whether the conditions for the TPS designation continue to be met and, if so, the length of an extension of the TPS designation (6-, 12-, or 18- months). *See* INA § 244(b)(3)(A). If the Secretary determines that the foreign state no longer meets the conditions for the TPS designation, she or he must terminate the designation. *See* INA § 244(b)(3)(B). Although the Secretary must make her or his determination on extension or termination at least 60 days before the expiration of the TPS designation, publication of the required *Federal Register* notice announcing the decision must be "on a timely basis." INA § 244(b)(3)(A). If the Secretary does not make a decision under INA § 244(b)(3)(A) that the foreign state no longer meets the conditions for designation, there is an automatic, minimum six-month extension of a country's TPS designation.
*See* INA § 244(b)(3)(C).

After the Secretary designates a country for TPS, nationals of the country (and persons without nationality who last habitually resided in the country) may apply for TPS, but they must individually demonstrate their eligibility pursuant to the criteria established in INA § 244(c) and the TPS regulations at 8 CFR § 244.1 *et seq*. These criteria include, but are not limited to, requirements that the applicant show continuous physical presence in the United States since the effective date of the country designation and continuous residence since such date as the Secretary determines; admissibility as an immigrant (with limited exceptions); that the applicant

PRE-DECISIONAL/DELIBERATIVE

HaitiTPSAR000222

PRE-DECISIONAL/DELIBERATIVE

Attachment A: TPS Legal Authority
Page 2

is not ineligible under certain mandatory criminal history, terrorism, and national security bars as specified in INA § 244(c)(2)(A)-(B); and that the applicant is registering for TPS in accordance with regulatory procedures in 8 CFR §§ 244.2–244.9.

If granted TPS, the alien receives employment authorization and an Employment Authorization Document, if requested, that is valid for the duration of the TPS designation. TPS is a temporary benefit that does not, by itself, provide aliens with a basis for seeking lawful permanent resident (LPR) status or any other immigration status. However, receipt of TPS benefits will not bar an otherwise eligible alien from adjusting to LPR status or acquiring another lawful immigration status. When a TPS country's designation ends, TPS beneficiaries return to the same immigration status, if any, that they held prior to TPS (unless that status has expired or been terminated) or any other status they may have acquired while registered for TPS.

PRE-DECISIONAL/DELIBERATIVE

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
Refugee, Asylum and International Operations Directorate
Research & TRIG Division, Research Branch
5900 Capital Gateway Drive
Camp Springs, MD 20588



## Haiti: Temporary Protected Status (TPS) Country of Origin Information (COI) Considerations[1]

### Overview

According to InSight Crime, the security situation in Haiti has deteriorated since the 2021 assassination of President Jovenel Moïse, with Haitian security forces "plagued by corruption, ineffectiveness, ties to gangs, chronic understaffing, poor training, and underfunding."[2] The International Crisis Group reported in February 2025 that "a violent siege of Haiti's capital in early 2024 triggered the creation of a transitional government and the eventual arrival of a Kenyan-led mission to help counter the gang threat. But infighting has paralysed the government, empowered the gangs and made it unlikely that planned elections can come off safely."[3]

### Political Considerations

Haiti has not had a "functioning legislature since January 2020, and there are no remaining elected officials."[4] In March 2024, de facto Prime Minister Ariel Henry "agreed to resign after a transitional council was formed."[5] The Transitional Presidential Council (TPC), a nine-person council tasked with naming a new prime minister and cabinet, was "announced in a decree" on April 12, 2024.[6] Members were sworn in on April 25, 2024.[7] The transitional council is set to

---

[1] This report covers the reporting period of February 1, 2024 to March 20, 2025.

[2] Haiti, InSight Crime, Feb. 6, 2025, available at: https://insightcrime.org/haiti-organized-crime-news/haiti/ (last visited Mar. 10, 2025).

[3] Locked in Transition: Politics and Violence in Haiti, International Crisis Group, Feb. 19, 2025, available at: https://www.crisisgroup.org/latin-america-caribbean/caribbean/haiti/107-locked-transition-politics-and-violence-haiti (last visited Mar. 18, 2025).

[4] Carla Y. Davis-Castro, Latin America and the Caribbean: Fact Sheet on Leaders and Elections, Congressional Research Service (CRS) Product, Feb. 21. 2025, available at: https://www.congress.gov/crs-product/98-684?q=%7B%22search%22%3A%22Haiti%22%7D&s=2&r=2 (last visited Mar. 12, 2025).

[5] Carla Y. Davis-Castro, Latin America and the Caribbean: Fact Sheet on Leaders and Elections, Congressional Research Service (CRS) Product, February 21. 2025, available at: https://www.congress.gov/crs-product/98-684?q=%7B%22search%22%3A%22Haiti%22%7D&s=2&r=2 (last visited Mar. 12, 2025).

[6] Evens Sanon and Dánica Coto, Transitional council in Haiti to choose new leaders is formally established amid gang violence, The Associated Press, Apr. 12, 2024, available at: https://apnews.com/article/haiti-transitional-council-gang-violence-86ae6d010d0fba2a5742ec82ec05ac25 (last visited Mar. 24, 2025).

[7] Carla Y. Davis-Castro, Latin America and the Caribbean: Fact Sheet on Leaders and Elections, Congressional Research Service (CRS) Product, February 21. 2025, available at: https://www.congress.gov/crs-product/98-684?q=%7B%22search%22%3A%22Haiti%22%7D&s=2&r=2 (last visited Mar. 12, 2025).

expire on February 7, 2026.[8] The TPC's responsibilities reportedly included "clearing the way for Henry's replacement, welcoming the Kenya-led Multinational Security Support mission and steering the country toward elections and constitutional reform this year so a new president can take office by Feb. 7, 2026."[9]

Haiti's government has been "plagued with political infighting."[10] The country had three different prime ministers in 2024.[11] Ariel Henry, the prime minister who had held the position since the death of Jovenel Moïse, stepped down in April 2024 after being prevented from returning to Haiti by armed groups following a visit to Kenya to discuss the deployment of an international peace keeping force.[12] Garry Conille, the first prime minister chosen by the TPC, was sworn in on June 3, 2024.[13] The TPC appointed Alix Didier Fils-Aime as Prime Minister on October 11, 2024,[14] "amid worsening violence and alleged power struggles between Conille and the TPC."[15]

The legitimacy of the TPC has been challenged by "corruption allegations,"[16] leaving the council "teetering on the brink of collapse."[17] The *Miami Herald* stated in January 2025 that the TPC "has been engulfed in a bribery scandal involving three of its seven voting members. The

---

[8] Carla Y. Davis-Castro, Latin America and the Caribbean: Fact Sheet on Leaders and Elections, Congressional Research Service (CRS) Product, February 21. 2025, available at: https://www.congress.gov/crs-product/98-684?q=%7B%22search%22%3A%22Haiti%22%7D&s=2&r=2 (last visited Mar. 12, 2025).

[9] Jacqueline Charles, Some Haiti leaders seek to reconfigure political transition panel amid bribery scandal, The Miami Herald, Jan. 8, 2025, available at: https://www.miamiherald.com/news/nation-world/world/americas/haiti/article298196483.html (last visited Mar. 18, 2025).

[10] Frances Robles, Haiti's Many Problems and Very Few Solutions, Explained, The New York Times, Nov. 17, 2024, available at: https://www.nytimes.com/2024/11/17/world/americas/haiti-problems-gangs-crimes.html (last visited on Mar. 18, 2025).

[11] Frances Robles, Haiti's Many Problems and Very Few Solutions, Explained, The New York Times, Nov. 17, 2024, available at: https://www.nytimes.com/2024/11/17/world/americas/haiti-problems-gangs-crimes.html (last visited on Mar. 18, 2025).

[12] Dánica Coto, With fear and hope, Haiti warily welcomes new governing council as gang-ravaged country seeks peace, The Associated Press, Apr. 25, 2024, available at: https://apnews.com/article/haiti-ariel-lhenry-resigns-violence-gangs-government-22868c51b5f4c9ca5a8d69fcb5df376b (last visited Mar. 18, 2025).

[13] Carla Y. Davis-Castro, Latin America and the Caribbean: Fact Sheet on Leaders and Elections, Congressional Research Service (CRS) Product, Feb. 21, 2025, available at: https://www.congress.gov/crs-product/98-684?q=%7B%22search%22%3A%22Haiti%22%7D&s=2&r=2 (last visited Mar. 12, 2025).

[14] Carla Y. Davis-Castro, Latin America and the Caribbean: Fact Sheet on Leaders and Elections, Congressional Research Service (CRS) Product, Feb. 21. 2025, available at: https://www.congress.gov/crs-product/98-684?q=%7B%22search%22%3A%22Haiti%22%7D&s=2&r=2 (last visited Mar. 12, 2025).

[15] Karla I. Rios, Haiti in Crisis: What Role for a Multinational Security Support Mission? Congressional Research Service, Updated Dec. 27, 2024, pg. 2, available at: https://www.congress.gov/crs-product/IN12331 (last visited Mar. 12, 2025).

[16] Karla I. Rios, Haiti in Crisis: What Role for a Multinational Security Support Mission? Congressional Research Service, Updated Dec. 27, 2024, pg. 2, available at: https://www.congress.gov/crs-product/IN12331 (last visited Mar. 12, 2025).

[17] Jose Flécher, Haiti's costly presidential council on brink of collapse amid deepening corruption scandal, The Haitian Times, Oct. 15, 2024, available at: https://haitiantimes.com/2024/10/15/haiti-presidency-the-presidential-council-verge-implosion/ (last visited Mar. 18, 2025).

HaitiTPSAR000225

allegations, which came to light in July [2024], have raised doubts about whether the embattled transitional government can survive and prepare the ground for credible elections."[18]

## Security Considerations

As of March 6, 2025, "the security situation remains extremely volatile in Haiti."[19] The International Crisis Group reported in February 2025 that gang violence in Haiti has "continued unabated."[20] In its 2024 Homicide Round-Up, InSight Crime reported that homicides in Haiti had increased 51.6% in 2024, from a rate of 40.9 homicides per 100,000 people in 2023 to 62 homicides per 100,000 people in 2024.[21]

Armed groups "have tightened their grip on much of Port-au-Prince, with the multinational security mission making little headway and transitional authorities mired in internal disputes."[22] The United Nations reported in April 2024 that there were "150 to 200 armed groups" active in Haiti.[23] CRS stated that "some local sources suggest the number of criminal groups is closer to 750, including self-defense groups."[24] Some of these criminal groups have organized into two larger gang alliances, known as the G9 and Family[25] and the G-Pèp.[26] Those two groups "have been rivals for years, battling for control of neighbourhoods in Port-au-Prince. Both groups have been accused of mass killings and sexual violence in areas under their authority, as well as in districts they want to take over."[27]

[18] Jacqueline Charles, Some Haiti leaders seek to reconfigure political transition panel amid bribery scandal, The Miami Herald, Jan. 8, 2025, available at: https://www.miamiherald.com/news/nation-world/world/americas/haiti/article298196483.html (last visited Mar. 18, 2025).

[19] Haiti travel advice, Government of Canada, last updated Mar. 6, 2025, available at: https://travel.gc.ca/destinations/haiti (last visited Mar. 12, 2025).

[20] Crisis Watch February 2025, International Crisis Group, Feb. 2025, available at: https://www.crisisgroup.org/crisiswatch/february-trends-and-march-alerts-2025#haiti (last accessed Mar. 6, 2025).

[21] Marina Cavalari, et al, InSight Crime's 2024 Homicide Round-Up, InSight Crime, Feb. 26, 2025, available at: https://insightcrime.org/news/insight-crime-2024-homicide-round-up/ (last visited Mar. 18, 2025).

[22] Locked in Transition: Politics and Violence in Haiti, International Crisis Group, Feb. 19, 2025, available at: https://www.crisisgroup.org/latin-america-caribbean/caribbean/haiti/107-locked-transition-politics-and-violence-haiti (last visited Mar. 18, 2025).

[23] Haiti: Gangs have 'more firepower than the police', UN News, Apr. 4, 2024, available at: https://news.un.org/en/story/2024/04/1148231 (last visited Mar. 17, 2025).

[24] Clare Ribando Seelke and Karla I. Rios, Haiti: Recent Developments and U.S. Policy, Congressional Research Service (CRS), Feb. 1, 2024, available at: https://crsreports.congress.gov/product/pdf/R/R47394 (last visited Mar. 6, 2025).

[25] G9 and Family is at times also referred to as "G9 Family and Allies", or simply "G9."

[26] Haiti, InSight Crime, Feb. 6, 2025, available at: https://insightcrime.org/haiti-organized-crime-news/haiti/ (last visited Mar. 17, 2025).

[27] Jillian Kestler-D'Amours, Who are Haiti's gangs and what do they want? All you need to know, Al Jazeera, Mar. 13, 2024, available at: https://www.aljazeera.com/news/2024/3/13/who-are-haitis-gangs-and-what-do-they-want-all-you-need-to-know (last visited Mar. 18, 2025).

HaitiTPSAR000226

In September 2023, the G9 and the G-Pèp[28] joined with other gangs to create "a new alliance called Viv Ansanm" (Living Together).[29] In October 2024, Armed Conflict Location and Event Data (ACLED) reported on the Viv Ansanm coalition:

> This coalition, which brought together the main gang factions operating in Port-au-Prince — G-9 and G-Pèp — pledged to protect civilians and called on the population living in gang-controlled neighborhoods to resume their daily activities, which are often disrupted by gang conflicts. […] However, the coordinated Viv Ansanm incursions launched on state institutions on 29 February, which aimed to force Prime Minister Ariel Henry to resign, marked a turning point and demonstrated the coalition's ability to adapt, negotiate, and work cohesively toward shared goals. This series of attacks led to Henry announcing on 11 March that he would resign. […] Furthermore, the attacks came amid advanced negotiations on the deployment of the Kenya-led Multinational Security Support (MSS) mission, created to stabilize the country's security. Gangs have perceived the MSS mission as an emerging threat, prompting them to join forces and adapt their operations in the lead-up to the troops' deployment.
>
> A year after going public, the Viv Ansanm alliance has altered Haiti's conflict landscape. The truce among previously warring gangs has led to a notable decrease in fighting, especially after the alliance consolidated with the February incursions. This allowed them to concentrate on revenue-generating activities, widen their reach to a larger number of areas, and counter security operations.[30]

Throughout 2024, "criminal groups united under the 'Viv Ansanm' coalition intensified large-scale and coordinated attacks that brought the country to a standstill from February to May, and from October to the present [January 2025]."[31] Criminal groups controlled around 85% of Port-au-Prince, Haiti's capital and largest city, as of November 2024.[32] Furthermore, criminal groups "have rapidly expanded into previously secure areas of Port-au-Prince, as well as key regions such as the Ouest and Artibonite departments, Haiti's agricultural hub. Many of these groups have alleged ties to police officers and political and economic elites."[33]

*The Haitian National Police & the Multinational Security Support Mission*

---

[28] Some sources refer to the criminal group as "G-PEP," while others refer to it as G-Pèp.

[29] Sandra Pellegrini, Viv Ansanm: Living together, fighting united – the alliance reshaping Haiti's gangland, Armed Conflict Location and Event Data (ACLED), Oct. 16, 2024, available at: https://acleddata.com/2024/10/16/viv-ansanm-living-together-fighting-united-the-alliance-reshaping-haitis-gangland/ (last visited Mar. 17, 2025).

[30] Sandra Pellegrini, Viv Ansanm: Living together, fighting united – the alliance reshaping Haiti's gangland, Armed Conflict Location and Event Data (ACLED), Oct. 16, 2024, available at: https://acleddata.com/2024/10/16/viv-ansanm-living-together-fighting-united-the-alliance-reshaping-haitis-gangland/ (last visited Mar. 17, 2025).

[31] World Report 2025 – Haiti, Human Rights Watch (HRW), Jan. 16, 2025, available at: https://www.ecoi.net/en/document/2120084.html (last visited Mar. 17, 2025).

[32] Conor Lennon, As violent gangs extend control in Haiti, UN commits to staying the course, UN News, Nov. 21, 2024, available at: https://news.un.org/en/story/2024/11/1157246 (last visited Mar. 18, 2025).

[33] World Report 2025 – Haiti, Human Rights Watch (HRW), Jan. 16, 2025, available at: https://www.ecoi.net/en/document/2120084.html (last visited Mar. 17, 2025).

HaitiTPSAR000227

As of March 2024, the Haitian National Police (HNP) was viewed as "underequipped, understaffed and low on morale after years of institutional degradation despite international support."[34] The Congressional Research Service has noted that the HNP is not only weak but "at times allegedly complicit with criminal groups."[35]A February 2024 report by the Global Initiative Against Transnational Organized Crime stated that "several sources close to the [HNP] also reported deep internal conflicts within the force, notably due to established or presumed complicities between some officers and armed groups or vigilante groups."[36]

The Multinational Security Support (MSS) mission, an international force led by Kenya, was deployed to Haiti in June 2024 "to provide security for critical infrastructure and operational support to the HNP."[37] As of February 7, 2025, *The Haitian Times* reported that "the total number of MSS members has reached 1,003. The multinational force includes police and military officers from Kenya, Jamaica, Belize, the Bahamas, Guatemala, and El Salvador."[38]

The MSS "has done little to oppose the gangs amid shortages in staff and funding, and uncertain political backing," according to InSight Crime.[39] In a January 2025 article, *The Haitian Times* stated that "a lack of funding prevents the MSS from completing its deployment target of 2,500 forces and obtaining the logistical and operational materials, particularly maritime and aerial equipment"[40] Furthermore, "many continue to question whether the mission has any kind of oversight or accountability structure."[41] Despite these setbacks, the United Nations Security Council renewed the mission's mandate through October 2, 2025.[42]

### Return to Haiti

---

[34] Nicolás Devia-Valbuena, et al, How to Avert a Gang Takeover of Haiti, United States Institute of Peace (USIP), Mar. 7, 2024, available at: https://www.usip.org/publications/2024/03/how-avert-gang-takeover-haiti (last visited Mar. 18, 2025).

[35] Karla I. Rios, Haiti in Crisis: What Role for a Multinational Security Support Mission? Congressional Research Service, Updated Dec. 27, 2024, pg. 2, available at: https://www.congress.gov/crs-product/IN12331 (last visited Mar. 12, 2025).

[36] Romain Le Cour Grandmaison, et al, A Critical Moment: Haiti's Gang Crisis and International Responses, Global Initiative Against Transnational Organized Crime, Feb. 2024, pg. 21, available at: https://globalinitiative.net/wp-content/uploads/2024/02/Romain-Le-Cour-Grandmaison-Ana-Paula-Oliveira-and-Matt-Herbert-A-critical-moment-Haitis-gang-crisis-and-international-responses-GI-TOC-February-2024.pdf.

[37] Karla I. Rios, Haiti in Crisis: What Role for a Multinational Security Support Mission? Congressional Research Service, Updated Dec. 27, 2024, pg. 2, available at: https://www.congress.gov/crs-product/IN12331 (last visited Mar. 12, 2025).

[38] Juhakenson Blaise, 144 Kenyan officers, Salvadoran helicopters, and U.S. support bolster Haiti security efforts, The Haitian Times, Feb. 7, 2025, available at: https://haitiantimes.com/2025/02/07/144-kenyan-police-officers-join-haiti-mss/ (last visited Mar. 18, 2025).

[39] Haiti, InSight Crime, Feb. 6, 2025, available at: https://insightcrime.org/haiti-organized-crime-news/haiti/ (last visited Mar. 10, 2025).

[40] Juhakenson Blaise, Key takeaways from Haiti's multinational mission: progress, setbacks, and future challenges, The Haitian Times, Jan. 8, 2025, available at: https://haitiantimes.com/2025/01/08/key-takeaways-from-haiti-multinational-mission/ (last visited Mar. 18, 2025).

[41] Juhakenson Blaise, Key takeaways from Haiti's multinational mission: progress, setbacks, and future challenges, The Haitian Times, Jan. 8, 2025, available at: https://haitiantimes.com/2025/01/08/key-takeaways-from-haiti-multinational-mission/ (last visited Mar. 18, 2025).

[42] Resolution 2751 (2024), United Nations Security Council, Sep. 30, 2024, pg. 1, available at: https://docs.un.org/en/S/Res/2751(2024) (last visited Mar. 24, 2025).

HaitiTPSAR000228

In March 2025, the International Organization for Migration (IOM) released its assessment of circumstances surrounding people who have been returned to Haiti in 2024, stating:

> Deportations of Haitians to Haiti remain one of the country's main migration dynamics. Many Haitians attempt to leave the country through regular or irregular pathways for various reasons. Those who take irregular routes not only risk their lives but are often deported back to Haiti by destination or transit countries. In 2024, nearly 200,000 people were deported to Haiti from various countries. Many had spent months or even years abroad and face significant challenges reintegrating into their communities. The security and socio-economic situation in Haiti further complicates this process. As a result, even after being deported, many attempt to leave again - sometimes multiple times - through irregular migration routes. […]

> The vast majority (93%) of deported individuals planned to return to their home or stay with relatives after deportation. Only 1% were unsure of where they would go upon arrival in Haiti. Transportation to areas of origin was the most frequently immediate need mentioned by deported [Haitians] (84%), followed by food (71%) and a place to stay overnight before continuing their journey (38%). […]

> In most cases, individuals who had experienced deportation in the past were deported by the same country that deported them at the time of the interviews, indicating repeated attempts to migrate to the same destination.[43]

### Freedom of Movement

In its 2023 annual report on human rights, released in April 2024, the U.S. Department of State discussed freedom of movement in Haiti:

> The law provided for freedom of internal movement, foreign travel, emigration, and repatriation, and the government generally respected these rights. The government's capacity to ensure the freedom of internal movement and repatriations was weakened by gang violence in the capital.[44]

Gang violence had "expanded into previously unaffected regions" and "kidnappings for ransom by armed gangs increased and affected all parts of society."[45] In addition, the U.S. Department of State reported that:

> armed gangs were also responsible for conflicts resulting in killings, brutal attacks

---

[43] Haitians deported to Haiti: Profiles, migration experience and intentions of Haitians deported in 2024, International Organization for Migration (IOM), Mar. 17, 2025, pg. 4-22, available at: https://reliefweb.int/report/haiti/haitians-deported-haiti-profiles-migration-experience-and-intentions-haitians-deported-2024 (last visited Mar. 18, 2025).
[44] 2023 Country Reports on Human Rights Practices: Haiti, U.S. Dep't. of State, Apr. 23, 2024, available at: https://www.ecoi.net/en/document/2107721.html (last visited Mar. 17, 2025).
[45] 2023 Country Reports on Human Rights Practices: Haiti, U.S. Dep't. of State, Apr. 23, 2024, available at: https://www.ecoi.net/en/document/2107721.html (last visited Mar. 17, 2025).

TPS COI Considerations: Haiti                                                                6

on citizens, targeted instances of sexual violence, mutilation of human remains, widespread displacement, and the destruction of homes and property. […]

Intergang clashes and generalized gang violence caused widespread displacement throughout the metropolitan area of Port-au-Prince. […] In gang-controlled neighborhoods and areas where gangs were active, gang members destroyed homes, property, and vehicles; killed and injured neighborhood residents; and limited economic opportunities. As a result, residents of these neighborhoods left their homes to shelter with family and friends in surrounding areas or in informal reception centers.

The government had extremely limited capacity to address the needs of IDPs [internally displaced persons] […] External partners and donors, in partnership with the Haitian General Directorate for Civil Protection, provided most of the humanitarian assistance to survivors and IDPs.[46]

On March 18, 2025, IOM noted that more than 60,000 people were displaced in Port-au-Prince in the preceding month, and that more than one million people were displaced in Haiti overall.[47] Human Rights Watch reported in its 2025 World Report (covering events of 2024) that the total number of displaced people "is more than double the 2022 figure, making Haiti the country with the highest global displacements per capita, due to crime-related violence."[48]

A March 2025 report by the USIP noted that "as armed groups extend their control into new territories […] major roads are impassable."[49] UN News quoted independent security expert Robbert Muggah regarding control of roadways around Port-au-Prince by gangs in an April 2024 article:

[T]wo rival factions joined forces "in coordinated attacks" targeting the airport, the National Palace, the National Theatre, hospitals, schools, police stations, customs offices and ports, "effectively forcing their will and expanding their territory", he explained.

"Gangs are in fact controlling very strategic areas of the capital and the main roads connecting Port-au-Prince to the ports and to the land borders as well as coastal towns and areas, where we see a lot of the trafficking happening," Mr. Muggah said.[50]

---

[46] 2023 Country Reports on Human Rights Practices: Haiti, U.S. Dep't. of State, Apr. 23, 2024, available at: https://www.ecoi.net/en/document/2107721.html (last visited Mar. 17, 2025).
[47] Violence Triggers Record Displacements in Port-au-Prince: Over 60,000 People in a Month, International Organization for Migration (IOM), Mar. 18, 2025, available at: https://www.iom.int/news/violence-triggers-record-displacements-port-au-prince-over-60000-people-month (last visited Mar. 18, 2025).
[48] World Report 2025 – Haiti, Human Rights Watch (HRW), Jan. 16, 2025, available at: https://www.ecoi.net/en/document/2120084.html (last visited Mar. 17, 2025).
[49] Kirk Randolph, et al, How to Break Gangs' Grip on Haiti, United States Institute of Peace (USIP), Mar. 13, 2025, available at: https://www.usip.org/publications/2025/03/how-break-gangs-grip-haiti (last visited Mar. 19, 2025).
[50] Haiti: Gangs have 'more firepower than the police', UN News, Apr. 4, 2024, available at: https://news.un.org/en/story/2024/04/1148231 (last visited Mar. 17, 2025).

HaitiTPSAR000230

## Economy

As of November 2024, the World Bank reported that "Haiti remains the poorest country in Latin America and the Caribbean and among the poorest countries in the world."[51] According to the World Bank, Haiti's "economy contracted for five consecutive years by 1.7% in 2019, 3.3% in 2020, 1.8% in 2021, 1.7% in 2022, and 1.9 percent in 2023. GDP is estimated to have contracted for a sixth year by 4.2% in 2024 behind the backdrop of gang violence."[52]

## Infrastructure

IOM stated in its 2025 Haiti Crisis Response plan that "since September 2022, the situation [in Haiti] has worsened, with gangs expanding their control and carrying out brutal attacks on critical infrastructure in Port-au-Prince, including schools, hospitals, and police stations."[53] According to InSight Crime, the Viv Ansanm alliance "has given the gangs a platform to sow political chaos by launching coordinated attacks against critical infrastructure, including airports, seaports, government buildings, and prisons. Repeated attacks on key infrastructure have paralyzed the capital city, derailing efforts to restore order."[54]

Haiti's infrastructure has endured damage from natural disasters as well, as Haiti is "one of the most vulnerable countries worldwide to natural hazards, mainly hurricanes, floods, and earthquakes," according to the World Bank Group.[55] CRS reported in February 2024 that "inadequate recovery efforts" following the 2010 earthquake, "combined with subsequent natural disasters (e.g., Hurricane Matthew, a 2021 earthquake) and disease outbreaks (e.g., cholera, Coronavirus Disease 2019 [COVID-19]), have further weakened the state's ability to protect and provide for its citizens."[56] According to REACH, a humanitarian initiative supported in part by the United Nations, "a significant escalation of violence and political turmoil in 2024 further eroded critical services and institutions, including the country's health system and water infrastructure."[57]

In February 2025, the International Federation of Red Cross and Red Crescent Societies (IFRC) provided more details on the status of health infrastructure in Haiti:

---

[51] The World Bank in Haiti, World Bank Group, Nov. 6, 2024, available at: https://www.worldbank.org/en/country/haiti/overview (last visited Mar. 10, 2025).

[52] The World Bank in Haiti, World Bank Group, Nov. 6, 2024, available at: https://www.worldbank.org/en/country/haiti/overview (last visited Mar. 10, 2025).

[53] Haiti Crisis Response Plan 2025, UN International Organization for Migration (IOM), Dec. 17, 2024, available at: https://crisisresponse.iom.int/response/haiti-crisis-response-plan-2025 (last visited Mar. 14, 2024).

[54] Haiti, InSight Crime, Feb. 6, 2025, available at: https://insightcrime.org/haiti-organized-crime-news/haiti/ (last visited Mar. 17, 2025).

[55] The World Bank in Haiti, World Bank Group, Nov. 6, 2024, available at: https://www.worldbank.org/en/country/haiti/overview (last visited Mar. 10, 2025).

[56] Clare Ribando Seelke and Karla I. Rios, Haiti: Recent Developments and U.S. Policy, Congressional Research Service (CRS), Feb. 1, 2024, available at: https://crsreports.congress.gov/product/pdf/R/R47394 (last visited Mar. 10, 2025).

[57] Haiti: A Deepening Public Health Crisis – January 2025, REACH, Feb. 6, 2025, available at: https://repository.impact-initiatives.org/document/impact/effec060/REACH_GLO_-Public-Health-Brief-Haiti_February-2025.pdf.

TPS COI Considerations: Haiti                                                                                     8

Hospitals, often caught in the crossfire of clashes between armed coalitions, are operating at best in slow motion. Staff are unable to get to their workplaces, and sick people are reluctant to seek treatment for fear of being hit by stray bullets or kidnapped. The elderly and disabled remain vulnerable to serious illness and abuse. And in general, the crisis is having an impact on the mental health of the affected populations. Several health facilities, such as the Médecins Sans Frontières hospital in Cité Soleil and Tabarre, the Albert Schweitzer hospital (Artibonite) and the Mirebalais University hospital (Centre), were targeted by gangs, forcing them to close temporarily. In the department of Artibonite, a quarter of health establishments report problems of physical access to health infrastructures, for both patients and staff, due to insecurity. Between January and August 2023, at least 40 doctors were kidnapped in Haiti. Even when health infrastructures do exist and function, they remain insufficient to provide the basic care required by those who desperately need it. When it comes to health needs, people living in remote areas don't often seek medical care, and only go to hospital as a last resort, when it's often too late. As a result, pregnant women, nursing mothers and young girls living in areas affected by insecurity must struggle daily to access services essential to their health, well-being, and survival.[58]

In January 2025, Médecins Sans Frontières (Doctors Without Borders, MSF) also described limited access to health infrastructure, like hospitals, in Haiti's capital:

Health care services in Port-au-Prince are under severe pressure. The main hospital, L'Hôpital de l'Université d'État d'Haïti, is currently inoperable and situated within one of the conflict zones. Other hospitals are facing similar challenges or are overwhelmed with casualties, limiting their ability to accept new patients. Even MSF's Tabarre Hospital, which specializes in trauma and burn care, is often at capacity, forcing it to focus only on the most severely wounded patients. Last year, in May alone, more than 30 medical centers and hospitals shut their doors—including L'Hôpital de l'Université d'État d'Haïti—due to vandalism, looting, or being located in insecure areas.

In addition to those wounded in the violence, people with chronic illnesses, such as tuberculosis and HIV, are at high risk due to the lack of access to medical services and lifesaving medications. Unsanitary conditions in displacement sites have spread across Port-au-Prince, heightening the risk of waterborne diseases like cholera.[59]

**Tourism**

---

[58] Haiti Earthquake and Cholera Emergency Appeal (MDRHT018)-Final Report, International Federation of Red Cross and Red Crescent Societies (IFRC), Feb. 13, 2025, available at: https://reliefweb.int/report/haiti/haiti-earthquake-and-cholera-emergency-appeal-mdrht018-final-report (last visited Mar. 18, 2025).
[59] Crisis in Haiti: What to know, Médecins Sans Frontières (MSF), Jan. 23, 2025, available at: https://www.doctorswithoutborders.org/latest/crisis-haiti-what-know (last visited Mar. 19, 2025).

HaitiTPSAR000232

The U.S. Department of State's most recent travel advisory for Haiti, issued in September 2024, classified Haiti as Level 4: Do Not Travel on its travel advisory scale, "due to kidnapping, crime, civil unrest, and limited health care."[60] Furthermore, the advisory stated:

> Since March 2024, Haiti has been under a State of Emergency. Crimes involving firearms are common in Haiti. They include robbery, carjackings, sexual assault, and kidnappings for ransom. Kidnapping is widespread, and U.S. citizens have been victims and have been hurt or killed. Kidnappers may plan carefully or target victims at random, unplanned times. Kidnappers will even target and attack convoys. Kidnapping cases often involve ransom requests. Victims' families have paid thousands of dollars to rescue their family members.
>
> Protests, demonstrations, and roadblocks are common and unpredictable. They often damage or destroy infrastructure and can become violent. Mob killings and assaults by the public have increased, including targeting those suspected of committing crimes.
>
> The airport in Port-au-Prince can be a focal point for armed activity. Armed robberies are common. Carjackers attack private vehicles stuck in traffic. They often target lone drivers, especially women. As a result, the U.S. embassy requires its staff to use official transportation to and from the airport.
>
> Do not cross the border by land between Haiti and the Dominican Republic due to the threat of kidnapping and violence. These dangers are present on roads from major Haitian cities to the border. The U.S. embassy cannot help you enter the Dominican Republic by air, land, or sea. U.S. citizens who cross into the Dominican Republic at an unofficial crossing may face high immigration fines if they try to leave. The U.S. Coast Guard has concerns about security in the ports of Haiti. Until those are addressed, the Coast Guard advises mariners and passengers traveling through the ports of Haiti to exercise caution.
>
> The U.S. government is very limited in its ability to help U.S. citizens in Haiti. Local police and other first responders often lack the resources to respond to emergencies or serious crime. Shortages of gasoline, electricity, medicine, and medical supplies are common throughout the country. Public and private medical clinics and hospitals often lack trained staff and basic resources. In addition, they require prepayment for services in cash.[61]

The Canadian government's Haiti travel advice website, current as of March 6, 2025, warned travelers to "avoid all travel to Haiti due to the threat posed by kidnappings, gang violence and

---

[60] Haiti Travel Advisory, U.S. Dep't. of State, Sep. 18, 2024, available at: https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/haiti-travel-advisory.html (last visited Mar. 17, 2025).

[61] Haiti Travel Advisory, U.S. Dep't. of State, Sep. 18, 2024, available at: https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/haiti-travel-advisory.html (last visited Mar. 17, 2025).

HaitiTPSAR000233

the potential for civil unrest throughout the country."[62] Regarding air travel, the same advisory noted that the "Toussaint-Louverture airport in Port-au-Prince has reopened although with limited operations. Most airlines have suspended their flights to and from Port-au-Prince until further notice."[63] The Dominican Republic had closed its air, land, and sea borders with Haiti as of March 5, 2025.[64]

Dominican Today, an online English-language news outlet based in the Dominican Republic, reported on the tourism industry in Haiti in December 2024:

> Haiti's ongoing crisis has severely impacted essential sectors such as health, education, and the economy, with tourism among the hardest hit. Insecurity and government inaction have paralyzed the industry, leaving the Ministry of Tourism unable to present a 2024 activity report. Violence and limited access to key destinations have hindered data collection and planning, further exacerbating the decline in visitor arrivals and the government's ability to devise recovery strategies.[65]

On March 11, 2025, the U.S. Federal Aviation Administration extended "prohibitions barring U.S. flights to the Haitian capital, Port-au-Prince, through September 8, citing risks from armed gangs to civil aviation."[66] In 2024, the main airport in Port-au-Prince closed for nearly three months[67] beginning in March,[68] and again for one month beginning in November, due to violence.[69]

**Food and Health Considerations**

According to Human Rights Watch, "coordinated attacks" by the Viv Ansanm coalition have "severely impacted public services, including electricity, water supply, sanitation, health care,

---

[62] Haiti travel advice, Government of Canada, Mar. 6, 2025, available at: https://travel.gc.ca/destinations/haiti (last visited Mar. 18, 2025).

[63] Haiti travel advice, Government of Canada, Mar. 6, 2025, available at: https://travel.gc.ca/destinations/haiti (last visited Mar. 18, 2025).

[64] Haiti travel advice, Government of Canada, Mar. 6, 2025, available at: https://travel.gc.ca/destinations/haiti (last visited Mar. 18, 2025).

[65] Insecurity stalls Haiti's tourism growth in 2024, Dominican Today, Dec. 31, 2024, available at: https://dominicantoday.com/dr/tourism/2024/12/31/insecurity-stalls-haitis-tourism-growth-in-2024/ (last visited Mar. 12, 2025).

[66] FAA extends ban on U.S. flights to Port-au-Prince through Sept. 8, Reuters, Mar. 11, 2025, available at: https://www.nbcnews.com/news/world/faa-extends-bar-us-flights-port-au-prince-september-8-rcna195888 (last visited Mar. 14, 2025).

[67] Haiti airport reopens after weeks of gang violence, BBC News, May 20, 2024, available at: https://www.bbc.com/news/articles/cndd394p7n2o (last visited Mar. 14, 2025).

[68] Security Alert: U.S. Embassy Port-au-Prince, Haiti (March 18, 2024), U.S. Embassy in Haiti, Mar. 18, 2024, available at: https://ht.usembassy.gov/security-alert-u-s-embassy-port-au-prince-haiti-march-18-2024/ (last visited Mar. 14, 2025).

[69] Caitlin Stephen Hu, et al, FAA grounds all US flights to Haiti after three planes were struck by gunfire, CNN, Nov. 12, 2024, available at: https://www.cnn.com/2024/11/11/americas/haiti-spirit-airlines-jetblue-intl-latam/index.html (last visited Mar. 14, 2025).

education, and transportation, significantly restricting access to essential goods."[70] Human Rights Watch further reported:

> Half of Haiti's population struggled daily to afford food, giving the country one of the highest rates of acute food insecurity in the world. Killings and kidnappings by criminal groups increased, with a weak state response and an ineffectual justice system. Sexual violence became widespread, with survivors having minimal access to health services and a near-absence of justice. Rising hunger and extreme poverty have forced children to join criminal groups, where they face abuse, including sexual exploitation.[71]

> Only 40 percent of Haitians had access to electricity, but intermittently and at high prices. Forty-five percent of the population lacks access to clean drinking water, and 7 out of 10 people do not have access to an improved sanitation system, aggravating the spread of cholera.[72]

*Food Insecurity*

The World Food Programme (WFP) reported in January 2025 that Haiti "has one of the world's highest levels of chronic food insecurity, with over half its total population chronically food insecure and 22 percent chronically malnourished children."[73] In addition, WFP stated that:

> The latest Integrated Food Security Phase Classification (IPC) of August 2024 shows that half of the population, or 5.4 million people, are food insecure (IPC3+). In addition, 2 million people are in IPC 4 (Emergency), and 6,000 in IPC 5 (Catastrophe), for the second time in Haiti and in the region since the beginning of these analyses. Compared to the September 2023 analysis, there has been an increase of 600,000 people in IPC4. The key drivers remained increased violence, limited access to food, rising prices, and climatic shocks.[74]

*Cholera*

---

[70] World Report 2025 – Haiti, Human Rights Watch (HRW), Jan. 16, 2025, available at: https://www.ecoi.net/en/document/2120084.html (last visited Mar. 17, 2025).
[71] World Report 2025 – Haiti, Human Rights Watch (HRW), Jan. 16, 2025, available at: https://www.ecoi.net/en/document/2120084.html (last visited Mar. 17, 2025).
[72] World Report 2025 – Haiti, Human Rights Watch (HRW), Jan. 16, 2025, available at: https://www.ecoi.net/en/document/2120084.html (last visited Mar. 17, 2025).
[73] WFP Haiti Country Brief January 2025, World Food Programme (WFP), Jan. 30, 2025, pg. 1, available at: https://docs.wfp.org/api/documents/WFP-0000164786/download/?_ga=2.187891944.1783373056.1741817299-675931106.1741817299 (last visited Mar. 12, 2025).
[74] WFP Haiti Country Brief January 2025, World Food Programme (WFP), Jan. 30, 2025, pg. 1, available at: https://docs.wfp.org/api/documents/WFP-0000164786/download/?_ga=2.187891944.1783373056.1741817299-675931106.1741817299 (last visited Mar. 12, 2025).

HaitiTPSAR000235

On March 11, 2025, MSF reported that "150 Haitians were treated for cholera between Feb. 15 and March 6 [2025]," and that cholera "was on the rise in Haiti."[75]

In February 2025, the IFRC provided statistics on the previous major cholera outbreak that began in 2022, and noted difficulties with underreporting:

> One year since the declaration of the Cholera outbreak, according to the epidemiological report published by the Ministry of Public Health on 31 January 2024, a total of 79,411 suspect cases had been reported with 4,608 confirmed cases, a total of 75,160 cases were hospitalized, and 1,172 deaths. Suspected cholera cases that were initially concentrated in certain areas of the capital are recorded in all 10 departments of the country, the majority still in the West (52 percent) although the growth rate is higher in the other nine departments. […] The number of cholera cases is underreported and underestimated as the capacity of the epidemiological surveillance system to detect suspected cases is still considered weak and confirmation of cases minimal, due to the lack of resources and the difficulty in transporting the samples to the laboratories due to lack of fuel and the presence of roadblocks by armed gangs which hamper access.[76]

---

[75] Wilner Bossou, VOA Creole: MSF reports 150 new cholera cases in Haiti, Voice of America, Mar. 11, 2025, available at: https://www.voanews.com/a/voa-creole-msf-reports-150-new-cholera-cases-in-haiti-/8007305.html (last visited Mar. 12, 2025).

[76] Haiti Earthquake and Cholera Emergency Appeal (MDRHT018)-Final Report, International Federation of Red Cross and Red Crescent Societies (IFRC), Feb. 13, 2025, available at: https://reliefweb.int/report/haiti/haiti-earthquake-and-cholera-emergency-appeal-mdrht018-final-report (last visited Mar. 12, 2025).

HaitiTPSAR000236

**Haiti as TPS-Designated Country: Comparison of Country Conditions between Initial and Latest**

**TPS Designation Time Frames**:

- Initial TPS designation Period: January 21, 2010, through July 22, 2011
- First Redesignation Periods: July 23, 2011, 2024, through January 22, 2013; from January 23, 2013 through July 22, 2014; from July 23, 2014, through January 22, 2016; from January 23, 2016, through July 22, 2017; (4) from July 23, 2017, through January 22, 2018[1]
- Second designation: August 3, 2021, through February 3, 2023
- Second Redesignation Period: February 4 through August 3, 2024; August 4, 2024, through August 3, 2025

**Reasons for Initial TPS Designation for Haiti**:

According to Federal Register (75 FR 3476) and the country condition summary of USCIS's 2023 TPS Report to Congress, Haiti was designated to TPS country because of the following reasons:

- Natural Disaster (7.1 magnitude earthquake) that killed 220,000, left 1.5 million displaced, and left many without shelter, food, or clean water
- Economic challenges related to reconstruction
- Disease outbreaks (Cholera)

**Reasons for Extension and Redesignation of TPS for Haiti**:

According to Federal Register (76 FR 29000, 77 FR 59943, , 79 FR 11808, 80 FR 51582, 82 FR 23830, 86 FR 41863, 88 FR 5022, 89 FR 54484) and the country condition summary of USCIS's 2024 TPS Report to Congress, Haiti was re-designated to TPS country because:

- Ongoing Natural disasters
- Humanitarian crisis
- National Security Situation, particularly from gang violence

---

[1] Haiti is one of the countries with TPS litigation. As such, the rescission of the TPS designation in 2019 had not gone into effect prior to the redesignation in 2021.

    – Economic destabilization
    – Political Instability in the wake of Presidential Assassination

**Improvements in Haiti country conditions**

Haiti has had some improvements in its infrastructure and risk management. For example, a health center affected by Hurricane Matthew in 2016 has been refurbished and serves patients every day.[2]

The American Red Cross has improved access to safe drinking water for thousands of households through construction of over 5300 water points that serve over 246,000 people.[3]

Also, Haiti saw an improvement in tax revenue collection in 2023 related to customs duties, though the improvement was reversed in 2024.  (The temporary reversal was attributed to weak economic activity.[4])

In March, 2025, the World Bank released a plan to make approximately US$320 million in grant financing available with the aim of building resilience among Haiti's most vulnerable [5]. It will do so by strengthening economic governance and creating employment opportunities, maintaining essential institutional capacity for the provision of basic service delivery, and preserving human capital to increase resilience to natural disasters and shocks.

Since April 23-25, 2025, UNICEF has reached more than 8,500 displaced individuals and members of the host community through multisectoral interventions, including safe drinking water distribution via water-trucking and provision of household water treatment products; free primary health care, deworming, and vaccination through mobile clinics;

---

[2] World Bank, Glimmers of hope as Haiti navigates its lingering crisis, available at https://www.worldbank.org/en/news/immersive-story/2024/12/20/glimmers-of-hope-as-haiti-navigates-its-lingering-crisis (last visited May 12, 2025).

[3] Red Cross, Preventing disease and improving health care factsheet, November 2024, available at https://www.redcross.org/content/dam/redcross/atg/Photos/What_We_Do/Preventing_Disease_and_Improving_Healthcare_Factsheet.pdf?srsltid=AfmBOor7uRPpGVqOzAjhWTi4b5ssffhMzK4Q7SZxbK1H-73K9kUTC7e3 (last visited May 12, 2025).

[4] World Bank, The World Bank in Haiti, 2024, available at https://www.worldbank.org/en/country/haiti/overview (last visited May 12, 2025).

[5] World Bank, World Bank Announces New Strategy for Haiti, March 4, 2025,  available at https://www.worldbank.org/en/news/immersive-story/2024/12/20/glimmers-of-hope-as-haiti-navigates-its-lingering-crisis (last visited May 12, 2025).

sensitization and behaviour change activities to prevent malnutrition; as well as educational plans, recreational activities and psychosocial support for children[6] .

**NIV Issuance and I-94 Admissions**

In FY2024, 7,938 nonimmigrant visas (NIV) were issued to Haitian nationals. In FY2025 (October 2024 through February 2025), 3,840 nonimmigrant visas were issued to Haitian nationals. If this trend continues, FY2025 will see an estimated 9,200 nonimmigrant visas issued to Haitian nationals.

Between FY2018 and FY2023, there were roughly 5 times as many I-94 admissions[7] as NIV issuances for Haitians, indicating that each Haitian national with a nonimmigrant visa is entering the country approximately five times on average. The rate of re-entry remained consistent across the six-year (FY2018-23) time period, despite the fluctuation in visa issuances. This seems to indicate Haitian nationals with a NIV has been in and out of the US quite frequently (though the destination of their foreign travel might not always be Haiti).

**Summaries from Country Conditions of Haiti from the 2023 and 2024 TPS Reports to Congress**:

DHS conducted a thorough review of country conditions in Haiti. Haiti is experiencing economic, security, political, and health crises simultaneously.  Haitian gangs are the primary source of violence and instability in Haiti and pose an increasing threat as they continue to escalate and expand their influence.  In the first three months of 2024, gang violence killed or injured more than 2,500 people. The gangs also attacked the capital's primary airport and major port terminals, and blocked roads to access the city.  An ongoing political impasse left Haiti without a functioning democratically elected national government and hindered Haiti's ability to respond to the gang-driven violence and allowed political and business elites to utilize gang violence to further their agendas (UN News, 2024).

At the same time, Haiti continued to struggle through a humanitarian crisis.  Haiti has one of the highest levels of chronic food insecurity in the world with more than half of its total population chronically food insecure and 22 percent of children chronically

---

[6] UNICEF, Haiti Humanitarian Flash Update No. 2, ,May 2025,  available at https://www.worldbank.org/en/news/immersive-story/2024/12/20/glimmers-of-hope-as-haiti-navigates-its-lingering-crisis (last visited May 12, 2025).

[7] Although I-94 admissions were reported by Country of Residence and NIV issuances were reported by Country of Nationality, a reasonable comparison can still be made across the six year period (2018-23).

malnourished (WFP, 2024). It is one of the poorest countries in the world, and it remains the poorest in Latin America and the Caribbean. The Haitian economy declined for five straight years, from 2019 through 2023 (Haiti Libre, 2024; UN News, 2024).

Several recent environmental disasters also contributed to the extraordinary and temporary conditions in Haiti.  On August 14, 2021, a 7.2 magnitude earthquake killed more than 2,200 people and injured 12,700 people. In June 2023, a 4.4 magnitude earthquake and 5.5 magnitude earthquake hit Haiti's west coast only two days apart, causing the deaths of at least four people while destroying homes, blocking roads, and overwhelming healthcare facilities (World Bank, 2024).

**Summaries of Country Conditions of Haiti from the Latest Reports of Various Sources**

In 2024, Haiti's multidimensional crisis reached catastrophic levels. Criminal groups united under the "Viv Ansanm" coalition intensified large-scale and coordinated attacks that brought the country to a standstill from February to May 2024, and from October 2024 to the present (Human Rights Watch [HRW], 2025). These attacks severely impacted public services, including electricity, water supply, sanitation, health care, education, and transportation, significantly restricting access to essential goods. In November 2024, the UN Security Council asked the UN Secretary-General to present recommendations for the role the UN could play in helping address the security, economic, and humanitarian crises in the country (HRW, 2025; UN Security Council, 2024).

*Safety and Security*

Rampant corruption and violence by armed criminal groups undermine basic services and contribute to pervasive physical insecurity.  Killings and kidnappings by criminal groups increased, with a weak state response and an ineffectual justice system (Freedom House, 2024; HRW, 2025). The UN Office of the High Commissioner for Human Rights reported that criminal groups killed at least 5,601 people and kidnapped nearly 1,500 in 2024 (HRW, 2025; Freedom House, 2024; UNOHCHR, 2025).

United Nations agencies reported that criminal groups control around 85 percent of Port-au-Prince, Haiti's capital and its metropolitan area (UN News, 2024). These groups have rapidly expanded into previously secure areas of Port-au-Prince, as well as key regions such as the Ouest and Artibonite departments, Haiti's agricultural hub. Many of these groups have alleged ties to police officers and political and economic elites (HRW, 2025; Freedom House, 2024). As of September, the so-called "self-defense" groups have reportedly killed over 260 individuals suspected of links to criminal organizations, often in collusion with the police, and have also adopted its tactics, such as extortion, according to the UN (HRW, 2025). As violence escalated, the United Nations-authorized Multinational Security Support (MSS) mission began deployment but was unable to effectively support the police in fighting criminal groups due to a lack of funding and personnel. The

HaitiTPSAR000240

transitional government requested that the UN Security Council and the UN Secretary-General transform the mission into a UN peacekeeping operation (HRW, 2025).

*Human Rights Violations Against Women and Children*

Security instability has fueled sexual violence, especially against women and girls. A report by UN Women, in collaboration with the Organization Initiative for the Development of Youth Outside of Schools (IDEJEN) and the Network for Gender Equality in Humanitarian Action in Haiti (REGAH), reveals that 300,000 displaced women and girls in Haiti live in precarious conditions without access to basic social services. The report shows that over 88 per cent of women surveyed in the six largest sites for internally displaced people (IDPs) in Port-au-Prince have no income. Consequently, more than 10 per cent of them have resorted to negative coping mechanisms, such as prostitution, to meet their needs. Sexual violence has escalated over the past year, becoming widespread. Nearly 70 per cent of the women surveyed said the increase in violence has mentally affected them. Only 10 per cent reported having access to health services in IDP sites.  Survivors face severely limited or nonexistent access to protection and care services. Between January and October, the Gender-Based Violence (GBV) sub-cluster reported 5,400 cases of gender-based violence, with 72 percent involving sexual violence allegedly committed mostly by members of criminal groups (HRW, 2024, 2025; UNOCHA, 2024).

Children are among the hardest hit by the violence. Rising hunger and severe poverty have forced hundreds, possibly thousands, of children to join criminal groups, where they are coerced into illegal activities and face abuse, including girls facing labor and sexual exploitation. According to the UN, approximately half a million children live under the control of these groups, with at least 30 percent of their members being children (HRW, 2024a, 2024b; UN News, 2024).

*Political Instability*

Worsening breakdowns of the Haitian electoral system in recent years have led to a series of expired mandates and constitutional impasses, leaving citizens without proper political representation. A new transitional government, led by a prime minister and a Transitional Presidential Council, was established with the aim of strengthening security and organizing free and fair elections. However

A new surge in gang violence starting in February 2024 prompted the Caribbean Community (CARICOM) to facilitate an agreement among Haitian stakeholders on a political transition to stabilize the country's security situation and restore democratic governance. The agreement established a Transitional Presidential Council (TPC), which was formally installed in April 2024 after the resignation of the then Prime Minister Ariel Henry in April This transitional government is tasked with restoring security, upholding the rule of law, urgently addressing the humanitarian crisis, and preparing for free and fair elections in 2026. Garry Conille, former UNICEF Regional Director, was subsequently

HaitiTPSAR000241

appointed as interim prime minister in late May. After five months in office, the Transitional Presidential Council dismissed Conille and replaced him with Alix Didier Fils-Aimé, a Haitian businessman The Provisional Electoral Council, tasked with organizing the elections, was established but had not yet set an electoral calendar at the time of writing. Political instability, corruption, and instability persist, with several members of the transitional presidential council facing corruption allegations, and scant progress in establishing an electoral calendar (Freedom House, 2024; HRW, 2025; Security Council Report, 2025).

*Justice System*

The judiciary and law enforcement agencies lack the resources, independence, and integrity to uphold due process and the rule of law and are additionally targeted by criminal groups. Antigovernment protests often result in excessive use of force by police (Freedom House, 2024). The justice system remains at a near standstill, largely due to corruption, ongoing violence and frequent strikes by magistrates and judicial staff. Criminal groups have seized control of the main court buildings for over two years, and few measures have been taken to relocate the courts or provide security for judicial officials (HRW, 2025).

From October 2023 through October 2024, only 241 people received criminal trials countrywide, the non-governmental National Human Rights Defense Network (RNDDH) reported. Accountability for past and ongoing human rights violations, including massacres and sexual violence, remains nearly nonexistent. In a rare positive development, in late July 2024, a judge sent 30 individuals to trial, including former police officer and current criminal leader Jimmy Chérizier, for their alleged involvement in the 2018 La Saline massacre, which resulted in over 70 people killed, nearly a dozen women and girls raped, and the vandalization and burning of more than 150 homes (HRW, 2025; UN Secretary General, 2024).

In early January 2024, another judge charged 51 individuals in connection with the assassination of the former president Jovenel Moïse. In the US, at least seven individuals have been sentenced in connection with the assassination and five more are scheduled to face trial in January 2025. After criminal groups attacked two major prisons in Port-au-Prince in 2024 and nearly 5,000 detainees, including several gang leaders, escaped, the Office of the United Nations High Commissioner for Human Rights in Haiti (UN OHCHR) reported a rise in threats and attacks against journalists, human rights defenders, and government officials (HRW, 2025).

As of October 2024, Haiti's prisons held nearly three times their capacity for detainees. Most of the 7,581 detainees—84 percent of whom were awaiting trial—were living in inhumane conditions, without access to adequate food, water, or health care. From January through October, 168 detainees died, most from malnutrition-related diseases (BBC, 2024; HRW, 2025; UN Secretary General, 2024).

HaitiTPSAR000242

*Economy*

The security crisis and political instability have compounded a dire humanitarian situation.  According FEWS Net's latest note, food inflation has been at 40 per cent since June and could continue until September 2024, partly due to supply chain disruptions caused by insecurity (UNOCHA, 2024). According to the World Bank (2024), over 64 percent of Haiti's population of 11.7 million lived on less than US$3.65 per day in 2024. Criminal violence and environmental hazards have severely disrupted economic activities, leading to significant losses in agricultural activities and other livelihoods. These challenges have further deepened poverty and increased unemployment across the country (UNOCHA, 2024).

*Internal Displacement and Migration*

As of September 2024, nearly 703,000 Haitians, 25 percent children, are internally displaced (UNIOM, 2024). The total is more than double the 2022 figure, making Haiti the country with the highest global displacements per capita, due to crime-related violence, according to IOM. Most of the displaced live in informal settlements with insufficient access to food, water, sanitation, shelter, and medical care. Seventy five percent of these sites are in areas controlled by criminal groups or high-risk zones, increasing their exposure to violence, according to the UN (HRW, 2025).

*Police Conduct*

Despite the appointment of a new director general in the police and contributions from Haiti's partners, such as funding, equipment and arms, the police continue to face financial, logistical, and staffing shortcomings to protect people from criminal violence, exacerbated by the flow of weapons and ammunition to Haiti, largely from the US state of Florida (HRW, 2025).

Between January and September 2024, police allegedly killed over 900 people and injured nearly 600 in operations, according to BINUH, some were reportedly killed or injured due to excessive use of force. The prosecutor in Miragoâne acknowledged that he was involved in 26 cases of extrajudicial executions; however, authorities are yet to investigate these cases (UNOHRHC, 2024; HRW, 2025). The police internal affairs office opened 139 investigations, including 34 for alleged human rights violations from January through early October 2024. Twenty-six investigations were completed, leading to 15 administrative decisions. Only two were sent for criminal prosecution (HRW, 2025).

*Food Security*

Half of Haiti's population struggled daily to afford food, giving the country one of the highest rates of acute food insecurity in the world (HRW, 2025; WFP, 2024). Despite expectations of seasonal improvements, low-income households still face major challenges in meeting their food needs. The World Food Program (2024)

has identified Haiti as having one of the highest proportions of acutely food insecure people in any crisis worldwide, in a report covering August 2024 to February 2025. About 5.5 million people require humanitarian assistance and 5.4 million are facing acute food insecurity, including 2 million experiencing emergency levels, and 6,000 people in catastrophic levels of hunger and a collapse of their livelihoods. Emergency food assistance remains insufficient, covering less than four per cent of the total population from January to March 2024. FEWS Net also reported that between 2 and 2.5 million people will need food assistance at least until January 2025 (HRW, 2025; UNOCHA, 2024).

*Right to Safe Living Conditions*

Only 40 percent of Haitians had access to electricity in 2022, but intermittently and at high prices. Forty-five percent of the population lacks access to clean drinking water, and 7 out of 10 people do not have access to an improved sanitation system, aggravating the spread of cholera. As of October 2024, the Ministry of Public Health and Population reported 87,382 suspected cases of cholera and 1,306 deaths since the beginning of the ongoing outbreak in October 2022 (HRW, 2025).

*Right to Healthcare*

Haiti's health system is on the verge of collapse. About 20 percent of health facilities (BINUH, 2024) remain operational, with just 40 percent functioning nationwide. Over 40,000 health workers fled the country due to violence, according to the UN Integrated Office in Haiti (BINUH). As the system crumbles under violence and instability, two out of five Haitians do not have access to urgently needed medical care (HRW, 2025).  Médecins Sans Frontières (MSF), which has provided health care in Haiti for over 30 years, suspended its operations in the capital in late November, due to attacks by "self-defense groups" on its ambulances, patients, and staff, as well as threats of death and rape against its personnel by some police officials. By the time of writing, MSF had only managed to restore the provision of some of their medical services (HRW, 2025; MSF, 2024).

*Right to Education*

Nearly half of Haitians aged 15 and older are illiterate (UNICEF, 2024). According to UNICEF (2024), Haiti has around 3.9 million school-aged children. However, escalating violence led to the closure of nearly 1,000 private and public schools in the West and Artibonite departments during the 2023-2024 academic year, affecting 300,000 students (HRW, 2025). Moreover, the poor quality of public education, high private school fees, and criminal attacks on students and schools have deprived approximately 1.2 million Haitian children of access to education (HRW, 2025; UN News, 2024).

HaitiTPSAR000245

# References

Freedom House. (2024). Haiti. https://freedomhouse.org/country/haiti/freedom-world/2024.

Haiti Libre (2024, Mar 2). Haiti - Recession : Haiti's economy in free fall, -10.5% of GDP in total over 5 years.  https://www.haitilibre.com/en/news-41354-haiti-recession-haiti-s-economy-in-free-fall105-of-gdp-in-total-over-5-years.html.

Human Rights Watch (HRW). (2023, Aug 13). "Living a Nightmare": Haiti Needs an Urgent Rights-Based Response to Escalating Crisis. https://www.hrw.org/report/2023/08/14/living-nightmare/haiti-needs-urgent-rights-based-response-escalating-crisis.

HRW. (2024, June 5). Children Are Among the Hardest Hit by Haiti's Violence. https://www.hrw.org/news/2024/06/05/children-are-among-hardest-hit-haitis-violence.

HRW. (2024, Oct 9). Haiti: Criminal Violence, Hunger Trapping Children. https://www.hrw.org/news/2024/10/09/haiti-criminal-violence-hunger-trapping-children.

HRW. (2024, Nov 25). Haiti: Scarce Protection as Sexual Violence Escalates. https://www.hrw.org/news/2024/11/25/haiti-scarce-protection-sexual-violence-escalates.

HRW. (2025). Haiti: Events of 2024. https://www.hrw.org/world-report/2025/country-chapters/haiti.

HRW. (2025, Jan 16). Haiti: Escalating Violence; Humanitarian Crisis. https://www.hrw.org/news/2025/01/16/haiti-escalating-violence-humanitarian-crisis.

Medecins Sans Frontieres (MSF, Doctors Without Borders). (2024, Nov 20) Violence and threats by police force MSF to suspend activities in Port-au-Prince metropolitan area. https://www.msf.org/violence-and-threats-police-force-msf-suspend-activities-port-au-prince-metropolitan-area-haiti.

Security Council Report. (2024, Dec 30). January 2025 Monthly Forecast: Haiti. https://www.securitycouncilreport.org/monthly-forecast/2025-01/haiti-28.php.

United Nations International Children's Emergency Fund (UNICEF). (2024, Nov 24) UNICEF Haiti Humanitarian Situation Report No. 9: October 2024. https://reliefweb.int/report/haiti/unicef-haiti-humanitarian-situation-report-no-9-october-2024.

United Nations Integrated Office in Haiti (BINUH). (2024, Oct 22). report of the Secretary-General. https://digitallibrary.un.org/record/4064139?ln=en&v=pdf.

United Nations Integrated Office in Haiti (2024,October 22). SRSG's Statement to Security Council (22 October 2024) https://binuh.unmissions.org/en/srsgs-statement-security-council-22-october-2024.

United Nations International Office of Migration (UN IOM). (2024, Sept). Haiti — Report on the internal displacement situation in Haiti — Round 8 (September 2024). https://dtm.iom.int/reports/haiti-report-internal-displacement-situation-haiti-round-8-september-2024.

United Nations Office for the Coordination of Humanitarian Affairs (UN OCHA). (2024 July 22). Haiti Emergency Situation Report No. 29 (as of 18 July 2024). https://www.unocha.org/publications/report/haiti/haiti-emergency-situation-report-no-29-18-july-2024.

United Nations Office of the High Commissioner for Human Rights (UN OHCHR). (2024 Sept 26). A/HRC/57/41: Situation of human rights in Haiti - Interim report of the United Nations High Commissioner for Human Rights - Advance edited version. https://www.ohchr.org/en/documents/country-reports/ahrc5741-situation-human-rights-haiti-interim-report-united-nations-high.

OHCHR. (2025, Jan 7). Haiti: Over 5,600 killed in gang violence in 2024, UN figures show. https://www.ohchr.org/en/press-releases/2025/01/haiti-over-5600-killed-gang-violence-2024-un-figures-show.

UN News. (2024, July 26). Global education fund announces $2.5 million grant for Haiti. https://news.un.org/en/story/2024/07/1152556.

UN News (2024, Nov 21). As violent gangs extend control in Haiti, UN commits to staying the course. https://news.un.org/en/story/2024/11/1157246.

UN News (2024, Dec 2). Haiti's children: Crisis demands urgent action. https://news.un.org/en/story/2024/12/1157686.

UN Security Council. (2024, Nov 29). Letter dated 29 November 2024 from the President of the Security Council addressed to the Secretary-General. https://digitallibrary.un.org/record/4068045/files/S_2024_868-EN.pdf.

World Bank (2024). The World Bank in Haiti. https://www.worldbank.org/en/country/haiti/overview.

World Food Programme (WFP). (2024, September, 30). Hunger in Haiti reaches historic high with one-in-two Haitians now in acute hunger. https://www.wfp.org/news/hunger-haiti-reaches-historic-high-one-two-haitians-now-acute-hunger.

HaitiTPSAR000247

PRE-DECISIONAL/DELIBERATIVE



**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director*
Camp Springs, MD 20588-0009

**U.S. Citizenship and Immigration Services**

June 3, 2025

**DECISION**

MEMORANDUM FOR THE SECRETARY

FROM:        Angelica Alfonso-Royals
             Acting Director

ANGELICA M ALFONSO-ROYALS
Digitally signed by ANGELICA M ALFONSO-ROYALS
Date: 2025.06.03 10:10:10 -04'00'

SUBJECT:     **Temporary Protected Status for Haiti**

PRE-DECISIONAL/DELIBERATIVE

HaitiTPSAR000248

PRE-DECISIONAL/DELIBERATIVE

PRE-DECISIONAL/DELIBERATIVE

HaitiTPSAR000249

PRE-DECISIONAL/DELIBERATIVE

PRE-DECISIONAL/DELIBERATIVE

HaitiTPSAR000250



PRE-DECISIONAL/DELIBERATIVE

HaitiTPSAR000251

PRE-DECISIONAL/DELIBERATIVE

PRE-DECISIONAL/DELIBERATIVE

HaitiTPSAR000252

PRE-DECISIONAL/DELIBERATIVE



PRE-DECISIONAL/DELIBERATIVE

HaitiTPSAR000253

PRE-DECISIONAL/DELIBERATIVE

PRE-DECISIONAL/DELIBERATIVE

HaitiTPSAR000254



**Secretary's Decision**:

1.  _Terminate_:  _Terminate Haiti's designation_

    Approve/date <u>⸻⸻⸻⸻⸻</u> 06/04/2025

HaitiTPSAR000255

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of Policy and Strategy*
5900 Capital Gateway Drive
Camp Springs, MD 20588-0009



**U.S. Citizenship and Immigration Services**

## HAITI TEMPORARY PROTECTED STATUS (TPS) RESULTS

**Disclaimer for all Special Protected Classes**

Information contained within this report may be subject to immigration specific confidentiality provisions, such as IIRIRA § 404(h), IRCA Section 121(c); 8 C.F.R. § 208.6 (Disclosure of Asylum Information to Third Parties, which is applied to refugee information by policy); 8 U.S.C. § 1367, pertaining to certain victims of domestic abuse, and certain victims of qualifying criminal activities and severe forms of human trafficking; Legalization, 8 U.S.C. §1255a(c)(4)-(5); Special Agriculture Worker (SAW), 8 U.S.C. §§ 1160(b)(5) and (6); LIFE Act, Pub. L. 106-553; Temporary Protected Status, 8 U.S.C. § 1254a(c)(6); other immigration specific limitations; and the terms and conditions as set forth in USCIS's System of Records Notices. This information may only be accessed by authorized personnel with a need to know the information and must be safeguarded.

A violation of the confidentiality provisions in SAW (8 USC 1160(b)(6)(D)), Legalization (8 U.S.C. § 1255A (c)(5)(E)), or LIFE Legalization (Pub. L. 106-553 §1104(c)(5) (December 21 2000)) cases can result in a fine up to $10,000. Violations of the confidentiality provisions of Section 1367(a)(2) are punishable by disciplinary action and a fine of up to $5,000 per violation and may be assessed against anyone who shares any information relating to a protected individual in violation of the confidentiality provisions of Section 1367 (see 8 U.S.C. § 1367(c)).

**Onward disclosure request process**

Requests for authorization to disclose information are to be made through the DHS Single Point of Service/Request for Information (SPS/RFI) process for referral to USCIS. To make a request for onward disclosure through the SPS/RFI process, an RFI form specifying the request for onward disclosure must be completed and submitted. The RFI form should include the information that would be shared, the entity with which it would be shared, and the purpose of the proposed disclosure, as well as the contact information of the requester.

The RFI form can be obtained from the RFI Desk/Office at uscis.rfi@uscis.dhs.gov or (202) 272-8812.

WARNING: this file is designated FOR OFFICIAL USE ONLY (FOUO) and contains DEPARTMENT OF HOMELAND SECURITY (DHS) U.S. CITIZENSHIP AND

1

IMMIGRATION SERVICES (USCIS) information. This document is to be controlled, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need to know."

**Data Retrieval Date:** FDNS-DS NexGen as of September 11, 2025.

**Notes:** Unique alien numbers were passed through FDNS-DS NexGen to identify if the alien number provided had an associated KST/Non-KST National Security Record or EPS/Non-EPS Public Safety Record indicating derogatory information. Only the primary entity on the FDNS Record was queried for each alien number.  Please note the KST/Non-KST designation is based on FDNS-DS NexGen at the time the record was closed or the time when the data was queried. If one individual is the subject of multiple National Security investigations with both KST and Non-KST designations listed, KST will be reported. If one individual is the subject of multiple Public Safety investigations with both EPS and Non-EPS designations listed, EPS will be reported. Unique receipts were passed through FDNS-DS NexGen to identify associated Statement of Findings (SOF) where the receipt number was directly associated to the SOF. Summary tables for Record and SOF results are provided in the workbook.

HaitiTPSAR000257

**HAITI TEMPORARY PROTECTED STATUS (TPS) RESULTS**

**Statement of Findings Determination on TPS Receipts Provided by TPS Country:**

| Fraud Record Determinations | Total |
|---|---|
| Fraud Found | 2,327 |
| Fraud Not Found | 512 |
| Inconclusive | 273 |
| No SOF Information Found | 565,433 |
| **Total** | **568,545** |

**Notes:** Receipt data provided were passed through FDNS-DS NexGen to identify if any receipt had an associated Statement of Findings.
**Source:** FDNS-NexGen as of 9-9-2025

**TPS Alien Numbers Provided where the Alien Number is Associated with a Public Safety Record and TPS Country:**

| Public Safety Records | Total |
|---|---|
| EPS | 369 |
| Non-EPS | 496 |
| No Public Safety Record Information Found | 567,680 |
| **Total** | **568,545** |

**Notes:** Unique alien numbers were passed through FDNS-DS NexGen to identify if the alien number provided had an associated KST/Non-KST National Security Record or EPS/Non-EPS Public Safety Record indicating derogatory information. Only the primary entity on the FDNS Record was queried for each alien number.  Please note the KST/Non-KST designation is based on FDNS-DS NexGen at the time the record was closed or the time when the data was queried. If one individual is the subject of multiple national security investigations with both KST and Non-KST designations listed, KST will be reported. If one individual is the subject of multiple Public Safety investigations with both EPS and Non-EPS designations listed, EPS will be reported. Unique receipts were passed through FDNS-DS NexGen to identify associated Statement of Findings (SOF) where the receipt number was directly associated to the SOF.
**Source:** FDNS-NexGen as of 8-7-2025

**Notes:** Unique alien numbers were passed through FDNS-DS NexGen to identify if the alien number provided had an associated KST/Non-KST National Security Record or EPS/Non-EPS Public Safety Record indicating derogatory information. Only the primary entity on the FDNS Record was queried for each alien number.  Please note the KST/Non-KST designation is based on FDNS-DS NexGen at the time the record was closed or the time when the data was queried. If one individual is the subject of multiple national security investigations with both KST and Non-KST designations listed, KST will be reported. If one individual is the subject of multiple Public Safety investigations with both EPS and Non-EPS designations listed, EPS will be reported. Unique receipts were passed through FDNS-DS NexGen to identify associated Statement of Findings (SOF) where the receipt number was directly associated to the SOF. **Source:** FDNS-NexGen as of 8-7-2025

HaitiTPSAR000258

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of Policy and Strategy*
5900 Capital Gateway Drive
Camp Springs, MD 20588-0009



U.S. Citizenship
and Immigration
Services

## Summary of TECS Hits for Haiti FY 2010-2025

DHS records indicate half of persons associated with the Haiti TPS program have been subject to administrative investigations for potential risks to national security or public safety, or for attempting to obtain immigration benefits through fraud or misrepresentation. DHS data reveals that approximately 50.5% of Haiti TPS filers have at least one TECS[1] hit in their immigration benefit request history, which may encompass multiple years and various types of benefit requests. It is important to note that a TECS hit does not always lead to derogatory findings or a negative adjudicative outcome.

### Summary of Haiti TECS Hit Data

| Description | Count |
|---|---|
| Total TECS Hits for TPS Population | 286,911 |
| Total unique I-821 A numbers[2] | 568,388 |
| Ratio of TECS Hit | 50.5% |

---

[1] TECS is an information-sharing platform which can assist authorized users to access different databases to identify individuals who pose a risk to national security or public safety, and individuals attempting to obtain immigration benefits through fraud or misrepresentation.

2 These include all individuals (as represented by unique A-numbers) who have filed Form I-821 under Haiti TPS designation(s). It is possible that a same individual has more than one A-numbers, though such cases are rare.

**www.uscis.gov**

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of Policy and Strategy*
5900 Capital Gateway Drive
Camp Springs, MD 20588-0009



U.S. Citizenship
and Immigration
Services

## HAITI ADVANCE PAROLE RECEIPT COUNT
## FY2010-2025 (YTD)

**I-131, Application for Travel Documents, Parole Documents, and Arrival/Departure Records**
CLAIMS3 Advanced Parole Receipts for Citizens of Haiti
January 21, 2010 – September 11, 2025

| Calendar Year | Receipts |
|---|---|
| 2010 (Jan 21) | 2,917 |
| 2011 | 7,315 |
| 2012 | 9,213 |
| 2013 | 8,751 |
| 2014 | 10,688 |
| 2015 | 9,580 |
| 2016 | 12,015 |
| 2017 | 5,403 |
| 2018 | 4,855 |
| 2019 | 5,142 |
| 2020 | 3,105 |
| 2021 | 2,395 |
| 2022 | 1,146 |
| 2023 | 1,617 |
| 2024 | 2,009 |
| 2025 (Sep 11) | 133 |
| **Total** | **86,284** |

**Notes:**
1.) This report reflects the most up to date data available at the time the database is queried.
2.) Counts may differ from those reported in previous periods due to system updates and post-adjudicative outcomes.
3.) Travel data unavailable in CLAIMS3.
4.) Counts are limited to application types for applying for an AP Document to allow return to the USA after temporary foreign travel.
5.) For a complete list of USCIS forms and descriptions, visit: https://www.uscis.gov/forms

**Source:**
Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality CLAIMS3, queried 9/2025, PAER0018826.

1

HaitiTPSAR000260

**I-131, Application for Travel Documents, Parole Documents, and Arrival/Departure Records**
ELIS Advance Parole Receipts for Citizens of Haiti
January 21, 2010 - September 11, 2025

| Calendar Year | Receipts | Receipts with Travel to Haiti | % with Travel to Haiti |
|---|---|---|---|
| 2010 (Jan 21) | - | - | n/a |
| 2011 | - | - | n/a |
| 2012 | - | - | n/a |
| 2013 | - | - | n/a |
| 2014 | - | - | n/a |
| 2015 | - | - | n/a |
| 2016 | - | - | n/a |
| 2017 | 1,341 | - | 0.0% |
| 2018 | 7,078 | - | 0.0% |
| 2019 | 2,440 | 69 | 2.8% |
| 2020 | 2,378 | 133 | 5.6% |
| 2021 | 12,804 | 781 | 6.1% |
| 2022 | 6,416 | 1,193 | 18.6% |
| 2023 | 14,349 | 1,356 | 9.5% |
| 2024 | 15,459 | 758 | 4.9% |
| 2025 (Sep 11) | 1,219 | 180 | 14.8% |
| **Total** | **63,484** | **4,470** | **7.0%** |

**Notes:**
1.) This report reflects the most up to date data available at the time the database is queried.
2.) Counts may differ from those reported in previous periods due to system updates and post-adjudicative outcomes.
3.) Counts are limited to application types for applying for an AP Document to allow return to the USA after temporary foreign travel.

**Source:**
Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality
ELIS, queried 9/2025, PAER0018826.

2

HaitiTPSAR000261



# Latin America and the Caribbean: Fact Sheet on Leaders and Elections

Updated February 21, 2025

**Congressional Research Service**

https://crsreports.congress.gov

98-684

**CRS REPORT**
Prepared for Members and
Committees of Congress

HaitiTPSAR000262

*Latin America and the Caribbean: Fact Sheet on Leaders and Elections*

T his report provides the results of recent presidential elections in Latin America and the Caribbean. Below are three tables, organized by region, that include the date of each country's independence, the name of the most recently elected president or prime minister, and the projected date of the next presidential election. Information in this report was compiled from numerous sources, including the U.S. State Department, Central Intelligence Agency's (CIA's) *World Factbook*, International Foundation for Electoral Systems (IFES) Election Guide, Economist Intelligence Unit (EIU), and other news sources.

## Table 1. South America: Heads of Government and Election Schedules

| Country | Independence Date | Head of Government | Last Election/ Runoff | Next Election/ Runoff |
|---|---|---|---|---|
| Argentina | July 9, 1816 | MILEI, Javier | Oct. 22, 2023/ Nov. 19, 2023 | Oct. 2027/ Nov. 2027 |
| Bolivia | Aug. 6, 1825 | ARCE, Luis | Oct. 18, 2020[a] | Aug. 17, 2025/ Oct. 19, 2025 |
| Brazil | Sept. 7, 1822 | DA SILVA, Luiz Inácio (widely known as "Lula") | Oct. 2, 2022/ Oct. 30, 2022 | Oct. 2026 |
| Chile | Sept. 18, 1810 | BORIC, Gabriel | Nov. 21, 2021/ Dec. 19, 2021 | Nov. 16, 2025/ Dec. 14, 2025 |
| Colombia | July 20, 1810 | PETRO, Gustavo | May 29, 2022/ June 19, 2022 | May 2026/ June 2026 |
| Ecuador | May 24, 1822 | NOBOA, Daniel | Aug. 20, 2023/ Oct. 15, 2023[b] | Feb. 9, 2025[c]/ Apr. 13, 2025 |
| Paraguay | May 14, 1811 | PEÑA, Santiago | Apr. 30, 2023 | Apr. 2028 |
| Peru | July 28, 1821 | BOLUARTE, Dina[d] | Apr. 11, 2021/ June 6, 2021 | Apr. 2026[e] |
| Uruguay | Aug. 25, 1825 | LACALLE POU, Luis | Oct. 27, 2024/Nov. 24, 2024[f] | Oct. 2[d]029/Nov. 2029 |
| Venezuela | July 5, 1811 | MADURO, Nicolás | July 28, 2024 | Uncertain[g] |

**Source:** Compiled by the Congressional Research Service (CRS).

**Notes:** For information on Guyana and Suriname, see **Table 3**.

a. Elections were held on October 18, 2020, after the November 2019 results were annulled, and then delayed in March 2020 due to the spread of COVID-19. See CRS In Focus IF12743, *Bolivia: Country Overview and U.S. Relations*, by Leticia Chacon.

b. On May 17, 2023, facing an imminent impeachment vote, President Guillermo Lasso invoked constitutional article 148, the so-called "crossed death" decree, dissolving congress and requiring snap general elections to choose a president and a legislature to serve the remainder of the current terms of office until 2025. Following elections in which no candidate won 50% of the vote, a runoff election was held between the top two candidates on October 15, 2023. Daniel Noboa won with 51.83% of the vote. President Noboa's inauguration took place November 23, 2023, and Ecuador's new National Assembly was seated on November 17. For additional information, see CRS In Focus IF11218, *Ecuador: Country Overview and U.S. Relations*, by Joshua Klein.

c. Following Ecuador's first round of presidential elections, the top two candidates were current President Daniel Noboa, who received 44.17% of the vote, and Luisa Gonzalez, who received 43.97% of the vote. Without a majority winner, a runoff election is scheduled for April 13, 2025, between the top two candidates.

HaitiTPSAR000263

d.  On December 7, 2022, Pedro Castillo attempted to dissolve congress, create a government of exception, and rule by decree. That same day, the Peruvian Congress impeached Castillo, who was arrested shortly afterwards. Also on December 7, Vice President Dina Boluarte was sworn in as president.

e.  Despite proposals by President Dina Boluarte and members of the legislature to hold early general elections in late 2023 or early 2024 in response to the impeachment and removal of former President Pedro Castillo, legislators failed to approve early elections in two successive congressional sessions as required by the constitution. Consequently, the electoral calendar remains unchanged, with the next general elections scheduled for April 2026. See Andrea Moncada, "Why Dina Boluarte Could Make It to 2026," *Americas Quarterly*, April 10, 2023, https://americasquarterly.org/article/why-dina-boluarte-could-make-it-to-2026/.

f.  Yamandú Orsi won Uruguay's presidential runoff election with 49.77% of the vote, defeating Álvaro Delgado, who received 45.94%. The remainder of the vote consisted of blank or other invalid ballots. Orsi is expected to take office on March 1, 2025.

g.  After a decade of increasingly authoritarian rule, Venezuela held presidential elections that most international observers, including the U.S. Department of State, concluded did not meet international standards. Venezuela's National Electoral Commission (CNE) claimed that Nicolás Maduro won 51.2% of the vote, compared with 44.2% for Edmundo González Urrutia. These results contradict preelection polling, exit polls, and precinct-level vote tabulations published by the opposition. For more information, see CRS Insight IN12354, *Venezuela's 2024 Presidential Election*, by Leticia Chacon and Clare Ribando Seelke.

### Table 2. Mexico and Central America: Heads of Government and Election Schedules

| Country | Independence Date | Head of Government | Last Election/ Runoff | Next Election/ Runoff |
|---|---|---|---|---|
| Mexico | Sept. 16, 1810 | SHEINBAUM, Claudia | June 2, 2024[a] | June 2030 |
| Costa Rica | Sept. 15, 1821 | CHAVES, Rodrigo | Feb. 6, 2022/ Apr. 3, 2022 | Feb. 2026/ Apr. 2026 |
| El Salvador | Sept. 15, 1821 | BUKELE, Nayib | Feb. 4, 2024 | Feb. 2029 |
| Guatemala | Sept. 15, 1821 | ARÉVALO, Bernardo | June 25, 2023/ Aug. 20, 2023 | by 2027 |
| Honduras | Sept. 15, 1821 | CASTRO, Xiomara | Nov. 28, 2021 | Nov. 30, 2025 |
| Nicaragua | Sept. 15, 1821 | ORTEGA, Daniel | Nov. 7, 2021[b] | Nov. 2026 |
| Panama | Nov. 3, 1903 | MULINO, José Raúl | May 5, 2024 | May 2029 |

**Source:** Compiled by CRS.

**Notes:** For information on Belize, see **Table 3**.

a.  Claudia Sheinbaum was inaugurated on October 1, 2024, as Mexico's first female president. For more information, see CRS In Focus IF12765, *Mexico: Political Overview and U.S.-Mexican Relations*, by Clare Ribando Seelke and M. Angeles Villarreal.

b.  Prior to the elections, the Ortega government arrested eight people who sought to challenge Ortega in the elections and dozens of political and civil society leaders. Much of the international community, including the United States, rejected the elections; the Organization of American States declared that the elections "were not free, fair or transparent and have no democratic legitimacy." See U.S. Mission to the Organization of American States, "OAS General Assembly Condemns the Ortega-Murillo Regime in Nicaragua," November 12, 2021, https://usoas.usmission.gov/oas-general-assembly-condemns-the-ortega-murillo-regime-in-nicaragua/. See also CRS Report R46860, *Nicaragua in Brief: Political Developments and U.S. Policy*, by Maureen Taft-Morales (for further information, congressional clients may contact Karla Rios), and CRS Report R48294, *Nicaragua: In Brief*, by Karla I. Rios.

HaitiTPSAR000264

### Table 3. Caribbean: Heads of Government and Election Schedules

| Country | Independence Date | Head of Government | Last Election/ Runoff | Next Election/ Runoff |
|---|---|---|---|---|
| Antigua and Barbuda | Nov. 1, 1981 | BROWNE, Gaston | Jan. 18, 2023 | by July 2028 |
| Bahamas | July 10, 1973 | DAVIS, Philip | Sept. 16, 2021 | by Sept. 2026 |
| Barbados | Nov. 30, 1966 | MOTTLEY, Mia | Jan. 19, 2022 | by Jan. 2027 |
| Belize | Sept. 21, 1981 | BRICEÑO, Johnny | Nov. 11, 2020 | Mar. 12, 2025 |
| Cuba[a] | May 20, 1902 | DÍAZ-CANEL, Miguel | Apr. 19, 2023 | 2028 |
| Dominica | Nov. 3, 1978 | SKERRIT, Roosevelt | Dec. 6, 2022[b] | by Mar. 2028 |
| Dominican Republic | Feb. 27, 1844 | ABINADER, Luis | May 19, 2024 | May 2028 |
| Grenada | Feb. 7, 1974 | MITCHELL, Dickon | June 23, 2022[c] | by June 2027 |
| Guyana | May 26, 1966 | ALI, Irfaan | Mar. 2, 2020 | by 2025 |
| Haiti | Jan. 1, 1804 | DIDIER FILS-AIMÉ, Alix[d] | Nov. 20, 2016[e] | Nov. 15, 2025/ Jan. 2026[f] |
| Jamaica | Aug. 6, 1962 | HOLNESS, Andrew | Sept. 3, 2020 | by 2025 |
| St. Kitts and Nevis | Sept. 19, 1983 | DREW, Terrance | Aug. 5, 2022 | by 2027 |
| St. Lucia | Feb. 22, 1979 | PIERRE, Philip | July 26, 2021 | by 2026 |
| St. Vincent and the Grenadines | Oct. 27, 1979 | GONSALVES, Ralph E. | Nov. 5, 2020 | by 2025 |
| Suriname | Nov. 25, 1975 | SANTOKHI, Chandrikapersad | May 25, 2020 | May 25, 2025 |
| Trinidad and Tobago | Aug. 31, 1962 | ROWLEY, Keith | Aug. 10, 2020 | by 2025 |

**Source:** Compiled by CRS.

**Notes:** Although Belize is located in Central America and Guyana and Suriname are located in South America, all three are members of the Caribbean Community (CARICOM).

a. Cuba does not have direct elections for its head of government. Instead, Cuba's legislature selects the members of the 31-member Council of State, with the president of that body serving as Cuba's head of government and head of state. In April 2023, Cuba's legislature selected Miguel Díaz-Canel for another five-year term. Díaz-Canel has served as president of the republic since Cuba's legislature appointed him in October 2019. See Andrea Rodriguez, "Cuba's Parliament Ratifies President Díaz-Canel for New Term," Associated Press, April 19, 2023, https://apnews.com/article/cuba-assembly-president-miguel-diazcanel-7f496a6b05f04aa3d3c7b4a1f3cb45dc.

b. In November 2022, Prime Minister Roosevelt Skerrit called a snap election that was held on December 6, 2022, ahead of elections constitutionally due by March 2025.

c. In May 2022, Prime Minister Keith Mitchell called a snap election held on June 23, 2022, ahead of elections constitutionally due in March 2023.

d. Haiti's President Jovenel Moïse was assassinated on July 7, 2021. Ariel Henry, named by Moïse but not yet sworn in, became de facto prime minister on July 20, 2021. Under the Haitian Constitution, either the Council of Ministers under the prime minister should govern or, in the last year of a presidential term, the legislature should elect a provisional president. There has been no functioning legislature since January 2020, and there are no remaining elected officials. On March 11, 2024, Henry agreed to resign after a transitional council was formed. On April 12, 2024, the Haitian governmental gazette published a decree establishing a nine-person council, effective until February 7, 2026, tasked with naming a new prime minister and cabinet. The transitional council was sworn in on April 25, 2024. See Evens Sanon and Dánica Coto, "Transitional Council in Haiti to Choose New Leaders Is Formally Established Amid Gang Violence," Associated Press, April 12, 2024, https://apnews.com/article/haiti-transitional-council-gang-violence-

HaitiTPSAR000265

86ae6d010d0fba2a5742ec82ec05ac25. See also U.S. State Department, "The United States Welcomes Establishment of Haiti's Transitional Presidential Council," press statement, April 12, 2024, https://www.state.gov/the-united-states-welcomes-establishment-of-haitis-transitional-presidential-council/. The transitional council first selected Garry Conille as prime minister, who was sworn in on June 3, 2024 and later appointed Alix Didier Fils-Aimé on October 11, 2024. See U.S. Department of State, "Designation of a New Prime Minister in Haiti Press Statement," November 12, 2024, https://www.state.gov/designation-of-a-new-prime-minister-in-haiti/. This follows a period of increasing civil unrest in Haiti. See CRS Report R47394, *Haiti: Recent Developments and U.S. Policy*, by Karla I. Rios and Clare Ribando Seelke. See also CRS Insight IN12331, *Haiti in Crisis: What Role for a Multinational Security Support Mission?*, by Karla I. Rios.

e.  Haiti held controversial national elections on October 25, 2015. After postponing runoff elections several times, the Provisional Electoral Council announced that new presidential elections would take place instead in October 2016; these were delayed for a month due to Hurricane Matthew.

f.  An April 12, 2024, decree created a transitional council that will exercise presidential powers until February 7, 2026, the date by which a new president must be sworn in. The transitional council appointed a provisional electoral commission, a requirement for elections to take place, on September 18, 2024. During a January 29, 2025, interview, the head of the transitional council stated that the first round of elections would be held on November 15, 2025, and a second round in early January 2026. See Evens Sanon and Dánica Coto, "Transitional Council in Haiti to Choose New Leaders Is Formally Established Amid Gang Violence," Associated Press, April 12, 2024, https://apnews.com/article/haiti-transitional-council-gang-violence-86ae6d010d0fba2a5742ec82ec05ac25. See also Haiti Libre, "Haiti—Elections: Finally a Provisional Electoral Council to prepare the first elections," September 19, 2024, https://www.haitilibre.com/en/news-43238-haiti-elections-finally-a-provisional-electoral-council-to-prepare-the-first-elections.html. See Corinne Frilet and Jean-Michel Hauteville, "Haiti's transitional president Leslie Voltaire announces November 2025 elections," *Le Monde,* January 31, 2025, https://www.lemonde.fr/en/international/article/2025/01/31/haiti-s-transitional-president-leslie-voltaire-announces-november-2025-elections_6737642_4.html.

HaitiTPSAR000266

## Author Information

Carla Y. Davis-Castro
Senior Research Librarian

---

## Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.

# Entry/Exit Overstay Report

Fiscal Year 2024 Report to Congress

*July 16, 2025*

Fiscal Year 2024 Report to Congress



*U.S. Customs and Border Protection*

HaitiTPSAR000268

# Message from the Acting Deputy Commissioner of U.S. Customs and Border Protection

July 16, 2025



U.S. Customs and Border Protection respectfully submits the Fiscal Year 2024 "Entry/Exit Overstay Report" as directed in the *Immigration and Naturalization Service Data Management Improvement Act of 2000* (Public Law 106-215) and Section 2(e) *Visa Waiver Permanent Program Act of 2000* (Public Law 106-396).

This report provides data on expected departures and overstays, by country, for foreign travelers to the United States who were admitted as nonimmigrants at an air or seaport port of entry and were expected to depart in Fiscal Year 2024 (October 1, 2023 – September 30, 2024).

Pursuant to congressional requirements, this report is being provided to the following Members of Congress:

The Honorable Mark Amodei
Chairman, House Appropriations Subcommittee on Homeland Security

The Honorable Lauren Underwood
Acting Ranking Member, House Appropriations Subcommittee on Homeland Security

The Honorable Katie Britt
Chair, Senate Appropriations Subcommittee on Homeland Security

The Honorable Chris Murphy
Ranking Member, Senate Appropriations Subcommittee on Homeland Security

The Honorable Rand Paul
Chairman, Senate Committee on Homeland Security and Governmental Affairs

The Honorable Gary C. Peters
Ranking Member, Senate Committee on Homeland Security and Governmental Affairs

The Honorable Mark E. Green
Chairman, House Committee on Homeland Security

HaitiTPSAR000269

The Honorable Bennie G. Thompson
Ranking Member, House Committee on Homeland Security

I would be pleased to respond to any questions.  Please do not hesitate to contact my office at (202) 344-2001.

Sincerely,

John Modlin
Acting Deputy Commissioner
U.S. Customs and Border Protection

ii

HaitiTPSAR000270

# Executive Summary

This report provides data on expected departures and overstays, by country, for foreign travelers to the United States who were admitted as nonimmigrants at an air or seaport port of entry (and were expected to depart in Fiscal Year 2024 (October 1, 2023 – September 30, 2024). In this report, expected departures are defined as entries by travelers who were lawfully admitted to the United States as a nonimmigrant and whose authorized period of admission expired within Fiscal Year 2024.

An overstay is defined as a nonimmigrant who was lawfully admitted to the United States but remained in the United States beyond the authorized period of admission. This can be a fixed period or for the duration of a certain activity, such as the period during which a student is pursuing a full course of study or any authorized technical/practical training program. U.S. Customs and Border Protection identifies two types of overstays: 1) individuals for whom no departure was recorded (Suspected In-Country Overstays), and 2) individuals whose departure was recorded after their authorized period of admission expired (Out-of-Country Overstays).

Determining lawful status requires more than matching entry and exit data. For example, a person may receive a 6-month period of admission upon entry and then subsequently apply for and receive an extension for the period of admission of up to 6 months from U.S. Citizenship and Immigration Services. Identifying extensions, changes, or adjustments of status are necessary steps to determine whether a person has overstayed their authorized period of admission; this report was generated with improvements to data analysis in an automated fashion to better account for these changes.

Valid periods of admission to the United States vary; therefore, it was necessary to establish "cutoff dates" for the purposes of this report. Unless otherwise noted, the tables accompanying this report refer to departures that were expected to occur between October 1, 2023, and September 30, 2024.

In Fiscal Year 2024, there were 46,657,108 expected departures, a 19.6 percent increase from the Fiscal Year 2023 figure of 39,005,712. The increase in the Fiscal Year 2024 expected departures population can be attributed to a multitude of factors including reduced impacts from travel restrictions associated with the Coronavirus Disease 2019 pandemic.

This report presents the overstay rates of those who remained in the United States beyond their authorized period of admission with no evidence of an extension to their period of admission or adjustment to another immigration status. Overstay rates are provided for the major categories listed in the sections below.

iii

HaitiTPSAR000271

**Total Overstay Rate**

As noted, U.S. Customs and Border Protection determined there were 46,657,108 in-scope nonimmigrant admissions[1] to the United States through air or seaport port of entry with expected departures occurring in Fiscal Year 2024, which represented the majority of air and sea annual nonimmigrant admissions.  Of this number, U.S. Customs and Border Protection calculated a total overstay rate of 1.15 percent, or 538,548 overstay events.  In other words, 98.85 percent of the in-scope nonimmigrant visitors departed the United States on-time and in accordance with the terms of their admission.

This report breaks down the overstay rates further to provide a better picture of those overstays who remained in the United States beyond their period of admission and for whom there is no identifiable evidence of a departure, an extension of period of admission, or transition to another immigration status.  At the end of Fiscal Year 2024, there were 482,954 Suspected In-Country Overstays, which represented 1.04 percent of expected departures, and there were 55,594 Out-of-Country Overstays, representing 0.11 percent of expected departures.

Due to subsequent departures and adjustments of status to lawful permanent resident by individuals in this population, by February 6, 2025, the number of Suspected In-Country Overstays for Fiscal Year 2024 decreased to 427,204, resulting in the Suspected In-Country Overstay rate of .92 percent.  As of February 6, 2025, the Department of Homeland Security was able to confirm the departures or adjustments of status of more than 99.08 percent of nonimmigrants scheduled to depart in Fiscal Year 2024, via air and seaport port of entry.

**Visa Waiver Program Country Overstay Rate**

This report separates Visa Waiver Program country overstay figures from non-Visa Waiver Program country figures.  For Visa Waiver Program countries, the Fiscal Year 2024, Suspected In-Country Overstay rate is 0.43 percent of the 18,853,231 expected departures.

**Non-Visa Waiver Program Participant Countries Overstay Rate**

For non-Visa Waiver Program countries (excluding Canada and Mexico), the Fiscal Year 2024, Suspected In-Country Overstay rate is 2.22 percent of the 12,131,255 expected departures.

**Student or Exchange Visitor Overstay Rate**

For nonimmigrants who were admitted on a student or exchange visitor visa (F, M, or J visa), the Fiscal Year 2024 Suspected In-Country Overstay rate is 2.45 percent of the 1,412,627 students and exchange visitors scheduled to complete their program in the United States.[2]

---

[1] See Appendix A for a full list defining "in-scope nonimmigrant classes of admission."

[2] Excludes Canada and Mexico students or exchange visitors.

HaitiTPSAR000272

**All Other In-Scope Classes of Admission Overstay Rate**

For all other in-scope non-Visa Waiver Program classes of admission, the Fiscal Year 2024 Suspected In-Country Overstay rate is 2.05 percent of the 1,141,821 expected departures.

**Canada and Mexico Overstay Rates**

Unlike other countries, the majority of travelers from Canada and Mexico enter the United States by land. Figures pertaining to Canada and Mexico are presented separately from the other countries since air and sea information represents a smaller portion of the Canadian and Mexican travel population. For Canada, the Fiscal Year 2024, Suspected In-Country Overstay rate for those traveling through air and seaport port of entry is 0.19 percent of 9,429,208 expected departures. For Mexico, the Fiscal Year 2024 Suspected In-Country Overstay rate for those traveling through air and seaport port of entry is 1.54 percent of 3,688,966 expected departures. This represents overstays by people who arrived by air and seaport port of entry and does not include overstays by people who arrived by land.

The Fiscal Year 2024 report covers the same classes of admission as previous Entry and Exit Overstay Reports, those traveling to the United States temporarily for business and pleasure, including those from designated Visa Waiver Program countries traveling under an Electronic System for Travel Authorization, student travelers, worker classifications, and other classes of nonimmigrant admission.[3] The only excluded classes are diplomats, crewmembers, travelers in transit, and special protected classes under Section 1367 (Appendix B).[4]

In Fiscal Year 2024, Department of Homeland Security continued developing overstay mission capabilities. The use of advanced biometrics improved the Department of Homeland Security's ability to confirm travelers' identities at border crossings and enhanced our ability to identify overstays. The vetting unit responsible for assisting the review of Out-of-Country Overstay leads is continuing the notification process for Visa Waiver Program travelers who have overstayed their period of admission in the United States. This includes emailing overstayers regarding their noncompliance and informing them of the ramifications of their violation.

U.S. Customs and Border Protection continues to notify Visa Waiver Program travelers in advance of the end date of their period of authorized admission. U.S. Customs and Border Protection plans to further expand these notifications to additional populations. Additionally, the Department of Homeland Security typically requires Visa Waiver Program countries with an overstay rate equal to or exceeding 2 percent to implement a public awareness campaign intended to educate their nationals on the importance of abiding by the terms of their admission to the United States.

---

[3] See Appendix A.

[4] Section 1367 of title 8, United States Code, establishes rules and penalties for the disclosure of information related to applicants for or beneficiaries of U visas, T visas, or Violence Against Women Act protections.

HaitiTPSAR000273

Department of Homeland Security continues to improve its data collection of both biographic and biometric data on travelers arriving or departing the United States, and some of these improvements are discussed in this report.

HaitiTPSAR000274



# Fiscal Year 2024 Entry/Exit Overstay Report

## Table of Contents

I.   Legislative Language ........................................................................................................... 1

II.  Background .......................................................................................................................... 2

III. Existing Operations ............................................................................................................ 4

    A.   Air and Sea Environments ........................................................................................... 4
    B.   Land Environment ........................................................................................................ 4
    C.   Overstay Definition...................................................................................................... 5
    D.   Overstay Identification and Action ............................................................................. 6

IV.  Overstay Rates .................................................................................................................... 9

    A.   Fiscal Year 2024 Overstay Rate Summary ................................................................ 11
    B.   Fiscal Year 2024 Visa Waiver Program Nonimmigrant Business or Pleasure Overstay Rates ...................................................................................................................................... 12
    C.   Fiscal Year 2024 Non-Visa Waiver Program Country B1/B2 Overstay Rates .................. 14
    D.   Fiscal Year 2024 Nonimmigrant Students and Exchange Visitors Overstay Rates ....... 19
    E.   Fiscal Year 2024 Overstay Rates for All Other In-scope Classes of Admission................ 25
    F.   Fiscal Year 2024 Canada and Mexico Nonimmigrant Overstay Rates ........................... 31
    G.   Fiscal Year 2023 Suspected In-Country Overstay Trend ............................................... 31

V.   Conclusion ........................................................................................................................ 34

VI.  Appendices........................................................................................................................ 35

    Appendix A.  In-Scope Nonimmigrant Classes of Admission .................................................. 35
    Appendix B.  Out-of-Scope Nonimmigrant Classes of Admission .......................................... 37
    Appendix C.  Fiscal Year 2023 Entry and Exit Overstay Data................................................. 38

HaitiTPSAR000275

# I.    Legislative Language

This document responds to the legislative language set forth in the *Immigration and Naturalization Service Data Management Improvement Act of 2000* (Public Law 106-215) and Section 2(e) *Visa Waiver Permanent Program Act of 2000* (Public Law 106-396).

Section-relevant part:

> An annual report to the House and Senate Judiciary on the integrated entry and exit data system for the preceding fiscal year. The report should include: (A) The number of aliens for whom departure data was collected, with an accounting by country of the departing alien's nationality; (B) The number of departing aliens whose departure data was successfully matched to the alien's arrival data, with an accounting by the alien's country of nationality and by the alien's classification as an immigrant or nonimmigrant; (C) The number of aliens who arrived pursuant to a nonimmigrant visa, or as a visitor under the visa waiver program, for whom no matching departure data have been obtained through the system or through other means as of the end of the alien's authorized period of stay, with an accounting by the alien's country of nationality and date of arrival in the United States; (D) The number of lawfully admitted nonimmigrants identified as having remained in the United States beyond the period authorized by the Attorney General, with an accounting by the alien's country of nationality; (E) the calculation, by each VWP country and each fiscal year, of the portion of nationals [that arrive and depart by sea or air U.S. port of entry and is provided a waiver under the program] and for whom no record of departure exists, expressed as a percentage of the total number of such nationals who are so described.

1

HaitiTPSAR000276

# II.    Background

The purpose of this report is to identify the Fiscal Year 2024, country-by-country overstay rates for all air and sea, in-scope[5] nonimmigrant classes of admission.

The overstay identification process is conducted utilizing arrival, departure, and immigration benefit information, which is consolidated to generate a complete history for individuals who traveled to the United States and were subsequently admitted, as described below.

U.S. Customs and Border Protection receives advance manifests from commercial sea and air carriers and private aircraft operators for all arrivals to and departures from the United States. These manifests indicate who is aboard the aircraft or vessel.  In the land environment, U.S. Customs and Border Protection gathers travel information directly on all persons who enter the United States from Canada or Mexico at land ports of entry.  Furthermore, U.S. Customs and Border Protection receives travel data on persons who enter Canada from the United States via land through a reciprocal sharing agreement with the Canadian government, as well as gathering data directly on some persons who enter Mexico from the United States.  Additionally, U.S. Customs and Border Protection reconciles a significant portion of travelers who enter through United States borders from Mexico since the majority of those travelers are frequent border crossers, and U.S Customs and Border Protection is able to close a previous arrival record when recording a new arrival.

By law, U.S. Customs and Border Protection officers inspect aliens and examine U.S. citizens upon arrival at United States ports of entry, which may include conducting an interview to determine the purpose and intent of travel.  U.S. Customs and Border Protection officers collect biographic information on all nonimmigrants applying for admission and confirm the accuracy of the biographic manifest data provided by the carriers, which are subject to fines for any missing or inaccurate data.  For most aliens, U.S. Customs and Border Protection also collects fingerprints and digital photographs to conduct biometric comparisons against data previously provided to the United States.[6,7]

For departing travelers, air and sea carriers provide biographic manifest data prior to all travelers leaving the United States.  Federal regulation requires carriers to provide specific sets of data, which most often include name and passport number.  Additionally, federal regulation subjects carriers to fines for missing or inaccurate data.  U.S. Customs and Border Protection then matches this biographic departure data against arrival data to determine who has complied with the terms of admission and who has overstayed.  U.S. Customs and Border Protection maintains a separate system specifically for this purpose.  This system also receives other Department of Homeland Security data relevant to discern whether a person is lawfully present, such as immigration benefit information or information on student visitors to the United States.

---

[5] See Appendix A for a full list defining "In-Scope nonimmigrant classes of admission."

[6] 8 Code of Federal Regulations § 235.1(f)(1)(ii).

[7] The Western Hemisphere Travel Initiative is a joint United States. State Department/Department of Homeland Security initiative that implemented § 7209 of the *Intelligence Reform and Terrorism Prevention Act of 2004* (Pub. L. No. 108-458).

HaitiTPSAR000277

In general, transportation hubs and border infrastructure in the United States were not constructed with exit processing in mind.  For example, airports in the United States do not have areas designated exclusively for processing travelers leaving the United States.  Instead, traveler departures are recorded biographically using outbound passenger manifests provided by commercial carriers.  Carriers are also required to validate the manifest against the travel document presented by the traveler before the traveler is permitted to board the aircraft or sea vessel.  U.S. Customs and Border Protection is continuing efforts for a biometric-based departure program to complement the biographic data collection that already exists for aliens for whom biometrics may be required under 8 Code of Federal Regulations § 215.8.  This program matches live photos of travelers to images in U.S. Customs and Border Protection holdings, which may include photos from passports, visa photos, or from previous border crossings, to better confirm the traveler's identity, as well as confirm exit crossings for aliens required to provide biometrics.

Travelers arrive at land ports of entry via various modes of transportation, including cars, trains, buses, bicycles, trucks, and on foot.  There are major physical, logistical, and operational obstacles to collecting an individual's biographic and biometric data upon departure.  Due to the existing limitations in collecting departure data in the land environment, this report provides limited departure and overstay information for land ports of entry.  U.S. Customs and Border Protection's ongoing efforts, described in this report, will continue to improve the existing process and availability of departure data.

HaitiTPSAR000278

# III.  Existing Operations

## A.    Air and Sea Environments

In the air and sea environments, U.S. Customs and Border Protection obtains entry records through both carrier-provided manifest data and inspections conducted by U.S. Customs and Border Protection officers.  U.S. Customs and Border Protection obtains biographic data on travelers who lawfully enter or depart the United States by air or sea.[8]  Federal regulation requires air and sea carriers to submit passenger manifests to U.S. Customs and Border Protection; this information is then recorded as arrivals to, or departures from, the United States.[9]  Air carriers are required to provide data for not only who has made a reservation for a particular flight, but also who is actually on the aircraft at the time the aircraft departs.[10]  Airlines are subject to fines for making errors regarding who is or is not on any particular aircraft.[11]

Although U.S. Customs and Border Protection currently obtains biographic arrival and departure information on most foreign nationals, and in many cases biometric data, U.S. Customs and Border Protection is committed to continuously improving existing biometric and biographic exit and entry processes.  This work is providing new opportunities to verify an individual's identity and facilitate collection of new biographic information on individuals where none previously existed.

## B.    Land Environment

Collection of departure information in the land environment is more difficult than in air and sea environments due to the major physical, logistical, and operational obstacles involved with electronically collecting an individual's biographic and biometric data.  It is not currently feasible to obtain advance reporting of arrivals and departures, as the majority of travelers cross borders as a driver or passenger in a vehicle or as a pedestrian.

**Northern Border Departures from the United States**

In 2011, Canada and the United States developed an entry and exit initiative under which Canada and the United States agreed to exchange biographic entry records for land crossings between the two countries, so that an entry into one is recorded as an exit from the other.  On June 30, 2013, Canada and the United States began exchanging biographic entry data for third-country nationals (including permanent residents of Canada and United States lawful permanent residents) who enter through land ports of entry along the shared border, where information is collected electronically.  Through this initiative, the United States has a working biographic land border

---

[8] In addition, the Department obtains biometric information on all nonimmigrants who enter the United States via air and sea, except for those who are exempt by regulation, which includes those over the age of 79 or under 14, diplomats, and certain other discrete categories.  *See* 8 Code of Federal Regulations §§ 235.1(f)(1)(ii); 235.1(f)(1)(iv).

[9] 8 Code of Federal Regulations § 231.1, (describing the specific data elements for each passenger that carriers are required to provide).

[10] 19 Code of Federal Regulations §§ 122.49a; 122.75a.

[11] 8 United States Code § 1221(g).

4

HaitiTPSAR000279

exit system for all Northern border crossings.  U.S. Customs and Border Protection continually analyzes the additional crossing data provided by Canada for enhanced statistical capabilities regarding overstays.

U.S. Customs and Border Protection currently matches 98.17 percent of the entry information received from Canada to corresponding entry information in the Arrival and Departure Information System.  As of October 1, 2024, this data-sharing agreement has yielded over 195.4 million departure records.  U.S. Customs and Border Protection uses this information to resolve previous traveler air or sea arrivals into the United States for those cases where the traveler may then subsequently depart by land to Canada.

## C.    Overstay Definition

An overstay is defined as a nonimmigrant who was lawfully admitted to the United States for an authorized period but stayed in the United States beyond their authorized admission period. Nonimmigrants admitted for "duration of status," who fail to maintain their status, may also be considered overstays.  "Duration of status" is a term used for aliens who are admitted for the duration of a specific program or activity, which may be variable, instead of for a set timeframe.[12]  The authorized admission period ends when the alien has accomplished the purpose for which they were admitted or is no longer engaged in authorized activities pertaining to that purpose.  For example, a student who enters the United States for a program must leave when the program is completed, change to another immigration status, or go on to pursue another program of study.

U.S. Customs and Border Protection classifies individuals as overstays by using the Arrival and Departure Information System to match records about departures and immigration benefits to arrival records collected during the admission process.  U.S. Customs and Border Protection further identifies nonimmigrant status through manual vetting processes to support possible enforcement action.  U.S. Customs and Border Protection identifies individuals as having overstayed if the individual's departure record shows they departed the United States after their authorized admission period expired (i.e., Out of-Country Overstays).[13]  U.S. Customs and Border Protection also identifies individuals as possible overstays if there are no records of a departure or change in status prior to the end of their authorized admission period (i.e., Suspected In-Country Overstays).[14]  Improvements to reporting methodology now more accurately account

---

[12] For example, "duration of status" for F nonimmigrants is defined as "the time during which an F-1 student is pursuing a full course of study at an [approved] educational institution . . . or engaging in authorized practical training following completion of studies …." 8 Code of Federal Regulations § 214.2(f)(5)(i).

[13] In these cases, there are implications for the individual who overstayed the authorized period of stay in the United States according to immigration law.  *See, e.g.*, 8 United States Code § 1202(g) (nonimmigrant visa is voided at conclusion of authorized period of stay if an individual remains in the United States beyond the authorized period); 8 United States Code § 1187(a)(7) (referring to the Visa Waiver Program , "if the alien previously was admitted without a visa under this section, the alien must not have failed to comply with the conditions of any previous admission as such a nonimmigrant"); and 8 United States Code § 1182(a)(9)(B)(i)(I) and (II) (alien inadmissible for 3 years if unlawfully present for more than 180 days but less than a year and voluntarily departs the United States prior to commencement of removal proceedings; alien inadmissible for 10 years if unlawfully present for a year or more and departs the United States).

[14] Pending immigration benefit applications and approved extensions of stay, change of nonimmigrant status, or adjustment of status to lawful permanent resident may extend or modify the authorized period of stay.  For example, upon entering the United States a person may be granted a six-month period of admission, but thereafter lawfully change immigration status prior to the expiration of that period, and in turn be authorized to stay beyond the initial six months.  These options are not available to all categories of alien.  *See* 8 United States Code § 1258; 8 Code of Federal

HaitiTPSAR000280

for individual travel histories or immigration benefit applications that collectively affect expected departure dates and possible overstay status.

In this report, Department of Homeland Security presents Arrival and Departure Information System-generated overstay rates by country of citizenship for nonimmigrant visitors who were admitted to the United States through air or seaport port of entry, regardless of overstay type.[15] The Arrival and Departure Information System-generated overstay rates produced for this report depict a snapshot of statistics reflecting the date the data was pulled for analysis. Although significant progress has been made, challenges remain with the integration of systems used in the travel continuum for reporting on classes of admission associated with land exits. It is anticipated these challenges will be mitigated in the future through improvements in land data collection for individuals exiting the United States and improvements in data exchanges with Mexico.

The following nonimmigrant classes of admission are not included in the report due to unspecified authorized periods of stay and/or legal protections: diplomats and other representatives, crewmembers, aliens in transit, and Section 1367 special-protected classes (Appendix B).

## D.    Overstay Identification and Action

U.S. Customs and Border Protection maintains arrival and departure information for all aliens based on border crossings and carrier data. Arrival and Departure Information System uses this information to generate daily overstay lists. These system-generated overstay lists include checks against the U.S. Customs and Border Protection Automated Targeting System- Passenger and information about immigration benefits held by U.S. Citizenship and Immigration Services, reducing the overall list size by identifying persons who have departed the United States or adjusted their status to another nonimmigrant or immigrant category. For Suspected In- Country Overstays, the U.S. Customs and Border Protection Automated Targeting System-Passenger then applies screening rules, as defined by U.S. Immigration and Customs Enforcement to determine the level of priority for each system-identified overstay.

As part of the overstay enforcement mission, Department of Homeland Security operational units further analyze these system-identified Suspected In-Country and Out-of-Country Overstay leads. The In-Country Overstay leads are worked by Homeland Security Investigations' Counter Threat Lead Development Unit. The Counter Threat Lead Development Unit is a national program dedicated to the investigation of nonimmigrant violators who pose a national security or public safety concern. Each year, the Counter Threat Lead Development Unit analyzes records of over one million potential status violators from various investigative databases and Department of Homeland Security entry/exit registration systems.

---

Regulations § 248.2. For example, those who enter under the Visa Waiver Program are generally not eligible to change or extend their nonimmigrant status. 8 Code of Federal Regulations §§ 245.1(b)(8); 248.2(a)(6).

[15] The sea overstay rates are only reflective of the population that were admitted to the United States at a seaport of entry but is not reflective of all traveler arrivals where the vessel both departs from and subsequently returns to the same location on the same voyage (commonly referred to as "closed loop" cruises). For example, if an alien already within the United States departs from the Port Canaveral, Florida Seaport for a seven-day cruise in the Caribbean and subsequently re-enters at Port Canaveral on the same voyage, then that arrival would not be taken into account for the purposes of this report.

HaitiTPSAR000281

To better manage investigative resources, the Counter Threat Lead Development Unit relies on a prioritization framework for these leads established in consultation with interagency partners within the national intelligence and federal law enforcement communities. Those nonimmigrant violators identified as posing a potential national security or public safety concern are prioritized and referred to Homeland Security Investigations field offices for investigation. Where nonimmigrant violators are identified, but do not meet the Counter Threat Lead Development Unit's criteria for investigation, Homeland Security Investigations sends that information to U.S Immigration and Customs Enforcement's Enforcement and Removal Operations National Criminal Analysis and Targeting Center. If the lead is credible and justifies further investigation, it is then forwarded to the respective United States Immigration and Customs Enforcement's Enforcement and Removal Operations field offices for enforcement action.

Homeland Security Investigations special agents and analysts monitor threat reports and proactively address emergent issues. This practice has contributed to Homeland Security Investigations' counterterrorism mission by managing and supporting high-priority national security initiatives based on specific intelligence from intra- and inter-agency partners. The goal is to identify, locate, and where applicable, prosecute and remove those overstays posing current or potential national security and public safety concerns to the United States. Homeland Security Investigations accomplishes its mission by conducting specialized research and analysis, executing targeted operations and special initiatives, and leveraging Homeland Security Investigations' expertise with partnering agencies. As part of the overstay enforcement mission, Homeland Security Investigations focuses its investigations on those subjects who pose a concern to national security or public safety.

Throughout Fiscal Year 2024, U.S. Customs and Border Protection continued to review and vet Out-of-Country Overstays. The Arrival and Departure Information System Vetting Unit receives Out-of-Country Overstay leads for U.S. Customs and Border Protection officers and analysts to vet and review daily. If during the vetting process a traveler is confirmed to have overstayed, the traveler may lose his or her eligibility to participate in the Visa Waiver Program, or his or her nonimmigrant visa will no longer be recognized as valid by U.S. Customs and Border Protection. In addition, a 3-year or 10-year bar on admission may be placed on the traveler on subsequent entries to the United States.[16] As of October 1, 2024, the work of the Arrival and Departure Information System Vetting Unit has resulted in over 402,244 actions taken of this kind.

U.S. Customs and Border Protection notifies Visa Waiver Program travelers of violation of their period of authorized admission via email and through U.S. Customs and Border Protection's public website providing Form I-94, Arrival/Departure Record and other immigration data. As part of this effort, the public I-94 website was updated to provide Visa Waiver Program travelers with a web portal where they can search their arrival and departure records. In January 2018, U.S. Customs and Border Protection began notifying Visa Waiver Program travelers in advance of the end date of their period of authorized admission. U.S. Customs and Border Protection plans to further expand these notifications to other populations.

---

[16] 8 United States Code § 1182: Inadmissible aliens (house.gov)

HaitiTPSAR000282

As of October 1, 2024, 1,494,461 email notifications were sent.  The goal is to improve traveler awareness, especially as it pertains to the length of time for which travelers are authorized admission to the United States.  U.S. Customs and Border Protection expects these proactive communications and improvements will encourage travelers to be more cognizant of their immigration status, especially as it pertains to their period of admission while in the United States.

8

HaitiTPSAR000283

# IV.  Overstay Rates

**Tables 1**– **6** represent country overstay rates from Fiscal Year 2024.  For this report, the term "in-scope" includes the following categories of nonimmigrant admissions: temporary workers and families (temporary workers and trainees, intracompany transferees, treaty traders, and investors), students, exchange visitors, temporary visitors for pleasure, temporary visitors for business, and other nonimmigrant classes of admission.[17]  This report calculates overstays by entry rather than by individual.  For example, if a traveler with a multiple entry visa enters multiple times during the reporting period and overstays more than once during this time, each time the traveler remains longer than the authorized period of admission is counted in this report as a separate overstay.

In **Tables 1 – 6,** the term "Expected Departures" represents the entries by foreign travelers to the United States who were admitted as nonimmigrants at an air or seaport port of entry and were expected to depart within Fiscal Year 2024.  The "Total Number of Overstays" for each country equals the summation of both the Out-of-Country and Suspected In-Country Overstays (based on number of overstay entries) for a specific country.  The "Overstay Rate" is the percentage of entries by travelers from each country who overstayed their authorized period of admission to the United States, regardless of type.[18]  This rate is the percentage of the Total Number of Overstays compared with the current fiscal year's Expected Departures.

U.S. Customs and Border Protection identified 46,657,108[19] in-scope nonimmigrants who were expected to depart the United States via air or sea in Fiscal Year 2024.  The Fiscal Year 2024 nonimmigrant travel data identified a Suspected In-Country Overstay rate of 1.04 percent (482,954) and a total overstay rate of 1.15 percent (538,548) out of the overall expected departures of in-scope travelers in Fiscal Year 2024.

## Temporary Visitors for Business and Pleasure (Tables 2, 3, and 6)

**Tables 2** and **3** present the overstay rates for temporary visitors for business and pleasure.  The overstay rates for temporary visitors for business and pleasure traveling under the Visa Waiver Program or on a B1 or B2 visa are identified in **Table 2**.  Similarly, **Table 3** identifies the overstay rates for temporary visitors for business and pleasure admitted to the United States under B1 or B2 classes of admission for non-Visa Waiver Program countries excluding Canada and Mexico.  The B1 and B2 overstay rates for Canada and Mexico (**Table 6**) are separate due to the high percentage of land travelers who are admitted to the United States relative to the other

---

[17] See Appendix A for a full list of "In-Scope nonimmigrant classes of admission."

[18] Rates are shown for countries as well as passport-issuing authorities and places of origin recognized by the United States.  With respect to all references to "country" or "countries" in this document, Section 4(b)(1) of the *Taiwan Relations Act of 1979* (Pub. L. No. 96-8) provides that "[w]henever the laws of the United States refer or relate to foreign countries, nations, states, governments, or similar entities, such terms shall include and such laws shall apply with respect to Taiwan." 22 United States Code § 3303(b)(1).  Accordingly, references to "country" or "countries" in the Visa Waiver Program authorizing legislation, Section 217 of the *Immigration and Nationality Act* (8 United States Code § 1187), are read to include Taiwan.  *See also* 8 Code of Federal Regulations § 217.1(a). Taiwan entered the Visa Waiver Program on October 2, 2012.

[19] Includes CBP identified travelers with TPS eligibility. In Fiscal Year24 TPS eligible counts are 56,062 expected departures, 245 Out of Country Overstays, 28,282 Suspected In Country Overstays, 28,527 Total Overstays.

9

HaitiTPSAR000284

countries.  It is important to note that the total number of overstays, as identified in this report, does not equal the total number of overstays who currently remain in the United States during this reporting period.  That number is lower because aliens identified as possible overstays can subsequently depart the United States or adjust their lawful status.  For purposes of this report, these are still considered overstays.

**Visa Waiver Program Countries Business or Pleasure Visitors Air and Sea Overstay Rate Summary**

In Fiscal Year 2024, U.S. Customs and Border Protection calculated that there were 18,853,231 B1, B2, Waiver-Business, and Waiver-Tourist expected departures for citizens of Visa Waiver Program countries.  The Fiscal Year 2024 Visa Waiver Program countries' total overstay rate is 0.49 percent of the Visa Waiver Program countries expected departures, and the Suspected In-Country Overstay rate is 0.43 percent of the Visa Waiver Program countries expected departures.

The 2017 Executive Enhancements to the Visa Waiver Program require Visa Waiver Program countries having a total overstay of 2 percent or greater for the previous fiscal year to initiate a public information campaign to educate their nationals on the conditions for admission into the United States.  The Department of Homeland Security, in consultation with the Department of State, will engage with countries exceeding this threshold to undertake active efforts to reduce their overstay rates.

**Non-Visa Waiver Program Countries Business or Pleasure Visitors Air and Sea Overstay Rate Summary (excluding Canada and Mexico)**

For non-Visa Waiver Program countries in Fiscal Year 2024, U.S. Customs and Border Protection calculated 12,131,255 expected departures.  The Fiscal Year 2024 non-Visa Waiver Program total overstay rate is 2.33 percent of the non-Visa Waiver Program expected departures, and the Suspected In-Country Overstay rate is 2.22 percent of the non-Visa Waiver Program expected departures.

**Students and Exchange Visitors**

For the purposes of this report, the term "Expected Departures" located in **Table 4** refers to a date identified in the Student and Exchange Visitor Information System based on the authorized program or employment status of an F or M student or J exchange visitor.[20]  The system-generated overstay leads are created by Arrival and Departure Information System matching information against the Student and Exchange Visitor Information System data.  However, one current challenge in this process is that Arrival and Departure Information System contains person-centric data, but the Student and Exchange Visitor Information System data is document-centric, meaning the system tracks a unique the Student and Exchange Visitor Information System identification number associated with each Form I-20 issued.  In a person-centric environment an individual is either active or inactive, but in a document-centric environment a

---

[20] "F" includes (F1/F2), "M" includes (M1/M2), "J" includes (J1/J2) classes of admission.

10

HaitiTPSAR000285

person could have multiple active and inactive records, making it difficult to determine if a person is in valid status.

In Fiscal Year 2024, U.S. Customs and Border Protection calculated a total of 1,412,627 students and exchange visitors who were expected to change status or depart the United States.[21] The total of 1,412,627 is composed of 965,467 F visa students; 10,417 M visa students; and 436,743 J visa categories of admission. The F, M, and J total overstay rate is 3.23 percent, and the Suspected In-Country Overstay rate is 2.45 percent of the total number of students and exchange visitors who were expected to change status or depart the United States. The Suspected In-Country Overstay rate is 2.44 percent for the F visa category, 2.85 percent for the M visa category, and 2.44 percent for the J visa category. The total overstay rate (i.e., both Suspected In-Country and Out-of-Country Overstays) for students and exchange visitors in Fiscal Year 2024 is 3.23 percent of the total number of students and exchange visitors who were expected to have changed status or departed from the United States in Fiscal Year 2024. The total overstay rate is 3.28 percent for the F visa category, 7.18 percent for the M visa category, and 3.03 percent for the J visa category.

**All Other In-scope Classes of Admission (excluding Mexico or Canada) Rate Summary**

In Fiscal Year 2024, for all other in-scope non-Visa Waiver Program classes of admission, U.S. Customs and Border Protection calculated 1,141,821 expected departures. The Fiscal Year 2024 all other in-scope non-Visa Waiver Program total overstay rate is 2.62 percent of all other in-scope non-Visa Waiver Program expected departures, and the Suspected In Country Overstay rate is 2.05 percent of all other in-scope non-Visa Waiver Program expected departures.

## A.  Fiscal Year 2024 Overstay Rate Summary

**Table 1** below provides a high-level summary of the country-by-country data identified in **Tables 2** through **6**. Fiscal Year 2024 exhibited a high number of travelers expected to depart and identified as eligible for Temporary Protected Status. These travelers are included in these tables.

| Table 1 | | | | | | |
|---|---|---|---|---|---|---|
| **Fiscal Year 2024 Summary Overstay Rates for Nonimmigrants Admitted to the United States via Air and Seaport of Entry** | | | | | | |
| **Admission Type** | **Expected Departures** | **Out-of-Country Overstays** | **Suspected In-Country Overstays** | **Total Overstays** | **Total Overstay Rate** | **Suspected In-Country Overstay Rate** |
| *Visa Waiver Program Countries Business or Pleasure Visitors (Table 2)* | 18,853,231 | 12,723 | 80,356 | 93,079 | 0.49% | 0.43% |

---

[21] This figure does not include the F/M/J classes of admission for those visitors with a Mexican or Canadian country of citizenship; those figures are included in **Table 4**. With the inclusion of Canada and Mexico expected departure total is 1,530,013. The F/M/J total overstay count and rate are respectively: 47,524 and 3.11 percent (32,560, 3.12% F; 778, 6.72% M; and 14,186, 2.99% J).

11

HaitiTPSAR000286

| | | | | | | |
|---|---|---|---|---|---|---|
| *Non-Visa Waiver Program Countries Business or Pleasure Visitors (excluding Canada and Mexico)* **(Table 3)** | 12,131,255 | 13,739 | 269,382 | 283,121 | 2.33% | 2.22% |
| *Student and Exchange Visitors (excluding Canada and Mexico)* **(Table 4)** | 1,412,627 | 11,158 | 34,540 | 45,698 | 3.23% | 2.45% |
| *All Other In-Scope Nonimmigrant Visitors (excluding Canada and Mexico)* **(Table 5)** | 1,141,821 | 6,538 | 23,361 | 29,899 | 2.62% | 2.05% |
| *Canada and Mexico Nonimmigrant Visitors* **(Table 6)** | 13,118,174 | 11,436 | 75,315 | 86,751 | 0.66% | 0.57% |
| Totals: | 46,657,108 | 55,594 | 482,954 | 538,548 | 1.15% | 1.04% |

## B. Fiscal Year 2024 Visa Waiver Program Nonimmigrant Business or Pleasure Overstay Rates

| Table 2 Fiscal Year 2024 Overstay Rates for Nonimmigrant Visitors Admitted to the United States for Business or Pleasure (Waiver-Business / Waiver-Tourist/B-1/B-2) via Air and Seaport of Entry for Visa Waiver Program Countries | | | | | | |
|---|---|---|---|---|---|---|
| **Country of Citizenship** | **Expected Departures** | **Out-of-Country Overstays** | **Suspected In-Country Overstays** | **Total Overstays** | **Total Overstay Rate** | **Suspected In-Country Overstay Rate** |
| *ANDORRA* | 1,427 | - | 16 | 16 | 1.12% | 1.12% |
| *AUSTRALIA* | 965,320 | 804 | 2,351 | 3,155 | 0.33% | 0.24% |
| *AUSTRIA* | 186,886 | 68 | 523 | 591 | 0.32% | 0.28% |
| *BELGIUM* | 271,273 | 110 | 746 | 856 | 0.32% | 0.27% |
| *BRUNEI* | 868 | 1 | 6 | 7 | 0.81% | 0.69% |
| *CHILE* | 438,861 | 1,109 | 9,088 | 10,197 | 2.32% | 2.07% |
| *CROATIA* | 10,971 | 19 | 30 | 49 | 0.45% | 0.27% |
| *CZECH REPUBLIC* | 120,648 | 89 | 381 | 470 | 0.39% | 0.32% |
| *DENMARK* | 230,107 | 63 | 537 | 600 | 0.26% | 0.23% |
| *ESTONIA* | 23,883 | 27 | 93 | 120 | 0.50% | 0.39% |
| *FINLAND* | 111,815 | 56 | 276 | 332 | 0.30% | 0.25% |

12

HaitiTPSAR000287

| | | | | | |
|---|---|---|---|---|---|
| FRANCE | 1,851,197 | 800 | 8,924 | 9,724 | 0.53% | 0.48% |
| GERMANY | 1,879,584 | 731 | 4,592 | 5,323 | 0.28% | 0.24% |
| GREECE | 90,136 | 206 | 673 | 879 | 0.98% | 0.75% |
| HUNGARY | 88,558 | 141 | 490 | 631 | 0.71% | 0.55% |
| ICELAND | 43,169 | 18 | 46 | 64 | 0.15% | 0.11% |
| IRELAND | 513,578 | 267 | 1,375 | 1,642 | 0.32% | 0.27% |
| ISRAEL | 373,198 | 351 | 2,616 | 2,967 | 0.80% | 0.70% |
| ITALY | 1,205,459 | 834 | 7,673 | 8,507 | 0.71% | 0.64% |
| JAPAN | 1,517,793 | 219 | 1,290 | 1,509 | 0.10% | 0.08% |
| KOREA, SOUTH | 1,083,123 | 787 | 1,983 | 2,770 | 0.26% | 0.18% |
| LATVIA | 22,869 | 60 | 155 | 215 | 0.94% | 0.68% |
| LIECHTENSTEIN | 1,558 | - | 9 | 9 | 0.58% | 0.58% |
| LITHUANIA | 43,174 | 72 | 251 | 323 | 0.75% | 0.58% |
| LUXEMBOURG | 14,514 | 3 | 48 | 51 | 0.35% | 0.33% |
| MALTA | 8,222 | 7 | 39 | 46 | 0.56% | 0.47% |
| MONACO | 928 | 1 | 3 | 4 | 0.43% | 0.32% |
| NETHERLANDS | 670,104 | 305 | 2,900 | 3,205 | 0.48% | 0.43% |
| NEW ZEALAND | 287,551 | 260 | 662 | 922 | 0.32% | 0.23% |
| NORWAY | 163,872 | 104 | 388 | 492 | 0.30% | 0.24% |
| POLAND | 364,348 | 407 | 1,513 | 1,920 | 0.53% | 0.42% |
| PORTUGAL | 196,178 | 397 | 3,292 | 3,689 | 1.88% | 1.68% |
| SAN MARINO | 582 | - | 3 | 3 | 0.52% | 0.52% |
| SINGAPORE | 119,761 | 110 | 253 | 363 | 0.30% | 0.21% |
| SLOVAKIA | 51,033 | 73 | 223 | 296 | 0.58% | 0.44% |
| SLOVENIA | 29,277 | 13 | 108 | 121 | 0.41% | 0.37% |
| SPAIN | 894,491 | 1,483 | 13,078 | 14,561 | 1.63% | 1.46% |
| SWEDEN | 294,960 | 184 | 723 | 907 | 0.31% | 0.25% |
| SWITZERLAND | 328,064 | 159 | 909 | 1,068 | 0.33% | 0.28% |
| TAIWAN | 315,280 | 482 | 1,262 | 1,744 | 0.55% | 0.40% |
| UNITED KINGDOM | 4,038,611 | 1,903 | 10,828 | 12,731 | 0.32% | 0.27% |
| **Totals:** | 18,853,231 | 12,723 | 80,356 | 93,079 | 0.49% | 0.43% |

13

HaitiTPSAR000288

C.  Fiscal Year 2024 Non-Visa Waiver Program Country B1/B2 Overstay Rates

| Table 3 Fiscal Year 2024 Overstay Rates for Nonimmigrants Admitted to the United States for Business or Pleasure via Air and Seaport of Entry for Non-Visa Waiver Program Countries (excluding Canada and Mexico) | | | | | | |
|---|---|---|---|---|---|---|
| Country of Citizenship | Expected Departures | Out-of-Country Overstays | Suspected In-Country Overstays | Total Overstays | Total Overstay Rate | Suspected In-Country Overstay Rate |
| AFGHANISTAN | 1,949 | 10 | 178 | 188 | 9.65% | 9.13% |
| ALBANIA | 24,310 | 24 | 569 | 593 | 2.44% | 2.34% |
| ALGERIA | 18,057 | 80 | 1,072 | 1,152 | 6.38% | 5.94% |
| ANGOLA | 3,839 | 12 | 542 | 554 | 14.43% | 14.12% |
| ANTIGUA AND BARBUDA | 16,706 | 18 | 199 | 217 | 1.30% | 1.19% |
| ARGENTINA | 594,000 | 221 | 4,580 | 4,801 | 0.81% | 0.77% |
| ARMENIA | 18,011 | 21 | 1,119 | 1,140 | 6.33% | 6.21% |
| AZERBAIJAN | 6,523 | 8 | 124 | 132 | 2.02% | 1.90% |
| BAHAMAS, THE | 299,354 | 250 | 2,427 | 2,677 | 0.89% | 0.81% |
| BAHRAIN | 4,376 | 4 | 53 | 57 | 1.30% | 1.21% |
| BANGLADESH | 38,590 | 51 | 2,162 | 2,213 | 5.73% | 5.60% |
| BARBADOS | 51,015 | 30 | 223 | 253 | 0.50% | 0.44% |
| BELARUS | 10,034 | 9 | 330 | 339 | 3.38% | 3.29% |
| BELIZE | 36,888 | 16 | 1,139 | 1,155 | 3.13% | 3.09% |
| BENIN | 2,139 | 8 | 256 | 264 | 12.34% | 11.97% |
| BHUTAN | 423 | 3 | 89 | 92 | 21.75% | 21.04% |
| BOLIVIA | 70,772 | 97 | 3,853 | 3,950 | 5.58% | 5.44% |
| BOSNIA AND HERZEGOVINA | 7,965 | 22 | 52 | 74 | 0.93% | 0.65% |
| BOTSWANA | 2,017 | 4 | 142 | 146 | 7.24% | 7.04% |
| BRAZIL | 1,708,258 | 1,172 | 20,168 | 21,340 | 1.25% | 1.18% |
| BULGARIA | 31,482 | 19 | 115 | 134 | 0.43% | 0.37% |
| BURKINA FASO | 2,752 | 12 | 240 | 252 | 9.16% | 8.72% |
| BURMA | 5,455 | 17 | 2,064 | 2,081 | 38.15% | 37.84% |
| BURUNDI | 800 | 1 | 42 | 43 | 5.38% | 5.25% |
| CABO VERDE | 3,694 | 14 | 490 | 504 | 13.64% | 13.26% |
| CAMBODIA | 9,535 | 14 | 325 | 339 | 3.56% | 3.41% |
| CAMEROON | 11,288 | 73 | 885 | 958 | 8.49% | 7.84% |

14

HaitiTPSAR000289

| | | | | | |
|---|---|---|---|---|---|
| CENTRAL AFRICAN REPUBLIC | 137 | - | 2 | 2 | 1.46% | 1.46% |
| CHAD | 991 | 12 | 272 | 284 | 28.66% | 27.45% |
| CHINA | 1,042,047 | 2,055 | 14,920 | 16,975 | 1.63% | 1.43% |
| COLOMBIA | 981,808 | 807 | 24,087 | 24,894 | 2.54% | 2.45% |
| COMOROS | 43 | - | - | - | - | - |
| CONGO (BRAZZAVILLE) | 1,369 | 5 | 271 | 276 | 20.16% | 19.80% |
| CONGO (KINSHASA) | 8,339 | 27 | 609 | 636 | 7.63% | 7.30% |
| COSTA RICA | 337,684 | 125 | 2,768 | 2,893 | 0.86% | 0.82% |
| COTE D'IVOIRE | 6,871 | 28 | 554 | 582 | 8.47% | 8.06% |
| CUBA | 13,124 | 15 | 898 | 913 | 6.96% | 6.84% |
| CYPRUS | 8,708 | 4 | 45 | 49 | 0.56% | 0.52% |
| DJIBOUTI | 273 | - | 54 | 54 | 19.78% | 19.78% |
| DOMINICA | 7,368 | 15 | 301 | 316 | 4.29% | 4.09% |
| DOMINICAN REPUBLIC | 506,640 | 275 | 14,974 | 15,249 | 3.01% | 2.96% |
| ECUADOR | 471,299 | 311 | 16,161 | 16,472 | 3.50% | 3.43% |
| EGYPT | 73,641 | 111 | 3,979 | 4,090 | 5.55% | 5.40% |
| EL SALVADOR | 287,123 | 169 | 3,254 | 3,423 | 1.19% | 1.13% |
| EQUATORIAL GUINEA | 964 | 6 | 203 | 209 | 21.68% | 21.06% |
| ERITREA | 804 | 6 | 78 | 84 | 10.45% | 9.70% |
| ETHIOPIA | 25,958 | 110 | 2,036 | 2,146 | 8.27% | 7.84% |
| FIJI | 7,451 | 37 | 257 | 294 | 3.95% | 3.45% |
| GABON | 1,414 | 10 | 184 | 194 | 13.72% | 13.01% |
| GAMBIA, THE | 1,630 | 16 | 191 | 207 | 12.70% | 11.72% |
| GEORGIA | 9,292 | 22 | 668 | 690 | 7.43% | 7.19% |
| GHANA | 34,065 | 80 | 2,664 | 2,744 | 8.06% | 7.82% |
| GRENADA | 14,693 | 14 | 246 | 260 | 1.77% | 1.67% |
| GUATEMALA | 349,289 | 194 | 4,803 | 4,997 | 1.43% | 1.38% |
| GUINEA | 2,837 | 17 | 189 | 206 | 7.26% | 6.66% |
| GUINEA-BISSAU | 96 | - | 11 | 11 | 11.46% | 11.46% |
| GUYANA | 73,123 | 112 | 2,814 | 2,926 | 4.00% | 3.85% |
| HAITI | 64,345 | 253 | 15,728 | 15,981 | 24.84% | 24.44% |
| HOLY SEE | 27 | - | - | - | - | - |
| HONDURAS | 310,834 | 166 | 4,850 | 5,016 | 1.61% | 1.56% |
| INDIA | 1,244,379 | 1,645 | 14,271 | 15,916 | 1.28% | 1.15% |
| INDONESIA | 89,322 | 132 | 5,040 | 5,172 | 5.79% | 5.64% |
| IRAN | 14,074 | 61 | 515 | 576 | 4.09% | 3.66% |

15

HaitiTPSAR000290

| IRAQ | 6,659 | 35 | 315 | 350 | 5.26% | 4.73% |
|---|---|---|---|---|---|---|
| JAMAICA | 308,173 | 309 | 10,251 | 10,560 | 3.43% | 3.33% |
| JORDAN | 34,379 | 90 | 1,995 | 2,085 | 6.06% | 5.80% |
| KAZAKHSTAN | 27,570 | 51 | 943 | 994 | 3.61% | 3.42% |
| KENYA | 26,537 | 50 | 2,348 | 2,398 | 9.04% | 8.85% |
| KIRIBATI | 66 | - | 1 | 1 | 1.52% | 1.52% |
| KOREA, NORTH | 8 | - | - | - | - | - |
| KOSOVO | 8,324 | 11 | 161 | 172 | 2.07% | 1.93% |
| KUWAIT | 25,265 | 117 | 140 | 257 | 1.02% | 0.55% |
| KYRGYZSTAN | 7,664 | 13 | 630 | 643 | 8.39% | 8.22% |
| LAOS | 1,870 | 27 | 503 | 530 | 28.34% | 26.90% |
| LEBANON | 27,732 | 31 | 449 | 480 | 1.73% | 1.62% |
| LESOTHO | 331 | - | 1 | 1 | 0.30% | 0.30% |
| LIBERIA | 1,741 | 10 | 247 | 257 | 14.76% | 14.19% |
| LIBYA | 1,197 | 5 | 19 | 24 | 2.01% | 1.59% |
| MACEDONIA | 9,463 | 14 | 84 | 98 | 1.04% | 0.89% |
| MADAGASCAR | 1,454 | 1 | 59 | 60 | 4.13% | 4.06% |
| MALAWI | 2,245 | 9 | 495 | 504 | 22.45% | 22.05% |
| MALAYSIA | 61,668 | 37 | 425 | 462 | 0.75% | 0.69% |
| MALDIVES | 278 | - | 4 | 4 | 1.44% | 1.44% |
| MALI | 3,103 | 12 | 148 | 160 | 5.16% | 4.77% |
| MARSHALL ISLANDS | 51 | 1 | 2 | 3 | 5.88% | 3.92% |
| MAURITANIA | 548 | 7 | 45 | 52 | 9.49% | 8.21% |
| MAURITIUS | 3,509 | 4 | 26 | 30 | 0.85% | 0.74% |
| MICRONESIA, FEDERATED STATES OF | 28 | - | 6 | 6 | 21.43% | 21.43% |
| MOLDOVA | 8,495 | 15 | 127 | 142 | 1.67% | 1.49% |
| MONGOLIA | 13,595 | 20 | 351 | 371 | 2.73% | 2.58% |
| MONTENEGRO | 4,480 | 12 | 147 | 159 | 3.55% | 3.28% |
| MOROCCO | 33,851 | 61 | 456 | 517 | 1.53% | 1.35% |
| MOZAMBIQUE | 1,473 | 3 | 84 | 87 | 5.91% | 5.70% |
| NAMIBIA | 1,773 | 3 | 69 | 72 | 4.06% | 3.89% |
| NAURU | 15 | 1 | - | 1 | 6.67% | - |
| NEPAL | 34,070 | 172 | 892 | 1,064 | 3.12% | 2.62% |
| NICARAGUA | 76,905 | 58 | 1,260 | 1,318 | 1.71% | 1.64% |
| NIGER | 574 | 1 | 76 | 77 | 13.41% | 13.24% |
| NIGERIA | 124,443 | 216 | 6,701 | 6,917 | 5.56% | 5.38% |
| OMAN | 3,232 | 10 | 20 | 30 | 0.93% | 0.62% |

16

HaitiTPSAR000291

| | | | | | |
|---|---|---|---|---|---|
| PAKISTAN | 92,364 | 117 | 3,083 | 3,200 | 3.46% | 3.34% |
| PALAU | 11 | - | 2 | 2 | 18.18% | 18.18% |
| PANAMA | 127,873 | 70 | 811 | 881 | 0.69% | 0.63% |
| PAPUA NEW GUINEA | 557 | 1 | 6 | 7 | 1.26% | 1.08% |
| PARAGUAY | 21,114 | 32 | 530 | 562 | 2.66% | 2.51% |
| PERU | 345,090 | 242 | 5,953 | 6,195 | 1.80% | 1.73% |
| PHILIPPINES | 291,050 | 535 | 4,281 | 4,816 | 1.65% | 1.47% |
| QATAR | 10,953 | 28 | 120 | 148 | 1.35% | 1.10% |
| ROMANIA | 87,301 | 96 | 580 | 676 | 0.77% | 0.66% |
| RUSSIA | 72,115 | 97 | 1,649 | 1,746 | 2.42% | 2.29% |
| RWANDA | 4,360 | 11 | 216 | 227 | 5.21% | 4.95% |
| SAINT KITTS AND NEVIS | 11,920 | 8 | 148 | 156 | 1.31% | 1.24% |
| SAINT LUCIA | 16,957 | 23 | 254 | 277 | 1.63% | 1.50% |
| SAINT VINCENT AND THE GRENADINES | 11,411 | 27 | 251 | 278 | 2.44% | 2.20% |
| SAMOA | 2,238 | 20 | 159 | 179 | 8.00% | 7.10% |
| SAO TOME AND PRINCIPE | 6 | - | 1 | 1 | 16.67% | 16.67% |
| SAUDI ARABIA | 59,804 | 113 | 319 | 432 | 0.72% | 0.53% |
| SENEGAL | 9,874 | 28 | 397 | 425 | 4.30% | 4.02% |
| SERBIA | 28,656 | 30 | 288 | 318 | 1.11% | 1.01% |
| SEYCHELLES | 246 | - | 2 | 2 | 0.81% | 0.81% |
| SIERRA LEONE | 4,593 | 36 | 721 | 757 | 16.48% | 15.70% |
| SOLOMON ISLANDS | 120 | - | 9 | 9 | 7.50% | 7.50% |
| SOMALIA | 202 | - | 43 | 43 | 21.29% | 21.29% |
| SOUTH AFRICA | 115,756 | 138 | 1,253 | 1,391 | 1.20% | 1.08% |
| SOUTH SUDAN | 186 | 2 | 11 | 13 | 6.99% | 5.91% |
| SRI LANKA | 16,636 | 19 | 387 | 406 | 2.44% | 2.33% |
| SUDAN | 2,902 | 18 | 452 | 470 | 16.20% | 15.58% |
| SURINAME | 13,217 | 9 | 4,107 | 4,116 | 31.14% | 31.07% |
| SWAZILAND | 911 | 3 | 75 | 78 | 8.56% | 8.23% |
| SYRIA | 5,314 | 9 | 368 | 377 | 7.09% | 6.93% |
| TAJIKISTAN | 1,849 | 19 | 121 | 140 | 7.57% | 6.54% |
| TANZANIA | 6,208 | 34 | 481 | 515 | 8.30% | 7.75% |
| THAILAND | 69,445 | 85 | 2,021 | 2,106 | 3.03% | 2.91% |
| TIMOR-LESTE | 44 | - | 1 | 1 | 2.27% | 2.27% |
| TOGO | 2,589 | 21 | 396 | 417 | 16.11% | 15.30% |
| TONGA | 2,358 | 12 | 140 | 152 | 6.45% | 5.94% |

17

HaitiTPSAR000292

| | | | | | |
|---|---|---|---|---|---|
| *TRINIDAD AND TOBAGO* | 175,585 | 88 | 1,002 | 1,090 | 0.62% | 0.57% |
| *TUNISIA* | 9,348 | 10 | 194 | 204 | 2.18% | 2.08% |
| *TURKEY* | 159,538 | 218 | 2,354 | 2,572 | 1.61% | 1.48% |
| *TURKMENISTAN* | 2,014 | 9 | 311 | 320 | 15.89% | 15.44% |
| *TUVALU* | 43 | - | 5 | 5 | 11.63% | 11.63% |
| *UGANDA* | 9,164 | 20 | 601 | 621 | 6.78% | 6.56% |
| *UKRAINE* | 69,400 | 103 | 736 | 839 | 1.21% | 1.06% |
| *UNITED ARAB EMIRATES* | 22,234 | 197 | 372 | 569 | 2.56% | 1.67% |
| *URUGUAY* | 58,355 | 41 | 1,109 | 1,150 | 1.97% | 1.90% |
| *UZBEKISTAN* | 10,223 | 55 | 406 | 461 | 4.51% | 3.97% |
| *VANUATU* | 164 | 3 | 2 | 5 | 3.05% | 1.22% |
| *VENEZUELA* | 222,151 | 335 | 18,706 | 19,041 | 8.57% | 8.42% |
| *VIETNAM* | 105,184 | 277 | 1,458 | 1,735 | 1.65% | 1.39% |
| *YEMEN* | 3,182 | 12 | 532 | 544 | 17.10% | 16.72% |
| *ZAMBIA* | 4,223 | 8 | 445 | 453 | 10.73% | 10.54% |
| *ZIMBABWE* | 9,154 | 24 | 698 | 722 | 7.89% | 7.63% |
| **Totals:** | 12,131,255 | 13,739 | 269,382 | 283,121 | 2.33% | 2.22% |

18

HaitiTPSAR000293

D.  Fiscal Year 2024 Nonimmigrant Students and Exchange Visitors Overstay Rates

| Table 4 | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| **Fiscal Year 2024 Overstay Rates for Nonimmigrant Students and Exchange Visitors (F, M, J) Admitted to the United States via Air and SeaportPorts of Entry (excluding Canada and Mexico)** | | | | | | |
| **Country of Citizenship** | **Expected Departures** | **Out-of-Country Overstays** | **Suspected In-Country Overstays** | **Total Overstays** | **Total Overstay Rate** | **Suspected In-Country Overstay Rate** |
| AFGHANISTAN | 322 | 2 | 73 | 75 | 23.29% | 22.67% |
| ALBANIA | 2,142 | 14 | 88 | 102 | 4.76% | 4.11% |
| ALGERIA | 656 | 16 | 92 | 108 | 16.46% | 14.02% |
| ANDORRA | 85 | - | - | - | - | - |
| ANGOLA | 707 | 14 | 141 | 155 | 21.92% | 19.94% |
| ANTIGUA AND BARBUDA | 386 | 4 | 10 | 14 | 3.63% | 2.59% |
| ARGENTINA | 15,642 | 74 | 313 | 387 | 2.47% | 2.00% |
| ARMENIA | 986 | 9 | 52 | 61 | 6.19% | 5.27% |
| AUSTRALIA | 11,852 | 123 | 62 | 185 | 1.56% | 0.52% |
| AUSTRIA | 4,097 | 20 | 18 | 38 | 0.93% | 0.44% |
| AZERBAIJAN | 1,139 | 7 | 44 | 51 | 4.48% | 3.86% |
| BAHAMAS, THE | 6,018 | 70 | 101 | 171 | 2.84% | 1.68% |
| BAHRAIN | 706 | 5 | 4 | 9 | 1.27% | 0.57% |
| BANGLADESH | 7,413 | 63 | 611 | 674 | 9.09% | 8.24% |
| BARBADOS | 621 | 9 | 10 | 19 | 3.06% | 1.61% |
| BELARUS | 803 | 6 | 29 | 35 | 4.36% | 3.61% |
| BELGIUM | 4,267 | 24 | 19 | 43 | 1.01% | 0.45% |
| BELIZE | 615 | 7 | 21 | 28 | 4.55% | 3.41% |
| BENIN | 310 | 2 | 112 | 114 | 36.77% | 36.13% |
| BHUTAN | 148 | - | 36 | 36 | 24.32% | 24.32% |
| BOLIVIA | 2,597 | 21 | 74 | 95 | 3.66% | 2.85% |
| BOSNIA AND HERZEGOVINA | 1,234 | 7 | 29 | 36 | 2.92% | 2.35% |
| BOTSWANA | 418 | 2 | 12 | 14 | 3.35% | 2.87% |
| BRAZIL | 49,766 | 412 | 1,316 | 1,728 | 3.47% | 2.64% |
| BRUNEI | 91 | 2 | 3 | 5 | 5.49% | 3.30% |
| BULGARIA | 5,631 | 46 | 62 | 108 | 1.92% | 1.10% |

19

HaitiTPSAR000294

| | | | | | |
|---|---|---|---|---|---|
| *BURKINA FASO* | 366 | 3 | 81 | 84 | 22.95% | 22.13% |
| *BURMA* | 2,246 | 37 | 1,291 | 1,328 | 59.13% | 57.48% |
| *BURUNDI* | 141 | 1 | 14 | 15 | 10.64% | 9.93% |
| *CABO VERDE* | 85 | 2 | 10 | 12 | 14.12% | 11.76% |
| *CAMBODIA* | 599 | 8 | 33 | 41 | 6.84% | 5.51% |
| *CAMEROON* | 670 | 5 | 142 | 147 | 21.94% | 21.19% |
| *CENTRAL AFRICAN REPUBLIC* | 28 | - | 1 | 1 | 3.57% | 3.57% |
| *CHAD* | 81 | 1 | 27 | 28 | 34.57% | 33.33% |
| *CHILE* | 10,799 | 67 | 207 | 274 | 2.54% | 1.92% |
| *CHINA* | 256,130 | 2,462 | 2,473 | 4,935 | 1.93% | 0.97% |
| *COLOMBIA* | 39,020 | 399 | 2,259 | 2,658 | 6.81% | 5.79% |
| *COMOROS* | 19 | 1 | 3 | 4 | 21.05% | 15.79% |
| *CONGO (BRAZZAVILLE)* | 102 | 4 | 21 | 25 | 24.51% | 20.59% |
| *CONGO (KINSHASA)* | 772 | 19 | 279 | 298 | 38.60% | 36.14% |
| *COSTA RICA* | 4,440 | 21 | 59 | 80 | 1.80% | 1.33% |
| *COTE D'IVOIRE* | 1,032 | 18 | 179 | 197 | 19.09% | 17.34% |
| *CROATIA* | 2,988 | 26 | 15 | 41 | 1.37% | 0.50% |
| *CUBA* | 100 | 1 | 8 | 9 | 9.00% | 8.00% |
| *CYPRUS* | 905 | 2 | 4 | 6 | 0.66% | 0.44% |
| *CZECH REPUBLIC* | 3,941 | 25 | 15 | 40 | 1.01% | 0.38% |
| *DENMARK* | 4,169 | 33 | 15 | 48 | 1.15% | 0.36% |
| *DJIBOUTI* | 19 | - | 4 | 4 | 21.05% | 21.05% |
| *DOMINICA* | 501 | 4 | 18 | 22 | 4.39% | 3.59% |
| *DOMINICAN REPUBLIC* | 11,351 | 107 | 549 | 656 | 5.78% | 4.84% |
| *ECUADOR* | 13,991 | 115 | 965 | 1,080 | 7.72% | 6.90% |
| *EGYPT* | 6,467 | 75 | 199 | 274 | 4.24% | 3.08% |
| *EL SALVADOR* | 2,707 | 16 | 76 | 92 | 3.40% | 2.81% |
| *EQUATORIAL GUINEA* | 216 | 5 | 122 | 127 | 58.80% | 56.48% |
| *ERITREA* | 65 | 1 | 22 | 23 | 35.38% | 33.85% |
| *ESTONIA* | 691 | 5 | 3 | 8 | 1.16% | 0.43% |
| *ETHIOPIA* | 1,613 | 11 | 214 | 225 | 13.95% | 13.27% |
| *FIJI* | 149 | 5 | 12 | 17 | 11.41% | 8.05% |
| *FINLAND* | 2,039 | 10 | 8 | 18 | 0.88% | 0.39% |
| *FRANCE* | 42,493 | 226 | 219 | 445 | 1.05% | 0.52% |
| *GABON* | 242 | 5 | 38 | 43 | 17.77% | 15.70% |
| *GAMBIA, THE* | 214 | 6 | 77 | 83 | 38.79% | 35.98% |

20

HaitiTPSAR000295

| | | | | | |
|---|---|---|---|---|---|
| GEORGIA | 1,661 | 11 | 55 | 66 | 3.97% | 3.31% |
| GERMANY | 38,981 | 220 | 141 | 361 | 0.93% | 0.36% |
| GHANA | 3,262 | 36 | 642 | 678 | 20.78% | 19.68% |
| GREECE | 5,650 | 14 | 23 | 37 | 0.65% | 0.41% |
| GRENADA | 251 | 5 | 10 | 15 | 5.98% | 3.98% |
| GUATEMALA | 3,521 | 15 | 64 | 79 | 2.24% | 1.82% |
| GUINEA | 119 | 1 | 10 | 11 | 9.24% | 8.40% |
| GUINEA-BISSAU | 22 | - | - | - | - | - |
| GUYANA | 481 | 6 | 31 | 37 | 7.69% | 6.44% |
| HAITI | 877 | 3 | 193 | 196 | 22.35% | 22.01% |
| HOLY SEE | - | - | - | - | - | - |
| HONDURAS | 4,731 | 39 | 132 | 171 | 3.61% | 2.79% |
| HUNGARY | 4,177 | 25 | 17 | 42 | 1.01% | 0.41% |
| ICELAND | 1,218 | 5 | 2 | 7 | 0.57% | 0.16% |
| INDIA | 179,138 | 1,177 | 6,553 | 7,730 | 4.32% | 3.66% |
| INDONESIA | 10,648 | 137 | 299 | 436 | 4.09% | 2.81% |
| IRAN | 2,260 | 17 | 72 | 89 | 3.94% | 3.19% |
| IRAQ | 787 | 8 | 47 | 55 | 6.99% | 5.97% |
| IRELAND | 11,873 | 33 | 52 | 85 | 0.72% | 0.44% |
| ISRAEL | 11,282 | 65 | 68 | 133 | 1.18% | 0.60% |
| ITALY | 28,611 | 120 | 130 | 250 | 0.87% | 0.45% |
| JAMAICA | 18,896 | 154 | 1,130 | 1,284 | 6.80% | 5.98% |
| JAPAN | 38,147 | 244 | 185 | 429 | 1.12% | 0.48% |
| JORDAN | 4,407 | 36 | 267 | 303 | 6.88% | 6.06% |
| KAZAKHSTAN | 8,369 | 64 | 139 | 203 | 2.43% | 1.66% |
| KENYA | 3,612 | 23 | 437 | 460 | 12.74% | 12.10% |
| KIRIBATI | 14 | - | - | - | - | - |
| KOREA, NORTH | 4 | - | - | - | - | - |
| KOREA, SOUTH | 82,641 | 501 | 383 | 884 | 1.07% | 0.46% |
| KOSOVO | 831 | 13 | 27 | 40 | 4.81% | 3.25% |
| KUWAIT | 9,933 | 117 | 39 | 156 | 1.57% | 0.39% |
| KYRGYZSTAN | 1,100 | 35 | 242 | 277 | 25.18% | 22.00% |
| LAOS | 184 | 1 | 20 | 21 | 11.41% | 10.87% |
| LATVIA | 795 | 5 | 5 | 10 | 1.26% | 0.63% |
| LEBANON | 2,989 | 12 | 51 | 63 | 2.11% | 1.71% |
| LESOTHO | 82 | - | 4 | 4 | 4.88% | 4.88% |
| LIBERIA | 191 | - | 37 | 37 | 19.37% | 19.37% |
| LIBYA | 345 | 5 | 67 | 72 | 20.87% | 19.42% |
| LIECHTENSTEIN | 48 | 1 | 1 | 2 | 4.17% | 2.08% |

21

HaitiTPSAR000296

| | | | | | |
|---|---|---|---|---|---|
| LITHUANIA | 1,824 | 5 | 11 | 16 | 0.88% | 0.60% |
| LUXEMBOURG | 279 | 1 | 2 | 3 | 1.08% | 0.72% |
| MACEDONIA | 1,239 | 13 | 44 | 57 | 4.60% | 3.55% |
| MADAGASCAR | 240 | 5 | 29 | 34 | 14.17% | 12.08% |
| MALAWI | 422 | 3 | 132 | 135 | 31.99% | 31.28% |
| MALAYSIA | 6,421 | 113 | 64 | 177 | 2.76% | 1.00% |
| MALDIVES | 54 | 1 | 6 | 7 | 12.96% | 11.11% |
| MALI | 307 | 2 | 19 | 21 | 6.84% | 6.19% |
| MALTA | 129 | - | - | - | - | - |
| MARSHALL ISLANDS | 4 | - | - | - | - | - |
| MAURITANIA | 102 | 1 | 2 | 3 | 2.94% | 1.96% |
| MAURITIUS | 405 | 8 | 11 | 19 | 4.69% | 2.72% |
| MICRONESIA, FEDERATED STATES OF | 2 | - | 1 | 1 | 50.00% | 50.00% |
| MOLDOVA | 732 | 14 | 34 | 48 | 6.56% | 4.64% |
| MONACO | 55 | - | - | - | - | - |
| MONGOLIA | 3,891 | 48 | 140 | 188 | 4.83% | 3.60% |
| MONTENEGRO | 1,699 | 15 | 77 | 92 | 5.41% | 4.53% |
| MOROCCO | 2,698 | 24 | 120 | 144 | 5.34% | 4.45% |
| MOZAMBIQUE | 246 | 2 | 15 | 17 | 6.91% | 6.10% |
| NAMIBIA | 221 | 2 | 13 | 15 | 6.79% | 5.88% |
| NAURU | 4 | - | - | - | - | - |
| NEPAL | 4,937 | 44 | 462 | 506 | 10.25% | 9.36% |
| NETHERLANDS | 9,530 | 57 | 40 | 97 | 1.02% | 0.42% |
| NEW ZEALAND | 4,218 | 47 | 20 | 67 | 1.59% | 0.47% |
| NICARAGUA | 919 | 6 | 18 | 24 | 2.61% | 1.96% |
| NIGER | 164 | 5 | 22 | 27 | 16.46% | 13.41% |
| NIGERIA | 8,311 | 92 | 897 | 989 | 11.90% | 10.79% |
| NORWAY | 5,260 | 37 | 14 | 51 | 0.97% | 0.27% |
| OMAN | 3,323 | 11 | 11 | 22 | 0.66% | 0.33% |
| PAKISTAN | 10,941 | 76 | 408 | 484 | 4.42% | 3.73% |
| PALAU | 4 | - | - | - | - | - |
| PANAMA | 4,775 | 28 | 57 | 85 | 1.78% | 1.19% |
| PAPUA NEW GUINEA | 142 | 5 | 17 | 22 | 15.49% | 11.97% |
| PARAGUAY | 2,546 | 19 | 120 | 139 | 5.46% | 4.71% |
| PERU | 18,533 | 162 | 608 | 770 | 4.15% | 3.28% |
| PHILIPPINES | 9,042 | 88 | 928 | 1,016 | 11.24% | 10.26% |
| POLAND | 7,931 | 34 | 61 | 95 | 1.20% | 0.77% |
| PORTUGAL | 3,518 | 29 | 24 | 53 | 1.51% | 0.68% |

HaitiTPSAR000297

| | | | | | | |
|---|---|---|---|---|---|---|
| QATAR | 1,059 | 11 | 2 | 13 | 1.23% | 0.19% |
| ROMANIA | 9,427 | 81 | 169 | 250 | 2.65% | 1.79% |
| RUSSIA | 7,088 | 56 | 223 | 279 | 3.94% | 3.15% |
| RWANDA | 1,404 | 17 | 100 | 117 | 8.33% | 7.12% |
| SAINT KITTS AND NEVIS | 266 | 2 | 6 | 8 | 3.01% | 2.26% |
| SAINT LUCIA | 304 | 6 | 12 | 18 | 5.92% | 3.95% |
| SAINT VINCENT AND THE GRENADINES | 162 | - | 9 | 9 | 5.56% | 5.56% |
| SAMOA | 50 | - | 5 | 5 | 10.00% | 10.00% |
| SAN MARINO | 23 | - | - | - | - | - |
| SAO TOME AND PRINCIPE | 7 | - | - | - | - | - |
| SAUDI ARABIA | 31,355 | 463 | 306 | 769 | 2.45% | 0.98% |
| SENEGAL | 635 | 9 | 74 | 83 | 13.07% | 11.65% |
| SERBIA | 3,365 | 32 | 93 | 125 | 3.71% | 2.76% |
| SEYCHELLES | 24 | - | - | - | - | - |
| SIERRA LEONE | 240 | 4 | 82 | 86 | 35.83% | 34.17% |
| SINGAPORE | 7,766 | 54 | 24 | 78 | 1.00% | 0.31% |
| SLOVAKIA | 2,992 | 3 | 13 | 16 | 0.53% | 0.43% |
| SLOVENIA | 670 | 1 | 3 | 4 | 0.60% | 0.45% |
| SOLOMON ISLANDS | 34 | 1 | - | 1 | 2.94% | - |
| SOMALIA | 40 | - | 10 | 10 | 25.00% | 25.00% |
| SOUTH AFRICA | 8,109 | 121 | 507 | 628 | 7.74% | 6.25% |
| SOUTH SUDAN | 92 | 2 | 22 | 24 | 26.09% | 23.91% |
| SPAIN | 42,591 | 174 | 179 | 353 | 0.83% | 0.42% |
| SRI LANKA | 1,966 | 17 | 44 | 61 | 3.10% | 2.24% |
| SUDAN | 386 | 9 | 37 | 46 | 11.92% | 9.59% |
| SURINAME | 193 | 1 | 13 | 14 | 7.25% | 6.74% |
| SWAZILAND | 167 | 2 | 8 | 10 | 5.99% | 4.79% |
| SWEDEN | 8,129 | 42 | 30 | 72 | 0.89% | 0.37% |
| SWITZERLAND | 5,919 | 33 | 14 | 47 | 0.79% | 0.24% |
| SYRIA | 289 | 3 | 24 | 27 | 9.34% | 8.30% |
| TAIWAN | 27,516 | 183 | 133 | 316 | 1.15% | 0.48% |
| TAJIKISTAN | 297 | 2 | 30 | 32 | 10.77% | 10.10% |
| TANZANIA | 938 | 14 | 117 | 131 | 13.97% | 12.47% |
| THAILAND | 16,007 | 76 | 267 | 343 | 2.14% | 1.67% |
| TIMOR-LESTE | 56 | 1 | - | 1 | 1.79% | - |
| TOGO | 218 | 2 | 54 | 56 | 25.69% | 24.77% |
| TONGA | 90 | 1 | 12 | 13 | 14.44% | 13.33% |

23

HaitiTPSAR000298

| | | | | | |
|---|---|---|---|---|---|
| *TRINIDAD AND TOBAGO* | 2,600 | 20 | 43 | 63 | 2.42% | 1.65% |
| *TUNISIA* | 1,296 | 15 | 109 | 124 | 9.57% | 8.41% |
| *TURKEY* | 23,533 | 216 | 618 | 834 | 3.54% | 2.63% |
| *TURKMENISTAN* | 342 | 4 | 62 | 66 | 19.30% | 18.13% |
| *TUVALU* | 9 | 1 | 1 | 2 | 22.22% | 11.11% |
| *UGANDA* | 1,163 | 12 | 143 | 155 | 13.33% | 12.30% |
| *UKRAINE* | 4,803 | 19 | 121 | 140 | 2.91% | 2.52% |
| *UNITED ARAB EMIRATES* | 2,890 | 29 | 13 | 42 | 1.45% | 0.45% |
| *UNITED KINGDOM* | 43,441 | 282 | 215 | 497 | 1.14% | 0.49% |
| *URUGUAY* | 1,125 | 10 | 9 | 19 | 1.69% | 0.80% |
| *UZBEKISTAN* | 1,283 | 13 | 198 | 211 | 16.45% | 15.43% |
| *VANUATU* | 14 | - | - | - | - | - |
| *VENEZUELA* | 5,640 | 24 | 174 | 198 | 3.51% | 3.09% |
| *VIETNAM* | 14,757 | 225 | 772 | 997 | 6.76% | 5.23% |
| *YEMEN* | 436 | 5 | 107 | 112 | 25.69% | 24.54% |
| *ZAMBIA* | 647 | 12 | 124 | 136 | 21.02% | 19.17% |
| *ZIMBABWE* | 1,525 | 18 | 213 | 231 | 15.15% | 13.97% |
| **Totals:** | **1,412,627** | **11,158** | **34,540** | **45,698** | **3.23%** | **2.45%** |

24

HaitiTPSAR000299

## E. Fiscal Year 2024 Overstay Rates for All Other In-scope Classes of Admission

| Country of Citizenship | Expected Departures | Out-of-Country Overstays | Suspected In-Country Overstays | Total Overstays | Total Overstay Rate | Suspected In-Country Overstay Rate |
|---|---|---|---|---|---|---|
| **Table 5** <br> **Fiscal Year 2024 Overstay Rates for Other In-scope Nonimmigrant Classes of Admission Admitted to the United States via Air and Seaport Portsof Entry for All Countries (excluding Canada and Mexico)** | | | | | | |
| AFGHANISTAN | 279 | - | 80 | 80 | 28.67% | 28.67% |
| ALBANIA | 540 | 2 | 20 | 22 | 4.07% | 3.70% |
| ALGERIA | 312 | 3 | 26 | 29 | 9.29% | 8.33% |
| ANDORRA | 13 | - | - | - | - | - |
| ANGOLA | 113 | - | 2 | 2 | 1.77% | 1.77% |
| ANTIGUA AND BARBUDA | 108 | 1 | 1 | 2 | 1.85% | 0.93% |
| ARGENTINA | 16,140 | 69 | 103 | 172 | 1.07% | 0.64% |
| ARMENIA | 1,025 | 2 | 44 | 46 | 4.49% | 4.29% |
| AUSTRALIA | 32,477 | 82 | 112 | 194 | 0.60% | 0.34% |
| AUSTRIA | 4,772 | 16 | 8 | 24 | 0.50% | 0.17% |
| AZERBAIJAN | 189 | 1 | 8 | 9 | 4.76% | 4.23% |
| BAHAMAS, THE | 516 | 2 | 3 | 5 | 0.97% | 0.58% |
| BAHRAIN | 85 | 1 | 1 | 2 | 2.35% | 1.18% |
| BANGLADESH | 841 | 1 | 87 | 88 | 10.46% | 10.34% |
| BARBADOS | 381 | 11 | 4 | 15 | 3.94% | 1.05% |
| BELARUS | 770 | 4 | 30 | 34 | 4.42% | 3.90% |
| BELGIUM | 6,075 | 13 | 11 | 24 | 0.40% | 0.18% |
| BELIZE | 232 | 1 | 30 | 31 | 13.36% | 12.93% |
| BENIN | 84 | - | 8 | 8 | 9.52% | 9.52% |
| BHUTAN | 17 | - | - | - | - | - |
| BOLIVIA | 668 | 2 | 28 | 30 | 4.49% | 4.19% |
| BOSNIA AND HERZEGOVINA | 398 | 7 | 27 | 34 | 8.54% | 6.78% |
| BOTSWANA | 65 | 1 | 5 | 6 | 9.23% | 7.69% |
| BRAZIL | 26,518 | 155 | 528 | 683 | 2.58% | 1.99% |
| BRUNEI | 5 | - | - | - | - | - |
| BULGARIA | 1,092 | 22 | 15 | 37 | 3.39% | 1.37% |
| BURKINA FASO | 77 | - | 8 | 8 | 10.39% | 10.39% |

25

HaitiTPSAR000300

| | | | | | | |
|---|---|---|---|---|---|---|
| BURMA | 283 | - | 46 | 46 | 16.25% | 16.25% |
| BURUNDI | 67 | - | 13 | 13 | 19.40% | 19.40% |
| CABO VERDE | 209 | 1 | 50 | 51 | 24.40% | 23.92% |
| CAMBODIA | 551 | 2 | 94 | 96 | 17.42% | 17.06% |
| CAMEROON | 426 | 1 | 75 | 76 | 17.84% | 17.61% |
| CENTRAL AFRICAN REPUBLIC | 5 | - | 2 | 2 | 40.00% | 40.00% |
| CHAD | 6 | - | 1 | 1 | 16.67% | 16.67% |
| CHILE | 11,098 | 110 | 138 | 248 | 2.23% | 1.24% |
| CHINA | 32,858 | 121 | 308 | 429 | 1.31% | 0.94% |
| COLOMBIA | 20,963 | 74 | 783 | 857 | 4.09% | 3.74% |
| COMOROS | 1 | - | - | - | - | - |
| CONGO (BRAZZAVILLE) | 26 | - | 6 | 6 | 23.08% | 23.08% |
| CONGO (KINSHASA) | 290 | 4 | 81 | 85 | 29.31% | 27.93% |
| COSTA RICA | 3,584 | 24 | 52 | 76 | 2.12% | 1.45% |
| COTE D'IVOIRE | 203 | - | 39 | 39 | 19.21% | 19.21% |
| CROATIA | 1,006 | 5 | 4 | 9 | 0.89% | 0.40% |
| CUBA | 1,192 | 8 | 204 | 212 | 17.79% | 17.11% |
| CYPRUS | 172 | - | - | - | - | - |
| CZECH REPUBLIC | 2,206 | 6 | 8 | 14 | 0.63% | 0.36% |
| DENMARK | 4,447 | 10 | 9 | 19 | 0.43% | 0.20% |
| DJIBOUTI | 11 | - | 1 | 1 | 9.09% | 9.09% |
| DOMINICA | 129 | - | 2 | 2 | 1.55% | 1.55% |
| DOMINICAN REPUBLIC | 10,637 | 79 | 1,055 | 1,134 | 10.66% | 9.92% |
| ECUADOR | 2,857 | 16 | 176 | 192 | 6.72% | 6.16% |
| EGYPT | 2,439 | 6 | 90 | 96 | 3.94% | 3.69% |
| EL SALVADOR | 9,053 | 668 | 1,068 | 1,736 | 19.18% | 11.80% |
| EQUATORIAL GUINEA | 13 | - | - | - | - | - |
| ERITREA | 95 | 1 | 17 | 18 | 18.95% | 17.89% |
| ESTONIA | 495 | - | 2 | 2 | 0.40% | 0.40% |
| ETHIOPIA | 1,024 | - | 138 | 138 | 13.48% | 13.48% |
| FIJI | 53 | - | 6 | 6 | 11.32% | 11.32% |
| FINLAND | 2,535 | 6 | 8 | 14 | 0.55% | 0.32% |
| FRANCE | 39,776 | 97 | 136 | 233 | 0.59% | 0.34% |
| GABON | 14 | - | 2 | 2 | 14.29% | 14.29% |
| GAMBIA, THE | 129 | - | 24 | 24 | 18.60% | 18.60% |
| GEORGIA | 293 | 2 | 7 | 9 | 3.07% | 2.39% |

26

HaitiTPSAR000301

| | | | | | | |
|---|---|---|---|---|---|---|
| GERMANY | 40,364 | 69 | 86 | 155 | 0.38% | 0.21% |
| GHANA | 1,390 | 8 | 166 | 174 | 12.52% | 11.94% |
| GREECE | 2,831 | 5 | 13 | 18 | 0.64% | 0.46% |
| GRENADA | 166 | - | 13 | 13 | 7.83% | 7.83% |
| GUATEMALA | 14,904 | 724 | 2,054 | 2,778 | 18.64% | 13.78% |
| GUINEA | 139 | 1 | 34 | 35 | 25.18% | 24.46% |
| GUINEA-BISSAU | 1 | - | - | - | - | - |
| GUYANA | 285 | 2 | 31 | 33 | 11.58% | 10.88% |
| HAITI | 1,261 | 2 | 418 | 420 | 33.31% | 33.15% |
| HOLY SEE | - | - | - | - | - | - |
| HONDURAS | 9,690 | 449 | 1,541 | 1,990 | 20.54% | 15.90% |
| HUNGARY | 1,367 | 13 | 15 | 28 | 2.05% | 1.10% |
| ICELAND | 300 | 1 | - | 1 | 0.33% | - |
| INDIA | 390,707 | 676 | 3,263 | 3,939 | 1.01% | 0.84% |
| INDONESIA | 1,403 | 8 | 91 | 99 | 7.06% | 6.49% |
| IRAN | 637 | 4 | 50 | 54 | 8.48% | 7.85% |
| IRAQ | 503 | 4 | 80 | 84 | 16.70% | 15.90% |
| IRELAND | 10,392 | 47 | 38 | 85 | 0.82% | 0.37% |
| ISRAEL | 9,928 | 18 | 64 | 82 | 0.83% | 0.64% |
| ITALY | 25,248 | 69 | 89 | 158 | 0.63% | 0.35% |
| JAMAICA | 21,472 | 992 | 1,731 | 2,723 | 12.68% | 8.06% |
| JAPAN | 75,132 | 92 | 136 | 228 | 0.30% | 0.18% |
| JORDAN | 1,141 | 6 | 47 | 53 | 4.65% | 4.12% |
| KAZAKHSTAN | 810 | 9 | 27 | 36 | 4.44% | 3.33% |
| KENYA | 1,315 | 1 | 155 | 156 | 11.86% | 11.79% |
| KIRIBATI | 1 | - | - | - | - | - |
| KOREA, NORTH | 4 | - | - | - | - | - |
| KOREA, SOUTH | 30,381 | 123 | 131 | 254 | 0.84% | 0.43% |
| KOSOVO | 258 | 2 | 20 | 22 | 8.53% | 7.75% |
| KUWAIT | 88 | 1 | 3 | 4 | 4.55% | 3.41% |
| KYRGYZSTAN | 101 | 4 | 12 | 16 | 15.84% | 11.88% |
| LAOS | 297 | 2 | 75 | 77 | 25.93% | 25.25% |
| LATVIA | 354 | 7 | 4 | 11 | 3.11% | 1.13% |
| LEBANON | 1,988 | 9 | 46 | 55 | 2.77% | 2.31% |
| LESOTHO | 7 | - | 1 | 1 | 14.29% | 14.29% |
| LIBERIA | 251 | - | 78 | 78 | 31.08% | 31.08% |
| LIBYA | 30 | - | 1 | 1 | 3.33% | 3.33% |
| LIECHTENSTEIN | 14 | - | - | - | - | - |
| LITHUANIA | 881 | 32 | 15 | 47 | 5.33% | 1.70% |

27

HaitiTPSAR000302

| | | | | | |
|---|---|---|---|---|---|
| LUXEMBOURG | 96 | 3 | - | 3 | 3.13% | - |
| MACEDONIA | 421 | 18 | 21 | 39 | 9.26% | 4.99% |
| MADAGASCAR | 41 | - | 9 | 9 | 21.95% | 21.95% |
| MALAWI | 55 | 1 | 3 | 4 | 7.27% | 5.45% |
| MALAYSIA | 2,058 | 7 | 19 | 26 | 1.26% | 0.92% |
| MALDIVES | 2 | - | - | - | - | - |
| MALI | 95 | 1 | 8 | 9 | 9.47% | 8.42% |
| MALTA | 122 | - | 1 | 1 | 0.82% | 0.82% |
| MARSHALL ISLANDS | - | - | - | - | - | - |
| MAURITANIA | 25 | - | 1 | 1 | 4.00% | 4.00% |
| MAURITIUS | 145 | 2 | 2 | 4 | 2.76% | 1.38% |
| MICRONESIA, FEDERATED STATES OF | - | - | - | - | - | - |
| MOLDOVA | 287 | 2 | 17 | 19 | 6.62% | 5.92% |
| MONACO | 56 | - | - | - | - | - |
| MONGOLIA | 431 | 21 | 47 | 68 | 15.78% | 10.90% |
| MONTENEGRO | 178 | - | 12 | 12 | 6.74% | 6.74% |
| MOROCCO | 785 | 2 | 41 | 43 | 5.48% | 5.22% |
| MOZAMBIQUE | 50 | 1 | 3 | 4 | 8.00% | 6.00% |
| NAMIBIA | 49 | 4 | 2 | 6 | 12.24% | 4.08% |
| NAURU | - | - | - | - | - | - |
| NEPAL | 1,482 | 5 | 64 | 69 | 4.66% | 4.32% |
| NETHERLANDS | 10,186 | 32 | 28 | 60 | 0.59% | 0.27% |
| NEW ZEALAND | 3,452 | 23 | 19 | 42 | 1.22% | 0.55% |
| NICARAGUA | 1,869 | 3 | 76 | 79 | 4.23% | 4.07% |
| NIGER | 49 | - | 5 | 5 | 10.20% | 10.20% |
| NIGERIA | 4,034 | 8 | 251 | 259 | 6.42% | 6.22% |
| NORWAY | 3,217 | 6 | 9 | 15 | 0.47% | 0.28% |
| OMAN | 47 | - | - | - | - | - |
| PAKISTAN | 3,911 | 17 | 166 | 183 | 4.68% | 4.24% |
| PALAU | - | - | - | - | - | - |
| PANAMA | 1,710 | 5 | 29 | 34 | 1.99% | 1.70% |
| PAPUA NEW GUINEA | 7 | - | - | - | - | - |
| PARAGUAY | 341 | - | 7 | 7 | 2.05% | 2.05% |
| PERU | 5,129 | 24 | 291 | 315 | 6.14% | 5.67% |
| PHILIPPINES | 19,511 | 275 | 3,326 | 3,601 | 18.46% | 17.05% |
| POLAND | 4,261 | 16 | 33 | 49 | 1.15% | 0.77% |
| PORTUGAL | 3,113 | 13 | 12 | 25 | 0.80% | 0.39% |

28

HaitiTPSAR000303

| | | | | | |
|---|---|---|---|---|---|
| QATAR | 24 | - | - | - | - | - |
| ROMANIA | 3,358 | 92 | 60 | 152 | 4.53% | 1.79% |
| RUSSIA | 5,179 | 33 | 160 | 193 | 3.73% | 3.09% |
| RWANDA | 230 | 1 | 34 | 35 | 15.22% | 14.78% |
| SAINT KITTS AND NEVIS | 76 | 2 | 3 | 5 | 6.58% | 3.95% |
| SAINT LUCIA | 72 | - | 7 | 7 | 9.72% | 9.72% |
| SAINT VINCENT AND THE GRENADINES | 57 | - | 2 | 2 | 3.51% | 3.51% |
| SAMOA | 8 | - | 1 | 1 | 12.50% | 12.50% |
| SAN MARINO | 1 | - | - | - | - | - |
| SAO TOME AND PRINCIPE | - | - | - | - | - | - |
| SAUDI ARABIA | 851 | 5 | 4 | 9 | 1.06% | 0.47% |
| SENEGAL | 229 | 10 | 28 | 38 | 16.59% | 12.23% |
| SERBIA | 2,357 | 99 | 69 | 168 | 7.13% | 2.93% |
| SEYCHELLES | 2 | - | - | - | - | - |
| SIERRA LEONE | 189 | 1 | 45 | 46 | 24.34% | 23.81% |
| SINGAPORE | 4,422 | 10 | 21 | 31 | 0.70% | 0.47% |
| SLOVAKIA | 936 | 4 | 4 | 8 | 0.85% | 0.43% |
| SLOVENIA | 410 | 2 | 1 | 3 | 0.73% | 0.24% |
| SOLOMON ISLANDS | 3 | - | - | - | - | - |
| SOMALIA | 59 | - | 11 | 11 | 18.64% | 18.64% |
| SOUTH AFRICA | 18,294 | 246 | 220 | 466 | 2.55% | 1.20% |
| SOUTH SUDAN | 26 | - | 8 | 8 | 30.77% | 30.77% |
| SPAIN | 24,671 | 66 | 69 | 135 | 0.55% | 0.28% |
| SRI LANKA | 648 | 4 | 21 | 25 | 3.86% | 3.24% |
| SUDAN | 133 | - | 11 | 11 | 8.27% | 8.27% |
| SURINAME | 92 | - | - | - | - | - |
| SWAZILAND | 24 | - | 2 | 2 | 8.33% | 8.33% |
| SWEDEN | 6,703 | 10 | 17 | 27 | 0.40% | 0.25% |
| SWITZERLAND | 4,912 | 8 | 9 | 17 | 0.35% | 0.18% |
| SYRIA | 376 | 2 | 40 | 42 | 11.17% | 10.64% |
| TAIWAN | 8,910 | 25 | 28 | 53 | 0.59% | 0.31% |
| TAJIKISTAN | 75 | - | 18 | 18 | 24.00% | 24.00% |
| TANZANIA | 230 | 1 | 14 | 15 | 6.52% | 6.09% |
| THAILAND | 2,700 | 24 | 243 | 267 | 9.89% | 9.00% |
| TIMOR-LESTE | - | - | - | - | - | - |
| TOGO | 146 | - | 33 | 33 | 22.60% | 22.60% |

29

| | | | | | | |
|---|---|---|---|---|---|---|
| *TONGA* | 34 | 3 | 4 | 7 | 20.59% | 11.76% |
| *TRINIDAD AND TOBAGO* | 2,202 | 3 | 33 | 36 | 1.63% | 1.50% |
| *TUNISIA* | 427 | 1 | 17 | 18 | 4.22% | 3.98% |
| *TURKEY* | 6,193 | 85 | 174 | 259 | 4.18% | 2.81% |
| *TURKMENISTAN* | 22 | - | 2 | 2 | 9.09% | 9.09% |
| *TUVALU* | - | - | - | - | - | - |
| *UGANDA* | 620 | 19 | 63 | 82 | 13.23% | 10.16% |
| *UKRAINE* | 4,037 | 68 | 64 | 132 | 3.27% | 1.59% |
| *UNITED ARAB EMIRATES* | 30 | - | 1 | 1 | 3.33% | 3.33% |
| *UNITED KINGDOM* | 71,363 | 152 | 297 | 449 | 0.63% | 0.42% |
| *URUGUAY* | 923 | 5 | 10 | 15 | 1.63% | 1.08% |
| *UZBEKISTAN* | 280 | 8 | 32 | 40 | 14.29% | 11.43% |
| *VANUATU* | 4 | - | - | - | - | - |
| *VENEZUELA* | 9,224 | 32 | 324 | 356 | 3.86% | 3.51% |
| *VIETNAM* | 3,191 | 11 | 253 | 264 | 8.27% | 7.93% |
| *YEMEN* | 103 | - | 11 | 11 | 10.68% | 10.68% |
| *ZAMBIA* | 84 | - | 11 | 11 | 13.10% | 13.10% |
| *ZIMBABWE* | 487 | - | 18 | 18 | 3.70% | 3.70% |
| **Totals:** | **1,141,821** | **6,538** | **23,361** | **29,899** | **2.62%** | **2.05%** |

30

HaitiTPSAR000305

## F. Fiscal Year 2024 Canada and Mexico Nonimmigrant Overstay Rates

| | | | | | | |
|---|---|---|---|---|---|---|
| **Table 6** | | | | | | |
| **Fiscal Year 2024 Overstay Rates for Canadian and Mexican Nonimmigrants Admitted to the United States via Air and Seaport Ports of Entry** | | | | | | |
| **Country of Citizenship** | **Expected Departures** | **Out-of-Country Overstays** | **Suspected In-Country Overstays** | **Total Overstays** | **Total Overstay Rate** | **Suspected In-Country Overstay Rate** |
| *CANADA* | 9,131,306 | 5,937 | 17,707 | 23,644 | 0.26% | 0.19% |
| *MEXICO* | 3,472,736 | 2,395 | 49,688 | 52,083 | 1.50% | 1.43% |
| **B1/B2 Totals:** | **12,604,042** | **8,332** | **67,395** | **75,727** | **0.60%** | **0.53%** |
| *CANADA* | 63,825 | 257 | 181 | 438 | 0.69% | 0.28% |
| MEXICO | 53,561 | 334 | 1,054 | 1,388 | 2.59% | 1.97% |
| **F, M, J Totals:** | **117,386** | **591** | **1,235** | **1,826** | **1.56%** | **1.05%** |
| *CANADA* | 234,077 | 739 | 488 | 1,227 | 0.52% | 0.21% |
| *MEXICO* | 162,669 | 1,774 | 6,197 | 7,971 | 4.90% | 3.81% |
| **Other In-scope Totals:** | **396,746** | **2,513** | **6,685** | **9,198** | **1.68%** | **1.68%** |
| *CANADA* | 9,429,208 | 6,933 | 18,376 | 25,309 | 0.27% | 0.19% |
| *MEXICO* | 3,688,966 | 4,503 | 56,939 | 61,442 | 1.67% | 1.54% |
| **Totals:** | **13,118,174** | **11,436** | **75,315** | **86,751** | **0.66%** | **0.57%** |

**Table 6** represents Canadian and Mexican nonimmigrant visitors admitted at air and seaport port of entry who were expected to depart in Fiscal Year 2024. Unlike all other countries, the majority of travelers from Canada or Mexico enter the United States by land. Overstay data concerning land exits from the United States along the Southern border will be further incorporated into future iterations of this report as additional exit data collection projects progress.

## G. Fiscal Year 2023 Suspected In-Country Overstay Trend

This section presents the change in the Fiscal Year 2023 Suspected In-Country Overstay rates by groups of major admission classes over the course of Fiscal Year 2023. **Table 7** provides a 7-, 9-, and 12-month snapshot of the Fiscal Year 2023 data, Suspected In-Country Overstay figures, and the associated rates. Complete Fiscal Year 2023 data appear in the appendix of this report.

At the end of Fiscal Year 2023, the overall Suspected In-Country Overstay number was 510,363 or 1.31 percent. At the end April 2024, the number further decreased to 399,708 or 1.02 percent. By the end of June 2024, the number decreased to 388,366 or 1.00 percent. Finally, as of October 1, 2024, the number of Suspected In-Country Overstays had further decreased to 351,620 rendering the Fiscal Year 2023 Suspected In-Country Overstay rate 0.90 percent.

31

HaitiTPSAR000306

32

HaitiTPSAR000307

**Table 7**
**Fiscal Year 2023 Suspected In-Country Overstay rates over time for Nonimmigrants admitted to the United States via Air and Seaport Ports of Entry**

| Admission Type | Expected Departures | Suspected In-Country Overstay | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Fiscal Year 2023 Report | | 7 Months as of 4/30/24 | | 9 Months as of 6/30/24 | | 12 Months as of 10/1/24 | |
| Visa Waiver Program Countries Business or Pleasure Visitors | 16,146,989 | 86,946 | 0.54% | 71,473 | 0.44% | 69,584 | 0.43% | 63,291 | 0.39% |
| Non-Visa Waiver Program Countries Business or Pleasure Visitors (excluding Canada and Mexico) | 9,810,543 | 298,560 | 3.04% | 237,180 | 2.42% | 230,978 | 2.35% | 210,369 | 2.14% |
| Student and Exchange Visitors (excluding Canada and Mexico) | 1,345,378 | 38,152 | 2.84% | 29,210 | 2.17% | 28,436 | 2.11% | 26,100 | 1.94% |
| All Other In-Scope Nonimmigrant Visitors (excluding Canada and Mexico) | 760,047 | 16,896 | 2.22% | 11,903 | 1.57% | 11,421 | 1.50% | 10,272 | 1.35% |
| Canada and Mexico Nonimmigrant Visitors | 10,942,755 | 69,809 | 0.64% | 49,942 | 0.46% | 47,947 | 0.44% | 41,588 | 0.38% |
| **Totals:** | **39,005,712** | **510,363** | **1.31%** | **399,708** | **1.02%** | **388,366** | **1.00%** | **351,620** | **0.90%** |

HaitiTPSAR000308

# V. Conclusion

Identifying aliens who overstay their authorized periods of admission is important for national security, public safety, immigration enforcement, and maintaining the integrity of the immigration benefits system.

Over the years, U.S. Customs and Border Protection has significantly improved data collection processes in the entry and exit environments. These improvements include the collection of data on all admissions to the United States by foreign nationals, reduced documentation for entry to the United States, collection of biometric data on most foreign travelers to the United States, and comparison of data against criminal and terrorist watchlists. Despite the different infrastructural, operational, and logistical challenges presented in the exit environment, U.S. Customs and Border Protection is working to resolve many issues regarding collection of departure information for foreign nationals. Further efforts, including partnerships with foreign governments and the private sector (e.g., airlines, airports, cruise lines), are ongoing and continue to improve data integrity.

During recent years, U.S. Customs and Border Protection made significant progress in terms of the ability to accurately report data on overstays. U.S. Customs and Border Protection will continue to expand its entry and exit system, which will improve U.S. Customs and Border Protection's ability to capture and accurately report this data. The Department of Homeland Security works to annually release overstay data and looks forward to providing updates to Members of Congress and their staff on future progress.

HaitiTPSAR000309

# VI.  Appendices

## Appendix A.  In-Scope Nonimmigrant Classes of Admission

| CLASS OF ADMISSION DESCRIPTION | CODE |
|---|---|
| **Temporary Workers and Trainees** | |
| Commonwealth of the Northern Mariana Islands-only transitional workers | CW1 |
| Spouses and children of CW1 | CW2 |
| Temporary workers in specialty occupations | H1B |
| Chile and Singapore Free Trade Agreement aliens | H1B1 |
| Registered nurses participating in the Nursing Relief for Disadvantaged Areas | H1C |
| Agricultural workers | H2A |
| Nonagricultural workers | H2B |
| Returning H2B workers | H2R |
| Trainees | H3 |
| Spouse and unmarried child(ren) under 21 years of age of H1B, H1B1, H1C, H2A, H2B, H2R, or H3 | H4 |
| Workers with extraordinary ability or achievement | O1 |
| Workers accompanying and assisting in performance of O1 workers | O2 |
| Spouses and children of O1 and O2 | O3 |
| Internationally recognized athletes or entertainers | P1 |
| Artists or entertainers in reciprocal exchange programs | P2 |
| Artists or entertainers in culturally unique programs | P3 |
| Spouses and children of P1, P2, or P3 | P4 |
| Workers in international cultural exchange programs | Q1 |
| Workers in religious occupations | R1 |
| Spouses and children of R1 | R2 |
| North American Free Trade Agreement professional workers | TN |
| Spouses and children of TN | TD |
| **Intracompany Transferees** | |
| Intracompany transferees | L1[22] |
| Spouses and children of L1 | L2 |
| **Treaty Traders and Investors** | |
| Treaty traders and their spouses and children | E1 |
| Treaty investors and their spouses and children | E2 |
| Treaty investors and their spouses and children Commonwealth of the Northern Mariana Islands- only | E2C |
| Australian Free Trade Agreement principals, spouses, and children | E3[23] |
| **Students** | |
| Academic students | F1 |
| Spouses and children of F1 | F2 |
| Vocational students | M1 |
| Spouses and children of M1 | M2 |
| **Exchange Visitors** | |
| Exchange visitors | J1 |
| Spouses and children of J1 | J2 |
| **Temporary Visitors for Pleasure** | |

---

[22] Includes L1A and L1B classes of admission
[23] Includes E3D and E3R classes of admission

35

| | |
|---|---|
| Temporary visitors for pleasure | B2 |
| Visa Waiver Program – temporary visitors for pleasure | Waiver-Tourist |
| **Temporary Visitors for Business** | |
| Temporary visitors for business | B1 |
| Visa Waiver Program – temporary visitors for business | Waiver-Business |
| **Alien Fiancées of United States Citizens and Children** | |
| Fiancées of United States citizens | K1 |
| Children of K1 | K2 |
| **Legal Immigration Family Equity LIFE Act** | |
| Spouses of United States citizens, visa pending | K3 |
| Children of United States citizens, visa pending | K4 |
| Spouses of permanent residents, visa pending | V1 |
| Children of permanent residents, visa pending | V2 |
| Dependents of V1 or V2, visa pending | V3 |
| **Other** | |
| Attendants, servants, or personal employees of A1 and A2 and their families | A3 |
| Attendants, servants, or personal employees of diplomats or other representatives | G5 |
| Attendant, servant, personal employer of North Atlantic Treaty Organization NATO-1 through NATO-6 or Immediate Family | NATO-7 |

36

HaitiTPSAR000311

# Appendix B.  Out-of-Scope Nonimmigrant Classes of Admission

| CLASS OF ADMISSION DESCRIPTION | CODE |
|---|---|
| **Diplomats and Other Representatives** | |
| Representatives of foreign information media and spouses and children | I1 |
| Ambassadors, public ministers, career diplomatic/consular officers and families | A1 |
| Other foreign government officials or employees and their families | A2 |
| Principals of recognized foreign governments | G1 |
| Other representatives of recognized foreign governments | G2 |
| Representatives of non-recognized or nonmember foreign governments | G3 |
| International organization officers or employees | G4 |
| North Atlantic Treaty Organization officials, spouses, and children | NATO-1 to NATO-6 |
| **Transit Aliens** | |
| Aliens in continuous and immediate transit through the United States | C1 |
| Aliens in transit to the United Nations | C2 |
| Foreign government officials, their spouses, children, and attendants in transit | C3 |
| **Special Classes** | |
| Alien Witness or Informant | S5 |
| Alien Witness or Informant | S6 |
| Qualified Family Member of S5, S6 | S7 |
| Victim of Trafficking, Special Protected Class | T1 |
| Spouse of T1, Special Protected Class | T2 |
| Spouse of T1, Special Protected Class | T3 |
| Parent of T1, Special Protected Class | T4 |
| Sibling unmarried of T1, Special Protected Class | T5 |
| Victim of Criminal Activity, Special Protected Class | U1 |
| Spouse of U2, Special Protected Class | U2 |
| Spouse of U1, Special Protected Class | U3 |
| Parent of U1, Special Protected Class | U4 |
| Sibling unmarried of U1, Special Protected Class | U5 |
| Special Protected Class, Violence against Women Act | VAWA |
| **Other** | |
| Crewmen | D1 |
| Crewman-different vessel/flight | D2 |

HaitiTPSAR000312

# Appendix C.  Fiscal Year 2023 Entry and Exit Overstay Data

**Fiscal Year 2023 Entry/Exit Overstay Data Overview**
Below are the tabulated rates from Fiscal Year 2023 entry and exit overstay data.  Fiscal Year 2023 data provide information on expected departures and overstays, by country, for foreign travelers to the United States who were admitted as nonimmigrants at an air or seaport port of entry and were expected to depart in Fiscal Year 2023 (October 1, 2022 – September 30, 2023).  This is determined by examining the number of admissions, by country, for foreign travelers who arrived as nonimmigrants during this time as of October 1, 2023.

At the end of Fiscal Year 2023, the overall Suspected In-Country Overstay number – i.e., those for whom Department of Homeland Security did not have evidence of a departure or transition to another immigration status – was 510,363 or 1.31 percent.  As of October 1, 2024, the number of Suspected In-Country Overstays had further decreased to 351,620 rendering the Fiscal Year 2023 Suspected In-Country Overstay rate 0.90 percent.

**Fiscal Year 2023 Overstay Rate Summary**
**Table C-1** below provides a high-level summary of the country-by-country data identified in **Tables C-2** through **C-6**.

**Table C-1**

**Fiscal Year 2023 Summary Overstay Rates for Nonimmigrants Admitted to the United States via Air and Seaport Ports of Entry**

| Admission Type | Expected Departures | Out-of-Country Overstays | Suspected In-Country Overstays | Total Overstays | Total Overstay Rate | Suspected In-Country Overstay Rate |
|---|---|---|---|---|---|---|
| *Visa Waiver Program Countries Business or Pleasure Visitors (**Table C-2**)* | 16,157,939 | 12,529 | 86,987 | 99,516 | 0.62% | 0.54% |
| *Non-Visa Waiver Program Countries Business or Pleasure Visitors (excluding Canada and Mexico) (**Table C-3**)* | 9,799,593 | 15,536 | 298,519 | 314,055 | 3.20% | 3.05% |
| *Student and Exchange Visitors (excluding Canada and Mexico) (**Table C-4**)* | 1,345,378 | 11,262 | 38,152 | 49,414 | 3.67% | 2.84% |

38

HaitiTPSAR000313

| | Expected Departures | Out-of-Country Overstays | Suspected In-Country Overstays | Total Overstays | Total Overstay Rate | Suspected In-Country Overstay Rate |
|---|---|---|---|---|---|---|
| *All Other In-Scope Nonimmigrant Visitors (excluding Canada and Mexico) (Table C-5)* | 760,047 | 5,831 | 16,896 | 22,727 | 2.99% | 2.22% |
| *Canada and Mexico Nonimmigrant Visitors (Table C-6)* | 10,942,755 | 9,634 | 69,809 | 79,443 | 0.73% | 0.64% |
| **Totals:** | **39,005,712** | **54,792** | **510,363** | **565,155** | **1.45%** | **1.31%** |

**Table C-2**

**Fiscal Year 2023 Overstay Rates for Nonimmigrant Visitors Admitted to the United States for Business or Pleasure (Waiver-Business/ Waiver-Tourist/B-1/B-2) via Air and Seaport Ports of Entry for Visa Waiver Program Countries**

| Country of Citizenship | Expected Departures | Out-of-Country Overstays | Suspected In-Country Overstays | Total Overstays | Total Overstay Rate | Suspected In-Country Overstay Rate |
|---|---|---|---|---|---|---|
| *ANDORRA* | 1,210 | - | 11 | 11 | 0.91% | 0.91% |
| *AUSTRALIA* | 841,665 | 774 | 2,444 | 3,218 | 0.38% | 0.29% |
| *AUSTRIA* | 163,914 | 64 | 538 | 602 | 0.37% | 0.33% |
| *BELGIUM* | 239,873 | 113 | 737 | 850 | 0.35% | 0.31% |
| *BRUNEI* | 697 | - | 7 | 7 | 1.00% | 1.00% |
| *CHILE* | 466,799 | 1,347 | 10,886 | 12,233 | 2.62% | 2.33% |
| *CROATIA* | 10,950 | 15 | 41 | 56 | 0.51% | 0.37% |
| *CZECH REPUBLIC* | 102,127 | 92 | 438 | 530 | 0.52% | 0.43% |
| *DENMARK* | 228,138 | 78 | 521 | 599 | 0.26% | 0.23% |
| *ESTONIA* | 20,681 | 14 | 64 | 78 | 0.38% | 0.31% |
| *FINLAND* | 105,123 | 49 | 207 | 256 | 0.24% | 0.20% |
| *FRANCE* | 1,672,440 | 726 | 8,456 | 9,182 | 0.55% | 0.51% |
| *GERMANY* | 1,686,672 | 695 | 5,289 | 5,984 | 0.35% | 0.31% |
| *GREECE* | 79,215 | 217 | 769 | 986 | 1.24% | 0.97% |
| *HUNGARY* | 76,322 | 173 | 732 | 905 | 1.19% | 0.96% |
| *ICELAND* | 43,541 | 18 | 50 | 68 | 0.16% | 0.11% |
| *IRELAND* | 488,464 | 264 | 1,527 | 1,791 | 0.37% | 0.31% |
| *ITALY* | 1,010,549 | 896 | 7,265 | 8,161 | 0.81% | 0.72% |
| *JAPAN* | 872,061 | 195 | 1,135 | 1,330 | 0.15% | 0.13% |
| *KOREA, SOUTH* | 871,142 | 620 | 1,975 | 2,595 | 0.30% | 0.23% |
| *LATVIA* | 19,649 | 56 | 175 | 231 | 1.18% | 0.89% |
| *LIECHTENSTEIN* | 1,218 | - | 2 | 2 | 0.16% | 0.16% |
| *LITHUANIA* | 37,317 | 79 | 256 | 335 | 0.90% | 0.69% |

39

HaitiTPSAR000314

| | | | | | | |
|---|---|---|---|---|---|---|
| LUXEMBOURG | 11,605 | - | 37 | 37 | 0.32% | 0.32% |
| MALTA | 6,784 | 6 | 40 | 46 | 0.68% | 0.59% |
| MONACO | 731 | 2 | 1 | 3 | 0.41% | 0.14% |
| NETHERLANDS | 601,197 | 315 | 2,154 | 2,469 | 0.41% | 0.36% |
| NEW ZEALAND | 243,319 | 229 | 599 | 828 | 0.34% | 0.25% |
| NORWAY | 165,503 | 65 | 359 | 424 | 0.26% | 0.22% |
| POLAND | 294,424 | 381 | 1,533 | 1,914 | 0.65% | 0.52% |
| PORTUGAL | 167,920 | 429 | 3,425 | 3,854 | 2.30% | 2.04% |
| SAN MARINO | 360 | 1 | - | 1 | 0.28% | - |
| SINGAPORE | 109,634 | 84 | 221 | 305 | 0.28% | 0.20% |
| SLOVAKIA | 42,325 | 63 | 247 | 310 | 0.73% | 0.58% |
| SLOVENIA | 21,775 | 10 | 62 | 72 | 0.33% | 0.28% |
| SPAIN | 841,671 | 1,837 | 18,192 | 20,029 | 2.38% | 2.16% |
| SWEDEN | 280,292 | 151 | 736 | 887 | 0.32% | 0.26% |
| SWITZERLAND | 272,287 | 128 | 921 | 1,049 | 0.39% | 0.34% |
| TAIWAN | 209,689 | 447 | 1,119 | 1,566 | 0.75% | 0.53% |
| UNITED KINGDOM | 3,848,656 | 1,896 | 13,816 | 15,712 | 0.41% | 0.36% |
| **Totals:** | **16,157,939** | **12,529** | **86,987** | **99,516** | **0.62%** | **0.54%** |

**Table C-3**

**Fiscal Year 2023 Overstay Rates for Nonimmigrants Admitted to the United States for Business or Pleasure via Air and Seaport Ports of Entry for Non-Visa Waiver Program Countries (excluding Canada and Mexico)**

| Country of Citizenship | Expected Departures | Out-of-Country Overstays | Suspected In-Country Overstays | Total Overstays | Total Overstay Rate | Suspected In-Country Overstay Rate |
|---|---|---|---|---|---|---|
| AFGHANISTAN | 1,227 | 8 | 111 | 119 | 9.70% | 9.05% |
| ALBANIA | 16,714 | 34 | 392 | 426 | 2.55% | 2.35% |
| ALGERIA | 8,404 | 34 | 469 | 503 | 5.99% | 5.58% |
| ANGOLA | 2,935 | 10 | 398 | 408 | 13.90% | 13.56% |
| ANTIGUA AND BARBUDA | 13,368 | 19 | 166 | 185 | 1.38% | 1.24% |
| ARGENTINA | 561,808 | 312 | 5,118 | 5,430 | 0.97% | 0.91% |
| ARMENIA | 11,928 | 38 | 989 | 1,027 | 8.61% | 8.29% |
| AZERBAIJAN | 4,736 | 13 | 115 | 128 | 2.70% | 2.43% |
| BAHAMAS, THE | 230,325 | 366 | 2,922 | 3,288 | 1.43% | 1.27% |
| BAHRAIN | 3,850 | 5 | 69 | 74 | 1.92% | 1.79% |
| BANGLADESH | 29,041 | 54 | 1,939 | 1,993 | 6.86% | 6.68% |
| BARBADOS | 38,365 | 37 | 164 | 201 | 0.52% | 0.43% |

40

HaitiTPSAR000315

| | | | | | | |
|---|---|---|---|---|---|---|
| BELARUS | 5,736 | 14 | 505 | 519 | 9.05% | 8.80% |
| BELIZE | 28,666 | 36 | 977 | 1,013 | 3.53% | 3.41% |
| BENIN | 1,508 | 14 | 160 | 174 | 11.54% | 10.61% |
| BHUTAN | 181 | 1 | 22 | 23 | 12.71% | 12.15% |
| BOLIVIA | 62,279 | 88 | 3,282 | 3,370 | 5.41% | 5.27% |
| BOSNIA AND HERZEGOVINA | 6,531 | 19 | 52 | 71 | 1.09% | 0.80% |
| BOTSWANA | 1,803 | 5 | 105 | 110 | 6.10% | 5.82% |
| BRAZIL | 1,288,512 | 1,234 | 19,577 | 20,811 | 1.62% | 1.52% |
| BULGARIA | 24,059 | 36 | 128 | 164 | 0.68% | 0.53% |
| BURKINA FASO | 2,605 | 10 | 306 | 316 | 12.13% | 11.75% |
| BURMA | 2,006 | 13 | 530 | 543 | 27.07% | 26.42% |
| BURUNDI | 808 | 1 | 123 | 124 | 15.35% | 15.22% |
| CABO VERDE | 2,289 | 10 | 284 | 294 | 12.84% | 12.41% |
| CAMBODIA | 7,657 | 11 | 189 | 200 | 2.61% | 2.47% |
| CAMEROON | 8,537 | 83 | 830 | 913 | 10.69% | 9.72% |
| CENTRAL AFRICAN REPUBLIC | 117 | 1 | 9 | 10 | 8.55% | 7.69% |
| CHAD | 761 | 6 | 371 | 377 | 49.54% | 48.75% |
| CHINA | 375,674 | 2,324 | 11,481 | 13,805 | 3.67% | 3.06% |
| COLOMBIA | 944,995 | 1,103 | 39,781 | 40,884 | 4.33% | 4.21% |
| COMOROS | 35 | 1 | 1 | 2 | 5.71% | 2.86% |
| CONGO (BRAZZAVILLE) | 962 | 2 | 283 | 285 | 29.63% | 29.42% |
| CONGO (KINSHASA) | 6,447 | 15 | 958 | 973 | 15.09% | 14.86% |
| COSTA RICA | 268,822 | 138 | 6,113 | 6,251 | 2.33% | 2.27% |
| COTE D'IVOIRE | 4,451 | 22 | 311 | 333 | 7.48% | 6.99% |
| CUBA | 11,612 | 20 | 873 | 893 | 7.69% | 7.52% |
| CYPRUS | 6,673 | 5 | 33 | 38 | 0.57% | 0.49% |
| DJIBOUTI | 159 | 1 | 37 | 38 | 23.90% | 23.27% |
| DOMINICA | 5,654 | 11 | 199 | 210 | 3.71% | 3.52% |
| DOMINICAN REPUBLIC | 440,894 | 321 | 19,938 | 20,259 | 4.59% | 4.52% |
| ECUADOR | 365,857 | 282 | 13,822 | 14,104 | 3.86% | 3.78% |
| EGYPT | 58,071 | 100 | 2,318 | 2,418 | 4.16% | 3.99% |
| EL SALVADOR | 227,146 | 178 | 3,823 | 4,001 | 1.76% | 1.68% |
| EQUATORIAL GUINEA | 910 | 10 | 190 | 200 | 21.98% | 20.88% |
| ERITREA | 667 | 5 | 129 | 134 | 20.09% | 19.34% |
| ETHIOPIA | 15,809 | 75 | 1,150 | 1,225 | 7.75% | 7.27% |
| FIJI | 7,856 | 26 | 345 | 371 | 4.72% | 4.39% |
| GABON | 1,050 | 6 | 108 | 114 | 10.86% | 10.29% |

41

HaitiTPSAR000316

| | | | | | |
|---|---|---|---|---|---|
| GAMBIA, THE | 1,258 | 12 | 127 | 139 | 11.05% | 10.10% |
| GEORGIA | 7,378 | 18 | 718 | 736 | 9.98% | 9.73% |
| GHANA | 25,454 | 60 | 1,850 | 1,910 | 7.50% | 7.27% |
| GRENADA | 9,661 | 16 | 169 | 185 | 1.91% | 1.75% |
| GUATEMALA | 271,320 | 194 | 5,405 | 5,599 | 2.06% | 1.99% |
| GUINEA | 1,887 | 15 | 140 | 155 | 8.21% | 7.42% |
| GUINEA-BISSAU | 88 | - | 5 | 5 | 5.68% | 5.68% |
| GUYANA | 56,965 | 116 | 3,070 | 3,186 | 5.59% | 5.39% |
| HAITI | 86,906 | 274 | 26,995 | 27,269 | 31.38% | 31.06% |
| HOLY SEE | 15 | - | - | - | - | - |
| HONDURAS | 253,410 | 220 | 10,117 | 10,337 | 4.08% | 3.99% |
| INDIA | 1,000,020 | 2,064 | 10,818 | 12,882 | 1.29% | 1.08% |
| INDONESIA | 74,847 | 81 | 3,091 | 3,172 | 4.24% | 4.13% |
| IRAN | 9,561 | 69 | 408 | 477 | 4.99% | 4.27% |
| IRAQ | 4,716 | 29 | 264 | 293 | 6.21% | 5.60% |
| ISRAEL | 357,402 | 196 | 1,907 | 2,103 | 0.59% | 0.53% |
| JAMAICA | 233,668 | 337 | 11,931 | 12,268 | 5.25% | 5.11% |
| JORDAN | 25,560 | 90 | 1,414 | 1,504 | 5.88% | 5.53% |
| KAZAKHSTAN | 20,240 | 55 | 810 | 865 | 4.27% | 4.00% |
| KENYA | 20,351 | 67 | 1,536 | 1,603 | 7.88% | 7.55% |
| KIRIBATI | 53 | - | 2 | 2 | 3.77% | 3.77% |
| KOREA, NORTH | 1 | - | - | - | - | - |
| KOSOVO | 4,960 | 9 | 112 | 121 | 2.44% | 2.26% |
| KUWAIT | 23,001 | 126 | 149 | 275 | 1.20% | 0.65% |
| KYRGYZSTAN | 4,640 | 9 | 504 | 513 | 11.06% | 10.86% |
| LAOS | 1,898 | 11 | 649 | 660 | 34.77% | 34.19% |
| LEBANON | 24,217 | 33 | 586 | 619 | 2.56% | 2.42% |
| LESOTHO | 233 | 1 | 6 | 7 | 3.00% | 2.58% |
| LIBERIA | 1,103 | 9 | 205 | 214 | 19.40% | 18.59% |
| LIBYA | 850 | 6 | 51 | 57 | 6.71% | 6.00% |
| MACEDONIA | 6,646 | 4 | 87 | 91 | 1.37% | 1.31% |
| MADAGASCAR | 1,104 | 6 | 33 | 39 | 3.53% | 2.99% |
| MALAWI | 1,655 | 3 | 234 | 237 | 14.32% | 14.14% |
| MALAYSIA | 44,312 | 41 | 367 | 408 | 0.92% | 0.83% |
| MALDIVES | 297 | - | 4 | 4 | 1.35% | 1.35% |
| MALI | 2,545 | 4 | 130 | 134 | 5.27% | 5.11% |
| MARSHALL ISLANDS | 34 | - | 1 | 1 | 2.94% | 2.94% |
| MAURITANIA | 493 | 3 | 68 | 71 | 14.40% | 13.79% |

42

HaitiTPSAR000317

| | | | | | | |
|---|---|---|---|---|---|---|
| MAURITIUS | 2,760 | 3 | 22 | 25 | 0.91% | 0.80% |
| MICRONESIA, FEDERATED STATES OF | 27 | - | - | - | - | - |
| MOLDOVA | 7,194 | 15 | 183 | 198 | 2.75% | 2.54% |
| MONGOLIA | 10,600 | 36 | 364 | 400 | 3.77% | 3.43% |
| MONTENEGRO | 3,208 | 6 | 227 | 233 | 7.26% | 7.08% |
| MOROCCO | 29,098 | 72 | 452 | 524 | 1.80% | 1.55% |
| MOZAMBIQUE | 1,196 | 2 | 58 | 60 | 5.02% | 4.85% |
| NAMIBIA | 1,528 | 5 | 133 | 138 | 9.03% | 8.70% |
| NAURU | 5 | - | - | - | - | - |
| NEPAL | 24,730 | 146 | 890 | 1,036 | 4.19% | 3.60% |
| NICARAGUA | 59,037 | 79 | 2,717 | 2,796 | 4.74% | 4.60% |
| NIGER | 607 | 2 | 43 | 45 | 7.41% | 7.08% |
| NIGERIA | 84,051 | 191 | 5,809 | 6,000 | 7.14% | 6.91% |
| OMAN | 3,138 | 6 | 23 | 29 | 0.92% | 0.73% |
| PAKISTAN | 73,450 | 132 | 3,563 | 3,695 | 5.03% | 4.85% |
| PALAU | 8 | - | - | - | - | - |
| PANAMA | 115,338 | 78 | 1,147 | 1,225 | 1.06% | 0.99% |
| PAPUA NEW GUINEA | 435 | - | 21 | 21 | 4.83% | 4.83% |
| PARAGUAY | 19,492 | 21 | 494 | 515 | 2.64% | 2.53% |
| PERU | 314,166 | 256 | 5,944 | 6,200 | 1.97% | 1.89% |
| PHILIPPINES | 210,842 | 533 | 6,031 | 6,564 | 3.11% | 2.86% |
| QATAR | 9,206 | 24 | 73 | 97 | 1.05% | 0.79% |
| ROMANIA | 64,937 | 99 | 558 | 657 | 1.01% | 0.86% |
| RUSSIA | 54,016 | 170 | 3,887 | 4,057 | 7.51% | 7.20% |
| RWANDA | 3,175 | 10 | 262 | 272 | 8.57% | 8.25% |
| SAINT KITTS AND NEVIS | 8,176 | 11 | 100 | 111 | 1.36% | 1.22% |
| SAINT LUCIA | 13,442 | 18 | 246 | 264 | 1.96% | 1.83% |
| SAINT VINCENT AND THE GRENADINES | 8,169 | 19 | 245 | 264 | 3.23% | 3.00% |
| SAMOA | 1,714 | 12 | 165 | 177 | 10.33% | 9.63% |
| SAO TOME AND PRINCIPE | 13 | - | - | - | - | - |
| SAUDI ARABIA | 45,786 | 135 | 298 | 433 | 0.95% | 0.65% |
| SENEGAL | 8,117 | 23 | 486 | 509 | 6.27% | 5.99% |
| SERBIA | 20,176 | 26 | 217 | 243 | 1.20% | 1.08% |
| SEYCHELLES | 225 | - | 9 | 9 | 4.00% | 4.00% |
| SIERRA LEONE | 3,034 | 27 | 441 | 468 | 15.43% | 14.54% |
| SOLOMON ISLANDS | 85 | - | 1 | 1 | 1.18% | 1.18% |

HaitiTPSAR000318

| | | | | | | |
|---|---|---|---|---|---|---|
| SOMALIA | 128 | - | 14 | 14 | 10.94% | 10.94% |
| SOUTH AFRICA | 91,328 | 104 | 813 | 917 | 1.00% | 0.89% |
| SOUTH SUDAN | 138 | - | 6 | 6 | 4.35% | 4.35% |
| SRI LANKA | 12,980 | 24 | 416 | 440 | 3.39% | 3.20% |
| SUDAN | 2,627 | 10 | 681 | 691 | 26.30% | 25.92% |
| SURINAME | 14,218 | 5 | 478 | 483 | 3.40% | 3.36% |
| SWAZILAND | 763 | 3 | 46 | 49 | 6.42% | 6.03% |
| SYRIA | 4,442 | 11 | 419 | 430 | 9.68% | 9.43% |
| TAJIKISTAN | 1,587 | 19 | 109 | 128 | 8.07% | 6.87% |
| TANZANIA | 5,467 | 37 | 523 | 560 | 10.24% | 9.57% |
| THAILAND | 60,042 | 130 | 1,860 | 1,990 | 3.31% | 3.10% |
| TIMOR-LESTE | 43 | - | - | - | - | - |
| TOGO | 1,692 | 12 | 310 | 322 | 19.03% | 18.32% |
| TONGA | 1,876 | 21 | 158 | 179 | 9.54% | 8.42% |
| TRINIDAD AND TOBAGO | 136,504 | 102 | 951 | 1,053 | 0.77% | 0.70% |
| TUNISIA | 8,416 | 20 | 359 | 379 | 4.50% | 4.27% |
| TURKEY | 123,537 | 208 | 2,553 | 2,761 | 2.23% | 2.07% |
| TURKMENISTAN | 925 | 6 | 136 | 142 | 15.35% | 14.70% |
| TUVALU | 47 | - | - | - | - | - |
| UGANDA | 6,652 | 23 | 537 | 560 | 8.42% | 8.07% |
| UKRAINE | 51,329 | 268 | 1,321 | 1,589 | 3.10% | 2.57% |
| UNITED ARAB EMIRATES | 20,393 | 237 | 391 | 628 | 3.08% | 1.92% |
| URUGUAY | 55,642 | 59 | 990 | 1,049 | 1.89% | 1.78% |
| UZBEKISTAN | 9,141 | 52 | 488 | 540 | 5.91% | 5.34% |
| VANUATU | 120 | - | 1 | 1 | 0.83% | 0.83% |
| VENEZUELA | 218,929 | 449 | 21,064 | 21,513 | 9.83% | 9.62% |
| VIETNAM | 68,014 | 180 | 1,202 | 1,382 | 2.03% | 1.77% |
| YEMEN | 1,984 | 9 | 383 | 392 | 19.76% | 19.30% |
| ZAMBIA | 3,493 | 23 | 365 | 388 | 11.11% | 10.45% |
| ZIMBABWE | 6,706 | 32 | 677 | 709 | 10.57% | 10.10% |
| **Totals:** | **9,799,593** | **15,536** | **298,519** | **314,055** | **3.20%** | **3.05%** |

44

HaitiTPSAR000319

**Table C-4**
**Fiscal Year 2023 Overstay Rates for Nonimmigrant Students and Exchange Visitors (F, M, J) Admitted to the United States via Air and Seaport Ports of Entry (excluding Canada and Mexico)**

| Country of Citizenship | Expected Departures | Out-of-Country Overstays | Suspected In-Country Overstays | Total Overstays | Total Overstay Rate | Suspected In-Country Overstay Rate |
|---|---|---|---|---|---|---|
| AFGHANISTAN | 273 | 6 | 74 | 80 | 29.30% | 27.11% |
| ALBANIA | 1,511 | 8 | 114 | 122 | 8.07% | 7.54% |
| ALGERIA | 534 | 4 | 33 | 37 | 6.93% | 6.18% |
| ANDORRA | 75 | - | - | - | - | - |
| ANGOLA | 744 | 12 | 172 | 184 | 24.73% | 23.12% |
| ANTIGUA AND BARBUDA | 379 | 7 | 11 | 18 | 4.75% | 2.90% |
| ARGENTINA | 16,446 | 94 | 317 | 411 | 2.50% | 1.93% |
| ARMENIA | 898 | 9 | 65 | 74 | 8.24% | 7.24% |
| AUSTRALIA | 10,915 | 123 | 66 | 189 | 1.73% | 0.60% |
| AUSTRIA | 4,262 | 19 | 19 | 38 | 0.89% | 0.45% |
| AZERBAIJAN | 1,106 | 7 | 34 | 41 | 3.71% | 3.07% |
| BAHAMAS, THE | 7,308 | 91 | 121 | 212 | 2.90% | 1.66% |
| BAHRAIN | 755 | 6 | 2 | 8 | 1.06% | 0.26% |
| BANGLADESH | 6,237 | 53 | 556 | 609 | 9.76% | 8.91% |
| BARBADOS | 599 | 7 | 8 | 15 | 2.50% | 1.34% |
| BELARUS | 731 | 7 | 39 | 46 | 6.29% | 5.34% |
| BELGIUM | 4,365 | 29 | 17 | 46 | 1.05% | 0.39% |
| BELIZE | 539 | 5 | 16 | 21 | 3.90% | 2.97% |
| BENIN | 227 | - | 76 | 76 | 33.48% | 33.48% |
| BHUTAN | 180 | 4 | 44 | 48 | 26.67% | 24.44% |
| BOLIVIA | 2,683 | 24 | 77 | 101 | 3.76% | 2.87% |
| BOSNIA AND HERZEGOVINA | 801 | 7 | 26 | 33 | 4.12% | 3.25% |
| BOTSWANA | 302 | 5 | 21 | 26 | 8.61% | 6.95% |
| BRAZIL | 47,794 | 506 | 1,692 | 2,198 | 4.60% | 3.54% |
| BRUNEI | 107 | 3 | 1 | 4 | 3.74% | 0.93% |
| BULGARIA | 3,218 | 54 | 87 | 141 | 4.38% | 2.70% |
| BURKINA FASO | 406 | 4 | 99 | 103 | 25.37% | 24.38% |
| BURMA | 1,954 | 35 | 789 | 824 | 42.17% | 40.38% |
| BURUNDI | 137 | 4 | 20 | 24 | 17.52% | 14.60% |
| CABO VERDE | 70 | 5 | 13 | 18 | 25.71% | 18.57% |

45

| | | | | | |
|---|---|---|---|---|---|
| *CAMBODIA* | 609 | 7 | 42 | 49 | 8.05% | 6.90% |
| *CAMEROON* | 758 | 6 | 149 | 155 | 20.45% | 19.66% |
| *CENTRAL AFRICAN REPUBLIC* | 24 | - | 2 | 2 | 8.33% | 8.33% |
| *CHAD* | 133 | 5 | 69 | 74 | 55.64% | 51.88% |
| *CHILE* | 10,910 | 83 | 224 | 307 | 2.81% | 2.05% |
| *CHINA* | 250,788 | 2,243 | 3,012 | 5,255 | 2.10% | 1.20% |
| *COLOMBIA* | 38,870 | 431 | 2,792 | 3,223 | 8.29% | 7.18% |
| *COMOROS* | 8 | - | - | - | - | - |
| *CONGO (BRAZZAVILLE)* | 148 | 5 | 47 | 52 | 35.14% | 31.76% |
| *CONGO (KINSHASA)* | 777 | 13 | 376 | 389 | 50.06% | 48.39% |
| *COSTA RICA* | 4,267 | 19 | 66 | 85 | 1.99% | 1.55% |
| *COTE D'IVOIRE* | 1,083 | 29 | 193 | 222 | 20.50% | 17.82% |
| *CROATIA* | 2,024 | 13 | 19 | 32 | 1.58% | 0.94% |
| *CUBA* | 128 | - | 24 | 24 | 18.75% | 18.75% |
| *CYPRUS* | 851 | 7 | 5 | 12 | 1.41% | 0.59% |
| *CZECH REPUBLIC* | 3,438 | 24 | 40 | 64 | 1.86% | 1.16% |
| *DENMARK* | 4,593 | 30 | 13 | 43 | 0.94% | 0.28% |
| *DJIBOUTI* | 16 | - | 7 | 7 | 43.75% | 43.75% |
| *DOMINICA* | 530 | 12 | 33 | 45 | 8.49% | 6.23% |
| *DOMINICAN REPUBLIC* | 18,615 | 143 | 1,118 | 1,261 | 6.77% | 6.01% |
| *ECUADOR* | 14,340 | 144 | 1,208 | 1,352 | 9.43% | 8.42% |
| *EGYPT* | 6,471 | 55 | 219 | 274 | 4.23% | 3.38% |
| *EL SALVADOR* | 2,408 | 10 | 94 | 104 | 4.32% | 3.90% |
| *EQUATORIAL GUINEA* | 332 | 8 | 225 | 233 | 70.18% | 67.77% |
| *ERITREA* | 92 | 1 | 50 | 51 | 55.43% | 54.35% |
| *ESTONIA* | 868 | 6 | 5 | 11 | 1.27% | 0.58% |
| *ETHIOPIA* | 1,660 | 20 | 308 | 328 | 19.76% | 18.55% |
| *FIJI* | 188 | 5 | 15 | 20 | 10.64% | 7.98% |
| *FINLAND* | 2,214 | 18 | 14 | 32 | 1.45% | 0.63% |
| *FRANCE* | 36,604 | 244 | 201 | 445 | 1.22% | 0.55% |
| *GABON* | 231 | 7 | 38 | 45 | 19.48% | 16.45% |
| *GAMBIA, THE* | 209 | 2 | 67 | 69 | 33.01% | 32.06% |
| *GEORGIA* | 1,438 | 9 | 101 | 110 | 7.65% | 7.02% |
| *GERMANY* | 40,207 | 234 | 188 | 422 | 1.05% | 0.47% |
| *GHANA* | 2,559 | 26 | 511 | 537 | 20.98% | 19.97% |
| *GREECE* | 5,619 | 20 | 31 | 51 | 0.91% | 0.55% |
| *GRENADA* | 222 | 3 | 15 | 18 | 8.11% | 6.76% |

46

HaitiTPSAR000321

| GUATEMALA | 3,137 | 13 | 54 | 67 | 2.14% | 1.72% |
|---|---|---|---|---|---|---|
| GUINEA | 108 | 1 | 15 | 16 | 14.81% | 13.89% |
| GUINEA-BISSAU | 15 | - | 2 | 2 | 13.33% | 13.33% |
| GUYANA | 503 | 2 | 25 | 27 | 5.37% | 4.97% |
| HAITI | 1,046 | 5 | 257 | 262 | 25.05% | 24.57% |
| HOLY SEE | 1 | - | - | - | - | - |
| HONDURAS | 4,417 | 46 | 147 | 193 | 4.37% | 3.33% |
| HUNGARY | 3,811 | 12 | 18 | 30 | 0.79% | 0.47% |
| ICELAND | 1,397 | 6 | 4 | 10 | 0.72% | 0.29% |
| INDIA | 151,719 | 1,263 | 5,818 | 7,081 | 4.67% | 3.83% |
| INDONESIA | 9,539 | 125 | 331 | 456 | 4.78% | 3.47% |
| IRAN | 2,872 | 20 | 109 | 129 | 4.49% | 3.80% |
| IRAQ | 855 | 8 | 61 | 69 | 8.07% | 7.13% |
| IRELAND | 11,410 | 30 | 43 | 73 | 0.64% | 0.38% |
| ISRAEL | 11,100 | 88 | 61 | 149 | 1.34% | 0.55% |
| ITALY | 27,308 | 101 | 131 | 232 | 0.85% | 0.48% |
| JAMAICA | 11,750 | 119 | 1,117 | 1,236 | 10.52% | 9.51% |
| JAPAN | 37,452 | 431 | 311 | 742 | 1.98% | 0.83% |
| JORDAN | 4,205 | 43 | 379 | 422 | 10.04% | 9.01% |
| KAZAKHSTAN | 6,684 | 64 | 163 | 227 | 3.40% | 2.44% |
| KENYA | 3,281 | 47 | 344 | 391 | 11.92% | 10.48% |
| KIRIBATI | 64 | - | 3 | 3 | 4.69% | 4.69% |
| KOREA, NORTH | 12 | - | - | - | - | - |
| KOREA, SOUTH | 79,483 | 400 | 455 | 855 | 1.08% | 0.57% |
| KOSOVO | 598 | 6 | 32 | 38 | 6.35% | 5.35% |
| KUWAIT | 12,759 | 101 | 63 | 164 | 1.29% | 0.49% |
| KYRGYZSTAN | 890 | 14 | 207 | 221 | 24.83% | 23.26% |
| LAOS | 185 | 3 | 9 | 12 | 6.49% | 4.86% |
| LATVIA | 845 | 4 | 4 | 8 | 0.95% | 0.47% |
| LEBANON | 2,715 | 12 | 46 | 58 | 2.14% | 1.69% |
| LESOTHO | 74 | - | 6 | 6 | 8.11% | 8.11% |
| LIBERIA | 192 | 4 | 43 | 47 | 24.48% | 22.40% |
| LIBYA | 439 | 14 | 123 | 137 | 31.21% | 28.02% |
| LIECHTENSTEIN | 21 | - | - | - | - | - |
| LITHUANIA | 1,462 | 8 | 15 | 23 | 1.57% | 1.03% |
| LUXEMBOURG | 237 | - | - | - | - | - |
| MACEDONIA | 755 | 8 | 43 | 51 | 6.75% | 5.70% |
| MADAGASCAR | 235 | 4 | 26 | 30 | 12.77% | 11.06% |
| MALAWI | 345 | 2 | 66 | 68 | 19.71% | 19.13% |

47

HaitiTPSAR000322

| MALAYSIA | 6,693 | 142 | 120 | 262 | 3.91% | 1.79% |
|---|---|---|---|---|---|---|
| MALDIVES | 78 | 1 | 1 | 2 | 2.56% | 1.28% |
| MALI | 356 | 3 | 25 | 28 | 7.87% | 7.02% |
| MALTA | 193 | - | - | - | - | - |
| MARSHALL ISLANDS | 2 | - | - | - | - | - |
| MAURITANIA | 85 | 3 | 2 | 5 | 5.88% | 2.35% |
| MAURITIUS | 447 | 7 | 13 | 20 | 4.47% | 2.91% |
| MICRONESIA, FEDERATED STATES OF | 3 | - | 1 | 1 | 33.33% | 33.33% |
| MOLDOVA | 850 | 4 | 29 | 33 | 3.88% | 3.41% |
| MONACO | 37 | 1 | - | 1 | 2.70% | - |
| MONGOLIA | 2,241 | 36 | 125 | 161 | 7.18% | 5.58% |
| MONTENEGRO | 1,348 | 24 | 166 | 190 | 14.09% | 12.31% |
| MOROCCO | 2,319 | 24 | 115 | 139 | 5.99% | 4.96% |
| MOZAMBIQUE | 239 | 5 | 10 | 15 | 6.28% | 4.18% |
| NAMIBIA | 213 | - | 22 | 22 | 10.33% | 10.33% |
| NAURU | 2 | - | - | - | - | - |
| NEPAL | 4,391 | 23 | 425 | 448 | 10.20% | 9.68% |
| NETHERLANDS | 9,864 | 79 | 61 | 140 | 1.42% | 0.62% |
| NEW ZEALAND | 3,919 | 47 | 37 | 84 | 2.14% | 0.94% |
| NICARAGUA | 908 | 7 | 20 | 27 | 2.97% | 2.20% |
| NIGER | 158 | - | 43 | 43 | 27.22% | 27.22% |
| NIGERIA | 7,556 | 90 | 1,089 | 1,179 | 15.60% | 14.41% |
| NORWAY | 5,931 | 41 | 26 | 67 | 1.13% | 0.44% |
| OMAN | 3,306 | 22 | 9 | 31 | 0.94% | 0.27% |
| PAKISTAN | 9,838 | 63 | 394 | 457 | 4.65% | 4.00% |
| PALAU | 1 | - | - | - | - | - |
| PANAMA | 5,119 | 30 | 75 | 105 | 2.05% | 1.47% |
| PAPUA NEW GUINEA | 119 | 3 | 9 | 12 | 10.08% | 7.56% |
| PARAGUAY | 3,005 | 31 | 120 | 151 | 5.02% | 3.99% |
| PERU | 20,286 | 148 | 755 | 903 | 4.45% | 3.72% |
| PHILIPPINES | 6,993 | 101 | 1,023 | 1,124 | 16.07% | 14.63% |
| POLAND | 6,817 | 30 | 70 | 100 | 1.47% | 1.03% |
| PORTUGAL | 3,508 | 34 | 34 | 68 | 1.94% | 0.97% |
| QATAR | 1,085 | 12 | 12 | 24 | 2.21% | 1.11% |
| ROMANIA | 6,964 | 91 | 233 | 324 | 4.65% | 3.35% |
| RUSSIA | 7,810 | 52 | 384 | 436 | 5.58% | 4.92% |
| RWANDA | 1,282 | 11 | 92 | 103 | 8.03% | 7.18% |

HaitiTPSAR000323

| | | | | | |
|---|---|---|---|---|---|
| SAINT KITTS AND NEVIS | 284 | 4 | 10 | 14 | 4.93% | 3.52% |
| SAINT LUCIA | 250 | 5 | 9 | 14 | 5.60% | 3.60% |
| SAINT VINCENT AND THE GRENADINES | 168 | 2 | 3 | 5 | 2.98% | 1.79% |
| SAMOA | 61 | - | 8 | 8 | 13.11% | 13.11% |
| SAN MARINO | 13 | - | - | - | - | - |
| SAO TOME AND PRINCIPE | 10 | - | 1 | 1 | 10.00% | 10.00% |
| SAUDI ARABIA | 34,699 | 477 | 402 | 879 | 2.53% | 1.16% |
| SENEGAL | 649 | 10 | 100 | 110 | 16.95% | 15.41% |
| SERBIA | 3,022 | 19 | 84 | 103 | 3.41% | 2.78% |
| SEYCHELLES | 31 | - | - | - | - | - |
| SIERRA LEONE | 187 | 5 | 62 | 67 | 35.83% | 33.16% |
| SINGAPORE | 7,176 | 41 | 33 | 74 | 1.03% | 0.46% |
| SLOVAKIA | 2,120 | 8 | 11 | 19 | 0.90% | 0.52% |
| SLOVENIA | 685 | 1 | 1 | 2 | 0.29% | 0.15% |
| SOLOMON ISLANDS | 19 | - | 1 | 1 | 5.26% | 5.26% |
| SOMALIA | 32 | - | 11 | 11 | 34.38% | 34.38% |
| SOUTH AFRICA | 6,802 | 102 | 502 | 604 | 8.88% | 7.38% |
| SOUTH SUDAN | 81 | 3 | 16 | 19 | 23.46% | 19.75% |
| SPAIN | 39,824 | 211 | 191 | 402 | 1.01% | 0.48% |
| SRI LANKA | 1,740 | 13 | 47 | 60 | 3.45% | 2.70% |
| SUDAN | 419 | 5 | 114 | 119 | 28.40% | 27.21% |
| SURINAME | 120 | 3 | 8 | 11 | 9.17% | 6.67% |
| SWAZILAND | 166 | 3 | 5 | 8 | 4.82% | 3.01% |
| SWEDEN | 8,955 | 49 | 55 | 104 | 1.16% | 0.61% |
| SWITZERLAND | 6,515 | 49 | 23 | 72 | 1.11% | 0.35% |
| SYRIA | 204 | - | 25 | 25 | 12.25% | 12.25% |
| TAIWAN | 23,809 | 152 | 153 | 305 | 1.28% | 0.64% |
| TAJIKISTAN | 330 | - | 24 | 24 | 7.27% | 7.27% |
| TANZANIA | 1,006 | 15 | 209 | 224 | 22.27% | 20.78% |
| THAILAND | 17,341 | 86 | 459 | 545 | 3.14% | 2.65% |
| TIMOR-LESTE | 76 | - | - | - | - | - |
| TOGO | 214 | 4 | 71 | 75 | 35.05% | 33.18% |
| TONGA | 102 | 3 | 27 | 30 | 29.41% | 26.47% |
| TRINIDAD AND TOBAGO | 2,196 | 18 | 57 | 75 | 3.42% | 2.60% |
| TUNISIA | 1,248 | 13 | 104 | 117 | 9.38% | 8.33% |
| TURKEY | 20,359 | 203 | 983 | 1,186 | 5.83% | 4.83% |

49

HaitiTPSAR000324

| | | | | | | |
|---|---|---|---|---|---|---|
| TURKMENISTAN | 207 | 4 | 41 | 45 | 21.74% | 19.81% |
| TUVALU | 5 | - | 1 | 1 | 20.00% | 20.00% |
| UGANDA | 1,035 | 10 | 163 | 173 | 16.71% | 15.75% |
| UKRAINE | 4,077 | 20 | 83 | 103 | 2.53% | 2.04% |
| UNITED ARAB EMIRATES | 3,525 | 24 | 13 | 37 | 1.05% | 0.37% |
| UNITED KINGDOM | 43,479 | 242 | 216 | 458 | 1.05% | 0.50% |
| URUGUAY | 880 | 2 | 6 | 8 | 0.91% | 0.68% |
| UZBEKISTAN | 1,596 | 28 | 290 | 318 | 19.92% | 18.17% |
| VANUATU | 14 | 1 | - | 1 | 7.14% | - |
| VENEZUELA | 6,085 | 22 | 142 | 164 | 2.70% | 2.33% |
| VIETNAM | 13,531 | 186 | 686 | 872 | 6.44% | 5.07% |
| YEMEN | 501 | 6 | 199 | 205 | 40.92% | 39.72% |
| ZAMBIA | 501 | 11 | 69 | 80 | 15.97% | 13.77% |
| ZIMBABWE | 1,354 | 13 | 233 | 246 | 18.17% | 17.21% |
| **Totals:** | **1,345,378** | **11,262** | **38,152** | **49,414** | **3.67%** | **2.84%** |

**Table C-5**

**Fiscal Year 2023 Overstay Rates for Other In-scope Nonimmigrant Classes of Admission Admitted to the United States via Air and Seaport Ports of Entry for All Countries (excluding Canada and Mexico)**

| Country of Citizenship | Expected Departures | Out-of Country Overstays | Suspected In-Country Overstays | Total Overstays | Total Overstay Rate | Suspected In-Country Overstay Rate |
|---|---|---|---|---|---|---|
| AFGHANISTAN | 243 | 1 | 49 | 50 | 20.58% | 20.16% |
| ALBANIA | 277 | 1 | 15 | 16 | 5.78% | 5.42% |
| ALGERIA | 156 | - | 4 | 4 | 2.56% | 2.56% |
| ANDORRA | 6 | 1 | 1 | 2 | 33.33% | 16.67% |
| ANGOLA | 102 | - | - | - | - | - |
| ANTIGUA AND BARBUDA | 48 | 1 | 2 | 3 | 6.25% | 4.17% |
| ARGENTINA | 10,507 | 45 | 69 | 114 | 1.08% | 0.66% |
| ARMENIA | 441 | 1 | 32 | 33 | 7.48% | 7.26% |
| AUSTRALIA | 20,453 | 91 | 100 | 191 | 0.93% | 0.49% |
| AUSTRIA | 3,512 | 17 | 6 | 23 | 0.65% | 0.17% |
| AZERBAIJAN | 129 | - | - | - | - | - |
| BAHAMAS, THE | 391 | 2 | 8 | 10 | 2.56% | 2.05% |
| BAHRAIN | 53 | - | - | - | - | - |
| BANGLADESH | 526 | 8 | 64 | 72 | 13.69% | 12.17% |
| BARBADOS | 358 | 15 | 5 | 20 | 5.59% | 1.40% |

50

HaitiTPSAR000325

| | | | | | | |
|---|---|---|---|---|---|---|
| BELARUS | 455 | 3 | 23 | 26 | 5.71% | 5.05% |
| BELGIUM | 4,193 | 17 | 19 | 36 | 0.86% | 0.45% |
| BELIZE | 164 | 4 | 5 | 9 | 5.49% | 3.05% |
| BENIN | 33 | 1 | 3 | 4 | 12.12% | 9.09% |
| BHUTAN | 10 | - | 1 | 1 | 10.00% | 10.00% |
| BOLIVIA | 508 | 1 | 14 | 15 | 2.95% | 2.76% |
| BOSNIA AND HERZEGOVINA | 210 | 1 | 13 | 14 | 6.67% | 6.19% |
| BOTSWANA | 31 | 3 | 2 | 5 | 16.13% | 6.45% |
| BRAZIL | 20,348 | 176 | 338 | 514 | 2.53% | 1.66% |
| BRUNEI | 8 | - | - | - | - | - |
| BULGARIA | 1,176 | 20 | 21 | 41 | 3.49% | 1.79% |
| BURKINA FASO | 43 | - | 4 | 4 | 9.30% | 9.30% |
| BURMA | 88 | 1 | 16 | 17 | 19.32% | 18.18% |
| BURUNDI | 11 | - | 4 | 4 | 36.36% | 36.36% |
| CABO VERDE | 104 | - | 14 | 14 | 13.46% | 13.46% |
| CAMBODIA | 142 | - | 14 | 14 | 9.86% | 9.86% |
| CAMEROON | 256 | 1 | 46 | 47 | 18.36% | 17.97% |
| CENTRAL AFRICAN REPUBLIC | 6 | - | 1 | 1 | 16.67% | 16.67% |
| CHAD | 5 | - | - | - | - | - |
| CHILE | 6,405 | 58 | 84 | 142 | 2.22% | 1.31% |
| CHINA | 15,988 | 118 | 297 | 415 | 2.60% | 1.86% |
| COLOMBIA | 13,370 | 61 | 481 | 542 | 4.05% | 3.60% |
| COMOROS | 1 | - | - | - | - | - |
| CONGO (BRAZZAVILLE) | 7 | - | 1 | 1 | 14.29% | 14.29% |
| CONGO (KINSHASA) | 145 | 2 | 23 | 25 | 17.24% | 15.86% |
| COSTA RICA | 2,966 | 18 | 38 | 56 | 1.89% | 1.28% |
| COTE D'IVOIRE | 132 | - | 10 | 10 | 7.58% | 7.58% |
| CROATIA | 625 | 4 | 4 | 8 | 1.28% | 0.64% |
| CUBA | 1,136 | 14 | 219 | 233 | 20.51% | 19.28% |
| CYPRUS | 163 | - | 1 | 1 | 0.61% | 0.61% |
| CZECH REPUBLIC | 2,065 | 13 | 7 | 20 | 0.97% | 0.34% |
| DENMARK | 3,448 | 4 | 15 | 19 | 0.55% | 0.44% |
| DJIBOUTI | 2 | - | - | - | - | - |
| DOMINICA | 131 | - | 4 | 4 | 3.05% | 3.05% |
| DOMINICAN REPUBLIC | 7,829 | 52 | 586 | 638 | 8.15% | 7.48% |
| ECUADOR | 1,863 | 21 | 97 | 118 | 6.33% | 5.21% |
| EGYPT | 1,912 | 8 | 71 | 79 | 4.13% | 3.71% |

51

HaitiTPSAR000326

| | | | | | | |
|---|---|---|---|---|---|---|
| EL SALVADOR | 5,562 | 492 | 832 | 1,324 | 23.80% | 14.96% |
| EQUATORIAL GUINEA | 1 | - | - | - | - | - |
| ERITREA | 61 | - | 16 | 16 | 26.23% | 26.23% |
| ESTONIA | 274 | 2 | 1 | 3 | 1.09% | 0.36% |
| ETHIOPIA | 617 | 4 | 81 | 85 | 13.78% | 13.13% |
| FIJI | 45 | - | 10 | 10 | 22.22% | 22.22% |
| FINLAND | 1,994 | 15 | 4 | 19 | 0.95% | 0.20% |
| FRANCE | 26,656 | 93 | 103 | 196 | 0.74% | 0.39% |
| GABON | 15 | 1 | 5 | 6 | 40.00% | 33.33% |
| GAMBIA, THE | 35 | - | 9 | 9 | 25.71% | 25.71% |
| GEORGIA | 327 | 1 | 28 | 29 | 8.87% | 8.56% |
| GERMANY | 25,102 | 93 | 66 | 159 | 0.63% | 0.26% |
| GHANA | 818 | 6 | 122 | 128 | 15.65% | 14.91% |
| GREECE | 2,121 | 8 | 10 | 18 | 0.85% | 0.47% |
| GRENADA | 92 | - | 5 | 5 | 5.43% | 5.43% |
| GUATEMALA | 9,659 | 451 | 1,503 | 1,954 | 20.23% | 15.56% |
| GUINEA | 134 | 2 | 43 | 45 | 33.58% | 32.09% |
| GUINEA-BISSAU | 1 | - | - | - | - | - |
| GUYANA | 114 | 1 | 7 | 8 | 7.02% | 6.14% |
| HAITI | 1,659 | 1 | 511 | 512 | 30.86% | 30.80% |
| HOLY SEE | - | - | - | - | - | - |
| HONDURAS | 6,936 | 420 | 1,170 | 1,590 | 22.92% | 16.87% |
| HUNGARY | 1,279 | 19 | 5 | 24 | 1.88% | 0.39% |
| ICELAND | 328 | - | - | - | - | - |
| INDIA | 241,155 | 992 | 2,830 | 3,822 | 1.58% | 1.17% |
| INDONESIA | 785 | 8 | 37 | 45 | 5.73% | 4.71% |
| IRAN | 319 | 1 | 39 | 40 | 12.54% | 12.23% |
| IRAQ | 282 | 6 | 33 | 39 | 13.83% | 11.70% |
| IRELAND | 7,376 | 42 | 20 | 62 | 0.84% | 0.27% |
| ISRAEL | 8,090 | 37 | 43 | 80 | 0.99% | 0.53% |
| ITALY | 16,263 | 53 | 76 | 129 | 0.79% | 0.47% |
| JAMAICA | 18,378 | 623 | 1,495 | 2,118 | 11.52% | 8.13% |
| JAPAN | 53,630 | 116 | 110 | 226 | 0.42% | 0.21% |
| JORDAN | 817 | 3 | 21 | 24 | 2.94% | 2.57% |
| KAZAKHSTAN | 485 | 4 | 26 | 30 | 6.19% | 5.36% |
| KENYA | 575 | 4 | 40 | 44 | 7.65% | 6.96% |
| KIRIBATI | - | - | - | - | - | - |
| KOREA, NORTH | 1 | - | - | - | - | - |

52

HaitiTPSAR000327

| | | | | | | |
|---|---|---|---|---|---|---|
| *KOREA, SOUTH* | 22,944 | 77 | 94 | 171 | 0.75% | 0.41% |
| *KOSOVO* | 162 | 2 | 16 | 18 | 11.11% | 9.88% |
| *KUWAIT* | 72 | - | - | - | - | - |
| *KYRGYZSTAN* | 42 | - | 7 | 7 | 16.67% | 16.67% |
| *LAOS* | 408 | - | 83 | 83 | 20.34% | 20.34% |
| *LATVIA* | 326 | 1 | 5 | 6 | 1.84% | 1.53% |
| *LEBANON* | 1,090 | 8 | 19 | 27 | 2.48% | 1.74% |
| *LESOTHO* | 3 | - | - | - | - | - |
| *LIBERIA* | 177 | 1 | 35 | 36 | 20.34% | 19.77% |
| *LIBYA* | 34 | 2 | 6 | 8 | 23.53% | 17.65% |
| *LIECHTENSTEIN* | 30 | - | - | - | - | - |
| *LITHUANIA* | 581 | 32 | 5 | 37 | 6.37% | 0.86% |
| *LUXEMBOURG* | 89 | - | 1 | 1 | 1.12% | 1.12% |
| *MACEDONIA* | 348 | 4 | 10 | 14 | 4.02% | 2.87% |
| *MADAGASCAR* | 16 | 1 | 2 | 3 | 18.75% | 12.50% |
| *MALAWI* | 24 | - | 1 | 1 | 4.17% | 4.17% |
| *MALAYSIA* | 1,476 | 5 | 18 | 23 | 1.56% | 1.22% |
| *MALDIVES* | 1 | - | - | - | - | - |
| *MALI* | 75 | - | 5 | 5 | 6.67% | 6.67% |
| *MALTA* | 53 | - | 1 | 1 | 1.89% | 1.89% |
| *MARSHALL ISLANDS* | - | - | - | - | - | - |
| *MAURITANIA* | 24 | - | 2 | 2 | 8.33% | 8.33% |
| *MAURITIUS* | 92 | 3 | 1 | 4 | 4.35% | 1.09% |
| *MICRONESIA, FEDERATED STATES OF* | - | - | - | - | - | - |
| *MOLDOVA* | 242 | 15 | 5 | 20 | 8.26% | 2.07% |
| *MONACO* | 25 | - | 1 | 1 | 4.00% | 4.00% |
| *MONGOLIA* | 413 | 35 | 40 | 75 | 18.16% | 9.69% |
| *MONTENEGRO* | 112 | 1 | 17 | 18 | 16.07% | 15.18% |
| *MOROCCO* | 504 | 2 | 19 | 21 | 4.17% | 3.77% |
| *MOZAMBIQUE* | 31 | 1 | 1 | 2 | 6.45% | 3.23% |
| *NAMIBIA* | 58 | - | - | - | - | - |
| *NAURU* | 1 | - | - | - | - | - |
| *NEPAL* | 983 | 4 | 26 | 30 | 3.05% | 2.64% |
| *NETHERLANDS* | 7,648 | 34 | 28 | 62 | 0.81% | 0.37% |
| *NEW ZEALAND* | 2,595 | 7 | 18 | 25 | 0.96% | 0.69% |
| *NICARAGUA* | 1,446 | 5 | 89 | 94 | 6.50% | 6.15% |
| *NIGER* | 18 | - | 2 | 2 | 11.11% | 11.11% |

53

HaitiTPSAR000328

| | | | | | | |
|---|---|---|---|---|---|---|
| NIGERIA | 2,299 | 4 | 185 | 189 | 8.22% | 8.05% |
| NORWAY | 1,586 | 1 | 8 | 9 | 0.57% | 0.50% |
| OMAN | 49 | - | - | - | - | - |
| PAKISTAN | 2,989 | 5 | 85 | 90 | 3.01% | 2.84% |
| PALAU | - | - | - | - | - | - |
| PANAMA | 818 | 2 | 10 | 12 | 1.47% | 1.22% |
| PAPUA NEW GUINEA | 3 | 1 | - | 1 | 33.33% | - |
| PARAGUAY | 195 | - | 6 | 6 | 3.08% | 3.08% |
| PERU | 3,553 | 29 | 249 | 278 | 7.82% | 7.01% |
| PHILIPPINES | 13,720 | 268 | 1,834 | 2,102 | 15.32% | 13.37% |
| POLAND | 3,778 | 30 | 26 | 56 | 1.48% | 0.69% |
| PORTUGAL | 2,417 | 15 | 9 | 24 | 0.99% | 0.37% |
| QATAR | 27 | - | - | - | - | - |
| ROMANIA | 3,029 | 62 | 61 | 123 | 4.06% | 2.01% |
| RUSSIA | 4,504 | 21 | 96 | 117 | 2.60% | 2.13% |
| RWANDA | 92 | - | 13 | 13 | 14.13% | 14.13% |
| SAINT KITTS AND NEVIS | 28 | - | - | - | - | - |
| SAINT LUCIA | 69 | - | 4 | 4 | 5.80% | 5.80% |
| SAINT VINCENT AND THE GRENADINES | 27 | - | 1 | 1 | 3.70% | 3.70% |
| SAMOA | 16 | - | 3 | 3 | 18.75% | 18.75% |
| SAN MARINO | 3 | - | - | - | - | - |
| SAO TOME AND PRINCIPE | 1 | - | - | - | - | - |
| SAUDI ARABIA | 489 | 5 | 3 | 8 | 1.64% | 0.61% |
| SENEGAL | 130 | 1 | 18 | 19 | 14.62% | 13.85% |
| SERBIA | 2,876 | 66 | 102 | 168 | 5.84% | 3.55% |
| SEYCHELLES | 5 | - | - | - | - | - |
| SIERRA LEONE | 101 | 2 | 25 | 27 | 26.73% | 24.75% |
| SINGAPORE | 3,255 | 15 | 11 | 26 | 0.80% | 0.34% |
| SLOVAKIA | 789 | 7 | - | 7 | 0.89% | - |
| SLOVENIA | 325 | - | - | - | - | - |
| SOLOMON ISLANDS | 4 | - | - | - | - | - |
| SOMALIA | 12 | - | 2 | 2 | 16.67% | 16.67% |
| SOUTH AFRICA | 13,950 | 221 | 164 | 385 | 2.76% | 1.18% |
| SOUTH SUDAN | 21 | 3 | 5 | 8 | 38.10% | 23.81% |
| SPAIN | 16,104 | 59 | 70 | 129 | 0.80% | 0.43% |
| SRI LANKA | 426 | 6 | 4 | 10 | 2.35% | 0.94% |

54

HaitiTPSAR000329

| | | | | | |
|---|---|---|---|---|---|
| SUDAN | 79 | - | 7 | 7 | 8.86% | 8.86% |
| SURINAME | 38 | - | - | - | - | - |
| SWAZILAND | 6 | - | - | - | - | - |
| SWEDEN | 5,022 | 15 | 16 | 31 | 0.62% | 0.32% |
| SWITZERLAND | 3,611 | 14 | 8 | 22 | 0.61% | 0.22% |
| SYRIA | 195 | 1 | 15 | 16 | 8.21% | 7.69% |
| TAIWAN | 6,363 | 20 | 22 | 42 | 0.66% | 0.35% |
| TAJIKISTAN | 42 | - | - | - | - | - |
| TANZANIA | 161 | 1 | 8 | 9 | 5.59% | 4.97% |
| THAILAND | 1,575 | 16 | 86 | 102 | 6.48% | 5.46% |
| TIMOR-LESTE | 2 | - | - | - | - | - |
| TOGO | 69 | 1 | 14 | 15 | 21.74% | 20.29% |
| TONGA | 28 | 1 | 9 | 10 | 35.71% | 32.14% |
| TRINIDAD AND TOBAGO | 1,457 | 6 | 18 | 24 | 1.65% | 1.24% |
| TUNISIA | 285 | 5 | 4 | 9 | 3.16% | 1.40% |
| TURKEY | 4,618 | 37 | 172 | 209 | 4.53% | 3.72% |
| TURKMENISTAN | 16 | - | - | - | - | - |
| TUVALU | - | - | - | - | - | - |
| UGANDA | 275 | 14 | 20 | 34 | 12.36% | 7.27% |
| UKRAINE | 4,548 | 114 | 112 | 226 | 4.97% | 2.46% |
| UNITED ARAB EMIRATES | 41 | - | - | - | - | - |
| UNITED KINGDOM | 46,369 | 179 | 184 | 363 | 0.78% | 0.40% |
| URUGUAY | 737 | 3 | 3 | 6 | 0.81% | 0.41% |
| UZBEKISTAN | 212 | 9 | 18 | 27 | 12.74% | 8.49% |
| VANUATU | - | - | - | - | - | - |
| VENEZUELA | 7,201 | 27 | 352 | 379 | 5.26% | 4.89% |
| VIETNAM | 1,622 | 19 | 129 | 148 | 9.12% | 7.95% |
| YEMEN | 27 | - | 1 | 1 | 3.70% | 3.70% |
| ZAMBIA | 63 | 2 | 3 | 5 | 7.94% | 4.76% |
| ZIMBABWE | 385 | 2 | 12 | 14 | 3.64% | 3.12% |
| **Totals:** | **760,047** | **5,831** | **16,896** | **22,727** | **2.99%** | **2.22%** |

55

HaitiTPSAR000330

| Table C-6 | | | | | | |
| Fiscal Year 2023 Overstay Rates for Canadian and Mexican Nonimmigrants Admitted to the United States via Air and Seaports Ports of Entry | | | | | | |
| Country of Citizenship | Expected Departures | Out-of-Country Overstays | Suspected In-Country Overstays | Total Overstays | Total Overstay Rate | Suspected In-Country Overstay Rate |
|---|---|---|---|---|---|---|
| *CANADA* | 7,705,004 | 4,698 | 17,160 | 21,858 | 0.28% | 0.22% |
| *MEXICO* | 2,856,696 | 2,122 | 46,723 | 48,845 | 1.71% | 1.64% |
| **B1/B2 Totals:** | **10,561,700** | **6,820** | **63,883** | **70,703** | **0.67%** | **0.60%** |
| *CANADA* | 60,053 | 255 | 185 | 440 | 0.73% | 0.31% |
| *MEXICO* | 53,082 | 425 | 1,277 | 1,702 | 3.21% | 2.41% |
| **F, M, J Totals:** | **113,135** | **680** | **1,462** | **2,142** | **1.89%** | **1.29%** |
| *CANADA* | 140,666 | 683 | 348 | 1,031 | 0.73% | 0.25% |
| *MEXICO* | 127,254 | 1,451 | 4,116 | 5,567 | 4.37% | 3.23% |
| **Other In-scope Totals:** | **267,920** | **2,134** | **4,464** | **6,598** | **1.67%** | **1.67%** |
| *CANADA* | 7,905,723 | 5,636 | 17,693 | 23,329 | 0.30% | 0.22% |
| *MEXICO* | 3,037,032 | 3,998 | 52,116 | 56,114 | 1.85% | 1.72% |
| **Totals:** | **10,942,755** | **9,634** | **69,809** | **79,443** | **0.73%** | **0.64%** |

HaitiTPSAR000331

# Nationwide Encounters

Encounter data includes U.S. Border Patrol (USBP) Title 8 Apprehensions, Office of Field Operations (OFO) Title 8 Inadmissibles, and Title 42 Expulsions. Data is available for the Northern Land Border, Southwest Land Border, and Nationwide (i.e., air, land, and sea modes of transportation) encounters.

Title 8 Enforcement Actions refers to apprehensions or inadmissibles processed under CBP's immigration authority. Inadmissibles refers to individuals encountered at ports of entry (POEs) by OFO who are seeking lawful admission into the United States (U.S.) but are determined to be inadmissible, individuals presenting themselves to seek humanitarian protection under our laws, and individuals who withdraw an application for admission and return to their countries of origin within a short timeframe. Apprehensions refers to the physical control or temporary detainment of a person by USBP between POEs who is not lawfully in the U.S. which may or may not result in an arrest.

Title 42 Expulsions refers to individuals encountered by USBP and OFO and expelled to the country of last transit or home country in the interest of public health under Title 42 U.S.C. 265 from March 21, 2020 to May 11, 2023.

Demographics for USBP and OFO include:

- Accompanied Minors (AM)

- Individuals in a Family Unit (FMUA)

- Single Adults

- Unaccompanied Alien Children (UAC) / Single Minors

HaitiTPSAR000332

To access the data used to build these dashboards, please visit the CBP Data Portal.

Data is extracted from live CBP systems and data sources. Statistical information is subject to change due to corrections, systems changes, change in data definition, additional information, or encounters pending final review. Final statistics are available at the conclusion of each fiscal year.

## U.S. Border Patrol At Large and U.S. Border Patrol at Entry Apprehensions

| Monthly Totals | — |

| Monthly Totals | Oct-23 | Nov-23 | Dec-23 | Jan-24 | Feb-24 | Mar-24 | Apr-24 | May-24 |
|---|---|---|---|---|---|---|---|---|
| **Nationwide Total Apprehensions** | 190,454 | 192,357 | 251,178 | 125,440 | 142,104 | 139,124 | 131,078 | 121,640 |
| *At Large* | 2,977 | 2,668 | 4,676 | 2,057 | 2,670 | 2,700 | 2,813 | 2,429 |
| *At Entry* | 187,477 | 189,689 | 246,502 | 123,383 | 139,434 | 136,424 | 128,265 | 119,211 |
| **Southwest Border Total Apprehensions** | 188,749 | 191,106 | 249,740 | 124,215 | 140,641 | 137,473 | 128,895 | 117,905 |
| *At Large* | 2,687 | 2,439 | 4,465 | 1,869 | 2,405 | 2,429 | 2,534 | 2,039 |
| *At Entry* | 186,062 | 188,667 | 245,275 | 122,346 | 138,236 | 135,044 | 126,361 | 115,866 |

HaitiTPSAR000333

| Monthly Totals | Oct-23 | Nov-23 | Dec-23 | Jan-24 | Feb-24 | Mar-24 | Apr-24 | May-24 |
|---|---|---|---|---|---|---|---|---|
| Northern Border Total Apprehensions | 1,522 | 1,148 | 1,178 | 926 | 1,267 | 1,480 | 1,940 | 3,399 |
| *At Large* | 240 | 189 | 143 | 121 | 182 | 165 | 166 | 221 |
| *At Entry* | 1,282 | 959 | 1,035 | 805 | 1,085 | 1,315 | 1,774 | 3,178 |

**At Entry:** Refers to an alien who has entered the United States without admission and has not yet reached his/her destination, regardless of the amount of time since entry.

**At Large:** Refers to an alien who has illegally entered the United States, has already reached their destination, and is

# U.S. Border Patrol and Office of Field Operations Encounters by Area of Responsibility and Component

*Note: Internet Explorer has problems displaying the following charts. Please use another browser (Chrome, Safari, Firefox, Edge) to view. When using a mobile device, the charts are best displayed in landscape mode.*

HaitiTPSAR000334

HaitiTPSAR000335



**U.S. Customs and Border Protection (CBP) Encounters**
Nationwide, Southwest Land Border,
and Northern Land Border Encounters by Fiscal Year (FY)

| Choose Region | Fiscal Year | Component | Area of Responsibility |
|---|---|---|---|
| Nationwide ▾ | (All) ▾ | (All) ▾ | (All) ▾ |

| Demographic | Citizenship | Title of Authority | |
|---|---|---|---|
| (All) ▾ | (All) ▾ | (All) ▾ | **Reset Filters** |

FY   ■ 2022   ■ 2023   ■ 2024   ■ 2025 (FYTD)

## FY Nationwide Encounters by Month

| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2025 (FYTD) | 142,749 | 124,974 | 124,488 | 81,483 | 28,619 | 29,017 | 29,199 | 29,474 | 25,193 | 24,598 | 26,191 | | 665,985 |
| 2024 | 309,024 | 308,605 | 370,883 | 242,530 | 256,071 | 246,505 | 247,929 | 240,924 | 204,932 | 170,180 | 158,893 | 144,666 | 2,901,142 |
| 2023 | 278,317 | 284,624 | 302,392 | 209,151 | 213,911 | 259,471 | 276,036 | 275,166 | 211,457 | 245,154 | 304,073 | 341,392 | 3,201,144 |
| 2022 | 187,136 | 198,553 | 205,691 | 186,808 | 190,578 | 250,404 | 262,109 | 274,992 | 247,523 | 238,929 | 251,521 | 272,338 | 2,766,582 |

## FY Comparison by Demographic



# U.S. Border Patrol and Office of Field Operations Encounters by State

**Note:** *Nationwide encounters are the sum of CBP encounters across all areas of responsibility including Northern Land Border, Southwest Land Border, OFO non-land border ports of entry (e.g., airports, seaports), and USBP sectors that do not share a land border with Canada or Mexico (e.g., Miami Sector). This data is available for further review and download on the Nationwide Encounters Public Data Portal page.*

HaitiTPSAR000336

HaitiTPSAR000337

Choose Region
| Nationwide ▼ |

Fiscal Year
| (All) ▼ |

State
| (All) ▼ |

Title of Authority
| (All) ▼ |

Demographic
| (All) ▼ |

Citizenship
| (All) ▼ |

**Reset Filters**



| | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2025 (FYTD) | 142,749 | 124,974 | 124,488 | 81,483 | 28,619 | 29,017 | 29,199 | 29,474 | 25,193 | 24,598 | 26,191 | | 665,985 |
| 2024 | 309,024 | 308,605 | 370,883 | 242,530 | 256,071 | 246,505 | 247,929 | 240,924 | 204,932 | 170,180 | 158,893 | 144,666 | 2,901,142 |
| 2023 | 278,317 | 284,624 | 302,392 | 209,151 | 213,911 | 259,471 | 276,036 | 275,166 | 211,457 | 245,154 | 304,073 | 341,392 | 3,201,144 |
| 2022 | 187,136 | 198,553 | 205,691 | 186,808 | 190,578 | 250,404 | 262,109 | 274,992 | 247,523 | 238,929 | 251,521 | 272,338 | 2,766,582 |

**FY Comparison by Demographic**

HaitiTPSAR000338

**U.S. Border Patrol and Office of Field Operations Encounters**

| | Single Adults | | | | FMUA | | | | UAC | | | | Accompanied Minors | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2022 | 2023 | 2024 | 2025 (FYTD) | 2022 | 2023 | 2024 | 2025 (FYTD) | 2022 | 2023 | 2024 | 2025 (FYTD) | 2022 | 2023 | 2024 | 2025 (FYTD) |
| Encounter Count | 1,993,694 | 2,061,723 | 1,788,490 | 480,050 | 614,023 | 993,947 | 996,074 | 155,675 | 152,880 | 137,992 | 110,672 | 28,697 | 5,985 | 7,482 | 5,906 | 1,563 |

HaitiTPSAR000339

| Choose Region | Demographic | Citizenship | |
|---|---|---|---|
| Nationwide ▼ | (All) ▼ | (All) ▼ | **Reset Filters** |

| | OFO | USBP | All CBP |
|---|---|---|---|
| **JUL FY2025** | 18,426 | 6,172 | 24,598 |
| **AUG FY2025** | 18,102 | 8,089 | 26,191 |
| **Percent Change** | ▼-1.8% | ▲31.1% | ▲6.5% |

| | Office of Field Operations | | | | | U.S. Border Patrol | | | | FYTD Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | Single Adults | FMUA | Accompanied Minors | UAC | *Total* | Single Adults | FMUA | UAC | *Total* | **FYTD Total** |
| OCT | 56,546 | 27,096 | 243 | 744 | *84,629* | 36,752 | 15,472 | 5,896 | *58,120* | **142,749** |
| NOV | 52,183 | 24,382 | 162 | 710 | *77,437* | 29,336 | 12,425 | 5,776 | *47,537* | **124,974** |
| DEC | 50,776 | 24,618 | 220 | 731 | *76,345* | 27,639 | 14,374 | 6,130 | *48,143* | **124,488** |
| JAN | 35,115 | 15,570 | 168 | 501 | *51,354* | 20,195 | 7,176 | 2,758 | *30,129* | **81,483** |
| FEB | 18,025 | 1,185 | 73 | 91 | *19,374* | 7,662 | 839 | 744 | *9,245* | **28,619** |
| MAR | 19,587 | 1,065 | 115 | 56 | *20,823* | 7,073 | 475 | 646 | *8,194* | **29,017** |
| APR | 17,758 | 1,249 | 118 | 67 | *19,192* | 8,618 | 585 | 804 | *10,007* | **29,199** |
| MAY | 17,899 | 1,062 | 99 | 54 | *19,114* | 8,820 | 507 | 1,033 | *10,360* | **29,474** |
| JUN | 15,552 | 1,486 | 75 | 62 | *17,175* | 7,023 | 334 | 661 | *8,018* | **25,193** |
| JUL | 15,857 | 2,410 | 111 | 48 | *18,426* | 5,346 | 360 | 466 | *6,172* | **24,598** |
| AUG | 15,384 | 2,462 | 179 | 77 | *18,102* | 6,904 | 543 | 642 | *8,089* | **26,191** |
| **Total** | **314,682** | **102,585** | **1,563** | **3,141** | **421,971** | **165,368** | **53,090** | **25,556** | **244,014** | **665,985** |

To ensure that law enforcement sensitive statistics are not publicly released, modifications to data filters have been made that may alter the format of data previously obtained from this dashboard.

For additional years of Southwest Land Border encounter data, visit the [Southwest Land Border Encounters](#) webpage.

**Last Modified: Sep 19, 2025**

HaitiTPSAR000340

# Explore All Countries Haiti

Central America and the Caribbean

Page last updated: October 01, 2025



## INTRODUCTION

**Background**

The native Taino -- who inhabited the island of Hispaniola when Christopher COLUMBUS first landed in 1492 -- were virtually wiped out by Spanish settlers within 25 years. In the early 17th century, the French established a presence on Hispaniola. In 1697, Spain ceded to the French the western third of the island, which later became Haiti. The French colony, based on forestry and sugar-related industries, became one of the wealthiest in the Caribbean but relied heavily on the forced labor of enslaved Africans and environmentally degrading practices. In the late 18th century, Toussaint L'OUVERTURE led a revolution of Haiti's nearly half a million slaves that ended France's rule on the island. After a prolonged struggle, and under the leadership of Jean-Jacques DESSALINES, Haiti became the first country in the world led by former slaves after declaring its independence in 1804, but it was forced to pay an indemnity of 100 million francs (equivalent to $22 billion USD in March 2023) to France for more than a century and was shunned by other countries for nearly 40 years. In 1862, the US officially recognized

HaitiTPSAR000341

Haiti, but foreign economic influence and internal political instability induced the US to occupy Haiti from 1915 to 1934.

Francois "Papa Doc" DUVALIER and then his son Jean-Claude "Baby Doc" DUVALIER led repressive and corrupt regimes that ruled Haiti in 1957-1971 and 1971-1986, respectively. Jean-Bertrand ARISTIDE was Haiti's first democratically elected president in 1991 and was elected a second time in 2000, but coups interrupted his first term after only a few months and ended his second term in 2004. President Jovenel MOÏSE was assassinated in 2021, leading the country further into an extra-constitutional governance structure and contributing to the country's growing fragility. The Government of Haiti then installed Ariel HENRY -- whom President MOÏSE had nominated shortly before his death -- as prime minister.

On 29 February 2024, a significant escalation of gang violence occurred on the 20th anniversary of ARISTIDE's second overthrow, after the announcement that HENRY would not hold elections until August 2025. HENRY's return from an overseas trip was diverted to Puerto Rico when the airport closed due to gang violence. With control of much of the capital, Port-au-Prince, gang leaders called for the ouster of HENRY'S government. By mid-March, Haiti's continued violence, HENRY'S inability to return to the country, and increasing pressure from the international community led HENRY to pledge to resign. On 25 April 2024, HENRY formally submitted his resignation as a nine-member Transitional Presidential Council assumed control, tasked with returning stability to the country and preparing elections. Since January 2023, Haiti has had no sitting elected officials.

The country has long been plagued by natural disasters. In 2010, a major 7.0 magnitude earthquake struck Haiti with an epicenter about 25 km (15 mi) west of the capital, Port-au-Prince. An estimated 300,000 people were killed, and some 1.5 million left homeless. The earthquake was assessed as the worst in this region in 200 years. A 7.2 magnitude earthquake hit Haiti's southern peninsula in 2021, causing well over 2,000 deaths; an estimated 500,000 required emergency humanitarian aid. Haiti is the poorest country in the Western Hemisphere, as well as one of the most unequal in wealth distribution.

## <u>GEOGRAPHY</u>

**Location**

Caribbean, western one-third of the island of Hispaniola, between the Caribbean Sea and the North Atlantic Ocean, west of the Dominican Republic

**Geographic coordinates**

19 00 N, 72 25 W

**Map references**

Central America and the Caribbean

**Area**

**total :** 27,750 sq km

**land:** 27,560 sq km

**water:** 190 sq km

comparison ranking: total 147

**Area - comparative**

slightly smaller than Maryland

## Area comparison map:



**Land boundaries**

**total:** 376 km

**border countries (1):** Dominican Republic 376 km

**Coastline**

1,771 km

**Maritime claims**

**territorial sea:** 12 nm

**contiguous zone:** 24 nm

**exclusive economic zone:** 200 nm

**continental shelf:** to depth of exploitation

**Climate**

tropical; semiarid where mountains in east cut off trade winds

**Terrain**

mostly rough and mountainous

**Elevation**

**highest point:** Pic la Selle 2,674 m

**lowest point:** Caribbean Sea 0 m

**mean elevation:** 470 m

**Natural resources**

bauxite, copper, calcium carbonate, gold, marble, hydropower, arable land

**Land use**

**agricultural land:** 65.1% (2022 est.)

arable land: 36.5% (2022 est.)

permanent crops: 10.9% (2022 est.)

permanent pasture: 17.8% (2022 est.)

**forest:** 12.4% (2022 est.)

**other:** 22.5% (2022 est.)

**Irrigated land**

800 sq km (2013)

**Population distribution**

fairly even distribution; largest concentrations located near coastal areas

**Natural hazards**

lies in the middle of the hurricane belt and subject to severe storms from June to October; occasional flooding and earthquakes; periodic droughts

**Geography - note**

shares island of Hispaniola with Dominican Republic (western one-third is Haiti, eastern two-thirds is the Dominican Republic); it is the most mountainous nation in the Caribbean

## PEOPLE AND SOCIETY

**Population**

**total:** 11,753,943 (2024 est.)

HaitiTPSAR000343

**male:** 5,792,443

**female:** 5,961,500

comparison rankings: total 83; male 85; female 83

**Nationality**

**noun:** Haitian(s)

**adjective:** Haitian

**Ethnic groups**

Black 95%, mixed and White 5%

**Languages**

French (official), Creole (official)

**major-language sample(s):** The World Factbook, une source indispensable d'informations de base. (French)

The World Factbook, sous endispansab pou enfomasyon debaz. (Haitian Creole)

The World Factbook, the indispensable source for basic information.

# French audio sample:

**Religions**

Catholic 55%, Protestant 29%, Vodou 2.1%, other 4.6%, none 10% (2018 est.)

**note:** 50-80% of Haitians incorporate some elements of Vodou culture or practice in addition to another religion, most often Roman Catholicism; Vodou was recognized as an official religion in 2003

**Age structure**

**0-14 years:** 30.5% (male 1,790,061/female 1,794,210)

**15-64 years:** 65.3% (male 3,787,782/female 3,887,791)

**65 years and over:** 4.2% (2024 est.) (male 214,600/female 279,499)

# 2024 population pyramid:



**Dependency ratios**

**total dependency ratio:** 53.1 (2024 est.)

**youth dependency ratio:** 46.7 (2024 est.)

**elderly dependency ratio:** 6.4 (2024 est.)

**potential support ratio:** 15.5 (2024 est.)

**Median age**

**total:** 25 years (2024 est.)

**male:** 24.7 years

**female:** 25.3 years

comparison ranking: total 173

**Population growth rate**

HaitiTPSAR000344

1.23% (2024 est.)
comparison ranking: 77

**Birth rate**

21.2 births/1,000 population (2024 est.)
comparison ranking: 60

**Death rate**

7.3 deaths/1,000 population (2024 est.)
comparison ranking: 111

**Net migration rate**

-1.6 migrant(s)/1,000 population (2024 est.)
comparison ranking: 160

**Population distribution**

fairly even distribution; largest concentrations located near coastal areas

**Urbanization**

**urban population:** 59.7% of total population (2023)

**rate of urbanization:** 2.47% annual rate of change (2020-25 est.)

**Major urban areas - population**

2.987 million PORT-AU-PRINCE (capital) (2023)

**Sex ratio**

**at birth:** 1.01 male(s)/female

**0-14 years:** 1 male(s)/female

**15-64 years:** 0.97 male(s)/female

**65 years and over:** 0.77 male(s)/female

**total population:** 0.97 male(s)/female (2024 est.)

**Mother's mean age at first birth**

22.4 years (2016/7 est.)

**note:** data represents median age at first birth among women 25-49

**Maternal mortality ratio**

328 deaths/100,000 live births (2023 est.)
comparison ranking: 24

**Infant mortality rate**

**total:** 36.8 deaths/1,000 live births (2024 est.)

**male:** 40.2 deaths/1,000 live births

**female:** 33.5 deaths/1,000 live births
comparison ranking: total 32

**Life expectancy at birth**

**total population:** 65.6 years (2024 est.)

**male:** 63.8 years

HaitiTPSAR000345

**female:** 67.4 years

comparison ranking: total population 205

**Total fertility rate**

2.44 children born/woman (2024 est.)

comparison ranking: 72

**Gross reproduction rate**

1.21 (2024 est.)

**Drinking water source**

**improved:**

urban: 84.6% of population (2022 est.)

rural: 42.8% of population (2022 est.)

total: 67.4% of population (2022 est.)

**unimproved:**

urban: 15.4% of population (2022 est.)

rural: 57.2% of population (2022 est.)

total: 32.6% of population (2022 est.)

**Health expenditure**

3.5% of GDP (2021)

4.1% of national budget (2022 est.)

**Physician density**

0.29 physicians/1,000 population (2022)

**Hospital bed density**

4.8 beds/1,000 population (2021 est.)

**Sanitation facility access**

**improved:**

urban: 82.9% of population (2022 est.)

rural: 42.6% of population (2022 est.)

total: 66.3% of population (2022 est.)

**unimproved:**

urban: 17.1% of population (2022 est.)

rural: 57.4% of population (2022 est.)

total: 33.7% of population (2022 est.)

**Obesity - adult prevalence rate**

22.7% (2016)

comparison ranking: 72

**Alcohol consumption per capita**

HaitiTPSAR000346

**total:** 2.85 liters of pure alcohol (2019 est.)

**beer:** 0.55 liters of pure alcohol (2019 est.)

**wine:** 0.03 liters of pure alcohol (2019 est.)

**spirits:** 2.26 liters of pure alcohol (2019 est.)

**other alcohols:** 0 liters of pure alcohol (2019 est.)
comparison ranking: total 118

**Tobacco use**

**total:** 7.1% (2025 est.)

**male:** 12.4% (2025 est.)

**female:** 2.1% (2025 est.)
comparison ranking: total 150

**Children under the age of 5 years underweight**

9.5% (2016/17)
comparison ranking: 53

**Currently married women (ages 15-49)**

51.4% (2023 est.)

**Child marriage**

**women married by age 15:** 2.1% (2017)

**women married by age 18:** 14.9% (2017)

**men married by age 18:** 1.6% (2017)

**Education expenditure**

1.1% of GDP (2023 est.)

13.2% national budget (2025 est.)
comparison ranking: Education expenditure (% GDP) 198

**Literacy**

**total population:** 68% (2017 est.)

**male:** 72.9% (2017 est.)

**female:** 63.9% (2017 est.)


## ENVIRONMENT

**Environmental issues**

deforestation (trees cleared for agriculture and used as fuel); soil erosion; inadequate potable water and lack of sanitation; natural disasters

**International environmental agreements**

**party to:** Biodiversity, Climate Change, Climate Change-Kyoto Protocol, Climate Change-Paris Agreement, Desertification, Hazardous Wastes, Law of the Sea, Marine Dumping-London Convention, Marine Life Conservation, Ozone Layer Protection

**signed, but not ratified:** Nuclear Test Ban

**Climate**

HaitiTPSAR000347

tropical; semiarid where mountains in east cut off trade winds

**Land use**

**agricultural land:** 65.1% (2022 est.)

arable land: 36.5% (2022 est.)

permanent crops: 10.9% (2022 est.)

permanent pasture: 17.8% (2022 est.)

**forest:** 12.4% (2022 est.)

**other:** 22.5% (2022 est.)

**Urbanization**

**urban population:** 59.7% of total population (2023)

**rate of urbanization:** 2.47% annual rate of change (2020-25 est.)

**Carbon dioxide emissions**

2.854 million metric tonnes of $CO_2$ (2023 est.)

**from petroleum and other liquids:** 2.848 million metric tonnes of $CO_2$ (2023 est.)

**from consumed natural gas:** 6,000 metric tonnes of $CO_2$ (2023 est.)

comparison ranking: total emissions 151

**Particulate matter emissions**

9.8 micrograms per cubic meter (2019 est.)

**Waste and recycling**

**municipal solid waste generated annually:** 2.31 million tons (2024 est.)

**percent of municipal solid waste recycled:** 9.1% (2022 est.)

**Total water withdrawal**

**municipal:** 190 million cubic meters (2022 est.)

**industrial:** 51 million cubic meters (2022 est.)

**agricultural:** 1.209 billion cubic meters (2022 est.)

**Total renewable water resources**

14.022 billion cubic meters (2022 est.)

## GOVERNMENT

**Country name**

**conventional long form:** Republic of Haiti

**conventional short form:** Haiti

**local long form:** République d'Haïti (French)/Repiblik d Ayiti (Haitian Creole)

**local short form:** Haïti (French)/ Ayiti (Haitian Creole)

**etymology:** derived from the Arawak name Ayti, meaning "Land of Mountains," that was originally applied to the entire island of Hispaniola

**Government type**

HaitiTPSAR000348

semi-presidential republic

**Capital**

**name:** Port-au-Prince

**geographic coordinates:** 18 32 N, 72 20 W

**time difference:** UTC-5 (same time as Washington, DC, during Standard Time)

**daylight saving time:** +1hr, begins second Sunday in March; ends first Sunday in November

**etymology:** the name means "the port of the prince" and probably came from a ship called The Prince that anchored in the bay in the early 18th century

**Administrative divisions**

10 departments (*départements*, singular - *département*); Artibonite, Centre, Grand'Anse, Nippes, Nord, Nord-Est, Nord-Ouest, Ouest, Sud, Sud-Est

**Legal system**

civil law system strongly influenced by Napoleonic Code

**Constitution**

**history:** many previous; latest adopted 10 March 1987, with substantial revisions in June 2012

**amendment process:** proposed by the executive branch or by either the Senate or the Chamber of Deputies; consideration of proposed amendments requires support by at least two-thirds majority of both houses; passage requires at least two-thirds majority of the membership present and at least two-thirds majority of the votes cast; approved amendments enter into force after installation of the next president of the republic; constitutional articles on the democratic and republican form of government cannot be amended

**note:** the constitution is commonly referred to as the "amended 1987 constitution"

**International law organization participation**

accepts compulsory ICJ jurisdiction; non-party state to the ICCt

**Citizenship**

**citizenship by birth:** no

**citizenship by descent only:** at least one parent must be a native-born citizen of Haiti

**dual citizenship recognized:** yes

**residency requirement for naturalization:** 5 years

**Suffrage**

18 years of age; universal

**Executive branch**

**chief of state:** President (vacant)

**head of government:** Prime Minister Alix Didier FILS-AIMÉ (since 10 November 2024)

**cabinet:** Cabinet chosen by the prime minister in consultation with the president; parliament must ratify the Cabinet and prime minister's governing policy

**election/appointment process:** president directly elected by absolute-majority popular vote in 2 rounds, if needed, for a 5-year term (eligible for a single non-consecutive term)

**most recent election date:** 20 November 2016

HaitiTPSAR000349

**election results:**
*2016:* Jovenel MOÏSE elected president in first round; percent of vote - Jovenel MOÏSE (PHTK) 55.6%, Jude CELESTIN (LAPEH) 19.6%, Jean-Charles MOÏSE (PPD) 11%, Maryse NARCISSE (FL) 9%; other 4.8%

*2011:* Michel MARTELLY elected president in second round; percent of vote in second round - Michel MARTELLY (Peasant's Response) 68%, Mirlande MANIGAT (RDNP) 32%

**expected date of next election:** elections were delayed in 2022 and 2023 and have not been rescheduled

**note:** former Prime Minister Ariel HENRY, who had assumed executive responsibilities following the assassination of President MOÏSE on 7 July 2021, resigned on 24 April 2024; a nine-member Presidential Transitional Council, equipped with presidential powers, was sworn in on 25 April 2024 and will remain in place until 7 February 2026

**Legislative branch**

**legislature name:** National Assembly (Assemblée nationale)

**legislative structure:** bicameral

**note 1:** when the two chambers meet collectively, it is known as the National Assembly (or L'Assemblée nationale) and is convened for specific purposes spelled out in the constitution

**note 2:** as of October 2024, the Senate and Chamber of Deputies were not functional

**Legislative branch - lower chamber**

**chamber name:** Chamber of Deputies (Chambre des Députés)

**number of seats:** 119 (all directly elected)

**electoral system:** plurality/majority

**scope of elections:** full renewal

**term in office:** 4 years

**most recent election date:** 8/9/2015 to 10/25/2015

**parties elected and seats per party:** Haitian Tet Kale Party (PHTK) (9); Konvansyon Inite Demokratik (KID) (7); Ayiti an aksyon (AAA) (6); Fanmi Lavalas (6); Patriotic Unity Party (Inite Patriyotik) (4); People's Struggle Party (OPL) (7); Other (24)

**percentage of women in chamber:** 0%

**expected date of next election:** December 2025

**Legislative branch - upper chamber**

**chamber name:** Senate (Sénat)

**number of seats:** 30 (all directly elected)

**electoral system:** plurality/majority

**scope of elections:** partial renewal

**term in office:** 6 years

**most recent election date:** 11/20/2016 to 1/29/2017

**parties elected and seats per party:** Haitian Tet Kale Party (PHTK) (9); Truth (Vérité) (3); Konvansyon Inite Demokratik (KID) (2); Bouclier (2); Ayiti an aksyon (AAA) (2); Other (10)

**expected date of next election:** December 2025

HaitiTPSAR000350

**Judicial branch**

**highest court(s):** Supreme Court or Cour de cassation (consists of 12 judges)

**judge selection and term of office:** judges appointed by the president from candidate lists submitted by the Senate of the National Assembly

**subordinate courts:** Courts of Appeal; Courts of First Instance; magistrate's courts; land, labor, and children's courts

**note:** the Superior Council of the Judiciary or Conseil Supérieur du Pouvoir Judiciaire is a 9-member body charged with the administration and oversight of the judicial branch of government

**note:** Haiti is a member of the Caribbean Court of Justice, the Constitutional Court (called for in the 1987 constitution but not yet established), and the High Court of Justice, for trying high government officials (currently not functional)

**note**: Article 174 of Haiti's constitution states that judges of the Supreme Court are appointed for 10 years, whereas Article 177 states that judges of the Supreme Court are appointed for life

**Political parties**

Alternative League for Haitian Progress and Emancipation (Ligue Alternative pour le Progrès et l'Emancipation Haïtienne) or LAPEH
Christian Movement for a New Haiti or MCNH or Mochrenha
Christian National Movement for the Reconstruction of Haiti or UNCRH
Combat of Peasant Workers to Liberate Haiti (Konbit Travaye Peyizan Pou Libere Ayiti) or Kontra Pep La
Convention for Democratic Unity or KID
Cooperative Action to Rebuild Haiti or KONBA
December 16 Platform or Platfom 16 Desanm
Democratic Alliance Party or ALYANS (coalition includes KID and PPRH)
Democratic Centers' National Council or CONACED
Democratic and Popular Sector (Secteur Démocratique et Populaire) or SDP
Democratic Unity Convention (Konvansyon Inite Demokratik) or KID
Dessalinian Patriotic and Popular Movement or MOPOD
Effort and Solidarity to Create an Alternative for the People or ESKAMP
Fanmi Lavalas or FL
Forward (En Avant)
Fusion of Haitian Social Democrats (Fusion Des Sociaux-Démocrats Haïtiens) or FHSD
G18 Policy Platform (Plateforme Politique G18)
Haiti in Action (Ayiti An Aksyon Haiti's Action) or AAA
Haitian Tet Kale Party (Parti Haitien Tet Kale) or PHTK
Independent Movement for National Reconciliation or MIRN
Lavni Organization or LAVNI
Lod Demokratik
Love Haiti (Renmen Ayiti) or RA
MTV Ayiti
National Consortium of Haitian Political Parties (Consortium National des Partis Politiques Haitiens) or CNPPH
National Shield Network (Reseau Bouclier National)
Organization of the People's Struggle (Oganizasyon Pep Kap Lite) or OPL
Patriotic Unity (Inite Patriyotik) or Inite
Platform Pitit Desalin (Politik Pitit Dessalines) or PPD
Political Party for Us All or Bridge (Pont) or Pou Nou Tout
Popular Patriotic Dessalinien Movement (Mouvement Patriotique Populaire Dessalinien) or MOPOD
Rally of Progressive National Democrats (Rassemblement des Démocrates Nationaux Progressistes) or RDNP
Respe (Respect)
Women and Families Political Parties (Defile Pati Politik Fanm Ak Fanmi)

**Diplomatic representation in the US**

HaitiTPSAR000351

**chief of mission:** Ambassador Lionel DELATOUR (since 11 June 2025)

**chancery:** 2311 Massachusetts Avenue NW, Washington, DC 20008

**telephone:** [1] (202) 332-4090

**FAX:** [1] (202) 745-7215

**email address and website:**
amb.washington@diplomatie.ht

https://www.haiti.org/

**consulate(s) general:** Atlanta, Boston, Chicago, Miami, Orlando (FL), New York

**Diplomatic representation from the US**

**chief of mission:** Ambassador (vacant); Chargé d'Affaires Henry T. WOOSTER (since 12 June 2025)

**embassy:** Tabarre 41, Route de Tabarre, Port-au-Prince

**mailing address:** 3400 Port-au-Prince Place, Washington, DC 20521-3400

**telephone:** [011] (509) 2229-8000

**FAX:** [011] (509) 2229-8027

**email address and website:**
acspap@state.gov

https://ht.usembassy.gov/

**International organization participation**

ACP, ACS, AOSIS, Caricom, CD, CDB, CELAC, FAO, G-77, IADB, IAEA, IBRD, ICAO, ICC (NGOs), ICRM, IDA, IFAD, IFC, IFRCS, ILO, IMF, IMO, Interpol, IOC, IOM, IPU, ITSO, ITU, ITUC (NGOs), LAES, MIGA, NAM, OAS, OIF, OPANAL, OPCW, PCA, Petrocaribe, UN, UNCTAD, UNESCO, UNIDO, Union Latina, UNWTO, UPU, WCO, WFTU (NGOs), WHO, WIPO, WMO, WTO

**Independence**

1 January 1804 (from France)

**National holiday**

Independence Day, 1 January (1804)

**Flag**

**description:** two equal horizontal bands of blue (top) and red; a centered white rectangle bears the coat of arms, which has a palm tree flanked by flags and two cannons above a scroll with the motto L'UNION FAIT LA FORCE (Union Makes Strength)

**meaning:** the colors are taken from the French flag and represent the union of ethnic groups

**National symbol(s)**

Hispaniolan trogon (bird), hibiscus flower

**National color(s)**

blue, red

**National anthem(s)**

**title:** "La Dessalinienne" (The Dessalines Song)

HaitiTPSAR000352

**lyrics/music:** Justin LHERISSON/Nicolas GEFFRARD

**history:** adopted 1904; named for Jean-Jacques DESSALINES, founder of Haiti

**National heritage**

**total World Heritage Sites:** 1 (cultural)

**selected World Heritage Site locales:** National History Park – Citadel, Sans Souci, Ramiers


## ECONOMY

**Economic overview**

small Caribbean island economy and OECS-member state; extreme poverty and inflation; enormous income inequality; ongoing civil unrest due to recent presidential assassination; US preferential market access; very open to foreign direct investment

**Real GDP (purchasing power parity)**

$32.971 billion (2024 est.)
$34.406 billion (2023 est.)
$35.059 billion (2022 est.)

**note:** data in 2021 dollars

comparison ranking: 145

**Real GDP growth rate**

-4.2% (2024 est.)
-1.9% (2023 est.)
-1.7% (2022 est.)

**note:** annual GDP % growth based on constant local currency

comparison ranking: 212

**Real GDP per capita**

$2,800 (2024 est.)
$3,000 (2023 est.)
$3,000 (2022 est.)

**note:** data in 2021 dollars

comparison ranking: 198

**GDP (official exchange rate)**

$25.224 billion (2024 est.)

**note:** data in current dollars at official exchange rate

**Inflation rate (consumer prices)**

26.9% (2024 est.)
36.8% (2023 est.)
34% (2022 est.)

**note:** annual % change based on consumer prices

comparison ranking: 194

**GDP - composition, by sector of origin**

**agriculture:** 15.9% (2024 est.)

**industry:** 33.4% (2024 est.)

**services:** 48.3% (2024 est.)

HaitiTPSAR000353

**note:** figures may not total 100% due to non-allocated consumption not captured in sector-reported data

comparison rankings: agriculture 52; industry 38; services 156

**GDP - composition, by end use**

**household consumption:** 99.8% (2024 est.)

**government consumption:** 5.7% (2024 est.)

**investment in fixed capital:** 9.9% (2024 est.)

**investment in inventories:** 0% (2024 est.)

**exports of goods and services:** 3.4% (2024 est.)

**imports of goods and services:** -18.8% (2024 est.)

**note:** figures may not total 100% due to rounding or gaps in data collection

**Agricultural products**

sugarcane, cassava, plantains, bananas, mangoes/guavas, avocados, maize, tropical fruits, rice, vegetables (2023)

**note:** top ten agricultural products based on tonnage

**Industries**

textiles, sugar refining, flour milling, cement, light assembly using imported parts

**Industrial production growth rate**

-4.7% (2024 est.)

**note:** annual % change in industrial value added based on constant local currency
comparison ranking: 177

**Labor force**

5.281 million (2024 est.)

**note:** number of people ages 15 or older who are employed or seeking work
comparison ranking: 83

**Unemployment rate**

15.1% (2024 est.)
14.6% (2023 est.)
14.7% (2022 est.)

**note:** % of labor force seeking employment
comparison ranking: 173

**Youth unemployment rate (ages 15-24)**

**total:** 37.5% (2024 est.)

**male:** 30% (2024 est.)

**female:** 47.1% (2024 est.)

**note:** % of labor force ages 15-24 seeking employment
comparison ranking: total 10

**Remittances**

18.9% of GDP (2023 est.)
18.8% of GDP (2022 est.)

HaitiTPSAR000354

19.1% of GDP (2021 est.)

**note:** personal transfers and compensation between resident and non-resident individuals/households/entities

**Budget**

**revenues:** $1.179 billion (2020 est.)

**expenditures:** $1.527 billion (2020 est.)

**Current account balance**

-$682.57 million (2023 est.)
-$491.954 million (2022 est.)
$87.656 million (2021 est.)

**note:** balance of payments - net trade and primary/secondary income in current dollars

comparison ranking: 119

**Exports**

$1.095 billion (2023 est.)
$1.355 billion (2022 est.)
$1.272 billion (2021 est.)

**note:** balance of payments - exports of goods and services in current dollars

comparison ranking: 182

**Exports - partners**

USA 82%, Canada 4%, Mexico 2%, France 2%, India 2% (2023)

**note:** top five export partners based on percentage share of exports

**Exports - commodities**

garments, essential oils, scrap iron, industrial acids/oils/alcohols, bedding (2023)

**note:** top five export commodities based on value in dollars

**Imports**

$5.303 billion (2023 est.)
$5.451 billion (2022 est.)
$5.048 billion (2021 est.)

**note:** balance of payments - imports of goods and services in current dollars

comparison ranking: 150

**Imports - partners**

USA 31%, Dominican Republic 23%, China 14%, Indonesia 4%, India 3% (2023)

**note:** top five import partners based on percentage share of imports

**Imports - commodities**

refined petroleum, rice, garments, cotton fabric, plastic products (2023)

**note:** top five import commodities based on value in dollars

**Reserves of foreign exchange and gold**

$2.718 billion (2024 est.)
$2.586 billion (2023 est.)
$2.173 billion (2022 est.)

**note:** holdings of gold (year-end prices)/foreign exchange/special drawing rights in current dollars

HaitiTPSAR000355

comparison ranking: 121

**Debt - external**

$1.865 billion (2023 est.)

**note:** present value of external debt in current US dollars
comparison ranking: 96

**Exchange rates**

gourdes (HTG) per US dollar -

**Exchange rates:**
131.811 (2024 est.)
141.036 (2023 est.)
115.631 (2022 est.)
89.227 (2021 est.)
93.51 (2020 est.)

## ENERGY

**Electricity access**

**electrification - total population:** 49.3% (2022 est.)

**electrification - urban areas:** 83%

**electrification - rural areas:** 1.2% (2019 est.)

**Electricity**

**installed generating capacity:** 472,000 kW (2023 est.)

**consumption:** 861 million kWh (2023 est.)

**transmission/distribution losses:** 152 million kWh (2023 est.)

comparison rankings: installed generating capacity 152; consumption 163; transmission/distribution losses 56

**Electricity generation sources**

**fossil fuels:** 81.3% of total installed capacity (2023 est.)

**solar:** 0.4% of total installed capacity (2023 est.)

**hydroelectricity:** 18.3% of total installed capacity (2023 est.)

**Coal**

**imports:** 5.7 metric tons (2022 est.)

**Petroleum**

**refined petroleum consumption:** 19,000 bbl/day (2023 est.)

**Natural gas**

**consumption:** 3.2 million cubic meters (2023 est.)

**imports:** 3.2 million cubic meters (2023 est.)

**Energy consumption per capita**

3.486 million Btu/person (2023 est.)
comparison ranking: 175

## COMMUNICATIONS

HaitiTPSAR000356

**Telephones - fixed lines**

**total subscriptions:** 6,000 (2021 est.)

**subscriptions per 100 inhabitants:** (2022 est.) less than 1
comparison ranking: total subscriptions 200

**Telephones - mobile cellular**

**total subscriptions:** 7.32 million (2021 est.)

**subscriptions per 100 inhabitants:** 64 (2021 est.)
comparison ranking: total subscriptions 110

**Broadcast media**

398 legal broadcasting stations, including about 60 community radio stations; 105 TV stations, including 36 in Port-au-Prince, 41 others in the provinces, and more than 40 radio-television stations; large number of stations operate irregularly or flout regulations; VOA Creole Service broadcasts daily on 30 affiliate stations (2019)

**Internet country code**

.ht

**Internet users**

**percent of population:** 39% (2019 est.)

**Broadband - fixed subscriptions**

**total:** 35,000 (2022 est.)

**subscriptions per 100 inhabitants:** (2022 est.) less than 1
comparison ranking: total 154

## TRANSPORTATION

**Civil aircraft registration country code prefix**

HH

**Airports**

17 (2025)
comparison ranking: 146

**Heliports**

2 (2025)
comparison ranking: 124

**Merchant marine**

**total:** 4 (2023)

**by type:** general cargo 3, other 1
comparison ranking: total 170

**Ports**

**total ports:** 5 (2024)

**large:** 0

**medium:** 1

**small:** 0

HaitiTPSAR000357

**very small:** 4

**ports with oil terminals:** 1

**key ports:** Cap Haitien, Jacmel, Miragoane, Petit Goave, Port au Prince

## MILITARY AND SECURITY

**Military and security forces**

the Haitian Armed Forces (FAdH): Army

Ministry of Justice and Public Security: Haitian National Police (Police Nationale d'Haïti or PNH) (2025)

**note:** the PNH is responsible for maintaining public security; it includes police, corrections, fire, emergency response, airport security, port security, and coast guard functions; its units include a presidential guard and a paramilitary rapid-response Motorized Intervention Unit (BIM)

**Military and security service personnel strengths**

estimates vary; up to 2,000 trained military personnel (the force is planned to eventually have around 5,000 personnel); estimates for the National Police range from a low of 9,000 to a high of about 13,000 (2025)

**Military equipment inventories and acquisitions**

in recent years, Canada, Taiwan, the US, and the UAE have provide some equipment to the Haitian security forces, including vehicles (2024)

**Military service age and obligation**

men and women 18-25 may volunteer for the FAdH (2023)

**Military - note**

Haiti's military was disbanded in 1995 after it participated in multiple coups and was accused of other political interference and human rights violations; the military was reinstated by former President MOISE in 2017 after the UN ended its peacekeeping operation in Haiti; the reconstituted military established an Army command in 2018 and has received some training assistance from Argentina, Colombia, Ecuador, France, and Mexico; the military's stated mission is to assist with natural disaster relief, border security, and combating transnational crime; in 2023, Prime Minister HENRY called upon the military to assist the National Police (PNH) in combating armed gangs, which have overwhelmed the PNH, killed hundreds of Haitians, and seized control of swaths of territory, including much of the capital Port-au-Prince, since the assassination of President MOISE in 2021

in 2023, the UN Security Council approved the deployment of a Kenya-led multinational security support mission (MSS) to help bring gang violence under control; the first contingent of MSS personnel from the Kenya National Police Service arrived in mid-2024; other countries pledging forces included the Bahamas, Bangladesh, Barbados, Benin, Chad, and Jamaica; the mission is slated to have a total of 2,500 personnel (2025)

## TERRORISM

**Terrorist group(s)**

**Terrorist group(s):** Gran Grif; Viv Ansanm

**note:** details about the history, aims, leadership, organization, areas of operation, tactics, targets, weapons, size, and sources of support of the group(s) appear(s) in the Terrorism reference guide

## TRANSNATIONAL ISSUES

**Refugees and internally displaced persons**

HaitiTPSAR000358

**refugees:** 5 (2024 est.)

**IDPs:** 1,041,229 (2024 est.)

**Trafficking in persons**

**tier rating:** Special Category

**Illicit drugs**

**USG identification:**
major illicit drug-producing and/or drug-transit country (2025)



*Congressional Research Service*
*Informing the legislative debate since 1914*

# Haiti: Recent Developments and U.S. Policy

Updated February 1, 2024

**Congressional Research Service**

https://crsreports.congress.gov

R47394

**CRS REPORT**
Prepared for Members and
Committees of Congress

HaitiTPSAR000360

**Congressional Research Service**
Informing the legislative debate since 1914

**SUMMARY**

R47394

February 1, 2024

**Karla I. Rios**
Analyst in Latin American Affairs

**Clare Ribando Seelke**
Specialist in Latin American Affairs

# Haiti: Recent Developments and U.S. Policy

Haiti, located on the island of Hispaniola bordering the Dominican Republic, remains mired in interrelated political, security, and humanitarian crises. Haiti lacks an elected president and legislature following the July 2021 assassination of President Jovenel Moïse. Moïse had named Ariel Henry to be prime minister prior to his death, but Henry had not been sworn in as required under Haitian law. Since the assassination, a political stalemate has persisted over whether Henry or a transitional government should govern until elections are convened. A December 2022 Henry-backed accord aimed to create a path to elect a president by February 7, 2024. As that date has approached, protests against the de facto Henry government have escalated.

The political impasse has hindered Haiti's ability to respond to worsening security and humanitarian crises. In October 2022, Henry asked for a foreign security force to help reestablish control amid rampant gang violence. Although many Haitian civil society groups initially opposed this request due to concerns regarding abuses committed during past interventions and Henry's unelected status, some have since expressed support for a foreign security force presence. After Kenya offered to lead a "multinational security support (MSS) mission," the U.N. Security Council adopted a resolution in October 2023 to authorize a non-U.N. mission funded by voluntary contributions. The status of the MSS is uncertain, however, as Kenya's High Court has ruled the deployment unconstitutional. The crises in Haiti continue to fuel instability and U.S.-bound migration.

## U.S. Policy

U.S. policy in Haiti has aimed to support Haitian efforts to restore security, the rule of law, democratic institutions leading to free and fair elections, and economic and social stability. The Biden Administration allocated $237.4 million in bilateral assistance for Haiti in FY2022 and $204.5 million in FY2023, including increased support for the Haitian National Police. The Administration requested $291.5 million for Haiti in FY2024. Separately, the Administration provided more than $126.5 million in humanitarian assistance to Haiti in FY2023. In March 2023, the Administration released a 10-year plan for promoting peace and stability in Haiti, a priority country under the Global Fragility Act (P.L. 116-94), supported by additional funds. The Administration pledged $100 million in foreign assistance and $100 million in Defense Department operational support to the proposed MSS. The U.S. Treasury and State Departments have publicly sanctioned eight current or former Haitian officials, including two former prime ministers, and several gang leaders. The United States co-drafted a U.N. Security Council resolution to sanction gang leaders in Haiti and their financial backers (adopted in October 2022).

## Congressional Action

Congress set objectives for U.S. policy toward Haiti through 2025 in the Haiti Development, Accountability, and Institutional Transparency Initiative Act (P.L. 117-103, Division V). The Consolidated Appropriations Act, 2023 (P.L. 117-328), did not designate a total funding level for Haiti but placed democracy-related conditions on some assistance. Neither the House-passed (H.R. 4665/H.Rept. 118-146) nor the Senate Appropriations Committee-reported (S. 2438/S.Rept. 118-71) versions of the Department of State, Foreign Operations, and Related Programs Appropriations Act, 2024, would designate a specific aid amount for Haiti. However, both measures would place restrictions on assistance to the central government. In addition to foreign assistance, the House passed, and the Senate Foreign Relations Committee reported, bills (H.R. 1684/S. 396) that would require an annual State Department report on ties between gangs and politicians in Haiti and would direct the President to impose sanctions on individuals identified in the report. Bills to renew trade preferences for Haiti (H.R. 5035/S. 552) also have been introduced in both houses. Congressional oversight efforts in the 118th Congress have focused on the Administration's plans to improve security and democracy in Haiti, its relationship with the Henry government, and its pledged support for a multinational force deployment to Haiti.

HaitiTPSAR000361

# Contents

Introduction ........................................................................................................................... 1
Political Situation ................................................................................................................. 2
   Background ...................................................................................................................... 2
   Post-Assassination Political Impasse ............................................................................ 4
Security Crisis ...................................................................................................................... 5
Humanitarian Situation ......................................................................................................... 7
U.N. Presence in Haiti and Recent Action ........................................................................... 8
   Sanctions Resolution ...................................................................................................... 9
   Multinational Security Support (MSS) Mission ............................................................ 10
U.S. Policy and Issues for Congress ..................................................................................... 11
   Foreign Assistance ......................................................................................................... 12
      Bilateral Assistance ................................................................................................ 12
      Humanitarian Assistance ........................................................................................ 14
      Funds to Support the Multinational Security Support Mission ............................... 14
      Global Fragility Act Implementation ..................................................................... 15
      Donor Coordination ............................................................................................... 15
   Trade Preferences ........................................................................................................... 16
   Sanctions: U.S. and Multilateral .................................................................................... 16
   U.S. Department of Justice Cooperation ........................................................................ 17
   Weapons and Drug Trafficking ...................................................................................... 18
   Migration Issues ............................................................................................................. 18
Outlook ................................................................................................................................. 20

# Figures

Figure 1. Map of Haiti ........................................................................................................... 2

# Tables

Table 1. U.S. Foreign Assistance to Haiti by Account: FY2018-FY2024 ..................................... 13

# Contacts

Author Information ................................................................................................................ 20

HaitiTPSAR000362

# Introduction

Haiti, a Caribbean country that shares the island of Hispaniola with the Dominican Republic (see **Figure 1**), has been of ongoing interest to Congress and successive U.S. presidential administrations because of its proximity to the United States, chronic instability, and vulnerability to natural disasters.[1] Although Haiti has endured corrupt, authoritarian leaders for much of its history, governance arguably had improved in the years prior to a 2010 earthquake.[2] That disaster killed more than 200,000 people and set development back significantly. Despite extensive international support for Haiti's recovery, democratic institutions remain weak and the country continues to contend with extreme poverty; wide economic disparities; and both human-made and natural disasters. An August 2021 earthquake killed 2,000 people.

> ### Haiti at a Glance
>
> **Capital:** Port-au-Prince
>
> **Population:** 12.3 million (2023, IMF est.)
>
> **Languages:** French (official), Creole (official)
>
> **Area:** 10,710 sq. miles, slightly larger than Massachusetts
>
> **GDP:** $25.9 billion (2023, current prices, IMF est.)
>
> **Real GDP Growth:** -1.8% (2021); -1.7% (2022); -1.5% (2023) (% change, constant prices, IMF)
>
> **Per Capita GDP:** $2,130 (2023, current prices, IMF)
>
> **Life Expectancy at Birth:** 60.8/66.7 years (male/female) (PAHO, 2022)
>
> **Maternal Mortality Ratio:** 480/100,000 live births (UNDP, 2022)
>
> **Sources:** International Monetary Fund (IMF); Pan American Health Organization (PAHO); United Nations Development Programme (UNDP).

The situation in Haiti further deteriorated after the assassination of President Jovenel Moïse in July 2021 led to uncertainty over who would succeed him. Two days before the assassination, Moïse named Ariel Henry to be prime minister, but Henry was not sworn in. Henry has served as de facto prime minister since mid-July 2021, although protests calling for his resignation have resurged in 2024.

Haiti lacks an elected president, legislature, and local government; the terms of the last 10 elected senators ended in January 2023. A political standoff between Henry's de facto government and opposition political and civil society leaders regarding how to form a transitional government to stabilize the country and convene elections persists amid a worsening security and humanitarian crisis.

In October 2022, Henry requested international support to help the Haitian National Police restore order. In October 2023, the U.N. Security Council adopted a resolution to authorize the deployment of a non-U.N. multinational security support (MSS) mission to Haiti led by Kenya and supported by voluntary contributions. Kenya had aimed to deploy its police to lead the MSS early this year, but a January 2024 ruling by Kenya's high court ruled the deployment unconstitutional.[3]

The 118th Congress may consider options for responding to the interrelated political, security, and humanitarian crises in Haiti, including what, if any, U.S. support should be provided to a potential MSS. This report provides an overview of the situation in Haiti and U.S. policy responses to date.

---

[1] For background, see Laurent DuBois, *Haiti: The Aftershocks of History* (New York, NY: Picador, 2013); Philippe Girard, *Haiti: The Tumultuous History: From Pearl of the Caribbean to Broken Nation* (New York, NY: Palgrave MacMillan, 2005, 2010).

[2] International Crisis Group, *Consolidating Stability in Haiti,* Latin America/Caribbean Report No. 21, July 18, 2007.

[3] Tom Odula, "Kenya's High Court Rules That Deploying the Nation's Police Officers to Haiti Is Unconstitutional," Associated Press (AP), January 26, 2024.

HaitiTPSAR000363

**Figure 1. Map of Haiti**



**Source:** Congressional Research Service (CRS).

# Political Situation

## Background

Haiti won independence from France in 1804, making it the second independent republic in the Western Hemisphere (after the United States). Since then, the country has experienced long periods of authoritarianism and political fragility, punctuated by foreign interventions and natural disasters.[4] Since the fall of the brutal Duvalier dictatorship (1957-1986), attempts to consolidate democratic rule have had limited success.[5] In 1991, a military coup interrupted the term of Haiti's first president elected in free and fair elections, Jean-Bertrand Aristide of the center-left *Fanmi Lavalas* party (1991; 1994-1996; 2000-2004). The threat of a U.S. military intervention allowed Aristide to return three years later to complete his term. In 2000, Aristide began a second term after the opposition boycotted the presidential election due to flawed parliamentary elections

---

[4] Rocio Cara Labrador and Diana Roy, "Haiti's Troubled Path to Development," Council on Foreign Relations, September 2022 (hereinafter Labrador and Roy, "Haiti's Troubled Path"). Haiti reportedly paid an indemnity to France of some $560 million, which caused a significant drain on Haiti's finances well into the 20th century. Concerns about the indebted country's ability to pay its creditors prompted a U.S. intervention from 1915 to 1934. Lazaro Gamio et al., "Haiti's Lost Billions," *New York Times*, May 20, 2022; Hans Schmidt, *The United States Occupation of Haiti: 1915-1934* (Rutgers, NJ: Rutgers University Press, 1971).

[5] Fearing communist rule and/or instability on the island, successive U.S. presidential administrations recognized the regimes of François Duvalier (1957-1971) and his son, Jean-Claude Duvalier (1971-1987), despite concerns about the leaders' authoritarian tendencies. See U.S. Department of State, Office of the Historian, "U.S. Relations with Haiti" in *Foreign Relations of the United States, 1958-1960, American Republics*, vol. V, document 309, at https://history.state.gov/historicaldocuments/frus1958-60v05/d309; and U.S. Department of State, Office of the Historian, "Telegram from the Embassy in Haiti to the Department of State" in *Foreign Relations, 1977-1980, Mexico, Cuba, and the Caribbean,* vol. XXIII, document 253, August 14, 1978, at https://history.state.gov/historicaldocuments/frus1977-80v23/d253.

HaitiTPSAR000364

favoring *Fanmi Lavalas*. In 2004, Aristide—facing an armed uprising against his rule led by Guy Philiipe, a drug trafficker subsequently imprisoned on money laundering charges in the United States, as well as U.S. and international pressure—resigned and went into exile.[6]

From 2004 to 2017, the U.N. Stabilization Mission in Haiti (MINUSTAH), a peacekeeping force that grew to 13,000 at its peak, sought to restore order in the country; build the Haitian National Police (HNP); and, later, help with recovery after a 2010 earthquake. The legacy of MINUSTAH is complicated, as troops helped restore some stability to Haiti but reintroduced cholera into the country and committed human rights and sexual abuses. This experience initially led many Haitians to oppose the type of foreign military involvement requested by the Henry government.[7]

President Michel Martelly (2011-2016) and his chosen successor, Jovenel Moïse (2017-July 2021), who represented the center-right *Tèt Kale* Party (PHTK), both took office after disputed elections and administered governments allegedly rife with corruption.[8] Under Moïse, Haiti experienced political and social unrest, high inflation, antigovernment protests, and gang violence. Like other Haitian politicians, Moïse allegedly provided money and arms to gangs in exchange for favors, including suppressing antigovernment protests such as those that erupted in 2018 after the government announced fuel price hikes.[9] A 2021 report by Harvard Law School's International Human Rights Clinic documented state (primarily police) involvement in attacks on neighborhoods in which some 240 civilians died from 2018 to 2020.[10] Instability increased in 2019 after Haitian auditors issued two reports to the country's chief prosecutor alleging Moïse and other officials had misappropriated and embezzled millions of dollars in public funds.[11]

Political gridlock between the executive and legislative branches led to the government not organizing scheduled October 2019 parliamentary elections. The terms of the entire lower Chamber of Deputies and two-thirds of the Senate expired in January 2020, as did the terms of all local government posts, without newly elected officials to take these positions.[12] Thereafter, Moïse ruled by decree, with some controversy over whether his term was to end in February 2021 or February 2022 (the U.S. State Department did not take a position on that dispute).[13]

---

[6] AP, "Supporters of Former Haitian Rebel Leader Guy Philippe Launch Widespread Protests," January 16, 2024. Daniel P. Erikson, "Haiti After Aristide: Still on the Brink," *Current History*, vol. 104, no. 679 (February 2005).

[7] Carla King et al., "'MINUSTAH Is Doing Positive Things Just as They Do Negative Things': Nuanced Perceptions of a UN Peacekeeping Operation Amidst Peacekeeper-Perpetrated Sexual Exploitation and Abuse in Haiti," *Conflict, Security & Development*, vol. 21, no. 6 (November 17, 2021), pp. 749-779. For how past interventions have influenced recent popular opinion in Haiti, see Rafael Bernal, "Human Rights Coalition to Biden: No Military Intervention in Haiti," *The Hill*, November 1, 2022.

[8] On Martelly and Moïse's elections, see Georges Fauriol, "Haiti's Problematic Electoral Dynamics," *Global Americans*, December 21, 2021. On Martelly and drug trafficking, see Jacqueline Charles and Michael Wilner, "Canada Sanctions Former Haiti President Michel Martelly, Two Former Prime Ministers," *Miami Herald*, November 21, 2022. On corruption in the Moïse government, see Maria Abi-Habib, "Haiti's Leader Kept a List of Drug Traffickers. His Assassins Came for It," *New York Times*, December 12, 2021.

[9] Chris Dalby, "International Sanctions Seek to Weaken Haiti's Patronage System Between Politicians, Gangs," *InSight Crime*, November 24, 2022. For Moïse officials' involvement in attacks on neighborhoods where protests occurred, see U.S. Department of the Treasury, "Treasury Sanctions Serious Human Rights Abusers on International Human Rights Day," December 10, 2020.

[10] Harvard Law School International Human Rights Clinic, *Killing with Impunity: State-Sanctioned Massacres in Haiti*, April 2021.

[11] U.S. Department of State, "Appendix C: Major Corruption Cases in Haiti and Government of Haiti Efforts to Address Corruption," November 10, 2022.

[12] The 10 remaining senators' terms expired on January 9, 2023.

[13] U.S. Department of State, "Appendix F: Alleged February 2021 Coup Against President Jovenel Moïse and U.S. and (continued...)

---

On July 7, 2021, armed assailants assassinated President Moïse in his private home in Port-au-Prince. Details of the attack remain under investigation; however, the U.S. Federal Bureau of Investigation (FBI) has arrested 11 individuals for their role in a plot to kill Moïse, three of whom have been sentenced to life in prison.[14] The FBI also has supported Haitian authorities' investigation of the crime, although threats to the safety of those authorities and turnover among the judges leading the investigation have hindered Haitian efforts.

## Post-Assassination Political Impasse

Moïse's assassination gave rise to uncertainty about who would succeed him as president and who would serve as prime minister. Under the Haitian Constitution (Article 149), if a president dies in the last two years of his term, the legislature should elect a provisional president to serve out the term.[15] As Haiti lacked a functioning legislature at the time of the assassination, the choice of who would succeed Moïse could not follow the prescribed constitutional order.

Three individuals laid claims to serve as prime minister: interim Prime Minister Claude Joseph; Ariel Henry, a neurosurgeon nominated to be prime minister two days before Moïse's death but not sworn in; and Joseph Lambert, then-president of the Haitian Senate. On July 11, an inter-agency U.S. delegation traveled to Haiti in response to a request for security and investigative assistance from the Haitian government. U.S. officials met with all three claimants to prime minister. After days of jockeying among the claimants over who would become prime minister, Joseph agreed that Henry would be prime minister and he foreign minister.[16] Lambert separately gave up his quest to be prime minister; the U.S. government later sanctioned him for drug trafficking. On July 17, the United States, United Nations, and other donors issued a statement calling for the formation of an "inclusive government" and encouraging Prime Minister-designate Ariel Henry to form a government.[17] Henry's irregular path to his position, struggles to address Haitian challenges while in office, and allegations of his possible involvement in Moïse's assassination, have eroded his credibility.[18]

Since the assassination, a political stalemate has persisted over how to convene elections and who should govern until an elected government is in place. In September 2021, de facto Prime Minister Henry and his supporters proposed that Henry name a provisional electoral council to convene elections, and that Henry remain the single head of government until a new elected government takes office. Rival political and civil society leaders, some of whom backed the Montana Accord, a 2021 proposal to form an interim government led by a president and prime minister, argued for a transitional government not led by Henry.[19]

---

International Partner Efforts to Support Free and Fair Elections in Haiti," November 2022, at https://www.state.gov/wp-content/uploads/2022/11/Appendix-F-Developments-in-Haiti-004977.pdf.

[14] Sarah Morland and Kylie Madry, "Ex-Colombian Soldier Pleads Guilty in Haiti President's Assassination," *Reuters*, December 22, 2023.

[15] Haiti's Constitution of 1987 with Amendments Through 2012 is available in English at https://www.constituteproject.org/constitution/Haiti_2012.pdf?lang=en.

[16] CRS interview with State Department officials, January 9, 2023.

[17] U.N. Integrated Office in Haiti (BINUH), "Core Group Press Release," July 17, 2021.

[18] Monique Beals, "Judge, Investigators say Haitian Prime Minister Involved in President's Assassination," *The Hill*, February 8, 2022.

[19] The Montana Accord proposed a two-year interim government led by a president and prime minister, with oversight committees, to restore order, administer elections, and create a truth and justice commission to address past human rights violations. Georges Fauriol, "Haiti: Betting on the Montana Accord," *Global Americans*, February 9, 2022.

On December 21, 2022, Henry put forth a new transition proposal—the National Consensus for an Inclusive Transition and Transparent Elections (or the December 21st agreement)—that was signed by a range of stakeholders, including some former signatories of the Montana Accord.[20] His government established a three-member High Transition Council (HTC) to implement that transition plan in January 2023 and appointed eight judges to the country's highest court in March 2023. Since May 2023, a group of eminent persons from the Caribbean Community (CARICOM) has facilitated several rounds of talks among Henry and other stakeholders focused on increasing the size of the HTC and possibly expanding its powers, as well as selecting an electoral council. Those talks have yielded limited progress.

Some Haitians are calling for Henry to step down by February 7, 2024, the date by which the December 21st agreement aimed to have an elected government assume office.[21] In recent months, protests calling for Henry's resignation have increased. Some of those protests have been led by former rebel leader Guy Philippe (repatriated from the United States in December) and members of an armed government environmental protection brigade that have clashed with police.[22]

# Security Crisis

Relations between Haitian gangs and the country's political and economic elite are well established. Haiti's past presidents and prominent politicians have used and received support from gangs. Generally, gangs provide political elites with services such as campaign support, voter intimidation, bribery, fundraising, vandalism, and protest disruption. Former President Aristide reportedly relied on support from gangs that engaged in political repression, and the Canadian government sanctioned former President Martelly for his role in financing gangs.[23] Business elites have formed relationships with gangs in order to protect their businesses and enable them to move merchandise throughout the country and abroad. In December 2022, the Canadian government imposed sanctions on three prominent businessmen for reportedly providing "illicit financial and operational support to gangs."[24]

Since Moïse's assassination, state authority has collapsed in parts of Port-au-Prince and surrounding areas. As of late 2023, armed gangs reportedly controlled 80% of the capital and other urban areas, as well as major highways and the agricultural region of Artibonite (see **Figure 1**).[25] These gangs are often better armed than the national police.[26] A wave of protests and gang-led violence erupted in September 2022 after de facto Prime Minister Henry announced the end of fuel subsidies. Gangs took over a major port and the country's main fuel terminal, temporarily grinding the economy to a halt and blocking humanitarian agencies' access to some areas. As

---

[20] U.N. Security Council, U.N. Integrated Office in Haiti (BINUH), *Report of the Secretary General*, S/2023/274, April 14, 2023.

[21] BINUH, *Report of the Secretary General,* S/2024/62, January 15, 2024. Hereinafter: S/2024/62.

[22] AP, "Haiti Cracks Down on Heavily Armed Environmental Agents After Clashes with Police," January 29, 2024.

[23] Immigration and Refugee Board of Canada, *Haiti: The Chimères, Their Activities and Their Geographic Presence; the Treatment of the Chimères by the Authorities and the Presence of Group Members Within the Government and the Police (2006-May 2008)*, June 3, 2008; Harold Isaac and Brian Ellsworth, "Canada Sanctions Haiti Ex-President Martelly for Financing Gangs," Reuters, November 20, 2022.

[24] Government of Canada, Global Affairs Canada, "Canada Imposes Sanctions Against Haitian Economic Elites," December 5, 2022.

[25] AP, "UN Human Rights Official is Alarmed by Sprawling Gang Violence in Haiti," October 31, 2023. BINUH, *Criminal Violence Extends Beyond Port-au-Prince: the Situation in Lower Artibonite from January 2022 to October 2023*, November 2023. Hereinafter: BINUH, November 2023.

[26] Jon Lee Anderson, "A Land Held Hostage," *The New Yorker*, July 24, 2023.

noted previously, Henry requested an international force to help quell the security situation in October 2022; however, such a force has yet to be established (see "Multinational Security Support (MSS) Mission" below).[27]

The U.N. Office for the Coordination of Humanitarian Affairs (UNOCHA) estimates that there are at least 300 criminal groups operating in Haiti.[28] However, some local sources suggest the number of criminal groups is closer to 750, including self-defense groups.[29] Many of these groups have developed alliances to amplify their operational capabilities. According to the U.N. Integrated Office in Haiti (BINUH), the number of reported homicides increased by 119% last year, rising from 2,183 in 2022 to 4,789 in 2023.[30] Kidnappings escalated from 1,359 in 2022 to 2,490 in 2023, an 83% increase.[31] Gangs have sought to find new revenue through kidnapping for ransom and other crimes amid diminished support from elites fearful of being designated for U.S. and Canadian sanctions.[32] Gang attacks on government personnel and critical infrastructure have increased as they have grown more autonomous.

According to U.N. reports, gangs have used "collective rape" and other gender-based violence (GBV) against women, children as young as 10, and the elderly to intimidate people.[33] Gender-based and sexual violence, though gravely underreported, is more prevalent in zones contested by gangs in which many inhabitants lack access to basic health, education, and social services. Doctors Without Borders estimates that its staff treated 42% more survivors of GBV in 2023 than in 2022 (some 3,700 victims), a majority of those were victims of armed actors rather than intimate partner violence.[34]

The U.N. Secretary-General described the Haitian National Police (HNP) in 2022 as "spread thin" and lacking weapons, equipment, and capacity.[35] Some 1,663 officers resigned over the course of 2023, leaving the HNP with 13,196 officers as of December.[36] Low pay and poor working conditions have increased attrition among HNP officers available to perform police duties.[37] At any given time, only 4,000 officers are available for policing.[38] In 2023, 45 out of 412 police buildings were non-operational, were under the direct control of armed gangs, or had been subjected to repeated attacks.[39]

---

[27] Catherine Osborn, "Haiti's Crisis Escalates," *Foreign Policy*, October 14, 2022.

[28] U.N. Office for the Coordination of Humanitarian Affairs (UNOCHA), "Haiti: Humanitarian Response Plan 2023 at a Glance," Relief Web, April 13, 2023.

[29] BINUH, November 2023.

[30] S/2024/62.

[31] Ibid.

[32] U.N. Security Council, BINUH, *Report of the Secretary General*, S/2023/41, January 17, 2023; BINUH, *Report of the Secretary General*, S/2023/492, July 3, 2023; Reuters, "Haiti Rights Group Records Three-Fold Rise in Kidnappings for Early 2023," April 4, 2023.

[33] This draws from BINUH and Office of the U.N. High Commissioner for Human Rights (OHCHR), *Sexual Violence in Port-au-Prince: A Weapon Used by Gangs to Instill Fear*, October 14, 2022; OHCHR and BINUH, *Human Rights Situation, Quarterly Report: January-March 2023*; Global Initiative Against Transnational Organized Crime, *Gang Control and Security Vacuums: Assessing Gender-Based Violence in Cité Soleil*, May 2023.

[34] Widlore Mérancourt and Amanda Coletta, "'Collective Rapes' Surge as Weapon in Haiti's Gang War," *Washington Post*, January 29, 2024.

[35] BINUH, *Report of the Secretary General*, S/2022/747, October 10, 2022. Hereinafter: S/2022/747.

[36] Security Council, S/2024/62.

[37] U.N. Security Council, BINUH, *Report of the Secretary General*, S/2023/492, July 3, 2023.

[38] Institute for Justice and Democracy in Haiti (IJDH), *Human Rights and the Rule of Law in Haiti: Key Recent Developments June Through November 2023*, December 2023.

[39] U.N. Security Council, S/2024/62 and S/2023/769.

HaitiTPSAR000368

A July 2022 International Crisis Group study estimated that 40% of HNP officers had ties to gangs.[40] Corruption, combined with the HNP and Haitian Coast Guard's lack of control over the country's ports and borders, have made Haiti a hub for drug and arms trafficking and worsened gang violence (see "Weapons and Drug Trafficking"). When police have sought to confront gangs, confrontations have often proven deadly. In November 2022, criminals assassinated the director of the HNP's training center at the center.

Impunity prevails in Haiti's weak justice system. In addition to failing to resolve Moïse's assassination, Haitian authorities have yet to arrest Jimmy Chérizier, a former HNP officer turned gang leader who was linked to Moïse, or other Haitian officials implicated in the 2018 La Saline massacre of 71 people.[41] Gangs overtook several of Haiti's main courthouses in summer 2022, and many of the courthouses remain inoperable. Without functioning courts, Haitian prisons continue to hold inmates, 85% of whom were in pretrial detention in June 2023; prisons have a 331% cell occupancy rate.[42] Many inmates lack access to food, water, and medical care. Haitian authorities have increased the prison budget by 87% for 2023/2024, including a 41% increase for food.[43]

The rampant violence in Haiti has left many Haitians hopeless and frustrated. Since April 2023, Haiti has experienced a rise in antigang vigilantism—the *Bwa Kale* movement.[44] On April 24, Port-au-Prince residents lynched and burned 10 alleged gang members. The movement is now in all 10 administrative departments (states) of Haiti; hundreds have been killed.[45]

# Humanitarian Situation

Haiti is a fragile country that is highly vulnerable to natural disasters due to its location and topography (exacerbated by deforestation and climate change), and the Haitian government's limited capacity to respond to such disasters. A decade after the devastating 2010 earthquake, inadequate recovery efforts, combined with subsequent natural disasters (e.g., Hurricane Matthew, a 2021 earthquake) and disease outbreaks (e.g., cholera, Coronavirus Disease 2019 [COVID-19]), have further weakened the state's ability to protect and provide for its citizens.[46] Flooding in June 2023 resulted in more than 40 deaths and left some 13,000 Haitians homeless.[47] The Fund for Peace's 2023 Fragile States Index ranked Haiti as the 10th most fragile state in the world due to various factors, including the state's lack of legitimacy and inability to deliver services, uneven economic development, and relatively low levels of social cohesion.[48]

---

[40] International Crisis Group, *New Gang Battle Lines Scar Haiti as Political Deadlock Persists*, July 27, 2022.

[41] Chérizier, then-Minister of the Interior Fednel Monchery, and President Moïse's Departmental Delegate Joseph Pierre Richard Duplan allegedly planned an attack carried out by gangs on protesters who had criticized the government. U.S. Department of the Treasury, "Treasury Sanctions Serious Human Rights Abusers on International Human Rights Day," December 10, 2020.

[42] BINUH, *Human Rights Situation Main Trends, Quarterly Report: July-September 2023*, October 27, 2023.

[43] S/2024/62.

[44] Reuters, "Haitian Residents Lynch and Set Fire to Suspected Gang Members," April 26, 2023.

[45] BINUH, *Report of the Secretary-General*, S/2023/768, October 16, 2023. Hereinafter: S/2023/768.

[46] On recovery and reconstruction, see Jonathan Katz, *The Big Truck That Went by: How the World Came to Save Haiti and Left Behind a Disaster* (New York, NY: St. Martin's Press, 2014); Government Accountability Office (GAO), *Haiti: USAID and State Should Improve Management and Assessment of Reconstruction Activities,* GAO-23-105211, March 2023. Hereinafter: GAO, March 2023. On subsequent disasters, see Labrador and Roy, "Haiti's Troubled Path."

[47] Jacqueline Charles, "At Least 42 Dead, Thousands Homeless in Haiti After a Weekend of Heavy Rains, Flooding," *Miami Herald*, June 5, 2023.

[48] The Fund for Peace, Fragile States Index, at https://fragilestatesindex.org/country-data/.

In contrast to some previous humanitarian crises Haiti has endured, the political and security situation is the primary driver of the current humanitarian emergency.[49] According to U.N. officials, as of October 2023, gang violence had displaced at least 195,000 people.[50] Gang blockades of highways have limited humanitarian access, particularly to the southern peninsula but also to communities to the east and north of the capital. The G9 gang's blockade of the Varreux fuel terminal from September to November 2022, combined with broad unrest, caused businesses and hospitals to close. During that period, Haitians, fearful of encountering gang violence, sheltered in place amid a lack of water and sanitation services, fuel, electricity, and food. UNOCHA estimates that 5.5 million Haitians are in need of humanitarian aid.[51] Since mid-September 2023, the Dominican Republic has closed its shared land border with Haiti in response to a water dispute. The continued closure could exacerbate humanitarian conditions in Haiti's border departments.[52]

In 2023, UNOCHA requested $719.9 million for the Humanitarian Response Plan in Haiti. As of December 2023, donors had provided 33% of the funds requested, or $242.2 million.[53]

Ongoing humanitarian concerns include food insecurity and inadequate access to health care, protection, and education. In September 2023, the World Food Program and its partners estimated that 4.4 million Haitians, roughly 44% of the population, faced acute levels of hunger.[54] In October 2022, cholera resurfaced in Haiti; as of December 2023, it had claimed 1,156 lives.[55] While cholera is preventable through vaccination and treatable with rehydration, gangs have reportedly prevented patient access to health facilities and denied medical staff entry to affected communities. In March 2023, BINUH reported that 21 health facilities had temporarily shut down or reduced their activities due to violence.[56] Children in Haiti are extremely vulnerable to protection concerns, particularly gender-based violence. They have also lost years of schooling due to COVID-19, insecurity and cholera-related school closures, and armed attacks on schools.[57]

# U.N. Presence in Haiti and Recent Action

The U.N. has had a continuous presence in Haiti for almost 20 years, with diplomatic and financial support provided by successive U.S. presidential administrations. Following the collapse of the Aristide government in 2004, the U.N. Security Council established MINUSTAH to help restore order and train the HNP.[58] After the 2010 earthquake, the Security Council expanded MINUSTAH's size and mission.

---

[49] UNOCHA, "Seven Things to Know About the Humanitarian Crisis in Haiti," October 26, 2022.

[50] International Organization for Migration (IOM), "Haiti Emergency Response: Situation Report," October 2023.

[51] UNOCHA, *Global Humanitarian Overview 2024*, December 2023.

[52] World Food Program (WFP), "Haiti: Overview of DR Border Closure Impacts," November 3, 2023.

[53] United Nations, "Support to Haiti's Police, Deployment of Multinational Mission Fundamental Towards Restoring Stability in Country, Senior Official Tells Security Council," January 25, 2024.

[54] WFP, "Severe Hunger Persists in Haiti as Violence Intensifies in the Capital," September 19, 2023.

[55] Pan-American Health Organization (PAHO), "Cholera Epidemic in Haiti and the Dominican Republic," December 27, 2023.

[56] OHCHR and BINUH, *Human Rights Situation, Main Trends, Quarterly Report: January-March 2023,* March 8, 2023; Reuters, "Medecins Sans Frontieres Shuts Haiti Hospital amid Gang Violence," March 8, 2023.

[57] U.N. Children's Fund, "Haiti: Armed Violence Against Schools Increases Nine-Fold in One Year," February 9, 2023.

[58] U.N. Security Council, "Resolution 1542 (2004)/Adopted by the Security Council at Its 4961st Meeting, on 30 April 2004," S/RES/1542 (2004), June 1, 2004. MINUSTAH's original mission aimed to restore security and stability, (continued...)

A Security Council resolution ended MINUSTAH in 2017, citing Haiti's peaceful completion of a long-delayed electoral process in February 2017 as a milestone.[59] The Security Council also praised MINUSTAH for supporting the political process, professionalizing the police, and improving security and stability in Haiti, achievements that proved short-lived. Haitian and international human rights and health experts criticized MINUSTAH for its role in introducing cholera to Haiti (a disease that had not been present in the country for more than a century) and for allegations of sexual abuse by some of its forces.[60] In 2016, then-Secretary-General Ban Ki-Moon apologized for the U.N.'s role in a cholera outbreak that ultimately caused nearly 10,000 deaths; the U.N. also launched a $400 million fund to confront the epidemic.[61]

In 2017, the U.N. Mission for Justice Support in Haiti (MINUJUSTH) succeeded MINUSTAH, focusing on strengthening judicial institutions, protecting human rights, increasing the professionalism of the HNP, and reinforcing the rule of law. The mission also supported violence-reduction projects and income-generating activities for youth. During MINJUSTH's mandate, the number of HNP officers increased by 10% to 15,400 and courts reported a 300% increase in files processed on the day of their reception.[62]

In October 2019, the U.N. transitioned to a political office, the U.N. Integrated Office in Haiti (BINUH), for an initial one-year period that the U.N. Security Council twice extended. BINUH's mandate, which currently runs through July 2024,[63] is to advise the Haitian government on how to establish an inclusive national dialogue on reestablishing stability, security, and the rule of law so elections can be held, among other aims. The mission also emphasizes protecting and promoting human rights, including by documenting recent gender-based violence by gangs and producing reports from Haiti for the U.N. Secretary-General and Security Council.[64] BINUH coordinates with other U.N. agencies, funds, and programs, ranging from humanitarian agencies such as the World Food Program to the U.N. Office on Drugs and Crime.

## Sanctions Resolution

On October 17, 2022, the Security Council discussed a resolution sponsored by the United States and Mexico to establish a U.N. sanctions regime against gang leaders in Haiti and those who finance them. The Security Council unanimously approved the sanctions resolution (Resolution

---

promote political processes (including elections), strengthen institutions and rule-of-law-structures, and promote and protect human rights.

[59] U.N. Security Council, "Resolution 2350 (2017)/Adopted by the Security Council at Its 7924th Meeting, on 13 April 2017," S/RES/2350 (2017), April 13, 2017. Critics argue, however, that a transitional government, not the U.N.-backed PHTK government, accomplished that goal. Even with MINUSTAH present, Haiti experienced a constitutional crisis after Michel Martelly failed to convene elections to choose his successor. Georges Fauriol, 'A Cycle of Instability': Haiti's Constitutional Crisis," Center for Strategic and International Studies, February 8, 2021.

[60] For background, see CRS In Focus IF10502, *Haiti: Cholera, the United Nations, and Hurricane Matthew*, by Maureen Taft-Morales and Tiaji Salaam-Blyther.

[61] U.N. News, "U.N.'s Ban Apologizes to People of Haiti, Outlines New Plan to Fight Cholera Epidemic and Help Communities," December 1, 2016. By the end of 2021, donors had contributed only $21.8 million to support the pledged $400 million fund. See U.N. Haiti Cholera Response Multi-Partner Trust Fund, *2021 Annual Report*.

[62] U.N. Mission for Justice Support in Haiti, "MINUJUSTH Completes Its Mandate, Putting an End to 15 Consecutive Years of Peacekeeping in Haiti," October 16, 2019.

[63] For background, see BINUH, "Mandate," at https://binuh.unmissions.org/en/mandate.

[64] BINUH and OHCHR, *Sexual Violence.*

---

HaitiTPSAR000371

2653) on October 21, 2022; an expert committee has recommended, and the Security Council has added, four gang leaders to its sanctions list (See "Sanctions: U.S. and Multilateral").[65]

## Multinational Security Support (MSS) Mission

On October 6, 2022, de facto Prime Minister Henry and his ministers requested the deployment of an international force to help Haitian forces quell the security situation and allow humanitarian aid to flow. On October 8, U.N. Secretary-General António Guterres sent a letter to the Security Council recommending various approaches to respond to that request.[66] On October 17, 2022, the Security Council discussed a proposed resolution by the United States and Mexico, which reportedly would have authorized the deployment of a non-U.N. multinational force to Haiti.[67] From October 2022 through mid-2023, few countries publicly offered to send their forces to Haiti and many countries, including Canada, declined U.S. requests to lead such a force.

In July 2023, Kenya announced its willingness to "positively consider" leading a multinational force in Haiti and sending 1,000 police to support the HNP if authorized by the Security Council.[68] The State Department and CARICOM praised Kenya's disposition even as some questioned the human rights record of the Kenyan police.[69] In August 2023, Kenya deployed an assessment mission accompanied by U.S. officials to Haiti. In an August 15 letter to the Security Council, the Secretary-General said the mission should focus on disarming gangs, securing key installations and highways, and reasserting state presence to enable basic services to reach the population.[70] He also asserted that "the robust use of force by a specialized multinational police force," likely supported by military assets, is needed to help the HNP reestablish law and order. He outlined how the U.N. could provide logistical support to the multinational force, while also expanding BINUH to facilitate a political accord and train the police, among other tasks.

On October 2, 2023, the Security Council approved Resolution 2699 to support a Kenyan-led multinational force financed by voluntary contributions to provide security for critical infrastructure, training, and operational support to the HNP.[71] Russia and China abstained from the vote. The resolution called on member states to contribute personnel, equipment, financial, and logistical support for the MSS.

In late January 2024, Kenya's High Court blocked the Kenyan government from deploying police officers to Haiti, ruling that police officers cannot be deployed on foreign operations missions.[72]

---

[65] Security Council, "Resolution 2692 (2023)," July 14, 2023. U.N. Security Council, "Security Council 2653 Sanctions Committee Adds 4 Entries to its Sanctions List," SC/15520, December 8, 2023.

[66] Such approaches included deploying a non-U.N. rapid action force (probably composed of some military forces) to support the HNP, forming a multinational police task force, creating a multinational antigang force, expanding BINUH's budget and mandate, bolstering the HNP and the justice sector, and combating arms trafficking. Security Council, S/2022/747.

[67] United States Mission to the United Nations, "Remarks by Ambassador Linda Thomas-Greenfield at a U.N. Security Council Briefing on Haiti," October 17, 2022.

[68] Reuters, "Kenya Ready to Lead Multinational Force to Haiti," July 29, 2023.

[69] U.S. Department of State, Press Statement, Antony J. Blinken, Secretary of State, "Kenya Considering Leading a Multinational Force in Haiti," August 1, 2023; CARICOM, "Statement on Multi-national Force to Support Haiti," August 4, 2023; Luke Taylor, "Kenya's Offer to Send Police to Haiti Sparks Human Rights Concerns," *The Guardian*, August 5, 2023..

[70] Security Council, "Letter Dated 14 August 2023 from the Secretary-General Addressed to the President of the Security Council," S/2023/596, August 15, 2023.

[71] Security Council, "Resolution 2699 (2023)," October 2, 2023.

[72] Jacqueline Charles, "No Cops for Haiti: Kenya Court Blocks Sending Police to Help Fight Kidnapping Gangs," *Miami Herald*, January 26, 2024.

The Kenyan government reportedly plans to challenge the ruling. While the U.S. State Department has reaffirmed its support for an MSS mission to Haiti, the composition, budget, and timing of a potential deployment remain unclear.[73]

Any units or participants in a mission to Haiti (whether police or military troops) would be subject to U.N. vetting, while those receiving U.S. support would be subject to U.S. human rights vetting (22 U.S.C. §2378d and 10 USC §362). Human rights experts have suggested additional training that should be provided to MSS members as well as mechanisms to prevent, investigate, and punish any potential human rights violations.[74]

# U.S. Policy and Issues for Congress

Biden Administration policy goals in Haiti include supporting Haitian-led efforts to confront gangs and insecurity, resolve the political and constitutional crisis, revive the economy, and address the root causes of emigration from the country.[75] Since Moïse's assassination, U.S., Canadian, and U.N. officials—among others criticized for past interventions in the country—have emphasized their support for "Haitian-led solutions" to the country's challenges. In March 2023, the Biden Administration issued a 10-year plan for Haiti, as mandated by the Global Fragility Act (GFA; P.L. 116-94), with a long-term, interagency goal of helping the government and citizenry of Haiti work together to develop a shared vision and plan to achieve long-term stability.[76] (See "Global Fragility Act Implementation.")

U.S. officials have pursued several courses of action to advance those goals. Secretary of State Antony Blinken and other top U.S. officials have stressed the urgency of reaching a political consensus on how to reestablish constitutional order to de facto Prime Minister Henry and other key stakeholders.[77] The U.S. government has sanctioned corrupt officials and encouraged other countries to do so, supported efforts to facilitate dialogue by CARICOM and others, expanded support for the HNP, and sought a partner country to lead a non-U.N. multinational force to help stabilize the country.[78] U.S. officials have pledged to provide significant funding, equipment, and logistical support to any multinational force deployed to Haiti that would expand on U.S. assistance to the HNP.[79] Despite the current uncertainty surrounding the MSS, U.S. officials have asked countries to donate funding and troops to support the mission.[80] While some analysts have urged U.S. policymakers not to support a multinational mission, others have recommended

---

[73] U.S. State Department, "United States Reiterates Support for Multinational Security Support Mission to Haiti," January 27, 2024; and International Crisis Group, *Haiti's Gangs: Can a Foreign Mission Break Their Stranglehold*, January 5, 2024.

[74] See, for example, Tirana Hassan, "Remarks Delivered at a U.N. Security Council Meeting on Haiti," Human Rights Watch, January 25, 2024.

[75] U.S. Department of State, *Integrated Country Strategy: Haiti*, revised and updated March 27, 2023.

[76] U.S. Department of State, *The U.S. Strategy to Prevent Conflict and Promote Stability 10-Year Strategic Plan for Haiti,* March 24, 2023.

[77] U.S. Department of State, "Secretary Blinken's Meeting with Haitian Prime Minister Henry," July 5, 2023.

[78] David C. Adams, "U.S. and Canada Turn to Sanctions against Haitian Politicians and Businessmen Accused of Ties to Gangs," *Univision*, December 19, 2022; International Crisis Group, *Haiti's Last Resort: Gangs and the Prospect for Foreign Intervention*, Briefing No. 48, December 14, 2022.

[79] U.S. Department of State, "Department Press Briefing," August 14, 2023.

[80] U.S. State Department, "United States Reiterates Support for Multinational Security Support Mission to Haiti," January 27, 2024.

greater, more multifaceted U.S. support for the MSS and redoubled efforts to broker a political consensus in Haiti.[81]

Congress has had a direct role in shaping U.S. policy toward Haiti and conducting oversight of U.S. policy development and implementation. Among other policy areas, Congress has influenced decisions regarding foreign assistance, trade preferences, sanctions policy, and migration. Individual Members have differed, however, on policy approaches and priorities. In December 2023, for example, six Members of Congress wrote a letter asking the Administration to withdraw its support for the MSS, while five Senators wrote a letter asking the Administration for clarification on issues ranging from dialogue in Haiti to sanctions to arms trafficking policy.[82] Should a multinational force be deployed to Haiti, Congress could determine what, if any, support the United States would provide for such a force and/or use its legislative and oversight tools to ensure that such a force respects human rights and that those who receive U.S. training or equipment are rigorously vetted, as required by U.S. law.[83]

# Foreign Assistance

## Bilateral Assistance

Congress has appropriated foreign assistance to support Haiti's recovery from recurrent natural disasters and foster long-term stability. In addition to significantly expanding such assistance in the aftermath of a massive 2010 earthquake, Congress has closely monitored the implementation and impact of U.S. assistance activities.[84] Congress also shapes U.S. policy toward Haiti through appropriations, conditions on appropriations, and reporting requirements linked to the obligation of U.S. assistance.

Congress enacted the Haiti Development, Accountability, and Institutional Transparency Initiative Act (HAITI Act) as part of the FY2022 Consolidated Appropriations Act, 2022 (P.L. 117-103, Division V). The HAITI Act stated that U.S. policy should support sustainable rebuilding and development efforts in Haiti that recognize Haitian independence, are led by the people and government of Haiti, and contribute to international efforts to support broad and inclusive dialogue to restore democratic institutions and legitimacy in the country.[85] The HAITI Act also required U.S. agencies to measure the progress of post disaster recovery and efforts to address corruption, governance, rule of law, and media freedoms in Haiti. The State Department submitted the reports required by the act and made them public on November 10, 2022.[86]

---

[81] Daniel Larison, "No Matter how Well-Intentioned, Armed Mission in Haiti is a Mistake," *Responsible Statecraft*, October 4, 2023; Georges Fauriol, *Wanted: A Reset of Haiti Policy*, United States Institute of Peace, January 25, 2024.

[82] Rafael Bernal, "House Democrats ask Biden Administration to Reverse Course in Haiti," *The Hill*, December 8, 2023; Senator Ed Markey, "Senators Markey and Warnock, Colleagues Urge Biden Administration to Address Humanitarian Crisis and Insecurity in Haiti," December 19, 2023.

[83] CRS In Focus IF10575, *Global Human Rights: Security Forces Vetting ("Leahy Laws")*, by Michael A. Weber.

[84] See, as an example, GAO-23-105211, March 2023.

[85] Other elements of U.S. policy cited in the act include building the long-term capacity of the government, civil society, and private sector to foster economic development in Haiti; fostering collaboration with the Haitian diaspora and the business community in Haiti; supporting anticorruption, press freedom, and human rights protection, including through the imposition of sanctions; restoring the natural resources of Haiti; promoting political stability and free and fair elections; providing comprehensive reporting on the goals and progress of the Haitian government and the U.S. government; and promoting the participation of Haitian women and youth in U.S. assistance programs.

[86] U.S. Department of State, Bureau of Western Hemisphere Affairs, "Haiti: Reports," November 10, 2022, at https://www.state.gov/haiti-reports/.

HaitiTPSAR000374

In addition to the HAITI Act, current and future U.S. programming and budget requests are likely to reflect the priorities of the State Department and USAID's two-year Integrated Country Strategy for Haiti, adopted in March 2022 and updated in March 2023, and the GFA-mandated *U.S. Strategy to Prevent Conflict and Promote Stability 10-Year Strategic Plan for Haiti*, released in March 2023 (see "Global Fragility Act Implementation").[87]

The FY2023 Consolidated Appropriations Act (P.L. 117-328), did not specify a comprehensive appropriations level for Haiti. The act required the State Department to withhold any aid to support the Haitian government until the Secretary of State certifies that a new president and parliament have taken office following free and fair elections or that a broadly representative transitional government is in place and it is in the U.S. interest to provide such assistance. The withholding requirement does not apply to aid intended to support free and fair elections; antigang police and justice administration; disaster relief and recovery; and education, public health, food security, and other basic human needs. As in prior years, the act prohibited assistance for the armed forces of Haiti. The explanatory statement accompanying P.L. 117-328 urged the Secretary of State to use "every appropriate diplomatic tool to press for dialogue" among key stakeholders and to take "strong legal action" against those engaged in human rights abuses, corruption, and other illicit activities.[88] The State Department has allocated an estimated $204.9 million in foreign assistance to Haiti for FY2023 (see **Table 1**).

The Administration has requested $291.5 million for Haiti in FY2024, with the largest increase in funding requested under the International Narcotics Control and Law Enforcement (INCLE) foreign assistance account to support the HNP and other justice sector actors. This prioritization of restoring security and justice coincides with the phase one activities outlined by the GFA strategic plan for Haiti. Congress has not yet concluded action on FY2024 appropriations but it has enacted continuing resolutions (P.L. 118-15, P.L. 118-22, and P.L. 118-35) that fund most foreign aid programs at the same level and under the same conditions as FY2023 until March 8, 2024. The FY2024 foreign assistance appropriations measures approved by the House (H.R. 4665/H.Rept. 118-146) and reported in the Senate (S. 2438/S.Rept. 118-71) do not specify funding levels for Haiti. However, both measures would place restrictions on assistance to the central government.

### Table 1. U.S. Foreign Assistance to Haiti by Account: FY2018-FY2024

(appropriations in thousands of current U.S. dollars)

| Account | FY2018 | FY2019 | FY2020 | FY2021 | FY2022 | FY2023 (Estimate) | FY2024 (Request) |
|---|---|---|---|---|---|---|---|
| DA | 32,000 | 51,000 | 51,000 | 52,000 | 59,000 | 46,400 | 113,200 |
| ESF | 8,500 | — | — | 14,800[a] | 20,500[b] | 7,000 | — |
| FFP | 3,244 | 11,719 | 7,996 | 3,110 | — | — | — |
| GHP (State) | 99,386 | 103,011 | 78,765 | 99,822 | 103,081 | 102,505 | 100,000 |
| GHP (USAID) | 24,200 | 24,500 | 24,500 | 24,500 | 24,500 | 30,000 | 33,000 |
| INCLE | 12,000 | 22,.800[c] | 33,000[d] | 57,600[e] | 33,300[f] | 33,300 | 45,000 |

---

[87] State Department, *Integrated Country Strategy,* updated March 2023; and State Department, *The U.S. Strategy to Prevent Conflict and Promote Stability 10-Year Strategic Plan for Haiti*.

[88] "Explanatory Statement Submitted by Mr. Leahy, Chair of the Senate Committee on Appropriations, Regarding H.R. 2617, Consolidated Appropriations Act, 2023," *Congressional Record*, vol. 168, no. 198—book II (December 20, 2022), p. S9299.

HaitiTPSAR000375