| | | | | | | | |
|---|---|---|---|---|---|---|---|
| IMET | 233 | 241 | 96 | 255 | 47 | — | 255 |
| FMF | 5,000 | — | — | — | — | — | — |
| **Total** | **184,563** | **213,471** | **195,357** | **252,087a** | **240,434b** | **204,905** | **291,455** |

**Sources:** U.S. Department of State, Congressional Budget Justification, Supplementary Tables-Foreign Operations, FY2020-FY2024 and U.S. Department of State, FY2023 estimate data, August 2023; and email from State Department official, September 13, 2023.

**Notes:** DA = Development Assistance; ESF = Economic Support Fund; FFP = Food for Peace; GHP = Global Health Programs; INCLE = International Narcotics Control and Law Enforcement; IMET = International Military Education and Training; FMF = Foreign Military Financing.

a.  This sum includes $14.8 million of ESF appropriated through the American Rescue Plan Act of 2021 (P.L. 117-2).

b.  This sum includes $15.0 million of ESF appropriated through the Additional Ukraine Supplemental Appropriations Act, 2022 (P.L. 117-128).

c.  This includes $8 million reprogrammed in FY2021.

d.  This includes $15 million reprogrammed in FY2021 and FY2022.

e.  This includes $44.6 million reprogrammed in FY2022.

f.  This includes $3 million provided through the Global Fragility Act.

## Humanitarian Assistance

The United States is the largest humanitarian donor to Haiti. In response to the worsening humanitarian situation in Haiti, USAID sent a Disaster Assistance Response Team (DART) to the country in October 2022 that has been coordinating the delivery of relief supplies and other assistance to a portion of the estimated 5.5million Haitians in need of humanitarian assistance.[89] In FY2022 and FY2023, USAID provided a total of more than $206 million in humanitarian assistance, including $179.8 million in emergency assistance.[90] FY2023 programs focused on providing in-kind food aid and emergency cash for people to purchase food; medical, psychosocial, and other assistance to victims of GBV; and, water, sanitation, and hygiene programs to prevent the spread of cholera and other diseases. In addition to responding to these immediate needs, USAID helped fund programs to reduce the country's risk of disasters and improve Haiti's capacity to respond to emergencies.

U.S. agencies also helped Haiti respond to the COVID-19 pandemic and related health needs. The United States has donated nearly 1.1 million COVID-19 vaccines to Haiti.[91] As of January 5, 2024, 3.2% of Haiti's population had completed the COVID-19 vaccination schedule, one of the lowest vaccination rates in the world.[92] USAID is working with the Haitian government to implement media campaigns encouraging vaccination, provide COVD-19 immunization services, and strengthen health care facilities' access to oxygen.

## Funds to Support the Multinational Security Support Mission

The Biden Administration has committed to providing support to the MSS mission to Haiti, although fulfilling that pledge is likely to require congressional support. The United States has pledged $100 million in foreign assistance, likely to consist of International Narcotics Control

---

[89] USAID, Bureau for Humanitarian Assistance, "Haiti Assistance Overview," November 2023.

[90] Ibid.

[91] U.S. Department of State, "COVID-19 Vaccine Distribution," at https://www.state.gov/countries-areas/haiti/#covid_map_link.

[92] Pan American Health Organization, "COVID-19 Vaccination in the Americas," https://ais.paho.org/imm/IM_DosisAdmin-Vacunacion.asp, accessed January 24, 2024.

and Law Enforcement (INCLE) funds, to support the MSS.[93] Additionally, the U.S. Department of Defense is prepared to provided up to $100 million in training, equipment, technical assistance, and other logistical support to the mission.

## Global Fragility Act Implementation

The 116th Congress enacted the GFA, which directed the executive branch to develop a 10-year strategy to prevent conflict globally and stabilize conflict-affected areas. It also directed the executive branch to select priority countries or regions to execute such efforts through 10-year plans. In April 2022, the Biden Administration announced one region and four priority countries for GFA implementation; Haiti was among them. The GFA also authorized three distinct funds: the Prevention and Stabilization Fund (PSF), the Complex Crisis Fund (CCF), and the Multi-Donor Global Fragility Fund. In March 2023, the Biden Administration released a 10-year plan for Haiti, as mandated by the GFA. According to a summary of the plan, the U.S.-interagency seeks to help "Haiti's citizens and government advance a shared vision and a permissive environment for long-term stability." It prioritizes security and justice sector sectors first, then broadens to focus on economic and development goals, as well as civil society strengthening.[94] The Administration has allocated at least $15.0 million of FY2021 PSF assistance, $13.0 million of FY2022 PSF assistance, and $3.3 million of FY2023 CCF assistance to Haiti.[95]

## Donor Coordination

The United States is the leading bilateral donor in Haiti, and Congress has encouraged U.S. executive agencies to coordinate foreign assistance priorities with key countries and international organizations represented in Haiti. Active since 2004, the "Core Group" has shaped international responses to key events in Haiti, as when it called on Henry to form a "consensual and inclusive government" in July 2021.[96] In addition to the U.S. Ambassador, the Core Group comprises the Special Representative of the U.N. Secretary-General; the Ambassadors of Brazil, Canada, France, Germany, Spain, and the European Union (EU); and the Special Representative of the Organization of American States.

Many members of the Core Group (including the EU, Spain, and France) have expressed interest in contributing to a multidonor basket fund on security that aims to support the long-term development of the HNP; Canada and the U.N. Development Program (UNDP) administer the fund. UNDP estimated the fund needs at least $28 million over two years to achieve its aims. According to BINUH, donations stood at roughly $25.5 million in October 2023.[97]

---

[93] U.S. Department of State, Antony J. Blinken, Secretary of State, "U.N. Security Council Authorizes Multinational Security Support Mission to Haiti," October 2, 2023.

[94] U.S. Department of State, *The U.S. Strategy to Prevent Conflict and Promote Stability 10-Year Strategic Plan for Haiti,* March 24, 2023.

[95] U.S. Department of State, Congressional Notification (CN) 23-300, August 14, 2023; USAID, CN 146, May 16, 2023.

[96] BINUH, "Core Group Press Release," July 17, 2021.

[97] Electronic correspondence with U.N. official, January 26, 2024.

## Trade Preferences[98]

Congress has extended unilateral trade preferences to Haiti through several trade preference programs enacted since 1975. The Caribbean Basin Economic Recovery Act (P.L. 98-67, subsequently amended, with no expiration), for example, provides limited duty-free entry of selected Caribbean products as a core element of the U.S. foreign economic policy response to uncertain economic and political conditions in the region. The current Haiti-specific preferences, which expire in 2025, provide unilateral preferences to the country's apparel sector.[99] The value of U.S. imports from Haiti entering under Caribbean preference programs increased from $25 million in 2000 to $253.3 million in 2022, an increase of over 900%. Those imports accounted for about 31.9% of total U.S. merchandise imports from Haiti. Over 90% of U.S. imports from Haiti in 2022 consisted of apparel items or clothing; knitted or crocheted apparel imports totaled $807.0 million, while other apparel items or clothing totaled $155.0 million.[100]

The Haiti Economic Lift Program Extension Act of 2023 (S. 552), introduced in the Senate in February 2023, would renew U.S. trade preferences for Haiti through 2035. In the House, H.R. 5035, introduced in July 2023, would modify and extend trade preferences for Haiti under the Caribbean Basin Economic Recovery Act.

## Sanctions: U.S. and Multilateral

In 2020, as part of its policy toward Haiti, the U.S. government began to impose economic sanctions and visa restrictions on those responsible for significant human rights abuses and/or corruption.[101] In December 2020, pursuant to Executive Order (E.O.) 13818, issued to implement requirements enacted in the Global Magnitsky Human Rights Accountability Act (P.L. 114-328), the U.S. Department of the Treasury (Treasury) imposed asset blocking sanctions on Jimmy Chérizier (gang leader and former HNP officer) and two former Moïse officials for involvement in the La Saline massacre. In April 2023, Treasury designated Gary Bodeu, former head of Haiti's Chamber of Deputies, for corruption (E.O. 13818). In December 2023, Treasury sanctioned the leaders of four of Haiti's largest gangs for involvement in sexual violence and other gross human rights violations (E.O. 13818). These individuals are barred from entry into the United States.

Pursuant to Section 7031(c) of annual foreign operations appropriations acts (P.L. 117-103, Division K and P.L. 117-328, Division K), the State Department has imposed visa restrictions on eight Haitian officials who have committed human rights violations and/or corruption. In 2022, the State Department imposed visa restrictions on then-Senator Lambert for corruption and gross violations of human rights, as well as former Haitian Customs Director Rommel Bell and then-Senator Celestin for corruption. In 2023, the State Department invoked section 7031 (c) authorities to impose visa restrictions on Gary Bodeau, former senator Nenel Cassey, former prime minister Laurent Lamothe, and former prime minister Jean-Marie Bellerive for corruption. The State Department has reportedly privately revoked the visas of dozens of other officials and their families.

---

[98] For additional information, see CRS Report R47432, *Caribbean Trade Preference Programs*, by Liana Wong and M. Angeles Villarreal.

[99] For a description of how the Haiti-specific preference programs have evolved and have affected Haitian exports and Haitian workers, see U.S. International Trade Commission, *U.S.-Haiti Trade: Impact of U.S. Preference Programs on Haiti's Economy and Workers*, December 2022.

[100] Compiled by CRS using data from U.S. International Trade Commission DataWeb.

[101] See U.S. Department of the Treasury, Office of Foreign Assets Control (OFAC), available at https://ofac.treasury.gov/.

In addition, Haitian officials have been designated for drug trafficking pursuant to E.O. 14059, which implements the Fentanyl Sanctions Act (P.L. 116-92); this E.O results in visa bans and economic sanctions. Treasury designated Joseph Lambert, then-president of the Haitian senate, and former Senator Youri Latortue for involvement in drug trafficking in November 2022. Treasury designated then-Senator Rony Celestin and former Senator Herve Fourcand pursuant to E.O. 14059 in December 2022.

The United States has encouraged other international partners and the U.N. Security Council to impose sanctions on gang leaders and on the financial backers of Haitian gangs, recognizing that targeted sanctions imposed in a multilateral manner may have a better chance of affecting change than unilateral sanctions.[102] U.S. sanctions have been closely coordinated with those announced by the Government of Canada, which also imposed sanctions on former President Martelly for drug trafficking—a move U.S. officials have welcomed.[103] In October 2022, the U.N. Security Council unanimously approved Resolution 2653 to require member states to impose sanctions on Jimmy Chérizier.[104] The Security Council established a panel of experts to assess sanctions compliance and recommend additional individuals and entities to be subject to travel bans, asset blocking, and an arms embargo. The committee added the same four gang leaders designated by the United States to its list in December 2023. The United Kingdom and the European Union have also added those gang leaders to their sanctions lists.

Congress is considering legislation that would require reporting from the State Department and potential sanctions on Haitians who back criminal gangs. In July 2023, the House passed an amended version of the Haiti Criminal Collusion Transparency Act of 2023 (H.R. 1684), aimed at identifying and penalizing ties between Haitian political and economic elites and criminal gangs. The Senate Foreign Relations Committee reported a companion bill, S. 396, in May 2023. The bills would require the Secretary of State, in coordination with the intelligence community, to report annually to specific congressional committees identifying Haitian political and economic elites tied to gangs, among other topics. They also would require the President to impose visa restrictions and economic sanctions on those individuals pursuant to Section 7031(c) of annual foreign operations appropriations, Section 1263 of the Global Magnitsky Human Rights Accountability Act (Title XII, Subtitle F of P.L. 114-328), or any other provision of law. The President could waive those sanctions requirements if the President certifies that it is in the U.S. national interest to do so or is necessary for the delivery of humanitarian or related assistance.

## U.S. Department of Justice Cooperation

The U.S. Department of Justice (DOJ) has obtained three convictions in the Moïse assassination, assisted Haitian officials investigating the assassination, and pursued cases involving those complicit in arms trafficking, gang violence, kidnapping, and drug trafficking in and through Haiti. In November 2022, DOJ indicted seven leaders of five Haitian gangs involved in kidnappings of U.S. missionaries that took place in 2021; one of those individuals also has been charged with participating in a kidnapping that resulted in the death of a U.S. citizen in Haiti in

---

[102] U.S. Department of the Treasury, *Treasury 2021 Sanctions Review*, October 2021.

[103] Government of Canada, "Sanctions: Grave Breach of International Peace and Security in Haiti," updated December 19, 2022, at https://www.international.gc.ca/campaign-campagne/haiti-sanction/index.aspx?lang=eng; Jacqueline Charles and Michael Wilner, "Canada Sanctions Former Haiti President Michel Martelly, Two Former Prime Ministers," *Miami Herald*, November 21, 2022.

[104] U.N. Security Council, "Security Council Committee Established Pursuant to Resolution 2653 (2022) Concerning Haiti," at https://www.un.org/securitycouncil/sanctions/2653.

HaitiTPSAR000379

October 2022.[105] DHS has established a vetted Transnational Criminal Investigative Unit within the HNP to work with U.S. prosecutors on cases affecting both countries, including the trafficking of arms, drugs, and people.

## Weapons and Drug Trafficking

In March 2023, the U.N. Office on Drugs and Crime (UNODC) issued a report that examined how illicit drug and weapons trafficking have exacerbated gang-related violence in Haiti. The report includes recommendations for national, regional, and international responses to address illicit trafficking, strengthen port security, reinforce the capabilities of the HNP, and promote stability in Haiti.[106]

The State Department's *International Narcotics Control Strategy Report (INCSR)*, issued in March 2023, asserts that continuing instability, a weak justice system, corruption, and the HNP's inability to patrol the country's extensive borders have kept drug seizures low and inhibited bilateral antidrug efforts. Haiti's porous border with the Dominican Republic and corruption in the Haitian customs authority have enabled gangs to obtain illicit arms.

U.S. agencies have taken some steps to combat illicit trafficking to Haiti. In August 2022, the U.S. Department of Homeland Security (DHS) Homeland Security Investigations office in Miami, FL, announced new initiatives to counter reported spikes in arms trafficking to Haiti.[107] In December 2022, the State Department sanctioned Rommel Bell, former customs director in Haiti, for corruption after Haiti's anticorruption unit launched an investigation into Bell's alleged participation in arms trafficking. The U.S. Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) signed an agreement with the HNP in November 2023 to help Haitian police use ATF's e-Trace system to investigate crimes involving firearms. U.S. law enforcement agencies are also supporting a new CARICOM Crime Gun Intelligence Unit in Trinidad to investigate regional arms trafficking cases alongside national officials.

In December 2023, legislation was introduced in the House, H.R. 6618, that would, among other provisions, transfer the regulatory control of certain arms exports from the Department of Commerce to the Department of State. The bill also would require the State Department and other relevant agencies to produce a report within 180 days on illegal arms trafficking to Haiti and other countries covered by the bill (including Mexico and Central American and Caribbean countries). It would require that report to inform a subsequent U.S. strategy on how to better combat the trafficking of arms exported from the United States to those countries.

## Migration Issues

Stemming irregular migration to the United States continues to be a high priority for U.S. policy and Congress.[108] U.S. government apprehensions of Haitian migrants have risen notably, both at sea and on the U.S. Southwest border. In FY2023, U.S. Customs and Border Protection (CBP)

---

[105] U.S. Department of Justice, "Criminal Charges Unsealed Against Gang Leaders for Kidnappings of U.S. Citizens," November 7, 2020; "Haitian Gang Leader Charged with Hostage Taking Offenses That Resulted in the Death of a U.S. Citizen in Haiti in October 2022," October 24, 2023.

[106] U.N. Office on Drugs and Crime, *Haiti's Criminal Markets: Mapping Trends in Firearms and Drug Trafficking,* March 2023.

[107] U.S. Department of Homeland Security, "Homeland Security Investigations (HSI) Announces Crackdown on Firearms, Ammunition Smuggling to Haiti, the Caribbean," August 19, 2022.

[108] The International Organization for Migration (IOM) defines *irregular migration* as "movement of persons that takes place outside the laws, regulations, or international agreements governing the entry into or exit from the State of origin, transit or destination." IOM, "Key Migration Terms," at https://www.iom.int/key-migration-terms.

encountered 163,781 Haitians nationwide, up from 56,596 Haitians encountered in FY2022.[109] Some of those Haitians had resided in third countries (particularly Brazil and Chile) since the 2010 earthquake and had few ties to Haiti.[110] From October 2022 to January 2023, U.S. Coast Guard-reported interdictions and/or encounters of Haitian migrants exceeded 1,700.[111] From January-November 2023, Mexican officials encountered roughly 21,100 Haitians in an irregular status.[112] Some 44,200 Haitians requested asylum in Mexico during that period, making Haiti the largest source country of asylum seekers in Mexico.[113]

On January 5, 2023, DHS announced the expansion of an immigration parole program for Venezuelans to include Haitians, Nicaraguans, and Cubans.[114] Haitians who have a U.S. financial sponsor can apply for up to two years of immigration parole, and, after being vetted, fly directly into the interior of the United States. In April 2023, DHS added another requirement for participation in the program making any Haitian interdicted at sea after April 27 ineligible for the parole program.[115] As of December 2023, some 133,000 Haitians had been vetted and approved for travel to the United States under the program and 126,000 Haitians had been paroled into the United States under this process.[116]

In contrast, Haitians apprehended crossing the U.S. Southwest border between ports of entry are subject to removal (deportation) under immigration law and they may apply for asylum. The Biden Administration removed 717 individuals to Haiti in FY2023, down from 1,532 in FY2022.[117] Human rights advocates have urged U.S. officials to suspend removals to Haiti amid the country's deteriorating security situation.[118]

The United States also has taken steps to provide other legal migration and protection pathways for some Haitians. Some 155,000 Haitians may be eligible for relief from removal under the Temporary Protected Status (TPS) designation announced in May 2021, and an estimated 105,100 additional Haitians are eligible under the extension announced in December 2022.[119] In August 2023, the Biden Administration announced a modernized Haitian Family Reunification Parole Program. As in the past, the program will allow certain U.S. citizens and legal permanent residents to seek parole for family members in Haiti (or other countries); most of the process can now be completed online.[120]

---

[109] U.S. Customs and Border Protection, "Nationwide Encounters," https://www.cbp.gov/newsroom/stats/nationwide-encounters.

[110] Caitlyn Yates, *Haitian Migration Through the Americas: A Decade in the Making*, Migration Information Source, September 30, 2021.

[111] United States Coast Guard News, "Operation Vigilant Sentry: Stopping Illegal Migration at sea," January 27, 2023.

[112] Gobierno do México (GOM), *Boletín Mensual de Estadísticas Migratorias*, 2023, accessed January 30, 2024.

[113] GOM, Comisión Mexicana de Ayuda a Refugiados (COMAR),"La COMAR en Números," January 9, 2024.

[114] Department of Homeland Security (DHS), "DHS Implements New Processes for Cubans, Haitians, and Nicaraguans and Eliminates Cap for Venezuelans," January 6, 2022.

[115] DHS, "Implementation of a Change to the Parole Process for Haitians," 88 FR 26327 *Federal Register* 26327-26329, April 28, 2023.

[116] DHS, U.S. Customs and Border Protection (CBP), "CBP Releases December 2023 Monthly Update," January 26, 2024.

[117] DHS, U.S. Immigration and Customs Enforcement (ICE), *FY2023 Annual Report,* December 29, 2023.

[118] Human Rights Watch, *US/Haiti: Suspend Deportation Flights to Haiti,* September 27, 2023.

[119] See CRS Report RS20844, *Temporary Protected Status and Deferred Enforced Departure*, by Jill H. Wilson.

[120] DHS, "DHS Modernizes Cuban and Haitian Family Reunification Parole Processes," August 10, 2023.

# Outlook

The 118th Congress has maintained a keen interest in developments in Haiti, as deteriorating security and humanitarian conditions in the country intersect with a broad range of U.S. interests and policy responses. Among other actions, Congress has directly engaged with U.S. policy approaches toward Haiti in relation to foreign assistance, trade preferences, sanctions policy, and migration. Congress may fund, oversee, and assess new policy approaches to address the situation in Haiti, including the deployment of a U.S.-backed, multinational security force to the country.

# Author Information

Karla I. Rios
Analyst in Latin American Affairs

Clare Ribando Seelke
Specialist in Latin American Affairs

# Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.

HaitiTPSAR000382



# ecoi.net

Document #2107721

## USDOS – US Department of State (Author)

## 2023 Country Report on Human Rights Practices: Haiti

### EXECUTIVE SUMMARY

During the year, gang violence in Haiti expanded into previously unaffected regions, including the Artibonite and Center Departments. Kidnappings for ransom by armed gangs increased and affected all parts of society. There were no democratically elected government officials in office.

Significant human rights issues included credible reports of: arbitrary or unlawful killings, including extrajudicial killings; torture or cruel, inhuman, or degrading treatment or punishment by government agents; harsh and life-threatening prison conditions; arbitrary arrest or detention; serious problems with the independence of the judiciary; serious abuses in a conflict, including widespread civilian deaths or harm, enforced disappearances or abductions, torture, and physical abuses; inability of citizens to change their government peacefully through free and fair elections; serious government corruption; extensive gender-based violence, including sexual and other forms of violence; substantial barriers to sexual and reproductive health services access; trafficking in persons, including forced labor; crimes involving violence and threats of violence targeting lesbian, gay, bisexual, transgender, queer, or intersex persons; and existence of some of the worst forms of child labor.

The government did not take credible steps to identify and punish officials who may have committed abuses.

HaitiTPSAR000383

Gang violence continued at high rates in the Port-au-Prince metropolitan area. Some gangs allegedly received support from political and economic elites. Armed gangs were also responsible for conflicts resulting in killings, brutal attacks on citizens, targeted instances of sexual violence, mutilation of human remains, widespread displacement, and the destruction of homes and property.

## Section 1.

## Respect for the Integrity of the Person

## A. ARBITRARY DEPRIVATION OF LIFE AND OTHER UNLAWFUL OR POLITICALLY MOTIVATED KILLINGS

There were several reports that the government or its agents committed arbitrary and unlawful killings, including extrajudicial killings. Between April and June, the Human Rights Office of the UN Integrated Office in Haiti (BINUH) documented at least 18 killings of northeast neighborhood residents in Tabarre, Port-au-Prince, by individuals in police uniforms. BINUH referred these cases to Haitian National Police (HNP) authorities, who stated police would investigate accordingly.

Local media documented seven cases of alleged extrajudicial killings of gang members in the Nippes Department, led by the state commissioner (state prosecutor) Jean Ernst Muscadin. Muscadin did not deny his involvement in the killings and frequently used social media to announce Nippes was a "graveyard for bandits."
The *bwa kale* (peeled wood) vigilante movement began in April; residents targeted and killed alleged gang members across the country. Human rights and UN representatives reported some victims were seized from police custody or otherwise encouraged by HNP members to do so.

Authorities made progress investigating the 2021 assassination of President Moïse. As of September, the investigative judge assigned to the case had questioned nearly 60 individuals, issued 30 arrest warrants, and charged 39 detainees. Investigating Judge Walter W. Voltaire also asked the Port-au-Prince prosecutor to summon the prime minister and other government officials to testify before the court; their testimonies were pending authorization by the Council of Ministers. Many members of civil society organizations and the government continued to believe the judiciary did not have the capacity to handle such a complex, sensitive, and politicized crime.

The government and judiciary made minimal progress on a growing list of emblematic killings. While authorities stated they continued to investigate large-scale attacks in the Port-au-Prince neighborhoods of Grande Ravine

HaitiTPSAR000384

(2017), Bel Air (2018), La Saline (2019), and Cité Soleil (2020), each of which left dozens dead, the government had yet to bring any perpetrators to justice. For example, the investigative judge assigned to the La Saline case, Jean Wilner Morin, interviewed only two suspects in July.

## B. DISAPPEARANCE

There were no reports of enforced disappearances by or on behalf of government authorities.

## C. TORTURE AND OTHER CRUEL, INHUMAN, OR DEGRADING TREATMENT OR PUNISHMENT, AND OTHER RELATED ABUSES

Although the constitution prohibited such practices, credible reports from nongovernmental organizations (NGOs) suggested HNP officers occasionally beat or abused detainees and suspects. BINUH and the Office of Citizens' Protection (OPC), an independent government ombudsman, documented cases of abuse in prisons.

Impunity remained a significant problem in the HNP. Civil society representatives alleged widespread impunity among police officers, driven largely by poor training and a lack of professionalism, as well as rogue elements within the HNP who allegedly maintained gang connections.

## Prison and Detention Center Conditions

Prison conditions were harsh and life threatening due to severe overcrowding, food shortages, and inadequate medical care.

**Abusive Physical Conditions:** Overcrowding at prisons and detention centers was severe. According to BINUH estimates, the nationwide cell occupancy rate was 331 percent above the designed capacity.

The Directorate of Prison Administration reported most prisoners received only one meal daily, of low nutritional quality. Detainees reported that without financial support or family members bringing them food, they had nothing to eat. Human rights representatives alleged food shortages were a result of widespread corruption.

Medical care for prisoners was provided almost exclusively by the NGO Health Through Walls, which had limited capacity to treat serious and life-threatening conditions. There was inadequate medical care to stop the spread of infections such as tuberculosis or scabies. The Directorate of Prison Administration reported that as of September 11, 200 prisoners had died of food shortage illnesses and other causes since January.

HaitiTPSAR000385

Prisoners in many prisons and detention centers, including the National Penitentiary in Port-au-Prince, did not have regular access to sanitary facilities and were required to relieve themselves in plastic bags they had to purchase. Prisoners at the National Penitentiary and at Les Cayes had extremely limited opportunities to leave their cells. Civil society and human rights representatives alleged gang members and wealthy individuals received special treatment while in detention and were sometimes released without proper cause.

**Administration:** OPC representatives regularly visited prisons and detention facilities, which allowed them to investigate credible allegations of inhuman conditions in prisons and make recommendations to government authorities.

**Independent Monitoring:** The Directorate of Prison Administration permitted the United Nations, local human rights NGOs, the International Committee of the Red Cross, and other organizations to monitor prison conditions.

## D. ARBITRARY ARREST OR DETENTION

The law prohibited arbitrary arrest and detention and provided for the right of any person to challenge the lawfulness of their arrest or detention in court. The government generally failed to observe these requirements.

### Arrest Procedures and Treatment of Detainees

The constitution stated authorities could arrest a person only if that person was in the act of committing a crime or if the arrest was based on a warrant issued by a competent official such as a justice of the peace or magistrate. Authorities were required to bring the detainee before a judge within 48 hours of arrest. The OPC stated authorities generally did not respect the 48-hour rule.

While authorities generally acknowledged the right to counsel, most detainees could not afford a private attorney. The Office of Legal Assistance was required to provide free legal assistance to anyone the office coordinator determined was unable to afford such assistance. OPC staff and human rights representatives reported, however, that shortages of funding, a limited number of lawyers, and the small number of court hearings hampered the effectiveness of the office.

There was a bail procedure, but it was rarely used.

The law required prosecutors to routinely visit detention centers and police stations to provide for proper treatment of detainees and respect

HaitiTPSAR000386

for arrest procedures; OPC staff stated these visits rarely occurred.

**Arbitrary Arrest:** Independent observers confirmed instances of police arresting individuals without warrants even when those individuals were not apprehended while committing a crime, or with improperly prepared warrants. Authorities frequently detained individuals on unspecified charges. Human rights organizations reported police sometimes arrested large groups of persons attending protests or near crime scenes without attempting to ascertain who was committing a crime.

Civil society and human rights organizations alleged some repatriated citizens were detained after their repatriation despite having committed no crime in the country. These organizations alleged the individuals were held illegally by government officials who sought to secure bribes in exchange for their release.

**Pretrial Detention:** Illegal and prolonged pretrial detention was a problem due to the arbitrary application of court rules, arbitrary judicial discretion, corruption, and poor recordkeeping. Many pretrial detainees never consulted with an attorney, appeared before a judge, or received a docket timeline. In some cases, detainees spent years in detention without appearing before a judge. Local human rights groups reported prisoners were often held even after completing their sentences, due to difficulty obtaining release orders from the prosecutor's office. Some prisoners were held longer in pretrial detention than the mandatory sentences for their accused crimes.

## E. DENIAL OF FAIR PUBLIC TRIAL

The law provided for an independent judiciary; however, the government did not respect judicial independence and impartiality. Judicial independence continued to erode, according to all major national magistrate and judges' associations and human rights activists. On February 28, Prime Minister Henry and the High Transition Council appointed eight judges to complete the Supreme Court and allow it a quorum to resume operations.

Senior officials in the executive branch exerted significant influence on the judicial branch and law enforcement, according to local and international human rights organizations. The organizations alleged politicians routinely influenced judicial decisions and used the justice system to target political opponents.

Detainees reported credible cases of extortion, false charges, illegal detention, physical violence by police, and judicial officials' refusals to comply with basic due process requirements. The executive branch had

HaitiTPSAR000387

the power to name and dismiss public prosecutors and court clerks at will. Judges faced less direct pressure from the executive branch because they served for fixed-term mandates, but civil society organizations and judges reported a fear of ruling against powerful interests due to concern for job security and personal safety.

The law required each of the country's 18 jurisdictions to convene jury and nonjury trial sessions twice per year, usually in July and December, for charges involving major, violent crimes. In September a Port-au-Prince judge reported nonjury cases resumed in the city for the first time in five years.

Corruption and a lack of judicial oversight severely hindered the right to a fair public trial. Human rights organizations reported several judicial officials, including judges and court clerks, arbitrarily charged fees to begin criminal prosecutions. Observers claimed judges and prosecutors ignored defendants who did not pay the fees.

There were credible allegations of unqualified and nonprofessional judges who received judicial appointments as political favors. There were also persistent accusations that court deans, responsible for assigning cases to judges for investigation and review, at times assigned politically sensitive cases to judges with close ties to the executive and legislative branches. Many judicial officials reportedly held full-time jobs outside the courts, although the constitution barred this practice except when teaching. In June the Superior Judicial Council declined to certify 30 magistrates because the magistrates had misrepresented their credentials, engaged in corruption, or committed other breaches of conduct. Of these noncertified magistrates, however, only one was removed from his position.

Judges were required to order a trial or dismiss the case within six months. Judges and other judicial actors frequently did not meet this deadline due to insecurity, corruption, or other noncompliance problems, resulting in unlawful and prolonged pretrial detention for many detainees.

Persistent strikes by clerks, lawyers, judges, and prosecutors hindered timely court proceedings. Nationwide strikes by court clerks and magistrates from March through June prevented most courts from conducting hearings during that period.

The lack of an elected president since the 2021 assassination of Jovenel Moïse and the absence of an elected parliament were major obstacles to maintaining a functioning judiciary. Individual lawyers, judges, and clerks in the Port-au-Prince area reported believing they were unsafe traveling to

HaitiTPSAR000388

work, which led to delayed trials and exacerbated pretrial detention. Human rights groups stated corruption and demands for bribes delayed the trial process.

Despite the July 2022 relocation of the Port-au-Prince Court of First Instance to the headquarters of the OPC for security reasons, the court lacked proper security mechanisms, and armed men robbed the new facilities on May 24. Although the former prosecutor for the court reported no sensitive documents were taken, the robbers stole weapons, money, and other documents from the court.

## Trial Procedures

The constitution provided for the right to a fair and public trial, but the judiciary did not uniformly enforce this right. Authorities widely ignored constitutional trial and due process rights.

Defendants had the right to the assistance of an attorney of their choice, but legal aid programs were limited, and those who could not pay for attorneys were not always provided one free of charge. The law did not specifically provide a defendant time to prepare an adequate defense. Defendants had the right to confront hostile witnesses and present their own witnesses and evidence, but judges often denied these rights. The perception of widespread impunity discouraged some witnesses from testifying at trials.

While French and Haitian Creole were both official languages, despite Haitian Creole being the most commonly spoken language, all laws were written and most legal proceedings conducted in French. Observers noted judges generally ensured defendants fully understood the proceedings.

The functioning of justice of the peace courts, the lowest courts in the judicial system, was inadequate. Justices presided based on their personal availability and often maintained separate, full-time jobs. Law enforcement authorities rarely maintained order during court proceedings, and frequently there was no court reporter. To avoid lengthy waits, defendants would often bribe judges to have their cases heard.

In many communities, especially in rural areas, elected communal administrators with no legal judicial authority took on the role of state judges and asserted powers of arrest, detention, and issuance of legal judgments. Some communal administrators turned their offices into courtrooms.

## Political Prisoners and Detainees

HaitiTPSAR000389

There were no reports of political prisoners or detainees.

## F. TRANSNATIONAL REPRESSION

Not applicable.

## G. PROPERTY SEIZURE AND RESTITUTION

Not applicable.

## H. ARBITRARY OR UNLAWFUL INTERFERENCE WITH PRIVACY, FAMILY, HOME, OR CORRESPONDENCE

The law prohibited such actions, and there were no reports the government failed to respect these prohibitions.

## I. CONFLICT-RELATED ABUSES

Armed gangs, some alleged to be supported by political and business actors, dramatically increased their territorial holdings throughout the metropolitan Port-au-Prince area and north into the Artibonite Department, including areas traditionally considered safe. Intergang conflicts, gang operations, and HNP attacks on gangs resulted in the death of hundreds of residents. Reports emerged of serious human rights abuses, including cannibalism and violent destruction of human remains, which were publicized for maximum psychological effect; the targeted use of collective and repeated sexual violence; the targeting of telecommunications and electric infrastructure; and the deliberate destruction of homes and businesses. In addition to gang violence, the nationwide vigilante bwa kale movement, composed of neighborhood residents, killed alleged gang members. BINUH reported gang violence killed 2,853 persons between January and August, including members of the HNP, alleged gang members, and neighborhood residents. Approximately 86 percent of killings occurred in the West Department, which included Port-au-Prince.

The Grand Ravine gang, led by Renel "Ti Lapli" Destine, continued attempting to seize the Carrefour-Feuilles area south of Port-au-Prince and launched attacks of increasing intensity on HNP and residents beginning in April and intensifying significantly in August.

The Eyes Wide Open Foundation reported a marked increase in gang violence in the Artibonite Department, immediately north of Port-au-Prince. The two largest gangs active in that area – Gran Grif and Kokorat Sans Ras – expanded their territories to control much of the lower Artibonite between July and September.

HaitiTPSAR000390

In July the Kraze Baryè gang, led by Vitel'Homme Innocent, seized control of much of the Tabarre neighborhood of Port-au-Prince. Human rights representatives and security sources reported that beginning on July 23, the gang sent squads of armed men through the area in a show of force to displace residents.

**Killings:** Violence continued at high rates within gang-controlled areas. From April through June, BINUH estimated at least 176 neighborhood residents were killed by gangs' snipers as they tried to enter and exit portions of Cité Soleil.

The Center for Analysis and Research in Human Rights estimated that between April 24 and June 24, vigilantes participating in the bwa kale movement killed 204 alleged gang members across all 10 departments. BINUH reported that on August 11-14, at least 28 residents were killed in the Grand Ravine gang's attacks on Carrefour-Feuilles.

On August 26, a local pastor led a large group of parishioners, armed with sticks, machetes, and other rudimentary weapons, on a march to gang-controlled Canaan. The Canaan gang, led by Jeff Larose, attacked the group when they arrived. BINUH estimated gang members killed 10 parishioners and kidnapped dozens more.

**Abductions:** Armed gangs in the Port-au-Prince metropolitan area and around the country continued the practice of kidnapping for ransom. As of June 30, BINUH reported 2,029 kidnappings for ransom, the majority of which occurred in the West Department, which included Port-au-Prince. These data, however, included only kidnappings reported to authorities; observers believed the actual number was likely higher. Human rights organizations reported gangs subjected those they kidnapped to mistreatment, including deprivation of food, physical and sexual violence, and other abuses. There were several reports of gangs inflicting and videotaping sexual violence against victims to pressure families to pay ransoms more quickly.

**Physical Abuse, Punishment, and Torture:** Investigations by several UN and human rights organizations concluded gangs in the metropolitan Port-au-Prince area systematically employed sexual violence as a tool of degradation and community control in gang-controlled and gang violence-prone areas. Armed groups raped women, girls, men, and boys with impunity and often in public places as gangs conquered new territory, fought in intergang conflicts, and sought to maintain control over territories. Survivors reported instances of rape by multiple aggressors in short periods of time, being penetrated by objects, and being raped in front of family members. Gangs videotaped and circulated sexual assaults

HaitiTPSAR000391

of kidnapped women and girls to pressure their families to pay ransoms. Human rights organizations also reported instances of gender-based violence as "retaliation" by one gang against populations controlled by rival gangs. Sexual violence remained widely underreported, especially among male survivors. BINUH reported at least 49 women and girls were raped by G-9 allied gang members in Cité Soleil as part of an April attack against the Brooklyn zone.

Armed groups filmed acts of decapitation, butchery, and cannibalism and circulated video on social media to terrorize police as well as members of rival gangs. Vigilante groups also shared footage of alleged gang members being burned alive.

Following the August 26 march of parishioners to the gang-controlled Canaan area, members of the Canaan gang circulated footage of themselves beating and torturing members of the church group.

**Other Conflict-related Abuse:** Gangs continually targeted schools, churches, and hospitals. On February 6, members of the Ti Makak gang invaded the Ecole Satigny, an elementary school south of Pétionville, and held its students hostage for several hours. Doctors Without Borders reported several attacks on their hospital facilities throughout Port-au-Prince, including a January 27 attack where gang members dragged a patient out of the hospital and executed him less than 15 yards from hospital grounds.

During the Grand Ravine gang's attacks against the Carrefour-Feuilles neighborhood beginning in April, gang members looted and burned homes en masse to displace residents and prevent any resistance. Grand Ravine members also disabled power infrastructure on August 14; as of September 12, the surrounding areas remained without power. Gang violence caused extensive displacement in the metropolitan area of Port-au-Prince.

## Section 2.

## Respect for Civil Liberties

### A. FREEDOM OF EXPRESSION, INCLUDING FOR MEMBERS OF THE PRESS AND OTHER MEDIA

The constitution provided for freedom of expression, including for members of the press and other media, and the government generally respected this right. Civil society observers, however, noted this right was not always upheld or respected, due principally to gang violence.

HaitiTPSAR000392

**Violence and Harassment:** Journalists reported a deteriorating security climate and said some journalists resorted to self-censorship to avoid being publicly targeted by political or gang leaders. Notably, as part of an attack on the lower Artibonite town of Liancourt, members of the Gran Grif gang burned down the Radio Antartique broadcasting station on July 23. The station's director and founder Roderson Elias said he believed the gang deliberately targeted the station. These attacks led many journalists to be fearful of reprisal. Other journalists said they received threats related to their coverage of gang activities.

**Nongovernmental Impact:** Journalists covering gang violence reported they feared reprisals from gangs; several incidents heightened these fears. On April 15, radio journalist Dumesky Kersaint was shot and killed by armed individuals in the gang-controlled Carrefour neighborhood of Port-au-Prince. On April 26, Ricot Jean, a journalist at Radio-Télé Evolution Inter in Saint-Marc, was killed by armed individuals. On May 7, armed individuals killed radio presenter Paul D. Jean Marie in Onaville, an area near gang-controlled Canaan, north of Port-au-Prince.

## Internet Freedom

The government did not restrict or disrupt access to the internet or censor online content.

## B. FREEDOMS OF PEACEFUL ASSEMBLY AND ASSOCIATION

The constitution provided for the freedoms of peaceful assembly and association, and the government generally respected these rights.

## Freedom of Peaceful Assembly

Organizers of planned gatherings were required to inform police in advance of planned gatherings, but police could not prevent them. There were reports of police using inappropriate force against protesters.

## Freedom of Association

Organizations representing the lesbian, gay, bisexual, transgender, queer, and intersex (LGBTQI+) community reported difficulties registering their organizations with the government, although no law restricted their registration.

## C. FREEDOM OF RELIGION

See the Department of State's *International Religious Freedom Report* at https://www.state.gov/religiousfreedomreport/.

## D. FREEDOM OF MOVEMENT AND THE RIGHT TO LEAVE THE COUNTRY

HaitiTPSAR000393

The law provided for freedom of internal movement, foreign travel, emigration, and repatriation, and the government generally respected these rights. The government's capacity to ensure the freedom of internal movement and repatriations was weakened by gang violence in the capital.

## E. PROTECTION OF REFUGEES

**Access to Asylum:** The law provided for granting refugee status or asylum through Haitian embassies or consulates abroad, and the government had established a system for providing protection to refugees. Third-country nationals could petition for asylum through the local office of the UN High Commissioner for Refugees.

## F. STATUS AND TREATMENT OF INTERNALLY DISPLACED PERSONS (IDPS)

Intergang clashes and generalized gang violence caused widespread displacement throughout the metropolitan area of Port-au-Prince. According to the International Organization for Migration and the Directorate General for Civil Protection, there were more than 194,600 IDPs as of June 30. Nearly 20,000 persons were displaced on August 12-15 alone because of gang expansion in the Carrefour-Feuilles neighborhood south of Port-au-Prince. In gang-controlled neighborhoods and areas where gangs were active, gang members destroyed homes, property, and vehicles; killed and injured neighborhood residents; and limited economic opportunities. As a result, residents of these neighborhoods left their homes to shelter with family and friends in surrounding areas or in informal reception centers.

The government had extremely limited capacity to address the needs of IDPs, especially strained due to the large-scale increases in displacement in July and August. External partners and donors, in partnership with the Haitian General Directorate for Civil Protection, provided most of the humanitarian assistance to survivors and IDPs.

For further information about IDPs in the country, please see the materials of the Internal Displacement Monitoring Center: https://www.internal-displacement.org .

## G. STATELESS PERSONS

Statelessness and the risk of statelessness was a major problem for individuals within and outside the country, especially for citizens along the border with the Dominican Republic. Although the Civil Registry and Office of National Identification issued 4.4 million new adult identification cards by February, thousands still lacked documentation, and when

HaitiTPSAR000394

undocumented citizens migrated irregularly to the Dominican Republic, they became stateless. Many children born in the Dominican Republic to Haitian parents also became stateless.

## Section 3.

## Freedom to Participate in the Political Process

The law provided citizens the ability to choose their government in free and fair periodic elections held by secret ballot and based on universal and equal suffrage. A long-running political impasse, complicated by the 2021 assassination of President Moïse, delayed legislative elections, originally scheduled for 2019 and 2020. Parliament was unable to function since neither the upper nor the lower house had any elected members. As of September, it remained unclear when elections would occur. Prime Minister Henry was negotiating with opposition parties to build a transitional government that could nominate a credible Provisional Electoral Council to oversee eventual elections.

## ELECTIONS AND POLITICAL PARTICIPATION

**Abuses or Irregularities in Recent Elections:** Legislative, municipal, and presidential elections were last held in 2016-17. While there were isolated allegations of voter fraud, the elections were generally regarded as credible by international and domestic observers.

**Participation of Women and Members of Marginalized or Vulnerable Groups:** No laws limited the participation of women or members of marginalized or vulnerable groups in the political process, but social norms suggesting elected officials should be "tough" and masculine, in addition to the threat of electoral violence, discouraged women from voting and, to a much greater extent, from running for office. Women politicians stated they faced significant resistance from colleagues and community members and were often told that as women they were not "strong" enough to "fight" in the violent nature of the country's politics.

## Section 4.

## Corruption in Government

The law provided criminal penalties for a wide variety of acts of corruption by officials. The government did not implement the law effectively. There were numerous reports of government corruption and a perception of impunity for abusers.

**Corruption:** Customs revenues increased significantly following the September 2022 departure of former Director General of the General Customs Administration, Romel Bell, after an investigation was opened by

the Anticorruption Unit. Private-sector sources alleged, however, that part of this increase was due to a lack of oversight on customs fees, which allowed customs officials to increase fees arbitrarily.

Human rights activists continued to allege corruption fueled gang violence, since diverted government funds were believed to contribute to financing of gangs. The NGO Haitian National Human Rights Defense Network stated corruption in public agencies led to trafficking of arms and drugs.

For additional information about corruption in the country, please see the Department of State's *Investment Climate Statement* for the country, and the Department of State's *International Narcotics Control Strategy Report*, which includes information on financial crimes.

## Section 5.

## Governmental Posture Towards International and Nongovernmental Monitoring and Investigation of Alleged Abuses of Human Rights

Several domestic and international human rights groups operated without government restriction to monitor and investigate human rights conditions or cases and publish their findings. Government officials generally cooperated with human rights groups, although they disagreed at times on the scope of certain problems and the most appropriate means of addressing them.

**Retribution against Human Rights Defenders:** Human rights groups believed they were unsafe or targeted by armed groups. Groups reporting on kidnapping, gang activities, or other human rights concerns were likely to receive threats from armed groups.

**The United Nations or Other International Bodies:** Despite UN efforts to open a local branch of the Office of the UN High Commissioner for Human Rights, as of September the government had not signed a host-country agreement.

**Government Human Rights Bodies:** The OPC's mandates were to investigate allegations of human rights abuse and to work with international organizations to implement programs to improve human rights. Human rights groups had generally favorable opinions of the OPC and its work and did not allege any infringement on its independence; however, they cited a lack of resources as a major hindrance to its operations.

## Section 6.

HaitiTPSAR000396

## Discrimination and Societal Abuses

### WOMEN

**Rape and Domestic Violence:** The law prohibited rape of women and men, as well as spousal and domestic or intimate partner rape and other forms of domestic and sexual violence, including so-called corrective rape of LGBTQI+ persons. The law did not recognize spousal rape as a crime. The penalty for conviction of rape was a minimum of 10 years of forced labor. In the case of gang rape, the maximum penalty was forced labor for life. The law was not enforced.

Sexual violence was rarely prosecuted, and cases were often settled outside the legal system under pressure from community and religious leaders. In cases of pregnancy, there was generally a monetary settlement calling on the rapist to pay for prenatal care and birth costs, and occasionally calling on the rapist to acknowledge the child as his own. In cases of adultery, the law excused a husband who killed his wife, her partner, or both if found engaging in adultery in the husband's home, but a wife who killed her husband under similar circumstances was subject to prosecution.

The law did not classify domestic violence against adults as a distinct crime. Women's rights groups, HNP leadership, and human rights organizations reported domestic violence against women was commonplace.

Survivors of gender-based violence faced major obstacles in seeking legal justice, as well as in accessing protective services such as women's shelters. The Ministry on the Status and Rights of Women reported insufficient funding to provide adequate support to survivors nationwide. Civil society organizations reported many survivors did not report cases of violence to government entities because of social pressure, fear of retaliation, especially in gang-related cases, a lack of confidence in the judicial system, and a lack of logistical and financial resources. Survivors preferred to seek support from NGOs.

According to some civil society organizations, many local nonprofit organizations that provided shelter, medical services, psychological services, and legal assistance to victims had to reduce services due to a lack of funding. There were reports that in rural areas, criminal cases, including cases of gender-based violence, were frequently settled outside the justice system. In such cases, local leaders often pressured family members to come to financial settlements with the accused to avoid

HaitiTPSAR000397

social discord and embarrassment. According to judicial observers, prosecutors often encouraged such settlements.

**Other Forms of Gender-based Violence and Harassment:** The feminist organization Neges Mawon reported invasive and violent "virginity checks" persisted. These were typically performed by family members on young women, sometimes using foreign objects. Neges Mawon also reported instances of young women being "prepared for intercourse" using foreign objects.

The law did not specifically prohibit sexual harassment, although the labor code stated men and women had the same rights and obligations. Observers indicated sexual harassment occurred frequently. There were no formal governmental programs to combat it on a national scale.

**Discrimination:** Women did not enjoy the same social and economic status as men. The constitution required 30 percent of political candidates, elected officials, and civil servants be women. The government generally enforced the constitutional provision effectively.

The law prohibited economic discrimination on the basis of gender, including for access to employment. The law was not enforced. Women faced barriers to accessing economic inputs and securing collateral for credit, information on lending programs, and other resources. Women faced restricted job opportunities, lower pay, and reduced access to banking and other support services.

In the private sector, several industries, including public transportation and construction, which in the past were male oriented, employed women workers at the same pay scale as men. Despite these improvements, gender discrimination remained a major concern. There was no governmental assessment or report on discrimination in the workplace. Better Work Haiti (BWH) reported a case of sexual harassment, two cases related to gender discrimination, and one case related to race and origin discrimination in its January-June synthesis report. In another factory, BWH assessments revealed that 19 women workers were terminated from their employment during pregnancy, maternity leave, and breastfeeding periods.

**Reproductive Rights:** There were no reports of coerced abortion or involuntary sterilization on the part of government authorities.

Social and economic barriers, including limited access to clinics and stigma against contraception use, remained for those seeking or accessing contraception. Cultural and historical barriers against the use of

HaitiTPSAR000398

the intrauterine device and contraception more generally persisted. Women living in poverty or in rural areas experienced significant obstacles accessing comprehensive reproductive health care due to insecurity, high transport costs, and a general lack of health-care availability in rural areas. Emergency contraceptives were available, although health providers noted they were not always distributed equitably between rural and urban areas or among individuals of varying income levels.

The government had protocols governing the provision of service to survivors of gender-based violence. Emergency contraception was part of a mandatory package of services for the clinical management of rape cases, according to government protocols. The Ministry on the Status and Rights of Women, along with local women's groups and health-care centers, aimed to provide postexposure prophylaxis, but resource constraints and lack of access to gang-controlled and rural areas prevented their delivery to many survivors. Although the Ministry of Health was responsible for maintaining these protocols and practices, donors and NGO partners provided nearly all such care.

In many rural areas, *sage femmes*, or community birth attendants, were the most common provider of maternal care. Although some received formal training, most had trained as apprentices to other sage femmes in their communities and practiced based on traditional methods of maternal care. In metropolitan areas, some women elected to give birth at home with a sage femme rather than in a health facility. Observers noted the choice could have been rooted in a desire for client-centered care, particularly for respectful maternity care.

A major cause of maternal deaths was the lack of formally trained birth attendants in rural areas. Other reasons included geographic difficulties in accessing health facilities and financial barriers to primary health care. Of the country's 571 communal sections (local districts), 125 had no health facilities. The proportion of births attended by skilled health personnel was 42 percent. The adolescent birth rate for those ages 15 to 19 was 100 per 1,000 girls due to a lack of contraceptive access, sexual violence, and other causes.

Stigma regarding menstruation persisted, and women's organizations reported significant barriers to menstrual hygiene for women and girls in rural areas, including lack of access to clean water and lack of income to purchase supplies. Although there were no legal barriers to women's access to education or employment when they became pregnant, observers reported many young women dropped out of school because of early pregnancies. Girls also reported not attending school when they were menstruating.

HaitiTPSAR000399

## SYSTEMIC RACIAL OR ETHNIC VIOLENCE AND DISCRIMINATION

The constitution provided for equal protection of all citizens, without discrimination. The constitution also established the OPC to protect "all individuals against any form of abuse by the government." The government did not enforce the law effectively.

There were high levels of colorism (prejudice or discrimination against individuals with a dark skin tone) and ethnic discrimination against the Syrian-Lebanese community, which controlled many aspects of the economy.

## CHILDREN

**Birth Registration:** Birth registration faced logistical and resource obstacles. The government did not register all births immediately. Obtaining birth certificates for children was a problem throughout the country. Children born in rural communities were less likely to be documented than children in urban areas. Birth certificates were required when citizens applied for the national biometrically enabled identification cards required for voting.

**Child Abuse:** The law prohibited domestic violence against children. The government lacked an adequate legal framework to support or enforce mechanisms to fully promote children's rights and welfare.

The practice of *restaveks*, or children born into poor families and offered to wealthier ones as domestic workers in exchange for the child receiving education, food, and shelter, remained a serious concern. Human rights representatives emphasized restavek children were highly vulnerable to psychological, physical, and sexual abuse, and trafficking in forced begging and commercial sex.

The Ministry of Social Affairs' Institute for Social Well-Being and Research observed that children living in gang-affected areas, primarily in Port-au-Prince, were highly vulnerable to exploitation by gang members. Children were often recruited as gang lookouts or forced into sexual relationships with gang members. The government was limited in its resources to go into these areas to identify, extract, and provide protection services to children forced to work for gangs.

**Child, Early, and Forced Marriage:** The legal age of marriage was 18 for men and 15 for women. Early and forced marriages were not widespread customs; however, forced marriages between rape survivors and their rapists occurred occasionally. Legal marriage was uncommon, and many

HaitiTPSAR000400