# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FRITZ EMMANUEL LESLY MIOT;
RUDOLPH CIVIL; MARLENE GAIL
NOBLE; MARICA MERLINE LAGUERRE;
and VILBRUN DORSAINVIL,

     *Plaintiffs*,

     v.

DONALD J. TRUMP, President of the United
States of America; UNITED STATES OF
AMERICA; THE DEPARTMENT OF
HOMELAND SECURITY; and KRISTI
NOEM, Secretary of Homeland Security,

     *Defendants*.

Case No. 1:25-cv-02471

<u>ORAL ARGUMENT REQUESTED</u>

<br><br>

## PLAINTIFFS' RENEWED MOTION
### AND
## MEMORANDUM OF LAW IN SUPPORT OF RENEWED MOTION
### <u>FOR A STAY UNDER 5 U.S.C. § 705</u>

# TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................................................... i

TABLE OF AUTHORITIES .............................................................................................. iii

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 3

    A.    The TPS statute restricts the Secretary of Homeland Security's authority to terminate a country's TPS designation. ........................................................... 3

    B.    Haiti has been designated for TPS since 2010. .................................................. 5

    C.    The Trump administration has terminated Haiti's TPS designation. ..................... 7

        1.    Secretary Noem "partially vacated" Secretary Mayorkas's July 2024 extension of Haiti's TPS designation. ......................................................... 8

        2.    Secretary Noem terminated Haiti's TPS designation the day that the "partial termination" was held unlawful. .................................................. 10

        3.    Secretary Noem issued a superseding termination notice after Plaintiffs challenged the July 1 termination notice. ................................................. 12

    D.    Termination of Haiti's TPS designation will irreparably harm Plaintiffs. ............ 14

ARGUMENT ...................................................................................................................... 21

I.    Plaintiffs are likely to succeed on the merits. .................................................... 21

    A.    The termination is arbitrary and capricious. ...................................................... 21

        1.    The termination was predetermined. ......................................................... 22

        2.    The termination relies on an unexplained departure from past practice. ... 24

        3.    The Secretary did not observe procedure required by law. ...................... 25

        4.    The explanation for the termination is implausible and contrary to the evidence. ................................................................................................. 26

            a.    The Secretary's determination that it is safe to return to Haiti is implausible and contrary to facts known to the agency. ............... 26

            b.    The Secretary's stated rationale does not support termination. .... 31

            c.    The Secretary's stated rationale is internally contradictory. .......... 33

    B.    The termination is contrary to constitutional right and power. ............................ 34

        1.    The termination is contrary to constitutional right. .................................. 34

        2.    The termination is contrary to constitutional power. ............................... 39

II.    Plaintiffs will suffer irreparable harm absent a stay. ......................................... 42

III.    Postponing the termination is in the public interest. .......................................... 43

CONCLUSION ........................................................................................................... 45

CERTIFICATE OF SERVICE ................................................................................... 47

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.L.A. Schechter Poultry Corp. v. United States*,
295 U.S. 495 (1935).....................................................................................42

*ABM Onsite Servs.-W., Inc.v. Nat'l Lab. Rels. Bd.*,
849 F.3d 1137 (D.C. Cir. 2017)...................................................................25

*Aracely R. v. Nielsen*,
319 F. Supp. 3d 110 (D.D.C. 2018)..............................................................43

*Cath. Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Rev.*,
513 F. Supp. 3d 154 (D.D.C. 2021)..............................................................21

*Centro Presente v. U.S. Dep't of Homeland Sec.*,
332 F. Supp. 3d 393 (D. Mass. 2018) ...............................................7, 35, 37

*City of Kansas City v. Dep't of Hous. & Urban Dev.*,
923 F.2d 188 (D.C. Cir. 1991)......................................................................33

*Cuomo v. U.S. Nuclear Regul. Comm'n*,
772 F.2d 972 (D.C. Cir. 1985)......................................................................21

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016).....................................................................................25

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009).....................................................................................25

*Fed. Energy Admin. v. Algonquin SNG, Inc.*,
426 U.S. 548 (1976).....................................................................................40

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
561 U.S. 477 (2010).....................................................................................39

*Gomez v. Trump*,
485 F. Supp. 3d 145 (D.D.C. 2020), *amended in part*, 486 F. Supp. 3d 445,
*amended in part sub nom. Gomez v. Biden*, 2021 WL 1037866 (D.D.C. 2021) ....................40

*Gundy v. United States*,
588 U.S. 128 (2019).....................................................................................40

*Haitian Evangelical Clergy Ass'n v. Trump*,
789 F. Supp. 3d 255 (E.D.N.Y. 2025) ................................................8, 9, 24, 43

*Harris v. Bessent,*
   775 F. Supp. 3d 86 (D.D.C. 2025) ......................................................................45

*Horizon Lines, LLC v. United States,*
   414 F. Supp. 2d 46 (D.D.C. 2006) ......................................................................33

*J. W. Hampton, Jr. & Co. v. United States,*
   276 U.S. 394 (1928)......................................................................................39, 40

*League of Women Voters v. Newby,*
   838 F.3d 1 (D.C. Cir. 2016) ........................................................................42, 43

*Leggett & Platt, Inc. v. Nat'l Lab. Rels. Bd.,*
   988 F.3d 487 (D.C. Cir. 2021) ............................................................................22

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983)......................................................................................22, 26

*N.C. State Conf. of the NAACP v. McCrory,*
   831 F.3d 204 (4th Cir. 2016) ..............................................................................35

*N.S. v. Hughes,*
   335 F.R.D. 337 (D.D.C. 2020), *modified on clarification sub nom. N.S. v.
   Dixon,* 2020 WL 6701076 ............................................................................43, 45

*N.Y. Cent. Sec. Corp. v. United States,*
   287 U.S. 12 (1932)..............................................................................................41

*NAACP v. U.S. Dep't of Homeland Sec.,*
   364 F. Supp. 3d 568 (D. Md. 2019) ....................................................................38

*Nat'l Broad. Co. v. United States,*
   319 U.S. 190 (1943)............................................................................................41

*Nat'l Treasury Emps. Union v. Fed. Lab. Rels. Auth.,*
   404 F.3d 454 (D.C. Cir. 2005) ............................................................................22

*Panama Refin. Co. v. Ryan,*
   293 U.S. 388 (1935)......................................................................................40, 42

*Perkins Coie LLP v. U.S. Dep't of Just.,*
   --- F. Supp. 3d ---, 2025 WL 1276857 (D.D.C. 2025), *appeal docketed,* No.
   25-5241 (D.C. Cir. July 2, 2025) ..................................................................41, 43

*Ramos v. Nielsen*,
   336 F. Supp. 3d 1075 (N.D. Cal. 2018), *vacated and remanded sub nom.*
   *Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted, opinion*
   *vacated*, 59 F.4th 1010 (9th Cir. 2023) ..............................................7, 35, 37, 38

*Saget v. Trump*,
   375 F. Supp. 3d 280 (E.D.N.Y. 2019) ........................................... *passim*

*Sanchez v. Mayorkas*,
   593 U.S. 409 (2021) ........................................................................23

*Stern v. Marshall*,
   564 U.S. 462 (2011) ........................................................................39

*Touby v. United States*,
   500 U.S. 160 (1991) ........................................................................41

*Trump v. Hawaii*,
   585 U.S. 667 (2018) ........................................................................35

*Trump v. Wilcox*,
   No. 24A966 (U.S.), 2025 WL 1372312 (Apr. 1, 2025) ..........................37

*U.S. Inst. of Peace v. Jackson*,
   783 F.Supp.3d 316 (D.D.C. 2025) ....................................................43

*United States v. Witkovich*,
   353 U.S. 194 (1957) ........................................................................40

*V.O.S. Selections, Inc. v. Trump*,
   149 F.4th 1312 (Fed. Cir. 2025), cert. granted, No. 25-250, 2025 WL 2601020
   (U.S. Sept. 9, 2025)........................................................................40

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977)................................................................34, 35, 39

*Washington v. Davis*,
   426 U.S. 229 (1976)....................................................................34, 35

*Whitman v. Am. Trucking Ass'ns, Inc.*,
   531 U.S. 457 (2001)................................................................39, 41, 42

*Zadvydas v. Davis*,
   533 U.S. 678 (2001)....................................................................34, 35

**Statutes**

5 U.S.C. § 705................................................................................ *passim*

5 U.S.C. § 706 ............................................................................................... *passim*

8 U.S.C. § 1254a ........................................................................................... *passim*

Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135, 2142–45,
    2177–2212 (Nov. 25, 2002) .......................................................................4

Homeland Security Act Amendments of 2003, Pub. L. 108-7, 117 Stat. 11, 526–
    32 (Feb. 20, 2003) .....................................................................................4

**Federal Register Notices**

75 Fed. Reg. 3476 (Jan. 21, 2010) ...............................................................5

76 Fed. Reg. 29000 (May 19, 2011) .............................................................6

77 Fed. Reg. 59943 (Oct. 1, 2012) ...............................................................6

79 Fed. Reg. 11808 (Mar. 3, 2014) ..............................................................6

80 Fed. Reg. 51582 (Aug. 25, 2015) ............................................................6

86 Fed. Reg. 41863 (Aug. 3, 2021) ........................................................6, 31

88 Fed. Reg. 5022 (Jan. 26, 2023) .........................................................6, 31

89 Fed. Reg. 54484 (July 1, 2024) .........................................................6, 31

90 Fed. Reg. 8443 (Jan. 20, 2025) .........................................................9, 12

90 Fed. Reg. 9040 (Feb. 5, 2025) ...............................................................24

90 Fed. Reg. 10511 (Feb. 24, 2025) .........................................................8, 24

90 Fed. Reg. 20309 (May 13, 2025) ............................................................24

90 Fed. Reg. 23697 (June 4, 2025) ..............................................................24

90 Fed. Reg. 28764 (July 1, 2025) ........................................................ *passim*

90 Fed. Reg. 43225 (Sept. 8, 2025) .............................................................24

90 Fed. Reg. 45401 (Sept. 22, 2025) ...........................................................24

90 Fed. Reg. 50484 (Nov. 6, 2025) ..............................................................24

90 Fed. Reg. 53378 (Nov. 25, 2025) ............................................................24

90 Fed. Reg. 54398 (Sept. 22, 2025) ...........................................................24

90 Fed. Reg. 54733 (Nov. 28, 2025)........................................................................ *passim*

**Other Authorities**

126 Cong. Rec. H8687 (Oct. 2, 1990) (statement of Rep. Moakley) .............................3

@Sec_Noem, X (Feb. 27, 2025 8:59 PM), https://bit.ly/3XNYbJZ.............................38

Alex Nowrasteh, Haitian Immigrants Have a Low Incarceration Rate, Cato at
    Liberty (July 7, 2025), https://bit.ly/44UuNFI....................................................33

Ali Bradley, Damita Menezes, *Trump on Springfield Haitian migrants: 'They
    have to be removed',* NEWSNATION (Oct. 2, 2024), https://bit.ly/4oUrghH............22

Ali Vitali, Kasie Hunt & Frank Thorp V, *Trump Referred to Haiti and African
    Nations as 'Shithole' Countries,* NBC NEWS (Jan. 11, 2018),
    https://nbcnews.to/4iVeGO6......................................................................36

Ariana Figueroa, *Trump promises mass deportations of undocumented people.
    How would that work?*, MISSOURI INDEPENDENT (Aug. 23, 2024),
    https://bit.ly/3KIc6hK................................................................................36

Ayendy Bonifacio, *Tracing the Anti-Haitianism Behind the Springfield
    Scapegoating*, NACLA (Sept. 16, 2024), https://bit.ly/4pY9tay.............................36

C-Span, *Donald Trump on Illegal Immigrants "Poisoning the Blood of Our
    Country,"* https://www.c-span.org/clip/campaign-2024/donald-trump-on-
    illegal-immigrants-poisoning-the-blood-of-our-country/5098439 .......................36

CNN, *Almost eight years later, Trump confirms he used the phrase 'shithole
    countries,'* at 00:49-54, 1:14-18, https://bit.ly/3YtFQC0.......................................37

DHS, "Entry/Exit Overstay Report, Fiscal Year 2024 Report to Congress," (July
    16, 2025), https://bit.ly/3MztDcr).............................................................32

*Doctors Without Borders permanently closes its emergency center in Haiti's
    capital*, ASSOCIATED PRESS (Oct. 15, 2025), https://bit.ly/4pzQtza ......................30

Ed Pilkington, *Mass deportations, detention camps, troops on the street: Trump
    spells out migrant plan,* THE GUARDIAN (May 3, 2024),
    https://bit.ly/4pKXZqY ............................................................................22

Edith Olmsted, *Trump Escalates Racist Attacks With Dangerous Lie*, THE NEW
    REPUBLIC (Oct. 9, 2024), https://bit.ly/4oKiHWJ ...............................................36

Evens Sanon*, Gangs attack a neighborhood in Haiti that's home to the country's
    elite,* ASSOCIATED PRESS (Feb. 4, 2025), https://bit.ly/4q5qn7a..............................30

Frances Robles, *How 360,000 Haitians Wound Up Living in Empty Lots and Crowded Schools*, N.Y. TIMES (May 10, 2024)......................................................30

Fredlyn Pierre Louis, *Haitian immigrants grapple with uncertainty as TPS end date looms,* NBC NEWS (March 8, 2025), https://bit.ly/3MVcSbK ..........................................2

*From Criminal Governance to Community Fragmentation: Addressing Haiti's Escalating Crisis*, GLOBAL INITIATIVE AGAINST TRANSNATIONAL ORGANIZED CRIME at 1 (Sept. 2025), https://bit.ly/49dtGCD ...........................................28, 30

*Gang Violence in Haiti Continues to Spread Beyond the Capital, Reaching the Rural Areas of Artibonite and Centre* (Nov. 11, 2025), https://bit.ly/3My5qmS ...................28

*Haiti gang crisis: Top rights expert decries attacks on hospitals*, UN NEWS (Jan. 3, 2025), https://bit.ly/495GM5M....................................................................................30

Haiti, Global Centre for the Responsibility to Protect (Nov. 14, 2025), https://bit.ly/3YoPR3r....................................................................................................29

*Haiti's gangs have 'near-total control' of the capital as violence escalates, UN says*, ASSOCIATED PRESS (July 2, 2025), https://bit.ly/44rLYhH ...........................................28

Hannah Fingerhut and Ali Swenson, *Trump defends controversial comments about immigrants poisoning the nation's blood at Iowa Rally*, ASSOCIATED PRESS (December 19, 2023), https://bit.ly/3KOROmz...........................................................36

*Homeland Security Secretary Nominee Governor Kristi Noem Testifies at Confirmation Hearing*, C-SPAN (Jan. 17, 2025), https://bit.ly/457ii9R ...............................38

*Homeland Security Secretary Nominee Governor Kristi Noem Testifies at Confirmation Hearing*, C-SPAN (Jan. 17, 2025), https://bit.ly/4aeqoB0..............................23

ICE, "ICE arrests illegal alien from Haiti connected to criminal terrorist organizations" (Sept. 25, 2025), https://bit.ly/4rObIPj .....................................................14

Jacqueline Charles, *'Unimaginable': The toll on Haiti's women and girls raped by violent gangs*, Miami Herald (Dec. 11, 2025)......................................................................29

Joey Garrison, *Who are Afrikaners? Trump welcomes white South Africans as other refugees are halted*, USA TODAY (May 10, 2025)......................................................38

Junior Racine, Danica Coto, and Evens Sanon, *Gangs launch large-scale attack in Haiti's central region as hundreds flee gunfire and burning homes,* ASSOCIATED PRESS (Dec. 1, 2025), https://bit.ly/3XRGs4f................................................29

Kristi Noem (@Sec_Noem), X (Jan. 29, 2025), https://bit.ly/48AWxBI......................................23

viii

*Last Chance? Breaking Haiti's Political and Criminal Impasse*, GLOBAL
INITIATIVE AGAINST TRANSNATIONAL ORGANIZED CRIME at 10 (Jan. 2025),
https://bit.ly/4aiUaEV ..................................................................................28

Maggie Astor, *Trump Says He Would Try Again to Revoke Haitian Immigrants'
Protections*, N.Y. TIMES (Oct. 3, 2024) ..............................................7, 22

Michael Gold, Maggie Haberman, *Trump, at Fund-Raiser, Says He Wants
Immigrants from 'Nice' Countries*, N.Y. TIMES (Apr. 7, 2024) ...............................36

Riley Hoffman, *READ: Harris-Trump presidential debate transcript,* ABC (Sept.
10, 2024), https://bit.ly/4aLeOgQ ..........................................................36

S.K.S. Shannon *et al.*, *The Growth, Scope, and Spatial Distribution of People
with Felony Records in the United State*s, 1948-2010, 54 DEMOGRAPHY 1795,
1808 (2017) ..............................................................................................11

Sara Dorn, *Trump Doubles Down on False Pet-Eating Claims; Suggests Haitian
migrants Eat 'Other Things Too*, Forbes (Oct. 16, 2024),
https://bit.ly/48CCvqk........................................................................37

*Security Council renews UN's Haiti mission amid spiralling crises*, UN NEWS
(July 14, 2025), https://bit.ly/48R71vo ..................................................28

*Springfield, Ohio*, N.Y. TIMES (Sept. 14, 2024) ...........................................44

Ted Hesson et al., *US diplomats asked if non-whites qualify for Trump refugee
program for South Africans*, REUTERS (July 25, 2025) ..............................38

Travel Advisory: Haiti, U.S. Dep't of State (July 15, 2025),
https://bit.ly/48wRYs0..........................................................................2

*Trump Slams Haitians Attempting to Enter U.S., Says They 'Probably Have
AIDS'*, ABC (Oct. 10, 2021), https://bit.ly/497smSF..............................36

*U.N. Chief warns gangs could overrun Haiti's capital without additional support*,
ASSOCIATED PRESS (Jan. 23, 2025), https://bit.ly/4q3WSTd.....................30

U.S. Department of State, "Deportation Actions Against U.S. Legal Permanent
Residents Affiliated with Haitian Foreign Terrorist Organization Viv
Ansanm" (July 21, 2025), https://bit.ly/4iZQsCs; ..................................14

U.S. Immigration and Customs Enforcement, "ICE ERO Boston arrests Haitian
gang member with numerous convictions," https://bit.ly/4rRzXMr (Jan. 24,
2025) .......................................................................................................12

ix

U.S. Mission to the UN, "Remarks at a UN Security Council Briefing on Haiti"
(Aug. 28, 2025), https://bit.ly/4aeqngr.......................................................................................27

U.S. Mission to the UN, "Remarks at a UN Security Council Briefing on Haiti"
(Oct. 22, 2025), https://bit.ly/4aHUr4g....................................................................................28

**INTRODUCTION**

This suit, brought under the Administrative Procedure Act and the Equal Protection Clause, challenges the Trump administration's unlawful termination of Temporary Protected Status for Haitian immigrants. Approximately 350,000 lives are at stake—literally, not figuratively. If the termination stands, people will almost certainly die. Some will likely be killed, others will likely die from disease, and yet others will likely starve to death.

Temporary Protected Status (TPS) is a statutorily created immigration status conferred on foreign nationals who—because of war, natural disaster, or other extraordinary conditions— cannot safely return to their home country. TPS allows recipients to live and work in the United States as long as their home country is designated for TPS.

Plaintiffs are Haitian immigrants with TPS. If Haiti's TPS designation is terminated, Plaintiffs—and other Haitian TPS holders—will be subject to immediate deportation to Haiti.

Haiti has been designated for TPS since 2010, when a massive earthquake tipped the already struggling country into a full-blown crisis. As recognized at the time, Haiti warranted TPS designation because, in the words of the statute, conditions in Haiti prevented Haitians "from returning to [Haiti] in safety." 8 U.S.C. § 1254a(b)(1)(C). Since 2010, Haiti's TPS designation has been repeatedly extended because that crisis has only intensified. Without a functioning government, Haiti is a nation in chaos. Rape, kidnapping, and murder are rampant while food, housing, and medical care are scarce.

Since the assassination of President Jovenel Moïse in 2021, armed gangs have gained control over much of [Haiti's capital] Port-au-Prince, creating a power vacuum that has made governing a challenge and fueled further violence, homelessness and starvation. More than 5,600 people were killed and 1,400 were kidnapped amid gang conflicts last year, according to the United Nations. The violence has rendered 1 million people

homeless in Haiti, forcing many into makeshift shelters and exacerbating the country's economic challenges.[1]

Recognizing the ongoing crises that grip Haiti, the State Department advises people to "not travel to Haiti due to kidnapping, crime, terrorist activity, civil unrest, and limited health care."[2]

Despite this, the administration has announced that it is terminating Haiti's TPS designation "effective February 3, 2026." 90 Fed. Reg. 54733, 54733 (Nov. 28, 2025). Given the imminent threat to their lives and other important interests, Plaintiffs ask, pursuant to 5 U.S.C. § 705, that the Court stay the termination pending a final resolution on the merits.

The prerequisites are satisfied: Plaintiffs are likely to succeed on the merits; they are likely to suffer irreparable harm absent a stay; and the public interest favors a stay.

Plaintiffs are likely to succeed on the merits. Plaintiffs are likely to prevail on their Equal Protection claim because the termination is motivated, at least in part, by racial animus. They are likely to prevail on their APA claim because the termination is unlawful in at least three ways. First, the termination is "arbitrary [and] capricious" (5 U.S.C. § 706(2)(A)) because—as shown by the pretextual bases offered as justification, and the administration's unexplained departure from past practice—it was a predetermined outcome driven by impermissible factors and without consideration of relevant facts. Second, the Secretary acted "without observance of procedure required by law" insofar as she failed to consider all factors that she must consider under 8 U.S.C. § 1254a(b)(3)(A). Third, the termination is "contrary to constitutional right [and] power" (*id. § 706(2)(B)) because it is motivated, at least in part, by discriminatory animus and because it rests on the Secretary's exercise of unfettered discretion in violation of the nondelegation doctrine.

---

[1]    Fredlyn Pierre Louis, *Haitian immigrants grapple with uncertainty as TPS end date looms*, NBC NEWS (March 8, 2025), https://bit.ly/3MVcSbK.

[2]    Travel Advisory: Haiti, U.S. Dep't of State (July 15, 2025), https://bit.ly/48wRYs0.

If allowed to take effect, the termination of Haiti's TPS designation will cause Plaintiffs and other Haitian TPS holders irreparable harm. Loss of TPS will expose them to immediate deportation to a lawless country where they will be at constant risk of rape, kidnapping, and murder while lacking access to sufficient food, housing, and medical care. And because many TPS holders, having lived in the United States for decades, have U.S.-citizen spouses and children, deportation would rip them from their families. Moreover, even if not instantly deported, TPS holders would be subject to indefinite detention and even if not detained, would in any event lose their right to work, which would prevent them from supporting themselves and their families.

A stay is in the public interest. There is a strong public interest in having the administration abide by the laws that govern its conduct. There also is a strong public interest in keeping families together. And there is a strong public interest in TPS holders' continued participation in the U.S. labor force: Haitian TPS holders, who pay taxes and staff essential jobs across a variety of industries, are critical to many local economies.

The termination should be stayed pending a final resolution on the merits.

## BACKGROUND

### A.     The TPS statute restricts the Secretary of Homeland Security's authority to terminate a country's TPS designation.

Congress created TPS to advance a core American principle: That the United States is a "beacon of freedom" to those displaced from their homelands by havoc beyond their control. 126 Cong. Rec. H8687 (Oct. 2, 1990) (statement of Rep. Moakley).

TPS permits immigrants from designated countries to live and work in the United States if certain statutory conditions are met. The Secretary of Homeland Security may designate a country for TPS if the Secretary finds that (1) there is "an ongoing armed conflict" within the country; (2) the county has suffered "an earthquake, flood, drought, epidemic, or other environmental disaster"

that renders it "unable, temporarily, to handle adequately the return" of nationals to the country; or (3) "there exist extraordinary and temporary conditions in the" country "that prevent" its nationals "from returning … in safety." 8 U.S.C. §§ 1254a(b)(1)(A)–(C). When considering whether to designate a country because it is unsafe for its national to return home, Secretary is allowed but not required to consider whether "permitting the [country's nationals] to remain temporarily in the United States is contrary to the national interest of the United States." *Id.* § 1254a(b)(1)(C).[3] Although the designation decision itself falls to the DHS Secretary, the decision may not be made arbitrarily or capriciously. It must be made in "consultation with the appropriate agencies of the Government" and based on the statutorily specified criteria. *Id*. § 1254a(b)(1).

Once a country is designated for TPS, that country's nationals who are physically present in the United States may register as TPS holders unless they are ineligible to do so. TPS holders may not be deported and are authorized to work in the United States so long as their home country's designation remains in place. *Id*. § 1254a(a)(1)(A).

Individuals are ineligible for TPS if (1) they have been convicted of a felony or more than one misdemeanor; (2) they are known to have engaged in drug trafficking; (3) they belong to a terrorist organization; or (4) their presence in the United States would have potentially serious adverse foreign policy consequences for the United States. 8 U.S.C. §§ 1254a(c)(1)(A), (2)(A)–(B); *id.* §§ 1182(a)(2)–(3). Recognizing that errors might be made and that circumstances might change, the Secretary of Homeland Security is required to withdraw TPS from any individual who has received TPS but is subsequently determined to be ineligible. 8 U.S.C. § 1254a(c)(3).

---

[3] Originally, Congress charged the Attorney General with administering the TPS statute, and the statute still refers to "the Attorney General." But in 2002 Congress transferred responsibility to the Secretary of Homeland Security. *See* Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135, 2142–45, 2177–2212 (Nov. 25, 2002); Homeland Security Act Amendments of 2003, Pub. L. 108-7, 117 Stat. 11, 526–32 (Feb. 20, 2003).

A country's initial designation is for a "period … of not less than 6 months and not more than 18 months." 8 U.S.C. § 1254a(b)(2).

A TPS designation is subject to periodic review. At least 60 days before the TPS designation is set to expire, the DHS Secretary, "after consultation with appropriate agencies of the Government, shall review the conditions in the foreign state … and shall determine whether the conditions for such designation … continue to be met." 8 U.S.C. § 1254a(b)(3)(A). If the Secretary determines that the conditions for designation continue to exist, the designation must be extended. *Id*. § 1254a(b)(3)(A). Conversely, if the Secretary determines that the conditions for designation are no longer met, the designation must be terminated. *Id.* § 1254a(b)(3)(B). Regardless which, "notice of … such determination (including the basis for the determination …)" must be timely published "in the Federal Register. "8 U.S.C. § 1254a(b)(3)(A). If the Secretary fails to make the mandated determination within the statutorily prescribed period, the designation is automatically extended by at least six months. *Id. §* 1254a(b)(3)(C). Thus, the only circumstance under which a TPS designation may be lawfully terminated is if, as a result of the statutorily mandated periodic review, the Secretary affirmatively determines that a foreign state "no longer continues to meet the conditions for designation under [8 U.S.C. § 1254a(b)((3)(B)]" and then gives timely notice of "the basis for the determination." 8 U.S.C. § 1254a(b)(3)(B).

If a TPS designation is terminated, the termination "shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension." 8 U.S.C. § 1254a(b)(3)(B).

## B.    Haiti has been designated for TPS since 2010.

Haiti was first designated for TPS in January 2010, following a devastating earthquake. 75 Fed. Reg. 3476 (Jan. 21, 2010). Since then, Haiti's TPS designation has been extended—and the

country has been redesignated—multiple times.[4] These successive actions were prompted by the enduring effects of the 2010 earthquake, which not only damaged Haiti's infrastructure and public health systems but also worsened pre-existing conditions, such as food insecurity and the lack of sufficient housing. Subsequent natural disasters, including Hurricane Matthew in 2016 and Hurricane Irma in 2017, compounded these problems, which directly and indirectly affect millions of Haitians. *See* 76 Fed. Reg. 29000 (May 19, 2011); 77 Fed. Reg. 59943 (Oct. 1, 2012); 79 Fed. Reg. 11808 (Mar. 3, 2014); 80 Fed. Reg. 51582 (Aug. 25, 2015); 86 Fed. Reg. 41863 (Aug. 3, 2021); 88 Fed. Reg. 5022 (Jan. 26, 2023); 89 Fed. Reg. 54484 (July 1, 2024).

During the prior administration, Haiti's TPS designation was extended three times by then-Secretary Mayorkas who, upon completing the statutorily mandated review process, concluded each time that the statutory conditions for Haiti's TPS designation continued to be met. *See* 86 Fed. Reg. 41863 (Aug. 3, 2021); 88 Fed. Reg. 5022 (Jan. 26, 2023); 89 Fed. Reg. 54484 (July 1, 2024). In 2021, Secretary Mayorkas concluded that "Haiti is grappling with," among other things, "a deteriorating political crisis, violence, and a staggering increase in human rights abuses" in addition to "rising food insecurity" and "a severe lack of healthcare services." 86 Fed. Reg. at 41864–67. In 2023, Secretary Mayorkas, reciting extensive evidence of Haiti's deteriorating situation, determined once again that "Haiti is experiencing economic, security, political, and health crises simultaneously." 88 Fed. Reg. at 5025. Finally, in July 2024, Secretary Mayorkas—citing political corruption, human-rights abuses, escalating gang violence, limited health care, food insecurity, and the continuing impact of a destructive 2021 earthquake that was quickly followed by a severe tropical storm—"determined" again "that an 18-month TPS extension is warranted

---

[4]    The extension of a TPS designation extends TPS protection only for those who already hold TPS. The redesignation of country for TPS enables those who were not present in the U.S. at the time of the prior designation to register for TPS.

because the extraordinary and temporary conditions supporting Haiti's TPS designation remain." 89 Fed. Reg. at 54487.  He further determined that "it is not contrary to the national interest of the United States to permit Haitian TPS holders to remain in the United States temporarily."  *Id*. at 54491.  The extension extended Haiti's TPS designation through February 3, 2026.  *Id.*

That is where things stood before President Trump returned to office in January.

### C.    The Trump administration has terminated Haiti's TPS designation.

Before taking office, President Trump, who has long slandered Haitian immigrants, vowed to "revoke" Haiti's TPS designation and send Haitian TPS holders "back to their country."[5] He has now made good on that threat.[6]

President Trump's termination of Haiti's TPS designation has been a three-step process: on February 24, his Secretary of Homeland Security, Kristi Noem, issued a "partial vacatur" prematurely terminating Haiti's TPS designation effective August 3; on July 1, the day that the partial vacatur was held unlawful, Secretary Noem issued a termination notice that purported to terminate Haiti's designation effective September 2; and on November 28, three months after Plaintiffs challenged the July 1 termination notice on constitutional and statutory grounds, she issued a superseding termination notice purporting to terminate Haiti's TPS designation effective February 3, 2026.  Plaintiffs' amended complaint challenges the November 28 notice.

---

[5]    Maggie Astor, *Trump Says He Would Try Again to Revoke Haitian Immigrants' Protections*, N.Y. TIMES (Oct. 3, 2024), https://nyti.ms/48QQTtS.
[6]    President Trump had tried to terminate Haiti's TPS designation during his first term but multiple courts prevented him from doing so, holding that his attempted termination was an unlawful "preordained" action motivated at least in part by the "discriminatory purpose of removing non-white immigrants from the United States." *Saget v.  Trump*, 375 F. Supp. 3d 280, 346, 374 (E.D.N.Y. 2019); *accord Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1100 (N.D. Cal.  2018), *vacated and remanded sub nom. Ramos v.  Wolf*, 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 59 F.4th 1010 (9th Cir.  2023); *see also Centro Presente v. U.S.  Dep't of Homeland Sec.*, 332 F. Supp. 3d 393, 415 (D. Mass. 2018).

### 1. Secretary Noem "partially vacated" Secretary Mayorkas's July 2024 extension of Haiti's TPS designation.

The first step was Secretary Noem's "partial vacatur" of then-Secretary Mayorkas's July 2024 extension of Haiti's TPS designation through February 3, 2026. The "partial vacatur" purported to change the expiration date of Haiti's TPS designation to "August 3, 2025, instead of February 3, 2026." 90 Fed. Reg. 10511, 10511 (Feb. 24, 2025). Although subsequently "set aside as unlawful under the APA" (*Haitian Evangelical Clergy Ass'n v. Trump*, 789 F. Supp. 3d 255, 273 (E.D.N.Y. 2025) ("*HECA*")), the "partial vacatur" was an essential element of the administration's purported termination of Haiti's TPS designation effective September 2, 2025—the administrative action challenged in Plaintiffs' original complaint. *Cf.* ECF 1.

As noted, the TPS statute forbids termination of a country's TPS designation earlier than the previously scheduled "expiration of the most recent previous extension." 8 U.S.C. § 1254a(b)(3)(B). Thus, by statute, Haiti's TPS designation could not be terminated sooner than February 3, 2026, when it is set to expire under the July 2024 extension. 89 Fed. Reg. at 54491.

To evade this statutory impediment to President Trump's agenda, Secretary Noem purported to shorten the extension by six months, to August 3, 2025, by "partially vacating" the July 2024 extension. 90 Fed. Reg. at 10513. If the extension were shortened, the administration could then terminate Haiti's TPS designation earlier than otherwise allowed while claiming to have nominally complied with 8 U.S.C. § 1254a(b)(3)(B)'s prohibition on premature terminations. And that is precisely what the administration did: after "partially vacating" the July 2024 extension, it issued a termination notice purporting to terminate Haiti's TPS designation "effective September

2, 2025." 90 Fed. Reg. at 28760.[7] Had the administration not "partially vacate[d]" the July 2024 extension first, it could not have claimed to have even nominally complied with § 1254a(b)(3)(B).

Secretary Noem issued the "partial vacatur" in "furtherance of" Executive Order 14159. 90 Fed. Reg. at 10513. Issued by President Trump within hours of regaining office, the order decries what it characterizes as an "unprecedented flood of illegal immigration into the United States." 90 Fed. Reg. 8443 (Jan. 20, 2025). Directing each to "align any and all departmental activities with the policies set out by this order," the order instructs the Secretary of State, Attorney General, and DHS Secretary to "promptly" take action "to rescind the policy decisions of the previous administration" that it says "led to the increased or continued presence of illegal aliens in the United States." *Id. at* 8446. Although TPS holders are not "illegal aliens," the order states that "[s]uch action shall include … ensuring that" TPS designations are "limited in scope and made for only so long as may be necessary to fulfill the textual requirements of the statute." *Id.*

Secretary Noem did not claim to have statutory authority to "partially vacate" the July 2024 extension of Haiti's TPS designation. Rather, she invoked what she asserted was her "inherent authority … to reconsider any TPS-related determination, and upon reconsideration, to vacate or amend the determination." 90 Fed. Reg. at 10514. But 8 U.S.C. § 1254a(b)(3)(A) prescribes "a specific procedure for reconsideration of a TPS designation" and thus "preclude[d] Secretary Noem from reconsidering a TPS designation pursuant to other procedures (or no procedures at all), including by partial vacatur." *HECA*, 789 F. Supp. 3d at 273. Because Secretary Noem did "not have statutory or inherent authority to partially vacate a country's TPS designation," the partial vacatur had to "be set aside as unlawful under the APA." *Id.*

---

[7]    Because notice of the termination was not published until July 1, it could not take effect earlier than September 2 under § 1254a(b)(3)(B), which, recognizing the important reliance interests involved, requires at least 60-days' notice of a termination.

9

## 2. Secretary Noem terminated Haiti's TPS designation the day that the "partial termination" was held unlawful.

Although set aside as unlawful, the "partial vacatur" laid the groundwork for the July 1 termination notice challenged in Plaintiffs' original complaint. Also issued "[i]n furtherance of" President Trump's January 20 executive order, the termination notice purported to terminate Haiti's TPS designation "effective September 2, 2025." 90 Fed. Reg. at 28760, 28762.

The since-supplanted July 1 termination notice said that the Secretary "reviewed country conditions in Haiti." 90 Fed. Reg. at 28762. Indeed, the notice accurately observed that "Haiti is in the grip of severe humanitarian and human rights crisis"; "[a]rmed gangs are striking the Port-au-Prince metropolitan area and its surroundings with terror and violence, including rape and other forms of sexual violence"; and "[w]idespread gang violence in Haiti is sustained by the country's lack of functional government authority." 90 Fed. Reg. at 28763. Still, the notice reported no determination by the Secretary whether Haitians can return to Haiti "in safety" (8 U.S.C. § 1254a(b)(1)(C)) and did not recite "the basis" for such a determination. *Id.* § 1254a(b)(3)(A). That was not surprising. Because even a cursory examination of conditions in Haiti would reveal that Haitians cannot return there in safety, those conditions could not justify termination of Haiti's TPS designation, which is President Trump's stated goal.[8]

Unlike any termination announced before President Trump's return to power, the July 1 termination notice rested exclusively on purported "national interest." Deeming the "[n]ational interest … an expansive standard that may encompass an array of broad considerations, including foreign policy, public safety (*e.g.*, potential nexus to criminal gang membership), national security, migration factors (*e.g.*, pull factors), immigration policy (e.g., enforcement prerogatives), and

---

[8]    It is beyond any reasonable dispute that the dire conditions in Haiti prevent Haitians from returning in safety. *See* Happel Decl. ¶¶ 15–159 (Ex. 1).

economic considerations (*e.g.*, adverse effects on U.S. workers, impact on U.S. communities)," the July 1 termination notice stated that, "the Secretary has determined that termination of TPS for Haiti is required because it is contrary to the national interest to permit Haitian nationals … to remain temporarily in the United States." 90 Fed. Reg. at 28762.

Although TPS is available only to individuals already in the United States (8 U.S.C. § 1254a(c)(1)(A)(i)), the July 1 termination notice cited President Trump's "determin[ation] to fully restrict and limit ***the entry*** of nationals from Haiti" as a reason to terminate Haiti's TPS designation. 90 Fed. Reg. at 28762 (emphasis added). Asserting that Haiti's TPS designation operates as a "pull factor[]" that induces Haitian migration to the United States, the notice declared the designation to be "inconsistent with President Trump's outlined policy priorities." *Id. at* 28763.

And although those convicted of a felony or more than one misdemeanor are ineligible for TPS (8 U.S.C. § 1254a(c)(2)(B)(i)), the July 1 termination notice also asserted that the Haiti's TPS designation "conflict[s] with the national interest of the United States" because "there are Haitian nationals who are TPS recipients who have been the subject of administrative investigations for fraud, public safety, and national security." 90 Fed. Reg. at 28763. There are 350,000 Haitian TPS holders but, with one possible exception, the termination notice identified no Haitian TPS holder who has been arrested for—let alone convicted of—a crime.[9] The lone possible exception was Wisteguens Charles. Citing an earlier DHS press release, the termination notice stated that Charles was "arrested, charged and convicted for 17 crimes between August 2022 and August 2024." *Id.* Notably, the termination notice did not say that Charles was a TPS holder; the press release cited in the notice described him instead as someone who "entered the U.S. lawfully" but

---

[9]   By comparison, 8.11% of the U.S. adult male population is estimated to have a felony conviction. S.K.S. Shannon *et al.*, *The Growth, Scope, and Spatial Distribution of People with Felony Records in the United State*s, 1948–2010, 54 DEMOGRAPHY 1795, 1808 (2017).

"violated the terms of his lawful admission."[10]

On July 30, Plaintiffs initiated this suit, alleging that the administration's termination of Haiti's TPS designation violated the Equal Protection Clause and the APA. ECF 1.

### 3. Secretary Noem issued a superseding termination notice after Plaintiffs challenged the July 1 termination notice.

On September 17, six weeks after Plaintiffs challenged the legality of the July 1 termination notice, President Trump and the other Defendants informed this Court that the July 1 termination notice would be superseded by a new notice. ECF 59. Six weeks later, on November 28, the superseding notice was published. 90 Fed. Reg. 54733 (Nov. 28, 2025). The notice purports to terminate Haiti's TPS designation "effective February 3, 2026." *Id.* Plaintiffs' amended complaint alleges that, like the termination previously announced on July 1, the termination announced on November 28 violates the Equal Protection Clause and the APA. ECF 74.

The November 28 termination is in many respects identical to the July 1 termination notice. Like its predecessor, the November 28 termination notice:

- Cites President Trump's "determin[ation] to fully restrict and limit the entry of nationals from Haiti" (90 Fed. Reg. at 54736 (citing 90 Fed. Reg. 24497));

- States that Haiti's TPS designation is being terminated in "furtherance" of President Trump's directive "to rescind policies that led to increased or continued presence of illegal aliens in the United States" (*id.* (quoting 90 Fed. Reg. 8443));

- Describes TPS as "an inherently temporary status" (*id. at* 54739);

- Claims that TPS is a "pull factor" that increases illegal immigration by Haitians (*id. at* 54735–37);

- Portrays Haitians as "violent crim[inals]" (*id. at* 54737);

- Adopts an "expansive" definition of "[n]ational interest" (*id. at* 54735); and

- Asserts that permitting Haitian TPS holders to remain in the United States is "contrary

---

[10] U.S. Immigration and Customs Enforcement, "ICE ERO Boston arrests Haitian gang member with numerous convictions," https://bit.ly/4rRzXMr (Jan. 24, 2025).

to the national interest" (*id*. at 54735).

The November 28 termination notice differs from the July 1 termination notice in four respects.

*First*, unlike the July 1 notice, the November 28 notice states that Secretary Noem "has determined that there are no extraordinary and temporary conditions in Haiti that prevent Haitian nationals … from returning in safety." 90 Fed. Reg. at 54790 Fed. Reg. at 54735. Despite repeatedly describing conditions in Haiti as "concerning" and acknowledging that "1.3 million people—approximately 12% of Haiti's population—have been forced to flee their homes and are internally displaced due to escalating violence" that "has engulfed Port-au-Prince and spreads beyond," the notice asserts that "parts of the country are suitable to return to." *Id*. (cleaned up). It is unclear what "suitable" means and, in any event, the notice identifies no such "suitable" areas.

*Second*, the November 28 notice points to a September 30 U.N. resolution that "authorized a new multinational Gang Suppression Force" that, when created, "will" supposedly "work in close coordination with the Haitian National Police … and the Haitian armed forces to conduct intelligence-led operations to neutralize gangs, provide security for critical infrastructure and support humanitarian access." 90 Fed. Reg. at 54735 (cleaned up). The notice offers no timeline for the creation and deployment of the new force.

*Third*, referencing the Gang Suppression Force, the November 28 notice asserts that "[e]nding Temporary Protected Status for Haiti reflects a necessary and strategic vote of confidence in the new chapter Haiti is turning" because "[o]ur immigration policy must align with our foreign policy vision of a secure, sovereign, and self-reliant Haiti" and "[t]he United States cannot call for bold change on the ground while signaling doubt from afar." 90 Fed. Reg. at 54738.

*Fourth*, in addition to the case of Wisteguens Charles (*see supra* at 11), the November 28 termination notice cites "arrests and indictments of aliens linked" to Haitian gangs. 90 Fed. Reg.

at 54738.  In particular, the notice points to the initiation of "deportation actions against U.S. lawful permanent residents" allegedly "affiliated with Viv Ansanm," a Haitian gang, and "the arrest of a Haitian" with an unspecified alleged gang affiliation who, according to a DHS press release, "is currently in ICE custody pending removal proceedings."  90 Fed. Reg. at 54738 (citing U.S. Department of State, "Deportation Actions Against U.S.  Legal Permanent Residents Affiliated with Haitian Foreign Terrorist Organization Viv Ansanm" (July 21, 2025), https://bit.ly/4iZQsCs; ICE, "ICE arrests illegal alien from Haiti connected to criminal terrorist organizations" (Sept. 25, 2025), https://bit.ly/4rObIPj).

### D. Termination of Haiti's TPS designation will irreparably harm Plaintiffs.

As the July 1 and November 28 termination notices and State Department advisories make clear, Haiti is a dangerous country without a functioning government where gangs terrorize the populace, large swaths of which lack adequate food, housing, and medical care.  Deporting TPS holders to Haiti upon termination of Haiti's TPS designation would therefore place them at imminent risk of serious bodily harm.  It would also wrench many from U.S.-citizen family members, including not only spouses and children but also parents in some instances.  And even if not immediately deported, Haitian TPS holders would suffer other irreparable harms upon termination of Haiti's TPS designation.  They would be subject to immediate, indefinite detention and, detained or not, would in any event immediately lose their right to work in the United States— and thus the ability to support themselves, their families, and dependent relatives living in Haiti.  Plaintiffs' stories illustrate these perils.

Plaintiff Fritz Miot, a Ph.D. candidate in neuroscience at Loma Linda University, has lived in the United States since 2001, when he lawfully entered the country on a J-2 visa.  Miot Decl. ¶ 2 (Ex. 2).  Afflicted with Type 1 diabetes, he must "inject [himself] with artificial insulin multiple

times a day." *Id.* ¶ 7. Given "Haiti's dysfunctional health care system" and the violence that has caused many doctors to flee the country, having to return to Haiti—where it is uncertain that he will be able to access either insulin or the specialized doctors he needs—would likely be a death sentence for Miot. *Id.* ¶¶ 7–8. Even if the requisite specialists were available, the mass exodus of medical professionals has significantly reduced the supply of doctors and caused a correspondingly significant increases in doctors' fees, likely rendering the remaining doctors' services "prohibitively expensive." *Id.* ¶ 8. And even if they were available and affordable, "physically getting to a specialist … would be difficult given the roadblocks and conditions of lawlessness and violence in the streets." *Id.* Miot also justifiably fears "catching diseases like cholera, malaria, and dengue fever which are endemic to Haiti and … regularly claim lives there but … are rare and treatable in the United States." *Id.* ¶ 9. Were he to contract "any one of these or other serious diseases," his "Type 1 diabetes would make them more dangerous and potentially life-threatening to [him] than they would be for someone without [his] condition." *Id.*

Miot would also be at risk of kidnapping if forced to return to Haiti. As someone who has "lived most of [his] life in the United States" and rarely speaks Creole, he "would stick out in Haiti as someone who had for years been living abroad in the United States." Ex. 2 ¶ 10. That would make him "a prime target" for kidnapping by the gangs that rule Haiti "because they would think that [he], as someone who has been in the United States for most of his life, would have money and/or would know people who have money to pay them a ransom for [his] release." *Id.* ¶ 11.

Like Miot, Plaintiff Rudolph Civil, "a software engineer for one of the nation's largest banks," has lived in the United States since childhood. Civil Decl. ¶ 2 (Ex. 3). Having left Haiti when he was seven-years old, Civil speaks Creole "infrequently" and "with an American accent." *Id.* ¶ 7. Consequently, he too "would stick out to everyone as someone who has lived for most of

his life in the United States" and thus be "a prime target for the gangs to kidnap and hold for a money ransom." *Id.* The risk that Civil would be targeted by gangs were he deported to Haiti is heightened by the fact that his father "was a government official … at the Bureau of Customs, a department associated with money and goods." *Id.* ¶ 8. In 2023, a gang member broke into his father's house, tried twice to shoot him, and ultimately, after the gun jammed, hit Civil's father on the head before robbing him and abducting Civil's cousin, who was there at the time. *Id.* Civil reasonably fears that gangs would target him if they learned that he is his father's son.

Although not afflicted with diabetes, Civil too fears contracting "cholera, malaria, and dengue fever." Ex. 3 ¶ 11. He fears that if he falls ill "it would be difficult to find and get to a doctor, since many doctors have left the country, some hospitals are no longer functioning, what doctors remain are expensive, and just getting from one area to another involves risking being stopped and accosted by gang member." *Id.*

Civil would likely be unable to "get a job in Haiti due to the tremendous unemployment and horrible conditions" as "[t]here are little if any software engineering opportunities or other jobs there for someone with [his] career skills and bachelor's degree in computer engineering." Ex. 3 ¶ 10. And even if he did find a job, he does not know how he would secure food or housing because he "would have no idea how to navigate to get things done in Haiti," which is effectively "a foreign country" to him because he left when still a child. *Id.* ¶¶ 12–13.

If Haiti's TPS designation is terminated, Civil would immediately lose his right to work in the United States. The consequences would be profound. Civil supports not only himself but also "contribute[s] to the support of family members in Haiti who need" what he sends them. Ex. 3 ¶ 5. He sends money to his grandmother and to his maternal aunt, "for [her] basic necessities and those (including schooling) of her three children." *Id.* Were he to lose his right to work in the United

States, Civil would lose the income with which he supports himself and "would not be able to contribute to the support of any of these people." *Id.*

Plaintiff Marlene Noble, who was "abandoned as an infant" in Port-au-Prince, contracted tuberculosis before she was two. Noble Decl. ¶¶ 3–5 (Ex. 4). It "caused [her] spinal cord to collapse," which made her "unable to sit, move well, or function without additional medical care." *Id.* ¶ 4. In 1993, when she was two, "a faith-based organization based in Florida" brought her "to the United States for medical treatment." *Id.* ¶ 5. She has lived here ever since. *Id.* ¶ 17. In 1999, she was adopted by a couple in Pennsylvania. *Id.* ¶ 7. From the time she arrived in the United States her "humanitarian parole status was renewed each time before it expired, until approximately the year 2000, when [she] was nine years old." *Id.* ¶ 8. It "was not renewed at that time because [she] had been adopted by" American parents, who—relying on what they were told by the adoption attorney—believed, albeit erroneously, that "the adoption had made [her] a US citizen." *Id.* ¶¶ 8, 17. It was not until 2021 that Noble, having retained an immigration attorney, determined that her adoptive parents had failed to timely adjust her status and that she was "very likely not a US citizen" and likely had no "easy path to secure citizenship or even secure lawful status." *Id.* ¶ 12. Upon learning this, Noble sought and received TPS. *Id.* ¶ 13.

Having been brought to the U.S. as a toddler, Noble knows no one in Haiti. Ex. 4 ¶ 18. She does "not speak, nor can [she] understand, French or Haitian Creole, the official languages of Haiti." *Id.* Deportation to Haiti would jeopardize Noble's physical wellbeing in at least two ways. First, Haiti "has no functional health care system to treat" her spinal "kyphosis," for she has already undergone two surgeries. *Id.* ¶¶ 15, 19. Second, lacking any connections or resources in Haiti, she "would immediately be homeless and subject to the country's current lawlessness and violence, particularly if," as would likely be the case, she is "seen as an American." *Id.* ¶¶ 19–20. Simply

put, Noble "would have no home, no resources or food, and … would suffer immense harm, if not death," if she is forced to return to Haiti, a country that she has not seen in more than three decades.

Like Noble, Plaintiff Marcia Laguerre was brought to the U.S. as a young child. She "entered the U.S. Virgin Islands with [her] parents in 2005 when [she] was one year and a few months old" and lived there "until 2007 or 2008," when her family "moved to Florida, where [they] lived for about two years before moving to New York." Laguerre Decl. ¶ 2 (Ex. 5). A junior majoring in economics at CUNY's Hunter College who works as a receptionist and administrative assistant at a fiduciary firm specializing in retirement planning, Laguerre is pursuing a career in finance. *Id.* ¶¶ 9–10. But for the threat that she will lose TPS, which she has had since 2010 (*id.* ¶ 2), Laguerre is well on her way to achieving her goal. Earlier this year, she passed the Securities Industry Essentials exam administered by the Financial Industry Regulatory Authority (FINRA) after she received a highly competitive scholarship that covered both the cost of a preparatory course and the cost of the exam itself. *Id.* ¶¶ 15–16, 18. And just one day before passing the exam, she was "offered a New York 2026 Wealth Management Summer Analyst Program — Private Bank internship for the Summer of 2026 at a Long Island branch of one of the nation's largest banks." *Id.* ¶ 17. It is, obviously, a "wonderful opportunity," but one that she will be unable to take advantage of "[w]ithout work authorization, which" she has "through TPS." *Id.*

Using the income from her job, Laguerre purchases the household groceries, contributes to the rent, and "regularly send[s] money" to her 19-year old sister, who attends the University of Albany and relies on those funds. Ex. 5 ¶ 24. Laguerre "won't be able to support [herself] or contribute in any of these ways" if she loses her TPS. *Id.* Laguerre is married to a U.S. citizen; she and her husband live in Queens. Ex. 5 ¶ 3, 21. Her sisters, also U.S. citizens, live in Brooklyn. *Id.* ¶¶ 3, 22. If deported, she will be separated from her spouse and sisters. *Id.* ¶ 20.

As with the other Plaintiffs who came to the U.S. as young children, Haiti is "a foreign country" to Laguerre, who does not "know anyone there." Ex. 5 ¶ 24. She does not speak Creole well and "can't read or write it or French." *Id.* She is "terrif[ied]" that if deported to Haiti "gang members would rape [her] and/or traffic [her] for sex" and that she would be targeted for kidnapping as "someone who has spent virtually her entire life in the United States." *Id.* ¶ 26.

Plagued by frequent bouts of illness, which cause "intense pain all over [her] body, extreme tiredness, headaches, itchiness, low appetite, difficulty holding down food, and sometimes a high temperature," Laguerre is worried by Haiti's "lack of sanitation … and medical services" and fearful that "the lack of adequate food and of sanitation would" cause her to "get seriously ill more frequently than" she does "now, and likely with more serious consequences." Ex. 5 ¶¶ 29–31.

Plaintiff Vilbrun Dorsainvil, who "worked as a medical doctor in Haiti, currently work[s] as a registered nurse … at Springfield Regional Medical Center in Springfield, Ohio." Dorsainvil Decl. ¶ 2 (Ex. 6). He owns a house in Springfield but would be "unable to pay" the mortgage if Haiti's TPS designation is terminated and he loses his work authorization. *Id.* Through the money that he earns as a nurse, Dorsainvil supports not only himself but also his cousin Ulrick and many people in Haiti, including his ex-fiancée and their mutual daughter, his mother, his godson, a brother, a nephew, and others. *Id.* ¶ 8. In some instances, the money that he provides is "[t]heir sole support." *Id.* ¶¶ 8, 15. If he loses TPS and his right to work in the U.S., he "wouldn't be able to support any of these people" and "do[es]n't know what would become of them." *Id.* ¶ 9.

"[B]orn into a family with a social conscience and democratic political views," Dorsainvil fears that he would be a victim of political violence if sent to Haiti, both because of his association with his brother Jean Claude Dorsainvil, who co-founded and led the Haitian Green Party, and because he shares—and acts on—his family's democratic beliefs. Ex. 6 ¶¶ 10, 20. Vilbrun's fears

are neither abstract nor speculative.  Jean Claude, who "made many enemies in Haiti because he fearlessly and regularly denounced the corruption of Haitian politicians on radio stations and in other public forums," was forced to flee Haiti, and now resides in Mexico, after he was "arrested and imprisoned for his political opinions in 2019." *Id.* ¶¶ 10, 14.  Vilbrun's "other siblings suffered because of" their and Jean Claude's "political views and associations." *Id.* ¶ 13.  His brother Rony likewise fled to Mexico after he "was arrested and imprisoned without cause, we think because of his association with Jean Claude." *Id.*  Another brother, Bernito, "fled to the countryside" after crashing his car badly while "try[ing] to elude" unknown men who had started to follow him and his wife on their way to church. *Id.*  Yet another brother, Rocheny, "fled Haiti in fear because of his association with Jean Claude" and "is now living in Romania." *Id.* ¶ 13.  Still "[o]ther siblings also fled or are in hiding because of their association with Jean Claude." *Id.*  Indeed, Vilbrun himself was "forc[ed] … to leave Haiti" after being attacked on multiple occasions "because of [his] family associations and/or outspoken views." *Id.* ¶ 12.

Because "Haiti lacks the rule of law," it "wouldn't be safe for" Dorsainvil "to return to Haiti now, even if [his] family hadn't experienced" the political violence that they have.  Ex. 6 ¶ 16.  He reasonably believes that he "would be a prime target for [gangs] to kidnap because," as "a professional, they could easily surmise or learn that I had been living abroad, and they would think that I would have money to pay them a ransom and/or know people who do." *Id.* ¶ 17.

Like the other Plaintiffs, Dorsainvil fears "that conditions in Haiti would make it impossible … to safely and consistently access basic necessities like food, work, and health care." Ex. 6 ¶ 18.  "Gang roadblocks and violence in the streets would make it dangerous for [him] simply to try to access whatever food might be available or other things I might need, for example a doctor or hospital if I were to get sick or injured." *Id.*

20

In sum, Plaintiffs—and 350,000 other Haitian TPS holders—would suffer irreparable harm if Haiti's TPS designation is terminated.

## ARGUMENT

"[T]o the extent necessary to prevent irreparable injury," a court considering an APA challenge "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. "The factors to be considered in determining whether a stay is warranted are: (1) the likelihood that the party seeking the stay will prevail on the merits …; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay." *Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985). When, as here, the government is the defendant, the last two factors collapse into one. *Cath. Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Rev.*, 513 F. Supp. 3d 154, 176 (D.D.C. 2021). Each factor favors a stay here.

## I. Plaintiffs are likely to succeed on the merits.

The APA declares unlawful, and directs a reviewing court to set aside, any agency action that is "in excess of statutory … authority"; "without observance of procedure required by law"; "arbitrary [and] capricious"; or "contrary to constitutional right [or] power." 5 U.S.C. § 706(2). Because the termination Haiti's TPS designation is all of these, Plaintiffs are likely to succeed on their claim that the termination violates the APA.

### A. The termination is arbitrary and capricious.

Agency action is arbitrary and capricious, and therefore unlawful under 5 U.S.C. § 706(2)(A), if the agency

has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that

runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Agency action also is arbitrary and capricious when the agency "fail[s] to follow its own well-established precedent without explanation." *Leggett & Platt, Inc. v. Nat'l Lab. Rels. Bd.*, 988 F.3d 487, 494 (D.C. Cir. 2021) (quoting *Nat'l Treasury Emps. Union v. Fed. Lab. Rels. Auth.*, 404 F.3d 454, 457 (D.C. Cir. 2005)). Secretary Noem's termination of Haiti's TPS designation is arbitrary and capricious by each of these measures.

### 1. The termination was predetermined.

Rather than a good-faith, evidence-based product of the congressionally mandated review of "the conditions in [Haiti]" (8 U.S.C. § 1254a(b)(3)(A)), the termination is a predetermined outcome driven by discriminatory animus against Haitian TPS holders. The decision to terminate Haiti's TPS designation was made long before President Trump took office and thus well before Secretary Noem could "consult[] with appropriate agencies of the Government" to determine whether the conditions for designation continue to exist. *Id.*

During the most recent campaign, the President repeatedly promised to "begin the largest domestic deportation operation in American history."[11] When asked whether he would end Haiti's TPS designation if elected, he responded unequivocally, declaring that he "absolutely … would revoke it" and send Haitians "back to their country."[12]

Secretary Noem echoed the President's plan for TPS following her nomination. At her

---

[11]  Ed Pilkington, *Mass deportations, detention camps, troops on the street: Trump spells out migrant plan*, THE GUARDIAN (May 3, 2024), https://bit.ly/4pKXZqY.

[12]  Maggie Astor, *Trump Says He Would Try Again to Revoke Haitian Immigrants' Protections*, N.Y. TIMES (Oct. 3, 2024), https://nyti.ms/45682P7; Ali Bradley, Damita Menezes, *Trump on Springfield Haitian migrants: 'They have to be removed'*, NEWSNATION (Oct. 2, 2024), https://bit.ly/4oUrghH.

confirmation hearing, she testified that "[TPS] has been abused and manipulated by the Biden Administration," that it "will no longer be allowed," and that TPS extensions will not "go[] forward the way that they are."[13] She later pledged to do whatever President Trump wants, stating that "[w]hen the President gives a directive, the Department of Homeland Security will follow it."[14]

Secretary Noem has made good on her promise to prioritize the President's discriminatory agenda over her statutory obligations. When she issued the November 28 termination notice, the July 1 termination notice, and the antecedent "partial vacatur," she did so in express "furtherance of" the President's directive "to rescind policies that led to increased or continued presence of illegal aliens in the United States" (90 Fed. Reg. at 54736 (citing 90 Fed. Reg. 8446); 90 Fed. Reg. at 28762; 90 Fed. Reg. at 10513)—which TPS holders, as a matter of law, are not. To the contrary, a TPS holder "shall be considered as being in, and maintaining, lawful status as a nonimmigrant." 8 U.S.C. § 1254a(f)(4); *see also Sanchez v. Mayorkas*, 593 U.S. 409, 416 (2021) ("The TPS statute permits [a TPS recipient] to remain in the country[.]"); *Saget*, 375 F. Supp. 3d at 367 (TPS holders "are lawfully present in the United States along with their U.S.-born dependents"). As further justification for the termination, the Secretary cited the President's "America First" agenda and "determin[ation] to fully restrict and limit the entry of nationals from Haiti." 90 Fed. Reg. at 28762.

"[P]reordained and pretextual," the termination of Haiti's TPS designation is—like the termination attempted during President Trump's first term—based on political whim and personal animus rather than the "purely evidence-based" review that "the statute requires." *Saget*, 375 F. Supp. 3d at 346.[15]

---

[13]  *Homeland Security Secretary Nominee Governor Kristi Noem Testifies at Confirmation Hearing*, C-SPAN (Jan. 17, 2025), https://bit.ly/4aeqoB0.
[14]  Kristi Noem (@Sec_Noem), X (Jan. 29, 2025), https://bit.ly/48AWxBI.
[15]  That Secretary Noem tried to prematurely terminate Haiti's TPS designation in blatant disregard of 8 U.S.C. § 1254a(b)(3)(B) less than five weeks after President Trump assumed power

## 2. The termination relies on an unexplained departure from past practice.

The principal ground that Secretary Noem gives for terminating Haiti's TPS designation is her "determin[ation] that … permitting Haitian nationals to remain temporarily in the United States is contrary to the U.S. national interest." 90 Fed. Reg. at 54735. The TPS statute has existed for 35 years but, until this year, no administration "ever justified a termination on national interest grounds." Reichlin-Melnick Decl. ¶ 28 (Ex. 7). That has suddenly changed. Within a matter of months, the current administration has repeatedly terminated TPS designations of predominantly non-white countries based exclusively or primarily on the administration's interpretation of the "national interest." 90 Fed. Reg. 54733, 54733–36 (Nov. 28, 2025) (Haiti); 90 Fed. Reg. 53378, 53379–81 (Nov. 25, 2025) (Burma); 90 Fed. Reg. 50484, 50486–87 (Nov. 6, 2025) (South Sudan); 90 Fed. Reg. 54398, 45401–02 (Sept. 22, 2025) (Syria); 90 Fed. Reg. 43225, 43228–30 (Sept. 8, 2025) (Venezuela); 90 Fed. Reg. 28760, 28762–64 (July 1, 2025) (Haiti); 90 Fed. Reg. 23697, 23698 (June 4, 2025) (Cameroon); 90 Fed. Reg. 20309, 20311 (May 13, 2025) (Afghanistan); 90 Fed. Reg. 10511, 10513–14 (Feb. 24, 2025) (Haiti); 90 Fed. Reg. 9040, 9042–43 (Feb. 5, 2025) (Venezuela); *see also* Ex. 7 ¶ 30.[16] The administration has offered no explanation for its abrupt departure from past practice.[17]

---

is further evidence that the termination was a preordained result. *Cf. HECA*, 789 F. Supp. 3d at 275 (February 24 partial vacatur "unlawful" because it was "in excess of [statutory] authority").

[16] The administration's unexplained shift in focus is reflected in the October 1 memo prepared by U.S.C.I.S., which spends only one paragraph discussing whether conditions in Haiti prevent TPS holders from returning in safety but then devotes four pages to "national interest considerations." AR 185–89.

[17] The scant and heavily redacted administrative record produced thus far suggests additional departures from past practice. For example, whereas in the past the State Department would prepare two memoranda—one by the U.S. embassy in Port-au-Prince and the other by the Bureau of Western Hemisphere Affairs—memorializing the State Department's assessment of country conditions, the administrative record produced thus far contains no such memoranda. Instead, it contains a lone email from the Department advising DHS that "State believes that there would be no foreign policy concerns with respect to a change in the TPS status of Haiti." AR 409.

24

Although "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change" (*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016)), "an agency's unexplained departure from precedent is arbitrary and capricious" and must be set aside as such. *ABM Onsite Servs.-W., Inc.v. Nat'l Lab. Rels. Bd.*, 849 F.3d 1137, 1142 (D.C. Cir. 2017). Thus, before departing from past practice, "the agency must at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'" *Encino Motorcars*, 579 U.S. at 221 (quoting *FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009)). Here, the administration has done neither.

### 3.     The Secretary did not observe procedure required by law.

The November 28 termination notice states that "the Secretary has determined that there are no extraordinary and temporary conditions in Haiti that prevent Haitian nationals … from returning in safety." 90 Fed. Reg. at 54735. But the existence of "extraordinary and temporary conditions" that prevent TPS holders from returning to their country "in safety" is only one of three conditions for designation set forth in 8 U.S.C. § 1254a(b)(1). A country may also be designated if there is "an ongoing armed conflict" that would "pose a serious threat to their personal safety" or if the foreign state requests designation following a natural disaster.

The congressionally mandated periodic review process requires the Secretary to "review the conditions in the foreign state" and "determine whether the conditions for such designation ***under this subsection*** continue to be met." 8 U.S.C. § 1254a(b)(3)(A) (emphasis added). Because the Secretary is required to determine whether the conditions for designation "under this subsection" still exist, the Secretary must consider ***all*** the conditions for designation set forth in § 1254a(b)(1). The statute does not allow her to restrict her inquiry to a single condition. Yet that is exactly what the Secretary did here. She considered only the condition set forth in § 1254a(b)(1)(C)—whether

there are extraordinary and temporary conditions that prevent Haitian TPS holders from returning in safety. She failed to consider the condition set forth in § 1254a(b)(1)(A)—whether there is "an ongoing armed conflict" that would "pose a serious threat to their personal safety."

The Secretary likely failed to consider the condition described in § 1254a(b)(1)(A) because that provision, unlike § 1254a(b)(1)(C), does not allow the her to terminate a designation based on "national interest" and would thus prevent her from terminating Haiti's designation on that ground, which is the principal basis she gives for the termination. But whatever the reason, the fact remains that the Secretary acted "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

### 4. The explanation for the termination is implausible and contrary to the evidence.

Secretary Noem's explanation for the termination of Haiti's TPS designation "runs counter to the evidence before the agency" and "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

### a. The Secretary's determination that it is safe to return to Haiti is implausible and contrary to facts known to the agency.

Secretary Noem's determination that "there are no extraordinary and temporary conditions in Haiti that prevent Haitian nationals … from returning in safety" (90 Fed. Reg. at 54735) is divorced from reality and contradicted by facts cited in the termination notice itself.

The only support offered for the Secretary's determination is the conclusory assertion that "parts of the country are suitable to return to." 90 Fed. Reg. at 54735.[18] The notice neither defines "suitable" nor explains how it relates to the statutory standard, which is whether conditions in Haiti prevent TPS holders "from … returning in safety." 8 U.S.C. § 1254a(b)(1)(C). Nor does the notice

---

[18] That the U.N. passed a resolution calling for the formation of a "Gang Suppression Force" (*cf.* 90 Fed. Reg. at 54735) is irrelevant to current conditions in Haiti. The force does not yet exist. Ex. 1 ¶ 21.

identify any supposedly "suitable" parts of Haiti to which TPS holders could safely return.[19]  That is unsurprising.  "No part of Haiti is safe."  Ex. 1 at 6.

Conditions in Haiti have gotten worse, not better, since Secretary Noem's now-superseded July 1 termination notice.  Indeed, the November 28 termination notice itself acknowledges that as of late August "1.3 million people—approximately 12% of Haiti's population—have been forced to flee their homes and are internally displaced due to *escalating violence*" that "has engulfed Port-au-Prince and *spreads beyond*."  90 Fed. Reg. at 54735 (cleaned up).  Recognizing this dire and deteriorating reality, the then-acting U.S. ambassador to the United Nations contemporaneously expressed—in remarks quoted in the termination notice—the administration's "concern about escalating levels of violence in Haiti" and "the territorial expansion of the gangs." U.S. Mission to the UN, "Remarks at a UN Security Council Briefing on Haiti" (Aug. 28, 2025), https://bit.ly/4aeqngr (quoted at 90 Fed. Reg. at 54735).  The spreading violence, said the ambassador, exposes individuals to "constant risks of being killed or injured during gang attacks, police operations, or acts of mob justice" as well as recurring incidents of sexual violence."  *Id.* Not only do "[c]orruption and indiscriminate violence remain major issues," but there also are "critical needs like food, shelter, medical care …, cholera treatment and prevention, hygiene, and malnutrition treatment for families and children."  *Id.*

That was in August.  Things have not improved since.  At the end of October, the permanent

---

[19]  The November 28 termination notice also fails to address evidence—contained in the declarations that Plaintiffs submitted in support of their previous motion for interim relief— showing that however dangerous Haiti may be in general it would be even more dangerous for returning TPS holders.  Returning TPS holders would be targeted by gangs and "face a substantial risk of danger, violence, and death" precisely because persons who have spent time in the United States are perceived "to have resources" and are thus "more likely to be victims of extortion" than the average Haitian.  The Secretary failed to address this evidence even though she issued the November 28 termination notice "[d]ue to the litigation."  AR 409 (Sept. 5, 2025 email).

ambassador to the U.N. once more recognized—again, in remarks quoted in the now-termination notice—that gangs "are terrorizing communities, extorting families, [and] recruiting children to commit horrors on behalf of the gang leaders." U.S. Mission to the UN, "Remarks at a UN Security Council Briefing on Haiti" (Oct. 22, 2025), https://bit.ly/4aHUr4g (quoted at 90 Fed. Reg. at 54735). And to this day the State Department continues to warn that people should "not travel to Haiti due to kidnapping, crime, terrorist activity, civil unrest, and limited health care."[20]

The ambassadors' observations and the travel advisory are well founded. Violent gangs have taken over Haiti, establishing a "mafia-like model that is so entrenched that the country can barely function without their consent."[21] These gangs "function like armed militias, controlling large swathes of the country."[22] In just the first five months of 2025, gang violence led to over 4,000 homicides.[23] And between July 1 and September 30, 2025 there were "at least 1,247" additional homicides.[24] And although it is most pronounced in Haiti's capital city of Port-au-Prince, where gangs control an estimated 90% of the territory,[25] no part of the country is safe. In 2025, "[g]angs' territorial expansion has reached unprecedented levels and continues to advance."[26] "During the third quarter of 2025" gang violence "continued to spread to the

---

[20] U.S. State Dep't, Travel Advisory, *supra* n.2; *see also* Barmes Decl. ¶¶ 5–8 (Ex. 8).

[21] *Last Chance? Breaking Haiti's Political and Criminal Impasse*, GLOBAL INITIATIVE AGAINST TRANSNATIONAL ORGANIZED CRIME at 10 (Jan. 2025), https://bit.ly/4aiUaEV.

[22] *From Criminal Governance to Community Fragmentation: Addressing Haiti's Escalating Crisis*, GLOBAL INITIATIVE AGAINST TRANSNATIONAL ORGANIZED CRIME at 1 (Sept. 2025), https://bit.ly/49dtGCD.

[23] *Security Council renews UN's Haiti mission amid spiralling crises*, UN NEWS (July 14, 2025), https://bit.ly/48R71vo.

[24] *Gang Violence in Haiti Continues to Spread Beyond the Capital, Reaching the Rural Areas of Artibonite and Centre*, espacinsular.org (Nov. 11, 2025), https://bit.ly/3My5qmS.

[25] *Haiti's gangs have 'near-total control' of the capital as violence escalates, UN says*, ASSOCIATED PRESS (July 2, 2025), https://bit.ly/44rLYhH.

[26] *From Criminal Governance to Community Fragmentation, supra* n.22.

peripheral and rural areas of Port-au-Prince, as well as to the Artibonite and Centre departments."[27] Indeed, Haitian police estimate that, as of December 1, 2025, "50% of the Artibonite region had fallen under gang control" following "large-scale attacks targeting towns including Bercy and Post-Sonde."[28] Put simply, in recent months, not just the capital but "rural communities have increasingly become targets of indiscriminate attacks."[29] It is for these reasons that just yesterday a State Department official emphasized that the Department's Level 4 travel advisory "is not limited to Port-au-Prince" but also applies to "all other parts of Haiti." Ex. 1 ¶ 20.

The consequences of this pervasive violence are horrific.

"[A]rmed gangs have systematically weaponized rape to terrorize the population, victimizing thousands of women, girls and even men."[30] Notably, however, "[t]he sexual targeting of women and girls isn't isolated to armed gangs."[31] On the contrary:

> Assaults are also becoming commonplace inside the soiled makeshift displacement camps where shacks have no doors and lighting and security are luxuries. Meanwhile, as government authority collapses and poverty worsens nationwide, a culture of rape and sexual exploitation is also growing in communities outside of gangs' control. Men in positions of power, whether they are community leaders, husbands or warlords, are coercing girls and women into sex in exchange for protection or money.[32]

Simply put, "rape and other forms of sexual" are rampant. 90 Fed. Reg. 28763.

Gang violence and the lack of effective governance means that victims of sexual assault and others who need medical care are often unable to obtain it. Because the gangs frequently target

---

[27] *Gang Violence in Haiti, supra* note 24.

[28] Junior Racine, Danica Coto, and Evens Sanon, *Gangs launch large-scale attack in Haiti's central region as hundreds flee gunfire and burning homes*, ASSOCIATED PRESS (Dec. 1, 2025), https://bit.ly/3XRGs4f.

[29] Haiti, Global Centre for the Responsibility to Protect (Nov. 14, 2025), https://bit.ly/3YoPR3r.

[30] Jacqueline Charles, *'Unimaginable': The toll on Haiti's women and girls raped by violent gangs*, Miami Herald (Dec. 11, 2025), https://bit.ly/456buJz.

[31] *Id.*

[32] *Id.*

hospitals, murdering or kidnapping doctors and nurses,[33] "only 37 per cent of Haiti's health facilities in Port-au-Prince are fully functional."[34] Indeed, the escalating gang violence is so severe that Doctors Without Borders, which typically operates in warzones, was forced to permanently close its emergency medical center after it was "hit several times by stray bullets."[35]

The violence has left "more than 1 million people homeless."[36] In 2024, Haiti alone "accounted for nearly 75% of global displacement cases."[37] "Nearly one in six children in Haiti are now internally displaced, and almost 700,000 minors live without stable shelter or secure housing."[38] Those displaced have been forced into "improvised shelters" or have taken up residence in "schools, churches and even government buildings," many of which "have no running water, flushing toilets or garbage pickup."[39] "The humanitarian crisis in Haiti has reached 'alarming levels'" with "nearly 2 million people facing emergency levels of food insecurity and 6,000 in catastrophic conditions facing starvation."[40]

The July 1 termination notice frankly acknowledged that "Haiti is in the grip of [a] severe humanitarian and human rights crisis." 90 Fed. Reg. at 28763. The November 28 termination notice omits that statement. The Secretary offers no explanation for its deletion but the reason is plain: it contradicts her determination that Haitian TPS holders can return to Haiti in safety.

---

[33] *Haiti gang crisis: Top rights expert decries attacks on hospitals*, UN NEWS (Jan. 3, 2025), https://bit.ly/495GM5M.
[34] *Id.*
[35] *Doctors Without Borders permanently closes its emergency center in Haiti's capital*, ASSOCIATED PRESS (Oct. 15, 2025), https://bit.ly/4pzQtza.
[36] Evens Sanon, *Gangs attack a neighborhood in Haiti that's home to the country's elite*, ASSOCIATED PRESS (Feb. 4, 2025), https://bit.ly/4q5qn7a.
[37] *From Criminal Governance to Community Fragmentation, supra* note 2.
[38] *Id.*
[39] Frances Robles, *How 360,000 Haitians Wound Up Living in Empty Lots and Crowded Schools*, N.Y. TIMES (May 10, 2024), https://bit.ly/4oMHJED.
[40] *U.N. Chief warns gangs could overrun Haiti's capital without additional support*, ASSOCIATED PRESS (Jan. 23, 2025), https://bit.ly/4q3WSTd.

### b.       The Secretary's stated rationale does not support termination.

The facts recited in the termination notice do not support termination.

As an initial matter, there is a fundamental mismatch between termination of Haiti's TPS status and the stated goal of reducing the "presence of illegal aliens in the United States." 90 Fed. Reg. at 54736.  TPS holders are not "illegal aliens."  By statute, each TPS holder "shall be considered as being in, and maintaining, lawful status as a nonimmigrant." 8 U.S.C. § 1254a(f)(4).

Without explicitly saying so, the November 28 termination notice insinuates that termination is in the national interest because Haiti's TPS designation is supposedly a "pull factor[]," *i.e.*, inducement, for "large-scale illegal immigration" of Haitians to the United States. 90 Fed. Reg. at 54736–37.  Notably, it does so despite dropping the July 1 termination notice's assertion that "misinformation about TPS eligibility and about the general availability of legal status in the United States may have been one factor for migrants trying to reach the U.S.  border." 90 Fed. Reg. at 28763. Regardless, the assertion that Haiti's TPS designation acts as a "pull factor" is wrong as a matter of both law and fact.  By statute, a person must be physically present in the United States at the time of the designation to qualify for TPS; no one who later enters the country is eligible for TPS.  8 U.S.C. § 1254a(c)(1)(A).  And empirically the contention that Haiti's TPS designation draws illegal migrants to the U.S. is belied by DHS's own data, which show that the number of Haitian nationals caught trying to enter the U.S. illegally plummeted between 2021 and 2024, steadily falling from slightly more than 46,160 in 2021 to just 2,790 in 2024, even though Haiti was designated and redesignated for TPS three times during that period.  Ex. 7 ¶ 15 & tbl. 1; *cf.* 86 Fed. Reg. 41863; 88 Fed. Reg. 5022; 89 Fed. Reg. 54484.

As Plaintiffs explained in their previous motion for interim relief, the Secretary's assertion to the contrary rests on a conflation of "U.S. Border Patrol data with U.S. Customs and Border

Protection … data." ECF 26 at 30 (quoting ECF 26-7 at ¶¶ 4–7). Remarkably, rather than correct the error, the November 28 termination notice not only repeats the error but compounds it with "a new false claim" (Ex. 7 ¶ 7)—namely, the assertion that "illegal immigration from Haiti into the U.S. continued to increase with extremely high numbers seen around the time of and following the latest new designations of Temporary Protected Status for Haiti by then Secretary Mayorkas." 90 Fed. Reg. at 54737. In fact, illegal migration by Haitians "effectively ceased" by the first half of 2022. Ex. 7 ¶ 14; *see generally id.* ¶¶ 6–20. There is quite simply "no evidence that designations of TPS for Haiti have increased" illegal migration. *Id.* ¶ 20.[41]

The termination notice next asserts that Haitian TPS holders threaten public safety. The notice cites "multiple large-scale prison breaks in Haiti" and "serious and violent crimes" being committed by "Haitian gang members." 90 Fed. Reg. at 28763. But it is silent when it comes to the criminality rate of Haitian TPS holders who, as a matter of law, cannot have the kinds of criminal histories described in the termination notice if they wish to be and remain eligible for TPS benefits. *See* 8 U.S.C. § 1254a(c)(2)(B), (3)(A); *id.* § 1182(a)(2)–(3). In fact, the President's first administration cited this statutory bar to TPS eligibility in explaining its decision to "not consider crime rates among TPS recipients." *Saget*, 375 F. Supp. 3d at 300. Meanwhile, government data

---

[41] The termination notice also points to data suggesting that Haitians overstay visas at a high rate, a phenomenon that it says might "present potential risks to U.S. national security and public safety, as aliens who overstay their visas may be harder to locate and monitor." 90 Fed. Reg. 54736. But here are at least two problems with the Secretary's reliance on overstay data. First, the notice does not tie overstays to Haiti's TPS designation. Second, the data cited in the notice overstate the number of aliens who "may be harder to locate and monitor" because DHS defines broadly "overstay" as any "nonimmigrant who was lawfully admitted to the United States but remained in the United States beyond the authorized period of admission." (DHS, "Entry/Exit Overstay Report, Fiscal Year 2024 Report to Congress," at iii (July 16, 2025), https://bit.ly/3MztDcr)—a definition that "sweeps in individuals who entered the United States lawfully and then applied for asylum or another status (including Temporary Protected Status), but had not received the status within the reporting period for the annual DHS Entry/Exit reports." Ex. 7 ¶ 21.

show that immigrants in general and Haitian immigrants in particular commit far fewer crimes than those born in the United States.  According to Census Bureau data, "[n]ative-born Americans have an incarceration rate 48 percent higher than that of all Haitian immigrants."[42]

The termination notice's demonstrably flawed analysis of the available data "casts serious doubt on the reliability of its legal conclusions."  *Horizon Lines, LLC v. United States*, 414 F. Supp. 2d 46, 56 (D.D.C. 2006).   Indeed, because it is "based on a factual premise that is flatly contradicted by the agency's own record," the termination notice does not reflect "reasoned administrative decisionmaking" and, for that reason, "cannot survive review under the arbitrary and capricious standard."  *Id.*  (internal quotation marks omitted) (quoting *City of Kansas City v. Dep't of Hous. & Urban Dev.*, 923 F.2d 188, 194 (D.C. Cir. 1991)).

### c.   The Secretary's stated rationale is internally contradictory.

Referring to the U.N. resolution to establish a Gang Suppression Force, the termination notice asserts that "[e]nding Temporary Protected Status for Haiti reflects a necessary and strategic vote of confidence in the new chapter Haiti is turning" because "[o]ur immigration policy must align with our foreign policy vision of a secure, sovereign, and self-reliant Haiti" and "[t]he United States cannot call for bold change on the ground while signaling doubt from afar."  90 Fed. Reg. at 54738.  But that makes no sense.  The only reason that the Gang Suppression Force and a "bold change on the ground" are needed is because Haiti today is an exceptionally dangerous place wracked by political instability, rampant violence, widespread human-rights abuse, limited healthcare, and pervasive food insecurity.  Yet those "extraordinary and temporary conditions …

---

[42]   Alex Nowrasteh, Haitian Immigrants Have a Low Incarceration Rate, Cato at Liberty (July 7, 2025), https://bit.ly/44UuNFI.   Haitian immigrants' low criminality may explain why the termination notice identifies only two Haitian immigrants alleged to have committed crimes who might have been TPS holders.  *See supra* at 11-12.

that prevent" Haitians "from returning … in safety" are precisely the circumstances for which TPS is intended.  8 U.S.C. § 1254a(b)(1)(C).  Thus, there is no contradiction between supporting the U.N. resolution and extending Haiti's TPS designation.  To the contrary, extension of Haiti's TPS designation would confirm the need for "bold change on the ground."

***

The fact that the termination rests on an unexplained departure from past practice and on determinations that are incomplete, implausible, contrary to facts known by DHS, and internally contradictory is itself evidence that the termination reflects a pre-determined outcome rather than a good-faith, evidence-based review as required by 8 U.S.C. § 1254a(b)(3)(A).

### B.   The termination is contrary to constitutional right and power.

Agency action that is "contrary to constitutional right [or] power" must be set aside as unlawful.  5 U.S.C. § 706(2)(B).  The termination of Haiti's TPS designation is contrary to constitutional right and contrary to constitutional power.

### 1.   The termination is contrary to constitutional right.

The termination is "contrary to constitutional right" because it is motivated, at least in part, by discriminatory animus.

The Fifth Amendment's "equal protection component" forbids the federal government from discriminating based on race, ethnicity, or national origin.  *Washington v. Davis*, 426 U.S. 229, 239 (1976).[43] A plaintiff need not prove that "the challenged action rested solely on racially discriminatory purposes."  *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–65 (1977).  It is enough to show that discriminatory intent was "a motivating factor."  *Id.* at

---

[43]  "[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."  *Zadvydas v.  Davis*, 533 U.S. 678, 693 (2001) (emphasis added) (collecting cases).

265–66.  Once shown, "judicial deference is no longer justified," and the government action is subject to strict scrutiny.  *Id.* at 266.[44] If discriminatorily motivated, facially neutral governmental actions "are just as abhorrent, and just as unconstitutional, as laws that expressly discriminate on the basis of race." *N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016) (citing *Arlington Heights*, 429 U.S. at 264–66; *Davis*, 426 U.S. at 241).

"When considering whether discriminatory intent motivates a facially neutral law, a court must undertake a 'sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" *McCrory*, 831 F.3d at 220 (quoting *Arlington Heights*, 429 U.S. at 266). Relevant circumstantial evidence includes but is not limited to (*id.*) the sequence of events leading to a decision; departures from normal procedures or substantive conclusions; the historical background of a decision; disparate impact, and statements made by the relevant decisionmakers. *Arlington Heights*, 429 U.S. at 266–67.  This is "a *nonexhaustive* list of factors to consider in making this sensitive inquiry." *McCrory*, 831 F.3d at 220 (emphasis added). Evidence that the discriminatory beliefs of others guided the decisionmaker is enough.  *Saget*, 375 F. Supp. 3d at 371 (finding "sufficient evidence of interactions and communications between White House officials and DHS regarding [the Secretary]'s decision" to terminate Haiti's TPS designation to raise "serious

---

[44]   The more deferential standard applied in *Trump v. Hawaii*, 585 U.S. 667 (2018), has no application in this case.  None of the "pivotal factors" that informed the Court's analysis there are present here.  *Saget*, 375 F. Supp. 3d at 367.  First, as TPS holders, Plaintiffs "are lawfully present in the United States" (*id.*), not "aliens abroad" seeking entry into the United States.  *Hawaii*, 585 U.S. at 702.  This makes "all the difference" because Plaintiffs' lawful presence "within the United States" entitles them to greater constitutional protection than those who remain abroad.  *Zadvydas v. Davis*, 533 U.S. 678, 693–94 (2001).  Second, the termination is not an executive order, "facially neutral," or pertinent to national security.  *Hawaii*, 585 U.S. at 702.  The termination targets a specific group of overwhelmingly non-white immigrants, namely, Haitians.  Thus, *Hawaii*'s more deferential standard does not apply, and the *Arlington Heights* standard applies.  *See Saget*, 375 F. Supp. 3d at 367 (refusing to apply *Hawaii* to TPS termination); *Ramos*, 321 F. Supp. 3d at 1127–31 (same); *Centro Presente*, 332 F. Supp. 3d at 410–12 (same).

questions on the merits of Plaintiffs' equal protection claim").

Here, the anti-Haitian animus culminating in the termination of Haiti's TPS designation is anything but subtle. The most damning evidence of animus—President Trump's own words—requires no interpretation. Echoing the racist trope of national purity, he has said that "illegal immigrants"—the category to which he assigns Haitian TPS holders[45]—are "poisoning the blood" of America.[46] President Trump has not only articulated animus against non-white immigrants generally[47] but long expressed discriminatory animus toward Haitians in particular.[48] During his first administration, for example, the President referred to Haiti as a "shithole country,"[49] suggested Haitians "probably have AIDS," and complained that Haitian immigration is "like a death wish for our country."[50] During his most recent campaign, he endorsed the conspiracy theory that Haitian immigrants were "eating the pets of the people" in Springfield, Ohio.[51] Even after that

---

[45]  Edith Olmsted, *Trump Escalates Racist Attacks With Dangerous Lie*, THE NEW REPUBLIC (Oct. 9, 2024), https://bit.ly/4oKiHWJ.

[46]  C-Span, *Donald Trump on Illegal Immigrants "Poisoning the Blood of Our Country,"* https://www.c-span.org/clip/campaign-2024/donald-trump-on-illegal-immigrants-poisoning-the-blood-of-our-country/5098439; Hannah Fingerhut and Ali Swenson, *Trump defends controversial comments about immigrants poisoning the nation's blood at Iowa Rally*, ASSOCIATED PRESS (December 19, 2023), https://bit.ly/3KOROmz.

[47]  *See, e.g.*, Ariana Figueroa, *Trump promises mass deportations of undocumented people. How would that work?*, MISSOURI INDEPENDENT (Aug. 23, 2024), https://bit.ly/3KIc6hK ("I don't know if you call [immigrants] people. In some cases they're not people, in my opinion."); Michael Gold, Maggie Haberman, *Trump, at Fund-Raiser, Says He Wants Immigrants from 'Nice' Countries*, N.Y. TIMES (Apr. 7, 2024), https://nyti.ms/44nzBDn ("Why can't we allow people to come in from nice countries, . . . you know like Denmark, Switzerland? Do we have any people coming in from Denmark? How about Switzerland? How about Norway?").

[48]  Ayendy Bonifacio, *Tracing the Anti-Haitianism Behind the Springfield Scapegoating*, NACLA (Sept. 16, 2024), https://bit.ly/4pY9tay.

[49]  Ali Vitali, Kasie Hunt & Frank Thorp V, *Trump Referred to Haiti and African Nations as 'Shithole' Countries*, NBC NEWS (Jan. 11, 2018), https://nbcnews.to/4iVeGO6.

[50]  *Trump Slams Haitians Attempting to Enter U.S., Says They 'Probably Have AIDS'*, ABC (Oct. 10, 2021), https://bit.ly/497smSF.

[51]  Riley Hoffman, *READ: Harris-Trump presidential debate transcript*, ABC (Sept. 10, 2024), https://bit.ly/4aLeOgQ.

lie was quickly and thoroughly debunked, the President, implying that Haitian immigrants are cannibals, claimed they were eating "other things too that they're not supposed to be."[52] And within the last few days he renewed his slurs, describing Haiti once again as a "filthy, dirty, [and] disgusting" "shithole country."[53]

President Trump has translated his anti-Haitian rhetoric into policy. During his first term, he tried to terminate Haiti's TPS designation but was prevented from doing so when multiple courts held the attempted termination to be an unlawful "preordained" action motivated at least in part by the "discriminatory purpose of removing non-white immigrants from the United States." *Saget*, 375 F. Supp. 3d at 346–47, 374; *accord Ramos*, 336 F. Supp. 3d at 1100; *see also Centro Presente*, 332 F. Supp. 3d at 415. And now, still motivated by his enduring animus against Haitian immigrants specifically and non-white immigrants generally, he is attempting to do so again.

President Trump's animus can be imputed to Secretary Noem. The President claims that "Article II of the Constitution vests the 'executive Power'—'all of it'—in the President alone." Reply in Supp. of Appl. for Stay, *Trump v. Wilcox*, No. 24A966 (U.S.), 2025 WL 1372312, at *1 (Apr. 1, 2025). Accepting this principle, Secretary Noem has declared that she will do anything that President Trump wants, stating that "[w]hen the President gives a directive, the Department of Homeland Security will follow it."[54] And indeed she has, terminating Haiti's TPS designation in avowed "furtherance of" President Trump's agenda. 90 Fed. Reg. at 54736. Because President Trump's animus against Haitian immigrants has "influenced or manipulated the decision-making process," the termination of Haiti's TPS designation "may violate the equal protection" clause

---

[52]   Sara Dorn, *Trump Doubles Down on False Pet-Eating Claims; Suggests Haitian migrants Eat 'Other Things Too'*, Forbes (Oct. 16, 2024), https://bit.ly/48CCvqk.

[53]   CNN, *Almost eight years later, Trump confirms he used the phrase 'shithole countries,'* at 00:49–54, 1:14–18, https://bit.ly/3YtFQC0.

[54]   Noem, *supra* at 27 n.15.

"[e]ven if it cannot be proven that" Secretary Noem or other subordinates "personally harbor animus towards TPS-beneficiaries from Haiti." *NAACP v. U.S. Dep't of Homeland Sec.*, 364 F. Supp. 3d 568, 577 (D. Md. 2019); *accord Saget*, 375 F. Supp. 3d at 369 (same); *Ramos*, 321 F. Supp. 3d at 1123 (same).[55]

Additional evidence confirms that the termination of Haiti's TPS designation is motivated, at least in part, by discriminatory animus against Haitians.

Although Plaintiffs "need not plead or show the disparate treatment of other similarly situated individuals," the termination of Haiti's TPS designation undeniably "impacts one race, namely non-white Haitians, more than another." *Saget*, 375 F. Supp. 3d at 366 n.25, 367. The termination stands in sharp contrast to the preferential treatment that President Trump has afforded white—but not black—South Africans, granting Afrikaners special refugee status based on exaggerated claims of "racial discrimination." Exec. Order No. 14204, 90 Fed. Reg. 9497 (Feb. 7, 2025) (directing government officials to "prioritize … admission and resettlement … for Afrikaners").[56]

Discriminatory animus also can be inferred from the administration's failure to observe statutorily mandated procedures as well as its unexplained departure from past practice. *See supra* at 24–26. Both are strong indications that "improper purposes are playing a role" in the termination

---

[55] That said, Secretary Noem too has expressed a distaste for non-white immigrants, calling them "dirtbags" (@Sec_Noem, X (Feb. 27, 2025 8:59 PM), https://bit.ly/3XNYbJZ); "murderers" (*Homeland Security Secretary Nominee Governor Kristi Noem Testifies at Confirmation Hearing*, C-SPAN (Jan. 17, 2025), https://bit.ly/457ii9R); and "rapists" (*id.*).

[56] *See also* Ted Hesson et al., *US diplomats asked if non-whites qualify for Trump refugee program for South Africans*, REUTERS (July 25, 2025), https://bit.ly/3XR2Smo ("Spencer Chretien, the highest-ranking official in the State Department's refugee and migration bureau, sa[id] the program is intended for white people"); Joey Garrison, *Who are Afrikaners? Trump welcomes white South Africans as other refugees are halted*, USA TODAY (May 10, 2025), https://bit.ly/48ONZpp.

of Haiti's TPS designation, especially in light of the fact that "the factors usually considered important by" the Secretary of Homeland Security "strongly favor a decision contrary to the one reached." *Arlington Heights*, 429 U.S. at 267.

A direct extension of President Trump's recently repeated discriminatory preference for immigrants from "nice," predominantly white countries "like Denmark, Switzerland, [and] Norway,"[57] the termination of Haiti's TPS designation is "contrary to constitutional right" and thus must be set aside as unlawful. 5 U.S.C. § 706(2)(B).

## 2. The termination is contrary to constitutional power.

Based exclusively on Secretary Noem's determination of what is in the "national interest," the termination of Haiti's TPS designation is also unlawful because it is "contrary to constitutional … power." 5 U.S.C. § 706(2)(B).

The Constitution vests the federal government with three distinct powers—legislative, executive, and judicial—each of which is to be exercised exclusively by its associated branch. *See Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 472 (2001) (legislative power); *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 496–97 (2010) (executive power); *Stern v. Marshall*, 564 U.S. 462, 484 (2011) (judicial power). It necessarily violates this separation of powers when Congress delegates to another branch its exclusive authority to exercise "legislative power." *Whitman*, 531 U.S. at 472.

A delegation of legislative power must satisfy the "intelligible principle" test, which requires Congress to "lay down by legislative act an intelligible principle to which the person or body authorized to" exercise discretion "is directed to conform." *J. W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 409 (1928). "Congress must set forth standards 'sufficiently definite

---

[57] Gold & Haberman, *supra* at n.47; *see also* CNN, *supra* n. 53.

and precise to enable Congress, the courts, and the public to ascertain' whether Congress's guidance has been followed." *Gundy v. United States*, 588 U.S. 128, 158 (2019). Only *after* "Congress ha[s] made all the relevant policy decisions" (*id. at* 163*)*, may an executive agency "determine specific facts" and "fill up the details under the general provisions made by the Legislature." *Panama Refin. Co. v. Ryan*, 293 U.S. 388, 426 (1935) (cleaned up).

These principles have no less force when the statute at issue involves foreign relations or national security. Indeed, the very case that first articulated and applied the non-delegation doctrine involved the president's powers over foreign trade. *See J.W. Hampton*, 276 U.S. at 404. Since then, the Supreme Court and other courts have continued to apply the doctrine to questions of foreign relations and national security, rejecting arguments that it is inapplicable in these areas. *See, e.g., United States v. Witkovich*, 353 U.S. 194, 198–200 (1957) (applying constitutional avoidance doctrine to adopt limiting construction of immigration statute that, in the interest of national security, "confer[red] upon the Attorney General unbounded authority"); *see also, e.g., Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 558–60 (1976) (statute implicating national security did not constitute an improper delegation of power because it "establishe[d] clear preconditions to Presidential action" and "articulate[d] a series of specific factors to be considered by the President"); *V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312, 1346–47 (Fed. Cir. 2025) ("the idea that tariff delegations are subject to a lower non-delegation standard is incompatible with *J.W. Hampton*"), cert. granted, No. 25-250, 2025 WL 2601020 (U.S. Sept. 9, 2025). One court of this district has specifically rejected the notion that the non-delegation applies differently in domestic versus foreign affairs, observing that "[w]hether Congress exceeded *its* broad authority to delegate depends not on the setting in which that authority is exercised, but on the text of the statute." *Gomez v. Trump*, 485 F. Supp. 3d 145, 187 (D.D.C. 2020), *amended in part*, 486

F. Supp. 3d 445, *amended in part sub nom. Gomez v. Biden*, 2021 WL 1037866 (D.D.C. 2021).

Legislation reaches the limit of what the Constitution permits where it directs the President or an agency to determine what course of action is in the interest of "public safety" (*Touby v. United States*, 500 U.S. 160, 163-65 (1991)), or—most especially—the "public interest." *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 225–26 (1943) (FCC's power to regulate airwaves); *N.Y. Cent. Sec. Corp. v. United States*, 287 U.S. 12, 24–25 (1932) (ICC's power to approve railroad consolidations). But in each case where broad delegations at the outer limit are permitted, the context provided by the statute, its declared aims, and a body of case law define the contours of what is meant by those terms. And these broad delegations are deemed acceptable because they come attended by more particular factors that the executive is instructed to consider. *See, e.g., Touby*, 500 U.S. at 166 (pursuit of "public safety" based on determination of a drug's "history and current pattern of abuse" and the "'scope, duration, and significance of [that] abuse.'").

The Secretary's delegated authority to terminate a TPS designation based on her own personal assessment of what is in "the national interest of the United States" lacks any guiding intelligible principle. 8 U.S.C. § 1254a(b)(1)(C). The Secretary admits that "'[n]ational interest' is an expansive standard that may encompass an array of broad considerations." 90 Fed. Reg. at 28762. Indeed, it is so broad and admittedly undefined that "the scope appears to be essentially unlimited." *Perkins Coie LLP v. U.S. Dep't of Just.*, --- F. Supp. 3d ---, 2025 WL 1276857, at *21 (D.D.C. 2025), *appeal docketed*, No. 25-5241 (D.C. Cir. July 2, 2025). "National interest" in the immigration context could be manipulated to capture anything the DHS Secretary personally thinks important and good for the country, even if legally or constitutionally dubious. The DHS Secretary cannot remedy this unlawful delegation "by adopting … a limiting construction of the statute." *Whitman*, 531 U.S. at 472. Rather, it is the exclusive role of Congress both to define

41

"national interest" and to specify what acts, standards, and conditions are relevant to its assessment. *See id.*; *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529–30 (1935); *Panama Refin. Co.*, 293 U.S. at 421. Otherwise, it is handing the executive a blank check.

Insofar as it gives the Secretary of Homeland Security unfettered discretion to determine what is in the "national interest" (8 U.S.C. § 1254a(b)(1)(C)), the TPS statute violates the nondelegation doctrine. Inasmuch as Secretary Noem's termination of Haiti's TPS designation in particular rests entirely on her uncabined determination of what is in the "national interest" (90 Fed. Reg. at 54735–36), the termination is "contrary to constitutional … power" and must therefore be set aside as unlawful. 5 U.S.C. § 706(2)(B).

## II. Plaintiffs will suffer irreparable harm absent a stay.

Denial of a stay would inflict irreparable harm on Plaintiffs. If the termination is not stayed pending a final decision on the merits, they will suffer injuries that are "certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief to prevent irreparable harm." *League of Women Voters v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (citation modified). In fact, the injuries would be "beyond remediation." *Id. at* 8.

Unless the termination is stayed, Plaintiffs will soon face deportation to a country where violence and human-rights abuse are pervasive but food, housing, and medical care are scarce. *See supra* 26–30; Ex. 1 ¶¶ 118–139, 145–152. If deported, Plaintiffs' lives will be at risk because Haiti is ruled by violent gangs likely to target Plaintiffs; because Plaintiffs would be unable to secure the medical treatment that they need; and because Plaintiffs may be unable to secure employment and thus unable to purchase food regardless whether there is food to be bought. *See* Ex. 2 ¶¶ 7–11; Ex. 3 ¶¶ 5, 7–13; Ex. 4 ¶¶ 3–20; Ex. 5 ¶¶ 2–31; Ex. 6 ¶¶ 8–20. And even if Plaintiffs do not die upon their return, they will be torn from their families. *See* Ex. 5 ¶¶ 3, 20–22. Indeed, Plaintiffs

might be separated from their families even if not deported because they will be subject to immediate, indefinite detention, which is itself "the sort of actual and imminent injur[y] that constitute[s] irreparable harm." *Aracely R. v. Nielsen*, 319 F. Supp. 3d 110, 155 (D.D.C. 2018). And even if not detained, Plaintiffs will lose their right to work in the U.S. and thus the ability to support themselves, their families, and others. *See* Ex. 3 ¶ 5; Ex. 5 ¶ 24; Ex. 6 ¶¶ 8, 9, 15.

Simply put, Plaintiffs—who have an important "reliance interest in Haiti maintaining its TPS designation until" lawfully terminated (*HECA*, 789 F. Supp. 3d at 268)—will suffer irreparable injury absent a stay. This factor, therefore, "weighs heavily in favor" of a stay. *Saget*, 375 F. Supp. 3d at 374.

## III.    Postponing the termination is in the public interest.

The public interest favors the preservation of Plaintiffs' constitutional rights, the violation of which "is always contrary to the public interest." *Perkins Coie LLP*, 2025 WL 1276857, at *49 (internal quotation marks and citation omitted). The same is true of enforcing the procedural obligations of administrative agencies. "There is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *U.S. Inst. of Peace v. Jackson*, 783 F.Supp.3d 316, 379 (D.D.C. 2025) (citation modified) (quoting *League of Women Voters*, 838 F.3d at 12), *appeal docketed*, No. 25-5185 (D.C. Cir. May 22, 2025); *accord N.S. v. Hughes*, 335 F.R.D. 337, 355 (D.D.C. 2020) ("The public has a clear interest in seeing that government officials do not exceed their statutory authority."), *modified on clarification sub nom. N.S. v. Dixon*, 2020 WL 6701076. Here, a stay would advance each of these public interests because the termination of Haiti's TPS designation is an "arbitrary [and] capricious" action "in excess of statutory … authority" that was effected "without observance of procedure required by law" and is "contrary to constitutional right [and] power." 5 U.S.C. § 706(2)(A)–(D).

As various amici—including states and members of Congress—have previously told the Court, staying the termination of Haiti's TPS designation would advance the public interest in other ways too.  *See* ECF 37 at 11–21; ECF 47 at 6–20; ECF 54 at 8–17.[58]

Ineligible for federal assistance (*see* 8 U.S.C. § 1254a(f)(2)), TPS holders are employed at high rates.  "TPS holders work in frontline jobs, hospitality, delivery, customer service, retail, restaurants, transportation, construction, factories, and manufacturing, among many other professional fields."  *NTPSA*, 773 F. Supp. 3d at 840.  Their labor is critical to many local economies.  ECF 37 at 14–21; ECF 47 at 12–15; ECF 54 at 8–14.  For example, Haitian TPS holders have helped power Springfield, Ohio's economic recovery, enabling employers to fill jobs and meet demand that they otherwise could not.[59] Termination of Haiti's TPS designation, and the corresponding end to Haitian TPS holders' work authorization, will disrupt and depress the economy in Springfield and the many other communities around the country where Haitian TPS holders have settled.  *Cf.*  773 F. Supp. 3d at 841–42 ("The cost to companies to replace laid-off TPS employees could be as high as $1.3 billion.").

Once Haitian TPS holders lose work authorization, they will be unable to support themselves or their families.  *See* Ex. 3 ¶ 5; Ex. 5 ¶ 24; Ex. 6 ¶¶ 8, 9, 15.  "[I]f TPS holders no longer have jobs, they or their families may need to seek public assistance."  *NTPSA*, 773 F. Supp. 3d at 840.  And "[w]ithout jobs, TPS holders and their families would also lose employer-sponsored health insurance, which would likely increase health care expenditures for local governments."  *Id.*  The financial burden on states and localities would be compounded by a

---

[58]  Although amici filed their briefs in support of Plaintiffs' original motion for a stay, what amici said then remains true today.
[59]  Miriam Jordan, Why Thousands of Haitians Have Settled in Springfield, Ohio, N.Y. TIMES (Sept. 14, 2024), https://nyti.ms/3XRhUbC.

simultaneous loss of tax revenues. "In New York," for example,

> TPS households earned $2.3 billion in income, paid $348.9 million in federal taxes, $305.5 million in state and local taxes, and also contributed $1.6 billion in spending power. Moreover, at least 41 percent of TPS households are homeowners and pay taxes on property having a total value of approximately $19 billion.

*Id.* at 841 (internal quotation marks omitted); *see also* ECF 47 at 13–14.[60] In short, unless postponed, the termination of Haiti's TPS designation will have an adverse "economic impact[] on the United States and the communities where the TPS holders currently live." *Id.*

But termination of Haiti's TPS designation would also inflict non-economic harm on the communities where TPS holders live. Termination of Haiti's TPS designation would also adversely affect public safety. "Fears of detention and deportation cause undocumented immigrants to forego medical care, such as diagnostic testing and vaccinations, which increases health risks to the broader community." *NTPSA*, 773 F. Supp. 3d at 842. Moreover, "immigrants without legal status are less likely to report crimes or testify in court, reducing public safety and making effective law enforcement more difficult." *Id.*; *accord* ECF 47 at 18–19.

Thus, the public interest strongly favors postponement of the termination.

The government, by contrast, will suffer no harm from a stay. Indeed, "the government 'cannot suffer harm from [a stay] that merely ends an unlawful practice or reads a statute as required.'" *Harris v. Bessent*, 775 F. Supp. 3d 86, 100 (D.D.C. 2025) (citation omitted); *accord N.S.*, 335 F.R.D. at 355.

## CONCLUSION

The Court should stay the termination pursuant to 5 U.S.C. § 705.

---

[60] *See also* American Immigration Counsel, The Contributions of Temporary Protected Status Holders to the U.S. Economy (Sept. 2023).

Dated: December 12, 2025

Respectfully submitted,
/s/ Andrew E. Tauber
Andrew E. Tauber

Ira J. Kurzban
Kevin Gregg
KURZBAN, KURZBAN, TETZELI & PRATT, P.A.
131 Madeira Ave.
Coral Gables, FL 33134
Phone: (305) 444-0060
ira@kktplaw.com
kgregg@kktplaw.com

Sejal Zota
JUST FUTURES LAW
1629 K Street N.W., Suite 300
Washington, DC 20006
Phone: (617) 812-2822
sejal@justfutureslaw.org

Raymond Audain
GISKAN SOLOTAROFF & ANDERSON LLP
1 Rockefeller Plaza, 8th Floor
New York, NY 10020
Phone: (646) 290-6249
raudain@gslawny.com

Matthew Stanford
BRYAN CAVE LEIGHTON PAISNER, LLP
2 N. Central Ave., Ste. 2100
Phoenix, AZ 85004
Phone: (602) 364-7000
matt.stanford@bclplaw.com

Andrew Tauber (D.C Bar No. 495980)
BRYAN CAVE LEIGHTON PAISNER, LLP
1155 F. Street NW, Ste. 700
Washington, D.C. 20004
Phone: (202)-508-6200
andrew.tauber@bclplaw.com

Geoffrey M. Pipoly
Alexa Thein
Madisen Hursey
BRYAN CAVE LEIGHTON PAISNER, LLP
161 N. Clark Street, Ste. 4300
Chicago, IL 60601
Phone: (312) 602-5000
geoff.pipoly@bclplaw.com
alexa.thein@bclplaw.com
madisen.hursey@bclplaw.com

Daniel Paul Mach
BRYAN CAVE LEIGHTON PAISNER, LLP
1290 Avenue of the Americas
New York, NY 10104
Phone: (212) 541-1146
daniel.mach@bclplaw.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that today, December 12, 2025, the foregoing document was filed with the Court's electronic filing system.

*/s/ Andrew E. Tauber*
Andrew E. Tauber

*Counsel for Plaintiffs*