# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FRITZ EMMANUEL LESLY MIOT; RUDOLPH CIVIL; MARLENE GAIL NOBLE; MARICA MERLINE LAGUERRE; and VILBRUN DORSAINVIL, <br><br> *Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, President of the United States of America; UNITED STATES OF AMERICA; THE DEPARTMENT OF HOMELAND SECURITY; and KRISTI NOEM, Secretary of Homeland Security. <br><br> *Defendants*. | Case No. 1:25-cv-02471 |

**DECLARATION OF AARON REICHLIN-MELNICK**

1.    I, Aaron Reichlin-Melnick, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.  I am not being compensated for my opinions of my testimony in this case.

2.    I am a Senior Fellow at the American Immigration Council ("Immigration Council"), a nonprofit and non-partisan organization whose mission includes the use of facts to educate the public on the important and enduring contributions that immigrants make to America.

3.    As a Senior Fellow at the Immigration Council, I have since 2018 tracked and analyzed trends in Department of Homeland Security ("DHS") border enforcement policies and data. I have testified before Congress seven times between 2021 and 2025 on topics which rely on my knowledge of DHS immigration data and immigration law and policy more generally.[1] I have

---

[1] *See, e.g.*, U.S. House of Representatives, Committee on the Judiciary, Subcommittee on Immigration Integrity, Security, and Enforcement, Testimony of Aaron Reichlin-Melnick for hearing on Presidential Power to Secure the Border (Mar. 24, 2024), *available at*

also previously submitted expert declarations analyzing government-produced immigration statistics and examining previous terminations of Temporary Protected Status.[2]

4.      Since 2018, I have maintained and regularly updated the Immigration Council's fact sheet on Temporary Protected Status,[3] which has required me to read and analyze each designation, extension, redesignation, and termination in the last seven years. As part of my policy work, I have also analyzed and tracked the size of the TPS population through regular analysis of the relevant U.S. Citizenship and Immigration Data.[4] As preparation for submitting an expert declaration in *Dahlia Doe v. Noem*, I also reviewed every prior TPS designation and re-designation, extension, and termination, from 1990 through present.[5]

5.      I previously submitted an expert declaration in this case analyzing Secretary Noem's July 1, 2025 Federal Register notice terminating Temporary Protected Status (TPS) for Haiti ("July 1 Termination Notice").[6] I have since read and analyzed Secretary Noem's November 28, 2025 termination notice for Haiti ("November 28 Termination Notice")[7] and submit this

---

https://docs.house.gov/meetings/JU/JU01/20240307/116925/HMTG-118-JU01-Wstate-Reichlin-MelnickA-20240307.pdf.

[2] *See, e.g.*, *Innovation Law Lab v. Wolf*, 3:19-cv-00807-RS (N.D. Cal. filed Feb. 14, 2019), *Padilla v. ICE*, No. 2:18-cv-00928 (W.D. Wash. filed June 25, 2018), *East Bay Sanctuary Coalition II v. Wolf*, 3:19-cv-04073, (N.D. Cal filed July 16, 2019); *Doe v. Noem*, No 1:25-cv-08686, ECF No. 20, Ex. 7 (S.D.N.Y filed Oct. 20, 2025).

[3] American Immigration Council, "Temporary Protected Status (TPS): An Overview," *last updated* November 25, 2025, https://www.americanimmigrationcouncil.org/fact-sheet/temporary-protected-status-tps-overview/.

[4] *See, e.g.*, U.S. Citizenship and Immigration Services, "Form I-821, Application for Temporary Protected Status Receipts, Approvals, Denials, and Pending by Country of Designation (Fiscal Year 2025, Q3)," Oct. 8, 2025, https://www.uscis.gov/sites/default/files/document/data/i821_radp_fy2025_q3.xlsx.

[5] *Doe v. Noem*, No 1:25-cv-08686, ECF No. 20, Ex. 7 (S.D.N.Y filed Oct. 20, 2025).

[6] U.S. Department of Homeland Security, "Termination of the Designation of Haiti for Temporary Protected Status," 90 Fed. Reg. 28760 (July 1, 2025).

[7] U.S. Department of Homeland Security, "Termination of the Designation of Haiti for Temporary Protected Status," 90 Fed. Reg. 54733 (Nov. 28, 2025).

updated declaration to again analyze Secretary Noem's data-related claims regarding TPS, as well as to analyze the use of a claim of national interest as grounds to terminate TPS.

### THE NOVEMBER 28 TERMINATION NOTICE CONTAINS FALSE CLAIMS ABOUT HAITIAN MIGRATION

6.     The November 28 Termination Notice repeats and doubles down on factual errors previously included in the July 1 Termination Notice. The November 28 Termination Notice again alleges that the designation and redesignation of TPS created a "pull factor" for Haitian migrants,[8] which Secretary Noem again erroneously links to an increase in "Haitians arriving in the United States illegally."[9] As in the July 1 Termination Notice, this claim contains multiple factual errors and again fails to acknowledge that Haitian migrants effectively stopped crossing the border unlawfully in 2022, making the population with TPS uniquely one which came primarily through lawful pathways.

7.     The November 28 Termination Notice repeats verbatim the false claim that "Prior to FY2025, U.S. Border Patrol recorded a consistent year-over-year increase in encounters with Haitian nationals: 56,596 in FY2022, 163,781 in FY2023, and 220,798 in FY2024,"[10] and adds a new false claim that "illegal immigration from Haiti continued to increase with extremely high numbers seen around the time of and following the latest new designations of [TPS] for Haiti by

---

[8] *Id.* at 54736-54737; *id.* at 54737 n. 36 ("Using TPS to grant temporary status to successive waves of new arrivals from a designated country may generate a significant pull factor for illegal immigration and act in tension with the congressional design.").

[9] *Id.* at 54736. One notable linguistic change between the July 1 Termination Notice and the Second Termination is the replacement of the phrase "irregular migration" with "illegal immigration." *Compare* July 1 Termination Notice, *supra* note 6 at 28762-28763 (discussing the "increase in the number of Haitians arriving in the United States irregularly" and a "pattern of large-scale irregular migration") *with* November 28 Termination Notice, *supra* note 7 at 54736-54737 (discussing the "increase in the number of Haitians arriving in the United States illegally" and a "pattern of large-scale illegal immigration").

[10] November 28 Termination Notice, *supra* note 7 at 54736.

then Secretary Mayorkas."[11] Neither of these claims are correct. As detailed below in Table 1, U.S. Border Patrol apprehensions of Haitian migrants in fact fell from a peak of 46,160 in FY 2021 to just 2,790 in FY 2024, a roughly 94 percent drop in unlawful entries.

8.      Both the First and November 28 Termination Notices reach this false conclusion by making the same error; confusing Border Patrol apprehension data with Customs and Border Protection (CBP) overall "encounters" data. This erroneously conflates *lawful* entries of migrants through humanitarian parole with *unlawful* entries between ports of entry.

9.      Border Patrol data includes only arrests of individuals who enter the country without inspection between ports of entry, while CBP's broader encounters data includes individuals who went to a port of entry, applied for admission, and were deemed "inadmissible" by CBP's Office of Field Operations (OFO). Individuals deemed inadmissible are either granted humanitarian parole and permitted to enter, or processed as inadmissible noncitizens and subject to expedited removal or another pathway available to OFO officers processing inadmissible noncitizens.

10.      The Biden administration established two relevant parole programs for which nationals of Haiti were eligible: (1) the Parole Process for Haitians[12] (part of a broader set of parole programs for Cubans, Haitians, Nicaraguans, and Venezuelans known as "CHNV" parole), and (2) the CBP One appointment process, under which migrants present in northern Mexico were permitted to schedule an appointment with CBP OFO to lawfully present at a southern border port of entry for processing and the grant of one year of humanitarian parole.[13]

---

[11] *Id.* at 54737.

[12] U.S. Department of Homeland Security, "Implementation of a Parole Process for Haitians," 88 Fed. Reg. 1243 (Jan. 9, 2023).

[13] American Immigration Council, "CBP One: An Overview," March 24, 2025, https://www.americanimmigrationcouncil.org/fact-sheet/cbp-one-overview/.

11.     Individuals who utilized either the CHNV program or the CBP One process were recorded in CBP data as "inadmissible" and counted within the larger total of CBP "encounters," despite their entry being lawful and within the confines of an established government program.

12.     Mistakenly conflating illegal entries recorded by U.S. Border Patrol with encounters at ports of entry recorded by OFO is emblematic of a broader error made throughout the First and November 28 Termination Notices. Rather than a grant of TPS in 2021 leading to a consistent rise in "illegal immigration,"[14] Haitian migrants largely *stopped* crossing the U.S.-Mexico border irregularly in summer 2022 and began entering almost exclusively through legal pathways created by the Biden administration — even after two subsequent TPS redesignations in 2023 and 2024.

13.     Monthly data shows that this shift in crossing patterns among Haitian migrants first began in summer 2022, soon after DHS created a pre-CBP One humanitarian exception process permitting some individuals to access ports of entry to seek asylum despite the use of Title 42.[15] Title 42 was a pandemic-era public health policy which shuttered the ports of entry to intending asylum seekers in March 2020.[16] Prior to the creation of this formalized humanitarian exception process (which was transitioned to the CBP One appointment system in January 2023), individuals intending to seek asylum could not seek asylum by going to a port of entry.

14.     Contrary to the false claims in the First and November 28 Termination Notices, since summer 2022 when the ports of entry were reopened to migrants seeking lawful processing,

---

[14] *Id.* at 54737.

[15] *See* Rosa Flores and Julia Jones, *Dreams of safety, health care, jobs: Why thousands of migrants are waiting in Mexico – and thousands more arrive each week*, CNN, Sept. 1, 2022, https://www.cnn.com/2022/09/01/americas/migrants-reynosa-mexico-title-42/index.html.

[16] American Immigration Council, *A Guide to Title 42 Expulsions at the Border* (May 25, 2022), https://www.americanimmigrationcouncil.org/fact-sheet/guide-title-42-expulsions-border/.

Haitian migrants overwhelmingly utilized lawful pathways to enter the United States, and irregular migration by nationals of Haiti effectively ceased (Figure 1).

**Figure 1: Haitian Migrant Encounters by Entry Method, January 2021 to January 2025[17]**



15.      Thus, rather than a population which primarily entered *unlawfully*, the Haitian migrant population in the U.S. today overwhelming entered *lawfully*. From FY 2021 through January 2025, 83.5 percent of all Haitians encountered by CBP were encountered at ports of entry, most often at southwest border ports of entry where they were seeking asylum, or at airports when arriving through the CHNV Parole Program (see Table 1). From FY 2023 through January 2025,

---

[17]    U.S.    Customs    and    Border    Protection,    *Nationwide    Encounters*, https://www.cbp.gov/newsroom/stats/nationwide-encounters, *last accessed* July 6, 2025; U.S. Customs and Border Protection, FY21 - FY24 Nationwide Encounters by Area of Responsibility, https://www.cbp.gov/sites/default/files/2024-10/nationwide-encounters-fy21-fy24-aor.csv.

after lawful pathways became accessible to Haitian migrants, a staggering 98.9 percent of CBP encounters of Haitians were at ports of entry.

**Table 1: Nationwide CBP Encounters of Haitian Nationals, by Component[18]**

| Fiscal Year | U.S. Border Patrol (between ports of entry) | Office of Field Operations (at ports of entry) |
|---|---|---|
| 2021 | 46,160 | 2,560 |
| 2022 | 30,850 | 25,740 |
| 2023 | 2,430 | 161,350 |
| 2024 | 2,790 | 218,010 |
| 2025 through January | 390 | 11,240 |
| TOTAL | 82,620 | 418,900 |

16.     The November 28 Termination Notice expands on the errors in the First Termination by making a new, additional attempt to conflate lawful entries through Biden administration programs with unlawful entries, stating that 63,400 Haitians who entered the United States after the June 3, 2024 are currently in the country without legal status.[19] However, the overwhelming majority of these people entered the country *legally* through CBP One or the CHNV Parole Program. From June 2024 through October 2025, 67,946 Haitians were encountered at ports of entry,[20] with the overwhelming majority entering through humanitarian parole. Many of these

---

[18]     U.S. Customs and Border Protection, *Nationwide Encounters*, https://www.cbp.gov/newsroom/stats/nationwide-encounters, *last accessed* July 6, 2025; U.S. Customs and Border Protection, FY21 - FY24 Nationwide Encounters by Area of Responsibility, https://www.cbp.gov/sites/default/files/2024-10/nationwide-encounters-fy21-fy24-aor.csv.

[19] November 28 Termination Notice, *supra* note 7 at 54737.

[20]     Department of Homeland Security, *Nationwide Encounters*, https://www.cbp.gov/newsroom/stats/nationwide-encounters, *last accessed* Dec. 10, 2025.

individuals would still be present with lawful status had the Trump administration not categorically terminated the paroles of individuals who entered at airports through the CHNV Parole Program or at the southern border with a CBP One appointment.[21]

17.    In addition, many of the Haitian nationals who did enter unlawfully and were apprehended by Border Patrol between FY 2021 through FY 2025 were repatriated and therefore are unlikely to have obtained TPS. Of the 82,620 Border Patrol apprehensions over that period, 23,460 (28.2 percent) resulted in an immediate expulsion under Title 42 or repatriation under Title 8 to Haiti or Mexico.[22] An additional 28,410 Haitians were transferred to Immigration and Customs Enforcement (ICE) detention, which resulted in either repatriation (in which case they would not have been physical present to obtain TPS) or release from detention to pursue relief (in which case they may have been able to subsequently obtain TPS).

18.    Contrary to the assertions in the First and November 28 Termination Notices, there is no evidence of an irregular-migration-related pull factor for TPS for Haitian migrants. The July 1 Termination Notice cited a September 30, 2021 report by the Migration Policy Institute for the proposition that "misinformation about TPS eligibility and about the general availability of legal status in the United States *may* have been one factor for migrants trying to reach the U.S. border."[23] But that report was published just two months after the August 1, 2021 redesignation of TPS, and

---

[21] Joel Rose, Sergio Martinez-Beltrán, "Migrants who entered the U.S. via CBP One app should leave 'immediately,' DHS says," *NPR*, April 8, 2025, https://www.npr.org/2025/04/08/g-s1-58984/cbp-one-app-migrants-dhs-border; U.S. Department of Homeland Security, "DHS Issues Notices of Termination for the CHNV Parole Program, Encourages Parolees to Self-Deport Immediately," June 12, 2025, https://www.dhs.gov/news/2025/06/12/dhs-issues-notices-termination-chnv-parole-program-encourages-parolees-self-deport.

[22] U.S Department of Homeland Security Statistics, "Immigration Enforcement and Legal Processes Monthly Tables - November 2024," January 16, 2025, https://ohss.dhs.gov/sites/default/files/2025-01/2025_0116_ohss_immigration-enforcement-and-legal-processes-tables-november-2024.xlsx.

[23] July 1 Termination Notice, *supra* note 3, at 28763 (emphasis added).

the authors acknowledged that their assertion was speculative, especially as "migrants reaching the United States in recent weeks have likely been on the move for years."[24] This claim was not included in the November 28 Termination Notice, leaving the assertions in the November 28 Termination Notice with even less evidentiary support. Evidence of actual migration patterns in the nearly four years since that report was published have shown little impact on *irregular* migration following designations or re-designations of TPS.[25]

19.    On January 26, 2023, Secretary Mayorkas re-designated TPS for Haiti a second time.[26] From February 2023 through June 2024, the Border Patrol reported just 2,699 Border Patrol apprehensions of Haitian migrants, falling to a low of zero in August 2023 and representing an average of 150 irregular entries per month.[27] On July 1, 2024, Secretary Mayorkas re-designated TPS for Haiti a third time.[28] From July 2024 through January 2025, the Border Patrol reported just 247 apprehensions of Haitian migrants, an average of just 35 irregular entries per month.[29]

---

[24] Migration Policy Institute, "Haitian Migration through the Americas: A Decade in the Making" (Sept. 30, 2021), https://www.migrationpolicy.org/article/haitian-migration-through-americas.

[25] *See* Benjamin Helms, David Leblang, "Labor Market Policy as Immigration Control: The Case of Temporary Protected Status," Int'l Studies Quart. Vol 66, Issue 3 (July 19, 2022), *available at* https://academic.oup.com/isq/article-abstract/66/3/sqac042/6646742 (finding that "an increase in remittances from the United States" due to policies such as TPS "decreases subsequent demand for entry in that country"); Fwd.us, "New data analysis shows that Temporary Protected Status for Central American countries should reduce, not increase, irregular migration at the border" (Nov. 15, 2023), https://www.fwd.us/news/tps-remittances/ (summarizing the above findings of Helms and Leblang).

[26] U.S. Department of Homeland Security, Extension and Redesignation of Haiti for Temporary Protected Status, 88 FR 5022 (Jan. 26, 2023).

[27] U.S. Customs and Border Protection, *Nationwide Encounters*, https://www.cbp.gov/newsroom/stats/nationwide-encounters, *last accessed* July 6, 2025.

[28] U.S. Department of Homeland Security, Extension and Redesignation of Haiti for Temporary Protected Status, 89 Fed. Reg. 54484 (July 1, 2024).

[29] U.S. Customs and Border Protection, *Nationwide Encounters*, https://www.cbp.gov/newsroom/stats/nationwide-encounters, *last accessed* December 10, 2025.

20.      As a result, contrary to the implication put forward by Secretary Noem in the Termination Notice, there is no evidence that designations of TPS for Haiti have increased irregular migration at the U.S.-Mexico border. The population of Haitian migrants with TPS today overwhelmingly entered through legal pathways, not through irregular migration.

21.      Finally, the November 28 Termination Notice contains a new argument suggesting that the presence of Haitian immigrants in the United States is contrary to the national interest because Haitians have a high visa overstay rate.[30] According to DHS, "[a]n overstay is defined as a nonimmigrant who was lawfully admitted to the United States but remained in the United States beyond the authorized period of admission."[31] This definition sweeps in individuals who entered the United States lawfully and then applied for asylum or another status (including Temporary Protected Status), but had not received the status within the reporting period for the annual DHS Entry/Exit reports.[32] Given the deteriorating security situation in Haiti following the assassination of Jovenel Moïse in July 2021, it is possible that a significant portion of recent Haitian overstays are individuals who lawfully entered the United States and then applied for asylum, but whose cases remained pending at time of reporting, such that they were counted as overstays.

### REVIEW OF THE USE OF "NATIONAL INTEREST" IN TPS TERMINATIONS

22.      My review of the 35-year history of TPS finds that before 2025, the sole rationale cited to justify termination of TPS has been an end to the temporary country conditions which

---

[30] November 28 Termination Notice, *supra* note 7 at 54736.

[31] U.S. Department of Homeland Security, "Entry/Exit Overstay Report, Fiscal Year 2024 Report to Congress," July 16, 2025, at iii, https://www.dhs.gov/sites/default/files/2025-09/25_0912_cbp_entry-exit-overstay-report-fiscal-year-2024.pdf.

[32] *Id.* ("This report presents the overstay rates of those who remained in the United States beyond their
authorized period of admission with no evidence of an extension to their period of admission or adjustment to another immigration status.").

authorized the initial designation. In 22 Federal Register Termination Notices from 1992 through 2018 that I reviewed, no Secretary or Attorney General has ever listed national interest as a rationale for termination.

23.     In each of the 22 terminations of TPS from 1992 through 2018 that I reviewed, the Secretary or Attorney General has explained that the termination was an informed decision resulting from the interagency review process of the country conditions underlying the initial designation. This review determined whether there remained an armed conflict, environmental disaster (or other prerequisite under INA § 244(b)(1)(B)), or other "extraordinary and temporary conditions" in the foreign state.

24.     References to "public interest" in Termination Notices prior to 2025 are rare and cursory. In total, the phrase is referenced in just three Termination Notices out of 22.

25.     The July 1 Termination Notice which references "national interest" is the June 1997 termination of TPS for Rwanda, and comes within a single sentence of boilerplate declaring compliance with the consultation requirement of INA § 244(b)(3).

26.     The second reference is contained in a March 1998 Termination Notice for TPS for Liberia, which contains substantively identical boilerplate.[33] Following a renewed outbreak of hostilities in Liberia, that termination was mooted by September 1998 redesignation which does

---

[33] *Compare* U.S. Department of Justice, Termination of Designation of Rwanda Under Temporary Protected Status Program After Final 6-Month Extension, 62 Fed. Reg. 33443 (June 19, 1997) ("pursuant to section 244(b)(3) of the Act, I have had consultations with the appropriate agencies of the U.S. Government concerning (a) the conditions in Rwanda; and (b) whether permitting nationals of Rwanda (and aliens having no nationality who last habitually resided in Rwanda) to remain temporarily in the United States is contrary to the national interest of the United States") *with* U.S. Department of Justice, Termination of Designation of Liberia Under the Temporary Protected Status Program, 64 Fed. Reg. 41463 (July 30, 1999) (same, substituting Liberia).

not reference national interest.[34] This was followed by a November 28 Termination Notice in July 1999 which also did not reference national interest.[35]

27.     The third reference occurs in a 2004 Termination and Redesignation Notice for Liberia. The Termination ends a 2002 designation of TPS under INA § 244(b)(3)(A) for the existence of an "ongoing armed conflict." Secretary Ridge first determined that the peace process following the Second Liberian Civil War had brought an end to the "armed conflict," which required termination of the 2002 designation. He then simultaneously re-designated TPS under INA § 244(b)(3)(C), and in so doing recited the statutory factors for a initial grant of TPS, including that the new grant was not contrary to national interest.

28.     Similar references to the phrase "national interest" in designations, redesignations, and extensions are equally cursory. Until 2025, no Attorney General or Secretary has explained their conclusion that it is not "contrary to the national interest" to permit TPS beneficiaries to remain temporarily in the United States," or ever justified a termination on national interest grounds.

29.     By contrast, Termination Notices, as well as extensions and designations, routinely provide a detailed explanation as to the existence (or lack thereof) of the country conditions which justify TPS. A comprehensive list of each TPS termination prior to 2025, as well as the dispositive rationale provided for termination in each case, is below.

    a.     **Kuwait (1991-1992)**: "I find after consultation with the appropriate agencies of the United States Government, that the extraordinary and temporary

---

[34] U.S. Department of Justice, Redesignation of Liberia Under Temporary Protected Status Program, 63 Fed. Reg. 51958 (Sept. 29, 1998).

[35] U.S. Department of Justice, Termination of Designation of Liberia Under the Temporary Protected Status Program, 64 Fed. Reg. 41463 (July 30, 1999).

conditions found to exist in Kuwait on March 27, 1991, are not presently in existence, in that substantial progress has been made toward the rebuilding of Kuwait society so that the temporary impediments to safe return posed on March 27, 1991, by the immediate aftermath of the Iraqi occupation and the subsequent military conflict no longer remain."[36]

b.      **Lebanon (1991-1993)**: "I find, after consultation with the appropriate agencies of the United States Government, that the extraordinary and temporary conditions found to exist in Lebanon on March 21, 1991, and on January 20, 1992, are not presently in existence. The United States embassy in Beirut reports that the security situation for Lebanese citizens is steadily improving. The Lebanese government's amnesty law specifically protects Lebanese citizens from prosecution for virtually all actions taken during the war years, and the majority of Lebanese go about their daily activity without hindrance."[37]

c.      **Rwanda (1994-1997):** "As a result of these consultations, I have determined that Rwanda no longer continues to meet the conditions for designation of TPS under section 244(b)(1) of the Act. The situation in Rwanda has greatly improved since the designation of TPS in 1994. … During the last half of 1996 and the beginning of 1997, approximately 1.3 million refugees returned to Rwanda. The ability of so many to return in relative safety demonstrates the end of the extraordinary circumstances that existed in 1994. While other avenues of

[36] U.S. Department of Justice, Termination of Designation of Kuwait under Temporary Protected Status Program, 57 Fed. Reg. 2930 (Jan. 24, 1992).
[37] U.S. Department of Justice, Termination of Designation of Lebanon Under Temporary Protected Status Program, 58 Fed. Reg. 7477 (Feb. 8, 1993).

immigration relief, including asylum, remain available to Rwandans in the United States who believe that their particular circumstances make return to Rwanda unsafe, we have determined that TPS is no longer appropriate for Rwandans in general."[38]

d.      **Liberia (1991-1999)**:

i.      1998 initial termination: "As a result of these consultations, I have determined that Liberia no longer continues to meet the conditions for designation of TPS under section 244(b)(1) of the Act. … In view of the Department of State's recommendation for termination, I have determined that TPS is no longer appropriate for Liberia in general."[39] Following a renewed outbreak of civil unrest, this termination did not take effect.

ii.      1999 final termination: "the Attorney General has determined that conditions in Liberia no longer support a TPS designation."[40]

e.      **Guinea-Bissau (1999-2000)**: "Based upon a more recent review of conditions within Guinea-Bissau by the Departments of Justice and State, the Attorney General finds that conditions no longer support a TPS designation. … I have consulted with the appropriate agencies of Government concerning conflict and security conditions in Guinea- Bissau. 8 U.S.C. 1254a(b)(3). Based on these

---

[38] U.S. Department of Justice, Termination of Designation of Rwanda Under Temporary Protected Status Program After Final 6-Month Extension, 62 Fed. Reg. 33443 (June 19, 1997).

[39] U.S. Department of Justice, Termination of Designation of Liberia Under Temporary Protected Status Program After Final 6-Month Extension, 63 Fed. Reg. 15437 (Mar. 31, 1998).

[40] U.S. Department of Justice, Termination of Designation of Liberia Under the Temporary Protected Status Program, 64 Fed. Reg. 41463 (July 30, 1999).

consultations, I have determined that Guinea-Bissau no longer meets the conditions for designation of TPS under section 244(b)(1) of the Act."[41]

f.      **Kosovo (1998-2000)**: "Based upon a more recent review of conditions within the Kosovo Province by the Departments of Justice and State, the Attorney General finds that conditions in the Kosovo Province no longer support a TPS designation. … I have consulted with the appropriate agencies of Government concerning conflict and security conditions in the Kosovo Province. 8 U.S.C. 1254a(b)(3). Based on these consultations, I have determined that the Kosovo Province no longer meets the conditions for designation of TPS under section 244(b)(1) of the Act."[42]

g.      **Bosnia-Herzegovina (1992-2001)**: "I have consulted with the appropriate agencies of Government concerning conflict and security conditions in Bosnia-Herzegovina. 8 U.S.C. 1254a(b)(3). Based on these consultations, I have determined that Bosnia-Herzegovina no longer meets the conditions for designation of TPS under section 233(b)(1) of the Act"[43]

h.      **Angola (2000-2003)**: "Based upon a recent review of conditions within Angola by the Departments of Justice and State, the Attorney General finds that conditions in Angola no longer support a TPS designation. … For the foregoing reasons, the Attorney General determines that Angolan TPS beneficiaries may

---

[41] U.S. Department of Justice, Six-Month Extension and Termination of Designation of Guinea-Bissau Under the Temporary Protected Status Program, 65 Fed. Reg. 15016 (Mar. 20, 2000).

[42] U.S. Department of Justice, Termination of the Province of Kosovo in the Republic of Serbia in the State of the Federal Republic of Yugoslavia (Serbia-Montenegro) Under the Temporary Protected Status Program, 65 Fed. Reg. 33356 (May 23, 2000).

[43] U.S. Department of Justice, Termination of Bosnia-Herzegovina Under the Temporary Protected Status Program, 65 Fed. Reg. 52789 (Aug. 30, 2000).

return safely to Angola at this time and, therefore, terminates the TPS designation for Angola."[44]

    **i.**      **Liberia (2002-2004)**: "Based upon this review, the Secretary of DHS, after consultation with appropriate government agencies, finds that the conditions that prompted designation of Liberia for TPS are no longer met. 8 U.S.C. 1254a(b)(3)(A) and (B). The armed conflict has ceased."[45]

    **j.**      **Montserrat (1997-2005)**: "Based upon this review, the Secretary of DHS, after consultation with appropriate government agencies, finds that Montserrat no longer continues to meet the conditions for designation under the TPS program. 8 U.S.C. 1254a(b)(3)(A). Because the volcanic eruptions are unlikely to cease in the foreseeable future, they can no longer be considered 'temporary' as required by Congress when it enacted the TPS statute."[46]

    **k.**      **Liberia (2004-2007)**: "Based upon this review, the Secretary, after consultation with appropriate Government agencies, determined that the extraordinary and temporary conditions that prompted the re-designation of Liberia for TPS no longer prevent Liberians (or aliens having no nationality who last habitually resided in Liberia) from returning to their home country in safety, and that the designation of Liberia for TPS should be terminated."[47]

---

[44] U.S. Department of Justice, Termination of Designation of Angola Under the Temporary Protected Status Program, 68 Fed. Reg. 3896 (Jan. 27, 2003).

[45] U.S. Department of Homeland Security, Termination and Re-Designation of Liberia for Temporary Protected Status, 69 Fed. Reg. 52297 (Aug. 25, 2004).

[46] Termination of the Designation of Montserrat Under the Temporary Protected Status Program; Extension of Employment Authorization Documentation, 69 Fed. Reg. 40642 (July 6, 2004).

[47] U.S. Department of Homeland Security, Termination of the Designation of Liberia for Temporary Protected Status; Automatic Extension of Employment Authorization Documentation for Liberia TPS Beneficiaries, 71 Fed. Reg. 55000 (Sept. 20, 2006).

**l.** **Burundi (1997-2007)**: "Based upon this review, the Secretary finds, after consultation with the appropriate Government agencies, that the armed conflict is no longer ongoing, that the extraordinary and temporary conditions that prompted the designation and re-designation of Burundi for TPS no longer prevent Burundians (or aliens having no nationality who last habitually resided in Burundi) from returning in safety, and that the designation of Burundi for TPS should be terminated."[48]

**m.** **Guinea (2014-2017)**: "Based on the reviews and after consulting with DOS, the Secretary has determined that the termination of the TPS designation of Guinea, after a 6-month extension of TPS benefits for orderly transition, is required because the extraordinary and temporary conditions that prompted Guinea's designation for TPS have substantially resolved and no longer prevent nationals of Guinea from returning in safety."[49]

**n.** **Sierra Leone (2014-2017)**: "Based on the reviews and after consulting with DOS, the Secretary has determined that the termination of the TPS designation of Sierra Leone, after a 6-month extension of TPS benefits for orderly transition, is required because the extraordinary and temporary conditions that

---

[48] U.S. Department of Homeland Security, Termination of the Designation of Burundi for Temporary Protected Status; Automatic Extension of Employment Authorization Documentation for Burundi TPS Beneficiaries, 72 Fed. Reg. 61172 (Oct. 29, 2007).

[49] U.S. Department of Homeland Security, Six-Month Extension of Temporary Protected Status Benefits for Orderly Transition Before Termination of Guinea's Designation for Temporary Protected Status, 81 Fed. Reg. 66064 (Sept. 26, 2016).

prompted Sierra Leone's designation for TPS have substantially resolved and no longer prevent nationals of Sierra Leone from returning in safety."[50]

o.       **Liberia (2014-2017)**: "Based on the reviews and after consulting with DOS, the Secretary has determined that the termination of the TPS designation of Liberia, after a 6-month extension of TPS benefits for orderly transition, is required because the extraordinary and temporary conditions that prompted Liberia's designation for TPS have substantially resolved and no longer prevent nationals of Liberia from returning in safety."[51]

p.       **Sudan (1997-2018, termination blocked in court):** "Based on this review and consultation, the Secretary has determined that conditions in Sudan have sufficiently improved for TPS purposes. Termination of the TPS designation of Sudan is required because it no longer meets the statutory conditions for designation. The ongoing armed conflict no longer prevents the return of nationals of Sudan to all regions of Sudan without posing a serious threat to their personal safety. Further, extraordinary and temporary conditions within Sudan no longer prevent nationals from returning in safety to all regions of Sudan."[52]

q.       **Nicaragua (1998-2018, termination blocked in court):** "Based on the review, including input received from other relevant U.S. Government agencies,

---

[50] U.S. Department of Homeland Security, Six-Month Extension of Temporary Protected Status Benefits for Orderly Transition Before Termination of Liberia's Designation for Temporary Protected Status, 81 Fed. Reg. 66059 (Sept. 26, 2016).

[51] U.S. Department of Homeland Security, Six-Month Extension of Temporary Protected Status Benefits for Orderly Transition Before Termination of Sierra Leone's Designation for Temporary Protected Status, 81 Fed. Reg. 66054 (Sept. 26, 2016).

[52] U.S. Department of Homeland Security, Termination of the Designation of Sudan for Temporary Protected Status, 82 Fed. Reg. 47228 (Oct. 11, 2017).

the Secretary has determined that conditions for Nicaragua's 1999 designation for TPS on the basis of environmental disaster due to the damage caused by Hurricane Mitch are no longer met."[53]

r.    **El Salvador (2001-2019, termination blocked in court)**: "Based on the review, including input received from other appropriate U.S. Government agencies, including the Department of State, the Secretary of Homeland Security has determined that the conditions supporting El Salvador's 2001 designation for TPS on the basis of environmental disaster due to the damage caused by the 2001 earthquakes are no longer met."[54]

s.    **Haiti (2010-2019, termination blocked in court)**: "Based on the review, including input received from other appropriate U.S. Government agencies, the Acting Secretary of Homeland Security determined on November 20, 2017 that the conditions for Haiti's designation for TPS—on the basis of 'extraordinary and temporary conditions' relating to the 2010 earthquake that prevented Haitian nationals from returning in safety—are no longer met."[55]

t.    **Nepal (2015-2019, termination blocked in court)**: "Based on the review—which considered input received from other appropriate U.S. Government agencies, including the Department of State—the Secretary of Homeland Security has determined that the conditions supporting Nepal's 2015 designation for TPS on

---

[53] U.S. Department of Homeland Security, Termination of the Designation of Nicaragua for Temporary Protected Status, 82 Fed. Reg. 59636 (Dec. 15, 2017).

[54] U.S. Department of Homeland Security, Termination of the Designation of El Salvador for Temporary Protected Status, 83 Fed. Reg. 2654 (Jan. 18, 2018).

[55] U.S. Department of Homeland Security, Termination of the Designation of Haiti for Temporary Protected Status, 83 Fed. Reg. 2648 (Jan. 18, 2018).

the basis of environmental disaster due to the April 25, 2015 earthquake are no longer met."[56]

      **u.**      **Honduras (1998-2020, termination blocked in court)**: "Based on the review, which considered input received from other appropriate U.S. Government agencies, including the Department of State, the Secretary of Homeland Security has determined that the conditions supporting Honduras's 1999 designation for TPS on the basis of environmental disaster due to the damage caused by Hurricane Mitch in October 1998 are no longer met."[57]

30.     In stark contrast to the unbroken 22-year history of TPS terminations from 1992 through 2024, in 2025 the Department of Homeland Security cited "national interest" as either one of multiple grounds, or the only ground, to terminate TPS in 10 separate notices.[58]

---

[56] U.S. Department of Homeland Security, Termination of the Designation of Nepal for Temporary Protected Status, 83 Fed. Reg. 23705 (May 22, 2018).

[57] U.S. Department of Homeland Security, Termination of the Designation of Honduras for Temporary Protected Status, 83 Fed. Reg. 26074 (June 5, 2018).

[58] U.S. Department of Homeland Security, Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status. 90 Fed. Reg. 9040, 9042-43 (Feb. 5, 2025); U.S. Department of Homeland Security, U.S. Department of Homeland Security, Partial Vacatur of 2024 Temporary Protected Status Decision for Haiti, 90 Fed. Reg. 10511, 10513-14 (Feb. 24, 2025); U.S. Department of Homeland Security, Termination of the Designation of Afghanistan for Temporary Protected Status, 90 Fed. Reg. 20309, 20311 (May 13, 2025); U.S. Department of Homeland Security, Termination of the Designation of Cameroon for Temporary Protected Status, 90 Fed. Reg. 23697, 23698 (June 4, 2025); U.S. Department of Homeland Security, July 1 Termination Notice, *supra* note 6; U.S. Department of Homeland Security, Termination of the 2021 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. 43225, 43228-30 (Sept. 8, 2025); U.S. Department of Homeland Security, Termination of the Designation of Syria for Temporary Protected Status, 90 Fed. Reg. 54398, 45401-02 (Sept. 22, 2025); U.S. Department of Homeland Security, Termination of the Designation of South Sudan for Temporary Protected Status, 90 Fed. Reg. 50484, 50486-87; U.S. Department of Homeland Security, Termination of the Designation of Burma for Temporary Protected Status, 90 Fed. Reg. 53378, 53379-81 (Nov. 25, 2025); November 28 Termination Notice, *supra* note 7.

AARON REICHLIN-MELNICK