

**Bryan Cave Leighton Paisner**

December 15, 2025

BRYAN CAVE LEIGHTON PAISNER LLP
161 North Clark Street  Suite 4300
Chicago  IL 60601 3315
T: +1 312 602 5000
F: +1 312 602 5050
bclplaw.com

Geoffrey M. Pipoly
Direct:  +1 312 602 5078
geoff.pipoly@bclplaw.com

The Honorable Ana C. Reyes
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, D.C. 20001

**Re:    Plaintiffs' letter brief regarding discovery, Fritz Emmanuel Lesly Miot, et al., v. Donald J. Trump, et al., 25-CV-02471.**

Dear Judge Reyes,

Consistent with the Court's order at the December 1, 2025, hearing, Plaintiffs submit this letter brief reflecting their position regarding discovery outside the certified administrative record ("CAR") submitted by the government.

For the reasons set out more fully below, Plaintiffs respectfully request that this Court (1) direct the government to complete its deficient administrative record; (2) authorize extra-record discovery in light of Plaintiffs' allegations of bad faith and pretext; (3) permit discovery on Plaintiffs' constitutional claim; and (4) order that discovery should begin immediately.

There have been at least six other TPS cases brought during President Trump's tenure in office in which district courts in three states have granted plaintiffs' requests for extra-record discovery.  *See Ramos v. Nielesen*, No. 18-cv-1554, Dkt. 34 (N.D. Cal. June 25, 2018) (ordering the government to supplement the administrative record; to respond to extra-record discovery requests; and to confer with plaintiffs about a 30(b)(6) deposition)*; Centro Presente v. Trump*, No. 18-cv-10340, Dkt. 60 (D. Mass. Oct. 11, 2018) (stipulation memorializing a September 2018 hearing granting extra-record discovery for which no transcript exists); *Saget v. Trump*, No. 18-cv-1599, Dkt. 72 at 88:5-89:2 (E.D.N.Y. Nov. 14, 2018) (ordering extra-record discovery); *id*. at Dkt. 77 (E.D.N.Y. Nov, 21 2018) ("The Court GRANTS Plaintiffs' request to seek additional discovery" and "DENIES Defendants' request that the Court stay its decision regarding extra-record discovery…"); *National TPS All. v. Noem*, No. 25-cv-1766, Dkt. 129 (N.D. Cal. May 2, 2025) (ordering extra-record discovery on both APA and equal protection claims as to Venezuela TPS termination); *Nat'l TPS All. v. Noem*, No. 25-cv-5687 (N.D. Cal. Aug. 21, 2025) (ordering extra-record discovery on both APA and equal protection claims as to Honduras, Nicaragua, and Nepal terminations); *CASA, Inc. v. Noem*, No. 25-1484, Dkt. 123 (D. Md. Dec. 8, 2025) ("CASA is permitted to seek extra-record discovery on its Administrative Procedure Act and equal protection claims asserted in Counts 2, 5, 7, and 8.").  This Court should do the same.

The Honorable Ana C. Reyes
December 15, 2025
Page 2



Bryan Cave Leighton Paisner

## I.    The CAR is Inadequate.

The APA requires this Court to conduct "plenary review of the Secretary's decision, . . . to be based on the full administrative record that was before the Secretary at the time he made his decision." *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 420 (1971); *see also* 5 U.S.C. § 706 (in evaluating agency action, "the court shall review the whole record"). This "whole record" requirement is a necessary element of effective judicial review, because the § 706(2) standard requires the Court to determine, inter alia, whether the agency "relied on factors which Congress has not intended it to consider," made a decision that "runs counter to the evidence" before it, or failed to offer a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983).

Because judicial review in APA cases must be based on "the *whole* record," 5 U.S.C. § 706 (emphasis added), "meaningful judicial review" is possible only if the agency "produce[s] an administrative record that delineates the path by which it reaches its decision." *Occidental Petrol. Corp. v. SEC*, 873 F.2d 325, 338 (D.C. Cir. 1989). The full administrative record "consists of all documents and materials directly or indirectly considered by agency decision-makers and includes evidence contrary to the agency's position." *Calloway v. Harvey*, 590 F. Supp. 2d 29, 36 (D.D.C. 2008) (Walton, J.). To permit meaningful judicial review, the grounds upon which the administrative agency acted must be clearly disclosed and adequately sustained. *Dep't of Com. v. New York*, 588 U.S. 752, 780 (2019).

An agency "is entitled to a strong presumption of regularity that it properly designated an administrative record." *Univ. of Colo. Health v. Azar*, 486 F. Supp. 3d 185, 199 (D.D.C. 2020) (Luh, J.) (internal citation omitted). But this presumption can be "overcome" where a plaintiff "put[s] forth concrete evidence that the documents it seeks to 'add' to the record were actually before the decisionmakers.'" *Id.* at 200 (citation omitted). This standard can be met through identification of "reasonable, non-speculative grounds for [the plaintiff's] belief that the documents were considered by the agency and not included in the record." *Id*.

Where it appears that the administrative record designated by the agency is not the "whole record" that was before the agency decisionmakers at the time of decision, a court may order that the record be completed. *See Home Box Office, Inc. v. F.C.C.*, 567 F.2d 9, 54 (D.C. Cir. 1977) ("Even the possibility that there is here one administrative record for the public and [the] court and another for the [agency] and those 'in the know' is intolerable."). "An administrative record may be 'supplemented' in one of two ways—either by (1) including evidence that should have been properly a part of the administrative record but was excluded by the agency, or (2) adding extrajudicial evidence that was not initially before the agency but the party believes should nonetheless be included in the administrative record." *Dist. Hosp. Partners, L.P. v. Sebelius*, 971 F. Supp. 2d 15, 20 (D.D.C. 2013) (Huvelle, J.), *aff'd sub nom. Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46 (D.C. Cir. 2015) *citing WildEarth Guardians v. Salazar*, 670 F.Supp.2d 1, 5 n. 4 (D.D.C. 2009) (Kollar-Kotelly, J.).

This Court cannot properly conduct its inquiry without access to the whole record, as opposed to simply those parts of the record the government has selectively presented. Here, the



**BCLP.**
Bryan Cave Leighton Paisner

CAR is facially deficient in numerous respects.  Plaintiffs have only had possession of the CAR for a few days, so there may be others, but here are a few examples of how the CAR is facially deficient:[1]

***First***, obvious critical documents are missing or so redacted as to functionally be missing. Most notably, perhaps the most critical document in the CAR—the actual decision memorandum that Secretary Noem reviewed and signed in order to terminate Haiti's TPS designation—is **<u>completely redacted</u>**.  The only content that is visible is the document's letterhead on the first page and Secretary Noem's signature on the last page.  Ex. A.  The "purpose of" this memorandum is to "give the secretary everything that they need to make an informed decision on whether to designate, extend or terminate TPS."  *Saget v. Trump*, 375 F. Supp. 3d 280, 300 (E.D.N.Y. 2019) (cleaned up).  Accordingly, because this memorandum is completely redacted, no one—not Plaintiffs and not the Court—can know what Secretary Noem actually considered when ordering that Haiti's TPS designation be terminated.

The government's decision not to produce this document is inconsistent with its conduct in prior TPS cases, where it has produced unredacted versions of the Secretary's decision memorandum as part of the CAR.  *See* Ex. B (2017 El Salvador); Ex. C (2017 Haiti); Ex. D (2017 Nicaragua).[2]  The government offers no explanation regarding why this document was unredacted in prior TPS cases but not in this TPS case.

Another critical document is a memorandum from USCIS's Office of Policy and Strategy ("OP & S").  This appears to be a memorandum generated by OP & S as one of the constituent memoranda that ultimately led to the (fully redacted) decision memorandum.  *See Saget*, 375 F. Supp. 3d at 299 (describing how constituent memoranda drafted by USCIS staff are "distilled" into the decision memorandum).  This document, too, contains redactions with no explanation. Ex. F.

Redactions aside, the CAR does not contain any drafts of these memoranda, so it is impossible to see how they evolved over time—and, therefore, impossible to see how the Trump administration went about applying the statutorily required TPS review process.  Drafts of these

---

[1]    The absence of these enumerated documents also gives rise to an inference that the Haiti CAR omits additional documents that DHS decisionmakers considered directly or indirectly in terminating Haiti's TPS designation.  Plaintiffs reserve the right to seek further completion of the CAR should they identify additional improperly omitted documents.

Here, moreover, the entire CAR is only 1,537 pages, only about 140 pages of which are documents that were not already available to the public.  Most of the production—at least 1,000 pages—consists of publicly available news reports, publicly available federal register notices, or publicly available government reports.  *See* Ex. Dkt. 78-1, CAR Index.  Put another way, most of the CAR is—to use the Court's terminology from the December 1, 2025 hearing—"fluff."

[2]    In the CAR for the 2017 termination of Sudan's TPS designation, the decisional memorandum signed by the Secretary of Homeland Security was redacted. But the record also contained the unsigned memorandum in unredacted form. Ex. E.

The Honorable Ana C. Reyes
December 15, 2025
Page 4


Bryan Cave Leighton Paisner

memoranda—and how they were rewritten by political appointees—have previously proven to be critical evidence establishing that the Trump Administration made its termination decision based on a preordained political agenda.

*Second*, and similarly, the CAR is **devoid of any memoranda at all from the State Department**—one of the "appropriate agencies of the Government" with which Secretary Noem was required to "consult[]" before ordering Haiti's TPS designation to be terminated. 8 U.S.C. § 1254a(b)(3)(A).  Given that obligation, DHS typically obtains a letter from the Secretary of State with a recommendation concerning each TPS determination. Ex. G, GAO Report 18; *see also Saget*, 375 F. Supp. 3d at 299.  No such letter was produced in the CAR.

Nor does the CAR contain any memoranda or factual reports from the U.S. Embassy in Haiti.  Input from local U.S. Embassies has historically been the starting point for the State Department's assessment of country conditions for purposes of the TPS review process. *See Saget*, 375 F. Supp. 2d at 298-99.  As part of its process for compiling country conditions reports, the State Department's Bureau of Population, Refugees, and Migration "directs the relevant regional bureau to reach out to overseas posts for information about country conditions."  Ex. G, GAO Report 23.  Indeed, because local Embassies are on-the-ground in their respective countries, input from the local Embassies "carries a tremendous amount of weight" in the TPS review process. *Saget*, 375 F. Supp. 3d at 299.  "Thus, the Department of State normally gives great deference to the factual reports prepared by the local Embassy." *Id*.  And, the "Department of State considers the Embassy's clearance and approval particularly important because the Embassy plays a primary role in gathering information on country conditions." *Id*.  Input from United States Embassies accordingly has been included in past administrative records in cases challenging TPS determinations.  Ex. H (cable from U.S. Mission to El Salvador recommending extension of that country's TPS designation); Ex. I (similar from the U.S. Mission to Honduras); Ex. J (similar from U.S. Mission to Haiti).

The CAR here contains none of these materials.  All that is in the CAR with regard to the State Department is a single email exchange between DHS official Rob Law and State Department official Spencer Chretien concerning whether terminating TPS would adversely affect foreign policy. Ex. K.  That email exchange is a total of two sentences long. *Id*.  In another TPS case, the district court determined that a "one-and-a-half page letter" from the State Department which "failed to include any information on country conditions in" the foreign state at issue amounted to "no meaningful consultation" with the State Department. *Nat'l TPS All. v. Noem*, --- F. Supp. 3d ---, 2025 WL 2578045, at *30 (N.D. Cal. Sept. 5, 2025) ("*NTPSA*").  The single, two-sentence email exchange produced in this CAR is even less than deemed inadequate in *NTPSA*.

*Third*, the government included no privilege log with its production of the CAR.  The government thus provided no explanation for why certain content in the CAR redacted (including the fully-redacted Secretary's decision memorandum).  The government has thus failed to demonstrate that any privilege applies to the redacted documents in the CAR as is their burden as the party claiming privilege. *See, e.g., United States Equal Emp. Opportunity Comm'n v. George Washington Univ.,* 2021 WL 7907064, at *3 (D.D.C. Sept. 23, 2021) (Kollar-Kotelly, J.) ("The burden is on the proponent of the [attorney-client] privilege to demonstrate that it applies.  And to

The Honorable Ana C. Reyes
December 15, 2025
Page 5


Bryan Cave Leighton Paisner

satisfy this burden, the party claiming attorney-client privilege must make a 'showing that the privilege applies to each communication for which it is asserted.'  In this jurisdiction, the 'attorney-client privilege must be strictly confined within the narrowest possible limits consistent with the logic of its principle.'") (cleaned up).[3]

The Court should therefore direct the government to complete the deficient record in this case.

## II.    Plaintiffs Seek an Order Requiring the Government to Supplement the CAR.

For the reasons set forth in the preceding section, the government should be ordered to supplement the CAR with the following documents:

- Unredacted decisional memoranda including but not limited to an unredacted director memorandum and unredacted OP & S memorandum;

- Drafts of these memoranda;

- Record of clearance and approval (the CAR should contain a document that indicates the officials who were part of the decision-making process. The document is often titled the "Record of Clearance and Approval."  This sort of document routinely appears in administrative records, including those in other cases challenging TPS determinations. *See, e.g.,* Ex. L (2025 Haiti Partial Vacatur Record of Clearance and Approval); Ex. M (2017 Nicaragua Termination Record of Clearance and Approval));

- Secretary of State Marco Rubio's recommendation regarding Haiti's TPS designation;

- State Department country conditions reports;

- DHS office of intelligence and analysis assessments;

- Input from Department of Defense combatant commands;

- Input from US Embassies;

- Input from foreign government officials, members of Congress, and NGOs;

- Rejected Decisional Memoranda;

---

[3]    Although certain documents in the CAR here are marked "PRE-DECISIONAL/DELIBERATIVE," in the absence of a privilege log it is not clear that these markings amount to an assertion of a privilege.  In any event, in prior TPS cases the government produced unredacted documents with the same markings.  Ex. A.

The Honorable Ana C. Reyes
December 15, 2025
Page 6



- Non-Concur Memoranda.

In addition, as noted above, some documents in the CAR have been marked "PRE-DECISIONAL/DELIBERATIVE." Although it is impossible to know for sure without seeing a privilege log, The government may have intended this marking to indicate that certain content has been withheld on the basis of the deliberative process privilege. To the extent that is so, Plaintiffs seek an order requiring the government to produce documents it has withheld on the basis of the deliberative process privilege. The deliberative process privilege is not absolute. Its validity depends on a balancing of the public interest in nondisclosure with the need for the information as evidence. *United States v. Am. Tel. & Tel.*, 524 F. Supp. 1381, 1386 n. 14 (D.D.C. 1981) (Greene, J.). Among the factors to be considered when the balance is struck are the relevance of the document, alternative means of proof, and the presence of allegations of governmental misconduct. *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 40 F.R.D. 318, 327–29 (D.D.C. 1966) (Robinson, J.).

Here, the withheld documents are relevant to Plaintiffs' allegations of pretextual and discriminatory motivations for the TPS designations. The evidence sought is primarily, if not exclusively, under the government's control, and the government—the Executive—is a party to and the focus of the litigation. There are also allegations of governmental misconduct here, *see, generally,* Dkt. 74, Plaintiffs' First Amended Complaint ("FAC") at ¶¶ 179-235, and other courts have held that if the party's cause of action is directed at the government's intent in rendering its policy decision and closely tied to the underlying litigation then the deliberative process privilege "evaporates." *In re Subpoena Duces Tecum Served on the Office of the Comptroller of Currency*, 145 F.3d 1422, 1424 (D.C. Cir. 1998). Thus, the government should produce documents over which they claim deliberative process privilege. *See Nat'l TPS All. v. Noem*, No. 25-cv-1766, Dkt. 184 (N.D. Cal. June 6, 2025) (rejecting government's argument that certain documents are protected by the deliberative process privilege); *Nat'l TPS All. v. Noem*, No. 25-cv-5687, Dkt. 107 (same).

## III.    Extra-Record Discovery is Appropriate Here.

Although judicial review of agency action ordinarily proceeds based on the administrative record alone, *see Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d 44, 47 (D.C. Cir. 2013), this "record rule" is subject to several exceptions that apply here.

### A. Extra-Record Discovery is Appropriate Because Plaintiffs Brought a Constitutional Claim.

Plaintiffs pleaded a constitutional claim—namely, that the termination of Haiti's TPS designation was improperly motivated by animus and discriminatory intent based on race and ethnicity in violation of the due process clause of the Fifth Amendment of the Constitution. FAC ¶¶ 269-271. That constitutional claim is predicated on President Trump and Secretary Noem's demonstrated racial animus against Haitians and other nonwhite immigrants. *See* FAC ¶¶ 65-113; *see also infra* Part III.b.2.



The "Supreme Court has held that a plaintiff who is entitled to judicial review of its constitutional claims under the APA is entitled to discovery in connection with those claims." *Puerto Rico Pub. Hous. Admin. v. U.S. Dep't of Hous. & Urban Dev.*, 59 F. Supp. 2d 310, 328 (D. P.R. 1999) (*citing Webster v. Doe*, 486 U.S. 592, 604 (1988)); *see also Rydeen v. Quigg*, 748 F. Supp. 900, 905-06 (D.D.C. 1990) (Pratt, J.) (considering extra-record affidavits because "[w]hen reviewing constitutional challenges to agency decisionmaking, courts make an independent assessment of the facts and the law"); *Little Earth of United Tribes, Inc. v. HUD*, 675 F. Supp. 497, 531 (D. Minn. 1987), *aff'd,* 878 F.2d 236 (8th Cir. 1989) (examining agency's actions de novo and considering extra record evidence because "the question presented is whether defendants violated plaintiffs' constitutional rights"); *Nat'l Med. Enters. v Shalala*, 826 F. Supp. 558, 565 n.11 (D.D.C. 1993) (Pratt, J.), *aff'd*, 43 F.2d 691 (D.C. Cir. 1995) ("While it is generally true that the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court, there are a number of exceptions to this rule. Chief among them is a court's review of a constitutional claim."). Further, "in reviewing a constitutional claim to an agency's decision, a court may undertake an independent assessment of the facts and the law" and may consider evidence beyond the administrative record produced by the government, including evidence "not before the agency upon administrative review." *Shalala*, 826 F. Supp. at 565 n.11.

This case raises claims very similar to previous TPS cases in which district courts granted plaintiffs' requests for extra-record discovery on the basis of their constitutional claims, including *Saget*, *Centro Presente*, *NTPSA,* and *CASA.  See supra* p. 1 (listing orders granting extra-record discovery).  As the Court held in *Saget*, adequate judicial review of the plaintiffs constitutional claim would be impossible based only on the administrative record.  That is because there, as here, the plaintiffs' constitutional claim was based on *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252 (1977), which requires an inquiry into both direct and circumstantial evidence of animus by government officials.  *Saget* explained:

> If this case were limited to the administrative record, as the Government suggests, it would be impossible to conduct the full and thorough analysis of direct and circumstantial evidence *Arlington Heights* demands [with respect to the plaintiffs' equal protection claim]. To constrain judicial review in such a way and to adopt the Government's view is inapposite to the Court's responsibility to "smoke out" unconstitutional government conduct under the doctrine.

*Saget*, 375 F. Supp. 3d at 368 (citing *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989); and *Battaglia v. Gen. Motors Corp.*, 169 F.2d 254, 257 (2d Cir. 1948)).

Plaintiffs are therefore entitled to conduct discovery regarding their constitutional claim.

## B. Extra-Record Discovery is Appropriate Here Because Plaintiffs Have Made a Strong Showing of Bad Faith.

The Supreme Court has authorized extra-record investigation where there is a showing of bad faith on the part of agency decisionmakers.  *Citizens to Pres. Overton Park*, 401 U.S. at

The Honorable Ana C. Reyes
December 15, 2025
Page 8



420.  Plaintiffs are required to make a "strong preliminary showing" of bad faith to expand the scope of review, *see Dep't of Commerce, et al. v. New York, et al.*, 588 U.S. 752, 781 (2019), and this case more than amply clears that bar.  Ferreting out whether an official act was motivated by animus cannot be determined solely by examining the administrative record, and courts have permitted extra-record discovery on APA claims challenging whether an ulterior policy motivated an agency decision.  *See, e.g., Hisp. Affs. Project v. Acosta*, 901 F.3d 378, 388 (D.C. Cir. 2018) (in an APA challenge to DHS's "alleged pattern and practice of automatically extending H-2A visas beyond the regulatory definition of temporary employment," the court was "free to exercise its discretion to permit further discovery 'to ascertain the contours of the precise policy at issue'" (internal quotations omitted).  Fewer than 200 pages of the CAR are actual agency documents created by this administration—some of which are redacted—and the bulk of the CAR consists of news articles and reports.

It is well established that courts reviewing the substantive validity of agency action may consider additional material beyond the administrative record—extra-record material bearing on the reasons for the agency's action—where there has been a "strong showing" that the agency has acted in "bad faith." *CASA, Inc.*, 2025 WL 3514378 at *15. Although courts have set a high bar for such additional evidence going to an agency decisionmaker's reasons for acting, that bar is not impossible to clear—courts have treated the possibility as a real one from *Overton Park* to this day. *See, e.g., Dep't of Commerce*, 588 U.S. at 781-782 (review of extra-record discovery was appropriate under circumstances); *Tummino v. Hamburg*, 936 F.Supp.2d 162, 185 (E.D.N.Y. 2013) (considering materials outside the administrative record was appropriate given the "strong showing of bad faith and improper political influence").

### 1. The Trump Administration Acted in Bad Faith by Unlawfully Terminating Haiti's TPS Designation Based on a Pre-Ordained, Political Edict.

The public record here reflects a pre-ordained decision to terminate Haiti's TPS designation and then pressure from the top of the Trump administration to accomplish that pre-ordained goal.  A few examples of include:

- On October 2, 2024—just days after falsely claiming on national television that Haitian TPS holders were stealing peoples' pets and eating them—a reporter asked President Trump if he would end TPS for Haiti if elected to a second term.  President Trump responded: "Absolutely I'd revoke it, and I'd bring them back to their country."  FAC ¶ 60.  But the TPS review process is supposed to be bottom-up, not top-down: it is supposed to be "grounded in fact—*i.e.*, based on objective conditions in the foreign country and regardless of any government official's political motives—and in good faith." *Saget*, 375 F. Supp. 3d at 346.

- Signaling in advance that a second Trump administration was determined to end TPS designations without regard to the law, now-Vice President Vance, falsely describing TPS holders as "illegal aliens", declared during the campaign that "[w]e're going to stop doing mass grants of Temporary Protected Status," even though the statute, by design, provides for granting blanket relief to all eligible citizens of a designated country present in the United States on the date of designation." *Id.* ¶ 61.

The Honorable Ana C. Reyes
December 15, 2025
Page 9


Bryan Cave Leighton Paisner

- Secretary Noem has made clear that she will not follow the objective, fact-based process required by the TPS statute, but instead will simply follow President Trump Trump's directive to end TPS for Haiti:  Secretary Noem has stated that "[w]hen the President gives a directive," concerning a TPS designation, "the Department of Homeland Security will follow it."  *Id.* ¶ 63.

- In enacting the partial vacatur of TPS for Haiti, Secretary Noem admitted she acted "[i]n furtherance of" the objectives set forth in President Trump's executive order entitled "Protecting the American People Against Invasion," which she characterized as directing her "to promptly take all appropriate actions, consistent with law, to rescind policies that led to increased or continued presence of illegal aliens in the United States."  *Id.* ¶ 118.

This evidence warrants a conclusion of bad faith that justifies expanding the record.  *See Sokaogon Chippewa Cmty. v. Babbitt*, 961 F. Supp. 1276, 1280 (W.D. Wis. 1997) ("If there are adequate grounds to suspect that an agency decision was tainted by improper political pressure, courts have a responsibility to bring out the truth of the matter."); *see also Tummino*, 603 F. Supp. 2d 519 at 544-45 (noting that "the mere existence of 'extraneous pressure' from the White House or other political quarters would render [the agency's] decision invalid" under the APA) (*citing D.C. Fed'n of Civic Ass'ns v. Volpe*, 459 F.2d 1231, 1248-49) (D.C. Cir. 1971)).  It is unlawful to terminate a TPS designation based on a preordained, political edict.  *See, e.g., Saget,* 375 F. Supp. 3d at 346 (evidence showed Secretary's decision to terminate TPS was preordained and pretextual).

### 2. The Trump Administration Acted in Bad Faith by Unlawfully Terminating Haiti's TPS Designation Based on a Racial Animus.

Plaintiffs are also entitled to extra-record discovery because "bad faith" in the form of racial animus infected the decision-making process with respect to Haiti's TPS designations.  *Overton Park*, 401 U.S. at 420.  Specifically, Plaintiffs have documented numerous public statements made by President Trump, during his presidential campaign and as president, in which he disparately disparaged non-white immigrants.  *See generally,* FAC ¶¶ 65-113.

In recent weeks, as this case began being litigated in earnest, both President Trump and Secretary Noem have doubled down on such rhetoric.  For example:

- Just days ago, on December 10, 2025—after Plaintiffs filed their amended complaint—President Trump stated at a rally that he continues to believe that Haitian immigrants are undesirable because they are, his view, people from a "shithole countr[y]."  President Trump simultaneously expressed a desire for increased immigration from predominantly white countries:  "Why can't we have some people from Norway, Sweden, just a few? Let us have a few from Denmark. Do you mind sending us a few people? Do you mind?"[4]

---

[4]    Alexandra Marquez, *Trump revives slur while discussing immigrants from Somalia and other 'disgusting' nations*, NBC NEWS (Dec. 10, 2025), https://www.nbcnews.com/politics/donald-trump/trump-immigrants-somalia-slur-rcna248395

The Honorable Ana C. Reyes
December 15, 2025
Page 10



- On December 1, 2025, Secretary Noem herself described immigrants from nineteen predominantly nonwhite countries, including Haiti, as "leeches," "entitlement junkies," and "foreign invaders" who "suck dry our hard-earned tax dollars," adding "WE DON'T WANT THEM. NOT ONE." FAC ¶ 107.

- Plaintiffs have identified multiple examples by the Trump Administration to curtail immigration for countries viewed as having non-white populations while at the same time removing immigration barriers for white immigrants. *Id.* at ¶¶ 99-105. Indeed, in a recent interview, White House Deputy Chief of Staff Stephen Miler stated he was "proud" that "President Trump has stopped all refugee resettlement into the country" and that "the only refugee resettlement that is happening is the Afrikaners…"[5]

Thus, the Trump administration not only disparages nonwhite immigrants, it seeks to admit only white immigrants.

Where allegations of racial or other animus are at issue, courts have permitted extra-record discovery because evaluating whether an official act was motivated by animus cannot be determined by examining the administrative record." *See Bos. All. of Gay, Lesbian & Transgender Youth v. U.S. Dep't of Health & Hum. Servs.*, 557 F. Supp. 3d 224, 245 (D. Mass. 2021) (considering extra-record evidence of animus in case that was "constitutional in substance" despite being brought under the APA because "limiting the scope of review to the administrative record makes little sense in the context of an inquiry into illicit animus"); *Cook Cnty v. Wolf*, 461 F. Supp. 3d 779, 793–796 (N.D. Ill. 2020) (holding that plaintiffs satisfied the "strong showing standard" based in part on preliminary evidence that DHS's "real reason" for promulgating an immigration rule was to "disproportionately suppress[] nonwhite immigration" (cleaned up)). This Court should follow suit.

## C. Extra-Record Discovery is Appropriate Because the Termination Decision Was Pretextual.

Plaintiffs state a case that supports the inference that the termination decision was pretextual rather than based on statutory requirements. *See, generally,* FAC at ¶¶ 179-235; *see also Dep't of Com.*, 588 U.S. at 782–83 (affirming the district court's order of extra-record discovery, despite finding that order was premature, where the evidence showed the secretary had made up his mind regarding including a citizenship question in the census well before receiving an inquiry from the DOJ and did so for reasons unknown but unrelated to the voting rights act); *Me. Care Servs., Inc. v. USDA*, 2001 WL 261558, at *2–*4 (D. Me. Mar. 15, 2001) (permitting extra-record discovery based on a strong showing of improper behavior). "Strong evidence of unalterably closed minds" is evidence of improper behavior that can "justify discovery into the agency's decisionmaking process." *Comm. of 100 on the Fed. City v. Foxx*, 140 F. Supp. 3d 54, 59 (D.D.C. 2015) (Cooper, J.) (cleaned up). The existing record contains ample preliminary evidence from which such predetermined and pretextual decision making can be inferred.

---

[5]    https://tinyurl.com/399w78kd

The Honorable Ana C. Reyes
December 15, 2025
Page 11



Plaintiffs have reason to believe that the termination of TPS was preordained based on President Trump's and his administration's desire to expel as many immigrants as possible—the more nonwhite immigrants the better—rather than on the criteria set forth in the TPS statute. *See Arlington Heights*, 429 U.S. at 268 (recognizing that "contemporary statements by members of the decisionmaking body" are "highly relevant" to determining whether the body acted with discriminatory intent); *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 945 F.3d 83, 111 (2d Cir. 2019) ("[E]vidence [of discriminatory purpose] may include the series of events leading up to a ... decision, the context in which the decision was made, ... [and] statements made by the decisionmaking body ....") (internal quotation marks omitted). Examples of this preordained agenda are set forth above in Part III.b, Plaintiffs' amended complaint, and Plaintiffs' motion for interim relief under APA § 705, ECF 81.

In addition, at least one of the very same individuals who were involved in the unlawful decision to terminate Haiti's TPS in 2018 has returned to the administration and was directly involved in the November 28, 2025 decision to terminate Haiti's TPS. The individual at issue is Rob Law. In the first Trump administration, Mr. Law worked at as a police adviser within USCIS. He is back in government, and around the time of the decision to terminate Haiti's TPS designation was Senior Counselor to Secretary Noem. *See* Ex. K.

Extra-record discovery in *Saget* and other TPS cases from the first Trump administration revealed that Mr. Law was directly involved in ginning up pretext to unlawfully terminate Haiti's TPS designation based on his superiors' desire that TPS be ended.[6] For example:

- Mr. Law "intentionally edited" the decision memorandum for the Secretary "to support the case for termination and to undermine the case for extension." Mr. Law wrote: "[t]he draft is overwhelmingly weighted for extension which *I do not think is the conclusion we are looking for*." *Saget*, 375 F. Supp. 3d at 351 (emphasis in original, citation omitted).

- Then, "[i]n fewer than thirty minutes—and thus within no time to conduct factual investigation or analysis" Mr. Law "returned another draft [decision] Memorandum that 'made the document fully support termination.'" In the draft, Law 'provided comment boxes where additional data should be provided to back up this decision.'" *Id.* (citation omitted).

- Mr. Law wrote to a colleague: "'I need positive data on the current status of Haiti to bolster the recommendation to terminate TPS. Look back to Sec. Kelly's [six-month] extension for language citing 'improvement' or the like that I can plug in.... *Be creative*." *Id*. at 372 (emphasis in original, citation omitted).

This evidence—which only came to light in *Saget* via extra-record discovery—was critical to the *Saget* court's conclusion that the 2017 attempted termination of Haiti's TPS was the result of a preordained political edict and that the stated reasons for terminating TPS were pretextual. That Mr. Law is back in government and again participating in a TPS termination process for Haiti raises the specter that he again ginned up pretext for the November, 2025 termination.

---

[6] *See, generally, Saget*, 375 F.Supp.3d 280.



All of the above in this section constitutes strong preliminary evidence of improper, preordained decision making which demands extra-record discovery to examine whether Secretary Noem failed to make her decision to terminate Haiti's TPS determination based the process required by the TPS statute. Indeed, other courts have granted extra-record discovery in cases challenging a TPS termination based on similar evidence that "DHS, USCIS, and the Department of State reverse engineered the TPS process with the principal aim of 'getting to no.'" *Saget*, 375 F. Supp. 3d at 343–344. *See Saget,* 375 F. Supp. 3d 280; *Centro Presente v. Trump*, No. 18-cv-10340, Dkt. 60 (D. Mass. Oct. 11, 2018) (stipulation memorializing a September 2018 hearing granting extra-record discovery for which no transcript exists); No. 18-cv-1554, Dkt. 34 (N.D. Cal. June 25, 2018) (ordering the government to supplement the administrative record; to respond to extra-record discovery requests; and to confer with plaintiffs about a 30(b)(6) deposition); *Natl. TPS All. v. Noem,* 2025 WL 2578045 (N.D. Cal. Sept. 5, 2025); and *CASA, Inc. v. Noem*, 2025 WL 3514378 (D. Md. Dec. 8, 2025).

That conclusion is reinforced by Secretary Noem's TPS track record writ large. With only one partial exception, Secretary Noem has terminated the TPS designation for every country for which a TPS designation or extension expired during her time in office. *See* Termination of the Designation of Nicaragua for Temporary Protected Status, 90 Fed. Reg. 30086 (July 8, 2025); Termination of the Designation of Honduras for Temporary Protected Status, 90 Fed. Reg. 30089 (July 8, 2025); Termination of the Designation of Haiti for Temporary Protected Status, 90 Fed. Reg. 28760 (July 1, 2025); Termination of the Designation of Nepal for Temporary Protected Status, 90 Fed. Reg. 24151 (June 6, 2025); 90 Fed. Reg. at 23697 (Cameroon); 90 Fed. Reg. at 20309 (Afghanistan); Termination of the October 3, 2023 Designation of Venezuela for Temporary Protected Status, 90 Fed. Reg. 9040 (Feb. 5, 2025).

The only partial exception to this streak of terminations is Secretary Noem's *nondecision* with respect to South Sudan—a country whose May 2025 extension the government has previously pointed to as evidence that TPS decisions as to Haiti are not infected with animus. Indeed, the government has previously argued that "[t]he fact that the Secretary recently allowed for a six-month extension of TPS as to South Sudan further undermines Plaintiffs' claims that the Secretary's actions were based on" racial animus against Haitians and other nonwhite immigrants. Gov't Reply ISO Motion to Dismiss at 10 n.2, *Haitian Evangelical Clergy Ass'n v. Trump*, No. 25-cv-1464, ECF No. 47 (E.D.N.Y. May 6, 2025). But contrary to the government's suggestion, that six-month extension was not due to the Secretary conducting the statutorily mandated review and concluding it was still unsafe for South Sudanese TPS holders to return to South Sudan: rather, by operation of statute, 8 U.S.C. § 1254a(b)(3)(C), South Sudan received an "automatic six-month extension" of its TPS designation because "the record of country conditions and consultation from the Department of State for South Sudan was not able to be updated prior to" the statutory deadline. 90 Fed. Reg. 19217, 19217–18 (May 6, 2025). Notwithstanding this dearth of information, the Federal Register notice of South Sudan's extension nevertheless "encouraged" South Sudanese TPS holders "to prepare for their return to South Sudan" during the six-month reprieve. *Id.* at 19,217. And, following that automatic six-month extension, Secretary Noem terminated South Sudan's TPS at the first possible opportunity. 90 Fed. Reg. 50484 (Nov. 6, 2025).

The Honorable Ana C. Reyes
December 15, 2025
Page 13



Bryan Cave Leighton Paisner

### D. Extra-Record Discovery is Appropriate Because There are Strong Indications That the Termination of Haiti's TPS Designation Was the Product of Departures from Past Practices.

Here, the record shows an extremely unusual decisionmaking process, and evidence of departures from past practices supports a finding that extra-record discovery is warranted. *See* FAC ¶¶ 179-235 (recitation of facts related to termination decision and departure from past practice); *accord* Plaintiffs' Renewed Motion for Interim Relief, ECF 81 at 24-25.

Although an agency need not show that its reasons for the new position are better than its reasons for the old one*, FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009), it "must at least display awareness that it is changing position and show that there are good reasons for the new policy," *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (internal quotation marks omitted). *See also Saget*, 375 F. Supp. 3d at 344 (E.D.N.Y. 2019) ("Plaintiffs here proffer many documents demonstrating a departure from past practices, pretext, and pressure from high-ranking White House officials…Consequently, Plaintiffs' preliminary showing is sufficient to allow this Court to review extra-record evidence in reaching its decision."); *see also United Student Aid Funds, Inc. v. Devos,* 237 F.Supp.3d 1, 5 (D.D.C. 2017) (Mehta, J.) (permitting extra-record evidence when administrative agency failed to articulate whether its policy differed from industry practice or otherwise constituted a change in position); *CP Salmon Corp. v. Ross*, 2017 WL 11682780, at *6 (D. Alaska Mar. 27, 2017) (permitting discovery to explore "'[u]nexplained inconsistency between agency actions'"); *Tummino*, 427 F. Supp. 2d at 233-34 ("[T]hat the FDA's decisionmaking processes were unusual in four significant respects satisfies the court that the necessary showing of bad faith . . . has been made.").

### IV.    Extra-Record Discovery Plaintiffs Seek.

The Court should order the following extra-record discovery. Plaintiffs do not seek unlimited extra-record discovery. Instead, Plaintiffs seek production of documents responsive to the Requests for Production attached hereto as Ex. N, as well as the opportunity to depose the individuals listed below:

Because there are strong grounds to compel the government to complete the record and to authorize Plaintiffs' tailored requests for extra-record discovery, Plaintiffs propose the following schedule:

- The government should complete the CAR by January 2, 2026;

- The government should produce all documents responsive to Plaintiffs' discovery requests on a rolling basis beginning as soon as possible and completing production by January 16, 2026;

- Expert reports should be disclosed by March 20, 2026.

The Honorable Ana C. Reyes
December 15, 2025
Page 14



## V.    Conclusion

For the foregoing reasons, Plaintiffs respectfully request that this Court (1) direct the government to complete their deficient administrative record; (2) authorize extra-record discovery in light of Plaintiffs' allegations of bad faith and pretext; (3) permit discovery on Plaintiffs' constitutional claim; and (4) order that discovery should begin immediately.

Very truly yours,


*/s/  Geoffrey M. Pipoly*
**GEOFFREY M. PIPOLY**

*Counsel for Plaintiffs*