# EXHIBIT G



**United States Government Accountability Office**

**Report to Congressional Requesters**

**April 2020**

# TEMPORARY PROTECTED STATUS

# Steps Taken to Inform and Communicate Secretary of Homeland Security's Decisions

GAO-20-134

# GAO Highlights

Highlights of GAO-20-134, a report to congressional requesters

**April 2020**

# TEMPORARY PROTECTED STATUS

## Steps Taken to Inform and Communicate Secretary of Homeland Security's Decisions

## Why GAO Did This Study

The INA includes provisions for eligible foreign nationals residing in the United States to obtain temporary humanitarian protection from removal, as well as work authorization, when their country of origin is designated for TPS. Since 1990, nationals of 22 countries have received TPS. The Secretary of Homeland Security may designate a country for TPS after consulting with other agencies and determining that the country meets statutory criteria related to armed conflict, environmental disaster, or extraordinary or temporary conditions that prevent its nationals from returning in safety. The Secretary may designate a country for TPS for periods of 6 to 18 months and can extend a TPS designation if deemed appropriate.

GAO was asked to review the TPS decision process. This report, among other things, (1) describes the approach DHS takes to inform the Secretary of Homeland Security's TPS reviews and (2) examines DHS's communication to the public regarding TPS decisions and related information, including employment authorization. GAO reviewed documentation and data related to TPS decisions, including a nongeneralizable sample of 26 decisions for eight countries in fiscal years 2014 through 2018. GAO selected the countries to reflect various types of TPS decisions, among other factors. GAO also interviewed agency officials.

## What GAO Recommends

GAO recommends USCIS consistently identify in published guidance the mechanisms used to communicate automatic extensions of TPS employment authorization documents. DHS concurred with GAO's recommendation.

View GAO-20-134. For more information, contact Chelsa Gurkin at (202) 512-2964 or GurkinC@gao.gov, or Rebecca Gambler at (202) 512-6912 or GamblerR@gao.gov.

## What GAO Found

The Department of Homeland Security's (DHS) reviews of countries for Temporary Protected Status (TPS) include three main steps, according to DHS and other agencies' documents and officials. First, the Secretary of Homeland Security may initiate a review of a country for TPS designation in response to various triggering factors, such as a request from a foreign government, on the basis of one or more statutory conditions. The Immigration and Nationality Act (INA) requires subsequent reviews after an initial designation. Second, U.S. Citizenship and Immigration Services (USCIS)—which manages and coordinates the TPS review process for DHS—and the Department of State (State) compile country conditions reports and recommendations to inform the Secretary's decision. Although the INA does not prescribe the other agencies that must be consulted for a TPS review,State generally has a role in providing input for the Secretary of Homeland Security's consideration.  GAO found DHS collected country conditions reports and recommendations from USCIS and State for all eight of the countries GAO selected for its review. Other DHS components and non-DHS entities may also provide information. Third, under the INA,the Secretary of Homeland Security exercises discretion in deciding whether to initially designate a country for TPS. For an existing designation, the Secretary determines whether country conditions warrant an extension or termination of TPS. DHS provides official notice of decisions in the Federal Register.

**Three Primary Steps in the Secretary of Homeland Security's Temporary Protected Status (TPS) Reviews**



Source: GAO analysis of documentary and testimonial information from the Department of Homeland Security and the Department of State.  |  GAO-20-134

DHS has communicated TPS decisions to the public through required Federal Register notices as well as other mechanisms. However, DHS has not provided consistent guidance regarding mechanisms it uses to communicate automatic extensions of TPS employment authorization documents. USCIS officials stated that the agency has typically communicated these extensions of documents for TPS beneficiaries through Federal Register notices. However, for five recent automatic extensions, USCIS instead mailed individual notifications to thousands of beneficiaries. USCIS guidance on its website identifies the individual notifications as a mechanism for communicating automatic extensions, but an employers' handbook and related guidance do not. As a result, some employers reportedly terminated TPS beneficiaries' employment because the employers did not understand or accept the notifications as proof of employment authorization. Consistent guidance about the mechanisms USCIS uses could help reduce the risk that TPS beneficiaries will lose their jobs because of confusion about their authorization to work in the United States.

_____ **United States Government Accountability Office**

# Contents

| Letter | | 1 |
|---|---|---|
| | Background | 4 |
| | Foreign Nationals from 22 Countries Have Received TPS, Totaling About 430,000 Beneficiaries in Fiscal Years 2000-2018 | 9 |
| | DHS's Approach to Inform the Secretary's TPS Reviews Includes Three Primary Steps | 15 |
| | DHS Has Communicated TPS Decisions through Required Federal Register Notices but Provided Inconsistent Guidance on Employment Authorizations | 29 |
| | Conclusions | 39 |
| | Recommendation for Executive Action | 40 |
| | Agency Comments | 40 |
| Appendix I | Objectives, Scope, and Methodology | 43 |
| Appendix II | Numbers and Characteristics of Temporary Protected Status Beneficiaries, Fiscal Years 2000-2018 | 49 |
| Appendix III | Comments from Department of Homeland Security | 54 |
| Appendix IV | Comments from U.S. Agency for International Development | 57 |
| Appendix V | GAO Contacts and Staff Acknowledgments | 58 |
| Tables | | |
| | Table 1: Key Department of Homeland Security (DHS) and Department of State (State) Components Involved in Temporary Protected Status (TPS) Decision Process | 8 |
| | Table 2: Department of Homeland Security's Public Communication of Temporary Protected Status (TPS) Extension for Honduras in 2016 | 31 |
| | Table 3: Judgmental Sample of Temporary Protected Status (TPS) Decisions | 46 |

Table 4: Temporary Protected Status (TPS) Beneficiaries, by Country of Citizenship, Fiscal Years 2000-2018          50

Figures

Figure 1: Example of Employment Authorization Document Issued by U.S. Citizenship and Immigration Services          8
Figure 2: Effective Dates, Designation Bases, and Types of Temporary Protected Status (TPS) Decisions, Fiscal Years 1990-2019          11
Figure 3: Temporary Protected Status Beneficiaries, by Country of Citizenship, Fiscal Year 2018          15
Figure 4: Three Primary Steps in Secretary of Homeland Security's Review for Initial or Existing Designation of Temporary Protected Status (TPS)          16
Figure 5: Initiation of Secretary of Homeland Security's Review for Initial or Existing Designation of Temporary Protected Status (TPS)          17
Figure 6: Information Collected for the Secretary of Homeland Security's Review for Initial or Existing Designation of Temporary Protected Status (TPS)          20
Figure 7: Secretary of Homeland Security's Decision on Temporary Protected Status (TPS)          28
Figure 8: Numbers of Federal Register Notices of Extensions, Terminations, or Redesignations of Temporary Protected Status (TPS) Designations Published before and after End Dates of Previous Designation Periods, Fiscal Years 1990-2019          33
Figure 9: Age and Gender of Temporary Protected Status (TPS) Beneficiaries, Fiscal Year 2018          51
Figure 10: Temporary Protected Status (TPS) Beneficiaries, by State of Residency, Fiscal Year 2018          52

**Abbreviations**

| | |
|---|---|
| DHS | Department of Homeland Security |
| INA | Immigration and Nationality Act |
| OMB | Office of Management and Budget |
| PRM | Bureau of Population, Refugees, and Migration |
| RAIO | Refugee, Asylum and International Operations Directorate |
| State | Department of State |
| TPS | Temporary Protected Status |
| USAID | U.S. Agency for International Development |
| USCIS | U.S. Citizenship and Immigration Services |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



**U.S. GOVERNMENT ACCOUNTABILITY OFFICE**

**441 G St. N.W.
Washington, DC 20548**

April 3, 2020

Congressional Requesters

Temporary Protected Status (TPS) is a form of humanitarian protection that provides a temporary benefit to eligible foreign nationals from designated countries who are residing in the United States. TPS protects beneficiaries from removal and permits work authorization.[1] Countries may be designated for TPS on the basis of statutory criteria related to armed conflict, such as civil war; an environmental disaster, such as an earthquake or hurricane; or extraordinary and temporary conditions in the country that prevent nationals from returning in safety.[2] Under the Immigration and Nationality Act (INA),[3] the Secretary of Homeland

---

[1]Pub. L. No. 82-414, title II, ch. 5, § 244, 66 Stat. 163 (1952), as added by the Immigration Act of 1990, Pub. L. No. 101-649, title III, § 302(a), 104 Stat. 4978, 5030-5036 (classified, as amended by the Immigration Act of 1990 and subsequent acts, at 8 U.S.C. § 1254a).

[2]Under 8 U.S.C. § 1254a, the Secretary of Homeland Security may designate a country (or a part of a country) for TPS, after consultation with appropriate agencies of the government, when the Secretary finds that conditions in a country meet certain statutory criteria related to ongoing armed conflict, an environmental disaster, or extraordinary and temporary conditions that prevent nationals from returning in safety. Specifically, regarding armed conflict, the Secretary may designate a country for TPS if the Secretary finds that there is an ongoing armed conflict within the foreign country and that, because of the conflict, requiring the return of foreign nationals to that country would pose a serious threat to their personal safety. Regarding environmental disaster, the Secretary may designate a country for TPS if the Secretary finds that there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the foreign country resulting in a substantial, but temporary, disruption in living conditions; the foreign country is temporarily unable to adequately handle the return of foreign nationals to the country; and the foreign country has officially requested TPS designation. Regarding extraordinary and temporary conditions, the Secretary may designate a country for TPS if the Secretary finds that there are extraordinary and temporary conditions in the foreign country that prevent foreign nationals from returning to the country safely, unless the Secretary finds that permitting foreign nationals to remain temporarily in the United States is contrary to the national interests of the United States.

[3]Unless specified otherwise, all references to the INA in this report refer to section 244 of the act.

Security,[4] after consultation with other agencies, may grant TPS to eligible foreign nationals in the United States from foreign countries that the Secretary has designated for TPS.[5] Although the INA does not prescribe the other agencies that must be consulted, the Department of State (State) generally has a role in providing input for the Secretary of Homeland Security's TPS reviews.[6]

Since TPS was established in 1990, 22 countries have received TPS designations.[7] In fiscal year 2018, more than 400,000 TPS beneficiaries were living in the United States, according to data from DHS's U.S. Citizenship and Immigration Services (USCIS). These beneficiaries were from 10 countries—El Salvador, Haiti, Honduras, Nepal, Nicaragua, Somalia, South Sudan, Sudan, Syria, and Yemen—with the majority from El Salvador, Honduras, and Haiti.[8] Since the beginning of fiscal year 2018, the Secretary of Homeland Security has announced decisions to terminate TPS for six countries—El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan; these decisions are currently the subject of litigation.

You asked us to review the decision-making process for TPS designations. This report (1) describes TPS determinations and numbers

---

[4]The authority to designate countries for TPS was transferred from the Attorney General to the Secretary of Homeland Security in 2003, after the Department of Justice's Immigration and Naturalization Service was abolished and its immigration services and enforcement functions were transferred to the Department of Homeland Security pursuant to the Homeland Security Act of 2002. Pub. L. No. 107-296, title I & IV, §§ 101, 102, 456, 471, 478, 116 Stat. 2135, 2142, 2143-44, 2200-01, 2205, 2211-12 (2002) (classified, as amended, at 6 U.S.C. §§ 111, 112, 275, 291, 298). See also 8 U.S.C. § 1103(a) (powers and duties of the Secretary of Homeland Security).

[5]According to 8 U.S.C. § 1254a(a)(1), the Secretary of Homeland Security may grant TPS to nationals of a foreign state designated for TPS by the Secretary or to stateless individuals whose last habitual residence was in a foreign state designated for TPS.

[6]The Secretary of Homeland Security is required to consult with appropriate agencies of the government before making a designation according to 8 U.S.C. § 1254a(b)(1), and prior to periodic reviews of existing designations, according to 8 U.S.C. § 1254a(b)(3). The statute does not prescribe the other agencies that must be consulted.

[7]Deferred Enforcement Departure is another example of discretionary humanitarian protection from removal that allows eligible foreign nationals from designated countries to remain in the United States on a temporary basis. Deferred Enforcement Departure is not within the scope of this review.

[8]TPS designations for the remaining 12 countries had been terminated as of the beginning of fiscal year 2018.

of beneficiaries since TPS was established; (2) describes the approach that DHS, in consultation with State and other relevant agencies, uses to inform the Secretary of Homeland Security's TPS reviews; and (3) examines DHS's public communication regarding TPS decisions and related information, including work authorization.

To describe TPS determinations and numbers of beneficiaries since TPS was established, we reviewed information and data in Federal Register notices for TPS designations for fiscal years 1990 through 2019 and analyzed USCIS data on numbers of TPS beneficiaries for fiscal years 1990 through 2018.[9] To assess the reliability of the USCIS data, we reviewed related documentation and interviewed USCIS officials to identify any missing or erroneous data and resolve any discrepancies. We determined that the data for fiscal years 2000 through 2018 were sufficiently reliable to provide general information about the size and characteristics of TPS beneficiaries.

To describe the approach that DHS uses to inform TPS reviews, we reviewed provisions in the INA related to TPS as well as DHS and State documentation related to the processes they have used since fiscal year 2014 to collect information for these reviews. This documentation included information that DHS and State provided for a judgmental, nongeneralizable sample of eight countries (El Salvador, Haiti, Honduras, Nepal, Nicaragua, Syria, and Yemen), representing 26 TPS decisions in fiscal years 2014 through 2018.[10] We selected this sample to represent a range of decision types and designation reasons, among other factors. While this sample cannot be generalized to the countries or decisions we did not review, it provided information about the approach DHS uses for TPS reviews. Additionally, we reviewed examples of information that other agencies—for example, the Department of Defense, the Department of Health and Human Services Centers for Disease Control and Prevention, and the U.S. Agency for International Development—and entities such as members of Congress or nongovernmental organizations

---

[9]Fiscal year 1990 is the year when TPS was established under the INA, and fiscal year 2018 is the most recent year for which data on TPS beneficiaries were available.

[10]We selected a judgmental, nongeneralizable sample of eight countries with initial or existing TPS designations in fiscal years 2014 through 2018, representing 26 of a total of 42 TPS decisions for eight of 13 countries in that period, to incorporate a range of decision types and reasons in recent years, among other factors. Because of ongoing litigation related to TPS, certain information had been redacted from some of the documentation that we reviewed. See appendix I for additional details of our objectives, scope, and methodology.

provided to DHS to inform TPS reviews. We also interviewed officials from DHS, State, the Department of Defense, the Department of Health and Human Services Centers for Disease Control and Prevention, and the U.S. Agency for International Development.

To examine DHS's public communication regarding TPS decisions and related information, we reviewed information that DHS published in Federal Register notices from November 29, 1990, through October 1, 2019. We also examined DHS guidance published on its website and DHS procedures as of fiscal year 2019 for communicating TPS work authorization. We compared DHS's guidance and procedures with relevant federal internal control standards.[11] Additionally, we reviewed information from the Department of Justice Civil Rights Division's website related to automatic extensions of employment authorization documents for TPS beneficiaries.[12] We also interviewed DHS officials.

We conducted this performance audit from September 2018 to March 2020 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that our evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

## Background

### Immigration and Nationality Act Provisions for Temporary Protected Status

The INA provides for the Secretary of Homeland Security, after consultation with other agencies, to designate a foreign country for TPS if the conditions in that country fall into one or more of three statutory categories. These categories are generally described as consisting of (1) ongoing armed conflict, (2) environmental disaster, and (3) extraordinary

---

[11]GAO, *Standards for Internal Control in the Federal Government*, GAO-14-704G (Washington, D.C.: September 2014).

[12]Department of Justice Civil Rights Division, "Telephone Interventions," accessed June 27, 2019, https://www.justice.gov/crt/telephone-interventions-2.

and temporary conditions.[13] The Secretary may designate a country for a period of at least 6 months but no more than 18 months.

At least 60 days before the end of the designation period, the Secretary is required, after consulting with other appropriate agencies, to undertake a review of the conditions in the foreign country for which a designation is in effect and to determine whether the conditions for such designation continue to be met. The Secretary must subsequently take one of the following actions:

- Extend the country's TPS designation for a period of 6, 12, or 18 months, if the Secretary determines that country conditions warrant an extension of TPS.[14] This provides TPS beneficiaries with an extended period of protection from removal.

- Terminate the country's TPS designation, if the Secretary determines that the country no longer meets the statutory criteria. This results in an expiration of the period of protection for foreign nationals who were granted TPS under a country's designation.[15]

In addition, the Secretary may exercise his or her discretion, on the basis of this review, to redesignate the country for TPS.[16] With a redesignation, the Secretary allows eligible nationals from the designated foreign country who have arrived in the United States since the initial designation, or another date established by the Secretary, to apply for TPS.

---

[13]See 8 U.S.C. § 1254a(b), which provides that the Secretary of Homeland Security may designate a country for TPS if nationals are unable to return safely to the country because of armed conflict or extraordinary and temporary conditions or if an environmental disaster in the country temporarily prevents a country from adequately handling the return of its nationals. In addition, 8 U.S.C. § 1254a(b)(1)(B)(3) requires that a designation based on environmental disaster must be officially requested by a foreign state. According to USCIS officials, such a request is generally submitted in writing and may be provided to DHS through State. USCIS officials stated that this request is required only for an initial designation based on environmental disaster and that official requests from the foreign government are not required for any subsequent TPS extensions.

[14]See 8 U.S.C. § 1254a(b)(3)(C). Under this section of the INA, a designation period is automatically extended for 6 months if the Secretary does not make a determination to terminate a country's TPS designation before the end date of the current designation.

[15]See 8 U.S.C. § 1254a(b)(3)(B).

[16]See 8 U.S.C. § 1254a(b). According to USCIS officials, from 1997 through 2017, DHS used the term "redesignate" for instances in which the Secretary of Homeland Security newly designated a country for TPS after an initial designation or extension period. Beginning in 2018, DHS began using the term "newly designate" for these decisions.

TPS provides temporary humanitarian protection to eligible foreign nationals in the United States who, for various reasons, may not have otherwise lawful status and therefore, in the absence of TPS, would be subject to enforcement and removal under the INA. Foreign nationals may be present in the United States without valid status and potentially removable for various reasons, such as having entered without inspection and admission at a port of entry or having remained in the country beyond the expiration of previous temporary status (e.g., tourist, foreign student). Eligible foreign nationals may also seek TPS when they currently have another lawful status, according to USCIS officials. USCIS officials noted that this may occur, for example, when a foreign national has a temporary nonimmigrant status nearing its end date when TPS is designated for his or her country and applies for TPS before the existing status expires.

Under the INA, applicants for TPS must apply during the registration period established by the Secretary of Homeland Security for a particular country designation. To be eligible for TPS, an applicant from a designated country must have been physically present in the United States continuously since the most recent designation's effective date and must have resided in the United States continuously since the date established by the Secretary of Homeland Security.[17] The INA also specifies that an individual is ineligible for TPS if he or she has been convicted of any felony or of two or more misdemeanors committed in the United States; if any of the statutory bars to asylum apply, such as involvement in persecution of others; or if he or she is reasonably regarded as a danger to the security of the United States, among other bases.[18]

---

[17]See 8 U.S.C. § 1254a(c). In accordance with the statute, applicants must have been continuously physically present since the effective date of the most recent TPS designation of their country of origin. The Secretary of Homeland Security sets the continuous physical presence date as either the publication date of the Federal Register notice or such later date as the Secretary determines. In addition, applicants must have been living, or continuously residing, in the United States as of the date prescribed by the Secretary of Homeland Security. For example, Yemen's initial TPS designation had an effective date and continuous physical presence date of September 3, 2015; the Secretary of Homeland Security prescribed the same date for continuous residence. See 80 Fed. Reg. 53319 (Sept. 3, 2015). For Yemen's 2017 redesignation, with an effective date and continuous physical presence date of March 4, 2017, the Secretary of Homeland Security prescribed January 4, 2017, as the continuous residence date. See 82 Fed. Reg. 859 (Jan. 4, 2017).

[18]See 8 U.S.C. §1254a(c)(2).

In addition to protecting beneficiaries from removal, TPS authorizes them to work in the United States for the designation period.[19] To receive evidence of work authorization, TPS beneficiaries generally apply to USCIS for an employment authorization document, Form I-766. USCIS provides this document as a plastic card that shows proof of the individual's authorization to work in the United States and includes a photograph of the individual.[20] Although USCIS does not require beneficiaries to apply for an employment authorization document, according to USCIS officials, beneficiaries typically apply to obtain these cards as evidence of their authorization to work in the United States. Figure 1 shows an example of an employment authorization document issued by USCIS.

---

[19]TPS allows beneficiaries to work in the United States and protects them from removal for the designation period, provided that they continue to meet TPS eligibility criteria and are not otherwise subject to removal proceedings or withdrawal of their status. See INA § 244(c)(3)(A-B); 8 C.F.R. § 244.14 regarding withdrawal of TPS.

[20]A TPS beneficiary continues to be authorized to work for as long as he or she has TPS. See INA § 244(a)(1)(B). TPS beneficiaries, like all employees, must provide a document or combination of documents to their employers evidencing their identity and employment authorization from a list of acceptable documents. An employment authorization document (Form I-766) is one of the acceptable documents that may be used to establish both identity and authorization to work in the United States. However, TPS beneficiaries may present any document from the list of acceptable documents that are available to demonstrate identity and eligibility to work in the United States. To apply for an employment authorization document, TPS beneficiaries must submit a completed Form I–765, "Application for Employment Authorization" (OMB Control No. 1615–0040), to USCIS, which has jurisdiction over the form, within the current TPS designation period. According to USCIS officials, applicants do not have to submit Form I-765 concurrently with an application to reregister for TPS.

**Figure 1: Example of Employment Authorization Document Issued by U.S. Citizenship and Immigration Services**

 

Source: U.S. Citizenship and Immigration Services.  |  GAO-20-134

## Key DHS and State Components That May Be Involved in TPS Reviews

Several key DHS and State components may be involved in the TPS decision process, as table 1 shows. Additionally, other DHS offices and components, as well as agencies such as the Department of Defense or U.S. Agency for International Development, may provide information about country conditions to help inform the Secretary of Homeland Security's decisions.

**Table 1: Key Department of Homeland Security (DHS) and Department of State (State) Components Involved in Temporary Protected Status (TPS) Decision Process**

| Agency | Component or official | Role |
|---|---|---|
| **DHS** | Secretary of Homeland Security | Responsible for determining whether to initially designate, extend, terminate, or redesignate TPS for a country. |
| | U.S. Citizenship and Immigration Services | Administers the United States' immigration services function by adjudicating requests for immigration benefits, including TPS. |
| **State**[a] | Secretary of State | Provides input for the Secretary of Homeland Security's consideration for TPS decisions. |
| | Bureau of Population, Refugees, and Migration | Responsible for humanitarian policy and diplomacy, and also provides humanitarian assistance. Has a role in supporting efforts to protect and assist refugees and vulnerable migrants around the world. |
| | Regional bureaus[b] | Serve as the liaison between the overseas posts and State's headquarters bureaus and offices. |
| | Overseas posts[c] | Typically provide information about country conditions for a TPS review. |

Source: GAO analysis of DHS and State documentary and testimonial information. | GAO-20-134

[a]The Secretary of Homeland Security is required to consult with appropriate agencies of the government before making a TPS designation, according to 8 U.S.C. § 1254a(b)(1), and prior to periodic reviews of existing designations, according to 8 U.S.C. § 1254a(b)(3).  Although the INA does not prescribe the other agencies that must be consulted, State generally has a role in providing input for the Secretary of Homeland Security's TPS reviews.

[b]State has six regional bureaus that support the department's mission in specific global regions: the Bureau of African Affairs, the Bureau of European and Eurasian Affairs, the Bureau of East Asian and Pacific Affairs, the Bureau of Near Eastern Affairs, the Bureau of South and Central Asian Affairs, and the Bureau of Western Hemisphere Affairs.

[c]Overseas posts include U.S. embassies and other posts in many countries.

# Foreign Nationals from 22 Countries Have Received TPS, Totaling About 430,000 Beneficiaries in Fiscal Years 2000-2018

## TPS Has Been Granted to Foreign Nationals from 22 Countries since It Was Established

Since TPS was established in 1990, foreign nationals in the United States from 22 countries[21] have been granted TPS.[22] Our review of Federal Register notices published in fiscal years 1990 through 2019 found varying bases for the 22 countries' TPS designations. We also found that designations for 20 of these countries were subsequently extended or the countries were redesignated one or more times.[23] Somalia, first designated for TPS in September 1991, had the longest overall designation period since TPS was established. As of the end of fiscal

---

[21]The 22 countries designated for TPS in fiscal years 1990 through 2019 included El Salvador, Kuwait, Lebanon, Liberia, Somalia, Bosnia-Herzegovina, Rwanda, Montserrat, Burundi, Sierra Leone, Sudan, Kosovo, Honduras, Nicaragua, Guinea-Bissau, Angola, Haiti, South Sudan, Syria, Guinea, Nepal, and Yemen. When Kosovo was designated for TPS in 1998, it was a province of Serbia. In February 2008, the Kosovo Parliament declared Kosovo independent and the United States recognized Kosovo as an independent state.

[22]The authority to designate countries for TPS was transferred from the Attorney General to the Secretary of Homeland Security in 2003, after the Department of Justice's Immigration and Naturalization Service was abolished and its immigration services and enforcement functions were transferred to DHS pursuant to the Homeland Security Act of 2002. Pub. L. No. 107-296, title I & IV, §§ 101, 102, 456, 471, 478, 116 Stat. 2135, 2142, 2143-44, 2200-01, 2205, 2211-12 (2002) (classified, as amended, at 6 U.S.C. §§ 111, 112, 275, 291, 298). See also 8 U.S.C. § 1103(a) (powers and duties of the Secretary of Homeland Security).

[23]A redesignation of TPS may allow eligible nationals from the designated foreign country who have arrived in the United States since the date of the initial designation to apply for TPS, whereas an extension allows existing beneficiaries to retain TPS as long as they continue to meet eligibility requirements.

year 2019, Somalia's designation had been extended 21 times and the country had been redesignated twice;[24] its most recent extension was set to expire in March 2020. Designations for only two countries were terminated without any extensions or redesignations—Kuwait, designated in 1991, and Guinea-Bissau, designated in 1999. Figure 2 shows all effective dates of TPS designations and subsequent decisions, including extensions, terminations, and redesignations, as well as the bases for the designations for each of the 22 countries in fiscal years 1990 through 2019.

---

[24]Somalia's redesignations were coupled with simultaneous extensions of TPS.

**Figure 2: Effective Dates, Designation Bases, and Types of Temporary Protected Status (TPS) Decisions, Fiscal Years 1990-2019**



Source: GAO analysis of information provided in Department of Homeland Security Federal Register notices.   |   GAO-20-134

[a]El Salvador was first designated for TPS in the Immigration Act of 1990. When the original 18-month designation expired in 1992, it was not extended and the country was not redesignated.

[b]One redesignation of Liberia followed a prior termination of the previous designation (1998), and another redesignation of the country was coupled with a simultaneous termination of the previous

designation (2004). Section 7611 of the National Defense Authorization Act for Fiscal Year 2020 allows Liberian nationals who meet all applicable eligibility criteria—including continuous presence in the United States from November 20, 2014, until the date an application is timely filed—and their qualifying family members to become lawful permanent residents (i.e., Green Card holders). See Pub. L. No. 116-92, div. F, title LXXVI, subtitle B, § 7611, 133 Stat. 1198 (2019).

cWhen Kosovo was designated for TPS in 1998, it was a province of Serbia. In February 2008, the Kosovo Parliament declared Kosovo independent and the United States recognized Kosovo as an independent state.

dThe listed designation bases represent statutorily defined categories of conditions on which a TPS designation—either an initial designation or any subsequent redesignation—may be based. When more than one designation basis is shown for a country, the bases shown do not distinguish between the category for the initial designation and categories that were added or removed at the time of any redesignations or subsequent designations.

eAccording to USCIS officials, from 1997 through 2017, "redesignation" was used to describe the Secretary of Homeland Security's designation of a country for TPS after an initial designation or extension period. Officials stated that in 2018, the Department of Homeland Security began using the term "newly designate" for these decisions. From fiscal year 1990, when TPS was established, through fiscal year 2019, all TPS redesignations except two for Liberia were coupled with a simultaneous extension of TPS. Extensions or terminations that occurred with a redesignation are not marked as such in the graphic.

As figure 2 shows, 26 TPS designations occurred in fiscal years 1990 through 2019, and 22 designations were extended at least once. As of September 30, 2019, the designations for all but four countries had been terminated and the termination of six countries' designations since fiscal year 2018 had been temporarily halted because of ongoing litigation. Redesignations occurred 20 times. [25]

- **Designations.** Of the 26 TPS designations, three were for one country, Liberia, and four were for two countries, El Salvador and Sierra Leone, that were each designated twice.

- **Extensions.** The majority of TPS designations (17 of 26 designations) were extended up to eight times. Designations for five countries—El Salvador, Honduras, Nicaragua, Somalia, and Sudan—were extended more than 10 times each. Three of the 22 countries' designations were not extended before termination.

- **Terminations**. The TPS designations for all countries except Somalia, South Sudan, Syria, and Yemen had been terminated as of September 30, 2019. The termination of six countries' designations

---

[25]Since fiscal year 1990, when TPS was established, through fiscal year 2019, all redesignations except two for Liberia were coupled with a simultaneous extension of TPS. One redesignation for Liberia followed a prior termination of the previous designation, and another redesignation for Liberia was coupled with a simultaneous termination of the previous designation. For the purposes of our review, in counting any extensions or terminations for each country, we did not include an extension or termination that occurred simultaneously with a redesignation.

since fiscal year 2018 had been temporarily halted because of ongoing litigation. Several lawsuits had been filed regarding the Secretary of Homeland Security's decisions to terminate TPS for El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan.[26] In October 2018, a U.S. district judge in California issued a preliminary injunction for one of the lawsuits, temporarily blocking DHS from enforcing the Secretary's TPS termination decisions for El Salvador, Haiti, Nicaragua, and Sudan. The U.S. government filed an appeal in response to the preliminary injunction. According to USCIS officials, DHS has regularly published notices of its continued compliance with the court's injunction and has stated that it will continue to publish such notices pending resolution of the case In April 2019, a district court judge in New York issued a second preliminary injunction covering Haiti, which the U.S. government appealed in June 2019. Additionally, under an agreement to stay the proceedings in response to a lawsuit filed in California in February 2019, the government stipulated that it would temporarily halt terminations for Honduras and Nepal until the appeal of the October 2018 injunction had been resolved.

- **Redesignations.** Of the 20 TPS redesignations, six were for countries that were redesignated once, two were for one country that was redesignated twice, and twelve were for four countries that each were redesignated thrice—the largest number of TPS redesignations.[27]

## About 430,000 Eligible Foreign Nationals Received TPS in Fiscal Years 2000-2018

USCIS data show that applications for TPS were approved for a total of 431,848 foreign nationals in fiscal years 2000 through 2018 and that the number of TPS beneficiaries each year[28] grew from about 70,000 in fiscal

---

[26]We previously reported on issues related to the reintegration of migrants in Central America, including potential returnees affected by recent terminations of TPS designations for El Salvador and Honduras. See GAO, *Central America: USAID Assists Migrants Returning to their Home Countries, but Effectiveness of Reintegration Efforts Remains to Be Determined*, GAO-19-62 (Washington, D.C.: Nov. 8, 2018).

[27]All but two of these redesignations were coupled with a simultaneous extension of TPS.

[28]The data on TPS beneficiaries in a given fiscal year include individuals who had been granted TPS as of September 30 of each fiscal year, including beneficiaries who were granted TPS in prior years and whose status was not withdrawn.

year 2000 to about 420,000 in fiscal year 2018.[29] The number of TPS beneficiaries increased most rapidly in fiscal years 2000 through 2005, particularly after the designation of Honduras in 1999 and El Salvador in 2001. According to USCIS officials, because adjudicating all TPS applications can take years, depending on the number of applicants from a country, the number of TPS beneficiaries for a designated country may continue rising after the established registration period for the specific designation. For example, although Honduras was initially designated for TPS in 1999, with an applicant registration period that ended on July 5, 1999, USCIS data show that the number of beneficiaries from Honduras who were granted TPS peaked in 2007 at 85,759 foreign nationals. See appendix II for additional information on the numbers of TPS beneficiaries in fiscal years 2000 through 2018, by country.

Data on the number of TPS beneficiaries for fiscal year 2018—the most recent available—show that the majority of TPS beneficiaries were from three countries (El Salvador, Honduras, and Haiti), as figure 3 shows.[30] About 98 percent of beneficiaries from six countries (Sudan, Honduras, Nicaragua, El Salvador, Haiti, and Nepal) in fiscal year 2018—408,773 foreign nationals—held TPS because the termination of their country's TPS designation was temporarily halted because of ongoing litigation. In addition, about 2 percent of beneficiaries from four countries (Somalia, South Sudan, Syria, and Yemen) in fiscal year 2018—9,019 foreign

---

[29]According to USCIS officials, USCIS data on TPS beneficiaries during this period may include some individuals who adjusted to another immigration status as well as some who left the United States or died. We determined that USCIS data for fiscal years 2000 through 2018 were sufficiently reliable to provide general information on numbers of TPS beneficiaries. USCIS was not able to provide reliable data on numbers of TPS beneficiaries before fiscal year 2000 because, according to USCIS officials, these data were not consistently entered electronically in USCIS information systems before fiscal year 2000. Some of the individuals may have later had their TPS withdrawn because of individual ineligibility or because they became naturalized U.S. citizens. According to USCIS officials, TPS beneficiaries who become U.S. citizens or whose status has been withdrawn, either because they no longer meet eligibility requirements or because they requested that USCIS withdraw their status, are removed from USCIS data in the fiscal year that their status changes.

[30]El Salvador was designated for TPS in 1990, in the statute that created TPS, and was designated again in 2001 after two major earthquakes in the country. Haiti was initially designated for TPS in 2010, after a major earthquake; the Secretary of Homeland Security redesignated Haiti in 2011 to allow eligible Haitians who arrived in the United States up to 1 year after the earthquake to apply for TPS. Honduras was initially designated for TPS after Hurricane Mitch struck the country in 1999. Ongoing insecurity due to violence and criminal activity, lack of economic opportunity, weak governance, and recurrent natural disasters have contributed to continual flows of migrants from Central American countries, including El Salvador and Honduras, as well as from Haiti, to the United States in recent years.

nationals—held TPS because their country's designation was extended. See appendix II for additional information about beneficiary characteristics in fiscal year 2018, including age, gender, and location.

**Figure 3: Temporary Protected Status Beneficiaries, by Country of Citizenship, Fiscal Year 2018**



Source: GAO analysis of U.S. Citizenship and Immigration Services data.  |  GAO-20-134

Note: The data shown reflect eligible foreign nationals who had been granted Temporary Protected Status as of September 30, 2018. According to USCIS officials, these data may include some foreign nationals who had an additional immigration status, as well as some who had left the United States or died, since receiving TPS.

## DHS's Approach to Inform the Secretary's TPS Reviews Includes Three Primary Steps

Our review of documentation for selected TPS decisions in fiscal years 2014 through 2018 and our interviews with DHS, USCIS, and State officials indicated that DHS's approach for initial or subsequent reviews of countries for TPS consists of three primary steps:

1. The Secretary of Homeland Security initiates a review of a country for TPS. For an initial TPS designation, the Secretary may initiate consideration of a country in response to various triggering factors. Such factors may include, for example, a request from a U.S. government entity or a foreign government for a TPS designation based on the statutory conditions for TPS (i.e., armed conflict, environmental disaster, or extraordinary and temporary conditions). For an existing designation approaching its end date, a statutory deadline requires the Secretary to undertake a review.

2.  DHS collects information on country conditions and recommendations from USCIS and State and provides this information to the Secretary of Homeland Security to inform his or her decision regarding an initial or existing TPS designation. Other DHS components and non-DHS entities, including other agencies and nongovernmental organizations, may also provide information to the Secretary or USCIS.

3.  The Secretary of Homeland Security receives the information and recommendations and makes a decision about TPS for the country. The Secretary exercises discretion in determining whether to initially designate a country for TPS. For an existing designation, under the INA, the Secretary is required to determine whether country conditions warrant an extension of TPS or whether the country no longer meets the statutory criteria and TPS must be terminated. Also, the Secretary exercises discretion in determining whether to redesignate a country that was previously designated for TPS.

Figure 4 illustrates these three steps.

**Figure 4: Three Primary Steps in Secretary of Homeland Security's Review for Initial or Existing Designation of Temporary Protected Status (TPS)**



Source: GAO analysis of documentary and testimonial information from the Department of Homeland Security and the Department of State.   |  GAO-20-134

Note: For an initial TPS designation, the Secretary of Homeland Security may initiate consideration of a country for TPS in response to various triggering factors. For an existing designation, a statutory deadline requires the Secretary to undertake a review. See 8 U.S.C. §1254a (b).

## Secretary of Homeland Security May Consider a Country for Initial TPS Designation in Response to Various Factors, and Statute Requires Subsequent Reviews

Various factors may trigger consideration of a country for an initial TPS designation, according to USCIS officials. Officials stated that the Secretary of Homeland Security's consideration of a country for an initial designation is discretionary. However, subsequent reviews of existing designations are required by statute. See figure 5.

**Figure 5: Initiation of Secretary of Homeland Security's Review for Initial or Existing Designation of Temporary Protected Status (TPS)**



Legend: INA = Immigration and Nationality Act.

Source: GAO analysis of documentary and testimonial information from Department of Homeland Security and Department of State.   |   GAO-20-134

Note: For an initial TPS designation, the Secretary of Homeland Security may initiate consideration of a country for TPS in response to various triggering factors, such as a request from a U.S. government entity or a foreign government. For an existing TPS designation, the Secretary is required, after consulting with appropriate agencies, to undertake a review of the conditions in the designated country at least 60 days before the designation's end date. 8 U.S.C. § 1254a(b)(3).

USCIS and State officials stated that for initial TPS designations, a request from DHS, State, the White House, members of Congress, or foreign governments may trigger consideration of whether to designate a country on the basis of one or more of the three statutory categories (i.e., armed conflict, environmental disaster, or extraordinary and temporary conditions).[31] USCIS officials added that, under the INA, the Secretary of Homeland Security has the sole authority to determine whether and when to consider a country for an initial TPS designation. Further, they noted that a request does not automatically result in a formal review of a country for TPS even if the country has experienced country conditions specified in one or more of the statutory categories, such as an armed conflict or environmental disaster.

For subsequent reviews of existing TPS designations, at least 60 days before the end of the designation period, the Secretary is required, after

---

[31]USCIS officials noted that a request from a foreign government is not required for DHS to consider a country for an initial TPS designation. They added that in some cases, DHS does not receive a request from any entity before the Secretary makes a determination to consider a country for an initial TPS designation.

consulting with other appropriate agencies, to undertake a review of the conditions in the foreign country for which a designation is in effect.[32]

## DHS Collects Country Conditions Reports and Recommendations to Inform the Secretary's TPS Decision

DHS collects similar information for each review of a country for TPS, according to DHS officials and our review of selected decisions. DHS officials identified four primary sources of information that the department collects to inform the Secretary of Homeland Security's TPS decisions: country conditions reports compiled by USCIS and State and recommendations from USCIS and State leadership. According to DHS and State officials, DHS generally consults with State on TPS decisions, although it is not specifically required to do so under the statute.[33] Our review of 26 TPS decisions for the eight selected countries found that DHS collected the following documents to inform each decision:

1. a country conditions report compiled by USCIS,

2. a memo with a recommendation from the USCIS Director to the Secretary of Homeland Security,

3. a country conditions report compiled by State, and

4. a letter with a recommendation from the Secretary of State to the Secretary of Homeland Security.[34]

USCIS manages and coordinates the TPS information-gathering process for the Secretary of Homeland Security. While State formally provides its input through the Secretary of State's letter and recommendation to the

---

[32]8 U.S.C. § 1254a(b)(3).

[33]The Secretary of Homeland Security is required to consult with appropriate agencies of the government before making a designation according to 8 U.S.C. § 1254a(b)(1), and prior to periodic reviews of existing designations, according to 8 U.S.C. § 1254a(b)(3). The statute does not prescribe the other agencies that must be consulted.

[34]Although the INA does not prescribe the type of input that must be provided by any agencies that the Secretary of Homeland Security consults with for a TPS review, we found that State generally has a role in providing input, including a country conditions report and recommendation, for the Secretary of Homeland Security's TPS reviews. We reviewed documentation that DHS collected to inform the Secretary's decisions for a judgmental, nongeneralizable sample of eight of the 13 countries for which TPS decisions were rendered in fiscal years 2014 through 2018. Our sample included 26 TPS decisions (specifically, two initial designation decisions, three redesignation decisions, 15 extension decisions, and six termination decisions) from a total of 42 decisions during that period. Because of ongoing litigation, certain information had been redacted from documents for 13 of the 26 TPS decisions in our judgmental sample. See appendix I for additional details of our objectives, scope, and methodology.

Secretary of Homeland Security, USCIS officials said that USCIS generally incorporates the input from State into USCIS's country conditions report and recommendation on TPS.[35] DHS officials noted that other internal DHS components, government agencies, and other entities may also provide information about country conditions or other factors to inform the Secretary of Homeland Security's decisions. Figure 6 shows the information collected to support the Secretary of Homeland Security's TPS reviews.

---

[35]According to USCIS officials, the Secretary of State's letter and recommendation to the Secretary of Homeland Security, as well as State's country conditions report, are generally attached to USCIS's country conditions report and recommendation to inform the Secretary of Homeland Security's review.

**Figure 6: Information Collected for the Secretary of Homeland Security's Review for Initial or Existing Designation of Temporary Protected Status (TPS)**



Legend: DHS = Department of Homeland Security; INA = Immigration and Nationality Act; State = Department of State; USCIS = U.S. Citizenship and Immigration Services.

Source: GAO analysis of documentary and testimonial information from DHS and State.   |  GAO-20-134

Note: The Secretary of Homeland Security is required to consult with appropriate agencies of the government before making a TPS designation, according to 8 U.S.C. § 1254a(b)(1), and prior to periodic reviews of existing designations, according to 8 U.S.C. § 1254a(b)(3). Although the INA does not prescribe the other agencies that must be consulted, State generally has a role in providing input for the Secretary of Homeland Security's TPS reviews, based on our review of documentation for selected TPS decisions in fiscal years 2014 through 2018 and our interviews with DHS, USCIS, and State officials.

USCIS officials indicated that the time frames for conducting TPS reviews may vary. They noted that a review for an initial designation may have a shorter time frame than a review for an existing designation, depending on the situation. In addition, the officials noted that USCIS generally starts the review process for an existing TPS designation about 6 months to a year before the end date of the country's current designation. They added

that they generally start the review process within this timeframe, given the INA requirement that the Secretary of Homeland Security either undertake a review and make a determination regarding country conditions at least 60 days in advance of the prior designation's end date or automatically extend the designation for 6 months.[36] According to USCIS officials, at the start of a review for an initial or existing designation, USCIS's Office of Policy & Strategy generally reaches out to USCIS's Refugee, Asylum and International Operations Directorate (RAIO) to request input on country conditions. USCIS officials also said that the office coordinates with State's Bureau of Population, Refugees, and Migration regarding the target time frame for receiving State's input. In general, once USCIS receives the input from RAIO and State, USCIS finalizes its country conditions report and recommendation memo for the Secretary of Homeland Security.

Our review of documentation for the eight countries in our nongeneralizable sample of 26 TPS decisions found variation in the time frames for USCIS's recommendation memos and for State's recommendation letters. For the 24 reviews of existing TPS designations, USCIS provided recommendation memos to the Secretary of Homeland Security about 2 to 7 months before the end date of the prior

[36]According to 8 U.S.C. § 1254a(b)(1)(C), after the Secretary of Homeland Security makes a decision regarding an initial TPS designation, the designation shall not become effective unless notice of the designation is published in the Federal Register. With regard to decisions to terminate or extend a designation after a required periodic review of an existing designation, the Secretary of Homeland Security is required to provide for the publication of notice of the determination in the Federal Register on a timely basis. Under the law, terminations may not take effect earlier than 60 days after the date of publication of the Federal Register notice announcing the termination decision or, if later, the expiration of the most recent previous extension. See 8 U.S.C. § 1254a(b)(3).

designations.[37] Most of State's 26 recommendation letters were dated about 2 days to 6 months before the USCIS recommendation memos.[38]

RAIO officials noted that they use an internal template as informal guidance for the draft country conditions reports that they compile for USCIS's Office of Policy & Strategy for reviews for initial or existing TPS designations. We reviewed the RAIO template and found, for example, that for reporting on a country being considered for a TPS designation on the basis of an environmental disaster, the template includes sections (e.g., several paragraphs) about the population harmed, damage to infrastructure, disruption in services, and status of disaster response and reconstruction. Officials added that country conditions reports may deviate from the template, because its use is not required; instead, it serves as general, informal guidance. RAIO officials also noted that information in the country conditions reports they compile is generally based on publicly available information or data related to country conditions. According to the officials, sources for such information may include U.S. agencies, foreign governments, international organizations, nongovernmental organizations, and news articles.

According to State officials, after State initiates its internal process for compiling information for the Secretary of Homeland Security's TPS

---

[37]Specifically, of the 24 TPS decisions for existing designations in our sample, nine of the USCIS recommendation memos were dated about 2 to 2.5 months in advance of the prior designation end date; six were dated about 3 to 4.5 months in advance of the prior designation end date; and eight were dated about 5 to 7 months in advance of the prior designation end date. One of the 24 USCIS recommendation memos provided to us was not dated, although USCIS provided an earlier draft memo for that TPS decision to us that was dated about 1.5 months in advance of the prior designation end date. Our sample also included two TPS decisions for initial designations (for a total of 26 decisions); because those designations did not have a prior end date, we did not include them in our analysis.

[38]Specifically, State's recommendation letters for 23 of the 26 TPS decisions were dated in advance of the USCIS recommendation memos for those reviews. Six State letters were dated 2 days to 2 weeks in advance of the USCIS recommendation memo, six were dated 1 to 2 months in advance, seven were dated 2.5 to 4 months in advance, and four were dated 4.5 to 6 months in advance. Three of the 26 State recommendation letters were dated about 1 to 2 weeks after the USCIS recommendation memo. For those three instances, USCIS officials indicated that USCIS officials had communicated with State officials at the working level about the ongoing TPS reviews; however, USCIS did not receive State's final letters in time to incorporate the input into USCIS's memos for the Secretary of Homeland Security. They added that, because State formally provides its input directly to the Secretary of Homeland Security, the Secretary has always received State's input in advance of a TPS decision. State officials indicated that although State strives to adhere to USCIS timelines, complex TPS cases with significant foreign policy considerations may require additional time for internal review.

review, the Bureau of Population, Refugees, and Migration generally requests input internally from the relevant regional bureau and post before compiling information for the Secretary of State's consideration. See the text box for more details of State's internal process for developing country conditions reports and recommendation letters to inform the Secretary of Homeland Security's TPS reviews.

**State Department's Internal Process for Compiling Information for the Secretary of Homeland Security's Temporary Protected Status Reviews**

The Department of State's (State) internal process for developing input for the Secretary of Homeland Security's Temporary Protected Status (TPS) reviews generally includes compiling information on country conditions as well as proposed recommendations from the relevant regional bureau and overseas post, according to documentation for selected TPS decisions in fiscal years 2014 through 2018 and our interviews with DHS, USCIS, and State officials. State's Bureau of Population, Refugees and Migration (PRM) facilitates and coordinates State's internal process for developing this input, according to informal guidance, which State officials said the bureau has used at the working level since 2012, as well as our interviews with State officials.

After DHS initiates a TPS review, PRM generally directs the relevant regional bureau to reach out to overseas posts for information about country conditions, according to State officials. State officials noted that in some cases, the regional bureau's country desk officer takes the lead in drafting the country conditions report, depending on the country context. Officials stated that the regional bureau generally uses a questionnaire on country conditions to request information from the post for a TPS review and that the post generally also provides a recommendation, in addition to the questionnaire responses, via cable or email to the regional bureau. For example, for a country that had an existing TPS designation based on ongoing armed conflict in the country, a country conditions cable provided, among other things, information about the status of the armed conflict, an assessment of whether the return of foreign nationals would pose a serious threat to their personal safety and whether the country was unable to handle the return of nationals, and information about the impact of the conflict on economic and humanitarian conditions. State and U.S. Agency for International Development (USAID) officials noted that other agencies represented at the overseas posts, such as USAID, may provide information for a post's input on country conditions, including information gathered "on the ground" as well as from publicly available sources.

Once the regional bureau receives any input from post, the bureau desk officer prepares a draft country conditions report and recommendation, and the regional bureau works with PRM to compile a joint action memo. PRM generally provides the joint action memo, which includes a country conditions report, to the Secretary of State, according to State officials. The memo may include a joint recommendation or varying recommendations (e.g., from PRM and the regional bureau) for the Secretary's consideration. After the Secretary determines what the department will recommend, State provides a final country conditions report and recommendation letter to the Secretary of Homeland Security as well as to U.S. Citizenship and Immigration Services' Office of Policy & Strategy.

Source: GAO summary of documentary and testimonial information provided by State and USAID. | GAO-20-134

We found that the USCIS and State country conditions reports and recommendation memos or letters that DHS and State provided for our nongeneralizable sample of 26 TPS decisions included information such as background on the cause (or reason for consideration) of the initial

TPS designation and a summary of the country's recovery from, or the status of, the situation to date. In addition, documentation provided to us for some of the TPS decisions included other information, such as certain economic indicators or broader country context. Specifically:

- **Cause and recovery or status.** USCIS and State documentation for each of the 26 TPS decisions in our review generally included (1) information related to the cause (or reason for consideration) of the initial TPS designation and (2) a summary of the country's recovery from, or the status of, the situation to date. For example, documentation for a country designated on the basis of armed conflict described the status of the conflict and ceasefire agreements; provided information about violence against civilians and recruitment of child soldiers; provided an update on civilian casualties since the prior review; and described humanitarian challenges stemming from the conflict, such as the risk of famine. For a country designated on the basis of environmental disaster, documentation described the status of investments in recovery and efforts to rebuild after the disaster, including the number of houses and schools that had been rebuilt or repaired. This documentation also included assessments of disruption in living conditions and the extent to which economic activity and basic services had been restored.

- **Economic indicators.** USCIS documentation for 16 TPS decisions and State documentation for 12 TPS decisions in our review included information about economic indicators. Examples of such information included an estimate of damages from an environmental disaster as a percentage of a country's gross domestic product, a summary of growth in a country's gross domestic product in recent years, and data on the increase in food prices as a result of armed conflict in a country.[39]

- **Broader country context.** USCIS documentation for 23 TPS decisions in our review and State documentation for 20 TPS decisions provided information about broader country context. For example, documentation for a country designated on the basis of armed conflict included broader context regarding topics such as recent natural disasters and the country's geography. As another example, documentation for a country designated on the basis of environmental

---

[39]We determined that USCIS and State documentation (e.g., country conditions reports and recommendation memos or letters) for a TPS decision included information about economic indicators if the documentation provided information about one or more indicators, such as gross domestic product, consumer prices, or unemployment statistics.

disaster provided information about subsequent natural disasters as well as violence, criminal activity, and corruption in the country.

In addition to USCIS and State, other DHS offices and components and non-DHS entities may provide information to inform the Secretary's decision. DHS officials noted that such information varies, may be solicited or unsolicited, and may be provided directly to the Secretary of Homeland Security or to USCIS. We reviewed examples of such information for several of the TPS decisions in our nongeneralizable sample.[40] This information included items such as

- immigration data or intelligence analyses from other DHS offices and components—for example, the Office of Immigration Statistics, U.S. Customs and Border Protection, and U.S. Immigration and Customs Enforcement;

- updates from the Department of Defense on the security situation in a country;

- technical input from the Centers for Disease Control and Prevention regarding the status of an epidemic; and

- input from other entities, including letters from members of Congress, foreign government officials, and nongovernmental organizations.[41]

In addition, DHS officials stated that the Secretary of Homeland Security may hold briefings or meetings on TPS reviews both internally and with

---

[40]DHS and State provided examples of other information compiled for each of the eight countries in our nongeneralizable sample, representing 15 of 26 TPS decisions.

[41]For example, a senior official from DHS's Office of Immigration Statistics provided us with several examples of immigration data that the office provided to DHS and USCIS officials for recent TPS reviews. The official noted that the office routinely provides immigration data—in particular, estimates of unauthorized individuals residing in the United States who would be eligible for an initial designation or redesignation—to both DHS and USCIS for TPS reviews. In addition, DHS's Office of Intelligence and Analysis developed an intelligence assessment that provided an overview of implications, including homeland security considerations and operational considerations for law enforcement, if TPS were to expire for certain countries. According to officials from the Office of Intelligence and Analysis, the office developed the assessment on its own initiative, and it was provided to the Secretary of Homeland Security as part of a daily briefing book as well as posted to an internal dissemination portal for cleared users. As another example, DHS's Office of the Military Advisor requested and received information from the Commander of a Department of Defense combatant command about the security situation, humanitarian challenges, and implications of terminating TPS for a country. Department of Defense officials stated that the department has not provided formal input for TPS reviews.

external entities, such as White House officials, foreign government officials, and nongovernmental organizations or advocacy groups.[42]

According to DHS officials, after USCIS and State compile their country conditions reports and recommendations for the Secretary of Homeland Security's consideration, other DHS components—including the Office of Strategy, Policy, and Plans; the Office of the General Counsel; and the Management Directorate—review the documents as part of the standard departmental clearance process before providing them to the Secretary. Officials from these DHS components noted that the purpose of their review is generally to provide relevant technical comments and ensure that complete information has been gathered for the Secretary's review.

## Secretary of Homeland Security Makes a TPS Decision

According to USCIS officials, after receiving the information and recommendations from USCIS and State, as well as information from any other sources, the Secretary of Homeland Security makes a decision regarding a country's initial or existing TPS designation.[43] USCIS officials indicated that the Secretary's decisions may not always follow the recommendations of the USCIS Director or the Secretary of State. For example, among the 26 TPS decisions from 2014 through 2018 that we reviewed, the Secretary of Homeland Security's decision was the same as State's recommendation in 21 cases and differed from State's recommendation in five cases.[44]

- **Initial designation.** USCIS officials stated that if the Secretary of Homeland Security determines a country meets the statutory criteria

---

[42]For example, we reviewed an agenda and materials for a briefing related to a TPS review for a country. Participants included officials from the White House, DHS, State, and the Department of Justice. The agenda included an overview of TPS and discussion of decision options. Attached materials included background on TPS and the statutory authorities governing TPS, as well as a summary of country conditions and decision options.

[43]Although we reviewed the steps that DHS takes to inform the Secretary of Homeland Security's TPS decisions, we did not review the Secretary's decision-making for specific TPS decisions for the countries we selected for our review. See appendix I for additional details of our objectives, scope, and methodology.

[44]The Secretary of State's recommendations in the five cases varied. These cases included instances when State recommended terminating a designation that DHS decided to extend or when State recommended extending a designation that DHS decided to terminate. Because of redactions that had been made in the information we received, we were unable to discern whether any of the Secretary of Homeland Security's TPS decisions differed from USCIS's recommendations.

for designation, the Secretary may then exercise discretion in deciding whether to initially designate the country for TPS.

- **Existing designation.** According to USCIS officials, the Secretary of Homeland Security exercises discretion in determining whether the conditions in a country satisfy statutory conditions for retaining an existing designation. However, the officials indicated that if the Secretary determines that the conditions for TPS designation continue to be met, the Secretary is required under the INA to extend the designation.[45] Additionally, USCIS officials stated that if the Secretary determines a country no longer meets conditions for TPS designation, the Secretary is required under the INA to terminate the designation. Finally, USCIS officials stated that the Secretary may exercise discretion in deciding to redesignate a country with an existing designation and that factors such as a significant deterioration in country conditions may weigh in favor of a redesignation.[46]

Once the Secretary of Homeland Security decides whether to designate a country or to extend or terminate TPS, the decision may be documented through a signed memorandum or communicated orally to USCIS, according to USCIS officials. DHS provided memorandums or notices documenting the Secretary's TPS decisions for all 26 decisions in our nongeneralizable sample.[47] After the Secretary makes a TPS decision, DHS typically communicates the decision to State before announcing it to the general public. Either DHS or State then communicates the decision to the foreign embassy in Washington, D.C., and State may communicate it to the foreign government overseas. Finally, under INA provisions

---

[45]8 U.S.C. § 1254a(b)(3).

[46]USCIS officials noted that, while factors such as a significant deterioration in country conditions may weigh in favor of a redesignation, there is no single factor that the Secretary of Homeland Security has generally considered in exercising discretion to redesignate a country for TPS.

[47]Specifically, DHS provided a completed signature page from a USCIS recommendation memo as documentation of the Secretary of Homeland Security's decisions in six cases. DHS provided a separate memorandum from the Secretary to the Director of USCIS documenting the TPS decision in two cases, a completed signature page for a memorandum from DHS's Office of the General Counsel documenting the Secretary's decision in another case, and completed signature pages for draft Federal Register notices documenting the Secretary's decisions in 17 cases.

related to TPS, the Secretary's decision is published in the Federal Register (see fig. 7).[48]

**Figure 7: Secretary of Homeland Security's Decision on Temporary Protected Status (TPS)**



Legend: INA = Immigration and Nationality Act; State = Department of State; USCIS = U.S. Citizenship and Immigration Services.

Source: GAO analysis of documentary and testimonial information from the Department of Homeland Security and from State.  |  GAO-20-134

Note: The Secretary of Homeland Security exercises discretion in determining whether to initially designate or redesignate a country for TPS. For an existing designation, under the INA, the Secretary of Homeland Security is required to determine whether country conditions warrant an extension of TPS or whether the country no longer meets the statutory criteria and TPS must be terminated. The INA requires DHS to provide official notice of TPS decisions through the Federal Register. A decision to designate a country for TPS is effective once published in the Federal Register or on a later date specified by the Secretary of Homeland Security. For subsequent TPS reviews of existing designations, DHS is required to provide timely notice of the Secretary of Homeland Security's decision in the Federal Register, and the effective date is generally the day after the end date of the current designation period. The INA provides that a termination shall not be effective earlier than 60 days after the date that a Federal Register notice is published or, if later, the expiration of the most recent previous extension. 8 U.S.C. § 1254a(b).

---

[48]According to 8 U.S.C. §1254A (b)(1), after the Secretary of Homeland Security makes a decision regarding an initial TPS designation, the designation shall not become effective unless notice of the designation is published in the Federal Register. With regard to decisions to extend or terminate a designation after a required periodic review of an existing designation, the Secretary of Homeland Security is required to provide for the publication of notice of the determination in the Federal Register on a timely basis. Under the law, terminations may not take effect earlier than 60 days after the date of publication of the Federal Register notice announcing the termination decision or, if later, the expiration of the most recent previous extension. See 8 U.S.C. § 1254a(b)(3).

# DHS Has Communicated TPS Decisions through Required Federal Register Notices but Provided Inconsistent Guidance on Employment Authorizations

## DHS Has Communicated TPS Decisions to the Public through Required Federal Register Notices and Other Mechanisms

Since 1990, all TPS decisions have been communicated to the public through statutorily required notices in the Federal Register.[49] DHS has also used other mechanisms, including press releases and its website, to help disseminate TPS-related information to the public.

We found that a Federal Register notice was published for all TPS decisions, as required under the INA, from November 1990 to September 2019.[50] In addition, DHS frequently used Federal Register notices as a mechanism for communicating other related information, such as effective dates for TPS designation periods, applicant registration periods, TPS beneficiary eligibility requirements, and information about employment authorization for beneficiaries. For example, the Federal Register notice

---

[49]The authority to designate countries for TPS was transferred from the Attorney General to the Secretary of Homeland Security in 2003, after the Department of Justice's Immigration and Naturalization Service was abolished and its immigration services and enforcement functions were transferred to the Department of Homeland Security pursuant to the Homeland Security Act of 2002. Pub. L. No. 107-296, title I & IV, §§ 101, 102, 456, 471, 478, 116 Stat. 2135, 2142, 2143-44, 2200-01, 2205, 2211-12 (2002) (classified, as amended, at 6 U.S.C. §§ 111, 112, 275, 291, 298). See also 8 U.S.C. § 1103(a) (powers and duties of the Secretary of Homeland Security).

[50]INA provisions related to TPS state that TPS decisions, including designations, extensions, and terminations, shall be published in the Federal Register. The effective dates of TPS decisions may vary, in accordance with the statute. See 8 U.S.C. § 1254a(b).

extending the TPS designation of El Salvador, published on July 8, 2016, included the following[51]:

- summary information about the extension, such as the period of extension and the start and end date of the extension;

- procedures and eligibility information for beneficiaries to register or reregister for TPS and to apply for renewal of employment authorization documents, including required forms and fees to register or reregister;[52]

- directions for obtaining additional information and help with questions by accessing the USCIS website or by contacting an identified USCIS official or a USCIS customer contact center; and

- general information about TPS as well as information about El Salvador's initial TPS designation and about the Secretary's authority and reason for extending TPS for El Salvador.

For a Federal Register notice of a TPS decision, according to USCIS officials, USCIS generally takes about 2 weeks to draft the notice. DHS then completes an internal review before submitting the notice to the Office of Management and Budget (OMB) for interagency review, according to officials. OMB's Office of Information and Regulatory Affairs coordinates the notice review process, including gathering comments or proposed revisions from relevant executive branch agencies. For example, we reviewed examples of technical comments from the Centers for Disease Control and Prevention regarding draft notices of TPS decisions for the Ebola-affected countries that included information and data on the status of the epidemic and an assessment of health care infrastructure. According to USCIS officials, OMB comments are returned to DHS without identifying the agency that made each comment, and additional interagency review and comment may occur before DHS publishes the notice in the Federal Register. USCIS officials also noted that, under regulation, OMB can take up to 90 days to complete the

[51]See 81 Fed. Reg. 44645 (July 8, 2016).

[52]Once granted TPS, an individual must reregister during each reregistration period, in the case of an extension or redesignation, to maintain TPS benefits. TPS beneficiaries generally have 60 days to reregister. However, late reregistration is permitted if good cause is met and USCIS officials are instructed to give beneficiaries the benefit of any doubt, according to USCIS officials. According to USCIS officials, because of ongoing TPS litigation, eligible beneficiaries from six countries (Haiti, El Salvador, Sudan, Nicaragua, Honduras, and Nepal) are allowed to maintain their TPS, provided they have reregistered during at least one or more of the reregistration periods specified in footnote 1 of the Federal Register notice published at 84 Fed. Reg. 59403 (Nov. 4, 2019).

interagency review, although the officials added that OMB aims to complete the process in a timely manner for TPS notices and generally takes about a month.

According to USCIS officials, to help raise awareness of TPS decisions, USCIS has generally also issued press releases announcing all TPS decisions and published them on its website in addition to publishing Federal Register notices. Table 2 summarizes information from DHS's publication of a press release and Federal Register notice for a 2016 TPS decision.

**Table 2: Department of Homeland Security's Public Communication of Temporary Protected Status (TPS) Extension for Honduras in 2016**

| Type of communication | Publication date | Description |
|---|---|---|
| Press release | May 16, 2016 | The prior extension of Honduras's TPS designation was set to end on July 5, 2016. In May, the Department of Homeland Security (DHS) published a press release on its website announcing that the Secretary of Homeland Security had extended TPS for eligible nationals of Honduras for an additional 18 months, effective July 6, 2016, through Jan. 5, 2018. The press release included guidance for TPS beneficiaries regarding TPS reregistration requirements. In addition, the press release stated that, for eligible foreign nationals who reregistered for TPS, U.S. Citizenship and Immigration Services would issue new employment authorization documents with a Jan. 5, 2018, expiration date. |
| Federal Register notice | May 16, 2016 | DHS published a Federal Register notice of the decision to extend the designation of Honduras for TPS. The notice included additional details of the decision as well as guidance for TPS beneficiaries regarding reregistration requirements. |

Source: GAO analysis of DHS documentation and information provided in Federal Register notices. | GAO-20-134

USCIS has also taken other steps to communicate TPS decisions and related information to the public. USCIS has updated its TPS country-specific webpages with alerts about the latest TPS decisions and registration periods, among other information. Further, according to USCIS officials, the Office of Public Affairs hosted periodic national TPS teleconferences for stakeholders and conducted outreach meetings to respond to questions and discuss TPS information in communities where there might be a large number of TPS beneficiaries. For example, a teleconference invitation from USCIS to stakeholders to discuss the extension of Haiti's TPS designation in May 2017 indicated that USCIS officials would share information about the TPS reregistration period and procedures for eligible Haitian nationals and would respond to stakeholder questions. Officials from USCIS's Office of Public Affairs also stated that the office has drafted guidance for communicating most TPS decisions. We reviewed examples of the guidance, which included planned time lines for publishing the press releases and information to

USCIS's website as well as for conducting outreach to Congress, stakeholder groups, and TPS beneficiaries.

## DHS Published Most Federal Register Notices of Decisions on Existing TPS Designations before Previous Designations' End Date

USCIS officials noted that once the Secretary of Homeland Security makes a TPS decision, time frames for publishing the Federal Register notice may vary.[53] USCIS officials stated that, in an effort to ensure public awareness of the decisions as soon as possible, USCIS has in some cases published a press release before the Federal Register notice of a decision was finalized and published.

In reviewing TPS decisions for existing designations (i.e., extensions, terminations, and redesignations) in fiscal years 1990 through 2019, we found the following:

- About two-thirds of Federal Register notices announcing TPS decisions for these existing designations were published at least 30 days before the end date of the previous designation period (100 of 158 total notices).

- In fiscal years 1990 through 2005, 21 Federal Register notices announcing TPS decisions for existing designations were published after the end of the previous designation period.[54]

- In fiscal years 2006 through 2019, all 71 Federal Register notices announcing TPS decisions for existing designations were published 4 to 159 days before the end date of the previous designation period.

See figure 8 for more details.

[53]The INA requires the Secretary of Homeland Security to undertake a review of country conditions for an existing TPS designation at least 60 days before the end of the current designation period. Under the INA, DHS must publish decisions to extend or terminate a country's TPS designation in the Federal Register on a "timely basis." 8 U.S.C. § 1254a(b)(3). USCIS officials noted that they aim to publish a Federal Register notice as expeditiously as possible after the Secretary makes a TPS decision. However, the officials said that timeframes for publishing the Federal Register notice of a TPS decision may vary, depending on the OMB interagency review process, among other factors.

[54]Under 8 U.S.C. § 1254a, a TPS country designation shall remain in effect until the effective date of the termination of the designation. Therefore, in instances in which the publication of a notice in the Federal Register occurred after the end date of the previous TPS designation, such TPS designation would continue unless and until terminated by the Secretary of Homeland Security.

**Figure 8: Numbers of Federal Register Notices of Extensions, Terminations, or Redesignations of Temporary Protected Status (TPS) Designations Published before and after End Dates of Previous Designation Periods, Fiscal Years 1990-2019**



Source: GAO analysis of information provided in Department of Homeland Security Federal Register notices.  |  GAO-20-134

Note: Under 8 U.S.C. § 1254a, DHS must publish decisions to extend or terminate a country's TPS designation in the Federal Register on a timely basis. A TPS country designation remains in effect until the effective date of the termination of the designation. Therefore, while publication of a notice in the Federal Register may occur after the previous period of TPS designation has lapsed, the TPS designation will continue unless and until terminated by the Secretary of Homeland Security.

## USCIS Published Guidance Has Not Consistently Identified All Mechanisms Used to Communicate Automatic Extensions of TPS Employment Authorization Documents

Since 1990, two mechanisms—Federal Register notices and individually mailed notifications, which TPS beneficiaries may use as evidence of their eligibility for employment—have been used to communicate automatic extensions of employment authorization documents. However, USCIS's published guidance has not consistently identified each of these as official mechanisms to verify eligibility, resulting in confusion among employers about TPS beneficiaries' employment eligibility. The INA states that DHS shall provide TPS beneficiaries with "an 'employment authorized' endorsement or other appropriate work permit" but does not specify the mechanisms that DHS should use to communicate TPS employment authorization. To receive documentation of work authorization, TPS beneficiaries generally apply for an employment authorization document after an initial TPS designation and also after any

subsequent extensions or redesignations of TPS.[55] See the text box for a description of the process that TPS beneficiaries and employers must follow to verify beneficiaries' employment eligibility.

---

[55]According to USCIS officials, TPS registrants and reregistrants are not required to apply for an employment authorization document; however, TPS beneficiaries typically apply for the document to obtain evidence of authorization to work in the United States.

**Employment Eligibility Verification (Form I-9) Process**

Form I-9 lays out a process for verifying that an employee is authorized to work in the United States. First, Form I-9 requires the employee to attest to his or her citizenship or immigration status and provide acceptable documentation of identity and employment authorization. Such documents may establish both identity and employment eligibility (e.g., an employment authorization document—Form I-766—that contains a photograph) or may establish identity only (e.g., a driver's license) or employment eligibility only (e.g., a Social Security card).

Next, Form I-9 requires the employer to attest that he or she has examined the documents presented by the employee; that the documents appear to be genuine and relate to the employee; and that, to the best of the employer's knowledge, the employee is authorized to work in the United States. In examining the documents, the employer must reject any that do not reasonably appear to be genuine and to relate to the individual presenting them or that are not on the list of acceptable documents; the employer must then ask for other documents that satisfy the requirements of Form I-9.

| | **Employment Eligibility Verification**<br>**Department of Homeland Security**<br>U.S. Citizenship and Immigration Services | **USCIS**<br>**Form I-9**<br>OMB No. 1615-0047<br>Expires 10/31/2022 |
|---|---|---|

►START HERE: Read instructions carefully before completing this form. The instructions must be available, either in paper or electronically, during completion of this form. Employers are liable for errors in the completion of this form.

ANTI-DISCRIMINATION NOTICE: It is illegal to discriminate against work-authorized individuals. Employers **CANNOT** specify which document(s) an employee may present to establish employment authorization and identity. The refusal to hire or continue to employ an individual because the documentation presented has a future expiration date may also constitute illegal discrimination.

**Section 1. Employee Information and Attestation** *(Employees must complete and sign Section 1 of Form I-9 no later than the first day of employment, but not before accepting a job offer.)*

| Last Name *(Family Name)* | First Name *(Given Name)* | Middle Initial | Other Last Names Used *(if any)* |
|---|---|---|---|

| Address *(Street Number and Name)* | Apt. Number | City or Town | State | ZIP Code |
|---|---|---|---|---|

| Date of Birth *(mm/dd/yyyy)* | U.S. Social Security Number | Employee's E-mail Address | Employee's Telephone Number |
|---|---|---|---|

I am aware that federal law provides for imprisonment and/or fines for false statements or use of false documents in connection with the completion of this form.

I attest, under penalty of perjury, that I am (check one of the following boxes):

☐ 1. A citizen of the United States

☐ 2. A noncitizen national of the United States *(See instructions)*

☐ 3. A lawful permanent resident    (Alien Registration Number/USCIS Number): _____

☐ 4. An alien authorized to work    until (expiration date, if applicable, mm/dd/yyyy): _____
    Some aliens may write "N/A" in the expiration date field. *(See instructions)*

*Aliens authorized to work must provide only one of the following document numbers to complete Form I-9:*
*An Alien Registration Number/USCIS Number OR Form I-94 Admission Number OR Foreign Passport Number.*

QR Code - Section 1
Do Not Write In This Space

Source: GAO summary of U.S. Citizenship and Immigration Services documents and guidance. | GAO-20-134

According to USCIS officials, USCIS aims to adjudicate both initial employment authorization applications and renewal applications within 90 days after receiving an application. When it is unable to process the adjudications in this time frame, USCIS issues automatic extensions of expiring employment authorization documents for TPS beneficiaries from

a specific country, to allow time for USCIS to process the volume of applications associated with a TPS reregistration period.[56] In some instances, USCIS may issue additional automatic extensions of employment authorization documents for specific countries if it has been unable to process all pending applications within the initial automatic extension period, according to USCIS officials.

When employment authorization documents are automatically extended for eligible TPS beneficiaries, the documents may appear to have expired even though they remain valid. According to USCIS officials, DHS has used the Federal Register notices announcing TPS decisions to communicate most automatic extensions of TPS employment authorization documents. For example, on January 17, 2017, DHS published a Federal Register notice extending the TPS designation of Somalia for 18 months and, in the same notice, automatically extended for 6 months the validity of employment authorization documents issued under Somalia's TPS designation.[57] DHS has also communicated automatic extensions of TPS employment authorization documents through Federal Register notices independent of a TPS decision. Generally, Federal Register notices announcing automatic extensions of TPS employment authorization documents include instructions for employers for completing the Form I-9, among other things. Additionally, some notices state that, to reduce employer confusion regarding automatic extensions of TPS employment authorization documents, beneficiaries should explain the extension to their employer and may also provide their employer with a copy of the relevant Federal Register notice.

---

[56]According to USCIS guidance, automatic extensions of employment authorization documents for TPS beneficiaries may be valid for up to 180 days. USCIS officials told us that beneficiaries must generally reregister during the reregistration period for an extension of their status and that reregistration is required for beneficiaries to obtain a new employment authorization document with the validity dates of the new TPS designation period. Individual TPS beneficiaries may also receive an automatic extension of their expiring employment authorization document on the basis of timely filing of a renewal application. According to USCIS officials, these extensions are issued on an individual basis. See 8 CFR 274a.13(d).

[57]According to USCIS officials, the majority of Federal Register notices announcing TPS decisions have included an automatic extension of employment authorization documents. However, some automatic extensions have been announced through Federal Register notices independent of TPS decisions. For example, on July 7, 2005, DHS published a Federal Register notice solely to announce an automatic extension of employment authorization documentation for Honduran and Nicaraguan TPS beneficiaries. See 70 Fed. Reg. 39325 (July 7, 2005).

In five cases, beginning in fiscal year 2018, USCIS mailed notifications of automatic extensions of employment authorization documents to thousands of TPS beneficiaries from Haiti, El Salvador, Syria, and Honduras as an alternative or a supplement to posting the information in Federal Register notices.[58] USCIS officials told us that in these cases, they mailed individual notifications of the automatic extensions to ensure that the beneficiaries would not experience any gaps in employment authorization. According to the officials, they began this practice because of the large number of affected beneficiaries. Our examination of USCIS documents found that in four of these five cases, USCIS mailed individual notifications to the TPS beneficiaries without also posting a Federal Register notice communicating the automatic extension.

In all five cases, USCIS published guidance on its website to inform TPS beneficiaries and employers about the use of individually mailed notifications to communicate employment authorization document extensions. USCIS's website states that TPS beneficiaries may present the Federal Register notice or individually mailed notification to their employer along with their expired employment authorization documents to show proof of continued employment authorization. The individual notifications also state that beneficiaries may show the notifications, along with the expired employment authorization document, to any U.S. employer as proof of continued employment authorization.[59]

However, a USCIS handbook for employers and related guidance do not specifically identify the individually mailed notifications as an official means of communicating these extensions.

- USCIS's *Handbook for Employers: Guidance for Completing Form I-9 (M-274)* provides guidance for employers on how to properly complete Form I-9, which helps employers verify that individuals are authorized to work in the United States. The handbook contains a section about

---

[58]Specifically, USCIS mailed notifications of automatic extensions of employment authorization documents for Haiti on January 22, 2018, and on July 18, 2018; for El Salvador on August 23, 2018; for Syria on September 11, 2018; and for Honduras on December 6, 2018. USCIS communicated an automatic extension of employment authorization documents for TPS beneficiaries from Haiti through the individually mailed notification, sent on January 22, 2018, as well as through a Federal Register notice published on January 18, 2018.

[59]USCIS officials noted that USCIS also provides information about automatic extensions of TPS employment authorization documents in E-Verify, a voluntary web-based system that allows employers to confirm the eligibility of their employees to work in the United States.

automatic employment authorization document extensions for TPS beneficiaries that references USCIS's use of Federal Register notices to inform the public of these extensions. However, the handbook for employers does not mention USCIS's use of individually mailed notifications to communicate the automatic extensions.

- USCIS's *Instructions for Form I-9, Employment Eligibility Verification* notes that certain employees, including TPS beneficiaries, may present an expired employment authorization document, which may be considered unexpired if the document has been extended by USCIS. The guidance also notes that employees should enter the expiration date of an automatic extension on Form I-9. However, the instructions for Form I-9 do not detail USCIS's mechanisms for communicating these extensions, including its use of individually mailed notifications.

Some employers have reportedly refused to accept expired employment authorization documents as proof of work authorization when the documents had been automatically extended. For example, the Department of Justice's Civil Rights Division telephone interventions website indicates that on approximately 50 occasions from September 2017 through May 2019, the Immigrant and Employee Rights Section intervened to deter employers or medical licensing boards from rejecting valid work authorization documents and, in some cases, from terminating employment for TPS beneficiaries whose employment authorization documents had been automatically extended.[60] Also, a letter to USCIS signed by 70 law professors and scholars states that some legal service providers have reported instances of employers' terminating TPS beneficiaries' employment because the employer did not understand or accept the individually mailed notifications.[61] Further, USCIS has received feedback from certain stakeholders concerned that beneficiaries might not be receiving the individual notifications in time to avoid any potential gaps in work authorization, according to USCIS officials.

USCIS officials told us that the Federal Register process may be beneficial for communicating employment authorization in some cases but that they may also continue to use the individually mailed notifications

---

[60]Department of Justice Civil Rights Division, "Telephone Interventions," accessed June 27, 2019, https://www.justice.gov/crt/telephone-interventions-2.

[61]Catholic Legal Immigration Network, letter to Secretary of Homeland Security and Director of U.S. Citizenship and Immigration Services, November 28, 2018, accessed March 27, 2019, https://cliniclegal.org/resources/humanitarian-relief/letter-70-law-professors-and-scholars-uscis-and-dhs-regarding-work.

as a mechanism to communicate future extensions, depending on the circumstances. USCIS has acknowledged the potential benefits of updating external guidance regarding automatic extensions of TPS employment authorization documents. However, as of December 2019, USCIS had not taken action to do so. Replying to a letter of concern from an advocacy group, USCIS stated that it could consider updating the handbook for employers to add additional guidance regarding individually mailed notifications.[62]

Effective information and communication are vital for an entity to achieve its objectives. According to *Standards for Internal Control in the Federal Government*, management should document policies in the appropriate level of detail and externally communicate the necessary quality information to achieve an entity's objectives.[63] Updating external guidance, such as the employer handbook, to clearly identify each of the official mechanisms that USCIS may use to communicate automatic extensions of TPS employment authorization documents could help USCIS ensure that employers understand and accept each of its official mechanisms for communicating these automatic extensions. This, in turn, would help to reduce the risk of employers' terminating beneficiaries from their jobs as a result of confusion caused by unclear or inconsistent guidance.

## Conclusions

The Secretary of Homeland Security has granted TPS, providing work authorization and protection from removal, to foreign nationals from 22 countries since TPS was established in 1990. DHS has generally communicated information about employment authorization for TPS beneficiaries in a Federal Register notice, although in some cases USCIS used individually mailed notifications to communicate automatic extensions of employment authorization documents. However, USCIS's published guidance has not consistently identified individually mailed notifications as a mechanism that may be used, leading to confusion about beneficiaries' employment eligibility and reportedly resulting in termination of some beneficiaries' employment. Consistent published guidance that clearly identifies each of the mechanisms used to communicate automatic extensions of TPS employment authorization

---

[62]U.S. Citizenship and Immigration Services, letter to Director of Advocacy at the Catholic Legal Immigration Network, December 6, 2018, accessed June 27, 2019, https://www.uscis.gov/sites/default/files/files/nativedocuments/Work_Authorization_extensions_for_individuals_with_TPS_from_Haiti_El_Salvador_and_Syria_-_Bussey.pdf.

[63]GAO-14-704G.

documents could help USCIS ensure that employers understand and accept the evidence USCIS provides for employment authorization, reducing the risk of erroneous termination of beneficiaries' employment.

## Recommendation for Executive Action

The Director of USCIS should update published guidance, such as *Handbook for Employers: Guidance for Completing Form I-9 (M-274)*, to consistently identify each of the official mechanisms that USCIS may use to communicate automatic extensions of TPS employment authorization documents.

(Recommendation 1)

## Agency Comments

We provided a draft of this report to DHS, State, the Department of Defense, the Department of Health and Human Services, and the U.S. Agency for International Development for review and comment. In its written comments, reproduced in appendix III, DHS agreed with our recommendation and noted planned actions to implement it, including updating guidance in DHS's M-274 handbook. DHS's planned actions will address the intent of our recommendation if they include updating guidance regarding each of the official mechanisms that USCIS may use to communicate automatic extensions of TPS employment authorization documents, including the use of individually mailed notifications. The U.S. Agency for International Development also provided written comments, which are reproduced in appendix IV. In addition, DHS and State provided technical comments that we incorporated as appropriate. The Department of Defense and the Department of Health and Human Services did not provide comments.

We are sending copies of this report to the appropriate congressional committees, and the Acting Secretary of Homeland Security and Secretary of State, as well as the Secretary of Defense, the Secretary of Health and Human Services, the Director of the Centers for Disease Control and Prevention, and the Administrator of the U.S. Agency for International Development.

If you or your staff have any questions about this report, please contact Chelsa Gurkin at (202) 512-2964 or GurkinC@gao.gov, or Rebecca Gambler at (202) 512-6912 or GamblerR@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made major contributions to this reports are listed in appendix V.

Chelsa Gurkin
Director, International Affairs and Trade

Rebecca Gambler
Director, Homeland Security and Justice

*List of Requesters*

The Honorable Benjamin L. Cardin
Ranking Member
Subcommittee on Western Hemisphere, Transnational Crime, Civilian
Security, Democracy, Human Rights, and Global Women's Issues
Committee on Foreign Relations
United States Senate

The Honorable Richard Blumenthal
United States Senate

The Honorable Cory A. Booker
United States Senate

The Honorable Richard J. Durbin
United States Senate

The Honorable Kirsten Gillibrand
United States Senate

The Honorable Edward J. Markey
United States Senate

The Honorable Jeffrey A. Merkley
United States Senate

The Honorable Gary C. Peters
United States Senate

# Appendix I: Objectives, Scope, and Methodology

Our objectives were to (1) describe Temporary Protected Status (TPS) determinations and numbers of beneficiaries since TPS was established in 1990; (2) describe the approach that the Department of Homeland Security (DHS), in consultation with the Department of State (State) and other relevant agencies, takes to inform the Secretary of Homeland Security's TPS reviews; and (3) examine DHS's public communication regarding TPS decisions and related information, including work authorization.

To describe TPS determinations since TPS was established in 1990, we reviewed information and data in Federal Register notices for all TPS designations in fiscal years 1990 through 2019. Specifically, we reviewed the designation time frames and bases (i.e., ongoing armed conflict, environmental disaster, or extraordinary and temporary conditions) for each designation since TPS was established. We also analyzed U.S. Citizenship and Immigration Services (USCIS) data on numbers of TPS beneficiaries for fiscal years 1990 through 2018. In addition, we analyzed USCIS data on TPS beneficiaries' characteristics, such as numbers, location, age, and gender of foreign nationals granted TPS, for fiscal year 2018.[1]

To assess the reliability of USCIS data on TPS beneficiaries, we reviewed documentation and interviewed USCIS officials to identify and rectify any missing or erroneous data. According to USCIS officials, USCIS removes from its data on TPS beneficiaries any who become U.S. citizens or whose status is withdrawn, either because they no longer meet eligibility requirements or because they requested that USCIS withdraw their status. However, according to officials, the data may include foreign nationals who have since died, moved out of the country, or have an additional immigration status. Additionally, because the data comprise information provided by TPS applicants, the data may include a small number of applicant errors, according to officials. We determined that the data for fiscal years 2000 through 2018 were sufficiently reliable to provide general information about the size and characteristics of TPS

---

[1]We selected this time period to include data on beneficiaries from the fiscal year when TPS was established through the most recent fiscal year for which data were available.

**Appendix I: Objectives, Scope, and
Methodology**

beneficiaries.[2] USCIS was not able to provide reliable data on numbers of TPS beneficiaries before fiscal year 2000 because, according to USCIS officials, these data were not consistently entered electronically in USCIS information systems.

To describe the approach that DHS, in consultation with State and other relevant agencies, takes to inform the Secretary of Homeland Security's TPS reviews, we reviewed provisions in the Immigration and Nationality Act (INA) related to TPS as well as DHS and State documentation, such as informal guidance documents used since fiscal year 2014 or earlier regarding steps taken for a TPS review.[3] We also conducted interviews with DHS and State officials related to the processes they have used to collect information for TPS reviews since fiscal year 2014. Specifically, we interviewed DHS officials from U.S. Customs and Border Protection; the U.S. Coast Guard; U.S. Immigration and Customs Enforcement; the Management Directorate; the Office of the Executive Secretary; the Office of Intelligence and Analysis; the Office of Legislative Affairs; the Office of Partnership and Engagement; the Office of Public Affairs; the Office of Strategy, Policy, and Plans, including the Office of Immigration Statistics; and USCIS—in particular, USCIS's Office of Policy and Strategy and USCIS's Refugees, Asylum, and International Operations Directorate. We interviewed State officials from the Bureau of Population, Refugees, and Migration and several regional bureaus, including desk officers from the Bureaus of African Affairs, Near Eastern Affairs, South and Central Asian Affairs, and Western Hemisphere Affairs. We also interviewed State

---

[2]USCIS also compiles estimates of expected TPS reregistrants based on reregistration trends; according to USCIS officials, these estimates help USCIS to forecast its budget. According to officials, USCIS recently stopped including expected TPS reregistration numbers in the Federal Register notices because the public found the data confusing. The officials added that the estimates could also be misleading depending on the circumstances, because, although the estimates are based largely on numbers of prior reregistrants, additional individuals from a country that is redesignated for TPS may be able to newly register for TPS. Therefore, we have not included USCIS data on expected TPS reregistrants in this report.

[3]We reviewed an internal template that USCIS's Refugee, Asylum and International Operations Directorate (RAIO) officials told us that they use as informal guidance for the draft country conditions reports that they compile for USCIS's Office of Policy & Strategy for reviews for initial or existing TPS designations. We did not assess the extent to which the RAIO country condition reports in our judgmental sample aligned with RAIO's internal template for these reports; rather, our methodology consisted of reviewing the reports in our sample to provide a general overview of the content and types of information included in each report.

officials from overseas posts for countries that we selected for our review, including El Salvador, Haiti, Honduras, Nepal, Sudan, and Yemen.[4]

We reviewed documentation that DHS and State provided for a judgmental, nongeneralizable sample of eight countries for which DHS rendered TPS decisions in fiscal years 2014 through 2018 (El Salvador, Haiti, Honduras, Nepal, Nicaragua, Sudan, Syria, and Yemen); the TPS decisions for these eight countries represented 26 of a total of 42 TPS decisions for 13 countries in that period.[5] We selected this sample to represent a range of decision types and designation reasons, among other factors. While this sample cannot be generalized to the countries or decisions we did not review, it provided valuable information about the approach that DHS uses for TPS reviews. The primary documents that we reviewed for each decision included information about country conditions that USCIS and State had compiled and recommendations that USCIS and State leadership had provided to the Secretary of Homeland Security. Some of the documents that we received had been redacted because of ongoing litigation related to TPS. Table 3 provides additional details of the decisions in our judgmental sample.

[4]We were not able to interview officials from the post in Nicaragua, because the mission had been evacuated after the latest TPS review and State officials informed us that those present at the post at the time of our review would not be able to respond to our questions. However, we were able to interview the regional bureau desk officer for Nicaragua, who was previously posted in Nicaragua during the latest TPS review for Nicaragua. In addition, regional bureau officials told us that State did not obtain country conditions information directly from the post for TPS reviews for Syria, because the embassy was closed due to hostilities in the country.

[5]Although we reviewed the approach that DHS takes to inform the Secretary of Homeland Security's TPS reviews, we did not review the Secretary of Homeland Security's decision-making for specific TPS decisions for the eight countries in our sample.

**Table 3: Judgmental Sample of Temporary Protected Status (TPS) Decisions**

| No. | Country | Decision type | Designation basis | Federal Register notice date |
|---|---|---|---|---|
| 1 | El Salvador | Extension | Environmental disaster | Jan. 7, 2015 |
| 2 | El Salvador | Extension | Environmental disaster | July 8, 2016 |
| 3 | El Salvador | Termination | Environmental disaster | Jan. 18, 2018 |
| 4 | Haiti | Extension | Extraordinary and temporary conditions | Mar. 3, 2014 |
| 5 | Haiti | Extension | Extraordinary and temporary conditions | Aug. 25, 2015 |
| 6 | Haiti | Extension | Extraordinary and temporary conditions | May 24. 2017 |
| 7 | Haiti | Termination | Extraordinary and temporary conditions | Jan. 18, 2018 |
| 8 | Honduras | Extension | Environmental disaster | Oct. 16, 2014 |
| 9 | Honduras | Extension | Environmental disaster | May 16, 2016 |
| 10 | Honduras | Extension | Environmental disaster | Dec. 15, 2017 |
| 11 | Honduras | Termination | Environmental disaster | June 5, 2018 |
| 12 | Nepal | Designation | Environmental disaster | June 24. 2015 |
| 13 | Nepal | Extension | Environmental disaster | Oct. 26, 2016 |
| 14 | Nepal | Termination | Environmental disaster | May 22, 2018 |
| 15 | Nicaragua | Extension | Environmental disaster | Oct. 16, 2014 |
| 16 | Nicaragua | Extension | Environmental disaster | May 16, 2016 |
| 17 | Nicaragua | Termination | Environmental disaster | Dec. 15, 2017 |
| 18 | Sudan | Extension | Armed conflict; extraordinary and temporary conditions | Sept. 2, 2014 |
| 19 | Sudan | Extension | Armed conflict; extraordinary and temporary conditions | Jan. 25, 2016 |
| 20 | Sudan | Termination | Armed conflict; extraordinary and temporary conditions | Oct. 11, 2017 |
| 21 | Syria | Extension, redesignation[a] | Armed conflict; extraordinary and temporary conditions | Jan. 5, 2015 |
| 22 | Syria | Extension, redesignation | Armed conflict; extraordinary and temporary conditions | Aug. 1, 2016 |
| 23 | Syria | Extension | Armed conflict; extraordinary and temporary conditions | Mar. 5, 2018 |
| 24 | Yemen | Designation | Armed conflict | Sept. 3, 2015 |
| 25 | Yemen | Extension, redesignation | Armed conflict; extraordinary and temporary conditions | Jan. 4, 2017 |
| 26 | Yemen | Extension | Armed conflict; extraordinary and temporary conditions | Aug. 14, 2018 |

Source: GAO summary of information about our judgmental sample of TPS decisions. | GAO-20-134

[a]According to USCIS officials, from 1997 through 2017, DHS used the term "'redesignate"' for instances in which the Secretary of Homeland Security newly designated a country for TPS after an initial designation or extension period. Beginning in 2018, DHS began using the term "'newly designate"' for these decisions. See 8 U.S.C. §1254a(b).

**Appendix I: Objectives, Scope, and
Methodology**

In addition, we reviewed examples of other information that may be
provided for a TPS review, including examples of input from other DHS
components, other U.S. agencies, the White House, members of
Congress, foreign governments, and nongovernmental organizations.
Specifically, we received examples of this type of information for each of
the eight countries in our judgmental, nongeneralizable sample,
representing 15 of the 26 TPS decisions. For example, this information
included immigration data and internal intelligence analyses compiled by
DHS's Office of Immigration Statistics, U.S. Customs and Border
Protection, U.S. Immigration and Customs Enforcement, and Office of
Intelligence and Analysis. We also reviewed examples of updates
provided by senior Department of Defense officials for the Secretary of
Homeland Security regarding the security situation in a country; technical
input from the Department of Health and Human Services Centers for
Disease Control and Prevention about the status of an epidemic in a
country; and information from the U.S. Agency for International
Development about country conditions on the ground. In addition, we
interviewed officials from these three agencies regarding the types of
information that they may provide for TPS reviews. Further, we reviewed
examples of letters from members of Congress, foreign government
officials, and nongovernmental organizations related to TPS reviews.
Moreover, we reviewed examples of briefing or meeting agendas and
related materials for internal and external briefings, including external
briefings with White House officials, foreign government officials, and
nongovernmental organizations.

To examine DHS's public communication regarding TPS decisions and
related information, including work authorization, we reviewed DHS's
public communications related to TPS, including Federal Register notices,
press releases, and USCIS's website, among other information. We
analyzed information in Federal Register notices published from
November 29, 1990, through October 1, 2019 (the most recent available
at the time of our review), to determine the timing of notices for TPS
decisions and the types of information included in the notices. We
reviewed examples of USCIS's Office of Public Affairs guidance for public
communication of TPS decisions. We also interviewed USCIS officials
regarding the mechanisms that DHS used to communicate TPS decisions
and related information, including DHS's process for drafting and
publishing Federal Register notices.

Further, we examined DHS's guidance and procedures as of fiscal year
2019 for communicating TPS employment authorization, including
automatic extensions of employment authorization. We reviewed USCIS's

**Appendix I: Objectives, Scope, and Methodology**

public communications related to automatic extensions of TPS employment authorization for both beneficiaries and employers in Federal Register notices, individually mailed notifications, an employer handbook, and information published on USCIS's website. We interviewed USCIS officials regarding USCIS's approach to communicating TPS employment authorization, including automatic extensions. We also reviewed information from the Department of Justice Civil Rights Division's website related to confusion over automatic extensions of employment authorization documents for TPS beneficiaries.[6] Additionally, we reviewed a letter to USCIS signed by 70 law professors and scholars related to instances of employers terminating TPS beneficiaries.[7] Finally, we compared DHS's guidance and procedures with federal internal control standards related to documenting policies and externally communicating information.[8]

We conducted this performance audit from September 2018 to March 2020 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

---

[6]Department of Justice Civil Rights Division, "Telephone Interventions," accessed June 27, 2019, https://www.justice.gov/crt/telephone-interventions-2.

[7]Catholic Legal Immigration Network, letter to Secretary of DHS and Director of USCIS, November 18, 2018, accessed March 27, 2019, https://cliniclegal.org/resources/humanitarian-relief/letter-70-law-professors-and-scholars-uscis-and-dhs-regarding-work. We did not independently verify the issues cited in this letter.

[8]GAO, *Standards for Internal Control in the Federal Government*, GAO-14-704G (Washington, D.C.: September 2014).

**GAO-20-134  Temporary Protected Status**

# Appendix II: Numbers and Characteristics of Temporary Protected Status Beneficiaries, Fiscal Years 2000-2018

Table 4 lists the numbers of TPS beneficiaries, by country of citizenship, in fiscal years 2000 through 2018. During this period, the country with the largest number of TPS beneficiaries in any given fiscal year was El Salvador, with 262,262 in fiscal year 2010; followed by Honduras, with 85,759 in fiscal year 2007; and Haiti, with 58,294 in fiscal year 2014. In contrast, during the same period, Montserrat had the smallest maximum number of TPS beneficiaries in any given fiscal year, with a maximum of 21 in fiscal year 2004; followed by Angola, with a maximum of 47 in fiscal year 2002; and Burundi, with a maximum of 50 in fiscal year 2007.

**Appendix II: Numbers and Characteristics of Temporary Protected Status Beneficiaries, Fiscal Years 2000-2018**

**Table 4: Temporary Protected Status (TPS) Beneficiaries, by Country of Citizenship, Fiscal Years 2000-2018**

| Year | Somalia | Monserrat | Burundi | Sierra Leone | Sudan | Honduras | Nicaragua[a] | Angola | El Salvador | Haiti | South Sudan | Syria | Guinea | Liberia | Nepal | Yemen |
|------|---------|-----------|---------|--------------|-------|----------|--------------|--------|-------------|-------|-------------|-------|--------|---------|-------|-------|
| 2000 | 10 | 15 | 19 | 961 | 179 | 65,874 | 3,581 | 22 | – | – | – | – | – | – | – | – |
| 2001 | 10 | 20 | 25 | 1,048 | 191 | 69,573 | 3,751 | 39 | 21,890 | – | – | – | – | – | – | – |
| 2002 | 37 | 20 | 25 | 1,082 | 193 | 72,812 | 4,013 | 47 | 98,364 | – | – | – | – | – | – | – |
| 2003 | 156 | 20 | 29 | 1,113 | 193 | 75,467 | 4,209 | – | 166,654 | – | – | – | – | 1,596 | – | – |
| 2004 | 167 | 21 | 29 | – | 192 | 78,183 | 4,433 | – | 225,301 | – | – | – | – | 1,959 | – | – |
| 2005 | 173 | – | 31 | – | 222 | 83,874 | 4,734 | – | 242,713 | – | – | – | – | 2,081 | – | – |
| 2006 | 385 | – | 49 | – | 603 | 85,414 | 4,850 | – | 252,786 | – | – | – | – | 4,474 | – | – |
| 2007 | 408 | – | 50 | – | 637 | 85,759 | 4,910 | – | 257,345 | – | – | – | – | 4,508 | – | – |
| 2008 | 414 | – | 49 | – | 645 | 85,461 | 4,935 | – | 261,181 | – | – | – | – | – | – | – |
| 2009 | 421 | – | – | – | 658 | 85,101 | 4,970 | – | 262,006 | – | – | – | – | – | – | – |
| 2010 | 440 | – | – | – | 668 | 85,150 | 4,966 | – | 262,262 | 42,132 | – | – | – | – | – | – |
| 2011 | 440 | – | – | – | 659 | 84,498 | 4,925 | – | 261,227 | 48,695 | – | – | – | – | – | – |
| 2012 | 436 | – | – | – | 659 | 84,005 | 4,891 | – | 260,476 | 58,031 | 1 | 177 | – | – | – | – |
| 2013 | 461 | – | – | – | 682 | 83,747 | 4,850 | – | 259,926 | 58,232 | 3 | 2,036 | – | – | – | – |
| 2014 | 479 | – | – | - | 829 | 83,049 | 4,790 | – | 258,071 | 58,294 | 20 | 4,471 | – | – | – | – |
| 2015 | 476 | – | – | 840 | 834 | 82,515 | 4,730 | – | 256,631 | 57,987 | 26 | 4,830 | 542 | 1,612 | 1,085 | – |
| 2016 | 480 | – | – | 1,256 | 830 | 81,635 | 4,657 | – | 253,619 | 57,638 | 42 | 6,008 | 1,013 | 2,303 | 12,139 | 780 |
| 2017 | 477 | – | – | – | 829 | 80,637 | 4,567 | – | 250,932 | 57,152 | 74 | 6,831 | – | – | 14,516 | 1,090 |
| 2018 | 463 | – | – | – | 804 | 80,748 | 4,524 | – | 251,664 | 56,455 | 83 | 7,009 | – | – | 14,578 | 1,464 |

Legend: – = no TPS beneficiaries.

Source: GAO analysis of U.S. Citizenship and Immigration Services data. | GAO-20-134

Notes: The data shown for each fiscal year represent eligible foreign nationals who were granted TPS and whose status was valid as of September 30 of that fiscal year. According to U.S. Citizenship and Immigration Services officials, foreign nationals granted TPS may be included in the data for multiple fiscal years as long as they maintain valid status. Officials noted that, depending on the population size, it may take USCIS years to adjudicate all applications for TPS from nationals of a given country. Therefore, numbers of TPS beneficiaries may continue to increase after the established registration period for a specific designation. The data shown may also include some eligible foreign nationals who have an additional immigration status as well as some who have left the United States or died, according to USCIS officials. USCIS officials noted that TPS beneficiaries who become U.S. citizens or whose status is withdrawn, either because they no longer meet eligibility requirements or because they requested that USCIS withdraw their status, are removed from the data in the fiscal year that their status changes. According to USCIS officials, data for TPS beneficiaries were not consistently entered electronically in USCIS's information system before fiscal year 2000. As a result, we determined that USCIS data on numbers of TPS beneficiaries before fiscal year 2000 were not sufficiently reliable for our purposes.

Figure 9 presents the ages and genders of Temporary Protected Status (TPS) beneficiaries in fiscal year 2018, based on U.S. Citizenship and Immigration Services information and data. The majority of TPS beneficiaries in fiscal year 2018 were 31 to 50 years of age (62 percent) and male (55 percent).

**Figure 9: Age and Gender of Temporary Protected Status (TPS) Beneficiaries, Fiscal Year 2018**



Source: GAO analysis of U.S. Citizenship and Immigration Services data.  | GAO-20-134

Note: The data shown represent foreign nationals who were granted TPS as of September 30, 2018. According to U.S. Citizenship and Immigration Services (USCIS), data are self-reported by Temporary Protected Status beneficiaries and may therefore include a small number of records with applicant error. As a result, the data shown do not sum precisely to the total number of TPS beneficiaries in fiscal year 2018 (417,792). According to USCIS officials, data may include some eligible foreign nationals who have an additional immigration status as well as some who have left the United States or died.

Figure 10 shows the location, by state of residency, of TPS beneficiaries in fiscal year 2018. TPS beneficiaries resided in all 50 states and the District of Columbia in fiscal year 2018, with the highest populations in California, Florida, Texas, and New York.

**Figure 10: Temporary Protected Status (TPS) Beneficiaries, by State of Residency, Fiscal Year 2018**



Source: GAO analysis of U.S. Citizenship and Immigration Services data.   |  GAO-20-134

Note: The data shown reflect addresses in U.S. Citizenship and Immigration Services' (USCIS)
information system at the time of the most recently approved TPS applications for eligible foreign
nationals who were granted TPS as of September 30, 2018. According to USCIS officials, the data do
not reflect any address changes after the most recently approved application. The data shown are

**Appendix II: Numbers and Characteristics of Temporary
Protected Status Beneficiaries, Fiscal Years 2000-2018**

self-reported by TPS beneficiaries and therefore may include a small number of records with applicant error, according to USCIS officials. Additionally, the data do not reflect TPS beneficiaries residing in U.S. territories or serving in the U.S. armed forces. As a result, the data shown do not sum precisely to the total number of TPS beneficiaries in fiscal year 2018 (417,792). According to officials, the data may include some eligible foreign nationals who have an additional immigration status as well as some who have left the United States or died.

# Appendix III: Comments from Department of Homeland Security



March 6, 2020

Chelsa Gurkin
Director, International Affairs and Trade
U.S. Government Accountability Office
441 G Street, NW
Washington, DC  20548

Rebecca Gambler
Director, Homeland Security and Justice
U.S. Government Accountability Office
441 G Street, NW
Washington, DC  20548

Re:    Management Response to Draft Report GAO-20-134, "TEMPORARY
       PROTECTED STATUS:  Steps Taken to Inform and Communicate Secretary of
       Homeland Security's Decisions"

Dear Ms. Gurkin and Ms. Gambler:

Thank you for the opportunity to comment on this draft report.  The U.S. Department of
Homeland Security (DHS) appreciates the U.S. Government Accountability Office's
(GAO) work in planning and conducting its review and issuing this report.

The Department is pleased to note GAO's (1) reporting of DHS's decision-making
process for determining whether to designate, extend, or terminate a foreign state's
designation for Temporary Protected Status (TPS), and (2) recognition that DHS
communicates all TPS decisions to the public through required Federal Register notices
and other mechanisms, such as website postings.  DHS remains committed to making all
TPS determinations in full compliance with the law.

The draft report contained one recommendation with which the Department concurs.
Attached find our detailed response to the recommendation.  DHS previously submitted
technical comments under a separate cover for GAO's consideration.

Again, thank you for the opportunity to review and comment on this draft report.  Please feel free to contact me if you have any questions.  We look forward to working with you again in the future.

Sincerely,

JIM H. CRUMPACKER, CIA, CFE
Director
Departmental GAO-OIG Liaison Office

Attachment

2

**Attachment:  Management Response to Recommendation
Contained in GAO-20-134**

GAO recommended that the Director of U.S. Citizenship and Immigration Services (USCIS):

**Recommendation 1:**  Update published guidance, such as Handbook for Employers: Guidance for Completing Form I-9 (M-274), to consistently identify each of the official mechanisms that USCIS may use to communicate automatic extensions of TPS employment authorization documents.

**Response:**  Concur.  USCIS's Immigration Records and Identity Services Directorate (IRIS)-Verification Division is currently revising the M-274.  The revised M-274 will provide additional information on completing the Employment Eligibility Verification (Form I-9) for TPS beneficiaries.  Specifically, these revisions will include additional subsections of instructions for completing Form I-9 when a TPS beneficiary's Employment Authorization Document (EAD) is automatically extended by a Federal Register notice and/or a TPS beneficiary receives a Notice of Action, Form I-797C, automatically extending their expired EAD after applying for a new EAD.  Also, the IRIS-Verification Division will revise TPS guidance on I-9 Central, the online Form I-9 resource center, to reflect the information added to the M-274.  Estimated Completion Date:  April 30, 2020.

3

# Appendix IV: Comments from U.S. Agency for International Development



MAR 1 0 2020

Thomas Melito
Managing Director, International Affairs and Trade
U.S. Government Accountability Office
441 G Street, N.W.
Washington, D.C. 20226

Re:    TEMPORARY PROTECTED STATUS – Steps Taken to Inform and Communicate
       Secretary of Homeland Security's Decisions (GAO-20-134)

Dear Mr. Melito:

Thank you for providing the U.S. Agency for International Development (USAID) with an opportunity to review and comment on the draft report produced by the U.S. Government Accountability Office (GAO) titled, *Temporary Protected Status: Steps Taken to Inform and Communicate Secretary of Homeland Security's Decisions* (GAO-20-134). USAID does not have any comments on the draft report.

In this engagement, the GAO reviewed the internal decision-making process at the U.S. Department of State for designating and/or extending Temporary Protected Status (TPS) for select nationalities. The GAO also reviewed the State Department's process for seeking input for the review of TPS by the Secretary for Homeland Security. USAID is not involved in the decision-making process for TPS designations; however, the State Department might ask the Agency to provide information gathered "on the ground" or from publicly available sources.

Thank you for the opportunity to respond to the draft report.

Sincerely,

Frederick M. Nutt
Assistant Administrator,
Bureau for Management

Enclosure: a/s

**GAO-20-134 Temporary Protected Status**

# Appendix V: GAO Contacts and Staff Acknowledgments

| GAO Contacts | Chelsa Gurkin, (202) 512-2964 or GurkinC@gao.gov |
| --- | --- |
| | Rebecca Gambler, (202) 512-6912 or GamblerR@gao.gov |
| Staff Acknowledgments | In addition to the contacts named above, Miriam Carroll Fenton and Taylor Matheson (Assistant Directors), Elisabeth Helmer, Cristina Norland, Ben DeYoung, Martin De Alteriis, Neil Doherty, Jenny Grover, Reid Lowe, Mary Moutsos, Jan Montgomery, Jon Najmi, Nicole Willems, and Bailey Wong made key contributions to this report. Alana Miller and Danielle Rudstein provided technical assistance. |

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through our website. Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. You can also subscribe to GAO's email updates to receive notification of newly posted products. |
| **Order by Phone** | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, https://www.gao.gov/ordering.htm. <br><br> Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537. <br><br> Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| **Connect with GAO** | Connect with GAO on Facebook, Flickr, Twitter, and YouTube. <br> Subscribe to our RSS Feeds or Email Updates. Listen to our Podcasts. <br> Visit GAO on the web at https://www.gao.gov. |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact FraudNet: <br><br> Website: https://www.gao.gov/fraudnet/fraudnet.htm <br><br> Automated answering system: (800) 424-5454 or (202) 512-7700 |
| **Congressional Relations** | Orice Williams Brown, Managing Director, WilliamsO@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548 |
| **Public Affairs** | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 U.S. Government Accountability Office, 441 G Street NW, Room 7149 Washington, DC 20548 |
| **Strategic Planning and External Liaison** | James-Christian Blockwood, Managing Director, spel@gao.gov, (202) 512-4707 U.S. Government Accountability Office, 441 G Street NW, Room 7814, Washington, DC 20548 |



Please Print on Recycled Paper.