UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FRITZ EMMANUEL LESLY MIOT, et al., <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, President of the United States, *et al.*, <br><br> Defendants. | Civil Action No. 25-2471 (ACR) |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION SEEKING INTERIM
RELIEF PURSUANT TO 5 U.S.C. § 705**

# **TABLE OF CONTENTS**

Introduction .................................................................................................................. 1

Background ................................................................................................................... 1

Legal Standard ............................................................................................................. 1

Argument ...................................................................................................................... 3

    I.      The Court Lacks the Authority to Grant the Requested Relief. ............................ 3

           A.      The Court Lacks Jurisdiction. ...................................................... 3

           B.      The INA Precludes the District Court from Staying Agency Action. ........ 3

    II.     Plaintiffs are Not Likely to Succeed on the Merits. ............................................ 11

           A.      Plaintiffs' Arbitrary-and-Capricious Claims Are Not Likely to Succeed. 12

                  1.   Incoming Presidential Administrations May Enter Office with Policy Goals. ................................................................................... 12

                  2.   Exercise of Statutory Authority Cannot Establish an Improper Deviation from Past Practice Theory. ................................................. 13

                  3.   The Secretary Followed Statutory Procedure ............................. 15

                  4.   The Court May Not Reweigh the Evidence before the Secretary. 19

           B.      Plaintiffs' Constitutional Claims are Not Likely to Succeed. ................... 21

                    1.   Plaintiffs' Discriminatory Animus Claim is Unlikely to Succeed. 21

                    2.   Plaintiffs' Nondelegation Claim is Nonexistent in their Complaint. 23

    III.    Plaintiffs Cannot Establish Irreparable Harm. ................................................... 27

IV.     The Balance of the Equities Favors Denying Interim Relief. ............................... 31

V.      Any Granting of Interim Relief Must be Narrowly Tailored. ............................... 33

Conclusion ................................................................................................................... 37

# **TABLE OF AUTHORITIES**

**Page(s)**

## **Cases**

*A.L.A. Schecter Poultry Corp. v. United States,*
  295 U.S. 495 (1935) ................................................................................................ 26

*Abbott v. Perez,*
  585 U.S. 579 (2018) ................................................................................................... 6

*Altagracia v. Office of the State Superintendent of Educ.,*
  45 F.4th 388 (D.C. Cir. 2022) ............................................................................... 23

*Am. Foreign Serv. Ass'n v. Trump,*
  No. 25-5184, 2025 U.S. App. LEXIS 15297 (D.C. Cir. June 20, 2025) ............... 32

*Am. Power & Light Co. v. SEC,*
  329 U.S. 90 (1946) ................................................................................................... 24

*Am.'s Bldg. Trades Unions v. Dep't of Def.,*
  783 F. Supp. 3d 290 (D.D.C. 2025) ....................................................................... 13

*Amoco Prod. Co. v. Gambell,*
  480 U.S. 531 (1987) ................................................................................................. 34

*Arbaugh v. Y&H Corp.,*
  546 U.S. 500 (2006) ................................................................................................... 3

*Baan Rao Thai Rest. v. Pompeo,*
  985 F.3d 1020 (D.C. Cir. 2021) ............................................................................. 22

*Barnes v. E-Sys., Inc. Grp. Hosp Med. & Surgical Ins. Plan,*
  501 U.S. 1301 (1991) ............................................................................................... 31

*Benisek v. Lamone,*
  585 U.S. 155 (2018) ................................................................................................... 2

*Biden v. Texas,*
  597 U.S. 785 (2022) ......................................................................................... 5, 6, 12

*Biovail Corp. v. FDA,*
  448 F. Supp. 2d 154 (D.D.C. 2006) ....................................................................... 31

*Bradshaw v. CHW Grp., Inc.,*
  2025 WL 306783 (D.N.J. Jan. 24, 2025) ................................................................. 3

*Bouarfa v. Mayorkas*,
  604 U.S. 6 (2024) ........................................................................................................... 35

*Brown v. Gilmore*,
  533 U.S. 1301 (2001) ........................................................................................................ 8

*Burke v. EPA*,
  127 F. Supp. 2d 235 (D.D.C. 2001) ................................................................................ 19

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) .......................................................................... 1, 27, 28, 29

*CityFed Fin. Corp. v. Office of Thrift Supervision*,
  58 F.3d 738 (D.C. Cir. 1995) ............................................................................................ 2

*Colorado River Indian Tribes v. Nat'l Indian Gaming Comm'n*,
  466 F.3d 134 (D.C. Cir. 2006) ........................................................................................ 18

*Corley v. United States*,
  556 U.S. 303 (2009) .......................................................................................................... 9

*Corp. for Pub. Broad. v. FEMA*,
  792 F. Supp. 3d 67 (D.D.C. 2025) ................................................................................... 31

*Cronin v. USDA*,
  919 F.2d 439 (7th Cir. 1990) ............................................................................................ 5

*Cuomo v. NRC*,
  772 F.2d 972 (D.C. Cir. 1985) .......................................................................................... 1

*D&G Holdings v. Burwell*,
  156 F. Supp. 3d 798 (W.D. La. 2016) ............................................................................... 4

*Damus v. Nielsen*,
  Civ. A. No. 18-0578 (JEB), 2018 WL 3232515 (D.D.C. July 2, 2018) ............................. 1

*Davis v. Pension Ben. Guar. Corp.*,
  571 F.3d 1288 (D.C. Cir. 2009) ............................................................................. 1, 30, 31

*De Beers Consol. Mines v. United States*,
  325 U.S. 212 (1945) ........................................................................................................ 23

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019) ................................................................................................... 12, 20

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
  591 U.S. 1 (2020) ........................................................................................... 23

*District of Columbia v. Dep't of Agric.*,
  444 F. Supp. 3d 1 (D.D.C. 2020) ................................................................... 27

*Doe v. Trump*,
  984 F.3d 848 (9th Cir. 2020) ......................................................................... 25

*Dorsey v. United States*,
  567 U.S. 260 (2012) ....................................................................................... 10

*Drummond Coal Co. v. Hodel*,
  796 F.2d 503 (D.C. Cir. 1986) ....................................................................... 14

*English v. Trump*,
  279 F. Supp. 3d 307 (D.D.C. 2018) ............................................................... 10

*Episcopal Hosp. v. Shalala*,
  994 F.2d 879 (D.C. Cir. 1993) ....................................................................... 20

*Farris v. Rice*,
  453 F. Supp. 2d 76 (D.D.C. 2006) ................................................................... 2

*FDA v. Wages & White Lion Invs.*,
  604 U.S. 542 (2025) ....................................................................................... 14

*Fernandez-Villafan v. Garland*,
  No. 23-3223, 2023 U.S. App. LEXIS 33272 (6th Cir. 2023) ....................... 30

*Florida Power & Light Co. v. Lorion*,
  470 U.S. 729 (1985) ....................................................................................... 19

*Francisco-Diego v. Garland*,
  No. 21-3870 2022 U.S. App. LEXIS 15036 (6th Cir. 2022) ........................ 30

*Fund for Animals v. Frizzell*,
  530 F.2d 982 (D.C. Cir. 1975) ....................................................................... 31

*Garland v. Aleman Gonzalez*,
  596 U.S. 543 (2022) ................................................................................. 4, 5, 8

*Gomez v. Trump*,
  485 F. Supp. 3d 145 (D.D.C. 2020) ............................................................... 25

*Guangatal v. Att'y Gen.*,
   No. 23-2151, 2025 U.S. App. LEXIS 15049 (3d Cir. 2025) ................................. 30

*Gundy v. United States*,
   588 U.S. 128 (2019) ................................................................................. 23, 24, 26

*Halo Electronics, Inc. v. Pulse Electronics, Inc.*,
   579 U.S. 93 (2016) ................................................................................................ 35

*Hanson v. Smith*,
   120 F.4th 223 (D.C. Cir. 2024) ............................................................................ 28

*Hecht Co. v. Bowles*,
   321 U.S. 321 (1944) .............................................................................................. 34

*Holder v. Humanitarian Law Project*,
   561 U.S. 1 (2010) ........................................................................................... 19, 32

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
   219 F. Supp. 2d 57 (D.D.C. 2002) ....................................................................... 32

*Immigrant Defs. L. Ctr. v. Noem*,
   145 F.4th 972 (9th Cir. 2025) ............................................................................... 34

*Ind. Mun. Power Agency v. FERC*,
   56 F.3d 247 (D.C. Cir. 1995) ............................................................................... 19

*Innovation Law Lab v. McAleenan*,
   924 F.3d 503 (9th Cir. 2019) ............................................................................... 33

*Institutional S'holder Servs., Inc. v. SEC*,
   142 F.4th 757 (D.C. Cir. 2025) .............................................................................. 9

*Islamic Am. Relief Agency v. Gonzales*,
   477 F.3d 728 (D.C. Cir. 2007) ............................................................................. 20

*J.E.F.M. v. Lynch*,
   837 F.3d 1026 (9th Cir. 2016) ............................................................................. 29

*Jobbers Ass'n v. FPC*,
   259 F.2d 921 (D.C. Cir.1958) .............................................................................. 28

*Kandamar v. Gonzales*,
   464 F.3d 65 (1st Cir. 2006) .................................................................................. 22

*Kinney-Coastal Oil Co. v. Kieffer*,
    277 U.S. 488 (1928) ................................................................ 33

*Kleindienst v. Mandel*,
    408 U.S. 753 (1972) ................................................................ 21

*League of Women Voters v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) .................................................... 2

*Lockhart v. United States*,
    546 U.S. 142 (2005) ................................................................ 10

*Make the Road N.Y.*,
    962 F.3d ..................................................................................... 33

*Make the Rd. N.Y. v. Noem*,
    2025 WL 2494908 (D.D.C. Aug. 29, 2025) ........................ 27

*Marcello v. Bonds*,
    349 U.S. 302 (1955) ................................................................ 10

*Marinescu v. Att'y Gen.*,
    284 F. App'x 889 (3d Cir. 2008) ........................................... 30

*Mexichem Specialty Resins, Inc. v. EPA*,
    787 F.3d 544 (D.C. Cir. 2015) ............................................. 27

*Mistretta v. United States*,
    488 U.S. 361 (1989) ......................................................... 24, 26

*Monumental Task Comm., Inc. v. Foxx*,
    157 F. Supp. 3d 573 (E.D. La. 2016) ................................... 5

*Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) .................................................................. 13

*Muvvala v. Wolf*,
    Civ. A. No. 20-2423 (CJN), 2020 U.S. Dist. LEXIS 177082 (D.D.C. Sept. 25, 2020) ........... 31

*Mylan Pharms., Inc. v. Shalala*,
    81 F. Supp. 2d 30 (D.D.C. 2000) ......................................... 31

*N.S. v. Dixon*,
    141 F.4th 279 (D.C. Cir. 2025) ............................................. 4

*Narenji v. Civiletti*,
   617 F.2d 745 (D.C. Cir. 1979) ................................................................ 22

*Nat'l Ass'n of Broads. v. FCC*,
   39 F.4th 817 (2022) ............................................................................... 18

*Nat'l Broad. Co. v. United States*,
   319 U.S. 190 (1943) ............................................................................... 23

*Nat'l Min. Ass'n v. Jackson*,
   768 F. Supp. 2d 34 (D.D.C. 2011) .......................................................... 27

*Nielsen v. Preap*,
   586 U.S. 392 (2019) ................................................................................. 4

*Nken v. Holder*,
   556 U.S. 418 (2009) ...................................................................... passim

*Olenga v. Gacki*,
   507 F. Supp. 3d 260 (D.D.C. 2020) ........................................................ 21

*Open Top Sightseeing USA v. Mr. Sightseeing,
   LCC*, 48 F. Supp. 3d 87 (D.D.C. 2014) .................................................. 31

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*,
   810 F.3d 631 (9th Cir. 2015) .................................................................. 23

*Palestine Info. Off. v. Shultz*,
   853 F.2d 932 (D.C. Cir. 1988) ................................................................ 24

*Panama Refin. Co. v. Ryan*,
   293 U.S. 388 (1935) ............................................................................... 26

*Pantoja v. Martinez*,
   No. 21-7118, 2022 WL 893017 (D.C. Cir. 2022) ..................................... 2

*Pierre v. Gonzales*,
   502 F.3d 109 (2d Cir. 2007) ................................................................... 30

*Project*,
   510 U.S. ................................................................................................. 33

*Pub. Citizen Health Research Grp. v. Acosta*,
   363 F. Supp. 3d 1 (D.D.C. 2018) ........................................................... 31

*Rai v. Biden*,
    567 F. Supp. 3d 180 (D.D.C. 2021) ........................................................................ 23

*Rajah v. Mukasey*,
    544 F.3d 427 (2d Cir. 2008)................................................................................... 22

*Reno v. Am.-Arab Anti-Discrim. Comm.*,
    525 U.S. 471 (1999) ....................................................................................... 19, 32

*Russello v. United States*,
    464 U.S. 16 (1983)................................................................................................. 9

*S. Utah Wilderness All. v. Norton*,
    542 U.S. 55 (2004)............................................................................................... 36

*Saget v. Trump*,
    375 F. Supp. 3d 280 (E.D.N.Y. 2019) ................................................................ 12

*Sampson v. Murray*,
    415 U.S. 61 (1974)............................................................................................ 1, 6

*Scottsdale C apital Advisors Corp. v. Fin. Indus. Regul. Auth., Inc.*,
    678 F. Supp. 3d 88 (D.D.C. 2023) ..................................................................... 1, 8

*Scripps-Howard Radio v. FCC*,
    316 U.S. 4 (1942)................................................................................................. 6

*Sierra Club v. Jackson*,
    833 F. Supp. 2d 11 (D.D.C. 2012) ....................................................................... 5

*Sprint Corp. v. FCC*,
    151 F.4th 347 (D.C. Cir. 2025) ........................................................................... 14

*Starbucks Corp. v. McKinney*,
    602 U.S. 339 (2024)................................................................................ 2, 34, 35

*Texas v. EPA*,
    829 F.3d 405 (5th Cir. 2016) ............................................................................... 5

*Tiktok Inc. v. Trump*,
    490 F. Supp. 3d 73 (D.D.C. 2020) ..................................................................... 32

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025)............................................................................ 33, 34, 35

*Trump v. Hawaii,*
    585 U.S. 667 (2018) ............................................................................ 19, 21, 22

*Trump v. Int'l Refugee Assistance Project,*
    582 U.S. 571 (2017) ...................................................................................... 32

*Ukeiley v. EPA,*
    896 F.3d 1158 (10th Cir. 2018) .................................................................. 14

*United States Ass'n of Reptile Keepers, Inc. v. Zinke,*
    852 F.3d 1131 (D.C. Cir. 2017) .................................................................... 2

*United States v. Burr,*
    25 F. Cas. 30 (C.C.D. Va. 1807) ................................................................ 35

*United States v. Cortez,*
    449 U.S. 411 (1981) ...................................................................................... 33

*United States v. Curtiss– Wright Export Corp.,*
    299 U.S. 304 (1936) ................................................................................ 24, 25

*United States v. Martinez-Fuerte,*
    428 U.S. 543 (1976) ...................................................................................... 32

*United States v. Oakland Cannabis Buyers' Coop.,*
    532 U.S. 483 (2001) ...................................................................................... 34

*United States v. Texas,*
    599 U.S. 670 (2023) ...................................................................................... 11

*Verde-Rodriguez v. Att'y Gen.,*
    734 F.3d 198 (3d Cir. 2013) ........................................................................ 29

*Verma v. U.S. Citizenship & Immigr. Servs.,*
    Civ. A. No. 20-3419 (RDM), 2020 U.S. Dist. LEXIS 239157 (D.D.C. Dec. 18, 2020) .......... 31

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,*
    435 U.S. 519 (1978) ........................................................................................ 7

*Weinberger v. Romero-Barcelo,*
    456 U.S. 305 (1982) ...................................................................................... 34

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001) ................................................................................ 24, 26

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ................................................................................ 1, 2, 35

*Wis. Gas Co. v. Fed. Energy Reg. Comm'n*,
   758 F.2d 669 (1985) ................................................................................... 28

*Wyoming v. Dep't of Interior*,
   2018 WL 2727031 (10th Cir. June 4, 2018) ............................................... 8

*Yakus v. United States*,
   321 U.S. 414 (1944) ................................................................................... 24

*Yang v. Lynch*,
   611 F. App'x 357 (7th Cir. 2015) ............................................................. 30

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ................................................................................... 15

*Your Home Visiting Nurse Servs. v. Shalala*,
   525 U.S. 449 (1999) ..................................................................................... 4

*Zadvydas v. Davis*,
   533 U.S. 678 (2001) ................................................................................... 33

*Zambelli Fireworks Mfg. Co. v. Wood*,
   592 F.3d 412 (3d Cir. 2010) ....................................................................... 3

*Zemel v. Rusk*,
   381 U.S. 1 (1965) ................................................................................ 24, 25

*Zeng v. Mayorkas*,
   Civ. A. No. 21-446 (DLF), 2021 U.S. Dist. LEXIS 111323 (D.D.C. Apr. 16, 2021) ............. 30

*Zhu v. Gonzales*,
   411 F.3d 292 (D.C. Cir. 2005) .................................................................. 25

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
   576 U.S. 1, (2015) ..................................................................................... 25

## **Statutes**

5 U.S.C. § 559 .............................................................................................. 10

5 U.S.C. § 702 .............................................................................................. 36

5 U.S.C. § 703 .............................................................................................. 35

5 U.S.C. § 705 ............................................................................................................ passim

8 U.S.C. § 1231(a) ............................................................................................................ 30

8 U.S.C. § 1252(a)(5) .................................................................................................. 28, 29

8 U.S.C. § 1252(f)(1) .................................................................................................. 4, 5, 9

8 U.S.C. § 1252(f)(2) ........................................................................................................... 9

8 U.S.C. § 1254a ................................................................................................................... 5

8 U.S.C. § 1254a(b)(1) .................................................................................................. 15, 20

8 U.S.C. § 1254a(b)(3)(B) ................................................................................................. 15

8 U.S.C. §§ 1254a(b)(1)(C) ............................................................................................... 13

15 U.S.C. § 634 ................................................................................................................... 11

29 U.S.C. § 160(e)-(f) ....................................................................................................... 11

29 U.S.C. § 1132(l)(3) ....................................................................................................... 11

**<u>Regulations</u>**

8 C.F.R. § 244.17(a) ........................................................................................................... 16

8 C.F.R. § 244.2 ................................................................................................................... 5

**<u>Other Authorities</u>**

57 Fed. Reg. 2931 (Jan. 24, 1992) .................................................................................... 17

62 Fed. Reg. 16,608 (Apr. 7, 1997) .................................................................................. 16

62 Fed. Reg. 33,442 (June 19, 1997) ................................................................................ 17

63 Fed. Reg. 15437 (Mar. 31, 1998) ................................................................................ 14

65 Fed. Reg. 33,356 (May 23, 2000) ................................................................................ 20

68 Fed. Reg. 23,748 (May 5, 2003) .................................................................................. 18

68 Fed. Reg. 3896 (Jan. 27, 2003) .................................................................................... 20

72 Fed. Reg. 61,172 (Oct. 29, 2007) ................................................................................ 17

75 Fed. Reg. 24,737 (May 5, 2010) ............................................................................... 17

77 Fed. Reg. 25,723 (May 1, 2012) ............................................................................... 18

79 Fed. Reg. 52,027 (Sept. 2, 2014) .............................................................................. 17

80 Fed. Reg. 51,582 (Aug. 25, 2015) ............................................................................ 16

81 Fed. Reg. 44,645 (July 8, 2016) ............................................................................... 16

81 Fed. Reg. 66,064 (Sept. 26, 2016) ........................................................................... 17

82 Fed. Reg. 23,830 (May 24, 2017). ............................................................................ 17

88 Fed. Reg. 5022 (Jan. 26, 2023) ................................................................................. 14

90 Fed. Reg. 54733 (Nov. 28, 2025)......................................................................... 12, 20

## INTRODUCTION

Defendants President Donald Trump, Secretary Kristi Noem ("the Secretary"), and the

Department of Homeland Security (collectively "Defendants") respectfully submit this opposition

to Plaintiffs' motion for interim relief under 5 U.S.C. § 705.

## BACKGROUND

For the sake of brevity, Defendants incorporate the background section from their motion

to dismiss.  *See* Defs' Mot. to Dismiss ("Defs' Mot.") (ECF No. 80) at 1-4.

## LEGAL STANDARD

The standards of review for relief under 5 U.S.C. § 705 is the same as for preliminary

injunctions.  *See Sampson v. Murray*, 415 U.S. 61, 80 (1974); *Cuomo v. NRC*, 772 F.2d 972, 974

(D.C. Cir. 1985).  "A preliminary injunction is an extraordinary remedy never awarded as of right."

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  "A plaintiff seeking a preliminary

injunction must establish that he is likely to succeed on the merits, that he is likely to suffer

irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor,

and that an injunction is in the public interest."  *Id.* at 20.  The moving party bears the burden of

persuasion and must demonstrate "by a clear showing" that the requested relief is warranted.

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)).  A "court

must be persuaded as to all four factors."  *Scottsdale Capital Advisors Corp. v. Fin. Indus. Regul.

Auth., Inc.,* 678 F. Supp. 3d 88, 100 (D.D.C. 2023).

Before the Supreme Court's decision in *Winter*, courts weighed these factors on a "sliding

scale," allowing "an unusually strong showing on one of the factors" to overcome a weaker

showing on another.  *Damus v. Nielsen*, Civ. A. No. 18-0578 (JEB), 2018 WL 3232515, at *4

(D.D.C. July 2, 2018) (quoting *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1291–92 (D.C.

Cir. 2009)).  The Supreme Court subsequently reaffirmed its disagreement with the sliding scale

approach, holding that "a plaintiff seeking a preliminary injunction must make a clear showing that 'he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (quoting *Winter*, 555 U.S. at 20).  And where a party "seeks a mandatory injunction—to change the status quo through action rather than merely to preserve the status quo—typically the moving party must meet a higher standard than in the ordinary case: the movant must show 'clearly' that [it] is entitled to relief or that extreme or very serious damage will result." *Farris v. Rice*, 453 F. Supp. 2d 76, 78 (D.D.C. 2006); *Pantoja v. Martinez*, No. 21-7118, 2022 WL 893017, at *1 (D.C. Cir. 2022) (per curiam) (characterizing injunction that would reinstate the plaintiff in his prior leadership roles as a "mandatory preliminary injunction . . . requir[ing] a higher standard than an ordinary preliminary injunction"); *but see League of Women Voters v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016) (rejecting distinction between a mandatory and prohibitory injunction).

Regardless, if the Court concludes that a claim fails as a matter of law—on a point of jurisdiction or merits—then interim relief is inappropriate.  *See United States Ass'n of Reptile Keepers, Inc. v. Zinke*, 852 F.3d 1131, 1135 (D.C. Cir. 2017).  Because preliminary injunctions are not "awarded as of right," but "[a]s a matter of equitable discretion, a preliminary injunction does not [even] follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits." *Benisek v. Lamone*, 585 U.S. 155, 158 (2018).  Even if the movant can show a strong likelihood of success on the merits but fails to make a sufficient showing of irreparable injury, the Court must deny the request for preliminary injunctive relief without considering the other factors.  *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995).

- 2 -

## ARGUMENT

### I.    The Court Lacks the Authority to Grant the Requested Relief.

#### A.    The Court Lacks Jurisdiction.

To grant the relief sought, the Court must have jurisdiction over this case.  Indeed, "'when there is a question as to a court's authority to hear a dispute, it is incumbent upon the court to resolve such doubts … before proceeding to … the merits.'"  *Bradshaw v. CHW Grp., Inc.*, --- F. Supp. 3d ---, Civ. A. No. 24-0114, 2025 WL 306783, at *1 (D.N.J. Jan. 24, 2025) (cleaned up) (quoting *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 418 (3d Cir. 2010)). If the Court "concludes that it lacks subject-matter jurisdiction, the court must dismiss the complaint in its entirety."  *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006).  As Defendants have argued, this Court lacks jurisdiction to review the Secretary's termination determination.  *See* Defs' Mot. at 6-13.  These jurisdictional bars foreclose Plaintiffs' presumption of likelihood on the success on the merits of their claims.  Therefore, this Court should dismiss this action for want of jurisdiction.

#### B.    The INA Precludes the District Court from Staying Agency Action.

The Court has been presented with the parties' views on § 1252(f)(1) numerous times.  *See* Defs' Opp'n to Class Certification (ECF No. 68); Defs' Surreply in Furtherance of Opposition to Class Certification (ECF No. 72).  In this instance, Defendants make a similar yet distinct argument: relief under § 705 is not available when there is a challenge to a provision covered by § 1252(f)(1).  Staying the effect of an agency decision is indeed injunctive or at the very least restrains the government's ability from carrying out a covered action.  That is precisely what § 1252(f)(1) was meant to avoid.

By way of reminder, § 1252(f)(1) strips the lower federal courts of the "jurisdiction or authority" to "enjoin or restrain the operation of" certain INA provisions—including those governing expedited removal—"other than with respect to the application of such provisions to an

individual alien against whom proceedings ... have been initiated." 8 U.S.C. § 1252(f)(1); *see*

*Nielsen v. Preap*, 586 U.S. 392, 402 (2019). By its terms, this provision bars the lower federal

courts from issuing any order that commands "federal officials to take or to refrain from taking

actions to enforce, implement, or otherwise carry out the specific statutory provisions," except in

"individual cases." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022); *see N.S. v. Dixon*,

141 F.4th 279, 288-90 (D.C. Cir. 2025).

   Section 705 provides that where a rule has not yet become effective, and "an agency finds

that justice so requires," it may postpone the effective date of action taken by it, pending judicial

review," and that:

> [o]n such conditions as may be required and to the extent necessary to prevent irreparable
> injury, the reviewing court, including the court to which a case may be taken on appeal
> from or on application for certiorari or other writ to a reviewing court, may issue all
> necessary and appropriate process to postpone the effective date of an agency action or to
> preserve status or rights pending conclusion of the review proceedings.

However, "Section 705 of the Administrative Procedure Act ("APA") is not an independent grant

of subject matter jurisdiction," and the "Supreme Court has stated that the APA does not provide

a mechanism to override the jurisdictional requirements of" more specific statutes that govern

review of a particular agency's actions. *D&G Holdings v. Burwell*, 156 F. Supp. 3d 798, 811

(W.D. La. 2016) (citing *Your Home Visiting Nurse Servs. v. Shalala*, 525 U.S. 449, 457-58 (1999)).

   Section 1252(f)(1) is such a provision. Section 1252(f)(1) provides: "Regardless of the

nature of the action or claim or of the identity of the party or parties bringing the action, no court

(other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the

operation of the provisions of part IV of this subchapter … other than with respect to the

application of such provisions to an individual alien against whom proceedings under such part

have been initiated." 8 U.S.C. § 1252(f)(1) (emphasis added). The Supreme Court held that

§ 1252(f)(1) "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Biden v. Texas*, 597 U.S. 785, 797 (2022) (quoting *Garland v. Aleman Gonzalez*, 596 U.S. 543, 544 (2022)). Section 1254a is undisputedly one of the provisions covered by § 1252(f)(1). *See* Defs' Surreply (ECF No. 72) at 1-2; *see also id.* at Ex. A. Section 1252(f)(1) thus precludes the Court from issuing orders restraining, even temporarily, implementation of § 1254a. As a basic matter, granting Plaintiffs the relief that they seek would require an order that runs to "an entire class of aliens," *Aleman Gonzalez*, 596 U.S. at 550-51—*i.e.*, every alien covered by the class definition[1]—rather than any "individual alien," 8 U.S.C. §1252(f)(1).

A court order postponing agency action under § 705 is such a coercive order. Such an order would "restrain" the agency's actions with respect to § 1254a and is thus analogous to a preliminary injunction in that an order under § 705 purports to maintain the status quo pending resolution of the merits. 5 U.S.C. § 705 (referencing "preserv[ation of] status or rights"). Indeed, courts routinely note that the standard for a § 705 stay "is the same as the standard for issuance of a preliminary injunction." *Monumental Task Comm., Inc. v. Foxx*, 157 F. Supp. 3d 573, 586 (E.D. La. 2016), *aff'd sub nom. Monumental Task Comm., Inc. v. Chao*, 678 F. App'x 250 (5th Cir. 2017); *see, e.g., Texas v. EPA*, 829 F.3d 405, 424 (5th Cir. 2016); *Cronin v. USDA*, 919 F.2d 439, 446 (7th Cir. 1990); *Sierra Club v. Jackson*, 833 F. Supp. 2d 11, 19 (D.D.C. 2012). And here, an order under § 705 postponing the effective date of the Secretary's termination determination would "order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise

---

[1]      Plaintiffs have proposed the following definition: "All persons in the United States who have been granted, or have applied for, Temporary Protected Status pursuant to 8 U.S.C. § 1254a and 8 C.F.R. § 244.2 and named Haiti as the designated TPS country under which they applied." *See* Pls' Mot. for Class Certification at 4. The Court has not yet ruled on whether the definition will be amended.

carry out" the Secretary's determination. *Texas*, 597 U.S. at 797; *see* Injunction, Black's Law Dictionary (12th ed. 2024) (defining injunction as "[a] court order commanding or preventing an action"). Thus, Plaintiffs' requested stay calls for an identical analysis as a preliminary injunction. Likewise, § 705 does not create a distinct remedy from an injunction, or any new remedies beyond the traditional equitable relief that existed at the time of the APA's passage. Even if Plaintiffs could show a pre-APA tradition of courts of appeals staying agency decisions challenged in special statutory review proceedings, *Scripps-Howard Radio v. FCC*, 316 U.S. 4, 16-17 (1942), they have not identified any pre-APA historical tradition of *district* courts staying agency decisions.

There is no evidence that when Congress adopted § 705 it intended to expand preexisting authority by allowing district courts to enjoin agency policies. Instead, Congress simply codified existing equitable remedies. Section 705 allows a court to issue only that "process" that is "necessary and appropriate." And the Supreme Court long ago concluded that "[t]he relevant legislative history of that section … indicates that it was primarily intended to reflect existing law" permitting appeals courts to stay certain agency actions pending direct review authorized by statute in the same manner that appellate courts can, in certain circumstances, stay a district court decision pending appeal. *Sampson*, 415 U.S. at 68 n.15*; see Scripps-Howard Radio*, 316 U.S. at 9-10 ("It has always been held … a federal court can stay the enforcement of a judgment pending the outcome of an appeal"). Section 705 was not intended "to fashion new rules of intervention for District Courts." *Sampson*, 415 U.S. at 68 n.15. Section 705 thus does not create any remedies distinct from traditional equitable relief. *Abbott v. Perez*, 585 U.S. 579, 595 (2018) ("[W]e have not allowed district courts to shield their orders from appellate review by avoiding the label injunction.") (cleaned up).

- 6 -

The Senate Report prepared in advance of the APA's enactment explains that the "first sentence" of § 705—relating to an agency's authority to postpone the effective date of a rule—simply "states existing law," while the "second sentence may be said to change existing law only to the extent that the language of the opinion in *Scripps-Howard* … may be interpreted to deny to reviewing courts the power to permit an applicant for a renewal of a license to continue to operate as if the original license had not expired, pending conclusion of the judicial review proceedings." S. Rep. No. 79-752, at 44 (1945), reprinted in GPO, Administrative Procedure Act: Legislative History, 1944-46, at 230 (1946), available at www.justice.gov/sites/default/files/jmd/legacy/2014/03/20/senaterept-752-1945.pdf.   The House Report separately noted that relief under § 705 requires a "proper showing" of the traditional prerequisites for relief.  H.R. Rep. No. 79-1980, at 43-44 (1946), reprinted in GPO, Administrative Procedure Act: Legislative History, 1944-46, at 277-78 (1946).

The Attorney General's Manual on the APA further supports the conclusion that § 705 does not create any new remedies.  The Supreme Court has accorded deference to this manual because it was issued contemporaneously with passage of the APA and because of the "role played by the Department of Justice in drafting the legislation."  *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, *Inc.*, 435 U.S. 519, 546 (1978).  The Manual explains that "[t]he provisions of section 10 [the APA's judicial review provisions] constitute a general restatement of the principles of judicial review embodied in many statutes and judicial decisions," and "generally leave[] the mechanics of judicial review to be governed by other statutes and by judicial rules."  U.S. Dep't of Justice, Attorney General's Manual on the Administrative Procedure Act 93 (1946).  Referring to § 705, the Manual emphasizes that the "general procedural provisions governing the issuance of preliminary injunctions . . . appear to be applicable to the exercise of the power conferred by

- 7 -

that subsection." *Id*. at 107.  Thus, the text, context, legislative history, sources contemporary to the APA's passage, and relevant case law all show that § 705 does nothing more than preserve traditional equitable relief—relief that is barred here by § 1252(f)(1).

Plaintiffs are not asking this Court for an order on an agency adjudication pending judicial review of that adjudication.  On the contrary, they are broadly requesting that this Court "prevent" the government from implementing its chosen "course of action" with respect to § 1254a.  *See Aleman Gonzalez*, 596 U.S. at 549 (orders requiring government to "refrain from actions that (again in the Government's view) are allowed" by a covered provision are barred by § 1252(f)). Such an order, even if labeled a stay, is injunctive in effect and prohibited by § 1252(f)(1).  *Brown v. Gilmore*, 533 U.S. 1301, 1303 (2001) (Rehnquist, C.J., in chambers) ("[A]pplicants are seeking not merely a stay of a lower court judgment, but an injunction against the enforcement of a presumptively valid state statute"); *Wyoming v. Dep't of Interior*, 2018 WL 2727031, at *1 (10th Cir. June 4, 2018) ("[t]he district court's 'stay' effectively enjoins enforcement of the Rule"). Indeed, in *Nken v. Holder*, the Supreme Court explained that "[a] stay simply suspends judicial alteration of the status quo, while injunctive relief grants judicial intervention" in the first instance. 556 U.S. 418, 429 (2009) (citation modified).

Plaintiffs' likely retort is that *Nken* confirms that an order running *in personam* is injunctive, whereas the order requested here would run against a determination, and this Court's § 705 order would therefore not be injunctive.  *See Make the Rd. N.Y. v. Noem*, No. 25-5320 (D.C. Cir.), Order Denying Stay Pending Appeal, Stmt. of J. Millett and J. Childs, at 33.[2]  Respectfully, such argument would not be well founded.  The *Nken* Court analyzed differences between stays

_____

[2]     As Defendants already argued in their motion to dismiss, the Court need not follow the statement.  *See* Defs' Mot. at 14-15.

and injunctions before confirming that "a stay operates upon the judicial proceeding itself." 556 U.S. at 428. And while a "stay" temporarily suspends "the authority to act—the order or judgment in question," it does so without "directing an actor's conduct." *Id*. at 429. Here, the Court's order would direct the Secretary's conduct by suspending her authority, albeit temporarily, in terminating a country's TPS designation.

Regardless, even if the Court otherwise concluded that a stay here does not "enjoin" operation of the Secretary's termination under *Nken*, § 1252(f)(1) is broader than § 1252(f)(2), given that it strips courts of jurisdiction to "enjoin or restrain the operation" of the covered provisions, rather than just prohibiting enjoining individual removal orders. 8 U.S.C. § 1252(f)(1). While Congress used the words "enjoin or restrain" in § 1252(f)(1), Congress used only "enjoin" in the very next provision. Section 1252(f)(2) bars courts from "enjoin[ing] the removal of any alien pursuant to a final order under this section" absent certain conditions. 8 U.S.C. § 1252(f)(2). Reading §1252(f)(1) as limited to injunctions would render the term "restrain" superfluous— contrary to the "cardinal principle of statutory construction" that courts must "give effect, if possible, to every clause and word of a statute." *Corley v. United States*, 556 U.S. 303, 314 (2009) (quotation marks omitted). Doing so also would violate the principle that "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (cleaned up). Congress's deliberate inclusion of the broader phrase "enjoin or restrain" in § 1252(f)(1), when considered alongside its use of only "enjoin" in § 1252(f)(2), confirms that § 1252(f)(1) cannot plausibly be read to apply only to injunctions. *Cf. Institutional S'holder Servs., Inc. v. SEC*, 142 F.4th 757, 767 (D.C. Cir. 2025) (using contextual clues to determine that regulating "different

conduct using broader language" indicates that "Congress meant something different in its choice of the term").

Finally, to the extent that Plaintiffs renew their argument that § 1252(f)(1) causes tension with 5 U.S.C. § 559, *see* Pls' Reply to Class Cert. (ECF No. 69) at 4, the Court should reject it outright.  As Defendants previously argued, Plaintiffs' argument would effectively confirm that no Congress would have the power to "repeal the earlier statute, to exempt the current statute from the earlier statute, to modify the earlier statute, or to apply the earlier statute but as modified." *English v. Trump*, 279 F. Supp. 3d 307, 320 (D.D.C. 2018) (quoting *Dorsey v. United States*, 567 U.S. 260, 273-74 (2012) (internal citations omitted)).  "Indeed, under those circumstances, a "subsequent Congress . . . may exempt itself . . . by 'fair implication'—that is, without an express statement."  *English*, 279 F.Supp.3 d at 320 (citing *Lockhart v. United States*, 546 U.S. 142, 148 (2005) (Scalia, J., concurring)).

The Supreme Court has explicitly rejected Plaintiffs' theory.  In *Marcello v. Bonds*, the Supreme Court was asked to review, among other things, whether the deportation hearings at issue were required to comply with the APA.  349 U.S. 302, 304 (1955).  The Court looked at the explicit text of the statute: "The procedure (herein prescribed) shall be the sole and exclusive procedure for determining the deportability of an alien under this section," and held that it was a "clear and categorical direction" that "exclude[d] the application of the [APA]."  *Id*. at 309.  The Supreme Court undoubtedly understood the presumption of judicial review and that modifications to review must be expressed, but it nevertheless refused to require Congress "to employ magical passwords in order to effectuate an exemption from" the APA.  *Id*. at 310.  Therefore, the Supreme Court has already foreclosed Plaintiffs' proposed reading of § 559.

Additionally, Plaintiffs' reading of § 559 poses issues related to statutory interpretation. As Defendants have argued, § 1252(f)(1)'s prefatory clause is clear: "Regardless of the nature of the action or claim." *See* Defs' Opp'n to Pls' Mot. for Class Cert. (ECF No. 68) at 11. The INA is replete with such references. *See, e.g.*, 8 U.S.C. §§ 1252(a)(2)(B)(ii), (b)(9), (g). And most recently, Justice Gorsuch warned against reading the APA as not being subject to § 1252(f)(1)'s limitations. *See United States v. Texas*, 599 U.S. 670, 690-701 (2023) (recognizing that a district court could not use § 706 vacatur to "sidestep" § 1252(f)(1)). There is no basis to assume that Justice Gorsuch would make such an observation without first considering the language of § 559 and that § 1252(f)(1) falls short of expressly modifying the APA. More broadly, Plaintiffs' reading would effectively gut jurisdictional bars and invite future parties to add APA claims to cases beyond those involving the INA. *See, e.g.*, the National Labor Relations Act (NLRA), 29 U.S.C. § 160(e)-(f); the Employment Retirement Income Security Act (ERISA), 29 U.S.C. § 1132(l)(3); and the Small Business Act (SBA), 15 U.S.C. § 634.

In sum, the Court cannot grant equitable remedies that "enjoin[] or restrain[] the operation" of the termination determination for Haiti's TPS designation. Congress specifically foreclosed that.

## II.    **Plaintiffs are Not Likely to Succeed on the Merits.**[3]

As Defendants have already argued, Plaintiffs' APA and constitutional claims are not only unlikely to succeed but should be dismissed entirely. *See* Defs' Mot. 15-32.

---

[3]    Defendants have raised merits arguments in their motion to dismiss. *See* Defs' Mot. (ECF No. 80). Should the Court determine that Defendants have not adequately addressed Plaintiffs' arguments here, then it should consider the arguments in Defendants' motion to dismiss as addressing those concerns.

**A.      Plaintiffs' Arbitrary-and-Capricious Claims Are Not Likely to Succeed.**

1.      <u>Incoming Presidential Administrations May Enter Office with Policy Goals.</u>

Plaintiffs contend that the Secretary's termination determination is arbitrary and capricious because the determination was reached during presidential campaigning.  *See* Pls' Mot. at 22-23. Not only is that a mischaracterization of the record, but it is not a viable claim under the APA in any event.  *See* Defs' Mot. at 16-18.

The Supreme Court has confirmed that "[i]t is hardly improper for an agency head to come into office with policy preferences and ideas, discuss them with affected parties, sound out other agencies for support, and work with staff attorneys to substantiate the legal basis for a preferred policy." *Dep't of Com. v. New York*, 588 U.S. 752, 783 (2019).  Contrary to Plaintiffs' contentions, *Saget v. Trump*, 375 F. Supp. 3d 280 (E.D.N.Y. 2019) does not provide a work around of the Supreme Court's decision.  Most obviously, *Saget* is a district court decision that predates *Dep't of Com.  Compare Saget*, 375 F. Supp. 3d 280 (published April 11, 2019) *with*, *Dep't of Com.*, 588 U.S. 782 (published June 27, 2019).  Indeed, only a few years later, the Supreme Court yet again confirmed that courts should not find any violations of law simply because a new administration enters office with a policy agenda.  *See Texas*, 597 U.S. at 812 ("But the agency's *ex ante* preference for terminating [the Migration Protection Protocols]—like any other feature of an administration's policy agenda—should not be held against the October 29 Memoranda.").

But Plaintiffs' argument fails on a more fundamental level.  The Secretary set forth extensive reasoning and analysis supporting her termination determination.  *See* Termination of the Designation of Haiti for [TPS], 90 Fed. Reg. 54733, 54735-38 (Nov. 28, 2025).  The notice reflects weighing various considerations, and the Secretary specifically determined that permitting Haiti TPS holders to remain in the United States would be contrary to the national interest, taking

into account current administration domestic policies and foreign policy interests.  90 Fed. Reg. at 54735-38.  That is the opposite of an unsupported determination.  Additionally, Plaintiffs point to the Secretary relying on Executive Orders when reaching her termination determination.  Pls' Mot. at 23.  But "[a]gencies are bound to follow binding executive orders unless rescinded or overridden through lawful procedures."  *N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 310 (D.D.C. 2025).   And, again, the Secretary reasonably considered the Administration's domestic and foreign policies and priorities in making the requisite national interest determination.  Thus, the record reflects that the Secretary "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

In short, Plaintiffs cannot achieve their desired outcome simply by contending that an alleged predetermined decision is enough to show a likely violation of the APA.  Pls' Mot. at 23.

2.    Exercise of Statutory Authority Cannot Establish an Improper Deviation from Past Practice Theory.

Plaintiffs contend that the Secretary's determination to terminate TPS based on "national interest" considerations is a deviation from prior practice, which makes their arbitrary-and-capricious claim likely to succeed.  *See* Pls' Mot. at 24-25.  But this argument implies illogically that national interest determinations must remain static and that a Secretary cannot exercise her congressionally delegated authority in aa manner contrary to her predecessor.  *See* Defs' Mot. at 23.  To the contrary, Congress specifically authorized the Secretary to make a "national interest" finding when considering whether to terminate TPS.  *See* 8 U.S.C. §§ 1254a(b)(1)(C), (3)(B).

DHS and the Department of Justice *have* considered the national interest element of § 1254a(b)(1)(C) in making extension or termination determinations for decades.  *See, e.g.*,

Extension and Redesignation of Haiti for Temporary Protected Status, 88 Fed. Reg. 5022, 5025 (Jan. 26, 2023) ("The Secretary has determined that an 18-month TPS extension is warranted because the extraordinary and temporary conditions supporting Haiti's TPS designation remain *and that such extension is not contrary to the national interest of the United States*." (emphasis added)); Termination of Designation of Liberia Under Temporary Protected Status Program After Final 6-Month Extension, 63 Fed. Reg. 15437, 15438 (Mar. 31, 1998) (terminating Liberia's Temporary Protected Status designation after "consultations with the appropriate agencies of the U.S. Government concerning (a) the conditions in Liberia; *and (b) whether permitting nationals of Liberia . . . to remain temporarily in the United States is contrary to the national interest of the United States*" (emphasis added)).  That there is no precedent in prior administrations for terminating a designation based on an adverse national interest determination does not mean that the agency lacks authority to do so or made some "hard-and-fast commitment" never to do so. *FDA v. Wages & White Lion Invs.*, 604 U.S. 542, 573, 583 (2025) (holding that the change-in-position applies only where an agency formally has made a "hard-and-fast commitment" to a particular course of action or reversed or disavowed an established "earlier [agency] position"); *see also Sprint Corp. v. FCC*, 151 F.4th 347, 367 (D.C. Cir. 2025) ("[F]air notice does not require agencies to give advance warning of a statute's *every possible* application.") (relying on *Wages & White Lion Invs.*).  The Secretary's termination determination does not amount to a change in interpretation to the statutory language.  *See Drummond Coal Co. v. Hodel*, 796 F.2d 503, 508 (D.C. Cir. 1986).  And acting in accordance with a statute passed by Congress cannot be deemed unlawful.  *See, e.g.*, *Ukeiley v. EPA*, 896 F.3d 1158, 1165 (10th Cir. 2018) ("[S]ince the EPA's Rule complies with the statute's plain meaning, we cannot find its application here arbitrary and

capricious."); *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585-88 (1952) (recognizing that the Executive must act with authority conferred by Congress).

3.    The Secretary Followed Statutory Procedure.

Plaintiffs also contend that the Secretary was required to reconsider Haiti's TPS designation under the other two provisions that could support a favorable determination. *See* Pls' Mot. at 25-26.  Both of those arguments fail.

The Secretary's termination determination follows a natural reading of the statute.  The TPS statute ties a country's initial TPS designation to specific events or conditions—i.e., an "ongoing armed conflict," "an earthquake, flood, drought, epidemic, … other environmental disaster," or other "extraordinary and temporary conditions."  8 U.S.C. § 1254a(b)(1).  The statute emphasizes that the conditions that give rise to the TPS designation must be "temporary" and "extraordinary."  *See id*. § 1254a(b)(1)(B)(i) (permitting the Secretary to designate a country for TPS if it finds, among other things, that an environmental disaster causes a "substantial, but temporary, disruption of living conditions"); *id*. § 1254a(b)(1)(C) (the Secretary may designate a country for TPS if she finds that "there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety").  Thus, when the statute mandates that the Secretary periodically evaluate whether "the conditions for [a country's TPS] designation … continue to be met," *id*. § 1254a(b)(3)(A), it follows that the Secretary is to evaluate whether the "extraordinary and temporary" conditions caused by the event that gave rise to the TPS designation continue to exist.  Congress specifically contemplated Secretaries revisiting original decisions when deciding whether to extend or terminate.  *See* 8 U.S.C. § 1254a(b)(3)(B) (referring back to subparagraph (A), which requires the Secretary to "determine whether the conditions of *such* designation" continue to be met, 8 U.S.C. § 1254a(b)(3)(A)).  Nothing in the statute suggests that a Secretary's periodic evaluation of a TPS

designation must incorporate entirely unrelated intervening events unrelated to the original designation.

That the statute contemplates that the Secretary will focus the determination to terminate or extend an existing TPS designation on the originating event is underscored by DHS's longstanding interpretation of the TPS statute as providing that the Secretary, when reviewing a country's TPS status, may redesignate (i.e., newly designate) a country for TPS, as opposed to extending the country's existing TPS designation. *See* Extension of Designation and Redesignation of Liberia Under Temporary Protected Status Program, 62 Fed. Reg. 16,608, 16,609 (Apr. 7, 1997); *see also* 8 C.F.R. § 244.17(a) ("Such registration applies to nationals of those foreign states designated or redesignated for more than one year by DHS."). DHS's recognition of the distinction between redesignations and extensions of previous designations demonstrates that the agency understands the statute to differentiate between whether new country conditions justify a TPS designation independently (thus warranting a redesignation) and whether conditions resulting from the events that gave rise to the initial designation continue to exist (thus warranting an extension of the initial designation).

Previous Secretaries generally considered new or intervening conditions to the extent that they would be linked to or impeded recovery from the event underlying the initial designation or re-redesignation. *See, e.g.*, Extension of the Designation of El Salvador, 81 Fed. Reg. 44,645 (July 8, 2016) ("Recovery from the [2001] earthquakes has been slow and encumbered by subsequent natural disasters and environmental challenges, including hurricanes and tropical storms, heavy rains and flooding, volcanic and seismic activity, an ongoing coffee rust epidemic, and a prolonged regional drought that is impacting food security."); Extension of the Designation of Haiti, 80 Fed. Reg. 51,582 (Aug. 25, 2015) ("Haiti's ability to recover [from the 2010 earthquake] has been

further constrained by political instability."); Extension of the Designation of Sudan, 79 Fed. Reg. 52,027 (Sept. 2, 2014) ("[T]he Secretary has determined that an 18-month extension is warranted because the armed conflict [in Sudan] is ongoing and the extraordinary and temporary conditions that prompted the May 2013 extension and redesignation continue to exist."); Extension of the Designation of Nicaragua, 75 Fed. Reg. 24,737 (May 5, 2010) (extending Nicaragua's TPS designation "because there continues to be a substantial, but temporary, disruption of living conditions in Nicaragua resulting from Hurricane Mitch").  Even in 2017, when Haiti was renewed for its TPS designation, the extension determination was made only because the conditions "supporting its [initial] designation for TPS persist[ed]."  *Haiti Extension*, 82 Fed. Reg. 23,830, 23,831 (May 24, 2017).

Even termination determinations made by prior Secretaries likewise indicate that they focused their analyses on whether the event and conditions that led to the original designation persisted—precisely the standard used here.  *See* Termination of Guinea's Designation, 81 Fed. Reg. 66,064 (Sept. 26, 2016) (noting that "[w]hile the impacts of the [Ebola] epidemic pose a lasting challenge to Guinea's economy and the capacity of its health system to provide treatment for preventable or treatable conditions," "the extraordinary and temporary conditions that prompted Guinea's TPS designation have substantially resolved and no longer prevent nationals of Guinea from returning to Guinea in safety"); Termination of the Designation of Burundi, 72 Fed. Reg. 61,172 (Oct. 29, 2007) ("[C]onditions that warranted the initial designation of TPS [for Burundi] in 1997 and the re-designation in 1999 no longer continue to be met."); Termination of Designation of Rwanda, 62 Fed. Reg. 33,442 (June 19, 1997) ("The ability of so many to return in relative safety demonstrates the end of the extraordinary circumstances that existed in 1994," when Rwanda was designated for TPS.); Termination of Designation of Kuwait Under TPS Program, 57

- 17 -

Fed. Reg. 2931 (Jan. 24, 1992) ("[T]he extraordinary and temporary conditions found to exist in Kuwait on March 27, 1991 are not presently in existence."); *see also, e.g.*, Extension of the Designation of Nicaragua, 68 Fed. Reg. 23,748 (May 5, 2003) ("Each decision to extend the TPS designation was made on the determination that the conditions that warranted the TPS designation initially continued to exist."); Extension and Redesignation of Somalia, 77 Fed. Reg. 25,723 (May 1, 2012) ("The Secretary has determined that an 18-month extension is warranted because the armed conflict is ongoing, and the extraordinary and temporary conditions that prompted [Somalia's] 2001 redesignation persist.").

Plaintiffs' theory would effectively turn the TPS statute's discretionary review process into a mandatory duty. As the TPS statute sets out, the Secretary "may designate" a foreign state with the TPS designation "only if" any one of three conditions are met (or a combination thereof). 8 U.S.C. § 1254a(b)(1)(A)-(C). Nothing in the statute requires the Secretary to ever undertake an initial review. Plaintiffs' proposed reading would require the Secretary to undertake an initial review on new grounds if a termination determination was made. In other words, every Secretary would then have to review and consider whether a foreign state meets other prongs under the TPS statute when Congress afforded discretion to the Secretary in the first place in conducting such a review. It is well-established that agencies "must abide 'not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes.'" *Nat'l Ass'n of Broads. v. FCC*, 39 F.4th 817, 820 (2022) (quoting *Colorado River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134, 139-40 (D.C. Cir. 2006)). The Court would be upsetting this balance if it accepted Plaintiffs' reading of the statute.

In sum, here the Secretary appropriately followed statutory procedure, and Plaintiffs' misconstruction of what the statute requires does not undercut the Secretary's determination here.

4.    The Court May Not Reweigh the Evidence before the Secretary.

Plaintiffs spill much ink arguing that the Secretary's determination is implausible and contrary to evidence. *See* Pls' Mot. at 26-34. This is nothing more than a request that this Court substitute its judgment for the Secretary's, and that is not permissible in an APA record review case. *See Burke v. EPA*, 127 F. Supp. 2d 235, 241 (D.D.C. 2001). First, many of Plaintiffs' proffered facts and arguments are based on extra-record articles and declarations, amongst other things. The Court should disregard such facts and arguments. *See Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985) ("The focal point for judicial review [of agency action] should be the administrative record already in existence, not some new record made initially in the reviewing court.").

But even if the Court does consider Plaintiffs' arguments, they still fail. Plaintiffs make much of ongoing conditions in Haiti, a foreign country, and argue that the Secretary's determination is implausible in light of those conditions. *See* Pls' Mot. at 26-30. This argument is nothing more than a clear invitation for this Court to "reweigh the conflicting evidence or otherwise [] substitute [its] judgment for that of the agency." *Ind. Mun. Power Agency v. FERC*, 56 F.3d 247, 254 (D.C. Cir. 1995). Worse, Plaintiffs are asking for this Court to draw its own inferences on questions related to foreign policy and national security, where "'the lack of competence on the part of the courts is marked.'" *Trump v. Hawaii*, 585 U.S. 667, 704 (2018) (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010)); *see also Reno v. Am.-Arab Anti-Discrim. Comm.* ("*AADC*"), 525 U.S. 471, 491 (1999) (noting that courts are "ill equipped" to review evidence related to "foreign-policy objectives").

Plaintiffs suggest that State Department travel advisories and other reports support their theory about terminating Haiti's TPS designation. *See* Pls' Mot. at 28. But Congress authorized the Secretary of Homeland Security to make the final determination without prescribing which

facts she must consider or how to best weigh the relevant evidence.  *See* 8 U.S.C. § 1254a(b)(1).

That happened here.  *See* Termination of the Designation of Haiti for [TPS], 90 Fed. Reg. 54733

(Nov. 28, 2025).  It is not for Plaintiffs or this Court to now second-guess that decisionmaking and

"penalize[e] [her] for departing" from other agencies' inferences.  *Dep't of Comm.*, 588 U.S. at

777.  The Secretary assessed the facts, set those out in the termination notice, and made a choice

"between reasonable policy alternatives."  *Id*. at 775.

Plaintiffs' theory suffers not only from legal flaws but practical ones, too.  TPS

designations have also been terminated in the past despite significant ongoing problems in the

relevant countries.  *See, e.g.*, Termination of Designation of Angola Under TPS Program, 68 Fed.

Reg. 3896 (Jan. 27, 2003) (terminating Angola's TPS designation despite the remaining "challenge

of assisting an estimated 4 million displaced Angolan nationals," ongoing "concern that Angola

lacks housing, medical services, water systems, and other basic services destroyed by a 27-year-

long war"); Termination of the Province of Kosovo, 65 Fed. Reg. 33,356 (May 23, 2000)

(terminating Kosovo's designation because, "[a]lthough conditions remain difficult with bursts of

ethnically-motivated violence, the situation in Kosovo cannot now be classified as ongoing internal

conflict").

At bottom, Plaintiffs are requesting that this Court impermissibly "interfere with the policy

decisions of an agency."  *Episcopal Hosp. v. Shalala*, 994 F.2d 879, 884 (D.C. Cir. 1993).  But

worse, they are asking for this Court to substitute its judgment on foreign policy and national

security considerations, where the utmost deference is required.  *See Islamic Am. Relief Agency v.*

*Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007) (confirming that "extreme" deferential review is

required "in an area at the intersection of national security, foreign policy, and administrative

law"); *Olenga v. Gacki*, 507 F. Supp. 3d 260, 280 (D.D.C. 2020) ("The Court's review is even more deferential where matters of foreign policy and national security are concerned.").

**B.     Plaintiffs' Constitutional Claims are Not Likely to Succeed.**

Plaintiffs continue to contend that they are likely to succeed on their constitutional discrimination claims, which requires the Court to apply the *Arlington Heights* standard.  The Supreme Court has specifically foreclosed that standard in the context of immigration, however.  Applying the correct standard, Defendants are likely to prevail.  Additionally, in their motion, Plaintiffs raise for the first time a nondelegation doctrine claim.  The Court should not even entertain the argument because Plaintiffs failed to plead the claim.  But the unpled claim also fails even on the merits were it to be considered.

**1.     Plaintiffs' Discriminatory Animus Claim is Unlikely to Succeed.**

As Defendants argued extensively, *Arlington Heights* does not supply the proper standard for this Court's analysis on a constitutional discrimination claim.  *See* Defs' Mot. at 24-29.  Rather, the appropriate standard to review Plaintiffs constitutional claim is the "facially legitimate and bona fide" standard[4] or *at most* rational basis[5].  The termination determination satisfies either one of those tests.  *See* Defs' Mot. at 29-33.  Plaintiffs cannot rely on statements by the President or impute upon the Secretary of Homeland Security the President's statements.  *See* Defs' Mot. at 30-31.

Plaintiffs contend that the Secretary's termination determination is motivated by anti-Haitian animus.  *See* Pls' Mot. at 36, 37, 38.  The Court should reject such a preposterous argument.

---

[4]     *See Hawaii*, 585 U.S. at 704 (citing *Kleindienst v. Mandel*, 408 U.S. 753, 769-70 (1972)).

[5]     *See Hawaii*, 585 U.S. at 704 (suggesting that rational basis review may be appropriate at times).

The TPS statute itself requires a country- or nationality-based determination. "Distinctions on the basis of nationality may be drawn in the immigration field by the Congress or the Executive . . . [and must be upheld] [s]o long as such distinctions are not wholly irrational . . . ." *Narenji v. Civiletti*, 617 F.2d 745, 747 (D.C. Cir. 1979) (citations omitted); *accord Rajah v. Mukasey*, 544 F.3d 427, 438 (2d Cir. 2008); *Kandamar v. Gonzales*, 464 F.3d 65, 72-74 (1st Cir. 2006). Accordingly, the *Arlington Heights* standard has no place in this analysis, and Plaintiffs' arguments, which rely on that standard, accordingly fail. *See Hawaii*, 585 U.S. at 704-05 (2018) (recounting how *Mandel*'s narrow standard of review would acknowledge separation-of-power concerns and the judiciary's "lack of competence" in collecting evidence and drawing inferences on questions related to national security).

The Secretary's determination to terminate Haiti's TPS designation is rooted in ongoing foreign policy goals and consideration of issues related to national security. *See* 90 Fed. Reg. at 54735 (recounting Secretary Rubio's statements in support of a gang suppression force that will work in close coordination with the Haitian National Police); *id*. at 54736 (providing statistics about Haitian nationals who overstay their authorized periods and remain in the United States in violation of immigration laws); *id*. (pointing to "added strain on local communities by increasing demand for public resources, contributing to housing and healthcare pressures, and competing in an already limited job market); *id*. at 54737 (discussing border encounters). As shown above, the Secretary, or the Attorney General prior to the creation of the Department of Homeland Security, routinely has decided to terminate a country's TPS designation. *See supra* at §§ II.A.3, II.A.4. Terminating Haiti's TPS designation is a quintessential decision that goes to "the admission and exclusion of noncitizens" and therefore "implicates relations with foreign powers, or involve[s] *classifications* defined in the light of changing political and economic circumstances[.]" *Baan*

*Rao Thai Rest. v. Pompeo*, 985 F.3d 1020, 1024 (D.C. Cir. 2021) (citation modified) (emphasis added).

Permitting a discriminatory animus claim to move forward would invite a tidal wave of litigation against which the Supreme Court has cautioned. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 34 (2020).

2.    Plaintiffs' Nondelegation Claim is Nonexistent in their Complaint.

Curiously, Plaintiffs have advanced a nondelegation theory as a basis for seeking interim relief in this case. *See* Pls' Mot. at 39-42. Yet, they never advance this claim in their complaint. A nondelegation claim must be raised in the complaint for the Court to consider it. *See Altagracia v. Office of the State Superintendent of Educ.*, 45 F.4th 388, 400 (D.C. Cir. 2022) (before entertaining the argument, acknowledging that a nondelegation claim was raised in the complaint); *see also, e.g.*, *De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945); *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015); *Rai v. Biden*, 567 F. Supp. 3d 180, 199 (D.D.C. 2021). Because Plaintiffs never pled this claim in their complaint, the argument is not properly before the Court, and it should be disregarded in its entirety.

Assuming *arguendo* that the Court determines that Plaintiffs have somehow sufficiently preserved this claim and theory for consideration, Plaintiffs are not likely to prevail on it. Congress afforded the Executive the appropriate discretion and latitude required for matters involving foreign policy.

The Supreme Court has consistently held that "very broad delegations" provide the "intelligible principle" necessary to avoid a non-delegation violation. *Gundy v. United States*, 588 U.S. 128, 135, 146 (2019) (plurality opinion). Those include delegations that are equally (if not far more) expansive than §1182(a)(3)(C)(iii), including delegations to regulate "in the public interest," *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 216 (1943) (upholding delegation to

regulate in the "public interest"), to set "fair and equitable" rates, *Yakus v. United States*, 321 U.S. 414, 422, 427 (1944), or to set air quality standards that are "requisite to protect the public health," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001).  The Court has clarified that the vesting of authority in an Executive Branch official is "constitutionally sufficient" under that standard "if Congress clearly delineates [1] the general policy, [2] the public agency which is to apply it, and [3] the boundaries of th[e] delegated authority."  *Mistretta v. United States*, 488 U.S. 361, 372–73 (1989) (quoting *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)); *see also Gundy v. United States*, 139 S. Ct. 2116, 2129 (2019) (plurality opinion) (reiterating that "a delegation is permissible if Congress has made clear to the delegee the general policy he must pursue and the boundaries of his authority" (cleaned up)).

The standard is even more relaxed when applied to statutes implicating issues of foreign policy.  *See Palestine Info. Off. v. Shultz*, 853 F.2d 932, 944 (D.C. Cir. 1988).  That is because "the Supreme Court has long recognized that the special exigencies of foreign policy require Congress to draft statutes that 'provide a standard far more general than that which has always been considered requisite with regard to domestic affairs.'"  *Id.* (quoting *United States v. Curtiss– Wright Export Corp.*, 299 U.S. 304, 324 (1936)).  As the Supreme Court instructed, "because of the leeway necessary to represent adequately this nation's interests in foreign affairs, Congress 'must of necessity paint with a brush broader than that it customarily wields in domestic areas.'"  *Palestine Info. Off.*, 853 F.3d at 944 (quoting *Zemel v. Rusk*, 381 U.S. 1, 17 (1965)).

Plaintiffs' only contention here is that § 1254a's "national interest" criterion does not set forth a proper intelligible standard and therefore violates the nondelegation doctrine.  Pls' Mot. at 41-42.  But that argument fails for several reasons.  First, Congress decided in its wisdom to "paint with a brush broader" in an area that requires balancing issues of foreign policy and domestic

affairs. *Zemel*, 381 U.S. at 17. That broad brush is required in this area "because of the changeable and explosive nature of contemporary international relations, and the fact that the Executive is immediately privy to information which cannot be swiftly presented to, evaluated by, and acted upon by the legislature." *Id.*; *see also Curtiss-Wright*, 299 U.S. at 320 (describing the President as "the sole organ of the federal government in the field of international relations"); *cf. Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 32, (2015) ("To allow Congress to control the President's communication in the context of a formal recognition determination is to allow Congress to exercise that exclusive power itself. As a result, the statute is unconstitutional.").

Second, their argument ignores the foreign policy intersection set forth by Congress, which allows the Secretary to weigh "national interests" against allowing aliens to remain in the United States. *See Gomez v. Trump*, 485 F. Supp. 3d 145, 187 (D.D.C. 2020) ("As already discussed, that less deference is warranted here because the Proclamations targeted domestic matters, as distinct from foreign affairs or national security matters, is a dubious proposition."); *Doe v. Trump*, 984 F.3d 848, 870 (9th Cir. 2020) ("The district court identified no coherent basis for insisting that, in delegating authority to impose additional restrictions on who may immigrate into this country from another nation, Congress must provide greater guidance when the asserted detrimental impact of such aliens is based on "domestic" policy concerns."). The D.C. Circuit has not only expressed no concern but indeed held that courts may not review issues of "national interest" when crossed with immigration. *See Zhu v. Gonzales*, 411 F.3d 292, 293-94 (D.C. Cir. 2005) (reviewing statute that permitted the Attorney General to waive a procedural requirement when deemed "to be in the

national interest).    It would be odd for Congress's use of "national interest" to not pose

nondelegation concerns there but then do so here.[6]

It is telling that in the Nation's entire history, the Supreme Court has only twice found a

delegation unconstitutional.    In 1935, the Court concluded that two provisions of the National

Industrial Recovery Act, ch. 90, 48 Stat. 195—enacted in response to the Great Depression—

contained "excessive delegations" because Congress "failed to articulate any policy or standard

that would serve to confine the discretion of the authorities to whom Congress had delegated

power." *Mistretta*, 488 U.S. at 373 & n.7 (emphasis added).    The Supreme Court held those

provisions invalid because one "provided literally no guidance for the exercise of discretion," and

the other "conferred authority to regulate the entire economy on the basis of no more precise a

standard than stimulating the economy by assuring 'fair competition.'" *Am. Trucking*, 531 U.S. at

474 (discussing *Panama Refin. Co. v. Ryan*, 293 U.S. 388 (1935), and *A.L.A. Schecter Poultry

Corp. v. United States*, 295 U.S. 495 (1935)).    Since 1935, the Court has "upheld, again without

deviation, Congress' ability to delegate power under broad standards." *Mistretta*, 488 U.S. at 373;

*see also Gundy*, 139 S. Ct. at 2129 (plurality op.) (noting that the Court has "over and over upheld

even very broad delegations").

To the extent that the Court considers Plaintiffs' nondelegation claim viable

notwithstanding their failure to raise it in the operative complaint, Defendants are more than likely

to succeed.

---

[6]    As the Secretary recognized in the Federal Register notice, "'national interest' is an
expansive standard that may encompass an array of broad considerations, including foreign policy,
public safety (e.g., potential nexus to criminal gang membership), national security, migration
factors (e.g., pull factors), immigration policy (e.g., enforcement prerogatives), and economic
considerations (e.g., adverse effects on U.S. workers, impact on U.S. communities)."  90 Fed. Reg.
at 54,735 & n.23 (citing cases).

## III.    <u>Plaintiffs Cannot Establish Irreparable Harm.</u>

Plaintiffs' entire argument on irreparable harm is primarily rooted in the fear of potential removal and deportation.  Pls' Mot. at 42-43.  But that is not irreparable harm.

Even in the context of a § 705 stay, this Court's analysis is guided by general irreparable harm considerations as if it were entertaining a preliminary injunction motion.  *See, e.g.*, *District of Columbia v. Dep't of Agric.*, 444 F. Supp. 3d 1, 33 (D.D.C. 2020); *Make the Rd. N.Y. v. Noem*, --- F. Supp. 3d ---, Civ. A. No. 25-0190 (JMC), 2025 WL 2494908, at *20 (D.D.C. Aug. 29, 2025). Therefore, Plaintiffs must establish that they will face "irreparable injury absent the requested preliminary relief." *Make the Rd. N.Y.*, 2025 WL 2494908, at *20 (citing *Nat'l Min. Ass'n v. Jackson*, 768 F. Supp. 2d 34, 50 (D.D.C. 2011); *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297).  To constitute irreparable injury, the injury "must be 'both certain and great,' 'actual and not theoretical,' 'beyond remediation,' and 'of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm.'"  *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quoting *Chaplaincy*, 454 F.3d at 297) (emphasis in original).  But in this case, Plaintiffs' alleged harms are: (1) theoretical; (2) not irreparable; and (3) not imminent.

At the outset, Plaintiffs' claimed irreparable harms—potential removal and potential loss of employment authorization—are inherent in the statutory scheme *Congress* designed, which provides "temporary" status.  *See* 8 U.S.C. § 1254a(b)(1)(B)(i), (ii), (C), and (g).  The Secretary's termination decision occurred as a result of congressionally prescribed periodic review and provided the requisite 60-day notice of termination.

Regardless, Plaintiffs cannot rely on potential threats of removal or detention, by themselves or collectively, to establish irreparable harm.  *See* Pls' Mot. at 42-43.  As a threshold concern, considering removal and removal-related detention as harms would effectively invite the Court to weigh in on questions of law and fact that arise from actions or proceedings to remove

aliens, and Congress has divested federal district courts of authority to review such questions. *See* 8 U.S.C. § 1252(a)(5), (b)(9), (g).[7]  Even if the Court were to review Plaintiffs' alleged removal concerns, Plaintiffs have not met their burden.  As the D.C. Circuit recently reaffirmed, "[t]he Supreme Court has held that 'simply showing some possibility of irreparable injury' is not sufficient to make the irreparable harm showing needed to obtain preliminary relief. *Hanson v. Smith*, 120 F.4th 223, 245 (D.C. Cir. 2024) (quoting *Nken*, 556 U.S. at 434), *cert. denied*, 145 S. Ct. 2778 (2025).   And indeed, the same *Nken* Court confirmed that, while a serious burden, removal "is not categorically irreparable."  556 U.S. at 435.  None of the Plaintiffs allege that they have ever been subject to removal proceedings, let alone that they have orders of removal. Therefore, their fears about removal are nothing more than "remote conjecture" at this point, and that is simply not enough to meet their high burden.  *Hanson*, 120 F.4th at 245.  Similarly for detention, there is nothing in the record that *suggests* that Plaintiffs would be subject to detention immediately upon TPS being terminated.  This speculation is precisely what the D.C. Circuit has said for years amounts to "pure conjecture." *Wis. Gas Co. v. Fed. Energy Reg. Comm'n*, 758 F.2d 669, 676 (1985).

Even if the threat of removal was not merely theoretical, Plaintiffs cannot establish that the threat of removal is irreparable.  If relief from removal can be afforded later, then there is no irreparable harm for the purposes of awarding extraordinary relief.  *See Chaplaincy*, 454 F.3d at 297-98 (citing *Va. Petro. Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir.1958)); *Nken*, 556 U.S. at 434.  None of the Plaintiffs alleges that they could not obtain review of their fear of return to Haiti through regular immigration proceedings if such proceedings were to be commenced.  If

---

[7]    Detention claims are subsumed into the bars in § 1252(b)(9) and (g), which both strip federal district courts of habeas jurisdiction over claims related to removal.

so, then Plaintiffs can present fear claims before an immigration judge, appeal an adverse ruling to the Board of Immigration Appeals, and file a petition for review with the appropriate court of appeals.  8 U.S.C. §§ 1252(a)(5), (b)(9); *see also Verde-Rodriguez v. Att'y Gen.*, 734 F.3d 198, 201 (3d Cir. 2013); *see also J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031 (9th Cir. 2016) ("Taken together, § 1252(a)(5) and § 1252(b)(9) mean that any issue – whether legal or factual – arising from any removal-related activity can be reviewed only through the [petition-for-review] process.").  But even if proceedings are not commenced, Plaintiffs have demonstrated that there is nothing that stops them from affirmatively seeking relief from removal by way of filing applications with U.S. Citizenship and Immigration Services.  *See* Declaration of Daniel Andrade ("Andrade Decl.") (ECF No. 68-1) ¶ 7.

*Chaplaincy* is instructive and dispositive in this case.  There, a group of current and former Navy chaplains alleged that the Navy had "established, promoted, and maintained religious quotas and other discriminatory practices in the Navy Chaplain Corps in violation of the First and Fifth Amendments."  454 F.3d at 295 (citation modified).  Reviewing the denial of a preliminary injunction, the D.C. Circuit concluded that the appellants had not met their burden on irreparable harm because they had not "articulate[d] a tangible injury that is either certain and great" or irreparable.  *Id*. at 298.  The Court found the injury allegations speculative because the ultimate relief sought would only result in the *possibility* of plaintiffs' injuries being rectified.  *See id*.  The Court also rejected proffered irreparable harm theories because the plaintiffs could seek redress through other means.  *See id*.

Similar circumstances apply here.  Plaintiffs allege that removal may result if their TPS is terminated.  *See* Pls' Mot. at 42-43.  But that does not mean that they could not be removed if they committed a qualifying crime or there is some other inadmissibility ground that disqualifies them

from TPS.  *See, e.g.*, 8 U.S.C. § 1254a(c)(2)(A)(i), (iii), (B).  Further, there is nothing that prevents Plaintiffs from self-removing of their own volition.  And importantly, Plaintiffs have an avenue through which they individually could seek redress on issues of removal.  Three of the five named Plaintiffs are already affirmatively seeking relief from removal.  For those individuals who have never been in removal proceedings, there is no removal order to execute.  *See* 8 U.S.C. § 1231(a). For those putative class members who are in proceedings, they can raise and obtain Article III review of issues related to removal, including fears about ongoing medical treatment[8] and potential employment opportunities.[9]  Similarly, if Plaintiffs are detained, which is a permissible component of the removal process, they may seek review of their detention through habeas.

Plaintiffs also contend that the potential loss of employment authorization would constitute irreparable harm.  Pls' Mot. at 43.  But "[t]hese alleged injuries do not meet the threshold of injunctive relief."  *Zeng v. Mayorkas*, Civ. A. No. 21-446 (DLF), 2021 U.S. Dist. LEXIS 111323, at *4 (D.D.C. Apr. 16, 2021).  That is because economic harm is generally not sufficient to constitute irreparable injury.  *See id.* (citing *Davis*, 571 F.3d at 1295).  The Court should not hesitate in denying Plaintiffs' request for interim relief particularly where they have failed to submit any evidence regarding monthly expenses, total savings, or other sources of income.  *See id.* at *7.  This is precisely why other courts within this District have denied preliminary injunctive

---

[8]     *See, e.g.*, *Pierre v. Gonzales*, 502 F.3d 109, 121–22 (2d Cir. 2007) (reviewing issues relevant to the petitioner's medical condition); *Yang v. Lynch*, 611 F. App'x 357, 359 (7th Cir. 2015) (recognizing that the Board of Immigration Appeals would review claims related to medical care in determining whether to reopen proceedings); *Fernandez-Villafan v. Garland*, No. 23-3223, 2023 U.S. App. LEXIS 33272, at *11 (6th Cir. 2023) (similar); *Guangatal v. Att'y Gen.*, No. 23-2151, 2025 U.S. App. LEXIS 15049, at *7 (3d Cir. 2025) (similar).

[9]     *See, e.g.*, *Marinescu v. Att'y Gen.*, 284 F. App'x 889, 894 (3d Cir. 2008) (discussing employment prospects established in evidentiary record); *Francisco-Diego v. Garland*, No. 21-3870 2022 U.S. App. LEXIS 15036, at *8 (6th Cir. 2022) (same).

relief in other cases. *See id.*; *Muvvala v. Wolf*, Civ. A. No. 20-2423 (CJN), 2020 U.S. Dist. LEXIS 177082, at *6 (D.D.C. Sept. 25, 2020); *Verma v. U.S. Citizenship & Immigr. Servs.*, Civ. A. No. 20-3419 (RDM), 2020 U.S. Dist. LEXIS 239157, at *6-7 (D.D.C. Dec. 18, 2020).

Finally, the submitted declarations do not move the needle. The named Plaintiffs have simply submitted the same declarations from August. *See* Pls' Mot. at Exs. 2-6. These declarations are stale and confirm that Plaintiffs cannot establish irreparable harm. Timing is a critical component in assessing irreparable harm. *See Open Top Sightseeing USA v. Mr. Sightseeing, LCC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014) (denying extension motion because the plaintiff's delay in filing the action and seeking injunctive relief and would cut against irreparable harm) (relying on *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975)). Plaintiffs' four-month-old declaration cannot substantiate a finding of irreparable harm. *See Corp. for Pub. Broad. v. FEMA*, 792 F. Supp. 3d 67, 77 (D.D.C. 2025) (declining to consider "stale" declarations when assessing irreparable harm); *Cf. Open Top Sightseeing*, 48 F. Supp. 3d at 90; *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 44 (D.D.C. 2000) (delay of two months in bringing action "militates against a finding of irreparable harm"); *Biovail Corp. v. FDA*, 448 F. Supp. 2d 154, 165 (D.D.C. 2006) ("The delay in filing this suit further undermines any showing of irreparable injury"). And Plaintiffs' reliance on a purported expert's declaration, *see* Pls' Mot. at 42, is simply insufficient to meet their burden on irreparable harm. *See Pub. Citizen Health Research Grp. v. Acosta*, 363 F. Supp. 3d 1, 22 (D.D.C. 2018).

## IV.    The Balance of the Equities Favors Denying Interim Relief.

Finally, where the government is a party, the balance of equities and public interest factors merge. *Nken*, 556 U.S. at 435. Courts "explore the relative harms to applicant and respondent, as well as the interests of the public at large." *Barnes v. E-Sys., Inc. Grp. Hosp Med. & Surgical Ins.*

*Plan*, 501 U.S. 1301, 1305 (1991). Here, the balance of the equities and public interest tips decisively in Defendants' favor.

"The interest in preserving national security is an urgent objective of the highest order." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 581 (2017) (per curiam). That is the challenge that this Court is reviewing: the Secretary's discretionary judgment in concluding that the conditions for Haiti's TPS designation are no longer met. The clear congressional purpose of § 1254a is to allow the Secretary to make a determination as to whether a foreign state's TPS designation is to be terminated and to do so in a timely manner. The granting of relief here would "inflict[] irreparable harm on the [Secretary of Homeland Security] by interfering with the national-security" and national interests "determinations entrusted to [her] by Congress." *Am. Foreign Serv. Ass'n v. Trump*, No. 25-5184, 2025 U.S. App. LEXIS 15297, at *9 (D.C. Cir. June 20, 2025). In a case in which the Court "must, of course, give deference to the Executive Branch's evaluation of the facts and the sensitive and weighty interests of national security and foreign affairs, including the timing of those . . . decisions," the public interest favors Defendants. *Tiktok Inc. v. Trump*, 490 F. Supp. 3d 73, 85 (D.D.C. 2020) (citation modified) (citing *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-34 (2010), *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 74 n.28 (D.D.C. 2002)).

Additionally, the significance of the public interest in the enforcement of the United States' immigration laws is well settled. *See, e.g., United States v. Martinez-Fuerte*, 428 U.S. 543, 556-58 (1976); *Nken*, 556 U.S. at 435. The Secretary's termination determination is meant to advance the enforcement of those laws, such as ending the unlawful presence of aliens who would remain in the United States in violation of law. *See Nken*, 556 U.S. at 436 (relying on *AADC*, 525 U.S., at 490). Preserving the political branches' authority to control the border serves "the obvious

necessity that the Nation speak with one voice" on such matters. *Zadvydas v. Davis*, 533 U.S. 678, 711 (2001).

Staying termination of Haiti's TPS designation would be "an improper intrusion by a federal court into the workings of a coordinate branch of the Government." *Legalization Assist. Project*, 510 U.S. at 1305-06.  That is especially so when Congress delegated the Secretary "sole and unreviewable" discretion to make this determination. *Make the Road N.Y.*, 962 F.3d at 632. Finally, the public interest factor weighs against granting Plaintiff's motion, as the public interest "favors the efficient administration of the immigration laws at the border," *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 510 (9th Cir. 2019), and an injunction would frustrate the "public interest in effective measures to prevent the entry of illegal aliens" at the Nation's borders, *United States v. Cortez*, 449 U.S. 411, 421 n.4 (1981).

## V.    Any Granting of Interim Relief Must be Narrowly Tailored.

If the Court grants the relief sought, it should be strictly limited to those plaintiffs in this matter who have established standing, a likelihood of success, and irreparable harm.

The Supreme Court has made clear that unlimited preliminary injunctive relief, untethered to the plaintiffs in a litigation, is unlawful.   Specifically, the Supreme Court has ruled that a "universal injunction . . . falls outside the bounds of a federal court's equitable authority under the Judiciary Act." *Trump v. CASA, Inc.*, 606 U.S. 831, 847 (2025).  At most, a court "may administer complete relief between the parties" and should not go beyond that to enjoin action or implementation more broadly.  *Id.* at 851 (quoting *Kinney-Coastal Oil Co. v. Kieffer*, 277 U.S. 488, 507 (1928)).

Section 705 states:

On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court … may issue all necessary and appropriate process to postpone

- 33 -

the effective date of an agency action or to preserve status or rights pending the conclusion of review proceedings.

5 U.S.C. § 705.  When a court grants interim relief under that provision, it must adhere to the traditional equitable principle that equitable remedies "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."  *CASA*, 606 U.S. at 852 (citation and emphasis omitted).  The Ninth Circuit recently concluded as much, and "limit[ed a] district court's § 705 Stay order" to a plaintiff's clients on the basis that CASA's "complete-relief principle provides some useful guidance for crafting interim equitable relief" in § 705 cases, which use the same traditional equitable principles that govern the preliminary injunctions at issue in *CASA*.  *Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 995-96 (9th Cir. 2025).

Congress ordinarily legislates against the backdrop of "established principles" of equity. *McKinney*, 602 U.S. at 346.  If Congress seeks to "depar[t] from traditional equity practice," it ordinarily "ma[kes] its desire plain."  *Hecht Co. v. Bowles*, 321 U.S. 321, 330 (1944).  Courts therefore must presume that a statute adheres to longstanding equitable principles "absent a clear command" to the contrary.  *McKinney*, 602 U.S. at 346.  The Supreme Court has "consistently employed this presumption when interpreting a wide variety of statutes."  *Id*.; *see, e.g.*, *Nken*, 556 U.S. at 433-36; *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 496 (2001); *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542-544 (1987); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982); *Hecht Co.*, 321 U.S. at 330.  Importantly here, Section 705 contains no clear statement displacing "the party-specific principles that permeate our understanding of equity." *CASA*, 606 U.S. at 844.

To the contrary, § 705 provides that a court may award interim relief only "to the extent necessary to prevent irreparable injury."  5 U.S.C. § 705.  The phrase "irreparable injury," in the context of interim equitable relief, refers to irreparable injury to the plaintiff—not irreparable

- 34 -

injury to third parties. *See, e.g.*, *Winter*, 555 U.S. at 20 ("A plaintiff seeking a preliminary injunction must establish … that he is *likely* to suffer irreparable harm in the absence of preliminary relief." (emphasis added)).  Granting relief to non-parties is in no way "necessary to prevent irreparable injury" to the five named plaintiffs. 5 U.S.C. § 705.

Other language in §705 further signals that the provision incorporates traditional equitable principles. Section 705 provides that a court "may (not "shall") grant relief.  5 U.S.C. §705.  The word "may" connotes discretion.  *See Bouarfa v. Mayorkas*, 604 U.S. 6, 13 (2024).  Discretion, of course, "is not whim." *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, 579 U.S. 93, 103 (2016) (citation omitted).  "A motion to [a court's] discretion is a motion, not to its inclination, but to its judgment; and its judgment is to be guided by sound legal principles." *United States v. Burr*, 25 F. Cas. 30, 35 (C.C.D. Va. 1807) (Marshall, C.J., riding circuit).  Those principles include the "elementary principle that a court cannot adjudicate directly upon" the rights of bystanders to the litigation.  *CASA*, 606 U.S. at 844 (citation omitted).  Section 705 also authorizes a court to award only "necessary and appropriate process."  5 U.S.C. § 705.  In *McKinney*, the Supreme Court interpreted a similar statutory phrase, "just and proper," to incorporate "the normal equitable rules." 602 U.S. at 347.  "The word 'proper' means 'appropriate,'" the Court explained, and crafting "'appropriate' equitable relief" requires following "'traditional rules.'"  *Id.* (citations omitted).  So too here. Statutory context confirms that reading of § 705.  The APA elsewhere makes clear that APA suits ordinarily take the form of challenges for equitable relief—specifically, "actions for declaratory judgments or writs of prohibitory or mandatory injunction." 5 U.S.C. § 703.  It therefore makes sense that interim relief in such suits would comport with traditional equitable principles.  In addition, the APA provision that creates a right of judicial review states: "Nothing herein … affects … the power or duty of the court to dismiss any action

**CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiffs' request for extraordinary relief.

Dated: December 24, 2025

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By:       */s/ Dhruman Y. Sampat*
        DHRUMAN Y. SAMPAT
        AMANDA L. TORRES
        Assistant United States Attorneys
        601 D Street, NW
        Washington, DC 20530
        (202) 252-2525 (Sampat)
        (202) 252-2507 (Torres)
        dhruman.sampat@usdoj.gov
        amanda.torres@usdoj.gov

*Attorneys for the United States of America*