## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **FRITZ EMMANUEL LESLY MIOT; RUDOLPH CIVIL; MARLENE GAIL NOBLE; MARICA MERLINE LAGUERRE; and VILBRUN DORSAINVIL,** | |
| *Plaintiffs*, | Case No. 1:25-cv-02471 |
| v. | **ORAL ARGUMENT REQUESTED** |
| **DONALD J. TRUMP, President of the United States of America; UNITED STATES OF AMERICA; THE DEPARTMENT OF HOMELAND SECURITY; and KRISTI NOEM, Secretary of Homeland Security,** | |
| *Defendants*. | |

### PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................ 1

BACKGROUND ............................................................................. 2

ARGUMENT ................................................................................. 3

I.    This Court has jurisdiction to grant the relief that Plaintiffs seek. ................... 3

    A.    Executive actions are presumptively subject to judicial review. ............................ 3

        1.    Executive actions are presumptively subject to APA review. ..................... 4

        2.    There is a strong presumption that constitutional claims are subject to judicial review. ............................................................. 6

    B.    The statutory provisions that the government invokes do not deprive the Court of jurisdiction to grant Plaintiffs the relief that they seek. ................... 7

        1.    8 U.S.C. § 1254a(b)(5)(A) does not deprive the Court of jurisdiction. ........ 7

        2.    8 U.S.C. § 1252(a)(2)(B)(ii) does not deprive the Court of jurisdiction. ... 11

        3.    8 U.S.C. § 1252(f)(1) does not preclude the relief that Plaintiffs seek. .... 15

II.    Plaintiffs have stated a claim. ................................................... 18

    A.    Plaintiffs have stated an APA claim. .......................................... 19

        1.    5 U.S.C. § 701(a) does not bar review. ................................. 19

        2.    The termination is arbitrary and capricious. ............................ 21

            a.    The termination was predetermined. ............................... 22

            b.    The termination relies on unexplained departures from past practice. ...................................................... 24

            c.    The explanation for the termination is implausible and contrary to the evidence. ...................................... 24

                i.    The Secretary's determination that it is safe to return to Haiti is implausible and contrary to the evidence. ........ 25

                ii.    The Secretary's stated rationale does not support termination. .................................................. 26

                iii.    The Secretary's stated rationale is internally contradictory. ............................................... 26

            d.    The termination was effected without observance of procedure required by law. ............................................. 27

        3.    The termination is contrary to constitutional right and power. ............. 28

i

a.    The termination is contrary to constitutional right. ......................28

b.    The termination is contrary to constitutional power....................28

B.    Plaintiffs have stated an equal-protection claim....................................29

1.    Everyone in the United States is entitled to equal protection...................29

2.    This case is governed by *Arlington Heights*...............................................29

3.    Plaintiffs have adequately alleged that the termination is based on racial animus. ..............................................................................................31

4.    Plaintiffs plausibly allege an equal protection claim under *Arlington Heights*...............................................................................................................32

a.    Public Statements by President Trump, Secretary Noem, and DHS evince racial bias. ................................................................32

i.    President Trump's statements evince racial bias..............34

ii.    Statements by Secretary Noem and DHS evince bias. .......36

b.    Trump administration policies evince racial bias. .........................37

i.    The administration has terminated nonwhite countries' TPS designations across the board. ...................................37

ii.    The administration has given white South Africans— and only white South Africans—preferential treatment....39

5.    The government's arguments to the contrary are without merit. ..............40

a.    Plaintiffs' claims are race-based, not nationality-based. ..............40

b.    President Trump's and Secretary Noem's statements are relevant. ......................................................................................41

CONCLUSION .......................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABM Onsite Servs.-W., Inc.v. NLRB,*
  849 F.3d 1137 (D.C. Cir. 2017)................................................................24

*Alli v. Decker,*
  650 F.3d 1007 (3d Cir. 2011) .................................................................18

*Am. Ass'n of Univ. Professors v. Rubio,*
  --- F. Supp. 3d ---, 2025 WL 2777659 (D. Mass. 2025).........................45

*Am. Clinical Lab. Ass'n v. Azar,*
  931 F.3d 1195 (D.C. Cir. 2019)..................................................................3

*Aman v. Cort Furniture Rental Corp.,*
  85 F.3d 1074 (3d Cir. 1996) .............................................................33, 41

*Ballou v. McElvain,*
  29 F.4th 413 (9th Cir. 2022) ....................................................................36

*Biden v. Texas,*
  597 U.S. 785 (2022) .................................................................................16

*Bolling v. Sharpe,*
  347 U.S. 497 (1954) .................................................................................29

*Bowen v. Mich. Acad. of Family Physicians,*
  476 U.S. 667 (1986) ...................................................................................3

*Brito v. Garland,*
  22 F.4th 240 (1st Cir. 2021) .....................................................................18

*CASA de Md., Inc. v. Trump,*
  355 F. Supp. 3d 307 (D. Md. 2018)....................................................*passim*

*Centro Presente v. DHS,*
  332 F. Supp. 3d 393 (D. Mass. 2018).........................................8, 31, 35

*City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.,*
  538 U.S. 188 (2003) .................................................................................33

*Cook Cty v. Wolf,*
  461 F. Supp. 3d 779 (N.D. Ill. 2020)........................................................35

*Dallas Safari Club v. Bernhardt,*
   518 F. Supp. 3d 535 (D.D.C. 2021).........................................................................23

*Dep't of Com. v. New York,*
   588 U.S. 752 (2019) ................................................................................... 19, 20

*Dep't of Homeland Sec. v. Regents of the Univ. of California,*
   591 U.S. 1 (2020) ................................................................................. 13, 31, 44

*Doe #1 v. Am. Fed. Of Gov. Empl.,*
   554 F. Supp. 3d 75 (D.D.C. 2021)...........................................................................43

*Doe v. Vill. of Mamaroneck,*
   462 F. Supp. 2d 520 (S.D.N.Y. 2006) ....................................................................36

*El Paso Natural Gas Co. v. United States,*
   632 F.3d 1272 (D.C. Cir. 2011)..................................................................................3

*English v. Trump,*
   279 F. Supp. 3d 307 (D.D.C. 2018).............................................................................5

*Epic Sys. Corp. v. Lewis,*
   584 U.S. 497 (2018) ...................................................................................................15

*Fiallo v. Bell,*
   430 U.S. 787 (1977) ...................................................................................................30

*Garland v. Aleman Gonzalez,*
   596 U.S. 543 (2022) ...................................................................................................16

*Gonzales v. Douglas,*
   269 F. Supp. 3d 948 (D. Ariz. 2017) ......................................................................34

*Griffith v. Fed. Lab. Rels. Auth.,*
   842 F.2d 487 (D.C. Cir. 1988).....................................................................................7

*Guerrero-Lasprilla v. Barr,*
   589 U.S. 221 (2020) .....................................................................................................3

*Gundy v. United States,*
   588 U.S. 128 (2019) ...................................................................................................28

*Gutierrez de Martinez v. Lamagno,*
   515 U.S. 417 (1995) .....................................................................................................4

*Haitian Evangelical Clergy Ass'n v. Trump,*
   789 F. Supp. 3d 255 (E.D.N.Y. 2025)..............................................................*passim*

iv

*Haitian Evangelical Clergy Ass'n v. Trump*,
    No. 25-cv-1464, ECF No. 47 (E.D.N.Y. May 6, 2025)........................38

*Hanson v. Hoffmann*,
    628 F.2d 42 (D.C. Cir. 1980)..........................................27

*Hawaii, Kleindienst v. Mandel*,
    408 U.S. 753 (1972) ...............................................29, 30

*Hicks v. IBM*,
    44 F. Supp. 2d 593 (S.D.N.Y. 1999) ...................................44

*Hunt v. Cromartie*,
    526 U.S. 541 (1999) .................................................33

*INS v. Cardoza–Fonseca*,
    480 U.S. 421 (1987) .................................................14

*J. W. Hampton, Jr. & Co. v. United States*,
    276 U.S. 394 (1928) .................................................28

*J.E.F.M. v. Lynch*,
    837 F.3d 1026 (9th Cir. 2016) .......................................15

*Jacinto-Castanon de Nolasco v. U.S. Immigr. & Customs Enf't*,
    319 F. Supp. 3d 491 (D.D.C. 2018)...................................29

*Johnson v. Robison*,
    415 U.S. 361 (1974) ..................................................7

*Kerry v. Din*,
    576 U.S. 86 (2015) ..................................................30

*Kingdomware Techs., Inc. v. United States*,
    579 U.S. 162 (2016) .................................................12

*Kucana v. Holder*,
    558 U.S. 233 (2010) ............................................3, 4, 14

*La Clinica de la Raza v. Trump*,
    706 F. Supp. 3d 903 (N.D. Cal. 2020)................................35

*La Union del Pueblo Entero v. Ross*,
    353 F. Supp. 3d 381 (D. Md. 2018)..................................35

*Leggett & Platt, Inc. v. Nat'l Lab. Rels. Bd.*,
    988 F.3d 487 (D.C. Cir. 2021)........................................22

v

*Lepre v. Dep't of Lab.*,
    275 F.3d 59 (D.C. Cir. 2001)............................................................................7

*Lucas v. Am. Fed'n of Gov't Emps.*,
    151 F.4th 370 (D.C. Cir. 2025)......................................................................15

*Make the Road New York v. Wolf*,
    962 F.3d 612 (D.C. Cir. 2020).....................................................................3, 18

*Mathews v. Diaz*,
    426 U.S. 67 (1976) ........................................................................................30

*Mayor and City Council of Baltimore v. Trump*,
    416 F. Supp. 3d 452 (D. Md. 2019)...............................................................35

*McNary v. Haitian Refugee Ctr., Inc.*,
    498 U.S. 479 (1991) ..........................................................................8, 9, 14, 15

*Mhany Mgmt., Inc. v. Cty of Nassau*,
    819 F.3d 581 (2d Cir. 2016) ..........................................................................34

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ........................................................................................22

*N. Carolina State Conf. of NAACP v. McCrory*,
    831 F.3d 204 (4th Cir. 2016) ..............................................................31, 32, 45

*NAACP v. DHS*,
    364 F. Supp. 3d 568 (D. Md. 2019)......................................................31, 35, 42

*Nakka v. USCIS*,
    111 F.4th 995 (9th Cir. 2024) ............................................................11, 14, 15

*Nasdaq Stock Mkt. LLC v. Sec. & Exch. Comm'n*,
    38 F.4th 1126 (D.C. Cir. 2022).......................................................................6

*In re Nat'l Nurses United*,
    47 F.4th 746 (D.C. Cir. 2022).......................................................................12

*Nat'l TPS All. v. Noem*,
    773 F. Supp. 3d 807 (N.D. Cal.) (*NTPSA I*) ...........................................*passim*

*Nat'l TPS All. v. Noem*,
    798 F. Supp. 3d 1108 (N.D. Cal. 2025) (*NTPSA II*)................................*passim*

*Nat'l Treasury Emps. Union v. Fed. Lab. Rels. Auth.*,
    404 F.3d 454 (D.C. Cir. 2005).......................................................................22

*Nielsen v. Preap,*
    586 U.S. 392 (2019) ...................................................................................18

*Nken v. Holder,*
    556 U.S. 418 ....................................................................................14, 18

*Panama Refin. Co. v. Ryan,*
    293 U.S. 388 (1935) ...................................................................................28

*Patel v. Garland,*
    596 U.S. 328 (2022) ..............................................................................10, 11

*Perkins Coie LLP v. Dept. of Justice,*
    783 F. Supp. 3d 105 (D.D.C. 2025)............................................................45

*Ramos v. Nielsen,*
    336 F. Supp. 3d 1075 (N.D. Cal. 2018)........................................................8

*Ramos v. Wolf,*
    975 F.3d 872 (9th Cir. 2020) .....................................................................31

*Reno v. Cath. Soc. Servs., Inc.,*
    509 U.S. 43 (1993) ..................................................................................4, 18

*Sackett v. E.P.A.,*
    566 U.S. 120 (2012) .....................................................................................4

*Saget v. Trump,*
    345 F. Supp. 3d 287 (E.D.N.Y. 2018).....................................................8, 42

*Saget v. Trump,*
    375 F. Supp. 3d 280 (E.D.N.Y. 2019).................................................*passim*

*Seila L. LLC v. CFPB,*
    591 U.S. 197 (2020) ...................................................................................43

*Shawnee Tribe v. Mnuchin,*
    984 F.3d 94 (2021) .....................................................................................19

*Smith v. Fairview Ridges Hosp.,*
    625 F.3d 1076 (8th Cir. 2010)....................................................................33

*State v. Dept. of Commerce,*
    315 F. Supp. 3d 766 (S.D.N.Y. 2018) .......................................................35

*Steffel v. Thompson,*
    415 U.S. 452 (1974) ...................................................................................18

*Texas v. United States*,
    40 F.4th 205 (5th Cir. 2022) ..................................................................................17

*Texas v. United States*,
    50 F.4th 498 (5th Cir. 2022) ..................................................................................17

*Trump v. Hawaii*,
    585 U.S. 678 (2018) ..............................................................................29, 30, 31

*Trump v. United States*,
    603 U.S. 593 (2024) ..............................................................................................45

*Ulstein Mar., Ltd. v. United States*,
    833 F.2d 1052 (1st Cir. 1987) ...............................................................................18

*Ungar v. Smith*,
    667 F.2d 188 (D.C. Cir. 1981) .................................................................................7

*United States v. Long*,
    997 F.3d 342 (D.C. Cir. 2021) ...............................................................................15

*United States v. Suquilanda*,
    116 F.4th 129 (2d Cir. 2024) .................................................................................31

*Village of Arlington Heights v. Metro. Housing Dev. Corp.*,
    429 U.S. 252 (1977) .......................................................................................*passim*

*Washington v. Davis*,
    426 U.S. 229 (1976) .......................................................................................32, 40

*Washington v. DHS*,
    598 F. Supp. 3d 1051 (E.D. Wash. 2020) ........................................................31, 35

*Washington v. Seattle School Dist. No. 1*,
    458 U.S. 457 (1982) ..............................................................................................33

*Webster v. Doe*,
    486 U.S. 592 (1988) ................................................................................................7

*Wheat v. Rogers & Willard, Inc.*,
    271 F. Supp. 3d 1327 (S.D. Ala. 2017) ..................................................................45

*Zadvydas v. Davis*,
    533 U.S. 678 (2001) .......................................................................................29, 30

**Statutes**

5 U.S.C. § 559 .......................................................................................................4, 5, 6

5 U.S.C. § 701(a) ....................................................................................................... 19

5 U.S.C. § 701(a)(1) ................................................................................................... 19

5 U.S.C. § 701(a)(2) ............................................................................................. 19, 20

5 U.S.C. § 706 .............................................................................................. 5, 16, 17, 18

5 U.S.C. § 706(2) ................................................................................................. 17, 19

5 U.S.C. § 706(2)(A) ................................................................................ 1, 21, 24, 25

5 U.S.C. § 706(2)(B) ............................................................................................. 1, 28

5 U.S.C. § 706(2)(C) .................................................................................................. 24

8 U.S.C. § 1160 ............................................................................................................ 8

8 U.S.C. § 1160(e) ................................................................................................. 9, 14

8 U.S.C. § 1182(a)(2) ................................................................................................. 26

8 U.S.C. § 1182(a)(3) ................................................................................................. 26

8 U.S.C. § 1252(a)(2) ................................................................................................. 14

8 U.S.C. § 1252(a)(2)(A)(iv) ..................................................................................... 14

8 U.S.C. § 1252(a)(2)(B)(i) ............................................................................ 10, 14, 15

8 U.S.C. § 1252(a)(2)(B)(ii) ................................................................................ passim

8 U.S.C. § 1252(f)(1) ........................................................................................... passim

8 U.S.C. § 1252(g) ....................................................................................................... 6

8 U.S.C. § 1254a ........................................................................................................ 16

8 U.S.C. § 1254a(b) ....................................................................................... 12, 21, 27

8 U.S.C § 1254a(b)(1) ........................................................................... 13, 21, 27, 28

8 U.S.C. § 1254a(b)(1)(C) ..................................................................... 11, 21, 27, 38

8 U.S.C. § 1254a(b)(3) ........................................................................................... 1, 13

8 U.S.C. § 1254a(b)(3)(A) ................................................................................... passim

8 U.S.C. § 1254a(b)(3)(B) ................................................................................... 13, 17

8 U.S.C. § 1254a(b)(3)(C) ....................................................................... 13, 17, 38

8 U.S.C. § 1254a(b)(5)(A)................................................................................ *passim*

8 U.S.C. § 1254a(c)(2)(B) .................................................................................. 26

8 U.S.C. § 1254a(c)(3)(A) .................................................................................. 26

28 U.S.C. § 1361 ................................................................................................ 11

28 U.S.C. § 1651 ................................................................................................ 11

28 U.S.C. § 2241 ............................................................................................. 6, 11

Administrative Procedure Act, Pub. L. 89-554, 80 Stat. 378 (Sept. 6, 1966) ................ 4

Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L.
    104-208, Div. C, § 306, 110 Stat. 3009 (Sept. 30, 1996) ............................... 4, 14, 15

Immigration Act of 1990, Pub. L. 101-649 Tit. III, § 302, 104 Stat. 4978, 5032
    (Nov. 29, 1990)................................................................................................ 4

Real ID Act of 2005, Pub. L. 109-13, Div. B, § 106, 119 Stat. 231 (May 11, 2005).......... 4, 14, 15

## Regulations

90 Fed. Reg. 19217 (May 6, 2025)...................................................................... 38

90 Fed. Reg. 50484 (Nov. 6, 2025) .................................................................... 38

90 Fed. Reg. 54733 (Nov. 28, 2025) ...................................................... 12, 25, 26, 42

## Constitutional Provisions

Fifth Amendment............................................................................... 1, 2, 8, 29

U.S. Const. art. II § 1 ....................................................................................... 43

U.S. Const. art. II § 3 ....................................................................................... 43

## Other Authorities

Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (Nov. 21, 2025)
    https://truthsocial.com/@realDonaldTrump/posts/115590786862216464 ........................... 43

Jessica A. Clarke, *Explicit Bias*, 113 NW. U. L. REV. 505, 558 (2018)........................ 32

Li Zhou, *America's long history of anti-Haitian racism, explained*, VOX (Sept. 15,
    2024), https://bit.ly/4jdafOJ........................................................................ 34

Travel Advisory: Haiti, U.S. Dep't of State (July 15, 2025),
    https://bit.ly/48wRYs0................................................................................................25

## INTRODUCTION

Plaintiffs allege well-pleaded facts showing that the termination of Haiti's TPS designation was a predetermined outcome motivated, at least in part, by racial animus. Those allegations are more than enough to state claims under the APA and the Fifth Amendment.

The government says that it does not matter if the termination was a predetermined outcome motivated, at least in part, by racial animus because, it argues, the Court lacks jurisdiction to hear Plaintiffs' claims, which the government characterizes as encroaching on the executive's supposedly unfettered discretion.

The government's position is extreme—and dangerous. If accepted, even egregious and admitted violations of 8 U.S.C. § 1254a(b)(3) would be immune from judicial scrutiny. Imagine two scenarios in which the Secretary's process for "determin[ing] whether the conditions for … designation … continue to be met" (*id.* § 1254a(b)(3)(A)) is to flip a coin—heads the conditions for extension are found to exist, tails they are not. In the first scenario, the Secretary uses a fair coin so that there is a 50% chance that the conditions are found to exist and a 50% chance that they are not. Such a procedure is clearly "arbitrary." 5 U.S.C. § 706(2)(A). In the second scenario, she uses a weighted coin that has a 95% chance of landing tails and only a 5% chance of landing heads. Such a procedure is equally arbitrary and, depending on how the weighted coin came to be used, quite possibly also "contrary to constitutional right." *Id.* § 706(2)(B). Flipping a coin—especially a weighted coin—is not the good-faith, fact-based process required by the TPS statute. It simply cannot be the case that a random process, particularly one weighted to a desired outcome, satisfies Congress's mandate to conduct a periodic review and determination after consultation with appropriate agencies. 8 U.S.C. § 1254a(b)(3)(A). Yet, on the government's theory, judicial review would be unavailable even in these scenarios—and even if the Secretary admitted that her process

was nothing more than the flip of a weighted coin that was weighted for racist purposes.

Fortunately, the government's jurisdictional theory is wrong. There is a strong presumption of reviewability under the APA, and an even stronger presumption of reviewability under the Constitution. The government cannot overcome that presumption here. Its suggestion otherwise misreads both statute and caselaw. The Plaintiffs have stated claims under the APA and the Fifth Amendment—and this Court has jurisdiction to hear them.

## BACKGROUND

The November 28 termination of Haiti's TPS designation is the fourth unlawful attempt by a Trump administration to end Haiti's designation. Federal courts blocked the first Trump administration's attempt to terminate Haiti's TPS designation as "preordained and pretextual," finding "both direct and circumstantial evidence [that] a discriminatory purpose of removing non-white immigrants from the United States was a motivating factor behind the decision to terminate TPS for Haiti." *Saget v. Trump*, 375 F. Supp. 3d 280, 346 (E.D.N.Y. 2019). And, when the current Trump administration tried to "partially vacate" Haiti's TPS designation in February, that attempt was "set aside as unlawful under the APA" because it exceeded the Secretary's statutory authority. *Haitian Evangelical Clergy Ass'n v. Trump*, 789 F. Supp. 3d 255, 273 (E.D.N.Y. 2025) ("*HECA*"). The first two attempts having failed, the current administration issued a new termination notice in July, only to withdraw it after Plaintiffs challenged its legality in this Court. After that attempt was thwarted, the administration issued the November 28 termination notice at issue here.[1]

The well-pleaded allegations in Plaintiffs' now-operative Second Amended Complaint (ECF 90) show through words and deeds that the Trump administration's latest attempt to

---

[1]    The history of Haiti's TPS designation and President Trump's attempts to terminate it are detailed in ECF 81 at 5–14. Rather than repeat it here, Plaintiffs incorporate it by reference.

terminate Haiti's TPS designation was motivated, at least in part, by the President and Secretary's racial animus to non-white immigrants generally and Haitians in particular. The relevant allegations are identified in the discussion below.

## ARGUMENT

### I. This Court has jurisdiction to grant the relief that Plaintiffs seek.

Pointing to various statutory provisions, the government argues that "[t]he Court lacks subject-matter jurisdiction" and is "preclude[d]" from granting the relief that Plaintiffs seek. ECF 80 at 6, 14 (capitalization altered). But that is wrong.

### A. Executive actions are presumptively subject to judicial review.

As other courts have noted when reviewing—and disallowing—the first and second Trump administrations' attempts to terminate Haiti's TPS designation, "there is a 'strong presumption that Congress intends judicial review of administrative action.'" *Saget v. Trump*, 375 F. Supp. 3d 280, 330 (E.D.N.Y. 2019) (quoting *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986)); *accord, e.g.*, *Nat'l TPS All. v. Noem*, 773 F. Supp. 3d 807, 825 (N.D. Cal.) (*NTPSA I*), *aff'd*, 150 F.4th 1000 (9th Cir. 2025). "That 'well-settled' and 'strong presumption' in favor of judicial review is so embedded in the law that it applies even when determining the scope of statutory provisions specifically designed to limit judicial review." *Make the Road New York v. Wolf*, 962 F.3d 612, 624 (D.C. Cir. 2020) (citing *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 229 (2020); *Kucana v. Holder*, 558 U.S. 233, 251 (2010); *Am. Clinical Lab. Ass'n v. Azar*, 931 F.3d 1195, 1204 (D.C. Cir. 2019); *El Paso Natural Gas Co. v. United States*, 632 F.3d 1272, 1276 (D.C. Cir. 2011)). "Because the 'presumption favoring interpretations of statutes [to] allow judicial review of administrative action' is 'well-settled,'" courts "assume[] that 'Congress legislates with knowledge of' the presumption" and thus require "'clear and convincing evidence' to dislodge the

3

presumption." *Kucana*, 558 U.S. at 251–52 (quoting *Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 64 (1993)). Therefore, "[w]hen a statute is 'reasonably susceptible to divergent interpretation,'" courts "adopt the reading that accords with traditional understandings and basic principles: that executive determinations generally are subject to judicial review." *Id.* at 251 (quoting *Gutierrez de Martinez v. Lamagno,* 515 U.S. 417, 434 (1995)). Here, there is no "clear and convincing evidence" (*Reno*, 509 U.S. at 64) that Congress intended to foreclose judicial review of Plaintiffs' APA and equal-protection claims. Indeed, the evidence is to the contrary.

## 1.    Executive actions are presumptively subject to APA review.

"The APA … creates a presumption favoring judicial review of administrative action." *Sackett v. E.P.A.*, 566 U.S. 120, 128 (2012). The government cannot overcome that presumption in this case. The government argues that Plaintiffs' APA claims are barred by 8 U.S.C. §§ 1252(a)(2)(B)(ii), 1252(f)(1), and 1254a(b)(5)(A). ECF 80 at 6–15. But none of those provisions supplant the APA.

As Plaintiffs previously noted (ECF 69 at 4), Congress has specifically addressed when a statute can be construed to limit review under the APA. In particular, Congress has decreed that a "[s]ubsequent statute may not be held to supersede or modify … chapter 7" of the APA "except to the extent that it does so ***expressly***." 5 U.S.C. § 559 (emphasis added). The APA was enacted in 1966. *See* Administrative Procedure Act, Pub. L. 89-554, 80 Stat. 378 (Sept. 6, 1966). The provisions that the government invokes—8 U.S.C. §§ 1252(a)(2)(B)(ii), 1252(f)(1), and 1254a(b)(5)(A)—were not enacted until 1990, 1996, and 2005 respectively. *See* Immigration Act of 1990, Pub. L. 101-649 Tit. III, § 302, 104 Stat. 4978, 5032 (Nov. 29, 1990) (§ 1254a(b)(5)(A)); Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. 104-208, Div. C, § 306, 110 Stat. 3009 (Sept. 30, 1996) (§ 1252(f)(1)); Real ID Act of 2005, Pub. L. 109-13, Div.

B, § 106, 119 Stat. 231 (May 11, 2005) (§ 1252(a)(2)(B)(ii)). None of the provisions expressly supersede or modify 5 U.S.C. § 706, which is part of chapter 7 of the APA. To the contrary, each is silent as to the APA. Thus, 5 U.S.C. § 559 forbids the Court from construing 8 U.S.C. §§ 1252(a)(2)(B)(ii), 1252(f)(1), or 1254a(b)(5)(A) as limiting its power to set-aside unlawful agency action under 5 U.S.C. § 706.

The government advances three arguments to evade § 559's express-statement requirement. None is persuasive.

*First*, says the government, applying § 559's express-statement requirement would mean that "no Congress would have the power to 'repeal the earlier statute, to exempt the current statute from the earlier statute, to modify the earlier statute, or to apply the earlier statute but as modified.'" ECF 72 at 2 (quoting *English v. Trump*, 279 F. Supp. 3d 307, 320 (D.D.C. 2018)). There is no merit to that contention. A later Congress can either repeal § 559, thereby eliminating the express-statement requirement, or include language in a subsequent statute that expressly exempts its operation from APA review.

*Second*, the government asserts that Plaintiffs' reading of § 559 would require Congress to use "magic words" to displace the APA. ECF 72 at 3. Not so. Congress can expressly displace the APA in an endless number of ways. It can provide that the statute in question applies "notwithstanding the APA"; that "the APA is inapplicable" to statute in question; that operation of the statute in question "shall not be limited by any other statutory provision, including the APA"; etc. The precise words that Congress uses are immaterial. What matters is that they must "expressly" supersede the APA. 5 U.S.C. § 559.

*Third*, the government claims that Plaintiffs' reading of § 559 "poses issues related to statutory interpretation" given § 1252(f)(1)'s prefatory clause, which says that the provision

applies "[r]egardless of the nature of the action or claim." ECF 72 at 3. Although it fails to identify any of the issues supposedly created by the prefatory clause, the government, citing 8 U.S.C. § 1252(g), says that the Immigration and Nationality Act ("INA") "is replete with" such clauses. *Id.* But § 1252(g) undermines the government's suggestion that Plaintiffs' reading of § 559 would bind future Congresses and require the use of magic words. The government does not quote § 1252(g) in its entirety but the provision's prefatory clause—and how it differs from that of § 1252(f)(1)—is revealing:

> Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), ***including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title***, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

8 U.S.C. § 1252(g) (emphasis added). Thus, the preface to § 1252(g)—and the almost identically worded preface to § 1252(a)(2)(B)(ii)—make clear that Congress knows how to expressly refer to statutes when suspending their operation through subsequent legislation. That it did not expressly suspend operation of the APA in any of the provisions invoked by the government is strong evidence that it did not intend for those provisions to supersede the APA. Indeed, the fact that § 1252(a)(2)(B)(ii) expressly suspends the operation of other statutes but not operation of the APA is, under the *expressio unius* canon, particularly strong evidence that Congress did not intend to supplant the APA. *Cf. Nasdaq Stock Mkt. LLC v. Sec. & Exch. Comm'n*, 38 F.4th 1126, 1137 (D.C. Cir. 2022) ("Mention of one thing … implies exclusion of another thing.") (cleaned up).

### 2.    There is a strong presumption that constitutional claims are subject to judicial review.

The presumption that constitutional claims are subject to judicial review is especially strong. As the D.C. Circuit has explained:

> When [a] plaintiff seeks to invoke the aid of the judicial branch on constitutional grounds, the Supreme Court and this court have both indicated that only the clearest evocation of congressional intent to proscribe judicial review of constitutional claims will suffice to overcome the presumption that the Congress would not wish to court the constitutional dangers inherent in denying a forum in which to argue that government action has injured interests that are protected by the Constitution.

*Ungar v. Smith*, 667 F.2d 188, 193 (D.C. Cir. 1981) (citing *Johnson v. Robison*, 415 U.S. 361, 94 (1974)); *accord, e.g.*, *Webster v. Doe*, 486 U.S. 592, 603–04 (1988); *Lepre v. Dep't of Lab.*, 275 F.3d 59, 67 (D.C. Cir. 2001). The "same standard [is] applied when the Government asserts that Congress intended a general proscription of judicial review to bar judicial cognizance of a claim that an administrative agency, in applying the statute, acted unconstitutionally." *Ungar*, 667 F.2d at 193. Thus, "[t]he maxim that congressional preclusion of judicial review must be clear and convincing applies in a particularly rigorous fashion … when," as here, "constitutional claims are at stake." *Griffith v. Fed. Lab. Rels. Auth.*, 842 F.2d 487, 494 (D.C. Cir. 1988) (cleaned up). Lacking clear and convincing evidence that Congress intended to preclude constitutional claims challenging the process that the Secretary employed when applying 8 U.S.C. § 1254a(b)(3)(A), the government cannot overcome the presumption of reviewability in this case.

> **B.    The statutory provisions that the government invokes do not deprive the Court of jurisdiction to grant Plaintiffs the relief that they seek.**

The strong presumption of reviewability aside, the statutory provisions on which the government relies do not deprive the Court of jurisdiction to grant the relief that Plaintiffs seek.

> **1.    8 U.S.C. § 1254a(b)(5)(A) does not deprive the Court of jurisdiction.**

The government contends that "8 U.S.C. § 1254a(b)(5)(A) bars all of Plaintiffs' APA and constitutional challenges" to the termination of Haiti's TPS designation. ECF 80 at 6. The government is wrong.

By its plain terms, the provision only bars judicial review of a "***determination*** … with

respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." 8 U.S.C. § 1254a(b)(5)(A) (emphasis added). That does not preclude review here. As every court reaching the issue has held, "§ 1254a(b)(5)(A) was designed to bar judicial review of substantive" findings with respect to "country-specific conditions" that are made "in service of TPS designations, terminations, or extensions …[,] not judicial review of general procedures or collateral practices related to such." *NTPSA I*, 773 F. Supp. 3d at 831; *accord HECA*, 789 F. Supp. 3d at 269; *Saget*, 375 F. Supp. 3d at 330–32; *CASA de Md., Inc. v. Trump*, 355 F. Supp. 3d 307, 317–21 (D. Md. 2018); *Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1102 (N.D. Cal. 2018), *vacated and remanded sub nom. Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 59 F.4th 1010 (9th Cir. 2023); *Centro Presente v. DHS*, 332 F. Supp. 3d 393, 408–09 (D. Mass. 2018). Simply put, § 1254a(b)(5)(A) "does not prevent courts from reviewing and setting aside agency action that is procedurally deficient." *HECA*, 789 F. Supp. 3d at 269.

This unbroken consensus is rooted in Supreme Court precedent, specifically, *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479 (1991), a case interpreting a provision analogous to § 1254a(b)(5)(A). *See HECA*, 789 F. Supp. 3d at 269 (citing *McNary*); *NTPSA I*, 773 F. Supp. 3d at 831 (same); *Saget v. Trump*, 345 F. Supp. 3d 287, 295 (E.D.N.Y. 2018) (same); *CASA*, 355 F. Supp. 3d at 317–18 (same); *Centro Presente*, 332 F. Supp. 3d at 407 (same). *McNary* involved 8 U.S.C. § 1160, which established a procedure by which undocumented foreign agricultural workers could apply for an adjustment of their immigration status. The statute directed the Attorney General to adjust an applicant's status if she determined that the applicant was eligible under the specified criteria. Individuals whose applications were denied sued, claiming that the process that she used to make her eligibility determinations "was conducted in an arbitrary fashion that deprived applicants of the due process guaranteed by the Fifth Amendment to the Constitution."

498 U.S. at 487. The question in *McNary* was whether the plaintiffs' claims were barred by § 1160(e), which declared that "[t]here shall be no administrative or judicial review of a determination respecting an application for adjustment of status under this section." Resisting judicial review, the government argued that courts lacked jurisdiction to hear the plaintiffs' suit because, said the government, it was "an action seeking 'judicial review of a determination respecting an application for adjustment of status'" and was "therefore barred by the plain language" of § 1160(e). 498 U.S. at 491.

Rejecting the government's argument, the Court held that § 1160(e) did not preclude the plaintiffs' claims. The Court began by explaining that the provision's "reference to 'a determination' describes a single act rather than a group of decisions or a practice or procedure employed in making decisions." *McNary*, 498 U.S. at 492. Thus, said the Court, § 1160(e)'s preclusion of claims arising "a determination" did not bar "general collateral challenges to unconstitutional practices and policies used by the agency in processing applications." *Id.*

The Court's analysis of § 1160(e) in *McNary* applies equally to § 1254a(b)(5)(A). Using language that is materially indistinguishable from that found in § 1160(e), § 1254a(b)(5)(A)'s only bars judicial review of a "***determination*** of the [Secretary] with respect to the designation, or termination or extension of a [TPS] designation." Thus, § 1254a(b)(5)(A) "is best read as barring judicial review of the merits of the determination itself, but not whether the determination" was the result of unlawful "practices and policies." *CASA*, 355 F. Supp. 3d at 320.

Plaintiffs' claims are procedural, not substantive. Plaintiffs do not contest the correctness of the Secretary's determinations with respect to country conditions or national interest. Rather, they challenge the process by which the Secretary made those determinations, alleging that it was "arbitrary, capricious, [and] an abuse of discretion"; "without observance of procedure required

9

by law"; "contrary to constitutional right [and] power"; and animated by racial animus. ECF 90 ¶¶ 271–81; ECF 74 ¶¶ 258–68. Although Plaintiffs identify various flaws in the Secretary's determinations, they do so only as evidence of the procedural irregularities that they challenge.

That Plaintiffs' claims are procedural rather than substantive is evident from the relief that they seek. Plaintiffs "do not seek a substantive declaration from the Court they are entitled to a TPS determination in their favor" and their "success in this case would not compel Defendants to extend Haiti's TPS designation." *Saget*, 375 F. Supp. 3d at 332. Rather, if Plaintiffs prevail, the Secretary would simply have "to make a new, good faith, fact- and evidence-based determination" applying "lawful criteria" before terminating Haiti's TPS designation. *Id.* "Plaintiffs' contention that the decision to [terminate] was arbitrary or capricious—and thus should be set aside—does not dictate how the Secretary should ultimately rule on a TPS designation, termination, or extension." *NTPSA I*, 773 F. Supp. 3d at 832.

Because Plaintiffs challenge the process by which the Secretary made her determinations rather than the determinations themselves, § 1254a(b)(5)(A) does not bar Plaintiffs' claims.

Resisting this conclusion, the government cites *Patel v. Garland*, 596 U.S. 328 (2022). *Cf.* ECF 80 at 7. But *Patel* is not to the contrary. *Patel* interpreted 8 U.S.C. § 1252(a)(2)(B)(i), a provision barring judicial review of "any judgment regarding the granting of relief" under certain specified statutes. Rejecting the petitioner's contention that the provision bars review only of ultimate decisions respecting the granting of relief, the Court held that the provision also bars review of the subsidiary factual determinations on which such decisions are based because they too involve "judgment." *See* 596 U.S. at 333–34. Here, analogizing to the terms used in § 1252(a)(2)(B)(i), the government says that § 1254a(b)(5)(A) precludes consideration of Plaintiffs' claims because it bars judicial review of "any determination … with respect to the

designation, or termination or extension of a designation." ECF 80 at 7. That is immaterial. Although "the word 'any indicates a broad sweep" (*id.*), "the word 'any' cannot overcome the fact that … § 1254a(b)(5)(A) refers to 'any ***determination***.'" *NTPSA I*, 773 F. Supp. 3d at 831 n.8 (emphasis added). Plaintiffs, however, do not seek review of any determination made by the Secretary with respect to Haiti's TPS designation. Rather than seek review of the Secretary's substantive determinations, they seek review only of the process by which the Secretary made those determinations. Because "*Patel* did not involve a collateral challenge to generally applicable agency policy or procedure" (*Nakka v. USCIS*, 111 F.4th 995, 1003 (9th Cir. 2024)), it has no bearing here.

Simply put, § 1254a(b)(5)(A) does not preclude Plaintiffs' claims.

### 2.    8 U.S.C. § 1252(a)(2)(B)(ii) does not deprive the Court of jurisdiction.

Nor are Plaintiffs' claims barred by 8 U.S.C. § 1252(a)(2)(B)(ii). It states:

> Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, and except as provided in subparagraph (D), and regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review … any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title.

8 U.S.C. § 1252(a)(2)(B)(ii).[2] According to the government, the provision bars Plaintiffs' claims because 8 U.S.C. § 1254a(b)(1)(C) "has all the marks of conferring on the Secretary tremendous discretion in determining whether a country should maintain its TPS designation." ECF 80 at 10. The government's argument misses the mark.

Plaintiffs do not challenge the Secretary's determinations; they challenge the process by

---

[2]    As noted (*see supra* at 6), § 1252(a)(2)(B)(ii) expressly suspends the operation of certain specified statutes—namely, 28 U.S.C. §§ 1361, 1651, and 2241—but is silent as to the APA.

which the Secretary made those determinations. Specifically, Plaintiffs allege that the Secretary

failed to follow the periodic reviewed process mandated by 8 U.S.C. § 1254a(b)(3)(A). ECF 90 ¶¶

56–64; ECF 74 ¶¶ 56–64.

The periodic review process is not discretionary. Neither are the criteria to be applied.

Congress has decreed that the Secretary, "after consultation with appropriate agencies of the

Government, ***shall*** review the conditions in the foreign state … and ***shall*** determine whether the

conditions for such designation under [§ 1254a(b)] continue to be met." 8 U.S.C. § 1254a(b)(3)(A).

"[T]he word 'shall' usually connotes a requirement" (*In re Nat'l Nurses United*, 47 F.4th 746, 754

(D.C. Cir. 2022) (quoting *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016)))

and it does so here. The Secretary admits as much. The termination notice acknowledges that "[a]t

least 60 days before the expiration of a foreign state's Temporary Protected Status designation or

extension, the Secretary—after consultation with appropriate U.S. Government agencies—***must***

review the conditions in the foreign state … to determine whether the country continues to meet

the conditions for the designation." 90 Fed. Reg. 54733, 54733 (Nov. 28, 2025) (emphasis added).

Not only is the Secretary required to conduct a periodic review but "Congress's use of

'shall,' specifically in requiring the Secretary to 'review the conditions in the foreign state,' evinces

its intent that the Secretary undertake a periodic review grounded in fact—*i.e.*, based on objective

conditions in the foreign country and regardless of any government official's political motives—

and in good faith." *Saget*, 375 F. Supp. at 346.

> The statute's requirement that the Secretary publish notice of a termination determination
> in the Federal Register, "including the basis for the determination," further evinces
> Congress's intent in this regard. The Secretary must articulate and publish the true and
> factual basis for termination. To be sure, the DHS Secretary exercises discretion to make
> the determination she deems fit, but the Secretary must base that discretion on the
> "conditions in the foreign state" and on consultations with appropriate Government officials.

*Id.* at 346–47 (quoting 8 U.S.C. § 1254a(b)(3)(A)–(B)). The congressionally mandated procedure

means that "the Secretary may not provide sham or pretextual justifications as the basis for the decision under the statute." *Id.* at 347.

In short, the Secretary has no discretion to deviate from the congressionally mandated procedure or base her determinations on anything other than the congressionally specified criteria. Because the Secretary lacks discretion in these matters, § 1252(a)(2)(B)(ii) has no application here.

The government rests its argument regarding the Secretary's purported discretion on the use of "may" in § 1254a(b)(1), which governs the initial designation of a country for TPS. *Cf.* ECF 80 at 11. But it is § 1254a(b)(3), not § 1254a(b)(1), that governs the periodic review process and it, unlike § 1254a(b)(1), uses the mandatory "shall." That Congress would give the Secretary discretion when making an initial designation but limit her discretion to terminate a designation makes sense. "The Supreme Court has … recognized that immigration programs, even if temporary in nature, can confer legally cognizable reliance interests on beneficiaries of those programs." *HECA*, 789 F. Supp. 3d at 267 (citing *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1 (2020)). "Where a TPS extension is given, it creates important reliance interests." *Id.* (quoting *NTPSA I*, 773 F. Supp. 3d at 850). "Indeed, the TPS statute itself implicitly recognizes the importance of such reliance interests because it ... builds in some delay before termination of TPS becomes effective: termination does not take effect until the later of 60 days from the date of notice or the expiration of the most recent previous extension." *Id.* (quoting *NTPSA I*, 773 F. Supp. 3d at 850 (citing § 1254a(b)(3)(B)). Congressional concern with reliance interests is also reflected in § 1254a(b)(3)(C), pursuant to which a TPS designation is automatically extended should the Secretary fail to make the determination required by § 1254a(b)(3)(A). To protect the reliance interests created by a TPS designation, Congress has denied the Secretary discretion in how she conducts the periodic review and instead required her to engage in a good-

faith, fact-based review using only the statutorily specified criteria to make her determination.

That § 1252(a)(2)(B)(ii) does not preclude adjudication of Plaintiffs' procedural claims is evidenced by how it differs from another provision in § 1252(a)(2), namely, § 1252(a)(2)(A)(iv). That provision, unlike § 1252(a)(2)(B)(ii), explicitly deprives courts of "jurisdiction to review ... ***procedures and policies*** adopted by the Attorney General to implement the provisions of section 1225(b)(1) of this title." 8 U.S.C. § 1252(a)(2)(A)(iv) (emphasis added). The two provisions were adopted at the same time as parts of the same legislation. *See* Pub. L. 104-208, Div. C, § 306, 110 Stat. 3009.[3] "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Nken v. Holder*, 556 U.S. 418, 430 (quoting *INS v. Cardoza–Fonseca*, 480 U.S. 421, 432 (1987)); *accord, e.g.*, *Kucana*, 558 U.S. at 249. "Because Congress explicitly stripped jurisdiction to review agency policy policies and procedures in § 1252(a)(2)(A)(iv) but not in § 1252(a)(2)(B)(i)," courts should "presume that Congress did not intend for the latter provision to preclude review of agency policies and procedures." *Nakka v. USCIS*, 111 F.4th 995, 1005–06 (9th Cir. 2024).

That presumption is particularly strong in this case. When Congress enacted § 1252(a)(2)(B)(ii), it "'was legislating against the backdrop of recent Supreme Court law,' namely, *McNary*." *Nakka*, 111 F.4th at 1005. As noted (*see supra* at 8–9), *McNary* held that a statutory provision declaring that "[t]here shall be no administrative or judicial review of a determination respecting an application for adjustment of status" (8 U.S.C. § 1160(e)) did not bar "general collateral challenges to unconstitutional practices and policies used by the agency in processing"

---

[3]    Congress subsequently amended 8 U.S.C. § 1252(a)(2)(B)(ii) to expressly state that it suspends operation of certain specified statutes. Pub. L. 109-13, Div. B, § 106, 119 Stat. 231.

such applications. 498 U.S. at 492. There is "a general 'presumption that Congress legislates against and preserves existing law and background understandings,' and a party arguing otherwise shoulders a 'heavy burden." *Lucas v. Am. Fed'n of Gov't Emps.*, 151 F.4th 370, 378 (D.C. Cir. 2025) (quoting *United States v. Long*, 997 F.3d 342, 356 (D.C. Cir. 2021); *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018)). The government cannot carry that burden here. Decided in 1991, years before Congress enacted § 1252(a)(2)(B)(ii), *McNary* "provided Congress with a 'blueprint for how [to] draft a jurisdiction-channeling statute that would cover not only individual challenges to agency decisions, but also broader challenges to agency policies and practices.'" *Nakka*, 111 F.4th at 1005 (quoting *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1034 (9th Cir. 2016)).

> But Congress did not follow the *McNary* blueprint when it drafted § 1252(a)(2)(B)(i). Nor did Congress follow the *McNary* blueprint when it amended § 1252(a)(2)(B) in 2005. Thus, Congress has clearly indicated that it did not intend § 1252(a)(2)(B)(i) to preclude district court jurisdiction over collateral policy and procedure claims.

*Id.* (citation omitted). That is equally true of § 1252(a)(2)(B)(ii), the simultaneously adopted and simultaneously amended provision on which the government relies here. *Cf.* Pub. L. 104-208, Div. C, § 306, 110 Stat. 3009; Pub. L. 109-13, Div. B, § 106, 119 Stat. 231. It does not deprive this Court of jurisdiction over Plaintiffs' collateral claims.

### 3.    8 U.S.C. § 1252(f)(1) does not preclude the relief that Plaintiffs seek.

Reprising an argument that it made in opposition to class certification (*cf.* ECF 68 at 7–15), the government argues that 8 U.S.C. § 1252(f)(1) prevents the Court from granting Plaintiffs the relief that they seek. ECF 80 at 14–15. The argument had no merit when first made by the government (*see* ECF 69 at 5–10) and it has no merit now.

Plaintiffs seek two forms of relief: a set-aside of the November 28 termination and a declaration that the termination rests on unconstitutional racial discrimination. ECF 90 at Prayer for Relief; ECF 74 at Prayer for Relief. Neither is barred by § 1252(f)(1), which provides that "no

court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation" of specified provisions of the INA. Even if the TPS statute—8 U.S.C. § 1254a—were one of those provisions (*but see* ECF 69 at 18–19), § 1252(f)(1) would not prevent this Court from setting aside the November 28 termination or declaring it unconstitutional because neither a set-aside nor a declaration would "enjoin or restrain" the operation of § 1254a.

Urging the contrary, the government relies—directly and indirectly—on *Garland v. Aleman Gonzalez*, 596 U.S. 543 (2022). ECF 68 at 7–12. But as Plaintiffs noted (ECF 69 at 7–8) and the government ignores, a clear majority of Supreme Court justices agree that *Aleman Gonzalez* "avoids a position on whether § 1252(f)(1) prevents a lower court from vacating or setting aside an agency action under the Administrative Procedure Act." *Biden v. Texas*, 597 U.S. 785, 839 (2022) (Barrett, Thomas, Alito, Gorsuch, JJ., dissenting); *accord Aleman Gonzalez*, 596 U.S. at 571 (Sotomayor, Kagan, Breyer, JJ., concurring in part and dissenting in part) (*Aleman Gonzalez* does "not purport to hold that § 1252(f)(1) affects courts' ability to 'hold unlawful and set aside agency action, findings, and conclusions' under the Administrative Procedure Act"); *cf. NTPSA I*, 773 F. Supp. 3d at 825 ("the Supreme Court has, to date, declined to address the issue of whether § 1252(f)(1) is a bar to a court issuing relief pursuant to the APA"); *HECA*, 789 F. Supp. 2d at 271 (same). In fact, "[n]o court has adopted the construction of § 1252(f)(1) advanced by the government." *HECA*, 789 F. Supp. 2d at 270 (quoting *NTPSA I*, 773 F. Supp. 3d at 826). To the contrary, "all courts that have addressed the issue have rejected the government's construction of the statute." *NTPSA I*, 773 F. Supp. 3d at 826 (collecting cases); *accord HECA*, 789 F. Supp. 3d at 270.

There is good reason why every court to have considered the question has rejected the government's contention that § 1252(f)(1) precludes a set-aside under 5 U.S.C. § 706. Contrary to

16

the government's assertion (ECF 68 at 8–9), a set-aside neither enjoins nor restrains the Secretary. There are "material differences" between an injunction and a set-aside under the APA. *HECA*, 789 F. Supp. 3d at 271 (quoting *Texas v. United States*, 40 F.4th 205, 219 (5th Cir. 2022), *overruled on other grounds*, *United States v. Texas*, 599 U.S. 670 (2023)); *accord NTPSA I*, 773 F. Supp. 3d at 827. A set-aside, unlike an injunction, "neither compels nor restrains further agency decision-making." *Texas v. United States*, 50 F.4th 498, 528–29 (5th Cir. 2022)). Because "[o]rders pursuant to 5 U.S.C. § 706(2) set aside unlawful agency actions without foreclosing future agency actions," such "orders are different in nature from injunctions, which prohibit an agency from taking a certain action at all, ever." *HECA*, 789 F. Supp. 3d at 271. Thus, an order setting aside the November 28 termination of Haiti's TPS designation would not prevent the government from lawfully terminating Haiti's TPS designation in the future.[4] It could still terminate Haiti's TPS designation if the Secretary, applying "lawful criteria" after consultation with the appropriate agencies, were to make a "good faith, fact- and evidence-based determination" (*Saget*, 375 F. Supp. 3d at 332) that Haiti "no longer continues to meet the conditions for designation." 8 U.S.C. § 1254a(b)(3)(B). In sum, a set-aside "does not dictate how the Secretary should ultimately rule on a TPS designation, termination, or extension." *NTPSA I*, 773 F. Supp. 3d at 832.

At bottom, the government argues that 8 U.S.C. § 1252(f)(1) bars relief under 5 U.S.C. § 706 because, in the government's view, a set-aside is the functional equivalent of an injunction. For the reasons discussed above, that is not so. In any event, "an injunction has a specific legal meaning, and the fact that a different procedural mechanism can achieve the same result as an injunction does not mean that the two should be deemed the same." *NTPSA I*, 773 F. Supp. 3d at

---

[4]    If the November 28 termination is set aside as unlawful, the existing designation would be automatically extended for six months, not by court order but by operation of statute. *Cf.* 8 U.S.C. § 1254a(b)(3)(C).

829 (citing *Nken*, 556 U.S. at 428–29).

For each of these reasons, 8 U.S.C. § 1252(f)(1) does not preclude a set-aside under 5 U.S.C. § 706.

Nor does it preclude declaratory relief. Emphasizing that § 1252(f)(1) "prohibits only injunctions," the D.C. Circuit has made clear that the provision "does not proscribe issuance of a declaratory judgment." *Make the Road*, 962 F.3d at 635 (citing *Nielsen v. Preap*, 586 U.S. 392 (2019)). Indeed, *Preap*, the case on which the court relied, rejected a jurisdictional challenge under § 1252(f)(1) precisely "because the District Court had jurisdiction to entertain the plaintiffs' request for declaratory relief" even if it lacked jurisdiction over their request for injunctive relief. 586 U.S. at 402. Thus, it is "apparent that the jurisdictional limitations in § 1252(f)(1) do not encompass declaratory relief." *Alli v. Decker*, 650 F.3d 1007, 1013 (3d Cir. 2011).

That is because declaratory judgments are in fact different from injunctions. Although "declaratory relief can sometimes have much the same practical effect as injunctive relief, it differs legally and materially." *Brito v. Garland*, 22 F.4th 240, 251 (1st Cir. 2021). "A declaratory judgment is a milder remedy' than an injunction" because "it 'does not, in itself, coerce any party or enjoin any future action.'" *Id.* (quoting *Ulstein Mar., Ltd. v. United States*, 833 F.2d 1052, 1055 (1st Cir. 1987)). Indeed, in passing the Declaratory Judgment Act, "Congress plainly intended declaratory relief to act as an alternative to the strong medicine of the injunction." *Steffel v. Thompson*, 415 U.S. 452, 266 (1974). And because it "is nothing more or less than a limit on injunctive relief," § 1252(f)(1) does not preclude declaratory judgments. *Reno*, 525 U.S. at 481.

## II.    Plaintiffs have stated a claim.

Contrary to the government's assertions (*cf.* ECF 80 at 15–33), Plaintiffs have stated statutory and constitutional claims for relief.

18

### A.    Plaintiffs have stated an APA claim.

Plaintiffs have adequately alleged an APA claim. Indeed, Plaintiffs have adequately alleged multiple grounds for relief under 5 U.S.C. § 706(2). The government's arguments to the contrary do not withstand scrutiny.[5]

### 1.    5 U.S.C. § 701(a) does not bar review.

The government argues that, as a threshold matter, Plaintiffs "do not have a viable APA claim" because 5 U.S.C. §§ 701(a)(1) and 701(a)(2) purportedly preclude review under the circumstances presented here. ECF 80 at 15 (capitalization altered). Not so.

Under § 701(a)(1), APA review is not available when "statutes preclude judicial review." Pointing to 8 U.S.C. §§ 1252(a)(2)(B)(ii), 1252(f)(1), and 1254a(b)(5)(A), the government claims that is the case here. ECF 80 at 15–16. But, as explained, those provisions do not preclude review of Plaintiffs' claims and thus do not preclude review under § 701(a)(1). *See supra* at 7–18.

The government's argument under § 701(a)(2) fares no better. Under that provision—which is to be "read 'quite narrowly'" (*Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 100 (2021) (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019))—APA review is unavailable when the relevant "agency action [is] committed to agency discretion by law." *Id*. at 99 (citation and quotation marks omitted). But, as explained above, the Secretary has no discretion in how to conduct the periodic review mandated by 8 U.S.C. § 1254a(b)(3)(A). To the contrary, she must engage in a good-faith, evidence-based review of country conditions in consultation with other relevant agencies and then base her ultimate determination regarding the continued existence of the statutory grounds for designation on that good-faith, evidence-based review. *See supra* at 13–

---

[5]    Regardless whether an APA claim can be maintained against the President (*cf.* ECF 80 at 24), Plaintiffs can assert an equal-protection claim against him.

14. Because the Secretary lacks discretion over the process that must be followed and the criteria that must be applied, § 701(a)(2) does not preclude judicial review of her departure from the statutorily mandated procedure.

Ignoring the mandatory nature of the congressionally prescribed periodic review process, the government focuses instead on the substantive determination that must be made through that process—namely, the determination whether the conditions for designation continue to be met. According to the government, § 701(a)(2) precludes review of the November 28 termination because it rests on the Secretary's underlying determinations that there are no "extraordinary and temporary conditions" in Haiti that prevent TPS holders from returning in safety and that, regardless of the existence of such conditions, it is not in the "national interest" to allow Haitian TPS holders to remain in the United States. ECF 80 at 17–18. Each of these determinations, say the government, are inherently discretionary and therefore immune to judicial review.

True or not, that is no answer to Plaintiffs' claims.[6] Plaintiffs challenge the process by which those determinations were made, not the determinations themselves. Narrowly construed, § 701(a)(2) is "restrict[ed] … to those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *New York*, 588 U.S. at 772 (cleaned up). Those rare circumstances do not exist here, where Congress has cabined the Secretary's discretion by prescribing the procedures that she must follow and specifying the criteria that she may consider.

The TPS statute, specifically § 1254a(b)(3)(A), establishes meaningful standards by which to judge whether the Secretary faithfully engaged in the congressionally mandated periodic review

---

[6]    And, because § 701(a)(2) applies only to claims brought under the APA, it certainly no answer to Plaintiffs' equal-protection claim. *Nat'l TPS All. v. Noem*, 798 F. Supp. 3d 1108, 1140 (N.D. Cal. 2025) (*NTPSA II*).

process. The Court can, for example, readily ascertain whether the Secretary engaged in meaningful "consultation with appropriate agencies" before making her determinations. 8 U.S.C. § 1254a(b)(3)(a). Similarly, the Court can discern whether the Secretary's determination that it is now possible for TPS holders to return to Haiti "in safety" (*id.* § 1254a(b)(1)(C)) is a "good faith, fact- and evidence-based determination" based on "lawful criteria" or is instead a pretextual conclusion intended to justify a predetermined outcome. *Saget*, 375 F. Supp. 3d at 332. The Court can likewise easily determine whether the Secretary considered all bases for designation set forth in § 1254a(b)(1) or, in derogation of her statutory duty, improperly limited her review to the basis set forth in § 1254a(b)(1)(C). And the Court can, through examination of direct and circumstantial evidence, assess whether the Secretary's determinations were motivated, at least in part, by impermissible racial animus. In judging these procedural questions, the Court would be guided by the standards set forth in § 1254a(b) and the Fifth Amendment's equal protection guarantee.

Because "Plaintiffs have brought legal challenges to the Secretary's action that are independent of the Secretary's" determinations with respect to country conditions and national interest (*NTPSA II*, 798 F. Supp. 3d at 1141), resolution of Plaintiffs' claims would not require the Court to "engage in policy choices and determinations that are best left to the political branches." ECF 80 at 17 (cleaned up). Thus, contrary to what the government argues, "§ 701(a)(2) is not a bar to judicial review of the claims asserted here." *NTPSA II*, 2798 F. Supp. 3d at 1133.

### 2. The termination is arbitrary and capricious.

Plaintiffs have adequately alleged that the termination is arbitrary and capricious. The government admits that agency action is arbitrary and capricious, and therefore unlawful under 5 U.S.C. § 706(2)(A), if the agency

> has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that

runs counter to the evidence before the agency, or is so implausible that it could not be
ascribed to a difference in view or the product of agency expertise.

ECF 80 at 20 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29, 43 (1983)). Agency action also is arbitrary and capricious when the agency "fail[s]
to follow its own well-established precedent without explanation." *Leggett & Platt, Inc. v. Nat'l
Lab. Rels. Bd.*, 988 F.3d 487, 494 (D.C. Cir. 2021) (quoting *Nat'l Treasury Emps. Union v. Fed.
Lab. Rels. Auth.*, 404 F.3d 454, 457 (D.C. Cir. 2005)). Plaintiffs have pleaded facts that, if true,
would show that the termination is arbitrary and capricious under each of these standards.

### a.    The termination was predetermined.

Plaintiffs allege that the decision to terminate Haiti's TPS designation was made long
before President Trump took office and thus well before Secretary Noem could "consult[] with
appropriate agencies of the Government" to determine whether the conditions for designation
continue to exist. 8 U.S.C. § 1254a(b)(3)(A). *See* ECF 90 ¶¶ 56–64, 128, 146, 164, 177, 204, 217,
226, 241, 247, 249–50, 280; ECF 74 ¶¶ 56–64, 124, 142, 160, 173, 200, 213, 222, 236–37; 267.
Plaintiffs have pleaded numerous facts from which the Court can reasonably conclude that the
termination was indeed preordained. For example, Plaintiffs allege that:

- President Trump had already attempted to unlawfully terminate Haiti's TPS
  designation during his first term in office (ECF 90 ¶¶ 249–58; ECF 74 ¶¶ 236–45);

- President Trump announced that if he were elected a second time there would be "large
  deportations in Springfield, Ohio," where, as he knew, many Haitian TPS holders
  reside (ECF 90 ¶ 59; ECF 74 ¶ 59);

- President Trump, three months before regaining office, declared that he "[a]bsolutely
  [would] revoke" Haiti's TPS designation if elected again (ECF 90 ¶ 60; ECF 74 ¶ 60);

- Secretary Noem stated in her confirmation hearing that the previous administration's
  purported "abuse[]" of TPS "will no longer be allowed" (ECF 90 ¶ 62; ECF 74 ¶ 62);

- Secretary Noem stated shortly after her confirmation that "[w]hen the President gives
  a directive, the Department of Homeland Security will follow it" (ECF 90 ¶ 62; ECF

74 ¶ 62);

- Secretary Noem attempted to unlawfully vacate Haiti's TPS designation on February 24, barely a month after assuming office (ECF 90 ¶¶ 118–31; ECF 74 ¶¶ 114–27);

- Secretary Noem attempted to unlawfully terminate Haiti's TPS designation on July 1, the same day that her attempted vacatur was held unlawful (ECF 90 ¶¶ 132–82; ECF 74 ¶¶ 128–78);

- Secretary Noem's November 28 termination notice rests on pretextual and other impermissible bases (ECF 90 ¶¶ 184–239; ECF 74 ¶¶ 174–239); and,

- Secretary Noem has terminated every TPS designation that she has reviewed despite the disparate conditions in the respective countries (ECF 90 ¶¶ 240–41).

These and other facts alleged in the complaint are sufficient to support a finding that the decision to terminate Haiti's TPS designation was, like President Trump's first attempted termination of Haiti's TPS designation, a "preordained" outcome rather than the result of a good-faith, fact-based, country-specific review as required by 8 U.S.C. § 1254a(b)(3)(A). *Saget*, 375 F. Supp. 3d at 346.

The government says nothing to disturb that conclusion. It does not deny that President Trump did and said what Plaintiffs allege. Nor does it deny that Secretary Noem did and said what Plaintiffs allege. And it does not dispute that the facts Plaintiffs allege are sufficient to show that the decision to terminate Haiti's TPS designation was predetermined rather than the result of a "periodic review in accordance with the dictates of the statute." *Saget*, 375 F. Supp. 3d at 346.

Still, the government argues that Plaintiffs' well-pleaded allegations are of no moment because "[t]he 'actual subjective motivation of agency decisionmakers is immaterial as a matter of law—unless there is a showing of bad faith or improper behavior.'" ECF 80 at 22 (quoting *Dallas Safari Club v. Bernhardt*, 518 F. Supp. 3d 535, 542–43 (D.D.C. 2021)). There are at least two problems with that argument. First, Plaintiffs need not show ***why*** the Secretary reached a preordained result; they need only show ***that*** she reached a preordained result. Thus, Plaintiffs' claim that the termination of Haiti's TPS designation was preordained does not depend on either

the President or the Secretary's subjective motivations. Second, Plaintiffs have in any event made

an adequate showing of bad faith—through well-pleaded allegations of procedural irregularities

and racial animus. *See* ECF 90 ¶¶ 183–248; ECF 74 ¶¶ 179–235; *see also infra* at 21–28, 31–40.

### b. The termination relies on unexplained departures from past practice.

The termination notice and the administrative record evidence at least four unexplained

departures from past practice: the Secretary's reliance on national interest; her reliance on the

supposedly temporary nature of a TPS designation; her reliance on purported criminality; and her

failure to meaningfully consult with the State Department. ECF 90 ¶¶ 188–90, 221, 247; AR 409;

ECF 74 ¶¶ 184–86, 217; *cf. Saget*, 375 F. Supp. 3d at 300, 352. These "unexplained departure[s]

from precedent [are] arbitrary and capricious" and the termination must therefore be set aside.

*ABM Onsite Servs.-W., Inc.v. NLRB*, 849 F.3d 1137, 1142 (D.C. Cir. 2017).[7]

The government's only response is to argue that the Secretary's reliance on national interest

as the principal basis for termination is not arbitrary and capricious because, says the government,

§ 1254a(b)(3)(A) "permits termination of TPS based on national interests." ECF 80 at 23. Yet even

if that were accurate (*but see infra* at 27–28), it does not dispose of Plaintiffs' claim. The fact that

a statute permits a challenged action would defeat a claim that the action was taken "in excess of

statutory authority." 5 U.S.C. § 706(2)(C). It does not defeat a claim that the action is "arbitrary

[and] capricious" insofar as it reflects an unexplained departure from past practice. *Id.* § 706(2)(A).

### c. The explanation for the termination is implausible and contrary to the evidence.

---

[7]    Because the allegation of inadequate consultation is based on material in the administrative record that was produced only after Plaintiffs had already filed their first amended complaint, it is not included in that complaint, which is the pleading targeted by the government's motion. The allegation is in Plaintiffs' second amended complaint. ECF 90 ¶ 247. Plaintiffs do not object to the government timely filing a short supplemental brief specifically addressing the new allegation.

Although it admits that an administrative action is unlawful if an agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," the government claims that the Court may not consider Plaintiffs' arbitrary-and-capricious claim because, says the government, it would require the Court "to reweigh the evidence" that was before the Secretary. ECF 80 at 20–21. But the government's expansive conception of what it means to reweigh evidence proves far too much. Were it correct, courts could never review agency action under the "arbitrary [or] capricious" standard. 5 U.S.C. § 706(2)(A). In any event, several bases for finding the termination of Haiti's TPS designation arbitrary and capricious require no "reweighing" regardless how one defines the term. The Court need only compare the Secretary's justifications to facts acknowledged in the termination notice; analyze the internal consistency of the Secretary's stated rationale; and examine the agency's past practices.

### i.    The Secretary's determination that it is safe to return to Haiti is implausible and contrary to the evidence.

Secretary Noem's conclusion that "there are no extraordinary and temporary conditions in Haiti that prevent Haitian nationals … from returning in safety" (90 Fed. Reg. at 54735) is not merely implausible—it is preposterous. It is contrary to information in the termination notice, which, for example, recognizes that "12% of Haiti's population … have been forced to flee their homes and are internally displaced due to escalating violence" that "has engulfed Port-au-Prince and spreads beyond." 90 Fed. Reg. at 54735 (cleaned up); *see also* ECF 81 at 28–29. It is inconsistent with the views of the State Department, which warns—with respect to both Port-au-Prince and "all other parts of Haiti" (ECF 81-1 ¶ 20)—that people should "not travel to Haiti due to kidnapping, crime, terrorist activity, civil unrest, and limited health care." Travel Advisory:

25

Haiti, U.S. Dep't of State (July 15, 2025), https://bit.ly/48wRYs0. And it is contrary to every news report out of Haiti. ECF 81 at 29–30; ECF 90 nn. 1–5, 9–24; ECF 74 ¶¶ nn.1–5, 9–24.

### ii.    The Secretary's stated rationale does not support termination.

Two of the justifications for termination given by the Secretary are that Haiti's TPS designation induces migration to and promotes crime in the U.S. 90 Fed. Reg. at 54736–37. But neither justification supports termination. *See* ECF 81 at 31–33.

Her assertion that Haiti's TPS designation acts as a "pull factor" rests on an objective error—the conflation of "U.S. Border Patrol data with U.S. Customs and Border Protection … data." ECF 81-7 at ¶¶ 6–61). The Secretary was advised of the error in July, when Plaintiffs challenged the July 1 termination notice, which rested on the same error. ECF 26 at 30 (citing ECF 26-7 at ¶¶ 4–7). Despite this, the November 28 termination repeats the error. The faulty data did not support the Secretary's determination in July, and they do not support her determination now.

Nor is termination supported by the Secretary's public-safety rationale. Although the termination notice cites anecdotal evidence that certain Haitians have committed crimes in the U.S., it is conspicuously silent as to the rate of criminality among Haitian TPS holders in particular. This is not surprising: By statute, individuals who commit the types of crimes described in the termination notice are not eligible for TPS. *See* 8 U.S.C. § 1254a(c)(2)(B), (3)(A); *id.* § 1182(a)(2)–(3); *see also* ECF 81 at 32–33; *Saget*, 375 F. Supp. 3d at 300.

### iii.    The Secretary's stated rationale is internally contradictory.

The third justification for termination given by the Secretary is that termination is necessary to harmonize U.S. immigration policy with U.S. foreign policy—specifically, U.S. support for the as-of-yet non-existent Gang Suppression Force that supposedly will arrive in Haiti next year. 90 Fed. Reg. at 54738; 81-1 ¶ 21, 30–32. But that explanation is internally contradictory. The very

reason for the Gang Suppression Force is that Haiti is consumed by political instability, rampant violence, and widespread human-rights abuse. Those "extraordinary and temporary conditions," which "prevent" Haitians "from returning … in safety" are precisely the conditions upon which Haiti's TPS designation are based. 8 U.S.C. § 1254a(b)(1)(C). There is therefore no contradiction between supporting the Gang Suppression Force and extending Haiti's TPS designation. ECF 81 at 33–34.

### 3.    The termination was effected without observance of procedure required by law.

When terminating Haiti's TPS designation, the Secretary failed to observe procedure required by law. Before terminating a TPS designation, the Secretary must "review the conditions in the [designated] foreign state" and "determine whether the conditions for such designation under this subsection," *i.e.*, § 1254a(b), "continue to be met." 8 U.S.C. § 1254a(b)(3)(A). The Secretary violated this mandated procedure in at least two ways—by failing to consider all grounds for designation under § 1254a(b)(1), and by basing the termination on national interest rather than conditions in Haiti. ECF 90 ¶ 248. Because U.S. national interest is not a "condition[] *in* the [designated] foreign state," it plays no role in the congressionally mandated periodic review process and is not a permissible basis on which to terminate a TPS designation. *Cf. supra* at 13–14 (explaining why Congress distinguished between an initial designation under § 1254a(b)(1) and the extension of designation under § 1254a(b)(3)(A)).[8] And because the Secretary must determine whether the conditions for designation "under this *subsection*" continue to be met, she must consider all possible bases for designation under § 1254a(b)(1). ECF 90 ¶ 248. Her reliance on

---

[8]    Plaintiffs' current complaint does not explicitly allege that the reliance on national interest is a departure from mandated procedure but they raised the argument in their motion for interim relief (ECF 81 at 25–26) and, absent prejudice to defendant, "a plaintiff is not bound by the legal theory on which he or she originally relied." *Hanson v. Hoffmann*, 628 F.2d 42, 53 n.11 (D.C. Cir. 1980).

national interest and failure to consider all bases for designation under § 1254a(b)(1) violates the statutorily prescribed period review process. *See* ECF 81 at 25–26.

### 4.    The termination is contrary to constitutional right and power.

The termination must be set aside under 5 U.S.C. § 706(2)(B) because it is contrary to both constitutional right and constitutional power.

### a.    The termination is contrary to constitutional right.

As explained in greater detail below, Plaintiffs have adequately alleged that the termination of Haiti's TPS designation was motivated, at least in part, by racial animus. *See infra* at 29–45; *see also* ECF 81 at 34–39. The termination must therefore be set aside as "contrary to constitutional right." 5 U.S.C. § 706(2)(B).

### b.    The termination is contrary to constitutional power.

The termination must also be set aside as "contrary to constitutional … power" (5 U.S.C. § 706(2)(B)) insofar as it rests on the Secretary's determination of "national interest."

A delegation of legislative power must satisfy the "intelligible principle" test, which requires Congress to "lay down by legislative act an intelligible principle to which the person or body authorized to" exercise discretion "is directed to conform." *J. W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 409 (1928). "Congress must set forth standards 'sufficiently definite and precise to enable Congress, the courts, and the public to ascertain' whether Congress's guidance has been followed." *Gundy v. United States*, 588 U.S. 128, 158 (2019). Only *after* "Congress ha[s] made all the relevant policy decisions" (*id. at* 163*)*, may an executive agency "determine specific facts" and "fill up the details under the general provisions made by the Legislature." *Panama Refin. Co. v. Ryan*, 293 U.S. 388, 426 (1935) (cleaned up). Because Congress failed establish any principle by which the Secretary is to ascertain the "national interest"

28

as used in § 125a(b)(1)(C)), a termination based on the "national interest" violates the non-delegation doctrine. *See* ECF 81 at 39–40.[9]

###### B. Plaintiffs have stated an equal-protection claim.

Notwithstanding the government's assertions (ECF 80 at 24–33), Plaintiffs have adequately alleged an equal-protection claim. *See* ECF 90 ¶¶ 282–84; ECF 74 ¶¶ 269–71.

###### 1. Everyone in the United States is entitled to equal protection.

Plaintiffs—who allege that the termination of Haiti's TPS designation was motivated, at least in part, by racial animus—are entitled to equal protection. Racial discrimination "is a denial of the due process of law guaranteed by the Fifth Amendment to the Constitution" (*Bolling v. Sharpe*, 347 U.S. 497, 500 (1954)), and "the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) (collecting cases); *accord, e.g.*, *Jacinto-Castanon de Nolasco v. U.S. Immigr. & Customs Enf't*, 319 F. Supp. 3d 491, 499 (D.D.C. 2018) ("Due process protects noncitizens who are on U.S. soil.").

###### 2. This case is governed by *Arlington Heights*.

The government argues (ECF 80 at 24–29) that if Plaintiffs' constitutional claim is reviewable at all, then it must be reviewed under the "deferential standard of review" applied in *Trump v. Hawaii*, 585 U.S. 678 (2018), rather than the more searching standard articulated in *Village of Arlington Heights v. Metropolitan Housing Development. Corp.*, 429 U.S. 252 (1977). The government is mistaken; this case is controlled by *Arlington Heights*.

Resisting application of *Arlington Heights*, the government—relying on *Hawaii,*

---

[9]    Because this legal theory does not appear on the face of their complaint, Plaintiffs do not oppose a short, timely supplemental brief on the point by the government.

*Kleindienst v. Mandel*, 408 U.S. 753 (1972), *Fiallo v. Bell*, 430 U.S. 787 (1977), and *Kerry v. Din*, 576 U.S. 86 (2015)—asserts that the termination of Haiti's TPS designation is subject only to "rational basis review." ECF 80 at 26 (quoting *Hawaii*, 585 U.S. at 704). It claims that the lower standard applies because "immigration decisions and policies are subject to deferential review." *Id.* at 24. But the government's reliance on *Hawaii* and the other cases is misplaced.

This case involves individuals with a statutorily bestowed immigration status who are already ***in the U.S***. *Hawaii*, *Mandel*, *Fiallo*, and *Din* did not; each of those cases involved individuals ***outside the U.S***. *See Hawaii*, 585 U.S. at 675 (plaintiffs "challenged the application of … entry restrictions to certain aliens abroad"); *Mandel*, 408 U.S. at 754 (plaintiffs challenged the "refus[al] to allow an alien scholar to enter the country"); *Fiallo*, 430 U.S. at 788–90 (plaintiffs challenged statute that "allowed the entry" of legitimate but not illegitimate children); *Din*, 576 U.S. at 88 (plaintiff sued "[w]hen the Government declined to issue an immigrant visa"). The distinction is critical. Although "a circumscribed inquiry applies to any constitutional claim ***concerning the entry*** of foreign nationals" (*Hawaii*, 585 U.S. at 705 n.5 (emphasis added)), it does not apply to claims brought by foreign nationals already here, because "the Due Process Clause applies to all 'persons' ***within the United States***, including aliens." *Zadvydas*, 533 U.S. at 693; *see also Mathews v. Diaz*, 426 U.S. 67, 77 (1976) ("Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional protection.").[10]

---

[10]    The government cites *Matthews* for the proposition that "the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government." ECF 80 at 25 (quoting 426 U.S. at 81). But *Matthews* is inapposite. First, the question is *Matthews* was whether it was permissible for Congress to provide "benefits to some aliens but not to others" based on their immigration status; it did not involve a racially discriminatory application of a facially neutral statute. Second, to say that regulation of immigration is committed to the political branches does not mean that the executive branch may implement a facially neutral immigration statute in a racially discriminatory way.

Thus, "[c]ontrary to the government's assertion, there is no general rule that federal immigration laws challenged for violating the Constitution should receive rational basis review." *United States v. Suquilanda*, 116 F.4th 129, 140 (2d Cir. 2024) (applying *Arlington Heights*). Indeed, even after *Hawaii*, the Supreme Court applied the *Arlington Heights* standard to a race-discrimination claim brought by undocumented immigrants challenging rescission of the Deferred Action for Childhood Arrivals program. *See DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 34 (2020) (plurality). It is therefore not surprising that "numerous lower courts have recognized" that the government's "expansive reading" of *Hawaii* is mistaken. *Washington v. DHS*, 598 F. Supp. 3d 1051, 1070 (E.D. Wash. 2020) (collecting cases).

Recognizing that TPS holders are entitled to equal protection because they are present in the U.S, every court that has considered a constitutional challenge to the termination of a TPS designation has applied *Arlington Heights*, not *Hawaii*. *See Dahlia Doe v. Noem* 11/18/25 Tr. at 28, ECF 87-1; *NTPSA II*, 798 F. Supp. 3d at 1132; *NTPSA I*, 773 F. Supp. 3d at 855–58; *Saget*, 375 F. Supp. 3d at 367–68; *Centro Presente,* 332 F. Supp 3d at 410–12; *NAACP v. DHS*, 364 F. Supp. 3d 568, 576 (D. Md. 2019). Even *Ramos v. Wolf*, 975 F.3d 872, 896 (9th Cir. 2020), the vacated decision on which the government otherwise relies (ECF 80 at 7–9), "reject[ed] the Government's contention that *Trump v. Hawaii*'s standard of review should apply" and reviewed the plaintiffs' equal-protection claim "under the *Arlington Heights* standard."

### 3.    Plaintiffs have adequately alleged that the termination is based on racial animus.

It is well settled that "facially neutral" government action can "be motivated by invidious racial discrimination." *N. Carolina State Conf. of NAACP v. McCrory*, 831 F.3d 204, 220 (4th Cir. 2016). "[S]uch laws" and policies "are just as abhorrent, and just as unconstitutional, as laws that expressly discriminate on the basis of race." *Id*. (citing *Arlington Heights*, 429 U.S. at 264–66

31

(1977); *Washington v. Davis*, 426 U.S. 229, 241 (1976)).

Recognizing this, the Supreme Court, in *Arlington Heights*, set out a framework for courts to follow when "considering whether discriminatory intent motivates a facially neutral law." *McCrory*, 831 F.3d at 220. Under *Arlington Heights*, a plaintiff need not show that a law or policy was "motived solely by" racial animus, nor even that racial animus "was the 'dominant' or 'primary'" motivation. 429 U.S. at 265. Rather, because "racial discrimination is not just another competing consideration" that government actors are permitted to consider when making decisions, "[w]hen there is proof that a discriminatory purpose has been a motivating factor in the decision … judicial deference" to the government's decision-making "is no longer justified." *Id*. at 264–65.

The *Arlington Heights* framework requires courts to conduct a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." 429 U.S. at 266. To guide this inquiry, the Court set forth a non-exhaustive list of factors for courts to consider, including "[t]he historical background of the [challenged] decision"; "[t]he specific sequence of events leading up to the challenged decision"; "[d]epartures from normal procedural sequence"; the legislative history of the decision; and the disproportionate "impact of the official action—whether it bears more heavily on one race than another." *Id*. at 266–67. A discriminatory purpose may "be inferred from the totality of the relevant facts." *Davis*, 426 U.S. at 242.

### 4. Plaintiffs plausibly allege an equal protection claim under *Arlington Heights*.

#### a. Public Statements by President Trump, Secretary Noem, and DHS evince racial bias.

Under the *Arlington Heights* framework*,* "statements of explicit bias" by government officials are "highly relevant" to the "contextual inquiry into whether discrimination was a motivating factor" behind facially neutral government action. Jessica A. Clarke, *Explicit Bias*, 113

NW. U. L. REV. 505, 558 (2018); *Arlington Heights,* 429 U.S. at 268 ("The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports."); *Washington v. Seattle School Dist. No. 1,* 458 U.S. 457, 471 (1982) (considering pre-enactment statements of law's sponsors); *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 197 (2003) ("[S]tatements made by decisionmakers or referendum sponsors during deliberation over a referendum may constitute relevant evidence of discriminatory intent in a challenge to an ultimately enacted initiative.").

The most obvious evidence that unlawful discriminatory animus played a motivating role in the decision to terminate Haiti's TPS designation is found in President Trump's, Secretary Noem's, and DHS's own statements about nonwhite immigrants, especially Haitians. To be sure, no government official has, to Plaintiffs' knowledge, ever explicitly said that "we are terminating Haiti's TPS designation because nonwhite immigrants are undesirable." But that is unsurprising; after all, "[o]utright admissions of impermissible racial motivation" by government officials "are infrequent." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999). It is also immaterial; the law recognizes that "[t]here are no talismanic expressions which must be invoked as a condition-precedent of the application of laws designed to protected against discrimination." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1083 (3d Cir. 1996). "[R]elevant for what they reveal," namely, "the intent of the speaker" (*id.*), "racially charged code words may provide evidence of discriminatory intent by sending a clear message and carrying the distinct tone of racial motivations and implications." *Smith v. Fairview Ridges Hosp.*, 625 F.3d 1076, 1085 (8th Cir. 2010); *see also, e.g., Aman,* 85 F.3d at 1083 (reasonable jury could conclude that statements referring to the African American plaintiff as a "drug dealer" "send a clear message and carry the distinct tone of racial motivations

and implications"); *Mhany Mgmt., Inc. v. Cty of Nassau*, 819 F.3d 581, 606–08 (2d Cir. 2016) (stated concerns about the changing "character" and "flavor" of a neighborhood, "though not overtly race-based," were nonetheless evidence of intentional discrimination because they were "directed at an influx of poor, minority residents"); *Gonzales v. Douglas*, 269 F. Supp. 3d 948, 967 (D. Ariz. 2017) (the terms "Raza," "un-American," "racial," "communist," "Aztlan," and "M.E.Ch.a" "operated as derogatory code words for Mexican Americans"). President Trump's, Secretary Noem's, and DHS's statements easily satisfy this standard.

### i.    President Trump's statements evince racial bias.

President Trump has, for years, disparaged nonwhite immigrants generally and Haitians in particular. President Trump has for years expressed the view that black immigrants from Haiti specifically and from other nonwhite countries generally are undesirable because they are from "shithole countries"—a statement he once denied but then admitted just weeks ago. ECF 90 ¶¶ 66, 108; ECF 74 ¶ 66–67. He thinks Haitians all "have AIDS"—a longstanding racist trope about Haitians dating back to the beginnings of the HIV/AIDS crisis in the 1980s.[11] ECF 90 ¶ 93; ECF 74 ¶ 93. He thinks that black immigrants from Africa are undesirable because, if admitted to the United States, they would then be reluctant to "go back to their huts." ECF 90 ¶ 66; ECF 74 ¶ 66. President Trump says that nonwhite immigrants are turning America into a "dumping ground." ECF 90 ¶ 101; ECF 74 ¶ 101. Echoing some of the oldest racist tropes of the past century, President Trump says that nonwhite immigrants are "poisoning the blood" of America. ECF 90 ¶ 85; ECF 74 ¶ 85. He says that nonwhite immigrants from Somalia are "garbage." ECF 90 ¶ 107; ECF 74 ¶ 106. And, in October 2024, President Trump famously falsely claimed that Haitian TPS holders in

---

[11]    Li Zhou, *America's long history of anti-Haitian racism, explained*, Vox (Sept. 15, 2024), https://bit.ly/4jdafOJ.

Springfield, Ohio were stealing, cooking, and eating citizens' pets—a longstanding bigoted trope against nonwhite immigrants. ECF 90, ¶¶ 87–92; ECF 74, ¶¶ 87–92.

President Trump's statements have been cited by multiple courts as relevant evidence of unlawful discriminatory animus under *Arlington Heights* in cases involving not only TPS but also other administration policies. As one court said in a TPS case, "[o]ne could hardly find more direct evidence of discriminatory intent" towards nonwhite immigrants than President Trump's own statements. *CASA*, 355 F. Supp. 3d at 325; *see also, e.g.*, *NTPSA I*, 773 F. Supp. 3d at 866; *NTPSA II*, 798 F. Supp. 3d at 1158; *Saget*, 375 F. Supp. 3d at 371; *Centro Presente,* 332 F. Supp 3d at 401, 415; *NAACP*, 364 F. Supp. 3d at 572, 577–78; *accord La Clinica de la Raza v. Trump*, 706 F. Supp. 3d 903, 933 (N.D. Cal. 2020); *Cook Cty v. Wolf*, 461 F. Supp. 3d 779, 784, 700 (N.D. Ill. 2020); *Washington*, 598 F. Supp. 3d at 1072; *Mayor and City Council of Baltimore v. Trump*, 416 F. Supp. 3d 452, 512–14 (D. Md. 2019); *State v. Dept. of Commerce*, 315 F. Supp. 3d 766, 809–10 (S.D.N.Y. 2018); *La Union del Pueblo Entero v. Ross*, 353 F. Supp. 3d 381, 395 (D. Md. 2018).

Critically, President Trump uses very different language when referring to immigrants from predominantly white countries. Rather than disparage them and cast them as undesirable, he praises them and casts them as desirable. For example, in the same breath in which he described nonwhite immigrants as undesirable people from "shithole countries," President Trump simultaneously expressed a desire for "nice people" from white countries like Norway, Sweden, and Denmark. ECF 90 ¶ 108. This contrast in language is itself evidence that President Trump's statements about nonwhite immigrants demonstrate his unlawful racial animus.[12]

---

[12]   To be clear, Plaintiffs are not *required* to show that President Trump treats white immigrants differently from nonwhite immigrants. The *Arlington Heights* framework

> dispenses with the need to plead that a similarly situated group was treated differently because discriminatory effects are either independently demonstrated or can readily be presumed. Once racially discriminatory intent infects the application of a neutral law or

ii.        Statements by Secretary Noem and DHS evince bias.

Secretary Noem herself has made similar disparaging remarks about nonwhite immigrants. For example, in December 2025 she described immigrants from 19 predominantly nonwhite countries subject to a travel ban as "as (among other things) "leeches," "entitlement junkies," and "foreign invaders" who "suck dry our hard-earned tax dollars," adding "WE DON'T WANT THEM. NOT ONE." ECF 74 ¶ 107; ECF 90 ¶ 110. She has also directly tied her invective against nonwhite immigrants to TPS. For example, she has: "described immigration as an 'invasion happening on purpose to remake the foundation of this country'"; stated at her confirmation hearing "that TPS 'has been abused and manipulated'"; stated, "[b]efore reviewing any country conditions," that "TPS 'will no longer be allowed extensions going forward the way that they are'"; described TPS as "'an immigration scheme that makes Americans less safe'"; and called TPS holders "'poorly vetted migrants' that included 'MS-13 gang members to known terrorists and murderers.'" *NTPSA II*, 798 F. Supp. 3d at 1034 (cleaned up); ECF 90 ¶ 111. These statements reflect Secretary Noem's personal animus against nonwhite immigrants.

> By stereotyping the TPS program and immigrants as invaders that are criminal, and by highlighting the need for migration management, Secretary Noem's statements perpetuate the discriminatory belief that certain immigrant populations will replace the white population. Although the Secretary's statements may appear innocent or only mildly offensive to one who is not a member of the targeted group, the statements are in reality intolerably abusive or threatening when understood from the perspective of a plaintiff who

---

policy, the group that is singled out for discriminatory treatment is no longer similarly situated to any other in the eyes of the law, so adverse effects can be presumed. In effect, the law recognizes that a government that sets out to discriminate intentionally in its enforcement of some neutral law or policy will rarely if ever fail to achieve its purpose.

*Doe v. Vill. of Mamaroneck*, 462 F. Supp. 2d 520, 543 (S.D.N.Y. 2006); *accord CASA*, 355 F. Supp. 3d at 322 n.7 (declining in a TPS case  to require evidence of similarly situated comparator groups under *Arlington Heights*). Plaintiffs present President Trump's contrasting language about white and nonwhite immigrants as "evidence of unlawful discriminatory intent" against nonwhite immigrants. *Ballou v. McElvain*, 29 F.4th 413, 424–25 (9th Cir. 2022) ("[A] relevant comparator is not an element of a disparate treatment claim…." (emphasis omitted).

is a member of the targeted group. Indeed, code words may demonstrate discriminatory intent.

*NTPSA II*, 798 F. Supp. 3d at 1034 (cleaned up).

DHS itself, under Secretary Noem's leadership, has also trafficked in racist tropes that the Secretary has not disavowed. Most notably, DHS has repeatedly invoked the concept of "remigration," a portmanteau of "reverse migration." For example, on November 28, 2025—the same day that the notice terminating Haiti's TPS designation was published—DHS posted online "The stakes have never been higher, and the goal has never been more clear: Remigration now." ECF 90 ¶ 113; ECF 74 ¶ 109. Although the term "remigration" may sound benign, it is often used as a racist dog-whistle for "creating greater ethnic homogeneity" and whiter countries via the forced deportation of nonwhite immigrants. ECF 90, ¶ 114; ECF 74, ¶ 110. On November 30, 2025 a journalist explained to Secretary Noem the racist meaning of the term "remigration" and asked "[h]ow, specifically, does the Trump administration define remigration?" In response, Secretary Noem did not disavow the racist use of the term. ECF 90 ¶ 116; ECF 74 ¶ 112.

### b.    Trump administration policies evince racial bias.

The Trump administration's other immigration policies confirm its preference for white—and only white—immigrants. These policies are show that the decision to terminate Haiti's TPS designation was motivated, at least in part, by a desire to rid America of nonwhite immigrants. *Cf. Arlington Heights*, 429 U.S. at 267 ("The historical background of the decision is one evidentiary source" for proving discriminatory intent, "particularly if it reveals a series of official actions taken for invidious purposes").

### i.    The administration has terminated nonwhite countries' TPS designations across the board.

Start with TPS itself. Since taking power in January 2025, Secretary Noem has terminated

every single TPS designation that has come across her desk for review: Venezuela, Haiti, Afghanistan, Cameroon, Nepal, Nicaragua, Honduras, Syria, South Sudan, Burma, and Ethiopia. ECF 90 ¶ 240. These countries were all designated for TPS based on different, country-specific conditions. ECF 90 ¶ 242. The ***only*** feature they all share is that each country is majority nonwhite. That every nonwhite country's TPS was terminated reflects a desire by the administration to expel nonwhite immigrants from America by stripping them of their legal status notwithstanding the statutory mandate to conduct a country-specific assessment of whether conditions in each country "prevent" its nationals from "returning … in safety." 8 U.S.C. § 1254a(b)(1)(C).

In at least one prior TPS case, the government has acknowledged—albeit implicitly—that the racial composition of a TPS population is relevant to an equal protection analysis. Specifically, in May 2025, the government pointed to the alleged "fact" that the "Secretary recently allowed for a six-month extension as to South Sudan" as evidence that "undermine[d]" the plaintiffs' claims "that the Secretary's actions" in partially vacating Haiti's TPS designation were "based on animus towards … nonwhite immigrants." Gov't Reply ISO Motion to Dismiss at 10 n.2, *Haitian Evangelical Clergy Ass'n v. Trump*, No. 25-cv-1464, ECF No. 47 (E.D.N.Y. May 6, 2025). Put another way, the government there argued that the extension of a nonwhite country's TPS designation (South Sudan's) was evidence that the vacatur of another nonwhite country's TPS designation (Haiti's) was not racially motivated.[13] This Court should not permit the government to have it both ways. The fact that Secreary Noem has terminated every TPS designation that has

---

[13]   The government's description of South Sudan's TPS designation was, at a minimum, misleading. The Secretary did not affirmatively extend South Sudan's designation. Rather, South Sudan received an "automatic six-month extension" of its TPS designation by operation of statute because "the record of country conditions and consultation from the Department of State for South Sudan was not able to be updated prior to" the statutory deadline. 90 Fed. Reg. 19217, 19217–18 (May 6, 2025); *cf.* 8 U.S.C. § 1254a(b)(3)(C). Following that statutory extension, Secretary Noem terminated South Sudan's TPS at the first possible opportunity. 90 Fed. Reg. 50484 (Nov. 6, 2025).

come up for review since she took office is evidence of her animus against nonwhite immigrants.

ii.        **The administration has given white South Africans—and only white South Africans—preferential treatment.**

Another policy reflecting the administration's animus against nonwhite immigrants is its treatment of white South Africans. During the same time that Secretary Noem was terminating TPS designations for nonwhite countries, she was simultaneously admitting white—and only white—immigrants from South Africa, giving them special priority to be admitted into the United States as refugees. ECF 90 ¶ 103; ECF 74 ¶ 103. Although the administration justified its decision on the basis that that white South Africans are "racially disfavored landowners," that is not true: they make up only seven percent of the South African population but own farmland that covers about half the country. ECF 90 ¶ 104; ECF 74 ¶ 104. To be clear: under the Trump administration, *only white South Africans* get special refugee status. Black and mixed-race South Africans do not. The special refugee program is intended only for white people, as at least one administration official has confirmed publicly. ECF 90 ¶ 105.

The Trump administration's preference only for white immigrants is not limited to South Africans. The administration is, at present, undertaking a "radical overhaul of the U.S. refugee system that would slash the program to its bare bones while giving preference" not only to white South Africans, but to "English speakers" and "Europeans who oppose migration." The net effect of these changes will be to "help mostly white people who say they are being persecuted while keeping the vast majority of other people out" of the United States. The rationale for the administration's overhaul of the refugee system is that "America's acceptance of refugees has made the country too diverse." ECF 90 ¶ 106; ECF 74 ¶ 105.

Put simply: The *only* immigrants the Trump administration appears willing to have in the United States through legal pathways are white immigrants.

*    *    *

For these reasons, Plaintiffs have plausibly alleged an equal protection claim under the *Arlington Heights* framework. *Davis*, 426 U.S. at 242 (a discriminatory purpose may "be inferred from the totality of the relevant facts").

### 5. The government's arguments to the contrary are without merit.

In its motion to dismiss, the government makes two arguments why, supposedly, the termination of Haiti's TPS designation was not motivated by racial animus. Neither has merit.

### a. Plaintiffs' claims are race-based, not nationality-based.

The government's lead argument is that "Plaintiffs' invocation of race and ethnicity discrimination is merely a backdoor attempt to raise a nationality claim." ECF 80 at 29. According to the government, because "Haiti's population is 95% black," by invoking race discrimination, Plaintiffs are necessarily invoking nationality discrimination which, the government says, is a basis on which it is free to discriminate without running afoul of the constitution. *Id*. at 29, 28.

The government misreads Plaintiffs' complaint. Plaintiffs allege that terminating Haiti's TPS designation was part of a broader campaign by the Trump administration to reduce nonwhite immigration while simultaneously increasing white immigration. *See* ECF 74 ¶¶ 65–113; ECF 90 ¶¶ 65–117. In support, Plaintiffs have identified statements by President Trump expressing his preference for "nice" immigrants from white countries and his disfavor for immigrants from nonwhite "shithole" countries like Haiti and Somalia. *See supra* at 34. Indeed, citing the administration's termination of TPS designations for nonwhite countries and contemporaneous granting of special status to white South Africans, Plaintiffs have alleged that the President's racial preferences have been made the official policy of the United States. *See supra* at 37–40. Plaintiffs have also identified statements by the President that play on well-established racist tropes—

40

including his claims that nonwhite immigrants are "poisoning the blood" of America; that nonwhite immigrants from Africa live in "huts"; that nonwhite Haitians all "have AIDS"; and that nonwhite immigrants are turning America into a "dumping ground." *See supra* at 34–35.

The fact that Plaintiffs are only one subset of the nonwhite immigrants President Trump, Secretary Noem, and DHS target with their invective and their discriminatory policies does not somehow mean that Plaintiffs' equal protection claim is really a nationality claim. Plaintiffs have plausibly alleged a race discrimination claim.

### b. President Trump's and Secretary Noem's statements are relevant.

The government spills considerable ink arguing that that President Trump's and Secretary Noem's statements are irrelevant to this Court's analysis of Plaintiffs' equal protection claim. *See* ECF 80 at 30–32. At a high level, the government seems to argue that neither President Trump's nor Secretary Noem's statements are relevant here unless they (a) were about Haiti's TPS designation, specifically; and (b) were made on or around November 2025, when Secretary Noem produced the latest termination notice for Haiti's TPS designation. But that is not the law. Again, "[t]here are no talismanic expressions which must be invoked as a condition-precedent of the application of laws designed to protected against discrimination." *Aman*, 85 F.3d at 1083.

*First*, the government argues that President Trump's statements are irrelevant because Secretary Noem—and not President Trump—is the decision-maker for purposes of TPS designations; so, the government argues, even if President Trump's statements reflect discriminatory animus, they cannot be imputed to Secretary Noem. ECF 80 at 31, 32 (arguing that "cat's paw" liability does not apply and that "President Trump's statements do not demonstrate animus by Secretary Noem"). The government makes a version of this argument in every TPS case. Courts routinely reject it. As one court put it: "there can be no doubt that if, as alleged, the

President influenced the decision to terminate [Haiti's] TPS, the discriminatory motivation cannot be laundered through the secretary." *CASA*, 355 F. Supp. 3d at 326; *accord NTPSA I*, 773 F. Supp. 3d at 862–63; *NTPSA II*, 798 F. Supp. 3d at 1157 ("[A]nimus can reasonably be inferred from the discriminatory statements made by Secretary Noem and/*or President Trump alone*" (emphasis added)); *Saget*, 345 F. Supp. 3d at 303 ("Plaintiffs are not required to show that Acting Secretary Duke personally harbored discriminatory animus."); *NAACP*, 364 F. Supp. 3d at 577 ("Defendants are incorrect" when they "claim that a lack of any statement by [the] Secretary is the crucial link missing from the chain of racial animus which warrants dismissal.").

In any event, the government ignores key allegations and indisputable facts concerning President Trump's personal involvement in TPS decisions. Plaintiffs allege that President Trump has personally inserted himself into the TPS decision-making process—so it is no answer for the government to argue, as it does, that President Trump's animus cannot be imputed to Secretary Noem. Plaintiffs allege that President Trump explicitly instructed Secretary Noem, via executive order, to reduce the number of immigrants present in the United States on TPS. ECF 90 ¶¶118–19; ECF 74 ¶¶ 114–115. Other courts in TPS cases have already held that this order from President Trump is sufficient to overcome an argument that he was cordoned off from the TPS decision-making process. *See, e.g.*, *Dahlia Doe v. Noem* 11/18/25 Tr. at 16:11-20, ECF 87-1; *accord NTPSA I*, 773 F. Supp. 3d. at 863 ("[T]here is evidence in this case that President Trump directly influenced TPS policy and/or decision-making at issue" including his executive orders). Indeed, Haiti's termination notice *itself* invokes President Trump's executive orders as a basis for the termination. 90 Fed. Reg. at 54736. Plaintiffs allege that at her confirmation hearing, when asked specifically about TPS designations, Secretary Noem testified that she would follow the President's "directive." ECF 90 ¶ 63; ECF 74 ¶ 63. Plaintiffs allege that DHS itself put out a press

release asserting that the terminations of TPS designations for "Afghanistan, Burma, Cameroon, Ethiopia, Haiti, Honduras, Nepal, Nicaragua, South Sudan, Syria, and Venezuela" were "delivered" not only by Secretary Noem but by "President Trump." ECF 90 ¶ 243. And President Trump has, personally, "as President of the United States …terminat[ed], effective immediately, the Temporary Protected Status (TPS Program) for Somalis in Minnesota."[14] These allegations and facts are more than enough to establish—particularly at the motion-to-dismiss stage—a nexus between President Trump himself and the termination of Haiti's TPS designation.[15]

*Second*, and relatedly, the government asserts that Plaintiffs do not "point to a single statement in which the Secretary" reflected animus against Haitians. ECF 80 at 31. Nonsense. Plaintiffs point to a social media post in which Secretary Noem described Haitians—and people from 18 other nonwhite countries as—"leeches," "entitlement junkies," and "foreign invaders" who "suck dry our hard-earned tax dollars," adding "WE DON'T WANT THEM. NOT ONE." ECF 90 ¶ 110; ECF 74 ¶ 107.[16] Secretary Noem's statement was plainly racially charged in this

---

[14] Donald J. Trump (@realDonaldTrump), Truth Social (Nov. 21, 2025) https://truthsocial.com/@realDonaldTrump/posts/115590786862216464. Plaintiffs acknowledge that a reference to this social media post is not in their operative complaint. But, as the government notes, this Court "may take judicial notice of publicly available information, including government resources found on the internet." ECF 80 at 30 n.9. Plaintiffs agree.

[15] President Trump's statements are also relevant because, according to the Supreme Court, the buck stops with him and not Secretary Noem. "Under our Constitution, the 'executive power'— all of it—is 'vested in a President.'" *Seila L. LLC v. CFPB*, 591 U.S. 197, 203 (2020) (quoting U.S. Const. art. II § § 1, 3). Put simply: Because all executive power is ultimately vested in the President under the "unitary executive" theory that the Court and the President have adopted, it is no answer for the government to suggest, as it does, that his statements are irrelevant to an indisputably executive policy.

[16] The government similarly asserts that "Plaintiffs take the Secretary's statements out of context and mischaracterize them." ECF 80 at 31. But the government never identifies *which* statements Plaintiffs supposedly take out of context, or *how* Plaintiffs take those statements out of context. "A litigant has an obligation to spell out its arguments squarely and distinctly;" therefore, "undeveloped arguments may be deemed waived." *Doe #1 v. Am. Fed. Of Gov. Empl*., 554 F. Supp.

context. *See, e.g., Hicks v. IBM*, 44 F. Supp. 2d 593, 598 (S.D.N.Y. 1999) (statement about "blacks on welfare" and "I'm tired of black people taking taxes" were "sufficient to give rise to an inference of discriminatory intent"). And, of course, Plaintiffs have identified numerous other statements by Secretary Noem that another Court has already held are sufficient evidence of racial animus and sufficiently tied to her TPS decisions. ECF 90 ¶ 111; *accord NTPSA I*, 773 F. Supp. 3d at 864 (even without President Trump's statements, "Plaintiffs have sufficiently alleged animus based on, inter alia, Secretary Noem's discriminatory statements").

*Third*, relying on *DHS v. Regents of the University of California*, 591 U.S. 1, 35 (2020), the government argues that President Trump's campaign statements about nonwhite immigrants or Haitians are too "remote in time" to "qualify as contemporary statements probative of the decision at issue." ECF 80 at 31 (cleaned up). That is wrong for at least two reasons. First, the government is wrong to assert—as it implicitly does—that the only Haiti-related TPS decision at issue here is the November 2025 termination. In fact, Plaintiffs allege the November 28, 2025 termination is the culmination of a multi-step plan to end Haiti's TPS designation that began with the February 2025 "partial vacatur." ECF 90 ¶¶ 274–277; ECF 74 ¶¶ 261–26. President Trump's campaign statements were made only a few months before the first step of this plan. ECF 90 ¶¶ 87–102; ECF 70 ¶¶ 87–102. They were, therefore, contemporaneous.

Moreover, *Regents* did not announce a bright-line rule that campaign statements are irrelevant. The Supreme Court there simply held that the campaign statements at issue *in that case* were too "remote in time" to control the equal protection analysis. 591 U.S. at 35. Indeed, courts since *Regents* have relied on President Trump's campaign statements as evidence of his intent

---

3d 75, 96 (D.D.C. 2021) (cleaned up). By failing to develop its argument that Plaintiffs have taken Secretary Noem's comments out of context, the government has waived this argument.

upon taking office—just as Plaintiffs allege here. *See, e.g.*, *Perkins Coie LLP v. Dept. of Justice*, 783 F. Supp. 3d 105, 162–64 (D.D.C. 2025) (Howell, J.); *Am. Ass'n of Univ. Professors v. Rubio*, --- F. Supp. 3d ---, 2025 WL 2777659, at *49 (D. Mass. Sept. 30, 2025).

*Fourth*, the government argues that statements which "postdate the termination decision" are irrelevant. ECF 80 at 31. Not so. Whatever their ultimate evidentiary value relative to pre-decision statements, post-decision statements are not irrelevant at the motion-to-dismiss stage. *See, e.g.*, *McCrory*, 831 F.3d at 229 n.7 (taking note of legislators' post-decision statements; noting that although those statements to not on their own establish discriminatory intent, nonetheless considering them "evidence of the racial … environment in which the General Assembly enacted the law" at issue); *Wheat v. Rogers & Willard, Inc*., 271 F. Supp. 3d 1327, 1334 n.15 (S.D. Ala. 2017) ("The automatic exclusion of post-decision statements from the realm of direct evidence … would prevent even a decisionmaker's *post hoc* explicit admission that her … decision had been based on a protected characteristic from being deemed direct evidence.").

*Fifth*, the government asserts that President Trump's statements are not evidence of discriminatory animus because "a president maintains broad powers to speak on matters of public concern." ECF 80 at 32 (citation and quotation marks omitted). The government's lone authority for this proposition is *Trump v. United States*, 603 U.S. 593 (2024)—a case about whether a president is immune from criminal prosecution. That case has nothing to do with this case and certainly has no bearing on whether a president's statements can be evidence of discriminatory intent. A President can speak freely. But if evinces racial animus when doing so, his words can be cited as evidence of that animus.

## CONCLUSION

The motion to dismiss should be denied.

Dated: December 24, 2025

Respectfully submitted,

/s/ Andrew E. Tauber
Andrew E. Tauber

/s/ Geoffrey M. Pipoly
Geoffrey M. Pipoly

Ira J. Kurzban
Kevin Gregg
KURZBAN, KURZBAN, TETZELI & PRATT, P.A.
131 Madeira Ave.
Coral Gables, FL 33134
Phone: (305) 444-0060
ira@kktplaw.com
kgregg@kktplaw.com

Sejal Zota
JUST FUTURES LAW
1629 K Street N.W., Suite 300
Washington, DC 20006
Phone: (617) 812-2822
sejal@justfutureslaw.org

Raymond Audain
GISKAN SOLOTAROFF & ANDERSON LLP
1 Rockefeller Plaza, 8th Floor
New York, NY 10020
Phone: (646) 290-6249
raudain@gslawny.com

Matthew Stanford
BRYAN CAVE LEIGHTON PAISNER, LLP
2 N. Central Ave., Ste. 2100
Phoenix, AZ 85004
Phone: (602) 364-7000
matt.stanford@bclplaw.com

Andrew Tauber (D.C Bar No. 495980)
BRYAN CAVE LEIGHTON PAISNER, LLP
1155 F. Street NW, Ste. 700
Washington, D.C. 20004
Phone: (202)-508-6200
andrew.tauber@bclplaw.com

Geoffrey M. Pipoly
Alexa Thein
Madisen Hursey
BRYAN CAVE LEIGHTON PAISNER, LLP
161 N. Clark Street, Ste. 4300
Chicago, IL 60601
Phone: (312) 602-5000
geoff.pipoly@bclplaw.com
alexa.thein@bclplaw.com
madisen.hursey@bclplaw.com

Daniel Paul Mach
BRYAN CAVE LEIGHTON PAISNER, LLP
1290 Avenue of the Americas
New York, NY 10104
Phone: (212) 541-1146
daniel.mach@bclplaw.com

*Attorneys for Plaintiffs*

46

**CERTIFICATE OF SERVICE**

I hereby certify that today, December 24, 2025, the foregoing document was filed with the Court's electronic filing system.

<u>*/s/ Andrew E. Tauber*</u>
Andrew E. Tauber

*Counsel for Plaintiffs*