## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **FRITZ EMMANUEL LESLY MIOT; RUDOLPH CIVIL; MARLENE GAIL NOBLE; MARICA MERLINE LAGUERRE; and VILBRUN DORSAINVIL,** | Case No. 1:25-cv-02471 |
| *Plaintiffs*, | |
| v. | **ORAL ARGUMENT REQUESTED** |
| **DONALD J. TRUMP, President of the United States of America; UNITED STATES OF AMERICA; THE DEPARTMENT OF HOMELAND SECURITY; and KRISTI NOEM, Secretary of Homeland Security,** | |
| *Defendants*. | |

## PLAINTIFFS' REPLY IN SUPPORT OF RENEWED MOTION
## FOR A STAY UNDER 5 U.S.C. § 705

## TABLE OF CONTENTS

ARGUMENT ....................................................................................................................1

I.    Plaintiffs are likely to succeed on the merits. ...............................................1

    A.    The Court has the authority to stay the termination. ...............................1

        1.    8 U.S.C. § 1252(f)(1) does not apply. ........................................1

        2.    8 U.S.C. § 1252(f)(1) does not preclude stays under 5 U.S.C. § 705..........4

    B.    The termination is arbitrary and capricious. ..........................................7

        1.    The termination was predetermined. ...........................................7

        2.    The termination relies on an unexplained departure from past practice....10

        3.    The explanation for the termination is implausible and contrary to the evidence. ..................................................................................12

    C.    The Secretary did not observe procedure required by law. ...................15

    D.    The termination is contrary to constitutional right and power. ............18

        1.    The termination is contrary to constitutional right. ...................18

        2.    The termination is contrary to constitutional power................................20

II.    Plaintiffs will suffer irreparable harm absent a stay. .......................................22

III.    Postponing the termination is in the public interest. ........................................24

IV.    A stay under § 705 applies to all Haitian TPS holders. ....................................25

CONCLUSION .............................................................................................................25

CERTIFICATE OF SERVICE.......................................................................................27

i

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*ABM Onsite Servs.-W., Inc.v. NLRB*,
849 F.3d 1137 (D.C. Cir. 2017)...................................................................10

*Berwind-White Coal-Min. Co. v. United States*,
9 F.2d 429 (E.D. Pa. 1925)..........................................................................6

*Biden v. Texas*,
597 U.S. 785 (2022) ............................................................................4, 9, 25

*Borochov v. Islamic Republic of Iran*,
94 F.4th 1053 (D.C. Cir. 2024)....................................................................3

*Chamber of Commerce of U.S. v. SEC*,
412 F.3d 133 (D.C. Cir. 2005)....................................................................13

*Chao v. Day*,
436 F.3d 234 (D.C. Cir. 2006)......................................................................3

*Columbia Broad. Sys. v. United States*,
316 U.S. 407 (1942) .....................................................................................7

*Dastmalchi v. INS*,
660 F.2d 880 (3d Cir. 1981) ........................................................................23

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ................................................................................8, 10

*Doe v. District of Columbia*,
706 F. Supp. 2d 128 (D.D.C. 2010)............................................................20

*Doe v. Noem*,
2025 WL 1161386 (W.D. Va. 2025) ...........................................................23

*Doe v. Noem*,
778 F. Supp. 3d 1151 (W.D. Wash. 2025) ..................................................23

*FDA v. Wages & White Lion Investors*,
604 U.S. 542 (2025) ..............................................................................11, 12

*Garland v. Aleman Gonzalez*,
596 U.S. 543 (2022) ................................................................................4, 5

*J.W. Hampton, Jr. & Co. v. United States,*
276 U.S. 394 (1928) ...........................................................................................21

*Khalil v. Joyce,*
780 F. Supp. 3d 476 (D.N.J. 2025)....................................................................24

*Make the Road New York v Noem,*
2025 WL 3563313 (D.C. Cir. 2025)...............................................................4, 5, 6

*Marcello v. Bonds,*
349 U.S. 302 (1955) .....................................................................................1, 2, 3

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) ...........................................................................12, 13, 14, 15

*N. Am.'s Bldg. Trades Unions v. Dep't of Def.,*
783 F. Supp. 3d 290 (D.D.C. 2025)....................................................................19

*Nat'l Broad. Co. v. United States,*
44 F. Supp. 688 (S.D.N.Y.) ..................................................................................7

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,*
145 F.3d 1399 (D.C. Cir. 1998)..........................................................................25

*Nat'l TPS All. v. Noem,*
798 F. Supp. 3d 1008 (N.D. Cal. 2025)..............................................................23

*Nat'l TPS All. v. Noem,*
No. 3:25-cv-05687 (N.D. Cal. Dec. 31, 2025) ..............................................4, 8, 24

*Nken v. Holder,*
556 U.S. 418 (2009) .......................................................................................5, 23

*Palestine Info. Off. v. Shultz,*
853 F.2d 932 (D.C. Cir. 1988).............................................................................21

*Patten v. United States,*
116 F.3d 1029 (4th Cir. 1997) ...............................................................................3

*Perkins Coie LLP v. U.S. Dep't of Just.,*
783 F. Supp. 3d 105 (D.D.C. 2025).................................................................21, 24

*Roe v. Noem,*
2025 WL 1382930 (D. Mont. 2025) ....................................................................23

*Saget v. Trump,*
375 F. Supp. 3d 280 (E.D.N.Y. 2019) ...........................................................*passim*

*In re Salazar-Regino*,
   23 I&N Dec. 223 (BIA 2002) ...................................................................24

*Sampson v. Murray*,
   415 U.S. 61 (1974) ...................................................................................6

*Sanchez v. Mayorkas*,
   593 U.S. 409 (2021) ...............................................................................20

*Scripps-Howard Radio v. F.C.C.*,
   316 U.S. 4 (1942) .....................................................................................5

*Shaughnessy v. Pedreiro*,
   349 U.S. 48 (1955) ...............................................................................2, 3

*Stand Up for California! v. U.S. Dep't of the Interior*,
   919 F. Supp. 2d 51 (D.D.C. 2013) ..........................................................13

*Student 1 v. Noem*,
   2025 WL 1431186 (D.N.J. 2025) ............................................................23

*U.S. Inst. of Peace v. Jackson*,
   783 F. Supp. 3d 316 (D.D.C. 2025) .........................................................24

*United States v. Balt. & O. R.R.*,
   293 U.S. 454 (1935) ............................................................................6, 25

*Wojciechowicz v. Garland*,
   77 F.4th 511 (7th Cir. 2023) ...................................................................23

*Wong Yang Sung v. McGarth*,
   339 U.S. 33 (1950) ...............................................................................1, 2

*Zhu v. Gonzales*,
   411 F.3d 292 (D.C. Cir. 2005) ................................................................21

**Constitutions**

U.S. Const., art. I .............................................................................21, 25

U.S. Const. amend. V ..............................................................................21

**Statutes**

5 U.S.C. § 559 ......................................................................................1, 3

5 U.S.C. § 705 ..................................................................................*passim*

5 U.S.C. § 706 ............................................................................................................. 3

5 U.S.C. § 706(2)(A) .................................................................................................. 12

5 U.S.C. § 706(2)(B) ................................................................................... 18, 20, 22

5 U.S.C. § 706(2)(D) .................................................................................................. 15

8 U.S.C. § 1101(a)(13)(A) ................................................................................... 19, 20

8 U.S.C. § 1252(f)(1) ........................................................................................ *passim*

8 U.S.C. § 1254a ......................................................................................................... 22

8 U.S.C. § 1254a(b) .............................................................................................. 15, 16

8 U.S.C. § 1254a(b)(1) ..................................................................................... 15, 16, 17

8 U.S.C. § 1254a(b)(1)(A) ......................................................................................... 16

8 U.S.C. § 1254a(b)(1)(C) ............................................................................. 16, 21, 22

8 U.S.C. § 1254a(b)(3) ............................................................................................ 9, 22

8 U.S.C. § 1254a(b)(3)(A) ................................................................................ *passim*

8 U.S.C. § 1254a(b)(3)(C) ........................................................................................ 23

8 U.S.C. § 1254a(c)(1)(A)(iv) .................................................................................. 16

16 U.S.C. § 1855(f)(1)(A) ........................................................................................... 6

1952 Immigration Act ......................................................................................... 1, 2, 3

Magnuson-Stevens Act ............................................................................................... 6

Supplemental Appropriation Act of 1951 ............................................................... 1

**Rules**

Fed. R. Civ. P. 65 ......................................................................................................... 6

**Regulations**

75 Fed. Reg. 3476 (Jan. 21, 2010) ........................................................................... 17

88 Fed. Reg. 5022 (Jan. 26, 2023) ........................................................................... 17

89 Fed. Reg. 54484 (July 1, 2024) ........................................................................... 17

90 Fed. Reg. 8443 (Jan. 29, 2025) .................................................................................. 19

90 Fed. Reg. 54735 (Nov. 28, 2025) ............................................................................. 13

Executive Order 14159 .................................................................................................. 19

**Other Authorities**

*Injunction*, Black's Law Dictionary (6th ed. 1990) ......................................................... 6

Mila Sohoni, *The Power to Vacate a Rule*,
    88 Geo. Wash. L. Rev. 1121 (Sept. 2020) .......................................................... 7

U.S. Dep't of State, Travel Advisory: Haiti, (July 15, 2025),
    https://bit.ly/48wRYs0) .................................................................................... 14

The government's arguments in opposition to Plaintiffs' motion for a stay under 5 U.S.C. § 705 do not undermine Plaintiffs' entitlement to interim relief.

## ARGUMENT

### I.  Plaintiffs are likely to succeed on the merits.

#### A.  The Court has the authority to stay the termination.

The government argues that 8 U.S.C. § 1252(f)(1)—which denies lower courts "authority to enjoin or restrain the operation" of certain provisions of the INA—precludes relief under 5 U.S.C. § 705. ECF 92 at 3–11. But § 1252(f)(1) does not apply and would not preclude a stay under § 705 even if it did apply. *Cf.* ECF 93 at 3–6, 15–18; ECF 69 at 4.

##### 1.  8 U.S.C. § 1252(f)(1) does not apply.

As previously noted (ECF 93 at 3–6; ECF 69 at 4), § 1252(f)(1) does not apply because it is silent as to the APA and a "[s]ubsequent statute may not be held to supersede or modify … chapter 7" of the APA "except to the extent that it does so *expressly*." 5 U.S.C. § 559 (emphasis added). Fighting this conclusion, the government argues that "[t]he Supreme Court has explicitly rejected Plaintiffs' theory" in *Marcello v. Bonds*, 349 U.S. 302 (1955). The government overreads *Marcello*.

Decided in a specific and possibly unique context, *Marcello* does not speak to the situation here. The question in *Marcello* was whether deportation hearings were governed by the general hearing procedures established by the APA or by the specific hearing procedures established by the Immigration Act of 1952. The backdrop to *Marcello* was a case that the Supreme Court had decided five years earlier, *Wong Yang Sung v. McGarth*, 339 U.S. 33 (1950). In it, the Court held that the APA governed deportation proceedings. 339 U.S. at 51. "Six months later," in response to *Wong Yang Sung*, Congress adopted a provision in the Supplemental Appropriation Act of 1951 declaring that "proceedings directed toward the exclusion or expulsion of aliens should not be

1

governed by … the Administrative Procedure Act." *Marcello*, 349 U.S. at 306. The question whether deportation hearings were governed by the APA or the Immigration Act arose anew in *Marcello* because when Congress amended the Immigration Act in 1952 it prescribed detailed hearing procedures that were modeled on but nevertheless different from the generally applicable procedures set forth in the APA, which the 1952 act did not expressly displace. Thus, as framed by the Court, the issue presented was "whether the Congress reversed itself in the 1952 Immigration Act and in effect reinstated the *Sung* case by making the hearing provisions of the Administrative Procedure Act directly applicable to deportation proceedings." *Id.* at 306–07.

In deciding the issue, the Court leaned heavily on the legislative history of the 1952 Immigration Act—including the Senate report accompanying the final bill, which explained that the 1951 exemption from the APA was "no longer necessary" because the 1952 act created "special procedures for deportation proceedings" that were "made exclusive." *Marcello*, 349 U.S. at 309–10 (cleaned up). The Court recognized that "[e]xemptions from the terms of the Administrative Procedure Act are not lightly to be presumed" given the requirement "that modifications must be express." *Id.* at 310 (citing *Shaughnessy v. Pedreiro*, 349 U.S. 48 (1955)). "But," said the Court,

> we cannot ignore the background of the 1952 immigration legislation, its laborious adaptation of the Administrative Procedure Act to the deportation process, the specific points at which deviations from the Administrative Procedure Act were made, the recognition in the legislative history of this adaptive technique and of the particular deviations, and the direction in the statute that the methods therein prescribed shall be the sole and exclusive procedure for deportation proceeding.

*Id.* It was this distinctive legislative history that led the Court to hold that the hearing procedures established by the 1952 Immigration Act displaced those of the APA.

The exceptional circumstances on which *Marcello* rests are not present here. Congress did not enact a precursor to § 1252(f)(1) expressly suspending operation of the APA, let alone do so in response to a Supreme Court decision applying the APA where Congress did not want it applied.

2

Nor does § 1252(f)(1) provide "detailed coverage of the same subject matter dealt with in" 5 U.S.C. §§ 705 and 706. *Marcello*, 349 U.S. at 308.

*Marcello*'s narrow scope is confirmed by *Shaughnessy*, which was decided just weeks before *Marcello*. Like *Marcello*, *Shaughnessy* involved the interaction of the APA and the 1952 Immigration Act. But unlike *Marcello*, which involved hearing procedures, *Shaughnessy* addressed judicial review. Specifically, the question in *Shaughnessy* was whether deportation orders arising from the hearing procedures—orders that the Immigration Act declared to be "final"—were subject to APA review. Citing what is now codified at 5 U.S.C. § 559, the Court held that they were, emphasizing that the provision's very "purpose was to remove obstacles to judicial review of agency action under subsequently enacted statutes like the 1952 Immigration Act." 349 U.S. at 51. Inasmuch as this case—like *Shaughnessy* but unlike *Marcello*—involves the availability of judicial review, this case is controlled by *Shaughnessy*.

There is, moreover, another reason why *Marcello* is best viewed as a *sui generis* result emanating from a particular constellation of historical circumstances: *Marcello* cannot be reconciled with § 559's plain text, which clearly states that a subsequent statute does not displace the APA "except to the extent that it does so ***expressly***." 5 U.S.C. § 559 (emphasis added).

> If an express repeal must be inferred, the 'repeal' is not express. A repeal that must be inferred is, by definition, an implied repeal.

*Patten v. United States*, 116 F.3d 1029, 1034 n.4 (4th Cir. 1997). Here, where § 1252(f)(1) is silent as to the APA, a repeal of § 705 would have to be inferred. But § 559 explicitly requires an "express" repeal. As the D.C. Circuit recently reaffirmed, a court's "analysis begins and ends with the plain meaning of the statutory text." *Borochov v. Islamic Republic of Iran*, 94 F.4th 1053, 1061 (D.C. Cir. 2024), *cert. denied*, 145 S. Ct. 2847 (2025); *accord, e.g.*, *Chao v. Day*, 436 F.3d 234, 235 (D.C. Cir. 2006). Here, the plain meaning of § 559 forecloses an implied repeal of § 705.

3

**2.    8 U.S.C. § 1252(f)(1) does not preclude stays under 5 U.S.C. § 705.**

Still, the government argues that § 1252(f)(1) precludes relief under 5 U.S.C. § 705. ECF 92 at 3–11. According to the government, "relief under § 705 is not available" because "[s]taying the effect of an agency decision is … injunctive or at the very least restrains the government's ability" to implement the decision, which, says the government, "is precisely what § 1252(f)(1) was meant to avoid." ECF 92 at 3. The government is wrong—and the D.C. Circuit has said so.

The D.C. Circuit rejected the government's argument just last month in *Make the Road New York v Noem*.[1] The plaintiffs there challenged the Trump administration's "expedited removal" policy, under which individuals may be removed from the U.S. "without further hearing or review." 2025 WL 3563313, at *1 (D.C. Cir. 2025). The district court stayed the policy pending resolution of the plaintiffs' claims. and the government asked the D.C. Circuit to lift the stay. Citing *Biden v. Texas*, 597 U.S. 785 (2022), and *Garland v. Aleman Gonzalez*, 596 U.S. 543 (2022)—the same cases that it cites here (*cf.* ECF 92 at 4–5)—the government argued that § 1252(f)(1) "barred the lower court from issuing a stay under 5 U.S.C. § 705." *Id.* at *15. The D.C. Circuit refused to lift the stay, finding that the government's argument "is not likely to succeed." *Id.*

The D.C. Circuit began its analysis with § 1252(f)(1)'s text. "That text," said the court, "weighs heavily against [DHS's] reading." *Make the Road*, 2025 WL 3563313, at *15. The D.C. Circuit began with the statute's critical words—"enjoin," "restrain," and "operation." The court explained that "the term 'to enjoin' ordinarily means to 'require,' 'command,' or 'positively direct' an action or to 'require a person to perform  or to abstain or desist from, some act'"; that "the word 'restrain' means to 'check, hold back, or prevent (a person or thing) from some course of action'";

---

[1]    And the Northern District of California rejected it just this week when, in the course of setting aside the Secretary's termination of TPS designations for Nepal, Honduras, and Nicaragua, it held that § 1252(f)(1) "does not prohibit the Court from granting Plaintiffs' requested relief." ECF 197 at 16, *Nat'l TPS All. v. Noem*, No. 3:25-cv-05687 (N.D. Cal. Dec. 31, 2025) (capitalization altered).

4

and that "the 'operation of' (a thing) means the functioning of or working of (that thing)," which, in law, is typically "through the actions of officials or other persons who implement them." *Id.* (cleaned up). "Putting these terms together," said the court, "§ 1252(f)(1) generally prohibits lower courts from entering injunctions that ***order federal officials to take or to refrain from taking actions*** to enforce, implement, or otherwise carry out the specified statutory provisions." *Id.* (quoting *Aleman Gonzalez*, 596 U.S. at 550). Thus, "[b]y its plain language," the court held, § 1252(f)(1) only "applies to those forms of relief that operate *in personam*—on individual actors." *Id.* at \*16 (citing *Nken v. Holder*, 556 U.S. 418, 428 (2009)).

While that "is exactly what injunctions do," a stay under § 705, said the court, "operates quite differently." *Make the Road*, 2025 WL 3563313, at \*16. "When a court enters a stay, it does not direct individuals to act or not to act." *Id.* "Instead, the order simply 'suspends the legal source of authority to act.'" *Id.* (quoting *Nken*, 556 U.S. at 428–29) (cleaned up). Thus, "a stay under Section 705 functions as a temporary form of vacatur" and, like a vacatur, "neither compels nor restrains ... agency decision-making." *Id.* at \*16–7 (cleaned up).[2] This case illustrates the point: Staying the November 28 termination of Haiti's TPS designation would neither compel the Secretary to extend Haiti's TPS designation nor prevent her from lawfully terminating it; the Secretary could immediately undertake a new periodic review pursuant to 8 U.S.C. § 1254a(b)(3)(A) without awaiting resolution of the litigation. Thus, as the D.C. Circuit held, "the best reading of Section 1252(f)(1) is that it does not bar stays of agency action." *Id.* at \*16.[3]

---

[2]    The Supreme Court recognized this principle even before enactment of the APA. Rejecting the assertion that a stay of agency action is "manifestly inappropriate since a stay would in effect involve the judicial exercise of an administrative function," the Court sustained a stay of an agency action because a stay, by its nature, "could not operate as an affirmative authorization of that which the [agency] has refused to authorize." *Scripps-Howard Radio v. F.C.C.*, 316 U.S. 4, 14 (1942).

[3]    That "Congress knows how to limit courts' power to enter Section 705 stays when it wants to" but did not do so when drafting § 1252(f)(1) is an "additional textual indication[]" that § 1252(f)(1)

Despite this, the government argues that construing § 1252(f)(1)—which says that a court may not "enjoin or restrain" the operation of certain statutory provisions—to allow a § 705 stay "would render the term 'restrain' superfluous." ECF 92 at 9. But the D.C. Circuit addressed and rejected this argument too. As the court explained, the word "restrain" retains independent force even when § 1252(f)(1) is read to permit stays under § 705 because "restrain" encompasses temporary restraining orders, which "are, to be sure, a form of 'injunctive relief,'" because they order an actor to refrain from certain action, but nevertheless "involve different processes and limitations from injunctions." *Make the Road*, 2025 WL 3563313, at 18 (citing Fed. R. Civ. P. 65; *Injunction*, Black's Law Dictionary (6th ed. 1990)). Inasmuch as the term "restrain" encompasses a category of relief that "enjoin" alone might not, "there is no redundancy." *Id*.

Moving from statutory text to legislative history, the government argues that § 705 also does not allow this Court to enter a stay because "Section 705 was not intended 'to fashion new rules of intervention for District Courts.'" ECF 92 at 6 (quoting *Sampson v. Murray*, 415 U.S. 61, 68 n.15 (1974)). True or not, that is immaterial. District courts both set aside and stayed administrative actions well before adoption of the APA. For example, when railroads filed "suit to set aside" an order of the Interstate Commerce Commission, a district court "set the order aside, on the ground that the Commission had acted arbitrarily," and the Supreme Court affirmed, holding that "the order may be set aside." *United States v. Balt. & O. R.R.*, 293 U.S. 454, 458, 463 (1935)); *see also, e.g.*, *Berwind-White Coal-Min. Co. v. United States*, 9 F.2d 429, 431 (E.D. Pa. 1925) (annulling ICC rule), *rev'd on other grounds sub nom. Assigned Car Cases*, 274 U.S. 564 (1927). Similarly, when broadcasters challenged an FCC licensing rule, the district court rejected their

---

does not bar stays under § 705. *Make the Road*, 2025 WL 3563313, at *16 (contrasting § 1252(f)(1) with 16 U.S.C. § 1855(f)(1)(A), which expressly states that "section 705 of [Title 5] is not applicable" to specified claims under the Magnuson-Stevens Act).

challenge on jurisdictional grounds but nevertheless exercised its "discretion in the plaintiffs' favor to stay enforcement of the regulations until they can argue their appeal." *Nat'l Broad. Co. v. United States*, 44 F. Supp. 688, 697 (S.D.N.Y.), *rev'd on other grounds* 316 U.S. 447 (1942). Notably, when the Supreme Court reversed the district court's jurisdictional holding, it emphasized that "the stay" entered by the district court "will be continued" pending a final resolution on the merits. 316 U.S. at 449. Dispelling any doubt as to the basis for that stay, the Court explained in a companion case that a suit seeking a set-aside "states a cause of action in equity." *Columbia Broad. Sys. v. United States*, 316 U.S. 407, 425 (1942). Thus, as one scholar has explained: "Well before the APA was enacted, the suit in equity had evolved into a tool for challenging the validity of statutes and agency action … in advance of their enforcement." Mila Sohoni, *The Power to Vacate a Rule*, 88 Geo. Wash. L. Rev. 1121, 1158 (Sept. 2020). Simply put, when the APA incorporated pre-existing equitable remedies, it authorized courts "to suspend federal regulatory action universally for extended periods of time pending merits review of its validity." *Id.* at 1160.

> **B.  The termination is arbitrary and capricious.**

The government argues that § 705 relief is inappropriate because, says the government, "Plaintiffs' APA and constitutional claims are … unlikely to succeed." ECF 92 at 11. Not so. Plaintiffs have already explained why they are likely to prevail on their claims. *See* ECF 93 at 19–29. Rather than repeat those arguments here, Plaintiffs will limit their response to the government's new arguments and variations on previous arguments. Nothing that the government says in opposition to § 705 relief disturbs the conclusion that Plaintiffs are likely to succeed on the merits.

> **1.  The termination was predetermined.**

Plaintiffs allege that the termination of Haiti's TPS designation was a predetermined outcome decided before President Trump regained power and thus before Secretary Noem could

have engaged in the statutorily mandated periodic review, which is the only basis upon which a TPS designation may be lawfully terminated. ECF 93 at 22–23 (citing ECF 90 ¶¶ 56–64, 128, 146, 164, 177, 204, 217, 226, 241, 247, 249–50, 280); *cf.* 8 U.S.C. § 1254a(b)(3)(A).[4]

Downplaying the timing issue, the government argues that "[i]t is hardly improper for an agency head to come into office with policy preferences and ideas." ECF 92 at 12 (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 783 (2019)). Perhaps, but that does not defeat Plaintiffs' claim that the termination of Haiti's TPS designation was a preordained result rather than the product of a good-faith, evidence-based, country-specific review of country conditions as required by § 1254a(b)(3)(A). *Saget v. Trump*, 375 F. Supp. 3d 280, 332 (E.D.N.Y. 2019).

Notably, even the case on which the government relies affirmed a district court order that set aside an agency action as "arbitrary and capricious," and thus unlawful under the APA, because it was "based on a pretextual rationale." *Dep't of Com.*, 588 U.S. at 766. Not only did the Supreme Court affirm the set-aside but it did so based on extra-record evidence, including a deposition of the Secretary of Commerce, which the district court had ordered upon the plaintiffs' showing of bad faith. *Id.* at 780–85. Dismissing the secretary's proffered rationale as pretextual, the Court held that although agency heads may enter office with policy preferences, they still must "offer genuine justifications for important decisions" made once in office. *Id.* at 785. The rule's purpose is simple:

> The reasoned explanation requirement of administrative law … is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public. Accepting contrived reasons would defeat the purpose of the enterprise. If judicial review is to be more than an empty ritual, it must demand something better than the explanation offered for the action taken in this case.

*Id.*

---

[4] The facts alleged in this case largely overlap with those alleged and proven by the plaintiffs in *NTPSA II*. Citing those facts, the Northern District of California not only denied the government's motion to dismiss but granted the plaintiffs partial summary judgment on their APA claims. ECF 197 at 23–24, 39–43, *Nat'l TPS All. v. Noem*, No. 3:25-cv-05687 (N.D. Cal. Dec. 31, 2025)

That rationale has special force here, where the TPS statute requires the DHS Secretary to publish "the basis for [her] determination" in the Federal Register. 8 U.S.C. § 1254a(b)(3)(A). And it distinguishes this case from *Biden v. Texas*, 597 U.S. 785 (2022), which the government cites for the proposition that an "agency's ex ante preference" for a policy "should not be held against" it. ECF 92 at 12 (quoting *Texas*, 597 U.S. at 812). *Texas* involved a statute that gave DHS unfettered discretion to send migrants arriving at the southern border back to Mexico to await the outcome of their removal proceedings. *See* 597 U.S. at 802–03. The Secretary does not have such discretion under the TPS statute. To the contrary, § 1254a(b)(3)(A) imposes a mandatory review process that specifies the criteria that she must apply when determining whether the conditions for designation continue to exist. Congress's declaration that the Secretary "shall review the conditions" in the designated country "evinces its intent that the Secretary undertake a periodic review grounded in fact—*i.e.*, based on objective conditions in the foreign country and ***regardless of any government official's political motives***." *Saget*, 375 F. Supp. 3d 346–47 (finding first Trump administration's attempt to terminate Haiti's TPS designation an unlawful "preordained and pretextual" decision) (emphasis added). Simply put, because § 1254a(b)(3)(A) requires the Secretary to make a factual determination, her determination must be based on facts, not politics.[5]

When—as here (*see, e.g.*, ECF 93 at 24–27)—an agency offers a pretextual basis for a preordained determination rooted in political considerations, that determination is arbitrary and capricious and must be set aside as such. When evaluating whether the agency's proffered rationale is genuine or pretextual, evidence of predetermination, including evidence outside the

---

[5]    The actual extension or termination of a country's TPS designation is a ministerial act over which the Secretary has no discretion. If the Secretary determines that the conditions for designation continue to exist, the designation must be extended. 8 U.S.C. § 1254a(b)(3)(A). Conversely, if the Secretary determines that the conditions for designation are no longer met, the designation must be terminated. *Id.* § 1254a(b)(3)(B). Thus, by statute, an administration's policy preferences are irrelevant to the extension or termination of a country's TPS designation.

9

administrative record, is plainly relevant to the requisite inquiry. Although its "review is deferential," the Court is "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com.*, 588 U.S. at 785 (cleaned up).

### 2. The termination relies on an unexplained departure from past practice.

As noted in Plaintiffs' opposition to the government's motion to dismiss, the termination notice and the administrative record evidence at least four unexplained departures from past practice: the Secretary's reliance on national interest; her reliance on the supposedly temporary nature of a TPS designation; her reliance on purported criminality; and her failure to meaningfully consult with the State Department. *See* ECF 93 at 24 (citing ECF 90 ¶¶ 188–90, 221, 247; AR 409).[6]

In its opposition to Plaintiffs' motion for a stay under § 705, the government addresses the first of these departures from past practice—the Secretary's reliance on national interest to justify termination of Haiti's TPS designation. ECF 92 at 13–15. The government does not dispute that "an agency's unexplained departure from precedent is arbitrary and capricious" and must be set aside as such. *ABM Onsite Servs.-W., Inc.v. NLRB*, 849 F.3d 1137, 1142 (D.C. Cir. 2017). And nothing said by the government undermines the conclusion that Secretary Noem departed from past practice without explaining that departure.

According to the government, setting aside the termination of Haiti's TPS designation because Secretary Noem, unlike all previous DHS secretaries, relied on "national interest" to justify the termination of a TPS designation "implies illogically that national interest determinations must remain static and that a Secretary cannot exercise her congressionally delegated authority in a manner contrary to her predecessor." ECF 92 at 13. That is a non-sequitur.

---

[6] The government admits that, in contrast to past practice (*cf. Saget*, 375 F. Supp. 3d at 298–300), the Secretary did not consult with the Secretary of State, the State Department desk responsible for Haiti, the U.S. ambassador to Haiti, or the U.S. embassy in Haiti. ECF 98 at 2.

Even if one wrongly assumes (*cf.* ECF 93 at 27–28) that § 1254a(b)(3)(A) allows the Secretary to consider national interest when determining whether the conditions for designation continue to exist, it does not mean that she may do so for the first time in the statute's 35-year history without explaining why she has deviated from her predecessors' unbroken practice of relying exclusively on "conditions in the foreign state" when terminating a country's TPS designation. 8 U.S.C. § 1254a(b)(3)(A); *cf.* ECF 90 ¶ 190.

Implicitly recognizing that Secretary Noem provided no explanation for her break from past practice, the government suggests that her reliance on national interest is not in fact a departure from past practice. According to the government, "DHS and the Department of Justice *have* considered the national interest element of § 1254a(b)(1)(C) in making extension or termination determinations for decades." ECF 92 at 13. But, as the government then admits, "***there is no precedent** in prior administrations **for terminating a designation based on an adverse national interest determination***." *Id.* at 14 (emphasis added); *see also* ECF 81-7 ¶ 28 ("Until 2025, no Attorney General or Secretary has … ever justified a termination on national interest grounds").

Citing *FDA v. Wages & White Lion Investors*, 604 U.S. 542 (2025), the government argues that this is immaterial because an agency need only explain a departure from past practice if it "has made a 'hard-and-fast' commitment' to a particular course of action." ECF 92 at 14. But the requirement that an agency explain its departure from past practice "is not limited to formal rules or official policies and applies equally to practices implied from agency conduct." *Saget*, 375 F. Supp. 3d at 355. *Wages & White Lion Investors* did not alter this established principle. That case involved an agency's purported departure from a regulatory construction that the agency had articulated in a guidance document published soon after adoption of a new rule. Although the Court found no departure from past practice, it was not because the guidance document lacked legal force.

Rather, the Court found no departure from past practice because there was no established practice before new rule and accompanying guidance. Looking at the guidance and associated materials, the Court found that they "paint[ed] a picture of an agency that was feeling its way toward a final stance and was unable or unwilling to say in clear and specific terms precisely what" the rule required. *Wages & White Lion Invs.*, 604 U.S. at 556. Here, by contrast, there is a well-established practice: In the 35 years since the TPS statute was enacted, no prior DHS secretary has justified the termination of a TPS designation on national interest grounds. The November 28 termination of Haiti's TPS designation is a sharp break from that previously uninterrupted practice.

### 3. The explanation for the termination is implausible and contrary to the evidence.

The Supreme Court has explained that agency action is arbitrary and capricious, and therefore unlawful under 5 U.S.C. § 706(2)(A), if the agency

> has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Despite this binding precedent, the government insists that this Court may not examine whether the Secretary's stated rationale for terminating Haiti's TPS designation is implausible or contrary to facts known to the agency. The Court must refrain from that inquiry because, says the government, it would cause the Court to "reweigh the conflicting evidence" and "substitute its judgment for the Secretary's." ECF 92 at 19. The government is mistaken.

This Court is required to conduct the inquiry when considering a claim under § 706(2)(A).

> "Although the 'scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency,'" the Court "must nonetheless be sure the [agency] has 'examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the

> choice made." *Chamber of Commerce of U.S. v. SEC*, 412 F.3d 133, 140 (D.C. Cir. 2005) (internal quotation marks omitted) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). In determining whether the agency's action was arbitrary and capricious, the Court must determine whether the agency action was a "product of reasoned decisionmaking" or whether the agency "failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.

*Stand Up for California! v. U.S. Dep't of the Interior*, 919 F. Supp. 2d 51, 62 (D.D.C. 2013). Thus, to fulfill its obligations under the APA, the Court ***must*** review the Secretary's determination to ascertain whether it is implausible or contrary to facts known to the agency. Were the rule otherwise, as the government claims, it would be essentially impossible for any court to find any administrative action arbitrary and capricious.

Regardless, the Court need not "reweigh … conflicting evidence" (ECF 92 at 19) to find that the Secretary's determination that "there are no extraordinary and temporary conditions in Haiti that prevent Haitian nationals … from returning in safety" (90 Fed. Reg. 54735, 54735 (Nov. 28, 2025)) is both implausible and contrary to facts known to the agency. There is no conflicting evidence to be reweighed. All evidence indicates that Haiti is an extraordinarily dangerous place; none suggests otherwise. The Court need not look any further than the November 28 termination notice, which reports that as of late August "1.3 million people—approximately 12% of Haiti's population—have been forced to flee their homes and are internally displaced due to escalating violence" that "has engulfed Port-au-Prince and spreads beyond." 90 Fed. Reg. at 54735 (cleaned up); *see* ECF 93 at 27. While the termination notice says that "parts of the country are suitable to return to" (90 Fed. Reg. at 54735) it offers no evidence to support that conclusory assertion.

Indeed, the Secretary's assertion that there are "suitable" parts of Haiti to which TPS holders could return is flatly contradicted by the State Department, which only a few weeks ago emphasized that its Level 4 travel advisory—which warns that people should "not travel to Haiti

13

for any reason" because of "kidnapping, crime, terrorist activity, civil unrest, and limited health care" (Travel Advisory: Haiti, U.S. Dep't of State (July 15, 2025), https://bit.ly/48wRYs0)—"is not limited to Port-au-Prince" but also applies to "all other parts of Haiti.  ECF 81-1 ¶ 20. The government urges this Court to disregard the State Department's warnings because "Congress authorized the Secretary of Homeland Security to make the final determination without prescribing which facts she must consider or how to best weigh the relevant evidence." ECF 92 at 19–20. But Congress prescribed the process by which she is to make that determination, and that process requires that she "consult[] with appropriate agencies of the Government," a term that surely includes the State Department. *Cf.* AR 409. Any meaningful consultation with the State Department would have alerted her to the fact that "all … parts of Haiti" are unsafe. July 15, 2025 Travel Advisory. The Secretary would also have learned that by reading the reports contained in the administrative record. *See, e.g.*, AR713 ("continued rise in killings, kidnappings, and other criminal acts throughout the country"); AR972 ( "the violence perpetrated by armed gangs against the Haitian population continued to spread across the country, reaching isolated rural areas as the presence of the State eroded"); AR 600 ("gangs have long operated throughout Haiti"); AR849–50 ("[r]ape and gang rape are spreading across Haiti"); *see also, e.g.*, ECF 81 at 26–30; ECF 90 nn.1–5, 9–24. Although it is the Secretary of Homeland Security who is authorized to make the "final determination," she may not willfully blind herself to plainly germane facts.[7] To the contrary, she "must examine the relevant data." *State Farm*, 463 U.S. at 43.

    According to the government, this Court should not "second-guess" Secretary Noem's termination of Haiti's TPS designation because she "assessed the facts" and "made a choice

---

[7]    Nor may the Secretary willfully misinterpret data, as she has in this case by conflating U.S. Border Patrol and U.S. Customs and Border Protection data despite being advised of her error. *See* ECF 93 at 27 (citing ECF 81-7 ¶¶ 6–61); ECF 26 at 30 (citing ECF 26-7 ¶¶ 4–7).

between reasonable policy alternatives." ECF 20 (cleaned up). That betrays a fundamental misunderstanding of the TPS statute and a fundamental flaw in the Secretary's termination decision. As explained above and below (*see supra* at 9; *infra* at 15–18), termination of a country's TPS designation must rest on a "purely evidence-based" review of the conditions in the designated country. *Saget*, 375 F. Supp. 3d at 346. Because the Secretary's determination must be "based on objective conditions in the foreign country," the congressionally mandated periodic review process does not allow consideration of the Secretary's policy preferences. *Id.*[8]

### C.    The Secretary did not observe procedure required by law.

Plaintiffs have explained (ECF 93 at 27–28; ECF 81 at 25–26) that the Secretary terminated Haiti's TPS designation "without observance of procedure required by law" (5 U.S.C. § 706(2)(D)) because she based the termination on national interest rather than conditions in Haiti and failed to consider all grounds for designation under § 1254a(b)(1). The government addresses only the latter in its opposition to Plaintiffs' motion for interim relief under § 705. What it says is unpersuasive.

By way of reminder, § 1254a(b)(3)(A) requires the Secretary to "review the conditions in the foreign state" and "determine whether the conditions for such designation under this subsection continue to be met." 8 U.S.C. § 1254a(b)(3)(A). Having been commanded by Congress to determine whether the conditions for designation "***under this subsection***" still exist, the Secretary must consider ***all*** the conditions for designation set forth in § 1254a(b). This includes whether

---

[8]    The discretion that the Secretary has when reviewing conditions in the designated country is simply the discretion that any decisionmaker inherently has when making a good-faith judgment requiring the evaluation of evidence under specified criteria. She does not have discretion to ignore relevant evidence; nor does she have discretion to base her determination on anything other than the congressionally specified criteria. Were a Secretary allowed to consider national interest when deciding whether to extend or terminate an existing TPS designation (*but see* ECF 93 at 27–28), the national-interest determination might possibly admit consideration of policy preferences. But even then, the Court would be obligated to review the Secretary's stated rationale and evaluate whether it supported her determination. *State Farm*, 463 U.S. at 43. Here, the Secretary's stated rationale does not pass muster. *See* ECF 93 at 26–27; ECF 81 at 33–34.

there is "an ongoing armed conflict" that "would pose a serious threat to the[] personal safety" of returning TPS holders. 8 U.S.C. § 1254a(b)(1)(A).

The government does not deny that the Secretary failed to consider any bases for designation other than those set forth in § 1254a(b)(1)(C). Indeed, it admits that the Secretary not only limited her review to determining whether the conditions for designation under § 1254a(b)(1)(C) continue to exist but then further limited her review to determining only whether the conditions that originally led to the designation under § 1254a(b)(1)(C) continue to exist. In defense of the Secretary's circumscribed review, the government argues that because

> the statute mandates that the Secretary periodically evaluate whether "the conditions for [a country's TPS] designation … continue to be met," *id*. § 1254a(b)(3)(A), it follows that the Secretary is to evaluate whether the "extraordinary and temporary" conditions caused by the event that gave rise to the TPS designation continue to exist.

ECF 92 at 15.

That argument fails. The conclusion does not follow from the premise, and the premise is wrong. When reciting the statutory text, the government elides the critical phrase "under this subsection." 8 U.S.C. § 1254a(b)(3)(A). The "subsection" is § 1254a(b), which includes all the grounds for designation under § 1254a(b)(1), not just the ground on which the current designation is based. If Congress had intended for the Secretary to limit her review to the original basis for the current designation and the continued existence of the conditions that first justified designation on that basis, it would have directed her to "review whether the conditions upon which the current designation is based continue to exist." But that is not the statute that Congress enacted.[9]

---

[9] The government says that its restrictive reading of § 1254a(b)(3)(A) finds support in the fact that the Secretary may not only extend a country's current TPS designation but also redesignate the country for TPS. According to the government, an extension is based on the continued existence of the "conditions … that gave rise to the initial designation" while a redesignation is based on "new country conditions." ECF 92 at 16. But the government misunderstands the purpose of and basis for redesignations. When a country is first designated for TPS, nationals of that country must apply for TPS within a specified period following the designation. *See* 8 U.S.C. §

And even if she were permitted to limit her review to the continued existence of the conditions upon which the current designation was based, the Secretary failed to review those conditions in this case. Haiti's current TPS designation rests on not only gang violence but also the fact that: "Haiti has one of the highest levels of chronic food insecurity in the world" with "more than half of its total population chronically food insecure and 22 percent of children chronically malnourished"; "an estimated 73,000 Haitians were confirmed or suspected to have cholera across all ten departments"; "[o]nly 55 percent of Haitian households could access safe drinking water while two-thirds of Haitians had limited or no access to sanitation services"; and "three-quarters of Haiti's healthcare facilities lack adequate medical supplies and sufficient trained personnel as the security crisis has led to a mass exodus of health workers." 89 Fed. Reg. 54484, 54490–91 (July 1, 2024). The termination notice does not address cholera, drinking water, sanitation, or medical care at all, and its lone reference to food insecurity is a citation to recent remarks by the U.S. ambassador to the U.N. that "highlight[ed] humanitarian concerns such as … food insecurity." 90 Fed. Reg. at 54735 n.15. Thus, even on the government's unduly restrictive view of the periodic review process, the Secretary failed to fulfill her statutory obligation.

According to the government, "Plaintiffs' theory" that the Secretary must consider all bases for designation under § 1254a(b)(1) "would effectively turn the TPS statute's discretionary review process into a mandatory duty." ECF 92 at 18. But the congressional mandated periodic review process *is* mandatory:  The Secretary "**shall** review the conditions in the foreign state … for which

---

1254a(c)(1)(A)(iv); *cf., e.g.*, 75 Fed. Reg. 3476, 3477 (Jan. 21, 2010). An extension of the current designation allows those who applied within the original eligibility period to retain TPS. The redesignation of a country reopens the application window, thereby allowing those who arrived after the initial window closed to obtain TPS. Extensions and redesignations are simply different mechanisms to extend the same TPS protection to different populations. Contrary to what the government asserts, they do not rest on different conditions, which is precisely why extensions are typically coupled with redesignations. *See, e.g.*, 88 Fed. Reg. 5022, 5023–24 (Jan. 26, 2023).

17

a designation is in effect under this subsection and ***shall*** determine whether the conditions for such designation under this subsection continue to be met." 8 U.S.C. § 1254a(b)(3)(A). The Secretary terminated Haiti's TPS designation without observing this legally required procedure.[10]

### D.    The termination is contrary to constitutional right and power.

#### 1.    The termination is contrary to constitutional right.

Pointing to statements and policies evincing racial animus, Plaintiffs are likely to succeed on their claim that the Trump administration's termination of Haiti's TPS designation was motivated, at least in part, by racial animus. ECF 90 ¶¶ 66, 85, 87–93, 101, 103–08, 110–11, 113–14, 116; *see also* ECF 92 at 32–40. The government does not deny that racial animus is a ground for a set-aside under 5 U.S.C. § 706(2)(B). Instead, it argues that Plaintiffs' claim is unlikely to succeed on the merits, and that the Court should not review the claim in any case because the termination of Haiti's TPS designation "is a quintessential decision that goes to the admission and exclusion of non-citizens." ECF 92 at 22 (cleaned up). The government is wrong on both counts.

According to the government, Plaintiffs are unlikely to prevail on their equal-protection claim because the President's racist statements must be ignored and because nationality-based discrimination is allowed in immigration matters. The first assertion is incorrect and the second is immaterial.

Plaintiffs have explained that President Trump's racist statements and policies are relevant to their equal-protection claim because they are probative of intent to discriminate on the basis of race. ECF 92 at 41–43. Although the government tries to dissociate the President's statements and policies from the termination of Haiti's TPS designation, its answers to the Court's questions and

---

[10]    One of the courts that blocked the first Trump administration's attempt to terminate Haiti's TPS designation noted that the agency had "departed from past practice" when it "consider[ed] only those conditions tethered to" the original basis for designation. *Saget*, 375 F. Supp. 3d at 359.

its opposition to Plaintiffs' motion for interim relief undermine that attempt. The government admits that there were "communications" and "meetings" with the White House regarding the termination of Haiti's TPS designation. ECF 98-1 at 3. And the government does not dispute that Secretary Noem pledged to follow President Trump's directives or that she terminated Haiti's TPS designation in express "furtherance of" Executive Order 14159, which directed her "to rescind policies that led to increased or continued presence of" what it characterizes as "illegal aliens in the United States," a term that the administration wrongly believes includes TPS holders. 90 Fed. Reg. at 54736 (citing 90 Fed. Reg. 8443, 8446 (Jan. 29, 2025)); *cf.* ECF 90 ¶ 61. Rather than deny that the Secretary acted at the President's behest, the government argues that "[a]gencies are bound to follow binding executive orders." ECF 92 at 13 (quoting *N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 310 (D.D.C. 2025)). But that does not help the government. It simply confirms President Trump's role in the termination of Haiti's TPS designation.

Whether immigration law allows nationality-based discrimination is irrelevant to Plaintiffs' equal-protection claim. Relying on well-pleaded facts regarding the targeting of Haitian TPS holders because they are Black and the unequal treatment of white and nonwhite immigrants, Plaintiffs allege **racial** discrimination, not nationality-based discrimination. *See* ECF 93 at 37–40 (citing, *inter alia*, ECF 90 ¶¶ 65–117, 240, 242). The government cannot avoid Plaintiffs' racial-discrimination claim by recasting it as a nationality-based claim.

And the government misstates the facts when it says that the Court should not consider Plaintiffs' equal-protection claim because the termination of Haiti's TPS designation involves "the admission and exclusion of non-citizens." ECF 92 at 22. "Admission" and "exclusion" are terms of art in immigration law. Admission refers to lawful entry after inspection by an immigration officer; exclusion refers to a legal determination that one is not eligible for admission. *Cf.* 8 U.S.C.

§ 1101(a)(13)(A) (defining admission); *id.* § 1101(a)(17) (distinguishing between "exclusion, deportation, expulsion, [and] removal"). Neither has anything to do with TPS, which is an immigration status bestowed upon individuals already present in the U.S. Although "[t]he TPS statute permits [an individual] to remain" in the U.S., "a grant of TPS does not come with a ticket of admission." *Sanchez v. Mayorkas*, 593 U.S. 409, 416 (2021). Conversely, the termination of a country's TPS designation does not necessarily result in an individual's exclusion from the U.S. Thus, the government's allusion to questions of admission and exclusion is a red herring, not a basis for denying review of Plaintiffs' equal-protection claim.

### 2.  The termination is contrary to constitutional power.

In their motion for interim relief, Plaintiffs argue that the Secretary's reliance on "national interest" as a basis for terminating Haiti's TPS designation is contrary to constitutional power—and must therefore be set aside under 5 U.S.C. § 706(2)(B)—because her (wrongly) claimed authority to terminate on that basis violates the non-delegation doctrine. ECF 81 at 39–40; *see also* ECF 92 at 28–29. The government offers two responses, neither of which rebuts Plaintiffs' claim.

The government first argues that the claim is not properly before the Court because it is not set forth in Plaintiffs' complaint. ECF 92 at 23. But Plaintiffs are only required to plead facts, not legal theories (*see Doe v. District of Columbia*, 706 F. Supp. 2d 128, 134 (D.D.C. 2010)), and the government cannot claim surprise in any event, because Plaintiffs raised the issue in their opening brief and the government has had an opportunity to respond.[11]

The government's merits argument fares no better. According to the government, broad delegations of authority are permissible, especially in matters involving national security. ECF 92 at 23–25. But the government ignores case law and Plaintiffs' discussion of it.

---

[11]   Should the Court deem an amendment of the complaint necessary for it to consider Plaintiffs' non-delegation claim, Plaintiffs request leave to formally add the claim.

The relevant question is whether the term "national interest" as used in § 1254a(b)(1)(C) "lay[s] down … an intelligible principle to which" the Secretary "is directed to conform." *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 409 (1928). As Plaintiffs noted (ECF 81 at 41) but the government ignores, another judge in this district recently held that the term "national interest" is so broad that its "scope appears to be essentially unlimited." *Perkins Coie LLP v. U.S. Dep't of Just.*, 783 F. Supp. 3d 105, 144 (D.D.C. 2025), *appeal docketed*, No. 25-5241 (D.C. Cir. July 2, 2025). In response, the government catalogues instances in which other statutory language, much narrower than "national interest," has been found to offer an intelligible principle. ECF 92 at 23–24. But Plaintiffs have explained how the statutory language litigated in several of the cases cited by the government was cabined by Congress's direction to consider certain factors, how the context and declared aims of those statutes established boundaries that rendered the language at issue justiciable, and how § 1254a(b)(1)(C) offers no comparable guidance. ECF 81 at 41–42.

The additional cases cited in the government's opposition (ECF 92 at 23–26) likewise fail to support the government's contention that "national interest" as used in § 1254a(b)(1)(C) provides an intelligible principle to guide the Secretary's exercise of discretion. For example, *Palestine Info. Off. v. Shultz*, 853 F.2d 932, 943–44 (D.C. Cir. 1988), which involved a vagueness challenge under the Fifth Amendment rather than a non-delegation claim under Art. I, the disputed language was accompanied by a nearly paragraph-long description of what Congress intended and the standards to be applied—a clear distinction that only reinforces the exceptional breadth of the unbounded phrase "national interest" as used in § 1254a(b)(1)(C). And as the issue was not properly before it, the court in *Zhu v. Gonzales*, 411 F.3d 292, 295–96 (D.C. Cir. 2005), "[a]ssum[ed] for the sake of the argument that the 'national interest' is a manageable legal standard" without deciding the question. Thus, while technically true, the government's assertion that the

*Zhu* Court "expressed no concern" with a "national interest" standard is misleading. ECF 92 at 25. Inasmuch as it focuses on cases where the "national interest" standard was never litigated, the government fails to explain how it constitutes an intelligible principle.

That Congress "decided in its wisdom to paint with a broader brush" in § 1254a (ECF 92 at 24 (cleaned up)) begs the question whether Congress's brush was ***unconstitutionally*** broad. Simply put, a delegation to a federal official to make any determination that they deem to be in the "national interest" provides not guidance but a limitless license for the Secretary to act on her personal or political preferences, including a plainly unconstitutional preference for white over nonwhite immigrants. Thus, to the extent that § 1254a(b)(1)(C) would permit the Secretary to terminate TPS protections based on the "national interest" (*but see* ECF 93 at 27),  the provision is "contrary to constitutional … power." 5 U.S.C. § 706(2)(B).

## II.    Plaintiffs will suffer irreparable harm absent a stay.

Plaintiffs have cataloged a plethora of harms that they will suffer if Haiti's TPS designation is terminated—including detention, loss of work authorization, separation from their families, and deportation to a violent country that lacks adequate food and medical services. ECF 81 at 14–21, 42–43 (citing ECF 81-1; 81-2; 81-3; 81-4; 81-5; 81-6).[12] According to the government, none of these things constitute "irreparable harm." ECF 92 at 27–31. The government is mistaken.

First, the government says that the harms are "inherent in the statutory scheme Congress designed" because a TPS designation is necessarily "temporary." ECF 92 at 27. Not so. Under 8 U.S.C. § 1254a(b)(3), a country's TPS designation may not be terminated unless the Secretary, after consultation with the appropriate agencies, conducts a good-faith, evidence-based, country-specific review of conditions in the designated country and then, based on that review,

---

[12]   The government argues that the Court should not consider Plaintiffs' August declarations because they are "stale" but gives no reason to think that facts set forth therein have changed.

affirmatively determines that the conditions for designation no longer exist. If the Secretary fails to make such a determination based on such a review, then the country's TPS designation is automatically extended by operation of law. 8 U.S.C. § 1254a(b)(3)(C). Thus, under the scheme that Congress established, the default is the extension, not termination, of a TPS designation.

Next, the government argues that removal "is not categorically irreparable." ECF 92 at 28 (quoting *Nken*, 556 U.S. at 435).[13] That is irrelevant. Courts have consistently recognized that removal is an irreparable harm when, as here, removal would cause an individual to lose work authorization or an educational opportunity, would result in family separation, or would expose an individual to physical harm as the result of violence or the deprivation of medical care. *See Doe v. Noem*, 778 F. Supp. 3d 1151, 1164–65 (W.D. Wash. 2025) (collecting cases); *see also, e.g.*, *Doe v. Noem*, 2025 WL 1161386, at *6 (W.D. Va. 2025); *Roe v. Noem*, 2025 WL 1382930, at *9 (D. Mont. 2025); *Student 1 v. Noem*, 2025 WL 1431186, at *9 (D.N.J. 2025). Here, "Plaintiffs will suffer irreparable harm if the TPS termination proceeds." *Nat'l TPS All. v. Noem*, 798 F. Supp. 3d 1008, 1035 (N.D. Cal. 2025) (citing loss of work authorization, health insurance, and educational and professional opportunities, as well as family separation); *accord Saget*, 375 F. Supp. 3d at 375.

The government also argues that removal does not constitute an irreparable harm "[i]f relief from removal can be afforded later," which the government suggests could be obtained "through regular immigration proceedings." ECF 92 at 28. But "[n]either an Immigration Judge nor the Board of Immigration Appeals, in the course of a deportation proceeding, can enter an order voiding an alien's deportation in response to a constitutional objection." *Dastmalchi v. INS*, 660 F.2d 880, 886 (3d Cir. 1981); *accord Wojciechowicz v. Garland*, 77 F.4th 511, 518 (7th Cir. 2023)

---

[13]    The government also asserts that TPS holders could avoid removal and its attendant harms by applying for asylum. ECF 92 at 30. But the prospect of asylum is largely illusory and even if it is granted, asylum, unlike TPS, is a discretionary status that can be revoked. *See* ECF 69 at 19–20.

(Board of Immigration Appeals "lacks jurisdiction to consider" claims "rooted in constitutional principles of equal protection"); *In re Salazar-Regino*, 23 I&N Dec. 223 (BIA 2002) ("we lack authority to rule on the constitutionality of the statutes we administer."). When considering whether a claim is properly heard by an immigration judge or an Article III judge in the first instance, the opportunity for "'meaningful review' is by far the most important" consideration. *Khalil v. Joyce*, 780 F. Supp. 3d 476, 512 (D.N.J. 2025) (collecting cases). Here, there is no opportunity for meaningful review of Plaintiffs' claims in immigration court.

**III.   Postponing the termination is in the public interest.**

In their motion for interim relief under § 705, Plaintiffs explained (ECF 69 at 43–45) that staying the termination of Haiti's TPS designation is in the public interest because: the violation of constitutional rights "is always contrary to the public interest" (*Perkins Coie LLP*, 783 F. Supp. 3d at 180 (cleaned up); there is "a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations" *U.S. Inst. of Peace v. Jackson*, 783 F. Supp. 3d 316, 379 (D.D.C. 2025) (cleaned up); and termination would harm the communities in which TPS holders live (*see* ECF 37 at 11–21; ECF 47 at 6–20; ECF 54 at 8–17).

Rather than deny any of these things, the government—pointing to the importance of border enforcement—argues that a stay would not be in the public interest because the termination of Haiti's TPS designation implicates national security interests. ECF 92 at 32. But the government "fail[s] to explain how the Secretary's TPS terminations concern matters of entry and national security" when TPS holders are already present in the United States, ineligible for TPS if they commit crimes, and subject to removal if they do commit crimes. ECF 197 at 32, *Nat'l TPS All. v. Noem*, No. 3:25-cv-05687 (N.D. Cal. Dec. 31, 2025). And, although "[t]he President has vital power in the field of foreign affairs, so does Congress, and the President does not have the authority

24

to override immigration laws enacted by Congress." *Biden v. Texas*, 597 U.S. 785, 830 (2022) (Alito, J., dissenting). Thus, contrary to the government's assertion, staying the administration's unlawful termination of Haiti's TPS designation would not be "an improper intrusion by a federal court into the workings of a coordinate branch of government." ECF 92 at 33 (cleaned up). On the contrary, it would maintain the separation of powers by protecting Congress's Article I authority.

## IV.    A stay under § 705 applies to all Haitian TPS holders.

The government argues that the benefit of any stay must be limited to the named plaintiffs or the class members if a class is certified because, it says, equitable relief was traditionally limited to the parties before the court. ECF 92 at 33–36. The government's history is wrong. Courts granted universal set-asides even before the APA. In *Baltimore and Ohio*, for example, the Supreme Court sustained the set-aside of a rule as to all railroads although the suit was brought by only a subset of railroads. *See Balt. & O. R.R.*, 293 U.S. at 458, 463; Tr. of Record at 4–5, *Balt. & O. R.R.*, 293 U.S. 454 (1935) (because "the railroads are so numerous as to make it impracticable to bring them all before this court" the plaintiffs "sue on behalf of themselves and all other railroads"). A stay under § 705 is an interim set-aside and, like a set-aside, applies to all. *Cf. Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) ("when a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed") (cleaned up). As the Chief Justice remarked just a few years ago: The government's suggestion that APA does not permit a "universal vacatur" is "fairly radical and inconsistent" with "established practice under the APA." Tr. of Oral Argument at 4, 35, *United States v. Texas*, 597 U.S. 785 (2022).

## CONCLUSION

The Court should stay the termination pursuant to 5 U.S.C. § 705.

Dated: January 2, 2026

Respectfully submitted,
/s/ Andrew E. Tauber
Andrew E. Tauber

/s/ Geoffrey M. Pipoly
Geoffrey M. Pipoly

Ira J. Kurzban
Kevin Gregg
KURZBAN, KURZBAN, TETZELI & PRATT, P.A.
131 Madeira Ave.
Coral Gables, FL 33134
Phone: (305) 444-0060
ira@kktplaw.com
kgregg@kktplaw.com

Sejal Zota
JUST FUTURES LAW
1629 K Street N.W., Suite 300
Washington, DC 20006
Phone: (617) 812-2822
sejal@justfutureslaw.org

Raymond Audain
GISKAN SOLOTAROFF & ANDERSON LLP
1 Rockefeller Plaza, 8th Floor
New York, NY 10020
Phone: (646) 290-6249
raudain@gslawny.com

Matthew Stanford
BRYAN CAVE LEIGHTON PAISNER, LLP
2 N. Central Ave., Ste. 2100
Phoenix, AZ 85004
Phone: (602) 364-7000
matt.stanford@bclplaw.com

Andrew Tauber (D.C Bar No. 495980)
BRYAN CAVE LEIGHTON PAISNER, LLP
1155 F. Street NW, Ste. 700
Washington, D.C. 20004
Phone: (202)-508-6200
andrew.tauber@bclplaw.com

Geoffrey M. Pipoly
Alexa Thein
Madisen Hursey
BRYAN CAVE LEIGHTON PAISNER, LLP
161 N. Clark Street, Ste. 4300
Chicago, IL 60601
Phone: (312) 602-5000
geoff.pipoly@bclplaw.com
alexa.thein@bclplaw.com
madisen.hursey@bclplaw.com

Daniel Paul Mach
BRYAN CAVE LEIGHTON PAISNER, LLP
1290 Avenue of the Americas
New York, NY 10104
Phone: (212) 541-1146
daniel.mach@bclplaw.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that today, January 2, 2026, the foregoing document was filed with the Court's electronic filing system.

*/s/ Andrew E. Tauber*
Andrew E. Tauber

*Counsel for Plaintiffs*