UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


* * * * * * * * * * * * * * *   )
FRITZ EMMANUEL LESLY MIOT, et al.,)   Civil Action
                                )   No. 25-02471
          Plaintiffs,           )
                                )
  vs.                           )
                                )
DONALD J. TRUMP, et al.,        )   Washington, D.C.
                                )   January 6, 2026
          Defendants.           )   1:30 p.m.
                                )   **AFTERNOON SESSION**
* * * * * * * * * * * * * * *   )


TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE ANA C. REYES
UNITED STATES DISTRICT JUDGE



APPEARANCES:

FOR THE PLAINTIFFS:       GEOFFREY PIPOLY, ESQ.
                          ANDREW TAUBER, ESQ.
                          SARAH HARRELL, ESQ.
                          BROOKE INGOGLIA, ESQ.
                          SEJAL ZOTA, ESQ.
                          BRYAN CAVE LEIGHTON PAISNER, LLP
                          1155 F Street, Northwest
                          Washington, D.C. 20004

                          RAYMOND AUDAIN, ESQ.
                          GISKAN, SOLOTAROFF & ANDERSON, LLP
                          One Rockefeller Plaza
                          Eighth Floor
                          New York, New York 10020

  *(Via Zoom)*             IRA J. KURZBAN, ESQ.
                          KURZBAN, KURZBAN, TETZELI & PRATT
                          131 Madeira Avenue
                          Coral Gables, Florida 33134

APPEARANCES, CONT'D:

FOR THE DEFENDANTS:          DHRUMAN Y. SAMPAT, ESQ.
                             JEREMY SIMON, ESQ.
                             AMANDA TORRES, ESQ.
                             UNITED STATES ATTORNEY'S OFFICE FOR
                               THE DISTRICT OF COLUMBIA
                             CIVIL DIVISION
                             601 D Street, Northwest
                             Washington, D.C. 20530


REPORTED BY:                 LISA EDWARDS, RDR, CRR
                             Official Court Reporter
                             United States District Court for the
                               District of Columbia
                             333 Constitution Avenue, Northwest
                             Room 6706
                             Washington, D.C. 20001
                             (202) 354-3269

THE COURT: Go ahead.

MR. SAMPAT: All right, your Honor.

THE COURT: So I want to go to the part now of the Federal Register that discusses that one of the positives in Haiti is projected modest GDP growth by 2026.

MR. SAMPAT: What footnote are we looking at?

THE COURT: Footnote 22.

MR. SAMPAT: 22. Okay. Further, according to the World Bank, modest GDP growth is projected by 2026 as investment increases from low baseline, assuming improvements on political and security fronts.

THE COURT: All right. You didn't have to get all that. I think he was talking to himself.

So the Federal Register -- you were just talking way too low for her to hear. So I don't want her stressing out.

MR. SAMPAT: Okay.

THE COURT: So the Federal Register says that according to the World Bank, quote, "Modest GDP growth is projected by 2026 as investment increases from a low baseline, assuming improvements on the political and security fronts," end quote. Right?

MR. SAMPAT: That is correct.

THE COURT: And that is a citation to the World Bank website. And the footnote reads "World Bank and

Haiti."  Right?

MR. SAMPAT:  Yes.

THE COURT:  And then the link it provides -- and we talked about this over the weekend on a minute order or email; I can't remember -- the World Bank's country webpage for Haiti, the overview.  Right?

MR. SAMPAT:  Yes, your Honor.  That's -- that is the website that I think your Honor referred to in the minute order.

THE COURT:  Right.  And then when I went to that, the overview has a link to a bunch of websites.  And so what I found -- I found the World Bank's Haiti MPO report, which is the macro-poverty outlook, which has the quoted language.  And so do you agree that that's the report that we're looking at?

MR. SAMPAT:  So no.  That's not the report that's cited.

THE COURT:  Okay.

MR. SAMPAT:  When your Honor issued the minute order, I took a look.

So on the website, when you're on the website, if you go to Overview and then click on the Economy tab on the website, you actually get the quote that's in the Federal Register.

THE COURT:  All right.  Let me go to that, then.

Now I'm at Economy.  The Read More one, maybe?

MR. SAMPAT:  So the way I was able to pull it up was --

THE COURT:  I see.  Okay.  I have it here.

MR. SAMPAT:  Yes.

THE COURT:  And again, the citation in the Federal Register is to the World Bank organization's report on Haiti, and the economy one specifically?

MR. SAMPAT:  Yes.

THE COURT:  And the World Bank is a credible source of information for the secretary?

MR. SAMPAT:  Because it's cited in the Federal Register, I would think so.  Yes.

THE COURT:  All right.  And it does say that in 2025, GDP is forecast to contract by 2.2 percent as political uncertainty and gang violence depress private investment and high inflation dampens private consumption. Right?

MR. SAMPAT:  That is what -- that is what it says, yes.

THE COURT:  Modest GDP growth is projected by 2026 as investment increases from a low baseline, assuming modest improvements on the political and security fronts.  Right?

MR. SAMPAT:  Yes.  I believe that's --

THE COURT:  So that projection is not a certainty;

it's, We think in 2026 there is going to be some modest GDP growth, but certain things have to happen for that to occur. Right?

MR. SAMPAT:  It is -- it is exactly that.  A projection.  Sure.

THE COURT:  It's a projection.  So it's not talking about what is going on in Haiti right now.  Right?

MR. SAMPAT:  Well --

THE COURT:  Let me say, if you look up -- and this, by the way, must have been written in 2024, because it discusses what -- that in 2025, GDP is forecast to contract by 2.2 percent.  Right?

MR. SAMPAT:  That's what it says.

I will just refer the Court to the paragraph before where it talks about inflation moderating from 44.2 percent in 2023 to -- that inflation moderated from 44.2 percent in 2023 to 25.8 percent in 2024.

I understand there's stuff that follows.  But I want to say that there's more to the GDP, which I assume also includes inflation.

THE COURT:  I understand.  But in terms of the GDP is forecast to contract by 22 percent, that was -- that must have been written sometime either late 2024 or early 2025, given that it talks about what happened in 2024 in the phrase that you just read.

MR. SAMPAT:  I think that's a reasonable assumption, your Honor.  I will just note that there isn't a date on the article.  And I don't think the one -- that the version in the certified administrative record has a date either.  But I could be wrong about that.

So I --

THE COURT:  In any event, we know it was not written in 2026.

MR. SAMPAT:  Yes.  That is correct.  So that we know.

THE COURT:  So this again is another projection.  It's something that will happen in the future.  It's a projection.

MR. SAMPAT:  Yes.

THE COURT:  And it's based on important assumptions.  Right?  That -- assuming modest improvements on the political and security fronts.  Right?

MR. SAMPAT:  I think they're based on assumptions, I think, like any projections are based on.  Right.

THE COURT:  But this indicates there's insecurity on political insecurity fronts as of the time of this projection.  Right?

MR. SAMPAT:  I'm sorry.  Could you repeat the question, your Honor?

THE COURT:  Yes.  If it's based on an -- if it's

based on an assumption that there's going to be improvements in the political and security fronts, that indicates that there is something to improve on those fronts.

MR. SAMPAT:  Yeah.  I wouldn't contest that.

THE COURT:  And then if we go to the About column on that webpage --

MR. SAMPAT:  So I don't have that.  Not on this one.  If you'd give me one moment, your Honor.

THE COURT:  Sure.

MR. SAMPAT:  I think I have the About portion. I'm referring to the version that's in the certified administrative record right now.

THE COURT:  If you want me to look at that, what's the CAR?

MR. SAMPAT:  The Bates stamp is 1478, so that puts it at 1485.

THE COURT:  This is in the administrative record. Right?

MR. SAMPAT:  This is the one in the administrative record.  That's correct.

THE COURT:  And it starts -- and it says -- sorry. The version -- I have a blockout on that version.

MR. SAMPAT:  I do, too.

THE COURT:  The part that's blocked out is: Haiti's development continues to be hindered by political

instability, increasing violence and unprecedented levels of insecurity, which exacerbate fragility.

MR. SAMPAT:  Okay.

THE COURT:  Do you take my word for it that that's what's on the webpage?

MR. SAMPAT:  I have no reason to doubt that, your Honor.  But I'll just say I don't have that version in front of me, so I'm not sure what it says.

THE COURT:  Do one of you have the internet so that you can pull it up?

MR. TAUBER:  Yes, I do, your Honor.

THE COURT:  Can you just show it to him so we can confirm that language?

MR. TAUBER:  Yes.  Let me back out of where I was.

MR. SAMPAT:  And I -- thank you, Andy.

MR. TAUBER:  Of course.

THE COURT:  I want to make sure we're clear on the record that this is the language.  The language is, the first two lines:  Haiti's development continues to be hindered by political instability, increasing violence and unprecedented levels.  Right?

MR. SAMPAT:  "Of insecurity."  Yes.

THE COURT:  So if we go back to the CAR: "insecurity, which exacerbate fragility."  Right?

MR. SAMPAT:  Yes.

THE COURT:  Haiti remains the poorest country in Latin America and the Caribbean.  Right?

MR. SAMPAT:  That's an accurate representation of what's in the document.

THE COURT:  Among the poorest countries in the world?

MR. SAMPAT:  That's also accurate.

THE COURT:  And Haiti's human development index places the country in the medium human development category, ranking 166 out of 193 countries?

MR. SAMPAT:  That is correct, meaning, if I'm doing my math right, there's 27 countries that fall below Haiti.

THE COURT:  And 165 that fall above it?

MR. SAMPAT:  Yes.

THE COURT:  And in 2024, the economy contracted by 4.2 percent, a sixth consecutive year of decline?

MR. SAMPAT:  Yep.  Got that.

THE COURT:  In 2025, GDP was also forecast to contract by 2.2 percent.  Right?

MR. SAMPAT:  Yes.  And then just to finish the sentence off:  As political uncertainty and gang violence depress private investment and high inflation increases -- sorry -- and high inflation dampens private consumption.

THE COURT:  And then it says:  And Haiti remains

one of the most vulnerable countries worldwide to natural hazards, mainly hurricanes, floods and earthquakes?

MR. SAMPAT:  Yep.  That's the first sentence in the following paragraph.

THE COURT:  And it says:  Despite some signs of progress, Haiti continues to face critical security challenges.  Right?

MR. SAMPAT:  Yes.  That's what the document says.

THE COURT:  And that's consistent with what we saw from Secretary Rubio and Ambassador Waltz?

MR. SAMPAT:  I'm not sure whether the World Bank -- whether Secretary Rubio and Ambassador Waltz all have the same definition of the word "critical security." But --

THE COURT:  Well, we can assume that they're all in the same neighborhood.  Right?

MR. SAMPAT:  I think that would be a fair -- that would be fair.

THE COURT:  It's neither here nor there, really.

And it says that 5,600 people were killed in 2024 and more than a million people are now internally displaced in Haiti.  Right?

MR. SAMPAT:  More than a -- yes.

THE COURT:  Then:  As the country's security crisis continues, 5.4 million Haitians struggle daily to

find enough to eat.  On the human development front, Haiti currently has a total of 88,782 suspected cases of cholera.  As of March 9, 2025, improvement in human capital have stalled and in some cases deteriorated.  Infant mortality remains at high levels and coverage of prevention measures is stagnating or declining, especially for the poorest households.

Is that right?

MR. SAMPAT:  That's a fair quotation of -- an accurate quotation, I should say, of that.

THE COURT:  And this indicates that this was updated April 28, 2025?

MR. SAMPAT:  That is correct.

THE COURT:  And again, this is in the administrative record and something that the secretary considers sufficiently credible to rely on?

MR. SAMPAT:  As -- because it's cited in the notice.  Yes.

THE COURT:  And again, what we have with this document is a projection of what will happen in the future with a discussion of what has actually happened in the present?

MR. SAMPAT:  It is.  I agree that it is forward-looking, which is the same thing as the TPS termination, which is that it doesn't take effect for 60

days.

THE COURT:  Okay.  And then if we look at the administrative record at Page 183 --

MR. SAMPAT:  183?

THE COURT:  Yes.  This is part of the USCIS decision memo.

MR. SAMPAT:  I am at 183.

THE COURT:  And this is part of the USCIS decision memo.  Right?

MR. SAMPAT:  This is the policy consideration.  That USCIS decision memo, I think, is found at 195.

THE COURT:  I misspoke.  You're right.  I'm wrong.  USCIS policy considerations memo.  It starts at 182, and 183 is a part of that memo.  Right?

MR. SAMPAT:  That is correct.

THE COURT:  And that memo -- I'm sorry.  I don't know where on the page -- it notes that in September 2025, the Federal Aviation Administration has extended the ban on U.S. commercial flights flying into the main Haiti airport through March 7, 2026.

MR. SAMPAT:  Can you repeat that?

THE COURT:  Sure.  In September, the FAA has extended the ban on U.S. commercial flights flying into the main Haiti airport through March 7, 2026.

MR. SAMPAT:  Oh, okay.  Yeah.  Okay.  Got it.

THE COURT: And that is because of the risk that powerful gangs might attack flights with drones and small arms. I'm not sure if that's in the decision memo or the MPO report.

MR. SAMPAT: So the domestic -- --

THE COURT: Actually, I can look at it.

MR. SAMPAT: If we go to 182, the paragraph talks about the control of gangs over Port-au-Prince and then the effect that's had on transportation. So I think, based on that, I guess the aviation -- oh, no. This is our Federal Aviation Administration. I believe that was based on there being a shooting on the tarmac or American planes being shot at.

THE COURT: Well, yes. Not singular.

MR. SAMPAT: Multiple planes. Yeah.

THE COURT: So currently, as you and I are talking today, U.S. commercial flights cannot go into the main Haitian airport in Port-au-Prince?

MR. SAMPAT: Yes. My understanding is that American airlines and the FAA wouldn't allow travel there, yes.

THE COURT: Because it's not safe?

MR. SAMPAT: Because -- what their reason is, I don't have that before me. I don't know if they have different reasons for their decision. I can't say.

THE COURT:  Well, then, let's look at what the FAA said.

MR. SAMPAT:  Okay.

THE COURT:  So the CAR cite, do you see that at 183 they cite Footnotes 8 and 9?

MR. SAMPAT:  Yes.

THE COURT:  And 9 is to an AP News report?

MR. SAMPAT:  Yes.  That's correct.

THE COURT:  And I did not expect you to be prepared to talk about everything in the footnotes to the things in the administrative record, but that's what I do.  So I looked at it, because I had the same question.  Why would they stop the flights?  And the article -- can you find it?

Can you show him the article?

MR. TAUBER:  Yeah.  I have it.

THE COURT:  Can you show it to him, please?

MR. TAUBER:  Certainly, your Honor.

THE COURT:  Can you just read along with me when he shows this to you?

MR. TAUBER:  (Shares personal computer with Mr. Sampat.)

MR. SAMPAT:  Thanks.

THE COURT:  Do you see it?

MR. SAMPAT:  I do.

THE COURT:  It starts with:  A Federal Aviation Administration ban on U.S. commercial flights to Haiti's capital that expired Monday -- and this is -- the article is dated September 8, 2025 -- has been extended to March 7th, 2026, because of the risk that powerful gangs might attack flights with drones and small arms.

Right?

MR. SAMPAT:  That's what the first paragraph says.

THE COURT:  So it's not safe for U.S. commercial flights to go to Haiti because they might be attacked with flights -- with drones and small arms.  That's the determination by the Federal Aviation Administration?

MR. SAMPAT:  I think this article represents what it -- a reporting that that's what the Federal Aviation Administration -- the Federal Aviation Administration did. I don't think it reflects the Federal Aviation Administration's belief on whether it's safe or not.  It's a -- so a risk doesn't necessarily mean it's not entirely safe.

THE COURT:  Well, let's go down.  It says:  The FAA noted that Haitian gangs now control 90 percent of Port-au-Prince as well as nearby strategic routes and border areas.

And it says, quote:  Haitian foreign terrorist organizations maintain access to small arms and unmanned

aircraft systems capable of reaching low-altitude phases of flight, the FAA said in a statement on Friday.  Right?

And why don't we just go to the main source, even though that's not what the memo cited.  Let's just go to the FAA statement.

MR. SAMPAT:  Sure.

THE COURT:  By any chance do you have the actual statement?

MR. SAMPAT:  I don't have the FAA statement.  I found the article in the administrative record so Mr. Tauber could get his laptop back.

THE COURT:  What page is that?

MR. SAMPAT:  In the CAR, it's Bates-stamped 603, so the PDF is 610.

THE COURT:  Thank you.

Can you go to the FAA's webpage and then search for Haiti?

MR. TAUBER:  Excuse me?

THE COURT:  You're our web browser today.  Could you please go to the Haiti --

MR. TAUBER:  I am a surfer, after all.

THE COURT:  Could you please go to the faa.gov website and then put in Haiti in the search term?

MR. TAUBER:  Yes, ma'am.  I'll pull it up this second.

THE COURT:  Go to the second link, the September 2025 update.

MR. PIPOLY:  I've got it.

THE COURT:  Can you show it to him, please?  It says Unclassified, FAA.

MR. PIPOLY:  Yes.

THE COURT:  Can you look at the URL and confirm for me, please, that we're now looking at the actual FAA statement?

MR. SAMPAT:  That is correct.

THE COURT:  And this was the statement that was quoted in the article that's in the administrative record?

MR. SAMPAT:  Yes.  It is the last -- it's in the last sentence of the second paragraph in the notice.

THE COURT:  And -- but the article with the other quotes is in the administrative record and you, you know, rightfully said, Well, we don't know that this was correctly quoted.  So we're going to the source.

MR. SAMPAT:  Yes.

THE COURT:  The FAA says:  The FAA continues to prohibit U.S. civil aviation operations under 10,000 feet MSL and specified portions of Haiti's aerospace in response to security forces' continued inability to prevent attacks against aircraft in Port-au-Prince and the surrounding regions.

Do you see that?

MR. SAMPAT:  Unfortunately, Mr. Pipoly -- I gave Mr. Pipoly the computer back.

THE COURT:  Sorry.  Can he have it while we do this, please?

MR. PIPOLY:  Yes.

THE COURT:  I hope you don't have any embarrassing emails pop up.

MR. PIPOLY:  I do not.

THE COURT:  There was a criminal trial -- I don't know if you guys heard about this.  There was one of those, like -- let's just say the person was found not guilty. It's one of those -- the protester throwing the sandwich guy.  It wasn't that case, but something similar.

And the Government was cross-examining somebody, and he had his laptop up to -- you know, for something.  It was in front of the jury and it was being screened.  It was -- I think it was actually one of the -- oh, no.  It wasn't one of those cases.  It was something different.  It was a different case.  It was actually a more substantive case.  And I think one of the defendants was actually on the stand being cross-examined by the Government attorney.

And one of the Government attorneys at the table wrote something like, "This guy's a total idiot or moron." And that, like, pops up on the screen, right?  So the jury's

looking at it.  And it was Judge Walton.  So he actually had to take a break and figure out what to do about it.

MR. SAMPAT:  On that, your Honor, I would just in -- assuming it's 2025?

THE COURT:  Yes.

MR. SAMPAT:  They would all realize that emails can travel pretty quickly.

THE COURT:  Yes.  And so then let me just read it again.

MR. SAMPAT:  Yes.

THE COURT:  The FAA continues to prohibit U.S. civil aviation operations in specified portions of Haiti's air space in response to security forces' continued inability to prevent attacks against aircraft in Port-au-Prince and the surrounding regions.

Right?

MR. SAMPAT:  That is the first sentence of that statement.  Yes.

THE COURT:  Within the last six months, Haitian FTOs -- FTO is a foreign terrorist organization -- expanded their area of operations to control nearly 90 percent of Port-au-Prince and the immediately surrounding strategic routes and border areas.

Did I read that correctly?

MR. SAMPAT:  Yes, you did, your Honor.

THE COURT:  Throughout this region, Haitian FTOs maintained access to small arms and unmanned aircraft systems capable of reaching low-altitude phases of flight.

Do you see that?

MR. SAMPAT:  Yes.  Yes, your Honor.  I see that.

THE COURT:  Haitian and internal security forces, which experienced persistent personnel and equipment shortages, have a limited ability to counter FTO activities in and around Port-au-Prince.  Additionally, these organizations' uncoordinated actions against FTOs, to include conducted USA strikes against FTO leaders in Port-au-Prince, reduce their operational effectiveness and further complicate low-altitude air space deconfliction efforts.

Do you see that?

MR. SAMPAT:  I do.

THE COURT:  So at least the Federal Aviation Administration does not think it is currently safe to -- for U.S. commercial flights to enter Haiti?

MR. SAMPAT:  At the time of the issuance of this notice, that --

THE COURT:  Well, through to March 6, 2026.

MR. SAMPAT:  It was a forward-looking decision that was made.  Right?  So -- and it seemed that -- and it's -- in its exercise of authority, it just said that

we're going to suspend flights until March 2026 because of these issues.

THE COURT:  And this had been something that had been ongoing.  Right?  There had been a bar on the flights.  This extends the bar into 2026?

MR. SAMPAT:  Yes.  That is correct.

And what I also would note is that the -- and I didn't see a date on the FAA's notice.  But the article is dated September 8, 2025, which is before the gang suppression forces came into being.  Let's say that.

THE COURT:  Was authorized?

MR. SAMPAT:  Was authorized.

So how that affects the FAA going forward, can it go back and do anything?  I don't know.  But --

THE COURT:  As of today, the FAA hasn't revoked it, right?

MR. SAMPAT:  That is my understanding.

THE COURT:  And as of when they first entered this ban, which was -- I don't know if I have that on top of my head, but it was -- I don't want to take the time to look for when it first went into effect.  Maybe the Plaintiffs can find it.  But at least in 2025, the FAA did not think it was safe to fly into Haiti.  Right?

MR. SAMPAT:  Without knowing when the first notice came out about the ban -- there may have been periods of

time in 2025 where it was and when it went into effect after that.  So...

THE COURT:  Well, somehow we'll find when the ban started.  And we can confirm that there weren't times when it was lifted.

But at least as of September 2025, with respect to what's in the administrative record for the secretary, it was that the Federal Aviation Administration does not think it is safe to fly into Haiti and has banned commercial flights into Port-au-Prince because they're worried about those flights getting attacked by foreign terrorist organizations?

MR. SAMPAT:  I haven't -- I would need the notice again, your Honor.  If the FAA doesn't use the word -- the words that "it is not safe," I would disagree with the characterization that it says -- when the FAA says that it is not safe.  There could be different reasons.  It could say --

THE COURT:  Well, let me ask you this:  Do you think that one of the reasons the FAA might stop commercial flights from going into Port-au-Prince and Haiti, given concerns about directing small-arms fire at low-flying aircraft, do you believe that that's at a minimum something regarding it's not safe to go in there?

MR. SAMPAT:  Some source of risk that may be posed

by flights coming into Haiti.  Sure.

THE COURT:  A sufficiently high risk that the FAA is stopping commercial flights into Haiti?

MR. SAMPAT:  Yeah.  I think that would be fair.

THE COURT:  Can you explain to me how it's safe to live in a country or to return to a country when it's not even safe to fly into that country?

MR. SAMPAT:  Your Honor, again, I'm not a foreign policy expert.

THE COURT:  I'm just saying as a matter of, like, logic.

I mean, by the way, how are the Haitians going to get back?  They're going to not take commercial flights from the U.S., because that's not safe.  So how are they going to get to Haiti?

MR. SAMPAT:  I read somewhere in the record that deportation flights were continuing.

THE COURT:  Oh, so we're okay to risk the lives of people on deportation flights; but on commercial flights, it's not safe?

MR. SAMPAT:  There could be a whole host of things about which airports are open, which ones are not.  That was also part of the record.  Again, without having a full understanding of this decision-making and how that goes, I can't say that.

THE COURT:  Fair enough.

At a minimum, conditions on the ground at Port-au-Prince and surrounding regions are sufficiently unsafe that the FAA has banned commercial flights from entering through to March 6th, 2026.

MR. SAMPAT:  I can say that the FAA has extended its ban on flying into Port-au-Prince until March 2026.

THE COURT:  And surrounding regions.

MR. SAMPAT:  I'm sorry?

THE COURT:  And surrounding regions.

MR. SAMPAT:  I'm looking at the article.  I'm not looking at the notice.

THE COURT:  It says:  continued inability to prevent attacks against aircraft in Port-au-Prince and the surrounding regions.

MR. SAMPAT:  So the ban -- the FAA's ban is into Port-au-Prince.  Again, I'm not a geography expert.  So where things are --

THE COURT:  Neither am I.

MR. SAMPAT:  Yeah.

THE COURT:  Because of flights getting shot at and the possibility of flights getting shot down?

MR. SAMPAT:  That is what this article seems to represent.

THE COURT:  Making it unsafe to travel into Haiti?

MR. SAMPAT:  No, your Honor.  I wouldn't say it's necessarily unsafe.

THE COURT:  Making it unsafe to travel into Port-au-Prince?

MR. SAMPAT:  Sure.  Maybe that's as far as we can go.

THE COURT:  And surrounding regions?

MR. SAMPAT:  What surrounding -- what those surrounding regions are, we don't know.  But there are other airports that are open, according to the record.

THE COURT:  There are other -- this is the only -- the main commercial airport in Haiti.  Right?

MR. SAMPAT:  I don't think that's accurate, your Honor.  I think there's others.  If I'm remembering the record correctly, I think there were a couple airports that -- at least one airport that was open.  I can't remember if it took commercial flights.

THE COURT:  That's my point.

MR. SAMPAT:  What I'm saying is, I can't remember if they took them.  They may.  I just don't know.

THE COURT:  Okay.  So let's go to whether other parts of Haiti are safe.

MR. SAMPAT:  Give me one moment, your Honor.  Let me just pull that up.

I have pulled up the other notice -- sorry -- the

termination notice.

THE COURT:  I think somewhere in 436 after it talks about the GDP growth in 2026, it says, quote:  The data surrounding internal relocation does indicate parts of the country are suitable to return to.

Right?

MR. SAMPAT:  Your Honor, 436, your Honor?

THE COURT:  I think so.  Unfortunately, I don't have the cite.  I'm sorry.

MR. SAMPAT:  I don't have it in 436.  Is it still on the World Bank?

THE COURT:  No.  We're on the Federal Register.

MR. SAMPAT:  Oh, I apologize.

THE COURT:  We've moved on.

MR. SAMPAT:  It's on 435, your Honor.

THE COURT:  I'm sorry.

MR. SAMPAT:  No.  It's --

THE COURT:  It's:  The data surrounding internal relocation does indicate parts of the country are suitable to return to?

MR. SAMPAT:  Yes.

THE COURT:  There's no citation after that sentence.  Can you point me to the administrative record, what data it's referring to?

MR. SAMPAT:  I can't point you to that, your

Honor.

THE COURT:  Can we add that to your list of --
this is an important one, because I went through the
administrative record, and I'll tell you what I found.  And
it was a multi- -- it was, like, a 1,400-page record, so I'm
not going to represent to you that I read the whole thing.
I'm going to give you guys time to either find for me in the
administrative record the data that supports that or tell me
that there isn't.

But certainly, you agree with me there's no
citation in the Federal Register for that sentence?

MR. SAMPAT:  All the citations have been relegated
to footnotes.  There is no footnote there.  So there is no
citation.

THE COURT:  And the next sentence, I believe, does
not talk about internal relocation.  Right?

MR. SAMPAT:  I'm sorry?

THE COURT:  What's the next sentence?

MR. SAMPAT:  There seem to be other -- sorry.  It
says:  There have also been some other positive
developments.

THE COURT:  So it's not -- whatever gets cited
next in the next sentence isn't about whether it's safe to
return to other parts of Haiti.  Right?

MR. SAMPAT:  Not in the sentence that immediately

follows.  But if I may just look down.

THE COURT:  Sure.  Yes.

MR. SAMPAT:  From a quick cursory review, I don't have anything, your Honor.

THE COURT:  So let's add that to your list.  I think we now have two.

MR. SAMPAT:  Yes.

THE COURT:  If it is in the CAR, the areas, I would like to know what areas in Haiti it's safe to return to.

MR. SAMPAT:  Okay.

THE COURT:  And I went through the administrative record.  If you go to the country -- the Haiti Country Conditions Report.

MR. SAMPAT:  Could you give me a Bates number, your Honor?

THE COURT:  Yes.  214.

MR. SAMPAT:  214, you said?

THE COURT:  214.

MR. SAMPAT:  I'm there, your Honor.  Thank you.

THE COURT:  You'll see that -- I think maybe at the very bottom it says Freedom of Movement.

MR. SAMPAT:  I'm there.

THE COURT:  That's just the title.  If you go to the next page.

MR. SAMPAT:  Okay.

THE COURT:  And it says -- and this is the Haiti Country Conditions Report that went to the secretary from USCIS.  Correct?

MR. SAMPAT:  This is in the --

THE COURT:  I want to make sure we're on the same page.

MR. SAMPAT:  -- country of origin information considerations memo from USCIS.

THE COURT:  Okay.  And just confirm for me that I'm reading this correctly.  It's the 2023 annual report on human rights released in April 2024.  The U.S. Department of State discussed freedom of movement in Haiti.  It says:  The law provides for internal movement.  And then it says:  The government's capacity to ensure the freedom of internal movement and repatriations was weakened by gang violence in the capital.

Do you see that?

MR. SAMPAT:  Oh, yes.  Which is that block paragraph right after Freedom of Movement.

THE COURT:  Yes.  I read this correctly, right?

MR. SAMPAT:  Yes.

THE COURT:  It goes on to say:  Gang violence had, quote, "expanded into previously unaffected regions," end quote.  And then, quote, "Kidnappings for ransom by armed

gangs increased and affected all parts of society," end quote.

Did I read that correctly?

MR. SAMPAT:  Yes, your Honor.

THE COURT:  This is all from citing a U.S. Department of State report?

MR. SAMPAT:  That is my understanding, your Honor, based on the citation found at Footnote 47.

THE COURT:  Then it says:  In addition, the United States Department of State reported that, quote, "Armed gangs are also responsible for conflicts resulting in killings, brutal attacks on citizens, targeted instances of sexual violence, mutilation of human remains, widespread displacement and the destruction of homes and property."

Did I read that correctly?

MR. SAMPAT:  Yes, you did, your Honor.

THE COURT:  All right.  And then if you go down back to the memo, it says:  On March 18, 2025, the Internal Organization For Migration noted that more than 60,000 people were displaced in Port-au-Prince in the preceding month and more than 1 million people were displaced in Haiti overall.

Did I say that correctly?

MR. SAMPAT:  Yes.  That's correct, your Honor.

THE COURT:  Then it goes on to cite a Human Rights

Watch report from 2025 covering events in 2024 that the total number of displaced people, quote, "is more than double the 2022 figure, making Haiti the country with the highest global displacements per capita due to crime-related violence."

Did I read that correctly?

MR. SAMPAT:  You read that correctly, your Honor. The only thing that I will say is that that sentence refers to the Human Rights Watch report.  To the extent your Honor was referring to the prior sentence, that cites to something else that I am not really familiar with.

THE COURT:  Fair enough.

MR. SAMPAT:  Okay.

THE COURT:  But fair enough.  But -- so the Human Rights Watch report that this memo is citing, so someone at USCIS thinks it's credible, because otherwise they wouldn't rely on it, says what I just said.  Right?

MR. SAMPAT:  Yes.

THE COURT:  And the March 2025 report by the U.S. Institute of Peace noted that, quote, "As armed groups extend their control into new territories, major roads are impassable," end quote.

Did I read that correctly?

MR. SAMPAT:  Yes, you did, your Honor.

THE COURT:  And then it goes on:  United Nations

news quoted independent security expert Robert Muggah regarding control of roadways around Port-au-Prince by gangs in an April 2024 article.

It quotes -- and I'm going to skip the first paragraph -- "Gangs are, in fact, controlling very strategic areas of the capital in the main roads connecting Port-au-Prince to the ports and the land borders as well as coastal towns and areas where we see a lot of trafficking happening."

Did I read that correctly?

MR. SAMPAT:  Yes.  I believe you did, your Honor.

THE COURT:  Again, I'm going to let you find, you know, other things.  But just looking at that, does that support or contradict the notion that there are safe places in Haiti to relocate to?

MR. SAMPAT:  Again, because neither one of us are geography experts, as we admitted, I don't know where all this is happening in terms of -- in relation to other places in Haiti.  So maybe this is about Port-au-Prince and those areas in Haiti where things are problematic.  But there could be other places to return to.

THE COURT:  And at a minimum, we're talking about ports to land borders as well as coastal towns and areas. Right?

MR. SAMPAT:  That's my understanding.  But I would

just note that the two paragraphs your Honor was referring to does start with:  United Nations quoted independent security expert Robert Muggah regarding the control of roadways around Port-au-Prince.

So the paragraphs seem to be related to Port-au-Prince specifically and maybe the surrounding areas, not the entire country of Haiti.

THE COURT:  Well, we can talk about how the USCIS determined what it was.

But let me make a different point, which is, at least the USCIS report with respect to country conditions, which is one of the reports -- one of the main reports that the secretary relied on, does not support the proposition -- it may not negate it in your view; it may not cover the entire country -- but certainly it does not support the notion that there are areas that are safe to return to, does it?

MR. SAMPAT:  Just on those things, I can't say, your Honor.  But I will refer your Honor to Pages 213 and 214 on the Bates stamps, which is -- which starts with the Return to Haiti heading, which is right above the Freedom of Movement section.

THE COURT:  Let me get there.  Sorry.  I'll have to pull it up.

MR. SAMPAT:  If it would be helpful, it's 221 in

the PDF.

THE COURT:  Sorry.  I needed to pull the CAR.  I screwed up.  I am not a web surfer.

Tommie, if you find it before I do, can you send me the link to the CAR?

THE LAW CLERK:  Yes.

THE COURT:  Sorry about that.  Can you ask Catherine to send a link to the full thing?

THE LAW CLERK:  Yes.

THE COURT:  Imagine if you were in private practice.  I was doing this at $200 every six minutes.

MR. SAMPAT:  I may be in the wrong line of work, your Honor.

THE COURT:  I'm definitely in a less -- a line of work that pays me a lot less, at a minimum.

Here we are.  I've got it now.  I'm sorry.  Tell me again what page.

MR. SAMPAT:  So it will be Bates-stamped 214, but in the PDF it will be 221, I believe.

THE COURT:  Okay.

MR. SAMPAT:  So I'll just go two paragraphs above Freedom of Movement:  The vast majority, 93 percent, of deported individuals plan to return to their home or stay with relatives after deportation.  Only 1 percent were unsure where they would go upon their arrival in Haiti.

Transportation to areas of origin were -- was most -- was the most frequently immediate need asked for -- or need mentioned by deported Haitians, followed by food and a place to stay overnight.

That seems to me that there are some places that are safe in Haiti to go to.  If an --

THE COURT:  Well, no.  It says there are places where people who are forcefully deported to Haiti go.  But it says nothing about whether or not those places are safe.

So, for example, when it says the vast majority of deported individuals plan to return to their home or stay with relatives after deportation, I think we can all agree that at a minimum Port-au-Prince is not safe; and if they have individuals with families in Port-au-Prince, it doesn't mean they're safe just because they have friends and family.

MR. SAMPAT:  I know your Honor is not hearing legal argument on this.  We're talking about facts.  But this is the crux of our jurisdictional arguments about reasonable people can seem to have disagreements or different opinions on what's safe and what's not.

THE COURT:  Well, no.  For sure.

MR. SAMPAT:  Right.  So --

THE COURT:  I mean, I don't know.  I think probably it's not safe going to a country that has one of the worst humanitarian crises that we've seen and people are

getting killed left and right and children are starving to death.  I realize it's not my call.

What is my call is trying to ensure that there are facts in the administrative record that support the decision.  And I know that you don't agree fully with that, but part of my call.  And just as -- in terms of the English language, a sentence that says, "Deported persons when they go back live with family and friends" does not say anything one way or the other about whether it's safe to be in those areas.  Right?

MR. SAMPAT:  That's not the only thing I'm focusing on, your Honor.  I would say only 1 percent were unsure of what they would return to -- where they would go upon arrival in Haiti.

THE COURT:  Well, yeah.  That also doesn't say if where they end up is safe or not.

MR. SAMPAT:  Well, I think the number says something.  1 percent of people feeling as being unsure where they would go to.  I think that number would be a lot higher if there was -- if there was a tremendous amount of uncertainty if areas were safe.  I think that's a reasonable -- that can be reasonably discerned from that statement.

THE COURT:  Do you think that something that is maybe far more reasonable to discern and actually the

correct understanding of this is that people when they're deported back to a country try to stay in the houses that they had or with family?  That only 1 percent didn't do that?

MR. SAMPAT:  That's possible.  But my -- but my reading can also be possible.  And again, that's --

THE COURT:  I'm not sure we can agree to disagree on that.  But all right.

In any event, again, I just want the record citation in the AR for the uncited statement that the data surrounding internal relocation does indicate parts of the country are suitable to return to.

MR. SAMPAT:  That is the request, your Honor.  And we'll do that.

THE COURT:  You would at least agree with me that where people go is not data surrounding internal relocation? It's describing when people leave the U.S., where they go into Haiti.  But it's not talking about whether people within Haiti can relocate into areas that are suitable to return to.

MR. SAMPAT:  Maybe not explicitly.  But I think it could be -- I think it could be six of one, half a dozen of the other.

THE COURT:  All right.  I mean, you and I just have a different understanding of the English language,

apparently.  But that's totally fine.

But let me ask you this, then:  With respect to internal relocation, at least the section of the USCIS memo that discusses freedom of movement or internal relocation says that that's impossible or difficult or unsafe.  Right?

MR. SAMPAT:  I would disagree that it says it's impossible.

THE COURT:  I take away impossible.

MR. SAMPAT:  Okay.  I think it acknowledges certain concerns about relocation.  Sure.

THE COURT:  Armed gangs?

MR. SAMPAT:  I'm sorry?

THE COURT:  Armed gangs and their violence.

MR. SAMPAT:  I --

THE COURT:  And we're about to get to armed gangs because the secretary is really concerned about those.

MR. SAMPAT:  So that -- yes.  Gangs have caused issues that have led to displacement.  I'm not disputing what that -- that the memo acknowledges that.

THE COURT:  And I do -- so I want to turn to the national interest.

MR. SAMPAT:  Sure.

THE COURT:  I do want a little bit of argument on this before we get into the facts.  But I have some specific questions to set up the argument.

MR. SAMPAT:  Okay.

THE COURT:  Maybe we'll let Plaintiffs talk for a while.

MR. SAMPAT:  I'm sorry, your Honor.  Do you have factual questions?

THE COURT:  No.  I mean, I will later.  But for right now, I mainly have more theoretical questions.

MR. SAMPAT:  Okay.

MR. PIPOLY:  Your Honor, if I could real quick, are you going to want to hear argument from us on this?

THE COURT:  Yes.

MR. PIPOLY:  Mr. Tauber will be able to handle that.

THE COURT:  Oh, he's going to do some work finally.

Your last name is Tauber?

MR. TAUBER:  Tauber.

THE COURT:  I thought you said "Talbott."  And my trans military decision is *Talbott*.

MR. TAUBER:  No worries.

THE COURT:  So I am trying to get my head around what standard the secretary used to assess the national interest prong of the statute.

MR. SAMPAT:  There is none, your Honor, because it's a discretionary decision that's not reviewable.

THE COURT:  Well, let's put reviewability aside for a moment.

I'm trying to address an APA issue and an equal protection issue, which is:  When the secretary was determining whether it was in the national interest for Haitians to return to Haiti, how did she approach that issue?  She must have had some standard by which she was judging that determination.

MR. SAMPAT:  If I may, your Honor.

THE COURT:  Yes.

MR. SAMPAT:  So as the register -- the Federal Register notice said it's an expansive standard that encompasses broad considerations -- and I'm quoting -- "including foreign policy, public safety" -- I won't go into the parens there -- "national security, migration factors, immigration policy and economic considerations."

So --

THE COURT:  So this broad thing that she considered?

MR. SAMPAT:  Those are broad factors that can make up national interest and what that constitutes.  But that's exactly why judicial review and judicial questioning of, like, what standard should be applied when considering national interest is -- Congress clearly put that beyond the purview of courts.

THE COURT:  Well, you and I going to agree to disagree on that.  But -- because she had to -- she had a factor that she was weighing against.  Right?  If the secretary came in and said, I don't believe Haitians being in the U.S. is in our national interest because I don't like vanilla ice cream, that wouldn't count.  Right?  I mean, clearly that would not count.

MR. SAMPAT:  In terms of --

THE COURT:  If the secretary said, I think that we should end TPS for Haitians because I don't like vanilla ice cream, and so therefore it's in the national interest for us to end TPS for Haitians, that would clearly not be what was contemplated by the statute.  Right?

MR. SAMPAT:  Your Honor, I don't know.

THE COURT:  I'm sorry.  Are you saying on behalf of the United States government as an officer of this Court that if the secretary made a determination that we should end Haitian TPS standards because it's in the national interest, and the reason I think it's in the national interest is because I don't like vanilla ice cream, that that could plausibly be an acceptable response?

MR. SAMPAT:  I think it's a broad definition that --

THE COURT:  Just answer my question.  Yes or no?

MR. SAMPAT:  Yes, your Honor.

THE COURT:  Well, then --

MR. SAMPAT:  Because --

THE COURT:  No, no.  Then you think words have no meaning.  I mean, at this point, if that's the argument, if that's really how far you think the discretion goes, that the secretary can determine something's in the national interest with respect to Haitians because she herself doesn't like vanilla ice cream, if you think that the text is that broad, then you and I are just not speaking the same language.

MR. SAMPAT:  But, your Honor, I'm answering --

THE COURT:  Put aside whether I can review it. I'm just saying about whether or not that would be within the national -- that would be a factor.

MR. SAMPAT:  There could be issues about vanilla ice cream.

THE COURT:  Her personal view?  You think there's any conceivable issue about the secretary's personal views as to vanilla ice cream that could bear on whether it's in the national interest to extend or not extend TPS status for Haitians?

MR. SAMPAT:  Based upon your hypothetical, it's -- I understand hypotheticals are always incomplete.  So I would have a lot more questions about it.

THE COURT:  Well, ask away.  I'll complete the

hypothetical for you.

MR. SAMPAT:  So is that the -- is it just --

THE COURT:  That's the only reason.  That's the only reason.

MR. SAMPAT:  Does --

THE COURT:  That's the only thing she's considering.

MR. SAMPAT:  I would want to know about what's going on with vanilla ice cream in the country.  I would have to -- I would have to --

THE COURT:  "There's a lot of vanilla ice cream, and I don't like it.  I don't want to eat it.  So therefore, Haitians have to leave."

MR. SAMPAT:  That sounds like an economic consideration to me.

THE COURT:  Are you kidding me right now?  Listen to yourself.

MR. SAMPAT:  Well, your Honor --

THE COURT:  You actually have done a fabulous job today.  You really have.  I understand that you're in a tough spot.  But just take a breath and listen to yourself.  It cannot be an economic consideration, an actual economic consideration, that because the secretary doesn't like vanilla ice cream Haitians can no longer be in the United States.

MR. SAMPAT:  But this goes to the reviewability. I think your Honor --

THE COURT:  Put aside reviewability.

MR. SAMPAT:  I understand.

THE COURT:  If the answer is, "I'm not going to answer the question," fine.

MR. SAMPAT:  So --

THE COURT:  That's a better response than, "Yes, that could be a national interest."

MR. SAMPAT:  So if your Honor's not satisfied with the answer, then there's nothing else to say.

THE COURT:  I'm just trying to ask.  Just take a beat.  You're an officer of the Court.  You're a lawyer. Just take a beat on this.  I'll ask you one more time.  If the answer is, "I can't answer that question," I understand and I'll move on.

If the answer is, "That constitutes national interest considerations that are valid under the statute," then you and I are going to have some issues.

The question is:  If the secretary has a Federal Register notice and says, I think it's safe to go back to Haiti and gives all the reasons, or it's not safe to go back to Haiti or whatever, and I think it's in the national interest to end TPS for all Haitians, 360,000 people, because I don't like vanilla ice cream, could that -- and

that's the only reason, and there's not a vanilla ice cream shortage, there's not a vanilla ice cream -- too much of it, Haitians don't eat a disproportionate amount of vanilla ice cream, but I just don't like it, and therefore I think all Haitians have to leave, and putting aside whether it's reviewable, would that actually be something that the secretary could rely on in saying it's not in the national interest for Haitians to stay in the United States?

MR. SAMPAT:  Because you've asked me to put aside the reviewability portion, I don't have an answer, because it's all hooked to one -- all hooked up to one another.

THE COURT:  All right.  Let's go back to our hypothetical Yankee country.  Instead of saying that it's in the national interest on immigration with respect to Haitians, the secretary says the following.  She says:  I think it's in the national interest to deport as many Catholics as possible, and all people from Yankee are Catholics.  So I'm ending TPS status for Yankee, the country.

Would she have discretion to do that?

MR. SAMPAT:  Could your Honor repeat the basis the secretary articulated?

THE COURT:  She says:  I think it's in the national interest to deport as many Catholics as possible.  All people from Yankee are Catholic.  And therefore, I find

it's in the national interest to end TPS status for Yankee.

Is that an acceptable exercise of her discretion?

MR. SAMPAT:  I don't know.  And I would say that there would -- based on your Honor's hypothetical, there seems to be a potential constitutional hook to this, obviously.

THE COURT:  Yeah.  There's a big First Amendment hook.  Right?  You can't just get rid of all Catholics because we don't like them.

MR. SAMPAT:  Sure.  But what I would say is on maybe -- in that sort of circumstance, it would be that the district court doesn't have the authority to review.  But in terms of removal proceedings, somebody could raise a constitutional claim and say, I am being targeted based on this and that -- and constitutional questions under -- I think it's 1252(a)(2)(D) are preserved.  They could get reviewed through --

THE COURT:  So even though it's a blatant, unquestionable First Amendment violation, a district court has no role, can't review it under the APA, can't review it on a constitutional claim that's brought before the Court by the Haitians?

MR. SAMPAT:  I think there's plenty of case law that talks about, you know, dressing up a constitutional claim --

THE COURT:  No.  This isn't dressing it up.  I'm saying -- this isn't dressing it up.  This is flat-out discrimination.  "I don't like Catholic people, and I think that it's not in the national interest for there to be Catholic people in this country.  I want them all deported.  Everyone from Yankee is Catholic, and therefore I am ending the TPS for Yankee."

That is a constitutional violation, square center.  I guarantee you that would be a 9-0 Supreme Court decision under any Supreme Court ever existing in this country.

MR. SAMPAT:  I --

THE COURT:  Now, of course my question to you is:  Is it the Government's position that the district court has no role whatsoever in reviewing the secretary's discretion even if there's a blatant constitutional violation involved?

MR. SAMPAT:  I think for that, it would be that the question of -- the constitutional question would be preserved for a petition for review.  So there would be -- there can be review at some point.

THE COURT:  By whom?

MR. SAMPAT:  By a Court of Appeals on a petition for review.

THE COURT:  Why can the Court of Appeals do it but not me?

MR. SAMPAT:  Because that's -- that's what

Congress contemplated.

THE COURT:  Where is it that Congress can do it on a petition for review, but I can't do anything?

MR. SAMPAT:  1252(b)(9).

THE COURT:  That's the jurisdiction-stripping statute?

MR. SAMPAT:  These are the removal -- the proceedings --

THE COURT:  Oh, removal proceedings?

MR. SAMPAT:  Removal proceedings stripping the statute.

I would say in that context, those issues can be preserved.  And if it's -- if an individual was being -- if Yankee was being targeted and a Yankee national had an argument that I'm being targeted because of my religion, the way I imagine this playing out would be, they would go in front of -- they would be subject to removal proceedings. They would raise their defenses.  They would then go up on a petition for review on -- to the appropriate Court of Appeals.  And the Court of Appeals can talk about the constitutional issue.

THE COURT:  With respect to each individual Haitian.  So there would be 350,000 removal proceedings. And those 350,000 people are all going to individually raise a religious constitutional claim, and then those all go up

to the Court of Appeals?

MR. SAMPAT:  So there -- a policy and practice claim could be brought under (b)(9).  So I would say that one person could bring a policy and practice claim.  I don't know how to --

THE COURT:  By the way, if your visa ends, you're not automatically put in removal proceedings.  Right?

MR. SAMPAT:  That is correct.

THE COURT:  You're -- the presumption is that you're going to leave the country.

MR. SAMPAT:  The presumption is that you will voluntarily leave or depart or whatnot.

THE COURT:  I can't just put myself in removal proceedings.  Right?

MR. SAMPAT:  One could certainly ask.  But obviously, the executive has prosecutorial discretion whether to initiate them in the first place.

THE COURT:  So it could be that I don't have an avenue for relief.  It could be that I just have to stay in the country illegally or leave voluntarily even though there's a massive constitutional violation afoot.

MR. SAMPAT:  It would be that as -- remaining in the United States because of -- remaining in the United States unlawfully without any status that, you know, there may just not be a district court review of it.  One would

have to wait until proceedings are commenced.

THE COURT:  Until.  Right?  In the meantime, I don't have work authorization.  In the meantime, there's all kinds of problems that I have because I'm not in the country legally.

MR. SAMPAT:  Yeah.  I think that's all contemplated by the letter T in TPS.

THE COURT:  I'm talking about reviewability.  I just want to make sure.  So the Government's -- what is the best case for the proposition that if there is a blatant constitutional violation, the jurisdiction-stripping statute also strips the Court of the ability to consider whether or not Catholics have been discriminated against in the hypothetical I just gave you?

MR. SAMPAT:  So I don't have an exact case on point.

THE COURT:  Or any case.

MR. SAMPAT:  Any case on point.

But what I will say is, I'll cite to *Tazu v. Attorney General*, 975 F.3d --

THE COURT:  Sorry.  If you could slow down and say that again.

MR. SAMPAT:  Sure.  It's *Tazu versus the Attorney General*, 975 F.3d 292, Third Circuit, 2020.

MR. TAUBER:  I'm sorry.  One more time.

MR. SAMPAT:  975 F.3d 292.

MR. TAUBER:  Thank you.

THE COURT:  Are you sure?

MR. SAMPAT:  I believe it's 292.

THE COURT:  Can you sing a few bars of that case for me?

MR. SAMPAT:  Sure.  The name is *Tazu*, T-A-Z-U, *versus the Attorney General of the United States*.  I think the opening line is something like the path matters -- the path in the law matters just as much as in life.

THE COURT:  975 F.3d what?

MR. SAMPAT:  292.

THE COURT:  What part are you quoting me?

MR. SAMPAT:  I don't know -- have a pincite to this.  But there's a cite, I believe, to 1252(a)(2)(D) in the decision.

THE COURT:  (2)(D)?

MR. SAMPAT:  (A)(2)(D).  Yes.  It may be down near the end of the decision, where it says something to the effect of constitutional issues and questions are all preserved, and that can be reviewed by a Court of Appeals in a PFR.

THE COURT:  Oh, yeah.  Okay.  I did read this one.

But this was a due process violation with respect to -- a claimed due process violation with respect to one

individual.  And the Court doesn't say that -- as I understand it, the district court doesn't have the right to review it, the constitutional review.  All it's saying is that he does have review through the removal process.

MR. SAMPAT:  So yes.

THE COURT:  It's not saying that the district court doesn't have the ability to consider a constitutional claim under the circumstances I just gave you.

MR. SAMPAT:  So it doesn't specifically say that.  But I think what -- I think the crux of that decision is to say -- if you have issues of -- if you have constitutional claims that arise from the act of removal itself, which is exactly what would really happen here --

THE COURT:  From the -- no.  It's not from the act of removal.  It's a constitutional claim based on a Federal Register being unconstitutional, a notice being unconstitutional.  In fact, there is no removal in the statute because all the statute does is have visas expire.

MR. SAMPAT:  Your Honor, I thought the hypothetical had -- your hypothetical had contemplated removal.

THE COURT:  My hypothetical is now in the world of the TPS world and the Federal Register.

MR. SAMPAT:  So if the Federal Register on its face said, "I simply want to deport all Yankees" and it

doesn't say anything else about Catholicism or anything like that, I think under different -- the standard of review that we're articulating, we think that's sufficient and there's no review of that.

But to the extent that there could be some review, maybe it can -- there is a hole through which the Court could exercise authority.  I don't think it -- I think the stripping provisions are strong.  I think it covers constitutional claims and APA claims.

THE COURT:  So the Government's position -- and if you want to, like, talk to your colleagues and tell me in the morning.  But so far as I understand the Government's position is that in my hypothetical, the secretary says, "I think it's in the national interest to deport as many Catholics as possible.  All Yankees are Catholics, and therefore I'm ending the TPS for Yankees."

The Government's position is that not only can the Court not look at that because of jurisdiction stripping, not only -- and that includes APA, so the Court can't look at the process by which the secretary got there and can't consider whether or not that's in the national interest, yes or no, and also the district court can't take up a claim that that is a clear equal protection or First Amendment violation in the district court, putting aside removal proceedings.

MR. SAMPAT:  So I would say because of the way your Honor framed the hypothetical, I would say yes, because you said the secretary --

THE COURT:  Can or cannot?

MR. SAMPAT:  Cannot.  Because as your Honor put it, the secretary wants to deport all Catholics.  So that would be a removal issue.

THE COURT:  But she's not -- okay.  I mean, I don't know.  I mean, it feels like we're splitting hairs. "I don't like Catholics.  All Yankees are Catholic.  And therefore, I'm ending the TPS designation for the country Yankee."  Is there a constitutional review of that assessment?

MR. SAMPAT:  On just that hypothetical, I can't say one way or another, your Honor.

THE COURT:  All right.  Now, with respect to national -- let's just go back to national interest for a moment.  With respect to national interest, does -- let's say that the secretary wants to get rid of all Yankees fans. This is where we started with this and this is why the country is called Yankee.  She wants to get rid of all Yankees fans.  She says, "I want to get rid of Yankees fans, and so I'm ending TPS for Yankee country."

There are ten total countries in my hypothetical that have a TPS extension coming up and that have TPS in the

U.S. at that time.  Right?

MR. SAMPAT:  Right.

THE COURT:  Can the secretary say, "I don't like Yankees.  I think we should deport as many Yankees as possible, and so therefore I'm ending all TPS," because that's in the national interest for each country?  Or does the secretary have to make an individualized determination on a country-by-country basis?

MR. SAMPAT:  I apologize.  I lost your Honor's hypothetical.

THE COURT:  So --

MR. SAMPAT:  Go ahead, your Honor.

THE COURT:  Maybe it'll be easier to go back to Catholics.  Let's not do that.

There are ten countries in my hypothetical that are designated as TPS countries.  One of them is Yankee.  We have a Federal Register for Yankee in which the secretary says, "I don't like Yankees fans.  And so therefore, I'm ending the TPS for Yankees coming out of Yankee country."

MR. SAMPAT:  Okay.

THE COURT:  And then the secretary says the same thing for the other nine countries:  "I don't like Yankees fans.  So therefore, I'm ending TPS for every country."

Does that make sense right now?

MR. SAMPAT:  It does.

THE COURT: Can the secretary just do that? Or does she have to make an individualized determination with respect to each country and the national interest of keeping Yankees or not Yankees and how many Yankees fans there might be in that country and whatnot?

MR. SAMPAT: So all ten countries have been designated for TPS --

THE COURT: Yes.

MR. SAMPAT: -- terminated TPS for Yankees. And then based on that -- based on just the feeling that the secretary doesn't like Yankee fans and she wants to terminate the other nine -- and there's no hook whatsoever to the Yankees on the other nine?

THE COURT: There's no what?

MR. SAMPAT: No hook. Look --

THE COURT: We don't know. That's my question, actually.

Can the secretary just say, I assume -- there's at least -- let's say it's a fact that there's at least one Yankees fan in every country. Can the secretary -- can the secretary say, "Because I want to get rid of Yankees fans, I'm just going to end TPS for all of these countries"? Or -- because that's in the national interest.

Or does she have to go through each country, A, B, C, D, and say, Country A has enough Yankees fans that it's

in the national interest to end TPS for Country A.  Country B doesn't have enough Yankees fans.  They've only got one out of 3 million people, so it doesn't really matter to the national interest.

Does she have to do that analysis for every country?  Or can she just say, "I don't like Yankees fans.  They are bad for the economy, bad for the national interest, so we're getting rid of them, so we're ending TPS for all countries"?

MR. SAMPAT:  From the way the statute's written, I think the latter is permissible.

THE COURT:  She can just say, "We don't like Yankees fans.  They hurt the economy.  And so for every single country, without doing any individualized determination, we can stop TPS"?

MR. SAMPAT:  I think the statute certainly allows for it.

THE COURT:  Where are you getting that reading in the statute?

Time is flying.  I'm having fun with you today.  Hopefully not that I'm playing with you today, but I enjoy this back-and-forth.

MR. SAMPAT:  I share that sentiment, your Honor.  I'm up here.  I have to say that.

So again, the termination subprovision in TPS, 8

USC 1254a(b)(3)(B).  Right?  If the attorney general determines under Subparagraph (a) that a foreign state no longer continues to meet the conditions for designation --

THE COURT:  A foreign state.

MR. SAMPAT:  A foreign state.  So -- which goes back to the designation.  If --

THE COURT:  But that's my point.

MR. SAMPAT:  Yeah.

THE COURT:  Instead of going state by state and making a determination, she can just say, "I don't like Yankees fans, so we're ending TPS for each of those ten countries"?

MR. SAMPAT:  So I think that's right.  And I will also say, like, it also presumes that those other countries were all designated under the same -- under (C).

THE COURT:  That was going to be my next question.  All right.  So that's the Government's position.

MR. SAMPAT:  Yes.

THE COURT:  Got it.

I am going to want to hear argument from Plaintiffs on this, but we've been going for about an hour and 20 minutes.

We got back at 1:30, right?

THE COURTROOM DEPUTY:  Yes, your Honor.

THE COURT:  Wow.  Time is really flying today.

We're definitely going to be back here tomorrow.

Let's come back at 3:05.

Thank you.

MR. SAMPAT:  Thank you, your Honor.

(Thereupon a recess was taken, after which the following proceedings were had:)

MR. SAMPAT:  Your Honor, before we begin, I assume you want to hear from Plaintiffs on this?

THE COURT:  Yes.

MR. SAMPAT:  Before we do, do we have any idea or do you have a time at which we're trying to end by?  The only reason I ask is co-counsel and I have issues with childcare, dog care.

THE COURT:  Of course.  What time do you need to be done by?

MS. TORRES:  By 5:00, your Honor, if that would be possible.

THE COURT:  Oh, yes.  Yes.  We'll be done by 5:00.

MS. TORRES:  Thank you.

THE COURT:  Would 4:45 be better?  I don't want people to be rushed for childcare or for anything.

MS. TORRES:  Actually, your Honor, 5:00 should be fine.  Thank you.

THE COURT:  If we're at a natural stopping point before 5:00, we'll stop early.  But either way, we'll be out

by 5:00.

MS. TORRES:  Thank you, your Honor.

MR. SAMPAT:  Childcare is a little bit different than dog care.

THE COURT:  No, it's not.  Dog care is far more important to me.

MR. SAMPAT:  I have to coordinate.

THE COURT:  I have a dog and no kids.  It's more important.  Kids can feed themselves.

MR. SAMPAT:  I, too, have a dog and no kids.

THE COURT:  What kind of dog?

MR. SAMPAT:  A Shih Tzu-poodle-Lhasa Apso mix.

THE COURT:  What's her name?

MR. SAMPAT:  I'm sorry?

THE COURT:  What's her name?

MR. SAMPAT:  Sonia Elena Ginsburg.

THE COURT:  If my dog was named that, I would have never been confirmed.  That's awesome.

Go ahead.

MR. TAUBER:  For the record, I'd just like to note that my rescue mutt, Max, is very jealous of that name.

THE COURT:  I thought it was cool because I had Scout from *To Kill a Mockingbird*.  But man.

I just want to start with a little bit of the sort of what your understanding is of what the national interest

standard is or what the secretary is using against it --

MR. TAUBER:  Sure.

THE COURT:  -- or what she's supposed to and then have some discussion on this reviewability issue.  I don't want to get into the full jurisdictional argument, because we're going to do that tomorrow.  But obviously, we can't talk about this without touching on it.

MR. TAUBER:  Certainly, your Honor.

Is there someplace you specifically want me to start?  So national interest.  Let's take national interest.

First, I know your Honor expressed deep skepticism at the beginning of today's hearing as to our nondelegation argument.  But all of the questions your Honor was asking the Government about the vanilla ice cream hypothetical, about the Catholic animus hypothetical, goes to:  What is the scope of national interest under the TPS statute?

And I think both the secretary's definition of national interest in the termination notice and the answers we've gotten here today show very clearly that the statutory phrase, "national interest," is boundless and has no intelligible principle.  And that is precisely what makes it unconstitutional under the nondelegation doctrine.

THE COURT:  So what's your best case for that?

MR. TAUBER:  I'm sorry?

THE COURT:  There are lots of statutes that

reference national security, national interest, and give discretion to an agency head to assess those.  I mean, it seems like that is sort of classically what can be delegated to an agency.  We have this process.  Under the process, we need to determine whether a substantial group of people are going to be allowed into the country or not.  You have the discretion to figure out the national interest.

MR. TAUBER:  Yes.  There certainly are statutes that direct an agency head to act in the national interest. But as we explain in our briefing -- and I unfortunately don't have all the cases at my fingertips right now -- the cases that the Government cites all are cases in which the relevant statute, though it used "national interest" or some analog of that concept, all of those statutes provided guidance to the agency head on how to use that discretion, either by a paragraph-long statement of the intention of Congress or through the provision of guidelines, you know, to guide that exercise of discretion.

I don't believe any of the cases that the Government has cited to this Court involve a statute that, like TPS, as to the phrase "national interest," there is absolutely no guiding principle.

And I would point your Honor to the recent decision from Judge Howell of this district in the *Perkins Coie* case, where she said -- and I quote -- "National

interest" --

THE COURT:  The *Perkins Coie* case.

MR. TAUBER:  Yes.

THE COURT:  Williams & Connolly stepped up and actually defended Perkins Coie.  The only law firm to do so.  I'm just noting.

MR. TAUBER:  Yes, your Honor.  But there, Judge Howell said:  National interest is so broad that its scope appears to be essentially unlimited.

And that's --

THE COURT:  That was used as an executive order, not a congressional statute.

MR. TAUBER:  Well, here, it's even -- yes.  Yes, your Honor.

But it's the phrase and the lack of guidance to the phrase.  And I would say that applies equally well here.

But that's a nondelegation argument.  Your Honor understands it.  It will buy it or not.  I get that.

But further things to be said about the national interest --

THE COURT:  We can talk about that more tomorrow. I'm not cutting you off.

MR. TAUBER:  No, no, no.  We've presented the briefing.  I'm happy to -- I just want to --

THE COURT:  Of course, if you want to talk about

it or brief more.

MR. TAUBER:  Sure.  So that's the first thing to observe.

The second thing to observe is that as a matter of statute, national interest is simply an irrelevant factor when it comes to the periodic review under 1254a -- 1254a(b)(3)(A).

THE COURT:  This is under (C).

MR. TAUBER:  No, your Honor.  The designation -- now I'm distinguishing between the original designation, which is governed by (b)(1) in this instance (C) and the periodic review process under (b)(3)(A).  That's what we're here about today, your Honor, because --

THE COURT:  Right.  But, look, you're not going to get anywhere with me on that argument, because I just cannot imagine that the statute is not written in a way that allows -- that demands, really, that the secretary do a national interest consideration with respect to designating the country that way, but it should not be read as to also say that -- give the secretary the power to undertake that with respect to extending the designation.  That just doesn't make any sense.

MR. TAUBER:  Let me quibble with the premise there --

THE COURT:  You can quibble as much as you want.

MR. TAUBER: -- which is that in (b)(1)(C), which is the basis for designation here, she is not required to consider the national interest. She may. I'm not saying she couldn't at the initial designation period. She may. It's optional.

So it's not --

THE COURT: My guess is he's going to say --

MR. TAUBER: -- so surprising that Congress would have erected a different standard for either the extension or termination for very good reason; namely, once a country is designated, so once the decision has been made under (b)(1)(C), then the designation runs for the period described in the Federal Register notice and it cannot be terminated prematurely.

Why? Congress understood and courts have recognized in *HECA*, for example, from the Eastern District of New York earlier this year and other cases that the designation of a country creates reliance interest on the part of the TPS holders who have structured their lives based on the grant of TPS.

So once the country is designated, there's a different consideration that comes into play as opposed to the initial designation. Obviously, there are no reliance interests before a designation. But upon the designation, reliance interests do arise.

And so this is expressed in the statutes in two ways.

First, under -- I'm flipping because I have the words -- under (b)(3), 1254a(b)(3)(A), the periodic review portion of the statute, it says:  At least 60 days before end of the initial designation and any extend --

THE COURT:  You need to slow down when you're reading.

MR. TAUBER:  I'm sorry.  I was going over the fluff.  But at least --

THE COURT:  Just forget the fluff.

MR. TAUBER:  At least 60 days before end of the initial period of designation and any extended period of designation of a foreign state...under this section, the secretary, not the attorney general, after consultation with appropriate agencies of government, shall review the conditions in the foreign state.

And that is to be the basis of her determination, is the conditions in the foreign state.

U.S. national interests is not a condition in the foreign state.

So under this plain language of the statute, it is to be restricted to the conditions in the foreign state.

THE COURT:  But it says "whether the conditions for such designation" under this subsection.  I would take

the "for such designation" as to be with respect to (C),
which is the (C) above, which is the temporary conditions
and national security -- national interest.

MR. TAUBER:  Well, your Honor, first of all, as
you know, we have an argument that the secretary by the
statute which refers to the subsection is not permitted to
restrict her review to just the basis for the current
designation, but must consider all -- that's obviously a
different point -- consider all of the potential bases for
designation under 1254a(b)(1).

But as far as the language that your Honor points
to "and shall determine whether the conditions for" --

THE COURT:  I think -- you're just reading way too
fast.

MR. TAUBER:  I'm sorry, your Honor.  It's a bad
habit.

THE COURT:  And you're also kind of mumbling
because you're trying to get over fluff.  If you don't want
to -- I have it in front of me.  You don't have to quote the
fluff.

MR. TAUBER:  I apologize, your Honor.

THE COURT:  You're fine.

MR. TAUBER:  When it refers to such designation, I
think it's just referring to a designation under (b)(1),
because it refers then to the subsection.

THE COURT:  Under (b)(1) --

MR. TAUBER:  All of it.  (B)(1) has the three possible bases for designation.

THE COURT:  Right.  The one that we're dealing with is (C).

MR. TAUBER:  Well, that's the basis for the current designation.  But we argue based on (b)(3)(A) the secretary must consider the other potential bases when reviewing the conditions in the country.

And in this instance --

THE COURT:  That doesn't make any sense to me. What's the specific words in (b)(3)?

MR. TAUBER:  The words that we're relying on here is "shall determine whether the conditions for such designation under this subsection."

This subsection is a reference to (b) -- to Subsection (b).

THE COURT:  That makes no sense as a reading, because you could have a situation where you designate a country under (C) where there's no ongoing armed conflict; there never was an armed conflict.  So why would they be reviewing whether there's an ongoing armed conflict?  That was never the basis for the designation.

MR. TAUBER:  Surely, if, for example, there's no armed conflict, it wouldn't take much at all.  It would be

just, like:  No.  There's no armed conflict.  We've reviewed.  We're done.  But they'd at least have to look at whether there was an armed conflict there.

And here, in the case of Haiti, it's not hypothetical.  There is an armed conflict.  There's an armed conflict between various gangs, amongst themselves --

THE COURT:  Is there any case that says --

And I take it you don't read the statute this way?

MR. SAMPAT:  Absolutely not, your Honor.

THE COURT:  See how --

MR. TAUBER:  It's been a few days since I've reviewed the transcript, but I believe in the *Dahlia Doe* case the Court made --

THE COURT:  *Dahlia Doe* is a California or New York case?

MR. TAUBER:  *Dahlia Doe* is Syria out of the Southern District of New York.  That's the oral transcript of the ruling.  There's no written ruling yet that I'm familiar with.

THE COURT:  Okay.

MR. TAUBER:  But the --

THE COURT:  I'm going to have to disagree with my colleagues on this.  I mean, I just -- that just seems like an odd and expansive reading of it.  I'm not sure it matters to your argument.

MR. TAUBER:  Well, it matters to one argument.  It doesn't matter to our fundamental argument nor the bottom line.

So moving on from that --

THE COURT:  But my main point is that when we get to (b)(3)(C), that extension of designation, if the attorney general does not determine under Subparagraph (a) that a foreign state or part of such state no longer meets the conditions for designation under Paragraph 1, the period of designation of the foreign state is extended for an additional six months or, in the discretion of the secretary, for 12 or 18 months.  Right?

MR. TAUBER:  Yes.  Exactly, your Honor.

THE COURT:  Okay.  But your argument is that that does not include a reference to the secretary considering national interest because it's referring to Subparagraph a(b)(1)(A) and not to (b)(1)(C), which is what contains the national interest prong?

MR. TAUBER:  No, your Honor.

THE COURT:  I got that wrong.

MR. TAUBER:  Let me just back up.  I'm not sure I understood.  Let me give you my understanding.

So 1254a(b)(3)(C) is the default rule.

THE COURT:  Extension for designation.

MR. TAUBER:  Yes.  Exactly.  So under the default

rule that Congress established, a TPS designation is automatically extended by default unless the secretary makes an affirmative finding pursuant to the process outlined in 1254a(b)(3)(A).

So these --

THE COURT:  Well, why a(b)(3)(A)?  It's only discussing (A).

MR. TAUBER:  Well, (b)(3)(A) is the periodic review procedure.  That's what directs the secretary to conduct the periodic review and to review the conditions in the designated state.

THE COURT:  Oh, so (A) here is referring to (3)(A) --

MR. TAUBER:  Yes, your Honor.

THE COURT:  -- not (1)(A).

MR. TAUBER:  Correct.

THE COURT:  But nonetheless, your contention is that (3)(A) does not include any reference to anything that references national interest?

MR. TAUBER:  To the contrary, its reference is very specific.  It says:  shall determine -- shall review the conditions in the foreign state.  That's the critical passage there.  "In the foreign state."  The U.S. national interest is not a condition in the foreign state.

THE COURT:  All right.

MR. TAUBER: So --

THE COURT: You all disagree with that?

MR. SAMPAT: Yes.

MR. TAUBER: You can assume they disagree with what I say.

So then your Honor had --

THE COURT: Actually, we had a partner at Williams & Connolly -- I won't say his name -- who was like an old-school criminal defense lawyer that some might call combative. And he went to the hilt for his client. He would fight you tooth and nail on every single argument. And he was part of an ongoing, very complex criminal proceeding in front of the same judge against the Government that I think had been going on over a year, maybe even two. And at one point during argument -- I'll just say his last name is Smith.

The Government is like, Mr. Smith has conceded.

The judge interrupted and said, Counsel, Mr. Smith has not conceded anything, a single thing in this entire case. I don't know what you're going to say next, but he didn't concede it.

But anyway, go ahead.

MR. TAUBER: I don't think you can accuse either party here of conceding too much.

So let's just talk about the Catholics. It seems

easier because that's an obvious constitutional claim notwithstanding the fact that someone from Boston understands exactly why --

THE COURT:  You're talking fast and mumbling --

MR. TAUBER:  It's the Catholics.

THE COURT:  -- because it's a tangential -- you don't really care about it.  And I wouldn't care.  I think there are very interesting, except I get stressed for her.

MR. TAUBER:  Certainly, your Honor.

So let's take the Catholic example.  The Government suggests this Court lacks jurisdiction to review even that outlandish -- the determination of that --

THE COURT:  I don't think he was suggesting; I think he flat-out said that.  I don't think he was suggesting.

MR. TAUBER:  Very well.  The Government has said that the Court lacks jurisdiction to consider even that outlandish hypothetical.

The Supreme Court --

THE COURT:  That individuals if they're put in removal proceedings can do that through removal proceedings.

MR. TAUBER:  Let's put a pin in that so we have something to say on that, too, your Honor.

The Supreme Court has said the Government is wrong in *McNary*.  The Supreme Court specifically held --

THE COURT:  Actually, we were talking to my clerks yesterday and talking about my thoughts on jurisdiction.  I was talking about the cases I wanted to talk about, you know, in an opinion when we get there.  I was like, Well, we have to cite *McNary*.  And Catherine is like, We're definitely citing *McNary*.

Go ahead.

MR. TAUBER:  Yes.  It's absolutely central to the issues before this Court.  *McNary* --

THE COURT:  Catherine is on it.

MR. TAUBER:  It squarely held that constitutional claims are reviewable even if individual determinations are not.

That's where we are.  We're raising a constitutional claim as well as an APA claim.  And of course our APA claim does not go to an individual determination; it goes to the process by which the determination was made.

THE COURT:  But what if -- this is going to be important when we talk about sort of just what I can and can't do under the APA.  Put aside the discussion.  This is going to be a discussion for tomorrow.  We're going to focus on that a great deal.

What if the secretary did everything right, consulted all the agencies, weighed all the data, you know, process-wise did everything she was supposed to do and came

to the conclusion that getting rid of Catholics is in the national interest and therefore -- and therefore we're ending TPS for Haiti because they're all Catholics?

It's a fine line between what's attacking a process and what's attacking a decision, which is certainly -- I think at a minimum you would agree that there's jurisdiction-stripping of the ultimate decision.

MR. TAUBER:  Well, to be careful, your Honor, remember that tension or extension under the statute is a ministerial act.  The decision-maker must as a matter of fact make the determination required under (b)(3)(A).

And if the result of that determination is that the conditions in the country are still such that the conditions for designation are met, she is obligated to extend.  Conversely, if in going through the process as a matter of fact she determines that they do not exist, she's obligated to terminate.

So it's really the -- the play is in how she reaches the determination because the ultimate extension --

THE COURT:  But let's say she reached the determination using full and appropriate process and came to the conclusion in her discretion that getting rid of all Catholics was in the national interest.

MR. TAUBER:  Well, if everything was procedurally proper, presumably our APA claim would vanish except to the

extent that the APA as well as simply the Fifth Amendment's equal protection guarantee independently provide that racial animus is not a permissible basis of government action.

THE COURT:  So I mean, here's what the problem is going to be when we sort of talk tomorrow, just as a spoiler alert for everybody.  If you don't want to hear what's going on tomorrow, close your ears.  But -- and this has always been a problem with the APA.  We can't second-guess the secretary's decision but we can strike something down there's contrary to law.  And clearly, a decision that says "We're basing a deportation decision on getting rid of all Catholics" would be contrary to law.

MR. TAUBER:  Yes.

THE COURT:  But it's also -- or arguably instead is a merits decision on the secretary issuing her discretion as to whether or not to extend the TPS for Haiti.

MR. TAUBER:  Your Honor, there are plenty of decisions.  I think maybe even *Arlington Heights* -- and the facts are a little fuzzy in my head -- where the decision-maker, the governmental decision-maker, seems to go through the right processes, the zoning hearings and all that, engages in what you'd imagine would be engaged in and then reaches a conclusion that might be consistent with what they've done, but nevertheless is animated by racial animus.  And the Supreme Court has held in *Arlington Heights* that

that's simply not permissible.

So it's the same thing here, too.  It's a fundamental --

THE COURT:  The problem is that we didn't have a jurisdiction-stripping requirement under *Arlington Heights*, as I recall.

And I'm just getting back to what is going to be the scope of this jurisdiction-stripping statute and what it allows me under the APA -- they say nothing under the APA, but let's say I disagree with that and I can do something under the APA -- what that exactly allows me to do in the context of an administrative record that, charitably stated, does not support and in fact I think contradicts in all cases the secretary's decision, arguably.

But I'm not allowed to second-guess how she reads the administrative record.

And so that's where sort of the rubber is going to meet the road when we get into this tomorrow in greater depth.  And I think Mr. Kurzban is agreeing with me because he's shaking his head yes.  But I mean, I think that's why we're going to have the rubber hit the road.  And that's why I want to be very careful when I'm considering the record, when I'm considering the citations, to not be in the lane I'm clearly not allowed to be in.  And that is second-guessing the way the secretary read the

administrative record, which is why Mr. Sampat repeatedly said to me, Well, different people can read that differently.

He was saying that because he's a very good lawyer and he knows that that sets up his argument that even if I read the administrative record as someone reading the English language would, that it's reasonable to read it a different way and my view doesn't count, that it's the secretary's views that count, and I can't do anything about that.

Did I get that right?

MR. SAMPAT:  Yes, your Honor.

MR. TAUBER:  Well, as the D.C. Circuit has said, quoting -- I believe it was Judge Friendly from the Second Circuit -- "This Court need not engage in naïveté that the general public does not have to engage in."

THE COURT:  I know.  But, look, I'm just -- with respect to my decision, with respect to these other TPS decisions, with respect to appellate review, the rubber is going to hit the road at some point on that question.  And putting aside, obviously, on the APA question.  But there are other issues.

MR. TAUBER:  We'll have further argument on this, I believe, tomorrow.  But I would just note right now that no court has accepted the Government's argument.

THE COURT:  Well, you know, the Supreme Court didn't stay the Venezuela decision.  So --

MR. TAUBER:  It's a tea leaf.  Who knows what it means?

THE COURT:  It means very little right now because we've taken over Venezuela, at least temporarily.

MR. TAUBER:  Yeah.

THE COURT:  Actually, I don't know if we've taken it over.  We've gone into it and taken their president.  I should say that, right now, that's all I know.

MR. TAUBER:  And I note --

THE COURT:  It doesn't matter.  Go ahead.

MR. TAUBER:  Again, I presume we're going to go to more in-depth discussion tomorrow, so I'm not sure whether the Court wants me to go there or no.  But we certainly have arguments specifically in the first instance under 5 USC Section 559 why none of these provisions deprive the Court of the authority --

THE COURT:  No.  Let's save that.  I was really focused on national interest for right now.

MR. TAUBER:  The one thing that your Honor mentioned that probably is worth commenting on is -- or I guess the Government raised this -- the possibility of asserting constitutional claims in immigration court.  We've presented you in our briefing case law standing squarely for

the proposition that the immigration judges in the Board of Immigration Appeals cannot, will not consider constitutional claims, do not have the institutional mechanisms by which to develop the record for constitutional claims. So it's entirely illusory.

And the notion that someone should put themselves into removal hearings just to test it is cruel.

THE COURT: You know, he has a job. He's doing it. Okay.

MR. TAUBER: Thank you, your Honor.

THE COURT: And we are going to get back into the facts unless you wanted to say anything before we get to tomorrow. Maybe tomorrow or later today or whatever. Maybe addressing his nondelegation argument would be useful. Maybe if you want more -- if you want time on that because you want more briefing, of course you can do that.

MR. SAMPAT: So on the nondelegation issue, your Honor, I think it's in our briefing. We had raised it as an alternative. We can certainly take that up tomorrow if your Honor would want.

THE COURT: Okay.

MR. SAMPAT: Are we still going through the termination notice and the footnotes, your Honor?

THE COURT: Yes. And as I understand it -- and we can go through this -- the secretary identified three

reasons that it's in the national interest to end TPS protection for Haitians. One is immigration issues, which we'll get into. Two is adding strain on local communities. And third is this pull factor with respect to immigration. That's basically it, right?

MR. SAMPAT: That is my understanding. If you'll give me one minute, your Honor.

THE COURT: Sure.

MR. SAMPAT: Thank you.

THE COURT: So let's start with immigration. At 4376, the Federal Register says, quote, "Haiti lacks a central authority with sufficient availability and dissemination of law enforcement information necessary to ensure its nationals do not undermine the national security of the United States."

I read that right, right?

MR. SAMPAT: Is there a footnote associated with that?

THE COURT: Footnote 27.

MR. SAMPAT: 27.

I'll read it back into the record. It says: In addition, as is widely known, Haiti lacks a central authority with sufficient availability and dissemination of law enforcement information necessary to ensure its nationals do not undermine the national security of the

United States.

THE COURT:  Correct?

MR. SAMPAT:  That's correct.

THE COURT:  Then she cites to that Footnote 27, which is an executive order signed by President Trump in June of 2025.

MR. SAMPAT:  That is correct, your Honor.

THE COURT:  And that is an executive order that is aimed at preventing persons from certain countries, including Haiti, from entering the United States.  Right?

MR. SAMPAT:  Yes.  I believe that was the 212(f) order.

THE COURT:  The executive order does not undertake an assessment of whether Haitian TPS holders who are presently in the United States create a national risk.  Right?

MR. SAMPAT:  If I may.  If you'd give me one moment, your Honor.

THE COURT:  Sure.

MR. SAMPAT:  Let me just make sure.

Your Honor, I unfortunately don't have the executive order in front of me.

THE COURT:  Maybe be ready to answer that tomorrow.

My understanding of the executive order that's

cited there is bans aimed at preventing persons from certain countries, including Haiti, from entering the United States. So whatever it's saying about its central authority being able or unable to vet nationals before they come into the country, that wouldn't impact people who are already here in Haiti under the TPS.  Right?

MR. SAMPAT:  Yeah.  I think that's right.  And -- but I will -- it was the June 10th, right?  Never mind.

THE COURT:  My favorite DOJ lawyer just walked in. He's great.

MR. SAMPAT:  He had intended to join me at counsel table to avoid me making Yankee references.

THE COURT:  Do you want to come up?  Are you on this case?  No?  You're good.

MR. SAMPAT:  So I am looking at the June 10th notice, which I believe is the proclamation -- I have it in the certified administrative record, your Honor.

THE COURT:  It's the executive order aimed at preventing people from coming into the country.

MR. SAMPAT:  Yes, it does.

But I will note that it does actually talk about -- it does talk about individuals from Haiti present in the United States.

THE COURT:  Illegally present in the United States?

MR. SAMPAT:  Yes.

THE COURT:  The Haitian TPS holders are not illegally in the United States.  They're legally in the United States.  Right?

MR. SAMPAT:  Well, they may have entered unlawfully and then gotten TPS.

THE COURT:  If they have TPS, they are in the country legally.  They have a visa.

MR. SAMPAT:  Well, it's not a visa, your Honor. It's just that they are --

THE COURT:  Temporary status.  Sorry.

MR. SAMPAT:  They're temporarily protected from enforcement decisions, sure.  But I think this -- they would still be covered in the statistics that are cited here.

THE COURT:  So it's the Government's view that Haitians who are here under a TPS status who entered the country illegally are in the country illegally right now?

MR. SAMPAT:  Is that they have temporary protected status but that they may be covered by the statistics that are cited in the proclamation that talk about individuals who overstayed their visas.

THE COURT:  Do we have any information as to how many TPS holders entered illegally or overstayed their visas?

MR. SAMPAT:  I don't believe that's in the record

in that fine of a detail, your Honor.

THE COURT:  Well, that's important detail, right?  Because when we're talking about the national interest of keeping Haitians under TPS status, a vast majority of the discussion is with respect to illegal immigrants who have overstayed their visas.

MR. SAMPAT:  That's one way to look at it.

I think another way to look at it is a little bit more broadly, which is individuals who may have entered the United States on a visitor visa and then overstayed but then received TPS were -- entered unlawfully, and then that was part of the consideration that went into the --

THE COURT:  But in order to understand that, we need to know what percentage of Haitian TPS holders that represents.  Right?

MR. SAMPAT:  I --

THE COURT:  It might be one person; it might be all 360,000 of them.

MR. SAMPAT:  I think maybe for you and I, your Honor, we may say that sort of minutia would be important.

THE COURT:  It's not minutia; it's an important point.  It goes to the scope of the problem --

MR. SAMPAT:  It --

THE COURT:  -- if there is one.

MR. SAMPAT:  It goes --

THE COURT:  Right now, can you say with certainty that there are any Haitian TPS holders that are here illegally?

MR. SAMPAT:  That they have TPS, so, like, I --

THE COURT:  I'm just saying:  Based on the administrative record, is there anywhere in the administrative record from which I could deduce that there are -- for sure their status supports at least one Haitian individual who is here illegally, has overstayed a visa or entered illegally and never had one?

MR. SAMPAT:  I don't know if that's in the record, your Honor.

THE COURT:  Well, add that one to your list.

MR. SAMPAT:  I would defer to the record.

But what I will say is, again, if someone had a visa, came here, overstayed and received TPS after that, that was an unlawful entry to begin with.

So --

THE COURT:  Well, those, too.  I mean, the notice talks about how individuals who overstay their visas are harder to locate, monitor and increasing vulnerabilities within immigration enforcement systems.

So that -- in order for that to apply, that has to assume that there are some individuals who have Haiti TPS status who overstayed their visas.  Right?  Otherwise, it

would be totally irrelevant.

MR. SAMPAT:  I think we're assuming that they would have Haiti TPS status and then overstayed their visas. I'm talking about a situation in which somebody had a visa that expired and then obtained TPS.

THE COURT:  Yes.  I get you.  But how many people are there like that in the country?

MR. SAMPAT:  I don't know off the top of my head.

THE COURT:  Does the administrative record know?

MR. SAMPAT:  There are plenty of statistics in here.

THE COURT:  I can assure you it does not have that.

MR. SAMPAT:  So I remember looking at the numbers. I know they were sort of -- I was doing my best.  But, you know --

THE COURT:  Well, I'm going to give you a chance to tell me.

MR. SAMPAT:  Okay.

THE COURT:  So that's one of the things I want you to look up.  Because you would agree with me at a minimum that if we're talking about one person out of 560,000, that wouldn't really present a national security concern.

MR. SAMPAT:  No.  But I just very quickly pulled this up.  It's 164 in the certified administrative record.

It's an email from Alicia Ward to Andrew Block, Sarah Miller and Brian Baker that talks about nonimmigrants who overstayed their visas and arrived since June 3rd, 2024. That's at 700 people.

Then there is a breakdown of numbers of individuals.

THE COURT:  Can you give me that again?

MR. SAMPAT:  Sure.  It's -- the Bates stamp is 164, so 171 in the PDF.

THE COURT:  Well, you have a problem now, because for me that's withheld as privileged unless you guys gave that to us --

MR. SAMPAT:  The numbers -- the numbers are?

THE COURT:  It might be in something you've since redacted.  Hold on.  I'm looking at -- I think I'm looking at it.  No.  Sorry.  I'm looking at the wrong CAR.

MR. PIPOLY:  Your Honor, I'm being told that our version of that has redactions as well.

MR. SAMPAT:  There are some redactions.  But the numbers are not redacted.

MS. TORRES:  Your Honor, may I approach counsel?

THE COURT:  Sure.

MS. TORRES:  (Tenders document to co-counsel.)

MR. SAMPAT:  So --

THE COURT:  I'm looking at the wrong one.  I'm

sorry.  I'm looking at the wrong one.  Where are you?  Where are you?  I need to get to the right one.

MR. SAMPAT:  In our -- in the certified administrative record before the Court --

THE COURT:  Just give me a moment.  I just need to get there.  I closed it again.

MR. SAMPAT:  Sure.

THE COURT:  Now I have it.  Hold on one second.  It's Docket Entry 78-5.

MR. PIPOLY:  I'll show you what I've got here.

MR. SAMPAT:  Do you mind if I come around?

MR. PIPOLY:  No.  Go ahead.

MR. SAMPAT:  I see.  Thank you.

THE COURT:  This says as of September -- I'm sorry -- as of June 3rd, 2024, nonimmigrants in valid status who arrived since then is 3,000?

MR. SAMPAT:  3,000, yes.

THE COURT:  And nonimmigrants who overstayed and arrived since [indiscernible] --

THE COURT REPORTER:  Sorry, Judge.  I missed that last part.

MR. SAMPAT:  I'll say it.  The first one is nonimmigrants in valid status who arrived since June 3rd, 2024.  That number is 3,000.

Then nonimmigrants who overstayed and arrived

since June 3rd, 2024, that number is 700.

THE COURT:  These are estimates of people who might become TPS holders?

MR. SAMPAT:  Those are estimates, yes.

THE COURT:  You mean potentially eligible, given the new designation with a continuous residence date of 4-14-2025.

MR. SAMPAT:  Yes.  Per the email, that's right. But that is -- but it goes to the point that I'm trying to make, which is individuals who overstayed their visas may still get TPS.  That doesn't -- that they have protected status, as they remain.  That's one thing.  But --

THE COURT:  I understand.  But the question is: How many are there?

MR. SAMPAT:  I don't know if that's in the record.

THE COURT:  That's my question.

MR. SAMPAT:  We have that.

But again, this is -- I will continue making this point about numbers can mean things different.

THE COURT:  I understand.

It says -- the Federal Register goes on to say: Elevated overstay rates present potential risk to U.S. national security and public safety as aliens who overstay their visas may be harder to locate and monitor, increasing vulnerability within immigrant enforcement systems.

Did I read that correctly?

MR. SAMPAT:  I believe you did.  I caught your Honor about halfway down.  So everything after "as aliens who overstay" is correct.  But I think that's right.

THE COURT:  Elevated overstay rates present potential risk to U.S. national security and public safety.

MR. SAMPAT:  Yes.

THE COURT:  Okay.  And as aliens who overstay their visas may be harder to locate and monitor, increasing vulnerabilities within immigration enforcement systems. Right?

MR. SAMPAT:  That is correct.

THE COURT:  So a couple questions on that. There's no citation to that.  Right?

MR. SAMPAT:  There is no footnote, which is how the register notice has been routinely citing to sources. No.

THE COURT:  Okay.  Now, what are the normal overstay rates that the secretary compared against to say, I assume -- it's not spelled out exactly -- that Haitian TPS holders have elevated overstay rates?

MR. SAMPAT:  I believe that's in the Congressional Report.

THE COURT:  If you'd just give me a citation.

MR. SAMPAT:  Give me one moment, your Honor.

I believe it's cited at Footnote 28.  So that puts it at Bates stamp 268, meaning PDF 725.

MR. PIPOLY:  268?

MR. SAMPAT:  Bates stamp 268, yes.

MR. PIPOLY:  Thank you.

THE COURT:  My Bates stamp 264 has a report called entry/exit overstay report.

MR. SAMPAT:  I'm sorry.  I didn't catch that, your Honor.

THE COURT:  My 264 is the start to -- the cover page.

MR. SAMPAT:  Sorry.  It's 268.

THE COURT:  278, did you say?

MR. SAMPAT:  268 is the Bates stamp, so 275 in the PDF.

THE COURT:  275.  My Haiti 275 is a table of contents.

MR. SAMPAT:  I think you're in the right document, though, your Honor.  So if you'd give me one moment, I'll find the exact page that we're looking at.

It's Haiti 290.

THE COURT:  290?

MR. SAMPAT:  290, yes.  So it's Page 15 at the bottom of the Congressional Report that shows that Haiti's -- I believe their overstay rate is 24.84 percent

and their suspected overstay rate is 24.44 percent.

THE COURT:  This is for nonimmigrants admitted to the U.S. for business or pleasure via air and seaport of entry for non-visa waiver program.

MR. SAMPAT:  It's one of the numbers I believe cited in the termination notice.

But this goes to show that Haiti's overstay rates are higher than countries like Burma, Laos and Suriname.

THE COURT:  Well, those would include people who are here under TPS status.  Right?  Potentially.  We don't know.

MR. SAMPAT:  I don't remember if -- I don't recall.  I don't think they do.

THE COURT:  It does not.

MR. SAMPAT:  No.

THE COURT:  So you would agree with me if someone came into the U.S. on a visa and, while they were legally here under the visa, got TPS protection status, those people were never here illegally?

MR. SAMPAT:  If they arrived on a valid visa, their visa authorization never lapsed, they didn't go commit a crime or anything like that, I have no reason to say that their presence in the United States is then unlawful at that point.

THE COURT:  And when the secretary says aliens who

overstay their visas may be harder to locate and monitor, she's not talking about TPS holders, because of course TPS holders report their whereabouts to the government. Right? They're required to notify the government of their address and any address change. Right?

MR. SAMPAT: Yes.

THE COURT: So when she says, Elevated overstay rates present potential risk to U.S. national security and public safety, as aliens who overstay their visas may be harder to locate and monitor, increasing vulnerabilities within immigration enforcement systems, she's not talking about people who have overstayed their visas and are now under TPS protection because people under TPS protection, we know where they are. We're keeping track of them.

MR. SAMPAT: I don't know what that --

THE COURT: I'm just talking about the English language here.

MR. SAMPAT: I understand that, your Honor.

THE COURT: I'm saying as a matter of logic, aliens who overstay their visas may be harder to locate and monitor. That's because if they overstayed their visas, we don't know where they are potentially. They could have moved. They have no obligation to. I mean, they have the obligation to leave the country. But if there's no -- they're not telling the country -- the government where they

are because now they're here illegally.  Right?
Potentially.

MR. SAMPAT:  But it can cover -- it can cover individuals that could potentially apply for TPS that haven't yet but are overstays and haven't --

THE COURT:  But, see, here's the thing.  Here's where you and I are going to have a conversation.  Because all of this assumes that the secretary not only extends the Haiti designation, the Haiti TPS for current people already in the country; the argument that you've just started to make and are about to make in more depth assumes that the secretary also redesignates Haiti.  Right?

Because we went -- that's why I was very careful to go over this this morning.  I did that very carefully for this very reason, because I knew we were going to get right to that argument that you just made, which is:  The secretary, you said this morning, has the ability to extend the designation for people already in the country but not redesignate.  Correct?

MR. SAMPAT:  That is what I said this morning.  Yes.

THE COURT:  And that is correct, right?  You weren't lying this morning?  You weren't wrong?

MR. SAMPAT:  I have no reason to.

THE COURT:  You're very good at what you do.

MR. SAMPAT:  One would -- I would hope so.

THE COURT:  You are.

MR. SAMPAT:  I appreciate that.

THE COURT:  Take my word for it.

The people who are already in the country, it can't be talking about them who are TPS holders today, because we know where they are.

MR. SAMPAT:  I would say, your Honor, I think based on the fact that they've -- that the secretary relied on statistics on overstays and things like that also and --

THE COURT:  We don't know that she did, because she didn't cite to anything here.  My guess is she didn't cite to anything here because there's -- I mean, what you're going to tell me is there's nothing in the administrative record that tells me how many people on TPS status were at some point here on an expired visa.

MR. SAMPAT:  So I don't know if it's in the record.

THE COURT:  I know.  You're going to tell me.

MR. SAMPAT:  I do my best to --

THE COURT:  As a matter of logic, this concern about elevated overstay rates, the concern when someone overstays their visa, according to the secretary, is aliens who overstay their visas.  Right?  That's the concern.

MR. SAMPAT:  That is the concern based on the

termination notice.  Yes.

THE COURT:  All right.  That category cannot as a matter of logic include current TPS holders, because we know where current TPS holders are because they're required to send the government their addresses and change of addresses. And we know it can't -- it doesn't need to refer to people coming into the country because the secretary has the discretion of extending the designation without redesignating.  So we know that whatever this is, it cannot as a matter of logic concern, does not apply to, current Haitian TPS holders.

MR. SAMPAT:  I think that presumes that current TPS holders are updating their addresses and whatnot with the government as required.

So --

THE COURT:  But I mean, that's a major assumption. I mean, it doesn't say individuals who are here on TPS visas don't update the government as they're required to.

MR. SAMPAT:  No.  But it --

THE COURT:  This is talking about individuals who overstay their visas.

MR. SAMPAT:  In that case, I think we're starting to slice the bread a little thin.

THE COURT:  No, we're not.  We're slicing it right down the middle of the bagel because this is -- there's no

onion.  There's one big loaf of bread and we are making one cut.

MR. SAMPAT:  With that, your Honor, I would say it's got to be viewed in the context of the entire notice.

THE COURT:  I know.  That's why I'm going through every part of the notice.  I'm just talking about this particular part.

MR. SAMPAT:  So I --

THE COURT:  I'm just talking -- I've been very careful to go over this entire notice with you, and that's why I'm doing it.  But I'm just talking about this part of the notice, this specific concern, that we cannot say that current Haitian TPS holders are presenting an overstay problem with respect to location monitoring because TPS holders -- in order to get TPS in the first place, we had to know where they were.  In order to continue work benefits, we have to know where they are.  And we have access to their addresses because they're supposed to tell us about changes of addresses.

We also have -- presumably, we'll get to this much later -- their tax information, if we need to actually track them down and they haven't updated us.  So what I'm saying is as a matter of logic, this issue cannot possibly apply to Haiti TPS holders.

Now, it might apply to the decision whether to

redesignate Haiti for new people coming in.  Then yes.  As a matter of logic, this could apply to that.

But we've already assessed that the secretary doesn't have to end the TPS for that -- to keep that out. She can just not new-designate, but continue to extend.

MR. SAMPAT:  I'm not going to go that far, your Honor, only because I know there are other data tables in this.

THE COURT:  Well, add it to your list.  I want to know what the data says in the administrative record about the number of TPS holders who don't alert the government as to their locations as required to by numerous government forms.

MR. SAMPAT:  I apologize, your Honor.  But I thought the inquiry was about TPS holders who are here unlawfully.

THE COURT:  That's one.  This was another one. Your argument is, Well, even if they have TPS, we might not know where they are because maybe they don't update the government as they're supposed to.

I'm saying that's rank speculation and that there's no evidence of that anywhere.  But I'm going to give you a chance to prove me wrong.

MR. SAMPAT:  So the first one is data in the admin record for TPS holders who are not updating their addresses.

The second one is the data for TPS holders --

THE COURT:  Who overstayed their visas before they got TPS.

MR. SAMPAT:  Okay.

THE COURT:  Okay?

MR. SAMPAT:  Got it.

THE COURT:  Now, let me just ask you this question.  Right now, TPS holders are required to update the government on where they are.  Right?

MR. SAMPAT:  Yes, ma'am.

THE COURT:  And there's, like, 368,000 of them or something?

MR. SAMPAT:  I think that's a ball-bark figure. But I think that's right.

THE COURT:  Let's say that this lapses in February of 2026.  Right?

MR. SAMPAT:  Uh-huh.

THE COURT:  So if they're not here on some other valid visa, those TPS individuals are no longer protected legally in the country.  Right?

MR. SAMPAT:  They would no longer have Temporary Protected Status.  Yes.  That's correct.

THE COURT:  They would no longer -- if they stayed -- but they wouldn't be put into removal proceedings. Right?  They would be told to leave?

MR. SAMPAT:  I think that applies regardless of whether somebody has TPS or not if they're here unlawfully. But once they lose TPS status, the enforcement proceedings can take place.  They can be put into removal proceedings. But nothing requires the government to put them into removal proceedings.

THE COURT:  Right.  And so let's say that I'm a Haitian TPS holder and I've been here in the country legally under this TPS standard for -- I don't know -- when was this first designated?  2011?

MR. PIPOLY:  2010.

THE COURT:  Let's say I've been here since 2011. Let's say that this ends in February of 2026.  And I decide, you know what?  They've said I have to leave the country, but I think if I leave the country I'll go to Haiti and I'm going to die.  And I would rather take the risk of being put in removal proceedings than know I'm going to go to Haiti and die.  So I'm just going to stay in the country.

At this point, the government has lost track of these individuals.  Right?  Because these people are no longer obligated to tell the government where they are. Right?

MR. SAMPAT:  Your Honor, I will just note that I know there is a registration requirement for other individuals.  I just know this.  And talking to a colleague

of mine, I don't remember the specific context and things like that.  But there is a statute that requires registration.  And how that's applied, who --

THE COURT:  For people who are here in the country illegally?  Do you think illegal immigrants register their whereabouts?

MR. SAMPAT:  I think there is -- I think there is a statute that requires it.  And I think there --

THE COURT:  I'm sorry.  There's a statute that requires individuals who are here illegally in the country and trying to stay here in the country illegally to register their information with the government?

MR. SAMPAT:  I think the requirement in the statute is that they have -- there's an obligation to update the government as to their whereabouts, including address or whatnot, and --

THE COURT:  For illegal immigrants.

MR. SAMPAT:  So the statute is broad.  So I think the statute is --

THE COURT:  Let's put -- if you want to cite me a statute, cite me a statute.  But let's all assume -- make the reasonable assumption that if I'm in the country illegally, I'm not going to tell the government where I am because I want to stay in the country illegally; and if I tell the government where I am, ICE is going to knock on my

door potentially.  Right?

MR. SAMPAT:  That -- potentially.  But I would say if the entire purpose is to get into removal proceedings to raise a fear claim, then that's --

THE COURT:  No, no, no.  My point is I want to not be in removal proceedings.

MR. SAMPAT:  Oh, sure.

THE COURT:  I want to stay.

MR. SAMPAT:  To -- which incentivizes -- that incentivizes actors to not register their addresses with the government.  Sure.  I would agree.

THE COURT:  So what do you think will exasperate -- if this is actually a problem, as the secretary states, right now logically the individuals who are here on Haiti TPS status aren't a part of this problem because they're updating the government on where they are because they're required to do so.  Right?  I mean, let's just assume that for a moment as a hypothetical, a valid hypothetical.

And now all of a sudden my visas have been taken away -- I mean, my protected status has been taken away. I'm no longer in the country legally and now I'm incentivized not to tell the government where I am.  Right?

MR. SAMPAT:  I think that's painted with a broad stroke.  But I'm not going to dispute what the general

premise is.  Sure.

THE COURT:  So what do you think is better or worse for the problem of not being able to track immigrants in the United States?  Having them here on a TPS-protected status, where they're required to report their whereabouts to the government, or saying, We're taking your visas away; we're taking your protected status away; leave the country?

MR. SAMPAT:  Your Honor, I'm not a policymaker. So as a matter of policy, I don't know.

THE COURT:  I'm talking about as a matter of logic, because at a minimum, you would want to -- that's something that you would want to look at.  Right?  If you're saying it's a problem, people overstaying their visas, something that you would have to consider is, would the problem be worse if we end this program?

MR. SAMPAT:  I would just say, there's nothing I have -- that I would have to consider.  It's a question of whether I would.

THE COURT:  Hold on.  Hold on.

MR. SAMPAT:  I'm sorry.

THE COURT:  Assume for me I'm allowed to do an APA review.  One of the things the APA says is the secretary has to consider important aspects of the problem.  Right?

MR. SAMPAT:  I think it's --

THE COURT:  I can cite you the exact language.

MR. SAMPAT:  Yes, please.

THE COURT:  I'm getting this from *State Farm*.  The agency -- an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider -- for example, whether or not someone likes vanilla ice cream -- entirely failed to consider an important aspect of a problem, offered an explanation for its decision that runs counter to the evidence before the agency or is so implausible that it cannot be ascribed to a difference in view or the product of agency expertise.

I want to focus right now on "entirely failed to consider an important aspect of the problem."

If the concern is people overstaying their visas and not being able to keep track of them, I would have to consider how many of those people actually exist in the Haiti TPS population.  And then I would have to consider, I think, both sides of the equation.  There's a problem that people who have overstayed visas because we don't know where they are.

If we get rid of TPS for Haitians, is that going to decrease the number of people who we don't have contact information for or is it going to increase the number of people who we don't have contact information for?  Right? That's an important part of assessing the problem.

MR. SAMPAT:  I think you and I can look at that and say, yeah, maybe this is how you and I -- your Honor and I would look at the issue.

But another policymaker, decision-maker, might be like, It's too narrow of an inquiry and wants to say, We want to just talk about broad overstays generally, and that's how we want to analyze the problem.

THE COURT:  Well, then, they would say overstays generally is a national interest problem.  But that's not what this says.  This says there's an overstay problem because aliens who overstay their visas may be harder to locate and monitor.

MR. SAMPAT:  But right before that it talks about the general overstay numbers.  So again, I think we have to --

THE COURT:  But the clause is saying what -- this says:  Elevated overstay rates present potential risks to U.S. national security and public safety, as aliens who overstay their visas may be harder to locate and monitor.

So it's saying:  Here's the problem.  And then it's saying why it's a problem.

MR. SAMPAT:  Right.

THE COURT:  Why it's a problem is that we can't keep track of people who are on overstayed visas.

And so wouldn't as a matter of logic to anyone

considering an important aspect of this problem -- wouldn't an important aspect of the problem, as that phrase is used in the English language that you and I have been talking in all day, wouldn't an important aspect of that problem be, if we get rid of TPS status for Haiti, is that going to increase or decrease the number of Haitians here who we don't have contact information for?  It's just information you would need to know.  Right?

MR. SAMPAT:  Again, I think there are -- reasonable people can differ on how they're going to look at it.  But I would go back --

THE COURT:  You and I, I guess, have a disagreement on what reasonableness is.  Fair enough.

Now, the secretary also determined -- this is at 54736 -- that those who overstay their visas are, quote, "an added strain on local communities by increasing the demand for public resources, contributing to housing and healthcare pressures and competing in an already limited job market."

I got that right?

MR. SAMPAT:  Yes, your Honor.

THE COURT:  I think she actually says it twice in the Federal Register.

MR. SAMPAT:  I thought I was having déjà vu.  But I think that's right.

THE COURT:  I looked at both places.  There's not

a citation in either sentence to that assertion. Right? There's no footnote citation.

MR. SAMPAT: Definitely not one here, your Honor, and I don't recall there being one. But if there is, it's in the record. But I don't think so. I can certainly take your Honor's word for it that it's not there.

THE COURT: Okay. Where am I going to find that in the administrative record? Let's start with that those who overstay their visas increase demand for public resources.

MR. SAMPAT: I can't remember if that was in one of the proclamations issued by the president in the executive orders issued on January 20th, 2025, or if there were -- if there was also mention of it in the June 10th travel ban proclamation.

But it may be that --

THE COURT: There has to be some data to support that somewhere, right?

MR. SAMPAT: I think --

THE COURT: I mean, if the president says the earth is flat, the secretary can't say the earth is flat and the data I have to support it is what the president says. She actually needs to have data that the earth is flat; and she actually won't find it, because the earth is not in fact flat.

MR. SAMPAT:  I think if it's going to comport with administration policies and things like that, I think it can track that there can be strains on local economies and whatnot.

THE COURT:  I mean, you point to me in the record where there's data -- point to me in the record where this is said and point to me in the record where there's data supporting it.  You can add that to your list.

MR. SAMPAT:  Just to make sure I have this right, you want the citation to the record where there's data on added strain on local communities, increased demand on public resources, contributing to healthcare and housing pressures and competing in the limited job market?

THE COURT:  Yes.

MR. SAMPAT:  Okay.

THE COURT:  If there's another sentence that says that somewhere in the record, that's totally fine with me. But also, point me to where there's data to support that.

Again, this was with respect to individuals that overstay their visas.  Correct?  That was the population we're dealing with in the Federal Register.

MR. SAMPAT:  Aliens who overstay nonimmigrant visas.

THE COURT:  So I guess we also need to know how many Haitian TPS holders overstayed their nonimmigrant

visas.  Right?  To see if they're a problem.

MR. SAMPAT:  I think that may be in the record.

THE COURT:  Okay.  Totally fine.  That's one of the things I've already asked you to look at.

MR. SAMPAT:  Yeah.

THE COURT:  All right.  Now, let me ask you this: If we're going to talk about what strains individuals place on a society, an important part of the aspect about whether they create a strain or not is what benefits they bring to the country.  Right?

MR. SAMPAT:  I think those could be two binary -- I think they can be binary.  So contributions to the society don't necessarily mean they're not strains on --

THE COURT:  Of course.  But you would have to look at them to offset each other.  Right?  Because if Haitians overall contribute more to society than they take out, then actually ending the Haiti TPS status would be against the national interest.

MR. SAMPAT:  Well, perhaps.  It's weighing the evidence.

THE COURT:  Right.  But you would have to have the evidence.  Right?

MR. SAMPAT:  So I think --

THE COURT:  You would have to know what contributions they make before you can say that they're

overall net strains.

MR. SAMPAT: I don't think that's necessarily -- I don't think -- I don't think so, your Honor. I think especially in light of the travel ban proclamation and things like that where, if we suspend entry, like if -- then a categorical approach to a certain country is absolutely permissible.

THE COURT: But we're not talking about -- we're not talking about preventing entry from a country. We're talking about extending a designation of people already in the country.

MR. SAMPAT: Right.

THE COURT: I'm just -- that where I'm focused right now.

MR. SAMPAT: No, your Honor. My point is more -- is broader than that, which is that if an incoming presidential administration decided to take Action A as it relates to a country, they can take an action and then take consistent action -- actions that are consistent with its policy priorities.

THE COURT: Of course.

MR. SAMPAT: Yep.

THE COURT: You and I are eye to eye on that.

MR. SAMPAT: Okay.

THE COURT: But let's talk about what we're

talking about today, which is people already in the country. And one of the reasons -- the national interest reasons that the secretary assessed is that those who overstay their visas have an added strain on local communities by increasing demand for public resources, contributing to housing and healthcare pressures and competing in an already limited job market.  Right?  There are important parts of that problem to consider.  And so one is whether there are in a local community housing and healthcare pressures. Right?

MR. SAMPAT:  I think there are many factors that could go into what this means.  I understand, your Honor. I'm just --

THE COURT:  Hold on.  I want yes's or no's.

MR. SAMPAT:  Sure.  Go ahead.

THE COURT:  If you're discussing that there's a strain on local communities by increasing housing and healthcare pressures, that assumes that in that local community there's housing and healthcare pressure.  Right? That's just an assumption in the statement.

MR. SAMPAT:  I think that's a fair reading of it.

THE COURT:  Can you and I both agree that not every single local community in the United States of America is currently facing housing and healthcare pressures?

MR. SAMPAT:  The answer is never all or none.  So

I think that's fair.

THE COURT:  You would also need to know that for the local communities in which there are Haitian TPS holders.  Right?

MR. SAMPAT:  But again, I think the statement is meant to be read broadly where it's not --

THE COURT:  I understand.  I understand it's meant to be read broadly.

I'm just talking about what parts -- what things you would need to consider to be able to make the statement.  You would need to consider if you're saying that someone is a strain on housing and healthcare pressures that there are in fact housing and healthcare pressures.  That's just one of the things you would have to think about.  Right?

MR. SAMPAT:  As a listed -- as a listed factor, I think it seems like it was considered.  How that -- how the secretary went about considering it, again, I'm not a policymaker.

THE COURT:  But the secretary can't just pull it out of thin air.  Right?  Under the APA.  She has to get the data from somewhere.  I'm just talking about what kind of evidence somebody would have to look at in my pretty simple question.

If you're going to say that people are adding to a problem, you first have to say and find support evidence for

that there's a problem.  Right?  That would be an important part of the consideration.  I'm saying people contribute to that problem.  One of the things I would have to think about is whether there's a problem.

MR. SAMPAT:  Yeah.  I think generally speaking, sure.

THE COURT:  Great.  Okay.

The same thing with respect to an already limited job market.  Because you and I agree that not every single local community faces a limited job market.  Right?

MR. SAMPAT:  Your Honor, I'm not an economist. I'm not a policymaker.  I'm not a foreign policy expert. I'm not an economist.  I'm a lot of not's today.

THE COURT:  Well, at least evidence that you would need to consider is whether in the local communities in which Haiti TPS people live is whether in those communities there's a limited -- already limited job market.

MR. SAMPAT:  But I would say --

THE COURT:  Before you say -- you can say whatever you want.  I'm going to let you.  But just answer the question first.

MR. SAMPAT:  So the reason I'm not answering it right away is simply to note that that presumes that there are just communities that have only Haitian TPS holders. Right?

THE COURT:  Indeed.  They might have other people.

MR. SAMPAT:  Right.

THE COURT:  Yeah.  It's something you would want to think about.  How many Haitian TPS holders are in a community?  But we're going to get to that.

But just again, before you can say that people who overstay their visas are straining local communities who already have limited job markets, you first have to consider whether where those individual are, whether those local communities have already limited job markets.  It's just logic.  Right?  That's evidence that would have to be considered.

MR. SAMPAT:  I think -- I think it -- the record shows that the secretary thought about it and came to --

THE COURT:  That's not my question, about whether the secretary thought about it.  My question is different.

My question is what evidence someone would need to look at to make the determination and think about it in a way that's more than -- what word do I want? -- pretextual.  So one of the things that someone would want to look at, would need to look at, to determine if Haitian TPS holders are a strain on a local community's limited job market is whether there's a limited job market in the local community in which those people are.  Right?  You would have to look at that.

Now, how you looked at it, how you weighed it, that's not the question. The question is just you would have to look at that part of the problem.

MR. SAMPAT: As a -- as a stated reason, I would say that it certainly seems it was contemplated.

THE COURT: But you're not answering my -- forget the Federal Register.

MR. SAMPAT: Sure.

THE COURT: Forget the Federal Register. Forget all of it.

We can go back to Yankee land. All right. Catholics in local communities who overstay their visas are a strain on already limited job markets, and therefore we're going to end the TPS designation for Yankee country. Okay?

MR. SAMPAT: Uh-huh.

THE COURT: Now, before I say that, before I consider that, as a basis to say that keeping them in here is contrary to our national interest, isn't one aspect that I have to look at whether there is in fact a limited job market?

MR. SAMPAT: Generally speaking, I would say probably.

But what I would say --

THE COURT: Come on. "Generally speaking, probably"? How can I say that they're straining a limited

job market if I don't know that there's a limited job market?  This is just literally logic.

MR. SAMPAT:  So --

THE COURT:  Literally we're in Socrates land right now.  That's literally logic.  Zeno, Plato, we're in that world.  We're not talking, like, quantum physics here.

MR. SAMPAT:  I understand that, your Honor.  I think it's -- you know, "job market" again is broad enough to be like, what are the geographic boundaries?  Things like that.  But sure.  Like, I think contemplating or considering what's in the notice -- or let's just keep it to Yankee land.  Like if there's a strain, I would think, yes, you have to consider this.

But what I would -- what I will add to that is simply that if we're limiting the review to, well, how many Yankee TPS holders are -- or are Yankee TPS holders causing a strain on the local job market, I think that may be narrow.

I think in a termination notice, you know, founded on, yes, it's country-specific, but I think overall immigration policy, I think it's absolutely fair to look at the big picture and say:  How is this working?

THE COURT:  Sure.  Look away.

I'm just talking about the things that you would need to look at while you're looking -- however it is you

want to look.  First of all, you need to look at evidence that there's a problem.  Right?

MR. SAMPAT:  Sure.

THE COURT:  And secondly, you need to look at evidence about whether there's a strain.  Right?

MR. SAMPAT:  But again, this goes to -- I know this goes to the national interest and the jurisdictional stuff.  I'm not going to --

THE COURT:  I'm just talking about if you're doing an analysis with respect to whether an individual considered important aspects of a problem, an important aspect of whether or not individuals are a strain on local communities' limited job markets, an important aspect of that is whether there is in fact a limited job market. Right?

MR. SAMPAT:  I would say you're -- there has to be a decision on whether there's a problem first.  Sure.

THE COURT:  You have to look at evidence on that. Right?

MR. SAMPAT:  Yes.

THE COURT:  And then you have to look at evidence establishing that there's a strain.  Right?

MR. SAMPAT:  Well, I would say again, because it's a national interest inquiry, I would say no, because it's in their discretion.  It's a discretionary decision.

Understanding your Honor may not want to go there or disagrees with the Government on that.

THE COURT:  I'm not saying that they can't decide that they're a strain.  I'm just saying that you would need to consider that.  And in order to consider it, you can't just sort of think of things out of thin air.  You have to have some evidence to support that analysis.  Right?

MR. SAMPAT:  Well, because, again, national interest is supposed to be broad, it can be a gut feeling sort of thing.  And I --

THE COURT:  If the government's position is that the secretary can have a gut feeling of something and that is sufficient under the APA then, yes, you and I are never going to agree.

MR. SAMPAT:  Sure.

THE COURT:  Now, let me say this:  Another important aspect of the issue is whether these Catholic Yankee TPS holders, whether they're net contributors or a net strain on a job market.  Right?  Because you're aware -- or you should be aware; you might not be aware -- but that in fact immigrants in this country are responsible for billions, if not trillions, a year in created jobs because they open businesses.

So, for example, my personal gym right now, the personal gym that I go to, was started by an immigrant.  And

he now has three locations in D.C. and is employing over 30 people.  Now, yes, he took a job as a manager.  He started off as a manager of a gym.  And now he has contributed over 50 jobs to the American economy.  He is a net gain of 49 jobs to the American economy, and he's an immigrant.  Right?

So just an example.  Obviously, I'm not saying that you need to know that or it's a great -- the name is Thesis.  If you guys want a personal trainer, I highly recommend mine.

If you're considering whether or not individuals are a strain on a local community's limited job market, you have to consider -- an important aspect of that consideration is whether those individuals are net contributors of jobs by creating jobs or a net strain on jobs by taking away job opportunities.  Right?

MR. SAMPAT:  I would disagree, your Honor, because in that case somebody may be a net positive or a net negative when it comes to contributions.  But they both have positive and negative -- let's call them factors that go into that analysis.  If -- if somebody has negative factors, that is -- that can be construed as a strain by itself.  And that's -- and that can be enough to say, that's a strain on the local --

THE COURT:  So the government's position is in making an assessment of an issue with respect to national

security, with respect to whether there's a strain on a local community's job market, the secretary does not need to consider at all what contribution the individuals make. She can just look at the strain and not consider at all whether or not they also contribute?

MR. SAMPAT: Yes, your Honor. And I think that dovetails nicely with our jurisdictional arguments as to why they're not subject for review. But those -- the national interest determination is not subject for review.

THE COURT: Okay. So you guys are going to have homework over the weekend -- or over tonight. We're going to give you or going to email you a BIA, Board of Immigration Appeals, decision which discusses how the national interest is used in another part of the INA. And that actually creates a standard, the BIA decision does, which requires a balancing of net positives versus net negatives.

And my friend Tommie here is going to give you the cite right now if she has it.

THE LAW CLERK: Yes. It's *Matter of Dhanasar*, D-H-A-N-A-S-A-R. That's the name. And it's 26 I&N Dec. 884.

THE COURT: I want to email that to you tonight or today.

MR. SAMPAT: I'm sorry. You said 884?

THE LAW CLERK:  884.

THE COURT:  And that decision is interpreting -- in fact, there was an earlier interpretation of the standard of national interest in the INA in the provision that the BIA overruled.

This was, like, 2015 or something?

THE LAW CLERK:  This is a 2016 decision.

THE COURT:  And it says:  We have a new standard, and the standard requires some balancing.

Now, this is in a section of the INA that discusses whether or not the attorney general can waive a requirement for a job listing for an individual who wants to come in on a work visa.  So it's not this part of the INA.  And I'm not suggesting that it is.  I'm suggesting this might be informative.  It's something at least to think about.

And it's an area in which there is vast discretion with the attorney general and now the secretary on this issue.

The BIA did not come to the determination that national interest is a standardless standard and it can be whatever the secretary wants it to be.  There's actually a test that they use.  And I understand it's not for this national interest.

But I do want to talk about this case after you

guys have a chance to look at it.  I'm not saying it's dispositive.  I'm not saying it's anything other than there's a phrase "national interest" in a different part of the INA; and at least one court, the BIA, in a precedential decision, has discussed that there is a standard.  All right?

MR. SAMPAT:  I appreciate that, your Honor.  I kind of remember the case because I believe it's actually in the administrative record.

THE COURT:  Go.

MR. SAMPAT:  But I will say, if you give me tonight to refresh on it, I appreciate it.  But my gut --

THE COURT:  If it's in the administrative record, I missed it.

MR. SAMPAT:  Yes.  It is.

MR. PIPOLY:  Yes, it is.  Sorry.

MR. SAMPAT:  No.  Go ahead.

MR. PIPOLY:  It starts at AR 461.

THE COURT:  Well, Tommie, it wasn't as good a find as I thought it was.

But in fairness, she only had yesterday to look for it.  So 461.

MR. SAMPAT:  So I am happy to take your Honor's invitation to refresh my recollection on the case.

THE COURT:  I'll tell you the part I'm looking at

in particular.

MR. SAMPAT:  Maybe Bates-stamp 468.

THE COURT:  I'm just trying to find where Tommie sent it to me.

MR. SAMPAT:  467 to 468.  But 890 to 891 in the decision.

THE COURT:  Tommie, can you resend me whatever you sent me on the language?

I have it here.  Hold on one second.

The factor that I'm looking at is at 890 and 891.

MR. SAMPAT:  The United States would still benefit from the foreign --

THE COURT:  Yes.  We emphasize in each case the factors considered must, taken together, indicate that on balance it would be beneficial to the United States to waive the requirements of a job offer and thus of a labor certification.

I'll give you tonight to --

MR. SAMPAT:  I can give you just a quick 30-second overview of my gut instinct --

THE COURT:  Sure.

MR. SAMPAT:  -- which is this is the executive defining its own discretion and how it's going to decide its discretion.  But that is permissible under the statute. It's judicial review and judicial standards.

So if -- this does nothing to displace the *iTech* and *Zhu* decisions from the D.C. Circuit that say there is no review of national interest. And --

THE COURT: Well, they don't say that.

MR. SAMPAT: I believe *iTech* is pretty broad, your Honor.

THE COURT: We can talk about *iTech* in that tomorrow, because this is not that broad. If it were that broad, I would not be having this conversation with you. But I understand your point about the executive making its own determination as to how -- but they're interpreting language. Right?

MR. SAMPAT: They're absolutely interpreting language. But, you know, I would say that at least --

THE COURT: I guess post-*Chevron*, we don't care what the agency thinks. But at least here, they were interpreting this language.

MR. SAMPAT: I will be better prepared on this point tomorrow, but I wanted to give you my 30-second overview.

THE COURT: Okay. So it would not matter to you -- it is not an important aspect of the problem for the government to consider how much TPS workers generated for the economy in one year? That wouldn't matter?

MR. SAMPAT: No.

THE COURT:  Are you interested?

MR. SAMPAT:  Am I interested?

THE COURT:  Yes.  Just personally.  Do you want to know?

MR. SAMPAT:  If your Honor has a number, I --

THE COURT:  I have lots of numbers.

MR. SAMPAT:  I'm curious to hear it.

THE COURT:  A study by Penn Wharton School found that TPS workers generated 35.9 billion -- that's with a B -- in GDP in 2023 with 10.7 billion from Florida alone, followed by Texas, 4.3 billion; California, 3.6 billion; and New York, 2.8 billion.  That's a lot of money.

MR. SAMPAT:  It sure sounds like a lot of money. But --

THE COURT:  Do you think it's in Florida's national interest to get rid of these people who are bringing in over $10 billion a year?  Because again, remember, we're de-designating -- or the government has de-designated every single TPS country.

MR. SAMPAT:  Sure.  I would say Florida and national interest are sort of contradictory because Florida -- because Florida doesn't get to define national interest.

THE COURT:  If you're a U.S. citizen who lives in Florida, would you have thoughts about whether we should

send all TPS holders home?

MR. SAMPAT:  Perhaps.

THE COURT:  Yeah.  Okay.

MR. SAMPAT:  But what I would also say is that, you know, I believe you said -- your Honor said it was Penn? It was the Wharton School of Business that issued that study?

THE COURT:  Yes.

MR. SAMPAT:  I don't recall that being --

THE COURT:  Rest assured, it's not.

MR. SAMPAT:  I wanted to make sure that was.

THE COURT:  This goes back to what evidence should be considered as an important aspect of this problem. National interest, given what the secretary has laid out as her standard.

MR. SAMPAT:  Different studies have different things.

THE COURT:  I hear you.  All right.

I want to go through one more issue.  After that, we only have a couple on the Federal Register, so we go to argument tomorrow.

If you need to leave at any point before 5:00, feel free.

MS. TORRES:  Thank you.

THE COURT:  Now, the Federal Register also states

the continuation of a devastating political, environmental, social and economic situation in Haiti guarantees an unbroken chain migration, particularly to the United States and Canada, and when combined with already heavy back loads [sic] in processing resident status changes, a large and growing flow of Haitians will persist.

That's at 37?

MR. SAMPAT:  Bottom of 36 to 37.

I would just say heavy backlogs.  I heard "back load."

THE COURT:  Sure.  That's at Footnote 35?

MR. SAMPAT:  That is correct.

THE COURT:  That cites a report from 2013?

MR. SAMPAT:  That cites -- yes.

THE COURT:  And basically what that report is saying is that things are so devastating in Haiti that people are forced to flee Haiti?

MR. SAMPAT:  If I may pull up the document.

THE COURT:  Sure.

MR. SAMPAT:  Thank you.

Your Honor, I don't have it necessarily as a study.

THE COURT:  Well, it's a 2013 report.  It's cited at Footnote 35.

MR. SAMPAT:  Yeah.  But the document that I have

is a published almost academic article.

THE COURT:  Whatever.

MR. SAMPAT:  So it does have that.  It does cite to that.  Yes.

THE COURT:  Okay.  That report that's being quoted says that there's a continuation of a devastating political, environmental, social and economic situation in Haiti that guarantees an unbroken chain migration.

MR. SAMPAT:  I believe that's a correct characterization.

THE COURT:  So that study from 2013 first of all doesn't tell us anything about what the current situation is in 2026.  Right?

MR. SAMPAT:  No.  But I will point your Honor to -- I don't have it in the CAR necessarily, although it is at the ranges 1008 to 1021.  But I have -- the bottom of the page that says 69:  The long road to development requires a critical mass of full-time, highly skilled human capital as the preferred in-country agents of growth and development.

So --

THE COURT:  I'm sorry.  Is that from the same report?

MR. SAMPAT:  That is from the same report.

THE COURT:  The 2013 report?

MR. SAMPAT:  Yes.

THE COURT:  My question was a little bit more specific.  Can you agree that -- can you and I agree that whatever this report says about the conditions in Haiti and migration with respect to Haiti in 2013 has no bearing on where we are today 13 years later in 2026?

MR. SAMPAT:  I wouldn't say they have no bearing. They may be precursors to some of this stuff that's going on now.

THE COURT:  But it doesn't tell us about what the current condition in Haiti is.

MR. SAMPAT:  Yes.  It doesn't reflect a current condition on January 6, 2026.

THE COURT:  And it doesn't indicate what the current migration pattern is from Haiti to the United States or from the United States to Haiti as of today?

MR. SAMPAT:  No.  But it does -- again, the author does talk about what is -- proposes what's required for Haiti.  And in the author's opinion, which is human capital, return of Haitian nationals to help build out Haiti.  That is -- it's in the report.  That's what was considered.

THE COURT:  But we're not talking about what's going to make Haiti better; we're talking about what -- the situation Haiti is in today.  My only point is that what this report talks about as the conditions of Haiti today -- in 2013 has no bearing on what it is today.

MR. SAMPAT:  Sure.  But again, what I would say in making Haiti better -- like this is -- the TPS termination decision is about -- it's forward-looking in a lot of ways. I agree with that.

But it seems to be that one of the considerations based on my reading can be that the decision to terminate TPS for Haiti is rooted in, we need Haitian nationals -- returning Haitian nationals to Haiti could be a good thing for the country's future to develop --

THE COURT:  Well --

MR. SAMPAT:  -- based on this article.

THE COURT:  The problem you run into is the World Bank numbers that are cited in the Federal Register, which talk about massive unemployment and massive poverty in Haiti.  But we don't have to get into that.

MR. SAMPAT:  Sure.

THE COURT:  My only point is, 2013 ain't telling you what's happening in 2026.

MR. SAMPAT:  I'm not going to contest that, your Honor.

THE COURT:  All right.  That gets us to almost the end of the Federal Register, but we don't have the time to do the final thing, so we'll put that off until tomorrow.

So tomorrow we'll start at 738 with:  DHS records indicate that there are Haitian nationals who are TPS

recipients who have been the subject of administrative investigations.  So that's what we're going to go into tomorrow.

MR. SAMPAT:  Okay, your Honor.

THE COURT:  Okay.  When I asked people to put together binders of key cases for me so that we all have a manageable list of cases that we're all dealing with and we're not having to review 300 cases for an argument, you guys were a little overzealous, which is totally fine.

But given that we're going to have argument tomorrow that's going to focus on jurisdiction, A, and this APA issue on sort of what's contrary to law versus looking at the secretary's decision, which bleeds into reviewability, you guys get to give me homework.  What are the cases that I should be most familiar with?  Your top three or four, five each.  The ones you really want me to focus on.  I'm not going to say you're going to be limited to talking about those.  I'm not going to spend all night with you guys.  I have more to read from the book.  So what cases would I focus on tonight?

MR. SAMPAT:  On the jurisdiction pieces specifically, I would say *Ramos v. Wolf* from the Ninth Circuit.  I would also -- on 1252a(2)(B)(ii), I would say *Zhu versus Gonzalez* from the D.C. Circuit.  And *iTech*, the *iTech versus Renaud* case from the D.C. Circuit.  That's what

I have on those.  I don't have anything available on the other ones.  I'll take a look at our briefing again.

THE COURT:  If as you're preparing, if you prepare -- you guys might not -- you certainly deserve a Scotch --

MR. SAMPAT:  I appreciate that.

THE COURT:  -- if more cases come to you that I should look at tonight, you guys can feel free to email chambers.  Just copy the other side.

MR. SAMPAT:  Thank you, your Honor.

THE COURT:  Sounds good.

Plaintiffs?

MR. TAUBER:  If I could have a moment, please.

THE COURT:  Sure.

MR. PIPOLY:  Your Honor, while he's looking at that, can I address a few housekeeping things?

THE COURT:  Yes.

Ma'am, you can take off whenever you want.

MS. TORRES:  Thank you, your Honor.

MR. PIPOLY:  So first of all, any objection by the Court to -- we've got quite a setup here.

THE COURT:  There's going to be a cleaner in here tonight.  But other than that, it'll be locked up.

MR. PIPOLY:  So you're okay with us leaving our stuff here?

THE COURT:  As long as there's not a bomb in there, you're fine.

MR. PIPOLY:  There is not.

THE COURTROOM DEPUTY:  They'll need to stack it neatly in the middle of the table or bench because they need to clean the tables.

MR. PIPOLY:  Oh, sure.  I'm fine moving it.  I don't want to have to drag it through security tomorrow.

THE COURT:  Sure.

MR. PIPOLY:  Second of all, I just wanted to put this on the Court's radar because the Court indicated earlier that we might end up talking about some of these discovery issues tomorrow.

THE COURT:  We will be discussing -- unless we bleed into Thursday, which I'm hoping we won't -- but yes. That's going to happen before we leave here.

MR. PIPOLY:  I just wanted to alert the Court so there's no surprise tomorrow that we got -- we learned today that Judge Chen in the *NTPSA I* case ordered extra record discovery on the Haiti termination.

I am not --

THE COURT:  He's a day ahead of me.

MR. PIPOLY:  I am not entirely sure what the scope of that is.  We'll try to wrap our heads around that tomorrow.

THE COURT:  If you could send that around.  When you find the decision or the transcript or whatever, if you could send it around to everyone as soon as you get it.

MR. PIPOLY:  Absolutely.  The order on the docket doesn't really specify.  We're trying to suss out exactly what was said.  I'm not --

THE COURT:  By the way, why are Judge Chen and I both looking at this?

MR. PIPOLY:  I couldn't tell you that, your Honor.  We did *Saget* back in the day and we were asked to do it again.  And they did *Ramos* back in the day.  They were asked to do it again.

THE COURT:  It's the problem with no nationwide injunction.  We're not even at a nationwide injunction.  We're at -- whatever.  Fine.

MR. PIPOLY:  They have slightly different theories than we do, for one thing.

THE COURT:  Okay.

MR. PIPOLY:  So key cases.

THE COURT:  Can we all start tomorrow at 10:00 a.m.?

MR. PIPOLY:  Yes.

THE COURT:  And then just as an FYI, I have to be at a lunch at 12:15, so we're going to have a longer-than-usual lunch tomorrow, because I don't think

we'll be done by 12:00.  So just FYI.

Okay.  And was there some other housekeeping --

MR. PIPOLY:  Just the key cases.

MR. TAUBER:  I was just going to give you the key cases, your Honor.  Sorry.  I lost my page right now.

So I think one of the jurisdictional issues that we raise is the issue under 5 USC Section 559, where a displacement of the APA must be express.  I would say the key cases are *Shaughnessy*, which we cite.  I can give you that cite.

THE COURT:  That's okay.  What circuit?

MR. TAUBER:  I know that --

THE COURT:  Is that the D.C. Circuit?

MR. TAUBER:  No.  That's the United States Supreme Court.

THE COURT:  Look at that.

MR. TAUBER:  And I know the Government in response cites to the *Marcelo* case.  You'd probably want to read those as a pair.

THE COURT:  Thank you.

MR. TAUBER:  Moving on to the arguments under 1254a(b)(5)(A), I would say that the central Supreme Court case on the issue will be *McNary*.

And then we have a list of cases specifically in the TPS context that -- and the *TPSA* case, the *HECA* case,

the *Saget* case --

THE COURT:  You're not understanding the --

MR. TAUBER:  They have discussions there.

THE COURT:  So you've got *Shaughnessy*, *Marcelo*, *McNary*?

MR. TAUBER:  Yes.  Those are probably the three most important cases from the Supreme Court there.

Then on 1252a(2)(B)(ii), I would in fact point the Court to the *HECA* case out of the Eastern District of New York, which cites *Department of Homeland Security versus Regents of the University of California*.

THE COURT:  Okay.

MR. TAUBER:  And on 1252(f)(1), the critical cases -- and I would say there are -- there will be several here.

THE COURT:  I'm starting to understand why your binder was so long.

MR. TAUBER:  There are lots of issues.

THE COURT:  Give me your top one on that section. Just give me a Supreme Court or D.C. Circuit case.  That's really all I care about.

MR. TAUBER:  The Supreme Court case?  Well, I have a Fifth Circuit case.

THE COURT:  I don't care.  I'm not reading a Fifth Circuit case tonight.

MR. TAUBER:  Then I will say to the Court -- we have the dissenting opinion in *Biden v. Texas.*

THE COURT:  I'm not reading *Biden v. Texas* tonight either.

MR. TAUBER:  And a concurring-in-part and dissenting-in-part opinion in *Aleman González.*

THE COURT:  Anything else on the APA?

MR. PIPOLY:  No, your Honor.

THE COURT:  Do you have a case on the nondelegation that you really want me to focus on?

MR. TAUBER:  There are several.

THE COURT:  Okay.  You get to pick one.

MR. TAUBER:  *Schechter.*

THE COURT:  Which one?

MR. PIPOLY:  *Schechter Poultry.*

THE COURT:  Okay.  I have no idea if there's -- do you have more?

MR. SAMPAT:  I will just add a couple cases on the 1252(f)(1).  *Aleman González* from the Supreme Court.

THE COURT:  Which one?

MR. SAMPAT:  *Garland versus Aleman González* from the Supreme Court.  And *N.S. versus Dixon* from the D.C. Circuit.

THE COURT:  *Dixon*?

MR. SAMPAT:  D-I-X-O-N.

THE COURT:  Okay.  I have no idea if there was any press on the phone.  If there's still press on the phone, if they're going to be reading the transcript, if there is, I would like to say, anytime I critique a lawyer it gets a lot of press.  I have complimented you all day.  I will do it again.  Hopefully, it gets picked up.  Because you deserve it.  You have done a phenomenally good job.  It's very impressive.

My clerks, who only deigned to come to the last half of this, said so.  I've said so.  I think you've been excellent.  Every time you've been in front of me, it's been very impressive.

MR. SAMPAT:  Thank you, your Honor.  If I may just make one point for the record.

THE COURT:  Sure.

MR. SAMPAT:  This goes back to our exchange this morning about our discussion about consulting with Secretary Rubio and DHS consulting.

Our position and our responses were that DHS directly -- or indirectly -- or didn't directly consult with Secretary Rubio.  And that doesn't have anything to do or that doesn't talk about internal deliberations within the State Department that may have happened with Secretary Rubio.

THE COURT:  Right.  Okay.  Thank you.

MR. TAUBER:  Thank you, your Honor.

MR. SAMPAT:  Thank you, your Honor.

THE COURTROOM DEPUTY:  All rise.

(Proceedings concluded.)

**CERTIFICATE**


                    I, LISA EDWARDS, RDR, CRR, do hereby

certify that the foregoing constitutes a true and accurate

transcript of my stenographic notes, and is a full, true,

and complete transcript of the proceedings produced to the

best of my ability.



                         Dated this 7th day of January, 2026.


                    /s/ Lisa Edwards, RDR, CRR
                    Official Court Reporter
                    United States District Court for the
                      District of Columbia
                    333 Constitution Avenue, Northwest
                    Washington, D.C. 20001
                    (202) 354-3269

## $

**$10** [1] - 127:17
**$200** [1] - 35:11

## /

**/s** [1] - 142:12

## 1

**1** [6] - 31:21, 35:24, 37:12, 37:18, 38:3, 71:9
**1)(A)** [1] - 72:15
**1,400-page** [1] - 28:5
**10,000** [1] - 18:21
**10.7** [1] - 127:10
**10020** [1] - 1:21
**1008** [1] - 130:16
**1021** [1] - 130:16
**10:00** [1] - 136:20
**10th** [3] - 84:8, 84:15, 109:14
**1155** [1] - 1:17
**12** [1] - 71:12
**1252(a)(2)(D** [2] - 47:16, 52:15
**1252(b)(9)** [1] - 49:4
**1252(f)(1** [1] - 138:13
**1252(f)(1)** [1] - 139:19
**1252a(2)(B)(ii** [2] - 133:23, 138:8
**1254a** [1] - 65:6
**1254a(b)(1)** [1] - 68:10
**1254a(b)(3)(A** [1] - 67:4
**1254a(b)(3)(A)** [2] - 65:7, 72:4
**1254a(b)(3)(B)** [1] - 59:1
**1254a(b)(3)(C** [1] - 71:23
**1254a(b)(5)(A** [1] - 137:22
**12:00** [1] - 137:1
**12:15** [1] - 136:24
**13** [1] - 131:5
**131** [1] - 1:23
**1478** [1] - 8:15
**1485** [1] - 8:16
**15** [1] - 93:23
**164** [2] - 88:25, 89:9
**165** [1] - 10:14
**166** [1] - 10:10

**171** [1] - 89:9
**18** [2] - 31:18, 71:12
**182** [2] - 13:13, 14:7
**183** [5] - 13:3, 13:4, 13:7, 13:13, 15:5
**193** [1] - 10:10
**195** [1] - 13:11
**1:30** [2] - 1:7, 59:23

## 2

**2)(D** [1] - 52:17
**2.2** [3] - 5:15, 6:12, 10:20
**2.8** [1] - 127:12
**20** [1] - 59:22
**20001** [2] - 2:10, 142:14
**20004** [1] - 1:18
**2010** [1] - 102:11
**2011** [2] - 102:10, 102:12
**2013** [7] - 129:13, 129:23, 130:11, 130:24, 131:4, 131:25, 132:17
**2015** [1] - 123:6
**2016** [1] - 123:7
**202** [2] - 2:10, 142:15
**2020** [1] - 51:24
**2022** [1] - 32:3
**2023** [4] - 6:16, 6:17, 30:11, 127:10
**2024** [13] - 6:10, 6:17, 6:23, 6:24, 10:16, 11:20, 30:12, 32:1, 33:3, 89:3, 90:15, 90:24, 91:1
**2025** [19] - 5:15, 6:11, 6:23, 10:19, 12:3, 12:12, 13:17, 16:4, 18:2, 20:4, 22:9, 22:22, 23:1, 23:6, 31:18, 32:1, 32:19, 83:6, 109:13
**2026** [23] - 1:7, 3:5, 3:9, 3:20, 5:21, 6:1, 7:8, 13:20, 13:24, 16:5, 21:22, 22:1, 22:5, 25:5, 25:7, 27:3, 101:16, 102:13, 130:13, 131:5, 131:12, 132:18, 142:10
**20530** [1] - 2:5
**20th** [1] - 109:13
**212(f** [1] - 83:11
**213** [1] - 34:19
**214** [5] - 29:17,

29:18, 29:19, 34:20, 35:18
**22** [3] - 3:7, 3:8, 6:22
**221** [2] - 34:25, 35:19
**24.44** [1] - 94:1
**24.84** [1] - 93:25
**25-02471** [1] - 1:4
**25.8** [1] - 6:17
**26** [1] - 122:21
**264** [2] - 93:6, 93:10
**268** [5] - 93:2, 93:3, 93:4, 93:12, 93:14
**27** [4] - 10:12, 82:19, 82:20, 83:4
**275** [3] - 93:14, 93:16
**278** [1] - 93:13
**28** [2] - 12:12, 93:1
**290** [3] - 93:21, 93:22, 93:23
**292** [4] - 51:24, 52:1, 52:4, 52:12

## 3

**3** [1] - 58:3
**3)(A** [2] - 72:13, 72:18
**3,000** [3] - 90:16, 90:17, 90:24
**3.6** [1] - 127:11
**30** [1] - 121:1
**30-second** [2] - 125:19, 126:19
**300** [1] - 133:8
**33134** [1] - 1:23
**333** [2] - 2:9, 142:14
**35** [2] - 129:11, 129:24
**35.9** [1] - 127:9
**350,000** [2] - 49:23, 49:24
**354-3269** [2] - 2:10, 142:15
**36** [1] - 129:8
**360,000** [2] - 45:24, 86:18
**368,000** [1] - 101:11
**37** [2] - 129:7, 129:8
**3:05** [1] - 60:2
**3rd** [4] - 89:3, 90:15, 90:23, 91:1

## 4

**4-14-2025** [1] - 91:7
**4.2** [1] - 10:17
**4.3** [1] - 127:11
**435** [1] - 27:15

**436** [3] - 27:2, 27:7, 27:10
**4376** [1] - 82:11
**44.2** [2] - 6:15, 6:16
**461** [2] - 124:18, 124:22
**467** [1] - 125:5
**468** [2] - 125:2, 125:5
**47** [1] - 31:8
**49** [1] - 121:4
**4:45** [1] - 60:20

## 5

**5** [2] - 80:16, 137:7
**5,600** [1] - 11:20
**5.4** [1] - 11:25
**50** [1] - 121:4
**54736** [1] - 108:15
**559** [2] - 80:17, 137:7
**560,000** [1] - 88:22
**5:00** [6] - 60:16, 60:18, 60:22, 60:25, 61:1, 128:22

## 6

**6** [3] - 1:7, 21:22, 131:12
**60** [3] - 12:25, 67:5, 67:12
**60,000** [1] - 31:19
**601** [1] - 2:5
**603** [1] - 17:13
**610** [1] - 17:14
**6706** [1] - 2:9
**69** [1] - 130:17
**6th** [1] - 25:5

## 7

**7** [2] - 13:20, 13:24
**700** [2] - 89:4, 91:1
**725** [1] - 93:2
**738** [1] - 132:24
**78-5** [1] - 90:9
**7th** [2] - 16:4, 142:10

## 8

**8** [4] - 15:5, 16:4, 22:9, 58:25
**88,782** [1] - 12:2
**884** [3] - 122:22, 122:25, 123:1
**890** [2] - 125:5, 125:10

**891** [2] - 125:5, 125:10

## 9

**9** [3] - 12:3, 15:5, 15:7
**9-0** [1] - 48:9
**90** [2] - 16:21, 20:21
**93** [1] - 35:22
**975** [4] - 51:20, 51:24, 52:1, 52:11

## A

**a(b)(1)(A** [1] - 71:17
**a(b)(3)(A** [1] - 72:6
**A)** [1] - 72:7
**a)(2)(D** [1] - 52:18
**a.m** [1] - 136:21
**ability** [5] - 21:8, 51:12, 53:7, 96:17, 142:7
**able** [6] - 5:2, 40:12, 84:4, 105:3, 106:15, 114:10
**absolutely** [7] - 63:22, 70:9, 75:8, 112:6, 118:21, 126:13, 136:4
**academic** [1] - 130:1
**acceptable** [2] - 42:21, 47:2
**accepted** [1] - 79:25
**access** [3] - 16:25, 21:2, 99:17
**according** [4] - 3:8, 3:19, 26:10, 97:23
**accurate** [5] - 10:3, 10:7, 12:10, 26:13, 142:4
**accuse** [1] - 73:23
**acknowledges** [2] - 39:9, 39:19
**act** [4] - 53:12, 53:14, 63:9, 76:10
**action** [3] - 77:3, 112:18, 112:19
**Action** [2] - 1:3, 112:17
**actions** [2] - 21:10, 112:19
**activities** [1] - 21:8
**actors** [1] - 104:10
**actual** [3] - 17:7, 18:8, 44:22
**add** [7] - 28:2, 29:5, 87:13, 100:9, 110:8,

118:14, 139:18

**added** [3] - 108:16, 110:11, 113:4

**adding** [2] - 82:3, 114:24

**addition** [2] - 31:9, 82:22

**additional** [1] - 71:11

**additionally** [1] - 21:9

**address** [5] - 41:3, 95:4, 95:5, 103:15, 134:16

**addresses** [7] - 98:5, 98:13, 99:18, 99:19, 100:25, 104:10

**addressing** [1] - 81:14

**admin** [1] - 100:24

**Administration** [8] - 13:18, 14:11, 16:2, 16:12, 16:15, 21:18, 23:8

**administration** [2] - 110:2, 112:17

**Administration's** [1] - 16:17

**administrative** [32] - 7:4, 8:12, 8:17, 8:19, 12:15, 13:3, 15:11, 17:10, 18:12, 18:16, 23:7, 27:23, 28:4, 28:8, 29:12, 37:4, 78:12, 78:16, 79:1, 79:6, 84:17, 87:6, 87:7, 88:9, 88:25, 90:4, 97:14, 100:10, 109:8, 124:9, 124:13, 133:1

**admitted** [2] - 33:17, 94:2

**aerospace** [1] - 18:22

**affected** [1] - 31:1

**affects** [1] - 22:13

**afoot** [1] - 50:21

**AFTERNOON** [1] - 1:8

**agencies** [2] - 67:16, 75:24

**agency** [10] - 63:2, 63:4, 63:9, 63:15, 106:3, 106:4, 106:9, 106:11, 126:16

**agents** [1] - 130:19

**agree** [18] - 4:14, 12:23, 28:10, 36:12, 37:5, 38:7, 38:15, 42:1, 76:6, 88:21, 94:16, 104:11,

113:22, 115:9, 120:14, 131:2, 132:4

**agreeing** [1] - 78:19

**ahead** [10] - 3:1, 56:12, 61:19, 73:22, 75:7, 80:12, 90:12, 113:15, 124:17, 135:22

**aimed** [3] - 83:9, 84:1, 84:18

**ain't** [1] - 132:17

**air** [5] - 20:13, 21:13, 94:3, 114:20, 120:6

**aircraft** [6] - 17:1, 18:24, 20:14, 21:2, 23:23, 25:14

**airlines** [1] - 14:20

**airport** [5] - 13:19, 13:24, 14:18, 26:12, 26:16

**airports** [3] - 24:22, 26:10, 26:15

**al** [2] - 1:3, 1:6

**Aleman** [3] - 139:6, 139:19, 139:21

**alert** [3] - 77:6, 100:11, 135:17

**Alicia** [1] - 89:1

**aliens** [10] - 91:23, 92:3, 92:8, 94:25, 95:9, 95:20, 97:23, 107:11, 107:18, 110:22

**allow** [1] - 14:20

**allowed** [4] - 63:6, 78:15, 78:24, 105:21

**allows** [4] - 58:16, 65:17, 78:9, 78:11

**almost** [2] - 130:1, 132:21

**alone** [1] - 127:10

**alternative** [1] - 81:19

**altitude** [3] - 17:1, 21:3, 21:13

**AMANDA** [1] - 2:3

**Ambassador** [2] - 11:10, 11:12

**Amendment** [3] - 47:7, 47:19, 54:23

**Amendment's** [1] - 77:1

**America** [2] - 10:2, 113:23

**American** [4] - 14:12, 14:20, 121:4, 121:5

**amount** [2] - 37:20, 46:3

**ANA** [1] - 1:11

**analog** [1] - 63:14

**analysis** [4] - 58:5, 119:10, 120:7, 121:20

**analyze** [1] - 107:7

**ANDERSON** [1] - 1:19

**Andrew** [1] - 89:1

**ANDREW** [1] - 1:15

**Andy** [1] - 9:15

**animated** [1] - 77:24

**animus** [3] - 62:15, 77:3, 77:24

**annual** [1] - 30:11

**answer** [11] - 42:24, 45:5, 45:6, 45:11, 45:15, 45:17, 46:10, 83:23, 113:25, 115:20

**answering** [3] - 43:11, 115:22, 117:6

**answers** [1] - 62:18

**anytime** [1] - 140:4

**anyway** [1] - 73:22

**AP** [1] - 15:7

**APA** [21] - 41:3, 47:20, 54:9, 54:19, 75:15, 75:16, 75:20, 76:25, 77:1, 77:8, 78:9, 78:11, 79:21, 105:21, 105:22, 114:20, 120:13, 133:12, 137:8, 139:7

**apologize** [4] - 27:13, 56:9, 68:21, 100:14

**Appeals** [8] - 48:21, 48:23, 49:20, 50:1, 52:21, 81:2, 122:13

**APPEARANCES** [1] - 2:1

**aPPEARANCES** [1] - 1:13

**appellate** [1] - 79:19

**applied** [2] - 41:23, 103:3

**applies** [2] - 64:16, 102:1

**apply** [6] - 87:23, 96:4, 98:10, 99:23, 99:25, 100:2

**appreciate** [4] - 97:3, 124:7, 124:12, 134:6

**approach** [3] - 41:6, 89:21, 112:6

**appropriate** [3] - 49:19, 67:16, 76:21

**April** [3] - 12:12, 30:12, 33:3

**Apso** [1] - 61:12

**AR** [2] - 38:10, 124:18

**arbitrary** [1] - 106:3

**area** [2] - 20:21, 123:17

**areas** [14] - 16:23, 20:23, 29:8, 29:9, 33:6, 33:8, 33:20, 33:23, 34:6, 34:16, 36:1, 37:10, 37:21, 38:19

**arguably** [2] - 77:14, 78:14

**argue** [1] - 69:7

**argument** [28] - 36:17, 39:23, 39:25, 40:10, 43:4, 49:15, 59:20, 62:5, 62:13, 64:17, 65:15, 68:5, 70:25, 71:1, 71:2, 71:14, 73:11, 73:15, 79:5, 79:23, 79:25, 81:14, 96:10, 96:16, 100:18, 128:21, 133:8, 133:10

**arguments** [4] - 36:18, 80:16, 122:7, 137:21

**arise** [2] - 53:12, 66:25

**Arlington** [3] - 77:18, 77:25, 78:5

**armed** [14] - 30:25, 31:10, 32:20, 39:11, 39:13, 39:15, 69:20, 69:21, 69:22, 69:25, 70:1, 70:3, 70:5

**arms** [6] - 14:3, 16:6, 16:11, 16:25, 21:2, 23:22

**arrival** [2] - 35:25, 37:14

**arrived** [6] - 89:3, 90:16, 90:19, 90:23, 90:25, 94:20

**article** [14] - 7:3, 15:13, 15:15, 16:3, 16:13, 17:10, 18:12, 18:15, 22:8, 25:11, 25:23, 33:3, 130:1, 132:11

**articulated** [1] - 46:22

**articulating** [1] - 54:3

**ascribed** [1] - 106:10

**aside** [8] - 41:1, 43:12, 45:3, 46:5, 46:9, 54:24, 75:20, 79:21

**aspect** [13] - 106:7, 106:13, 108:1, 108:2, 108:4, 111:8, 117:18,

119:11, 119:13, 120:17, 121:12, 126:22, 128:13

**aspects** [2] - 105:23, 119:11

**asserting** [1] - 80:24

**assertion** [1] - 109:1

**assess** [2] - 40:22, 63:2

**assessed** [2] - 100:3, 113:3

**assessing** [1] - 106:25

**assessment** [3] - 55:13, 83:14, 121:25

**associated** [1] - 82:17

**assume** [10] - 6:19, 11:15, 57:18, 60:7, 73:4, 87:24, 92:20, 103:21, 104:18, 105:21

**assumes** [3] - 96:8, 96:11, 113:18

**assuming** [6] - 3:10, 3:21, 5:22, 7:16, 20:4, 88:2

**assumption** [5] - 7:2, 8:1, 98:16, 103:22, 113:20

**assumptions** [2] - 7:16, 7:18

**assure** [1] - 88:12

**assured** [1] - 128:10

**attack** [2] - 14:2, 16:5

**attacked** [2] - 16:10, 23:11

**attacking** [2] - 76:4, 76:5

**attacks** [4] - 18:23, 20:14, 25:14, 31:12

**Attorney** [2] - 51:23, 52:8

**attorney** [7] - 19:22, 51:20, 59:1, 67:15, 71:6, 123:11, 123:18

**ATTORNEY'S** [1] - 2:3

**attorneys** [1] - 19:23

**au** [23] - 14:8, 14:18, 16:22, 18:24, 20:15, 20:22, 21:9, 21:12, 23:10, 23:21, 25:3, 25:7, 25:14, 25:17, 26:4, 31:20, 33:2, 33:7, 33:19, 34:4, 34:6, 36:13, 36:14

**AUDAIN** [1] - 1:19

**author** [1] - 131:16

**author's** [1] - 131:18
**authority** [7] - 21:25, 47:12, 54:7, 80:18, 82:12, 82:23, 84:3
**authorization** [2] - 51:3, 94:21
**authorized** [2] - 22:11, 22:12
**automatically** [2] - 50:7, 72:2
**availability** [2] - 82:12, 82:23
**available** [1] - 134:1
**avenue** [1] - 50:19
**Avenue** [3] - 1:23, 2:9, 142:14
**aviation** [3] - 14:10, 18:21, 20:12
**Aviation** [9] - 13:18, 14:11, 16:1, 16:12, 16:14, 16:15, 16:16, 21:17, 23:8
**avoid** [1] - 84:12
**aware** [3] - 120:19, 120:20
**awesome** [1] - 61:18

## B

**b)** [1] - 69:17
**b)(1** [4] - 65:11, 68:24, 69:1, 69:2
**b)(1)(C** [3] - 66:1, 66:12, 71:17
**b)(3** [2] - 67:4, 69:12
**b)(3)(A** [2] - 69:7, 72:8
**b)(3)(A)** [2] - 65:12, 76:11
**b)(3)(C** [1] - 71:6
**b)(9)** [1] - 50:3
**back-and-forth** [1] - 58:22
**backlogs** [1] - 129:9
**bad** [3] - 58:7, 68:15
**bagel** [1] - 98:25
**Baker** [1] - 89:2
**balance** [1] - 125:15
**balancing** [2] - 122:16, 123:9
**ball** [1] - 101:13
**ball-bark** [1] - 101:13
**ban** [11] - 13:18, 13:23, 16:2, 22:19, 22:25, 23:3, 25:7, 25:16, 109:15, 112:4
**Bank** [9] - 3:9, 3:19, 3:25, 5:7, 5:10, 11:12, 27:11, 132:13

**Bank's** [2] - 4:5, 4:12
**banned** [2] - 23:9, 25:4
**bans** [1] - 84:1
**bar** [2] - 22:4, 22:5
**bark** [1] - 101:13
**bars** [1] - 52:5
**based** [21] - 7:15, 7:18, 7:19, 7:25, 8:1, 14:9, 14:11, 31:8, 43:22, 47:4, 47:14, 53:15, 57:10, 66:20, 69:7, 87:5, 97:9, 97:25, 132:6, 132:11
**baseline** [3] - 3:10, 3:21, 5:22
**bases** [3] - 68:9, 69:3, 69:8
**basing** [1] - 77:11
**basis** [9] - 46:21, 56:8, 66:2, 67:18, 68:7, 69:6, 69:23, 77:3, 117:17
**Bates** [11] - 8:15, 17:13, 29:15, 34:20, 35:18, 89:8, 93:2, 93:4, 93:6, 93:14, 125:2
**Bates-stamp** [1] - 125:2
**Bates-stamped** [2] - 17:13, 35:18
**bear** [1] - 43:19
**bearing** [3] - 131:4, 131:6, 131:25
**beat** [2] - 45:13, 45:14
**become** [1] - 91:3
**BEFORE** [1] - 1:11
**begin** [2] - 60:7, 87:17
**beginning** [1] - 62:12
**behalf** [1] - 42:15
**belief** [1] - 16:17
**below** [1] - 10:12
**bench** [1] - 135:5
**beneficial** [1] - 125:15
**benefit** [1] - 125:11
**benefits** [2] - 99:16, 111:9
**best** [5] - 51:10, 62:23, 88:15, 97:20, 142:7
**better** [6] - 45:8, 60:20, 105:2, 126:18, 131:22, 132:2
**between** [3] - 65:10, 70:6, 76:4
**beyond** [1] - 41:24

**BIA** [5] - 122:12, 122:15, 123:5, 123:20, 124:4
**Biden** [2] - 139:2, 139:3
**big** [3] - 47:7, 99:1, 118:22
**billion** [6] - 127:9, 127:10, 127:11, 127:12, 127:17
**billions** [1] - 120:22
**binary** [2] - 111:11, 111:12
**binder** [1] - 138:17
**binders** [1] - 133:6
**bit** [5] - 39:23, 61:3, 61:24, 86:8, 131:1
**blatant** [3] - 47:18, 48:15, 51:10
**bleed** [1] - 135:15
**bleeds** [1] - 133:13
**Block** [1] - 89:1
**block** [1] - 30:19
**blocked** [1] - 8:24
**blockout** [1] - 8:22
**Board** [2] - 81:1, 122:12
**bomb** [1] - 135:1
**book** [1] - 133:19
**border** [2] - 16:22, 20:23
**borders** [2] - 33:7, 33:23
**Boston** [1] - 74:2
**bottom** [5] - 29:22, 71:2, 93:24, 129:8, 130:16
**boundaries** [1] - 118:9
**boundless** [1] - 62:20
**bread** [2] - 98:23, 99:1
**break** [1] - 20:2
**breakdown** [1] - 89:5
**breath** [1] - 44:21
**Brian** [1] - 89:2
**brief** [1] - 65:1
**briefing** [6] - 63:10, 64:24, 80:25, 81:16, 81:18, 134:2
**bring** [2] - 50:4, 111:9
**bringing** [1] - 127:17
**broad** [14] - 41:13, 41:18, 41:20, 42:22, 43:9, 64:8, 103:18, 104:24, 107:6, 118:8, 120:9, 126:5, 126:8, 126:9

**broader** [1] - 112:16
**broadly** [3] - 86:9, 114:6, 114:8
**BROOKE** [1] - 1:16
**brought** [2] - 47:21, 50:3
**browser** [1] - 17:19
**brutal** [1] - 31:12
**BRYAN** [1] - 1:17
**build** [1] - 131:19
**bunch** [1] - 4:11
**Burma** [1] - 94:8
**business** [1] - 94:3
**Business** [1] - 128:6
**businesses** [1] - 120:23
**buy** [1] - 64:18
**BY** [1] - 2:7

## C

**C)** [3] - 59:15, 65:8, 69:5
**California** [3] - 70:14, 127:11, 138:11
**Canada** [1] - 129:4
**cannot** [12] - 14:17, 44:22, 55:4, 55:5, 65:15, 66:13, 81:2, 98:2, 98:9, 99:12, 99:23, 106:10
**capable** [2] - 17:1, 21:3
**capacity** [1] - 30:15
**capita** [1] - 32:4
**capital** [6] - 12:3, 16:3, 30:17, 33:6, 130:18, 131:18
**capricious** [1] - 106:3
**CAR** [9] - 8:14, 9:23, 15:4, 17:13, 29:8, 35:2, 35:5, 89:16, 130:15
**care** [8] - 60:13, 61:4, 61:5, 74:7, 126:15, 138:21, 138:24
**careful** [4] - 76:8, 78:22, 96:13, 99:10
**carefully** [1] - 96:14
**Caribbean** [1] - 10:2
**case** [38] - 19:14, 19:20, 19:21, 47:23, 51:10, 51:15, 51:17, 51:18, 52:5, 62:23, 63:25, 64:2, 70:4, 70:7, 70:13, 70:15, 73:20, 80:25, 84:14,

98:22, 121:17, 123:25, 124:8, 124:24, 125:13, 133:25, 135:19, 137:18, 137:23, 137:25, 138:1, 138:9, 138:20, 138:22, 138:23, 138:25, 139:9
**cases** [24] - 12:2, 12:4, 19:19, 63:11, 63:12, 63:19, 66:17, 75:3, 78:14, 133:6, 133:7, 133:8, 133:15, 133:20, 134:7, 136:19, 137:3, 137:5, 137:9, 137:24, 138:7, 138:14, 139:18
**catch** [1] - 93:8
**categorical** [1] - 112:6
**category** [2] - 10:9, 98:2
**Catherine** [3] - 35:8, 75:5, 75:10
**Catholic** [8] - 46:25, 48:3, 48:5, 48:6, 55:10, 62:15, 74:10, 120:17
**Catholicism** [1] - 54:1
**Catholics** [17] - 46:17, 46:18, 46:24, 47:8, 51:13, 54:15, 55:6, 55:10, 56:14, 73:25, 74:5, 76:1, 76:3, 76:23, 77:12, 117:12
**caught** [1] - 92:2
**caused** [1] - 39:17
**causing** [1] - 118:16
**CAVE** [1] - 1:17
**center** [1] - 48:8
**central** [5] - 75:8, 82:12, 82:22, 84:3, 137:22
**certain** [5] - 6:2, 39:10, 83:9, 84:1, 112:6
**certainly** [14] - 15:18, 28:10, 34:15, 50:15, 58:16, 62:8, 63:8, 74:9, 76:6, 80:15, 81:19, 109:5, 117:5, 134:4
**certainty** [2] - 5:25, 87:1
**CERTIFICATE** [1] - 142:1
**certification** [1] - 125:17

certified [5] - 7:4, 8:11, 84:17, 88:25, 90:3

certify [1] - 142:4

chain [2] - 129:3, 130:8

challenges [1] - 11:7

chambers [1] - 134:9

chance [4] - 17:7, 88:17, 100:23, 124:1

change [2] - 95:5, 98:5

changes [2] - 99:18, 129:5

characterization [2] - 23:16, 130:10

charitably [1] - 78:12

Chen [2] - 135:19, 136:7

Chevron [1] - 126:15

childcare [3] - 60:13, 60:21, 61:3

children [1] - 37:1

cholera [1] - 12:2

Circuit [12] - 51:24, 79:13, 79:15, 126:2, 133:23, 133:24, 133:25, 137:13, 138:20, 138:23, 138:25, 139:23

circuit [1] - 137:11

circumstance [1] - 47:11

circumstances [1] - 53:8

citation [12] - 3:24, 5:6, 27:22, 28:11, 28:14, 31:8, 38:10, 92:14, 92:24, 109:1, 109:2, 110:10

citations [2] - 28:12, 78:23

cite [16] - 15:4, 15:5, 27:9, 31:25, 51:19, 52:15, 75:5, 97:12, 97:13, 103:20, 103:21, 105:25, 122:19, 130:3, 137:9, 137:10

cited [13] - 4:17, 5:12, 12:17, 17:4, 28:22, 63:20, 84:1, 85:14, 85:20, 93:1, 94:6, 129:23, 132:13

cites [7] - 32:10, 63:12, 83:4, 129:13, 129:14, 137:18, 138:10

citing [4] - 31:5, 32:15, 75:6, 92:16

citizen [1] - 127:24

citizens [1] - 31:12

civil [2] - 18:21, 20:12

CIVIL [1] - 2:4

Civil [1] - 1:3

claim [15] - 47:14, 47:21, 47:25, 49:25, 50:3, 50:4, 53:8, 53:15, 54:22, 74:1, 75:15, 75:16, 76:25, 104:4

claimed [1] - 52:25

claims [7] - 53:12, 54:9, 75:12, 80:24, 81:3, 81:4

classically [1] - 63:3

clause [1] - 107:16

clean [1] - 135:6

cleaner [1] - 134:22

clear [2] - 9:17, 54:23

clearly [6] - 41:24, 42:7, 42:12, 62:19, 77:10, 78:24

CLERK [5] - 35:6, 35:9, 122:20, 123:1, 123:7

clerks [2] - 75:1, 140:9

click [1] - 4:22

client [1] - 73:10

close [1] - 77:7

closed [1] - 90:6

co [2] - 60:12, 89:23

co-counsel [2] - 60:12, 89:23

coastal [2] - 33:8, 33:23

Coie [3] - 63:25, 64:2, 64:5

colleague [1] - 102:25

colleagues [2] - 54:11, 70:23

Columbia [2] - 2:8, 142:13

COLUMBIA [2] - 1:1, 2:4

column [1] - 8:5

combative [1] - 73:10

combined [1] - 129:4

coming [6] - 24:1, 55:25, 56:19, 84:19, 98:7, 100:1

commenced [1] - 51:1

commenting [1] - 80:22

commercial [14] - 13:19, 13:23, 14:17, 16:2, 16:9, 21:19, 23:9, 23:20, 24:3, 24:13, 24:19, 25:4, 26:12, 26:17

commit [1] - 94:21

communities [12] - 82:3, 108:16, 110:11, 113:4, 113:17, 114:3, 115:15, 115:16, 115:24, 116:7, 116:10, 117:12

communities' [1] - 119:13

community [6] - 113:9, 113:19, 113:23, 115:10, 116:5, 116:23

community's [3] - 116:22, 121:11, 122:2

compared [1] - 92:19

competing [3] - 108:18, 110:13, 113:6

complete [2] - 43:25, 142:6

complex [1] - 73:12

complicate [1] - 21:13

complimented [1] - 140:5

comport [1] - 110:1

computer [2] - 15:21, 19:3

concede [1] - 73:21

conceded [2] - 73:17, 73:19

conceding [1] - 73:24

conceivable [1] - 43:18

concept [1] - 63:14

concern [8] - 88:23, 97:21, 97:22, 97:24, 97:25, 98:10, 99:12, 106:14

concerned [1] - 39:16

concerns [2] - 23:22, 39:10

concluded [1] - 141:4

conclusion [3] - 76:1, 76:22, 77:23

concurring [1] - 139:5

concurring-in-part [1] - 139:5

condition [4] - 67:20, 72:24, 131:10, 131:12

conditions [18] - 25:2, 34:11, 59:3, 67:17, 67:19, 67:23, 67:24, 68:2, 68:12, 69:9, 69:14, 71:9, 72:10, 72:22, 76:13, 76:14, 131:3, 131:24

Conditions [2] - 29:14, 30:3

conduct [1] - 72:10

conducted [1] - 21:11

confirm [4] - 9:13, 18:7, 23:4, 30:10

confirmed [1] - 61:18

conflict [8] - 69:20, 69:21, 69:22, 69:25, 70:1, 70:3, 70:5, 70:6

conflicts [1] - 31:11

Congress [8] - 41:24, 49:1, 49:2, 63:17, 66:8, 66:15, 72:1, 106:4

congressional [1] - 64:12

Congressional [2] - 92:22, 93:24

connecting [1] - 33:6

Connolly [2] - 64:4, 73:8

consecutive [1] - 10:17

consider [30] - 51:12, 53:7, 54:21, 66:3, 68:8, 68:9, 69:8, 74:17, 81:2, 105:14, 105:17, 105:23, 106:5, 106:7, 106:13, 106:16, 106:17, 113:8, 114:10, 114:11, 115:15, 116:8, 117:17, 118:13, 120:5, 121:12, 122:3, 122:4, 126:23

consideration [9] - 13:10, 44:15, 44:22, 44:23, 65:18, 66:22, 86:12, 115:2, 121:13

considerations [6] - 13:13, 30:9, 41:13, 41:16, 45:18, 132:5

considered [7] - 41:19, 114:16, 116:12, 119:10, 125:14, 128:13, 131:20

considering [9] - 41:23, 44:7, 71:15,

78:22, 78:23, 108:1, 114:17, 118:10, 121:10

considers [1] - 12:16

consistent [4] - 11:9, 77:23, 112:19

constitutes [3] - 41:21, 45:17, 142:4

Constitution [2] - 2:9, 142:14

constitutional [25] - 47:5, 47:14, 47:15, 47:21, 47:24, 48:8, 48:15, 48:17, 49:21, 49:25, 50:21, 51:11, 52:20, 53:3, 53:7, 53:11, 53:15, 54:9, 55:12, 74:1, 75:11, 75:15, 80:24, 81:2, 81:4

construed [1] - 121:21

consult [1] - 140:20

consultation [1] - 67:15

consulted [1] - 75:24

consulting [2] - 140:17, 140:18

consumption [2] - 5:17, 10:24

CONT'D [1] - 2:1

contact [3] - 106:22, 106:24, 108:7

contains [1] - 71:17

contemplated [5] - 42:13, 49:1, 51:7, 53:20, 117:5

contemplating [1] - 118:10

contention [1] - 72:17

contents [1] - 93:17

contest [2] - 8:4, 132:19

context [5] - 49:12, 78:12, 99:4, 103:1, 137:25

continuation [2] - 129:1, 130:6

continue [3] - 91:18, 99:16, 100:5

continued [3] - 18:23, 20:13, 25:13

continues [7] - 8:25, 9:19, 11:6, 11:25, 18:20, 20:11, 59:3

continuing [1] - 24:17

continuous [1] - 91:6

**contract** [4] - 5:15, 6:11, 6:22, 10:20
**contracted** [1] - 10:16
**contradict** [1] - 33:14
**contradictory** [1] - 127:21
**contradicts** [1] - 78:13
**contrary** [5] - 72:20, 77:10, 77:12, 117:18, 133:12
**contribute** [3] - 111:16, 115:2, 122:5
**contributed** [1] - 121:3
**contributing** [3] - 108:17, 110:12, 113:5
**contribution** [1] - 122:3
**contributions** [3] - 111:12, 111:25, 121:18
**contributors** [2] - 120:18, 121:14
**control** [6] - 14:8, 16:21, 20:21, 32:21, 33:2, 34:3
**controlling** [1] - 33:5
**conversation** [2] - 96:7, 126:9
**conversely** [1] - 76:15
**cool** [1] - 61:22
**coordinate** [1] - 61:7
**copy** [1] - 134:9
**Coral** [1] - 1:23
**correct** [25] - 3:23, 7:9, 8:20, 10:11, 12:13, 13:15, 15:8, 18:10, 22:6, 30:4, 31:24, 38:1, 50:8, 72:16, 83:2, 83:3, 83:7, 92:4, 92:12, 96:19, 96:22, 101:22, 110:20, 129:12, 130:9
**correctly** [13] - 18:17, 20:24, 26:15, 30:11, 30:21, 31:3, 31:15, 31:23, 32:6, 32:7, 32:23, 33:10, 92:1
**counsel** [4] - 60:12, 84:11, 89:21, 89:23
**Counsel** [1] - 73:18
**count** [4] - 42:6, 42:7, 79:8, 79:9
**counter** [2] - 21:8, 106:8

**countries** [16] - 10:5, 10:10, 10:12, 11:1, 55:24, 56:15, 56:16, 56:22, 57:6, 57:22, 58:9, 59:12, 59:14, 83:9, 84:2, 94:8
**country** [83] - 4:5, 10:1, 10:9, 24:6, 24:7, 27:5, 27:19, 29:13, 30:8, 32:3, 34:7, 34:11, 34:15, 36:24, 38:2, 38:12, 44:9, 46:13, 46:19, 48:5, 48:10, 50:10, 50:20, 51:4, 55:11, 55:21, 55:23, 56:6, 56:8, 56:19, 56:23, 57:3, 57:5, 57:20, 57:24, 58:1, 58:6, 58:14, 63:6, 65:19, 66:10, 66:18, 66:21, 69:9, 69:20, 76:13, 84:5, 84:19, 85:8, 85:17, 88:7, 95:24, 95:25, 96:10, 96:18, 97:5, 98:7, 101:20, 102:8, 102:14, 102:15, 102:18, 103:4, 103:10, 103:11, 103:22, 103:24, 104:22, 105:7, 111:10, 112:6, 112:9, 112:11, 112:18, 113:1, 117:14, 118:20, 120:21, 127:19, 130:19
**Country** [4] - 29:13, 30:3, 57:25, 58:1
**country's** [2] - 11:24, 132:9
**country-by-country** [1] - 56:8
**country-specific** [1] - 118:20
**couple** [4] - 26:15, 92:13, 128:20, 139:18
**course** [9] - 9:16, 48:12, 60:14, 64:25, 75:15, 81:16, 95:2, 111:14, 112:21
**Court** [47] - 2:7, 2:8, 6:14, 42:16, 45:13, 47:21, 48:9, 48:10, 48:21, 48:23, 49:19, 49:20, 50:1, 51:12, 52:21, 53:1, 54:6, 54:18, 54:19, 63:20, 70:13, 74:11, 74:17, 74:19, 74:24, 74:25, 75:9, 77:25, 79:15,

80:1, 80:15, 80:17, 90:4, 134:21, 135:11, 135:17, 137:15, 137:22, 138:7, 138:9, 138:20, 138:22, 139:1, 139:19, 139:22, 142:12, 142:13
**COURT** [554] - 1:1, 3:1, 3:3, 3:7, 3:12, 3:18, 3:24, 4:3, 4:10, 4:18, 4:25, 5:4, 5:6, 5:10, 5:14, 5:21, 5:25, 6:6, 6:9, 6:21, 7:7, 7:11, 7:15, 7:20, 7:25, 8:5, 8:9, 8:13, 8:17, 8:21, 8:24, 9:4, 9:9, 9:12, 9:17, 9:23, 10:1, 10:5, 10:8, 10:14, 10:16, 10:19, 10:25, 11:5, 11:9, 11:15, 11:19, 11:24, 12:11, 12:14, 12:19, 13:2, 13:5, 13:8, 13:12, 13:16, 13:22, 14:1, 14:6, 14:14, 14:16, 14:22, 15:1, 15:4, 15:7, 15:9, 15:17, 15:19, 15:24, 16:1, 16:9, 16:20, 17:7, 17:12, 17:15, 17:19, 17:22, 18:1, 18:4, 18:7, 18:11, 18:15, 18:20, 19:4, 19:7, 19:10, 20:5, 20:8, 20:11, 20:19, 21:1, 21:6, 21:17, 21:22, 22:3, 22:11, 22:15, 22:18, 23:3, 23:19, 24:2, 24:5, 24:10, 24:18, 25:1, 25:8, 25:10, 25:13, 25:19, 25:21, 25:25, 26:3, 26:7, 26:11, 26:18, 26:21, 27:2, 27:8, 27:12, 27:14, 27:16, 27:18, 27:22, 28:2, 28:15, 28:18, 28:22, 29:2, 29:5, 29:8, 29:12, 29:17, 29:19, 29:21, 29:24, 30:2, 30:6, 30:10, 30:21, 30:23, 31:5, 31:9, 31:17, 31:25, 32:12, 32:14, 32:19, 32:25, 33:12, 33:22, 34:8, 34:23, 35:2, 35:7, 35:10, 35:14, 35:20, 36:7, 36:21, 36:23, 37:15, 37:24, 38:7, 38:15, 38:24, 39:8,

39:11, 39:13, 39:15, 39:20, 39:23, 40:2, 40:6, 40:11, 40:14, 40:18, 40:21, 41:1, 41:10, 41:18, 42:1, 42:9, 42:15, 42:24, 43:1, 43:3, 43:12, 43:17, 43:25, 44:3, 44:6, 44:11, 44:16, 44:19, 45:3, 45:5, 45:8, 45:12, 46:12, 46:23, 47:7, 47:18, 48:1, 48:12, 48:20, 48:23, 49:2, 49:5, 49:9, 49:22, 50:6, 50:9, 50:13, 50:18, 51:2, 51:8, 51:17, 51:21, 52:3, 52:5, 52:11, 52:13, 52:17, 52:23, 53:6, 53:14, 53:22, 54:10, 55:4, 55:8, 55:16, 56:3, 56:11, 56:13, 56:21, 57:1, 57:8, 57:14, 57:16, 58:12, 58:18, 59:4, 59:7, 59:9, 59:16, 59:19, 59:25, 60:9, 60:14, 60:18, 60:20, 60:24, 61:5, 61:8, 61:11, 61:13, 61:15, 61:17, 61:22, 62:3, 62:23, 62:25, 64:2, 64:4, 64:11, 64:21, 64:25, 65:8, 65:14, 65:25, 66:7, 67:7, 67:11, 67:24, 68:13, 68:17, 68:22, 69:1, 69:4, 69:11, 69:18, 70:7, 70:10, 70:14, 70:20, 70:22, 71:5, 71:14, 71:20, 71:24, 72:6, 72:12, 72:15, 72:17, 72:25, 73:2, 73:7, 74:4, 74:6, 74:13, 74:20, 75:1, 75:10, 75:18, 76:20, 77:4, 77:14, 78:4, 79:17, 80:1, 80:5, 80:8, 80:12, 80:19, 81:8, 81:11, 81:21, 81:24, 82:8, 82:10, 82:19, 83:2, 83:4, 83:8, 83:13, 83:19, 83:23, 84:9, 84:13, 84:18, 84:24, 85:2, 85:7, 85:11, 85:15, 85:22, 86:2, 86:13, 86:17, 86:21, 86:24, 87:1, 87:5, 87:13, 87:19, 88:6, 88:9, 88:12, 88:17, 88:20,

89:7, 89:10, 89:14, 89:22, 89:25, 90:5, 90:8, 90:14, 90:18, 90:20, 91:2, 91:5, 91:13, 91:16, 91:20, 92:5, 92:8, 92:13, 92:18, 92:24, 93:6, 93:10, 93:13, 93:16, 93:22, 94:2, 94:9, 94:14, 94:16, 94:25, 95:7, 95:16, 95:19, 96:6, 96:22, 96:25, 97:2, 97:4, 97:11, 97:19, 97:21, 98:2, 98:16, 98:20, 98:24, 99:5, 99:9, 100:9, 100:17, 101:2, 101:5, 101:7, 101:11, 101:15, 101:18, 101:23, 102:7, 102:12, 103:4, 103:9, 103:17, 103:20, 104:5, 104:8, 104:12, 105:2, 105:10, 105:19, 105:21, 105:25, 106:2, 107:8, 107:16, 107:23, 108:12, 108:21, 108:25, 109:7, 109:17, 109:20, 110:5, 110:14, 110:16, 110:24, 111:3, 111:6, 111:14, 111:21, 111:24, 112:8, 112:13, 112:21, 112:23, 112:25, 113:14, 113:16, 113:22, 114:2, 114:7, 114:19, 115:7, 115:14, 115:19, 116:1, 116:3, 116:15, 117:6, 117:9, 117:16, 117:24, 118:4, 118:23, 119:4, 119:9, 119:18, 119:21, 120:3, 120:11, 120:16, 121:24, 122:10, 122:23, 123:2, 123:8, 124:10, 124:13, 124:19, 124:25, 125:3, 125:7, 125:13, 125:21, 126:4, 126:7, 126:15, 126:21, 127:1, 127:3, 127:6, 127:8, 127:15, 127:24, 128:3, 128:8, 128:10, 128:12, 128:18, 128:25, 129:11, 129:13, 129:15, 129:19,

129:23, 130:2, 130:5, 130:11, 130:21, 130:24, 131:1, 131:9, 131:13, 131:21, 132:10, 132:12, 132:17, 132:21, 133:5, 134:3, 134:7, 134:11, 134:14, 134:17, 134:22, 135:1, 135:9, 135:14, 135:22, 136:1, 136:7, 136:13, 136:18, 136:20, 136:23, 137:11, 137:13, 137:16, 137:20, 138:2, 138:4, 138:12, 138:16, 138:19, 138:24, 139:3, 139:7, 139:9, 139:12, 139:14, 139:16, 139:20, 139:24, 140:1, 140:15, 140:25

**court** [1] - 47:12, 47:19, 48:13, 50:25, 53:2, 53:7, 54:22, 54:24, 79:25, 80:24, 124:4

**Court's** [1] - 135:11

**COURTROOM** [3] - 59:24, 135:4, 141:3

**courts** [2] - 41:25, 66:15

**cover** [4] - 34:14, 93:10, 96:3

**coverage** [1] - 12:5

**covered** [2] - 85:14, 85:19

**covering** [1] - 32:1

**covers** [1] - 54:8

**cream** [15] - 42:6, 42:11, 42:20, 43:8, 43:16, 43:19, 44:9, 44:11, 44:24, 45:25, 46:1, 46:2, 46:4, 62:14, 106:6

**create** [2] - 83:15, 111:9

**created** [1] - 120:22

**creates** [2] - 66:18, 122:15

**creating** [1] - 121:14

**credible** [3] - 5:10, 12:16, 32:16

**crime** [2] - 32:4, 94:22

**crime-related** [1] - 32:4

**criminal** [3] - 19:10, 73:9, 73:12

**crises** [1] - 36:25

**crisis** [1] - 11:25

**critical** [5] - 11:6, 11:13, 72:22, 130:18, 138:13

**critique** [1] - 140:4

**cross** [2] - 19:15, 19:22

**cross-examined** [1] - 19:22

**cross-examining** [1] - 19:15

**CRR** [3] - 2:7, 142:3, 142:12

**cruel** [1] - 81:7

**crux** [2] - 36:18, 53:10

**curious** [1] - 127:7

**current** [12] - 68:7, 69:7, 96:9, 98:3, 98:4, 98:10, 98:12, 99:13, 130:12, 131:10, 131:11, 131:14

**cursory** [1] - 29:3

**cut** [1] - 99:2

**cutting** [1] - 64:22

## D

**D-H-A-N-A-S-A-R** [1] - 122:21

**D-I-X-O-N** [1] - 139:25

**D.C** [13] - 1:6, 1:18, 2:5, 2:10, 79:13, 121:1, 126:2, 133:24, 133:25, 137:13, 138:20, 139:22, 142:14

**Dahlia** [3] - 70:12, 70:14, 70:16

**daily** [1] - 11:25

**dampens** [2] - 5:17, 10:24

**data** [19] - 27:4, 27:18, 27:24, 28:8, 38:10, 38:16, 75:24, 100:7, 100:10, 100:24, 101:1, 109:17, 109:22, 109:23, 110:6, 110:7, 110:10, 110:18, 114:21

**date** [4] - 7:3, 7:4, 22:8, 91:6

**dated** [2] - 16:4, 22:9

**Dated** [1] - 142:10

**days** [4] - 13:1, 67:5, 67:12, 70:11

**de** [2] - 127:18,

127:19

**de-designated** [1] - 127:19

**de-designating** [1] - 127:18

**deal** [1] - 75:22

**dealing** [3] - 69:4, 110:21, 133:7

**death** [1] - 37:2

**Dec** [1] - 122:21

**decide** [3] - 102:13, 120:3, 125:23

**decided** [1] - 112:17

**decision** [43] - 13:6, 13:8, 13:11, 14:3, 14:25, 21:23, 24:24, 37:5, 40:19, 40:25, 48:9, 52:16, 52:19, 53:10, 63:24, 66:11, 76:5, 76:7, 76:10, 77:9, 77:10, 77:11, 77:15, 77:20, 78:14, 79:18, 80:2, 99:25, 106:8, 107:4, 119:17, 119:25, 122:13, 122:15, 123:2, 123:7, 124:5, 125:6, 132:3, 132:6, 133:13, 136:2

**decision-maker** [4] - 76:10, 77:20, 107:4

**decision-making** [1] - 24:24

**decisions** [4] - 77:18, 79:19, 85:13, 126:2

**decline** [1] - 10:17

**declining** [1] - 12:6

**deconfliction** [1] - 21:13

**decrease** [2] - 106:22, 108:6

**deduce** [1] - 87:7

**deep** [1] - 62:11

**default** [3] - 71:23, 71:25, 72:2

**DEFENDANTS** [1] - 2:2

**Defendants** [1] - 1:7

**defendants** [1] - 19:21

**defended** [1] - 64:5

**defense** [1] - 73:9

**defenses** [1] - 49:18

**defer** [1] - 87:14

**define** [1] - 127:22

**defining** [1] - 125:23

**definitely** [4] - 35:14, 60:1, 75:6, 109:3

**definition** [3] - 11:13, 42:22, 62:17

**deigned** [1] - 140:9

**delegated** [1] - 63:3

**deliberations** [1] - 140:22

**demand** [4] - 108:16, 109:9, 110:11, 113:5

**demands** [1] - 65:17

**depart** [1] - 50:12

**Department** [5] - 30:12, 31:6, 31:10, 138:10, 140:23

**deport** [6] - 46:16, 46:24, 53:25, 54:14, 55:6, 56:4

**deportation** [5] - 24:17, 24:19, 35:24, 36:12, 77:11

**deported** [7] - 35:23, 36:3, 36:8, 36:11, 37:7, 38:2, 48:5

**depress** [2] - 5:16, 10:23

**deprive** [1] - 80:17

**depth** [3] - 78:19, 80:14, 96:11

**DEPUTY** [3] - 59:24, 135:4, 141:3

**described** [1] - 66:13

**describing** [1] - 38:17

**deserve** [2] - 134:4, 140:6

**designate** [2] - 69:19, 100:5

**designated** [8] - 56:16, 57:7, 59:15, 66:11, 66:21, 72:11, 102:10, 127:19

**designating** [2] - 65:18, 127:18

**designation** [38] - 55:11, 59:3, 59:6, 65:9, 65:10, 65:21, 66:2, 66:4, 66:12, 66:18, 66:23, 66:24, 67:6, 67:13, 67:14, 67:25, 68:1, 68:8, 68:10, 68:23, 68:24, 69:3, 69:7, 69:15, 69:23, 71:6, 71:9, 71:10, 71:24, 72:1, 76:14, 91:6, 96:9, 96:18, 98:8, 112:10, 117:14

**despite** [1] - 11:5

**destruction** [1] - 31:14

**detail** [2] - 86:1, 86:2

**deteriorated** [1] - 12:4

**determination** [19] - 16:12, 41:8, 42:17, 56:7, 57:2, 58:15, 59:10, 67:18, 74:12, 75:16, 75:17, 76:11, 76:12, 76:19, 76:21, 116:18, 122:9, 123:20, 126:11

**determinations** [1] - 75:12

**determine** [7] - 43:6, 63:5, 68:12, 69:14, 71:7, 72:21, 116:21

**determined** [2] - 34:9, 108:14

**determines** [2] - 59:2, 76:16

**determining** [1] - 41:5

**devastating** [3] - 129:1, 129:16, 130:6

**develop** [2] - 81:4, 132:9

**development** [7] - 8:25, 9:19, 10:8, 10:9, 12:1, 130:17, 130:19

**developments** [1] - 28:21

**Dhanasar** [1] - 122:20

**DHRUMAN** [1] - 2:2

**DHS** [3] - 132:24, 140:18, 140:19

**die** [2] - 102:16, 102:18

**differ** [1] - 108:10

**difference** [1] - 106:10

**different** [20] - 14:25, 19:19, 19:20, 23:17, 34:10, 36:20, 38:25, 54:2, 61:3, 66:9, 66:22, 68:9, 79:2, 79:8, 91:19, 116:16, 124:3, 128:16, 136:16

**differently** [1] - 79:3

**difficult** [1] - 39:5

**direct** [1] - 63:9

**directing** [1] - 23:22

**directly** [2] - 140:20

**directs** [1] - 72:9

**disagree** [9] - 23:15, 38:7, 39:6, 42:2, 70:22, 73:2, 73:4, 78:10, 121:16

**disagreement** [1] - 108:13

**disagreements** [1] - 36:19

**disagrees** [1] - 120:2

**discern** [1] - 37:25
**discerned** [1] - 37:22
**discovery** [2] - 135:13, 135:20
**discretion** [17] - 43:5, 46:20, 47:2, 48:14, 50:16, 63:2, 63:7, 63:15, 63:18, 71:11, 76:22, 77:15, 98:8, 119:25, 123:17, 125:23, 125:24
**discretionary** [2] - 40:25, 119:25
**discriminated** [1] - 51:13
**discrimination** [1] - 48:3
**discussed** [2] - 30:13, 124:5
**discusses** [5] - 3:4, 6:11, 39:4, 122:13, 123:11
**discussing** [3] - 72:7, 113:16, 135:14
**discussion** [7] - 12:21, 62:4, 75:20, 75:21, 80:14, 86:5, 140:17
**discussions** [1] - 138:3
**displace** [1] - 126:1
**displaced** [4] - 11:21, 31:20, 31:21, 32:2
**displacement** [3] - 31:14, 39:18, 137:8
**displacements** [1] - 32:4
**dispositive** [1] - 124:2
**disproportionate** [1] - 46:3
**dispute** [1] - 104:25
**disputing** [1] - 39:18
**dissemination** [2] - 82:13, 82:23
**dissenting** [2] - 139:2, 139:6
**dissenting-in-part** [1] - 139:6
**distinguishing** [1] - 65:10
**District** [6] - 2:8, 2:8, 66:16, 70:17, 138:9, 142:13
**DISTRICT** [4] - 1:1, 1:1, 1:11, 2:4
**district** [10] - 47:12, 47:19, 48:13, 50:25, 53:2, 53:6, 54:22,

54:24, 63:24, 142:13
**DIVISION** [1] - 2:4
**Dixon** [2] - 139:22, 139:24
**Docket** [1] - 90:9
**docket** [1] - 136:4
**doctrine** [1] - 62:22
**document** [7] - 10:4, 11:8, 12:20, 89:23, 93:18, 129:18, 129:25
**Doe** [3] - 70:12, 70:14, 70:16
**dog** [7] - 60:13, 61:4, 61:5, 61:8, 61:10, 61:11, 61:17
**DOJ** [1] - 84:9
**domestic** [1] - 14:5
**DONALD** [1] - 1:6
**done** [7] - 44:19, 60:15, 60:18, 70:2, 77:24, 137:1, 140:7
**door** [1] - 104:1
**double** [1] - 32:3
**doubt** [1] - 9:6
**dovetails** [1] - 122:7
**down** [11] - 16:20, 25:22, 29:1, 31:17, 51:21, 52:18, 67:7, 77:9, 92:3, 98:25, 99:22
**dozen** [1] - 38:22
**drag** [1] - 135:8
**dressing** [3] - 47:24, 48:1, 48:2
**drones** [3] - 14:2, 16:6, 16:11
**due** [3] - 32:4, 52:24, 52:25
**during** [1] - 73:15
**déjà** [1] - 108:23

## E

**early** [2] - 6:23, 60:25
**ears** [1] - 77:7
**earth** [4] - 109:21, 109:23, 109:24
**earthquakes** [1] - 11:2
**easier** [2] - 56:13, 74:1
**Eastern** [2] - 66:16, 138:9
**eat** [3] - 12:1, 44:12, 46:3
**economic** [6] - 41:16, 44:14, 44:22, 129:2, 130:7
**economies** [1] -

110:3
**economist** [2] - 115:11, 115:13
**economy** [7] - 5:8, 10:16, 58:7, 58:13, 121:4, 121:5, 126:24
**Economy** [2] - 4:22, 5:1
**EDWARDS** [2] - 2:7, 142:3
**Edwards** [1] - 142:12
**effect** [5] - 12:25, 14:9, 22:21, 23:1, 52:20
**effectiveness** [1] - 21:12
**efforts** [1] - 21:14
**Eighth** [1] - 1:20
**either** [9] - 6:23, 7:5, 28:7, 60:25, 63:16, 66:9, 73:23, 109:1, 139:4
**Elena** [1] - 61:16
**elevated** [5] - 91:22, 92:5, 92:21, 97:22, 107:17
**Elevated** [1] - 95:7
**eligible** [1] - 91:5
**email** [6] - 4:5, 89:1, 91:8, 122:12, 122:23, 134:8
**emails** [2] - 19:8, 20:6
**embarrassing** [1] - 19:7
**EMMANUEL** [1] - 1:3
**emphasize** [1] - 125:13
**employing** [1] - 121:1
**encompasses** [1] - 41:13
**end** [22] - 3:22, 30:24, 31:1, 32:22, 37:16, 42:10, 42:12, 42:18, 45:24, 47:1, 52:19, 57:22, 58:1, 60:11, 67:6, 67:12, 82:1, 100:4, 105:15, 117:14, 132:22, 135:12
**ending** [12] - 46:18, 48:6, 54:16, 55:11, 55:23, 56:5, 56:19, 56:23, 58:8, 59:11, 76:3, 111:17
**ends** [2] - 50:6, 102:13
**enforcement** [8] - 82:13, 82:24, 85:13,

87:22, 91:25, 92:10, 95:11, 102:3
**engage** [2] - 79:15, 79:16
**engaged** [1] - 77:22
**engages** [1] - 77:22
**English** [5] - 37:6, 38:25, 79:7, 95:16, 108:3
**enjoy** [1] - 58:21
**ensure** [4] - 30:15, 37:3, 82:14, 82:24
**enter** [1] - 21:19
**entered** [7] - 22:18, 85:5, 85:16, 85:23, 86:9, 86:11, 87:10
**entering** [3] - 25:5, 83:10, 84:2
**entire** [6] - 34:7, 34:15, 73:19, 99:4, 99:10, 104:3
**entirely** [5] - 16:18, 81:5, 106:6, 106:12, 135:23
**Entry** [1] - 90:9
**entry** [4] - 87:17, 94:4, 112:5, 112:9
**entry/exit** [1] - 93:7
**environmental** [2] - 129:1, 130:7
**equal** [3] - 41:3, 54:23, 77:2
**equally** [1] - 64:16
**equation** [1] - 106:18
**equipment** [1] - 21:7
**erected** [1] - 66:9
**especially** [2] - 12:6, 112:4
**ESQ** [10] - 1:14, 1:15, 1:15, 1:16, 1:16, 1:19, 1:22, 2:2, 2:2, 2:3
**essentially** [1] - 64:9
**established** [1] - 72:1
**establishing** [1] - 119:22
**estimates** [2] - 91:2, 91:4
**et** [2] - 1:3, 1:6
**event** [2] - 7:7, 38:9
**events** [1] - 32:1
**evidence** [15] - 100:22, 106:9, 111:20, 111:22, 114:22, 114:25, 115:14, 116:11, 116:17, 119:1, 119:5, 119:18, 119:21, 120:7, 128:12
**exacerbate** [2] - 9:2,

9:24
**exact** [3] - 51:15, 93:20, 105:25
**exactly** [9] - 6:4, 41:22, 53:13, 71:13, 71:25, 74:3, 78:11, 92:20, 136:5
**examined** [1] - 19:22
**examining** [1] - 19:15
**example** [7] - 36:10, 66:16, 69:24, 74:10, 106:5, 120:24, 121:6
**exasperate** [1] - 104:13
**excellent** [1] - 140:11
**except** [2] - 74:8, 76:25
**exchange** [1] - 140:16
**excuse** [1] - 17:18
**executive** [11] - 50:16, 64:11, 83:5, 83:8, 83:13, 83:22, 83:25, 84:18, 109:13, 125:22, 126:10
**exercise** [4] - 21:25, 47:2, 54:7, 63:18
**exist** [2] - 76:16, 106:16
**existing** [1] - 48:10
**expanded** [2] - 20:20, 30:24
**expansive** [2] - 41:12, 70:24
**expect** [1] - 15:9
**experienced** [1] - 21:7
**expert** [5] - 24:9, 25:17, 33:1, 34:3, 115:12
**expertise** [1] - 106:11
**experts** [1] - 33:17
**expire** [1] - 53:18
**expired** [3] - 16:3, 88:5, 97:16
**explain** [2] - 24:5, 63:10
**explanation** [1] - 106:8
**explicitly** [1] - 38:21
**express** [1] - 137:8
**expressed** [2] - 62:11, 67:1
**extend** [8] - 32:21, 43:20, 67:6, 76:15, 77:16, 96:17, 100:5
**extended** [7] - 13:18,

13:23, 16:4, 25:6, 67:13, 71:10, 72:2
**extending** [3] - 65:21, 98:8, 112:10
**extends** [2] - 22:5, 96:8
**extension** [6] - 55:25, 66:9, 71:6, 71:24, 76:9, 76:19
**extent** [3] - 32:9, 54:5, 77:1
**extra** [1] - 135:19
**eye** [2] - 112:23

## F

**F.3d** [4] - 51:20, 51:24, 52:1, 52:11
**FAA** [21] - 13:22, 14:20, 15:1, 16:21, 17:2, 17:5, 17:9, 18:5, 18:8, 18:20, 20:11, 22:13, 22:15, 22:22, 23:14, 23:16, 23:20, 24:2, 25:4, 25:6
**FAA's** [3] - 17:16, 22:8, 25:16
**faa.gov** [1] - 17:22
**fabulous** [1] - 44:19
**face** [2] - 11:6, 53:25
**faces** [1] - 115:10
**facing** [1] - 113:24
**fact** [15] - 33:5, 53:17, 57:19, 74:2, 76:11, 76:16, 78:13, 97:9, 109:24, 114:13, 117:19, 119:14, 120:21, 123:3, 138:8
**factor** [6] - 42:3, 43:14, 65:5, 82:4, 114:15, 125:10
**factors** [7] - 41:15, 41:20, 106:4, 113:11, 121:19, 121:20, 125:14
**facts** [5] - 36:17, 37:4, 39:24, 77:19, 81:12
**factual** [1] - 40:5
**failed** [2] - 106:6, 106:12
**fair** [11] - 11:17, 11:18, 12:9, 24:4, 25:1, 32:12, 32:14, 108:13, 113:21, 114:1, 118:21
**fairness** [1] - 124:21
**fall** [2] - 10:12, 10:14
**familiar** [3] - 32:11,

70:19, 133:15
**families** [1] - 36:14
**family** [3] - 36:15, 37:8, 38:3
**fan** [1] - 57:20
**fans** [13] - 55:19, 55:22, 56:18, 56:23, 57:4, 57:11, 57:21, 57:25, 58:2, 58:6, 58:13, 59:11
**far** [7] - 26:5, 37:25, 43:5, 54:12, 61:5, 68:11, 100:6
**Farm** [1] - 106:2
**fast** [2] - 68:14, 74:4
**favorite** [1] - 84:9
**fear** [1] - 104:4
**February** [2] - 101:15, 102:13
**Federal** [34] - 3:4, 3:14, 3:18, 4:23, 5:6, 5:12, 13:18, 14:10, 16:1, 16:12, 16:14, 16:15, 16:16, 21:17, 23:8, 27:12, 28:11, 41:11, 45:20, 53:15, 53:23, 53:24, 56:17, 66:13, 82:11, 91:21, 108:22, 110:21, 117:7, 117:9, 128:20, 128:25, 132:13, 132:22
**feed** [1] - 61:9
**feet** [1] - 18:21
**few** [3] - 52:5, 70:11, 134:16
**Fifth** [3] - 77:1, 138:23, 138:24
**fight** [1] - 73:11
**figure** [4] - 20:2, 32:3, 63:7, 101:13
**final** [1] - 132:23
**finally** [1] - 40:15
**fine** [12] - 39:1, 45:6, 60:23, 68:22, 76:4, 86:1, 110:17, 111:3, 133:9, 135:2, 135:7, 136:15
**fingertips** [1] - 63:11
**finish** [1] - 10:21
**fire** [1] - 23:22
**firm** [1] - 64:5
**First** [3] - 47:7, 47:19, 54:23
**first** [25] - 9:19, 11:3, 16:8, 20:17, 22:18, 22:21, 22:24, 33:4, 50:17, 62:11, 65:2, 67:3, 68:4, 80:16, 90:22, 99:15, 100:24,

102:10, 114:25, 115:21, 116:8, 119:1, 119:17, 130:11, 134:20
**five** [1] - 133:16
**flat** [6] - 48:2, 74:14, 109:21, 109:23, 109:25
**flat-out** [2] - 48:2, 74:14
**flee** [1] - 129:17
**flight** [2] - 17:2, 21:3
**flights** [25] - 13:19, 13:23, 14:2, 14:17, 15:13, 16:2, 16:6, 16:10, 16:11, 21:19, 22:1, 22:4, 23:10, 23:11, 23:21, 24:1, 24:3, 24:13, 24:17, 24:19, 25:4, 25:21, 25:22, 26:17
**flipping** [1] - 67:3
**floods** [1] - 11:2
**Floor** [1] - 1:20
**Florida** [6] - 1:23, 127:10, 127:20, 127:22, 127:25
**Florida's** [1] - 127:15
**flow** [1] - 129:6
**fluff** [4] - 67:10, 67:11, 68:18, 68:20
**fly** [3] - 22:23, 23:9, 24:7
**flying** [6] - 13:19, 13:23, 23:22, 25:7, 58:20, 59:25
**focus** [6] - 75:21, 106:12, 133:11, 133:17, 133:20, 139:10
**focused** [2] - 80:20, 112:13
**focusing** [1] - 37:12
**followed** [2] - 36:3, 127:11
**following** [3] - 11:4, 46:15, 60:6
**follows** [2] - 6:18, 29:1
**food** [1] - 36:3
**footnote** [6] - 3:6, 3:25, 28:13, 82:17, 92:15, 109:2
**Footnote** [7] - 3:7, 31:8, 82:19, 83:4, 93:1, 129:11, 129:24
**Footnotes** [1] - 15:5
**footnotes** [3] - 15:10, 28:13, 81:23
**FOR** [4] - 1:1, 1:14,

2:2, 2:3
**forced** [1] - 129:17
**forcefully** [1] - 36:8
**forces** [2] - 21:6, 22:10
**forces'** [2] - 18:23, 20:13
**forecast** [4] - 5:15, 6:11, 6:22, 10:19
**foregoing** [1] - 142:4
**foreign** [20] - 16:24, 20:20, 23:11, 24:8, 41:14, 59:2, 59:4, 59:5, 67:14, 67:17, 67:19, 67:21, 67:23, 71:8, 71:10, 72:22, 72:23, 72:24, 115:12, 125:12
**forget** [4] - 67:11, 117:6, 117:9
**forms** [1] - 100:13
**forth** [1] - 58:22
**forward** [4] - 12:24, 21:23, 22:13, 132:3
**forward-looking** [3] - 12:24, 21:23, 132:3
**founded** [1] - 118:19
**four** [1] - 133:16
**fragility** [2] - 9:2, 9:24
**framed** [1] - 55:2
**free** [2] - 128:23, 134:8
**Freedom** [4] - 29:22, 30:20, 34:21, 35:22
**freedom** [3] - 30:13, 30:15, 39:4
**frequently** [1] - 36:2
**Friday** [1] - 17:2
**friend** [1] - 122:18
**Friendly** [1] - 79:14
**friends** [2] - 36:15, 37:8
**FRITZ** [1] - 1:3
**front** [8] - 9:7, 12:1, 19:17, 49:17, 68:19, 73:13, 83:22, 140:11
**fronts** [7] - 3:11, 3:22, 5:23, 7:17, 7:21, 8:2, 8:3
**FTO** [3] - 20:20, 21:8, 21:11
**FTOs** [3] - 20:20, 21:1, 21:10
**full** [6] - 24:23, 35:8, 62:5, 76:21, 130:18, 142:5
**full-time** [1] - 130:18
**fully** [1] - 37:5
**fun** [1] - 58:20

**fundamental** [2] - 71:2, 78:3
**future** [3] - 7:12, 12:20, 132:9
**fuzzy** [1] - 77:19
**FYI** [2] - 136:23, 137:1

## G

**Gables** [1] - 1:23
**gain** [1] - 121:4
**gang** [5] - 5:16, 10:22, 22:9, 30:16, 30:23
**gangs** [13] - 14:2, 14:8, 16:5, 16:21, 31:1, 31:11, 33:2, 33:5, 39:11, 39:13, 39:15, 39:17, 70:6
**garland** [1] - 139:21
**GDP** [12] - 3:5, 3:9, 3:19, 5:15, 5:21, 6:1, 6:11, 6:19, 6:21, 10:19, 27:3, 127:10
**General** [3] - 51:20, 51:24, 52:8
**general** [8] - 59:1, 67:15, 71:7, 79:16, 104:25, 107:14, 123:11, 123:18
**generally** [5] - 107:6, 107:9, 115:5, 117:21, 117:24
**generated** [2] - 126:23, 127:9
**GEOFFREY** [1] - 1:14
**geographic** [1] - 118:9
**geography** [2] - 25:17, 33:17
**Ginsburg** [1] - 61:16
**GISKAN** [1] - 1:19
**given** [5] - 6:24, 23:21, 91:5, 128:14, 133:10
**global** [1] - 32:4
**Gonzalez** [1] - 133:24
**González** [3] - 139:6, 139:19, 139:21
**governed** [1] - 65:11
**Government** [14] - 19:15, 19:22, 19:23, 62:14, 63:12, 63:20, 73:13, 73:17, 74:11, 74:16, 74:24, 80:23, 120:2, 137:17

**government** [26] - 42:16, 67:16, 77:3, 95:3, 95:4, 95:25, 98:5, 98:14, 98:18, 100:11, 100:12, 100:20, 101:9, 102:5, 102:19, 102:21, 103:12, 103:15, 103:23, 103:25, 104:11, 104:16, 104:23, 105:6, 126:23, 127:18

**Government's** [8] - 48:13, 51:9, 54:10, 54:12, 54:17, 59:17, 79:25, 85:15

**government's** [3] - 30:15, 120:11, 121:24

**governmental** [1] - 77:20

**grant** [1] - 66:20

**great** [4] - 75:22, 84:10, 115:7, 121:7

**greater** [1] - 78:18

**ground** [1] - 25:2

**group** [1] - 63:5

**groups** [1] - 32:20

**growing** [1] - 129:6

**growth** [7] - 3:5, 3:9, 3:19, 5:21, 6:2, 27:3, 130:19

**guarantee** [2] - 48:9, 77:2

**guarantees** [2] - 129:2, 130:8

**guess** [9] - 14:10, 66:7, 77:8, 78:15, 80:23, 97:12, 108:12, 110:24, 126:15

**guessing** [1] - 78:25

**guidance** [2] - 63:15, 64:15

**guide** [1] - 63:18

**guidelines** [1] - 63:17

**guiding** [1] - 63:22

**guilty** [1] - 19:12

**gut** [4] - 120:9, 120:12, 124:12, 125:20

**guy** [1] - 19:14

**guys** [11] - 19:11, 28:7, 89:11, 121:8, 122:10, 124:1, 133:9, 133:14, 133:19, 134:4, 134:8

**gym** [3] - 120:24, 120:25, 121:3

# H

**habit** [1] - 68:16

**hairs** [1] - 55:9

**Haiti** [93] - 3:5, 4:1, 4:6, 4:12, 5:8, 6:7, 10:1, 10:13, 10:25, 11:6, 11:22, 12:1, 13:19, 13:24, 16:10, 17:17, 17:20, 17:23, 21:19, 22:23, 23:9, 23:21, 24:1, 24:3, 24:15, 25:25, 26:12, 26:22, 28:24, 29:9, 29:13, 30:2, 30:13, 31:21, 32:3, 33:15, 33:19, 33:20, 34:7, 34:21, 35:25, 36:6, 36:8, 37:14, 38:18, 38:19, 41:6, 45:22, 45:23, 70:4, 76:3, 77:16, 82:11, 82:22, 83:10, 84:2, 84:6, 84:22, 87:24, 88:3, 93:16, 93:21, 96:9, 96:12, 99:24, 100:1, 102:15, 102:17, 104:15, 106:17, 108:5, 111:17, 115:16, 129:2, 129:16, 129:17, 130:7, 131:3, 131:4, 131:10, 131:14, 131:15, 131:18, 131:19, 131:22, 131:23, 131:24, 132:2, 132:7, 132:8, 132:15, 135:20

**Haiti's** [8] - 8:25, 9:19, 10:8, 16:2, 18:22, 20:12, 93:25, 94:7

**Haitian** [26] - 14:18, 16:21, 16:24, 20:19, 21:1, 21:6, 42:18, 49:23, 83:14, 85:2, 86:14, 87:2, 87:8, 92:20, 98:11, 99:13, 102:8, 110:25, 114:3, 115:24, 116:4, 116:21, 131:19, 132:7, 132:8, 132:25

**Haitians** [24] - 11:25, 24:12, 36:3, 41:6, 42:4, 42:10, 42:12, 43:7, 43:21, 44:13, 44:24, 45:24, 46:3, 46:5, 46:8, 46:15, 47:22, 82:2, 85:16, 86:4, 106:21, 108:6, 111:15, 129:6

**half** [2] - 38:22, 140:10

**halfway** [1] - 92:3

**handle** [1] - 40:12

**happy** [2] - 64:24, 124:23

**harder** [8] - 87:21, 91:24, 92:9, 95:1, 95:10, 95:20, 107:11, 107:19

**HARRELL** [1] - 1:15

**hazards** [1] - 11:2

**head** [8] - 22:20, 40:21, 63:2, 63:9, 63:15, 77:19, 78:20, 88:8

**heading** [1] - 34:21

**heads** [1] - 135:24

**healthcare** [9] - 108:17, 110:12, 113:6, 113:9, 113:18, 113:19, 113:24, 114:12, 114:13

**hear** [7] - 3:15, 40:10, 59:20, 60:8, 77:6, 127:7, 128:18

**heard** [2] - 19:11, 129:9

**HEARING** [1] - 1:10

**hearing** [2] - 36:16, 62:12

**hearings** [2] - 77:21, 81:7

**heavy** [2] - 129:4, 129:9

**HECA** [3] - 66:16, 137:25, 138:9

**Heights** [3] - 77:18, 77:25, 78:5

**held** [3] - 74:25, 75:11, 77:25

**help** [1] - 131:19

**helpful** [1] - 34:25

**hereby** [1] - 142:3

**herself** [1] - 43:7

**high** [5] - 5:17, 10:23, 10:24, 12:5, 24:2

**higher** [2] - 37:20, 94:8

**highest** [1] - 32:4

**highly** [2] - 121:8, 130:18

**hilt** [1] - 73:10

**himself** [1] - 3:13

**hindered** [2] - 8:25, 9:20

**hit** [2] - 78:21, 79:20

**hold** [6] - 89:15, 90:8, 105:19, 113:14, 125:9

**holder** [1] - 102:8

**holders** [32] - 66:19, 83:14, 85:2, 85:23, 86:14, 87:2, 91:3, 92:21, 95:2, 95:3, 97:6, 98:3, 98:4, 98:11, 98:13, 99:13, 99:15, 99:24, 100:11, 100:15, 100:25, 101:1, 101:8, 110:25, 114:4, 115:24, 116:4, 116:21, 118:16, 120:18, 128:1

**hole** [1] - 54:6

**home** [3] - 35:23, 36:11, 128:1

**Homeland** [1] - 138:10

**homes** [1] - 31:14

**homework** [2] - 122:11, 133:14

**Honor** [140] - 3:2, 4:7, 4:8, 4:19, 7:2, 7:24, 8:8, 9:7, 9:11, 15:18, 20:3, 20:25, 21:5, 23:14, 24:8, 26:1, 26:14, 26:23, 27:7, 27:15, 28:1, 29:4, 29:16, 29:20, 31:4, 31:7, 31:16, 31:24, 32:7, 32:9, 32:24, 33:11, 34:1, 34:19, 35:13, 36:16, 37:12, 38:13, 40:4, 40:9, 40:24, 41:9, 42:14, 42:25, 43:11, 44:18, 45:2, 46:21, 53:19, 55:2, 55:5, 55:15, 56:12, 58:23, 59:24, 60:4, 60:7, 60:16, 60:22, 61:2, 62:8, 62:11, 62:13, 63:23, 64:7, 64:14, 64:17, 65:9, 65:13, 68:4, 68:11, 68:15, 68:21, 70:9, 71:13, 71:19, 72:14, 73:6, 74:9, 74:23, 76:8, 77:17, 79:12, 80:21, 81:10, 81:18, 81:20, 81:23, 82:7, 83:7, 83:18, 83:21, 84:17, 85:9, 86:1, 86:20, 87:12, 89:17, 89:21, 92:3, 92:25, 93:9, 93:19, 95:18, 97:8, 99:3, 100:7, 100:14, 102:23, 105:8, 107:2, 108:20, 109:3, 112:3, 112:15, 113:12, 115:11, 118:7, 120:1, 121:16, 122:6, 124:7, 126:6, 127:5, 128:5, 129:21, 130:14, 132:20, 133:4, 134:10, 134:15, 134:19, 136:9, 137:5, 139:8, 140:13, 141:1, 141:2

**Honor's** [5] - 45:10, 47:4, 56:9, 109:6, 124:23

**HONORABLE** [1] - 1:11

**hook** [4] - 47:5, 47:8, 57:12, 57:15

**hooked** [2] - 46:11

**hope** [2] - 19:7, 97:1

**hopefully** [2] - 58:21, 140:6

**hoping** [1] - 135:15

**host** [1] - 24:21

**hour** [1] - 59:21

**households** [1] - 12:7

**housekeeping** [2] - 134:16, 137:2

**houses** [1] - 38:2

**housing** [9] - 108:17, 110:12, 113:6, 113:9, 113:17, 113:19, 113:24, 114:12, 114:13

**Howell** [2] - 63:24, 64:8

**human** [8] - 10:8, 10:9, 12:1, 12:3, 30:12, 31:13, 130:18, 131:18

**Human** [3] - 31:25, 32:9, 32:14

**humanitarian** [1] - 36:25

**hurricanes** [1] - 11:2

**hurt** [1] - 58:13

**hypothetical** [20] - 43:22, 44:1, 46:13, 47:4, 51:14, 53:20, 53:22, 54:13, 55:2, 55:14, 55:24, 56:10, 56:15, 62:14, 62:15, 70:5, 74:18, 104:18, 104:19

**hypotheticals** [1] - 43:23

## I

**I&N** [1] - 122:21
**ICE** [1] - 103:25
**ice** [15] - 42:6, 42:10, 42:20, 43:8, 43:16, 43:19, 44:9, 44:11, 44:24, 45:25, 46:1, 46:2, 46:3, 62:14, 106:6
**idea** [3] - 60:10, 139:16, 140:1
**identified** [1] - 81:25
**idiot** [1] - 19:24
**illegal** [3] - 86:5, 103:5, 103:17
**illegally** [16] - 50:20, 84:24, 85:3, 85:17, 85:23, 87:3, 87:9, 87:10, 94:19, 96:1, 103:5, 103:10, 103:11, 103:23, 103:24
**illusory** [1] - 81:5
**imagine** [4] - 35:10, 49:16, 65:16, 77:22
**immediate** [1] - 36:2
**immediately** [2] - 20:22, 28:25
**immigrant** [3] - 91:25, 120:25, 121:5
**immigrants** [5] - 86:5, 103:5, 103:17, 105:3, 120:21
**Immigration** [2] - 81:2, 122:13
**immigration** [11] - 41:16, 46:14, 80:24, 81:1, 82:2, 82:4, 82:10, 87:22, 92:10, 95:11, 118:21
**impact** [1] - 84:5
**impassable** [1] - 32:22
**implausible** [1] - 106:9
**important** [26] - 7:15, 28:3, 61:6, 61:9, 75:19, 86:2, 86:20, 86:21, 105:23, 106:7, 106:13, 106:25, 108:1, 108:2, 108:4, 111:8, 113:7, 115:1, 119:11, 119:13, 120:17, 121:12, 126:22, 128:13, 138:7
**impossible** [3] - 39:5, 39:7, 39:8
**impressive** [2] -

140:8, 140:12
**improve** [1] - 8:3
**improvement** [1] - 12:3
**improvements** [5] - 3:11, 3:21, 5:23, 7:16, 8:1
**in-country** [1] - 130:19
**in-depth** [1] - 80:14
**INA** [5] - 122:14, 123:4, 123:10, 123:13, 124:4
**inability** [3] - 18:23, 20:14, 25:13
**incentivized** [1] - 104:23
**incentivizes** [2] - 104:9, 104:10
**include** [5] - 21:11, 71:15, 72:18, 94:9, 98:3
**includes** [2] - 6:20, 54:19
**including** [4] - 41:14, 83:10, 84:2, 103:15
**incoming** [1] - 112:16
**incomplete** [1] - 43:23
**increase** [3] - 106:23, 108:6, 109:9
**increased** [2] - 31:1, 110:11
**increases** [4] - 3:10, 3:20, 5:22, 10:23
**increasing** [9] - 9:1, 9:20, 87:21, 91:24, 92:9, 95:10, 108:16, 113:5, 113:17
**indeed** [1] - 116:1
**independent** [2] - 33:1, 34:2
**independently** [1] - 77:2
**index** [1] - 10:8
**indicate** [6] - 27:4, 27:19, 38:11, 125:14, 131:13, 132:25
**indicated** [1] - 135:11
**indicates** [3] - 7:20, 8:2, 12:11
**indirectly** [1] - 140:20
**indiscernible** [1] - 90:19
**individual** [9] - 49:13, 49:22, 53:1, 75:12, 75:16, 87:9,

116:9, 119:10, 123:12
**individualized** [3] - 56:7, 57:2, 58:14
**individually** [1] - 49:24
**individuals** [25] - 35:23, 36:11, 36:14, 74:20, 84:22, 85:20, 86:9, 87:20, 87:24, 89:6, 91:10, 96:4, 98:17, 98:20, 101:19, 102:20, 102:25, 103:10, 104:14, 110:19, 111:7, 119:12, 121:10, 121:13, 122:3
**infant** [1] - 12:4
**inflation** [6] - 5:17, 6:15, 6:16, 6:20, 10:23, 10:24
**information** [11] - 5:11, 30:8, 82:13, 82:24, 85:22, 99:21, 103:12, 106:23, 106:24, 108:7
**informative** [1] - 123:15
**INGOGLIA** [1] - 1:16
**initial** [4] - 66:4, 66:23, 67:6, 67:13
**initiate** [1] - 50:17
**injunction** [2] - 136:14
**inquiry** [3] - 100:15, 107:5, 119:24
**insecurity** [5] - 7:20, 7:21, 9:2, 9:22, 9:24
**instability** [2] - 9:1, 9:20
**instance** [3] - 65:11, 69:10, 80:16
**instances** [1] - 31:12
**instead** [3] - 46:13, 59:9, 77:14
**instinct** [1] - 125:20
**Institute** [1] - 32:20
**institutional** [1] - 81:3
**intelligible** [1] - 62:21
**intended** [2] - 84:11, 106:5
**intention** [1] - 63:16
**interest** [76] - 39:21, 40:23, 41:5, 41:21, 41:24, 42:5, 42:11, 42:19, 42:20, 43:7, 43:20, 45:9, 45:18, 45:24, 46:8, 46:14, 46:16, 46:24, 47:1,

48:4, 54:14, 54:21, 55:17, 55:18, 56:6, 57:3, 57:23, 58:1, 58:4, 58:7, 61:25, 62:10, 62:16, 62:18, 62:20, 63:1, 63:7, 63:9, 63:13, 63:21, 64:1, 64:8, 64:20, 65:5, 65:18, 66:3, 66:18, 68:3, 71:16, 71:18, 72:19, 72:24, 76:2, 76:23, 80:20, 82:1, 86:3, 107:9, 111:18, 113:2, 117:18, 119:7, 119:24, 120:9, 122:9, 122:14, 123:4, 123:21, 123:24, 124:3, 126:3, 127:16, 127:21, 127:23, 128:14
**interested** [2] - 127:1, 127:2
**interesting** [1] - 74:8
**interests** [3] - 66:24, 66:25, 67:20
**internal** [11] - 21:6, 27:4, 27:18, 28:16, 30:14, 30:15, 38:11, 38:16, 39:3, 39:4, 140:22
**Internal** [1] - 31:18
**internally** [1] - 11:21
**internet** [1] - 9:9
**interpretation** [1] - 123:3
**interpreting** [4] - 123:2, 126:11, 126:13, 126:17
**interrupted** [1] - 73:18
**investigations** [1] - 133:2
**investment** [5] - 3:10, 3:20, 5:17, 5:22, 10:23
**invitation** [1] - 124:24
**involve** [1] - 63:20
**involved** [1] - 48:15
**IRA** [1] - 1:22
**irrelevant** [2] - 65:5, 88:1
**issuance** [1] - 21:20
**issue** [17] - 41:3, 41:4, 41:7, 43:18, 49:21, 55:7, 62:4, 81:17, 99:23, 107:3, 120:17, 121:25, 123:19, 128:19,

133:12, 137:7, 137:23
**issued** [4] - 4:19, 109:12, 109:13, 128:6
**issues** [14] - 22:2, 39:18, 43:15, 45:19, 49:12, 52:20, 53:11, 60:12, 75:9, 79:22, 82:2, 135:13, 137:6, 138:18
**issuing** [1] - 77:15
**it'll** [2] - 56:13, 134:23
**iTech** [5] - 126:1, 126:5, 126:7, 133:24, 133:25
**itself** [2] - 53:12, 121:21

## J

**January** [4] - 1:7, 109:13, 131:12, 142:10
**jealous** [1] - 61:21
**JEREMY** [1] - 2:2
**job** [28] - 44:19, 81:8, 108:18, 110:13, 113:7, 115:9, 115:10, 115:17, 116:8, 116:10, 116:22, 116:23, 117:13, 117:19, 118:1, 118:8, 118:17, 119:13, 119:14, 120:19, 121:2, 121:11, 121:15, 122:2, 123:12, 125:16, 140:7
**jobs** [6] - 120:22, 121:4, 121:5, 121:14, 121:15
**join** [1] - 84:11
**judge** [2] - 73:13, 73:18
**JUDGE** [1] - 1:11
**Judge** [7] - 20:1, 63:24, 64:7, 79:14, 90:20, 135:19, 136:7
**judges** [1] - 81:1
**judging** [1] - 41:8
**judicial** [4] - 41:22, 125:25
**June** [8] - 83:6, 84:8, 84:15, 89:3, 90:15, 90:23, 91:1, 109:14
**jurisdiction** [11] - 49:5, 51:11, 54:18, 74:11, 74:17, 75:2, 76:7, 78:5, 78:8, 133:11, 133:21

**jurisdiction-stripping** [5] - 49:5, 51:11, 76:7, 78:5, 78:8
**jurisdictional** [5] - 36:18, 62:5, 119:7, 122:7, 137:6
**jury** [1] - 19:17
**jury's** [1] - 19:25

## K

**keep** [4] - 100:4, 106:15, 107:24, 118:11
**keeping** [4] - 57:3, 86:4, 95:14, 117:17
**key** [5] - 133:6, 136:19, 137:3, 137:4, 137:9
**kidding** [1] - 44:16
**Kidnappings** [1] - 30:25
**kids** [3] - 61:8, 61:9, 61:10
**Kill** [1] - 61:23
**killed** [2] - 11:20, 37:1
**killings** [1] - 31:12
**kind** [4] - 61:11, 68:17, 114:21, 124:8
**kinds** [1] - 51:4
**knock** [1] - 103:25
**knowing** [1] - 22:24
**known** [1] - 82:22
**knows** [2] - 79:5, 80:3
**KURZBAN** [3] - 1:22, 1:22
**Kurzban** [1] - 78:19

## L

**labor** [1] - 125:16
**lack** [1] - 64:15
**lacks** [4] - 74:11, 74:17, 82:11, 82:22
**laid** [1] - 128:14
**land** [5] - 33:7, 33:23, 117:11, 118:4, 118:12
**lane** [1] - 78:23
**language** [17] - 4:13, 9:13, 9:18, 37:7, 38:25, 43:10, 67:22, 68:11, 79:7, 95:17, 105:25, 108:3, 125:8, 126:12, 126:14,

126:17
**Laos** [1] - 94:8
**lapsed** [1] - 94:21
**lapses** [1] - 101:15
**laptop** [2] - 17:11, 19:16
**large** [1] - 129:5
**last** [7] - 18:13, 18:14, 20:19, 40:16, 73:15, 90:21, 140:9
**late** [1] - 6:23
**Latin** [1] - 10:2
**latter** [1] - 58:11
**LAW** [5] - 35:6, 35:9, 122:20, 123:1, 123:7
**law** [10] - 30:14, 47:23, 52:10, 64:5, 77:10, 77:12, 80:25, 82:13, 82:24, 133:12
**lawyer** [5] - 45:13, 73:9, 79:4, 84:9, 140:4
**leaders** [1] - 21:11
**leaf** [1] - 80:3
**learned** [1] - 135:18
**least** [20] - 21:17, 22:22, 23:6, 26:16, 34:11, 38:15, 39:3, 57:19, 67:5, 67:10, 67:12, 70:2, 80:6, 87:8, 115:14, 123:15, 124:4, 126:14, 126:16
**leave** [13] - 38:17, 44:13, 46:5, 50:10, 50:12, 50:20, 95:24, 101:25, 102:14, 102:15, 105:7, 128:22, 135:16
**leaving** [1] - 134:24
**led** [1] - 39:18
**left** [1] - 37:1
**legal** [1] - 36:17
**legally** [7] - 51:5, 85:3, 85:8, 94:17, 101:20, 102:8, 104:22
**LEIGHTON** [1] - 1:17
**LESLY** [1] - 1:3
**less** [2] - 35:14, 35:15
**letter** [1] - 51:7
**levels** [3] - 9:1, 9:21, 12:5
**Lhasa** [1] - 61:12
**life** [1] - 52:10
**lifted** [1] - 23:5
**light** [1] - 112:4
**limited** [20] - 21:8, 108:18, 110:13, 113:7, 115:8, 115:10, 115:17, 116:8,

116:10, 116:22, 116:23, 117:13, 117:19, 117:25, 118:1, 119:13, 119:14, 121:11, 133:17
**limiting** [1] - 118:15
**line** [5] - 35:12, 35:14, 52:9, 71:3, 76:4
**lines** [1] - 9:19
**link** [5] - 4:3, 4:11, 18:1, 35:5, 35:8
**Lisa** [1] - 142:12
**LISA** [2] - 2:7, 142:3
**list** [7] - 28:2, 29:5, 87:13, 100:9, 110:8, 133:7, 137:24
**listed** [2] - 114:15
**listen** [2] - 44:16, 44:21
**listing** [1] - 123:12
**literally** [3] - 118:2, 118:4, 118:5
**live** [3] - 24:6, 37:8, 115:16
**lives** [3] - 24:18, 66:19, 127:24
**LLP** [2] - 1:17, 1:19
**load** [1] - 129:10
**loads** [1] - 129:4
**loaf** [1] - 99:1
**local** [22] - 82:3, 108:16, 110:3, 110:11, 113:4, 113:9, 113:17, 113:18, 113:23, 114:3, 115:10, 115:15, 116:7, 116:9, 116:22, 116:23, 117:12, 118:17, 119:12, 121:11, 121:23, 122:2
**locate** [8] - 87:21, 91:24, 92:9, 95:1, 95:10, 95:20, 107:12, 107:19
**location** [1] - 99:14
**locations** [2] - 100:12, 121:1
**locked** [1] - 134:23
**logic** [12] - 24:11, 95:19, 97:21, 98:3, 98:10, 99:23, 100:2, 105:11, 107:25, 116:11, 118:2, 118:5
**logically** [1] - 104:14
**longer-than-usual** [1] - 136:25
**look** [45] - 4:20, 6:9, 8:13, 13:2, 14:6, 15:1,

18:7, 22:20, 29:1, 54:18, 54:19, 57:15, 65:14, 70:2, 79:17, 86:7, 86:8, 88:21, 105:12, 107:1, 107:3, 108:10, 111:4, 111:14, 114:22, 116:18, 116:20, 116:21, 116:24, 117:3, 117:19, 118:21, 118:23, 118:25, 119:1, 119:4, 119:18, 119:21, 122:4, 124:1, 124:21, 134:2, 134:8, 137:16
**looked** [3] - 15:12, 108:25, 117:1
**looking** [24] - 3:6, 4:15, 12:24, 18:8, 20:1, 21:23, 25:11, 25:12, 33:13, 84:15, 88:14, 89:15, 89:16, 89:25, 90:1, 93:20, 118:25, 124:25, 125:10, 132:3, 133:12, 134:15, 136:8
**lose** [1] - 102:3
**lost** [3] - 56:9, 102:19, 137:5
**low** [8] - 3:10, 3:15, 3:20, 5:22, 17:1, 21:3, 21:13, 23:22
**low-altitude** [3] - 17:1, 21:3, 21:13
**low-flying** [1] - 23:22
**lunch** [2] - 136:24, 136:25
**lying** [1] - 96:23

## M

**ma'am** [3] - 17:24, 101:10, 134:18
**macro** [1] - 4:13
**macro-poverty** [1] - 4:13
**Madeira** [1] - 1:23
**main** [8] - 13:19, 13:24, 14:17, 17:3, 26:12, 33:6, 34:12, 71:5
**maintain** [1] - 16:25
**maintained** [1] - 21:2
**major** [2] - 32:21, 98:16
**majority** [3] - 35:22, 36:10, 86:4
**maker** [4] - 76:10, 77:20, 107:4

**man** [1] - 61:23
**manageable** [1] - 133:7
**manager** [2] - 121:2, 121:3
**Marcelo** [2] - 137:18, 138:4
**March** [10] - 12:3, 13:20, 13:24, 16:4, 21:22, 22:1, 25:5, 25:7, 31:18, 32:19
**market** [17] - 108:18, 110:13, 113:7, 115:9, 115:10, 115:17, 116:22, 116:23, 117:20, 118:1, 118:2, 118:8, 118:17, 119:14, 120:19, 121:11, 122:2
**markets** [4] - 116:8, 116:10, 117:13, 119:13
**mass** [1] - 130:18
**massive** [3] - 50:21, 132:14
**math** [1] - 10:12
**Matter** [1] - 122:20
**matter** [18] - 24:10, 58:3, 65:4, 71:2, 76:10, 76:16, 80:12, 95:19, 97:21, 98:3, 98:10, 99:23, 100:2, 105:9, 105:10, 107:25, 126:21, 126:24
**matters** [4] - 52:9, 52:10, 70:24, 71:1
**Max** [1] - 61:21
**McNary** [6] - 74:25, 75:5, 75:6, 75:9, 137:23, 138:5
**mean** [26] - 16:18, 24:12, 36:15, 36:23, 38:24, 40:6, 42:6, 43:4, 55:8, 55:9, 63:2, 70:23, 77:4, 78:20, 87:19, 91:5, 91:19, 95:23, 97:13, 98:16, 98:17, 104:17, 104:21, 109:20, 110:5, 111:13
**meaning** [3] - 10:11, 43:4, 93:2
**means** [3] - 80:4, 80:5, 113:12
**meant** [2] - 114:6, 114:7
**meantime** [2] - 51:2, 51:3
**measures** [1] - 12:5

**mechanisms** [1] - 81:3

**medium** [1] - 10:9

**meet** [2] - 59:3, 78:18

**meets** [1] - 71:8

**memo** [13] - 13:6, 13:9, 13:11, 13:13, 13:14, 13:16, 14:3, 17:4, 30:9, 31:18, 32:15, 39:3, 39:19

**mention** [1] - 109:14

**mentioned** [2] - 36:3, 80:22

**merits** [1] - 77:15

**met** [1] - 76:14

**middle** [2] - 98:25, 135:5

**might** [19] - 14:2, 16:5, 16:10, 23:20, 57:4, 73:9, 77:23, 86:17, 89:14, 91:3, 99:25, 100:18, 107:4, 116:1, 120:20, 123:15, 134:4, 135:12

**Migration** [1] - 31:19

**migration** [5] - 41:15, 129:3, 130:8, 131:4, 131:14

**military** [1] - 40:19

**Miller** [1] - 89:1

**million** [4] - 11:21, 11:25, 31:21, 58:3

**mind** [2] - 84:8, 90:11

**mine** [2] - 103:1, 121:9

**minimum** [8] - 23:23, 25:2, 33:22, 35:15, 36:13, 76:6, 88:21, 105:11

**ministerial** [1] - 76:10

**minute** [4] - 4:4, 4:9, 4:19, 82:7

**minutes** [2] - 35:11, 59:22

**minutia** [2] - 86:20, 86:21

**MIOT** [1] - 1:3

**missed** [2] - 90:20, 124:14

**misspoke** [1] - 13:12

**mix** [1] - 61:12

**Mockingbird** [1] - 61:23

**moderated** [1] - 6:16

**moderating** [1] - 6:15

**modest** [7] - 3:5, 3:9,

3:19, 5:21, 5:22, 6:1, 7:16

**moment** [10] - 8:8, 26:23, 41:2, 55:18, 83:18, 90:5, 92:25, 93:19, 104:18, 134:13

**Monday** [1] - 16:3

**money** [2] - 127:12, 127:13

**monitor** [8] - 87:21, 91:24, 92:9, 95:1, 95:10, 95:21, 107:12, 107:19

**monitoring** [1] - 99:14

**month** [1] - 31:21

**months** [3] - 20:19, 71:11, 71:12

**morning** [6] - 54:12, 96:14, 96:17, 96:20, 96:23, 140:17

**moron** [1] - 19:24

**mortality** [1] - 12:4

**most** [5] - 11:1, 36:2, 133:15, 138:7

**MOTION** [1] - 1:10

**move** [1] - 45:16

**moved** [2] - 27:14, 95:23

**Movement** [4] - 29:22, 30:20, 34:22, 35:22

**movement** [4] - 30:13, 30:14, 30:16, 39:4

**moving** [3] - 71:4, 135:7, 137:21

**MPO** [2] - 4:12, 14:4

**MR** [566] - 3:2, 3:6, 3:8, 3:17, 3:23, 4:2, 4:7, 4:16, 4:19, 5:2, 5:5, 5:9, 5:12, 5:19, 5:24, 6:4, 6:8, 6:13, 7:1, 7:9, 7:14, 7:18, 7:23, 8:4, 8:7, 8:10, 8:15, 8:19, 8:23, 9:3, 9:6, 9:11, 9:14, 9:15, 9:16, 9:22, 9:25, 10:3, 10:7, 10:11, 10:15, 10:18, 10:21, 11:3, 11:8, 11:11, 11:17, 11:23, 12:9, 12:13, 12:17, 12:23, 13:4, 13:7, 13:10, 13:15, 13:21, 13:25, 14:5, 14:7, 14:15, 14:19, 14:23, 15:3, 15:6, 15:8, 15:16, 15:18, 15:21, 15:23, 15:25, 16:8, 16:13, 17:6,

17:9, 17:13, 17:18, 17:21, 17:24, 18:3, 18:6, 18:10, 18:13, 18:19, 19:2, 19:6, 19:9, 20:3, 20:6, 20:10, 20:17, 20:25, 21:5, 21:16, 21:20, 21:23, 22:6, 22:12, 22:17, 22:24, 23:13, 23:25, 24:4, 24:8, 24:16, 24:21, 25:6, 25:9, 25:11, 25:16, 25:20, 25:23, 26:1, 26:5, 26:8, 26:13, 26:19, 26:23, 27:7, 27:10, 27:13, 27:15, 27:17, 27:21, 27:25, 28:12, 28:17, 28:19, 28:25, 29:3, 29:7, 29:11, 29:15, 29:18, 29:20, 29:23, 30:1, 30:5, 30:8, 30:19, 30:22, 31:4, 31:7, 31:16, 31:24, 32:7, 32:13, 32:18, 32:24, 33:11, 33:16, 33:25, 34:18, 34:25, 35:12, 35:18, 35:21, 36:16, 36:22, 37:11, 37:17, 38:5, 38:13, 38:21, 39:6, 39:9, 39:12, 39:14, 39:17, 39:22, 40:1, 40:4, 40:8, 40:9, 40:12, 40:17, 40:20, 40:24, 41:9, 41:11, 41:20, 42:8, 42:14, 42:22, 42:25, 43:2, 43:11, 43:15, 43:22, 44:2, 44:5, 44:8, 44:14, 44:18, 45:1, 45:4, 45:7, 45:10, 46:9, 46:21, 47:3, 47:10, 47:23, 48:11, 48:16, 48:21, 48:25, 49:4, 49:7, 49:10, 50:2, 50:8, 50:11, 50:15, 50:22, 51:6, 51:15, 51:18, 51:23, 51:25, 52:1, 52:2, 52:4, 52:7, 52:12, 52:14, 52:18, 53:5, 53:9, 53:19, 53:24, 55:1, 55:5, 55:14, 56:2, 56:9, 56:12, 56:20, 56:25, 57:6, 57:9, 57:15, 58:10, 58:16, 58:23, 59:5, 59:8, 59:13, 59:18, 60:4, 60:7, 60:10, 61:3, 61:7, 61:10, 61:12, 61:14, 61:16,

61:20, 62:2, 62:8, 62:24, 63:8, 64:3, 64:7, 64:13, 64:23, 65:2, 65:9, 65:23, 66:1, 66:8, 67:9, 67:12, 68:4, 68:15, 68:21, 68:23, 69:2, 69:6, 69:13, 69:24, 70:9, 70:11, 70:16, 70:21, 71:1, 71:13, 71:19, 71:21, 71:25, 72:8, 72:14, 72:16, 72:20, 73:1, 73:3, 73:4, 73:23, 74:5, 74:9, 74:16, 74:22, 75:8, 75:11, 76:8, 76:24, 77:13, 77:17, 79:12, 79:13, 79:23, 80:3, 80:7, 80:11, 80:13, 80:21, 81:10, 81:17, 81:22, 82:6, 82:9, 82:17, 82:20, 83:3, 83:7, 83:11, 83:17, 83:20, 84:7, 84:11, 84:15, 84:20, 85:1, 85:5, 85:9, 85:12, 85:18, 85:25, 86:7, 86:16, 86:19, 86:23, 86:25, 87:4, 87:11, 87:14, 88:2, 88:8, 88:10, 88:14, 88:19, 88:24, 89:8, 89:13, 89:17, 89:19, 89:24, 90:3, 90:7, 90:10, 90:11, 90:12, 90:13, 90:17, 90:22, 91:4, 91:8, 91:15, 91:17, 92:2, 92:7, 92:12, 92:15, 92:22, 92:25, 93:3, 93:4, 93:5, 93:8, 93:12, 93:14, 93:18, 93:23, 94:5, 94:12, 94:15, 94:20, 95:6, 95:15, 95:18, 96:3, 96:20, 96:24, 97:1, 97:3, 97:8, 97:17, 97:20, 97:25, 98:12, 98:19, 98:22, 99:3, 99:8, 100:6, 100:14, 100:24, 101:4, 101:6, 101:10, 101:13, 101:17, 101:21, 102:1, 102:11, 102:23, 103:7, 103:13, 103:18, 104:2, 104:7, 104:9, 104:24, 105:8, 105:16, 105:20, 105:24, 106:1, 107:1, 107:13, 107:22,

108:9, 108:20, 108:23, 109:3, 109:11, 109:19, 110:1, 110:9, 110:15, 110:22, 111:2, 111:5, 111:11, 111:19, 111:23, 112:2, 112:12, 112:15, 112:22, 112:24, 113:11, 113:15, 113:21, 113:25, 114:5, 114:15, 115:5, 115:11, 115:18, 115:22, 116:2, 116:13, 117:4, 117:8, 117:15, 117:21, 118:3, 118:7, 119:3, 119:6, 119:16, 119:20, 119:23, 120:8, 120:15, 121:16, 122:6, 122:25, 124:7, 124:11, 124:15, 124:16, 124:17, 124:18, 124:23, 125:2, 125:5, 125:11, 125:19, 125:22, 126:5, 126:13, 126:18, 126:25, 127:2, 127:5, 127:7, 127:13, 127:20, 128:2, 128:4, 128:9, 128:11, 128:16, 129:8, 129:12, 129:14, 129:18, 129:20, 129:25, 130:3, 130:9, 130:14, 130:23, 130:25, 131:6, 131:11, 131:16, 132:1, 132:11, 132:16, 132:19, 133:4, 133:21, 134:6, 134:10, 134:13, 134:15, 134:20, 134:24, 135:3, 135:7, 135:10, 135:17, 135:23, 136:4, 136:9, 136:16, 136:19, 136:22, 137:3, 137:4, 137:12, 137:14, 137:17, 137:21, 138:3, 138:6, 138:13, 138:18, 138:22, 139:1, 139:5, 139:8, 139:11, 139:13, 139:15, 139:18, 139:21, 139:25, 140:13, 140:16, 141:1, 141:2

**MS** [8] - 60:16,

60:19, 60:22, 61:2, 89:21, 89:23, 128:24, 134:19

**MSL** [1] - 18:22
**Muggah** [2] - 33:1, 34:3
**multi** [1] - 28:5
**multiple** [1] - 14:15
**mumbling** [2] - 68:17, 74:4
**must** [8] - 6:10, 6:22, 41:7, 68:8, 69:8, 76:10, 125:14, 137:8
**mutilation** [1] - 31:13
**mutt** [1] - 61:21

**N**

**N.S** [1] - 139:22
**nail** [1] - 73:11
**name** [9] - 40:16, 52:7, 61:13, 61:15, 61:21, 73:8, 73:16, 121:7, 122:21
**named** [1] - 61:17
**namely** [1] - 66:10
**narrow** [2] - 107:5, 118:18
**national** [91] - 39:21, 40:22, 41:5, 41:15, 41:21, 41:24, 42:5, 42:11, 42:18, 42:19, 43:6, 43:14, 43:20, 45:9, 45:17, 45:23, 46:7, 46:14, 46:16, 46:24, 47:1, 48:4, 49:14, 54:14, 54:21, 55:17, 55:18, 56:6, 57:3, 57:23, 58:1, 58:4, 58:7, 61:25, 62:10, 62:16, 62:18, 62:20, 63:1, 63:7, 63:9, 63:13, 63:21, 63:25, 64:8, 64:19, 65:5, 65:18, 66:3, 67:20, 68:3, 71:16, 71:18, 72:19, 72:23, 76:2, 76:23, 80:20, 82:1, 82:14, 82:25, 83:15, 86:3, 88:23, 91:23, 92:6, 95:8, 107:9, 107:18, 111:18, 113:2, 117:18, 119:7, 119:24, 120:8, 121:25, 122:8, 122:14, 123:4, 123:21, 123:24, 124:3, 126:3, 127:16, 127:21, 127:22,

128:14
**nationals** [7] - 82:14, 82:25, 84:4, 131:19, 132:7, 132:8, 132:25
**Nations** [2] - 32:25, 34:2
**nationwide** [2] - 136:13, 136:14
**natural** [2] - 11:1, 60:24
**naïveté** [1] - 79:15
**near** [1] - 52:18
**nearby** [1] - 16:22
**nearly** [1] - 20:21
**neatly** [1] - 135:5
**necessarily** [6] - 16:18, 26:2, 111:13, 112:2, 129:21, 130:15
**necessary** [2] - 82:13, 82:24
**need** [30] - 23:13, 36:2, 36:3, 60:14, 63:5, 67:7, 79:15, 86:14, 90:2, 90:5, 98:6, 99:21, 108:8, 110:24, 114:2, 114:10, 114:11, 115:15, 116:17, 116:21, 118:25, 119:1, 119:4, 120:4, 121:7, 122:2, 128:22, 132:7, 135:4, 135:5
**needed** [1] - 35:2
**needs** [1] - 109:23
**negate** [1] - 34:14
**negative** [3] - 121:18, 121:19, 121:20
**negatives** [1] - 122:17
**neighborhood** [1] - 11:16
**net** [10] - 112:1, 120:18, 120:19, 121:4, 121:13, 121:14, 121:17, 122:16
**never** [9] - 61:18, 69:21, 69:23, 84:8, 87:10, 94:19, 94:21, 113:25, 120:13
**nevertheless** [1] - 77:24
**New** [7] - 1:21, 66:17, 70:14, 70:17, 127:12, 138:10
**new** [5] - 32:21, 91:6, 100:1, 100:5, 123:8
**new-designate** [1] - 100:5

**News** [1] - 15:7
**news** [1] - 33:1
**next** [7] - 28:15, 28:18, 28:23, 29:25, 59:16, 73:20
**nicely** [1] - 122:7
**night** [1] - 133:18
**nine** [3] - 56:22, 57:12, 57:13
**Ninth** [1] - 133:22
**no's** [1] - 113:14
**non** [1] - 94:4
**non-visa** [1] - 94:4
**nondelegation** [6] - 62:12, 62:22, 64:17, 81:14, 81:17, 139:10
**none** [3] - 40:24, 80:17, 113:25
**nonetheless** [1] - 72:17
**nonimmigrant** [2] - 110:22, 110:25
**nonimmigrants** [6] - 89:2, 90:15, 90:18, 90:23, 90:25, 94:2
**normal** [1] - 92:18
**Northwest** [4] - 1:17, 2:5, 2:9, 142:14
**not's** [1] - 115:13
**note** [9] - 7:2, 22:7, 34:1, 61:20, 79:24, 80:11, 84:21, 102:23, 115:23
**noted** [3] - 16:21, 31:19, 32:20
**notes** [2] - 13:17, 142:5
**nothing** [7] - 36:9, 45:11, 78:9, 97:14, 102:5, 105:16, 126:1
**notice** [26] - 12:18, 18:14, 21:21, 22:8, 22:24, 23:13, 25:12, 26:25, 27:1, 41:12, 45:21, 53:16, 62:18, 66:13, 81:23, 84:16, 87:19, 92:16, 94:6, 98:1, 99:4, 99:6, 99:10, 99:12, 118:11, 118:19
**notify** [1] - 95:4
**noting** [1] - 64:6
**notion** [3] - 33:14, 34:16, 81:6
**notwithstanding** [1] - 74:2
**NTPSA** [1] - 135:19
**number** [11] - 29:15, 32:2, 37:17, 37:19, 90:24, 91:1, 100:11,

106:22, 106:23, 108:6, 127:5
**numbers** [10] - 88:14, 89:5, 89:13, 89:20, 91:19, 94:5, 107:14, 127:6, 132:13
**numerous** [1] - 100:12

**O**

**objection** [1] - 134:20
**obligated** [3] - 76:14, 76:17, 102:21
**obligation** [3] - 95:23, 95:24, 103:14
**observe** [2] - 65:3, 65:4
**obtained** [1] - 88:5
**obvious** [1] - 74:1
**obviously** [7] - 47:6, 50:16, 62:6, 66:23, 68:8, 79:21, 121:6
**occur** [1] - 6:2
**odd** [1] - 70:24
**OF** [3] - 1:1, 1:10, 2:4
**offer** [1] - 125:16
**offered** [1] - 106:7
**OFFICE** [1] - 2:3
**officer** [2] - 42:16, 45:13
**Official** [1] - 2:7
**official** [1] - 142:12
**offset** [1] - 111:15
**old** [1] - 73:9
**old-school** [1] - 73:9
**once** [4] - 66:10, 66:11, 66:21, 102:3
**one** [92] - 3:4, 5:1, 5:8, 7:3, 8:8, 8:19, 9:9, 11:1, 19:11, 19:13, 19:18, 19:19, 19:21, 19:23, 23:20, 26:16, 26:23, 28:3, 33:16, 34:12, 36:24, 37:9, 38:22, 45:14, 46:11, 50:4, 50:15, 50:25, 51:25, 52:23, 52:25, 55:15, 56:16, 57:19, 58:2, 69:4, 71:1, 73:15, 80:21, 82:2, 82:7, 83:17, 86:7, 86:17, 86:24, 87:8, 87:10, 87:13, 88:20, 88:22, 89:25, 90:1, 90:2, 90:8, 90:22, 91:12, 92:25, 93:19, 94:5, 97:1,

99:1, 100:17, 100:24, 101:1, 105:22, 109:3, 109:4, 109:11, 111:3, 113:2, 113:8, 114:13, 115:3, 116:20, 117:18, 124:4, 125:9, 126:24, 128:19, 132:5, 136:17, 137:6, 138:19, 139:12, 139:14, 139:20, 140:14
**One** [1] - 1:20
**ones** [3] - 24:22, 133:16, 134:2
**ongoing** [4] - 22:4, 69:20, 69:22, 73:12
**onion** [1] - 99:1
**open** [4] - 24:22, 26:10, 26:16, 120:23
**opening** [1] - 52:9
**operational** [1] - 21:12
**operations** [3] - 18:21, 20:12, 20:21
**opinion** [4] - 75:4, 131:18, 139:2, 139:6
**opinions** [1] - 36:20
**opportunities** [1] - 121:15
**opposed** [1] - 66:22
**optional** [1] - 66:5
**oral** [1] - 70:17
**order** [17] - 4:4, 4:9, 4:20, 64:11, 83:5, 83:8, 83:12, 83:13, 83:22, 83:25, 84:18, 86:13, 87:23, 99:15, 99:16, 120:5, 136:4
**ordered** [1] - 135:19
**orders** [1] - 109:13
**Organization** [1] - 31:19
**organization** [1] - 20:20
**organization's** [1] - 5:7
**organizations** [2] - 16:25, 23:12
**organizations'** [1] - 21:10
**origin** [2] - 30:8, 36:1
**original** [1] - 65:10
**otherwise** [2] - 32:16, 87:25
**outlandish** [2] - 74:12, 74:18
**outlined** [1] - 72:3
**outlook** [1] - 4:13
**overall** [4] - 31:22, 111:16, 112:1, 118:20

**overnight** [1] - 36:4
**overruled** [1] - 123:5
**overstay** [32] - 87:20, 91:22, 91:23, 92:4, 92:5, 92:8, 92:19, 92:21, 93:7, 93:25, 94:1, 94:7, 95:1, 95:7, 95:9, 95:20, 97:22, 97:24, 98:21, 99:13, 107:10, 107:11, 107:14, 107:17, 107:19, 108:15, 109:9, 110:20, 110:22, 113:3, 116:7, 117:12
**overstayed** [18] - 85:21, 85:23, 86:6, 86:10, 87:9, 87:16, 87:25, 88:3, 89:3, 90:18, 90:25, 91:10, 95:12, 95:21, 101:2, 106:19, 107:24, 110:25
**overstaying** [2] - 105:13, 106:14
**overstays** [5] - 96:5, 97:10, 97:23, 107:6, 107:8
**overview** [4] - 4:6, 4:11, 125:20, 126:20
**Overview** [1] - 4:22
**overzealous** [1] - 133:9
**own** [2] - 125:23, 126:11

**P**

**p.m** [1] - 1:7
**Page** [2] - 13:3, 93:23
**page** [9] - 13:17, 17:12, 29:25, 30:7, 35:17, 93:11, 93:20, 130:17, 137:5
**Pages** [1] - 34:19
**painted** [1] - 104:24
**pair** [1] - 137:19
**PAISNER** [1] - 1:17
**Paragraph** [1] - 71:9
**paragraph** [8] - 6:14, 11:4, 14:7, 16:8, 18:14, 30:20, 33:5, 63:16
**paragraph-long** [1] - 63:16
**paragraphs** [3] - 34:1, 34:5, 35:21
**parens** [1] - 41:15

**part** [27] - 3:3, 8:24, 13:5, 13:8, 13:14, 24:23, 37:6, 52:13, 66:19, 71:8, 73:12, 86:12, 90:21, 99:6, 99:7, 99:11, 104:15, 106:25, 111:8, 115:2, 117:3, 122:14, 123:13, 124:3, 124:25, 139:5, 139:6
**particular** [2] - 99:7, 125:1
**particularly** [1] - 129:3
**partner** [1] - 73:7
**parts** [8] - 26:22, 27:4, 27:19, 28:24, 31:1, 38:11, 113:7, 114:9
**party** [1] - 73:24
**passage** [1] - 72:23
**path** [2] - 52:9, 52:10
**pattern** [1] - 131:14
**pays** [1] - 35:15
**PDF** [6] - 17:14, 35:1, 35:19, 89:9, 93:2, 93:15
**Peace** [1] - 32:20
**Penn** [2] - 127:8, 128:5
**people** [61] - 11:20, 11:21, 24:19, 31:20, 31:21, 32:2, 36:8, 36:19, 36:25, 37:18, 38:1, 38:16, 38:17, 38:18, 45:24, 46:17, 46:25, 48:3, 48:5, 49:24, 58:3, 60:21, 63:5, 79:2, 84:5, 84:19, 88:6, 89:4, 91:2, 94:9, 94:18, 95:12, 95:13, 96:9, 96:18, 97:5, 97:15, 98:6, 100:1, 102:20, 103:4, 105:13, 106:14, 106:16, 106:19, 106:22, 106:24, 107:24, 108:10, 112:10, 113:1, 114:24, 115:2, 115:16, 116:1, 116:6, 116:24, 121:2, 127:16, 129:17, 133:5
**per** [2] - 32:4, 91:8
**percent** [17] - 5:15, 6:12, 6:16, 6:17, 6:22, 10:17, 10:20, 16:21, 20:21, 35:22, 35:24, 37:12, 37:18, 38:3, 93:25, 94:1

**percentage** [1] - 86:14
**perhaps** [2] - 111:19, 128:2
**period** [5] - 66:4, 66:12, 67:13, 71:9
**periodic** [5] - 65:6, 65:12, 67:4, 72:8, 72:10
**periods** [1] - 22:25
**Perkins** [3] - 63:24, 64:2, 64:5
**permissible** [5] - 58:11, 77:3, 78:1, 112:7, 125:24
**permitted** [1] - 68:6
**persist** [1] - 129:6
**persistent** [1] - 21:7
**person** [4] - 19:12, 50:4, 86:17, 88:22
**personal** [6] - 15:21, 43:17, 43:18, 120:24, 120:25, 121:8
**personally** [1] - 127:3
**personnel** [1] - 21:7
**persons** [3] - 37:7, 83:9, 84:1
**petition** [4] - 48:18, 48:21, 49:3, 49:19
**PFR** [1] - 52:22
**phases** [2] - 17:1, 21:3
**phenomenally** [1] - 140:7
**phone** [2] - 140:2
**phrase** [7] - 6:25, 62:20, 63:21, 64:15, 64:16, 108:2, 124:3
**physics** [1] - 118:6
**pick** [1] - 139:12
**picked** [1] - 140:6
**picture** [1] - 118:22
**pieces** [1] - 133:21
**pin** [1] - 74:22
**pincite** [1] - 52:14
**PIPOLY** [31] - 1:14, 18:3, 18:6, 19:6, 19:9, 40:9, 40:12, 89:17, 90:10, 90:12, 93:3, 93:5, 102:11, 124:16, 124:18, 134:15, 134:20, 134:24, 135:3, 135:7, 135:10, 135:17, 135:23, 136:4, 136:9, 136:16, 136:19, 136:22, 137:3, 139:8, 139:15
**Pipoly** [2] - 19:2, 19:3

**place** [5] - 36:4, 50:17, 99:15, 102:4, 111:7
**places** [8] - 10:9, 33:14, 33:18, 33:21, 36:5, 36:7, 36:9, 108:25
**plain** [1] - 67:22
**Plaintiffs** [5] - 1:4, 22:21, 40:2, 59:21, 60:8
**plaintiffs** [1] - 134:12
**PLAINTIFFS** [1] - 1:14
**plan** [2] - 35:23, 36:11
**planes** [2] - 14:12, 14:15
**Plato** [1] - 118:5
**plausibly** [1] - 42:21
**play** [2] - 66:22, 76:18
**playing** [2] - 49:16, 58:21
**Plaza** [1] - 1:20
**pleasure** [1] - 94:3
**plenty** [3] - 47:23, 77:17, 88:10
**point** [35] - 26:18, 27:23, 27:25, 34:10, 43:4, 48:19, 51:16, 51:18, 59:7, 60:24, 63:23, 68:9, 71:5, 73:15, 79:20, 86:22, 91:9, 91:19, 94:24, 97:16, 102:19, 104:5, 110:5, 110:6, 110:7, 110:18, 112:15, 126:10, 126:19, 128:22, 130:14, 131:23, 132:17, 138:8, 140:14
**points** [1] - 68:11
**policies** [1] - 110:2
**policy** [11] - 13:10, 13:13, 24:9, 41:14, 41:16, 50:2, 50:4, 105:9, 112:20, 115:12, 118:21
**policymaker** [4] - 105:8, 107:4, 114:18, 115:12
**political** [12] - 3:11, 3:21, 5:16, 5:23, 7:17, 7:21, 8:2, 8:25, 9:20, 10:22, 129:1, 130:6
**poodle** [1] - 61:12
**poorest** [3] - 10:1, 10:5, 12:6
**pop** [1] - 19:8

**pops** [1] - 19:25
**population** [2] - 106:17, 110:20
**Port** [23] - 14:8, 14:18, 16:22, 18:24, 20:15, 20:22, 21:9, 21:12, 23:10, 23:21, 25:3, 25:7, 25:14, 25:17, 26:4, 31:20, 33:2, 33:7, 33:19, 34:4, 34:6, 36:13, 36:14
**Port-au-Prince** [23] - 14:8, 14:18, 16:22, 18:24, 20:15, 20:22, 21:9, 21:12, 23:10, 23:21, 25:3, 25:7, 25:14, 25:17, 26:4, 31:20, 33:2, 33:7, 33:19, 34:4, 34:6, 36:13, 36:14
**portion** [3] - 8:10, 46:10, 67:5
**portions** [2] - 18:22, 20:12
**ports** [2] - 33:7, 33:23
**posed** [1] - 23:25
**position** [8] - 48:13, 54:10, 54:13, 54:17, 59:17, 120:11, 121:24, 140:19
**positive** [3] - 28:20, 121:17, 121:19
**positives** [2] - 3:4, 122:16
**possibility** [2] - 25:22, 80:23
**possible** [8] - 38:5, 38:6, 46:17, 46:24, 54:15, 56:5, 60:17, 69:3
**possibly** [1] - 99:23
**post** [1] - 126:15
**post-Chevron** [1] - 126:15
**potential** [7] - 47:5, 68:9, 69:8, 91:22, 92:6, 95:8, 107:17
**potentially** [7] - 91:5, 94:10, 95:22, 96:2, 96:4, 104:1, 104:2
**Poultry** [1] - 139:15
**poverty** [2] - 4:13, 132:14
**power** [1] - 65:20
**powerful** [2] - 14:2, 16:5
**practice** [3] - 35:11, 50:2, 50:4

157

**PRATT** [1] - 1:22
**precedential** [1] - 124:4
**preceding** [1] - 31:20
**precisely** [1] - 62:21
**precursors** [1] - 131:7
**preferred** [1] - 130:19
**prematurely** [1] - 66:14
**premise** [2] - 65:23, 105:1
**prepare** [1] - 134:4
**prepared** [2] - 15:10, 126:18
**preparing** [1] - 134:3
**presence** [1] - 94:23
**present** [8] - 12:22, 84:22, 84:24, 88:23, 91:22, 92:5, 95:8, 107:17
**presented** [2] - 64:23, 80:25
**presenting** [1] - 99:13
**presently** [1] - 83:15
**preserved** [4] - 47:16, 48:18, 49:13, 52:21
**president** [4] - 80:9, 109:12, 109:20, 109:22
**President** [1] - 83:5
**presidential** [1] - 112:17
**press** [3] - 140:2, 140:5
**pressure** [1] - 113:19
**pressures** [8] - 108:18, 110:13, 113:6, 113:9, 113:18, 113:24, 114:12, 114:13
**presumably** [2] - 76:25, 99:20
**presume** [1] - 80:13
**presumes** [3] - 59:14, 98:12, 115:23
**presumption** [2] - 50:9, 50:11
**pretextual** [1] - 116:19
**pretty** [3] - 20:7, 114:22, 126:5
**prevent** [3] - 18:23, 20:14, 25:14
**preventing** [4] - 83:9, 84:1, 84:19, 112:9

**prevention** [1] - 12:5
**previously** [1] - 30:24
**Prince** [23] - 14:8, 14:18, 16:22, 18:24, 20:15, 20:22, 21:9, 21:12, 23:10, 23:21, 25:3, 25:7, 25:14, 25:17, 26:4, 31:20, 33:2, 33:7, 33:19, 34:4, 34:6, 36:13, 36:14
**principle** [2] - 62:21, 63:22
**priorities** [1] - 112:20
**private** [5] - 5:16, 5:17, 10:23, 10:24, 35:10
**privileged** [1] - 89:11
**problem** [39] - 77:4, 77:8, 78:4, 86:22, 89:10, 99:14, 104:13, 104:15, 105:3, 105:13, 105:15, 105:23, 106:7, 106:13, 106:18, 106:25, 107:7, 107:9, 107:10, 107:20, 107:21, 107:23, 108:1, 108:2, 108:4, 111:1, 113:8, 114:25, 115:1, 115:3, 115:4, 117:3, 119:2, 119:11, 119:17, 126:22, 128:13, 132:12, 136:13
**problematic** [1] - 33:20
**problems** [1] - 51:4
**procedurally** [1] - 76:24
**procedure** [1] - 72:9
**proceeding** [1] - 73:13
**proceedings** [21] - 47:13, 49:8, 49:9, 49:10, 49:17, 49:23, 50:7, 50:14, 51:1, 54:25, 60:6, 74:21, 101:24, 102:3, 102:4, 102:6, 102:17, 104:3, 104:6, 142:6
**Proceedings** [1] - 141:4
**process** [13] - 52:24, 52:25, 53:4, 54:20, 63:4, 65:12, 72:3, 75:17, 75:25, 76:5, 76:15, 76:21

**process-wise** [1] - 75:25
**processes** [1] - 77:21
**processing** [1] - 129:5
**proclamation** [4] - 84:16, 85:20, 109:15, 112:4
**proclamations** [1] - 109:12
**produced** [1] - 142:6
**product** [1] - 106:10
**program** [2] - 94:4, 105:15
**progress** [1] - 11:6
**prohibit** [2] - 18:21, 20:11
**projected** [4] - 3:5, 3:9, 3:20, 5:21
**projection** [7] - 5:25, 6:5, 6:6, 7:11, 7:13, 7:22, 12:20
**projections** [1] - 7:19
**prong** [2] - 40:23, 71:18
**proper** [1] - 76:25
**property** [1] - 31:14
**proposes** [1] - 131:17
**proposition** [3] - 34:13, 51:10, 81:1
**prosecutorial** [1] - 50:16
**Protected** [1] - 101:22
**protected** [7] - 85:12, 85:18, 91:11, 101:19, 104:21, 105:4, 105:7
**protection** [7] - 41:4, 54:23, 77:2, 82:2, 94:18, 95:13
**protester** [1] - 19:13
**prove** [1] - 100:23
**provide** [1] - 77:2
**provided** [1] - 63:14
**provides** [2] - 4:3, 30:14
**provision** [2] - 63:17, 123:4
**provisions** [2] - 54:8, 80:17
**public** [10] - 41:14, 79:16, 91:23, 92:6, 95:9, 107:18, 108:17, 109:9, 110:12, 113:5
**published** [1] - 130:1
**pull** [9] - 5:2, 9:10,

17:24, 26:24, 34:24, 35:2, 82:4, 114:19, 129:18
**pulled** [2] - 26:25, 88:24
**purpose** [1] - 104:3
**pursuant** [1] - 72:3
**purview** [1] - 41:25
**put** [21] - 17:23, 41:1, 41:24, 43:12, 45:3, 46:9, 50:7, 50:13, 55:5, 74:20, 74:22, 75:20, 81:6, 101:24, 102:4, 102:5, 102:16, 103:20, 132:23, 133:5, 135:10
**puts** [2] - 8:15, 93:1
**putting** [3] - 46:5, 54:24, 79:21

## Q

**quantum** [1] - 118:6
**questioning** [1] - 41:22
**questions** [8] - 39:25, 40:5, 40:7, 43:24, 47:15, 52:20, 62:13, 92:13
**quibble** [2] - 65:23, 65:25
**quick** [3] - 29:3, 40:9, 125:19
**quickly** [2] - 20:7, 88:24
**quite** [1] - 134:21
**quotation** [2] - 12:9, 12:10
**quote** [17] - 3:19, 3:22, 4:23, 16:24, 27:3, 30:24, 30:25, 31:2, 31:10, 32:2, 32:20, 32:22, 63:25, 68:19, 82:11, 108:15
**quoted** [6] - 4:13, 18:12, 18:18, 33:1, 34:2, 130:5
**quotes** [2] - 18:16, 33:4
**quoting** [3] - 41:13, 52:13, 79:14

## R

**racial** [2] - 77:2, 77:24
**radar** [1] - 135:11
**raise** [5] - 47:13, 49:18, 49:24, 104:4,

137:7
**raised** [2] - 80:23, 81:18
**raising** [1] - 75:14
**Ramos** [2] - 133:22, 136:11
**ranges** [1] - 130:16
**rank** [1] - 100:21
**ranking** [1] - 10:10
**ransom** [1] - 30:25
**rate** [2] - 93:25, 94:1
**rates** [8] - 91:22, 92:5, 92:19, 92:21, 94:7, 95:8, 97:22, 107:17
**rather** [1] - 102:16
**RAYMOND** [1] - 1:19
**RDR** [3] - 2:7, 142:3, 142:12
**reached** [1] - 76:20
**reaches** [2] - 76:19, 77:23
**reaching** [2] - 17:1, 21:3
**Read** [1] - 5:1
**read** [27] - 6:25, 15:19, 20:8, 20:24, 24:16, 28:6, 30:21, 31:3, 31:15, 32:6, 32:7, 32:23, 33:10, 52:23, 65:19, 70:8, 78:25, 79:2, 79:6, 79:7, 82:16, 82:21, 92:1, 114:6, 114:8, 133:19, 137:18
**reading** [13] - 30:11, 38:6, 58:18, 67:8, 68:13, 69:18, 70:24, 79:6, 113:21, 132:6, 138:24, 139:3, 140:3
**reads** [2] - 3:25, 78:15
**ready** [1] - 83:23
**real** [1] - 40:9
**realize** [2] - 20:6, 37:2
**really** [17] - 11:19, 32:11, 39:16, 43:5, 44:20, 53:13, 58:3, 59:25, 65:17, 74:7, 76:18, 80:19, 88:23, 133:16, 136:5, 138:21, 139:10
**reason** [13] - 9:6, 14:23, 42:19, 44:3, 44:4, 46:1, 60:12, 66:10, 94:22, 96:15, 96:24, 115:22, 117:4
**reasonable** [7] - 7:1, 36:19, 37:22, 37:25,

79:7, 103:22, 108:10
**reasonableness** [1] - 108:13
**reasonably** [1] - 37:22
**reasons** [7] - 14:25, 23:17, 23:20, 45:22, 82:1, 113:2
**received** [2] - 86:11, 87:16
**recent** [1] - 63:23
**recess** [1] - 60:5
**recipients** [1] - 133:1
**recognized** [1] - 66:16
**recollection** [1] - 124:24
**recommend** [1] - 121:9
**record** [58] - 7:4, 8:12, 8:17, 8:20, 9:18, 12:15, 13:3, 15:11, 17:10, 18:12, 18:16, 23:7, 24:16, 24:23, 26:10, 26:15, 27:23, 28:4, 28:5, 28:8, 29:13, 37:4, 38:9, 61:20, 78:12, 78:16, 78:22, 79:1, 79:6, 81:4, 82:21, 84:17, 85:25, 87:6, 87:7, 87:11, 87:14, 88:9, 88:25, 90:4, 91:15, 97:15, 97:18, 100:10, 100:25, 109:5, 109:8, 110:5, 110:6, 110:7, 110:10, 110:17, 111:2, 116:13, 124:9, 124:13, 135:19, 140:14
**records** [1] - 132:24
**redacted** [2] - 89:15, 89:20
**redactions** [2] - 89:18, 89:19
**redesignate** [2] - 96:19, 100:1
**redesignates** [1] - 96:12
**redesignating** [1] - 98:9
**reduce** [1] - 21:12
**refer** [3] - 6:14, 34:19, 98:6
**reference** [5] - 63:1, 69:16, 71:15, 72:18, 72:20
**references** [2] - 72:19, 84:12
**referred** [1] - 4:8

**referring** [7] - 8:11, 27:24, 32:10, 34:1, 68:24, 71:16, 72:12
**refers** [4] - 32:8, 68:6, 68:23, 68:25
**reflect** [1] - 131:11
**reflects** [1] - 16:16
**refresh** [2] - 124:12, 124:24
**regarding** [3] - 23:24, 33:2, 34:3
**regardless** [1] - 102:1
**Regents** [1] - 138:11
**region** [1] - 21:1
**regions** [9] - 18:25, 20:15, 25:3, 25:8, 25:10, 25:15, 26:7, 26:9, 30:24
**Register** [25] - 3:4, 3:14, 3:18, 4:24, 5:7, 5:13, 27:12, 28:11, 41:12, 45:21, 53:16, 53:23, 53:24, 56:17, 66:13, 82:11, 91:21, 108:22, 110:21, 117:7, 117:9, 128:20, 128:25, 132:13, 132:22
**register** [5] - 41:11, 92:16, 103:5, 103:11, 104:10
**registration** [2] - 102:24, 103:3
**related** [2] - 32:4, 34:5
**relates** [1] - 112:18
**relation** [1] - 33:18
**relatives** [2] - 35:24, 36:12
**released** [1] - 30:12
**relegated** [1] - 28:12
**relevant** [1] - 63:13
**reliance** [3] - 66:18, 66:23, 66:25
**relied** [3] - 34:13, 97:9, 106:4
**relief** [1] - 50:19
**religion** [1] - 49:15
**religious** [1] - 49:25
**relocate** [2] - 33:15, 38:19
**relocation** [8] - 27:4, 27:19, 28:16, 38:11, 38:16, 39:3, 39:4, 39:10
**rely** [3] - 12:16, 32:17, 46:7
**relying** [1] - 69:13
**remain** [1] - 91:12

**remaining** [2] - 50:22, 50:23
**remains** [4] - 10:1, 10:25, 12:5, 31:13
**remember** [10] - 4:5, 26:17, 26:19, 76:9, 88:14, 94:12, 103:1, 109:11, 124:8, 127:18
**remembering** [1] - 26:14
**removal** [24] - 47:13, 49:7, 49:9, 49:10, 49:17, 49:23, 50:7, 50:13, 53:4, 53:12, 53:15, 53:17, 53:21, 54:24, 55:7, 74:21, 81:7, 101:24, 102:4, 102:5, 102:17, 104:3, 104:6
**Renaud** [1] - 133:25
**repatriations** [1] - 30:16
**repeat** [3] - 7:23, 13:21, 46:21
**repeatedly** [1] - 79:1
**Report** [4] - 29:14, 30:3, 92:23, 93:24
**report** [27] - 4:12, 4:14, 4:16, 5:7, 14:4, 15:7, 30:11, 31:6, 32:1, 32:9, 32:15, 32:19, 34:11, 93:6, 93:7, 95:3, 105:5, 129:13, 129:15, 129:23, 130:5, 130:22, 130:23, 130:24, 131:3, 131:20, 131:24
**reported** [1] - 31:10
**REPORTED** [1] - 2:7
**REPORTER** [1] - 90:20
**Reporter** [2] - 2:7, 142:12
**reporting** [1] - 16:14
**reports** [2] - 34:12
**represent** [2] - 25:24, 28:6
**representation** [1] - 10:3
**represents** [2] - 16:13, 86:15
**request** [1] - 38:13
**required** [11] - 66:2, 76:11, 95:4, 98:4, 98:14, 98:18, 100:12, 101:8, 104:17, 105:5, 131:17
**requirement** [4] - 78:5, 102:24, 103:13,

123:12
**requirements** [1] - 125:16
**requires** [7] - 102:5, 103:2, 103:8, 103:10, 122:16, 123:9, 130:17
**rescue** [1] - 61:21
**resend** [1] - 125:7
**residence** [1] - 91:6
**resident** [1] - 129:5
**resources** [4] - 108:17, 109:10, 110:12, 113:5
**respect** [26] - 23:6, 34:11, 39:2, 43:7, 46:14, 49:22, 52:24, 52:25, 55:16, 55:18, 57:3, 65:18, 65:21, 68:1, 79:18, 79:19, 82:4, 86:5, 99:14, 110:19, 115:8, 119:10, 121:25, 122:1, 131:4
**response** [5] - 18:22, 20:13, 42:21, 45:8, 137:17
**responses** [1] - 140:19
**responsible** [2] - 31:11, 120:21
**rest** [1] - 128:10
**restrict** [1] - 68:7
**restricted** [1] - 67:23
**result** [1] - 76:12
**resulting** [1] - 31:11
**Return** [1] - 34:21
**return** [14] - 24:6, 27:5, 27:20, 28:24, 29:9, 33:21, 34:16, 35:23, 36:11, 37:13, 38:12, 38:20, 41:6, 131:19
**returning** [1] - 132:8
**review** [37] - 29:3, 41:22, 43:12, 47:12, 47:20, 48:18, 48:19, 48:22, 49:3, 49:19, 50:25, 53:3, 53:4, 54:2, 54:4, 54:5, 55:12, 65:6, 65:12, 67:4, 67:16, 68:7, 72:9, 72:10, 72:21, 74:11, 79:19, 105:22, 118:15, 122:8, 122:9, 125:25, 126:3, 133:8
**reviewability** [7] - 41:1, 45:1, 45:3, 46:10, 51:8, 62:4, 133:14
**reviewable** [3] -

40:25, 46:6, 75:12
**reviewed** [4] - 47:17, 52:21, 70:2, 70:12
**reviewing** [3] - 48:14, 69:9, 69:22
**revoked** [1] - 22:15
**REYES** [1] - 1:11
**rid** [12] - 47:8, 55:19, 55:21, 55:22, 57:21, 58:8, 76:1, 76:22, 77:11, 106:21, 108:5, 127:16
**rightfully** [1] - 18:17
**rights** [1] - 30:12
**Rights** [3] - 31:25, 32:9, 32:15
**rise** [1] - 141:3
**risk** [11] - 14:1, 16:5, 16:18, 23:25, 24:2, 24:18, 83:15, 91:22, 92:6, 95:8, 102:16
**risks** [1] - 107:17
**road** [4] - 78:18, 78:21, 79:20, 130:17
**roads** [2] - 32:21, 33:6
**roadways** [2] - 33:2, 34:4
**Robert** [2] - 33:1, 34:3
**Rockefeller** [1] - 1:20
**role** [2] - 47:20, 48:14
**Room** [1] - 2:9
**rooted** [1] - 132:7
**routes** [2] - 16:22, 20:23
**routinely** [1] - 92:16
**rubber** [3] - 78:17, 78:21, 79:19
**Rubio** [5] - 11:10, 11:12, 140:18, 140:21, 140:24
**rule** [3] - 71:23, 72:1, 106:3
**ruling** [2] - 70:18
**run** [1] - 132:12
**runs** [2] - 66:12, 106:8
**rushed** [1] - 60:21

**S**

**safe** [30] - 14:22, 16:9, 16:17, 16:19, 21:18, 22:23, 23:9, 23:15, 23:17, 23:24, 24:5, 24:7, 24:14,

24:20, 26:22, 28:23, 29:9, 33:14, 34:16, 36:6, 36:9, 36:13, 36:15, 36:20, 36:24, 37:9, 37:16, 37:21, 45:21, 45:22

**safety** [5] - 41:14, 91:23, 92:6, 95:9, 107:18

**Saget** [2] - 136:10, 138:1

**SAMPAT** [451] - 2:2, 3:2, 3:6, 3:8, 3:17, 3:23, 4:2, 4:7, 4:16, 4:19, 5:2, 5:5, 5:9, 5:12, 5:19, 5:24, 6:4, 6:8, 6:13, 7:1, 7:9, 7:14, 7:18, 7:23, 8:4, 8:7, 8:10, 8:15, 8:19, 8:23, 9:3, 9:6, 9:15, 9:22, 9:25, 10:3, 10:7, 10:11, 10:15, 10:18, 10:21, 11:3, 11:8, 11:11, 11:17, 11:23, 12:9, 12:13, 12:17, 12:23, 13:4, 13:7, 13:10, 13:15, 13:21, 13:25, 14:5, 14:7, 14:15, 14:19, 14:23, 15:3, 15:6, 15:8, 15:23, 15:25, 16:8, 16:13, 17:6, 17:9, 17:13, 18:10, 18:13, 18:19, 19:2, 20:3, 20:6, 20:10, 20:17, 20:25, 21:5, 21:16, 21:20, 21:23, 22:6, 22:12, 22:17, 22:24, 23:13, 23:25, 24:4, 24:8, 24:16, 24:21, 25:6, 25:9, 25:11, 25:16, 25:20, 25:23, 26:1, 26:5, 26:8, 26:13, 26:19, 26:23, 27:7, 27:10, 27:13, 27:15, 27:17, 27:21, 27:25, 28:12, 28:17, 28:19, 28:25, 29:3, 29:7, 29:11, 29:15, 29:18, 29:20, 29:23, 30:1, 30:5, 30:8, 30:19, 30:22, 31:4, 31:7, 31:16, 31:24, 32:7, 32:13, 32:18, 32:24, 33:11, 33:16, 33:25, 34:18, 34:25, 35:12, 35:18, 35:21, 36:16, 36:22, 37:11, 37:17, 38:5, 38:13, 38:21, 39:6, 39:9, 39:12, 39:14, 39:17,

39:22, 40:1, 40:4, 40:8, 40:24, 41:9, 41:11, 41:20, 42:8, 42:14, 42:22, 42:25, 43:2, 43:11, 43:15, 43:22, 44:2, 44:5, 44:8, 44:14, 44:18, 45:1, 45:4, 45:7, 45:10, 46:9, 46:21, 47:3, 47:10, 47:23, 48:11, 48:16, 48:21, 48:25, 49:4, 49:7, 49:10, 50:2, 50:8, 50:11, 50:15, 50:22, 51:6, 51:15, 51:18, 51:23, 52:1, 52:4, 52:7, 52:12, 52:14, 52:18, 53:5, 53:9, 53:19, 53:24, 55:1, 55:5, 55:14, 56:2, 56:9, 56:12, 56:20, 56:25, 57:6, 57:9, 57:15, 58:10, 58:16, 58:23, 59:5, 59:8, 59:13, 59:18, 60:4, 60:7, 60:10, 61:3, 61:7, 61:10, 61:12, 61:14, 61:16, 70:9, 73:3, 79:12, 81:17, 81:22, 82:6, 82:9, 82:17, 82:20, 83:3, 83:7, 83:11, 83:17, 83:20, 84:7, 84:11, 84:15, 84:20, 85:1, 85:5, 85:9, 85:12, 85:18, 85:25, 86:7, 86:16, 86:19, 86:23, 86:25, 87:4, 87:11, 87:14, 88:2, 88:8, 88:10, 88:14, 88:19, 88:24, 89:8, 89:13, 89:19, 89:24, 90:3, 90:7, 90:11, 90:13, 90:17, 90:22, 91:4, 91:8, 91:15, 91:17, 92:2, 92:7, 92:12, 92:15, 92:22, 92:25, 93:4, 93:8, 93:12, 93:14, 93:18, 93:23, 94:5, 94:12, 94:15, 94:20, 95:6, 95:15, 95:18, 96:3, 96:20, 96:24, 97:1, 97:3, 97:8, 97:17, 97:20, 97:25, 98:12, 98:19, 98:22, 99:3, 99:8, 100:6, 100:14, 100:24, 101:4, 101:6, 101:10, 101:13, 101:17, 101:21, 102:1, 102:23, 103:7,

103:13, 103:18, 104:2, 104:7, 104:9, 104:24, 105:8, 105:16, 105:20, 105:24, 106:1, 107:1, 107:13, 107:22, 108:9, 108:20, 108:23, 109:3, 109:11, 109:19, 110:1, 110:9, 110:15, 110:22, 111:2, 111:5, 111:11, 111:19, 111:23, 112:2, 112:12, 112:15, 112:22, 112:24, 113:11, 113:15, 113:21, 113:25, 114:5, 114:15, 115:5, 115:11, 115:18, 115:22, 116:2, 116:13, 117:4, 117:8, 117:15, 117:21, 118:3, 118:7, 119:3, 119:6, 119:16, 119:20, 119:23, 120:8, 120:15, 121:16, 122:6, 122:25, 124:7, 124:11, 124:15, 124:17, 124:23, 125:2, 125:5, 125:11, 125:19, 125:22, 126:5, 126:13, 126:18, 126:25, 127:2, 127:5, 127:7, 127:13, 127:20, 128:2, 128:4, 128:9, 128:11, 128:16, 129:8, 129:12, 129:14, 129:18, 129:20, 129:25, 130:3, 130:9, 130:14, 130:23, 130:25, 131:6, 131:11, 131:16, 132:1, 132:11, 132:16, 132:19, 133:4, 133:21, 134:6, 134:10, 139:18, 139:21, 139:25, 140:13, 140:16, 141:2

**Sampat** [2] - 15:22, 79:1

**sandwich** [1] - 19:13

**SARAH** [1] - 1:15

**Sarah** [1] - 89:1

**satisfied** [1] - 45:10

**save** [1] - 80:19

**saw** [1] - 11:9

**Schechter** [2] -

139:13, 139:15

**school** [1] - 73:9

**School** [2] - 127:8, 128:6

**scope** [5] - 62:16, 64:8, 78:8, 86:22, 135:23

**Scotch** [1] - 134:5

**Scout** [1] - 61:23

**screen** [1] - 19:25

**screened** [1] - 19:17

**screwed** [1] - 35:3

**seaport** [1] - 94:3

**search** [2] - 17:16, 17:23

**Second** [1] - 79:14

**second** [11] - 17:25, 18:1, 18:14, 65:4, 77:8, 78:15, 78:25, 90:8, 101:1, 125:9, 135:10

**second-guess** [2] - 77:8, 78:15

**second-guessing** [1] - 78:25

**secondly** [1] - 119:4

**secretary** [68] - 5:11, 12:15, 23:7, 30:3, 34:13, 39:16, 40:22, 41:4, 42:4, 42:9, 42:17, 43:6, 44:23, 45:20, 46:7, 46:15, 46:22, 54:13, 54:20, 55:3, 55:6, 55:19, 56:3, 56:7, 56:17, 56:21, 57:1, 57:11, 57:18, 57:20, 57:21, 62:1, 65:17, 65:20, 67:15, 68:5, 69:8, 71:12, 71:15, 72:2, 72:9, 75:23, 77:15, 78:25, 81:25, 92:19, 94:25, 96:8, 96:12, 96:17, 97:9, 97:23, 98:7, 100:3, 104:14, 105:22, 108:14, 109:21, 113:3, 114:17, 114:19, 116:14, 116:16, 120:12, 122:2, 123:18, 123:22, 128:14

**Secretary** [5] - 11:10, 11:12, 140:17, 140:21, 140:23

**secretary's** [7] - 43:18, 48:14, 62:17, 77:9, 78:14, 79:9, 133:13

**section** [5] - 34:22,

39:3, 67:14, 123:10, 138:19

**Section** [2] - 80:17, 137:7

**security** [25] - 3:11, 3:22, 5:23, 7:17, 8:2, 11:6, 11:13, 11:24, 18:23, 20:13, 21:6, 33:1, 34:3, 41:15, 63:1, 68:3, 82:14, 82:25, 88:23, 91:23, 92:6, 95:8, 107:18, 122:1, 135:8

**Security** [1] - 138:10

**see** [15] - 5:4, 15:4, 15:24, 19:1, 21:4, 21:5, 21:15, 22:8, 29:21, 30:18, 33:8, 70:10, 90:13, 96:6, 111:1

**seem** [3] - 28:19, 34:5, 36:19

**SEJAL** [1] - 1:16

**send** [6] - 35:4, 35:8, 98:5, 128:1, 136:1, 136:3

**sense** [4] - 56:24, 65:22, 69:11, 69:18

**sent** [2] - 125:4, 125:8

**sentence** [15] - 10:22, 11:3, 18:14, 20:17, 27:23, 28:11, 28:15, 28:18, 28:23, 28:25, 32:8, 32:10, 37:7, 109:1, 110:16

**sentiment** [1] - 58:23

**September** [7] - 13:17, 13:22, 16:4, 18:1, 22:9, 23:6, 90:14

**SESSION** [1] - 1:8

**set** [1] - 39:25

**sets** [1] - 79:5

**setup** [1] - 134:21

**several** [2] - 138:14, 139:11

**sexual** [1] - 31:13

**shaking** [1] - 78:20

**shall** [5] - 67:16, 68:12, 69:14, 72:21

**share** [1] - 58:23

**shares** [1] - 15:21

**Shaughnessy** [2] - 137:9, 138:4

**Shih** [1] - 61:12

**shooting** [1] - 14:12

**shortage** [1] - 46:2

**shortages** [1] - 21:8

**shot** [3] - 14:12,

25:21, 25:22

**show** [7] - 9:12, 15:15, 15:17, 18:4, 62:19, 90:10, 94:7
**shows** [3] - 15:20, 93:24, 116:14
**sic** [1] - 129:5
**side** [1] - 134:9
**sides** [1] - 106:18
**signed** [1] - 83:5
**signs** [1] - 11:5
**similar** [1] - 19:14
**SIMON** [1] - 2:2
**simple** [1] - 114:22
**simply** [6] - 53:25, 65:5, 77:1, 78:1, 115:23, 118:15
**sing** [1] - 52:5
**single** [6] - 58:14, 73:11, 73:19, 113:23, 115:9, 127:19
**singular** [1] - 14:14
**situation** [6] - 69:19, 88:4, 129:2, 130:7, 130:12, 131:23
**six** [4] - 20:19, 35:11, 38:22, 71:11
**sixth** [1] - 10:17
**skepticism** [1] - 62:11
**skilled** [1] - 130:18
**skip** [1] - 33:4
**slice** [1] - 98:23
**slicing** [1] - 98:24
**slightly** [1] - 136:16
**slow** [2] - 51:21, 67:7
**small** [6] - 14:2, 16:6, 16:11, 16:25, 21:2, 23:22
**small-arms** [1] - 23:22
**Smith** [3] - 73:16, 73:17, 73:18
**so..** [1] - 23:2
**social** [2] - 129:2, 130:7
**society** [4] - 31:1, 111:8, 111:12, 111:16
**Socrates** [1] - 118:4
**SOLOTAROFF** [1] - 1:19
**someone** [11] - 32:15, 74:2, 79:6, 81:6, 87:15, 94:16, 97:22, 106:6, 114:11, 116:17, 116:20
**someplace** [1] - 62:9
**something's** [1] - 43:6
**sometime** [1] - 6:23

**somewhere** [5] - 24:16, 27:2, 109:18, 110:17, 114:21
**Sonia** [1] - 61:16
**soon** [1] - 136:3
**sorry** [37] - 7:23, 8:21, 10:24, 13:16, 19:4, 25:9, 26:25, 27:9, 27:16, 28:17, 28:19, 34:23, 35:2, 35:7, 35:16, 39:12, 40:4, 42:15, 51:21, 51:25, 61:14, 62:24, 67:9, 68:15, 85:11, 89:16, 90:1, 90:15, 90:20, 93:8, 93:12, 103:9, 105:20, 122:25, 124:16, 130:21, 137:5
**sort** [12] - 47:11, 61:24, 63:3, 75:19, 77:5, 78:17, 86:20, 88:15, 120:6, 120:10, 127:21, 133:12
**sounds** [3] - 44:14, 127:13, 134:11
**source** [4] - 5:11, 17:3, 18:18, 23:25
**sources** [1] - 92:16
**Southern** [1] - 70:17
**space** [2] - 20:13, 21:13
**speaking** [4] - 43:9, 115:5, 117:21, 117:24
**specific** [7] - 39:24, 69:12, 72:21, 99:12, 103:1, 118:20, 131:2
**specifically** [8] - 5:8, 34:6, 53:9, 62:9, 74:25, 80:16, 133:22, 137:24
**specified** [2] - 18:22, 20:12
**specify** [1] - 136:5
**speculation** [1] - 100:21
**spelled** [1] - 92:20
**spend** [1] - 133:18
**splitting** [1] - 55:9
**spoiler** [1] - 77:5
**spot** [1] - 44:21
**square** [1] - 48:8
**squarely** [2] - 75:11, 80:25
**stack** [1] - 135:4
**stagnating** [1] - 12:6
**stalled** [1] - 12:4
**stamp** [7] - 8:15, 89:8, 93:2, 93:4, 93:6, 93:14, 125:2

**stamped** [2] - 17:13, 35:18
**stamps** [1] - 34:20
**stand** [1] - 19:22
**standard** [15] - 40:22, 41:7, 41:12, 41:23, 54:2, 62:1, 66:9, 102:9, 122:15, 123:3, 123:8, 123:9, 123:21, 124:5, 128:15
**standardless** [1] - 123:21
**standards** [2] - 42:18, 125:25
**standing** [1] - 80:25
**start** [8] - 34:2, 61:24, 62:10, 82:10, 93:10, 109:8, 132:24, 136:20
**started** [5] - 23:4, 55:20, 96:10, 120:25, 121:2
**starting** [2] - 98:22, 138:16
**starts** [5] - 8:21, 13:13, 16:1, 34:20, 124:18
**starving** [1] - 37:1
**state** [16] - 59:2, 59:4, 59:5, 59:9, 67:17, 67:19, 67:21, 67:23, 71:8, 71:10, 72:11, 72:22, 72:23, 72:24
**State** [5] - 30:13, 31:6, 31:10, 106:2, 140:23
**state...under** [1] - 67:14
**statement** [13] - 17:2, 17:5, 17:8, 17:9, 18:9, 18:11, 20:18, 37:23, 38:10, 63:16, 113:20, 114:5, 114:10
**states** [2] - 104:14, 128:25
**STATES** [3] - 1:1, 1:11, 2:3
**States** [28] - 2:8, 31:10, 42:16, 44:25, 46:8, 50:23, 50:24, 52:8, 82:15, 83:1, 83:10, 83:15, 84:2, 84:23, 84:25, 85:3, 85:4, 86:10, 94:23, 105:4, 113:23, 125:11, 125:15, 129:3, 131:14, 131:15, 137:14, 142:13

**statistics** [4] - 85:14, 85:19, 88:10, 97:10
**status** [25] - 43:20, 46:18, 47:1, 50:24, 85:11, 85:16, 85:19, 86:4, 87:8, 87:25, 88:3, 90:15, 90:23, 91:12, 94:10, 94:18, 97:15, 102:3, 104:15, 104:21, 105:5, 105:7, 108:5, 111:17, 129:5
**Status** [1] - 101:22
**statute** [31] - 40:23, 42:13, 45:18, 49:6, 49:11, 51:11, 53:18, 58:16, 58:19, 62:16, 63:13, 63:20, 64:12, 65:5, 65:16, 67:5, 67:22, 68:6, 70:8, 76:9, 78:8, 103:2, 103:8, 103:9, 103:14, 103:18, 103:19, 103:21, 125:24
**statute's** [1] - 58:10
**statutes** [4] - 62:25, 63:8, 63:14, 67:1
**statutory** [1] - 62:19
**stay** [11] - 35:23, 36:4, 36:11, 38:2, 46:8, 50:19, 80:2, 102:18, 103:11, 103:24, 104:8
**stayed** [1] - 101:24
**stenographic** [1] - 142:5
**stepped** [1] - 64:4
**still** [7] - 27:10, 76:13, 81:22, 85:14, 91:11, 125:11, 140:2
**stop** [4] - 15:13, 23:20, 58:15, 60:25
**stopping** [2] - 24:3, 60:24
**strain** [22] - 82:3, 108:16, 110:11, 111:9, 113:4, 113:17, 114:12, 116:22, 117:13, 118:12, 118:17, 119:5, 119:12, 119:22, 120:4, 120:19, 121:11, 121:14, 121:21, 121:22, 122:1, 122:4
**straining** [2] - 116:7, 117:25
**strains** [4] - 110:3, 111:7, 111:13, 112:1
**strategic** [3] - 16:22, 20:22, 33:5

**Street** [2] - 1:17, 2:5
**stressed** [1] - 74:8
**stressing** [1] - 3:15
**strike** [1] - 77:9
**strikes** [1] - 21:11
**stripping** [8] - 49:5, 49:10, 51:11, 54:8, 54:18, 76:7, 78:5, 78:8
**strips** [1] - 51:12
**stroke** [1] - 104:25
**strong** [1] - 54:8
**structured** [1] - 66:19
**struggle** [1] - 11:25
**studies** [1] - 128:16
**study** [4] - 127:8, 128:7, 129:22, 130:11
**stuff** [4] - 6:18, 119:8, 131:7, 134:25
**subject** [4] - 49:17, 122:8, 122:9, 133:1
**Subparagraph** [3] - 59:2, 71:7, 71:16
**subprovision** [1] - 58:25
**subsection** [5] - 67:25, 68:6, 68:25, 69:15, 69:16
**Subsection** [1] - 69:17
**substantial** [1] - 63:5
**substantive** [1] - 19:20
**sudden** [1] - 104:20
**sufficient** [4] - 54:3, 82:12, 82:23, 120:13
**sufficiently** [3] - 12:16, 24:2, 25:3
**suggesting** [4] - 74:13, 74:15, 123:14
**suggests** [1] - 74:11
**suitable** [4] - 27:5, 27:19, 38:12, 38:19
**support** [10] - 33:14, 34:13, 34:15, 37:4, 78:13, 109:17, 109:22, 110:18, 114:25, 120:7
**supporting** [1] - 110:8
**supports** [2] - 28:8, 87:8
**supposed** [5] - 62:3, 75:25, 99:18, 100:20, 120:9
**suppression** [1] - 22:10
**Supreme** [14] - 48:9, 48:10, 74:19, 74:24,

74:25, 77:25, 80:1, 137:14, 137:22, 138:7, 138:20, 138:22, 139:19, 139:22

**surely** [1] - 69:24
**surfer** [2] - 17:21, 35:3
**Suriname** [1] - 94:8
**surprise** [1] - 135:18
**surprising** [1] - 66:8
**surrounding** [15] - 18:24, 20:15, 20:22, 25:3, 25:8, 25:10, 25:15, 26:7, 26:8, 26:9, 27:4, 27:18, 34:6, 38:11, 38:16
**suspected** [2] - 12:2, 94:1
**suspend** [2] - 22:1, 112:5
**suss** [1] - 136:5
**Syria** [1] - 70:16
**systems** [6] - 17:1, 21:3, 87:22, 91:25, 92:10, 95:11

## T

**tab** [1] - 4:22
**table** [4] - 19:23, 84:12, 93:16, 135:5
**tables** [2] - 100:7, 135:6
**Talbott** [2] - 40:18, 40:19
**talks** [9] - 6:15, 6:24, 14:7, 27:3, 47:24, 87:20, 89:2, 107:13, 131:24
**tangential** [1] - 74:6
**targeted** [4] - 31:12, 47:14, 49:14, 49:15
**tarmac** [1] - 14:12
**TAUBER** [87] - 1:15, 9:11, 9:14, 9:16, 15:16, 15:18, 15:21, 17:18, 17:21, 17:24, 40:17, 40:20, 51:25, 52:2, 61:20, 62:2, 62:8, 62:24, 63:8, 64:3, 64:7, 64:13, 64:23, 65:2, 65:9, 65:23, 66:1, 66:8, 67:9, 67:12, 68:4, 68:15, 68:21, 68:23, 69:2, 69:6, 69:13, 69:24, 70:11, 70:16, 70:21, 71:1, 71:13,

71:19, 71:21, 71:25, 72:8, 72:14, 72:16, 72:20, 73:1, 73:4, 73:23, 74:5, 74:9, 74:16, 74:22, 75:8, 75:11, 76:8, 76:24, 77:13, 77:17, 79:13, 79:23, 80:3, 80:7, 80:11, 80:13, 80:21, 81:10, 134:13, 137:4, 137:12, 137:14, 137:17, 137:21, 138:3, 138:6, 138:13, 138:18, 138:22, 139:1, 139:5, 139:11, 139:13, 141:1
**Tauber** [4] - 17:10, 40:12, 40:16, 40:17
**tax** [1] - 99:21
**Tazu** [3] - 51:19, 51:23, 52:7
**TAZU** [1] - 52:7
**tea** [1] - 80:3
**temporarily** [2] - 80:6, 85:12
**temporary** [3] - 68:2, 85:11, 85:18
**Temporary** [1] - 101:21
**ten** [4] - 55:24, 56:15, 57:6, 59:11
**tenders** [1] - 89:23
**tension** [1] - 76:9
**term** [1] - 17:23
**terminate** [3] - 57:12, 76:17, 132:6
**terminated** [2] - 57:9, 66:14
**termination** [11] - 12:25, 27:1, 58:25, 62:18, 66:10, 81:23, 94:6, 98:1, 118:19, 132:2, 135:20
**terms** [5] - 6:21, 33:18, 37:6, 42:8, 47:13
**territories** [1] - 32:21
**terrorist** [3] - 16:24, 20:20, 23:11
**test** [2] - 81:7, 123:23
**TETZELI** [1] - 1:22
**Texas** [3] - 127:11, 139:2, 139:3
**text** [1] - 43:8
**THE** [566] - 1:1, 1:11, 1:14, 2:2, 2:4, 3:1, 3:3, 3:7, 3:12, 3:18, 3:24, 4:3, 4:10, 4:18, 4:25, 5:4, 5:6, 5:10,

5:14, 5:21, 5:25, 6:6, 6:9, 6:21, 7:7, 7:11, 7:15, 7:20, 7:25, 8:5, 8:9, 8:13, 8:17, 8:21, 8:24, 9:4, 9:9, 9:12, 9:17, 9:23, 10:1, 10:5, 10:8, 10:14, 10:16, 10:19, 10:25, 11:5, 11:9, 11:15, 11:19, 11:24, 12:11, 12:14, 12:19, 13:2, 13:5, 13:8, 13:12, 13:16, 13:22, 14:1, 14:6, 14:14, 14:16, 14:22, 15:1, 15:4, 15:7, 15:9, 15:17, 15:19, 15:24, 16:1, 16:9, 16:20, 17:7, 17:12, 17:15, 17:19, 17:22, 18:1, 18:4, 18:7, 18:11, 18:15, 18:20, 19:4, 19:7, 19:10, 20:5, 20:8, 20:11, 20:19, 21:1, 21:6, 21:17, 21:22, 22:3, 22:11, 22:15, 22:18, 23:3, 23:19, 24:2, 24:5, 24:10, 24:18, 25:1, 25:8, 25:10, 25:13, 25:19, 25:21, 25:25, 26:3, 26:7, 26:11, 26:18, 26:21, 27:2, 27:8, 27:12, 27:14, 27:16, 27:18, 27:22, 28:2, 28:15, 28:18, 28:22, 29:2, 29:5, 29:8, 29:12, 29:17, 29:19, 29:21, 29:24, 30:2, 30:6, 30:10, 30:21, 30:23, 31:5, 31:9, 31:17, 31:25, 32:12, 32:14, 32:19, 32:25, 33:12, 33:22, 34:8, 34:23, 35:2, 35:6, 35:7, 35:9, 35:10, 35:14, 35:20, 36:7, 36:21, 36:23, 37:15, 37:24, 38:7, 38:15, 38:24, 39:8, 39:11, 39:13, 39:15, 39:20, 39:23, 40:2, 40:6, 40:11, 40:14, 40:18, 40:21, 41:1, 41:10, 41:18, 42:1, 42:9, 42:15, 42:24, 43:1, 43:3, 43:12, 43:17, 43:25, 44:3, 44:6, 44:11, 44:16, 44:19, 45:3, 45:5, 45:8, 45:12, 46:12, 46:23, 47:7, 47:18,

48:1, 48:12, 48:20, 48:23, 49:2, 49:5, 49:9, 49:22, 50:6, 50:9, 50:13, 50:18, 51:2, 51:8, 51:17, 51:21, 52:3, 52:5, 52:11, 52:13, 52:17, 52:23, 53:6, 53:14, 53:22, 54:10, 55:4, 55:8, 55:16, 56:3, 56:11, 56:13, 56:21, 57:1, 57:8, 57:14, 57:16, 58:12, 58:18, 59:4, 59:7, 59:9, 59:16, 59:19, 59:24, 59:25, 60:9, 60:14, 60:18, 60:20, 60:24, 61:5, 61:8, 61:11, 61:13, 61:15, 61:17, 61:22, 62:3, 62:23, 62:25, 64:2, 64:4, 64:11, 64:21, 64:25, 65:8, 65:14, 65:25, 66:7, 67:7, 67:11, 67:24, 68:13, 68:17, 68:22, 69:1, 69:4, 69:11, 69:18, 70:7, 70:10, 70:14, 70:20, 70:22, 71:5, 71:14, 71:20, 71:24, 72:6, 72:12, 72:15, 72:17, 72:25, 73:2, 73:7, 74:4, 74:6, 74:13, 74:20, 75:1, 75:10, 75:18, 76:20, 77:4, 77:14, 78:4, 79:17, 80:1, 80:5, 80:8, 80:12, 80:19, 81:8, 81:11, 81:21, 81:24, 82:8, 82:10, 82:19, 83:2, 83:4, 83:8, 83:13, 83:19, 83:23, 84:9, 84:13, 84:18, 84:24, 85:2, 85:7, 85:11, 85:15, 85:22, 86:2, 86:13, 86:17, 86:21, 86:24, 87:1, 87:5, 87:13, 87:19, 88:6, 88:9, 88:12, 88:17, 88:20, 89:7, 89:10, 89:14, 89:22, 89:25, 90:5, 90:8, 90:14, 90:18, 90:20, 91:2, 91:5, 91:13, 91:16, 91:20, 92:5, 92:8, 92:13, 92:18, 92:24, 93:6, 93:10, 93:13, 93:16, 93:22, 94:2, 94:9, 94:14, 94:16, 94:25, 95:7, 95:16, 95:19, 96:6,

96:22, 96:25, 97:2, 97:4, 97:11, 97:19, 97:21, 98:2, 98:16, 98:20, 98:24, 99:5, 99:9, 100:9, 100:17, 101:2, 101:5, 101:7, 101:11, 101:15, 101:18, 101:23, 102:7, 102:12, 103:4, 103:9, 103:17, 103:20, 104:5, 104:8, 104:12, 105:2, 105:10, 105:19, 105:21, 105:25, 106:2, 107:8, 107:16, 107:23, 108:12, 108:21, 108:25, 109:7, 109:17, 109:20, 110:5, 110:14, 110:16, 110:24, 111:3, 111:6, 111:14, 111:21, 111:24, 112:8, 112:13, 112:21, 112:23, 112:25, 113:14, 113:16, 113:22, 114:2, 114:7, 114:19, 115:7, 115:14, 115:19, 116:1, 116:3, 116:15, 117:6, 117:9, 117:16, 117:24, 118:4, 118:23, 119:4, 119:9, 119:18, 119:21, 120:3, 120:11, 120:16, 121:24, 122:10, 122:20, 122:23, 123:1, 123:2, 123:7, 123:8, 124:10, 124:13, 124:19, 124:25, 125:3, 125:7, 125:13, 125:21, 126:4, 126:7, 126:15, 126:21, 127:1, 127:3, 127:6, 127:8, 127:15, 127:24, 128:3, 128:8, 128:10, 128:12, 128:18, 128:25, 129:11, 129:13, 129:15, 129:19, 129:23, 130:2, 130:5, 130:11, 130:21, 130:24, 131:1, 131:9, 131:13, 131:21, 132:10, 132:12, 132:17, 132:21, 133:5, 134:3, 134:7, 134:11, 134:14, 134:17, 134:22, 135:1, 135:4, 135:9, 135:14, 135:22,

136:1, 136:7, 136:13, 136:18, 136:20, 136:23, 137:11, 137:13, 137:16, 137:20, 138:2, 138:4, 138:12, 138:16, 138:19, 138:24, 139:3, 139:7, 139:9, 139:12, 139:14, 139:16, 139:20, 139:24, 140:1, 140:15, 140:25, 141:3

**themselves** [3] - 61:9, 70:6, 81:6

**theoretical** [1] - 40:7

**theories** [1] - 136:16

**therefore** [13] - 42:11, 44:12, 46:4, 46:25, 48:6, 54:16, 55:11, 56:5, 56:18, 56:23, 76:2, 117:13

**Thereupon** [1] - 60:5

**Thesis** [1] - 121:8

**they've** [4] - 58:2, 77:24, 97:9, 102:14

**thin** [3] - 98:23, 114:20, 120:6

**thinks** [2] - 32:16, 126:16

**third** [1] - 82:4

**Third** [1] - 51:24

**thoughts** [2] - 75:2, 127:25

**three** [5] - 69:2, 81:25, 121:1, 133:16, 138:6

**throughout** [1] - 21:1

**throwing** [1] - 19:13

**Thursday** [1] - 135:15

**title** [1] - 29:24

**today** [20] - 14:17, 17:19, 22:15, 44:20, 58:20, 58:21, 59:25, 62:19, 65:13, 81:13, 97:6, 113:1, 115:13, 122:24, 131:5, 131:15, 131:23, 131:24, 131:25, 135:18

**today's** [1] - 62:12

**together** [2] - 125:14, 133:6

**Tommie** [5] - 35:4, 122:18, 124:19, 125:3, 125:7

**tomorrow** [26] - 60:1, 62:6, 64:21, 75:21, 77:5, 77:7, 78:18, 79:24, 80:14, 81:13,

81:19, 83:24, 126:8, 126:19, 128:21, 132:23, 132:24, 133:3, 133:11, 135:8, 135:13, 135:18, 135:25, 136:20, 136:25

**tonight** [9] - 122:11, 122:23, 124:12, 125:18, 133:20, 134:8, 134:23, 138:25, 139:3

**took** [4] - 4:20, 26:17, 26:20, 121:2

**tooth** [1] - 73:11

**top** [4] - 22:19, 88:8, 133:15, 138:19

**TORRES** [9] - 2:3, 60:16, 60:19, 60:22, 61:2, 89:21, 89:23, 128:24, 134:19

**total** [4] - 12:2, 19:24, 32:2, 55:24

**totally** [5] - 39:1, 88:1, 110:17, 111:3, 133:9

**touching** [1] - 62:7

**tough** [1] - 44:21

**towns** [2] - 33:8, 33:23

**TPS** [112] - 12:24, 42:10, 42:12, 42:18, 43:20, 45:24, 46:18, 47:1, 48:7, 51:7, 53:23, 54:16, 55:11, 55:23, 55:25, 56:5, 56:16, 56:19, 56:23, 57:7, 57:9, 57:22, 58:1, 58:8, 58:15, 58:25, 59:11, 62:16, 63:21, 66:19, 66:20, 72:1, 76:3, 77:16, 79:18, 82:1, 83:14, 84:6, 85:2, 85:6, 85:7, 85:16, 85:23, 86:4, 86:11, 86:14, 87:2, 87:4, 87:16, 87:24, 88:3, 88:5, 91:3, 91:11, 92:20, 94:10, 94:18, 95:2, 95:13, 96:4, 96:9, 97:6, 97:15, 98:3, 98:4, 98:11, 98:13, 98:17, 99:13, 99:14, 99:15, 99:24, 100:4, 100:11, 100:15, 100:18, 100:25, 101:1, 101:3, 101:8, 101:19, 102:2, 102:3, 102:8, 102:9, 104:15, 105:4,

106:17, 106:21, 108:5, 110:25, 111:17, 114:3, 115:16, 115:24, 116:4, 116:21, 117:14, 118:16, 120:18, 126:23, 127:9, 127:19, 128:1, 132:2, 132:7, 132:25, 137:25

**TPS-protected** [1] - 105:4

**TPSA** [1] - 137:25

**track** [7] - 95:14, 99:21, 102:19, 105:3, 106:15, 107:24, 110:3

**trafficking** [1] - 33:8

**trainer** [1] - 121:8

**trans** [1] - 40:19

**TRANSCRIPT** [1] - 1:10

**transcript** [6] - 70:12, 70:17, 136:2, 140:3, 142:5, 142:6

**transportation** [2] - 14:9, 36:1

**travel** [6] - 14:20, 20:7, 25:25, 26:3, 109:15, 112:4

**tremendous** [1] - 37:20

**trial** [1] - 19:10

**trillions** [1] - 120:22

**true** [2] - 142:4, 142:5

**Trump** [1] - 83:5

**TRUMP** [1] - 1:6

**try** [2] - 38:2, 135:24

**trying** [10] - 37:3, 40:21, 41:3, 45:12, 60:11, 68:18, 91:9, 103:11, 125:3, 136:5

**turn** [1] - 39:20

**twice** [1] - 108:21

**two** [8] - 9:19, 29:6, 34:1, 35:21, 67:1, 73:14, 82:3, 111:11

**Tzu** [1] - 61:12

**Tzu-poodle-Lhasa** [1] - 61:12

**U**

**U.S** [24] - 13:19, 13:23, 14:17, 16:2, 16:9, 18:21, 20:11, 21:19, 24:14, 30:12, 31:5, 32:19, 38:17, 42:5, 56:1, 67:20,

72:23, 91:22, 92:6, 94:3, 94:17, 95:8, 107:18, 127:24

**ultimate** [2] - 76:7, 76:19

**unable** [1] - 84:4

**unaffected** [1] - 30:24

**unbroken** [2] - 129:3, 130:8

**uncertainty** [3] - 5:16, 10:22, 37:21

**uncited** [1] - 38:10

**Unclassified** [1] - 18:5

**unconstitutional** [3] - 53:16, 53:17, 62:22

**uncoordinated** [1] - 21:10

**under** [51] - 18:21, 45:18, 47:15, 47:20, 48:10, 50:3, 53:8, 54:2, 59:2, 59:15, 62:16, 62:22, 63:4, 65:6, 65:8, 65:12, 66:11, 67:3, 67:4, 67:22, 67:25, 68:10, 68:24, 69:1, 69:15, 69:20, 71:7, 71:9, 71:25, 75:20, 76:9, 76:11, 78:5, 78:9, 78:11, 80:16, 84:6, 85:16, 86:4, 94:10, 94:18, 95:13, 102:9, 114:20, 120:13, 125:24, 137:7, 137:21

**undermine** [2] - 82:14, 82:25

**understood** [2] - 66:15, 71:22

**undertake** [2] - 65:20, 83:13

**unemployment** [1] - 132:14

**unfortunately** [4] - 19:2, 27:8, 63:10, 83:21

**United** [29] - 31:9, 32:25, 34:2, 42:16, 44:24, 46:8, 50:23, 52:8, 82:15, 83:1, 83:10, 83:15, 84:2, 84:23, 84:24, 85:3, 85:4, 86:10, 94:23, 105:4, 113:23, 125:11, 125:15, 129:3, 131:14, 131:15, 137:14, 142:13

**united** [1] - 2:8

**UNITED** [3] - 1:1, 1:11, 2:3

**University** [1] - 138:11

**unlawful** [2] - 87:17, 94:23

**unlawfully** [5] - 50:24, 85:6, 86:11, 100:16, 102:2

**unless** [4] - 72:2, 81:12, 89:11, 135:14

**unlimited** [1] - 64:9

**unmanned** [2] - 16:25, 21:2

**unprecedented** [2] - 9:1, 9:21

**unquestionable** [1] - 47:19

**unsafe** [5] - 25:4, 25:25, 26:2, 26:3, 39:5

**unsure** [3] - 35:25, 37:13, 37:18

**up** [34] - 5:2, 6:9, 9:10, 17:24, 19:8, 19:16, 19:25, 26:24, 26:25, 34:24, 35:3, 37:16, 39:25, 41:21, 46:11, 47:24, 48:1, 48:2, 49:18, 49:25, 54:22, 55:25, 58:24, 64:4, 71:21, 79:5, 81:19, 84:13, 88:21, 88:25, 129:18, 134:23, 135:12, 140:6

**update** [5] - 18:2, 98:18, 100:19, 101:8, 103:14

**updated** [2] - 12:12, 99:22

**updating** [3] - 98:13, 100:25, 104:16

**URL** [1] - 18:7

**USA** [1] - 21:11

**USC** [3] - 59:1, 80:16, 137:7

**USCIS** [10] - 13:5, 13:8, 13:11, 13:13, 30:4, 30:9, 32:16, 34:8, 34:11, 39:3

**useful** [1] - 81:14

**usual** [1] - 136:25

**V**

**valid** [6] - 45:18, 90:15, 90:23, 94:20, 101:19, 104:18

**vanilla** [15] - 42:6,

42:10, 42:20, 43:8, 43:15, 43:19, 44:9, 44:11, 44:24, 45:25, 46:1, 46:2, 46:3, 62:14, 106:6

**vanish** [1] - 76:25

**various** [1] - 70:6

**vast** [4] - 35:22, 36:10, 86:4, 123:17

**Venezuela** [2] - 80:2, 80:6

**version** [6] - 7:4, 8:11, 8:22, 9:7, 89:18

**versus** [9] - 51:23, 52:8, 122:16, 133:12, 133:24, 133:25, 138:10, 139:21, 139:22

**vet** [1] - 84:4

**via** [2] - 1:22, 94:3

**view** [5] - 34:14, 43:17, 79:8, 85:15, 106:10

**viewed** [1] - 99:4

**views** [2] - 43:18, 79:9

**violation** [8] - 47:19, 48:8, 48:15, 50:21, 51:11, 52:24, 52:25, 54:24

**violence** [9] - 5:16, 9:1, 9:20, 10:22, 30:16, 30:23, 31:13, 32:5, 39:13

**visa** [16] - 50:6, 85:8, 85:9, 86:10, 87:9, 87:16, 88:4, 94:4, 94:17, 94:18, 94:20, 94:21, 97:16, 97:23, 101:19, 123:13

**visas** [36] - 53:18, 85:21, 85:24, 86:6, 87:20, 87:25, 88:3, 89:3, 91:10, 91:24, 92:9, 95:1, 95:9, 95:12, 95:20, 95:21, 97:24, 98:17, 98:21, 101:2, 104:20, 105:6, 105:13, 106:14, 106:19, 107:11, 107:19, 107:24, 108:15, 109:9, 110:20, 110:23, 111:1, 113:4, 116:7, 117:12

**visitor** [1] - 86:10

**voluntarily** [2] - 50:12, 50:20

**vs** [1] - 1:5

**vu** [1] - 108:23

**vulnerabilities** [3] - 87:21, 92:10, 95:10

**vulnerability** [1] - 91:25

**vulnerable** [1] - 11:1

## W

**wait** [1] - 51:1

**waive** [2] - 123:11, 125:15

**waiver** [1] - 94:4

**walked** [1] - 84:9

**Walton** [1] - 20:1

**Waltz** [2] - 11:10, 11:12

**wants** [8] - 55:6, 55:19, 55:21, 57:11, 80:15, 107:5, 123:12, 123:22

**Ward** [1] - 89:1

**Washington** [5] - 1:6, 1:18, 2:5, 2:10, 142:14

**Watch** [3] - 32:1, 32:9, 32:15

**ways** [2] - 67:2, 132:3

**weakened** [1] - 30:16

**web** [2] - 17:19, 35:3

**webpage** [4] - 4:5, 8:6, 9:5, 17:16

**website** [6] - 3:25, 4:8, 4:21, 4:23, 17:23

**websites** [1] - 4:11

**weekend** [2] - 4:4, 122:11

**weighed** [2] - 75:24, 117:1

**weighing** [2] - 42:3, 111:19

**Wharton** [2] - 127:8, 128:6

**whatnot** [5] - 50:12, 57:5, 98:13, 103:16, 110:4

**whatsoever** [2] - 48:14, 57:12

**whereabouts** [4] - 95:3, 103:6, 103:15, 105:5

**whole** [2] - 24:21, 28:6

**widely** [1] - 82:22

**widespread** [1] - 31:13

**Williams** [2] - 64:4, 73:8

**wise** [1] - 75:25

**withheld** [1] - 89:11

**wolf** [1] - 133:22

**word** [6] - 9:4, 11:13, 23:14, 97:4, 109:6, 116:19

**words** [5] - 23:15, 43:3, 67:4, 69:12, 69:13

**workers** [2] - 126:23, 127:9

**World** [11] - 3:9, 3:19, 3:24, 3:25, 4:5, 4:12, 5:7, 5:10, 11:11, 27:11, 132:12

**world** [4] - 10:6, 53:22, 53:23, 118:6

**worldwide** [1] - 11:1

**worried** [1] - 23:10

**worries** [1] - 40:20

**worse** [2] - 105:3, 105:15

**worst** [1] - 36:25

**worth** [1] - 80:22

**wow** [1] - 59:25

**wrap** [1] - 135:24

**written** [6] - 6:10, 6:23, 7:8, 58:10, 65:16, 70:18

**wrote** [1] - 19:24

## Y

**Yankee** [23] - 46:13, 46:17, 46:18, 46:25, 47:1, 48:6, 48:7, 49:14, 55:12, 55:21, 55:23, 56:16, 56:17, 56:19, 57:11, 84:12, 117:11, 117:14, 118:11, 118:16, 120:18

**Yankees** [24] - 53:25, 54:15, 54:16, 55:10, 55:19, 55:22, 56:4, 56:18, 56:19, 56:22, 57:4, 57:9, 57:13, 57:20, 57:21, 57:25, 58:2, 58:6, 58:13, 59:11

**year** [6] - 10:17, 66:17, 73:14, 120:22, 126:24, 127:17

**years** [1] - 131:5

**yes's** [1] - 113:14

**yesterday** [2] - 75:2, 124:21

**York** [7] - 1:21, 66:17, 70:14, 70:17, 127:12, 138:10

**yourself** [2] - 44:17, 44:21

## Z

**Zeno** [1] - 118:5

**Zhu** [2] - 126:2, 133:24

**zoning** [1] - 77:21

**Zoom** [1] - 1:22

**ZOTA** [1] - 1:16