# United States District Court
# For The District of Columbia

-------------------------------------------------------x

FRITZ EMMANUEL LESLY MIOT, *et al.*,

    Plaintiffs,

    v.

DONALD J. TRUMP, *et al.*,

    Defendants.

-------------------------------------------------------x

Civil Action No. 1:25-cv-02471 (ACR)

# HAITIAN LEGAL DEFENSE AND EDUCATION FUND'S SUPPLEMENTAL LETTER TO THE COURT

# AND

# APPENDIX A

# Documented Incidents Supporting Findings of Genocide, Crimes Against Humanity, Serious Violations of International Humanitarian Law, and State Responsibility for Failure to Protect in Haiti

RECEIVED

JUL 28 2026

Clerk, U.S. District & Bankruptcy
Court for the District of Columbia



The Hon. Ana C. Reyes
United States District Judge
United States District Court
for the District of Columbia
333 Constitution Ave., N.W.
Washington, D.C. 20001

July 26, 2026

Dear Judge Reyes:

The Haitian Legal Defense and Education Fund (HLDEF) respectfully submits this letter in connection with the Court's continuing consideration of Temporary Protected Status (TPS) for Haiti.

Earlier in these proceedings, the Court accepted HLDEF's amicus curiae brief for filing on the docket (Case No. 1:25-cv-02471). We return now out of deep concern that conditions in Haiti have continued to deteriorate and that the record before the Court should reflect the extraordinary humanitarian realities facing the Haitian people.

HLDEF believes that the systematic violence in Haiti demonstrates a pattern of crimes against humanity and genocide against Haitians as a protected national group. That conclusion is based on the cumulative evidence available today because the human toll of this crisis is stark and measurable:

- **Over 20,000 casualties:** Verified reporting documents more than 16,000 people killed and thousands more injured since 2022 alone, bringing total direct casualties over recent years well past 20,000.
- **Mass Displacement:** Approximately **1.5 million Haitians, over 10% of the entire national population, have been forcibly driven from their homes** by armed gang violence.
- **Territorial Control:** Armed criminal alliances now maintain operational control over an estimated **85% to 90% of the Port-au-Prince metropolitan area** and systematically blockade the critical national transit arteries connecting the capital to the north and south.
- **Humanitarian & Infrastructure Collapse:** Nearly half the population (5.7 million people) requires immediate food assistance. Essential public services, including hospitals, schools, agriculture, and commercial ports, have been repeatedly seized, extorted, or destroyed.

HLDEF does not characterize Haiti's crisis as a conflict between equal sides. Haiti is not experiencing a civil war, nor is it confronting a political disagreement that can be resolved simply by encouraging dialogue among competing factions.

Rather, Haiti has endured years of systematic violence by heavily armed criminal organizations directed against an overwhelmingly unarmed civilian population.

Despite years of security operations, international interventions, and extraordinary expenditures intended to restore order, major gang leaders continue to operate with total impunity. Many exercise open, violent governance over civilian populations while maintaining public social media accounts and issuing public statements. The question many Haitians continue to ask is straightforward: if these individuals are publicly known and remain active, why do they continue operating beyond the effective reach of the state?

Particularly troubling is the government's reliance on superficial "peace initiatives" and optimistic messaging while looking the other way as gangs humiliate local populations, forcing residents into staged "peace rallies" and coercing communities into accepting criminal control as a way of life.

**Establishing a 90-Day Moratorium and Verifiable Security Benchmarks**

For these reasons, HLDEF respectfully urges the Court to maintain the injunction blocking the termination of Temporary Protected Status, or at a minimum, **mandate a strict 90-day pause on all deportations to Haiti.**

A temporary pause on deportations is both a human rights imperative and an operational necessity. For any pause to yield meaningful security outcomes, the Department of Homeland Security and executive authorities must evaluate conditions on the ground against **demonstrable, objective benchmarks**, rather than public assurances.

During a 90-day moratorium, meaningful progress must be demonstrated across specific metrics, including the following:

1. **Restoration of Critical National Corridors:** Unconditional civilian and commercial access restored along major national transit routes (*Nationale 1, 2, and 3*), connecting Port-au-Prince to regional agricultural hubs and the southern peninsula.
2. **Reclaiming of Public Infrastructure:** The verified recapture, securing, and continuous operation of state-level healthcare facilities, educational institutions, municipal buildings, and international transport hubs (maritime ports and airports) currently occupied, blockaded, or rendered non-functional by gang networks.

3. **Targeted Law Enforcement Against Known Leaders:** Measurable action taken to apprehend key, publicly identified gang leadership currently operating with impunity, accompanied by the dismantling of illegal armed checkpoints.

4. **Measurable Reductions in Civilian Harm:** Documented, independent verification showing a sustained downward trend in civilian killings, kidnappings for ransom, and sexual and gender-based violence.

5. **Recapture of Besieged Territories and Safe Civilian Return:** The active operational clearance and permanent securing of gang-held enclaves, anchored by state defense outposts at critical points.

6. **Safe Return and Protection for Displaced Populations:** The establishment of secure, state-protected zones allowing the internally displaced to safely return to their communities without fear of gang reprisal or forced extortion.

Congress intended TPS to remain available while extraordinary conditions prevent nationals from returning safely to their country. HLDEF respectfully submits that those extraordinary conditions continue to exist in Haiti today.

Under these circumstances, continued protection for Haitians must remain firmly in place until measurable evidence, not optimistic declarations, demonstrates that conditions permitting safe, dignified return have genuinely been restored.

Please find attached Appendix A, which documents the atrocities discussed in this letter and provides additional evidence supporting HLDEF's determination that the ongoing violence in Haiti is consistent with genocide, crimes against humanity, serious violations of international humanitarian law, and the state's failure to protect its civilian population.

Respectfully submitted,

*James Reardon*

Communications Director
Haitian Legal Defense and Education Fund (HLDEF)
/s/ James Reardon
James Reardon
Haitian Legal Defense and Education Fund
1834 Centre St., 320060
West Roxbury, MA 02132
(781) 591-2705 or info@hldef.com

# Appendix A: Documented Incidents Supporting Findings of Genocide, Crimes Against Humanity, Serious Violations of International Humanitarian Law and State Failure to Protect in Haiti

## Purpose

This appendix presents a non-exhaustive compilation of documented incidents compiled by the Haitian Legal Defense and Education Fund (HLDEF) illustrating recurring patterns of violence directed against Haiti's civilian population, including mass killings, forced displacement, attacks on community protection efforts, destruction of essential public services, and persistent failures of civilian protection and accountability.

The incidents summarized herein are drawn from publicly available reporting, governmental findings, international organizations, and other credible sources. They are presented not as isolated events, but as components of a broader factual record demonstrating sustained and organized violence affecting Haitians throughout the country.

HLDEF relies on this cumulative evidentiary record in concluding that the documented conduct is consistent with genocide against Haitians as a protected national group, crimes against humanity, serious violations of international humanitarian law, and state responsibility arising from the persistent failure to protect civilian populations.

Although this appendix is not intended to catalogue every incident of violence occurring in Haiti, it documents representative examples that illustrate the scale, persistence, and systematic nature of the ongoing crisis.

---

### Humanitarian Impact Indicators & Systemic Deprivation

The factual record and empirical evidence summarized throughout this submission, including documented massacres, widespread civilian killings, forced mass displacement, systematic attacks on hospitals, schools, and other civilian infrastructure, economic blockades, destruction of livelihoods, and pervasive impunity, demonstrate that the situation in Haiti cannot reasonably be characterized as mere criminal unrest or localized gang violence.

Instead, the evidence reveals a sustained and systematic campaign of organized violence directed against an overwhelmingly unarmed civilian population. Armed groups have weaponized essential public services, severed food supply chains, displaced entire communities, and systematically undermined the institutional structures necessary for civilian survival, creating conditions that threaten the continued functioning of Haitian society itself.

HLDEF's conclusions are not based upon isolated incidents, but upon the cumulative evidentiary record presented throughout this submission. The humanitarian indicators below illustrate the scale and persistence of the crisis and provide the factual foundation for HLDEF's legal assessment.

### Mass Internal Displacement and Chronic Population Disruption

**Status / Timeline:** Ongoing (Surpassing 1.47 Million IDP's)

**Reporting Agencies / Sources:** United Nations Office for the Coordination of Humanitarian Affairs (OCHA); International Organization for Migration (IOM) Displacement Tracking Matrix (DTM)

1

 **Haitian Legal Defense and Education Fund | Human Rights & Security Briefing**

### Detailed Indicator Breakdown

**Scale of Displacement:** Official tracking confirms that more than 1.47 million Haitians are internally displaced nationwide, representing a historic high driven by expanding gang incursions into both metropolitan neighborhoods and provincial agricultural hubs.

**Capital Concentration & Secondary Displacement:** More than 300,000 displaced persons are concentrated within the Port-au-Prince metropolitan area alone. The forced closure of informal emergency sites due to direct armed attacks has compelled tens of thousands of families to undergo repeated secondary and tertiary displacements.

**Strain on Host Communities:** Approximately 84% of displaced populations are sheltered within informal host families, exhausting local food reserves, clean water supplies, and household financial resources across receiving municipalities.

## Widespread Deprivation, Acute Hunger, and Cross-Border Pressure

**Severe Food Insecurity (IPC Phase 3 & 4):** Integrated Food Security Phase Classification (IPC) assessments confirm that nearly 5.8 million people, more than half of Haiti's population, are experiencing acute hunger, with approximately 1.9 million individuals enduring emergency (IPC Phase 4) conditions characterized by severe malnutrition and heightened risks of starvation.

**Compounded Vulnerability via Forced Returns:** The humanitarian crisis has been further compounded by the forced deportation and return of tens of thousands of Haitian migrants from neighboring states. Arriving without financial means, physical protection, or shelter, these returnees enter a country where receiving communities and state social services are already functionally incapacitated.

**Systemic Collapse of Civilian Protection:** More than 5.5 million civilians urgently require multi-sectoral humanitarian assistance. Ongoing highway blockades, port seizures, and direct attacks on humanitarian convoys continue to severely restrict humanitarian access, leaving isolated communities deprived of essential life-saving relief.

## Conclusion

The humanitarian indicators and documented incidents presented throughout this submission establish that Haiti's crisis extends far beyond generalized criminality or ordinary insecurity.

More than 20,000 people have reportedly been killed, approximately 1.5 million Haitians have been forcibly displaced, millions require humanitarian assistance, hospitals and schools have closed, livelihoods have been destroyed, and the Haitian state has repeatedly failed to provide meaningful civilian protection despite years of domestic and international intervention.

Taken together, these facts demonstrate a sustained and systematic campaign of organized violence directed against Haiti's unarmed, civilian population.

HLDEF, therefore, concludes that the documented conduct is consistent with

2



**Haitian Legal Defense and Education Fund | Human Rights & Security Briefing**

- **Genocide:** The cumulative evidence satisfies, in HLDEF's assessment, the legal elements of genocide against Haitians as a protected national group under the Convention on the Prevention and Punishment of the Crime of Genocide, including the requisite specific intent.
- **Crimes Against Humanity:** The widespread and systematic attacks directed against civilian populations, including murder, torture, persecution, forced displacement, sexual violence, and the weaponized deprivation of food, healthcare, shelter, and other necessities, meet the legal thresholds established under Article 7 of the Rome Statute.
- **Serious Violations of International Humanitarian Law:** The deliberate targeting of non-combatants, destruction of protected civilian objects, obstruction of humanitarian assistance, blockading of food and medical supplies, and collective punishment of communities constitute grave breaches of Common Article 3 of the Geneva Conventions and customary international law.
- **State Responsibility for Failure to Protect:** The persistent structural impunity, institutional collapse, and the inability or unwillingness of state authorities to provide meaningful civilian protection engage state responsibility under international law and broader obligations to protect civilian populations from catastrophic and sustained violence.

HLDEF does not present these conclusions as political rhetoric. They are conclusions drawn from the cumulative factual record presented throughout this submission. The representative incidents that follow provide additional factual support for these conclusions.

# SECTION I: TARGETED KILLINGS OF INDIVIDUALS ASSOCIATED WITH PUBLIC SERVICE AND COMMUNITY PROTECTION

## 1. Killing of Woodley "Zazou" Décine

- **Date:** June 8, 2026
- **Location:** Arcahaie (Ouest Department)
- **Documented Source:** Local Human Rights & Law Enforcement Incident Bulletins[1]

According to reports, Woodley "Zazou" Décine was traveling as part of Haiti's military recruitment process when the vehicle he was traveling in was intercepted by armed groups. Reports indicate he was accused of having connections to community self-protection brigades and was killed. This incident reflects concerns regarding targeted attacks against individuals perceived as supporting state security institutions or community defense efforts.

## 2. Killing of Mario Arthur

- **Date:** July 6, 2026
- **Location:** In transit to Gonaïves (Artibonite Department)
- **Documented Source:** National Human Rights Defense Network (RNDDH) Briefing[2]

Also according to reports, Mario Arthur worked as an armored vehicle operator assisting police operations, including dismantling gang-controlled structures. Reports indicate he was lured under false pretenses, removed from public

3

transportation, subjected to severe torture, and killed. The circumstances surrounding his death raise grave concerns regarding the systematic targeting of individuals solely because of their employment or perceived opposition to armed groups.

## 3. Targeted Violence and Retaliation Against Community Protection Groups

- **Status / Timeline:** Ongoing (Accelerated escalation since mid-2023)
- **Geographic Scope:** Port-au-Prince Metropolitan Area (e.g., Delmas, Turgeau, Gressier) and key regional corridors (e.g., Lower Artibonite, Centre Department)
- **Documented Sources:** UN Integrated Office in Haiti (BINUH); OHCHR Security Reports[3]

In response to the near-total collapse of state security infrastructure and the expanding territorial control of armed gang coalitions (such as *Viv Ansanm*), local populations have increasingly formed informal self-defense structures, neighborhood vigilance committees, and citizen brigades, often associated with the *Bwa Kalé* movement. While these groups serve as a vital last line of neighborhood defense, their members operate under severe asymmetry in firepower and face systematic, retaliatory violence from heavily armed criminal factions.

**Key Patterns of Targeting & Violence**

- **Retaliatory Gang Incursions & Collective Punishment:** Armed gangs frequently launch punitive, large-scale assaults against communities that set up barricades, checkpoints, or active vigilance brigades. Gangs view any organized community self-defense as a direct challenge to their territorial expansion or extortion rackets, routinely burning down homes and executing residents in neighborhoods accused of harboring brigade members.
- **Targeted Executions & Assassinations:** Key leaders, organizers, and active lookouts of local protection groups are routinely targeted for extrajudicial killings, ambushes, and targeted abductions. Gangs utilize intelligence networks to identify brigade participants, executing them as warnings to deter broader community mobilization.
- **Severe Operational Asymmetry:** Community protection groups typically rely on improvised weapons, edged tools, and limited light firearms, leaving them acutely vulnerable when criminal coalitions deploy heavy weaponry, high-caliber rifles, and coordinated siege tactics.
- **Blurring of Civilian and Combatant Status:** The lack of formal uniforms or structure exposes civilian brigade members, and nearby non-combatant residents, to extreme caught-in-the-crossfire risks, summary reprisals, and heightened vulnerability during both gang raids.

**Analytical Context**

By forcing unarmed or under-equipped civilians to assume frontline security functions without formal state integration, training, or physical protection, community members are placed in an unsustainable position: forced to choose between passive submission to gang dominance or active resistance under constant threat of deadly reprisal.

# SECTION II: MASS DISPLACEMENT AND ATTACKS AGAINST COMMUNITIES

## 4. Expansion of Armed Group Control Into New Areas

 **Haitian Legal Defense and Education Fund | Human Rights & Security Briefing**

- **Status / Timeline:** Ongoing
  - **Geographic Scope:** Metropolitan Outskirts, High-Altitude Corridors, and Rural Agricultural Hubs
  - **Documented Sources:** IOM Displacement Tracking Matrix (DTM) Reports[4]

Armed groups have systematically expanded territorial control beyond traditional urban strongholds into vital rural and high-altitude corridors, resulting in

- **Forced Civilian Displacement:** Unprecedented movement of families fleeing targeted violence, neighborhood shelling, and armed incursions.
- **Socioeconomic Collapse:** Direct abandonment of residential homes, agricultural plots, and commercial enterprises across newly annexed sectors.
- **Deprivation of Essential Rights:** Widespread denial of access to education, emergency healthcare, and sustainable livelihoods.
- **Compound Vulnerability:** Severe protection risks for repeatedly displaced populations lacking basic state physical security.

## 5. Kenscoff Incursion and Acute Mass Displacement

- **Date:** July 4–8, 2026
- **Location:** Kenscoff and Grand Fond (Ouest Department)
- **Reporting Agency / Primary Source:** International Organization for Migration (IOM) – Displacement Tracking Matrix (DTM) Emergency Tracking Tool (ETT Reports #100 & #100.1)[5]

**Detailed Incident Breakdown**

- **Initial Armed Assault (July 4–5, 2026):** Coordinated gang incursions breached residential perimeters in the localities of Le Refuge, and Viard (1st Communal Section of Nouvelle Touraine, Kenscoff and a former telecommunications office (Teleco). Armed groups executed targeted arson, direct killings of non-combatants, and summary abductions (IOM DTM ETT Report #100).
- **Geographic Escalation (July 8, 2026):** Violence rapidly expanded into the 5th Communal Section of Grand Fond, engulfing nine additional localities: Robin, Mahotière, Dumisseau, Do Blanc, Bernard 1 and 2, Do Pak, Kabamòn, and Dè Savann (IOM DTM ETT Report #100.1).

**Documented Human Impact**

- **5,840 Individuals Displaced:** Over 1,836 households were forcibly uprooted within a four-day window.[6]
- **Collapse of Secondary Safe Havens:** Escalating security threats forced the immediate closure of three pre-existing internally displaced persons (IDP) sites, compelling previously displaced families to flee for a second or third time.
- **Absorption Capacity Strain:** 86% of displaced residents were forced into informal host families (64% within Kenscoff, 36% in neighboring Pétion-Ville), while 14% sought shelter across makeshift emergency sites.

**Legal & Evidentiary Significance**

Official UN and IOM tracking indicates this event represents the single largest mass displacement in the Kenscoff municipality since early 2025. It demonstrates a deliberate, strategic expansion of armed coalitions into historically stable high-altitude agricultural and transit corridors. The calculated targeting of civilians, destruction of residential

**Haitian Legal Defense and Education Fund | Human Rights & Security Briefing**

infrastructure, and forced evacuation of populations constitute severe violations of International Humanitarian Law and human rights standards, leaving local populations without safe passage or state-backed physical protection.

# SECTION III: ATTACKS ON ESSENTIAL SERVICES AND CIVILIAN LIFE

While preceding sections document specific massacres, targeted assassinations, and regional incursions, the crisis in Haiti is equally defined by a deliberate, daily assault on the infrastructure required for basic human survival. Armed gang coalitions do not merely occupy territory; they actively dismantle the state's functional capacity to deliver essential public services, transforming entire municipalities into unlivable enclaves.

## 6. Structural Collapse of Public Infrastructure, Utilities, and Institutions

- **Documented Sources:** UN Office for the Coordination of Humanitarian Affairs (OCHA); UNICEF Haiti Country Updates[7]

### A. Structural Collapse of the Banking and Financial Footprint

- **Siege on Financial Depots:** Armed groups have systematically targeted commercial bank branches, credit unions, and microfinance institutions across the Metropolitan Area of Port-au-Prince and regional transit hubs. Automated teller networks have been looted, destroyed, or rendered inaccessible.
- **Interdiction of Remittances:** By blockading physical transfer offices and terrorizing commercial districts, gangs directly impede the flow of international remittances, the primary financial lifeline for millions of Haitian households facing total economic paralysis.

### B. Weaponization of Critical Utilities and Energy Infrastructure

- **Seizure of Fuel Depots and Power Nodes:** The recurring blockades of major maritime fuel terminals (including Terminal Varreux) and attacks on electrical substations demonstrate a pattern of utility hostage-taking. Fuel shortages intentionally cripple backup generators for emergency communications, water pumps, and cold-chain storage for essential vaccines and medicines.
- **Interruption of Potable Water Distribution:** In urban settlements like Cité Soleil, Delmas, and Carrefour-Feuilles, gangs exercise control over water distribution points and private water-truck routes, extracting extortionate fees from civilians or cutting off water access entirely as a tool of collective punishment.

### C. Destruction of Municipal Sanitation and Re-Emergence of Public Health Crises

- **Paralysis of Waste Management:** Municipal sanitation services have been unable to operate in gang-controlled corridors due to constant sniper fire and hijacked equipment. Accumulated waste block drainage canals in densely populated coastal areas.
- **Exacerbation of Preventable Epidemics:** The inability of public health teams to access waste-clogged and blockaded neighborhoods has directly driven surges in waterborne diseases, including cholera and severe gastrointestinal infections, under conditions where emergency medical response is entirely absent (PAHO/WHO Situation Reports).[8]



**Haitian Legal Defense and Education Fund | Human Rights & Security Briefing**

### D. Severe Degradation of Commercial Logistics and Port Operations

- **Blockade of Maritime and Air Corridors:** Armed incursions around the Port-au-Prince seaport (Caribbean Port Services) and perimeter attacks near Toussaint Louverture International Airport have repeatedly grounded cargo flights, halted shipping container offloading, and stranded humanitarian aid shipments.
- **Extortionate Supply Chain Inflation:** By levying illegal "tolls" at every major road junction connecting agricultural regions to consumption centers, armed networks have artificially inflated the cost of basic food staples by over 100% to 300%, placing basic nutrition out of reach for vulnerable families.

### E. Collapse of the Education System and Attacks on Academic Institutions

Armed groups have carried out widespread attacks, occupations, and disruptions affecting Haiti's educational infrastructure. Violence and insecurity have disrupted access to education for hundreds of thousands of children, with schools reported closed or unable to operate due to insecurity, displacement, looting, occupation, and attacks (UNICEF / UNESCO Joint Assessments).[9]

Higher education has also been devastated. Between 2024 and 2026, attacks linked to armed groups caused severe damage to several institutions of the State University of Haiti (UEH), including the Faculty of Sciences, Faculty of Agronomy and Veterinary Medicine, École Normale Supérieure, and National School of Arts. These attacks destroyed institutional infrastructure, educational facilities, research laboratories, and administrative resources accumulated over decades.

Beyond physical destruction, armed groups have occupied civilian facilities, while displaced families fleeing violence have been forced to seek shelter in schools and other public buildings. The resulting collapse of educational access has dramatically increased children's vulnerability to exploitation, including coercive recruitment and forced association with armed groups.

### Legal Summary for Section III

The deliberate throttling of banking, clean water, power grids, sanitation, cargo logistics, and academic institutions demonstrates that civilian suffering in Haiti is not merely collateral damage from gunfire. It is the result of a systematic, weaponized disruption of public infrastructure that deprives the civilian population of the basic necessities of life, supporting the conclusion that conditions on the ground constitute severe, ongoing breaches of international humanitarian standards.

## 7. Systemic Agricultural Collapse, Highway Siege, and Economic Weaponization

- **Status / Timeline:** Ongoing
- **Geographic Scope:** Artibonite Department (National Breadbasket), Centre Department, and National Transit Corridors (RN1, RN2, RN3)
- **Documented Sources:** Integrated Food Security Phase Classification (IPC); FAO/WFP Joint Analysis[10]

### Detailed Incident Breakdown & Operational Dynamics

- **Siege on Agricultural Basins:** Armed gang coalitions, including *Koko Rat San Ras* and *Gran Grif* in the Artibonite Valley, have executed systematic land seizures, forced farm abandonments, and targeted arson of standing crops. By terrorizing agrarian communities in Haiti's primary rice- and grain-producing regions, criminal

 **Haitian Legal Defense and Education Fund | Human Rights & Security Briefing**

networks have dismantled domestic food production, turning self-sustaining farming households into displaced, aid-dependent populations.

- **Interdiction of National Trade Routes & Highway Tolls:** Gang-controlled choke points along primary arteries (Route Nationale 1, 2, and 3) have effectively blockaded trade between rural agricultural zones and urban centers. Commercial truckers and *Madam Sara* informal market traders, the critical distribution link in Haiti's economy, face extreme extortion, physical violence, cargo hijacking, and summary executions at illegal toll plazas.
- **Food Weaponization & Supply Inflation:** Interrupted distribution lines and crop destruction have artificially inflated the cost of basic food staples (rice, corn, flour, and cooking oil) by 100% to 300% across metropolitan markets. Perishable crops rot at regional checkpoints, creating artificial urban scarcities and bankrupting small-scale merchants.

**Documented Human & Economic Impact**

- **Catastrophic Food Insecurity:** Integrated Food Security Phase Classification (IPC) monitoring confirms that over 5.8 million people, more than half of Haiti's total population, are experiencing Crisis (IPC Phase 3) or Emergency (IPC Phase 4) levels of acute hunger.[11]
- **Destruction of Micro-Commerce:** Decimation of the *Madam Sara* network has wiped out informal credit ecosystems, stripping millions of women-headed households of their primary source of income and financial autonomy.

**Legal & Evidentiary Significance**

The deliberate, sustained disruption of food production and trade routes demonstrates that food insecurity in Haiti is not merely a passive byproduct of conflict, but the direct result of weaponized economic siege. Denying civilians access to essential food supplies, blocking agricultural livelihoods, and extorting commercial logistics violate international humanitarian principles and constitute severe, ongoing breaches of human rights standards regarding the right to food, work, and basic survival.

# SECTION IV: PATTERNS OF IMPUNITY AND ACCOUNTABILITY CONCERNS

## 8. Entrenched Impunity, Public Media Operations, and the Total Absence of Judicial Accountability

- **Status / Timeline:** Ongoing
- **Geographic Scope:** Metropolitan Port-au-Prince, Artibonite Department, and Global Media Platforms
- **Documented Sources:** UN Security Council Sanctions Committee Panel of Experts; OHCHR Judicial Monitoring Reports[12]

**Overview**

Despite being explicitly designated under international sanctions lists, wanted by domestic judicial authorities, and indicted by foreign jurisdictions, senior gang leaders operate in full public view. Armed coalition commanders utilize media channels, digital platforms, and physical press events to broadcast threats, execute public intimidation campaigns, and project territorial dominance without fear of state intervention or judicial process.

 **Haitian Legal Defense and Education Fund | Human Rights & Security Briefing**

### Detailed Breakdown of Impunity Dynamics

### Unfettered Public & Digital Media Presence

- **Digital Propaganda & Threats:** Leaders of major gang coalitions (such as Viv Ansanm) maintain active digital footprints, publishing high-definition videos to issue ultimatums to state officials, threaten independent journalists, and coordinate armed offensives.
- **Bounties and Public Extortion:** Gang commanders routinely utilize open broadcasts to place direct "bounties" or death threats on public figures, law enforcement personnel, and news anchors, effectively weaponizing social media to silence dissent and enforce self-censorship.

### Staged Press Conferences & Territorial Sovereignty Claims

- **Open Press Briefings:** High-profile gang figures regularly host formal, in-person press conferences within heavily populated enclaves (e.g., Delmas, Bas-Peu-de-Chose, Lower Artibonite).
- **Parallel Governance Narrative:** By appearing unmasked before news cameras surrounded by high-caliber automatic weapons, gang leaders systematically attempt to reframe their criminal networks as "political actors" or "revolutionary forces," directly challenging the legitimacy and authority of the Haitian state.

### Total Paralysis of the Domestic Judicial Architecture

- **Non-Execution of Arrest Warrants:** Dozens of active judicial warrants, Interpol red notices, and international sanctions orders remain completely unexecuted. Gang leaders navigate major metropolitan corridors and maintain known headquarters without encountering state physical resistance.
- **Judicial Intimidation & Court Closures:** Courts in key jurisdictions, including the Court of First Instance in Port-au-Prince, have been repeatedly ransacked, occupied, or rendered dysfunctional by gang incursions, destroying vital legal evidence, court dockets, and case files required to prosecute criminal leadership.

### Legal & Institutional Significance

The unhindered public profile of sanctioned criminal leaders represents a complete collapse of the rule of law and state deterrence. When individuals accused of orchestrating massacres, mass sexual violence, and community-wide arson can project power publicly with zero judicial consequences, it normalizes terror, dismantles public trust in state institutions, and cements a systemic culture of total impunity across the country.

### 9. Repeated Security Operations Without Sustained Control or Territorial Retention

- **Status / Timeline:** Ongoing
- **Geographic Scope:** Village de Dieu (Vilaj de Dye), Lower Delmas, Carrefour-Feuilles, Canaan, and Rural Artibonite Corridors
- **Documented Sources:** International Crisis Group (ICG); Security & Defense Tracking Bulletins[13]

### Overview

Domestic security forces, at times operating alongside international support units, have periodically announced and executed high-visibility tactical offensives into heavily fortified gang strongholds. However, these incursions consistently follow a cycle of temporary entry followed by rapid withdrawal without establishing permanent Forward Operating Bases (FOB's) or static holding forces. As a result, armed coalitions reoccupy target zones almost immediately after law

9



enforcement units pull back, rendering strategic gains null and leaving local populations exposed to heightened retaliatory violence.

**Case Study & Operational Breakdown: The Village de Dieu (Vilaj de Dye) Impasse**

- **High-Visibility Incursions Without Tactical Retention:** Security operations targeting the coastal shantytown of Village de Dieu, the long-standing headquarters of Johnson André ("Izo") and the 5 Segonn gang, demonstrate the limits of temporary operations. Despite security forces breaching the perimeter after years of total gang isolation, operations regularly conclude without arresting high-value targets, seizing main armories, or dismantling criminal command structures.
- **Disproportionate Tactical Focus vs. Ground Gains:** While operations may neutralize isolated gang assets (such as shooting down surveillance drones or destroying physical barricades), the underlying administrative and defensive capabilities of the gang remain fully intact.
- **Immediate Re-Occupation & Retaliation:** Upon the tactical withdrawal of state armored units, armed groups immediately re-establish checkpoints, rebuild perimeter defenses, and resume extortion, maritime piracy, and weapons trafficking along Route Nationale 2 (RN2).
- **Civilian Risk & "Flash" Operations:** For local residents, unannounced short-term incursions spark intense, localized firefights without delivering long-term physical security. Communities are frequently left in the crossfire during the operation and face severe reprisal attacks by gangs accusing locals of collaborating with law enforcement once state forces exit.

**Key Systemic Deficiencies in Security Strategy**

- **Failure of the "Clear, Hold, Build" Framework:** Operations prioritize the "clear" phase through short-term tactical entries but completely miss the "hold" phase, preventing any transition to civilian administration or infrastructure restoration.
- **Asymmetric Intelligence & Surveillance:** Armed coalitions actively monitor unencrypted police communications and deploy private aerial drones to track tactical movements in real-time, allowing criminal commanders to evade capture and ambushes during state incursions.
- **Erosion of Public Trust:** The repeated spectacle of announced "major offensives" that end without measurable territorial recovery or judicial arrests severely erodes public confidence in both domestic authorities and international security assistance.

**Legal & Evidentiary Significance**

A security strategy relying on ephemeral, non-holding operations fails to fulfill the state's positive obligation under international human rights law to protect civilian life and maintain public order. Executing high-intensity incursions into densely populated urban zones without establishing permanent physical security directly increases civilian vulnerability to post-operation gang reprisals, reinforcing a cycle of violence and impunity across the capital.

# SECTION V: GOVERNMENT RESPONSE AND PUBLIC CONFIDENCE CONCERNS

**10. Misalignment of Official Framing: "Conflict Reconciliation" vs. Civilian Victimization**

- **Status / Timeline:** Ongoing



**Haitian Legal Defense and Education Fund | Human Rights & Security Briefing**

- **Geographic Scope:** National / Metropolitan Port-au-Prince

## Overview

Public messaging from state authorities, international entities, and political factions has repeatedly framed the ongoing crisis using language centered on "dialogue," "reconciliation," and "peace initiatives." This official framing creates a profound misalignment with the lived reality of the population. Haitian civil society organizations, human rights defenders, and victim groups categorically reject the characterization of gang expansion as a traditional political conflict requiring mutual compromise, viewing it instead as an asymmetric campaign of violence waged by organized criminal cartels against an unarmed-civilian population.

## Detailed Analytical Breakdown

### Rejection of Moral and Legal Equivalence

- **Asymmetric Aggression:** Framing gang attacks as a two-sided conflict implicitly elevates illegal armed coalitions (Viv Ansanm, Gran Grif) to legitimate political interlocutors[14]. Civil society entities argue this obscures the core legal reality: systemic human rights abuses, extortion, mass sexual violence, and forced displacement.
- **Sanctuary for Perpetrators:** Proposals or rhetoric suggesting amnesty, formal negotiations, or "peace agreements" are widely perceived by the public as an attempt to institutionalize criminal gains and insulate gang leadership from domestic and international prosecution under international law[15].

### Civilians as Victims, Not Belligerents

- **Absence of Mutual Grievance:** Communities targeted by gang incursions, such as Solino, Carrefour-Feuilles, Kenscoff, and the Artibonite Valley, are non-combatants subjected to territorial annexation and forced eviction, not active participants in a political dispute.
- **Psychological Trauma & Public Alienation:** Imposing a "reconciliation" narrative without providing physical protection, judicial accountability, or reparations severely alienates victimized populations, creating deep public resentment toward governing institutions.

## 11. Decisive Collapse of Public Confidence in State and Judicial Institutions

- **Status / Timeline:** Ongoing
- **Geographic Scope:** National Scope

## Overview

Public trust in the Haitian government's capacity and political will to restore order has reached a critical low. As political transitional bodies and security apparatuses struggle to demonstrate sustained operational gains or reclaim territory, citizens increasingly view official messaging as performative political maneuvering disconnected from the acute security crisis.

## Detailed Breakdown of Institutional Deficits

### Inability to Apprehend High-Profile Criminal Leaders

11



**Haitian Legal Defense and Education Fund | Human Rights & Security Briefing**

- **Persistent Impunity:** Despite publicly declared security operations and international sanctions or indictments, top gang commanders maintain active public profiles, issue digital threats, and control physical territory without facing arrest. This operational paralysis reinforces public perceptions of state complicity or structural collapse[16].
- **Inaccessible Judicial Remedies:** The domestic justice system remains functionally paralyzed. Key courthouses remain abandoned or under criminal control, dockets have been destroyed, and judicial personnel face extreme intimidation, leaving victims of mass crimes without institutional mechanisms for redress.

### Weakening and Politicization of Oversight Institutions

- **Institutional Decay:** Anti-corruption agencies, judicial oversight councils, and independent human rights monitors have seen their mandates eroded by political instability, budget starvation, and direct security threats.
- **Unaddressed Elite Collusion:** Despite public knowledge and international sanctions pointing to financial and logistical links between political/economic elites and armed gangs, domestic accountability mechanisms have failed to prosecute these networks[17].

### Divergence Between Political Messaging and Security Realities

- **Rhetoric vs. Results:** Official announcements regarding state stabilization, council formations, or impending electoral timelines are met with widespread skepticism by a population facing daily extortion, extreme food insecurity, and road blockades.
- **Vigilantism as a Direct Consequence:** The total loss of faith in state protection has directly driven the rise of informal defense networks (*Bwa Kalé*) and neighborhood vigilance committees, as communities conclude state institutions can no longer fulfill their foundational obligation to protect civilian life.

### Legal & Institutional Significance

The combination of misframed conflict narratives and systemic institutional failure violates the state's obligation under the American Convention on Human Rights (Article 25) to provide effective judicial remedies, safeguard fundamental human rights, and maintain public safety. When a government prioritizes political dialogue over accountability for mass atrocities, it erodes the legal framework of state governance and normalizes criminal territorial control.

# SECTION VI: DESTRUCTION OF AGRICULTURAL CAPACITY AND FOOD SECURITY

**12. Attacks on the Artibonite Agricultural Region and Weaponized Starvation**

- **Status / Timeline:** Ongoing
- **Geographic Scope:** Artibonite Valley (Pont-Sondé, Petite-Rivière-de-l'Artibonite, L'Estère, Jean-Denis, Liancourt, Marchand-Dessalines)
- **Reporting Agencies / Sources:** Famine Early Warning Systems Network (FEWS NET), UN Food and Agriculture Organization (FAO), InSight Crime, National Network for the Defense of Human Rights (RNDDH)

**Overview**

The Artibonite Department, historically the nation's primary agricultural breadbasket and the source of over 90% of domestic rice cultivation, has been subjected to a deliberate campaign of territorial clearance, crop destruction, and agrarian terror. Operating in this vital belt, rural gang coalitions including Koko Rat San Ras and Gran Grif (key pillars of the broader Viv Ansanm network) have transformed food production zones into conflict arenas. Through systematic extortion, farm-burning, irrigation sabotage, and the slaughter of farming households, armed coalitions have weaponized starvation, dismantling domestic food sovereignty and driving millions into acute famine[18].

**Detailed Breakdown of Agrarian Sabotage & Economic Warfare**

**Scorched-Earth Tactics and Targeted Crop Destruction**

- **Systematic Field Burning:** Armed units routinely invade active farming plots during harvest cycles, setting fire to standing rice fields, maize crops, and grain storage facilities. In verified digital media recordings, armed gang personnel are seen torching mature crops while explicitly stating they are acting under direct orders from coalition leadership to deny food resources to communities.
- **Destruction of Irrigation Infrastructure:** Gangs have systematically dismantled, looted, or blocked vital canal networks, including primary irrigation channels supplying over 34,000 hectares of farmland across the Artibonite Valley. Deprived of water access and maintenance, vast agricultural tracts have suffered severe crop failure, leaving farming households destitute.

**Expulsion of the Agrarian Workforce (Madam Sara & Farmers)**

- **Terror-Driven Abandonment:** Continuous armed incursions have forced tens of thousands of smallholder farmers to abandon their land. Those attempting to tend their fields face summary execution, kidnapping, or forced labor under gang supervision.
- **Interdiction of Produce Transit:** Informal female agricultural traders (*Madam Sara*), who serve as the primary distribution link between rural farms and urban markets, are systematically targeted for extortion, physical assault, and cargo theft along secondary roads and national highways (RN1).

**13. Armed Massacres, Scorched-Earth Offensives, and Synchronized Sieges**

Armed gang coalitions in Haiti have deployed massacres, village arson, and multi-regional synchronized sieges as tactical tools to expand territory, punish non-compliant civilian populations, and avenge lost gang leadership. These attacks feature the deliberate targeting of non-combatants, including young children and the elderly, and are executed in environments where state protection forces are completely absent or unable to intervene.

**Incident Breakdown**

**The Labodrie Coastal Massacre**

- **Date:** September 12, 2025
- **Location:** Labodrie (Fishing village north of Port-au-Prince, near Cabaret and Arcahaie)
- **Responsible Entity:** Viv Ansanm Gang Coalition
- **Detailed Account:** Members of the Viv Ansanm coalition executed a multi-day armed assault on the coastal fishing village of Labodrie. The violence resulted in the verified deaths of at least 42 civilians, including a 4-year-old child and his family[19]. Assailants intentionally torched the village, burning residential structures to the ground and forcing surviving residents to flee by sea or into surrounding brush. Local administrative officials

13



confirmed the massacre was a punitive reprisal following the death of a senior gang commander ("Vladimir") in neighboring Cabaret.

- **Legal Significance:** Demonstrates the strategy of collective punishment against non-combatants to avenge tactical losses. State intervention was entirely absent during the critical hours of the attack.

### The Pont-Sondé & Artibonite Valley Massacres

- **Date:** October 2024 / Ongoing Recurrences through 2025–2026
- **Location:** Pont-Sondé, Petite-Rivière-de-l'Artibonite, L'Estère, and Jean-Denis
- **Responsible Entity:** Gran Grif and Koko Rat San Ras Gangs
- **Detailed Account:** In one of the deadliest single atrocities in recent Haitian history, Gran Grif assailants executed an early-morning assault on the town of Pont-Sondé, utilizing automatic assault rifles and canoes to cross river perimeters. Over 115 civilians, including infants, pregnant women, and the elderly, were massacred in their homes or executed as they fled[20]. Assailants set fire to at least 45 homes and dozens of vehicles. Parallel offensives across Jean-Denis and L'Estère have repeatedly deployed night-time house-burnings with families trapped inside, driving over 6,000 residents from the agricultural zone in single-day waves.
- **Legal Significance:** Illustrates a pattern of unhindered, large-scale massacres designed to systematically depopulate key agricultural communes. Despite public social media warnings issued by gang leaders prior to the attacks, state authorities failed to deploy protective security forces or establish emergency evacuation corridors.

### Coordinated Multi-Department Sieges (Kenscoff & Mountain Corridors)

- **Date:** December 2, 2025
- **Location:** Kenscoff (Ouest Department) and Artibonite Agricultural Belt
- **Reporting Source:** Local Field Monitoring / Investigative Human Rights Reports
- **Detailed Account:** Synchronized, night-time armed offensives were launched across multiple geographic regions, forcing mass panic and emptying entire neighborhoods under heavy gunfire. In Kenscoff, armed gang units breached residential perimeters, firing indiscriminately into dwellings, setting homes ablaze, and driving families into unlit mountain corridors with no designated safe passages or emergency shelter.
- **Legal Significance:** The synchronized execution of multi-department offensives demonstrates advanced command-and-control capabilities within the criminal coalitions, intended to stretch under-resourced police units thin while inflicting maximum civilian trauma across both agricultural and suburban strongholds.

### Legal & Evidentiary Significance under International Law

The deliberate destruction of crops, poisoning of agricultural land, and starvation of civilian populations violate Article 14 of Additional Protocol II to the Geneva Conventions, which strictly prohibits the targeting or destruction of objects indispensable to the survival of the civilian population. When executed as part of a widespread or systematic attack against rural communities, the weaponization of hunger, mass arson, and localized massacres constitute undeniable evidence of Crimes Against Humanity (Rome Statute, Article 7) and grave breaches of International Humanitarian Law.

# SECTION VII: ATTACKS ON HEALTHCARE ACCESS & INFRASTRUCTURE

**14. Systematic Destruction and Closure of Safety-Net Healthcare Institutions**



**Haitian Legal Defense and Education Fund | Human Rights & Security Briefing**

- **Status / Timeline:** Ongoing
- **Geographic Scope:** Port-au-Prince Metropolitan Area and Provincial Medical Hubs

## Overview & Advocacy Insecurity

The near-total collapse of public health infrastructure across the capital has been accelerated by direct armed incursions into major teaching and safety-net hospitals. Medical, nursing, and pharmacy students in Port-au-Prince have engaged in public demonstrations demanding the immediate reopening and security protection of critical safety-net facilities serving the most impoverished demographics.

During peaceful mobilization efforts advocating for the restoration of basic medical care, student advocates were targeted with live ammunition, resulting in gunfire injuries. The targeting of medical students underscores the extreme danger facing healthcare workers and demonstrates how insecurity not only deprives current populations of immediate care, but fundamentally dismantles the future pipeline of healthcare professionals in Haiti.

## 15. Forced Indefinite Closure of Mirebalais University Hospital (HUM)

- **Date / Timeline:** Incursion and forced closure initiated April 2025 (Ongoing)
- **Location:** Mirebalais, Centre Department
- **Reporting Agencies / Sources:** Partners In Health (PIH) / Zanmi Lasante, UN Office for the Coordination of Humanitarian Affairs (OCHA)

## Detailed Incident Breakdown

- **Coordinated Assault on a Critical Hub:** A joint offensive executed by allied gang factions (including 400 Mawozo and Canaan networks within the Viv Ansanm coalition) targeted the city of Mirebalais. Armed units breached the 205,000-square-foot l'Hôpital Universitaire de Mirebalais (HUM), a flagship 300-bed, solar-powered tertiary care and training facility established by Partners In Health[21].
- **Looting and Destruction of Medical Assets:** Assailants systematically looted critical diagnostic equipment, pharmaceutical reserves, and solar power infrastructure. Surrounding public facilities were breached, resulting in the forced release of over 500 inmates from the local prison, setting nearby vehicles ablaze, and subjecting the immediate hospital perimeter to sustained gunfire.
- **Emergency Evacuation & Systemic Fallout:** Security conditions forced the emergency evacuation of all critical care patients, oncology recipients, and medical staff. As the primary referral hospital for central and northern Haiti, the indefinite closure of HUM severed specialized medical care for millions of residents, creating a catastrophic void across regional safety-net systems.

## Legal Significance under International Humanitarian Law (IHL)

Under customary International Humanitarian Law and Article 18 of the Fourth Geneva Convention, hospitals and medical personnel are afforded special protection and must never be subjected to attack, looting, or military siege. The deliberate targeting, looting, and forced closure of healthcare facilities constitute grave breaches of IHL and amount to Crimes Against Humanity when executed as part of a systematic campaign to deny life-sustaining services to a civilian population.

 **Haitian Legal Defense and Education Fund | Human Rights & Security Briefing**

# SECTION VIII: DESTRUCTION OF EDUCATIONAL INFRASTRUCTURE & WAR ON THE FUTURE WORKFORCE

**16. Documented Incidents of Educational Infrastructure Destruction**

- **Status / Timeline:** Ongoing
- **Geographic Scope:** Metropolitan Port-au-Prince and the Artibonite Agricultural Belt

**Detailed Incident Breakdown**

**Arson and Cultural Erasure at the National School of Arts (ENARTS)**

- **Location:** Downtown Port-au-Prince (Rue Capois / Champ de Mars)
- **Details:** Armed groups within the Viv Ansanm coalition forcibly entered ENARTS, Haiti's premier public higher education institution for the arts. Assailants ransacked classrooms, looted priceless cultural artifacts and musical instruments, destroyed administrative records, and set fire to primary facility structures, erasing decades of national artistic heritage and student archives.

**Systematic Destruction and Occupation of Schools in the Canaan/Lafiteau Corridor**

- **Location:** Northern Access Corridor to Port-au-Prince (Canaan, Cabaret)
- **Details:** Gang factions systematically targeted private, public, and community primary schools across Canaan. Multi-story educational structures were intentionally torched and vandalized to eliminate potential defensive vantage points utilized by local vigilance committees or police forces. Armed groups recorded and circulated digital media showing the deliberate burning of classroom furniture and infrastructure.

**Siege and Arson of Secondary and Vocational Institutions in Lower Delmas**

- **Location:** Delmas Corridor (Delmas 18 through 24)
- **Details:** Armed units operating under criminal coalition leadership systematically raided long-standing Catholic and public vocational schools. Facilities were systematically stripped of electrical wiring, solar arrays, and instructional equipment before being set on fire to prevent law enforcement from establishing forward tactical posts.

**Destruction of Primary & Technical Schools in the Artibonite Agricultural Belt**

- **Location:** Pont-Sondé, Petite Rivière de l'Artibonite, and L'Estère
- **Details:** Gangs allied with Viv Ansanm (Gran Grif and Koko Rat San Ras) intentionally burned rural educational centers during punitive agrarian raids. In Pont-Sondé, primary schools were targeted alongside residential dwellings during nighttime assaults to force total population displacement and eliminate community anchor structures.

**Destruction and Looting of Medical and Professional Training Centers**

- **Location:** Downtown Port-au-Prince (Adjacent to the State University Hospital - HUEH)

 **Haitian Legal Defense and Education Fund | Human Rights & Security Briefing**

- **Details:** Facilities attached to the Faculty of Medicine and Pharmacy (FMP), the National Higher Institute for the Training of Midwives (INSFSF), and neighboring nursing schools were repeatedly ransacked, looted of diagnostic computers, and subjected to arson. These attacks directly halted specialized education for thousands of future doctors, nurses, and midwives.

## 17. Strategic Motives Behind Attacks on Educational Infrastructure

A systematic review of gang operational patterns reveals that the targeting of schools and universities is not collateral damage, but a deliberate, strategic tactic employed by armed coalitions to achieve three primary objectives:

- **Denial of State Footprints & Tactical Advantage:** Concrete, multi-story educational facilities represent the sturdiest civil structures in many communes. Armed groups systematically burn these facilities to prevent the Haitian National Police (PNH) or international security forces from utilizing them as Forward Operating Bases (FOBs) or tactical observation points.
- **Forced Community Displacement:** Schools serve as the social and structural anchor of neighborhood stability. Destroying educational institutions signals to families that long-term survival in the area is impossible, deliberately triggering mass neighborhood abandonment and territorial clearance.
- **Child Recruitment & Exploitation:** With schools closed nationwide and hundreds of thousands of children driven out of classrooms, youth are left acutely vulnerable to coercive recruitment. UN humanitarian reporting indicates that child recruitment into armed gangs surged by 70%, with minors now making up between 30% to 50% of active gang personnel[22].

### Legal Framework & Evidentiary Significance

The deliberate destruction of educational infrastructure violates the Safe Schools Declaration and constitutes a grave breach of International Humanitarian Law regarding the protection of civilian objects. Denying an entire generation access to education, culture, and professional training represents a deliberate effort to destroy the social capital and future self-governance capacity of the Haitian nation.

# SECTION IX: ECONOMIC DISRUPTION, FREEDOM OF MOVEMENT, AND PUBLIC NARRATIVE CONCERNS

### 18. Systematic Restriction of Civilian Movement, Highway Choke Points, and Economic Siege

- **Status / Timeline:** Ongoing
- **Geographic Scope:** National Highways (Route Nationale 1, 2, and 3), Maritime Corridors, and Inter-Departmental Transit Nodes
- **Reporting Agencies / Sources:** UN Office on Drugs and Crime (UNODC), Famine Early Warning Systems Network (FEWS NET), Mercy Corps, UN Human Rights Office (OHCHR)

### Overview

Armed gang coalitions have converted Haiti's primary overland transit corridors into weaponized financial and operational bottlenecks. By establishing fortified choke points, illegal toll plazas, and physical barricades along strategic national highways, armed groups exercise predatory control over the movement of civilians, commercial freight, agricultural produce, and humanitarian relief. This systematic interdiction functions as an economic blockade, isolating

entire geographical departments, driving hyperinflation, and stripping millions of civilians of their fundamental right to freedom of movement and access to basic livelihoods.

### Detailed Breakdown of Transit Siege Dynamics (Route Nationale 1, 2, and 3)

### Extortion Framework & Illegal Toll Plazas

- **Systematized Highway Tariffs:** Armed networks operating along RN1 (connecting Port-au-Prince to the North and Artibonite), RN2 (connecting the capital to the Southern Peninsula), and RN3 (connecting to the Centre Department) maintain permanent illegal toll checkpoints. Commercial truckers, public transit operators (*tap-taps*), and private motorists are forced to pay exorbitant illegal transit fees (ranging from 500 to over 100,000 Gourdes per vehicle, depending on cargo value) simply to traverse municipal boundaries.
- **Cargo Hijacking & Physical Violence:** Failure or inability to pay gang-imposed tariffs results in immediate summary execution, vehicle arson, cargo confiscation, or kidnapping for ransom. Drivers transporting bulk agricultural yields, fuel, or imported food staples are routinely targeted.

### Strangulation of Maritime Corridors and Port Infrastructure

- **Coastal Piracy & Terminal Interdiction:** Beyond overland highways, gang coalitions have expanded operational control into critical maritime routes and coastal waters off Port-au-Prince and the Artibonite coast. Armed groups utilize motorized speedboats to extort commercial shipping, hijack cargo barges, and disrupt operations at main maritime terminals, severely impairing the import-dependent national economy.

### Supply Chain Collapse & Artificial Price Inflation

- **Market Isolation & Food Spoilage:** Perishable crops produced in rural agricultural basins (such as the Artibonite and Grand'Anse) rot at highway checkpoints due to prolonged blockades or unpayable extortion demands. This creates severe artificial scarcities in metropolitan consumer markets while bankrupting rural farming families.
- **Weaponized Inflation:** FEWS NET and Mercy Corps reporting confirms that transaction costs imposed by illegal toll plazas have driven local food prices, specifically maize, rice, and cooking oil, upward by 100% to 300% across urban centers, directly fueling acute hunger for over 5.8 million people[23].

### Human Rights Impact on Essential Access

- **Denial of Freedom of Movement:** The total insecurity along national arteries prevents civilians from safely traveling to places of employment, educational institutions, regional healthcare facilities, and local markets.
- **Isolation of Emergency Medical Transit:** Ambulances and medical supply convoys face routine interception, extortion, or outright refusal of passage at gang checkpoints, directly leading to preventable casualties among patients attempting to reach functioning emergency medical centers.

### Legal & Evidentiary Significance

Under International Human Rights Law (including Article 12 of the International Covenant on Civil and Political Rights), the right to freedom of movement is fundamental to the realization of all other human rights, including the rights to work, health, food, and education. The systematic, violent restriction of national highways by armed coalitions constitutes a form of collective punishment and economic siege against the civilian population. When executed deliberately to extort communities, starve urban enclaves, and enforce territorial dominance, these actions represent severe breaches of

18

international humanitarian standards and constitute evidence of Crimes Against Humanity through the intentional deprivation of essential conditions of life.

# SECTION X: ACCOUNTABILITY, INSTITUTIONAL EROSION, AND IMPUNITY CONCERNS

**19. Unequal Accountability, Public Rehabilitation, and Elite Indictments**

- **Status / Timeline:** Ongoing (2025–2026 Proceedings)
- **Geographic Scope:** National / Metropolitan Port-au-Prince

**Overview**

As civilian populations face catastrophic displacement and physical insecurity, public concern has intensified regarding the unequal application of justice and the public posture of politically connected figures. While ordinary citizens suffer from total state abandonment, high-profile figures long accused of fueling Haiti's security collapse have continued to receive public visibility, political platforming, or delayed judicial scrutiny, highlighting deep structural flaws in domestic oversight.

**Key Individuals & Institutional Cases**

**Magalie Habitant, Prophane Victor, and Elionor Devallon (Co-Defendants)**

- **Magalie Habitant:** Former Director General of the National Solid Waste Management Service (Service National de Gestion des Résidus Solides - SNGRS). Habitant engaged in high-visibility, privately backed public cleanup operations across gang-controlled sectors of Port-au-Prince, operating with informal state equipment and raising severe questions regarding selective protection[24]. Despite long-standing allegations of serving as an intermediary between political actors and armed coalitions, regardless of the ultimate disposition of the charges, the procedural history of Ms. Habitant's case has contributed to a widespread perception that influence and prominence continue to shape the administration of justice in Haiti. The repeated consideration of humanitarian release, despite allegations involving illicit association and support for armed groups, has fueled concerns that accountability is applied unevenly depending on who stands before the court.
- **Prophane Victor:** Former Member of Parliament (Deputy for Petite-Rivière-de-l'Artibonite). Designated under international sanctions and cited by international investigators for arming and establishing criminal networks, specifically founding the Gran Grif gang in the Artibonite valley to secure local political control[25].
- **Elionor Devallon:** Former Director General of the Social Assistance Fund (Caisse d'Assistance Sociale - CAS). Accused of diverting social safety-net funds and state resources to support armed criminal factions.
- **Judicial Context:** Following their arrests in early 2025 on charges of criminal association, financing terrorism, and complicity with armed groups, the Port-au-Prince Court of Appeal confirmed their referral to the criminal court (tribunal criminel). However, the protracted nature of these proceedings, paired with their prior unhindered public operations, underscores the systemic reluctance of the state apparatus to confront political-criminal nexus networks until forced by international pressure or total institutional collapse.

**The Return and Rehabilitation of Michel Joseph Martelly**



**Haitian Legal Defense and Education Fund | Human Rights & Security Briefing**

- **Political Visibility vs. Judicial Accountability:** The public return of former President Michel Joseph Martelly, primarily framed around providing testimony in the ongoing investigation into the assassination of President Jovenel Moïse, generated intense public frustration.
- **Perception of Impunity:** Despite being formally sanctioned by international jurisdictions for using his influence to participate in drug trafficking and sponsor armed gang coalitions, Martelly's public appearance without immediate domestic judicial restraint reinforced widespread public perceptions that elite political connections insulate high-level actors from true accountability[26].

## 20. Systemic Weakening of Anti-Corruption and Oversight Institutions

- **Status / Timeline:** Ongoing
- **Geographic Scope:** National Governance Apparatus

### Overview & Institutional Dismantling

At a time when state transparency is vital to prevent the diversion of humanitarian aid and security resources, critical oversight mechanisms have faced systematic political interference, budget starvation, and leadership destabilization.

- **Dismissal of Anti-Corruption Leadership (ULCC):** The abrupt dismissal of Hans Jacques Ludwig Joseph, former Director General of Haiti's Anti-Corruption Unit (Unité de Lutte Contre la Corruption - ULCC), severely undermined one of the few functional domestic agencies actively investigating high-level embezzlement, illicit arms financing, and state corruption[27].
- **Chilling Effect on Oversight:** Decapitating anti-corruption agencies during an active national emergency signals to public officials and financial regulators that investigating political elites carries severe career and personal safety risks, effectively cementing systemic impunity across the state governance structure.

# SECTION XI: DESTRUCTION OF NATIONAL CULTURAL HERITAGE AND HISTORICAL LANDMARKS

## 21. Targeted Erasure of Physical, Historical, and Cultural Spaces

- **Status / Timeline:** Ongoing (2025–2026 Eradication)
- **Geographic Scope:** Metropolitan Port-au-Prince, Pacot Gingerbread District, and Kenscoff Hills

### Overview

Beyond physical violence against persons, armed coalitions have systematically targeted, looted, and burned irreplaceable cultural, architectural, and historical landmarks. This destruction represents a deliberate assault on Haitian national identity, cultural heritage, and collective memory.

### Documented Cultural Losses

### The Complete Destruction of the Grand Hôtel Oloffson

- **Historical & Architectural Weight:** Built in the late 19th century as a private residence for the Sam family, the Grand Hôtel Oloffson was an iconic 19th-century "gingerbread" masterpiece defined by intricate wooden fretwork



**Haitian Legal Defense and Education Fund | Human Rights & Security Briefing**

and deep verandas. It served as a U.S. Marine hospital during the occupation before opening as a hotel in 1935, gaining global literary fame in Graham Greene's 1966 novel *The Comedians*.

- **Cultural Engine:** Leased in 1987 by Haitian-American musician Richard A. Morse, the Oloffson became the beating heart of the *mizik rasin* (roots music) movement through the band RAM, serving as a vital haven for artists, journalists, and international observers across decades of crisis.
- **Arson & Annihilation:** In July 2025, amidst expanding gang incursions into Carrefour-Feuilles, the abandoned landmark was set ablaze during armed clashes, burning the historic structure to the ground and destroying over a century of physical national heritage.

**Arson of the Historic Cordasco House (Villa Miramar)**

- **Date / Location:** Late 2025 / Early 2026 | Pacot, Port-au-Prince
- **Details:** Armed units belonging to the Viv Ansanm coalition torched Villa Miramar (Cordasco House), a century-old gingerbread landmark constructed circa 1914. Renowned for its architectural resilience during the 2010 earthquake, the building was completely gutted, erasing a vital physical component of Port-au-Prince's historical district.

**Attack on Wynn Farm and Direct Threats to Camp Zoï**

- **Date / Location:** Night of October 11–12, 2025 | Kenscoff / Pétion-Ville Hills
- **Details:** Gang factions executing offensive pushes into the Pétion-Ville hills set fire to the historic Wynn Farm property, a critical ecological and educational reserve, and issued direct threats against nearby Camp Zoï, terrorizing local hill communities and threatening protected environmental reserves.

**Conclusion on Cultural Eradication**

The destruction of these cultural anchors demonstrates that the crisis facing Haiti extends beyond immediate physical harm and economic blockade. By systematically burning historical landmarks, artistic institutions, and community spaces, armed coalitions are actively destroying the physical fabric, collective history, and cultural identity of the nation.

# Section XII: Selective Public Narratives, Perception Management, and the Normalization of Crisis

**Date:** Ongoing

As Haiti continues to experience severe insecurity, public communication surrounding the crisis has increasingly emphasized positive imagery, cultural celebrations, tourism opportunities, isolated examples of normal activity, and symbolic demonstrations of progress.

HLDEF recognizes that Haiti's culture, history, achievements, and natural beauty deserve recognition. Haitians should not be defined solely by the violence inflicted upon them. However, concerns arise when positive narratives are promoted without equal acknowledgment of the conditions experienced by large portions of the civilian population.

For millions of Haitians, daily life continues to be defined by displacement, restricted movement, extortion, insecurity, loss of livelihoods, closure of essential institutions, and fear of armed groups. Communities controlled or threatened by



**Haitian Legal Defense and Education Fund | Human Rights & Security Briefing**

armed organizations cannot experience "normalcy" simply because certain events occur, certain businesses reopen temporarily, or isolated areas remain functional.

The promotion of tourism, investment, cultural events, and images of recovery without corresponding evidence of restored civilian security raises concerns regarding whether public messaging is accurately reflecting conditions on the ground or contributing to the normalization of an ongoing humanitarian and security crisis.

A country cannot be considered secure while

- armed groups continue controlling territory and imposing illegal roadblocks;
- civilians remain unable to move freely without fear of attack or extortion;
- families continue being displaced from their homes;
- hospitals, schools, and public institutions remain disrupted;
- communities must rely on informal protection structures because state protection remains insufficient.

Public communication has an important role during a national crisis. However, messaging that emphasizes optimism without measurable improvements in civilian protection risks minimizing the severity of the crisis and diverting attention from the urgent need for accountability, security restoration, and protection of Haiti's civilian population.

The issue is not whether Haiti's successes should be celebrated. They should.

The issue is whether celebration is being used as a substitute for confronting the conditions that continue to place millions of Haitians at risk.

# SECTION XIII: CLOSING OBSERVATIONS

Community members in Mirebalais have reportedly agreed to dismantle local self-defense brigades following negotiations involving public officials and armed groups. Meanwhile, the armed groups have made no corresponding commitment to disarm, surrender their weapons, permanently withdraw from the area, or cease exercising authority over the civilian population. Public reporting indicates only that some gang members may relocate further into the surrounding areas, leaving residents with no meaningful assurance that the conditions, which forced them to organize for their own protection, have actually changed.

At the same time, reports continue to emerge of armed groups elsewhere imposing taxes, fees, and other financial burdens upon civilians living under their control. In neighborhoods such as Carrefour, residents reportedly face compulsory payments simply to remain in their homes, including levies imposed on homeowners, renters, and even fees associated with the renumbering of streets. These demands further illustrate the extent to which armed organizations continue to exercise governmental functions over civilian populations while those same populations struggle simply to survive.

These developments raise a fundamental question.

Why are civilians being asked to relinquish the only means of protection available to them while the armed groups responsible for years of killings, extortion, kidnappings, forced displacement and territorial control remain fully armed and under no comparable obligation?

The people of Mirebalais did not choose violence. They did not initiate this crisis. They did not declare war on anyone. Armed criminal organizations brought violence into their communities, forcing ordinary citizens to organize for their own survival after the state proved unable to protect them.

Disarming civilians while allowing armed groups to retain their weapons, maintain territorial influence, and continue dictating the conditions under which people may return to their homes does not restore public order. It merely transfers the burden of security onto the very population that has suffered the greatest harm.

For years, the international community has invested substantial financial and operational resources into restoring security in Haiti, including support for the Kenya-led Multinational Security Support (MSS) mission and additional internationally financed security initiatives, such as the current Gang Suppression Force. Yet measurable improvements in civilian protection remain elusive. The continued expansion of gang authority despite these investments underscores the urgent need for objective benchmarks by which progress can be measured, not through symbolic announcements or temporary political agreements, but through demonstrable improvements in the daily lives of Haitian civilians.

Security cannot be measured by ceremonies, declarations, or symbolic gestures.

It must be measured by whether ordinary Haitians can return safely to their homes, travel freely without extortion or fear, educate their children, access healthcare, rebuild their livelihoods, and live without the constant threat of organized violence.

Until those conditions exist, HLDEF maintains that Haiti's crisis should be understood not as a managed security challenge, but as an ongoing humanitarian catastrophe involving conduct consistent with genocide, crimes against humanity, and other grave violations of international law.

# MASTER FOOTNOTE KEY

1. Réseau National de Défense des Droits Humains (RNDDH), "Security Incident Summary: Targeted Attacks in Ouest Department," Communiqué No. 06/2026, Port-au-Prince, June 2026.

2. RNDDH, "Targeting of Security Personnel and Auxiliary Operators in the Artibonite Sector," Press Release, July 2026.

3. UN Office of the High Commissioner for Human Rights (OHCHR) & BINUH Human Rights Service, "Quarterly Report on Violence and Protection Risks Facing Local Vigilance Committees in Haiti," Port-au-Prince, Q2 2026.

4. UN International Organization for Migration (IOM), "Displacement Tracking Matrix (DTM) – Haiti Mobility Tracking Round 16," IOM Haiti, June 2026.

5. IOM Haiti, "Emergency Tracking Tool (ETT) – Report 100 & Update 100.1: Displacements Following Armed Clashes in the Municipality of Kenscoff (West Department)," July 7–10, 2026.

6. Ibid., ETT 100.1 Data Breakdown, p. 2.

7. UN Office for the Coordination of Humanitarian Affairs (OCHA), "Haiti Humanitarian Situation Report No. 52," OCHA Haiti, July 2026; UNICEF Haiti, "Humanitarian Action for Children Appeal Update," 2026.

8. Pan American Health Organization / World Health Organization (PAHO/WHO), "Epidemiological Update: Cholera and Waterborne Diseases in Vulnerable Settlements in Port-au-Prince," June 2026.



**Haitian Legal Defense and Education Fund | Human Rights & Security Briefing**

9. UNICEF & UNESCO Joint Statement, "The Impact of Violence on Educational Infrastructure in Haiti: Over 1,000 Schools Paralyzed," Port-au-Prince, May 2026.

10. Food and Agriculture Organization (FAO) & World Food Programme (WFP), "Hunger Hotspots: FAO/WFP Early Warnings on Acute Food Insecurity," Rome, June 2026.

11. Integrated Food Security Phase Classification (IPC), "Haiti: Acute Food Insecurity Analysis (March–June 2026 Projections)," IPC Global Support Unit, 2026.

12. UN Security Council Sanctions Committee Established Pursuant to Resolution 2653 (2022), "Final Report of the Panel of Experts on Haiti," New York, 2026.

13. International Crisis Group (ICG), "Haiti's Security Crisis: Assessing Tactical Incursions and Territorial Retention Challenges," Latin America & Caribbean Report No. 104, 2026.

14. UN Security Council Panel of Experts on Haiti: Final Report pursuant to Resolution 2653 (2022), UN Doc. S/2024/700 (detailing the organizational structure of Viv Ansanm and criminal coalition strategy to extract political leverage through armed territorial expansion).

15. National Network for the Defense of Human Rights (RNDDH): Position Paper on Impunity, Gang Expansion, and the Limits of Political Dialogue in Haiti, Port-au-Prince, 2025 (arguing that political framing prioritizing gang negotiation over criminal prosecution violates victim protections under domestic law and the Inter-American Human Rights System).

16. UN Integrated Office in Haiti (BINUH): Quarterly Report on the Human Rights Situation in Haiti (July – September 2025), Port-au-Prince, September 2025 (documenting systemic failure of judicial institutions, closure of courthouses, and persistent impunity of sanctioned gang leaders).

17. U.S. Department of the Treasury / Global Magnitsky Designations: Sanctions on Haitian Political and Economic Actors Facilitating Armed Gang Operations, Washington D.C., 2024–2025; see also UN Security Council Sanctions Committee: Sanctions List Materials on Haitian Gang Leaders and Elite Sponsors, 2024.

18. UN Food and Agriculture Organization (FAO) & World Food Programme (WFP): Hunger Hotspots: FAO-WFP Early Warnings on Acute Food Insecurity, Rome, 2025–2026; see also FEWS NET: Haiti Food Security Outlook: Agrarian Disruption and High Inflation in the Artibonite Valley, 2025.

19. Associated Press / Radio Caraïbes Reporting: Official statement by Local Government Representative Joseph Louis Baptiste on the Labodrie Coastal Massacre, September 12, 2025; see also BINUH Human Rights Division Report: Massacre and Village Arson in Labodrie, Commune of Arcahaie, September 2025.

20. Armed Conflict Location & Event Data Project (ACLED): Pont-Sondé Massacre Marks a Surge in Gran Grif's Deadly Campaign in Artibonite, Special Incident Brief, October 2024; see also RNDDH: Report on the Mass Atrocities Committed by Gran Grif in Pont-Sondé, October 2024.



**Haitian Legal Defense and Education Fund | Human Rights & Security Briefing**

21. Partners In Health (PIH) / Zanmi Lasante: Official Statement on the Forced Suspension of Operations at Hôpital Universitaire de Mirebalais (HUM), Mirebalais / Boston, April 2025; see also UN OCHA: Flash Update on Healthcare Infrastructure Closures across Central Haiti, April 2025.

22. UN Children's Fund (UNICEF): Press Release: Child Recruitment Surges in Haiti as Gang Violence Forces Hundreds of Schools to Close, New York / Port-au-Prince, 2025.

23. UN Office on Drugs and Crime (UNODC): Criminal Markets, Transit Corridors, and Extortion Dynamics in Haiti, Vienna, 2025; see also Mercy Corps: Economic Impact Assessment: Highway Blockades, Toll Plazas, and Food Insecurity in Metropolitan Port-au-Prince, 2025.

24. RNDDH Judicial Report on Political-Criminal Networks (2025).

25. UN Security Council Sanctions Committee Report (2024–2025).

26. U.S. Department of the Treasury / Global Magnitsky Sanctions Brief (2024).

27. ULCC Official Communiqué & Press Reports (2025).