UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FRITZ EMMANUEL LESLY MIOT, et al.,

Plaintiff,

v.

DONALD J. TRUMP, President of the United States, et al.,

Defendants.

Civil Action No. 25-2471 (ACR)

**DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS AND MEMORANDUM OF LAW IN SUPPORT THEREOF**

# TABLE OF CONTENTS


Introduction ........ 1

Background ........ 1

I. Factual History ........ 1

II. Procedural History ........ 3

Legal Standard ........ 5

I. Rule 12(h)(3) ........ 5

II. Rule 12(c) ........ 5

ARGUMENT ........ 5

I. The Court Should Grant Judgment in Defendants' Favor on Count I. ........ 5

II. Defendants are Entitled to Judgment on Count II. ........ 9

A. A Deferential Standard of Review Applies. ........ 9

1. The "Facially Legitimate and Bona Fide" Standard is Proper. ........ 10

2. At Most, the Rational Basis Standard Applies. ........ 13

B. The Secretary's Termination Decision Passes Constitutional Muster. ........ 15

Conclusion ........ 19

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Agyeman v. Bondi*,
804 F. Supp. 3d 132 (D.D.C. 2025) .......... 6

*Anthropic PBC v. Dep't of War*,
--- F.4th ---, 2026 WL 2881404 (D.C. Cir. Sept. 25, 2026) .......... 16

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 16, 19

*Banker v. Averill*,
Civ. A. No. 22-1445 (DLF), 2025 WL 2192983 (D.D.C. Aug. 1, 2025) .......... 16

*Doc Soc'y v. Blinken*,
Civ. A. No. 19-3632 (TJK), 2023 WL 5174304 (D.D.C. Aug. 11, 2023) .......... 13

*Doc Soc'y v. Rubio*,
141 F.4th 1273 (D.C. Cir. 2025) .......... 13

*Egbert v. Boule*,
596 U.S. 482 (2022) .......... 7

*Ellsberg v. Mitchell*,
807 F.2d 204 (D.C. Cir.1986) .......... 19

*Fiallo v. Bell*,
430 U.S. 787 (1977) .......... 10, 13, 14

*Freeman v. Giuliani*,
732 F. Supp. 3d 30 (D.D.C. 2024) .......... 17

*Hampton v. Mow Sun Wong*,
426 U.S. 88 (1976) .......... 10

*Harisiades v. Shaughnessy*,
342 U.S. 580 (1952) .......... 14

*Ho v. Garland*,
106 F.4th 47 (D.C. Cir. 2024) .......... 17

*Kerry v. Din*,
576 U.S. 86, 135 S. Ct. 2128 (2015) .......... 11

*Khalil v. President, United States*,
164 F.4th 259 (3d Cir. 2026) ........................................................................................ 9

*Kleindienst v. Mandel*,
408 U.S. 753 (1972)........................................................................................... 10, 11

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)................................................................................................ 5

*Lykins v. Ass. Att'y Gen. Rose*,
608 F. Supp. 693 (D.D.C. 1984) ............................................................................ 18

*Mahdawi v. Trump*,
183 F.4th 103 (2d Cir. 2026) ........................................................................................ 9

*Marine Eng'rs Beneficial Ass'n v. Liberty Mar. Corp.*,
933 F.3d 751 (D.C. Cir. 2019) ...................................................................................... 5

*Mathews v. Diaz*,
426 U.S. 67 (1976)............................................................................................. 10, 14

*McNary v. Haitian Refugee Ctr., Inc.*,
498 U.S. 479 (1991).................................................................................................. 8

*Miller v. Christopher*,
96 F.3d 1467 (D.C. Cir. 1996) ................................................................................... 12

*Miot v. Trump*,
No. 26-5050, 2026 WL 659420 (D.C. Cir. Mar. 6, 2026) ............................................. 4

*Mullin v. Doe*,
146 S. Ct. 2121 (2026)........................................................................................ passim

*Mwani v. bin Laden*,
417 F.3d 1 (D.C. Cir. 2005) .......................................................................................... 5

*Narenji v. Civiletti*,
617 F.2d 745 (D.C. Cir. 1979) ............................................................................. 11, 14

*Patel v. Garland*,
596 U.S. 328 (2022)............................................................................................... 6, 7

*Patel v. Rubio*,
Civ. A. No. 26-1349 (DLF), 2026 WL 2517560 (D.D.C. Aug. 26, 2026) ................................ 7

*Ramos v. Wolf*,
975 F.3d 872 (9th Cir. 2020) .................................................................................. 17, 18

*Sanchez v. Mayorkas*,
593 U.S. 409 (2021) ................................................................................................ 12

*Sheldon v. Sill*,
49 U.S. (8 How.) 441 (1850) ......................................................................................... 7

*Sherley v. Sebelius*,
686 F.3d 776 (D.C. Cir. 2012) ..................................................................................... 18

*Tate v. Nat'l Postal Mail Handlers Union Local 305*,
Civ. A. No. 16-2021 (DLF), 2018 WL 2538445 (D.D.C. Apr. 12, 2018) ................................ 5

*Trump v. Hawaii*,
585 U.S. 667 (2018) ........................................................................................... passim

*Uru v. Rubio*,
Civ. A. No. 25-2524 (PLF), 2026 WL 523153 (D.D.C. Feb. 25, 2026) ................................... 7

*Vill. of Arlington Heights v. Metro Hous. Dev. Corp.*,
429 U.S. 252 (1977) ............................................................................................ 9, 16

*Webster v. Doe*,
486 U.S. 592 (1988) .................................................................................................. 6

*Wilkinson v. Garland*,
601 U.S. 209 (2024) .................................................................................................. 8

*Wye Oak Tech., Inc. v. Republic of Iran*,
24 F.4th 686 (D.C. Cir. 2024) ................................................................................ 6, 17

**Statutes**

5 U.S.C. § 705 ........................................................................................................ 1

8 U.S.C. § 1252(b)(9) .................................................................................................. 8

8 U.S.C. § 1254a(a)(1) ............................................................................................... 14

8 U.S.C. § 1254a(b) ................................................................................................... 14

8 U.S.C. § 1254a(b)(5)(A) ............................................................................................ 6

8 U.S.C. § 1254a(b)(1)(C) ............................................................................................ 1

28 U.S.C. § 2347(b) ........ 9

**Rules**

Fed. R. Civ. P. 12(c) ........ 5

Fed. R. Civ. P. 12(h)(3) ........ 1

**Other Sources**

75 Fed. Reg. 3476 (Jan. 21, 2010) ........ 2

86 Fed. Reg. 41863 (Aug. 3, 2021) ........ 2

88 Fed. Reg. 5022 (Jan. 26, 2023) ........ 2

89 Fed. Reg. 54484 (July 1, 2024) ........ 2

90 Fed. Reg. 10511 (Feb. 24, 2025) ........ 2

90 Fed. Reg. 28760 (July 1, 2025) ........ 3

90 Fed. Reg. 54733 (Nov. 29, 2025) ........ 2, 3

Defendants President Donald Trump, Secretary Markwayne Mullin ("the Secretary"), and the Department of Homeland Security (collectively "Defendants") respectfully move this Court to dismiss for lack of jurisdiction, *see* Fed. R. Civ. P. 12(h)(3), and for judgment on the pleadings, *see id*. 12(c).

## INTRODUCTION

Plaintiffs challenge the Secretary's decision to terminate Haiti's designation under the Temporary Protected Status ("TPS") statute. Defendants seek judgment on all counts raised in this action because Congress spoke clearly: courts may not review these claims. The Supreme Court agreed and reversed this Court's decision to grant relief under 5 U.S.C. § 705, holding that the TPS statute barred judicial review of Plaintiffs' claims under the Administrative Procedure Act. Though it left open the question as to whether the judicial-review bar covers Plaintiffs' constitutional claims, the Supreme Court nevertheless reversed this Court's § 705 order, holding that Plaintiffs' equal protection theory fails on the record before it. The record has not changed, and the Court here now benefits from Supreme Court precedent and the law-of-the-case doctrine. It should grant judgment in Defendants' favor and end this litigation.

## BACKGROUND

### I. Factual History

This Court is by now familiar with this case's general background. As relevant here, the Secretary of Homeland Security is authorized to designate a foreign country for TPS if the Secretary finds that "there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the [Secretary] finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States." 8 U.S.C. § 1254a(b)(1)(C). Initial designations are discretionary and must be periodically reviewed to determine whether the conditions underlying

the designation continue to be met. *Id.* § 1254a(b)(2), (b)(3)(A). The Secretary must "consult[] with appropriate agencies," and, if he determines that a designation is no longer justified, must "terminate the designation by publishing notice in the Federal Register of th[at] determination," including "the basis for the determination." *Id.* § 1254a(b)(3)(A), (B).

Haiti was most recently designated for TPS in 2021 because of "extraordinary and temporary conditions" following a presidential assassination and based on "deteriorating political crisis, violence, and a staggering increase in human rights abuses."[1] Designation of Haiti for TPS, 86 Fed. Reg. 41863, 41864 (Aug. 3, 2021). In 2023, then-Secretary Mayorkas extended and "redesignated" Haiti for TPS. Extension and Redesignation of Haiti for TPS, 88 Fed. Reg. 5022 (Jan. 26, 2023). In 2024, he again "redesignated" Haiti for TPS and extended the designation for eighteen months until February 3, 2026. Extension and Redesignation of Haiti for TPS, 89 Fed. Reg. 54484 (July 1, 2024) ("2024 Extension").

On February 24, 2025, former Secretary Kristi Noem partially vacated the 2024 Extension, shortening Haiti's TPS designation from eighteen months to twelve months, to end on August 3, 2025. Partial Vacatur of 2024 TPS Decision for Haiti, 90 Fed. Reg. 10511 (Feb. 24, 2025). Secretary Noem cited several reasons for doing so, including that there was no discussion in the July 1, 2024 Federal Register Notice of why the eighteen-month period was selected in lieu of a

---

[1] Haiti was initially designated for TPS on January 21, 2010, based on a determination that there were extraordinary and temporary conditions stemming from a major earthquake that prevented nationals of Haiti from returning in safety and that permitting such aliens to remain temporarily in the United States would not be contrary to the national interest of the United States. Designation of Haiti for Temporary Protected Status. 75 Fed. Reg. 3476 (Jan. 21, 2010). Haiti's TPS designation was extended numerous times over the following decade. Former Acting Secretary Elaine Duke terminated the TPS designation effective July 22, 2019, but various court injunctions required DHS to continue TPS for Haitians pending a final court order. *See generally* Termination of the Designation of Haiti for Temporary Protected Status, 90 Fed. Reg. 54733, 54734 (Nov. 28, 2025).

six- or twelve-month period, or why permitting the ever-increasing population of Haitian TPS recipients, particularly those who entered the country unlawfully, to remain temporarily in the United States was not contrary to the U.S. national interest. *See id*. at 10513. On July 1, 2025, she announced the termination of Haiti's TPS designation, effective September 2, 2025, that "permitting Haitian nationals to remain temporarily . . . is contrary to the national interest of the United States." Termination of the Designation of Haiti for TPS, 90 Fed. Reg. 28760, 28762-64 (July 1, 2025).

On November 28, 2025, Secretary Noem published a new notice in the Federal Register, announcing that Haiti's TPS designation would be terminated. Termination of the Designation of Haiti for [TPS], 90 Fed. Reg. 54733 (Nov. 28, 2025). The Secretary reviewed: (1) "whether extraordinary and temporary conditions in Haiti [] prevent[ed] aliens who are Haitian nationals from returning to Haiti in safety continued to exist"; and (2) "if permitting Haitian nationals to remain temporarily in the United States was contrary to the national interest of the United States." *Id*. at 54735. The Secretary found in the negative on the first inquiry, *id*., and in the affirmative on the second. *Id*. at 54738. In reaching both answers, the Secretary set forth extensive reasoning and analysis, reflecting the weighing of various considerations. *See id*. at 54735-38. The Secretary informed the public that Haiti's TPS designation was set to end on February 3, 2026, at 11:59 pm. *Id*. at 54739.

## II. Procedural History

Plaintiffs filed a class action complaint on July 30, 2025, challenging the Secretary's determination to terminate TPS for Haiti, alleging that it violated the Administrative Procedure Act ("APA") and the Fifth Amendment of the United States Constitution. *See generally* Compl. (ECF No. 1). Following then-Secretary Noem's new termination notice, Plaintiffs filed an amended complaint and then a second amended complaint while the parties were in the middle of

briefing Plaintiffs' motion for emergency relief under § 705 and Defendants' motion to dismiss. *See* Am. Compl. (ECF No. 74), 2d Am. Compl. (ECF No. 90). The second amended complaint is the operative pleading governing these proceedings.

Plaintiffs are five Haitian nationals and were former TPS beneficiaries at the time that this proceeding began. *See* 2d Am. Compl. ¶¶ 1-5. They originally brought this action as a putative class action and moved for class certification but have since informed the Court of their intention to withdraw their class certification motion. *See* 2d Am. Compl. ¶ 6, Pls' Mot. for Class Cert. (ECF No. 67), Ex. A (attached email). Plaintiffs raise numerous theories under which the new termination notice violates the APA in multiple ways. *See* 2d Am. Compl. ¶¶ 280-81. They allege that the Secretary's termination determination violated the Fifth Amendment's equal protection guarantee because the decision allegedly was motivated by discriminatory animus. *See id.* ¶ 284. Plaintiffs request two separate declarations from the Court. They ask that this Court first declare the termination decision violates the APA and the Fifth Amendment's equal protection guarantee. *See id.* Prayer for Relief, ¶ b. Second, Plaintiffs request that the Court set aside the Secretary's termination decision. *Id.* ¶ c.

The Court previously granted Plaintiffs' emergency motion for relief under § 705 and stayed the termination decision. *See* Op. (ECF No. 124); Order (ECF No. 123). Defendants appealed immediately and requested that this Court stay its order. *See* Defs' Mot. for Stay (ECF No. 126). The Court denied that request, as did the D.C. Circuit. *See* Order on Stay (ECF No. 135); *Miot v. Trump*, No. 26-5050, 2026 WL 659420 (D.C. Cir. Mar. 6, 2026). But the Supreme Court granted certiorari and heard the case on an expedited basis.

On June 25, 2026, the Supreme Court held unequivocally that § 1254a(b)(5)(A) bars judicial review of all non-constitutional claims challenging the Secretary's TPS determinations—

including claims of procedural error. *See Mullin v. Doe*, 146 S. Ct. 2121, 2133-2137 (2026). The Supreme Court declined to address whether § 1254a(b)(5)(A) bars constitutional claims, but it nevertheless held that Plaintiffs failed to show that the termination decision "was based on the race of the Haitian people." *Id*. at 2139. The ruling reversed this Court's § 705 order, and the termination decision went into effect. *See id*. at 2140; *see also* Order (ECF No. 144).

## LEGAL STANDARD

### I. Rule 12(h)(3)

Under Rule 12(h)(3), the Court must dismiss suit when jurisdiction is lacking regardless of the stage of litigation. *See Mwani v. bin Laden*, 417 F.3d 1, 11 (D.C. Cir. 2005); *see also Tate v. Nat'l Postal Mail Handlers Union Local 305*, Civ. A. No. 16-2021 (DLF), 2018 WL 2538445, at *2 (D.D.C. Apr. 12, 2018). A plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

### II. Rule 12(c)

This motion asks the Court to dispose of Plaintiffs' claims and grant Defendants judgment as a matter of law. "After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). Judgment on the pleadings is warranted when the movant "demonstrates that no material fact is in dispute and that it is entitled to judgment as a matter of law." *Marine Eng'rs Beneficial Ass'n v. Liberty Mar. Corp.*, 933 F.3d 751, 760. (D.C. Cir. 2019). A "court evaluating the [Rule] 12(c) motion [must] accept as true the allegations in the opponent's pleadings." *Id*. at 761 (citation modified).

## ARGUMENT

### I. The Court Should Grant Judgment in Defendants' Favor on Count I.

Congress spoke emphatically when it declared that "[t]here is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a

designation, of a foreign state" for TPS. 8 U.S.C. § 1254a(b)(5)(A). By foreclosing "judicial review," 8 U.S.C. § 1254a(b)(5)(A) bars all of Plaintiffs' APA and constitutional challenges to termination determinations. *See* H.R. Rep. No. 101-245, at 14 (1989) ("Moreover, none of the [Secretary's] decisions with regard to granting, extending, or terminating TPS will be subject to judicial review."). The Supreme Court agrees at least as it pertains to the APA claims. *See Doe*, 146 S. Ct. at 2133-2137. As regards to the APA claims, Defendants need not show any more given that the decision is now precedent governing this issue nationwide and—if that were not enough—that it is the law of the case. *See Wye Oak Tech., Inc. v. Republic of Iran*, 24 F.4th 686, 697 (D.C. Cir. 2024) ("The law-of-the-case doctrine refers to a family of rules embodying the general concept that a court involved in later phases of a lawsuit should not re-open questions decided ... by that court or a higher one in earlier phases." (citation modified)).

The Supreme Court declined to address whether the TPS statute's judicial-review bar applied to constitutional claims. *See Doe*, 146 S. Ct. at 2137. This Court previously concluded that it does not apply to constitutional claims, relying on *Webster v. Doe*, 486 U.S. 592, 603 (1988). *See* Op. at 19. Defendants respectfully disagree and preserve their contrary argument. *See Doe*, 146 S. Ct. 2140-44 (Thomas, J., concurring).

As Judge Bates recognized just last year, the D.C. Circuit has stated that statutory text and legislative history "must evince congressional intent to preclude review." *Agyeman v. Bondi*, 804 F. Supp. 3d 132, 140 n.7 (D.D.C. 2025). The TPS statute certainly evinces that intent. Starting with the text, Congress prohibited judicial review of "any determination" "with respect to" termination decisions. 8 U.S.C. § 1254a(b)(5)(A). The modifier "any" encompasses determinations "of 'whatever kind.'" *Patel v. Garland*, 596 U.S. 328, 338 (2022). The phrase "with respect to" broadens the statute's effect such that it covers "'not only its subject but also

matters related to that subject.'" *Doe*, 146 S. Ct. at 2133 (quoting *Patel*, 596 U.S. at 339). Plaintiffs' constitutional claim is a "matter related to" the termination because it is a claim that the termination was unlawful because it violated the Fifth Amendment's equal protection guarantee. It is thus a claim "with respect to" the determination to termination of TPS for Haiti as much as Plaintiffs' non-constitutional claims are. *See, e.g.*, *Uru v. Rubio*, Civ. A. No. 25-2524 (PLF), 2026 WL 523153, at *4 (D.D.C. Feb. 25, 2026) (reading the judicial review bar in 8 U.S.C. § 1201(i) to cover constitutional claims); *Patel v. Rubio*, Civ. A. No. 26-1349 (DLF), 2026 WL 2517560, at *2-5 (D.D.C. Aug. 26, 2026) (same).

Next, legislative history. That too makes clear that Congress did not intend federal courts to review termination decisions, whether on non-constitutional or constitutional grounds. *See* H.R. Rep. No. 101-245, at 14 (1989) ("Moreover, none of the [Secretary's] decisions with regard to granting, extending, or terminating TPS will be subject to judicial review."). This specific language reflects Congress's clear intent in limiting Article III jurisdiction. *See* U.S. Const. art. III, § 1, cl. 1 ("The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."); *see also* *Sheldon v. Sill*, 49 U.S. (8 How.) 441, 449 (1850) ("Courts created by statute can have no jurisdiction but such as the statute confers."); *Egbert v. Boule*, 596 U.S. 482, 491 (2022) (recognizing that "Congress," not the courts, has the authority and ability to weigh the pros and cons of remedial schemes, including "economic and governmental concerns," "administrative costs," and the "impact on governmental operations systemwide").

To the extent review of Plaintiffs' constitutional claims is available, it is through a petition for review of the removal order following removal proceedings. Congress explicitly channeled "all questions of law and fact" "arising from any action taken or proceeding brought to remove an

alien from the United States" into a petition for review. 8 U.S.C. § 1252(b)(9). That statute was enacted as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), and its language tracks the Supreme Court's *McNary* decision, in which the statute contained a judicial review provision channeling review "of a determination respecting an application" into the courts of appeal, but it did not refer to a "group of decisions or a practice or procedure employed in making decisions." *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 492 (1991). There, the Supreme Court determined the plaintiffs' constitutional pattern-and-practice claims were not barred from district court review, reasoning in part that Congress "easily could have used broader statutory language" if it had "intended the limited review provisions [at issue] to encompass challenges to [Immigration and Naturalization Service] procedures and practices." *Id*. at 494. The Supreme Court provided two examples of what might constitute language "expansive" enough to remove jurisdiction claims: language channeling (1) "all causes . . . arising under any of the provisions" of the program at issue, or (2) "all questions of law and fact" arising from the program. *Id*. at 494.

Congress listened to the Supreme Court's instructions when it enacted § 1252(b)(9) on how to ensure that the statutory language was clear and sufficient, not only to strip courts of jurisdiction and channel them through the courts of appeal, but also how it intended to address the concerns about permitting district court review due to the concerns that not all aliens would be subject to removal proceedings. Congress's answer was clear – only those who become subject to removal proceedings may obtain review of decisions that ultimately will be the basis of their removal. In the case of terminating TPS, those aliens who either have removal orders or are ultimately ordered removed could obtain some sort of review if need be. *See Wilkinson v. Garland*, 601 U.S. 209, 217-22 (2024) (recognizing that § 1252(a)(2)(D) preserves constitutional claims in a petition for

review). And if there are concerns about the record made before the immigration courts and the Board of Immigration Appeals, circuit courts may use the rare safety valve and send the matter to the appropriate district courts for consideration. *See* 28 U.S.C. § 2347(b); *Khalil v. President, United States*, 164 F.4th 259, 280-81 (3d Cir. 2026) (holding that 28 U.S.C. § 2347(b) permits a court of appeals to develop a record for review); *Mahdawi v. Trump*, 183 F.4th 103, 122-23 (2d Cir. 2026) (same).

Regardless of whether the Court considers § 1254a(b)(5)(A) to be jurisdiction-stripping provision, the outcome is the same: it evinces Congress's intent to foreclose judicial review in federal district courts, including of constitutional claims.

## II. <u>Defendants are Entitled to Judgment on Count II.</u>

Plaintiffs have alleged that discriminatory animus motivated the TPS termination, asserting that it violates the equal protection guarantee of the Fifth Amendment. 2d Am. Compl. ¶¶ 281, 283-84. Even were the Court determined that the jurisdiction-stripping provision did not reach this claim, the Supreme Court has now rejected that the relied-upon allegations give rise to an inference of prohibited discriminatory animus; rather the alleged statements "in substance all expressed policy views" that provide race-neutral justifications. *Doe*, 146 S. Ct. at 2138. Though the applicable standard may be up for debate, the outcome is not: Plaintiffs' constitutional claim should not proceed past this stage, and the Court should grant judgment in favor of Defendants.

### A. A Deferential Standard of Review Applies.

Plaintiffs wrongly presume that their claims must be reviewed under *Vill. of Arlington Heights v. Metro Hous. Dev. Corp.*, 429 U.S. 252 (1977). 2d Am. Compl. ¶¶ 281, 283. Although this Court previously accepted Plaintiffs' theory, *see* Op. at 65-66, the Supreme Court declined to rule on what the proper standard should be. *See Doe*, 146 S. Ct. at 2138. Therefore, Defendants renew their arguments for the purposes of preservation.

Challenges to immigration decisions and policies are subject to a deferential standard of review. *See Trump v. Hawaii*, 585 U.S. 667, 704 (2018) ("'Any rule of constitutional law that would inhibit the flexibility' of the President 'to respond to changing world conditions should be adopted only with the greatest caution,' and [the Court's] inquiry into matters of entry and national security is highly constrained.") (quoting *Mathews v. Diaz*, 426 U.S. 67, 81-82 (1976)).

1. The "Facially Legitimate and Bona Fide" Standard is Proper.

The Court should apply the "facially legitimate and bona fide reason" standard when reviewing the decision to terminate a TPS designation. This standard accounts for the Supreme Court's regular observations that "the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government." *Mathews*, 426 U.S. at 81. The rationale for affording Congress and the Executive significant latitude in this area is two-fold: first, immigration policy "may implicate [the United States'] relations with foreign powers" and second, such policy "must be defined in the light of changing political and economic circumstances." *Id.* Accordingly, decisions about the nation's immigration laws "are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary." *Id.*; *accord Fiallo v. Bell*, 430 U.S. 787, 798 (1977) ("[I]t is clear from our cases . . . that [challenged immigration policies] are policy questions entrusted exclusively to the political branches of our Government, and we have no judicial authority to substitute our political judgment for that of the Congress."); *see also Hampton v. Mow Sun Wong*, 426 U.S. 88, 101 n.21 (1976) ("[T]he power over aliens is of a political character and therefore subject only to narrow judicial review." (citation omitted)).

Given that "plenary congressional power to make policies and rules for exclusions of aliens has long been firmly established," *Kleindienst v. Mandel*, 408 U.S. 753, 769-70 (1972), the Court applies a deferential standard of review in cases challenging Executive actions taken pursuant to

congressionally delegated authority. *Id*. at 769-70. The constitutional right at stake in *Mandel* was a First Amendment right—the right of U.S. citizens to hear from and meet with a Belgian-Marxist academic invited to embark on a U.S. speaking tour whose request for a waiver of ineligibility for a temporary nonimmigrant visa had been denied. *Id*. at 759. Reviewing the plaintiffs' claim, the Court was satisfied that the reason given for the waiver denial was "facially legitimate and bona fide" and ended its inquiry there. *Id*. at 769-70 ("[T]he courts will neither look behind the exercise of [an agency's discretion over immigration law], nor test it by balancing its justification against the First Amendment interests of [the challengers]."). Such limitations on a court's review "ha[ve] particular force in the area of national security, for which Congress has provided specific statutory directions pertaining to visa applications by noncitizens who seek entry to this country." *Kerry v. Din*, 576 U.S. 86, 135 S. Ct. 2128, 2140 (2015) (Kennedy, J., concurring); *see also Narenji v. Civiletti*, 617 F.2d 745, 748 (D.C. Cir. 1979).

The Supreme Court reaffirmed the principle that control over admission of foreign nationals into the United States is vested in the political branches and that a court's "inquiry into matters of entry and national security is highly constrained." *Hawaii*, 585 U.S. at 704, 705 n.5 (rejecting application of a "free-ranging inquiry . . . in the national security and foreign affairs context"). In that case, the plaintiffs brought, among other claims, a First Amendment challenge to a Presidential Proclamation placing restrictions on the ability of nationals of eight foreign countries to enter the United States, based on the Executive's assessment that the targeted countries lacked sufficient information-sharing and identity-management protocols and practices to identify security threats. *Id*. at 673-80. Rejecting the plaintiffs' Establishment Clause claim under the First Amendment, the Court recognized that *Mandel* would be the likely test but declined to confirm that standard at the government's suggestion. *Id*. at 705. The Court instead held that Plaintiffs'

claim failed even assuming that courts may "look behind the face of" Executive action to the extent of applying rational basis review. *Id*. at 704. Under that standard, a court asks whether the challenged action "is plausibly related to the Government's stated objective to protect the country and improve the vetting processes." *Id*. at 704. Such a policy passes constitutional muster, moreover, "so long as it can reasonably be understood to result from a justification independent of unconstitutional grounds." *Id*. at 705.

*Mandel* supplies the appropriate test to apply in this case, as one involving "admission and immigration" and that "overlap[s] with the area of national security." *Hawaii*, 585 U.S. at 704. As the Supreme Court unanimously held, the granting of TPS provides that covered aliens are deemed to be in nonimmigrant status for limited purposes but does not admit aliens into the country. *See Sanchez v. Mayorkas*, 593 U.S. 409, 414 (2021) (discussing § 1254a(f)(4)). Therefore, in reviewing the termination of a TPS designation, this Court is being asked to review questions regarding immigration and whether to permit the continued presence of aliens, many of whom have never been admitted to the United States. That is no different than in *Mandel*, where a person sought admission to the United States.

Indeed, the D.C. Circuit has applied the "facially legitimate and bona fide" test when reviewing an equal protection challenge in the immigration context. *See Miller v. Christopher*, 96 F.3d 1467, 1470-71 (D.C. Cir. 1996) ("We now determine whether there is a facially legitimate and bona fide reason for the statute at issue here."). While Plaintiffs do not raise a facial challenge to the TPS statute, the challenged action is entitled to a deferential standard of review here. To begin, similar to the Executive Order at issue in *Hawaii*, the termination decision is "legitimate[ly] ground[ed] in national security concerns" and foreign affairs dimension. 585 U.S. at 701-707. Indeed, the termination decision is replete with concerns about national security. *See, e.g.*, 90 Fed.

Reg. at 54737 (explaining how recognized terrorist organizations' violence is "widespread" and that the "breakdown in governance directly impacts U.S. national security interests, particular in the context of uncontrolled migration"); *id*. at 54738 (addressing arrests and indictments of aliens linked to the terrorist organizations, who pose tangible threats to national security and public safety). Judicial inquiries into such areas "raise[] concerns for separation of powers" given the overlap with foreign policy and foreign affairs. *Id*. at 704 (citing cases). Additionally, the Secretary relies on multiple executive orders as the basis for terminating Haiti's TPS designation, confirming that the decision is part of an Executive branch-wide effort to strengthen border security and regulate admission of aliens into the country. *See* 90 Fed. Reg. at 54736, 54738. A less deferential standard of review necessarily would constrain a president's ability "to respond to changing world conditions," which is precisely why judicial review is "highly constrained." *Hawaii*, 585 U.S. at 704. *Mandel* review "is categorical," "depend[ing] on the type of 'decision[ ] made by the Congress or the President,' not the identity of the person asserting the right or the severity of the asserted burden. *See Doc Soc'y v. Blinken*, Civ. A. No. 19-3632 (TJK), 2023 WL 5174304, at *19 (D.D.C. Aug. 11, 2023) (quoting *Fiallo*, 430 U.S. at 796), *rev'd in part on other grounds, vacated in part sub nom. Doc Soc'y v. Rubio*, 141 F.4th 1273 (D.C. Cir. 2025).

2. <u>At Most, the Rational Basis Standard Applies.</u>

If the Court deems the "facially legitimate and bona fide reason" standard inapplicable, then it should apply rational basis. *Trump v. Hawaii* prescribes rational-basis review for constitutional challenges to Executive immigration policy: such measures stand so long as they are "plausibly related" to legitimate objectives, in deference to judgments that "implicate relations with foreign powers" and involve "classifications defined in the light of changing political and economic circumstances." 585 U.S. at 702, 704–05. A country-conditions termination is the paradigm of such a judgment, and nationality-based classifications in the immigration laws receive

rational-basis review in any event. *Mathews v. Diaz*, 426 U.S. 67, 79–80 (1976) (applying rational basis review). And applying rational-basis review to such immigration-related distinctions is already the established law in the D.C. Circuit. *See Narenji*, 617 F.2d at 747 (reviewing an equal protection challenge and holding that distinctions that "are not wholly irrational" "must be sustained"). Making categorical distinctions based on nationality is permitted in immigration law, as are many other forms of line-drawing. *See Fiallo*, 430 U.S. at 793 (rejecting an equal protection challenge to a sex-based immigration policy and recognizing a "need for special judicial deference to congressional policy choices in the immigration context").

The Court should reconsider and not apply Plaintiffs' problematic proposed standard under *Arlington Heights*. It runs contrary to the TPS statute itself, which requires "a foreign state" to be designated for TPS. 8 U.S.C. § 1254a(b). Aliens who are nationals of such a foreign state may receive TPS protections. 8 U.S.C. § 1254a(a)(1). Under Plaintiffs' discrimination theory, any person challenging TPS termination would be entitled to the heightened review standard because the termination is necessarily based on national origin. That test would invite courts to second-guess immigration policy in ways that the Supreme Court has repeatedly cautioned against. *See Narenji*, 617 F.2d at 747 (Distinctions on the basis of nationality may be drawn in the immigration field by the Congress or the Executive. So long as such distinctions are not wholly irrational they must be sustained." (citations omitted)). Because the Secretary's termination decision effects conditions of entry into the United States, the Court should apply a deferential standard of review. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 596-97 (1952) (Frankfurter, J., concurring) ("The conditions for entry for every alien . . . have been recognized as matters solely for the responsibility of the Congress and wholly outside the power of this Court to control."); *accord Hawaii*, 585 U.S. at 703 (clarifying that a deferential standard of review applies "across different contexts and

constitutional claims," including to "broad executive action" related to admission and immigration law).

**B. The Secretary's Termination Decision Passes Constitutional Muster.**

Regardless of the test that this Court employs, Defendants are entitled to judgment as a matter of law on Plaintiffs' constitutional claim.

The termination decision is rooted in the Executive Branch's goals related to foreign policy, regulation of immigration, and economic policy. *See, e.g.*, 90 Fed. Reg. at 54735 (recounting Secretary Rubio's statements in support a gang suppression force that will work in close coordination with the Haitian National Police); *id*. at 54736 (providing statistics about Haitian nationals who overstay their authorized periods and remain in the United States in violation of immigration laws); *id*. (pointing to "added strain on local communities by increasing demand for public resources, contributing to housing and healthcare pressures, and competing in an already limited job market). Moreover, the termination decision exudes considerations of national security. *See id*. at 54736 (tying immigration enforcement to risks related to national security); *id*. at 54737 (discussing the concerns that Haiti's lack of government control and how that limits the ability to share criminal information related to recognized terrorist organizations). These considerations are precisely what the Supreme Court listed when applying a deferential standard of review. *See Hawaii*, 585 U.S. at 686 (recognizing that utmost deference to the Executive when weighing matters of international affairs and national security); *id*. at 702 ("relations with foreign powers" and "which involve classifications defined in the light of changing political and economic circumstances"); *id*. at 708 (reiterating that courts "cannot substitute [their] own assessment for the Executive's prejudice judgments" on matters of national security and immigration policy determinations). That was sufficient to uphold the Executive Order in *Hawaii*. It suffices here as well.

Plaintiffs' claims fail even under the higher standard that they invoke. *See* 2d Am. Compl. ¶¶ 281, 283 (citing *Arlington Heights*, 429 U.S. at 265-66). As the Supreme Court held, "whatever one may think of the cited statements, they are insufficient to show that the termination of Haiti's TPS designation was based on the race of the Haitian people." *Doe*, 146 S. Ct. at 2139. As the D.C. Circuit just recently recognized, "[pungent] rhetoric seldom provides a sound basis for judging the lawfulness of federal executive action." *Anthropic PBC v. Dep't of War*, --- F.4th ---, 2026 WL 2881404, at *17 (D.C. Cir. Sept. 25, 2026). That should be the end of this Court's inquiry here.

Again, the Supreme Court was clear: None of the cited statements at issue were "overtly racial, and in substance all expressed policy views that could rest on race-neutral justifications"; the termination of every designation that came up for review—thirteen countries of racially diverse populations—supplied "a strong, race-neutral explanation," and respondents were "unlikely to prove that race was a motivating factor." *Doe*, 146 S. Ct. at 2139. Indeed, even Plaintiffs could not propose a workable theory of their equal protection claim when questioned about it; instead, they sought to dismiss their petition for a writ of certiorari as being improvidently granted. *See id.*; *see also id.* at 2140 n.7. With the benefit of additional evidence that Plaintiffs sought to put before the Supreme Court in support of their dismissal motion, it still nevertheless concluded that "[t]his evidence was cumulative of other evidence in the record[.]" *Id.* at 2140 n.7.

At this juncture, the Court need only follow the Supreme Court's lead regarding the allegations contained in the second amended complaint. The Supreme Court deemed those allegations insufficient to show that they were likely to succeed to on the merits, so they certainly cannot succeed on the merits without more. *See Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009) (requiring that courts choose the "'obvious alternative explanation"); *see also Banker v. Averill*,

Civ. A. No. 22-1445 (DLF), 2025 WL 2192983, at *3 (D.D.C. Aug. 1, 2025) (requiring a plaintiff to dispel "any obviously alternative explanations" when reviewing a motion for judgment on the pleadings (citation modified, quoting *Ho v. Garland*, 106 F.4th 47, 54 (D.C. Cir. 2024)). The Supreme Court "review[ed] all the relevant evidence" and nevertheless concluded that Plaintiffs were "unlikely to prove that race was a motivating factor in the decision to terminate Haiti's TPS designation." *Doe*, 146 S. Ct. at 2140. Plaintiffs continue to rest on the very pleading that was before the Supreme Court, disavowing any intention to seek to amend. Ex. A (emails); *see also* Jt. Status Rep. (ECF No. 146) (reflecting that the government will use Plaintiffs' second amended complaint as the operative complaint). Thus, they have failed to offer anything more than the allegations already deemed inadequate by the Supreme Court, meaning the "obvious alternative explanation" is the Supreme Court's own "strong, race-neutral explanation of the[] [alleged] statements: the president administrations general stance on immigration and its obvious antipathy toward past administrations' TPS policies." *Id*. Meaning, the Supreme Court's decision "resolv[ed] the same question" that this Court must now revisit, and therefore, it is the very much the "same issue" that this Court is being asked to consider. *See Freeman v. Giuliani*, 732 F. Supp. 3d 30, 45 (D.D.C. 2024) (citation modified); *Wye Oak Tech.*, 24 F.4th at 700. Putting aside the Supreme Court's decision on this exact issue, Defendants are entitled to judgment because the record indicated that "any desire to terminate TPS was motivated by the administration's immigration policy, with its emphasis on a merit-based entry system, its focus on America's economic and national security interests, and its view on the limitations of TPS and the program's seeming overextension my prior administrations." *Ramos v. Wolf*, 975 F.3d 872, 899 (9th Cir. 2020). *reh'g en banc granted, opinion vacated*, 59 F.4th 1010 (9th Cir. 2023).

Plaintiffs cannot salvage this case and seek refuge in a higher applicable standard of review at this stage of the proceedings. As the D.C. Circuit has recognized, preliminary injunction holdings may constitute the law of the case when there are no issues of time constraints and a limited record. *See Sherley v. Sebelius*, 686 F.3d 776, 783 (D.C. Cir. 2012). The parties here moved promptly to address Plaintiffs' concerns, set the matter for expedited briefing, appeared for a two-day hearing with a robust administrative record already available, and presented the relevant arguments. Plaintiffs then obtained the emergency relief that they sought; that ruling was then reviewed and reversed by the Supreme Court. Plaintiffs cannot complain that their litigation strategy has now backfired. *See Lykins v. Ass. Att'y Gen. Rose*, 608 F. Supp. 693, 696 (D.D.C. 1984) (acknowledging that "litigation strategy and judgment" may have consequences). Plaintiffs offered a "broad" definition of "non-white nation[s]" that would "encompass[] major European countries." *Doe*, 146 S. Ct. at 2139. Nor could Plaintiffs salvage their complaint with any additional evidence or allegations. As the Supreme Court recognized, Plaintiffs seek to proceed under a theory that "the termination of a TPS designation for a Nordic or Germanic country would be sufficient in their judgment to show that the Secretary's unbroken record of TPS terminations was race-neutral." *Doe*, 146 S. Ct. at 2139. Meaning, permitting Plaintiffs to proceed on their equal protection claim would invite them to move the goal posts throughout the litigation because they cannot propose a workable definition and theory of their own claim. *See id*. ("It may be that only the termination of a TPS designation for a Nordic or Germanic country would be sufficient in their judgment to show that the Secretary's unbroken record of TPS terminations was race-neutral."); *see also Ramos*, 975 F.3d at 898 (recognizing that most countries designated for TPS had "majority non-white populations").

The Court should resolve this outstanding dispute now. *See, e.g.*, *Ellsberg v. Mitchell*, 807 F.2d 204, 208 (D.C. Cir.1986) ("We decline to license any plaintiff to embark on a fishing expedition in government waters on the basis of" speculation of government misbehavior); *see also Iqbal*, 556 U.S. at 678-79 (recognizing that flawed complaints "do[] not unlock the doors of discovery").

Accordingly, the Court should grant judgment to Defendants on Count II.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion and enter judgment in their favor on all claims.

Dated: October 20, 2025

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By: */s/ Dhruman Y. Sampat*
DHRUMAN Y. SAMPAT
AMANDA L. TORRES
Assistant United States Attorneys
601 D Street, NW
Washington, DC 20530
(202) 252-2525 (Sampat)
(202) 252-2507 (Torres)
dhruman.sampat@usdoj.gov
amanda.torres@usdoj.gov

*Attorneys for the United States of America*